1 IN THE UNITED STATES DISTRICT COURT
 FOR THE WESTERN DISTRICT OF TEXAS
2 SAN ANTONIO DIVISION

3

LA UNION DEL PUEBLO ENTERO, .
4 ET AL, .
 .
5  PLAINTIFFS, .
  vs. . DOCKET NO. 5:21—CV—844—XR
6 .
 GREGORY W. ABBOTT, ET AL, .
7 .
  DEFENDANTS. .
8

9

10 TRANSCRIPT OF BENCH TRIAL
 BEFORE THE HONORABLE XAVIER RODRIGUEZ
11 UNITED STATES DISTRICT JUDGE
 OCTOBER 11, 2023
12

13

14

15

16 APPEARANCES:
 FOR THE PLAINTIFFS: NINA PERALES, ESQUIRE
17 FATIMA MENENDEZ, ESQUIRE
 JULIA LONGORIA, ESQUIRE
18 MALDEF
 110 BROADWAY
19 SUITE 300
 SAN ANTONIO TX 78205
20

21 JAMES MICHAEL SHOWALTER, ESQUIRE
 ARENTFOX SCHIFF LLP
22 2335 WACKER DRIVE, SUITE 7100
 CHICAGO IL 60606
23

24

25

```
 1                              MICHAEL JONES, ESQUIRE
 2                              ELIAS LAW GROUP LLP
                                250 MASSACHUSETTS AVENUE NW
 3                              SUITE 400
                                WASHINGTON DC 20001
 4

 5

 6   FOR THE DEFENDANTS:        RYAN G. KERCHER, ESQUIRE
                                KATHLEEN HUNKER, ESQUIRE
 7                              WILLIAM WASSDORF, ESQUIRE
                                TEXAS ATTORNEY GENERAL
 8                              P.O. BOX 12548
                                MC 009
 9                              AUSTIN TX 78711

10

11                             ZACHARY WILLIAM BERG, ESQUIRE
                                TEXAS ATTORNEY GENERAL
12                             300 W. 15TH STREET
                                AUSTIN TX 78701
13

14                             ERIC J.R. NICHOLS, ESQUIRE
                                BUTLER SNOW LLP
15                             1400 LAVACA STREET, SUITE 1000
                                AUSTIN TX 78701
16

17                             LOUIS J. CAPOZZI, III, ESQUIRE
                                JONES DAY
18                             51 LOUISIANA AVENUE NW
                                WASHINGTON DC 20001
19

20

21

22   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                                OFFICIAL COURT REPORTER
23                             UNITED STATES DISTRICT COURT
                                SAN ANTONIO, TEXAS
24

25
```

1    *(San Antonio, Texas; October 11, 2023, at 8:30 a.m., in*
2    *open court.)*

3    MISS PERALES:  Good morning, Your Honor.

4    One short housekeeping matter before we take up with
5    the witnesses again.

6    Plaintiffs and defendants have been conferring
7    regarding the anticipated testimony on Monday of
8    Jonathan White whose testimony was the subject of a motion in
9    limine.  We understand from the Court that there will be an
10    examination and cross-examination of Mr. White on the
11    permissible scope of his testimony and then there will be a
12    proffer which will be separate.

13    We, plaintiffs, propose that that proffer be in the
14    form of Q and A with Mr. White as opposed to a description by
15    counsel of what he would have elicited from Mr. White, and
16    with the Court's permission plaintiffs would like to have an
17    hour before cross-examining Mr. White on the proffer testimony
18    in order to organize a response to material that, in our view,
19    by definition, we haven't seen before because it was withheld
20    in discovery.

21    Plaintiffs have discussed this with State defendants
22    and I don't know if my friend Mr. Kercher wants to add
23    anything.

24    MR. KERCHER:  That's fine with us, Your Honor.  It
25    might be the case that that hour of preparation would come

JENNIFER MARTINEZ — DIRECT

1  right around lunchtime anyway.  We'll see, but we don't object

2  to giving them an opportunity to put their notes together if

3  we're going to do a Q and A.

4          THE COURT:  Thank you.

5          MISS PERALES:  And so the parties would just like to

6  know if that's the way the Court would like to proceed.

7          THE COURT:  That's fine with me.

8          MISS PERALES:  Thank you, Your Honor.

9          THE COURT:  Anything else?

10          Your next witness.

11          MR. SHOWALTER:  Good morning, Your Honor.  Mike

12  Showalter for HAUL plaintiffs.

13          Plaintiffs call Jennifer Martinez.  Miss Martinez's

14  testimony will be relevant to plaintiffs challenges to SB 1,

15  Sections 5.02, 5.03, 5.06, 5.07, 5.10, 6.03, 6.04, and 6.05.

16      (JENNIFER MARTINEZ, having been duly sworn, testified as

17  follows:)

18                         DIRECT EXAMINATION

19  BY MR. SHOWALTER:

20  Q.  Good morning, Miss Martinez.  Could you please state your

21  name for the record.

22  A.  My name is Jennifer Martinez.

23  Q.  And where do you live?

24  A.  I live in Austin, Texas.

25  Q.  How long have you lived in Austin, Texas?

JENNIFER MARTINEZ - DIRECT

1  A.  Twenty-five years.

2  Q.  And how long have you lived in Texas?

3  A.  Born and raised.

4  Q.  What is your educational background?

5  A.  I have an undergraduate degree in public relations and a

6  master's degree, organizational leadership and ethics.

7  Q.  What is your current occupation?

8  A.  I'm the chief executive officer of The Arc of Texas.

9  Q.  And how long have you held that job?

10  A.  March 1st, 2019.

11  Q.  What was your role before you became the CEO at The Arc of

12  Texas?

13  A.  I was the director of operations at the Office of Mental

14  Health Coordination with the Texas Health and Human Services

15  Commission.

16  Q.  And what are your job responsibilities in your current

17  role as CEO?

18  A.  I'm responsible for the operational success of The Arc of

19  Texas and guided by a board of 15 members.  I have five

20  directors that report to me to move the mission of The Arc of

21  Texas forward.

22  Q.  And what is that mission specifically?

23  A.  Our mission to is promote, protect, and advocate for the

24  human rights and self-determination of Texans with

25  intellectual and developmental disabilities.

JENNIFER MARTINEZ - DIRECT

1    Q.  Is there an acronym for intellectual and developmental

2    disabilities that's commonly used?

3    A.  Yes, IDD.

4    Q.  What are common conditions within the IDD acronym?

5    A.  IDD, common diagnoses within IDD would be Down Syndrome,

6    autism, Cerebral Palsy, and a myriad of others.

7    Q.  Are people with IDD conditions permitted to vote in Texas?

8    A.  Yes.

9    Q.  What are some examples of assistance or supports that

10   people with IDD may need to vote?

11   A.  I think hearing is a large one.  Cuing is someone who has

12   worked with a person with IDD to determine before they get to

13   a voting location what their values are, what their priorities

14   are, and then align that with who is available to vote in an

15   election for who the candidates are.

16        Oftentimes in a voting location that will look like

17   recall, remember the conversation we had, what were the things

18   you said were important to you, who were the individuals that

19   you were interested in voting for.  That's often what cuing

20   will look like in a voting location.

21   Q.  Are there issues that people with IDD-type conditions may

22   have navigating physical space of voting locations?

23   A.  Yes.  So some folks with IDD also have physical

24   disabilities.  I think of one of our members who is a policy

25   committee member as well who uses assisted technology in a

1  wheelchair, so not only is he going to need the physical space

2  to be available to him, but also using assistive technology

3  he's going to be not speaking, he's going to be uses his eyes

4  to look at his screen to do the talking for him.

5      There's also translation of the forms, making sure that

6  our members understand what's on the form.  That's going to be

7  another piece for us in a voting location.

8  Q.  Can you provide some examples of what translation related

9  to forms might look like as to voting?

10 A.  Yeah.  So a lot of the work that we do requires what we

11 call plain language, so it's making sure that the information

12 is of a — what's typically we would say a third-grade level

13 so that our members can fully comprehend the information and

14 make educated decisions about the information, and so when

15 forms are not in plain language we take the time to make sure

16 that that information is available, we're understanding what

17 the information on the form is asking of us.

18 Q.  I have a few questions now about The Arc of Texas.  Is the

19 Arc of Texas a 501(c)(3) nonprofit organization?

20 A.  Yes, we are.

21 Q.  When was The Arc of Texas founded?

22 A.  1953.

23 Q.  Who founded it?

24 A.  A group of parents in Texas.

25 Q.  For what purpose?

JENNIFER MARTINEZ - DIRECT

1  A.  To assist their children at that time who had intellectual

2  and developmental disabilities to make sure they have access

3  to education, their issues around employment.  There are

4  always issues around community supports.  So they are

5  basically advocating on behalf and with their children.

6  Q.  What is The Arc of Texas' mission today?

7  A.  As I stated earlier, our mission is to promote, protect,

8  and advocate for the self-determination and human rights of

9  Texans with intellectual and developmental disabilities.

10  Q.  What activities does The Arc of Texas engage in to further

11  its mission?

12  A.  We have programs and services.  We also — the backbone of

13  what we do is grass roots advocacy, so we're interested in

14  making sure that the individuals with IDD are prepared and

15  understand how to advocate for the things that are important

16  to them.

17      In order to do that, we assist them with identifying who

18  their local representative or Senator is, help them talk

19  through what is important to them, teach them about how do you

20  testify, how do you show up at the Capitol.  We do everything

21  we can to make it possible for them to speak for themselves.

22  Q.  What sort of supports does The Arc of Texas put in place

23  to help people with IDD conditions self-advocate for public

24  policy positions?

25  A.  So not only is our public policy and advocacy committee

JENNIFER MARTINEZ - DIRECT

1  made up of folks with intellectual and developmental

2  disabilities, but 51 percent of our board is also made up of

3  family members or individuals with IDD so their voice is

4  throughout the leadership of The Arc of Texas.

5      So we are identifying the things that are important to

6  them.  We're moving on those issues.  We have four public

7  policy priorities that are board and our policy committee have

8  developed that includes civil rights and voting.  We also are

9  concerned about inclusive education, competitive integrated

10  employment, and then community supports.

11  Q.  How are those — how are supports that people with IDDs

12  need different in the policy space in contrast to people who

13  have only physical disabilities?

14  A.  I think folks with IDD require a little bit more time.

15  There's additional supports that they need to make sure that

16  they fully understand what questions are being asked of them,

17  which is where the cuing can come into play, making sure they

18  have relationships with the folks that are supporting them so

19  they know what their needs are, what their wants are, to make

20  sure that they are being seen and heard.

21      I think, in addition to that, there's always concern about

22  somebody with IDD may not self-select as someone with IDD.

23  They may not consider themselves as someone who has an

24  intellectual developmental disability necessarily, so

25  sometimes that's a tough situation to provide the supports to

3495

JENNIFER MARTINEZ - DIRECT

1  make sure they have what they need in that situation.

2  Q.  And how do you — how does The Arc of Texas guarantee that

3  people who do not self-select or self-identify as having an

4  IDD get appropriate supports to engage in voting or other

5  aspects of advocacy?

6  A.  So the incredibly important piece to folks with IDD is

7  support systems that they have around them.  There's direct

8  support professionals who are incredibly important, their

9  family, their larger community.

10      Those folks are incredibly important in recognizing what

11  the needs are of individuals with IDD, and recognize what they

12  may have deficits in that could be supported, so it's

13  incredibly important for folks to have the right supports

14  around them to be successful.

15          THE COURT:  If you could slow down just a little bit,

16  the court reporter is trying to take down everything you are

17  saying.

18          THE WITNESS:  Understood.

19  BY MR. SHOWALTER:

20  Q.  How large of an organization is The Arc of Texas?

21  A.  We have a little over 7,000 members.

22  Q.  And by 7,000 members I assume you're talking about people,

23  so physical members.  Do you have organizational members as

24  well?

25  A.  We do.  We have 24 local chapters.  We have — obviously

1  we have spoken about community members, board members, donors.

2  There's lots of different ways you can be a member of The Arc

3  of Texas.

4  Q.  What's the difference in what community chapters do versus

5  The Arc of Texas itself?

6  A.  So each of our community Arcs is responding to a need from

7  their local community.  So, for instance, here in San Antonio,

8  The Arc of San Antonio has direct support work that they do.

9  They have day habilitation sites.  So folks with IDD can come

10  to their sites across San Antonio and be with one another and

11  their peers.  They will self-select what they want to do that

12  day, whether it's cooking, watching a movie, playing

13  volleyball.

14      If you're The Arc of Harris County, they have programs

15  around educational advocacy that they are very proud of and do

16  to support families in the education setting.

17      The Arc of VFW hosts conferences that bring folks

18  together.  So each of these local Arcs has a distinct call,

19  depending on what their community is asking for them, but they

20  tend to do more direct support and service work than The Arc

21  of Texas who does more systems work.

22  Q.  Are the local chapters separately organized from sort of a

23  corporate prospective?

24  A.  Yes, they have their own 501(c)(3).

25  Q.  Is The Arc of Texas part of a national organization?

3497

JENNIFER MARTINEZ – DIRECT

1   A.  We are a member of The Arc of the United States.

2   Q.  And structurally how do you relate to them, do you share

3   board members, or —

4   A.  We do not.  We do not share board members or committee

5   members.  They resource for us on federal policy that may be

6   impacting our members in Texas.  They provide programming

7   around education and criminal justice.  They also host

8   conferences and leadership institutes that we attend, just

9   learned best practices in our disability community.

10  Q.  How does someone go about becoming a member of The Arc of

11  Texas?

12  A.  You can be a member of a local chapter.  You can be a

13  committee member.  You can be on our board of directors.  You

14  can be a donor.  You can subscribe to our disability dispatch

15  email.  Those are the typical ways that we would see someone

16  become a member of The Arc of Texas.

17  Q.  Do members have to pay dues?

18  A.  They do not.

19  Q.  Why?

20  A.  We're very committed to folks with IDD being able to be

21  full members of our organization and unfortunately oftentimes

22  folks with IDD live in poverty and don't have extra money to

23  pay membership dues.  That was a barrier that was identified

24  by our members so we decided to have a zero membership dollar

25  amount to not create a barrier for folks with IDD in Texas to

1  impact our organization as members.

2  Q.  And when was that decision made?

3  A.  A little over ten years ago.

4  Q.  What are some benefits of membership of The Arc of Texas?

5  A.  I think when I talk to local chapters, the biggest thing

6  that we hear is about the work we do at the capitol.  We're

7  locally in Austin.  That's where our headquarters are.  So

8  we're going to be sending out information during legislative

9  session to keep our members abreast of what's occurring that

10 may impact their local members.

11     When it's not legislative session oftentimes we do

12 trainings.  We will sit on different councils and boards to

13 make sure that the legislation that was passed is implemented

14 correctly, and as intended.

15     We also serve as experts in different stakeholder groups

16 to make sure that the voices of folks with IDD are part of the

17 conversation and decisions about their lives are being

18 considered.

19 Q.  Do members ever meet?

20 A.  Yes.  We have, at the state level we have quarterly board

21 meetings.  Our policy committee meets on a monthly basis.

22 Other committees meet on a quarterly basis.  Our local

23 chapters meet.  When they meet, some of those are monthly.

24 Some are more often for community events, but, yes there's an

25 opportunity for them to meet.

3499

JENNIFER MARTINEZ - DIRECT

1        We also have an annual business meeting that brings all of
2    our chapters together to vote in our new officers and to renew
3    our — review our financials from the local chapter
4    perspective.  And that happens each summer.
5    Q.  Does The Arc have individual and chapter members in
6    Harris County?
7    A.  We do.
8    Q.  You mentioned some other counties before.  What's the
9    current organizational structure of The Arc of Texas?
10   A.  We have a 14-member board that provides management
11   oversight.  We have 24 local chapters that we work in
12   partnership with, and over 7,000 members here in Texas.
13   Q.  What are the qualifications to be a board member?
14   A.  You have to have someone on the committee have experience
15   in the disability world.  We, by our bylaws, have to have at
16   least 51 percent of our board members be family members or
17   someone with a disability, so we're looking for that voice to
18   be on our board when we're making decisions, but typically we
19   want you engaged in our organization at a committee level
20   before you're on our board and to have some lived experience,
21   work experience in the community that we think could help our
22   mission at The Arc of Texas.
23   Q.  What are The Arc of Texas' public policy priorities?
24   A.  We have four public policy priorities.  It is community,
25   inclusive education, competitive integrated employment, and

JENNIFER MARTINEZ - DIRECT

1  civil rights and justice.

2  Q.  Does civil rights and justice relate to voting?

3  A.  Yes.

4  Q.  Can you tell us about the importance of voting to The Arc

5  of Texas?

6  A.  It's the backbone of everything that we do.  We believe

7  it's the action of self-determination which is in our mission.

8  It is the action that precipitates everyone's engagement in

9  the grass roots advocacy that we do at The Arc of Texas.

10  Q.  How long has voting rights advocacy been a priority at The

11  Arc of Texas?

12  A.  Since its inception.

13  Q.  How does The Arc of Texas decide on public policy

14  priorities?

15  A.  We have a public policy and advocacy committee that's made

16  up of members of our disability community, our board, our

17  local chapters, and those individuals meet on a monthly basis

18  and they will identify issues that they are hearing about that

19  are of concern to the disability community and then those will

20  be brought up to our board for their consideration and

21  ultimate approval.

22  Q.  You mentioned the importance of voting issues to The Arc

23  of Texas as an organization.  What activities did Arc of Texas

24  engage in with regards to voting rights before passage of SB

25  1?

JENNIFER MARTINEZ - DIRECT

1   A.  So we're historically going to be doing education and

2   outreach on the date of when an election is occurring,

3   deadlines that impact your ability to vote, where to find out

4   where your polling locations are.

5      We partner with other organizations to make sure we have

6   the most accurate information, so that would be the League of

7   Women Voters, Disability Rights Texas, among others.  So we're

8   making sure our members are educated on what to expect and how

9   to vote successfully.

10  Q.  Are those presentations tailored to people with IDDs?

11  A.  They are.  All of the presentations have the plain

12  language component so that it can be understood by our

13  members.

14  Q.  Does The Arc of Texas engage in legislative advocacy

15  itself?

16  A.  Yes, we do.

17  Q.  What does that mean?

18  A.  So we have a policy staff that was tasked with taking the

19  policy priorities and looking to see what legislation is

20  either forthcoming or possibly we could impact its inception.

21  We support our individuals with IDD to go to the capitol and

22  testify on their own behalf.

23      We meet with senators and representatives and share with

24  them our expertise on how a bill would be positive for our

25  community or how it could provide unintended consequences for

3502
JENNIFER MARTINEZ - DIRECT

1   the IDD community.  In addition to that, we provide
2   opportunities for our members to meet with their
3   representatives and senators and share directly with them as
4   constituents what their concerns are.
5   Q.  Could you provide some examples of what sort of supports
6   people with IDD conditions might need to go testify
7   themselves?
8   A.  Yeah.  One of the things that we find important is to,
9   when you're writing, doing written testimony for someone with
10  IDD, you're going to need to make sure that the language is
11  coming from the words someone with IDD would use.
12      Again, we're not going to be using big words that are not
13  intuitive to the person with IDD, and then we help them craft
14  the story that is specific to the bill that they are speaking
15  on.
16      And to be quite frank with you, I don't know that that's
17  just something folks with IDD struggle with.  Oftentimes if
18  you're not used to being at the capitol, you have a very
19  finite amount of time to testify.  You have to be very careful
20  about how you use your time.
21      And so a lot of what we do is practice, make sure that
22  what they want to convey is being conveyed in the time that
23  they are allotted and they are doing it in a way that is
24  succinct and concise but still is communicating what's
25  important to them.

JENNIFER MARTINEZ - DIRECT

1       So a lot of our support is written testimony, practicing,
2   and making sure it's their own words.
3   Q.  Shifting back to voting, what does voter training look
4   like for folks with IDD?
5   A.  So some of it can be pretty generic, where do I vote, how
6   do I find out who my candidates are, some of the things are
7   going to be typical for someone without IDD.
8       The thing that is specific to us is, again, the plain
9   language guides and helping folks understand what's going to
10  happen when you walk in that voting location, what should you
11  expect.  If something doesn't go as you expect, how do you
12  handle that situation so that your vote is counted.
13      It's making sure that we're aware of any and all
14  opportunities that we have to set our members up for success.
15  Whether they are doing mail-in ballots or in-person voting, we
16  want to make sure they have the best information they can to
17  be successful in language that they understand.
18  Q.  If Arc of Texas members have individualized questions
19  about voting, what do you do?
20  A.  So, like I mentioned earlier, we do systems work.  So we
21  don't do individual, what we would consider, case management
22  or direct support work.  So what we tend to do is refer them
23  out to experts, and our opinion in the disability world on
24  voting, and that would be Disability Rights Texas.
25  Q.  Shifting topics a little bit, are you familiar with what I

JENNIFER MARTINEZ - DIRECT

1  mean or what we mean when we talk about SB 1?

2  A.  Yes.

3  Q.  In your own words, what do you understand SB 1 to do?

4  A.  SB 1 makes it harder for my members to receive assistance

5  in voting and successfully utilize mail-in ballots.

6  Q.  Does SB 1 in your views affect — have voter

7  identification impacts which relate to folks with IDD?

8  A.  Yes.  I think there's two things that are very concerning

9  to us, one of which is the recall of which ID you used when

10 you were filling that out can sometimes be difficult for folks

11 with IDD.  And the other one I think is even more concerning

12 is some of our members live in congregate care settings.

13     They don't have access to their IDs.  They don't have

14 access to a lot of their personal belongings, so if they

15 wanted to verify or check it would be a difficult process for

16 them to get their own personal identification to confirm that

17 it was accurate.

18 Q.  You used the term "congregate care settings," can you

19 provide an example or two of what those might be?

20 A.  Yeah.  So, for instance, the state of Texas has

21 institutions called State Supported Living Centers, that would

22 be a congregate care setting.  Group homes could be a

23 congregate care setting.  Anyplace where somebody is not

24 living independently but is going to be under a supervision

25 where they don't have access to their own personal belongings

JENNIFER MARTINEZ - DIRECT

1  is the fear for us in congregate settings.

2  Q.  Did The Arc of Texas members or staff provide testimony in

3  relation to SB 1 —

4      *(Crosstalk)*

5  Q.  Is The Arc of Texas challenging any provisions of SB 1?

6  A.  Yes.

7  Q.  What provisions of SB 1 is The Arc of Texas challenging?

8  A.  Section 5 and Section 6.

9  Q.  How did The Arc of Texas decide to challenge SB 1?

10  A.  It came from our members and our public policy and

11  advocacy committee.  They were concerned about the impact on

12  our IDD community.

13  Q.  What has The Arc of Texas told its members about SB 1

14  since the bill passed?

15  A.  We have talked about the additional burdens that have been

16  placed on them as individuals with IDD to make sure that they

17  are using the correct voter identifications and making sure

18  those match.

19      We've also talked some about the availability of their

20  direct support professionals being able to support them and

21  being prepared to sign an oath with a lot of information.

22  Those with direct support professionals may or may not be

23  willing to sign and how that could impact their ability to

24  vote and be prepared for that.

25      We've talked about the fear that they have just in general

JENNIFER MARTINEZ - DIRECT

1  about getting in trouble for doing something wrong when they
2  are just attempting to vote.
3  Q.  What have you been telling your members to do, if they
4  have an issue in voting due to SB 1?
5  A.  We've asked them to stay where they are, if it's in a
6  voting location, and to call a hot line the Disability Rights
7  Texas has for voters.
8  Q.  Why did you tell them to contact Disability Rights Texas
9  as opposed to county officials, say, in the county which it
10  was at?
11  A.  So we trust the expertise of Disability Rights Texas when
12  it comes to voting matters and they understand our population
13  of folks with IDD because they have an expertise as it relates
14  to voting and IDD so we were comfortable with them giving out
15  the most accurate and correct information.
16  Q.  And I take it from that you were less comfortable with
17  referring them back to county or state resources?
18  A.  Correct.
19  Q.  How have The Arc of Texas' resources been affected
20  following the passage of SB 1?
21  A.  We're not a large nonprofit, although we cover a very
22  large state, and so we have a finite number of resources to
23  cover the four public policy priority areas.
24      During the last session or the prior session, we were not
25  able to connect to the work that we wanted to on inclusive

JENNIFER MARTINEZ - DIRECT

1  education issues like restraint and seclusion, the recent

2  issues around competitive integrated employment, and

3  opportunity for folks with disabilities to become more of an

4  employment-first state that we did not have the time or

5  resources to provide our expertise on.

6      A big issue for us is waivers, Medicaid waivers and

7  people's ability to access those in a timely fashion.  We

8  often provide expertise on what that could look like and how

9  folks could receive those services earlier.  We weren't able

10 to provide that sort of level of scrutiny that we typically

11 would.  It's a finite number of staff people and this was the

12 one that we had to focus all of our attention on.

13 Q.  So because people were focused on SB 1 they were not

14 focused on some of these other issues?

15 A.  That's correct.

16 Q.  Just taking a half step back, you mentioned restraint and

17 seclusion.  Can you talk about what those issues are?

18 A.  Yeah.  Not this last session but the previous session

19 there have been quite a bit of concern and even media coverage

20 from folks in North Texas that students that were special

21 education students were being restrained and put in closets,

22 secluded, at a much higher rate than their percentage of their

23 school population and we felt like there was something amiss,

24 there was something happening that we needed to bring our

25 expertise to bear to provide those legislators with expert

1  analysis of what we thought could be happening so that there
2  could be an opportunity for folks to do trainings for
3  educators, law enforcement in those school settings so they
4  understood what was happening versus having a physical
5  response to what was likely a behavioral issue.
6  Q.  Who would be the person at The Arc of Texas most engaged
7  with restraint and seclusion issues?
8  A.  At that time it was Ashley Ford, who continues to be on
9  our policy team, but at that point she was the person assigned
10 to do inclusive education.
11 Q.  Would she, as a person, also have been assigned some
12 duties which related to SB 1?
13 A.  Yes.
14 Q.  Why couldn't -- why is it important that you just didn't
15 defer dealing with restraint and seclusion issues until the
16 next term so that you could address issues with SB 1?
17 A.  I think there's a couple reasons.  The first one is that
18 if you have a kid who is being put in a closet, you want us to
19 find a solution now.  You can't wait two years.
20     The legislators don't meet every year.  It's a different
21 body every time they come back, right?  Folks change,
22 different people leave different committees.  The opportunity
23 for us exists one time when they are altogether with
24 particular committee leads.  That's going to change every time
25 we have a legislative session come back in, so we never have

JENNIFER MARTINEZ - DIRECT

1  that opportunity again.

2  Q.  How have -- how are The Arc of Texas' policy priorities,

3  other than SB 1, affected as a result of the passage of SB 1?

4  A.  We simply didn't have the resources to dedicate to those

5  in a fashion that was equal.  We had to divert our staff time

6  and resources to making sure people understood what SB 1 was

7  changing for our voting members.

8  Q.  Outside of the issues that you've discussed, were any

9  other policy priorities sort of deferred so that people could

10  focus on SB 1?

11  A.  I think a big one continues to be and we saw it in this

12  last session is access to Medicaid waivers and understanding

13  the importance of folks having appropriate supports and

14  services in the community.  That list has continued to grow.

15     The funding has continued to decrease and our inability to

16  focus on that two sessions ago, I think, is a piece of why we

17  are going backwards in that particular policy priority.

18  Q.  Did you have to reorganize your staff to deal with the

19  passage of SB 1?

20  A.  Our staff is actually smaller now than it was then, so

21  Ashley Ford is now our director of public policy and advocacy.

22  We had a person working criminal justice for us and then a

23  person who is our deputy director.  We went from a staff of

24  four to a staff of three so everyone sort of had to shift

25  around what they were responsible for.

1  Q.  How has SB 1 changed The Arc of Texas' voting rights work?

2  A.  So the broad strokes for us are that our members are

3  frightened.  They're afraid they are going to do something

4  wrong.  There's fear about, am I doing this the right way, and

5  they are simply trying to vote.

6      So the training has moved from here's where your poll

7  location is and here's how you find out who the candidates

8  are, in addition to that we are talking about make sure you

9  know what ID you are using, make sure you have the appropriate

10 assister with you if you can.  It just feels like there's this

11 additional burden that's been placed on my members to simply

12 vote.  And they feel that.

13 Q.  So is it fair to say that the tenor of your work has

14 changed?

15 A.  It's not information based.  It's just trying to help

16 them, in addition to being information based, quell their

17 fears that they still have the right to vote and they won't

18 get in trouble.

19 Q.  How will SB 1 impact The Arc of Texas' voting rights

20 efforts off into the future?

21 A.  It will continue to be multiprong, right?  It will never

22 go back to being simply, here's where you vote, how you vote.

23 It's, you have the right to vote, please don't leave the line

24 if something goes awry when you're voting.  It's just a

25 different -- it's an additional exercise and communicating how

3511
JENNIFER MARTINEZ – DIRECT

1  you successfully vote in Texas.

2  Q.  Won't it just –– won't your work related to SB 1 just

3  trail off, since everybody you needed to educate will have

4  been educated?

5  A.  There's not a cohort that you are one and done.  There are

6  new 18 year olds that become eligible every single election.

7  So we're always going to have to continue to do both of these

8  types of education as folks become eligible to vote.

9  Q.  Just to wrap it up, what impact has the passage of SB 1

10  had on The Arc of Texas' overall mission?

11  A.  So if you think about our mission, we talk about the

12  self-determination of our members, that's such a core function

13  for us, and if you've taken away different options for how my

14  members want to vote then you have taken away some of their

15  self-determination.

16  Q.  You've mentioned briefly before three words, cuing,

17  translation, and navigating the voting site.  What is cuing in

18  the voting assistance context?

19  A.  So an assister would likely be a direct support

20  professional in Texas, which, by the way, they are paid less

21  than $11 an hour, there's a massive workforce crisis in Texas

22  that has been getting worse every year, so if you are talking

23  about cuing with a DSP they likely had a conversation with a

24  person with IDD prior to being at the voting station or

25  polling location, talked about what their values are, what's

JENNIFER MARTINEZ - DIRECT

1  important to them, looking at what's important to different

2  candidates, and aligning those as much as they can so when

3  you're at the voting location you can hear DSP saying for some

4  recall, remember the conversation that we had, which was what

5  were the values that you identified, how did those match with

6  the candidates we talked about, do you see that candidate's

7  name on this ballot, this screen.

8      So that's typically, it's a recall from a previous

9  conversation where there was a deeper understanding of why the

10  decision was being made.

11  Q.  And what is navigating in the voter assistance context?

12  A.  I think there's both physical, just physically being able

13  to navigate with a wheelchair.  I think there's also when you

14  think about IDD, I think I mentioned Shawn earlier, just the

15  process of being in a voting location with an assistive

16  technology screen and trying to communicate with your eyes,

17  navigating the sounds and the number of people, and all of

18  that can be very overwhelming to somebody with IDD and so

19  there's an intellectual navigation that's occurring as well as

20  the physical navigation that we typically think of.

21  Q.  Would navigating be assistance required for a person with

22  an IDD like autism?

23  A.  A person with autism would absolutely theoretically, I

24  don't know everyone, but a person with autism is likely going

25  to have some concerns around lots of people, noises, lighting,

1 waiting, all of that could be incredibly overwhelming to

2 somebody with autism in a typical voting location.

3 Q.  And then just shifting to the third one, what types of

4 translating assistance might a person with IDD need?

5 A.  I think the one that comes to mind most prevalently is the

6 plain language piece of this, if you are looking at a form and

7 you're looking for assistance on what it means I think that is

8 a piece of it.

9      There is a physical component to that too.  If you are

10 someone with an intellectual and developmental disability and

11 a physical disability, you may not be physically able to touch

12 the form, right?  So there's some of that.

13     But I think it's typically the plain language piece of

14 what is the form asking of me so I'm clear that I'm filling it

15 out correctly.

16 Q.  In general how has SB 1 impacted the ability of voters

17 with IDD to receive the sort of assistance that they might

18 need in voting?

19 A.  It's added a hurdle.  It's placed a burden on the person

20 with an intellectual developmental disability to voice their

21 own eligibility.  It's placed a burden on them to identify and

22 remember the four digits of an ID that they may not even have

23 access to on a regular basis.  It's just simply required them

24 to ask for assistance that they are not guaranteed that they

25 are going to get.

3514

JENNIFER MARTINEZ - DIRECT

1  Q.  Why aren't they guaranteed to not get —
2  A.  You can ask for an accommodation but that doesn't mean
3  you're going to receive an accommodation.
4  Q.  Moving to specific provisions of SB 1.  I'll start by
5  asking some questions on Articles 5 and 6 of SB 1 relating to
6  voter identification and the assistance of voters.  What is
7  the basis of Arc of Texas' opposition to Article 5 of SB 1
8  relating to voter identification requirements to vote by mail?
9  A.  So our big concern continues to be the identification
10 number and making sure that we have the correct ID and we have
11 access to that to be accurate.
12     The other concern is if there's a curing needed for that
13 ballot, that it puts a real burden on our members to cure that
14 if they don't have access to their ID and/or they have to go
15 into a physical polling location oftentimes which is not a
16 great situation for our folks, which is why they selected a
17 mail-in ballot option to have their vote counted.
18 Q.  You say it may not be a "great situation," for your folks,
19 what do you mean by that?
20 A.  Some of the examples I've used like someone with autism
21 who would prefer to mail-in ballot, utilize mail-in ballots to
22 not be overstimulated in a voting location.  It could be that
23 someone can't rely on transportation to get there on the day
24 that they can, so that's an additional burden on my members
25 who don't often have access to transportation.  It's not as

3515

JENNIFER MARTINEZ – DIRECT

1  easy as it would be for a typical person.  Those are two of

2  the things that come to mind.

3  Q.  Why can't they just call the relevant county voting office

4  and ask for whatever assistance they need to deal with their

5  IDD issues?

6  A.  I think they probably can call.  I don't know that just

7  because they call they receive what they need.  Again, that's

8  why we refer folks to Disability Rights Texas to bring to bear

9  their expertise in IDD which I don't know exists in all the

10 County Clerk's offices.

11 Q.  What is the basis of The Arc of Texas' opposition to

12 Section 6.03 of SB 1 requiring those who assist voters to

13 complete a form specifying their name, relationship to the

14 voter, and whether they have received any compensation to

15 assist the voter?

16 A.  You're talking about asking someone who is an underpaid

17 undervalued direct support professional to sign their name,

18 their compensation, and the myriad of other things we're being

19 asked to do, and if they don't, my voter doesn't get to vote.

20 That seems burdensome to me and to my members.

21 Q.  Do you believe that the criminal provisions of Section

22 6.03 associated within provide any burden?

23         MR. NICHOLS:  Objection.  Form.  Leading.

24         THE COURT:  Sustained.

25         THE WITNESS:  The criminal —

*Gigi Simcox, RMR, CRR*

JENNIFER MARTINEZ - DIRECT

1          THE COURT:  One second, ma'am.

2   BY MR. SHOWALTER:

3   Q.  Are there criminal provisions associated with 6.03?

4   A.  There are criminal provisions and those are of a concern

5   to our members.  You are asking someone who is already

6   overworked and underpaid to then take on perhaps a criminal --

7   it's just mind-boggling to me.  So, yes, the criminal piece of

8   this is very disadvantageous to my members.

9   Q.  Is The Arc of Texas, just to sum up, in general is The Arc

10  of Texas concerned that the cumulative impact of these burdens

11  could deter potential assisters and thus harm Arc of Texas

12  members?

13  A.  Yes.  The cumulative effect of difficulty navigating,

14  filling out additional forms, having assisters sign documents

15  that can make them criminally liable, those are all things

16  that have a sort of freezing effect on the assister's interest

17  in supporting our members, and we're hearing that through just

18  the fear, right, there is just this fear that we're going to

19  do something wrong.

20          MR. NICHOLS:  Objection.  Calls for hearsay, Your

21  Honor Nichols.

22          THE COURT:  That's overruled.

23          MR. NICHOLS:  As to what she's hearing, is what — is

24  the only objection I had.

25          THE COURT:  You can't object to what she's heard.

3517
JENNIFER MARTINEZ - DIRECT

1  You can only object to hearsay as to what someone else is —
2  that she's repeating what somebody else said.
3          MR. NICHOLS:  Yes, sir.  That's hearsay.
4          THE COURT:  That's overruled.
5  BY MR. SHOWALTER:
6  Q.  You can continue.
7          THE COURT:  Do you remember the question, ma'am?
8          THE WITNESS:  I do.
9          So the public policy and advocacy committee that is
10 made up of members with intellectual and developmental
11 disabilities, families, community members, have shared that
12 this sort of impact of SB 1 has made them fearful of doing
13 something wrong, of assisters' unwillingness to put themselves
14 in a position that might be criminally prosecuted for
15 assisting somebody and that being misunderstood.
16 BY MR. SHOWALTER:
17 Q.  Derek, could you pull up the blank form Oath of
18 Interpreter, so that's HAUL MFV 089.
19     Miss Martinez, do you recognize what's been placed in
20 front of you?
21 A.  I do.
22 Q.  What is it?
23 A.  It's the oath of assistance that an assister or a DSP
24 would be asked to sign when they are supporting an individual
25 with IDD voting.

3518

JENNIFER MARTINEZ - DIRECT

1  Q.  I'd like to draw your attention to the sentence that
2  begins, "I swear or affirm under penalty of perjury that the
3  voter I'm assisting represented to me that they are eligible
4  to receive assistance," do you see that?
5  A.  Yes.
6  Q.  Does The Arc of Texas have issues with this requirement?
7  A.  Yes.
8  Q.  And what are they?
9  A.  It burdens my member in voicing their eligibility.  Folks
10 with IDD may not want to publicly state their disability.
11 Like anybody else, they like to be the same as everybody and
12 not be different, and so oftentimes they don't want to
13 publicly explain their diagnosis.
14 Q.  And you are saying — you take the word "represented,"
15 there to mean publicly explain your diagnosis.  What might
16 that look like, how would a person with IDD represent to their
17 assister that they are eligible to receive assistance?
18 A.  That's — I think that's a piece that's unclear.  It could
19 be that they state that they need assistance.  It could be
20 that someone who has been with this person for a while and
21 knows they have a diagnosis, but again it's — there are some
22 issues of clarity which concern us.
23     And, in addition to that, the definition of disability
24 isn't static.  What a disability is, is intellectual and
25 developmental disability changes depending on what program or

3519
JENNIFER MARTINEZ - DIRECT

1  service you are interested in applying for and eligible for,

2  and that changes.  So there's some confusion around even what

3  the definition of disability is.

4  Q.  Do you have concerns with this requirement, that a voter

5  must represent their disability in order to exercise their

6  right to vote?

7  A.  Yes, it burdens my members.

8  Q.  Is there a consistent federal or state requirement as to

9  what might be a disability?

10  A.  There is not.  There is not a standard definition that we

11  all can look to as dependent upon federal, state programs,

12  services, they are all slightly different based on what

13  services or supports you are looking to receive.

14  Q.  What about a voting specific definition of disability, are

15  you aware of any?

16  A.  No.

17  Q.  Let me draw your attention to the same line on the exhibit

18  where we left off after the word assistance, the clause

19  begins, "I will not suggest by word, sign, or gesture how the

20  voter should vote," do you see that?

21  A.  I do.

22  Q.  So does Arc of texas have concern with this language in

23  the context of SB 1?

24  A.  Yes.

25  Q.  Why?

3520
JENNIFER MARTINEZ – DIRECT

1  A.  If you are successful and appropriately cuing someone,

2  this could absolutely be misconstrued as you are suggesting by

3  word or sign how they should vote.  And, in fact, it's an

4  appropriate support for someone with IDD to have some

5  assistance with recall.

6  Q.  Let's move on to the next line.  Let's move forward to the

7  part that begins —— let's move back a little bit.

8      There is language in this oath which talks about penalty

9  of perjury.

10     Derek, can you highlight that language.

11     So that's the first sentence.  So the fifth word into the

12  highlighting, does The Arc of Texas have concern with the

13  penalty of perjury language in this oath?

14  A.  Yes.  Direct support professionals who would likely be the

15  assisters are being put in a position where they could be

16  criminally charged because of a misunderstanding about what

17  they are doing to accurately and appropriately support someone

18  with IDD who is voting.

19  Q.  Let's move back to where we were before I got my note

20  here.  I'd like to draw your attention to the part that said

21  "I did not pressure or coerce the voter into choosing me to

22  provide assistance."  Do you see that language?

23  A.  I do.

24  Q.  Does The Arc of Texas have concerns about this language in

25  the oath?

JENNIFER MARTINEZ - DIRECT

1  A.  Yes.  I think, again, there can just be misunderstandings

2  if you're not an expert in IDD that you would see something

3  that is an appropriate support that could be misconstrued.

4      I also again think it puts a lot of the burden on low-wage

5  overworked direct support professionals.  And I think it

6  oftentimes, if you don't have a direct support professional

7  who you know well, there could be some confusion.  It just,

8  it's all very unclear and burdens my members in ways that

9  scare them.

10 Q.  Does The Arc of Texas have concerns about the term

11 "pressure" or "coerce" specifically in this language?

12 A.  Yes.

13 Q.  And what might those concerns be?

14 A.  If you're looking at a person with IDD voting you can

15 misunderstand the conversation that's occurring and read that

16 as pressure or coercion when it's recall and appropriate

17 supports.  It's just unclear is the issue that continues to

18 frighten us.

19 Q.  So back to the exhibit right where we left off after the

20 semicolon, the oath says, "I'm not the voter's employer, an

21 agent of the voter's employer, or an officer or agent of a

22 labor union to which the voter belongs," do you see that?

23 A.  I do.

24 Q.  How might that part of the oath impact your members?

25 A.  Direct support professionals are hard to come by and if

JENNIFER MARTINEZ - DIRECT

1  someone is perhaps unwilling to take this oath out of fear,
2  there may be a new direction support professional who comes
3  in.  And who knows?  If you're sort of filling in for someone
4  maybe they are the owners of the provider group home you live
5  in.  Perhaps it is someone who belongs to an organization you
6  belong to.  We don't know.
7      The reality is there's a workforce crisis and our members
8  are being put in a position where they are having to have
9  folks who don't know them as well assist them and so this
10 could be a situation that we were unaware of because that was
11 who was available to support them.
12 Q.  One last question about this exhibit.  Same line where we
13 left off towards the end of the line.  The oath reads, "I
14 understand that if assistance is provided to a voter who is
15 not eligible for assistance, the voter's ballot may not be
16 counted," do you see that?  Does that language concern The Arc
17 of Texas?
18 A.  Yes.  So my voter has gone to a voting location, done
19 everything that they are required to do in the right way, when
20 someone who doesn't know what it looks like to appropriately
21 support someone with IDD can make an assumption that would
22 negate their vote, that's incredibly troublesome to me.
23 Q.  In general, is it easy for people with intellectual or
24 physical disabilities to find personal care attendants to work
25 with them?

JENNIFER MARTINEZ - DIRECT

1   A.   No.

2   Q.   Why?

3   A.   You can make more money at McDonald's.  You are doing very

4   intense labor.  You are doing things like activities of daily

5   living which includes bathing folks, getting them in and out

6   of their chairs or beds.  It's reminding them to do things

7   throughout the day that are important to them.  It's a very

8   hard job and it's very low paid and a lot of folks are opting

9   out.

10  Q.   Why is it important for people with disabilities to be

11  able to choose the person who assists them when voting?

12  A.   It's really important to have a relationship with someone

13  that is supporting you.  I think certainly true in voting

14  booths, but I think you'll also find that I personally want to

15  know who is going to help me vote.  I don't want this to be a

16  stranger.  In the same way that I'm in a voting booth, I want

17  to make sure that person understands deeply why I'm making the

18  choice I am and is able to support me to make sure that that

19  actually happens and is successful.

20  Q.   Would that be necessary for the assister to be effectively

21  be able to cue the voter?

22  A.   That's the long deep relationship.  If you don't

23  understand why someone is doing what they are doing, it's more

24  difficult to successfully cue and really be there to support

25  them and making sure what they have decided they want to do

1  happens.

2  Q.  What is the basis of The Arc of Texas' opposition to

3  Section 6.05's requirement that assistance to people voting by

4  mail must provide on the ballot envelope their relationship to

5  the voter, whether they receive compensation to help the voter

6  vote, and their contact information?

7  A.  It's just another burden that's being placed between my

8  members and their ability to vote.  From a direct support

9  professional, now not only am I signing an oath I'm putting

10  additional information on the outside of an envelope.  It just

11  feels like a lot to ask of somebody who is likely not

12  comfortable in a criminal justice setting and see something

13  like "perjury" or big words that scare them, and it scares

14  them away from supporting our staff and our teams.

15  Q.  So are you saying that the criminal penalties associated

16  with this provision provide concerns?

17  A.  They absolutely provide concerns.

18  Q.  Is The Arc worried that this provision could deter

19  potential assisters from helping people with mail ballots?

20  A.  Yes.

21  Q.  What is the basis of the The Arc's opposition to 6.07's

22  requirement that assisters indicate their relationship to the

23  voter on the carrier envelope for the ballot?

24  A.  Again, it just feels like an additional thing that our

25  voters are being asked to do.  It is an assister is being

3525
JENNIFER MARTINEZ - DIRECT

1  placed in a position where they are having to provide detailed
2  personal information to the state of Texas for a job that they
3  do on an hourly basis, very hard work.  Just feels like a
4  burden.
5  Q.  Have members of The Arc of Texas contacted The Arc of
6  Texas because they had difficulty voting due to SB 1?
7  A.  They have.
8  Q.  Have members of The Arc of Texas' public policy committee
9  shared that they have had difficulty voting due to SB 1?
10  A.  They have.
11  Q.  Are you aware that other individuals testifying here this
12  week regarding their concerns with SB 1 include Jennifer
13  Miller, Laura Halvorson, Lydia Nunez Landry, Teri Saltzman,
14  and Amy Litzinger?
15  A.  Yes.
16  Q.  Are these individuals members of The Arc of Texas?
17  A.  Yes.
18  Q.  Are you familiar with the barriers they have experienced
19  since SB 1 was enacted?
20  A.  Yes.  I have seen the declarations that they made, so it's
21  very similar to what we hear in the policy committee meetings,
22  which is around cuing, the availability of assisters, the
23  ballots not being cured so they are having to go into a voting
24  location despite how physically demanding that could be for
25  some of our members, so I'm aware, yes.

3526
JENNIFER MARTINEZ - DIRECT

1  Q.  Just a few more questions and I'll pass you to my friends

2  here.  Why did The Arc of Texas decide to become a plaintiff

3  in this lawsuit?

4  A.  Our members brought this as an issue to us.  It fit within

5  our policy priorities and our board of directors agreed that

6  it was a lawsuit that we needed to participant in to protect

7  our members.

8  Q.  What is The Arc of Texas' relationship to other plaintiffs

9  in this lawsuit?

10 A.  We have partner relationships with some of them.  The

11 disability community tends to work very well together.  Some

12 of them are members.  Those are typically the relationships

13 that we have.

14 Q.  Why did The Arc of Texas decide to sue the state and

15 county officials and district attorneys named in this lawsuit?

16 A.  They were the individuals or agencies that would be doing

17 the work on the ground to implement SB 1.

18 Q.  What is the nature or harm being alleged by Arc of Texas

19 in this lawsuit?

20 A.  It makes it more difficult for our voters to receive

21 assistance and to utilize mail-in ballots.

22 Q.  And is The Arc alleging harm to itself as an organization?

23 A.  Yes.

24         MR. SHOWALTER:  Nothing further.

25         I pass the witness.

3527
JENNIFER MARTINEZ - CROSS

1          THE COURT:  Anything else on this side?

2          Any cross?

3                    CROSS-EXAMINATION

4   BY MR. KERCHER:

5   Q.  Morning, Miss Martinez.  Thank you for being here.  My

6   name is Ryan Kercher.  I work for the Attorney General's

7   Office.  I'm going to fight through a little bit of a sore

8   throat; hopefully you forgive me.

9          I want to start by talking to you about Arc of Texas'

10  membership, okay.  Membership to Arc of Texas grants access to

11  information from the organization and the opportunity to

12  inform the organization's programs and policies, is that fair?

13  A.  That's a piece of it, yes.

14  Q.  There's not a formal process to become a member of The Arc

15  of Texas, is that right?

16  A.  Our bylaws have particular types of members, like we

17  talked about local chapters, committee members, board members

18  of different types of voting opportunities about annual

19  meeting, but there isn't a form, per se, that you have to fill

20  out.

21  Q.  All that's required to become a member is to sign up to

22  receive a monthly disability dispatch email, right?

23  A.  It's one of those, yes.

24  Q.  Our ways include signing up to testify at the capitol on

25  behalf of a policy priority of the organization?

3528
JENNIFER MARTINEZ - CROSS

1    A.   I would say you probably have to be a public policy

2    committee member, but typically those members do testify.

3    Q.   You could also sign up by making a donation, right?

4    A.   You could.

5    Q.   But you are not required to pay a fee, true?

6    A.   No, you're not.

7    Q.   You could also become a member by sitting on a committee,

8    is that right?

9    A.   Yes.

10   Q.   It's also true that you do not have to be a person with a

11   disability in order to be a member of Arc of Texas, right?

12   A.   That's correct.

13   Q.   And the organization has 27 member chapters, is that still

14   true?

15   A.   Twenty-four at this point.

16   Q.   Those member chapters are stand-alone 501(c)(3)

17   organizations, right?  Those independent chapters associate

18   with The Arc of Texas because they are aligned in mission,

19   vision, and policy priorities, is that true?

20   A.   Correct.

21   Q.   And being a member of Arc of Texas does not mean that you

22   get to vote directly on who sits on The Arc of Texas board, is

23   that right?

24   A.   No, that's inaccurate.  We have an annual meeting in July

25   or August of each year and per our bylaws local chapters have

JENNIFER MARTINEZ - CROSS

1  votes so we will present our slated nominees to those local

2  chapters and they vote those board members on to or don't vote

3  those members on to our board.

4  Q.  Well, as I understand it, each independent chapter has a

5  proxy who votes for the members of the — for a proxy of the

6  independent chapters members, is that right?

7  A.  There can be a proxy, yes.

8  Q.  And then there's a single member on the board who

9  represents all of the individual chapters, is that right?

10  A.  Correct.

11  Q.  There are 14 total board members, is that right?

12  A.  Yes.

13  Q.  If the board member representing the chapters votes

14  against something, that individual board member could be

15  outvoted by the other 13 members of the board, is that right?

16  A.  Sure.  That's how voting works, yes.

17  Q.  Each of the independent 501(c)(3)s, of course, has its own

18  board, right?

19  A.  That's correct.

20  Q.  And you are not aware of whether each of those boards

21  independently voted to initiate this litigation, is that true?

22  A.  We meet with in addition to having a chapter

23  representative on our 14-member board I personally meet with

24  the executive directors of the local chapters the Wednesday

25  after each of our board meetings to share with them any

3530
JENNIFER MARTINEZ - CROSS

1  activities or big decisions that were made at the board level
2  to keep them apprised, so they were aware.
3  Q.  Isn't it right that even if the individual chapters had
4  voted against initiating this litigation, that vote could have
5  been outvoted by the other members of Arc of Texas board?
6  A.  Correct.
7  Q.  But it is your understanding that Arc of Texas
8  corporate -- as Arc of Texas corporate representative that Arc
9  of Texas and its independent chapters are plaintiffs in this
10 case, is that right?
11 A.  The Arc of Texas is a plaintiff in this case.
12 Q.  I'm sorry.  Say that again?
13 A.  The Arc of Texas is a plaintiff in this case.
14 Q.  So my question is a little bit different.  It's your
15 understanding not just that Arc of Texas itself is a
16 plaintiff, but also that its chapters, its subordinate
17 chapters, those independent 501(c)(3)s are also plaintiffs in
18 this case?
19 A.  It's my understanding that my chapters are fully aware of
20 where I'm sitting today and how we are moving forward as
21 plaintiffs as The Arc of Texas, their own independent
22 501(c)(3)s.
23 Q.  So my question is a little bit different still and I'm
24 working on it.  I'm trying to get us there.
25 A.  Okay.

3531
JENNIFER MARTINEZ - CROSS

1  Q.  My question is not about whether the chapters are aware of
2  the litigation.  My question is whether it's your
3  understanding as Arc of Texas' corporate representative that
4  those chapters are also plaintiffs in this lawsuit?
5  A.  I would assume that my local chapters were aware of this
6  and have been a part of the process, are a part of this
7  lawsuit, yes.
8  Q.  Is it fair to say that you are assuming because you're not
9  sure?
10  A.  I'm assuming because I haven't talked to every local
11  chapter.  Again, we meet with them on a quarterly basis and
12  have a chapter rep who represents them.
13  Q.  Let's talk a little bit about Arc of Texas' budget, okay?
14  A.  Okay.
15  Q.  Now, the entity has a set operating budget, true?
16  A.  True.
17  Q.  And you have reallocated some of that budget to deal with
18  SB 1 as you described on direct, right?
19  A.  So we're a pretty small organization, so it wasn't a
20  reallocation.  It was, quite frankly, our policy budget
21  remained the same, just within that budget different things
22  were not able to be completed and some of those were moved to
23  SB 1 within that existing budget.  That about budget didn't
24  change.
25  Q.  That's helpful.  Thank you.

1      And I think you talked on direct how there are something
2  like four policy priorities that Arc of Texas, is that right?
3  A.  That's right.
4  Q.  Prior to SB 1, it was not the case that Arc of Texas would
5  take its policy budget and distribute it evenly among those
6  four policy priorities, right?
7  A.  So we've always had a departmental budget which is managed
8  by our director of public policy and advocacy and so whatever
9  the most pressing thing is we're going to be spending time on
10  that issue.  This time it happened to be SB 1.
11  Q.  Arc of Texas has always had a dynamic budget for its
12  policy priorities it sounds like, is that fair?
13  A.  I wouldn't say it's dynamic.  It's actually pretty static.
14  It's always about the same amount just because we, yeah, we're
15  a small nonprofit.
16  Q.  I appreciate that answer.  I didn't ask a very good
17  question.  I'm not asking whether or not the policy budget is
18  growing and shrinking.  I mean the way that Arc of Texas
19  distributes that budget as among its policy priorities is
20  always dynamic, according to what's happening in the world,
21  right?
22  A.  The legislative session dictates how those dollars are
23  spent.
24  Q.  You've given such good answers.  I'm cutting through a lot
25  of my notes, so I appreciate your help today.

JENNIFER MARTINEZ - CROSS

1      You mentioned on direct examination that your staff has

2    shrunk from four to three, is that right?

3    A.  That's right.

4    Q.  And what I couldn't tell from that answer was whether or

5    not you attribute that change in staff size to SB 1?

6    A.  No, we don't.

7    Q.  You do not?

8    A.  No.

9    Q.  Okay.  Thank you.

10      Let's talk a little bit about voting for people with IDD,

11   okay.  You said on direct that some adults with IDD do not

12   recognize that they may need help in a particular

13   circumstance, is that right?

14   A.  That's correct.

15   Q.  We have heard in this trial from some witnesses that they

16   believe that individuals should be able to decide for

17   themselves whether they need help voting.  Would you agree

18   with me that individuals should be able to decide for

19   themselves whether they need help voting whenever that's

20   possible?

21   A.  I think self-determination is a cornerstone of what The

22   Arc of Texas is interested in.  I do think we have a

23   responsibility to make sure that folks are supported in their

24   decisions, so, yes, I'm always going to respond in a positive

25   way to a person with IDD making their own decisions, as long

3534

JENNIFER MARTINEZ - CROSS

1  as they have the appropriate supports and services around

2  them.

3  Q.  And that's a very thoughtful answer.  It sounds to me

4  like, and I want you to tell me if this is wrong, it sounds to

5  me like you are trying to find a balance between

6  self-determination on the one hand for voters with IDD and

7  ensuring that folks with IDD have the help that they need if

8  they don't know they need help, is that fair?

9  A.  So we're always going to side with self-determination,

10 right?  That's the cornerstone.  And sometimes folks make poor

11 decisions when they self-determine.  I certainly have, right?

12 Q.  Guilty.

13 A.  Everyone in this room probably has.

14     I think for us it's making sure that you minimize those

15 self-determined actions and know how to limit the benefit —

16 or incident, but, yes, there is a fine line there for sure.

17 Q.  I don't know whether you recall the specifics of the legal

18 pleadings in this case, but do you recall that in the

19 complaint that Arc of Texas filed in this case it referenced

20 that only about 43 ballots in the November 2020 Election were

21 implicated in voter fraud, do you remember that?

22 A.  I do remember that.

23 Q.  If those 43 ballots had belonged to Arc of Texas' members

24 with disabilities, Arc of Texas would feel the need to do

25 something about it, is that fair?

JENNIFER MARTINEZ - CROSS

1  A.  If — again, if my members through that policy committee

2  had identified that as an issue, then we certainly would

3  consider it an issue.  We haven't heard that.  That continues

4  to not be an issue but rises to me hearing about it as a

5  concern from our members.

6  Q.  I appreciate it has not been a concern in your

7  organization, but as I understand your answer, if your

8  members, if your constituents were telling you that this is a

9  problem, you would feel compelled to act if you could, is that

10 fair?

11 A.  If my members were being harmed by something, whatever

12 that is, and it fits within our policy priorities and my board

13 agrees, then we would move on something.

14 Q.  I think you said on direct that the support needs of a

15 particular person with IDD will be unique to that person,

16 right?

17 A.  Typically, yes.

18 Q.  It's dangerous, maybe, to draw, try and draw hard and fast

19 rules for IDD across the board, right?

20 A.  Yes, with the caveat that there are typical supports that

21 almost everyone with IDD will need, such as the cuing, and

22 navigating, and help with plain language guides, but, yes,

23 everyone is unique within the confines of some of those

24 standard things we know are often needed.

25 Q.  And I do want to talk to you about some of those standard

JENNIFER MARTINEZ - CROSS

 1  protocols like the cuing and the navigating, but before we
 2  turn to that, it's right to say that Arc of Texas has no
 3  evidence of any county ever having denied a reasonable
 4  accommodation that's been requested by a person with IDD?
 5  A.  So we do systems work, which I mentioned earlier, which
 6  means when we're getting calls like that we're going to send
 7  those over to Disability Rights Texas, who is the expert in
 8  this arena, so I wouldn't necessarily have firsthand knowledge
 9  because we're not doing case management or direct service
10  work.
11  Q.  Right and I'm not trying to beat up on Arc of Texas but I
12  do want to kind of clarify where the information that Arc of
13  Texas can provide ends, and so I want to bring you back to
14  that question.  Understanding now that Arc of Texas does not
15  collect that kind of information --
16  A.  Right.
17  Q.  -- as a result, Arc of Texas does not have any evidence
18  that a county has denied a request for reasonable
19  accommodation to a voter with IDD?
20        MR. SHOWALTER:  Objection.  Calls for legal
21  conclusion.
22        THE COURT:  Do you understand the question?
23        THE WITNESS:  I do.
24        THE COURT:  Go ahead.
25        THE WITNESS:  We wouldn't know one way or the other.

JENNIFER MARTINEZ - CROSS

1  We don't collect the information so I couldn't tell you

2  affirmatively yes or no.

3  BY MR. KERCHER:

4  Q.  Now let's turn to some of those standard support

5  mechanisms like cuing and navigating that you described for us

6  on direct.  You expressed some concern that assisters might be

7  precluded from offering some of these kinds of standard

8  services that folks with IDD very often need, right?

9  A.  Right.

10  Q.  You have not described for us, though, particular

11  instances where, for example, an assister was cuing a voter

12  and was prevented from cuing that voter, right?

13  A.  Yes.

14  Q.  And I'm assuming that because you have not provided that

15  specific kind of information that you don't have it, is that

16  fair?

17  A.  Again, we're going to refer that kind of stuff to DRTX,

18  that's not something we're going to have to share

19  unfortunately.  What I can say is that we hear from our policy

20  committee members that there is fear and that there is concern

21  and that's what we're responding to.

22  Q.  Let's talk now a little bit about the oath of assistance.

23  You walked through several provisions there that caused some

24  of that fear, some of that anxiety that were talking about,

25  right?

1  A.  Right.

2  Q.  Voters with IDD, under that oath of assistance, are

3  supposed to, as you understand it, represent that they are

4  eligible to receive assistance and that concerns you, right?

5  A.  Yes.

6  Q.  And you also discussed that very often voters with IDD

7  will have with them as assisters direct support professionals,

8  right?

9  A.  Yes.

10 Q.  Or could be a family member, for example, right?

11 A.  Yes.

12 Q.  Those direct support professionals, their job is to help

13 someone and provide support to folks with IDD, right?

14 A.  Correct.

15 Q.  And so that person that -- I want to make sure I get it

16 right -- direct support professional would know from prior

17 discussions and interactions with that voter that that

18 person -- what kind of help that person needs, is that true?

19 A.  True.

20 Q.  Another portion of that oath that concerned you was the

21 section that talked about "will not suggest by word, sign, or

22 gesture," right?  Is that a yes?

23 A.  Yes.

24 Q.  I need an out-loud answer.  Thank you.

25       That's particularly concerning for you in the context of

JENNIFER MARTINEZ - CROSS

1  cuing, right?

2  A.  Yes.

3  Q.  And, again, though, and I understand that Arc of Texas is

4  not collecting this information, but, to be clear, Arc of

5  Texas knows of no assister who was prevented cuing under SB 1,

6  is that true?

7  A.  I don't know if they did or did not.

8  Q.  Let's talk about the provision where an assister has to

9  swear or affirm that they did not pressure or coerce the

10  voter.  Now, you are worried, again, that something like cuing

11  could be misinterpreted as pressuring or coercing, right?

12  A.  Yes.

13  Q.  And, again, you are aware of no specific instance where

14  that has or has not happened, true?

15  A.  Just listening to our public policy committee speak to

16  their concerns.

17  Q.  I want to understand that answer.  When you say "speak to

18  those concerns," those are concerns people have that it might

19  happen, rather than relaying specific instances where it has

20  happened, is that fair?

21  A.  It's being brought to our policy committee as something

22  that we need to engage in.  Somebody is concerned about it,

23  whether it's because they personally experienced it, or

24  someone they know has, or just larger concerns I couldn't tell

25  you.

JENNIFER MARTINEZ - CROSS

1  Q.  Now, I apologize if this seems like a simplistic question.

2  I'm not trying to be patronizing, but we agree generally that

3  voters should not be pressured or coerced, right?

4  A.  Yes.

5  Q.  We also agree that voters with IDD may be vulnerable to

6  pressure or coercion, depending upon their diagnosis?

7  A.  I think that depends on the supports they have.

8      Again, this is our point about direct service

9  professionals and their inability to be with someone who they

10 know.  Direct supports and services with folks that are

11 members of The Arc of Texas are incredibly engaged in the

12 political process.  They are grass roots advocates themselves.

13     So I don't have a concern other than them not receiving

14 the right supports and services when they show up at that

15 voting location and didn't have the opportunity to do the prep

16 work before they showed up.

17 Q.  I think we may actually be speaking to the same issue.

18 When you talk about having the right support for folks with

19 IDD having the assister of their choice may be a part of that

20 correct support, is that right?

21 A.  Correct.

22 Q.  It would not be the correct kind of support, though, for a

23 voter with IDD if their assister of choice was pressuring or

24 coercing them, right?

25 A.  Correct.

3541
JENNIFER MARTINEZ - CROSS

1  Q.  That would be inappropriate behavior on behalf of the

2  direct support professional, right?

3  A.  That would be.

4  Q.  I know this may feel like it's getting repetitive but I do

5  need to kind of understand the limits of what Arc of Texas can

6  tell us today.  But you are not aware of a voter with IDD

7  whose vote did not count because of the oath of assistance, is

8  that true?

9  A.  Again, systems work refer to DRTX about policy committee.

10  Q.  I want to talk a little bit about the cure process and I

11  understand that you would like for that process to work a

12  little bit differently, is that true?

13  A.  I would like it to —— I would like for them to not have to

14  go through the curing process.  I would like their votes to be

15  accepted when they vote.

16  Q.  Well, I imagine we all share that.

17  A.  Right.

18  Q.  We would love it if nobody ever made a mistake, but if

19  somebody does have a mistake, whether they have IDD or not,

20  are you opposed to a cure process that allows a voter to fix

21  an error either on their application for ballot by mail or on

22  their ballot by mail?

23  A.  It's how difficult it is to fix it.  For my folks, it's

24  the concern, we talked about they don't always have access to

25  the identification they are going to need to successfully cure

JENNIFER MARTINEZ - CROSS

1   a ballot.

2       They don't always have access to go to places physically,

3   where they would need to provide that identification.  So it's

4   just this increased burden and it's just difficult.  It's

5   difficult to be a person with a disability, and particularly

6   one with an intellectual and developmental disability.

7   Q.  And I think I'm hearing sort of two pieces to the

8   objection.  I want you to tell me if I'm wrong.  One is an

9   objection to having to provide this sort of identification

10  information in the first place, the ID number or the driver's

11  license, whatever that may be, and the other piece of it is

12  the way the cure process actually works where it may require a

13  voter to go in person to fix the problem, is that right?

14  A.  Or to vote in person if their ballot was not cured in

15  time.

16  Q.  If a voter with IDD makes a mistake on their application

17  for ballot by mail, do you want for them to have the

18  opportunity to fix that?

19  A.  I do.

20  Q.  If the cure process for fixing that could be changed so

21  that people didn't have to go in person, for example, is that

22  something that you would like for this to happen out of this

23  lawsuit?

24  A.  I would like for it to be less burdensome on my members to

25  vote in Texas successfully.

JENNIFER MARTINEZ - CROSS

1  Q.  Is it right to say that other than your objection to the

2  ID requirement, Arc of Texas' objection to the cure process is

3  that the process does not achieve its ends very well?

4  A.  I think it places a burden on my members that already

5  there is sort of this cumulative effect of being difficult to

6  vote that is just an additional burden that does not sit well

7  with The Arc of Texas.

8  Q.  And I understand that piece of it, but, again, setting

9  aside The Arc of Texas' concern about the voter ID

10 requirement, would Arc of Texas prefer to have no opportunity

11 to cure a mistake on an application for ballot by mail or

12 ballot by mail, or it would prefer that there be some process,

13 is that fair?

14 A.  Correct.

15       MR. KERCHER:  Thank you very much for your time,

16 Miss Martinez.  I appreciate your thoughtful answers.

17       Your Honor, I pass the witness.

18       THE COURT:  Anything else on this side?

19       MR. NICHOLS:  Yes, Your Honor.

20 BY MR. NICHOLS:

21 Q.  Good morning, Miss Martinez.

22 A.  Good morning.

23 Q.  Just wanted to make sure that the Court has a clear record

24 in terms of your testimony about matters that relate to the

25 criminal process in Texas, okay.  Is that okay with you?

3544
JENNIFER MARTINEZ - CROSS

1   A.   Okay.

2   Q.   So with respect to what I understand you telling the

3   Court, you're telling the Court that certain members of Arc of

4   Texas have expressed concerns about features of SB 1 that

5   contain in their view criminal provisions, am I getting that

6   right?

7   A.   Our public policy and advocacy committee has raised these

8   concerns to my staff and our board, yes.

9   Q.   Right.  But in terms of — and you want to listen to

10  concerns raised by your members, correct?

11  A.   Correct.

12  Q.   And you want to consider those, correct?

13  A.   Yes.

14  Q.   But you're not telling the Court that you-all have tracked

15  individual concerns and whether individual concerns are raised

16  out of situations where people have been investigated or

17  prosecuted, correct?

18  A.   So, again, we do systems-level work.  We do not do direct

19  case management.  We're finding this information out through

20  operations through The Arc of Texas which relies heavily on

21  our members to bring us issues that they are concerned about

22  so we could act upon those.

23  Q.   Yes.  And specifically I believe, Miss Martinez, Arc of

24  Texas is a systems advocacy organization, not an individual

25  case management organization, correct?

1  A.  That's right.

2  Q.  And so, for example, if someone were to ask you, as a

3  representative of Arc of Texas, to give an example of an

4  assister who was declined to provide assistance on account of

5  concerns of criminal penalties in Senate Bill 1, Arc of Texas

6  couldn't do that, right?

7  A.  We would refer that to DRTX.

8  Q.  And so, also, if I were to ask you to tell the Court about

9  all of the cases that Arc of Texas knows about where an

10  assister has been criminally investigated or prosecuted for

11  assisting someone who has IDD, or another disability, you

12  would look at me and say, Mr. Nichols, I can't do that,

13  correct?

14  A.  I can't do that.  Certainly there are members who probably

15  could, policy committee members, but I cannot, no.

16  Q.  Yes, but you understand the Court can only —

17  A.  Yes.

18  Q.  — make decisions on evidence presented to the Court by

19  people who come to court, correct?

20  A.  Correct.

21  Q.  And so you cannot provide any evidence to the Court on

22  behalf of Arc of Texas about anyone who has been — any

23  assister who has been investigated or prosecuted for helping

24  someone with a disability vote in Texas, correct?

25  A.  That's going to come from the concerns we hear from our

JENNIFER MARTINEZ — CROSS

1 policy committee.

2          MR. NICHOLS:  All right.  Appreciate the time.  Thank

3 you, ma'am.

4          THE WITNESS:  Thank you.

5          THE COURT:  Any redirect?

6          MR. SHOWALTER:  Just briefly.

7 BY UNIDENTIFIED MALE SPEAKER:

8 Q.  Are there any members of local chapters of The Arc of

9 Texas who are not members of The Arc of Texas itself?

10 A.  No.

11 Q.  And even though you do systems-level work, would it be

12 against the organization's purpose if you waited till one of

13 your members was prosecuted in relation to the criminal

14 provisions of SB 1 before challenging it?

15 A.  We would never do that.  That's — we are so interested

16 and invested in our members bringing issues to us so that we

17 can impact them before we are harmed, before our members are

18 put in positions where their votes are not counted, where they

19 are frightened, all of those things are concerns of ours.

20 Q.  How many members across the board does Arc of Texas have?

21 A.  I think it's around 7,400.

22 Q.  And I assume that you personally do not know every member?

23 A.  Unfortunately, no, I don't.

24 Q.  Could you walk us through the process that you use to take

25 individual member concerns and turn them into policy

3547

JENNIFER MARTINEZ — CROSS

1  priorities?

2  A.  So we do a lot of outreach to our local chapters.  Not

3  only do I meet with them, but we do out into the community and

4  meet with our chapters, typically the year prior to a

5  legislative session to start hearing from those local members

6  and that leadership on what their concerns are.

7      We identify if there's a trend line, if we're seeing

8  something that's happening across a state that's a concern and

9  then we look to see if that fits into one of our policy

10  priorities and then bring that to our committee.

11      That public policy committee brings to bear their

12  expertise and what they are hearing and then that is presented

13  to our board for their consideration.

14      So we have a very active engagement with our local

15  chapters to identify what their concerns are so that we can

16  make sure we're addressing those at a state level.

17  Q.  And how long has this been your process, The Arc of Texas'

18  process for policy formulation?

19  A.  We're a grass roots organization.  This way of bringing

20  information from the field up is the way we were designed from

21  our inception.  I can say certainly since I have been at the

22  Arc of Texas, I was a staff member over a decade ago, this was

23  the process as well.  This was just sort of in the DNA of what

24  The Arc of Texas does.

25          MR. SHOWALTER:  Nothing further, Miss Martinez.

*Gigi Simcox, RMR, CRR*

CATHY CRANSTON - DIRECT

1  Thank you for your time.

2          THE COURT:  Anything else based on those?

3          MR. KERCHER:  No, Your Honor.

4          MR. NICHOLS:  No, sir.

5          THE COURT:  Thank you, ma'am.

6          Next witness.

7          MR. CAMPBELL-HARRIS:  Good morning, Your Honor.  My

8  name is Dayton Campbell-Harris and I represent the OCA GH and

9  HAUL plaintiffs in this matter.

10          Plaintiffs call Kathy Cranston to the stand who will

11  offer testimony on our ADA Rehabilitation Act and Section 208

12  of the VRA claims against Sections 502, 507, and Section 604

13  of SB 1.

14          The witness is running to the bathroom so we might

15  wait like five minutes.

16          THE COURT:  Does anyone else need a break?

17          MR. KERCHER:  Seems as good a time as any, Your

18  Honor.

19          THE COURT:  Let's go ahead and take five or ten.

20      *(Recess)*

21      (CATHY CRANSTON, having been duly sworn, testified as

22  follows:)

23                      DIRECT EXAMINATION

24  BY MR. CAMPBELL-HARRIS:

25  Q.  Good morning.

CATHY CRANSTON – DIRECT

1   A.   Good morning.

2   Q.   Can you please state your name for the record.

3   A.   My name is Cathy Cranston.

4   Q.   Are you a named plaintiff in this case?

5   A.   No, I am not.

6   Q.   Okay.  Where did you grow up?

7   A.   I grew up in Houston, Texas, and I moved to Clute, Texas,

8   when I was nine years old.

9   Q.   And where do you live now?

10  A.   I live in Austin, Texas.

11  Q.   Are you registered to vote there?

12  A.   Yes, I am.

13  Q.   Do you encourage others to vote?

14  A.   Absolutely.

15  Q.   Why is that?

16  A.   I believe it's our responsibility and our civic duty to do

17  it.

18  Q.   How long have you lived in Austin?

19  A.   I've lived in Austin since 1987.

20  Q.   And what do you do for work?

21  A.   I work as a personal care attendant.

22  Q.   How long have you worked as a personal care attendant?

23  A.   On and off for about 40 years.

24  Q.   Thank you.  Did you attend college?

25  A.   I did.

CATHY CRANSTON — DIRECT

1  Q.  And where did you attend college?

2  A.  I attended at Brazosport Junior College and then

3  transferred into University of Houston.  I also went to —— for

4  a semester to the University of Texas Allied School of Health

5  for nursing and then I returned to University of Houston.

6  Q.  Did you join any student groups while in college?

7  A.  Yes, I did.

8  Q.  What were those student groups?

9  A.  I was a member of OSDUH, which is the Organization of

10  Students with Disabilities at U of H.

11  Q.  Did you work in college as well?

12  A.  I did.

13  Q.  What did you do for work?

14  A.  I worked as a personal care attendant.  I also worked as a

15  monitor of the —— where the housing was located and —— trying

16  to remember.  Oh, I also worked there at, it was called

17  Handicapped Student Services at that time, so I did multiple

18  jobs, yeah.

19  Q.  What did you do at Handicap Student Services?

20  A.  At Handicap Student Services I assisted in testing

21  students with disabilities.  I assisted in writing for them,

22  note taking.  I assisted in reading the material.  I was

23  learning how to use the Kurzweil, which assisted people that

24  are blind, because I also assisted, the Commission for the

25  Blind was located right there near Handicap Student Services

3551

CATHY CRANSTON - DIRECT

1  within the same building so we kind of tag teamed and worked

2  altogether.

3  Q.  Thank you.  Can you describe what your duties were as a

4  personal care attendant in college?

5  A.  I assisted individuals with their activities of daily

6  living, such as getting them up out of bed, dressing them,

7  transferring them, providing personal care.

8      You know, whether it was doing bowel programs, external

9  catheter changes, assisting women with their personal sanitary

10 hygiene, that kind of thing when they had their menstrual

11 cycles.

12     I did all kinds of things to assist them in getting around

13 campus also, just whatever needs that they had I would assist

14 them in doing so, yeah.

15 Q.  Why did you first want to serve others?

16 A.  I was -- my mother and my parent, my father, they modeled

17 that behavior.  Part of, we went to church and so at a very

18 young age I learned giving back to my community.

19     I also, in church I went to a predominantly

20 Spanish-speaking church when I was about 14, 15 -- 13, 14, 15,

21 and on, so I learned through the church to give back to the

22 church in that way, cleaning the church, also assisting the

23 younger children and learning English because the church,

24 predominantly the membership was Spanish-speaking and so I

25 assisted in English, learning English for the younger kids.

3552
CATHY CRANSTON – DIRECT

1    I also went on mission trips through the church working as
2 a lab technician actually.  The medical students from here, we
3 met up with the medical students from the FF [phonetic] from
4 Mexico City and we would go into small villages actually and
5 we would bring all of our supplies to do surgery or do
6 testing, do —— provide the medical necessities that people
7 needed and then we would leave.  We'd come back to the States.
8    I'm trying to remember if there was other stuff, but,
9 really, my foundation was through the church.  We also went
10 into, probably when I was 11, or 12, 13, I went into nursing
11 facilities with my mother and played music for the residents
12 there and I witnessed the disparity that exists within nursing
13 facilities among the residents, the hunger for human touch and
14 just the loneliness, and so in doing that it had an extreme
15 impact on my life.  And in retrospect, I wouldn't think it
16 would have brought me to this place, but it did, so, yeah.
17 Q.  Thank you for sharing.  I want to circle back to what you
18 did after college.  Did you work after college?
19 A.  Yes, I did.
20 Q.  And what did you do for work?
21 A.  I worked as a person —— I continued working as a personal
22 care attendant, but I also provided attendant services for my
23 husband who has a disability as well.  I got pregnant about a
24 year after, approximately a year after we were married, or so,
25 and so being a mother became my priority and so that was my

CATHY CRANSTON - DIRECT

1  focus, but on and off I would do attendant services as well.

2     At the time my husband was working for Houston Center for

3  Independent Living there and when he was working there I would

4  go into the center and assist people if needed, but it wasn't

5  on a regular basis, but, you know, when I would go and visit I

6  would assist people if they needed assistance.  Also helped at

7  the different events that they had, that kind of thing, so...

8  Q.  And when did you start working after college?  What year

9  did you start working after college?

10 A.  Let's see.  We moved to Austin in '87, so I would think —

11 let's see.  We were married in '83.  Probably '83, '84.  Yeah.

12 During that time, yeah.

13 Q.  Okay.  Did you join any organizations that advocate for

14 people with disabilities after college?

15 A.  Yes, I did.

16 Q.  And what were those organizations?

17 A.  ADAPT of Texas.  Also we created ADAPT of Texas, we

18 created Personal Attendant Coalition of Texas to advocate for

19 the rights and wage increase for the personal care attendants.

20 I also became a member of REV UP Texas which is register,

21 educate, vote, and use your power, so...

22 Q.  Thank you.  So let's talk about ADAPT a little bit.  What

23 does ADAPT do?

24 A.  ADAPT is a grass roots disability rights organization.  We

25 advocate for people with disabilities around housing,

CATHY CRANSTON - DIRECT

1  transportation, attendant services, whatever issues that the
2  community brings to us, if there is desire on part of the
3  membership to work on those issues, we work on those issues as
4  well.  But now my main focus is advocating for personal care
5  attendants as well around wages and benefits.
6  Q.  When did you join ADAPT?
7  A.  I joined ADAPT when I reconnected with Bob, Mr. Kafka.  He
8  was my supervisor at Handicap Student Services, so I
9  reconnected with him, my husband and I did when we moved to
10  Austin, and that was in 1987.  Probably 1988 after we got
11  settled and we reconnected with him.
12  Q.  Okay.  What have your duties been since joining ADAPT?
13  A.  Initially more kind of like secretarial.  I answered the
14  phone.  I typed up stuff for them.  I welcomed people into the
15  office.  I'd help with mailouts and we had newsletters so we
16  did bulk mailings too.  So I did that.
17      And then the longer I stayed, you know, I participated in
18  the meetings.  I started participating in trips that would go
19  out of the state of Texas and stuff like that.
20      So then I was driving caravans with individuals with
21  disabilities as well as able-bodied attendants and I also
22  hired the personal care attendants.  I was part of the
23  interview process for personal care attendants, as well as the
24  individuals, a couple of other individuals with disabilities
25  would be part of that interview process and we would interview

3555
CATHY CRANSTON - DIRECT

1  potential attendants for our members.
2  Q.  How difficult has it been to find qualified personal care
3  attendants?
4  A.  It's been, as far as on our trips and really just out in
5  general, it's been very difficult.  We actually have a
6  shortage of personal care attendants here in Texas and a part
7  of that, of course, and we all probably know this but I need
8  to go on record to say, it's because the wages are severely
9  low here in Texas.  There is no competitive wage all
10 whatsoever under the Medicaid funding arena.
11      And so I just wanted to share a recent thing that
12 happened.  We had a couple of our members that had
13 disabilities and that were in need of having a PCA, personal
14 care attendant, to travel with us to D.C. and we were not able
15 to find any, and so one of our members couldn't go but I ended
16 up calling our members out in El Paso, and Pica, the lady that
17 organizes the attendants on that end, she was willing to work
18 with our other member who she knew personally, good friend.
19      And she says oh, no, no, no, Danny has to go, and so she
20 was willing to work for him too.  They already were working,
21 had ten individuals that they were assisting.  She, and then
22 her sister, they hired her sister out of California to come
23 over to assist as a personal care attendant so that their
24 members could travel as well.
25      And so this is just an example of what we're finding in

CATHY CRANSTON - DIRECT

1   the difficulty in finding people that are willing to provide

2   that attendant services for people with disabilities, so,

3   yeah.

4   Q.  Thank you for sharing that example.  You mentioned REV UP

5   Texas as well.  What does REV UP Texas do?

6   A.  It's an organization that educates people with

7   disabilities, but also that is it's not just people with

8   disabilities that are members.  It can be their family

9   members, whoever is interested in working on issues of voting.

10      And so with an acronym, register, educate, vote, use your

11  power.  So what that's saying is that we are trying to educate

12  people with disabilities, to empower them to say, hey, use

13  your vote, it matters.  It's not saying how to vote, it's

14  saying use your vote, it's your right to vote.  And so that's

15  what we do.

16      We also do events like we had a Texas disability issue

17  forum where we invite candidates to come and speak to the

18  community.  And -- what else do we do?  Well, I look for

19  volunteers to assist at the forums.  We have to find locations

20  for the forums.

21      So those are just some of the things that I do with REV

22  UP.

23  Q.  Thank you.  I'd like to turn to SB 1.  Are you familiar

24  with SB 1?

25  A.  Yes.

CATHY CRANSTON - DIRECT

1  Q.  And when did you first become familiar with it?

2  A.  I became familiar with SB 1 in 2021.

3  Q.  What is your impression of SB 1?

4  A.  Not a very good impression.  I think there are parts of it

5  that I just totally disagree with and I think that it can and

6  will infringe on the rights of people with disabilities to

7  vote.  Um, yeah.

8  Q.  Were there any specific changes to Texas election law that

9  SB 1 made that troubled you?

10 A.  Can you repeat that or rephrase it?

11 Q.  I can.  Were there any changes to Texas election law that

12 SB 1 made that troubled you?

13 A.  Oh, gosh.  Okay.  Let me take a sip.  My processing is —

14 anyway.

15 Q.  Were there any specific changes that — to Texas election

16 law that SB 1 made that troubled you?

17 A.  Yes.  Some of the changes that happened that I saw and

18 that impacted people, like the drive-thru where they had the

19 drive-thru voting, that went away, which from my perspective

20 as a personal attendant and also assisting individuals with

21 disabilities, that impacts a personal with a disability that

22 utilizes to drive-thru and especially around the pandemic

23 because it was a health and safety issue, and like especially

24 right at the beginning of the pandemic that would be kind of

25 like a health and safety issue, and so it took that away.

CATHY CRANSTON - DIRECT

1    Also it limited —— it honed down on the locations, as well
2    as the less ballot boxes, and, for me, as an attendant and
3    especially people —— attendants —— many attendants don't have
4    like vehicles and stuff so they use public transportation.
5    And so when you hone down locations it makes it cumbersome
6    for the attendant but also people with disabilities.  People
7    with disabilities also utilize public transportation, and so I
8    could see that being a big issue in that way and getting in
9    the way of individuals getting to the polls, you know.
10   Q.  Were there any changes that SB 1 made that troubled you
11   about how it could impact personal care attendants?
12   A.  I can't remember.  There was something I wanted to say and
13   I just can't remember it.
14   Q.  That's okay.  We can come back to it.  Have you assisted
15   people with disabilities with voting?
16   A.  Yes.
17   Q.  And how have you provided that assistance?
18   A.  I have driven people to vote.  I have removed like their
19   ID and to hand it to the —— what are they called?  The poll?
20   The people that are working there at the polls.  I can't
21   remember the name, but, yes.
22   Before I've helped people that have cognitive
23   disabilities.  I've read —— well, not just cognitive, but also
24   people that don't read that have a disability, I've read
25   the —— I'm having a loss for words.  I've read what is on the

3559

CATHY CRANSTON - DIRECT

1  ballot to them, that kind of thing, yeah.

2  Q.  Okay.

3  A.  Oh, wait.  One more thing.

4      I've also assisted people to physically get in to the

5  polls, like individuals that use wheelchairs, I've had to pop

6  them up, like tip the wheelchair back to get them in to

7  polling place because it was inaccessible.

8  Q.  And just to clarify, what do you mean by popping them up?

9  A.  Tipping the wheelchair back, like I put my foot on the

10 wheelie bar and I pull it back.  It's an electric chair, which

11 is really heavy so I just have to push them, bump them up,

12 yeah, because they need to go up.

13 Q.  I agree.  In your experience do personal care attendants

14 then assist individuals with voting?

15 A.  Yes.

16 Q.  And why is that?

17 A.  The way I see myself is I'm an extension of that person

18 with the disability and so I'm there to help them fulfill in

19 the same way that I can just easily get in and go vote and

20 all, I'm an extension, so I help them fulfill their civic

21 duty, their responsibility in voting, their right.  It's their

22 civil right to be able to do that, so...

23 Q.  Is there anything that SB 1 changed in regards to you

24 helping people vote?

25 A.  Yes.

CATHY CRANSTON - DIRECT

1  Q.  What were those changes?

2  A.  For me, it has to do with the oath and putting me — I

3  have had more time to think about what that oath really means

4  and it gives me more angst than when I first read it before —

5  you know, and because there's a lot of responsibility placed

6  on the personal care attendant to make the judgment calls and

7  it's a burden to do that and also to know that if, especially

8  the penalty of perjury, if I don't get it right, that I could

9  be at risk, so...

10  Q.  Let's talk a little bit more about the oath.  I'm going to

11  ask Derek to pull up what's been marked as HAUL Exhibit 089.

12      Cathy, do you recognize the language within the document

13  in front of you?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's the oath of assistance.

17  Q.  And based on your personal knowledge what do you

18  understand the oath of assistance to do?

19  A.  What is it supposed to do?  Well, it's making me swear

20  that I know that this individual is disabled.

21      Can you repeat the question?

22  Q.  I can.  Based on your personal knowledge, what do you

23  understand the oath of assistance to require?

24  A.  It requires me to affirm under penalty of perjury that the

25  person I'm assisting is disabled, that that's the way they

1  presented themselves.  It has a bunch of pieces in there.
2  Q.  Maybe it will help if we walk through it piece by piece.
3      Let's start with the first sentence.  It begins with, "I
4  swear" — and in brackets — "or affirm under penalty of
5  perjury that the voter I am assisting represented to me they
6  are eligible to receive assistance."
7      Did I read that correctly?
8  A.  Yes.
9  Q.  Do you see whether the oath includes criteria for
10 eligibility or criteria for assistance anywhere?
11 A.  No, it does not.
12 Q.  And in your experience as a personal care attendant would
13 you be hesitant to sign the oath without knowing that
14 criteria?
15 A.  Yes, I would.
16 Q.  And why is that?
17 A.  Because of the penalty of perjury.  It's just a red flag
18 for me.  I don't know, because, see, I don't just help people
19 I know.  I help people that I don't know, and if I went to —
20 like I've been in the polling locations where individuals
21 needed assistance but I didn't know them so I wouldn't step
22 forward.
23     And it's just really scary as an attendant.  Penalty of
24 perjury is a big deal.  And, for me, as an attendant, one, I
25 don't want to break the law because I don't, I follow the law,

3562

CATHY CRANSTON – DIRECT

1  it's a great responsibility and, for me, it's more than
2  attendants should have to take on.
3      We don't get paid enough money as it is and here we are
4  being asked by the State of Texas to take this oath when we
5  don't even know the detail of the specifics and I don't want
6  to make a mistake, you know?  Yeah.
7  Q.  What do you understand the penalty of perjury to mean?
8  A.  To me, it means that if I'm telling a lie that I will be
9  penalized, that it's a criminal penalty, and so for me a lot
10  could be at stake, even my job could be at stake, depending on
11  how this would fall, the whole oath, how it would fall, how it
12  would affect my work.
13      Because there is a registry that if you do certain types
14  of offenses in the State of Texas as a personal care
15  attendant, if you get on that registry, you can't work as a
16  PCA.  You know, things like whether it's prostitution or
17  animal cruelty, or theft.
18      I don't know where the piece about — where is it?  That
19  says about the pressure.  "I did not appreciate or coerce," I
20  don't know how that falls under the code, the board of nurses
21  I think examiners have all that information, so I don't know
22  where that falls.
23  Q.  Let's talk about the pressure and coerce language in a
24  moment.  Did you have conversations with any other personal
25  care attendants about the penalty of perjury language?

1  A.  I did, under the guise of my organizing through ADAPT of
2  Texas, and also through Personal Attendant Coalition of
3  Texans, yes.
4  Q.  Let's go to the pressure or coerce language.  Do you see
5  in the oath where it says "I did not pressure or coerce the
6  voter into choosing me to provide assistance?"
7  A.  Yes.
8  Q.  Do you see the words "pressure" or "coerce" defined
9  anywhere in the oath?
10  A.  No.
11  Q.  What do you understand the words pressure or coerce to
12  mean?
13  A.  It's like for intimidation for me when I read that, that
14  that's what means.
15  Q.  How does that language affect your work as a personal care
16  attendant?
17  A.  It makes me not want to do it.  And a part of —— because I
18  had experience with pressure and coercion working as a
19  personal care attendant and not even knowing that I was doing
20  it.
21      I'm going to share a story with one of the individuals
22  that I had worked for.  She's passed away already, so I want
23  to say her first name to give her that.  Her name is Diana.
24      And the home care agency that I was employed in at that
25  time asked me to go in and work for her as her personal care

3564
CATHY CRANSTON - DIRECT

1  attendant.  She had hoarding issues and she used to put her
2  colostomy bags in her closet and she had the closet, it was
3  filled with that, and clothes and stacks and stuff.  So I went
4  in there, donning proper -- you know, to keep myself safe,
5  went in there and cleaned it up.
6      And so I worked for her about a year and everything seemed
7  okay.  And so then she became hospitalized and then she didn't
8  come home.  And so then I went to work for somebody else, but
9  probably about six months to a year later I was told by the
10  staff there that I had intimidated her.
11      And the reason it was very upsetting for me is because I
12  had no idea that I was intimidating that woman.  She didn't
13  change her behavior.  She still was the same Diana.  I knew
14  her from other attendants.  I had been around her, and so I
15  didn't -- there was nothing that said I was intimidating this
16  woman, and so when I read that, where it says, "I did not
17  pressure or coerce the voter into choosing me to provide
18  assistance," it's a subtle line.
19      You don't know how your behavior, what you have to say,
20  how your tone, you just don't know.  And I didn't know.  And
21  it really made me step back as a personal are attendant to
22  think about how I do that, how do I speak to people, what tone
23  do I use, because, you know, she had mental health issues, but
24  I didn't -- I thought I was talking okay to her.
25      I thought I wasn't -- you know, but here I found out I was

3565

CATHY CRANSTON – DIRECT

1  intimidating this woman, so... yeah.

2  Q.  Thank you so much for providing that story.

3      Let's continue to another part of the oath.  It starts

4  with "I understand that if assistance is provided to a voter

5  who is not eligible for assistance, the voter's ballot may not

6  be counted."  Do you see that?

7  A.  Yes.

8  Q.  Did I read that correctly?

9  A.  Yes.

10 Q.  Has this language had any impact on your work?

11 A.  On my work?  Yeah, it — yes.

12 Q.  How has it impacted you?

13 A.  It makes me not want to assist to fulfill my work, to be

14 an attendant, to do what that individual with disabilities

15 needs me to do in order for them to, in this situation, to go

16 vote.

17     I think the burden falls on the attendant to make sure

18 they get it right, and it's more than what we've signed up for

19 in that way.  It's the individual's right to go vote and it

20 provides a great amount of angsts for me now, so...

21 Q.  Do all individuals you've worked with identify as people

22 with disabilities?

23 A.  No.

24 Q.  How does this language impact the assistance you provide

25 someone who does not identify as someone with a disability?

CATHY CRANSTON - DIRECT

1  A.  Can you repeat the question, please?

2  Q.  I can.  How does this language impact the assistance you

3  provide someone who does not identify as a person with

4  disabilities?

5  A.  I think it would — it could potentially put the person at

6  risk of not being able to get what they need when they go and

7  vote.  And the reason I say this, you know, I can think of

8  individuals that don't see themselves as being disabled and

9  not all, but some people that are deaf do not see themselves

10  as having a disability, which is kind of weird because under

11  the ADA they are protected under the Americans with

12  Disabilities Act.

13      They are protected under that law, and so that's our law

14  for people with disabilities.  So, yeah, and in doing such, I

15  could see somebody coming up and needing assistance, like sign

16  language interpretation, and if they don't see themselves in

17  that light and then, you know, they are not going to get what

18  they need in that way.

19  Q.  Thank you.  Are you familiar with reasonable accommodation

20  requests?

21  A.  Yes, I am.

22  Q.  Do you know whether reasonable accommodations or

23  modifications are available for the oath requirement?

24  A.  No, I do not.

25  Q.  How does this language of the oath impact accommodation

CATHY CRANSTON — DIRECT

1  requests to waive the oath requirement?

2  A.  Can you repeat that again?

3  Q.  I can.  How does this language of the oath impact

4  accommodation requests to waive the oath requirement?

5          MR. BERG:  Objection.  Calls for speculation.

6          THE COURT:  I'm not sure I —

7          Do you understand the question?

8          THE WITNESS:  I just need him to rephrase it.

9          THE COURT:  I don't understand your question.

10          MR. CAMPBELL-HARRIS:  I can move on; that's okay.

11  BY MR. CAMPBELL-HARRIS:

12  Q.  In your personal experience, did personal care attendants

13  before 2022 experience trouble assisting voters?

14  A.  To my knowledge, no.

15  Q.  And in your personal experience were personal care

16  attendants hesitant to assist voters before 2022 because of

17  the oath?

18  A.  Wait.  Let me get some water and then repeat it again,

19  please.

20  Q.  Okay.  In your personal experience were personal care

21  attendants hesitant to assist voters before 2022 because of

22  the oath?

23  A.  Yes.

24  Q.  Let's turn to the language that says "I will not

25  communicate information about how the voter has voted."

3568
CATHY CRANSTON - DIRECT

1   A.  Okay.  I see it.

2   Q.  How does this language impact your work as a personal care

3   attendant?

4   A.  As a personal care attendant sometimes you are working

5   with a family member and they live in the same household as

6   their family and unfortunately sometimes family members get

7   into that individual that I'm working with, they get into

8   their business, so to speak, to where they would want to

9   know -- and I could see this happening in certain families --

10  want to know how a person voted, and in that way, because of

11  the family dynamics, that could potentially cause an attendant

12  to break -- to break the oath.

13  Q.  Thank you.  Derek, you can take the oath down.

14      I'd like to turn now to some questions about your

15  experience serving others as a personal care attendant.  Are

16  you aware whether SB 1 created any new requirements for

17  including an ID number on a mail ballot application or a mail

18  ballot?

19  A.  Yes.

20  Q.  What is your understanding of the new requirements?

21  A.  My understanding of the new requirements is that an

22  individual has to write their license or the -- I think it's

23  the last four digits of their social security number on -- I

24  think it's on the ballot or on the envelope.  I'm not quite

25  sure, but that they have to do that.

CATHY CRANSTON - DIRECT

1  Q.  And have you worked with individuals who have physical

2  disabilities?

3  A.  Yes.

4  Q.  In your experience, have any of those individuals with

5  physical disabilities had trouble writing legibly?

6  A.  Yes.

7  Q.  And have you worked with individuals who had memory

8  problems?

9  A.  Yes.

10  Q.  Have those individuals you assisted who had memory

11  problems sometimes have difficulty remembering where they

12  located their personal ID?

13  A.  Yes.

14  Q.  Let's speak a little bit more generally now about SB 1.

15     As a personal care attendant, do you try to comply with

16  voting laws?

17  A.  Absolutely.

18  Q.  And based on your experience, do personal care attendants

19  try to comply with voting laws?

20  A.  Yes.

21  Q.  And based on your experience from being a personal care

22  attendant in college, at REV UP, at ADAPT, since SB 1 has

23  passed, how has the oath requirement affected the work of

24  personal care attendants?

25  A.  I think it's going to cause -- well, not just gonna, I

CATHY CRANSTON – CROSS

1  know it has created angst within my community of personal care

2  attendants and I think it's going to get in the way of

3  potentially individuals with disabilities being able to get

4  what they need in order to go vote.

5          MR. CAMPBELL-HARRIS:  Thank you so much, Cathy.

6          Your Honor, I pass the witness.

7          THE COURT:  Anything else on this side?

8          Any cross?

9          MR. BERG:  Yes, Your Honor.

10                      CROSS-EXAMINATION

11  BY MR. BERG:

12  Q.  Good morning, Miss Cranston.

13  A.  Good morning.

14  Q.  My name is Zachary Berg.  I'm with the Office of Attorney

15  General.  Thank you for being here.

16  A.  Thank you.

17  Q.  You testified that you're a member of REV UP, correct?

18  A.  Yes, sir.

19  Q.  And REV UP does not organize vote assisters, correct?

20  A.  Can you repeat that question?

21  Q.  REV UP does not organize vote assisters?

22  A.  That's correct.

23  Q.  And you've never canvassed for REV UP, correct?

24  A.  That's correct.

25  Q.  And you've never driven people to the polls for REV UP?

3571
CATHY CRANSTON – CROSS

1  A.  I've driven people to the polls, but not for REV UP.

2  Q.  And you have never personally assisted an individual

3  filling out an application for ballot by mail, correct?

4  A.  Not for ballot by mail, no, that's correct.

5  Q.  You have a disability, correct?

6  A.  Yes, I do.

7  Q.  And you've never requested assistance to vote on the

8  account of your disability?

9  A.  Because I don't need it.

10  Q.  And you've never requested an ADA accommodation when

11  voting, correct, for yourself?

12  A.  That's correct.

13  Q.  You voted early in person for the March 2022 Primary,

14  correct?

15  A.  I believe so.

16  Q.  And your ballot was accepted?

17  A.  It was in person, to my knowledge it was.  I mean, it went

18  through the computer and so hopefully it was, yeah.

19  Q.  And you voted early in person for the

20  May 7th Constitutional/Local Election?

21        MR. CAMPBELL-HARRIS:  Objection, Your Honor.  This is

22  beyond the scope of direct.

23        THE COURT:  I'll allow it.

24        THE WITNESS:  Repeat that again, please.

25

3572
CATHY CRANSTON - CROSS

1   BY MR. BERG:
2   Q.  You voted early in person for the May 7th,
3   Constitutional/Local Election in 2022?
4   A.  I believe so.
5   Q.  And your ballot was accepted for that?
6   A.  To my knowledge, yes.
7   Q.  And you also voted early in person for the May 24th, 2022
8   Primary Run-off?
9   A.  What was that?  What date was that?
10  Q.  May 24th, 2022.
11  A.  24th, 2022.  I believe so.
12  Q.  And that ballot was accepted, correct?
13  A.  Yes.
14  Q.  And you've never assisted anybody in voting by mail except
15  for putting their ballot in the mailbox, correct?
16  A.  And driving them to the poll, or actually driving them to
17  Airport Boulevard so that they could do it themselves as well.
18  Q.  So one time you did drop-off voting, correct?
19  A.  Yes.
20  Q.  You testified that a good attendant is an extension of the
21  person they work with, correct?
22  A.  That's correct.
23  Q.  A good attendant is an external tool for the person being
24  assisted, right?
25  A.  Yes, we're a tool.  Yes.

CATHY CRANSTON — CROSS

1  Q.  And as an attendant you'll sometimes go to the doctor's

2  office with a client and help them understand what the doctor

3  or a physical therapist is saying, right?

4  A.  That's what I said in my deposition, yes.

5  Q.  And you'll help a client with assistance in voting because

6  that's part of who they are as an individual, correct?

7  A.  I said that in my deposition, yes, but, in retrospect,

8  after I started thinking about the oath, with the time since

9  the deposition until now, and then with the — at the ADAPT of

10  Texas office with the calls I received and the people I spoke

11  with regarding that oath and all, it has created angst and

12  it's given me — I already had a little bit of angst when I

13  was doing that deposition, it even made it harder now, so,

14  yeah.

15  Q.  When there's a healthy relationship between a personal

16  attendant and an individual that needs assistance, the power

17  is supposed to reside in the person who needs assistance,

18  right?

19  A.  That's correct.

20  Q.  And that's the — the person with the disability, older

21  person, or person with the intellectual and developmental

22  disability, they are in the seat of power, right?

23  A.  Correct.

24  Q.  You would agree, however, that there are individuals who

25  don't understand or appreciate the dynamics of that

CATHY CRANSTON — CROSS

1  relationship?

2  A.  Will you repeat that, please?

3  Q.  Would you agree that there are individuals who don't

4  understand or appreciate the dynamics of that relationship?

5  A.  There are some, yes.

6  Q.  And you would agree that there is an opportunity for a

7  personal care attendant or assister to exploit or pressure a

8  voter with a disability while assisting them casting their

9  ballot?

10  A.  Potentially, yes.

11  Q.  And on direct you shared the story about Diana, correct?

12  A.  Yes.

13  Q.  About how she felt intimidated by you and you never knew,

14  right?

15  A.  Right.

16  Q.  And you said that there's a subtle line between what you

17  thought as helping her and what she thought of as

18  intimidation, is that right?

19  A.  Yes.

20  Q.  You would agree that in that subtle line we should err on

21  the side of protecting the person being assisted, correct?

22  A.  No.  I think you need to protect both.  And that's part of

23  the problem I have with the oath because there's no protection

24  for the personal care attendant that is assisting the voter

25  and — yes.  That's what I wanted to tell you on that one.

3575

CATHY CRANSTON – CROSS

1  Q.  Let's talk a little bit more about your experience as an
2  attendant with voting.  You are aware that a voter doesn't
3  need to provide proof of disability in order to secure
4  assistance at the polls, correct?
5  A.  Yes.
6  Q.  And if you're an attendant to a — to someone with a
7  disability, you are already aware that they have a disability,
8  correct?
9  A.  If I know them, but if I don't know them and I'm offering
10  myself up to assist them I'm taking them at their word.
11  Q.  You did not assist an individual voting in the March 2022
12  Primary, correct?
13  A.  I don't think so.  I don't remember.
14  Q.  And you did not assist an individual voting in the May 7,
15  2022 Constitutional/Local Election?
16  A.  Actually, just a minute.  I did assist somebody in the —
17  did you say the March?
18  Q.  March 2022 Primary.
19  A.  I did.  And that's because when I looked at my deposition
20  I think I said no I didn't, and then I was thinking about it
21  and then I realized that I did assist somebody.  I drove them
22  there and then I took them, got them to the polling place and
23  then took out their ID, helped them set up, but then they
24  voted on their own.  So I wanted to clarify that one, yeah.
25  Q.  Thank you for clarifying that.

CATHY CRANSTON – CROSS

1     So the oath of assistance did not prevent you from

2  assisting that person during the March 2022 Primary, correct?

3  A.  I was not given an oath to assist them.

4  Q.  And you didn't assist anyone in the May 7th,

5  Constitutional Local Election?

6  A.  No.

7  Q.  And you did not assist an individual voting in the

8  May 24th Primary Run-off?

9  A.  I don't believe so.

10  Q.  And you did not assist any voters in the

11  May 7th Constitutional Election or the May 24th Primary

12  Run-off because you were not asked to, correct?

13  A.  Can you repeat that?  I'm getting confused with all these

14  dates and you're going back and forth.  I get confused, so...

15  Q.  Yeah, I'll back it up.

16     So you did not assist a voter in the May 7th

17  Constitutional Election because no one asked you to assist

18  them, correct?

19  A.  No one was there that needed my assistance.

20  Q.  And you did not assist a voter in the May 24, 2022 Primary

21  Run-off because no one asked you for your assistance, correct?

22  A.  That's correct.

23  Q.  So no voter has been unable to vote because of your

24  concerns about SB 1, correct?

25  A.  I would say that it's beyond just me.  We're talking about

1  there's about 300,000 —

2  Q.  Well, I'm asking about you.

3  A.  Well, about me, no.  There was not an individual person

4  that asked me directly for their assistance — for my

5  assistance.

6  Q.  Okay.  Let's talk a little about disability.  You would

7  agree with me that each person's disability is different from

8  another person's disability?

9  A.  They are, yes.

10  Q.  And you would agree that because of the variety — that

11  variety, individuals with disabilities need different things

12  to lead full lives?

13  A.  Yes.

14  Q.  And you would agree with me that accommodations need to be

15  individualized to a person's disability and needs?

16  A.  Yes, but there are some certain commonalities that go

17  across the board.

18  Q.  And would you agree with me that a person with a

19  disability may not want assistance while voting?

20  A.  That's correct, that's right.

21  Q.  Let's talk a little bit about the passage of SB 1.

22  A.  Can you hold up?  I just want to drink some water.

23  Q.  Yeah.  So let's talk a little bit about the passage of SB

24  1.  You did not speak to any legislators about SB 1 before its

25  passage, correct?

CATHY CRANSTON - CROSS

1  A.  Before its passage?  Could you repeat the question?

2  Q.  You did not speak to any legislators regarding SB 1 before

3  its passage?

4  A.  Probably not directly.  I believe I dropped a card at the

5  hearings and stuff like that, so...  But I don't recall

6  speaking to one directly, no legislator.

7  Q.  And you did not testify before the legislature regarding

8  SB 1, correct?

9  A.  No, I dropped a card.  Yeah.

10  Q.  And the card you dropped was the only part of your

11  participation in the passage of SB 1, correct?

12  A.  Well, not the passage, but, yeah.

13  Q.  That was the only interaction you had with the legislature

14  during the passage of SB 1, is that correct?

15  A.  That I can recall.

16  Q.  Would you agree that the State has an interest in ensuring

17  that voters can vote in secret?

18  A.  I don't know if I agree with that.

19  Q.  Would you agree with that statement —— with the proviso

20  that an attendant counts as the voter?

21  A.  We're an extension in that way, yes.

22  Q.  Would you agree that the secrecy of the ballot protects

23  voters from being pressured or coerced into making certain

24  choices?

25  A.  Can you repeat the question, please?

3579

CATHY CRANSTON — CROSS

1  Q.  Would you agree that the secrecy of the ballot protects

2  voters from being pressured or coerced into making certain

3  choices?

4  A.  I don't agree with that.

5  Q.  Sorry.  What was your answer to that?

6  A.  I do not agree with that.

7  Q.  What do you not agree about?

8  A.  So you are saying — I just want to make sure I

9  understood.  You were saying that the secrecy of the ballot

10  is — what now again?  Please.

11  Q.  We can move on; that's fine.

12      You testified that you were concerned about the wording of

13  the oath of assistance, correct?

14  A.  Yes.

15  Q.  And you were unsure on how the words in the oath might be

16  applied to you, correct?

17  A.  Applied to all attendants, not just to me.

18  Q.  You did not read any guidance materials on SB 1 produced

19  by Travis County?

20  A.  No.

21  Q.  Or guidance materials from any county?

22  A.  Not that I can recall, no.

23  Q.  And you did not contact the Travis County Clerk's Office

24  about interpreting any provision within SB 1?

25  A.  Not about the provision but about accessibility issues I

3580
CATHY CRANSTON – CROSS

1  did.

2  Q.  And you did not contact the Travis County District

3  Attorney's Office about interpreting any provision within SB

4  1?

5  A.  Not that I can recall.

6  Q.  And you did not read the election advisories from the

7  Secretary of State's Office?

8  A.  I don't remember if I did that or not, really.

9  Q.  And you did not contact the Secretary of State's Office to

10  ascertain the interpretation of any provision in SB 1?

11  A.  The what?  I'm sorry.

12  Q.  You did not contact the Secretary of State's Office about

13  interpreting any provision within SB 1?

14  A.  I don't believe so.

15  Q.  So your understanding of the provisions within SB 1 is

16  based on your own interpretation of the text, correct?

17  A.  Some of it, yes.

18  Q.  And you did not seek clarification from anybody at

19  Travis County?

20  A.  No.

21  Q.  And you did not seek clarification from anybody at

22  Secretary of State?

23  A.  No.

24  Q.  And you're not aware of anyone who had has been criminally

25  charged for violating SB 1?

CATHY CRANSTON - CROSS

1    A.   Not yet.

2    Q.   And you're not aware of anyone who has been assessed a

3    civil penalty for violating SB 1?

4    A.   Not as of yet, no.

5    Q.   Have you met Senator Bryan Hughes before?

6    A.   I do know him, yes.

7    Q.   And you knew him when he was just a representative, right?

8    A.   No, I know him as a Senator as well, but, yes, I go -- my

9    relationship with him goes back a ways, yes.

10   Q.   And, in fact, your relationship predates the founding of

11   REV UP Texas even?

12          MR. CAMPBELL-HARRIS:  Objection, Your Honor.  Again,

13   beyond the scope of direct.

14          THE COURT:  That's overruled.

15          What's the relevance of this?

16          MR. BERG:  It goes to legislative intent and her

17   personal knowledge.

18          THE COURT:  Legislative intent?

19          MR. BERG:  I can move on.

20          I'll pass the witness.

21          Thank you, Miss Cranston.

22          THE WITNESS:  Thank you, sir.

23          MR. NICHOLS:  Very briefly, Your Honor.

24   BY MR. NICHOLS:

25   Q.   Good morning, Miss Cranston.

3582
CATHY CRANSTON - CROSS

1  A.  Good morning, sir.

2  Q.  Very much appreciate your service to others.

3  A.  We need higher wages, sir.

4  Q.  Yes, ma'am.  I appreciate that fully and you and I can

5  talk separately about that as well; be happy to do that.

6      The -- like you -- like me, you live in Travis County,

7  correct?

8  A.  Yes, sir.

9  Q.  And I just want to make sure the record is clear, are you

10 continuing to provide the good personal care attendant

11 services to folks in Travis County that you talked about

12 today?

13 A.  Yes, sir.

14 Q.  And are you serving individuals who live in Travis County?

15 A.  Yes, I do.

16 Q.  And so with respect to any -- and has that been true since

17 you've lived in Travis County since 1987, I believe?

18 A.  It is, but I've served people that were not from Texas

19 too, so, yeah.

20 Q.  Yeah.

21 A.  Um-hum.

22 Q.  But in terms of what you are doing currently, are you

23 serving --

24 A.  Yes.

25 Q.  -- individuals who live in Travis County only?

CATHY CRANSTON – CROSS

```
 1   A.  Yes.
 2   Q.  Okay.  And are you -- has that been true since the passage
 3   of Senate Bill 1 that you've testified about here today?  In
 4   other words, is it true that you've served only people in
 5   Travis County since SB 1 was passed?
 6   A.  Well, if we're just talking about Travis County, yes, but
 7   you have to understand I do travel and in my travels I assist
 8   other people that are from other states as a personal care
 9   attendant as well.  So I just didn't know if that was
10   pertinent, but I just wanted to clarify that.
11   Q.  Sure.  In terms of people in Texas that you are providing
12   personal care attendant services to, those individuals live in
13   Travis County, right?
14   A.  Yes.  I also am support for certain people too.
15   Q.  Sure, but in terms of the day-to-day support that could
16   potentially cause you to have to help somebody to vote, for
17   example --
18   A.  Right.
19   Q.  -- those folks are in Travis County, correct?
20   A.  Yes.
21   Q.  Okay.
22           MR. NICHOLS:  Thank you, Judge.
23           THE COURT:  Any redirect?
24           MR. CAMPBELL-HARRIS:  Yes, Your Honor.
25
```

1  BY MR. CAMPBELL-HARRIS:

2  Q.  Hi, Cathy.

3  A.  Hello again.

4  Q.  Just a couple of questions from me.  Have you received any

5  assurances or guarantees from any government prosecuting

6  attorney offices that there would be no prosecutions for

7  violating SB 1?

8  A.  No.

9  Q.  And as a personal care attendant are you aware of any

10 independent duty you have to contact government entities about

11 interpreting the law, particularly with voting rights?

12 A.  No.

13        MR. CAMPBELL-HARRIS:  Thank you.  That's all.

14        THE COURT:  Anything based on that?

15        MR. BERG:  No, Your Honor.

16        MR. NICHOLS:  No, sir.

17        THE COURT:  You may step down.  Thank you, ma'am.

18        Your next witness.

19        MR. JONES:  Morning, Your Honor.  Michael Jones for

20 the LULAC plaintiffs, and our next witness will be Ameer

21 Patel.  Mr. Patel will provide support for LULAC plaintiffs'

22 challenges to Sections 3.04, 3.09, 3.10, 3.12, 3.13, 5.02,

23 5.03, 5.07, 50.8, and 7.04.

24     (AMEER PATEL, having been duly sworn, testified as

25 follows:)

AMEER PATEL - DIRECT

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. JONES: |
| 3 | Q.  Good morning, Mr. Patel. |
| 4 | A.  Good morning. |
| 5 | Q.  Can you please state your full name for the record? |
| 6 | A.  Ameer Patel. |
| 7 | Q.  Can you tell us why you are here today? |
| 8 | A.  I am here to testify on behalf of Voto Latino about SB 1's |
| 9 | impacts on the Latino community and Voto Latino's mission and |
| 10 | programming. |
| 11 | Q.  What is your current role with Voto Latino? |
| 12 | A.  I am the managing director. |
| 13 | Q.  We'll talk more about Voto Latino's activities shortly, |
| 14 | but first I just want to ask a couple of questions about your |
| 15 | background.  Have you held any other positions during your |
| 16 | time at Voto Latino? |
| 17 | A.  I have.  I've been there for four years.  My previous |
| 18 | position was the vice president of programs. |
| 19 | Q.  Mr. Patel, what is Voto Latino? |
| 20 | A.  Voto Latino is a 501(c)(4) nonprofit nonpartisan social |
| 21 | law fair organization. |
| 22 | Q.  And what is Voto Latino's mission? |
| 23 | A.  Voto Latino's mission is to educate and empower a new |
| 24 | generation of Latino voters ultimately guiding the Latino |
| 25 | community towards globalization and its political power. |

3586

AMEER PATEL - DIRECT

1  Q.  What do you do at Voto Latino in your capacity as managing
2  director?
3  A.  I oversee the day-to-day operations of the organization as
4  well as ensure we carry forth the mission and programming
5  outlined by our board and our president.
6  Q.  Mr. Patel, can you explain to the Court at a big picture
7  level how Voto Latino advances its mission?
8  A.  Yes.  Voto Latino's intent enfranchises Latino voters
9  across our core states, and we do that primarily through
10  direct communication, which can vary and flow from digital
11  advertising, to mail, SMS outreach, and at times in person
12  activations as well.
13  Q.  You just mentioned your core states.  Where does Voto
14  Latino do this sort of work that you just discussed?
15  A.  It has varied in the past; however, for the 2024 cycle, in
16  no particular order is Arizona, Nevada, Pennsylvania, and here
17  in Texas.
18  Q.  And why does Voto Latino organize in Texas?
19  A.  There are several reasons.  For one, Latino voter
20  participation rates in the state of Texas trail national
21  numbers.  There -- in 2020, the last Presidential Election,
22  there were roughly 6 million eligible Latinos in the state of
23  Texas, of who only 2.7 million turned out and cast a ballot,
24  which is less than half the national average of that election
25  almost 54 percent.  So Latinos in Texas turned out at

AMEER PATEL - DIRECT

1  10 percent lower than Latinos nationally.

2      In addition to that, there will also be 800,000 new Latino

3  voters who will become eligible to vote by the next

4  Presidential Election cycle, so in 2024, from the past

5  election cycle so those opportunities provide a need for us to

6  do our work in the state to mitigate some of those gaps.

7  Q.  And I believe you just mentioned Latino turnout in Texas.

8  As someone who organizes in Latino communities in the state,

9  in your personal experience do Latino voters in Texas have

10  difficulty participating in politics at the same levels as

11  they do in other states?

12  A.  They do, yes.  As I mentioned, Latino voters have

13  historically and in recent elections as well trailed other

14  populations in the state as well as nationally in

15  participation rates.

16  Q.  Over the last few years what kinds of programs or

17  activities has Voto Latino conducted in Texas?

18  A.  To simplify, we have three primary bodies of work.  One is

19  voter registration where our objective is to connect with

20  young Latinos in the state who are unregistered and get them

21  the information they would need to register to vote and get on

22  a voter file.

23      Two is Geo TV, oftentimes known as voter turnout, here we

24  would communicate directly with Latino voters in the State who

25  are already registered to vote, get them the information they

3588
AMEER PATEL - DIRECT

1  need to cast a ballot which can be ranging from absentee
2  voting to early voting to Election Day voting.
3       And, lastly, on the voter advocacy side of things, here,
4  we talk to voters about issues that matter to them, inform
5  them about policies that might impact them going forward where
6  candidates stand on those issues, and what might be on their
7  ballot in terms of what they are voting on.
8  Q.  Mr. Patel, can you please explain the difference between
9  Voto Latino's voter advocacy and Geo TV programs?
10  A.  Yes.  As I mentioned, for Geo TV, its primarily talking to
11  Latino voters who are already registered to vote and its more
12  about helping them and navigating them through the voting
13  process, whether it's early voting or Election Day voting,
14  whereas for voter advocacy it's more about informing them
15  about issues and candidates that might impact them so they can
16  cast a meaningful ballot.
17  Q.  And, Mr. Patel, what kinds of resources does Voto Latino
18  typically devote to voter registration?
19  A.  It's primarily digital, so paid digital advertising.  In
20  addition to that we would also layer in mail and SMS.
21  Q.  And in order to stand up those programs, does it require
22  the use of staff time at all?
23  A.  Yes.  Significant staff time goes into creating the
24  content for those with communications as well as implementing
25  and executing communication strategy.

AMEER PATEL - DIRECT

1  Q.  Mr. Patel, what kinds of resources does Voto Latino

2  typically devote to voter advocacy?

3  A.  Similarly, its primarily digital; however, we also will

4  use mail, SMS, Spanish language radio, as well as significant

5  staff resources.

6  Q.  And what kinds of resources does Voto Latino typically

7  devote to Get Out the Vote activities?

8  A.  Similarly, digital paid advertising, peer-to-peer text

9  messaging, mail, and Spanish language radio.  And staff

10  resources.

11  Q.  Can you please just explain what you mean by peer-to-peer

12  SMS?

13  A.  Yes.  It's a form of communication that involves staff and

14  volunteers where they would send messages to other voters in

15  the state.  So, for this instance, for Geo TV, texting other

16  Latino voters and helping them through text messages,

17  peer-to-peer, one-on-one, navigate the voting process where

18  they can potentially go vote early, what are the hours, and

19  such.

20  Q.  Mr. Patel, how did Voto Latino first learn of SB 1?

21  A.  In line with our mission, voting laws directly impact our

22  ability to do our work in states, like in the state of Texas,

23  so we follow them pretty closely.  SB 1 was first flagged to

24  us by state and local partners and then we followed it very

25  closely through the State Legislature, and as it eventually

AMEER PATEL – DIRECT

1  became law.

2  Q.  And what was Voto Latino's reaction to SB 1's passage?

3  A.  We were disappointed and very worried that it would impact

4  the Latino communities that we tried to enfranchise and have a

5  direct impact on our ability to do programming in the state of

6  Texas.

7  Q.  So why was Voto Latino concerned that SB 1 would make it

8  more difficult for Voto Latino to conduct its programming in

9  Texas?

10  A.  SB 1 directly has impacts on our Geo TV programming.  It

11  extends to many parts of early voting from absentee to

12  in-person voting and so its impacts on that would go to reduce

13  and restrict the opportunities in which Latino communities can

14  vote, and, therefore, creating additional barriers to voting

15  in the state of Texas.

16      And for our programming, it would drastically change the

17  means and methods in which we communicate to Latino voters

18  about the options that are available to them in terms of

19  voting early.

20  Q.  So by communicating these impacts of SB 1 to Texas voters

21  does Voto Latino reach the same number of Latino voters in

22  Texas in its other programming as a result?

23  A.  No, not necessarily.  As I mentioned, we try to put our

24  work into three different buckets of work by having to extend

25  more resources into Geo TV, whether that's talking more

3591

AMEER PATEL - DIRECT

1  frequently to voters or talking to additional voters, it would
2  pull away resources from other bodies of work.  We wouldn't
3  get additional resources just to combat SB 1.
4  Q.  And one of the bodies of work that it would pull resources
5  away from, would that include voter advocacy, for example?
6  A.  Yes.  It directly would.  Our goal is to be able to have
7  Latinos who are registered and have the opportunity to cast a
8  meaningful ballot, but one of the most important things is for
9  them to be able to understand what is on their ballot issues
10 that impact them, and in an ideal world we would spend more
11 resources on advocacy, but we can't necessarily do that if
12 voters aren't able to cast ballots through, you know,
13 bureaucratic changes or additional burdens placed on them.
14 Q.  Mr. Patel, in your experience what impact, if any, do the
15 provisions of SB 1 that limit early voting hours have on
16 Latino communities in Texas?
17 A.  Often Latino voters tend to hold hourly wage jobs that
18 require them to be on site for those jobs, those often occur
19 during normal business hours, ranging from hospitality to food
20 industry and construction, and so limiting the amount of early
21 voting hours particularly after hours voting would drastically
22 impact their ability to vote beyond their traditional work
23 hours.  For Voto Latino that would impact our ability to be
24 able to turn out those voters for early voting periods.
25 Q.  And I believe you touched on this, but how does that

1  impact Voto Latino's mission?

2  A.  Like I said, our mission is to enfranchise Latino voters,

3  and if —— SB 1 and limiting early voting hours directly is the

4  opposite of that by reducing the available hours in which they

5  can vote early and placing additional burdens on them.

6  Q.  Mr. Patel, in your experience, what impact, if any, do the

7  provisions of SB 1 that eliminate drive-thru voting have on

8  Voto Latino's programs and the Latino communities it serves in

9  Texas?

10  A.  Yeah.  Drive-thru voting provides a safe way for people to

11  cast a ballot.  Additionally, it provided an opportunity for

12  those that might have children, for those that might have

13  disabled family members to be able to cast a ballot without

14  having to leave them from the safety of their car.  It is also

15  a way that people relied on voting in 2020.

16      By taking away that ability, it removes yet another method

17  of voting that people have already utilized in the past to

18  cast a ballot for Voto Latino's programming.  It changes that

19  because now we have to inform voters that a method of voting

20  in which they have used in the past that was available to them

21  is no longer available to them and have to find them

22  additional methods of voting.

23  Q.  And how does that impact Voto Latino's mission?

24  A.  It makes our mission work more different of enfranchising

25  Latino voters by restricting the methods in which they can

3593
AMEER PATEL — DIRECT

1   actually vote.

2   Q.  Mr. Patel, in your experience, what impact, if any, do the

3   provisions of SB 1 that effectively eliminate ballot drop

4   boxes by requiring that election officials receive absentee

5   ballots at the time of delivery have on the Latino communities

6   in Texas?

7   A.  They go on to place additional burdens on an already

8   challenging and complicated absentee process that Latino

9   voters have not utilized in the past as the same rates as

10  other populations.

11      By effectively asking them to turn in their ballot in a

12  drop-off box and provide ID, it places new burdens that were

13  not there previously, making it more challenging for them to

14  successfully vote absentee.

15      For our programming, it involves us to have to communicate

16  those additional burdens to voters without sort of making the

17  process seem more complicated and a deterrent.

18  Q.  How does that impact Voto Latino's mission?

19  A.  Absolutely.  It makes our job of enfranchising Latino

20  voters and making sure they turn out more difficult by placing

21  additional burdens on them.

22  Q.  Next, I want to talk about the provisions that impose new

23  voter identification requirements for absentee ballots and

24  ballot applications.  What impact, if any, did those new

25  requirements have on the Latino communities that Voto Latino

AMEER PATEL – DIRECT

1  serves in Texas?

2  A.  As I mentioned, it provides additional barriers to an

3  already challenging and rather difficult to navigate process

4  by adding additional barriers to the absentee request as well

5  as the absentee return; therefore, it places additional

6  barriers on Latino voters who are often, as we've heard from

7  other plaintiffs, elderly or disabled individuals in making it

8  more challenging for them to actually be able to cast a

9  meaningful ballot.

10 Q.  And, Mr. Patel, has Voto Latino taken any steps to

11 mitigate the effects of SB 1?

12 A.  Yes.  As soon as SB 1 was passed we spent significant

13 staff resources trying to better understand the bill, what is

14 in it, what impacts it would have on Latino voters in the

15 state of Texas, and we created several pieces of content that

16 were used on social media to disseminate that information to

17 our audiences ranging from infographics, to reels, to just

18 text that would alert them of the changes which would impact

19 how they vote in future elections.

20     In addition to that we've released press releases as well

21 as done interviews with local reporters about the impacts of

22 SB 1 on Latino communities.

23 Q.  And did those activities require the use of staff

24 resources?

25 A.  Correct.  We do not have the opportunity or the ability to

3595

AMEER PATEL - DIRECT

1  hire new staff as a result of SB 1, so we had to use our
2  current existing staff, pull them from other projects they
3  were working on.  We also did not expect SB 1 to be as
4  something that we would have to take on in this calendar year,
5  so we had to divert these resources of staff into dealing with
6  communicating SB 1 to the voters in the state of Texas.
7  Q.  And earlier this morning we talked about Voto Latino's
8  general programming and day-to-day activities.  What impact,
9  if any, did Voto Latino's mitigation efforts that you just
10  discussed have on the organization's other programming?
11  A.  As I mentioned, by having to pull staff resources from
12  other programming that was happening, this was September of
13  2021, we were engaged in efforts in other elections, namely
14  Virginia and New Jersey.
15      In addition to that, it prevented us from being able to
16  take on additional work to communicate certain issues that are
17  being discussed at a state or national level and we had to
18  refocus our staff resources and our content about SB 1 and its
19  future impacts on Latino voters.
20  Q.  Do you expect this reallocation of resources to continue
21  in the future?
22  A.  I do.  Actually, far more so.  Latino voters are, much
23  like many voters, often can be Presidential Election year only
24  voters voting only in Presidential Elections, 2020, 2024 is
25  coming up.  So many of the voters that voted in 2020 the first

3596

AMEER PATEL - DIRECT

1  time will be voting again in 2024 and they might not be aware

2  of the impacts SB 1 has had on where they can return their

3  ballot or what hours they can vote or through what means and

4  so we plan on spending some significant resources in the

5  future to inform them of that change.

6  Q.  Does Voto Latino plan to make any other changes to its

7  2024 programming or tactics to counteract the effects of SB 1?

8  A.  Yes.  Particularly, there are three programs that we are

9  planning on launching in 2024 in lead-up to the elections.

10      One is a particular program around absentee where we would

11  target voters who requested an absentee ballot but have not

12  already turned in that absentee ballot, using data available

13  from the Board of Elections and Secretary of State and we

14  would communicate to them through paid advertising, mail, and

15  SMS data about the information they need to successfully turn

16  in that ballot, so where they can turn it in, what is the

17  timeline they need to be able to turn it in.

18      The second program is actually a series of partnerships

19  with influencers, particularly local influencers, so college

20  athletes, local DJs, and such, to be able to get Geo TV

21  election-related materials out to their audiences in the state

22  of Texas about how they can vote, early voting times, early

23  voting hours, and such.

24      The third is a campaign focused exclusively on alerting

25  voters who voted in 2020 about changes to election procedures

AMEER PATEL - DIRECT

1  directly as a result of SB 1 about how certain methods of

2  voting may no longer be available, such as drive-thru voting,

3  certain methods of returning ballots.

4      In addition to that, changes in hours of voting.  That

5  would be done through digital, mail, SMS, and through other

6  tactics that I've outlined.

7  Q.  And, Mr. Patel, has Voto Latino previously engaged in the

8  activities that you just mentioned?

9  A.  Those activities, no.

10  Q.  Now, has Voto Latino ever worked with influencers in other

11  contexts?

12  A.  We have worked with influencers in other contexts.  It's

13  more so at a national level working with influencers that you

14  can see their website, social media, that are more like

15  celebrities about getting mass contact around, just make sure

16  you vote, make sure you vote, your vote is counted, out to a

17  national audience.  This is more strategic about funding local

18  influencers in the state of Texas to be able to communicate

19  election-related information.

20  Q.  And I presume that Voto Latino has informed Texas voters

21  of changes in voting rules and other context.  How does the --

22  I believe you called it a campaign to increase awareness of

23  the impacts of SB 1 on Latino voters in Texas in 2024, how

24  does that differ from what Voto Latino has typically done?

25  A.  One of the things is that, as I mentioned, SB 1 has kind

3598

AMEER PATEL - DIRECT

1  of far-reaching impacts on almost all aspects of early voting

2  and so the rule itself, like many provisions of the law impact

3  a larger audience of Latino voters in the state that have

4  utilized methods of voting in past elections that are no

5  longer available to them, our timing perhaps has changed, and

6  so this is a very intentional campaign that's more around a

7  voter's alert of election laws that have changed that may

8  directly impact you, and so, therefore, getting them that sort

9  of information as opposed to traditional outreach Geo TV

10  campaigns that might try to combine alert with other

11  informative programs.

12  Q.  Mr. Patel, why is Voto Latino engaging in these new

13  activities and programs in 2024?

14  A.  It's to directly combat the impacts that SB 1 will have on

15  voters in 2024.

16  Q.  And where will the resources necessary to conduct these

17  activities come from?

18  A.  As I mentioned, we have not received extra funding as a

19  result of SB 1 so they will come from diverting other

20  resources from other programming.  We've already outlined in

21  our campaign plan that we were going to register voters in the

22  state of Texas in 2024 than we have done in 2020.  That's a

23  direct result of moving those resources to Geo TV.

24        We also will be able to reach fewer voters in the state of

25  Texas for voter advocacy sort of work, meaning that we will

3599
AMEER PATEL - CROSS

1  not only reach fewer voters, we will also reach fewer voters

2  with less contacts or touch points which will prevent us in

3  being able to inform as many voters as we would like about

4  policies and candidates because we would like to divert those

5  resources towards an increased Geo TV universe and these

6  additional campaigns I have outlined.

7          MR. JONES:  Your Honor, I'll pass the witness at this

8  time.

9          THE COURT:  Anything else on this side?

10         Any cross?

11         MR. CAPOZZI:  Yes, Your Honor.

12                      CROSS-EXAMINATION

13  BY MR. CAPOZZI:

14  Q.  Good morning, Mr. Patel.  How are you today?

15  A.  Good morning.

16  Q.  Any name is Louis Capozzi from Jones Day.  I'm with the

17  intervenor defendants.

18      Let's talk a little bit about Voto Latino's structure.

19  Voto Latino is not a membership organization, right?

20  A.  That is correct.  We're not a membership organization.

21  Q.  And Voto Latino does not have dues-paying members, rights?

22  A.  That is correct.  We do not have members and we certainly

23  do not collect dues.

24  Q.  So Voto Latino's board and officers are chosen by

25  committees drawn from Voto Latino's board of directors, right?

*Gigi Simcox, RMR, CRR*

（空）

AMEER PATEL – CROSS

1  A.  That is correct.  They created a committee to elect other

2  board officers.

3  Q.  And no employee or officer of Voto Latino has been

4  threatened with prosecution under any SB 1 provision, right?

5  A.  That is correct.  To my knowledge, no one on Voto's board

6  or employee falls in that category.

7  Q.  You would agree that when the legislature changes the

8  election laws, educating voters about those changes is

9  important, right?

10 A.  Yes, I would agree that alerting voters about any election

11 laws is important.

12 Q.  And Voto Latino has been doing that for a long time,

13 right?

14 A.  That is correct.  Geo TV has been an important part of our

15 work; however, it's very rare that election laws such as SB 1

16 have such a larger and profound impact.

17 Q.  But you've educated voters about past changes in Texas

18 election law too, right?

19 A.  We have, correct.

20 Q.  And so it's fair to say that educating voters about

21 election law changes is a regular part of Voto Latino's work,

22 right?

23 A.  It is a regular part; however, as I kind of mentioned, it

24 is a part of work that we hope to see decrease over time as

25 more voters get accustomed to voting so we can spend more

3601

AMEER PATEL - CROSS

1  resources on things like voter advocacy and informing them

2  about issues.

3  Q.  With respect to Voto Latino's voter education efforts, you

4  said you've worked with celebrities before to get information

5  out to voters, right?

6  A.  Yes, we have.

7  Q.  If the Court enjoins all or parts of SB 1, Voto Latino

8  will communicate those changes to voters too, right?

9  A.  Sorry.  Can you repeat the question?

10  Q.  Yeah.  Let me try to reword it.  If the Court or some

11  other court gets rid of SB 1 and the rules go back to what

12  they were before, Voto Latino would communicate those changes

13  to voters, right?

14  A.  It would have a less of an impact because methods that

15  Latinos voters have used in the past can remain intact, and so

16  we would be able to run more traditional Geo TV campaigns and

17  those three additional campaigns I outlined would no longer be

18  required.

19  Q.  But Voto Latino would communicate those changes to voters,

20  right?

21  A.  We would communicate SB 1 has been overturned or is not

22  being implemented, yes.

23  Q.  So several elections in Texas now have been run under the

24  rules in SB 1 and so voters would need to be educated on what

25  the rules were before SB 1, right?

1  A.  As again I mentioned, there's a lot of Latino voters who
2  only vote in Presidential Election years and might not have
3  encountered those rule changes in prior so the universe of
4  people that have voted past elections and encountered those
5  changes would be much smaller than the one we are proposing
6  here.
7  Q.  But some Latino voters did vote in 2022, right?
8  A.  That is correct.
9  Q.  And those voters would need to be educated on what the
10  rules are, if SB 1 was thrown out, right?
11  A.  It would be more so on an expansion of voting where we
12  would say like the way you voted in 2022 is still available,
13  but you can also vote during after hours and drive-thru
14  voting, yes.
15  Q.  So you would get information about those additional voting
16  opportunities out to the voters?
17  A.  Correct.  To those voters, correct.
18  Q.  You said Voto Latino works to register voters, right?
19  A.  We do.  It's own of our three bodies of work.
20  Q.  And you've been doing that for a while, right?
21  A.  Yep, since our inception in 2004.
22  Q.  So Voto Latino did voter registration in the 2020
23  Election?
24  A.  We did, yes.
25  Q.  And in the 2018 Election?

3603

AMEER PATEL — CROSS

1  A.  Yes.

2  Q.  And Voto Latino also regularly engages in Get Out the Vote

3  activities, right?

4  A.  Yes.

5  Q.  And Voto Latino has been doing that for a while, right?

6  A.  Yes.

7  Q.  In 2020?

8  A.  Yep.

9  Q.  And in 2018?

10  A.  Correct.

11  Q.  You testified that Voto Latino shifted resources from Get

12  Out the Vote efforts to voter education efforts, right?

13  A.  Yeah.  Shifting resources from voter advocacy to Geo TV.

14  Q.  Okay.  So you shifted resources from voter education to

15  Get Out the Vote efforts, right?

16  A.  Correct.

17  Q.  And you also said that Voto Latino shifted resources from

18  voter education to voter registration, right?

19  A.  In response to SB 1, it's more from voter registration to

20  voter turnout Geo TV and voter advocacy, as we mentioned, to

21  Geo TV.

22  Q.  Okay.  So the shift of resources within Voto Latino is

23  primarily to Get Out the Vote efforts, right?

24  A.  As a result of SB 1, yes.

25  Q.  Okay.  You are familiar with Senate Bill 1111, right?

AMEER PATEL – CROSS

1  A.  I am, yes.

2  Q.  And this law enacted in 2021 —

3          MR. JONES:  Objection, Your Honor.  This is

4  irrelevant.  SB 1111 is not at issue in this case.

5          THE COURT:  Let me hear the question first.

6          MR. CAPOZZI:  Yeah.  This line of questioning, Your

7  Honor, is going to assess Voto Latino's responses to SB 1111

8  which occurred at the same time as their response to SB 1.  It

9  goes to standing.

10          THE COURT:  Go ahead.

11  BY MR. CAPOZZI:

12  Q.  Now, this law enacted in 2021 imposed various restrictions

13  on voter registration, right?

14  A.  To my understanding, yes.

15  Q.  And Voto Latino filed a lawsuit against SB 1111 around the

16  same time it filed its lawsuit against SB 1, right?

17  A.  I believe in 2021, yes.

18  Q.  And Voto Latino's voter registration campaign in 2022 was

19  partly in response to SB 1111 and partly in response to SB 1,

20  right?

21  A.  No.  SB 1 directly impacts early voting, and so that

22  impacted the Geo TV programming.  It would not have an impact

23  on how we conducted voter registration, aside from pulling

24  resources from voter registration to Geo TV.

25  Q.  So your testimony is that SB 1111 — I'm sorry.  Strike

AMEER PATEL — CROSS

1   that.
2       Your testimony is that SB 1 did not affect Voto Latino's
3   voting registration efforts?
4   A.  Aside from moving resources from voter registration to Geo
5   TV.
6   Q.  Voto Latino's voter education campaign in 2022 was also
7   partly in response to SB 1111, right?
8   A.  SB 1111 only would impact the way we conduct voter
9   registration in the State of Texas.
10  Q.  I'm sorry.  The question was about voter education.  So
11  you said that Voto Latino engaged in a voter education
12  campaign in 2022, right?
13  A.  Just for clarification, by education, you mean the
14  advocacy issues?
15  Q.  Yes.
16  A.  Yes, we did.
17  Q.  And that voter education/advocacy was in response to both
18  SB 1 and SB 1111, right?
19  A.  No.  SB 1111 only impacted voter registration work in
20  terms of how we do that and the information around registering
21  to vote.
22  Q.  Brian, can you pull up the SB 1111 deposition, page 55
23  line 14, through 56 line 6.
24      You are aware that Voto Latino was deposed in the SB 1111
25  litigation, right?

3606
AMEER PATEL – CROSS

1  A.  Yes, I am.  It wasn't myself, but I am aware.

2  Q.  It was another representative, Miss Kumar from SB 1111 —

3  from Voto Latino, right?

4  A.  Yes.  It was our president Maria Teresa Kumar.

5  Q.  So I'm just going to read some information from that

6  deposition.  "The question.  So my first question for you is a

7  bit in general how is Voto Latino injured by SB 1111?"

8      "Answer.  As I mentioned to you before, we do our budget

9  in cycles and so January 2021 we had provided that we were

10  going to register roughly about 175,000 voters and we were

11  going to reach out to 1.3 million voters in Texas.  As a

12  result of SB 1111 and all the other laws that came into effect

13  post-January we had to reallocate our funding and lower our

14  goals to concentrate on voter education."

15      Did I read that correctly?

16  A.  You did, yes.

17  Q.  And Voto Latino's Get Out the Vote campaign in 2022 was

18  also partly in response to SB 1111, right?

19  A.  Get Out the Vote voter turnout was in response to — any

20  reconfiguring of the program was in response to SB 1.

21  Q.  Is it fair to say that Voto Latino's decision to redeploy

22  resources resulted from multiple changes in Texas voting law

23  since late 2021, including SB 1 and SB 1111?

24  A.  They would have impacted, and they have impacted,

25  different parts of our programming.  As I mentioned, SB 1

AMEER PATEL - CROSS

1  would deal directly with how we do our voter turnout GEO TV

2  programming while SB 1111 would be more directly with voter

3  registration and the information around registering to vote.

4  Q.  But can't tease out how many resources you've diverted as

5  a result of SB 1 and SB 1111, right?

6  A.  We know as a result of SB 1 we have reduced our voter

7  registration goal in the state of Texas to what we have done

8  in 2020 to spend more resources on Geo TV.

9  Q.  Brian, can you pull up from the deposition page 65 line 7

10  through 66 line 1.

11      So the question.  "So my question for you is whether Voto

12  Latino has teased out how much of its injury is attributable

13  to SB 1 and how much is attributable to SB 11111?"

14      "Answer.  I think it's, again, just the collective of the

15  legislation and we, when legislation is passed, we just

16  augment the work, sadly, and we have to divert resources.  I

17  can't tease out specifically how much but I know that we are

18  now almost from when we did voter education outreach, for

19  example, in the last midterm of 2018, we're almost tripling

20  the amount of the funding that we are raising to educate folks

21  based on the post-2020 environment."

22      "Question.  Okay.  So do you know — I know you probably

23  can't give me specific numbers, but do you know approximately

24  how much of the expenditure diversions have been a result of

25  SB 1111 versus SB 1?"

AMEER PATEL - CROSS

1      "Answer.  When you are educating a voter, you can't really
2   tease out one or the other.  You have to educate them on the
3   suite of the changes of the law."
4      Did I read that correctly?
5           MR. JONES:  Your Honor, I just want to object on
6   improper impeachment grounds and that I don't believe that
7   counsel has established that the resources that Mr. Patel was
8   referring to are the same resources that were being referred
9   to in this deposition.
10           THE COURT:  Are you trying to impeach him, or what is
11   this being used for?
12           MR. CAPOZZI:  Well, this testimony is admissible both
13   as impeachment because both he and Miss Kumar are speaking on
14   behalf of Voto Latino.
15           THE COURT:  Yeah, but I don't see where he's saying
16   something inconsistent from the previous corporate
17   representative.
18           MR. CAPOZZI:  I asked Mr. Patel if the resources
19   diverted to voter education, if he could tease out whether
20   they came from SB 1 versus SB 1111.
21           THE COURT:  In the earlier statement when you had it
22   shown otherwise, she clearly stated because of SB 1111 and
23   other — and she made a broad phrase, and so I still don't see
24   where you are impeaching him.  So you said there was a second
25   point, maybe you will fair better on that.

3609
AMEER PATEL - CROSS

1          MR. CAPOZZI:  So the point of this particular
2    testimony which I just read is to show that Voto Latino could
3    not previously tease out the diversion of resources based on
4    SB 1 versus SB 1111.
5          THE COURT:  You can go with that.
6    BY MR. CAPOZZI:
7    Q.  Voto Latino has also ramped up its fundraising efforts
8    after the passage of SB 1, correct?
9    A.  Can you repeat that?
10   Q.  Voto Latino has also ramped up its fundraising efforts
11   after the passage of SB 1 and SB 1111, correct?
12   A.  No, I would not agree with that.  We have not devoted
13   additional resources to fundraising as a result of SB 1 or SB
14   1111.  We have not also received any significant fundraising
15   balance as a result of SB 1 or SB 1111.  SB 1 is a part of our
16   Geo TV programming and an example I would give of why our work
17   is important in the state.
18   Q.  Brian, can you pull up page 86 lines 3 through 7.
19          The question.  "The money you raised, was it earmarked for
20   SB 1111 or was it slated for Voto Latino's efforts generally?"
21          "Answer.  It's slated specifically for SB 1111 and SB 1."
22          Did I read that correctly?
23          MR. JONES:  Your Honor, I would object again on
24   improper impeachment grounds because counsel still has yet to
25   establish that they were referring to the specific amount of

*Gigi Simcox, RMR, CRR*

AMEER PATEL — CROSS

1  funds raised for both laws.

2          THE COURT:  He can take care of himself.

3          That's overruled.

4          MR. CAPOZZI:  Thank you, Your Honor.

5  BY MR. CAPOZZI:

6  Q.  You testified that Voto Latino pulled resources from

7  elections in Virginia and New Jersey in 2021, right?

8  A.  Yep.  Staff resources and time, yes.

9  Q.  Can you say how much Voto Latino pulled from New Jersey in

10  2021?

11  A.  Well, we have not tried to give a — calculate an exact

12  dollar amount.  I can say we put significant staff resources

13  and time into SB 1 and informing voters afterwards, but we

14  have not attempted to put an exact dollar amount on that.

15  Q.  Is the same true of resources pulled from the Virginia

16  elections in 2021?

17  A.  Yes.  Similarly enough, we have not attempted to put an

18  exact dollar amount on the staff time and resources that were

19  pulled.

20  Q.  You haven't identified a specific event or activity that

21  Voto Latino had to forego entirely because of the diversion of

22  resources to SB 1, right?

23  A.  There are certain bodies of work which we had to pull from

24  to combat SB 1 and communicate about SB 1.  I cannot give you

25  exact examples at the moment.

3611

AMEER PATEL - REDIRECT

1    MR. CAPOZZI:  Nothing further for me.  Thank you.

2    THE COURT:  Anything else from this side?

3    MR. NICHOLS:  No, sir.  Thank you.

4    THE COURT:  Any redirect?

5    MR. JONES:  Briefly, Your Honor.

6                REDIRECT EXAMINATION

7  BY MR. JONES:

8  Q.  Mr. Patel, in your conversations with counsel you

9  discussed voter education and voter advocacy as they apply to

10 your programming in Texas, is that correct?

11 A.  That's correct.

12 Q.  Do you understand those two terms to be interchangeable?

13 A.  No.  That was one of my challenges there.  I don't think

14 those two terms are synonymous.  There's kind of an education

15 aspect to registration.  There's an education aspect to

16 turnout and advocacy but I would not use them interchangeably.

17 Q.  And so does Voto Latino inform Latino voters in Texas

18 about different things in both its efforts to engage in voter

19 advocacy programs as well as in its Geo TV programming?

20 A.  That's correct.  There's an informative educational

21 element to both of those programs.

22 Q.  But in those programs you aren't necessarily educating

23 voters about the same thing?

24 A.  Correct.  It would be different roles and different

25 challenges.

*Gigi Simcox, RMR, CRR*

3612

AMEER PATEL - REDIRECT

1          MR. CAPOZZI:  Objection.  That was a leading

2    question, Your Honor.

3          THE COURT:  The objection is late.

4          Any other questions?

5          MR. JONES:  Yes, Your Honor.

6    BY MR. JONES:

7    Q.  I believe you also mentioned that informing voters is a

8    regular part of Voto Latino's work?

9    A.  It is, correct.

10   Q.  How do the efforts that Voto Latino plans to undertake in

11   2024 differ from Voto Latino's past efforts to inform voters

12   of changes in Texas election laws?

13   A.  As I mentioned, it primarily impacts our Geo TV body of

14   work where we are now having to launch new activities that we

15   have not engaged in, in the past, as a result which deviates

16   resources from other programming, but it's more specifically

17   focused on informing voters around the significant changes

18   that SB 1 causes and hurdles imposes on early voting to Latino

19   voters in the state of Texas.

20   Q.  And in the deposition that you discussed with counsel, did

21   you understand your colleague to be referring to any of the

22   resources that you just referred to, that Voto Latino plans to

23   divert in 2024 in response to SB 1?

24   A.  No.  I believe for SB 1111 she was primarily discussing

25   voter registration programming.

3613
AMEER PATEL — REDIRECT

1  Q.  And would you agree that those specific — strike that.

2      Do you understand her to have been referring to any future

3  programming in 2024 in those specific excerpts that you read?

4  A.  No, not in those specific excerpts.

5  Q.  Voto Latino, I believe you said, regularly engages in Geo

6  TV Get Out the Vote efforts?

7  A.  Correct.

8  Q.  How will Voto Latino change its Geo TV programming to the

9  extent it will prospectively specifically in response to SB 1?

10 A.  As I mentioned, there are three new initiatives and

11 campaigns we are launching from the absentee programming and

12 making sure absentee voters requested ballots and not turned

13 them in get the information they need, to strategic influencer

14 communication, as well as the voter update alert programming.

15     Those are additional programming that we have not done in

16 the past in programming that are deviating resources from

17 other bodies of work like voter advocacy and registration.

18 Q.  And you also mentioned several specific activities that

19 Voto Latino undertook specifically in response to SB 1.  I

20 think you mentioned infographic, social media, reels.  Did any

21 of those specific activities have anything to do with SB 1111?

22 A.  They did not.  Those were specific to SB 1.

23         MR. JONES:  Your Honor, if I may briefly confer with

24 counsel.

25     (Off the record discussion)

3614

AMEER PATEL — REDIRECT

1          MR. JONES:  No further questions.

2          THE COURT:  Anything else on this side?

3          MR. CAPOZZI:  No, Your Honor.  Thank you.

4          THE COURT:  And you may step down, sir.  Thank you.

5          With that, let's go ahead and take a lunch break 45

6  minutes.  We'll restart at 12:45.

7          *(Recess)*

8          *(Change in reporter)*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bob Kafka – Direct

1      (Change in reporter)

2      *(12:42 p.m.)*

3          THE COURT:  Thank you.  Please be seated.

4          THE CLERK:  Would you raise your right hand, please,

5  sir.

6      (The oath was administered)

7          MR. McGREAL:  Your Honor, Christopher McGreal on

8  behalf of the OCA plaintiffs group.  I call Bob Kafka to the

9  stand.

10         Your Honor, Mr. Kafka is here to testify as a

11 plaintiff representative of RevUp.  Mr. Kafka's testimony will

12 provide support for plaintiffs OCA and HAUL and their

13 challenges to SB1 Sections 5.02, 5.03, 5.07, 5.10, 5.12, and

14 6.04, which plaintiffs challenge under Title 2 of the ADA and

15 Section 504 of the Rehabilitation Act of 1973.

16              BOB KAFKA, PLAINTIFFS' WITNESS, SWORN

17                    DIRECT EXAMINATION

18 BY MR. McGREAL:

19 Q.  Good afternoon.  What is your name?

20 A.  Bob Kafka.

21 Q.  Can you please spell that for the record?

22 A.  B-O-B.  Kafka is K-A-F-K-A.

23 Q.  Where do you currently live?

24 A.  Austin, Texas.

25 Q.  Have you always lived in Texas?

3616
Bob Kafka – Direct

1  A.  No.  I was born in New York City, and then after I got out

2  of the Army, I moved to Houston, Texas, to go to the

3  University of Houston, and then moved to Austin after that.

4  Q.  Are you here to testify on behalf of RevUp?

5  A.  Yes.

6  Q.  Is "RevUp" an acronym?

7  A.  Yes, it is.

8  Q.  What does the R stand for?

9  A.  Register.

10  Q.  What does the E stand for?

11  A.  Educate.

12  Q.  What does the V stand for?

13  A.  Vote.

14  Q.  What does the U stand for?

15  A.  Use.

16  Q.  And what does the P stand for?

17  A.  Power.

18  Q.  Does RevUp have a specific mission?

19  A.  Yes.  RevUp is developed to empower people with

20  disabilities to get more involved in the disability and

21  political process to be able to influence issues of concern to

22  the disability community.

23  Q.  Are there issues that are important to RevUp's mission?

24  A.  Yes, sir.

25  Q.  And what are those?

3617
Bob Kafka – Direct

1  A.  For example, accessible, affordable integrated housing,

2  long waiting lists for home- and community-based services,

3  community attendants' wages and benefits that are currently

4  just barely able to cover people's lifestyle; also, accessible

5  transportation, durable medical equipment, assistive

6  technology, issues that affect the very, very -- disability

7  population that makes up the disability vote.

8  Q.  What sort of activities does RevUp do to further its

9  mission?

10  A.  We have a website.  We do podcasts.  We've had PSAs.  We

11  do fliers information.  We have also a network of regional

12  reps that help disseminate our information and our mission.

13  Q.  Does RevUp use social media at all?

14  A.  Yes, very much so.

15  Q.  Is RevUp nonpartisan?

16  A.  Yes.

17  Q.  When was RevUp founded?

18  A.  2015.

19  Q.  Who founded it?

20  A.  I did.

21  Q.  Why did you start RevUp?

22  A.  Well, it became apparent -- I've been active in the

23  disability rights movement, very much like other movements, it

24  starts with direct action, then it moves towards legislation;

25  for instance, the passage of the Americans with Disabilities

Bob Kafka – Direct

1  Act.

2      But it became apparent to most groups that –- it did to us

3  here in Texas, that there needed to be more involvement at the

4  ballot box to be able to, in a nonpartisan way, influence the

5  people who actually vote on our issues.

6  Q.  Is RevUp unique to Texas?

7  A.  It began here in Texas in 2015.  I was a very close friend

8  of the executive director of the American Association of

9  People with Disabilities, and we said that –- that you could

10  use all our information that we developed here as a template

11  and that it could be used by the American Association of

12  People with Disabilities.

13      And currently now, there are between 35 and 40 RevUp-type

14  organizations throughout the country.

15  Q.  Do you currently serve any role with RevUp?

16  A.  Yes.  I'm the president of the board and the state

17  coordinator.

18  Q.  What does the president of the board do?

19  A.  We take care of all fiscal and legal responsibilities in

20  terms of providing the State information when required.

21  Q.  And what does a state coordinator do?

22  A.  We coordinate a regional network.  I don't have to tell

23  you all that Texas, with 254 counties, is large.  We're based

24  in Austin.  But to get the word out, we needed to have a

25  regional network.

3619
Bob Kafka – Direct

1  Q.  Are you paid by RevUp for any of your roles?

2  A.  No.

3  Q.  Can you describe the basic structure of RevUp?

4  A.  Yes.  We have a nonprofit board incorporated in the state

5  of Texas.  We have an office here in Austin.  I'm the state

6  coordinator.  And then we have regional rep networks

7  throughout the state to disseminate our information and also

8  carry forth the mission of RevUp.

9  Q.  Does RevUp have members?

10  A.  Yes.

11  Q.  Are members required to pay dues?

12  A.  No.

13  Q.  Why doesn't RevUp require dues from its members?

14  A.  Well, our structure is somewhat unique in the sense that

15  because we are trying to be inclusive, not exclusive, any

16  membership fee would be seen as onerous.

17      You may not be aware that a lot of people with

18  disabilities are low-income and on supplementary security

19  income, which the average is $675 a month, so even a 5 or $10

20  membership fee would be onerous.

21      And so because we want to include as many people as

22  possible, we have no membership fee.

23  Q.  Do you have to be a person with a disability to become a

24  member of RevUp?

25  A.  No.  Our definition of the disability vote focuses on

3620

Bob Kafka – Direct

1  people with disabilities, but family members have an interest,

2  providers, professionals –– even bureaucrats, because people

3  vote based on self-interest.

4      And so as a person with a disability, I may want more

5  home- and community-based services.  If you're a family member

6  of somebody who needs those services, you, too, would be

7  there.  If you're a provider of those services, you have a

8  self-interest to advocate for more funding for that, and if

9  you're a professional, again.  So you can see, like most

10  people in the voting arena, self-interest is what motivates it

11  based on issues, not party.

12  Q.  How many members does RevUp have?

13  A.  We use the number 500.  It's approximate, because of our

14  crowd sourcing concept of what's a member.  If you're

15  interested in the mission of RevUp, we consider you a member,

16  though we do have, you know, more active members who have

17  served the role as regional reps in the various different

18  parts of Texas.

19  Q.  Where are the members located?

20  A.  All over the state of Texas.

21  Q.  How engaged are the members in RevUp?

22  A.  We have from who just receive our information to those who

23  are active in doing the various different registration,

24  education, and voting; and then we have our regional reps, who

25  we engage on a monthly basis on regional phonecalls.

3621
Bob Kafka – Direct

1  Q.  Have you ever heard of the phrase "grassroots"?

2  A.  We are definitely grassroots, we're nonpartisan, and we're

3  statewide.  We're very proud of us –– grassroots, in terms of,

4  without that much funding, we were able to spread the word

5  about the disability vote and start building what I would

6  consider the necessary mechanisms to educate the population on

7  our issues.

8  Q.  Mr. Kafka, in your capacity as a board president of RevUp,

9  are you familiar with what is often referred to as SB1 or

10  Senate Bill 1?

11  A.  Yes, sir.

12  Q.  When did RevUp first become aware of SB1?

13  A.  When it first got introduced.

14  Q.  So RevUp was aware of SB1 before it became a law?

15  A.  Yes, sir.

16  Q.  Did RevUp have concerns about SB1 before it became a law?

17  A.  Yes, sir.

18  Q.  What were those concerns?

19  A.  Our concern was, as I said earlier, the disability vote

20  was a growing concept, and our concern was that some of the

21  sections of the bill would end up inhibiting the ability of

22  people with disabilities to vote, both in strictly –– you

23  know, I mean, on our mission in terms of that they might not

24  register, educate, or the most important is getting out the

25  disability vote.

3622
Bob Kafka – Direct

1   Q.  Did RevUp do anything about these concerns regarding SB1

2   before it became a law?

3   A.  Yes, we did.

4   Q.  And what did RevUp do?

5   A.  We sent out information fliers to contact their

6   representative in senate.  We also testified at various

7   different hearings.  We also had contacted the governor's

8   office, the Governor's Committee on People with Disabilities,

9   the speaker and the lieutenant governor.

10       And so we tried to, in all levels, get the grassroots

11  network that we call in RevUp to contact them about their

12  concerns about Senate Bill 1.

13  Q.  In your capacity as a RevUp board member, board president,

14  are you familiar with Section 5.02 of SB1 that deals with

15  certain new identification information being required on the

16  vote-by-mail application for a ballot?

17  A.  Yes, sir.

18  Q.  And then again as a RevUp board member, are you familiar

19  with Section 5.03 of SB1 that deals with the requirement of a

20  space on the vote-by-mail application for a ballot for the

21  information now required by Section 5.02 of SB1?

22  A.  Yes.

23  Q.  And are you also familiar, in your capacity as a RevUp

24  board member, with Section 5.07 of SB1 that deals with the

25  information required by Section 5.02 of SB1 must match the

3623
Bob Kafka – Direct

1  information on file for the voters' registration information?

2  A.  Yes, sir.

3  Q.  Reading all these sections together, does RevUp have any

4  concerns?

5  A.  Yes.  We have major concerns.  Because of the nature of

6  the disability community –– cognitive, intellectual, sensory,

7  physical –– the requirement to put down numbers that they ––

8  one, they may not have, but because of their disability, may

9  not remember or, you know, just would be really concerned that

10  they would make a mistake, we felt that this would have the

11  effect of inhibiting disabled people to vote.  And so –– and

12  we made those concerns known to the legislature.

13  Q.  And those concerns continue to this day?

14  A.  Yes, they continue.  Again, the vast majority of people

15  with disabilities are not policy wonks.  And so with all the

16  attention SB1 got and all this sort of work of the problems

17  that people were having, it just sort of went through the

18  whole community.  And so the concerns continue today.

19  Q.  Mr. Kafka, in your capacity as a RevUp board member, are

20  you familiar with Section 5.10 of SB1 that deals with ways to

21  correct the identification information required under

22  Sections 5.02 and 5.03?

23  A.  Yes.

24  Q.  Does RevUp have any concerns about Section 5.10 of SB1?

25  A.  Yes, we do.

3624
Bob Kafka – Direct

1  Q.  What are those concerns?

2  A.  Well, I have two degrees from the University of Houston.

3  And so those who are at UT and A&M, they laugh at my

4  credentials.

5      But it's very complex.  I had a difficult time

6  understanding how to implement that.  And because of the

7  nature of the disability community, people with cognitive,

8  people with physical/sensory, disabilities, that correction is

9  really -- it sounds good on paper, number one, actually

10 implementing it is difficult; but, number two, even knowing

11 that it exists is also problematic.  So that combination

12 really makes 5.10 a major concern to RevUp.

13 Q.  Mr. Kafka, are you familiar with Section 5.12 of SB1 which

14 is entitled "Opportunity to Correct Defect --

15 A.  Yes.

16 Q.  -- Call-in Signature Verification Committee"?

17 A.  Yes, sir.

18 Q.  Does RevUp have any concerns about Section 5.12 of SB1?

19 A.  Yeah, a couple of concerns.  One, even though I did not

20 vote by mail, since I had my disability, my signature today is

21 unrecognizable to me, as it was before.  And so the fact that

22 you can correct that signature if it was questioned, again,

23 requires the information to know that there's even a process

24 to be able to do it.

25     And by the nature of the, you know, fabric that makes up

3625
Bob Kafka – Direct

1  the disability community, it is very, very highly unlikely

2  that that would occur, again, because of people's cognitive,

3  intellectual, sensory, and physical disabilities that, you

4  know, make up our population.

5  Q.  And, Mr. Kafka, as a RevUp board member, are you familiar

6  with Section 6.04 of SB1 that deals with an oath that someone

7  must take who assists a voter that votes in person?

8  A.  Yes.

9  Q.  Does RevUp have any concerns about Section 6.04?

10 A.  Yes, sir.

11 Q.  What are those concerns?

12 A.  The main concern is the criminalization of assisting a

13 person with disabilities.  We are currently, in the state of

14 Texas, in a major crisis in finding attendants because of low

15 wages, no benefits.  And so the ability of the person to find

16 somebody is even exponentially increased, especially if they

17 think by some chance that they may end up being criminally

18 accused.

19     And so the oath really is something that has shown to be

20 inhibiting finding people, attendants, that would be willing

21 or even less willing to do it because of the threat of

22 perjury.

23 Q.  Has SB1 had an impact on RevUp's mission?

24 A.  Yes.

25 Q.  What impact has SB1 had on RevUp's mission?

Chris Poage, RMR, CRR
Official Court Reporter

3626

Bob Kafka – Direct

1  A.  We are a small, grassroots, statewide organization.  And

2  the time that it took, number one, just answering questions

3  about SB1, but also, it took away from our education tactic.

4      We do, like I said, podcasts.  We had to do three or four

5  podcasts about SB1, which we have done on issues like

6  accessible, affordable, integrated housing; accessible

7  transportation; long waiting lists; benefits for community

8  attendants.  And so we had only a limited amount of podcasts

9  that we did.

10     Same thing in terms of posting on Facebook information,

11  Zoom calls that we had to do in terms of getting that

12  information out to our community.

13  Q.  So, Mr. Kafka, if I understand, did SB1 take time away

14  from RevUp being able to fully educate its members and the

15  public about issues such as you mentioned, housing

16  affordability, that are important to RevUp's mission?

17  A.  Yeah.  And that was one of the major things that SB1 did

18  in terms of our mission, is that the time that we spent, you

19  know, answering questions, and the time we did not spend on

20  substantive issues like the issues I mentioned, accessible

21  housing, affordable attendant services, accessible

22  transportation.  Those are things that we wanted to spend,

23  that we spent more time on SB1.

24  Q.  And Mr. Kafka, the R in RevUp stands for register?

25  A.  Yes.

3627
Bob Kafka – Direct

1  Q.  Did SB1 impact RevUp's ability to help individuals on how
2  to register to vote?
3  A.  Well, again, in -- the registration took -- you know, it
4  took away from the time that we could give information on how
5  to register.
6  Q.  And that would be time that could have been spent on
7  educating individuals on how to register to vote?
8  A.  -- leading it back to the education piece on issues.
9  Q.  In your role as a board member and state coordinator, is
10  RevUp aware of any problems that its members have because of
11  SB1?
12  A.  Oh, yes.
13  Q.  Based on your understanding, what is the effect that these
14  problems have had on RevUp's members?
15  A.  We think overall, like I said, we were building the
16  concept that there is such a thing as a disability vote.
17  There had been studies showing that the disability vote was
18  growing.
19       Our major concern was that SB1 would inhibit not only the
20  growth, but also may even make it lower at a time when we were
21  trying to get people with disabilities to more civically be
22  involved in the community like any other citizen.
23       And so SB1 sort of cast a pall over everything that we
24  did.  And, again, though we obviously don't touch the 3 to 5
25  billion people with disabilities in this state, we are really

3628
Bob Kafka – Direct

1  concerned that they might not register, or if they were

2  registered, they might not get out the vote.

3  Q.  Is RevUp aware of any problems for its members who vote by

4  mail because of their disability because of SB1?

5  A.  Yes.  Again, you know, the requirement in 5.07 about

6  matching numbers is of major concern, that people would not

7  ask for a mail by ballot [sic].

8  Q.  Is RevUp aware of any problems that its members have faced

9  regarding the oath under Section 6.04?

10  A.  Yes.  We continually get phonecalls, emails about the

11  criminalization of the attendant.  We get questions from

12  attendants, but we also get questions from people with

13  disabilities who don't want to put their attendant in

14  jeopardy.

15      It's a very close, symbiotic relationship between the

16  attendant and the person with the disability.

17  Q.  As of today, does SB1 continue to impact RevUp?

18  A.  Yes.

19  Q.  What impact does SB1 have on RevUp to this day?

20  A.  As -- since RevUp now is -- I mean -- I'm sorry.

21      Senate Bill 1 is two years old.  Since that time of its

22  passage, there are people with disabilities who now are

23  eligible to vote that weren't at the time.  A disability is a

24  minority you can join at any time.  I broke my neck at 27, you

25  know, when I became a person with a disability.

3629
Bob Kafka – Direct

1    So in the two years, for good or for bad, people have had
2  strokes, car accidents, amputations because of it.  And so the
3  numbers of people with disabilities who were not identified as
4  a person with disability grew.
5    And so that information about Senate Bill 1 might inhibit
6  them from even starting the process to get registered, but
7  then with the other -- even if they did get registered, the
8  ability to go out and vote, especially if they needed an
9  attendant.
10 Q.  Mr. Kafka, in your understanding as a board member and
11 board president, and based on your experience of your
12 organization, will SB1 have an impact on RevUp's mission going
13 forward in the 2024 national election year?
14 A.  Yes.  Again, the 2023, there was mayoral elections,
15 there's a competitive vote down in the Harris County area.
16 But next year is going to be a presidential election.  And so
17 we expect quite a bit of increased interest.  And the remnants
18 of SB1 and the requirements in the various sections that we
19 are concerned about will linger.
20   And so it definitely will take more of our scarce
21 resources to start addressing those in a way that we really
22 want to focus, again, on the issues like accessible,
23 affordable integrated housing, wages and benefits, long
24 waiting lists, durable medical equipment.
25   There's a whole slew of issues that, you know, hit the

3630
Bob Kafka - Cross

1  diverse disability community.

2  Q.  Thank you.

3      MR. McGREAL:  I'll pass the witness.

4      THE COURT:  Anything else on this side?

5      Any cross?

6      MR. CAPOZZI:  Yes, Your Honor.

7                   CROSS-EXAMINATION

8  BY MR. CAPOZZI:

9  Q.  Good afternoon, Mr. Kafka.  How are you today?

10  A.  Very good.

11  Q.  I want to talk about RevUp as an organization.

12      You have a board of directors, right?

13  A.  Yes, sir.

14  Q.  And the board elects new board members, right?

15  A.  Correct.

16  Q.  You don't have a membership list, right?

17  A.  Not as you would call membership list, right.

18  Q.  That's because, I think you testified, you can be a member

19  of RevUp if you're interested in issues affecting people with

20  disabilities, right?

21  A.  Generally, yes.  That's true.

22  Q.  And you said RevUp members don't pay dues, right?

23  A.  Correct.

24  Q.  And there's no formal application process to become a

25  member of RevUp, right?

3631
Bob Kafka – Cross

1   A.  No.  We have found, using the crowd sourcing mechanism for

2   a small nonprofit in a state like Texas is really a dynamic

3   way to get people involved without spending tons of money,

4   because, again, you know, membership lists, dues, and

5   everything like that actually takes a lot of administrative

6   staff.

7      We can spend our time outreaching and trying to get

8   information to the community and get involved.

9   Q.  And you haven't identified a specific member of RevUp who

10  was ultimately unable to vote in 2022, correct?

11  A.  I'm –– not specific names, though, from an overall macro

12  sense, just the phonecalls and emails and other communication,

13  we know that there were many RevUp members that were affected,

14  though I don't have a name to give you.

15  Q.  Let's talk a little bit more about what RevUp does.

16     RevUp was founded in 2015, right?

17  A.  Correct.

18  Q.  And RevUp regularly engages in voter education through its

19  social media, right?

20  A.  Correct.

21  Q.  You have engaged in voter education since RevUp's

22  founding, right?

23  A.  From the very beginning.

24  Q.  So when the legislature passes a law that affects how

25  members of the community of people with disabilities vote, it

3632
Bob Kafka - Cross

1   is part of RevUp's mission to inform voters of those changes

2   to the election laws, right?

3   A.  The E in education is really focused on substantive issues

4   that affect the lives of people with disabilities.  Again, the

5   nuts and bolts of policy, usually we don't spend tons of time

6   on that.

7       SB1 required us to do it because -- again, because we're a

8   small, grassroots, statewide organization, the need to get out

9   information on substantive issues that affect their lives.  So

10  that's why, you know, we do not, except now we've had to

11  because of SB1.

12  Q.  So when -- let me try to clarify my question.

13      When the legislature makes important changes to the

14  election laws that affect people with disabilities, RevUp's

15  mission is to inform people of those changes, right?

16  A.  I would say it a little differently.  I wouldn't say that

17  was part of our mission.  I think we had to react to the

18  changes because we did want to get the information out.

19      But I would not describe it as our mission.  Our mission

20  is to educate on substantive issues.  Senate Bill 1, on the

21  other hand, required us to get that information out.  But I

22  would be very hesitant to describe it -- that as part of our

23  mission.

24  Q.  You believe that RevUp's voter education outreach

25  regarding SB1 has been effective, right?

3633
Bob Kafka – Cross

1  A.  We're hoping we get out as much information through our

2  network.  But, again, there's so many people, 3 to 5 million,

3  the Governor's Committee on People with Disabilities estimate.

4  So even with our statewide regional network, we're not

5  touching all 5 million people.

6  Q.  If a Court gets rid of SB1 and changes the rules, RevUp

7  would have to get information out to members of the community

8  of people with disabilities about those changes, right?

9  A.  I think we would actually try to have a celebratory thing

10 without any of the specifics.  We'd probably offer champagne

11 for the regional reps to celebrate that SB1 was gone, though

12 we wouldn't get into the specifics of that.  We would just

13 say -- I don't want to be facetious, but "Ding dong, the witch

14 is dead," type of thing.

15 Q.  So after the champagne and the celebration, would RevUp

16 get information out about the new Texas election rules to the

17 community of people with disabilities?

18 A.  We would have to get out the information that SB1 was

19 gone.  And then depending on what was out, we would do that.

20     But, again, I want to just clarify that our mission is the

21 education on substantive issues.

22 Q.  You testified that RevUp changed the focus of some of its

23 social media to focus on SB1, right?

24 A.  Correct.

25 Q.  And RevUp devoted some of its podcasts to discussing SB1,

Bob Kafka - Cross

1  right?

2  A.  Correct.

3  Q.  But you haven't identified a specific event or activity

4  that RevUp had to forgo entirely because of that changed

5  focus, right?

6  A.  Well, there's only so much -- so many times that we could

7  do a podcast.  So, again, considering that podcast we're

8  doing -- at that point, we were doing them monthly, we had to

9  in a way take away from those substantive issues that I

10  mentioned that affect people's lives, to do information on

11  SB1.

12  Q.  Does RevUp have a budget for its podcasts?

13  A.  It's a minimal, but yes, we do.

14  Q.  Do you know what that budget was in 2022?

15  A.  I'd have to calculate exactly.  It -- basically we have a

16  technical assistant.  We use ASLs for accessibility, and --

17  but since we don't pay any staff, I'd have to get back to you

18  on the exact budget.

19  Q.  And you don't know what the exact budget on -- for podcast

20  was in 2020 either, right?

21  A.  Right.  But the resources I'm talking about, sir, is not

22  money so much as time.  And, again, for a small, grassroots

23  organization, the time that we had was much more than the

24  money that we spent on the podcasts, which, you know, we had

25  to spend similar on Senate Bill 1.

Bob Kafka – Cross

1    But it was the lack of the ability to do it on the

2  substantive issues, which is so critical, because our mission

3  is really to get out the issues because we're, you know, very

4  nonpartisan, and we want people to vote based on the issues

5  the candidates support or don't.  We've don't want them to

6  vote by party.

7  Q.  Let's talk a little bit about some of the provisions of

8  SB1 that you talked about on direct.  You're familiar with

9  Section 6.04, which revises the voter assistance oath, right?

10  A.  Am I aware of 6.04?  Yes.

11  Q.  And RevUp's specific issues with Section 6.04 are the

12  criminalization under the penalty of perjury and the specific

13  enumeration of what assistants can do, right?

14  A.  Right.

15  Q.  Texas had a voter assistance oath before SB1, right?

16  A.  Yes.

17  Q.  Do you know whether the prior voter assistance oath was

18  also under penalty of perjury?

19  A.  I believe it was a Class A misdemeanor.  I don't believe

20  it said "perjury."

21  Q.  You're not aware of any threatened prosecutions under

22  SB1's voter assistance provisions, right?

23  A.  No.  But I can tell you, just from the phonecalls and

24  discussions with people with disabilities that have attendant,

25  though I don't have a specific name, but that concern about,

3636
Bob Kafka – Cross

1  you know, criminalization -- and again, because whether it was
2  Class A, perjury, people basically are asking, "Why, by just
3  me going to vote and needing help, should my attendant even be
4  worried about being criminally charged for what they were
5  thinking was assisting somebody to do their civic duty?"
6  Q.  Well, let's talk about the relationship between people
7  with disabilities and their caregivers for a minute.
8      When it comes to voting, you would agree that caregivers
9  should respect the wishes of the people they assist, right?
10 A.  Yeah.  We call them "community attendants," not
11 caregivers.  But whatever definition, yeah, we are very much,
12 what we would call, consumer-directed, person-centered.
13 Q.  And you -- and RevUp has seen some cases of abuse by
14 caretakers or community attendants, right?
15 A.  When you say "abuse" --
16 Q.  Cases where community attendants or caregivers abused the
17 people they were charged with caring for.  You've seen
18 examples of that, right?
19 A.  Well, in terms of the voting and RevUp, no, sir, I have
20 not gotten phonecalls about community attendants --
21 Q.  Well, let me -- let me clarify my question.  Let's just
22 take a step back.
23     I'm not asking you specifically about voting, just as a
24 general matter.  RevUp has seen examples of situations where
25 community attendants and caregivers have abused the people

Bob Kafka – Cross

1  they're supposed to care for, right?

2  A.  Well, my, you know, expertise in terms of RevUp is

3  basically strictly on voting.  You know, the provision of

4  attendant services is extremely complex.  And the relationship

5  between an attendant and the person they serve is -- varies

6  greatly.

7      And so, you know, I can't say, as RevUp, that we've

8  received any complaints.

9          MR. CAPOZZI:  Brian, can you pull up Page 158, lines

10  9 through 12.

11  BY MR. CAPOZZI:

12  Q.  You were deposed in this case, right, Mr. Kafka?

13  A.  Yes.

14  Q.  I'm going to read from a section of the deposition.

15      "Question:  Has RevUp ever seen abuse by caretakers?

16      "Answer:  To be honest, yes, there has been in the past.

17  But, again, it hasn't been rampant.  But, you know, to be

18  truthful, I would have to say yes, there has been."

19      Did I read that correctly?

20  A.  If that's from the disposition [sic], I guess you can be

21  trusted that it's truthful.

22  Q.  And do you stand by your prior testimony that there have

23  been some instances of abuse by community attendants?

24  A.  I stand by that, but I also stand by the answer I just

25  gave you, as my role in RevUp.

Bob Kafka – Redirect

1  Q.  And you agree that Texas has a legitimate interest in

2  preventing and protecting against abuse by community

3  attendants and caretakers, right?

4  A.  Yes.

5          MR. CAPOZZI:  Thank you, Mr. Kafka.

6          That's all.

7          THE WITNESS:  But not in voting.  It's not in -- it's

8  not in Section 6.04 about abuse by voting.

9          MR. CAPOZZI:  Thank you, Mr. Kafka.

10          MR. McGREAL:  Your Honor, just a few followups.

11                    REDIRECT EXAMINATION

12  BY MR. McGREAL:

13  Q.  Mr. Kafka, as I mentioned on direct, the R in RevUp stands

14  for register?

15  A.  Correct.

16  Q.  And the E stands for education?

17  A.  Correct.

18  Q.  Is part of RevUp's mission to educate or help individuals

19  on how to register?

20  A.  Yes.

21  Q.  So it's not all about how to vote?

22          MR. SZUMANSKI:  Objection, Your Honor; leading.

23          THE COURT:  Sustained.

24          THE WITNESS:  Again --

25

3639

Bob Kafka – Redirect

1  BY MR. McGREAL:

2  Q.  And you mentioned the there are state coordinators,

3  Mr. Kafka?

4  A.  There are regional reps, and I'm the state coordinator.

5  Q.  And what level of engagement are those state coordinators?

6  A.  The regional reps, basically, we convene monthly

7  phonecalls to get information from them, from the local

8  communities throughout the state, and we give them information

9  that we hope that they will then disburse through their

10  network as we define our RevUp membership.

11  Q.  For an -- for an organization of your size, in your

12  opinion as the board president, is a podcast a major event for

13  you?

14  A.  Oh, yeah.  It's really a big deal.  You know, today's

15  world, organizations are changing.  And social media is

16  essential to get the word out.  And it's more essential, I

17  think, here in Texas because of its size.  So a podcast

18  getting out information on substantive issues I feel is a very

19  important part of RevUp.

20        MR. McGREAL:  Thank you, Mr. Kafka.

21        No further questions.

22        THE COURT:  Anything else?

23        MR. CAPOZZI:  Just a couple more.

24

25

3640

Bob Kafka – Recross

| | |
|---|---|
| 1 | RECROSS-EXAMINATION |
| 2 | BY MR. CAPOZZI: |
| 3 | Q. Hello, Mr. Kafka. You testified that after SB1, RevUp |
| 4 | will be engaging in efforts to register voters, right? |
| 5 | A. Correct. |
| 6 | Q. And RevUp has been engaging in voter registration efforts |
| 7 | since its founding, right? |
| 8 | A. Yes. |
| 9 | MR. CAPOZZI: Thank you, Mr. Kafka. |
| 10 | THE COURT: Anything else from anyone? No. |
| 11 | Thank you, sir. |
| 12 | THE WITNESS: Thank you. |
| 13 | THE COURT: And your next witness. |
| 14 | MS. TULIN: Your Honor, the LUPE plaintiffs call Josh |
| 15 | Houston. If we could have a moment to swap counsel tables and |
| 16 | witnesses, that would be wonderful. |
| 17 | (Witness enters courtroom) |
| 18 | (The oath was administered) |
| 19 | MR. BERRY: Good afternoon. Your Honor, my name is |
| 20 | Patrick Berry. I'm an attorney at the Brennan Center, one of |
| 21 | the counsel for the LUPE plaintiffs. |
| 22 | Mr. Houston is here to testify as a plaintiff |
| 23 | representative for Texas Impact. Mr. Houston's testimony is |
| 24 | relevant to all of Texas Impact's claims, including those |
| 25 | challenging Section 4.09, 5.07, and 5.13 of SB1 under Section |

3641
Joshua Houston – Direct

1  2 of the Voting Rights Act, and as well as the United States

2  Constitution.

3          JOSHUA HOUSTON, PLAINTIFFS' WITNESS, SWORN

4                    DIRECT EXAMINATION

5  BY MR. BERRY:

6  Q.  Good afternoon.  Can you please state your full name for

7  the record.

8  A.  Joshua Steven Houston.

9  Q.  And what do you do for a living, Mr. Houston?

10 A.  I'm an attorney and a registered lobbyist.

11 Q.  And where do you work?

12 A.  At Texas Impact.

13 Q.  And what is your role at Texas Impact?  What is your

14 title?

15 A.  I'm the advocacy director.

16 Q.  And what are your responsibilities as the advocacy

17 director at Texas Impact?

18 A.  Well, it's a small nonprofit, so you end up doing all the

19 things.  But the primary responsibilities are for policy and

20 legal matters.

21 Q.  And how long have you held this position?

22 A.  For 13 years.

23 Q.  Thank you.

24      So let's talk a bit about Texas Impact.  Mr. Houston, what

25 is Texas Impact?

3642
Joshua Houston – Direct

1  A.   It is the membership organization for the state's mainline

2  Protestant, Jewish and Muslim denominations in the state.

3  Q.   And when was Texas Impact founded?

4  A.   In 1973 out of the Texas Conference of Churches.

5  Q.   And what is the mission of Texas Impact?

6  A.   To promote, advance public policy, consistent with the

7  social principles of our member denominations.

8  Q.   And can you please tell the Court what the central

9  activities of Texas Impact are?

10  A.   Well, I mean, we promote public policy, so we educate our

11  members, we equip our members, we mobilize them, and then we

12  lobby as well.

13  Q.   And what are the policy areas that Texas Impact focuses

14  on?

15  A.   It is a very large legislative agenda.  It's kind of like,

16  what does the faith community not care about?

17      But it ranges from obviously voting rights, but also

18  public education, healthcare, oh, religious freedom,

19  migration, climate, energy policy, payday lending, foster

20  care, kind of anywhere that there is a nexus between the

21  state's public policy and somewhere that one of our member

22  faith communities has a mission or ministry.

23  Q.   Thank you.

24      And does Texas Impact have a partisan affiliation?

25  A.   No.

3643
Joshua Houston – Direct

1   Q.  And does Texas Impact have members?

2   A.  Yes.

3   Q.  And what is the membership structure of Texas Impact?

4   A.  So we have denominational members, or denominations and

5   operations at an institutional level.  And then we have -- and

6   local congregations, because not all faith communities have

7   the same corporate structure.  And then we have individual

8   members as well.

9   Q.  Thank you.

10      So let's first talk about your institutional and

11  congregational members.  Where in Texas are your institutional

12  and congregational members located?

13  A.  All over.  We're a statewide organization.

14  Q.  And approximately how many institutional and

15  congregational members do you have?

16  A.  At an institutional level, a couple dozen, at least in the

17  ballpark, 25ish.  And then at a congregational level,

18  somewhere around 1600 local congregations.

19  Q.  And what are the denominations of your institutional and

20  congregational members?

21  A.  Oh, I'm going to leave some out.  But all the five

22  annual -- the five annual conferences of the United Methodist

23  Church, the Presbyterian Church USA, the Evangelical Lutheran

24  Church in America, the Episcopal Church, the Disciples of

25  Christ, the Quakers, the Cooperative Baptist Fellowship, the

3644
Joshua Houston – Direct

1  UCC or United Church of Christ, Unitarian Universalist.

2      And then at an organizational level, we have Muslim and

3  Jewish organizations.  They don't have a denomination per se.

4  Q.  And Mr. --

5          THE COURT:  One second.  Just full disclosure, I'm a

6  member of a congregation that belongs to the ELCA.  I'm not

7  aware that my local congregation is involved in Texas Impact.

8  I have had no prior dealings or -- but just want to throw that

9  out there.

10          MR. KERCHER:  At long last, Your Honor, the break

11  that State defendants have been looking for in this trial.

12          We have no objection to the Court continuing to

13  preside.

14          THE COURT:  Thank you.

15          MR. BERRY:  Thank you, Your Honor.

16  BY MR. BERRY:

17  Q.  Do your institutional and congregational members pay dues?

18  A.  Yes.

19  Q.  And how much?

20  A.  At the institutional level, it varies wildly because we're

21  more interested in the relationship than the money, but it's

22  like $500, at a minimum, for institutional members.  I believe

23  it's a hundred dollars for congregational members, and then

24  for individuals it's $40.  And I think that's been true since

25  1973.

3645
Joshua Houston - Direct

1   Q.  Okay.  And so let's now talk about Texas Impact's

2   individual members.  Where in Texas do your individual members

3   reside?

4   A.  They live all over the state.

5   Q.  And can you please tell the Court approximately how many

6   individual members you have?

7   A.  Well, I mean, dues paying that are current is around --

8   probably hovers around 400 at any one time.  But really,

9   membership is in the -- well, there's a couple different ways

10  to look at it.

11      The membership in the database is about 22 -- 22,000

12  members that we have verified, you know, with an address --

13  name, address and with -- against the voter file, verified

14  that they're registered voters in Texas.

15      And then when you take the total membership of all the

16  denominations, you're looking at around 5 million Texans that

17  belong to a local congregation that is -- falls under the

18  institutional membership of Texas Impact.

19  Q.  Thank you.

20      And Mr. Houston, do you have individual members from

21  across the political spectrum?

22  A.  Yes.

23  Q.  And what is the demographic makeup of your individual

24  members?

25  A.  Oh, they make up all races.  If you're looking for a

3646
Joshua Houston - Direct

1  racial breakdown, you could cut demographics a couple

2  different ways.  So would you mind asking me a little more

3  specific?

4  Q.  So does the -- does your individual -- do your individual

5  members include black and Latino Texans?

6  A.  Yes.

7  Q.  And Mr. Houston, do you have members who vote by mail

8  either because of a disability or their age?

9  A.  Yes.

10  Q.  And do you have members who require assistance with voting

11  in person or by mail either because of a disability or their

12  age?

13  A.  Yes.

14  Q.  And do you have members who require assistance with voting

15  in person or by mail because of cultural or language barriers?

16  A.  Yes.

17  Q.  And do you have members who have assisted others with

18  voting, either in person or by mail?

19  A.  Yes.

20  Q.  And do you have members who have served as poll workers or

21  election judges?

22  A.  Yes.

23  Q.  Mr. Houston, does Texas Impact have paid staff?

24  A.  Yes.

25  Q.  And how many?

3647
Joshua Houston – Direct

1   A.  We have seven full-time employees, an additional two that
2   are part-time status.  We have three that we classify as
3   fellows, and at the moment one intern.
4   Q.  And are you one of the paid staff members?
5   A.  Yes.
6   Q.  And are all staff, including yourself, members of Texas
7   Impact?
8   A.  Yes.
9   Q.  Thank you.
10      So let's shift gears a bit.  Does Texas Impact do any
11  civic engagement work related to voting?
12  A.  Yes.
13  Q.  And can you please tell the Court more about the types of
14  voter engagement work that you do?
15  A.  Pretty much from start to finish, starting with the most
16  basic, which is registering to vote.  We have a lot of
17  congregations that do voter registration.  A lot of them go
18  the extra mile and help people check for their voter
19  registration.  We have people that help do applications to
20  vote by mail.
21      And we have -- kind of as the next step beyond that, we
22  have people that serve as VDRs.  We encourage them to be
23  trained as volunteer deputy registrars, VDRs.
24      We do a lot of educational efforts around the -- whatever
25  election it may be to help try to get out the vote to remind

3648
Joshua Houston – Direct

1  folks to participate.

2      We also try to help implement the election because we

3  think that's critical to be -- so we help both the nonprofit

4  community and the -- and government.  We help the counties try

5  to implement by recruiting poll workers.

6      And to the extent that some folks may not have time to

7  spend a full day being a poll worker, we then encourage them

8  to help the nonprofit community by serving as poll monitors,

9  standing outside the hundred-foot election area line and just

10 being the eyes and the ears of the Election Protection

11 Coalition.  We're a member of the Texas Election Protection

12 Coalition and have recruited for that.  And so they're the

13 eyes and the ears of the Election Protection lawyers out in

14 the field.

15 Q.  And when does Texas Impact conduct these activities?

16 A.  Year round.  But, I mean, obviously, the intensity of it

17 is around both the -- kind of three to six months prior to a

18 primary or a general election.

19 Q.  And where in Texas do you conduct these activities?

20 A.  Statewide.

21 Q.  And are you personally involved in any of this voter

22 engagement work?

23 A.  Yes.

24 Q.  And does anyone else, like paid staff or volunteers,

25 conduct these activities on Texas Impact's behalf?

3649
Joshua Houston - Direct

1  A.  Yeah.  It's a small nonprofit.  So whenever we do things,

2  it often involves other staff.

3  Q.  And do your staff or volunteers get reimbursed expenses or

4  get fed when they do this voter engagement work for Texas

5  Impact?

6  A.  Yes.

7  Q.  And Mr. Houston, why does Texas Impact do this

8  voting-related work?

9  A.  Oh, it's pretty critical to our mission, whenever we try

10 to encourage people to vote.  So our mission is to advance

11 public policy consistent with the, you know, social principles

12 of all the denominations.

13     But if they aren't voting, then they are not really

14 participating fully or in an influential way.  I mean, I think

15 one of the things we often kind of bluntly tell our members to

16 stress the importance of voting is that "If you do not vote,

17 then you matter to God, but you don't matter to the Texas

18 Legislature."

19 Q.  Thank you.

20     And so I'd like to focus now on Senate Bill 1 or what

21 we've been calling "SB1."  Are you familiar with SB1 passed

22 during the second special session of 2021?

23 A.  Yes.

24 Q.  And did you read it at the time it was passed?

25 A.  Yes.

Joshua Houston – Direct

1   Q.  And how did you become familiar with SB1?

2   A.  We were watching all things voting rights, beginning

3   with -- so in the Texas Legislature, you can begin filing

4   bills the first Monday after the election.  And so in

5   November, before the 87th even started, we started tracking

6   voting rights bills.

7   Q.  Okay.  And what was Texas Impact's position on SB1?

8   A.  We opposed it.

9   Q.  And why did Texas Impact oppose SB1?

10  A.  We opposed it because we felt it would adversely affect

11  our membership.

12  Q.  And can you explain a bit more about why you were

13  concerned that SB1 would have that impact?

14  A.  Yeah.  Specifically, with the final version that passed,

15  our big concerns were with the effect it would have on

16  people's willingness to serve as poll watchers -- poll

17  workers.  And we were also concerned about the vote-by-mail

18  pieces because we have a lot of members that are disabled or

19  65 and older that have to rely on voting by mail.

20  Q.  And did Texas Impact's experience in the 2020 election

21  during the pandemic impact your response to SB1?

22  A.  Yes.  It informed it.

23  Q.  And can you just explain why your work in 2020 informed

24  your opposition?

25  A.  Yeah, of course.  So if you kind of back up to -- a lot's

3651
Joshua Houston – Direct

1  happened since then, but in March of 2020 we had a primary

2  election.  And then roughly about a weekend or so afterward is

3  when the kind of quarantine lockdowns began.  And then, of

4  course, there was going to be a primary runoff in May, but it

5  wisely was postponed until July of that year.

6      So as we were, you know, thinking about how in the world

7  are the counties going to be able to carry out an election in

8  the middle of a global pandemic, we really looked at two big

9  things.

10     Our big concern, and we knew -- I think it was Bexar

11  County that said in the press that the average age of a poll

12  worker is around 72 years old.  And, you know, we don't --

13  exact number doesn't matter.  It comports with our experience.

14  And one of the big things in the news was that COVID-19 was

15  especially dangerous for -- the older you were.

16     And so we had concerns about people's willingness to serve

17  as poll workers.  And so we began thinking of ways to really

18  increase our efforts to recruit poll workers, especially

19  younger ones, to try to serve.  And so we did that from our

20  membership.

21     And then when we looked at ways to alleviate the lines at

22  the polling locations, we said, "Okay.  Well, we have a lot of

23  members who were 65 or older that could vote by mail, are

24  eligible to, but aren't."  And so we began to look for ways to

25  increase our congregants voting by mail.

3652
Joshua Houston - Direct

1  Q.  And did you make the legislature aware about your concerns
2  with SB1?
3  A.  Yes.
4  Q.  And how?
5  A.  Well, the usual lobby efforts.  So as an individual, we
6  would have office visits, make one-pagers, distribute those
7  things, and, you know, testify before committee and, you know,
8  work the -- work the committee, and then the larger membership
9  of the house and senate.
10      And then we also did kind of a full-blown mobilization
11  because, frankly, it doesn't matter what I personally think.
12  It's our membership that is interesting to elected officials.
13  And so we prefer to have our membership mobilized and visiting
14  with their legislators to raise their concerns as well.
15      And so we did a number of events to try to mobilize our
16  membership, educational events.  And we did some, you know, a
17  number of lobby days, if I recall.  And then I think we also
18  did some direct social media around it.
19  Q.  And Mr. Houston, did Texas Impact raise these concerns
20  with members of both political parties?
21  A.  Yeah.  Yes.
22  Q.  Thank you.
23      So now I want to talk about SB1 after it was passed by the
24  legislature and took effect.  Let's start with Section 4.09,
25  which makes it an offense for poll workers to take any action

Joshua Houston – Direct

 1  that would make a poll watcher's observation not reasonably

 2  effective.

 3      Are you familiar with this provision?

 4  A.  I am.

 5  Q.  And has this provision prompted any concerns among your

 6  members?

 7  A.  It has.  We have heard feedback that they really don't

 8  know what their parameters are.  So on the one hand, they have

 9  the powers of a district court judge.  And the statute gives

10  them a duty to maintain order in the polling location.

11      However, the criminal penalty that hangs over their head,

12  they're not sure what "reasonably effective" is.  I mean,

13  there's a number of ambiguities about it that cause them

14  concern about when they can engage and when they can't engage

15  and how do they go about maintaining order without violating

16  the law.

17  Q.  And how do you know that your members have these concerns?

18  A.  They've told us.  One in particular I believe was here a

19  couple weeks ago, our former board president, Rick Ertel.

20          MR. NICHOLS:  Your Honor, I'll just object to

21  hearsay.

22          MR. BERRY:  So, Your Honor, Mr. Houston is testifying

23  about his personal knowledge of what the members of Texas

24  Impact have shared with him.

25          MR. NICHOLS:  And if it's just being offered for what

3654
Joshua Houston - Direct

1  was said, without being offered for the truth of the matter

2  asserted, then obviously it's not hearsay by definition, if

3  that -- if that's the response.

4          THE COURT:  I'll let it in.  That's overruled.

5  BY MR. BERRY:

6  Q.  So Mr. Houston, you mentioned Rick Ertel.  And Rick Ertel

7  is a member of Texas Impact?

8  A.  Yes.

9  Q.  And what was your understanding of Mr. Ertel's concern

10  with the Section 4.09 of SB1?

11  A.  He was concerned about when -- if he was to serve as a

12  judge, what he said is he was concerned about when he could

13  engage and when he couldn't engage, and if a poll watcher were

14  to get aggressive.

15          MR. KERCHER:  Objection, Your Honor.  This is

16  cumulative, Mr. Ertel's previous testimony.

17          THE COURT:  That's overruled.

18          THE WITNESS:  His big concern was about criminal

19  liability, if he intervened to maintain order and, you know,

20  he got prosecuted for it.

21  BY MR. BERRY:

22  Q.  And Mr. Houston, based off of your experience and

23  interactions with your members, do you expect their concerns

24  about poll watchers will go away as they adjust to SB1?

25  A.  No.  In fact, the more we -- the more -- we did a number

Chris Poage, RMR, CRR
Official Court Reporter

3655
Joshua Houston – Direct

1  of educational events after SB1 went into effect.  And in our

2  experience, the more we explained it, the more we educated our

3  membership, the more nervous they got.

4          MR. NICHOLS:  Your Honor, again, this is just

5  speculating as to what somebody else's understanding --

6          THE COURT:  That's noted and overruled.

7  BY MR. BERRY:

8  Q.  And Mr. Houston, did Texas Impact make any changes to its

9  practices for recruiting poll watchers because of Section

10  4.09?

11  A.  We increased our efforts to make sure that the counties

12  had enough workers.

13  Q.  And how exactly did you increase your efforts?

14  A.  Well, we began to -- well, we did a number of social media

15  ad buys, I remember that.  We certainly mentioned it at every

16  event that we did, that they should serve in that way.

17      And we had a partnership with an operation called "Power

18  the Polls," so that we could attempt to track our

19  effectiveness, because once you say, "You should do this," you

20  don't know if they actually did because they go to the County,

21  and the County doesn't tell you.

22          We wanted some way to try to quantify people that

23  would go to Power the Polls and at least they got to that step

24  before ending up at the County.

25  Q.  And Mr. Houston, have you ever run social media ads to

Joshua Houston - Direct

1  recruit poll workers before SB1?

2  A.  Not to this size and scope.  I have a vague memory of us

3  doing it in 2020 during the pandemic for the reason that there

4  was a pandemic and we figured shortages of poll workers, but

5  never before that.

6  Q.  Okay.  Thank you.

7       So next, I want to ask you about Sections 5.07 and 5.13 of

8  SB1 concerning ID numbers on mail ballot applications and

9  carrier envelopes.

10      Are you familiar with those provisions?

11 A.  I am.

12 Q.  And have these provisions prompted any concerns among your

13 members?

14 A.  They have.

15 Q.  And what is your understanding of what those concerns are?

16 A.  The big concern is that they do not remember what number

17 they registered with.  So that's the major one, because they

18 don't really know how to even find out what number they used.

19      Another concern is that they will just forget it, because

20 on the -- it's on the inside of the flap, and people just

21 aren't used to looking at the inside of envelopes.

22 Q.  And Mr. Houston, are you aware of any specific members of

23 Texas Impact who had difficulty voting by mail because of

24 SB1's new ID requirements for mail ballots?

25 A.  Yes.

3657
Joshua Houston - Direct

1  Q.  And what was your understanding of what happened with

2  those specific members?

3  A.  Yes.  Sadia Tirmizi is a member of Texas Impact.  She

4  reached out to me because she was trying to help her parents.

5  Her dad was a cancer patient and immunocompromised, and they

6  were nervous about going to the polls.  And they bumped

7  into -- I don't know the -- remember the exact details, but

8  there was a back and forth where they were having trouble with

9  the application.  She was helping her mom and -- mom and dad.

10  Q.  And Mr. Houston, based off of the -- your interaction with

11  your members, do you expect their concerns about voting by

12  mail will go away as they adjust to SB1?

13  A.  No.  There's kind of a two-prong problem.  One is, as

14  folks get older, they may vote -- there's always going to be

15  somebody voting by mail for the first time in an election.

16  And, you know, the first time you do anything, there's a

17  learning curve.

18      The second big problem is that they don't remember what

19  number that they used to register with.  And they're not real

20  sure how to find out.

21      And the way the law on the registration side is worded is,

22  is that you're supposed to use your state ID, and only if you

23  don't have one, then you use your Social Security number.  But

24  they really have no idea what they did, in some instances

25  decades, before they decided they wanted to vote by mail for

3658
Joshua Houston – Direct

1  the first time.

2  Q.  And Mr. Houston, has Texas Impact changed any of its work

3  related to mail voting because of these new ID requirements

4  for mail ballots?

5  A.  Yes.

6  Q.  And how so?

7  A.  So I mentioned previously that in the pandemic of 2020, we

8  were trying to recruit folks that were 65 and older to vote by

9  mail.  The way we did that was through a program we call "Vote

10 by Mail Captains," and it was to find somebody at a local

11 congregation that would kind of take on the project of passing

12 out applications to vote -- to vote by mail to everybody that

13 was 65-plus in the congregation.

14     We had about roughly 25 people from 25 congregations

15 participate in that, especially -- it was around the -- we did

16 it in the general, but we started it during the -- the

17 primary, the July primary before, you know, it became real

18 polarized.

19     So fast-forward, SB1 passes and goes into effect.  We took

20 a look at our previous work and said, "Can we still recommend

21 that people should vote by mail?"  And the answer was, "No."

22 So we quit the program and quit encouraging people to vote by

23 mail.

24     Nevertheless, we know that there are people who are --

25 because of their age or because of their physical abilities,

3659
Joshua Houston – Direct

1  are going to have to vote by mail.  And so we continued to do
2  education around it, but we did not —— we stopped the
3  recruitment effort.
4  Q.  And just one clarifying question.  So the 25 people who
5  participated in this program, those individuals participated
6  as captains?
7  A.  Correct.
8  Q.  And Mr. Houston, would Texas Impact have continued its
9  Vote By Mail Captains program but for SB1?
10  A.  Yeah, probably.
11  Q.  And so let's talk about the impact that SB1 has had on
12  Texas Impact.  So Mr. Houston, earlier you testified that
13  Texas Impact ran social media paid ads to recruit poll
14  workers.  You also testified that you held a series of events
15  to educate your members about SB1's mail ID requirements.
16      Did those efforts require staff and volunteer time?
17  A.  Yes.
18  Q.  And were those the same staff and volunteers who work on
19  Texas Impact's other activities?
20  A.  Yes.
21  Q.  Mr. Houston, did Texas Impact make any other expenditures
22  to try to counteract SB1?
23  A.  Yeah.  We had a number of educational events.
24      And additionally, we also started to do —— we started a
25  contract with a group called "Ballot Ready."  And what it is,

3660
Joshua Houston - Direct

1  is it's an online app that attempts to be a one-stop shop of

2  information for people to make it easier.

3      We knew that -- we had done a big publication on how to

4  vote by mail during the pandemic of 2020, but it had become

5  obsolete.  And rather than rewriting it and laying it back out

6  and researching it and publishing it, we were hoping that

7  Ballot Ready would kind of help short-circuit the need for

8  that in a more economical way, or more efficient way.

9  Q.  And how much did Ballot Ready cost?

10 A.  I believe it was between 25- and $30,000 per year, with a

11 multiyear plan.

12 Q.  And Mr. Houston, you mentioned that Texas Impact had to

13 completely revamp that vote-by-mail publication that you

14 mentioned.

15     Did you have to make any other changes to your educational

16 materials or your website?

17 A.  Oh, yes.  The -- we had to make sure -- we had to scrub

18 the website for old information, because one of the issues was

19 the old -- if we had old applications to vote by mail or old

20 applications to register to vote, we needed to make sure that

21 we had the new and updated ones so that people didn't mess up.

22 Q.  Okay.  So a few more questions.

23     So earlier, Mr. Houston, you testified that Texas Impact

24 canceled its Vote By Mail Captain program because of SB1.  Are

25 there any other specific projects or issues that were affected

Joshua Houston – Direct

1  by SB1?

2  A.  Yeah, kind of everything else on the legislative agenda.

3  I mean, we're not a large nonprofit.  And we have a very large

4  legislative agenda.  So whenever you're working on one thing,

5  you're not working on something else.

6      So time spent on helping people vote is time not spent on

7  public education or healthcare or the electric grid or any of

8  the other items on our legislative agenda that our board set

9  for us.

10  Q.  And Mr. Houston, does the reluctance of some of your

11  membership to serve as poll workers affect your ability to

12  accomplish your mission?

13  A.  Yes, it does.  Our major concern with a lack of poll

14  workers is that when you don't have enough poll workers,

15  frankly, locations -- polling locations can't open.  They need

16  workers to operate.

17      And if polling locations don't open, then there are people

18  who show up and ultimately resulting in disenfranchised people

19  with inflexible schedules due to work or childcare or just

20  with transportation issues.  And so we have -- and whenever

21  polling locations don't open, we worry deeply about that

22  disenfranchisement.

23  Q.  And does the reluctance of your members to vote by mail

24  affect Texas Impact's ability to accomplish its mission?

25  A.  It does, because there are folks who just simply have no

Joshua Houston – Cross

1  other option but to vote by mail.  And if they have an

2  increased risk of their ballot being rejected, it affects

3  their franchise.  And if their franchise is affected, then our

4  influence is affected as an organization, and then our

5  mission, of course.

6          MR. BERRY:  Thank you, Mr. Houston.

7          I pass the witness.

8          THE COURT:  Anything else from this side?

9          Any cross?

10                    CROSS-EXAMINATION

11  BY MR. KERCHER:

12  Q.  Good afternoon, Mr. Houston.  My name is Ryan Kercher.  I

13  work for the Attorney General's office.  I'm battling through

14  some seasonal allergies, so I hope you won't begrudge me a

15  cough drop.  I know that --

16  A.  Myself too.

17  Q.  -- the rest of the group won't begrudge it; they've heard

18  me cough today once already.

19      You talked on direct about Texas Impact's membership, and

20  I want to start there with you, if that's okay.

21      You said that there were some 1600 individual

22  congregations who are members of -- or that are members of

23  Texas Impact.  Did I hear that correctly?

24  A.  Yes, you did.

25  Q.  And those individual congregations, they pay regular dues

3663
Joshua Houston – Cross

1  in order to be members; is that right?

2  A.  Not in all cases.  Sometimes they're -- there are members

3  of the -- sometimes the local congregation belongs to a

4  denomination, and that denomination is a member, if that makes

5  sense.  And so the corporate structure of every local

6  congregation under it would be included.

7  Q.  So's that helpful, because I think you also said you have

8  something like two dozen institutional members; is that right?

9  A.  Correct.

10  Q.  And those institutional members may include those

11  congregations which are, themselves, groups of individual

12  congregations, right?

13  A.  Correct.

14  Q.  And so either as an individual congregation or as a member

15  of a larger institutional group, these members are paying dues

16  to Texas Impact for membership; is that right?

17  A.  Yes.

18  Q.  And then you said there are something like 400 current

19  dues-paying individual members of Texas Impact; is that right?

20  A.  Yes.

21  Q.  Can you identify any individual dues-paying member to

22  Texas Impact who stopped paying dues as a result of SB1?

23  A.  No.

24  Q.  Can you identify any institutional member of Texas Impact

25  who stopped paying dues to Texas Impact as a result of SB1?

3664
Joshua Houston – Cross

1  A.  No.

2  Q.  And you can probably guess what my last question is.

3  Well, I'll go ahead and drill all the way down.

4      Can you identify any individual congregation that had

5  previously paid its own dues to Texas Impact that stopped

6  paying those dues as a result of SB1?

7  A.  No.

8  Q.  I want to turn your attention now to Section 4.09 and some

9  of the concerns that you talked about to the Court regarding

10 that provision.

11     You reference Mr. Ertel, who we heard from earlier in this

12 trial.  You know, though, that Mr. Ertel was not ever

13 prosecuted for the work that he did as an election worker,

14 right?

15 A.  Not to my knowledge.

16 Q.  And you gave us no examples of any election workers who

17 have been prosecuted under SB1, true?

18 A.  I'm not aware of any.

19 Q.  And you're not aware of any members of Texas Impact who

20 had been threatened with prosecution under SB1 for what they

21 believe to be innocent poll—working behavior, right?

22 A.  Not to my knowledge.

23 Q.  So of all of these concerns that you talked about, which

24 I'm sure are sincere concerns by folks, but of all of the

25 concerns that you talked about, about how SB1 would be

Joshua Houston – Cross

1  enforced and whether it would be enforced against innocent

2  poll workers who just wanted to do their job, you cannot

3  provide the Court with any examples of that actually

4  happening; is that fair?

5  A.  It is true.

6  Q.  Let's talk a little bit about the ID requirements that you

7  discussed under 5.07 and 5.13.

8      You talked a little bit about folks being concerned that

9  they will write the numbers down incorrectly, right?

10 A.  Yes.

11 Q.  And you talked about folks being concerned that they

12 cannot remember what number they used when they originally

13 registered to vote, right?

14 A.  Correct.

15 Q.  And you said that members of Texas Impact have expressed

16 concern that they don't know where to get that information,

17 right?

18 A.  Correct.

19 Q.  When members have expressed that concern to Texas Impact,

20 does Texas Impact direct them to contact county or state

21 elections officials to get that information?

22 A.  We have.

23 Q.  Are you aware of anybody who was unable to get that

24 information after contacting county and state officials

25 seeking that information?

Chris Poage, RMR, CRR
Official Court Reporter

3666

Joshua Houston – Cross

1   A.  No.

2   Q.  I understand from your direct testimony that in addition

3   to being a fellow attorney, you are also a registered

4   lobbyist, right?

5   A.  True.

6   Q.  And I understand that you do some lobbying work on behalf

7   of Texas Impact.  That's part of your job description; is that

8   true?

9   A.  Correct.  I'm in-house.  It's not a contract.

10  Q.  I appreciate that clarification.

11      And I also understood you to say that by the nature of the

12  organization, Texas Impact has a pretty broad lobbying

13  portfolio, a number of issues that it's interested in, true?

14  A.  True.

15  Q.  But that includes voting rights, of course?

16  A.  Yes.

17  Q.  And you are familiar with SB1.  You know it is a great big

18  bill, right?

19  A.  It is.

20  Q.  Lots and lots of changes to Texas voting laws under that

21  bill, fair?

22  A.  Fair.

23  Q.  Isn't it right that even if Texas Impact agreed with every

24  single one of the provisions that passed in SB1, that a bill

25  of that size affecting voting rights would require a large

3667
Joshua Houston – Cross

1  amount of education and educational materials and educational

2  resources in order for Texas Impact to fulfill its mission to

3  help its membership understand and better vote?

4  A.  So we certainly do legislative updates after every

5  session.  That is routine.  We've never been through one on

6  voting rights that is this size and scope or that produced

7  this level of anxiety from our members about exercising their

8  most basic right.

9  Q.  And is it right to say that when we talked about earlier

10 when you were directing members to go to talk to county

11 elections officials and state elections officials about some

12 of the things that they were nervous about, that was a way

13 that Texas Impact was able to alleviate some of that voter

14 concern?

15 A.  Yes.

16         MR. KERCHER:  Thank you for your time today,

17 Mr. Houston.

18         Pass the witness, Your Honor.

19         THE COURT:  Anything else?

20         MR. NICHOLS:  Very, very small.

21                    CROSS-EXAMINATION

22 BY MR. NICHOLS:

23 Q.  Just one other aspect of 4.09 that you talked about,

24 Mr. Houston.  You talked about a concern that something in SB1

25 would prevent the localities from getting enough poll workers.

3668

Joshua Houston – Cross

1    Did I hear that correctly?

2 A.  Yes.

3 Q.  So are you aware of any situation where any county has

4 been unable to staff election locations with poll workers?

5 A.  We have heard Dallas County had some issues.  I cannot

6 remember the exact election.

7 Q.  Okay.  So other than what you may have heard about Dallas

8 County, have you tracked or are aware of any situation where

9 localities have been unable to staff their polling locations

10 with people who, despite the sometimes superheated political

11 environment that we all live in, are willing to step up and do

12 their public service as poll workers?

13 A.  Dallas County is the only one that comes to mind.

14      MR. NICHOLS:  Okay.  Thank you, Judge.

15      THE COURT:  Anything else?

16      MR. BERRY:  No further questions, Your Honor.

17      THE COURT:  Thank you, sir.  You're excused.

18      THE WITNESS:  Thank you.

19      THE COURT:  And your next witness?

20      MS. PERALES:  Good afternoon, Your Honor.  Nina

21 Perales for the LUPE plaintiffs.  LUPE plaintiffs call

22 Ms. Tania Chavez.

23    (Witness enters courtroom)

24    (At the bench off the record)

25      THE COURT:  Yeah.  You were previously sworn?

Tania Chavez – Direct

```
1              THE WITNESS:  Uh-huh.

2              THE COURT:  You remain under oath.

3              THE WITNESS:  Thank you.

4              MS. PERALES:  Thank you, Your Honor.

5         Ms. Chavez's testimony will relate to organizational

6    standing.

7              TANIA CHAVEZ, PLAINTIFFS' WITNESS, SWORN

8                     DIRECT EXAMINATION

9    BY MS. PERALES:

10   Q.  Good afternoon, Ms. Chavez.

11   A.  Good afternoon.

12   Q.  Can you restate your name for the record, please.

13   A.  Tania A. Chavez Camacho.

14   Q.  Thank you.

15        Ms. Chavez, you're here to continue your testimony on the

16   one-month anniversary of the start of this trial on

17   September 11th, and we will not try to retread the ground that

18   we have tread before.

19        Earlier in the trial you testified about the effect of SB1

20   on LUPE and its members.  I'd like to discuss some additional

21   details about how SB1 affects LUPE's use of its organizational

22   resources.

23        Has SB1 made it more difficult for LUPE to conduct its

24   operations?

25   A.  Yes, it has.
```

3670
Tania Chavez – Direct

1  Q.  Have you made any changes to your resources allocation as
2  a result of SB1?
3  A.  Yes, we have.
4  Q.  Now, when you testified in September, you mentioned that
5  LUPE added a civic engagement department in response to SB1.
6  I'd like to ask you a few questions about that.
7      Did you make any new hires for civic engagement after SB1
8  passed?
9  A.  Yes, we did.
10 Q.  And can you tell me the first person?
11 A.  The first person that we hired was Alexis Eliserio.  We
12 hired him in September of 2022 as a civic engagement
13 organizer.
14 Q.  And can you spell Eliserio for the Court, please?
15 A.  Yes.  E-L-I-S-E-R-I-O.
16 Q.  Thank you.
17     Did you hire anybody else?
18 A.  Yes.  In January of 2023 we hired a second civic
19 engagement organizer by the name of Evone Bueno, B-U-E-N-O,
20 Bueno.
21 Q.  Bueno.
22     When did you create the civic engagement department?
23 A.  In January of 2023.
24 Q.  Is there a director of civic engagement?
25 A.  Yes.  Michael Mireles.

3671

Tania Chavez – Direct

1  Q.  Can you spell Mireles, please?

2  A.  M–I–R–E–L–E–S.

3  Q.  Why did you create these new positions and the civic

4  engagement department?

5  A.  SB1 really became an issue for LUPE in the way that

6  community members were coming into our offices, and the

7  inability for some of our staff members to feel competent

8  about how they were supporting voters.

9      With –– in prior elections, since 2020, since the bill was

10 passed, we encountered challenges with the Get Out the Vote

11 efforts.  But as we understood it to be continuous efforts

12 that we needed to invest resources, and we wanted to maximize

13 our education to the staff, we quickly realized that they felt

14 hindered and afraid.  And at some point they actually stopped

15 helping voters overall.

16     People were coming into the offices, and whether they were

17 coming in to fill out a ballot by mail, or whether they were

18 coming in to fill out an application to apply for the ballot

19 by mail, or maybe just to register to vote, they were just

20 turning folks away because, you know, they didn't feel

21 competent.

22     So we decided to create a department to localize that work

23 and make sure that it was being done in conjunction and in

24 compliance with the current statutes of SB1.

25 Q.  Thank you.

3672
Tania Chavez – Direct

1    And are the two civic engagement organizer positions at
2  LUPE new positions?
3  A.  Yes, they are.
4  Q.  I'm going to shift now to your work on application for
5  ballot by mail.  You mentioned in your September testimony
6  that LUPE does help voters request applications for ballot by
7  mail.
8      Do you recall that?
9  A.  Yes, I do.
10 Q.  And why is LUPE helping voters request applications for
11 ballot by mail after SB1?
12 A.  So community members were coming into our LUPE offices,
13 and they will say, "Well, I did not get my ballot."  And this
14 is when we –– we got triggered about this being an issue.
15     And so we quickly learned that Hidalgo County, at the time
16 in 2020, sent applications for ballot by mails to all
17 residents that qualify as a result of the pandemic.  And so
18 community members quickly became accustomed to that.  And when
19 they didn't receive it in the mail the next year, it became an
20 issue.
21     In addition, Cameron County had done similar practices
22 where they remind the folks that they needed to apply for
23 their ballot by mail.  And so it had become customary for our
24 community members.
25     And when the SB1 became in effect and the elections

3673
Tania Chavez – Direct

1  offices were told not to send anything in regards to ballot by
2  mail, then that's when we had to assess the work and ensure
3  that community members were applying for ballot by mail.
4  Q.  Who at LUPE helps voters request applications for ballot
5  by mail?
6  A.  Our civic engagement staff.
7  Q.  Does the application for ballot by mail require an ID
8  number from the voter after SB1?
9  A.  Yes, it does.
10 Q.  Is there a difference in the amount of time spent by LUPE
11 staff assisting voters to complete applications for ballot by
12 mail after SB1?
13 A.  Yes, there is.  One of the challenges that we have is that
14 oftentimes folks become confused as to which is the number
15 that they're supposed to put on the application.  And so we
16 have to explain to them that it has to be -- it cannot be
17 their voter registration number.  It has to be their Social
18 Security number or voter ID -- or the driver's license number.
19     And so as a rule of thumb, we have asked community members
20 to put vote numbers just to make sure that they receive it.
21 Q.  Now, I'd like to shift to LUPE's work on the mail ballot
22 itself.
23     You mentioned in your September testimony that LUPE
24 explains to voters what areas of the mail ballot need to be
25 filled out; is that right?

3674
Tania Chavez – Direct

1    A.   That is correct.  We project on the screen.  And since we

2    are now unable to directly assist voters one by one on how to

3    fill out their actual ballot, we resort to projecting on the

4    screen.  And we go towards the areas that they are supposed to

5    fill out, making -- you know, reminding them, you only make

6    one marking per race.

7         But it's still not sufficient.  Folks have a lot of

8    questions.  And we often have to refrain the questions to make

9    sure that we're not addressing any one specific question about

10   their own ballot, but that we're answering the question in a

11   general sense.

12        And this just has elongated the meetings, the sessions,

13   sessions that before we didn't have to have, to begin with,

14   and so now we do.

15        *(Sneezing)*

16             THE WITNESS:  Bless you.

17             MR. KERCHER:  Thank you.  Thank you.

18   BY MS. PERALES:

19   Q.   Who performs the work of talking to voters about the areas

20   of the mail ballot that need to be filled out?

21   A.   The civic engagement staff.

22   Q.   Can you ask the voters to bring their mail ballots to

23   these group meetings where you project the ballot on the wall?

24   A.   No.  As a matter of fact, we often --

25        *(Sneezing)*

3675
Tania Chavez – Direct

1              THE WITNESS:  *Salud*.  Bless you, sir.

2              As a matter of fact, we often tell folks to make sure

3    that they do not bring the ballot.  We have some advocacy that

4    we want to do, and it relates to the ballots.  So in order to

5    prevent any implications that we may have, we ask them to

6    please not bring it.

7              Of course, it always -- it can always be an issue.

8    And so part of the work that we need to make sure is that we

9    tell our staff, you know, "Focus on projecting on the screen,

10   focus on going over what are the parts of the application that

11   they can fill out -- of that ballot that they can fill out."

12   BY MS. PERALES:

13   Q.  Thank you.

14       Does the change from individual one-on-one assistance with

15   the mail ballot to the projection of the ballot on the wall

16   and the general discussion make a difference in the quality of

17   the service that LUPE delivers to its members?

18   A.  Most definitely.  So in my prior testimony I shared that a

19   vast majority of the community members that we work with are

20   elderly.  And so because they're elderly, they might have

21   vision impair challenges.  Whenever we don't have the ability

22   to actually sit down with the voter and help them fill out the

23   ballot, it becomes an issue.

24       In addition to that, there might be challenges of literacy

25   that they might be experiencing.  And so we -- not being able

Chris Poage, RMR, CRR
Official Court Reporter

3676
Tania Chavez – Direct

1  to either read the ballot for them has very much hindered our
2  ability to help our community members.
3      When they're coming to LUPE, to any of our offices, any of
4  our centers, it's because they want to receive the help that
5  they need.  And when we have to turn them away and tell them
6  "We cannot help you on this particular piece that you're
7  asking us to do," it demoralizes our staff; more than
8  anything, it demoralizes the community member that is seeking
9  the help because we're asking them to cast their ballot, and
10 we can't even help them to do that.
11 Q.  When you're presenting to the group about the mail ballot
12 instead of doing your one-on-one activity with the voter, is
13 that a difference -- does that make a difference in terms of
14 your routine activities?
15 A.  Oh, yes, most definitely.  You know, before, we would feel
16 very confident to be able to help community members one on
17 one, without any issues, being able to very much cater to
18 every voter, whatever their need might be, even if we needed
19 to drive to somebody's home to help them fill out that ballot
20 by mail.
21     Now we cannot do that.  And now we have to resort to this
22 new -- these new community sessions.  But not only that, our
23 overall staff no longer feels the ability to help community
24 members.  So we have to narrow the help to just the civic
25 engagement staff.

3677

Tania Chavez – Direct

1    Q.  Has LUPE turned away members who came to the office for
2    assistance with voting after SB1?
3    A.  Yes, we have.  As we were going with the provisions of SB1
4    and we talked to the staff and we attempted to do training
5    with them, this is when they started rejecting voters.  We
6    learned -- it was interesting because we didn't realize that
7    they were doing this.  And that was part of, like, a major
8    decision why we decided to establish a department.
9        When we realized that community members will come, and
10   staff who had been with us for 20, 30 years, senior
11   organizers, been doing this work, and all of the sudden they
12   just don't want to help community members, that's when we
13   decided to make sure that we centralized the work.
14   Q.  And just to be clear, now that you have centralized the
15   work to civic engagement, if a LUPE member comes to the office
16   with their mail ballot and says, "I need somebody to sit with
17   me and assist me in completing my mail ballot," are you
18   allowed to use your paid civic engagement staff person to do
19   that?
20   A.  We are unable to do that.
21   Q.  Have these changes in your practices impacted LUPE's
22   ability to carry out its mission?
23   A.  Yes.  One of our main goals is to make sure that we
24   maximize the political power in South Texas; that we are
25   turning voters to the polls; that they exercise their

3678
Tania Chavez – Direct

1  democratic right.

2      And whenever we are not confident that they actually turn

3  in the ballot by mail, that hinders that goal, that mission.

4  When we, ourselves, are not able to help community members

5  turn in or fill out their ballot by mail, it also reduces the

6  voter turnout.

7      Moreover, if they accidentally put the wrong number on the

8  flap of the envelope, we try to do as much education as we can

9  when they come to our office, from the moment they apply, to

10  remind them, "You have to put both numbers, just to make sure

11  we prevent any rejections."

12      But the reality is that if we're not helping them fill out

13  the ballots, we have no certainty that they put both numbers.

14  Q.  I'm going to shift now to training of LUPE staff.  Have

15  you made any changes in how you train LUPE staff post SB1?

16  A.  Yes, we have.  You see, it used to be that our community

17  organizers, we will spend about, I don't know, 6, 10, 12 weeks

18  on geo.tv.  And so they've already been doing this for

19  decades, years.  So they knew, geo.tv –– you know, what was

20  the ––

21      (Court reporter clarification.)

22  BY MS. PERALES:

23  Q.  If you don't mind slowing down.  I think you were

24  answering that your organizers knew about how to do

25  canvassing; is that right?

3679
Tania Chavez – Direct

1  A.  Yes.  So our former or current organizers, who have been

2  with LUPE for a long time, under the regular organizing

3  department, prior to creating the civic engagement department,

4  they were the ones doing geo.tv work.  They knew what to do.

5  A few weeks before election, we will do canvassing training.

6  They were deployed, ready to go, get the work done.

7      Training has changed significantly as a result of SB1.  We

8  have to make sure that we're in compliance with the statutes

9  of the law.  And there's a lot of compliance challenges that

10 we have to face.  One of them is:  What is the work that we

11 need to do to make sure that we -- that canvassers and staff

12 know to not directly help a voter fill out their

13 application -- their ballot by mail?

14     What is the training that we have to do to ensure that

15 their application for ballot by mail is accepted?

16     In addition to that, we also have to do a lot of training

17 around ballot measures.  And what is the work that we need to

18 do to make sure that we are in compliance?  And so those are

19 some of the challenges that we're facing.

20 Q.  And has what you've described meant that LUPE has made

21 changes in the way it trains its own staff?

22 A.  Most definitely.  It takes more time to prepare for the

23 trainings.  It takes more time -- it has taken a lot more time

24 to make sure that the folks that are supervising canvassers,

25 that they're 100-percent certain of the provisions of SB1 that

3680

Tania Chavez – Direct

1  we need to be in compliance with.

2      And on top of that, as folks are deployed to the field,

3  that a quality assurance is happening as we're knocking on

4  doors, as we're doing sessions at the LUPE offices.  And so

5  that's part of making sure that we don't inadvertently break

6  the law along the way.

7  Q.  Is LUPE planning any advocacy on ballot measures for the

8  2023 November Constitutional Amendment Election?

9  A.  Yes, we are.

10 Q.  Can you give me an example?

11 A.  So a big one that is coming up for us is around expanding

12 broadband access.  If I'm not mistaken, I believe that is

13 Proposition 8.

14      And for us, that's a huge issue in South Texas.  Rural

15 communities that we work with, that we -- commonly known as

16 "colonias," unincorporated communities, they do not have

17 broadband access, many of them.  Some of them do, not all of

18 them.  And so we -- we continue to advocate for a broadband

19 infrastructure in South Texas colonias.  And so for us, this

20 will be an opportunity to draw some of those funds to South

21 Texas.

22      There's also another project, Proposition 6, if I'm not

23 mistaken, around water projects, again, unincorporated

24 communities needing access to drainage and the way that the

25 water flows after hurricane or rain.  These are projects that

3681

Tania Chavez – Direct

1  are very important to our community, and to –– essential to

2  the mission and the work that LUPE does.

3       And Proposition 1, which in essence will hinder the

4  protections that La Union del Pueblo Entero, through decades,

5  we have done to protect the rights of farm workers.

6  Q.  What changes, if any, have you made to training LUPE staff

7  with respect to advocating on these ballot measures

8  potentially when there is a mail ballot present?

9  A.  It has been interesting.  Community members come into our

10  offices.  We have four offices open to the public.  And those

11  four offices, we hold multiple events.  We have seven offices

12  where we hold multiple events.

13       When we are doing advocacy around ballot measures, the

14  training that we are doing at the moment, and we're still in

15  training, is that they can do the advocacy so long as they're

16  not aware of an actual ballot being in their presence.

17       There's no way for us to –– we're not going to be

18  searching people's bags as soon as they come into the door.

19  And so the instruction and the training that we're giving them

20  is, if they're aware of any ballot being present in any of our

21  events, that either they have to ask the community member to

22  put their ballot away somewhere else outside our building,

23  whether that is their car or drive back home and come back;

24  ask a community member to leave; or we have to stop doing the

25  work that we're doing.

3682

Tania Chavez – Direct

1      And so it's -- we are -- these are issues that matter to

2  us.  These are issues that matter to the community that we

3  represent, the issues that matter to the membership of LUPE.

4      And whenever we cannot advocate for the needs that our

5  community has, for the needs of the LUPE membership, then why

6  are we doing our work, and when the law is preventing us from

7  doing our mission and carrying out our work.  So that's where

8  we're at at the moment.

9  Q.  I'd like to shift to your training of LUPE staff with

10  respect to the new oath of assistance, which includes the

11  assister swearing that they got a representation from the

12  voter that the voter is eligible for assistance.

13      Has that changed the way you change -- you train your

14  staff?

15  A.  We have, particularly because now we have to get

16  representation from the voter that they qualify to receive

17  assistance.  And this dives into sensitive territory.  And

18  oftentimes our LUPE staff cannot be cross-trained on every

19  single issue.  We're training them how to make sure that we

20  are following the provisions of the law as we're trying to

21  carry out the democratic process in Texas.

22      But as we talk to them about, "You have to make sure the

23  voter represents themself being eligible for the assistance,"

24  this might dive into somebody not being literate, and also

25  somebody being afraid of sharing why they're not literate or

3683
Tania Chavez – Direct

1  what the literacy limitation may be.

2      These are sensitive issues.  Maybe somebody has a

3  not-physically-noticeable disability.  It might be a mental

4  disability they need assistance for.  And because we have to

5  actively ask the voter whether or not they actually qualify to

6  receive assistance, it dives into territory that our

7  organizers -- our civic engagement organizers are not as

8  confident.  But nonetheless, we still have to do it.

9  Q.  And do you have to train them on these things that you're

10  discussing now?

11  A.  Yes, we do.

12  Q.  Are any of these new training activities part of the

13  previous routine of LUPE?

14  A.  No.  As I mentioned earlier today, we went through the

15  cycles of a lot of canvassing training, a lot of like Get Out

16  the Vote training.  We will provide the basic training, maybe

17  something was updated here and there and we will share what

18  that update was.

19      But this has significantly hindered our ability to get out

20  the vote in a timely manner.

21  Q.  If LUPE -- I'm shifting now to what would happen if LUPE

22  makes no changes in the -- in the face of SB1.  So I'm going

23  to ask you a few questions there.

24      If LUPE had not conducted more outreach to tell voters

25  that they have to request applications for ballot by mail,

Tania Chavez - Direct

1  what would have happened?

2  A.  They probably -- those ballots probably would have not

3  counted, right?  Those ballots probably would have -- those

4  voters probably wouldn't have voted.

5  Q.  If LUPE had not educated voters to put their ID numbers on

6  their mail ballots and applications for ballot by mail, what

7  do you think would have happened?

8  A.  They probably wouldn't have counted.

9  Q.  If LUPE does not develop approaches to advocacy on ballot

10  measures, potentially when there is a mail ballot present, in

11  your view, what would happen?

12  A.  Can you repeat that question again?

13  Q.  If LUPE does not develop approaches to advocate on ballot

14  measures, potentially when there is a mail ballot present,

15  what, in your view, would happen?

16  A.  So I want to make sure I'm understanding your question.

17  If we will not -- if we're not observing the provisions of

18  SB1, right, as we're trying to navigate advocacy for ballot by

19  mail, one of the things that is super important for us is that

20  we reach hard-to -- we try to knock on hard-to-reach voters.

21      And so when we do that, it's important that those voters

22  find the confidence to cast their ballot, that we talk to them

23  where to go vote, because particularly the communities we work

24  with, the polling locations are far away.

25      And if we have to stop our advocacy at the door because we

3685

Tania Chavez – Direct

1  find a ballot in the home or we become aware of one, it

2  hinders our ability to advocate for these measures, and it

3  hinders our ability to really draw resources to South Texas on

4  the issues that we're supporting.

5  Q.  A small followup question to that.  If LUPE makes no

6  changes, if LUPE continues to advocate on ballot measures,

7  when you know there's a mail ballot there, you just plow right

8  ahead and do that, what is the consequence for LUPE?

9  A.  We'll probably go to jail.  I will probably go to jail as

10  a top employee of the organization and as a president of the

11  corporation, and our staff will face prosecution as well.

12  Q.  Now, I'm going to shift to what you would be doing if

13  there was no SB1.  If there was no SB1, right now what would

14  LUPE be doing with its --

15  A.  We would have been knocking on doors several weeks ago.

16  Q.  And what do you call your door-knocking activity?

17  A.  Canvassing.

18  Q.  Are you currently canvassing?

19  A.  No.  We haven't yet started canvassing because we're still

20  finalizing the training.  So training is happening next week,

21  and we are finalizing the components of our training.  We

22  started training about two, three weeks ago, and we're now on

23  the last stages.

24  Q.  Is that SB1 training?

25  A.  Yes, SB1 training.

3686
Tania Chavez – Direct

1  Q.  What is the importance of canvassing to LUPE's activities?

2  A.  As I mentioned before, canvassing in hard-to-reach

3  communities, canvassing in the colonias where you had the

4  deserts, where you don't have school nearby, where you don't

5  have polling locations nearby, it's really important to our

6  work because that means that the voters that we're trying to

7  reach are going to -- not just valid information, but it's

8  information that probably nobody else would have taken to

9  them.

10      And when we talk to them about the issues that matter to

11  them at their door, we're ensuring that they have the

12  information that they need.

13      And I just want to be clear that LUPE not just canvasses

14  during Get Out the Vote efforts.  Canvassing is a part -- it's

15  an essential part of the work that LUPE does.  LUPE canvasses,

16  knocking on doors, in a neighborhood so that people come out

17  for a house meeting in that neighborhood.  We canvass and

18  knock on doors so that we can give them educational

19  information at the doors; for example, the voter outreach that

20  we did in 2020 and 2021.

21  Q.  If you're not canvassing, how does that affect the

22  community and LUPE members?

23  A.  Information wouldn't get -- the information that they

24  need, they wouldn't get it.  And their ability to feel

25  confident about casting their vote, it wouldn't be reached.

Tania Chavez – Direct

1  And overall, voter turnout will not be reached, and voter
2  turnout will not be the same.
3  Q.  Has LUPE shifted resources away -- well, in addition to
4  canvassing and the delay in canvassing, has LUPE shifted
5  resources away from other activities or projects to support
6  the SB1-related activities that you've described?
7  A.  Yes.  So now I have to worry about fundraising for a new
8  department.  I have to also spend a lot of my time making sure
9  that compliance is being followed, and so working very closely
10 with the director of civic engagement and the deputy director
11 -- building to make sure that compliance is followed.  It
12 takes -- that takes a lot of time away for other work that
13 LUPE also needs to do.
14      And when time and attention is devoted at a greater
15 percentage for civic engagement, it hinders your ability to
16 invest in other advocacy work; for example, advancing
17 broadband infrastructure for colonias residents.
18 Q.  How has shifting your attention and your leadership
19 affected LUPE's ability to carry out its mission?
20 A.  I am responsible for the entire organization.  And it is
21 important that every other department gets equal attention and
22 support from me.  And honestly, I haven't been able to do that
23 because SB1 has been taking a lot of that time away.
24      And so I want to be fair to our staff, fair to the
25 community because the issues that they are advocating for

3688
Tania Chavez – Cross

1  matters.  Every two years they set an agenda for us on the

2  issues that matters to them.  And we want to make sure that we

3  honor that agenda that they set for themselves and the issues

4  that they want to advance, like making sure they're safe in

5  their communities, lighting for all colonia residents in South

6  Texas, better drainage infrastructure, that are just some of

7  the issues that matter to our constituency.

8  Q.  And just to give a small example, you mentioned that

9  upcoming you're going to be doing some SB1 compliance training

10  with your civic engagement staff; is that right?

11  A.  That is correct.

12  Q.  Who is going to be delivering that training?

13  A.  I am.

14  Q.  Thank you.

15        MS. PERALES:  I pass the witness.

16        THE COURT:  Anything else from this side?

17        Any cross?

18        MR. BRYANT:  Yes, Your Honor.

19                    CROSS-EXAMINATION

20  BY MR. BRYANT:

21  Q.  Hello, Ms. Chavez.  Good to see you again.

22  A.  Hello.

23  Q.  From your testimony, it appears to me that LUPE is a

24  growing organization; is that right?

25  A.  That is correct, but I don't know where you're going with

3689
Tania Chavez - Cross

1  that.  But, yes, we've been growing for a long time.

2  Q.  Okay.  As I recall, the revenues -- revenues in 2020 were

3  around 2.5 to 3 million; is that right?

4  A.  Uh-huh.  That's correct.

5  Q.  And this year, they're 4.1 million?

6  A.  That is correct.

7  Q.  And I believe you testified previously that LUPE's

8  revenues increased from 2022 to 2023 by about a half a

9  million, from 3.6 million to 4.1 million; is that right?

10 A.  That is correct.

11 Q.  And likewise, with the revenue growth has come employment

12 growth, right?

13 A.  It has.  Uh-huh.

14 Q.  Now, prior to SB1, LUPE engaged in a lot of activities

15 that have nothing directly to do with voting or voting rights;

16 is that correct?

17 A.  We engage in a lot of activities that had nothing to do

18 with voting; and we engage in a lot of activities that have to

19 do with voting.

20 Q.  Right.

21     And I know some of the activities of LUPE deal with

22 infrastructure; is that right?

23 A.  Yes.

24 Q.  With providing advice on immigration issues?

25 A.  Yes.  We are certified by the Department of Justice to do

3690
Tania Chavez – Cross

1  that work.

2  Q.  And providing income tax services?

3  A.  That's correct.  And we're in compliance with the IRS to

4  do that work.

5  Q.  And you advise your members and others in the community on

6  many other topics that they seek assistance from you aside

7  from voting?

8  A.  That's correct.

9  Q.  Now, both before and after SB1, LUPE's active in trying to

10  help its members in the community, in general, register to

11  vote; is that right?

12  A.  No.  We didn't had a good, strong -- we've registered

13  voters before.  We've never done it in such a structural way

14  as we have before.  Because now we have to make sure -- if you

15  recall in my testimony, I mentioned how community members will

16  come to our offices and folks will register them if they will

17  come in and seek for that advice.

18      But I also share that many of them, unfortunately, were

19  turned away as a result of SB1 because staff members felt

20  confused, and so we had to now make it a very structural

21  process under the civic engagement department on who were

22  registered to vote.

23  Q.  Okay.  My point was simpler than that.  It was simply that

24  one of your activities was registering voters or assisting in

25  registration of voters before SB1 and also after SB1?

3691
Tania Chavez – Cross

1   A.  Yes.

2   Q.  And you regularly engaged in training of your staff

3   regarding voting rights, voting procedures, et cetera, before

4   and after SB1?

5   A.  We have, with a much higher degree now after SB1.

6   Q.  My question was:  Did LUPE do that before and after SB1?

7   A.  We did it, and I explained we're doing it at a much higher

8   degree and expending a lot more hours after SB1.

9   Q.  But you did it before SB1 as well?

10          MS. PERALES:  Objection --

11          THE WITNESS:  I answered your question, sir.

12          THE COURT:  One second.

13          What was the objection?

14          MS. PERALES:  Asked and answered.

15          THE COURT:  That's sustained.

16  BY MR. BRYANT:

17  Q.  And SB1 did Get Out the Vote and canvassing activities

18  both before and after SB1?

19  A.  We did, and we did it a lot earlier.  We are now delayed

20  as a result of SB1.

21  Q.  What is it about SB1 that causes you to do your Get Out

22  the Vote efforts later?

23  A.  We have to do a lot more training and compliance to make

24  sure that the staff that are going to be overseeing the work

25  are not breaking the law; to make sure that as we assist

3692
Tania Chavez – Cross

1  community members, that we give them the correct information,

2  such as which number to put on the flap of their ballot by

3  mail, which number to put on the application for ballot by

4  mail, what to do if they're in the presence of a ballot by

5  mail.

6      We also go over, what are some of the challenges that you

7  may face if somebody asks you to assist them with voter

8  assistance at the polls?  What is the oath of office that you

9  have to take?  What does it mean to take the oath of office?

10 Did you -- were you told by the voter whether or not they

11 actually qualified to receive assistance?

12      Those are some of the challenges that we're facing.

13          MR. BRYANT:  Your Honor, I object to the answer as

14 nonresponsive to my question.

15          THE COURT:  Repeat your question.

16 BY MR. BRYANT:

17 Q.  My question was --

18          MR. BRYANT:  Frankly, I forgot it, Your Honor.

19 Actually, the answer went so far afield.  But it was

20 essentially:

21 BY MR. BRYANT:

22 Q.  Have you continued to do the training of your staff both

23 before and after SB1?

24 A.  We have, to a much higher degree, to be in compliance with

25 SB1.

3693
Tania Chavez – Cross

1  Q.  But the basic activity of training your staff was before
2  and after SB1, correct?
3  A.  It was a basic activity before SB1; it's no longer a basic
4  activity after SB1.
5  Q.  Is there any reason you could not start your training
6  schedule earlier so that you could be sure you completed in
7  time to do your normal Get Out the Vote and canvassing
8  efforts?
9  A.  Yes.  There's other issues that our community members
10  needs attention to, and when –– I am the one actually training
11  on staff and being –– becoming familiar with the law and the
12  provisions.
13      And in prior testimony, and you asked me, when did I
14  become familiar with SB1, and I shared with you that date.
15  And so when I am the one having to do the training with the
16  staff, and I'm also accountable for the rest of the
17  organization, it delays the process on how we are in
18  compliance with SB1.
19  Q.  And you devoted a good deal of time to testifying in this
20  case.  I assume you've devoted also some time to generally
21  working with your attorneys regarding this case; is that
22  right?
23  A.  A few hours.  Yes, that's correct.
24  Q.  And did that also take you away from any training
25  activities that only you can perform in LUPE?

3694
Tania Chavez – Cross

1  A.  Yes.  Because you asked me to get deposed, and here I am
2  today.
3  Q.  Did you, at LUPE, engage in voter education activities
4  both before and after SB1?
5  A.  Yes, we have.
6  Q.  And as in the past, prior to SB1, when there were voting
7  rights changes, you had to train your staff, as you're doing
8  now, on those voting law changes that were in SB1?
9  A.  We have.  And as I mentioned before, none of them had been
10  as exhaustive as this legislation.  And none of the -- that
11  I'm aware, none of the prior changes actually prohibited the
12  organization paying a staff member to assist the voter.
13      And so when now that is an issue, we need to make sure
14  that we regard the safety of our staff by ensuring that
15  they're not prosecuted.
16  Q.  And do all the activities of LUPE that are not related to
17  voting that you engaged in prior to SB1 continue?
18  A.  Not all of them.  As a matter of fact, within the
19  organizing department, we have not had a solid victory since
20  2021.  We have not continue doing our advocacy campaign on
21  broadband infrastructure.  We're trying to rebuild that, and
22  it has been really hard.  But no, we -- not all the activities
23  that LUPE was doing prior to SB1 are being conducted at the
24  time.
25  Q.  Aside from that instance, are there any others?

3695

Tania Chavez – Cross

1   A.  Excuse me?

2   Q.  Aside from the advocacy on the specific broadband

3   infrastructure constitutional amendment, are there any other

4   examples of that?

5   A.  Yes.  Drainage infrastructure for South Texas, lighting

6   infrastructure for colonia residents, college taxes for

7   undocumented students, and particularly getting parents

8   engaged in the K-12 education system, access to healthcare,

9   and the expansion of Medicaid, our advocacy on the potential

10  for an immigration reform or anything that may be a result of

11  that has also not been super strong since.

12      Yeah, we have -- we have grown as an organization, as you

13  mentioned before.  Unfortunately, now we have to choose

14  whether our funding goes to civic engagement or it goes to

15  another project.

16      And when there's only so many foundations and we can only

17  ask them for so much money, I can't -- we can't devote all the

18  resources to all of these projects.  We have to choose one or

19  another, right?

20      And so we are growing because other needs in the

21  organization have surfaced, but we are not doing all the same

22  issue advocacy work that we were doing before, prior to SB1.

23  Q.  If I understand your answer, your advocacy efforts are not

24  as super strong as they were before SB1?

25  A.  That is correct.

3696
Tania Chavez – Cross

1   Q.  Do you continue to do advocacy after SB1?

2   A.  We try, but not in a campaign development as we usually

3   have done.

4   Q.  Now, LUPE's a growing organization, as we've discussed.

5   And it continues to have the same goals as it did before SB1,

6   as an organization?

7   A.  No.  As a matter of fact, we decided to make sure that

8   we're protecting the rights of voters in making sure that we

9   increase the political power in South Texas.  And that while

10  we've always encouraged folks to cast their votes, making an

11  organizational decision to invest more resources, more time,

12  more effort in protecting the right to vote has been something

13  that resulted from SB1 now that it is being hindered by the

14  Texas Legislature.

15  Q.  So your testimony is that LUPE has changed its

16  organizational goals since SB1?

17  A.  We have increased an organizational goal.

18  Q.  Has it changed its fundamental goal, which I believe you

19  testified was to empower its members and the community and

20  make their lives better?

21  A.  We have not.

22  Q.  And so it continues to fight for that goal today, as it

23  did before SB1?

24  A.  To a lesser degree we continue to fight for that, because

25  our time and resources are being pulled away as a result of

3697

Tania Chavez – Cross

1  SB1.

2  Q.  And your organization's ability to achieve its goals,

3  including apparently dealing with SB1, that hasn't stopped,

4  has it?

5  A.  That hasn't stopped what?

6  Q.  That hasn't stopped.  It's still going on, just as it was

7  before SB1?

8  A.  What hasn't stopped?

9  Q.  The goal of your organization to empower and make lives

10 better in the community you serve and those of your members.

11 A.  I like to believe we're bigger than SB1 and greater than

12 SB1, and we stand by the rights of the community.  And we're

13 here to protect -- ensure that we protect their rights, and

14 that's why we are here.

15     And so when somebody attacks our community and the

16 legislation attacks the rights of voters, that's part of us

17 responding to their needs and to their need to respond to

18 those efforts.  And so that's why we are here.

19     So one of our core values is LUPE's responding to the

20 needs of the community.  And so the Texas Legislature has

21 brought us here, and here we are.

22 Q.  And as your organizational revenues at LUPE have grown in

23 recent years, have you made voluntary budgetary choices to

24 move some resources from things you did before SB1 to training

25 your staff and the other responses to SB1 that you've

Tania Chavez – Cross

1  described in your testimony?

2  A.  We certainly have put hire freezes in other departments

3  that needed additional support so that we could enact a new

4  department of civic engagement.  That is something that we

5  have done.  Staff have approached me about needing additional

6  staff, and we have not done that to ensure that we sustain a

7  civic engagement department.

8      As I mentioned before, some of my fundraising time has

9  gone to making sure that we are supporting this new

10  department.  LUPE is growing because it has been growing for

11  decades.  And we're adding departments not related to advocacy

12  and not related to voting rights.

13      However, whenever you have to speak to a foundation and

14  you have to tell them all the -- work that you have, they can

15  only make a choice about giving you funding for one thing.

16  And we cannot sustain.  So if we sustain a civic engagement

17  department, I cannot sustain additional organizers because I

18  have to play my cards.

19      So are they going to sustain the civic engagement work

20  now?  But that also means letting go of funding for other

21  programs.  And like I said -- like I said before, we're a

22  membership-based organization.  And so part of the reason why

23  we continue to employ people and why we continue to sustain

24  our operations, regardless of fundraising efforts, is because

25  community members are paying a membership.  And those dues

3699

Tania Chavez - Cross

```
 1  serve to sustain the work of LUPE, and serve to sustain the
 2  work of -- existing work that has existed before to SB1.
 3  Q.  Do the members' dues pay -- provide a greater percentage
 4  of LUPE's revenues in 2023 than in previous years?
 5  A.  Whenever you have a growing membership, yes, you do.
 6  Q.  So your testimony is that the members' dues in 2023
 7  play -- are a higher percentage of LUPE's revenues than in
 8  previous years?
 9  A.  It was probably around the same percentage.  But also,
10  whenever you don't have additional resources with funding,
11  thus, those direct allocations serve -- sustain our work.
12  Q.  And you described your fundraising efforts.  Have those
13  fundraising efforts been successful so that LUPE can continue
14  to grow?
15  A.  For a grant, yes -- for grant allocations, yes.
16  Q.  And do you anticipate that LUPE will continue to pursue
17  all of its priorities and will not suffer any impairment of
18  its ability to grow because of SB1?
19  A.  Oh, I think I already shared with you how we're not
20  growing or working our advocacy as a result of SB1.  So the
21  question to your -- the answer to your question will be:  No,
22  we are significantly affected by the fact that the rest of our
23  work cannot move at a -- at a greater pace, at the pace that
24  we will always like to move our work, right, because we're
25  bogged down by SB1 and ensuring the requirements of the law
```

3700
Tania Chavez - Cross

1  are observed.

2  Q.  And you always are going to have to comply, as a good

3  organization, with whatever requirements the federal

4  government and the state government and local governments put

5  on you; is that right?

6  A.  Yes, as long as they don't violate the constitutional

7  rights of our members.

8  Q.  Well, I thought that you were complying with SB1 even

9  though you may believe that?

10  A.  Well, that's the law.  So that's why we're fighting it

11  here in court, because we actually don't believe it's in

12  compliance with the constitutional rights of our members.

13  Q.  Now, you described in your testimony that your

14  organization formerly did one-on-one work with mail-in voters

15  and you had to change that to general meetings?

16  A.  Uh-huh.  That is correct.

17  Q.  Which is more labor intensive for LUPE?

18  A.  Well, we -- actually, like, the vast -- the group sessions

19  are more labor intensive for LUPE.  One, because we have to

20  increase training for our staff to make sure they know what

21  the limitations are, which is something we didn't used to do

22  before.  Meetings take longer.  Actually, those meetings did

23  not used to exist.

24      And so helping somebody fill out a ballot by mail was an

25  everyday thing that we were doing, whether we were at a

3701
Tania Chavez – Cross

1  colonia doing a house meeting, whether people were coming in

2  for a service.  It was -- it wasn't like the main priority

3  that we had in front of us.  And now we have to make it at

4  like -- a very tangible event, a very tangible thing,

5  training.

6      And so for us, when I have to devote resources, time, and

7  effort to train staff on how to have those events, when to

8  have those events, think about -- we're already thinking about

9  January, having sessions where they will come in and register

10 voters in January so that we don't have to miss the

11 registration to apply for ballot by mail, when we have to

12 actively think about those things, for us, that's more labor

13 intensive.

14 Q.  And have you done your budget for next year for LUPE?

15 A.  No.  Because here we are.  I have not yet had time to

16 start thinking about what the budget for 2024 will be.

17 Q.  Is it fair to say that you, as executive director of LUPE,

18 have directed the changes you have described in the

19 organization's operations to respond to SB1 this year?

20 A.  Yes.

21 Q.  And those are voluntary choices that LUPE has made in the

22 interest of its cause?

23 A.  These are not my voluntary choices.  These are choices

24 that I have to do with a board of directors.  These are

25 choices that we have to do with the community member that we

Tania Chavez - Cross

1  represent.

2      We actually have community member meetings.  And we are

3  very pride -- we take a lot of pride in making sure that the

4  voice of the community is elevated, and that we don't make

5  decisions for our members, and that our decisions lead those

6  efforts.  So I simply endorse the decisions that our community

7  members have done, and the board members ensure that whatever

8  we carry out as our work is in compliance with the law.

9      But these are not my choices.  These are choices that are

10  made by our community members, and I have an honor of carrying

11  them out.

12  Q.  And I didn't mean to suggest that they were unilateral,

13  really talking about LUPE's decisions, including the process

14  you just described, all of the budgetary changes that have

15  been made to respond to SB1 were the voluntary choice of the

16  organization?

17  A.  We were forced to make those budgetary changes as a result

18  of the way that we had to respond to a new law that have been

19  enacted, and that now we have to allocate resources

20  differently to ensure that the rights of our community members

21  are being respected.

22  Q.  The legislature didn't mandate those changes, did it?

23  A.  The legislature enacted a law.  And so unless you and I

24  went to different schools -- but as far as I know, when the

25  law comes from the legislation, yes, the legislature enacted

1  those changes, signed by the governor.

2  Q.  Yes.  And your organization made the budgetary changes it

3  thought was necessary to respond to SB1?

4  A.  Because we now had to defend the rights of our voters.

5  That's why we made those changes.

6          MR. BRYANT:  Pass the witness.

7          THE COURT:  Anything else on this side?

8          MR. NICHOLS:  No, sir.

9          THE COURT:  Any redirect?  Ms. Perales, any redirect?

10         MS. PERALES:  No further questions, Your Honor.

11         THE COURT:  Thank you, ma'am.  You can step down.

12         So we surprisingly went through the witness list

13  today.

14         MS. PERALES:  I'm sorry, Your Honor?

15         THE COURT:  We surprisingly concluded the witness

16  list, I think.

17         MS. PERALES:  We have.

18         MR. KERCHER:  That's right.

19         MS. HOLMES:  Yes.

20         MS. PERALES:  I believe there's a little bit of

21  housekeeping, Your Honor.

22         MS. HOLMES:  Yes.

23         THE COURT:  Okay.

24         MS. HOLMES:  Yes, Your Honor.  I think we're all much

25  more efficient than we anticipated.  But I'd like to move a

1    set of exhibits into evidence.  And I think there's going to

2    be a little bit more housekeeping from some of my colleagues

3    on the plaintiffs' side.

4            So I'd move to admit HAUL/MFV 9, 90, 94 through 120,

5    167, 169, 174, 182 through 184, 189, 190, 212, 233, 235, 236,

6    263, 277, 290, 293, 387, and 388.

7            THE COURT:  Any objections to any of those exhibits?

8            MR. WASSDORF:  What was the last two?

9            MS. HOLMES:  The last two were 387 and 388.

10           MR. WASSDORF:  Just one second, Your Honor.

11           No objection, Your Honor.

12           THE COURT:  Pardon me.  HAUL 9, 90, 94 through 120,

13   167, 169, 174, 182 through 184, 189 through 190, 212, 233,

14   235, 236, 263, 277, 290, 293, 387, and 388 are all admitted.

15           *(Plaintiff HAUL/MFV Exhibit Nos. 9, 90, 94 through 120,*

16   *167, 169, 174, 182 through 184, 189 through 190, 212, 233,*

17   *235, 236, 263, 277, 290, 293, 387, and 388 admitted)*

18           MS. HOLMES:  Thank you, Your Honor.

19           THE COURT:  Anything else?

20           MR. DOLLING:  Good afternoon, Your Honor.  Zachary

21   Dolling for the OCA plaintiffs.  We also have a short list of

22   exhibits that we would like to move into -- to admit into

23   evidence.  They are OCA Plaintiffs' Number 31, 77 to 81, 225,

24   347, 348, 349, 351, 352, 353, 356 to 365, 367 to 370, 401 to

25   407, 409, 410, 414, 415, and 416.

```
 1              THE COURT:  414, 415...

 2              MR. DOLLING:  And 416.

 3              THE COURT:  Any objections to any of those?

 4              MR. WASSDORF:  No objection, Your Honor.

 5              THE COURT:  OCA 31, 77 through 81, 225, 347 through

 6   349, 351 through 353, 356 to 365, 367 through 370, 401 through

 7   407, 409 through 410, 415 through 416 are all admitted.

 8              MR. DOLLING:  And 414, Your Honor.

 9              THE COURT:  I'm sorry.  I must have missed it --

10   misspoke.

11              Yeah, 415 through 416.

12              MR. DOLLING:  I'm sorry.  I think we're still missing

13   414.

14              THE COURT:  I just said that, I thought.  414.

15              MR. DOLLING:  Yeah.

16              THE COURT:  I'll say it that way:  414 through 416.

17       (Plaintiff OCA Exhibit Nos. 31, 77 through 81, 225, 347

18   through 349, 351 through 353, 356 to 365, 367 through 370, 401

19   through 407, 409 through 410, 414 through 416  admitted)

20              MR. DOLLING:  Thank you, Your Honor.

21              THE COURT:  Yeah.

22              Anything else?

23              MR. KERCHER:  To preview some testimony for tomorrow,

24   Your Honor, I think we have two witnesses.  The first of those

25   witnesses will be plaintiffs' final witness, Dr. Cruz, an
```

3706

1    expert.

2          The second will be State defendant's first witness,

3    who is Mr. Frank Phillips.  He is an elections official from

4    Denton County.

5          I want to bring something to the Court's attention so

6    that we don't have any misunderstandings.  At least some of

7    what Mr. Phillips will testify about is experience with voter

8    fraud in Denton County.  Having conferred with plaintiffs on

9    this, we understand that his testimony is not the subject of

10   their motion in limine regarding witnesses from the Secretary

11   of State's office or the Office of the Attorney General.

12         Mr. Phillips was previously deposed in this case.

13   The DOJ asked questions.  Private plaintiffs, as I recall, did

14   not.  There were, I think, a pair of investigative privilege

15   objections asserted because Mr. Phillips has information about

16   a particular prosecution that he felt uncomfortable sharing

17   before the case went to trial.  It is not State defendant's

18   intent to elicit the information that they objected to coming

19   out in the deposition.

20         I've discussed that with Ms. Perales, whose motion in

21   limine it was, we discussed at the beginning of trial, and I

22   believe that we have an understanding of what the Court can

23   expect from Mr. Phillips.  And I don't think that it will

24   infringe into the Court's order on what, for example,

25   Mr. Ingram or Mr. White may or may not testify to.

1              MS. PERALES:  Yes, Your Honor.  Ms. Tulin will be

2    examining Mr. Phillips.  I'm confirming the conversation with

3    Mr. Kercher and, of course, reserving the right to make any

4    other sort of objections to Mr. Phillips' testimony.

5              THE COURT:  Yeah.  So that seems consistent, as long

6    as he's not going to talk about the subject that he invoked

7    investigative privilege to.

8              MR. KERCHER:  That's right.  And in that regard, Your

9    Honor, there were just a few details of a particular

10   prosecution that he could not share because the case had not

11   gone to trial.  That trial is still pending, and so we will

12   still ensure that that information is not elicited.

13             THE COURT:  Okay.  Thank you.

14             Anything else that we need to talk about today?

15             MS. TULIN:  Your Honor, we may have -- we probably

16   will have a few additional housekeeping items before we close

17   the plaintiffs' case-in-chief, but I think we will use this

18   afternoon to confer with the other side about that.  And I'm

19   hopeful that we will -- even with the early closing tomorrow,

20   we will have time to deal with that tomorrow.

21             THE COURT:  Are we talking about exhibits, or what

22   are we talking about?

23             MS. TULIN:  Exhibits, and some requests for judicial

24   notice that are outstanding and that we've been bandying

25   about.

1          THE COURT:  Yeah.  Feel free to stay in here and work
2   it out.
3          Anything else?
4          MR. KERCHER:  That's it for State defendants, Your
5   Honor.
6          THE COURT:  We'll see you in the morning.
7          So -- by the way, so we have 8:30.  You might want to
8   show up for this.  I don't know whether you all have been
9   following this at all.  So this is regarding a related lawsuit
10  that blind plaintiffs brought against Bexar County seeking the
11  same ability to vote as military service personnel overseas,
12  as well as expats living overseas to vote through electronic
13  transmissions.
14         And the Court had previously granted the plaintiffs'
15  summary judgment motion.  And there seems to be some issue
16  with compliance.  And I guess it's a problem with the software
17  system.  I'm not sure what the problem is.  That's what I'm
18  assuming.  But that's the discussion tomorrow morning.
19         So you're welcome to arrive early and watch that if
20  you want.  If it's related or not related to this or if you're
21  interested or not interested, we're going to take that up at
22  8:30, and hopefully it won't take up too much time.
23         MS. TULIN:  Thank you, Your Honor.
24         One note about that is just that Dr. Cruz is
25  paraplegic, uses a wheelchair.  You've heard the testimony in

1    this case about the extra time that it takes to get ready.  So

2    we have planned to have him here at 9:00.  It would be great

3    if we don't have to have him here before 9:00.  But if we do,

4    please let us know so that we can give him enough notice.

5            THE COURT:  I think if he's ready to take the stand

6    at 9:00, that'll be fine.

7            MS. TULIN:  Thank you.

8            THE COURT:  Anything else?

9            And we'll see you tomorrow morning.

10      *(Overnight recess at 3:08 p.m.)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          —oOo—

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply

5    with those prescribed by the Court and the Judicial Conference

6    of the United States.

7

8    Date:  10/11/2023              /s/  *Gigi Simcox*
                                    United States Court Reporter
9                                   262 West Nueva Street
                                    San Antonio, TX 78207
10

11

12                                  /s/  *Chris Poage*
                                    United States Court Reporter
13                                  262 West Nueva Street
                                    San Antonio, TX 78207
14

15

16

17

18

19

20

21

22

23

24

25