1     IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF TEXAS
2       SAN ANTONIO DIVISION

3

LA UNION DEL PUEBLO ENTERO,  .
4 ET AL,          .
            .
5     PLAINTIFFS,  .
    vs.      . DOCKET NO. 5:21–CV–844–XR
6           .
GREGORY W. ABBOTT, ET AL,  .
7           .
     DEFENDANTS.  .
8

9

10      TRANSCRIPT OF BENCH TRIAL
    BEFORE THE HONORABLE XAVIER RODRIGUEZ
11     UNITED STATES DISTRICT JUDGE
      OCTOBER 12, 2023
12

13

14

15

16 APPEARANCES:
FOR THE PLAINTIFFS:  NINA PERALES, ESQUIRE
17        FATIMA MENENDEZ, ESQUIRE
        JULIA LONGORIA, ESQUIRE
18        MALDEF
        110 BROADWAY
19        SUITE 300
        SAN ANTONIO TX 78205
20

21        AMIR BADAT, ESQUIRE
        NAACP LEGAL DEFENSE & EDUCATIONAL
22        FUND INC
        40 RECTOR STREET, FIFTH FLOOR
23        NEW YORK NY 10006

24

25

```
 1

 2                          LEAH J. TULIN, ESQUIRE
                            JASLEEN K. SINGH, ESQUIRE
 3                          BRENNAN CENTER FOR JUSTICE AT NYU
                             SCHOOL OF LAW
 4                          1140 CONNECTICUT AVENUE NW
                            SUITE 1150
 5                          WASHINGTON DC 20036

 6

 7                          AMIR BADAT, ESQUIRE
                            NAACP LEGAL DEFENSE & EDUCATIONAL
 8                          FUND INC
                            40 RECTOR STREET, FIFTH FLOOR
 9                          NEW YORK NY 10006

10

11
     FOR THE DEFENDANTS:    RYAN G. KERCHER, ESQUIRE
12                          KATHLEEN HUNKER, ESQUIRE
                            WILLIAM WASSDORF, ESQUIRE
13                          DAVID BRYANT, ESQUIRE
                            TEXAS ATTORNEY GENERAL
14                          P.O. BOX 12548
                            MC 009
15                          AUSTIN TX 78711

16

17                          ERIC J.R. NICHOLS, ESQUIRE
                            BUTLER SNOW LLP
18                          1400 LAVACA STREET, SUITE 1000
                            AUSTIN TX 78701
19

20

21

22   REPORTED BY:          GIGI SIMCOX, RMR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            SAN ANTONIO, TEXAS
24

25
```

1          (San Antonio, Texas; October 12, 2023, at 8:45 a.m., in

2    open court.)

3          MISS TULIN:  Your Honor, we can certainly start with

4    some housekeeping matters, and I believe Dr. Kruse is outside,

5    so we should be able to start a little bit early.  If you

6    don't mind, I will just do some housekeeping up here while we

7    have the computer.

8          My apologies, Your Honor.  One page of a two-page

9    document I was going to refer to.  So, good morning, Your

10   Honor.

11         THE COURT:  Morning.

12         MISS TULIN:  Briefly, the — I have two matters to

13   address.  The first is the LUPE plaintiffs have a request for

14   judicial notice.  We will file it.  We have been back and

15   forth with the defendants, and I believe it is now unopposed,

16   so we're prepared to file it.

17         MR. NICHOLS:  I haven't spoken with you about it, so

18   we probably need to talk about it.

19         MISS TULIN:  Okay.  Well, I'm happy to talk about it

20   or just file it saying that Defendant Ogg has — does not have

21   a position.  We initially circulated this to everyone on

22   September 5th.  We have been back and forth about it, and I

23   spoke yesterday with the defendant, the State defendants, and

24   they no longer have any objection to what has been circulated.

25   And I sent an email last night saying please let me know if

1    any other defendants object, and I have heard nothing, so...

2         MR. WASSDORF:  I just wanted to address the Court on

3    one thing.  This involves some U.S. Census data to which

4    plaintiffs have done some calculations.  I would just ask that

5    we reserve the right to object to the extent that we discover

6    any errors in the calculations down the line.

7         THE COURT:  So I'm confused about what's being

8    tendered.  I mean, I can take judicial notice of any census

9    data, but if you're now extrapolating from that data and

10   you've created new charts, I can't take judicial notice of

11   that.

12        MISS TULIN:  So what —— what we have circulated ——

13   and again, we can just file it in writing, and then we can

14   deal with it that way, but it is census data.  There are some

15   basic calculations in an appendix that are explained in

16   writing and that, I believe, we made some —— we went back and

17   forth with the State defendants about the —— those

18   calculations and the numbers, and as of yesterday afternoon, I

19   understood that they did not plan to oppose any part of the

20   request.

21        MR. WASSDORF:  It might be better phrased as a

22   stipulation rather than a judicial notice.

23        THE COURT:  You're right where I was headed, so it

24   ought to be either judicial notice of census data and an

25   agreed exhibit, and you give it an exhibit number —— or

1    unopposed exhibit.  But again, I can't take judicial notice of

2    extrapolations that you've made from data, so if you're going

3    to do that — and I would suggest you do it the way I — and

4    the way counsel was just suggesting.  We take judicial notice

5    of whatever census data, and then there is a new plaintiffs'

6    exhibit number that's unobjected to.

7            MISS TULIN:  And that is absolutely fine.  We have no

8    problem with that, Your Honor.  So we will submit that, and we

9    can go forward with that.

10           The other piece of what I wanted to do today is we

11   have — and in the — we can do this however everybody wants

12   to go forward.  We have a list of exhibits that the State

13   defendants have said they have no objection to, and so I would

14   like to move to admit those.  There are still another category

15   of LUPE exhibits that we would like to move for admission.  I

16   believe that there are going to be objections, and in the

17   interest — since we're ending early today, I think it might

18   be prudent to —

19           THE COURT:  Defer that to Monday.

20           MISS TULIN:  Exactly.  So I can go ahead and read

21   this list if you like.

22           MR. NICHOLS:  Your Honor, I would just ask for the

23   courtesy of getting whatever list that they want to admit.  I

24   can look at it, and then we can come back to the Court on

25   Monday and let you know whether there are any objections.

3716
DOUGLAS KRUSE — DIRECT

1          THE COURT:  So it looks like we need to flush this
2  out some more, so why don't we take care of that list on
3  Monday.
4          MISS TULIN:  Okay.  Thank you, Your Honor.
5          THE COURT:  Any other housekeeping?  Or lack of
6  housekeeping?
7          Your next witness.
8          MISS SINGH:  Good morning, Your Honor.  Jasleen Singh
9  for LUPE OCA and HAUL plaintiffs.  We call Dr. Douglas Kruse
10  to be a witness.
11    (DOUGLAS KRUSE, having been duly sworn, testified as
12  follows:)
13          MISS SINGH:  For the record, we are offering
14  Dr. Kruse's expert testimony for claims challenging Sections
15  502, 503, 506, 507, 510, 512, 513, 601, 603, 604, 605, 606,
16  and 704 of SB 1 under the Americans with Disabilities Act,
17  Section 504 of the Rehabilitation Act, and Section 208 of the
18  Voting Rights Act.
19                    DIRECT EXAMINATION
20  BY MISS SINGH:
21  Q.  Good morning, Dr. Kruse.
22  A.  Good morning.
23  Q.  Can you please state your full name for the record.
24  A.  Douglas Kruse.
25  Q.  Where are you currently employed?

DOUGLAS KRUSE – DIRECT

1  A.  I'm employed at Rutgers University.

2  Q.  What is your position there?

3  A.  My position is professor.

4  Q.  And what is the title of your position there?

5  A.  I am — my title is "Distinguished Professor."

6  Q.  And how long have you served in this position?

7  A.  I have been a professor at Rutgers for 35 years.  I've

8  been a distinguished professor for 10 years.

9  Q.  And what are some of your duties as a Distinguished

10  Professor?

11  A.  Teaching and research.  I teach courses to graduate

12  students and undergraduates, Ph.D. students, and master's and

13  undergraduate students, and I do research on a variety of

14  topics and administer several grants.

15  Q.  Did you provide an expert report in this case?

16  A.  I did.

17  Q.  And do you have a copy of that report with you?

18  A.  I do, right in front of me.

19  Q.  Can we please pull up Dr. Kruse's report, which has been

20  marked as LUPE 2.  And if we can just scroll down to the

21  second page.

22      Okay.  Is this a true and correct copy of the report you

23  submitted in this case?

24  A.  It appears to be.

25  Q.  Okay.

DOUGLAS KRUSE — DIRECT

1          MISS SINGH:  Your Honor, I'd like to move LUPE 2 into
2   evidence.
3          THE COURT:  Any objection?
4          MR. BRYANT:  Your Honor, no objection.  I just wanted
5   to clarify.  Is it LUPE Exhibit 2?
6          MISS SINGH:  Correct.
7          MR. BRYANT:  Thank you.  No objection.
8          THE COURT:  LUPE 2 is admitted.
9   BY MISS SINGH:
10  Q.  Dr. Kruse, do you have a CV?
11  A.  I do.
12  Q.  And so if we can look at Exhibit A of your report, which
13  begins on page 44.  And we can scroll down to that next page.
14  Is this CV a complete and accurate summary of your background
15  and professional experience as of the time of your
16  February 28th, 2022 report?
17  A.  It is.
18  Q.  And have there been any updates to your CV since then?
19  A.  Yes.  I published four articles since then, and three of
20  the articles that were listed as forthcoming in the CV have
21  since appeared.  I've also received two grants from the U.S.
22  Elections Assistance Commission.
23  Q.  So let's talk briefly about your educational background.
24  Where did you earn your academic degrees?
25  A.  I received my bachelor's from Harvard College, my master's

DOUGLAS KRUSE - DIRECT

1  degree from the University of Nebraska, Lincoln, and Ph.D. in

2  economics from Harvard University.

3  Q.  And did you become a professor at Rutgers immediately

4  after earning your Ph.D.?

5  A.  Yes.

6  Q.  And other than distinguished professor, do you hold any

7  other positions at Rutgers?

8  A.  At Rutgers, yes, I'm the co-director of the Program for

9  Disability Research.  I'm also associate director of the

10  Institute for the Study of Employee Ownership and Profit

11  Sharing.

12  Q.  And what are some of your duties as co-director of the

13  Program for Disability Research?

14  A.  We administer a -- we -- I coordinate several grants.  We

15  actually have six grants going on right now, which is about

16  five grants too many; three grants in the area of disability

17  and employment, and three grants in the area of disability and

18  voting, and I -- with my co-director, Lisa Schur, I coordinate

19  a team of researchers both at Rutgers and at other

20  universities:  Indiana, Syracuse, and Harvard University.

21  Q.  How long have you held that position?

22  A.  Since 2005.

23  Q.  What are your primary areas of research?

24  A.  My primary areas of research, there are really two.  One

25  is in the area of disability, particularly disability in

DOUGLAS KRUSE - DIRECT

1  employment and disability in voting; and the other is the

2  study of employee ownership, profit sharing, gain sharing, and

3  other group incentives, which I did for my dissertation way

4  back when.

5  Q.  So let's focus on your research regarding people with

6  disabilities.  Can you generally describe your research?

7  A.  My research broadly looks at the economic, social, and

8  political inclusion of people with disabilities.  I — as a

9  labor economist I spent a lot of time looking at the

10  employment of people with disabilities, the kind of

11  disparities they face and the kind of opportunities, the

12  facilitators to greater employment opportunities for people

13  with disabilities.

14      And in the area of voting, have done a lot of research on

15  voter turnout among people with disabilities, the disparities

16  they face.  And then issues of voting access, what kinds of

17  barriers they face in exercising the right to vote.

18  Q.  Have you published any books, articles, or other

19  publications on people with disabilities?

20  A.  I have.  Three of my books actually deal with disability.

21  One of the books — the major book is published by Cambridge

22  University Press, a broad overview of economic, social and

23  political inclusion of people with disabilities, and I've also

24  published a number of peer-reviewed articles.

25  Q.  And have you held any positions outside of Rutgers related

DOUGLAS KRUSE - DIRECT

1   to disability access?

2   A.  I have.  I've -- I was appointed to the president's

3   committee on the employment of people with disabilities and

4   also to the New Jersey State Rehabilitation Council, which

5   advises the Division of Vocational Rehabilitation Services.  I

6   was actually appointed by Christine Todd -- Governor Christine

7   Todd Whitman.

8   Q.  Have you held any position outside of Rutgers not

9   specifically related to disability access?

10  A.  The two positions I hold right now are research associate

11  at the National Bureau of Economic Research and I'm a research

12  fellow at the IZA Institute of Labor Economics in Bonn,

13  Germany.

14  Q.  And you mentioned one of your areas of research is voting

15  access for voters with disabilities.  Can you provide some

16  examples of the research you've done on that topic?

17  A.  A lot of that research has been based on surveys that my

18  colleagues and I have conducted based on national -- national

19  post-election surveys.  We've done national post-election

20  surveys on disability and voting access after five elections

21  starting in 1998.  The three most recent surveys were

22  sponsored by the U.S. Election Commission.  In addition to

23  that, to those surveys, we've also analyzed the current

24  population survey voting and registration supplement, which

25  we'll be talking about more later, and matched that to state

DOUGLAS KRUSE – DIRECT

1  policy data for some other publications I've done.

2  Q.  Thank you.  And have you published any books, articles, or

3  other publications on these topics?

4  A.  Yes, I have.

5  Q.  And have any of your publications been peer-reviewed?

6  A.  Oh, yes, they've all been peer-reviewed.

7  Q.  Have you presented your research on these topics to peers?

8  A.  Oh, yes, quite often.

9  Q.  Do you review the academic work of other individuals

10  publishing on these topics?

11  A.  I do, far too much; about two per month, which is — it

12  takes a long time.

13  Q.  Are you familiar with the Election Assistance Commission?

14  A.  Very much.

15  Q.  And what is that?

16  A.  The Election Assistance Commission was set up by the Help

17  America Vote Act of 2002.  There are six commissioners

18  appointed by the President.  Three Democrats, three

19  Republicans.  They — their mission is to assist state and

20  local entities in administering elections.

21  Q.  And have you conducted work for or on behalf of the

22  Election Assistance Commission?

23  A.  I have.

24  Q.  Can you describe that work?

25  A.  Yes.  The — as I mentioned, we've done five surveys

DOUGLAS KRUSE — DIRECT

1  starting in 1998, following elections.  The three most recent

2  surveys were sponsored by the EAC in 2012, 2020, and 2022; so

3  we analyzed those data and present reports that were issued by

4  the EAC.

5      In addition, we've also done two other reports in the past

6  couple years for the EAC, one based on a national survey on

7  voting information, and then — related to disability, and the

8  other a series of focus groups on the experiences of voters

9  with disabilities since HAVA was passed exploring their

10  experiences in the past 20 years.

11  Q.  Thank you.  And have you received any awards or other

12  recognition for your scholarly work?

13  A.  I have.  Three of my books were noted by Princeton

14  University as noteworthy books of the year.  And, in fact, one

15  of them received the award of outstanding book of the year.

16  Three of my articles have received awards.  Let's see.  Last

17  year I was named a fellow of the Labor Employment Relations

18  Association.  And a fellow –– in academia, a fellow –– a

19  fellow status is used by some professional societies to

20  indicate someone who has made substantial contributions to

21  a — to the field over the course of their career, so it's a

22  nice honor.

23      The last recognition I'll mention — and I'm generally too

24  modest to say this, having been raised in Nebraska in a good,

25  modest way; but we did receive some very nice recognition

DOUGLAS KRUSE - DIRECT

1  about a year and a half ago.  A team of Spanish scholars

2  analyzed all the research that had been done and published

3  over the past 30 years on in the area of disabilities and

4  employment, and they published an article, a peer-reviewed

5  article in this concluding that Rutgers was the number one

6  ranked institution in the world for disability and employment

7  research.

8  Q.  Thank you.

9  A.  So I was very happy to show that to my mother.

10  Q.  Thank you, Dr. Kruse.

11        MISS SINGH:  Your Honor, at this time I tender

12  Dr. Douglas Kruse as a qualified expert witness in the field

13  of voters with disabilities.

14        THE COURT:  Any objection?

15        MR. BRYANT:  No, Your Honor.

16        THE COURT:  Noted.  He's so recognized.

17        MISS SINGH:  Thank you.

18  BY MISS SINGH:

19  Q.  So Dr. Kruse, I want to talk a bit about your report and

20  methodology.  Briefly, can you tell us what you were asked to

21  do in this case?

22  A.  I was asked to analyze the data regarding the barriers and

23  factors that contribute to barriers for voting among people

24  with disabilities and use that evidence to assess the

25  provisions of SB 1.

3725

DOUGLAS KRUSE – DIRECT

1  Q.  And can you briefly explain how your report is organized?

2  A.  My report is organized by first introducing the datasets

3  that I use, and then — the representative datasets.  We'll

4  talk more about those — then going through the results on the

5  kinds of economic, social factors, and political factors that

6  affect voting on people with disabilities with direct evidence

7  on voting.

8      And then I apply that — in the third part of the report,

9  I apply that evidence to the provisions of SB 1.

10 Q.  Thank you.  We can actually pull down the CV for now.

11 Thank you.

12     And so after performing that analysis, which we will

13 discuss shortly, did you form an opinion?

14 A.  I did.

15 Q.  And did you form an opinion about any specific provisions

16 of SB 1?

17 A.  Yes.

18 Q.  Which provisions?

19 A.  The provisions — boy, I can't rattle them all off here.

20 Q.  Generally speaking.

21 A.  Generally speaking — and there are a number of provisions

22 and — that start with five, six, and seven.  And I'm sorry.

23 I can't rattle those — those provisions off.

24 Q.  That's okay.  So before we talk in more detail about the

25 findings regarding — regarding some of those provisions, I'd

3726

DOUGLAS KRUSE - DIRECT

1  like to focus on the methodology you used in conducting your

2  analysis.

3      Can you please explain the materials you reviewed in

4  preparing your report?

5  A.  What I did was to take all the large-scale national

6  datasets I could find that have information on disability and

7  on factors that relate to the -- relate to voting among people

8  with disabilities, and I analyzed those data.  I analyzed the

9  microdata, the individual level or household -- household data

10  and generated -- generated statistics and comparisons between

11  people with and without disabilities on voting measures, on --

12  and on issues like travel, travel issues that relate to the

13  issues that people have in voting.

14  Q.  And did you review SB 1?

15  A.  I did.  I read the entire thing.

16  Q.  Okay.  And did you review anything else?

17  A.  No, I don't believe so.

18  Q.  So you mentioned several surveys that you reviewed.  Could

19  you tell us what those surveys are?

20  A.  There are six surveys I used:  The American Community

21  Survey, the Survey of Income and Program Participation, the

22  Current Population Survey, Voting and Registration Supplement,

23  the Survey of the Performance of American Elections, National

24  Household Travel Survey, and the Disability and Voting

25  Accessibility Survey.

DOUGLAS KRUSE - DIRECT

1  Q.  Thank you.  And what data do you relay upon in your

2  report?

3  A.  I rely on data from all of those — from all of those six

4  datasets.

5  Q.  Okay.

6  A.  My analysis is based on those.

7  Q.  So let's take each of those data sources you mentioned in

8  turn.  What is the American Community Survey and who conducts

9  it?

10  A.  The Census Bureau conducts American Community Survey.

11  They do this once a year.  It's a survey of approximately

12  one percent of American households.  Three million people are

13  included in those households each year, so it's a very

14  large — very large dataset.

15  Q.  And what is the Survey of Income and Program Participation

16  and who conducts it?

17  A.  Survey of Income and Participation is also analyzed — it

18  is conducted by the Census Bureau.  It's designed to be a

19  longitude survey.  They ask people questions for several years

20  every quarter, so every three months.  But they also have

21  special supplements now and then, and in this case, I rely on

22  a special supplement they did in 2014 that asked extensive

23  questions about disability and the types of assistance people

24  need.

25  Q.  What is the Current Population Survey, Voting and

DOUGLAS KRUSE — DIRECT

1  Registration Supplement and who conducts it?

2  A.  The Current Population Survey itself is the monthly survey

3  that the Census Bureau conducts on behalf of the Bureau of

4  Labor Statistics to generate employment statistics each month.

5  The numbers that we see the first Friday of every month at the

6  BLS releases on employment rates come from the CPS, the

7  Current Population Survey.

8      Every two years in even numbered years in November they

9  have a special supplement to that Current Population Survey, a

10  Voting and Registration Supplement which asks people whether

11  they voted in the election that was just held a couple weeks

12  earlier and ask a variety of questions about whether people

13  voted and, if not, why they didn't vote and so forth.

14  Q.  What is the National Household Travel Survey and who

15  conducts it?

16  A.  National Household Travel Survey was conducted in 2017 by

17  the Department of Transportation asking a wide variety of

18  questions about the travel situation of Americans, both with

19  and without disabilities.

20  Q.  And what is the Disability and Voting Accessibility Survey

21  and who conducts it?

22  A.  Disability and Voting Accessibility Survey is a name that

23  we gave to the survey I was describing we've done for the U.S.

24  Election Assistance Commission three times.  That's the

25  post—election survey of people with and without disabilities

DOUGLAS KRUSE – DIRECT

1  around the country.  It's done by — at Rutgers, we coordinate

2  this.  We contract with the survey firm SSRS, which is a very

3  well-established national survey firm that contracts with a

4  number of major media organizations for doing surveys.

5  Q.  And finally, what is the Survey of the Performance of

6  American Elections and who conducts it?

7  A.  The Survey of The Performance of American Elections is

8  the — a survey conducted by the MIT and PEW Foundation every

9  four years following the elections.  They ask registered

10  voters — now it's just confined to registered voters —

11  asking about their voting experiences in the most recent

12  election.

13  Q.  And so, generally speaking, how is the data for these

14  surveys gathered?

15  A.  It's gathered in a — can be gathered in a variety of

16  ways.  Some of it — and there's different mixes in the

17  different surveys.  All of these — the method is designed to

18  be, in each of these cases, representative of the population.

19  Sometimes the data is gathered by in-person interviews,

20  sometimes by telephone interviews, sometimes online, and,

21  yeah, so a variety of methods.

22  Q.  And that method of data gathering, it's used for each of

23  the surveys?

24  A.  Yes.  They have a different mix, as I said, but they —

25  but each of those surveys — I believe each of those surveys

DOUGLAS KRUSE – DIRECT

1  uses each of those methods.

2  Q.  Are the surveys anonymous?

3  A.  Yes.

4  Q.  Why is this methodology reliable?

5  A.  People are more likely to be truthful in an anonymous

6  survey.  They are going to be less worried that any

7  information they provide will be used to their detriment in

8  any way.

9  Q.  And why is the methodology that you described in how the

10  survey data is gathered, why is that reliable?

11  A.  They —— they try to collect the data in a representative

12  way to make sure that we can generalize the results to the

13  population, to make sure that the sample is a valid sample

14  that reflects the population as a whole.

15  Q.  And do you believe the data itself is reliable?

16  A.  Oh, I do.  And the data in these datasets have been used

17  by many, many scholars in peer-reviewed research.  It's ——

18  these datasets are highly regarded as high-quality surveys.

19  Q.  And what is a high-quality survey?

20  A.  High-quality survey is one where it's been designed

21  with —— it's been designed with care, so the questions are

22  pretested and generally tested out in focus groups and so

23  forth, to make sure that they are measuring what the

24  researchers want to measure.  In addition, the high quality

25  survey makes sure to have a representative sample, as I said,

DOUGLAS KRUSE – DIRECT

1  so that the results can be generalized.

2      In addition, the high-quality survey will do weighting,

3  provide weights following to the survey to each observation to

4  reflect the population; the reason being that any sample —

5  any random sample will have some random differences from the

6  population, so it may be that a particular sample perhaps

7  undercounts young people, and so the — in the — and if you

8  know the population parameters, you can create weights that

9  give a little extra weight to those young people to make sure

10 that the overall sample is as representative as possible of

11 the overall population.  And I do use those weights in all my

12 surveys, the weights developed by the survey administrators.

13 Q.  Thank you.  And we'll explore some of what you mean by

14 weighting further —

15 A.  Yeah, sure.

16 Q.  — in a little bit.

17      Do the sources of your data that you've used, do they have

18 any limitations?

19 A.  They can have limitations.  The main limitation with

20 regard to measuring disability is that it's hard to measure

21 disability.  I've been engaged in a lot of fun scholarly

22 debates over the years about how to measure disability.  And

23 disability is such a varied concept and varied experience that

24 it's really impossible in a short set of questions to capture

25 all kinds of disability; therefore, the surveys I analyze —

DOUGLAS KRUSE - DIRECT

1  for example, the American Community Survey uses six questions,
2  as does the Current Population Survey.  Those capture most
3  disabilities, but they are going to be conservative estimates.
4  They are going to underreport, they're going to undercount
5  some types of disabilities, and we can talk a little more
6  about that later, but they will undercount things like speech
7  impairments, like bipolar, depression even.  There are some
8  things that these measures will not capture.
9       There's also — I should also say a limit of some of the
10 surveys is that they don't include people in institutions.
11 The American Committee Survey does, and so some of the other
12 surveys do, but the Current Population Survey and the Survey
13 of Income and Program Participation don't include people in
14 institutions:  Mental hospitals, nursing homes, prisons.  And,
15 of course, prisons, a lot of people are not eligible to vote
16 in prisons, but — and we can talk more about that later, but
17 whether you include them or not, that's — really doesn't
18 affect the overall results.
19 Q.  And do different surveys have different sample sizes?
20 A.  They do.
21 Q.  And how does sample size impact the data?
22 A.  Sample size is a key factor in analyzing data in achieving
23 and creating margins of error for all the estimates.  The
24 typical sample size in a national survey these days is about a
25 thousand.  When you read in the paper about results on, you

DOUGLAS KRUSE - DIRECT

1  know, presidential horse race or something like that, those
2  surveys are typically based on the sample of a thousand, which
3  produces a margin of error of plus or minus 3.2 percentage
4  points.
5     If you have a much larger sample, as most of the surveys I
6  analyze do, the margin of error goes down, meaning you are
7  more confident about the data, about the estimates that you
8  make.
9  Q.  And you had mentioned that the Survey of Income and
10 Program Participation was published in 2014?
11 A.  Yes.
12 Q.  How reliable is 2014 data?
13 A.  It's — yes, that's the most recent time they conducted
14 that, and I analyze those data because it does — the Survey
15 of Income and Program Participation does have about 100
16 questions measuring disability, so it provides some real
17 insights into the — the upper bounds.  It's to the kind of
18 underreport there may be in the other surveys.
19    It was done in 2014.  There's no reason to believe that
20 it's not representative of today.  And if anything, disability
21 rates of have been increasing due to the aging of the
22 population, and aging is strongly associated with disability,
23 as we'll talk about.  So, if anything, the estimates are
24 likely to be a bit higher since 2014.
25 Q.  And when was the National Household Travel Survey

DOUGLAS KRUSE - DIRECT

1  published?

2  A.  That was done in 2017, yes.

3  Q.  And sort of same question.  How reliable is 2017 data?

4  A.  Same issue; that since that time, there's no reason to

5  believe that the 2017 numbers are not representative of today.

6  If anything, the results may be that there may be higher rates

7  of disability since then due to the aging in the population.

8  And I should also say to the pandemic.  The -- in the past

9  couple years, some of my colleagues at Rutgers and Harvard

10  have analyzed data looking at how rates of disability have

11  increased due to long COVID in the most recent year and a

12  half.  So rates of disability seem to be going up,

13  unfortunately.

14  Q.  Okay.  Could you please describe the principles or methods

15  you used in reaching the conclusions in your report?

16  A.  In analyzing the data or in -- okay.  What I did was to

17  take the microdata, the individual-level data from these

18  datasets and generate -- generate estimates doing comparisons,

19  in most cases between people with and without disabilities,

20  and using statistical methods to generate the margin of error,

21  the standard error, how confident we are that there is a true

22  difference between people with and without disabilities.

23      And in my -- in the tables I present, I use an asterisk to

24  indicate where a particular difference is well outside the

25  margin of error, and where there's no asterisk then that

DOUGLAS KRUSE - DIRECT

1  margin may be within the margin of error.

2  Q.  Are these principles or methods widely used in your field?

3  A.  Very much.  Yes, very standard.

4  Q.  Okay.  So now I'd like to talk about your findings about

5  the prevalence and characteristics of people with disabilities

6  in Texas.

7  A.  Okay.

8  Q.  First of all, why did you include these findings in your

9  report?

10  A.  Well, I wanted to be able to generate numbers that would

11  be relevant to assessing the potential effects of SB 1 on the

12  voting of -- voting access among people with disabilities in

13  Texas, so I was able to, for most of the datasets, generate

14  good sample sizes just from Texas data.

15  Q.  So now I'd like to pull up Table 1 of your report.

16  A.  Okay.

17  Q.  And could you tell us what we're looking at here in

18  Table 1?

19  A.  This is -- these are data from the American Community

20  Survey.  The American Community Survey, as I mentioned, the

21  national dataset is about 3 million people per year.  What I

22  did was I restricted this to people who are eligible to vote,

23  people who are age 18 or older and are citizens, and found

24  just over 127,000 people that I could use to analyze, so it's

25  a far larger than the thousand standard that I was mentioning

DOUGLAS KRUSE - DIRECT

1  before.  This — margins of error are very small.

2      I used those data to generate estimates of the number of

3  people with disabilities in Texas based upon the six

4  questions, six disability questions used by the ACS.

5  Q.  And so these numbers in column one come directly from the

6  ACS?

7  A.  Yes.  They're numbers I generated using the — using the

8  weights for each observation.  As I said, they provide a

9  weight indicating how many people in the population this

10  observation represents, so I essentially just totaled those up

11  to figure out how many people with disabilities and how many

12  people without disabilities there were in Texas in 2020.  At

13  the time I did the report, the 2020 data were the most recent

14  available.

15  Q.  And so I have a couple questions about that.  So if we

16  look down at the sample size, this 127,398 number, can you

17  tell us what that means?

18  A.  Well, the Census Bureau, in doing its survey, was able to

19  contact households that have 127,398 people who are age 18 or

20  older and who are citizens living in Texas.

21  Q.  Okay.  And then when it comes to weighting, each of those

22  127,398 people were assigned a weight?

23  A.  Yes, they were assigned a weight.  And actually, if you

24  total up all the weights, that's what gets to the number at

25  the very top, the 19,425,500.  This is the same thing that is

DOUGLAS KRUSE – DIRECT

1  done —— as I mentioned, the Bureau of Labor Statistics

2  releases unemployment —— the unemployment rate each month.

3  What they do is they use estimates from the Current Population

4  Survey with appropriate weights to come up with how many

5  people are employed and how many people are unemployed, so

6  same —— same method here.

7  Q.  Thank you.

8      And are columns two and three here your own calculations

9  based on the numbers in column one?

10 A.  Yes, they are.

11 Q.  Okay.  And can you explain —— I know you talked about this

12 a little bit before, but can you explain what the "margin of

13 error" means here?

14 A.  Margin of error is how confident we are about a particular

15 figure.  The margin of error indicates an —— in this case a

16 95 percent confidence interval, which is the standard

17 confidence interval used in —— in all kinds of —— all kinds of

18 research.  You can see the margin of error of 0.3 percent.

19 Taking the disability number, percent of adult citizens,

20 15.6 percent are estimated to have a disability, one out of

21 six basically.  And the 0.3 percent indicates that the —— you

22 know, based on this sample, we are 95 percent confident that

23 the true number in the population is 15.6 percent plus or

24 minus 0.3; in other words, that the —— we're 95 percent

25 confident the true number is between 15.3 percent and

DOUGLAS KRUSE - DIRECT

1    15.9 percent.

2    Q.  Okay.  Thank you.  And I see here at the top it states

3    that this data is for "Texas citizens age 18 or older"?

4    A.  Yes.

5    Q.  For Texas-specific data you include in your report, did

6    you always look at the voting age population?

7    A.  I always looked at the voting age population.  There were

8    two datasets that did not have citizen information, and I note

9    that in the report.  But for four of the datasets, the other

10    four datasets, they do have information on citizens.  But all

11    datasets do include just people age 18 or older.

12    Q.  And so when I say "Texans," will you understand that I'm

13    referring to voting-age Texans?

14    A.  Yes.

15    Q.  Okay.  And Dr. Kruse, how many Texans with disabilities

16    reside in Texas?

17    A.  I estimate as of 2020, 3 million, just over 3 million.

18    Q.  Thank you.  And is that a reflection of the number we see

19    in column one across from "Disability"?

20    A.  Yes.

21    Q.  Okay.  Could that number be higher?

22    A.  Oh, absolutely.  As I said, it's difficult to measure

23    disability.  Been in lots of scholarly debates about that.

24    The six questions in the -- the Census Bureau uses six

25    questions in ACS and the CPS, Current Population Survey, and

DOUGLAS KRUSE - DIRECT

1  those questions are widely acknowledged to, you know, capture

2  important dimension of disability, but to be undercounts,

3  because it's really just impossible to design questions that

4  will capture every type of disability.

5  Q.  Okay.

6  A.  Or at least it would take a thousand questions, and no

7  survey can put in a thousand questions.  It's just not

8  practical.

9  Q.  And could voters mark more than one disability on this

10  survey?

11  A.  They could, yes.  There are six questions there, and you

12  see those six questions, the six measures listed below, people

13  would mark any one of those or they could mark all six even.

14  Q.  Okay.

15  A.  Although I don't think very many people did that.

16  Q.  And so does the 3 million number that we see, does that

17  number account for — does that eliminate overlap?  Does it

18  account for the fact that people —

19  A.  Yes.

20  Q.  — can mark more than one?

21  A.  Yeah, right.  If you add up those six numbers below, you

22  get a number well more than 3 million.  The 3 million figure

23  represents people who responded "yes" to one or more of the

24  questions, but does not include the overlap.

25  Q.  Okay.  And so looking down to where it says "Mobility

DOUGLAS KRUSE — DIRECT

1  Impairment," what can you tell us about the number listed
2  here?
3  A.  Well, that's 1.6 million.  That indicates that just over
4  half of people with disabilities indicate a mobility
5  impairment.  And the question that they used in the ACS is:
6  "Do you have difficulty walking or climbing the stairs?"
7  That's the measure of mobility impairment.
8  Q.  What's the number across from "difficulty going outside
9  home alone"?
10 A.  Right.  That's one — a little over 1.1 million, 1,127,500
11 so that indicates about one-third of the people with
12 disability have difficulty going outside the home alone.  The
13 question — I don't have the exact reading right here, but the
14 question they use to measure that is:  Does this person have
15 difficulty going outside home alone to do errands such as a
16 grocery shopping or visiting a doctor's office.
17 Q.  Okay.  And would one-third be accurate for voting age
18 Texans with a cognitive impairment?
19 A.  Yes.  That number is actually pretty similar to the
20 home — difficulty going outside home alone.  Cognitive
21 impairment is just very close to 1.1 million as well.  And
22 that particular question to measure that is difficulty
23 remembering, concentrating, or making decisions.
24 Q.  Thank you.  So now I'd like to talk a bit about
25 demographics of voters with disabilities.  Could we pull up

DOUGLAS KRUSE - DIRECT

1  Table 3.  Thank you.

2      So Dr. Kruse, what is this table showing us?

3  A.  Well, in this table I take a deeper dive into the American

4  Community Survey that I've just presented here, looking at the

5  characteristics of people with and without disabilities along

6  several dimensions:  Gender, race and ethnicity, age, and

7  education.

8  Q.  And so looking at the race and ethnicity portion of this,

9  is disability more prevalent within certain racial or ethnic

10  groups?

11  A.  Yeah, the disability numbers are higher among blacks and

12  among Native Americans.  You can see in column three there

13  17.9 percent figure for blacks, 17.8 percent figure for Native

14  Americans, and tends to be lower for Asians, and for Hispanic.

15  And I should note that the black and the white numbers exclude

16  Hispanic.

17  Q.  Okay.  So I actually want to ask about that, so I'm

18  looking at the Hispanic Latinx number here, and that number

19  seems to be generally lower.  Can you explain why that might

20  be?

21  A.  Yeah, that's really interesting.  That's something I

22  looked into.  The — that's basically because Hispanics tend

23  to be younger.  Just looking at the age compilation, they tend

24  to be younger, and young people are less likely to have

25  disabilities in general.  If I did do a comparison, which I

DOUGLAS KRUSE – DIRECT

1    report in the — in my expert report breaking out the
2    Hispanic, but the disability numbers among Hispanics by age
3    group, and find that the rate of disability is higher in each
4    age group among Hispanics except for the very youngest age
5    group.
6         But the basic answer to your question is that that figure
7    is low because Hispanic are — are in some sense
8    overrepresented among young people.
9    Q.   Thank you.
10        And looking down at the table — I know you mentioned this
11   a little earlier, but do rates of disability correlate with
12   age?
13   A.   Very, very highly.  That's one of the striking findings
14   that forms a — that informs that lot of disability research.
15   You can see among people age 18 to 34, the youngest group,
16   only 7 percent have a disability.  That number rises steadily,
17   very steadily with age.  For people 85 or more, 70 percent are
18   designated as having a disability.  And as I mentioned before,
19   the aging of the population, as us — as us baby boomers get
20   older, we get higher rates of disability, and that leads to
21   higher rates of disability projected in the population as a
22   whole for the next couple decades, as long as us baby boomers
23   are around and haven't died off yet.
24   Q.   Thank you.
25        So we can pull this table down, and I want to shift gears

DOUGLAS KRUSE - DIRECT

1  a bit.

2      Dr. Kruse, are there common issues that voters with

3  disabilities experience?

4  A.  Yes.  There are.

5  Q.  Can you tell us about some of those issues?

6  A.  Some of the issues have to do with employment.  The people

7  with disabilities are less likely to be employed, and there's

8  been a lot of research on that.  As I mentioned, that's one of

9  the key areas that I've done a lot of research on.  They are

10  more likely to live alone.  They are less likely to be

11  married.  So there's some increased isolation.  They tend to

12  have travel difficulties.  They are less likely to be able to

13  drive cars.  They have lower rates of internet access, so

14  those are just -- that's just kind of a high-level overview of

15  some of the -- some of the barriers that they -- that they

16  often face.

17  Q.  Thank you.

18      So let's talk about some of those, in turn, and I want to

19  start with living situation.

20      Could we pull up Table 4.  And could we also pull up

21  demonstrative one and display that alongside Table 4.

22      Great.  Thank you.

23      So Dr. Kruse, first looking at Table 4, which should be on

24  the left side of your screen, could you tell us what this

25  103,808 number is at the bottom of column three?

DOUGLAS KRUSE - DIRECT

1  A.  Yes.  The 103,808 is the sample size of people without

2  disabilities.  It's in the wrong column.  And I confess when I

3  was cutting and pasting the results from my statistical

4  program, I copied and pasted in the wrong cells.

5  Q.  Okay.

6  A.  So 101,808 belongs in column two.  The 23,590 belongs in

7  column one, and the 9,609 belongs nowhere.  That number is

8  just a mistake.

9  Q.  Okay.  And so does demonstrative one accurately portray

10  where those sample sizes should be listed?

11  A.  Yeah.  That's —— that's the way I should have —— I should

12  have presented it.  I apologize for the mistake in copying and

13  pasting.

14  Q.  And does the 9,609 number listed, does that affect the

15  data that you have analyzed here?

16  A.  Not at all.

17  Q.  Okay.

18  A.  That was just a random number from the statistical program

19  that is not relevant here.

20  Q.  Okay.  And these two numbers, the 23,590 and the 103,808

21  that adds up to 127,398?

22  A.  Yes.  Exactly.

23  Q.  Thank you.

24       MISS SINGH:  So, Your Honor, I'd like to move to

25  admit demonstrative one into evidence as LUPE 352.

DOUGLAS KRUSE - VOIR DIRE

1          THE COURT:  Any response?

2          MR. BRYANT:  Your Honor, my only hesitation is that

3    this — what's described as a demonstrative was not produced

4    to us, as I understand it, and we only learned of it in the

5    last 24 hours or so.  Could I take the witness on voir dire

6    for a second?

7          THE COURT:  Sure.

8                        **VOIR DIRE**

9    BY MR. BRYANT:

10   Q.  Dr. Kruse, when did you discover the errors that you made

11   in Table 4?

12   A.  I discovered that, I think that was about a month ago when

13   I was rereading the expert report.  I did do, I thought, a

14   careful review of — of all the tables earlier when I —

15   before producing the report, but I — I think it was about a

16   month ago I discovered the — that I missed that.

17   Q.  And when did you create the correct version that is now

18   described as the demonstrative?

19   A.  I told the lawyers about this — what was it?  It was

20   several weeks ago, and they created the demonstrative.

21   Q.  And do you know when the attorneys with whom you work

22   created the demonstrative that's now offered into evidence?

23   A.  No, I don't.  No, I just saw this demonstrative myself a

24   few days ago.

25         MR. BRYANT:  Your Honor, I think we have to object to

3746

DOUGLAS KRUSE - DIRECT

1  it because, obviously, this document was created more than a

2  few days ago, but we were not provided a copy of it until

3  within the last 24 hours.

4         THE COURT:  Yeah.  It was created at least two weeks

5  ago, and so notice should have been given to the other side.

6  Frankly, it's not going to make much of a difference.  His

7  verbal testimony cleans up Table 4, but the objection is

8  sustained.  The demonstrative is not admitted.  I will take

9  into account his verbal testimony in support of why Table 4 is

10  incorrect.

11         MISS SINGH:  Thank you.

12               DIRECT EXAMINATION CONTINUED

13  BY MISS SINGH:

14  Q.  So let's just focus on Table 4, then.

15  A.  Okay.

16  Q.  Can you tell us what this table is showing us?

17  A.  It's showing several measures of economic and social

18  inclusion.  The employment numbers indicate that people with

19  disabilities are much less likely to be employed, about

20  roughly half as likely to be employed as other working age

21  people without disabilities.  They are about twice as likely

22  to be in poverty.  That's, of course, related to the low

23  employment rates.  18 percent, over one out of six people with

24  disabilities live in poverty compared to only about 9 percent

25  of people without disabilities.

DOUGLAS KRUSE — DIRECT

1     People with disabilities are much more likely to receive

2  Social Security income, due both to general Social Security

3  retirement income for people age 65 and older, and also Social

4  Security Disability Insurance, or Supplemental Security

5  Income.

6         THE COURT:  Professor, I don't mean to interrupt,

7  but — so this is interesting and kind of sad, but how is it

8  relevant?

9         MISS SINGH:  This is relevant because it sort of —

10  it provides background on the various barriers and common

11  issues that voters with disabilities face, and that interacts

12  with their access to voting.

13         THE COURT:  Yeah, try to get there as quick as you

14  can.

15         MISS SINGH:  Okay.

16  BY MISS SINGH:

17  Q.  So, Dr. Kruse, let's — let's focus on the "Live Alone"

18  row.  Can you further explain the numbers in columns one and

19  two?

20  A.  Yeah.  People with disabilities are more likely to live

21  alone without — without anyone else in the household, and

22  that's related very much to the numbers at the bottom there,

23  on marital status.  They are much less — they're much likely

24  to be married, more likely to be separated or divorced, more

25  likely to be widowed, less likely to be never married.  So

DOUGLAS KRUSE - DIRECT

1  this relates to the social isolation a lot of people with
2  disabilities have, which can relate to — as we'll talk about
3  later — difficulties in getting assistance.
4  Q.  So — and can you describe what impact living alone has on
5  the ability of people with disabilities to vote?
6  A.  It can have several impacts.  The living alone means that
7  you're less likely to have someone who will talk to you about
8  voting, encourage you to vote.  Political scientists have
9  looked at issues of political recruitment for voting.  It also
10  means you're less likely to have someone who can physically
11  take, help you go to the election office or polling place to
12  register to vote or to actually vote, and less likely to have
13  someone who can take you to an election office to help correct
14  a ballot, a defective ballot.
15  Q.  Thank you, Dr. Kruse.
16      So let's turn to another common issue you had mentioned,
17  access to internet.
18      Could we pull up Table 6.
19      And could you tell us what we're looking at here?
20  A.  What we're looking at here at the — this has the results
21  from two datasets.  The top dataset is the American Community
22  Survey, and they have a measure of whether a house has
23  internet access, and the basic result there is that people
24  with disabilities — or only 85 percent of people with
25  disabilities live in homes with internet access compared to

DOUGLAS KRUSE - DIRECT

1  95 percent of the people without disabilities.

2      The -- perhaps a more useful way to look at it is to flip

3  it and say that 15 percent of people with disabilities live in

4  homes without internet access compared to only five percent of

5  people without disabilities, so they're three times -- people

6  with disabilities are three times more likely to live in homes

7  without internet access.

8  Q.  And why is there such a difference in sample size for 2019

9  and 2020 here?

10  A.  Oh, the 2020 data are based on the American Community

11  Survey, which has a very large sample, as I said.  The 2019

12  data are drawn from the Current Population Survey, which has a

13  much smaller sample.  So the margins of error are going to be

14  higher.

15  Q.  Okay.

16  A.  The Current Population Survey measured not whether someone

17  lived in a house with internet access, but whether the

18  individual him or herself used the internet.

19  Q.  And so let's talk about that.  So you're referring to

20  "Individual uses internet at home or elsewhere, 2019"?

21  A.  Yes.

22  Q.  Is that -- okay.

23      And so let's go a little bit lower to the next highlight,

24  the -- yeah.

25      And so can you explain that number where it says "All"?

3750
DOUGLAS KRUSE - DIRECT

1  A.  Right.  What that indicates is that 60 percent of people

2  with disabilities use the internet at home or elsewhere.

3  Again, this is distinguished from being in a home with

4  internet access.  People with disabilities may be in a home

5  with internet access but not use the internet themselves, and

6  so this individual data indicates that only 60 percent use the

7  internet compared to 82 percent of the people without

8  disabilities.

9      So, again, flipping this, about 40 percent of people with

10  disabilities do not use internet compared to about 18 percent

11  of people without disabilities, and that's about the

12  two-to-one ratio.

13  Q.  Thank you.

14      And going back just a little bit, based on the

15  approximately, you said, 15 percent of voting-age Texans with

16  a disability who do not have internet, do you know about how

17  many people that is in Texas?

18  A.  That is -- let's see.  I have that in my report.

19  Q.  Is that included in your report?

20  A.  Yes, that's in my report.

21  Q.  Okay.  That's fine.  Thank you.

22      And could you tell us what impact lack of access to a

23  computer or the internet has on the ability of people with

24  disabilities to vote?

25  A.  It can have a variety of impacts where we live in a very

DOUGLAS KRUSE – DIRECT

1  computer-centric society, and we've got so much actively going

2  to the internet.  People with disabilities — well, people who

3  lack internet access may have a difficult time registering to

4  vote.  They may have a difficult time getting voting

5  information, both information on the process of voting, where

6  and how to vote, and also who to vote for.  And they also have

7  a difficult time in correcting and curing the ballot if the

8  primary way to do that is online.

9      So there's a variety of ways that lack of internet access

10  can impede the ability to exercise the right to vote.

11  Q.  Thank you.

12      And last table here.  Could we — I just wanted to talk

13  about a different feature that you mentioned as a barrier for

14  voters with disabilities, and that was transportation.  So I

15  want to take a look at Table 7 quickly.

16      Can you briefly describe what Table 7 is?

17  A.  Table 7, the top half — this one also — this table also

18  represents two different — the results from two different

19  surveys.  The top half is from the National Household Travel

20  Survey, which is based on people who report having a condition

21  or handicap that makes it difficult to — difficult to travel,

22  and we see that people with disabilities are much more

23  likely — people with such disabilities are much more likely

24  to live in a zero vehicle household.

25      14 percent live in a zero vehicle household compared to

DOUGLAS KRUSE - DIRECT

1  only 3 percent of people without disabilities.  They are less

2  likely to take -- they have lower number of average trips in a

3  day.  They are much more likely to take no trips in a day

4  outside of the house.  They are much less likely to be able to

5  drive.

6  Q.  And so what impact does lack of access to personal

7  transportation have on the ability of people with disabilities

8  to vote?

9  A.  That can have a variety of impacts as well, just like lack

10  of internet access can; that people are not — will have more

11  difficult time getting to an election office to register.

12  They will have more difficult time going to vote if they want

13  to vote in person.

14  Q.  Thank you.  And we can pull this down now.

15      And I want to shift gears a little bit and ask you about

16  disabilities and stigma.  Is there any stigma associated with

17  individuals with disabilities?

18  A.  There is.  There continues to be.  Hopefully, it's

19  lessening, but there — I do cite in my expert report five

20  recent surveys of the literature showing that stigma is alive

21  and well against people with disabilities, unfortunately.

22      The — and that varies by type of disability.  People with

23  mental and cognitive impairments tend to face the greatest

24  amount of stigma.  People in wheelchairs like me tend to face

25  a middle amount of stigma.  People with conditions like

DOUGLAS KRUSE - DIRECT

1  asthma, less stigma.  But the overall result is clearly that

2  stigma continues to exist.

3  Q.  Are you familiar with the term "congregate settings"?

4  A.  Yes.

5  Q.  Can you describe what you mean by that term in your

6  report?

7  A.  By "congregate settings," it's people who live in group

8  quarters.

9  Q.  Okay.  And what sort of quarters are you referring to?

10 A.  The group quarters, there can be a variety of group

11 quarters.  The ones that I'm focused on are nursing homes and

12 mental hospitals.

13 Q.  Are there particular barriers for voters living in

14 congregate settings?

15 A.  Yes, there can be particular barriers.  The — they often

16 can — they can face barriers in exercising the right to vote,

17 in particular, because the support they get from the staff of

18 congregate settings can vary tremendously.  There can be some

19 staff — and there's been research on this — some staff that

20 are very supportive of people with disabilities voting, and

21 other staff who are not supportive of that and don't provide

22 the assistance necessary.

23 Q.  Do voters with disabilities have lower turnout rates than

24 voters without disabilities?

25 A.  Yes.  There's a wide variety of research showing that's

DOUGLAS KRUSE - DIRECT

1  true.

2  Q.  And what factors might influence that participation gap?

3  A.  Scientists point to several factors, and these are

4  relevant ones for people with disabilities.  In particular,

5  people with disabilities have lower average education and

6  income levels, and that's associated with lower turnout.

7  People with disabilities also have more social isolation, as

8  we've talked about, and that — and more social isolation

9  means more you're less likely to be recruited to vote and be

10  able to get to the polls and so forth.

11      And also psychological factors that lower rates of

12  efficacy, feeling that you can make a difference or that the

13  political system is responsive to people like you.  And some

14  of that can reflect the internalized stigma that people with

15  disabilities encounter.

16      But the research we've done indicates that those factors

17  account for much, but not all, of the disability gap and

18  turnout; that there still are a remaining gap, which appears

19  to reflect, in part, difficulties — the physical difficulties

20  people with disabilities have in the act of voting.

21  Q.  Thank you.  So now I want to talk about challenges voters

22  with disabilities may face when voting in person.  And in your

23  opinion, are there barriers that voters with disabilities face

24  when voting in person?

25  A.  Oh, yes.  There can be barriers — if they want to vote in

3755
DOUGLAS KRUSE - DIRECT

1  person, barriers in getting to the polling place.
2  Particularly, with the travel difficulties they often face.
3  Once you're there, difficulties getting inside the polling
4  place.  Polling places are supposed to be accessible, but
5  still there are a number that aren't.  May have steps and so
6  forth.
7      Then once inside the polling place, there can be
8  difficulties in operating the voting machine, in reading and
9  understanding the ballot, and interacting with the -- with the
10  staff, with the polling place officials and the poll workers.
11  Q.  Thank you.  And can we pull up Table 10, please.
12      And Dr. Kruse, what is this table showing us?
13  A.  This table -- pardon me.  This table is drawn from the
14  survey that we did for the U.S. Election Systems Commission
15  following the National Elections in 2020, November 2020, we
16  asked a variety of questions, a wide variety of questions,
17  about voting experiences, including difficulties that people
18  may have faced.
19      And they found that among people who reported voting in
20  person, that 18 percent of people with disabilities reported
21  one or more difficulties in voting.  18 percent.  So over one
22  in six.  Almost one in five.  That rate is about twice the
23  rate of people without disabilities, 9.8 percent.
24  Q.  What is the most common barrier for voters with
25  disabilities at a polling place?

DOUGLAS KRUSE – DIRECT

1  A.  The most common difficulty that both people with and
2  without disabilities mentioned was difficulty waiting in line.
3  And of course, we read a lot of media reports about
4  difficulties waiting in line in 2020, and since.
5      7.4 percent of people with disabilities compared to
6  6.2 percent of people without disabilities.
7  Q.  And looking at number two, are voters with disabilities
8  more likely to have issues getting inside a polling place?
9  A.  Yes.  The — we find that 3.2 percent of people with
10  disabilities reported difficulties getting inside the polling
11  place.  And remember, this is just among people who did
12  actually manage to vote.  People who were discouraged by
13  difficulties are not — are not counted here.
14  Q.  And down to number seven, does — are voters with disa —
15  or how much more likely are voters with disabilities to have
16  issues writing on the ballot, based with these?
17  A.  Well, we find that 1.2 percent had difficulty writing on
18  the ballot, and no — no people with — without disabilities
19  reported that.
20  Q.  Thank you.  And in your opinion, are these barriers to
21  in-person voting, could they leave some voters with
22  disabilities to vote by mail?
23  A.  Oh, absolutely.  These kind of difficulties are very
24  likely to have people say, okay, I'm just going to — I'm just
25  going to stay at home and mark the — mark the ballot on my

3757
DOUGLAS KRUSE – DIRECT

1  kitchen table and send it in.

2  Q.  Thank you.  We can pull this down.

3      So now I'd like to talk about mail voting and talk about

4  challenges voters with disabilities may face when voting by

5  mail.

6      Let's pull up table 8.

7      And Dr. Kruse, what is this table showing us?

8  A.  Well, this table looks –– it uses the Current Population

9  Survey Voting and Registration Supplement conducted by the

10 Census Bureau and reports some of the statistics on voter ––

11 overall voter turnout, and then the method.  Did people vote

12 in person, did they vote early or not, and did they vote ––

13 did they vote by mail.

14 Q.  And based on this table, can you estimate how much more

15 likely a Texan voter with a disability is to vote by mail than

16 a voter without a disability?

17 A.  Yes.  The –– we find that in 2020, 30.2 percent of people

18 with disabilities who voted –– this is just restricted to

19 voters, so one-third of people with disabilities who voted

20 reported voting by mail.  That's compared to 8.2 percent of

21 people without disabilities, or roughly a four-to-one ratio.

22 Q.  Thank you.  And based on the 59.4 percent number, can you

23 estimate the number of voters with disabilities who voted?

24 A.  Yes.  I estimate that about 1.3 million of Texans with

25 disabilities voted in 2020.

3758
DOUGLAS KRUSE - DIRECT

1  Q.  And based on the 30.2 percentage, can you estimate how

2  many mail voters in Texas are voters with disabilities?

3  A.  Yes.  The — I estimated, based on this data, that there

4  were about 398,000 people with disabilities who voted by mail

5  in 2020 —

6  Q.  And did this —

7  A.  — that's (inaudible).

8  Q.  Thank you.  And based on this 8.2 percentage, can you

9  estimate how many mail voters in Texas are voters without

10  disabilities?

11  A.  Yes.  That figure was 680,000, I believe.

12  Q.  Okay.

13  A.  Very close to that.

14  Q.  And so taking those numbers together, and based on this

15  chart, are you able to estimate what percentage of people

16  voting by mail are voters with disabilities in Texas?

17  A.  Yes.  It turns out that about 32 percent of people who

18  voted by mail were people with disabilities.

19  Q.  Okay.  And can you tell us about —

20      We can take this chart down.

21      Can you tell us about some of the barriers that voters

22  with disabilities face with regard to voting by mail?

23  A.  Yes.  They can face barriers in several ways.  First of

24  all, in obtaining the ballot.  It can be difficult to — first

25  of all, you have to request a ballot, and you have to — in a

DOUGLAS KRUSE – DIRECT

1  state like Texas, you have to provide an excuse for why you
2  want to vote by mail.  Then once you receive the ballot, there
3  can be difficulties in filling it out, seeing it.
4  Particularly, people with vision impairments.  We found that
5  22 percent of — international data, 22 percent of people with
6  disabilities reported difficulties in — people with visual
7  disabilities reported difficulties in filling out a mail
8  ballot.
9      And then — and people with dexterity issues may have
10  difficulties filling out the ballot, putting it in the
11  envelope and so forth.  And then returning the ballot, taking
12  it to a — taking it to a mailbox.  That can pose difficulties
13  for some people, depending on the disability, of course.
14  Q.  Thank you.  And I just want to quickly pull up Table 11.
15  And Dr. Kruse, can you explain this 2.1 number and 5.4 number
16  we see at the top here?
17  A.  Sure.  Just as with the in-person voters, we ask that
18  people who voted by mail, if they had any difficulty and what
19  type of difficulty they had in voting.  We found that
20  5.4 percent of people with disabilities who voted by mail said
21  that they had some — some — one or more difficulties in
22  doing so compared to 2.1 percent of people without
23  disabilities, so more than a two-to-one ratio.
24  Q.  Thank you.  And we can pull this down.
25      Dr. Kruse, are you familiar with SB 1 provisions that

1  require a voter to fill out their driver's license number,

2  personal identification number, or alternatively, the last

3  four digits of their Social Security number on their mail

4  ballot application and mail ballot?

5  A.  Yes.

6  Q.  What difficulties do these provisions impose on voters

7  with disabilities?

8  A.  The main issue there is that someone with a disability may

9  not have that information readily available, and it may be

10  difficult to retrieve it.  In particular, if -- you know,

11  people with disabilities are more likely to be old -- a lot of

12  people with disabilities are old, as I said, and it may be

13  that someone, when they first registered, they registered

14  several decades ago, and they don't remember what number they

15  put down, and they don't -- they may have to go retrieve

16  information, and they may not know exactly where it is.

17     Especially if they are in a congregate setting.  Maybe

18  it's their parents who live elsewhere who have the

19  information, so it can pose an additional hardship.

20  Q.  So is it your opinion that people with disabilities will

21  be more likely to lack access to their state ID number and

22  Social Security number?

23  A.  Yes.  More likely.  Some of them will -- some of them will

24  have a hard time retrieving that information.

25  Q.  Approximately how many voters in Texas have cognitive

DOUGLAS KRUSE – DIRECT

1  disabilities?

2  A.  From the American Committee Survey, as we've talked about

3  in Table 1, about 1.1 million have difficulty remembering,

4  concentrating, or making decisions.

5  Q.  And we reviewed that number in Table 1?

6  A.  Yes.

7  Q.  What sort of barriers might a voter with a cognitive

8  disability face with these provisions?

9  A.  Well, they might have difficulty, first of all,

10  understanding the — the instructions, understanding what

11  the — was required to do, but then even if they do understand

12  it, they may have difficulty retrieving information.

13  Remembering where you have stored such information, or

14  remembering even who has it.  Oh, geez, is it my — where is

15  my Social Security card?  Does my mother have that?  Is it

16  filed somewhere?  You know, that's an issue that I think many

17  of us face with — even without cognitive disabilities, but

18  especially a problem for people with cognitive disabilities.

19  Q.  And is it your opinion that residents of congregate

20  facilities might face barriers because of these provisions?

21  A.  Yes.  Yes, as I mentioned, there is research showing that

22  this is — that they experience — voting for people in

23  congregate settings is very much affected by the — by the

24  staff, and it may be that the staff people are helpful or may

25  not be helpful in helping people obtain the information, and

1  may be that the information is not even available there in a

2  congregate setting.  Maybe it was lost in the move somewhere

3  to a congregate setting.

4  Q.  Is it your understanding that under SB 1, if a voter does

5  not have a driver's license, personal ID number, or Social

6  Security number, that they can make a statement that they have

7  not been issued any of these permissible identification

8  numbers?

9  A.  Yes.

10  Q.  And does that option pose any difficulty on a voter with a

11  disability?

12  A.  If someone is certain that they don't have those things,

13  then they have to attest to that.  I think the main issue

14  would be people who are not certain if they have one of those

15  things, or if they — they may be certain that they have one

16  of those things, but not know exactly where it is.

17      So I'm guessing there are very few people who say, no, I

18  have zero of those numbers.  No, I don't have a Social

19  Security number.  I don't have anything else like that, so I

20  think that provision — that clause applies to very — I'm

21  guessing that clause applies to very few people.

22  Q.  Are voters with disability more likely to have difficulty

23  writing these numbers on an absentee ballot application or a

24  ballot?

25  A.  Many are.  Again, it depends on the disability, but people

DOUGLAS KRUSE - DIRECT

1  with dexterity problems such as people with Cerebral Palsy or
2  quadraplegia may have difficulty in the physical act of
3  writing.
4  Q.  Voters have to fill in other personal information on the
5  absentee ballot application and ballot, right —
6  A.  Yes.
7  Q.  — in Texas?  So why is filling in an voter ID number or
8  Social Security number, why does that pose more difficulties
9  than filling in the rest of the application or ballot?
10  A.  Well, it's a question of how easily accessible that
11  information is, the voter ID or Social Security information.
12  It may be that someone just doesn't have that information
13  readily available, has to go search for it, try to remember
14  where it is.  And that does impose an additional cost and
15  additional hassle.  It's an additional hassle to — that
16  people may have to face in filling that information out.
17  Q.  And as you stated before, voters with disabilities are
18  more likely to lack access to those ID numbers, correct?
19  A.  Yes.  We don't have hard information on that, but it's
20  very likely, particularly given the number of people who
21  are — with disabilities who are older and may have registered
22  many decades ago.  It's very likely that they will lack
23  that — lack that access.
24  Q.  So I want to talk a bit about cure processes for
25  applications for mail ballots and for — for applications for

DOUGLAS KRUSE – DIRECT

1  mail ballots and for mail ballots.

2      Are you aware of the cure processes available to voters

3  who submit a defective application for ballot-by-mail?

4  A.  Yes, from what's represented in SB 1.

5  Q.  Are you aware of the cure processes available to voters

6  who submit a defective mail ballot?

7  A.  Yes.

8  Q.  Is it your understanding that voters can correct issues

9  with their mail ballot applications by an online tool?

10  A.  Yes.

11  Q.  And in your opinion, would that pose accessibility

12  barriers to some voters with disabilities?

13  A.  It would.  As I mentioned, people with disability are

14  three times more likely to live in a house without internet

15  access.  They're twice as likely not to use the internet

16  themselves.  And even if they do use the internet, as I cite

17  in the report, they study indicating that 98 percent of

18  websites are not fully accessible, so even if you do have

19  internet access, there can be issues of whether the website is

20  fully accessible for people with disabilities.

21  Q.  Thank you.  And is it your understanding that voters can

22  correct issues with their mail ballot applications or mail

23  ballot by appearing in person?

24  A.  Yes.

25  Q.  And in your opinion, would that pose accessibility

DOUGLAS KRUSE - DIRECT

1  barriers for voters with disabilities?

2  A.  Well, it will pose difficulties for some people.  You know

3  many, people with disabilities may be able to do that without

4  issue, but as we saw, people with disabilities often face

5  travel issues, travel difficulties.  They are more likely to

6  live alone.  They are less likely to be able to drive.  So

7  they may face difficulties in getting to a place where they

8  can physically, in person, correct a defective ballot.

9  Q.  And hypothetically, if a voter could correct their mail

10  ballot application or mail ballot through a form sent to their

11  home rather than coming in person and rather than going

12  online, would that address accessibility barriers that voters

13  may face with a current cure process?

14  A.  Well, that option may certainly help some people; however,

15  it presents all of the issues that voting by mail presents.

16  The accessibility issues, the problems that people may face in

17  filling out the forms and reading the forms, particularly if

18  you have a visual impairment.  And then in returning the

19  forms, getting to a mailbox, doing -- I don't know if this

20  will be postage free or not, but even the act of putting on a

21  stamp costs some money, and for people in poverty, that can be

22  a big deal.  So there's -- so it does not fully address all

23  the accessibility issues.

24  Q.  So is it your opinion that curing a ballot that is

25  defective because of issues with the ID requirements will be

DOUGLAS KRUSE - DIRECT

1  more difficult for voters with disabilities?

2  A.  Yes.

3  Q.  If a voter with a disability is facing difficulty voting

4  by mail, could they just vote in person instead?

5  A.  They could.  Some of them could, if they are able to get

6  to the — get to the polling place and get inside the polling

7  place and use the machines and so forth.

8  Q.  But would they — they would face the barriers that we

9  discussed earlier today?

10 A.  Right.  Exactly, the ones that I was just rattling off.

11 The depending — again, so much depends on the type of

12 disability, but — but they would vary — but people with

13 disabilities run into more difficulties voting in person than

14 they do voting by mail, so...

15 Q.  In your opinion, could SB 1's ID provisions have prevented

16 some voters with disabilities from casting a ballot?

17 A.  Yes, I think so.

18 Q.  Do you find that voters with different types of disability

19 prefer one method of voting over another?

20 A.  Yes.  The people with mobility impairment, for example,

21 are the least likely to vote in person, understandably.

22 They're — they find the greatest difficulty in going outside,

23 going outside alone, so they are the most likely to vote by

24 mail.  People with visual impairments will often find it

25 easier to vote in person, because each HAVA, The Help America

3767

DOUGLAS KRUSE - DIRECT

1  Vote Act of 2002, requires that each polling place have a —
2  an accessible voting machine where someone with a visual
3  impairment can vote privately and confidentially without
4  anyone knowing how they voted.
5      That's a real problem for voting by mail with people with
6  visual impairments is that they typically have to have someone
7  help them vote, and that other person gets to know how they
8  voted, and the other person fills out the ballot for them,
9  and — so it's not a confidential vote, which is what people
10 are entitled to.
11 Q.  So having different options enables voters with
12 disabilities to vote?
13 A.  Absolutely.  That's one of the main points I've made in a
14 number of talks about disability and voting, which is:  The
15 more options the better.  The more options there are to
16 vote — you know, given the wide range of disabilities, the
17 more options there are to vote, the greater the likelihood
18 that a person with a particular disability will find a method
19 that works well for them.  So the more options, the better.
20 Q.  Thank you.
21 A.  One size doesn't fit all.
22 Q.  So now I'd like to talk more about assistance for voters
23 with disabilities.  And this is the last table we'll be taking
24 a look at today.
25      Could we pull up Table 5?

1    A.    Okay.

2    Q.    Dr. Kruse, what is this table showing us?

3    A.    This is from the Survey of Income and Program

4    Participation looking at people who need assistance with

5    activities of daily living.  Activities of daily living

6    include — you can see the list of things there.  Things like

7    getting dressed, taking a bath, preparing meals.

8    Q.    And so this table accurately reflects various kinds of

9    tasks a person with a disability may need assistance with in

10   daily life?

11   A.    Yes, yes.  Basic activities that we — most of these we

12   all have to do every day.

13   Q.    Okay.

14   A.    And the numbers here represent people who need assistance

15   with these basic activities that we all — pretty much all of

16   these we have to do every day.

17   Q.    And based on this 41.2 percent number up at the top, can

18   you estimate how many Texans with disabilities need assistance

19   with daily living?

20   A.    I estimate that about 2.3 million Texans need some

21   assistance with activities of daily living based on this

22   dataset, but I took the 2014 numbers, and I adjusted them to

23   reflect the population growth from 2014 to come up with that

24   number.

25   Q.    Is that number similar in your report?

DOUGLAS KRUSE - DIRECT

1  A.  Yes.

2  Q.  Thank you.  Let's take a look at this "Going outside the

3  home for errands category."  Could you explain that

4  percentage?

5  A.  Well, that indicates that about a fourth of people with

6  disabilities in Texas report difficulty going outside the home

7  for errands.  And that — you know, that's very consistent

8  with the high rate we saw from the American Community Survey

9  as well, which is a differently worded question, but it's very

10  similar, a very similar concept, difficulty going outside the

11  home.

12  Q.  And generally speaking, who provides assistance to people

13  with disabilities?

14  A.  Well, at the bottom you can see that the — about the

15  third of people with disabilities get help provided by the

16  family members, 34.9 percent figure.  Friends or neighbors,

17  paid help, partners or companions, other nonrelatives.  If you

18  take those latter numbers there below "family members," and

19  you add those up and eliminate the overlap, 10.6 percent of

20  people with disabilities receive help from a nonfam — from

21  any nonfamily member within a day.

22  Q.  And could you tell us what fraction or percentage of

23  Texans with disabilities receiving assistance receive it from

24  people outside of their family or household?

25  A.  What fraction?

DOUGLAS KRUSE - DIRECT

1  Q.  Based on that 10.6 number right there?

2  A.  What fraction of people who receive assistance?  The — it

3  would be about — about one fourth.  You know, the

4  41 percent — dividing the 10 percent by the 41 percent figure

5  at the top, about one-fourth people who need assistance get it

6  from a nonfamily member.

7  Q.  Thank you.  Would people with disabilities who require

8  assistance with daily tasks also require assistance during the

9  voting process?

10 A.  Yes.  There's likely a high correlation there.  Some of

11 these activities of daily living:  Getting dressed, for

12 example, require dexterity, require certain amount of

13 mobility, and that kind of dexterity may be necessary in

14 operating a voting machine, for example.

15     Going outside the home for errands, that relates to being

16 able to get to a polling place, for example.  And a number of

17 these activities related to the physical issues that people

18 may have in the act of voting, getting to a polling place, or

19 in voting at home as well.

20 Q.  Is it your opinion that voters with disabilities are more

21 likely to need assistance in voting?

22 A.  Oh, yes, definitely.

23 Q.  Why?

24 A.  Compared to people without disabilities, yes.

25 Q.  Why is that?

DOUGLAS KRUSE - DIRECT

1  A.  Because of the limitations that many of them face, the

2  issues with seeing or dexterity or being able to get around a

3  polling place.  They are much more likely to have difficulties

4  in exercising their right to vote.

5  Q.  Thank you.  We can pull this down.

6     Voters with disabilities may require assistance with

7  voting whether voting in person or by mail?

8  A.  Yes.

9  Q.  Okay.  Do you know how much more likely a voter with a

10 disability is to need assistance for voting in person?

11 A.  Yes.  I presented some numbers on that in the report.

12 About 6 percent, a little over 6 percent of people with

13 disabilities who voted in person said they needed assistance

14 in doing that, and that was over twice the rate of people

15 without disabilities who voted in person.

16 Q.  And do you know how much more likely a voter with a

17 disability is to need assistance voting by mail?

18 A.  That one is even more striking of a difference.  We found

19 that in this -- this is from the DVAS, the Disability Voting

20 Accessibility Survey.  Following the 2020 elections, we found

21 that of those who voted by mail, 10 percent, a little over

22 10 percent, said that they needed assistance in voting

23 comparted to only 1 percent of people without disabilities who

24 reported needing assistance in voting, so a ten-to-one ratio

25 there.

DOUGLAS KRUSE - DIRECT

1  Q.  And that's in your report as well?

2  A.  Yes.

3  Q.  Can voter assistance come from people who are doing voter

4  outreach with an organization or campaign?

5  A.  Oh, certainly can, yes.

6  Q.  And voter assistance can come from friends or neighbors?

7  A.  Yes.

8  Q.  And you stated earlier today that voters with disabilities

9  are more likely to be socially isolated, correct?

10  A.  Yes.

11  Q.  And earlier today we also talked about stigma around

12  people with disabilities.

13  A.  Yes.

14  Q.  Are voters with disabilities also subject to a stigma that

15  makes people unwilling to assist them with daily tasks?

16  A.  There is something to stigma that may make it difficult to

17  obtain assistance, that may make some people reluctant, and

18  the stigma, I should emphasize, is not necessarily a disliking

19  or a hating or fearing someone.  It may be simply a

20  uncertainty or discomfort.  In fact, there's a — a stigma is

21  often measured using what's called a "social distance scale;"

22  that is, how comfortable you are interacting with someone.

23  And people can be very uncomfortable interacting with people

24  with disabilities, which means that it may be difficult for

25  a — somebody with a disability to get someone to assist them.

DOUGLAS KRUSE – DIRECT

1  Not because people — they don't want to be helpful, just

2  because they are uncomfortable being around someone with a

3  disability.

4  Q.  And would that apply to people being unwilling to assist

5  with voting?

6  A.  Oh, absolutely, it could.

7  Q.  Can people with cognitive disabilities make important

8  decisions such as voting, while relying on a trusted assister?

9  A.  Well, they certainly can.  People with cognitive

10  disabilities very often want to vote, know who they want to

11  vote for, but may have a difficult time understanding

12  procedures, understanding the wording on ballots and so forth,

13  and understanding the process as a whole.

14  Q.  And when a person with a cognitive disability uses a

15  trusted assister, is the assister making a decision for that

16  person?

17  A.  No.  The assister is helping that person express their

18  views, helping them draw out their views and express those on

19  a ballot.

20  Q.  Thank you.

21      So could restrictions on what types of assistance a voter

22  assister can provide harm voters?

23  A.  Well, it certainly can.  The restrictions on assistance

24  mean that it becomes more difficult to vote, and there's

25  plenty of political science research showing that increased

1  difficulty, increased costs of voting, are associated with

2  lower voter turnout.  So, yes, it's clear that restrictions on

3  assistance can affect the ability to vote.

4  Q.  So I want to talk a little bit about Section 6.06 of SB 1.

5  This section criminalizes any person who solicits, receives,

6  or accepts compensation for helping a voter with their mail

7  ballot.

8      Did you offer an opinion on this provision in your report?

9  A.  Yes.

10 Q.  Could we pull up pages 29 to 30 from Dr. Kruse's report.

11     And we're looking at paragraph 104 to 106.  Dr. Kruse,

12 what was your opinion on this provision?

13 A.  My opinion on this provision is that this is going to make

14 it more difficult.  This could make it more difficult for some

15 people with disabilities to exercise the right to vote.  It

16 could be as simple as I — maybe my neighbor is able to help

17 me vote, and I buy that person an ice cream cone or I pay for

18 their gas or something like that.  Well, that would be —— that

19 would be criminalized, according to the wording of this —— of

20 6.06.

21 Q.  And if we turn to Section 7.04, which limits in-person

22 interaction with one or more voters in the physical presence

23 of a ballot intended to deliver votes for a specific candidate

24 or measure.

25     Did you offer an opinion on this provision in your report?

DOUGLAS KRUSE — DIRECT

1   A.   Yes.  I think that also could make it more difficult for
2   people with disabilities to get the assistance they may need.
3   Q.   How so?
4   A.   Well, people with disabilities may have — you know, they
5   are more socially isolated, as — as we talked about and may
6   have very few options.  It may be that you don't have family
7   or friends available.  Maybe you don't even have a neighbor
8   available.  Maybe someone is able to help you out.  You really
9   want to vote for candidate X, but it turns out this person is
10  willing to help you out is also a volunteer in the campaign
11  for candidate X.  Well, that would be criminalized here.  This
12  person is trying to help you vote trying to express your
13  previous plaintiff preferences but you're not able to use
14  their help because of this provision.
15  Q.   And Dr. Kruse, earlier today you testify that individuals
16  with disabilities have less access to transportation than
17  individuals without disability.  Do you remember that
18  testimony?
19  A.   Yes.
20  Q.   And so I want to talk for a moment about Section 6.01 of
21  SB 1, which requires a person who drives seven or more voters
22  to the polling place for curbside voting to fill out a new
23  form.
24       Did you offer an opinion on this provision in your report?
25  A.   Yes.

DOUGLAS KRUSE – DIRECT

1  Q.  And what was your opinion?

2  A.  My opinion was that like these other provisions, it makes

3  it more difficult to get assistance.  It's an extra burden.

4  It's an extra hassle that may make people reluctant to provide

5  such assistance.

6  Q.  Can you explain more?

7  A.  Well, it may be that, for example, someone is willing to

8  drive people at a nursing home to a polling place, and there

9  may be a small bus or van or something like that that can

10  drive seven or more people, but this would mean that the

11  person doing the driving has to go through an extra hurdle

12  that may increase their reluctance.

13      They may wonder, oh, geez, why am I having to sign this?

14  Am I going to be liable for — you know, what am I going to be

15  liable for?  Do I have to attest that every one of these

16  people has a disability or that they meet special criteria?

17  It's just an extra hurdle that — that they increase the

18  reluctance of people to provide necessary assistance.

19  Q.  In your opinion, if a voter with a disability has to take

20  the extra step of representing to the assister that they are

21  eligible for assistance as a condition of receiving

22  assistance, would that serve as an additional barrier to

23  voting?

24  A.  It could.  It doesn't sound like a big deal, but it — but

25  it's an extra hurdle.  It's an extra thing to do.  Combined

3777

DOUGLAS KRUSE - DIRECT

1  with all the other barriers that people with disabilities
2  face, it's an extra thing to — simply to remember, but
3  there's also an extra issue that both the assister and the
4  person with the disability may be uncertain about.  It's an
5  extra hurdle.  It kind of exacerbates the other issues that —
6  in combination with all the other hurdles that people with
7  disabilities face, that they — that may make it more
8  difficult to exercise the right to vote.
9  Q.  And in your opinion, if a vote assister has to take an
10 additional step in order to provide assistance, would that
11 serve as an additional barrier to voting for a voter with a
12 disability?
13        MR. NICHOLS:  Your Honor, I'll object.  I don't think
14 that — he's been tendered as an expert in vote assisters.  I
15 think he has been tendered as an expert in disabled voters.
16        MISS SINGH:  These questions are regarding voters
17 with disabilities ability to get an assister.
18        MR. NICHOLS:  She is asking him to offer opinions
19 about the state of mind of voter assisters.
20        THE COURT:  Let me hear your question again.
21 BY MISS SINGH:
22 Q.  In your opinion, if a vote assister has to take an
23 additional step in order to provide assistance, would that
24 serve as an additional barrier for a voter with a disability
25 to be able to vote?

1        THE COURT:  Yeah, that's noted and overruled.

2        Go ahead.

3        THE WITNESS:  Yes, I think so.  I think, in

4   particular, going back to the issue of stigma and

5   uncomfortableness, discomfort that people without disability

6   may have about interacting with someone with a disability, I

7   think that extra step — that extra step in the mind of the

8   assister may be — may increase their reluctance to provide

9   necessary assistance.

10  Q.  Thank you.

11      And I want to briefly discuss Section 6.03 and Section

12  6.05 of SB 1, and these provisions impose new requirements for

13  vote assisters to document their assistance for in-person and

14  mail voting.

15      Did you offer an opinion on these provisions in your

16  report?

17  A.  Yes.

18  Q.  And what was that opinion?

19  A.  The opinion was that — as with these other provisions,

20  that it creates extra hurdles, extra barriers, these extra

21  requirements that can decrease the likelihood that someone

22  with a disability won't get the assistance they need.

23  Q.  Thank you, Dr. Kruse.

24      We can take this down.  Just zooming out of the — I just

25  want to ask:  What is your overall opinion of the provisions

DOUGLAS KRUSE – DIRECT

1 related to mail voting and assistance imposed by SB 1?

2 A.  My overall opinion is that these provisions are going to

3 raise the cost of voting for people with disabilities.  Taken

4 one by one, you know, each of these may seem to be a small

5 thing.  Together, though, they compound.  They can raise the

6 cost of voting, make it more difficult to vote.  And that's —

7 as I said, there's plenty of political science research

8 showing that when the costs of voting are higher, people are

9 less likely to vote.  Even if they do go ahead and vote, there

10 are still higher costs being imposed.  There's still extra

11 hassle.

12     And perhaps that's one way to think about that.  It's not

13 in terms of the, you know, overwhelming costs, but it's extra

14 hassle.  And to the extent that there's extra hassle, people

15 with disabilities are going to be less likely to vote.  And if

16 they do vote, hey, it's still extra hassle that's being

17 created by these provisions.

18 Q.  Thank you.

19         MISS SINGH:  I pass the witness.

20         THE COURT:  Any cross?

21         MR. NICHOLS:  Your Honor, could we inquire as to

22 whether it would a good time for a restroom break?

23         THE COURT:  If you need a break, just let me know.

24 Do you need a break, yes?

25         MR. NICHOLS:  And maybe the witness as well.

DOUGLAS KRUSE - CROSS

1          THE COURT:  Let's take 15.

2          *(Recess)*

3                    CROSS-EXAMINATION

4   BY MR. BRYANT:

5   Q.  My name is David Bryant.  I'm with the Office of the

6   Attorney General of Texas.  And I'm one of the attorneys

7   representing the State defendants in this case.  It's good to

8   meet you.

9   A.  Good to meet you.

10  Q.  I understand you're a professor in the School of

11  Management and Labor Relations at Rutgers?

12  A.  That's right.

13  Q.  And you are, by education, a labor economist?

14  A.  Yes.

15  Q.  You don't have any degrees in political science?

16  A.  I took a concentration in public policy analysis when I

17  was getting my master's degree, but I do not have a degree in

18  political science.

19  Q.  And you're not a lawyer, right?

20  A.  I'm sorry, not a?

21  Q.  Lawyer?

22  A.  No, no.

23  Q.  I'll try to get closer, too.

24  A.  No.  Married to one, but not a lawyer myself.

25  Q.  Well, I won't comment on that.

3781

DOUGLAS KRUSE — CROSS

1    A.  You're good.  Okay.

2    Q.  Is it fair to say that your opinions and your report in

3    this case do not involve management, labor relations?

4    A.  That's true, yes.

5    Q.  And your expert report opinions and testimony today don't

6    directly involve economics, do they?

7    A.  I think they do.  The economics are very much a

8    calculation of voting.  And, in fact, I was curious about

9    this.  Just last week I went to the major database of

10   economics journals called EconLit, and I just typed in the

11   word "voting," and I found that 101,000 articles in economics

12   journals had mentioned voting.  Voting is very much a live

13   topic among economists, voting in interim elections, and

14   shareholder elections, and political elections.  So voting is

15   a very live topic in economics.

16   Q.  And your expert report and opinions and testimony today

17   generally do not involve —— are based on data that you

18   generated through your own research, is that correct?

19   A.  The disability and voting accessibility data survey data

20   I've had a very strong hand in generating those data, but the

21   other datasets were generated by Census Bureau and couple of

22   other entities, yes.

23   Q.  So you had a hand in one of the six national surveys that

24   you have referred to in your report?

25   A.  In creating that survey, exactly.

DOUGLAS KRUSE — CROSS

1  Q.  You did not gather any data for your expert report

2  opinions or testimony in this case by actually communicating

3  with or surveying any Texas voters with disabilities?

4  A.  Well, Texas voters are definitely a part of the samples

5  for each of the databases, including — for each of the

6  datasets, including the survey that we did for the Election

7  Assistance Commission.  Texas is obviously a big state, so

8  it's a — so it's well-represented in the national sample.

9      So, yes, we did — we did include — all the datasets

10 include Texans with disabilities.

11 Q.  Did you, in connection with your report, opinions, or

12 testimony in this case, actually communicate with any Texas

13 voters with disabilities?

14 A.  I did personally did not communicate, no.

15 Q.  And did you personally communicate with any Texas voters

16 without disabilities?

17 A.  I personally did not, no.

18 Q.  And is your expert report, opinions, and testimony based

19 on any communications with anyone who has acted as an assister

20 in a Texas election?

21 A.  No.

22 Q.  And is your report, opinions, and testimony in this case

23 based on communications with anybody who has declined to act

24 as an assister in any Texas election for any reason?

25 A.  No.

DOUGLAS KRUSE — CROSS

1  Q.  Is your expert report, opinion — opinions and testimony

2  in this case based on communications with anyone who has

3  transported any voters with disabilities to the polls in any

4  Texas election or declined to do so?

5  A.  No.

6  Q.  Is your report, opinions, and testimony based in part on

7  any communications with Texas county election officials or

8  election workers?

9  A.  No.

10  Q.  Is your report, opinions, or testimony in this case based

11  on any communications with any Texas county district

12  attorneys?

13  A.  No.

14  Q.  Is your report, opinions, and testimony in this case in

15  any way based on communications with anyone in or employed by

16  the Texas legislature?

17  A.  No.

18  Q.  Is your expert opinion, report, and testimony in this case

19  based on communications with anyone in the Texas Secretary of

20  State's Office?

21  A.  No.

22  Q.  And is your expert report, opinions, or testimony in this

23  case based in whole or in part on communications with anyone

24  in the Texas Attorney General's Office?

25  A.  No.

1  Q.  Now, your expert report in this case is dated

2  February 28th, 2022, is that correct?

3  A.  Yes.

4  Q.  And —

5  A.  I think so.  I have to check, yes.

6  Q.  And is it fair to say that your — all of your expert

7  opinions and your expert report in this case was finalized

8  before the very first Texas election under SB 1?

9  A.  Yes.  My understanding, yes.

10  Q.  So is it fair to say that your expert report and opinions

11  in this case reflect zero actual experience with SB 1 in any

12  elections in Texas?

13  A.  Yes.  SB 1 was not in effect at the time I did my expert

14  report, right.

15  Q.  But your expert report and opinions in this case include

16  predictions as to possible effects of provisions of SB 1 on

17  Texas voters with disabilities?

18  A.  Yes.  Effects I considered very, very likely.

19  Q.  For example, the "Conclusion" section in your report at

20  page 31 in the first sentence states — this is paragraph 110:

21  "In sum, in my opinion based on reasonable certainty, these

22  provisions of SB 1 will create an extra burden in voting for a

23  significant number of people with disabilities across the

24  State of Texas and may prevent some from voting altogether."

25      Is that a fair summary of your opinions in this case?

DOUGLAS KRUSE — CROSS

1  A.  Yes.

2  Q.  In your expert opinion and report, did you quantify what

3  you considered, quote, "significant," as — in the phrase "a

4  significant number of people"?

5  A.  I did not apply a particular number to that significant.

6  I — throughout the report I refer to a number of results

7  which have numbers associated with them, indicating that this

8  group is likely to have extra burdens:  For example, people

9  with cognitive impairments, people with travel disabilities

10  and so forth, but I did not apply a particular number to a

11  prediction of exactly what SB 1 would do.  I just raised the

12  high likelihood that there would be an extra burden of voting

13  for many people with disabilities.

14  Q.  So paragraph 110 in the selection that I read was your

15  opinion and your prediction on February 28th, 2002 [verbatim].

16  Now, over 19 months later, and many Texas elections later,

17  have you determined the extent to which your opinion and your

18  prediction actually did or did not come true in practice,

19  later in 2022 or in 2023 to date?

20  A.  No.  I've not been able to do that analysis.

21  Q.  Can you identify a single Texas voter who has actually

22  been prevented from voting in a Texas election because of any

23  provision of SB 1?

24  A.  No.  I've not been in contact with any voter that's

25  been —

DOUGLAS KRUSE — CROSS

1  Q.  Can you identify a single Texas voter who has actually

2  experienced an increased burden in voting because of any

3  provision of SB 1?

4  A.  There have been some media reports of some, but I did not

5  identify them myself.

6  Q.  So you have no personal knowledge?

7  A.  No personal knowledge, no.  Just what I see in the media

8  reports.

9  Q.  Can you identify any Texas voters who have requested a

10 reasonable accommodation because of their disability by reason

11 of any provision of SB 1?

12 A.  No.  I'm not aware of any data on requests for reasonable

13 accommodations.

14 Q.  And is it also true that you cannot identify a single

15 Texas voter who requested such an accommodation and was denied

16 such an accommodation?

17 A.  Right.  Yeah, I don't — I haven't seen any data.  I would

18 love to see such data on request for reasonable accommodation,

19 but I am not aware that such data exists.

20 Q.  Now, you talked in your testimony about six national

21 surveys that were taken between 2014 and 2020, is that right?

22 A.  Yes, yes.

23 Q.  And they all — all of those surveys have some use of the

24 term "disability," is that right?

25 A.  Right, right, right.

DOUGLAS KRUSE – CROSS

1   Q.  Do they all define disability the same?

2   A.  No.

3   Q.  Could you describe the differences in the ways that the

4   term "disability" is used in those surveys?

5   A.  Sure.  As I said, how to measure disability has been a

6   lively source of debate.  The Census Bureau now uses six

7   questions identifying, four major — major impairments and two

8   major limitations in life activities.  Those six questions are

9   used for the American Community Survey and for the Current

10  Population Survey.

11      We also, for the Disability Voting Accessibility Survey,

12  used those six questions, plus a seventh question, kind of

13  a — kind of a clean-up question, a broader question, to catch

14  other types of disabilities.  The Survey Voting Income and

15  Program Participation in 2014 used over 100 questions to

16  identify disability.  The National Household Travel Survey and

17  the Survey of Performance in the American Elections each used

18  just one question to measure disability.

19      The — let me just make one more point about this.  I

20  think the remarkable thing is that whether disability is

21  measured with just one question or more questions, we do see

22  very similar results across surveys.  For example, in

23  employment, in an economic situation and so forth, so it would

24  be nice to have consistent measures of disability across the

25  surveys, but we see very similar results no matter what we —

DOUGLAS KRUSE — CROSS

1  what measure of disability we use.

2  Q.  Do any of the national surveys upon which your report and

3  opinions rely define "disability" in the same way as

4  disability is defined under the Americans with Disabilities

5  Act, or ADA?

6  A.  They all attempted to get at that, to use that, but you

7  can't — you can't just read the ADA definition of disability

8  in a survey.  It's much too complicated.  Each of the surveys

9  have tried to capture a portion of that ADA definition.

10  Q.  You quote the definition of disability under the ADA in

11  your report, don't you?

12  A.  Yes.

13  Q.  And all of the surveys on which your report is based, in

14  fact, don't use that definition in their use of the term

15  "disability"?

16  A.  The ADA definition is not — word for word is not amenable

17  to being used in a survey.  It would require far too much

18  explanation.  The surveys all — they say attempt to measure a

19  portion of the people who are limited in a major life

20  activity, substantial major life activity, as the ADA says.

21  And, you know, for example, the ACS is trying to measure

22  difficulty in dressing or bathing, which is considered a major

23  life activity.  Difficulty in going outside home alone, which

24  is a major life activity.

25      So the surveys try to measure these difficulties in major

1  life activities that are listed by the ADA definition and in

2  the interpretation of the ADA definition, particularly with

3  the ADA Amendments Act in 2008.  They were very specific about

4  the conditions that could qualify if one is having a

5  disability.

6  Q.  Would you agree that the majority of voters with

7  disabilities who do vote do not have significant difficulties

8  in voting?

9  A.  Right.  That's what our survey shows, yes.

10 Q.  And your report refers to a study that found that among

11 voters with disabilities who voted in polling places in 2020,

12 18 percent reported some type of difficulty in doing so, but

13 82 percent apparently did not have any difficulty in voting in

14 a polling place?

15 A.  Correct.

16 Q.  And would you agree that the percentage of voters with

17 disabilities who reported such difficulties in voting declined

18 significantly from 2012 to 2020?

19 A.  Yes.  That was a very interesting and very heartening

20 result.  We did the survey in 2012, and we found that the

21 percent who reported difficulties decreased from 30 percent in

22 2012, among in-person voters, 30 percent down to 18 percent,

23 which is real credit to work that election officials have done

24 to make polling places more accessible.

25 Q.  Is it correct that one of the surveys relied on in your

DOUGLAS KRUSE – CROSS

1  report says that approximately 15 percent of Texans have a

2  disability and another says that over 30 percent of Texans has

3  a disability?

4  A.   Yes.  If we use a much more expansive definition of

5  "disability," the 15 percent figure is a conservative figure

6  based on those six questions, but everyone recognizes that

7  it's a conservative figure, and it's a underreport.  The SIP,

8  the Survey of Income and Program Participation asks about 100

9  questions, as I said, and that number — if you count people

10  who answered yes to one of those questions, you get up to

11  30 percent of Texans with disabilities having some kind of

12  disabling condition.

13  Q.   So all of the survey data on which you rely in your report

14  and opinions is from prior to the passage of SB 1 in 2021?

15  A.   Yes.

16  Q.   Now, I notice that some of the tables refer to data

17  apparently nationally, and some refer to data nationally and

18  from Texas?

19  A.   Yes.

20  Q.   And some just refer to data as to Texas?

21  A.   Yes.

22  Q.   Can you explain whether any of the surveys actually really

23  just involve overall United States data proportionally applied

24  to Texas?

25  A.   Right.  What I did was for the large datasets, American

DOUGLAS KRUSE - CROSS

1  Community Survey, where I could get a good sample size for
2  Texas, I present Texas-specific numbers.  Where the sample
3  size gets smaller for Texas, I provide the Texas numbers, and
4  where the sample size is, I think, 566 for SIP, that's still a
5  respectable sample size.  There are national surveys that get
6  done and reported with samples of 500 or so, but because the
7  sample size is smaller, there's a higher margin of error.  I
8  provide the U.S. — the overall national U.S. numbers for
9  comparison and find similar patterns between Texas and the
10 U.S.  And I think that's an important point, that the — the
11 disability population in Texas looks a lot like the overall
12 disability population in the U.S.
13        Then for the — for two of the surveys, survey of
14 Program — and survey of the performance of American
15 elections, and disability voting and accessibility survey, I
16 just used the national numbers, because the sample of Texans
17 is too small in each of those for a reliable estimates, but
18 again, the results from the other larger surveys show that the
19 disability population in Texas looks a lot like the disability
20 population in the U.S.  So I feel quite confident in saying
21 that those national numbers are very likely to apply to Texans
22 with disabilities.
23 Q.  Did you state in your report in this case that, quote,
24 "Specific data on voting difficulties by disability status are
25 not available in Texas."  That's in paragraph 18 of your

DOUGLAS KRUSE - CROSS

1  report

2  A.  Yes.

3  Q.  Is that true?

4  A.  Yes.  Just as I was indicating, the sample, the Disability

5  and Voting Access Survey was a national sample.  It included

6  Texans.  Texas is obviously a big state and is

7  well-represented in the national sample, but the sample just

8  for Texans was too small for reliable estimates, so I relied

9  on national numbers here to infer what types of voting

10 difficulties are likely to be faced by people in Texas.

11 Q.  Are your — is your report and opinions in this case based

12 on the assumption or proposition that Texas voters with

13 disabilities are not significantly different in any way from

14 voters with disabilities nationally?

15 A.  They are not substantially different, correct.  There are

16 a few differences around the margins.  More Hispanics with —

17 more Hispanics and so forth, so there's going to be a few

18 differences here and there, but not substantially different in

19 a way that affects the conclusions of my report.

20 Q.  And is your report based on that proposition?

21 A.  Yes.  I think that's fair to say.

22 Q.  Okay.  And what did you do in connection with your work in

23 this case to test that assumption or proposition by analyzing

24 any data that was specific to Texas voters with disabilities?

25 A.  I did comparisons between Texas and United States of

DOUGLAS KRUSE - CROSS

1  national numbers.  For example, in Table -- oh, I forget what

2  it is -- the Table 8, I compared the voter -- voting turn outs

3  in Texas among people with and without disabilities to the

4  national numbers and found that the voting gap in -- between

5  people with and without disabilities was 5.2 percentage points

6  in Texas compared to 5.7 percent in -- voting gap in the

7  United States as a whole, which is very similar and not

8  significantly different.  Within the margin of error.

9      So Texas, again, looks a lot like the U.S. as a whole in

10 terms of the disability population in their propensity to

11 vote.

12 Q.  You referred earlier in your testimony to what you refer

13 to as an "internal social stigma."  Do you recall that?

14 A.  Yes.

15 Q.  Could you explain what that means?

16 A.  That is that it's very clear, as I indicate and I cite in

17 my report, the number of -- or many studies have shown that

18 there's general stigma, the social distance I was referring to

19 earlier; that people are uncomfortable around people with

20 disabilities.  Many people are.  Not everyone, of course.

21 Many people are.

22     That stigma that people face often leads to a -- often

23 gets internalized by people with disabilities.  They -- that

24 reinforces their social isolation.  They don't want to go out

25 and socialize because they are going to encounter stares,

1   discomfort, and so forth, so — and that is relevant to the

2   question of voting assistance; that it makes people with

3   disabilities more reluctant to ask for assistance, knowing

4   that a person is uncomfortable around them.

5   Q.  And does that internal social stigma also tend to make

6   people not want to let other people know that they have

7   disabilities?

8   A.  Yes.

9   Q.  Now, all of the data on which you rely in your report and

10  opinion is survey data?

11  A.  Yes.

12  Q.  And it's not data generated from objective observations of

13  people with disabilities by third persons, but it's

14  self-reported data generated by those who chose to respond to

15  surveys?

16  A.  It's — yes, it's self-reported.  There have been some

17  studies that I've compared that have been able to match

18  reports to medical conditions, to medical records, and find

19  that certainly a high correlation, but the datasets they use

20  here are based on self reports.

21  Q.  And so would you expect that people with disabilities who

22  have internal social stigma would not want to let people who

23  survey them or attempt to survey them know either the fact or

24  the extent of their actual disabilities?

25  A.  Oh, absolutely.  That's a big issue with — in regard to

3795
DOUGLAS KRUSE - CROSS

1  surveying people about disability issues, that people will
2  tend to underreport.  And that shows up even in studies that
3  have matched to medical records, that people will -- people
4  will underreport.  So the -- that's why the estimates I
5  present, particularly from ACS, from the Census Bureau
6  studies, tend to underreport, because there will be people who
7  have particularly inadvisable disabilities.  It's not
8  immediately obvious.  They will not want to endure the stigma
9  that they face if they admit a disability.
10     And even in an anonymous survey, people will not want to
11  say they have a disability.  I'll just give the example of my
12  mother-in-law who was very, very hard of hearing.  Clearly had
13  a disability, but there's no way on earth she would ever say
14  she had a disability.
15  Q.  And can you exclude the possibility that some survey
16  respondents overreported or exaggerated the extent or severity
17  of any disabilities they might have?
18  A.  It's possible, but it's much less likely.  It's possible
19  people will report that that's a concern with particular work
20  disability measures where people are asked why they are not
21  working, and some people will say, "Well, I'm not working
22  because I have a disability."  Maybe they -- maybe they are
23  using that as an excuse.  That's why these measures that the
24  Census Bureau has adopted are not tied to work.  They are tied
25  to specific -- specific impairments.

1          Do you have a difficulty seeing?  Do you have difficulty

2     hearing, remembering, concentrating, or making decisions?

3     Which are much less subject to that kind of overreporting.

4     So, of course, there's going to be some overreporting here and

5     there, but underreporting is much more of an issue.

6     Q.  Is there anyway to determine or accurately estimate the

7     extent to which a phenomena of internal social stigma or

8     overreporting affected the self-reported data that you relied

9     on in your expert reported opinions?

10    A.  I don't think so, no.  There are certainly some studies

11    that have looked at overreporting and underreporting.  I don't

12    think there's an easy and reliable way to apply those

13    estimates to these particular data.

14    Q.  Would you agree this a flaw that's inherent in all

15    self-reported data-like surveys?

16    A.  It's an issue with all the — with all surveys.  People

17    may misreport in all kinds of ways.

18    Q.  Is it fair to summarize your opinions in this case as

19    opinions that there are specific provisions of SB 1 that you

20    believe add to the risk that there may be Texas voters with

21    disabilities whose rights under the ADA may be violated?

22    A.  Yes.

23    Q.  But you can't identify any individuals whose rights under

24    the ADA actually have been violated by any provisions of SB 1?

25    A.  I cannot point to specific people, no.  I'm basing this on

DOUGLAS KRUSE — CROSS

 1  the survey data and the patterns I see in the survey data

 2  applied to the provisions of SB 1.

 3  Q.  You discussed in your report at paragraph 15 various

 4  barriers that Texas voters with disabilities face in accessing

 5  voting.

 6  A.  Okay.

 7  Q.  Is it true that none of all of those barriers were created

 8  by SB 1?

 9  A.  That's true.  They existed before SB 1.

10  Q.  Your report was before SB 1 was implemented, and these

11  barriers all preexisted SB 1?

12  A.  Oh they certainly did, yes.

13  Q.  And although not created by SB 1, each of those voters'

14  to — barriers to voters with disabilities in Texas still

15  exist after SB 1?

16  A.  Oh, they certainly do.

17  Q.  You state in your expert report that "Only 59 percent of

18  voting eligible people with disabilities in Texas voted in

19  Texas in 2020."

20      That's at paragraph 16.  Do you recall that portion of the

21  report?

22  A.  Yes.

23  Q.  We'll bring it up for you.

24  A.  Oh, sure.  I have that.

25  Q.  So is it correct that you stated that only 59 percent of

DOUGLAS KRUSE - CROSS

1  voting eligible people with disabilities in Texas voted in

2  Texas in 2020?

3  A.  Yes.

4  Q.  And that was compared with 64.5 percent of voting eligible

5  people in Texas without disabilities?

6  A.  Yes.

7  Q.  So this created a 5.1 percentage point gap that you

8  report, and that existed as of 2020 before SB 1 was ever

9  passed?

10 A.  Yes, that's right.  And I'll just note that earlier I said

11 5.2.  It turns out it's a rounding thing; that it's about

12 5.15, so it could go either to 5.1 or 5.2.

13 Q.  And all of this was based on the General Election in 2020?

14 A.  Correct.

15 Q.  Based on a single election?

16 A.  Yes.

17 Q.  You didn't study — you didn't study other prior elections

18 in making that statement, only 2020 General Election?

19 A.  These particular numbers apply just to 2020.  We have

20 analyzed the prior elections and find very similar results in

21 the prior elections.  I believe in my expert report I put down

22 the 2016 numbers as well.

23 Q.  Is it correct, as you acknowledge at paragraph 66 of your

24 report:  "That voter participation can change significantly

25 across elections for voters both with disabilities and without

DOUGLAS KRUSE – CROSS

1  disabilities"?

2  A.  Yes.

3  Q.  And did voter participation in the 2020 General Election

4  vary significantly from the 2016 and 2018 General elections?

5  A.  It did not vary substantially from 2016.  It did from

6  2018.  There is a — there is an important distinction between

7  the presidential elections and the midterm elections.  The

8  disability gap tends to close up a bit actually in midterm

9  elections because people with –– because older people are more

10 likely to vote in midterm elections.  Young people are less

11 likely to vote.  And the fact that older people are more

12 likely to vote in midterm elections means — and more likely

13 to have disabilities, means that the disability gap tends to

14 close to two to three points in midterms and then expand again

15 in presidential elections.

16 Q.  Is it fair to say that the 2020 General Election had some

17 unique characteristics that were not shared by any election

18 before that or after that?

19 A.  Yeah.  I heard tell that the pandemic happened.

20 Q.  And did that pandemic that was active at the time of the

21 2020 General Election made voting in person especially

22 dangerous for voters with disabilities?

23 A.  Oh, yes.

24 Q.  And did that predictably diminish the turnout of voters

25 with disabilities in Texas in 2020 in the General Election?

DOUGLAS KRUSE - CROSS

1  A.  The — I'm trying to remember the exact 2016 numbers.  The

2  gap stayed rather similar between 2016 and 2020, because a lot

3  of people with disabilities were able to avoid the issues

4  associated with the pandemic by voting by mail, as we talked

5  about before.  30 percent, almost one-third of Texans with

6  disabilities who voted in 2020 voted by mail.  So that helped

7  alleviate any issues associated with turnout going down.

8  Q.  Now, in your direct testimony, you stated in paragraph 17

9  that:  "Among vote — Texas voters in 2020, 30.2 percent of

10  people with disabilities voted using a mail ballot as compared

11  to 8.2 percent of people without disabilities"?

12  A.  Yes.

13  Q.  And is it fair to say that all or virtually all of the

14  people in Texas who had disabilities were eligible to vote by

15  mail under Texas law?

16  A.  Yes.  They could apply for a mail ballot.  That's right.

17  Q.  In the 8.2 percent number, are you including people

18  without disabilities who were ineligible to use a mail ballot

19  under Texas law?

20  A.  Yes.  To be honest, I don't remember the specific

21  provisions related to the pandemic.  I know in Texas, in 2020,

22  I know many states liberalized the access to vote to mail

23  ballots.  Maybe Texas did not.  So in that case, yeah, the 8.2

24  percent would not have — in many of those — many people with

25  disabilities would not — many people without disabilities

1  would not have been eligible.  That 8.2 percent again could

2  include some people with disabilities who were undercounted by

3  the disability measure used in the Current Population Survey,

4  so there could be people with disabilities reflected in that

5  number, in the 8.2 percent number as well.

6  Q.  And because of the special circumstances of the 2020

7  General Election, would you agree that that 30.2 percent

8  figure who voted by mail in that election is probably inflated

9  and unrepresentative of Texas elections over time?

10  A.  I do provide, in paragraph 69, a comparison to 2016 where

11  I find that using the same survey done after the 2016

12  elections, 19.8 percent of people with disabilities voted by

13  mail compared to 6.0 percent of people without disabilities.

14  So it's — so the numbers are lower in 2020.  That's not a

15  surprise, but there's still a big gap, so people with

16  disabilities were still three times — people with

17  disabilities who voted were still three times more likely than

18  people without disabilities who voted to vote by mail.

19  Q.  In your report, you included various individual anecdotes

20  and reported anonymous comments that you believe support your

21  conclusions, right?

22  A.  Yes.

23  Q.  There's no reason for us to conclude or believe that those

24  anecdotes or anonymous comments were from Texas voters?

25  A.  That's true, yes.

3802
DOUGLAS KRUSE – CROSS

1  Q.  And you didn't rely on any of the anecdotes or anonymous

2  comments for any of your conclusions in this case?

3  A.  No, I didn't.  I found I — I do lots of statistical

4  studies, and I love generating statistics, and I've had a lot

5  of people say, Wow, these are great statistics, but give us

6  some real-life story here; so I like to illustrate some of the

7  statistical findings with real-life anecdotes.

8      But the anecdotes are purely, purely illustrative.  They

9  don't affect my conclusions.  My conclusions are all based on

10  the statistical evidence.

11  Q.  Okay.  I'm going to ask you some questions about the

12  groups of sections of SB 1 that you testified about on direct.

13  In general, the first group is the sections in Section 5 that

14  deal with ID numbers on vote by mail.  Your report and your

15  opinions predict that those provisions generally would create

16  barriers for voters with disabilities in Texas?

17  A.  Yes, that they create extra — extra costs, extra hassles

18  in voting, which can discourage voting.

19  Q.  In making that prediction, did you — you didn't speak to

20  any Texas voters with disabilities, right?

21  A.  Correct.

22  Q.  And you didn't speak with any state or government

23  officials, including the Secretary of State of Texas and the

24  Texas Attorney General, in arriving at those predictions?

25  A.  Correct.

1  Q.  Since February 8, 2022, have you spoken with any Texas

2  voters with disability to determine whether –– to what extent

3  any of the Section 5 provisions actually created any

4  significant barriers to voting for them?

5  A.  No, I have not.

6  Q.  And you have never read any of the guidance documents that

7  have been put out by the Texas Secretary of State to discuss

8  the various options, procuring problems people might

9  experience with applications for ballot by mail?

10 A.  No.  I did not read that guidance.

11 Q.  And when you reached your assessment or prediction about

12 the effect of the Section 5 provisions of SB 1, you weren't

13 aware that there was no cure process for application for

14 ballots by mail under Texas law prior to SB 1?

15 A.  Right.  I was not aware of that at the time.  I became

16 aware of it when I was deposed.

17 Q.  And you can't identify a single person who has been unable

18 to vote in Texas because of any of the Section 5 sections of

19 SB 1?

20 A.  No, I can't point to a specific person.  I haven't ––

21 that's not the kind of research I do.

22 Q.  And so now I'm going to ask you about what I'll refer to

23 as the Section 6 provisions that generally deal with

24 assisters, people who provide assistance to voters.

25     Is it also true that you didn't communicate with any Texas

DOUGLAS KRUSE — CROSS

1  voters with disabilities in arriving at your prediction that

2  those Section 6 provisions would create barriers to such

3  voters with disabilities in Texas?

4  A.  Right.  Again, the Texans with disabilities were part of

5  the datasets I analyzed, but I did not talk to any specific

6  Texans with disabilities about the specific provisions of

7  SB 1.

8  Q.  And you've not communicated with any Texas voters with

9  disabilities since February 28, 2022 to see whether or not

10  their personal experience has borne out your predictions about

11  the Section 6 provisions fully, partially, or not at all?

12  A.  That's correct.

13  Q.  And you also had not communicated with anybody who has

14  assisted voters in Texas or declined to assist voters in

15  Texas, to learn whether or not their personal experience has

16  borne out any of your predictions about how they would react

17  to the Section 6 provisions of SB 1?

18  A.  That's correct.  Can I correct one of my previous —

19        THE COURT:  It's okay.  Your lawyers will have an

20  opportunity to ask you any questions.

21        THE WITNESS:  Okay.

22        THE COURT:  We've sort of made it all very clear that

23  he hasn't talked to anybody, so...

24        MR. BRYANT:  Okay.

25        THE WITNESS:  Well, I did just want to add —

DOUGLAS KRUSE — CROSS

1            THE COURT:  No, sir.  You'll wait.

2            Okay.  Next question.

3    BY MR. BRYANT:

4    Q.  And is that also true for Section 7.04, that you didn't

5    talk with anybody who was a voter with disabilities in Texas

6    prior to making your prediction of SB 1's Section 704 effect,

7    and you haven't spoken with anyone who is a voter with

8    disability since then?

9    A.  Correct.

10   Q.  And you have no data as to whether or to what extent any

11   assisters in Texas actually have declined to assist any voters

12   with disabilities because of any provision of SB 1?

13   A.  Correct.

14   Q.  And you have no data as to whether or to what extent any

15   Texas voters with disabilities have actually had difficulties

16   in finding assisters because of any provisions of SB 1?

17   A.  That's correct.

18   Q.  Briefly dealing with the vote-harvesting provision Section

19   704, are you aware of any data on whether and to what extent

20   persons engaged in what's defined as "vote-harvesting" under

21   Section 704 exercise or have exercised undue influence or

22   coerced voters in their voting choices?

23   A.  I'm not aware of any evidence on any coercion like that or

24   any undue influence.

25   Q.  And have you -- are you aware of any data regarding the

DOUGLAS KRUSE — CROSS

1  extent to which persons engaged in vote—harvesting practices,

2  as defined in Section 7.04 of SB 1, have altered any votes

3  between the time that the votes were handed to the voter by

4  them and the time the votes were delivered to election

5  officials in Texas?

6  A.  I haven't heard of any evidence of that happening.

7          MR. BRYANT:  Pass the witness.

8          THE COURT:  Any further cross?

9          MR. NICHOLS:  Just very, very briefly, Judge.

10 BY MR. NICHOLS:

11 Q.  Dr. Kruse, Eric Nichols.  You and I have not met before

12 today, correct?

13 A.  That's correct.

14 Q.  But we did meet today.  It turns out we have a common — a

15 friend in common —

16 A.  Yes.

17 Q.  — a former colleague of yours who is at the School of

18 Management and Labor Relations?

19 A.  Yes, yes.  David Finegold was our Dean and a good friend

20 of mine.

21          MR. NICHOLS:  Apologies, Judge.  Just forgetting the

22 name on the record.

23 BY MR. NICHOLS:

24 Q.  Dr. Kruse, I take it that you are not an expert in

25 criminal law, much less Texas criminal law, correct?

DOUGLAS KRUSE – REDIRECT

1   A.  That's true.

2   Q.  And I take it also that you're not an expert in criminal

3   procedure, much less Texas criminal procedure, correct?

4   A.  Certainly true.

5   Q.  And so as I understand your testimony, Dr. Kruse, you are

6   not here to testify to the Court any opinions on the

7   likelihood that any person in Texas would be investigated by a

8   law enforcement agency under any provision of Texas law,

9   correct?

10  A.  Right.

11  Q.  And you are not here to testify to the Court about the

12  likelihood that any person in Texas would be subject to

13  prosecution under any Texas law, correct?

14  A.  Right, right.

15          MR. NICHOLS:  That's all I have.

16          Thank you, Judge.

17          THE COURT:  Any further redirect?

18                      REDIRECT EXAMINATION

19  BY MISS SINGH:

20  Q.  Hi, Dr. Kruse.

21  A.  Hey, there.

22  Q.  So my friend on the other side asked you about paragraph

23  17.

24      Could we pull that up.

25      And I believe Mr. Bryant asked you about whether the

DOUGLAS KRUSE — RECROSS

1 percentage of voters without disabilities included eligible

2 voters.  Does the data you relied on for these calculations

3 include eligible voters or people who actually voted?

4 A.  These are people that actually voted.

5 Q.  And then Mr. Bryant asked you some questions on cross

6 where you wanted to offer a correction.  What was it that you

7 wanted to add?

8 A.  Oh, just a very minor thing.  He asked about whether I

9 talked to any Texans with disabilities who may have had

10 difficulty in voting, and it occurred to me after I responded

11 that I did talk once with Bob Kafka, a Texan with a

12 disability, who I understand was also testifying in this trial

13 as well.  So I just want to be totally and completely honest

14 that I did talk to Bob Kafka.

15 Q.  Thank you, Dr. Kruse.

16          MISS SINGH:  No further questions.

17          THE COURT:  Anything based on that?

18          MR. BRYANT:  One question, Your Honor.

19                    RECROSS-EXAMINATION

20 BY MR. BRYANT:

21 Q.  Dr. Kruse, thanks for adding the information about

22 Mr. Kafka.  Did your conversation with Mr. Kafka play any role

23 whatsoever in your expert report opinions or your testimony in

24 this case today?

25 A.  No, absolutely not.

FRANK PHILLIPS – DIRECT

1          MR. BRYANT:  Pass the witness.

2          THE COURT:  Anything else based on that?

3          Thank you, sir.  You are excused.

4      *(Pause in proceedings)*

5          MR. KERCHER:  Your Honor, pursuant to an agreement

6   between the parties, the plaintiffs are not yet going to rest

7   while the parties continue to sort out some exhibit issues

8   regarding plaintiffs exhibits, but by prior agreement, the

9   State defendants will call their first witness, Mr. Frank

10  Phillips, who is in town from Denton County and needs to get

11  back for the election.  So the next witness will be State

12  Defendants first witness, Mr. Frank Phillips.

13          MISS HUNKER:  He'll be in, in a minute, Your Honor.

14  He's just quickly coming back from the restroom.

15          THE COURT:  If anybody needs to stretch, that's fine.

16      (FRANK PHILLIPS, having been duly sworn, testified as

17  follows:)

18                    DIRECT EXAMINATION

19  BY MISS HUNKER:

20  Q.  Good morning, Mr. Phillips.

21  A.  Good morning.

22  Q.  I really appreciate you traveling here today, especially

23  given the fast-approaching November election.  To just sort of

24  get it out of the way, can you please state your name for the

25  record.

3810

FRANK PHILLIPS – DIRECT

1  A.  Frank Phillips.

2  Q.  Mr. Phillips, what is your educational background?

3  A.  I have a bachelor's degree in government from Texas

4  Women's University.

5  Q.  What is your current employer and job title?

6  A.  I work for Denton County, and I'm the elections

7  administrator.

8  Q.  Who hired you as the Denton County elections

9  administrator?

10  A.  Well, as you know, in Texas, that's a little convoluted.

11  It's a recommendation by the Election Commission, which is

12  made up of the county judge, county tax assessor, county

13  clerk, and the party chairs of the Democrat and Republican

14  Party, and then that's confirmed by the Denton County

15  Commissioner's court.

16  Q.  And how long have you worked in the role of election

17  administrator for Denton County?

18  A.  Since 2009.

19  Q.  Is that the first time you occupied the role of

20  Denton County election administrator?

21  A.  Yes, it is.  In 2009?  Yes.

22  Q.  Were you election administrator for any other Texas

23  county?

24  A.  Yes.  In 2014 to 2016, I was elections administrator for

25  Tarrant County.

*Gigi Simcox, RMR, CRR*

3811

FRANK PHILLIPS – DIRECT

1  Q.  Altogether, how long have you worked in Texas elections?

2  A.  Fourteen years.

3  Q.  What did you do prior to joining the Denton County

4  elections office?

5  A.  My background is law enforcement.  I worked for the

6  Shreveport Police Department.  Then I moved to Texas, worked

7  for Farmer's Branch Police Department in Denton County,

8  Constable III, and then I became the chief administrator for

9  county commissioner, Precinct 3, then I went and did a

10  two-year contract job to the State department with the

11  International Police Task Force, and one year in Herzegovina

12  and one year in Bosnia, and then when I returned from there, I

13  was hired as director of administration for our — the county

14  judge in Denton County until I went to elections.

15  Q.  What are your current responsibilities as election

16  administrator?

17  A.  Well, in general, they are twofold.  I serve as the voter

18  registrar, so we handle all voter registration matters and

19  also the elections administrator, so we handle all elections.

20  And in our county, we contract with all of our cities,

21  schools, our jurisdictions like that.  So we perform all

22  elections in Denton County.

23  Q.  Thank you, Mr. Phillips.  I want to break that down a bit.

24  To clarify, as an election administrator, are you the voter

25  registrar for Denton County?

3812

FRANK PHILLIPS — DIRECT

1   A.   I am.

2   Q.   What are your responsibilities as a voter registrar?

3   A.   Well, the first one would be to register people to vote,

4   and at the same time to cancel their registrations if they

5   moved to another county or out of the State and just maintain

6   the voter registration files.

7   Q.   Is Denton County an online or off-line county?

8   A.   We are an off-line county.

9   Q.   For clarity, can you briefly explain what being an

10  off-line county means?

11  A.   Yes.  You really have two choices in the State of Texas.

12  Your county can utilize the State's voter registration system

13  as your everyday in-house voter registration system that's

14  called "TEAM," managed by the Secretary of State's Office.

15      Larger counties don't find TEAM adequate mainly because of

16  the speed.  I think we can overwhelm it, so most of us use

17  third-party vendors to facilitate our voter registration

18  system.

19  Q.   As election administrator, are you the early voting clerk

20  for Denton County?

21  A.   I am.

22  Q.   And what responsibilities do you have as the early voting

23  clerk?

24  A.   To perform the act of early voting, and to — which

25  includes mail and in-person voting.

FRANK PHILLIPS – DIRECT

1  Q.  So do you oversee in-person voting in Denton County?

2  A.  Yes.

3  Q.  Do you oversee voting by mail in Denton County?

4  A.  Yes.

5  Q.  In your role as an election administrator, do you attend

6  conferences, seminars, and trainings about running elections?

7  A.  I do.  We typically attend the Texas Secretary of State's

8  legislative updates.  Our Election Law Seminar, I believe is

9  what they call it.  And we also attend training through the

10  Election Center.  And I almost forgot one.  Also the Texas

11  Association of Election Administrators, TAEA.

12  Q.  What are some of the subjects addressed by these

13  conferences and seminars?

14  A.  They are far and wide.  Usually the Texas Secretary of

15  State's conference, as its name would suggest, is mainly about

16  legislative updates out of the last legislative session.  In

17  years — in our off years of legislative session, they

18  sometimes go back and touch back on legislative issues that

19  came from the last legislative session, or sometimes they are

20  just more generic, I would say, run-of-the-mill stuff that we

21  do every day.

22  Q.  Did any of the conferences, seminars, and trainings you

23  attend address the implementation of Senate Bill 1?

24  A.  Yes.

25  Q.  In the lead-up to the March Primary, did the Secretary of

FRANK PHILLIPS - DIRECT

1  State's Office offer webinars about the interpretation and

2  application of SB 1?

3  A.  They did.

4  Q.  Did you or your office attend those seminars?

5  A.  Yes.

6  Q.  Did the Secretary of State's Office continue to offer

7  webinars about the interpretation and application of SB 1

8  after the March Primary ended?

9  A.  Yes, I believe they did.

10  Q.  And did you and your office attend those webinars?

11  A.  I know my office staff did, yes.

12  Q.  How large is your elections office?

13  A.  You mean employee wise?  Or -- if you count me, it's me

14  and 19 employees full-time, so 20 full-time employees.

15  Q.  And how about temporary employees?

16  A.  Yes.  We normally keep -- and it varies by election.  We

17  usually have two or three -- we kind of call them permanent

18  temps -- that we have all the time.  During elections, heavy

19  elections, presidential, even governor, we can get up in the

20  neighborhood of 50 temps.

21  Q.  In addition to your office staff, does Denton County

22  recruit people to work the election at polling sites such as

23  election judges or clerks?

24  A.  Yes, we do.

25  Q.  How many poll workers does Denton County typically need to

FRANK PHILLIPS – DIRECT

1  conduct an election?

2  A.  Well, again, that varies on the size of the election.  It

3  can be as many as — I want to say, about 2500 is the most

4  we've had in any one given election.

5  Q.  Does your office provide training to its election workers?

6  A.  We do.

7  Q.  What topics are covered by this training?

8  A.  Everything.  We cover paperwork, how to fill out the

9  paperwork, when that paperwork is used, how to operate the

10  equipment, set up the equipment, tear down the equipment, how

11  to interact with voters.

12  Q.  When does this training take place?

13  A.  It usually starts about two to three weeks before early

14  voting starts.

15  Q.  Does your office provide training to members of the early

16  voting ballot board?

17  A.  Yes, we do.

18  Q.  What topics are covered by this training?

19  A.  Again, just about anything that the early voting ballot

20  board have to do including signature verification, accepting

21  mail ballots or the carrier envelopes once they come back in,

22  and any legislative changes that may have occurred since they

23  last served on the early voting ballot board.  And we

24  generally follow the handout that the Secretary of State

25  provides.

3816

FRANK PHILLIPS - DIRECT

1  Q.  When does the training take place?

2  A.  Usually it's the first day.  We have occasionally called

3  them in before they actually made us the early voting ballot

4  board, if there were a lot of substantial changes; but

5  normally, it's what we would call the first day they meet.

6  That's the first thing we do with them.

7  Q.  How big is Denton County in terms of population?

8  A.  About two months ago, north central Texas COG said we

9  passed the 1 million mark, so about 1 million.

10  Q.  How many people are registered to vote in Denton County?

11  A.  615,000 give or take.

12  Q.  How does that compare with other Texas counties?

13  A.  Well, we're one of the larger counties.  We tend to go

14  back and forth with I believe it's El Paso County, on being

15  either the number seven or number eight largest in the State.

16  Q.  Would you consider Denton County to be a large county?

17  A.  Absolutely.

18  Q.  Has Denton County population grown in the last few years?

19  A.  Oh, significantly.  For what it's worth, 86 people a day

20  move into Denton County, so...

21  Q.  Has that growth affected how your office conducts its

22  elections?

23  A.  Well, it's affected it budgetarily, because, you know,

24  more people mean more polling sites, mean more paperwork, but

25  as far as the day-to-day running of election, it really hasn't

3817
FRANK PHILLIPS - DIRECT

1  changed it, but it has required us to hire new employees, more
2  temps.  We — five years ago, six years ago, I think we were
3  at 15 or 16 employees.  Now we're at 20.
4  Q.  You mentioned earlier that for a few years you were the
5  election administrator of Tarrant County?
6  A.  Um-hum.
7  Q.  Do you know the population of Tarrant County?
8  A.  They are about twice our size, so I would guesstimate 2.1,
9  2.2 million.
10 Q.  Would you consider Tarrant County to be a large county?
11 A.  Absolutely.
12 Q.  Are you a member of the Secretary of States CEO advisory
13 group?
14 A.  I am.
15 Q.  In your words, what is the Secretary of States advisory
16 group?
17 A.  So roughly, I'm going to say within the last two years,
18 the Secretary of State's Office approached several of us
19 elections administrators and some county clerks to be a part
20 of this group, and we do several things.  And it really
21 depends on where we're at in an election cycle.  Sometimes we
22 just talk about things in general, but it's really an avenue
23 where the Secretary of State's Office can get feedback from us
24 on how — if there's any issues, especially during election
25 time.  Are there any ongoing issues?  If there are, how did

FRANK PHILLIPS – DIRECT

1  your county correct it or how are you handling it?

2     And she has — when I say "she," I'm referring to

3  Christina Adkins, who is now the Director of Elections, but

4  she is — she's really good about if there's going to be new

5  forms, she runs those forms past us before they are

6  distributed or become an official form, for feedback or any

7  recommended adjustments, things like that.

8  Q.  Have you found that the Secretary of State's Office is

9  responsive to concerns raised by the advisory group?

10  A.  Absolutely, yes.

11  Q.  Can you think of an example?

12  A.  Well, one would be our current application for ballot by

13  mail.  She had — because of the legislative changes, they

14  need to make some adjustments, so they come up with a couple

15  of draft applications, and they sent those to us, let us look

16  them over.  And actually my deputy elections administrator

17  made substantial changes to it, and it's virtually the one we

18  are using today, maybe with some minor tweaks.

19  Q.  Outside of the advisory group meetings, do you communicate

20  with the Secretary of State's Office?

21  A.  Yes.

22  Q.  Does your office?

23  A.  Yes.

24  Q.  For what purpose?

25  A.  Usually a legal question or an interpretation of the

3819

FRANK PHILLIPS – DIRECT

1  Election Code or something like that.  That's usually an

2  attorney we're speaking to.

3  Q.  So you kind of got at my next question, but I'm going to

4  ask it for clarity sake.  When your office has questions on

5  how to interpret the Election Code, does your office contact

6  the Secretary of State's Office for advice?

7  A.  Absolutely.

8  Q.  When your office isn't certain on how to apply the

9  Election Code to a given set of circumstances, does your

10  office contact the Secretary of State's Office for advice?

11  A.  Yes.

12  Q.  When your office has questions over its responsibilities

13  under the Election Code, does your office contact the

14  Secretary of State's Office for advice?

15  A.  Yes.

16  Q.  Why does your office contact the Secretary of State's

17  Office in these instances?

18  A.  I'm sorry.  Say that again.

19  Q.  Why do you and your staff contact the Secretary of State's

20  Office in these instances?

21  A.  Well, we want to make sure we're doing it correctly.  You

22  know, sometimes you can talk to other elections administrators

23  and, you know, we disagree with each other on a particular

24  topic, and so sometimes we'll —— we need some clarification.

25  So that would be the Secretary of State's Office to give us

3820
FRANK PHILLIPS — DIRECT

1  that clarification.

2  Q.  If the Secretary of State offers you advice on how to

3  interpret or apply the Election Code, does your office tend to

4  take it?

5  A.  We do.

6  Q.  Do you consider yourself legally bound to take the

7  Secretary of State's advice?

8  A.  I don't believe I'm legally bound to, but we still do.

9  Q.  Why, then, does your office take the advice offered by the

10  Secretary of State's Office?

11  A.  Well, I think that's the function of the Secretary of

12  State's Office is to provide us with the most legal way to do

13  something.  I think it would be kind of —— it may be

14  detrimental on our part to not follow their advice.

15  Q.  In your experience, have you found the Secretary of

16  State's Office knowledgeable about the requirements stipulated

17  in the Election Code?

18  A.  I have.

19  Q.  In your experience, have you found the Secretary of

20  State's Office knowledgeable about best practices in running

21  its elections?

22  A.  Yes.

23  Q.  In the course of your work, do you and your office receive

24  election advisories from the Secretary of State's Office?

25  A.  Oh yes, ma'am.

FRANK PHILLIPS – DIRECT

1  Q.  And very briefly, what is an election advisory?

2  A.  Secretary of State's Office puts out several a year, and

3  they can vary by topic.  They are usually around election

4  time, and some of them are — are repeats that they kind of

5  put out every year, maybe about election dates and times; but

6  it could be something very specific like how to handle mail

7  ballots, ballot, for instance.  Many topics that they put out.

8  Q.  In your experience, do election advisories define every

9  term in the Election Code?

10  A.  No, no, no.

11  Q.  But do they address common questions that arise?

12  A.  They do.

13  Q.  Does your office take into consideration the guidance

14  provided in the Secretary of State election advisories when

15  developing policies and procedures for administering

16  elections?

17  A.  Absolutely.  We even have a shared drive on our computers

18  that are just for election advisories that we refer to, yes.

19  Q.  Does your office typically follow the guidance provided by

20  the Secretary of State's Office in its election advisories?

21  A.  Yes.

22  Q.  Why is that?

23  A.  Really, what I spoke to before.  I mean, I think they have

24  the whole State in mind when they put out an advisory, not

25  just one particular county.  And for the sake of uniformity

FRANK PHILLIPS — DIRECT

1  and — you know, I don't want somebody in Collin County doing
2  something — a voter doing something different than a voter in
3  Denton County does, so we tend to follow their advice mainly
4  for the uniformity.
5  Q.  Did you and your office receive election advisories
6  regarding the implementation of Senate Bill 1?
7  A.  Yes.
8  Q.  Did these advisories address the implementation of the ID
9  number requirement?
10  A.  They did.
11  Q.  Did these advisories address poll watcher provisions?
12  A.  Yes.
13  Q.  Did your office follow the guidance provided by the
14  Secretary of State in these advisories?
15  A.  We did.
16  Q.  In the event you had questions that were not addressed by
17  the election advisories, would you and your office contact
18  staff at the Secretary of State's Office directly?
19  A.  Yes.
20  Q.  Was of the Secretary of State's Office able to answer your
21  questions?
22  A.  I've never had the Secretary of State office never been
23  able to answer a question.
24  Q.  Do you find that you and your office have a better
25  understanding of SB 1's provisions today than when SB 1 was

3823

FRANK PHILLIPS — DIRECT

1  first enacted?

2  A.  Yeah.  Just from the use of it.  Just — it's just become

3  normal for us now, yes.

4  Q.  Were you the election administrator for Denton County

5  during the November 2020 General Election?

6  A.  Yes, I was.

7  Q.  During that election, did your office identify any

8  incidents of election fraud?

9  A.  We did.  There was a — even though that was the General

10  Election for state and county officers, we still had a — a

11  special election that the City of Carollton had placed on the

12  ballot for mayor.  And we discovered that one of the mayoral

13  candidates was submitting multiple fraudulent applications for

14  ballot by mail.

15  Q.  The person who conducted this fraud, do you recall his

16  name?

17  A.  Zul Mohamed.

18         THE COURT:  We are saying "did fraud."  I mean, is

19  there an adjudication of that or is this an allegation?

20         MISS HUNKER:  There's an adjudication ongoing.

21         THE COURT:  There's no adjudication ongoing.  It's

22  either been adjudicated or not adjudicated, so it's an

23  allegation.

24         MISS HUNKER:  The trial is upcoming.  It is

25  continuing allegation until, of course, the conviction.

FRANK PHILLIPS - DIRECT

1              THE COURT:  It's a criminal case?

2              MISS HUNKER:  It is a criminal case.

3              THE COURT:  So he's, like, innocent until proven

4    guilty, right?  So it's an allegation.

5              MISS HUNKER:  It's an allegation for now, Your Honor.

6              THE COURT:  You just made it seem like he committed

7    fraud.  That's what you just said.  So it's an allegation of

8    fraud.

9              MISS HUNKER:  That's correct, Your Honor.

10             THE COURT:  Okay.

11   BY MISS HUNKER:

12   Q.  I want to walk this through step by step.  What first

13   alerted your office to the possibility that mail voting fraud

14   may be occurring?

15   A.  It was actually a temporary employee who we had hired to

16   help input applications for ballot by mail into our system,

17   and she brought it to the attention of my absentee coordinator

18   that she had noticed several of the applications were being

19   asked to be mailed to an address in Lewisville, and she kept

20   seeing that address repeatedly.

21   Q.  Why is it a red flag that multiple ballots were being sent

22   to a single address?

23   A.  Well, it's not abnormal at all for three or four to go to

24   an address, but when you start seeing that number up in the

25   teens or more, you know, it's a red flag of potential fraud.

FRANK PHILLIPS — DIRECT

1  So at that point, I asked them to collect all of those, bring

2  them to me, and go back through the ones they had already

3  processed to make sure that they didn't miss any before she

4  first noticed it.

5  Q.  Once your office noticed the irregularity, did you look up

6  the address on the ABBM?

7  A.  I did.

8       MISS TULIN:  Your Honor, I'm just going to lodge an

9  objection.  We talked about this yesterday.  The — in the

10  deposition, we got, I would say, as much information as my

11  counterpart has elicited up to this point.

12       The next question that was asked was:  "Could you

13  tell me more about how your office was able to identify this

14  incident in 2020," and that is when the investigative

15  privilege was raised, and so — and the response was, "I can

16  speak generally about it."

17       So I don't —

18       THE COURT:  Did he speak generally about it in the

19  deposition?

20       MISS TULIN:  He spoke generally, but I think we're

21  getting very, very close to new information that we have not

22  heard.

23       MISS HUNKER:  Your Honor, this information goes

24  directly to the response.  There's a specific set of details

25  that I am not going to be asking, and that is what the

FRANK PHILLIPS — DIRECT

1  investigative privilege was addressing.

2        THE COURT:  Well, as soon as he starts talking about

3  stuff that he did not say in the deposition, I'm going to

4  sustain an objection, so you phrase your questions

5  accordingly.

6  BY MISS HUNKER:

7  Q.  Once you noticed the irregularity, did you look up the

8  address on the ABBM?

9  A.  I did.

10       MISS TULIN:  Your Honor, that's not -- that

11  information is not --

12       THE COURT:  The objection is sustained.  The answer

13  is stricken.

14  BY MISS HUNKER:

15  Q.  Did you identify the address as being a commercial post

16  box facility?

17  A.  Yes.

18  Q.  After you and your office determined that the address was

19  a commercial post box facility, what did you do next?

20  A.  I attempted to -- well, when I was in Tarrant County, the

21  Attorney General's Office had an investigator work with us on

22  a case they were working, and -- just to provide information.

23  And I tried to contact that person, but honestly, I couldn't

24  find his contact info so called our sheriff's department.

25  Q.  To your knowledge, did the sheriff's office execute a

FRANK PHILLIPS — DIRECT

1  search warrant for Mr. Mohamed?

2  A.  Yes.

3  Q.  Was Mr. Mohamed found in possession of mail ballots when

4  the warrant was executed?

5       MISS TULIN:  Objection, Your Honor.  I think at this

6  point we're both in investigative privilege land and also in

7  personal knowledge.

8       MISS HUNKER:  This was brought up in the exhibits in

9  the deposition.

10       THE COURT:  Yeah, but how do you have personal

11  knowledge of that?

12       THE WITNESS:  Well ——

13       THE COURT:  Somebody told you that?

14       THE WITNESS:  It wasn't personal knowledge that I

15  saw.

16       THE COURT:  No.  Did you go to the house and were you

17  present at the house?

18       THE WITNESS:  I was not.

19       THE COURT:  Sustained.  Next question.

20  BY MISS HUNKER:

21  Q.  At some point did somebody contact voters listed on the

22  flagged ABBMs and mail ballots?

23       MISS TULIN:  Same objection.

24       THE COURT:  Say the question again.

25

3828

FRANK PHILLIPS - DIRECT

1  BY MISS HUNKER:

2  Q.  At some point did somebody contact voters listed on the

3  flagged ABBMs and mail ballots?

4          THE COURT:  Somebody from the sheriff's office?

5          MISS HUNKER:  He can clarify in his answer.  I just

6  asked somebody, Your Honor.

7          THE COURT:  Did anybody from your office that you

8  have personal knowledge of do that follow-up?

9          THE WITNESS:  No, sir.

10          THE COURT:  Next question.  Sustained.

11  BY MISS HUNKER:

12  Q.  To your knowledge, did these voters consent to having

13  Mr. Mohamed submit their ABBM on their behalf?

14  A.  Not to my knowledge.

15  Q.  To your knowledge, did these voters consent to having

16  Mr. Mohamed mark their ballots?

17          MISS TULIN:  I'm going to raise the same objection,

18  Your Honor.

19          THE COURT:  Which objection are you at now?

20          MISS TULIN:  Both.  Both personal knowledge, and also

21  the line of questioning at the -- the investigative privilege

22  objection in the deposition shut down this entire line of

23  questioning.

24          MISS HUNKER:  It did not shut down this line of

25  questioning.  And also I should point out that you had the

FRANK PHILLIPS - DIRECT

1  opportunity to ask questions at this deposition, yet the

2  private plaintiffs chose not to —

3         THE COURT:  Okay.  We're not going to have —

4         MISS HUNKER:  — ask a single question.

5         THE COURT:  Counsel, we're not going to direct

6  arguments to each other.

7         MISS HUNKER:  My apologies, Your Honor.

8         THE COURT:  You're going to make the objections to

9  the Court.

10         So as to the personal knowledge, are you speculating,

11  or do you have any personal knowledge one way or the other

12  whether these people gave acquiescence?

13         THE WITNESS:  I have no personal knowledge.

14         THE COURT:  That's sustained.

15  BY MISS HUNKER:

16  Q.  How many fraudulent ABBMs were submitted to your office?

17         MISS TULIN:  Objection.  Calls for speculation.

18         THE COURT:  No.  That doesn't.

19         If you know, you can answer that question.

20         MISS TULIN:  Well, I guess I would also say the

21  alleged fraudulent applications.

22         THE COURT:  Yeah, I know.  So it's all alleged, and

23  until he's actually convicted, it's all an allegation.

24         THE WITNESS:  I believe the number was 84.

25

3830

FRANK PHILLIPS - DIRECT

 1  BY MISS HUNKER:

 2  Q.  Based on your experience and knowledge of Texas law and

 3  election procedures, could incidents of voter fraud

 4  disenfranchise voters?

 5  A.  Absolutely.

 6  Q.  How so?

 7  A.  Well, let's take an example of someone submitting a

 8  fraudulent application for ballot-by-mail that is not

 9  discovered, and they are mailed a mail ballot, they vote that

10  mail ballot and return it.  Then we're going to mark in our

11  system that that voter has voted.  Now, if that voter, the

12  real voter turns around and does one or two things:  Either

13  submits an application for ballot-by-mail, we would reject it,

14  in that they had already submitted a mail ballot, or if they

15  showed up in person, our system would show that they had

16  already voted by mail.  And assuming our poll workers follow

17  the proper procedure, they will notify us, and then that voter

18  would be offered a provisional ballot until it could be

19  worked -- or worked out, but it is possible that, yes, they

20  could be denied the right to vote.

21  Q.  In the alleged incident that occurred in Denton County in

22  2020, what would have happened if the voters who had ABBMs

23  submitted on their behalf attempted to vote?

24  A.  What I just -- the example I just gave.  That's what would

25  have happened.

FRANK PHILLIPS - DIRECT

1  Q.  In your experience, is mail-in voting more vulnerable to

2  fraud than in-person voting?

3  A.  Absolutely.

4  Q.  How is mail voting more vulnerable?

5  A.  Well, anytime that ballot leaves our office, we don't know

6  what happens to it.  We don't know whose hands it passes

7  through or who actually, you know, voted and returned that

8  ballot, so the potential is there.

9  Q.  The incident that we spoke about in 2020, did the person

10 accused of voter fraud take advantage of these vulnerabilities

11 when he submitted ABBMs?

12       MISS TULIN:  Objection.  Calls for speculation.

13       THE COURT:  Your voice trailed off.  I didn't hear

14 that.

15 BY MISS HUNKER:

16 Q.  From the incident in 2020 that we've been discussing, did

17 Mr. Mohamed, who is accused of voter fraud, take advantage of

18 these vulnerabilities when he submitted ABBMs?

19 A.  Yes, in my opinion, yes.

20 Q.  I'm going to change subjects somewhat, but before I do, I

21 want to ask if there weren't so many ABBMs routed through the

22 same commercial address, do you think it likely that the fraud

23 would have gone undetected in 2020?

24       MISS TULIN:  Objection.  Calls for speculation.

25       MISS HUNKER:  He knows the procedures in his office,

FRANK PHILLIPS - DIRECT

1  Your Honor.  I think he —

2          THE COURT:  Yeah.  That's overruled.

3          Go ahead.

4          THE WITNESS:  Yeah, I think it's highly likely it

5  would have went undetected.

6  BY MISS HUNKER:

7  Q.  I want to turn now to Senate Bill 1, specifically the ID

8  number requirement.

9      Prior to Senate Bill 1, how did Denton County establish

10  the identity of a voter who submitted an application for

11  ballot-by-mail?

12  A.  When an application for ballot-by-mail arrived in the

13  office, we take the info that's on there at face value.  We

14  look that voter up, and if they are a registered voter, then

15  we would send them a mail ballot.

16  Q.  Did your office analyze — I'm sorry.

17      Was there any procedure to confirm that person applying to

18  vote by mail was, in fact, the qualified voter?

19  A.  Was "a qualified voter" or "the qualified voter"?

20  Q.  "The qualified voter."

21  A.  No.

22  Q.  So prior to Senate Bill 1, when your office identified the

23  voter, was your office merely locating a voter's file in a

24  registration database?

25  A.  Yes.

3833

FRANK PHILLIPS – DIRECT

1  Q.  Turning to ballots-by-mail, prior to SB 1, how did

2  Denton County establish the identity of a voter who submitted

3  a mail ballot?

4  A.  Well, it's kind of the same procedure.  When that carrier

5  envelope that contains the ballot comes into our office, we

6  look that voter up again and just mark the record that they

7  have voted.  Now, actually confirming the identity, no.

8  Q.  Would the signature verification committee or early voting

9  ballot board analyze a voter's signature before accepting and

10  counting the ballot?

11  A.  Yes.

12  Q.  How did that signature comparison process work?

13  A.  We're talking pre-SB 1?

14  Q.  Pre-SB 1.

15  A.  Whenever we get an application for ballot-by-mail, we scan

16  that into our system, we capture that signature.  When the

17  carrier envelope that contains a ballot comes in, we scan that

18  into our system, capture that signature -- image of that

19  signature, and then the early voting ballot board compares the

20  signature on the application for the ballot-by-mail with

21  that -- the signature on the carrier envelope.  If they match,

22  in their opinion, they are accepted.  If they don't, then

23  there is a procedure they can go through to try to rectify it.

24      When I say that, the way we literally have it is we have

25  one Republican, one Democrat that are agreeing that these

*Gigi Simcox, RMR, CRR*

FRANK PHILLIPS – DIRECT

1  signatures match.  If they don't, then the whole ballot board
2  reviews that signature –– those signatures.  And either accept
3  or reject it.
4  Q.  What signatures would the signature verification committee
5  or early voting ballot board use as the comparison?
6  A.  Well, on the face of it, they would use the signature on
7  the ABBM, application for ballot–by–mail, and the carrier
8  envelope.  They also had the authority to go back –– I believe
9  it was six years at the time –– to –– of any other signatures
10  we may have had on file.
11  Q.  Would the signature verification committee or early voting
12  ballot board compare the signature on the ballot with ––
13  BY MISS HUNKER:
14  Q.  Would the signature verification committee or early voting
15  ballot board compare the signature to the ballot with the
16  signature on the application for ballot–by–mail?
17  A.  Yes.
18  Q.  Does this mean that if a person submitted a fraudulent
19  ABBM and then submitted a mail ballot, the signature
20  verification committee or early voting ballot board would
21  compare the signature on the ballot to the previous signature
22  submitted on the application for ballot–by–mail?
23  A.  Yes.
24  Q.  You mentioned earlier that you caught on to the fraud in
25  2020 because there were a number of ballots being sent to the

3835

FRANK PHILLIPS – DIRECT

1  same commercial mailbox.  Were you also alerted to the fraud

2  by the signature requirement?

3  A.  No.

4  Q.  Why didn't the signature requirement flag the fraud in

5  this specific case?

6  A.  Well, in this specific case, we only had the signature on

7  the application for ballot-by-mail.  At that point, there was

8  no other signature to compare it to.

9  Q.  Is this one of the vulnerabilities of voting by mail that

10  you discussed earlier?

11  A.  Yes.

12  Q.  Let's discuss the changes to these practices and

13  procedures in the wake of Senate Bill 1.  Following the

14  passage of Senate Bill 1, how does Denton County establish the

15  identity of a voter who submit an application for

16  ballot-by-mail?

17  A.  It's virtually the same process I described before with

18  the addition of driver's license, Texas state ID or -- and/or

19  the last four of the Social Security number.  And one of those

20  has to match what we have on file in the voter registration

21  system.

22  Q.  And how does Denton County establish the identity of a

23  voter who submitted a mail ballot?

24  A.  With that driver's license or Social.

25  Q.  Will your office remove the flap on the carrier envelope

*Gigi Simcox, RMR, CRR*

3836

FRANK PHILLIPS — DIRECT

1  to determine whether the voter put an ID number that matches

2  the one on file?

3  A.  Yes.

4  Q.  Since the law's passage, does the Denton County Elections

5  Office utilize the ID number requirement under SB 1 to confirm

6  the identity of a mail voter?

7  A.  We do.

8  Q.  Does the Denton County Election's Office utilize the ID

9  number required under SB 1 to confirm that the person casting

10  the ballot is, in fact, the registered voter qualified to vote

11  by mail?

12  A.  We do.

13  Q.  We spoke a little while ago about the vulnerabilities

14  associated with mail-in voting.  In your opinion, does SB 1

15  address that vulnerability?

16  A.  It definitely goes a long way in addressing

17  vulnerabilities, yes.

18  Q.  How does it address that vulnerability?

19  A.  Well, not to use the exact example, but if we had someone

20  that was submitting a fraudulent application for

21  ballot-by-mail, before SB 1, really, all they needed was a

22  list of registered voters, and they could fill out their

23  information, the information that was required on the

24  application for ballot-by-mail.

25  Q.  How does —

3837
FRANK PHILLIPS - DIRECT

1  A.  And it would be very hard to do that post-SB 1, because

2  you're also going to have to have a driver's license number or

3  the last four of a Social or Texas ID number.  To find those

4  in large numbers would be extremely difficult.

5  Q.  Had SB 1's mail ballot ID number requirement been in place

6  in 2020, do you believe it would have helped identify the

7  alleged mail voting fraud that we discussed earlier?

8  A.  I do, in the sense of they would have -- they would have

9  had to probably make up numbers.  But that's just speculation

10 again.

11         THE COURT:  Well, that answered that.

12         THE WITNESS:  Yeah, sorry.

13 BY MISS HUNKER:

14 Q.  Do you think the lack of an ID number requirement made it

15 easier to complete fraudulent ABBMs and receive illegitimate

16 mail ballots in the alleged fraud you and I had discussed?

17 A.  Yes.

18 Q.  You mentioned earlier that the person accused of voting

19 fraud in 2020 was running for the mayor of Carollton.  Is the

20 City of Carollton contained entirely within Denton County or

21 does to span multiple counties?

22 A.  It's in multiple counties.

23 Q.  In which other counties is the City of Carollton also

24 located?

25 A.  It's also in Dallas and Collin.

FRANK PHILLIPS - DIRECT

1  Q.  To your knowledge, did either Dallas or Collin County

2  detect the fraud being conducted in 2020?

3  A.  I have no knowledge of Dallas or Collin.

4  Q.  After you became aware of the fraud, did your office

5  sequester the alleged ABBM -- sorry.  Let me repeat that.

6      After you became aware of the alleged fraud, did your

7  office sequester the flagged ABBMs and mail ballots?

8  A.  Yes.

9  Q.  Why did you do so?

10  A.  So we could turn them over to the sheriff.

11  Q.  Do you know if either Dallas or Collin County were able to

12  sequester fraudulent ABBMs or mail ballots submitted by

13  Mr. Mohamed?

14  A.  I don't know.

15  Q.  Are you aware of elections decided by a handful of votes?

16  A.  Absolutely.

17  Q.  Can you please give me an example?

18  A.  Sure.  City of Pilot Point just elected their current

19  mayor by -- well, during the regular election, they tied, and

20  then they had to go into an run-off, and then the mayor ended

21  up winning by, it the either one or two votes.  Same person

22  won a city council seat a few years before with one vote.  And

23  we routinely have -- especially smaller cities -- that the

24  winner may be decided by ten or twelve votes.

25  Q.  Based on your experience, is it more likely that voter

FRANK PHILLIPS – DIRECT

1  fraud could change the outcome of a close election than other

2  elections?

3  A.  Absolutely.

4  Q.  Was the alleged fraud perpetrated in Denton County in 2020

5  covered by news outlets?

6  A.  Yes.

7  Q.  Do you recall when the news reports about the alleged

8  fraud broke?

9  A.  I mean, I don't remember the date, but they broke the day

10 that the sheriff made an arrest.

11 Q.  Would these news reports have come out just as the 2021

12 legislative session was about to start?

13 A.  Yes.

14 Q.  Did Senate Bill 1 change how the signature verification

15 committee and early voting ballot board compared signatures on

16 the carrier envelope?

17 A.  There's now — it's presumed that those signatures are

18 valid, but it hasn't resolved them of their responsibility to

19 make a determination if the signatures match on the — an ABBM

20 or — and a carrier envelope.

21 Q.  Did SB 1 change which signatures the signature

22 verification committee and early voting ballot board can

23 reference when reviewing a voter's signatures?

24 A.  You mean outside of the ABBM and carrier?

25 Q.  Correct.

FRANK PHILLIPS – DIRECT

1  A.  Something on file?  Yes, they can go back to any that they

2  have on file at this point, without a time frame that we had

3  before.

4  Q.  Earlier in this trial, several county officials spoke

5  about how Senate Bill 1 expanded the number of signatures that

6  the signature verification committee and early voting ballot

7  board could reference when reviewing a voter's signature on a

8  mail ballot.

9     Based on your experience in Denton County, did this

10 provision make it easier for the signature verification

11 committee or early voting ballot board to accept a mail

12 ballot?

13 A.  Yes.

14 Q.  How so?

15 A.  If — especially if we're dealing with a more elderly

16 population, your signature changes over time, and sometimes

17 we'd get applications and carrier envelopes where they are

18 substantially similar, but there may be enough difference that

19 it does raise a question, but it does allow the ballot board

20 to compare those signatures with any we have on file, which

21 makes a better chance that that voter is going to get

22 accepted.

23 Q.  Are there voters who only have a few signatures in their

24 file?

25 A.  Oh, yeah, for sure.

FRANK PHILLIPS - DIRECT

1  Q.  Did the provision make it easier for the signature

2  verification committee or early voting ballot board to accept

3  ballots from these voters?

4  A.  Yes.

5  Q.  In Denton County, when the signature verification

6  committee or early voting ballot board examines a mail ballot,

7  does the signature verification committee or early voting

8  ballot board use the expanded signature list to find

9  additional opportunities to match the voter's signature?

10  A.  Yes.

11  Q.  Let's talk a little about the implementation of Senate

12  Bill 1.  Again, we're going to focus on the ID number

13  requirement.

14      What was the first election your office held under the new

15  law?

16  A.  Let's see.  I think we might have been the first in the

17  state.  We had — most of the State, the first election would

18  have been the March Primary, but we had a special election in

19  January.  Forgive me.  I don't remember the jurisdiction of

20  it, but we had a special election in January where we had to

21  implement SB 1's criteria.

22  Q.  Would the March Primary have been the second election held

23  in Denton County after SB 1's effective date?

24  A.  Yes.

25  Q.  Did your office face any obstacles implementing SB 1?

3842

FRANK PHILLIPS - DIRECT

1  A.  Our largest obstacle was — remember, this was during the

2  time of COVID, and supplies were scarce.  We had trouble

3  getting paper to print, to get envelopes and things like that,

4  so that was our biggest challenge.

5  Q.  Did the timing of SB 1's passage present any challenges?

6  A.  It did for us, because, I mean we were on a short time

7  frame.  I believe it became effective in December after a

8  special session, if I'm correct.  And we had to have this

9  implemented, you know, just a few weeks later in January.

10  Q.  And you mentioned the paper shortage.  Did you have

11  trouble obtaining new forms and getting them to voters?

12  A.  Well, we didn't have trouble getting them to the voter

13  because we did ultimately get them on time.  We just struggled

14  to get them to time, because of paper shortages.

15  Q.  Did you also have to train staff about the new

16  requirements?

17  A.  Yes, of course.

18  Q.  Did you have to train members of the early voting ballot

19  board or signature verification committee about the new

20  requirement?

21  A.  Yes.

22  Q.  Was there a learning curve for staff and early voting

23  ballot board members?

24  A.  Yes, always.

25  Q.  Did it take to him to understand best practices when

FRANK PHILLIPS - DIRECT

1  implementing the ID number requirement?

2  A.  It did take a little time, but it wasn't -- I mean, they

3  caught on to it pretty quick.

4  Q.  Did you notice any voter confusion about the ID number

5  requirement during the first few election after SB 1 took

6  effect?

7  A.  I did.

8  Q.  How were voters confused?

9  A.  They weren't putting any number down.  They would leave

10 those blank, and that was the main source of confusion, and I

11 think that was mainly from people who had been voting by mail

12 for years, and they were just filling out the things they had

13 always filled out.

14 Q.  In your experience, is there always a learning curve when

15 new voting requirements are introduced?

16 A.  There is.

17 Q.  Because of these obstacles, did Denton County initially

18 experience higher than normal rejection rates for ABBMs and

19 mail ballots during the March 2022 Primary?

20 A.  Yes.

21 Q.  Did that rejection rate go down?

22 A.  It did.  It started going down -- well, it went down

23 throughout the entire election.

24 Q.  Were you seeing reductions in rejection rates as the

25 March 2022 Primary proceeded?

3844

FRANK PHILLIPS − DIRECT

1  A.  Yes.

2  Q.  Were you seeing reduction in rejection rates during the

3  May 2022 Constitutional Election?

4  A.  We did.

5  Q.  Were you seeing reductions in rejection rates during the

6  Primary run-off in 2022?

7  A.  Yes.

8  Q.  Was Denton County able to reduce its mail ballot rejection

9  rate for the November 2022 General Election as compared to the

10  March 2022 Primary?

11  A.  Oh, substantially, yes.

12  Q.  I am going to bring up our first exhibit of our

13  discussion.  The Secretary of State's Office published a list

14  of county rejection rates for each election in 2022.  I have

15  this State Exhibit 22.  Let's take a look at Denton County.

16      The Democratic Primary, what was the rejection rate listed

17  as?

18  A.  10.91 percent.

19  Q.  And let's take a look at the Republican Primary.  What is

20  the rejection rate listed as?

21  A.  17.39 percent.

22  Q.  Does this match your recollection of the rejection rates

23  in these two elections?

24  A.  It does.

25  Q.  Let's turn to the November 2022 Election.  What is the

3845

FRANK PHILLIPS - DIRECT

1  rejection rate listed as?

2  A.  1.66 percent.

3  Q.  Does this match your recollection of what the rejection

4  rated was the November 2022 General Election?

5  A.  It does.

6  Q.  To your recollection, is the 1.66 rejection rate

7  comparable to election pre-SB 1?

8  A.  Yes, I would say it's very close.

9  Q.  What steps did Denton County take to reduce the rejection

10  rate?

11  A.  Starting with the March Primary and to this day, we

12  insert -- we developed an insert that we put in the mail to

13  the voter that was kind of highly detailed and what they

14  should fill out, especially on the carrier envelope.  We

15  circled the DL number, Social Security number area, or took a

16  screenshot of it, blew that up, said, you know, you have to

17  fill this out.  And we also recommended -- although it's not

18  required -- we recommended they put both their DL and the last

19  four of their Social.  And we also did a video that we posted

20  on our website and social media for the same topics.

21  Q.  So I am going to bring up State Exhibit 68.  Is this the

22  insert that Denton County included with the carrier envelope?

23  A.  Yes.

24  Q.  Does the Secretary of State's Office recommend adding an

25  insert to the carrier envelope?

FRANK PHILLIPS – DIRECT

1  A.  They did.

2  Q.  Did your office find the insert successful in reminding

3  voters to put their ID number down?

4  A.  Yes.

5  Q.  And I noticed that the insert recommends that a voter put

6  both numbers down.  Is that something your office recommends

7  regularly?

8  A.  Yes, we still recommend that.

9  Q.  You mentioned a little bit about the voter education that

10  your office conducted.  Did the Secretary of State's Office

11  recommend that you engage in voter education?

12  A.  They did.

13  Q.  Did they offer education materials to use as part of your

14  campaign?

15  A.  As I recall, they did offer some type of an example of an

16  insert, but at that point we had already done our own, and it

17  was having success, and so we didn't feel the need to change

18  it.

19  Q.  Do you consider your efforts to educate voters about the

20  ID number requirement successful?

21  A.  Yes.

22  Q.  In the event a voter submits a ABBM with a missing or

23  mismatched ID number, how does your office inform the voter?

24  A.  Depends on the stage of the election, really, but prior to

25  this legislative –– this past legislative –– legislative

FRANK PHILLIPS - DIRECT

1  session, when a carrier envelope came back in that was

2  defective, missing a Social or had one of them on there, but

3  different than the one we had on file, if it was before the

4  early voting ballot board started meeting, we would mail that

5  carrier envelope back to the voter with instructions of how to

6  correct the deficiency.

7      If — once the early voting ballot board started meeting,

8  they would mail — regardless if they had any other contact

9  information, they would always mail a letter to the voter

10  explaining the defect and how to cure it.

11      If they had an email address, they would also email that

12  voter.  If they had a phone number, they would also attempt to

13  call that voter.

14  Q.  Has this process changed?

15  A.  It has changed.  At this point, we do not mail the carrier

16  envelope back to the voter, which — but we — prior to early

17  voting ballot board meeting, we still mail a letter to the

18  voter.  We'll try to contact them if we have other contact

19  information also.

20  Q.  Do you send the voter now a corrective action form?

21  A.  We do.

22  Q.  And does your office email the voter if possible?

23  A.  If we have their email address.

24  Q.  Did the changes introduced in the 2023 legislature make it

25  easier for voters to complete the corrective action process?

FRANK PHILLIPS – DIRECT

1   A.   I think it does.  They can complete it on the form now you

2   know or online on the Ballot Tracker depending on what the

3   defect is.

4   Q.   In the event an ID number appeals to match the voter

5   record does your office check TEAM?

6   A.   Yes.

7   Q.   Does your office check to determine whether there's been a

8   transcripts error?

9   A.   Yes.  That's itself main reason we check TEAM because

10  it — I mean we have found instances where we transposed a

11  number a carrier envelope would arrive with a DL or a social

12  on there that was different than we had but it's similar or

13  maybe just transposed numbers and we have found instances

14  where we were at fault where we had transposed that number and

15  we can go back and find that on their original applications

16  for a voter registration, things likes that.

17  Q.   In the event you transposed a number, and identify that in

18  your records, would you accept the ABBM or mail ballot?

19  A.   Yes.

20  Q.   Earlier you discussed training for members of the early

21  voting ballot board.  Did it take time for them to understand

22  their responsibilities pursuant to SB 1's ID number

23  requirement?

24  A.   It did.  They are creatures of habit, so something new.

25  Q.   Similarly, did it take time for your office to understand

FRANK PHILLIPS - DIRECT

1  its responsibilities pursuant to Senate Bill 1's ID number

2  requirement?

3  A.  I mean, time, yes, but minimal.  I mean, we understood it

4  immediately.

5  Q.  Did it take time for your office to identify and implement

6  best practices?

7  A.  Yes.

8  Q.  Does Denton County Elections Office have a better sense of

9  how to implement SB 1 today than it did during the March 2022

10  Primary?

11  A.  Yeah.  It's just old hat now.

12  Q.  Based on your observations, have voters exhibited less

13  confusion about SB 1's ID number requirement in more recent

14  elections than they did when Senate Bill 1 was first enacted?

15  A.  Yes.  It's rare that we get a complaint on it now.

16  Q.  Likewise, based on your observation, have voters had less

17  difficulty complying with the ID number requirement?

18  A.  Yes.

19  Q.  Do you expect these trends to continue going forward?

20  A.  I do.

21  Q.  Why is that?

22  A.  It's just, I guess like anything else in life, there are

23  you know a lot of mail ballot voters now but a lot are repeat

24  mail ballot voters.  And once they got used to the new process

25  it's just now the process so they know what to do.

3850

FRANK PHILLIPS – DIRECT

1  Q.  You mentioned earlier that Denton County is an off-line
2  county.  What third-party vendor did Denton County use during
3  the March 2022 Primary?
4  A.  In March of 2022 it would have been VOTEC.
5  Q.  Is that the company that manages the VEMAC system?
6  A.  It is.
7  Q.  Has Denton County since changed vendors?
8  A.  We have.
9  Q.  What vendor does Denton County use now?
10 A.  We use VR Systems.
11 Q.  And when did Denton County change vendors?
12 A.  It was somewhere -- I mean we just passed a year so
13 roughly August of last year.
14 Q.  Would Denton County have used the VR System during the
15 November  2022 General Election?
16 A.  Yes.
17 Q.  In the March 2022 Primary did your office encounter any
18 problems with the Ballot Tracker?
19 A.  March '22?  Yes.
20 Q.  What were those problems?
21 A.  We would get calls from voters who were trying to make
22 corrective action on the Ballot Tracker and their main trouble
23 they seem to be having was actually getting into the Ballot
24 Tracker because at the time I believe it required you to
25 enter, if I remember correctly you had to enter your address

FRANK PHILLIPS – DIRECT

1  and it had to be entered in the exact format the State had it

2  in, and I believe that caused some issues.

3      And then there was an issue where TEAM — TEAM being the

4  State where the Ballot Tracker is located — I believe they

5  had made a coding change and had not notified the third party

6  vendors so it caused some type of hiccup for a bit until they

7  were able to get that coding change to the vendors and then

8  they could change their stuff.

9  Q.  In regards to the coding problem did your office contact

10  the Secretary of State's Office?

11  A.  We did.

12  Q.  Was that problem resolved?

13  A.  It was.

14  Q.  Did your office encounter any problems with the Ballot

15  Tracker regarding the coding issue with the November 2022

16  General Election?

17  A.  No.

18  Q.  Did your office encounter any problems with the Ballot

19  Tracker for the November 2022 General Election at all?

20  A.  I don't recall any and my staff's very good about

21  notifying me of those things.

22  Q.  Did your office encounter any problems with the Ballot

23  Tracker for the elections Denton County hosted in 2023?

24  A.  No.

25  Q.  Now, you had mentioned about signing in to the Ballot

3852

FRANK PHILLIPS – DIRECT

1  Tracker using the street address.  Has that requirement been

2  changed?

3  A.  That has been changed.  I'm not 100 percent sure what the

4  new requirements are.  I just –– my absentee coordinator told

5  me the address had changed.

6  Q.  Following the March 2022 Primary, were voters in

7  Denton County able to use the Ballot Tracker to cure their

8  ABBMs and mail ballots?

9  A.  When again?

10  Q.  Following the March 2022 Primary, were voters in

11  Denton County able to use the Ballot Tracker to cure their

12  ABBM and mail ballots?

13  A.  Yes.

14  Q.  Do you recall when the Ballot Tracker was first

15  introduced?

16  A.  I really –– I don't exactly, no.

17  Q.  Was the March 2022 Primary the first election that Texas

18  offered the Ballot Tracker as an option?

19  A.  That sounds right.

20  Q.  Did Senate Bill 1 expand the options a voter had to cure a

21  detective ballot?

22  A.  Yes.

23  Q.  Would those cure options also become available to voters

24  in 2022?

25  A.  One more time?

FRANK PHILLIPS – DIRECT

1  Q.  Would these cure options also have become available to

2  voters in 2022?

3  A.  I believe so, yes.

4  Q.  Did the Ballot Tracker and expanded cure options available

5  in 2022 prompt Denton County to report more data about ABBM

6  rejections in the TEAM's database?

7  A.  Yes.  It collects more data now than it previously did.

8  Q.  Did the Ballot Tracker and expanded cure options available

9  in 2022 prompt Denton County to report more data about mail

10  ballot rejections in the TEAM's database?

11  A.  Yes.

12  Q.  Prior to 2022, did Denton County specifically track ABBM

13  rejection rates?

14  A.  We did not.

15  Q.  Prior to 2022, did Denton County specifically track mail

16  ballot rejection rates?

17  A.  No.

18  Q.  And is there a reason why you did not track mail ballot

19  rejection rates or ABBM rejection rates prior to 2022?

20  A.  I guess two reasons.  They were low, the rejection rate,

21  and there was no requirement to track it; and we had so much

22  going on during election, if it's not required, we're probably

23  not doing it, so...

24  Q.  What options does a voter have for returning a marked mail

25  ballot?

FRANK PHILLIPS — DIRECT

1  A.  Well, of course, they can mail it back in.  On Election

2  Day, they can turn it in in person.  If they decide they would

3  rather vote in person, they can surrender that mail ballot in

4  a polling site during early voting and vote in person.

5  Q.  Before SB 1 when voters returned their mail ballots in

6  person, was there always an election official there to take

7  possession of the ballot?

8  A.  Yes.

9  Q.  Were ballots being dropped into an unattended box?

10  A.  No, no.

11  Q.  Following the passage of SB 1, is there an election

12  official present to take possession of the ballot when a voter

13  seeks to deliver their mail ballots in person?

14  A.  Yes.

15  Q.  Following SB 1, are ballots being dropped into an

16  unattended box?

17  A.  No.

18  Q.  Do you understand in-person delivery of mail ballots at an

19  election office to be different than a drop box?

20  A.  Oh, absolutely, yeah.

21  Q.  Do you support drop boxes?

22  A.  I do not, no.

23  Q.  Why not?

24  A.  Well, my reasons may be different than some other reasons.

25  I'm — what worries me about a drop box is they are typically

FRANK PHILLIPS – DIRECT

1  unattended, and that drop box has some type of slot that you

2  can put your ballot in.  Now, it may be the old cop in me, but

3  every time I think of a ballot — a drop box, I think of what

4  could happen to that, what could somebody do to it to destroy

5  it.  And really, all it would take is somebody with a little

6  bit of gasoline or something like that, squirt it in the slot,

7  and throw a match in there, and you've torched the whole

8  thing, so I'm adamantly opposed to drop boxes.

9  Q.  Prior to SB 1, did Denton County utilize drop boxes?

10 A.  No.

11 Q.  Do you utilize Drop boxes now following SB 1's passage?

12 A.  No.

13 Q.  Mr. Phillips, I'm going to shift gears a bit and direct

14 our conversation towards in-person voting.

15     First up, polling hours.  For the November 2022 General

16 Election, what hours were polling locations open in

17 Denton County during the first week of early voting?

18 A.  November 2022?

19 Q.  Correct.

20 A.  8:00 a.m. to 5:00 p.m.

21 Q.  What were the hours during the second week of early

22 voting?

23 A.  The first few days were 8 to 5.  The last two were 7 to 7.

24 Q.  And what about the hours polling places were open on

25 Election Day in November 2022?

FRANK PHILLIPS – DIRECT

1   A.  Seven to 7.

2   Q.  Are these hours typical of a mid-term election in Denton

3   County?

4   A.  Yes.

5   Q.  You stated earlier that you were the election

6   administrator for Denton County in 2022.  In that election,

7   did Denton County have any 24-hour polling places?

8   A.  No.

9   Q.  Did Denton County have any polling places that opened

10  before 6:00 a.m. before that election?

11  A.  No.

12  Q.  Did Denton County have any polling places that closed

13  after 10:00 p.m. during that election?

14  A.  No.

15  Q.  Has Denton County ever organized polling places that

16  opened before 6:00 a.m. or closed after 10:00 p.m.?

17  A.  We have not.

18  Q.  Why doesn't Denton County organize either 24-hour polling

19  locations or polling locations that are open somewhat after

20  10:00 p.m. but before 6:00 a.m.?

21  A.  Well, whenever you open, you have to staff that polling

22  location with poll workers.  So number one, that's going to be

23  your first challenge is trying to find enough workers to fill

24  those extra hours.  And that, in turn, eats into your budget.

25  I mean, you always had budget considerations to take care of.

3857
FRANK PHILLIPS — DIRECT

1  And especially on 24-hour, we just don't feel that enough

2  people would vote to — you're not going to get a return on

3  your investment.  You're not getting — I don't want to say

4  it's not worth it.  That sounds bad, but it's return on

5  investment is the way I think about it.  I just don't think

6  you're going to get it.

7  Q.  Do you have concerns about ensuring the safety of election

8  workers?

9  A.  I do, especially late at night, of course.

10 Q.  Are you aware of the provision in SB 1 that states that

11 polling places may only be open between 6:00 a.m. and

12 10:00 p.m.?

13 A.  I am.

14 Q.  Did Denton County have to change the hours its polling

15 locations were open in response to this provision in Senate

16 Bill 1?

17 A.  We did not.

18 Q.  Including curbside voting, did Denton County offer a

19 drive-through voting option in 2020 General Election?

20 A.  No.

21 Q.  Has Denton County ever offered drive-through voting?

22 A.  No.

23 Q.  Why did Denton County decide not to offer drive-through

24 voting?

25 A.  Well, we actually discussed it.  I mean, it was a short

FRANK PHILLIPS – DIRECT

1  discussion mainly because of some of the same things I just

2  spoke about.  You have to have a place big enough to do it.

3  You have to worry about the security of your equipment, and

4  you're going to have to have the availability of a parking lot

5  or a huge facility where cars can queue.  It just was

6  impractical to us.

7  Q.  Are you aware of the provision in Senate Bill 1 that

8  prohibited drive-through voting outside of the limited

9  exception of curbside voting?

10  A.  I am.

11  Q.  Did Denton County have to change its voting provisions in

12  response to this provision?

13  A.  No.

14  Q.  Mr. Phillips, I'm going to bring up State Exhibit 161,

15  which has already been admitted into evidence.  Please let me

16  know when you see it on your screen.

17  A.  I see it.

18  Q.  Do you see the banner on top saying the "Texas Secretary

19  of State"?

20  A.  I do.

21  Q.  Do you see where it says "Denton County Voter Registration

22  Figures"?

23  A.  Yes.

24  Q.  Do you see the column where it says "Voted Percentage"?

25  A.  Yes.

FRANK PHILLIPS - DIRECT

1  Q.  What percentage of registered voters voted in 2016?

2  A.  63.89 percent.

3  Q.  And let's look at 2020.  What percentage of registered

4  voters voted in 2020?

5  A.  I don't see it anymore.  There it is.  73.72 percent.

6  Q.  Does this match your recollection of turnout, these two

7  elections in Denton County?

8  A.  It does.

9  Q.  How many percentage points approximately did turnout

10  increase in Denton County from 2016 to 2020?

11  A.  Was the other one 68?  Roughly 5 percent.  Is that

12  correct?  I can't see the other screen anymore, so...

13     Oh, 10 percent, 63 point — about roughly 10 percent.

14  Q.  Did Denton County experience a 10 percent point increase

15  in voter turnout between 2016 and 2020 despite not having

16  24-hour voting or drive-through voting?

17  A.  Yes.

18  Q.  If a voter needs assistance, can that voter request

19  assistance from an election worker?

20  A.  They can.

21  Q.  Are you aware of any incidents in the November 2022

22  General Election where an election worker refused to assist a

23  voter after the voter had requested assistance?

24  A.  No.

25  Q.  Are you aware of any incidents in the November 2022

FRANK PHILLIPS – DIRECT

1  General Election where an election worker refused to take the

2  oath of assistance?

3  A.  No.

4  Q.  Can a voter request assistance from a third party?

5  A.  Yes.

6  Q.  Are you aware of any voter who was unable to obtain

7  assistance from the person of their choice?

8  A.  I am not.

9  Q.  Are you aware of any incidents in the November 2022

10 General Election where a third party refused to assist a voter

11 after the voter requested their assistance?

12 A.  No.

13 Q.  Are you aware of any incidents in the November 2022

14 General Election where a third party refused to take the oath

15 of assistance?

16 A.  No.

17 Q.  Are you aware of any instances where a voter was unable to

18 receive voting assistance because of Senate Bill 1?

19 A.  I am not.

20 Q.  Are you familiar with the requirement that a person who

21 transports seven or more voters to a polling place to vote

22 curbside fill out a form?

23 A.  Yes.

24 Q.  Are you aware of any individual who refused to transport

25 seven or more individuals to a polling location to vote

FRANK PHILLIPS – DIRECT

1  curbside because of the requirement that they fill out the

2  form?

3  A.  No.

4  Q.  Are you aware of any voter that was unable to find

5  transportation to the polls because of the requirement that a

6  person who transports seven or more people to a polling place

7  to vote curbside fill out the form?

8  A.  I'm not aware of it, no.

9  Q.  To your knowledge, did your office receive calls from a

10  voters expressing ——

11                    *(Court reporter clarification)*

12  BY MISS HUNKER:

13  Q.  To your knowledge, did your office receive calls from

14  voters expressing concern about the voting assistance

15  provisions in Senate Bill 1?

16  A.  Not that I'm aware of, no.

17  Q.  To your knowledge, did your office receive calls from

18  voters exhibiting confusion about the voting assistance

19  provisions in Senate Bill 1?

20  A.  No.

21  Q.  Does Denton County take its responsibilities under the ADA

22  seriously?

23  A.  Absolutely.

24  Q.  Does Denton County work to ensure that its voting program

25  is accessible to voters with disabilities?

FRANK PHILLIPS - DIRECT

1   A.  We do.  Before we use any polling site, a new one, I have

2   my elections techs go out, and they make sure the building is

3   ADA compliant.  If it's not, and it's something that we can

4   assist the owner of the building to remediate, we will do

5   that.

6   Q.  To your knowledge, did your office receive any request for

7   accommodation regarding the requirement that mail-in voters

8   put their Social Security number or Texas ID number on their

9   ABBM or mail ballot?

10  A.  No.

11  Q.  To your knowledge, did your office receive any request for

12  accommodation that asked Denton County to change any of its

13  policies or procedures related to SB 1's ID number

14  requirement?

15  A.  No.

16  Q.  To your knowledge, did your office receive any requests

17  for accommodation regarding Senate Bill 1's voting assistance

18  provisions?

19  A.  No.

20  Q.  To your knowledge, did your office receive any requests

21  for accommodation that asked Denton County to change any of

22  its policies or procedures related to voting assistance

23  provisions?

24  A.  No.

25  Q.  If a voter came to your office to cure their mail ballot,

FRANK PHILLIPS – DIRECT

1  but was unable to enter the office because of a disability,

2  would your staff go to the voter's car to help them complete

3  the corrective action process?

4  A.  Absolutely.

5  Q.  If a voter informed your office that they were homebound

6  and unable to come to your office due to a disability, would

7  your staff go to the voter's home to help the voter complete

8  the corrective action process if requested?

9  A.  We would.

10  Q.  In your words, what is the purpose of a poll watcher?

11  A.  A poll watcher is a person appointed by a candidate, a

12  party, or a PAC, that — a political action committee — that

13  is there to observe the conduct and the execution of the

14  election at either a polling site or central count or ballot

15  board area.

16  Q.  Can a poll watcher fulfill his role if he's unable to

17  observe election activities?

18  A.  No.

19  Q.  Who appoints poll watchers?

20  A.  It's — in a — it can be party, a political party.  It

21  can be a candidate, or it can be a political action committee

22  that's for or against a measure that happens to be on the

23  ballot.

24  Q.  In your experience, are poll watchers appointed by both

25  Democrats and Republicans?

3864

FRANK PHILLIPS – DIRECT

1  A.  Yes.

2  Q.  In your experience, have there been African–American poll

3  watchers?

4  A.  Yes.

5  Q.  Have there about Hispanic poll watchers?

6  A.  Yes.

7  Q.  Have there been Asian poll watchers?

8  A.  One doesn't come to mind, but I don't always know all of

9  them.  I just happen to know some of the others you spoke of.

10 Q.  Have there been White poll watchers?

11 A.  Yes.

12 Q.  Have there been poll watchers of every race?

13 A.  To my knowledge.

14 Q.  Does Denton County typically have poll watchers at voting

15 locations?

16 A.  Yes.  It's become pretty normal, yes.

17 Q.  Does Denton County typically have poll watchers report to

18 Central Count?

19 A.  Yes.

20 Q.  Are you familiar with the provisions in SB 1 that pertain

21 to poll watchers?

22 A.  Yes.

23 Q.  Did Denton County substantively change its policy and

24 procedures with respect to poll watchers in response to these

25 provisions?

FRANK PHILLIPS – DIRECT

1  A.  No, with the exception of we had to add additional

2  training.  We had to modify our training to make sure we

3  address the changes in SB 1 with our poll workers.  That was

4  the main change.

5  Q.  Are you aware of any reported incidents in Denton County

6  of harassment or intimidation of voters by poll watchers

7  attributable to SB 1?

8  A.  No.

9  Q.  Are you aware of any reported incidents in Denton County

10  of violence or threatened violence against voters by poll

11  watchers attributable to SB 1?

12  A.  No.

13     *(Court reporter clarification)*

14  BY MISS HUNKER:

15  Q.  Are you aware of any reported incidents in Denton County

16  of violence or threatened violence against voters by poll

17  watchers attributable to SB 1?

18  A.  No.

19  Q.  Are you aware of any reported incidents where election —

20  let me rephrase.

21     Are you aware of any reported incidents in Denton County

22  of harassment or intimidation of election workers by poll

23  watchers attributable to SB 1?

24  A.  No.

25  Q.  Are you aware of any reported incidents where an election

FRANK PHILLIPS - DIRECT

1  judge wished to remove —

2          COURT REPORTER:  Can we take a break?

3          THE COURT:  Yes.  Let's take a fifteen.

4          How are we doing on time?

5          MISS HUNKER:  I only have about two pages left, Your

6  Honor.

7          THE COURT:  Is there going to be anymore questions on

8  this side?

9          MR. NICHOLS:  No, sir.

10         THE COURT:  And how long do you think your cross will

11 be?

12         MS. TULIN:  Less than an hour.  An hour or less.

13         THE COURT:  So we've covered a lot of stuff I've

14 heard before, so, I mean, just allocate your time prudently.

15         Let's take ten minutes.

16    *(Recess)*

17 BY MISS HUNKER:

18 Q.  Mr. Phillips, I'm going to repeat my last questions since

19 we took a break sort of in the middle.

20    Are you aware of any reported incident where an election

21 judge wished to remove a poll watcher because of the poll

22 watcher's behavior, but was unable to do so because of Senate

23 Bill 1?

24 A.  I am not.

25 Q.  Are you aware of any charges being brought against an

3867

FRANK PHILLIPS – DIRECT

1  election worker because the worker was accused of improperly

2  removing a poll watcher?

3  A.  No.

4  Q.  Are you aware of any charges being brought against an

5  election worker because the worker was accused of improperly

6  obstructing a poll watcher?

7  A.  No.

8  Q.  Did the provisions in SB 1 substantively change what poll

9  watchers could and could not do when observing election

10  activities?

11  A.  I think it clarified it.  So I mean, yes, it changed in

12  that regard.

13  Q.  And what do you mean by "clarified"?

14  A.  Okay.  This is just my view of it post — or pre-SB 1.

15  I've always been of the belief that a poll watcher could walk

16  around, you know, and place themselves in a position to see

17  what they needed to see.  Now, we would occasionally get

18  election judges that would assign them to a seat that may not

19  have been advantageous and kind of make them stay there, but I

20  think SB 1 spelled out that you can get up.  You have freedom

21  of movement, see whatever you need to see, hear what you need

22  to hear, so I think it just clarified what a poll watcher

23  could do — can do.

24  Q.  In the November 2022 General Election, how many polling

25  locations did Denton County have for the early voting period?

*Gigi Simcox, RMR, CRR*

FRANK PHILLIPS – DIRECT

1  A.  It was either 48 or 50.  I'm not — I can't remember

2  which.

3  Q.  How many polling locations did Denton County have on

4  Election Day?

5  A.  I believe it was 163 or 166.

6  Q.  Was Denton County able to staff its polling locations?

7  A.  Yes.

8  Q.  Did Denton County have to close any polling locations

9  because of staffing shortages?

10  A.  No.

11  Q.  Did Denton County have to close any polling locations

12  because of staffing shortages due to SB 1's poll watcher

13  provisions?

14  A.  No.

15  Q.  Will Denton County be able to staff its polling locations

16  for the upcoming November constitutional election?

17  A.  Yes.

18  Q.  Did Denton County have more contentious interactions

19  between election staff and poll watchers pre-SB 1 or

20  post-SB 1?

21  A.  I don't think it's changed.  We really don't have negative

22  interactions with them.

23  Q.  And do you think that SB 1 clarified the rules related to

24  poll watchers for election workers?

25  A.  I do.

FRANK PHILLIPS – DIRECT

1  Q.  Do you think SB 1 clarified the rules for poll watchers?

2  A.  Yes.

3  Q.  Are you familiar with SB 1's requirement that poll

4  watchers sit for training conducted by the Secretary of

5  State's office before being certified?

6  A.  Yes.

7  Q.  Based on your experience, has the training helped poll

8  watchers understand their responsibilities and limitations

9  under the Election Code.

10  A.  Yes, I think it has.  I know some of these — I mean, poll

11  watchers outside of their poll-watching activity, and I think

12  they were grateful for the clarifications, yeah.

13  Q.  Based on your experience, has the training lessened the

14  tension you spoke of between poll watchers and election

15  workers?

16  A.  I think so, because the poll — the poll workers no longer

17  try to confine them to one small spot now, yeah.

18  Q.  Was Denton County able to provide voters with ample

19  opportunities to vote under SB 1?

20  A.  Yes.

21  Q.  Do you anticipate continuing to provided voters with ample

22  opportunities to vote going forward under SB 1?

23  A.  I do.

24        MISS HUNKER:  Thank you, Your Honor.  I pass the

25  witness.

3870

FRANK PHILLIPS – CROSS

```
 1              THE COURT:  Anything further to this side?

 2              MR. NICHOLS:  No, sir.

 3              THE COURT:  Cross.

 4                          CROSS-EXAMINATION

 5   BY MS. TULIN:

 6   Q.  Good afternoon, Mr. Phillips.

 7   A.  Good afternoon.

 8   Q.  We met briefly in the hallway this morning.

 9   A.  Yes.

10   Q.  And I am sorry to say that you are the first — this is

11   the first day we have worked through lunch in this case, so I

12   am sorry to be the person who is between you and your lunch.

13   A.  Not a problem.

14   Q.  I'd like to start by talking about the ID number

15   requirements that were created by SB 1 for mail ballots.

16   A.  Okay.

17   Q.  You are familiar with those provisions, right?

18   A.  Yes, ma'am.

19   Q.  The January 2022 Special Election was the first election

20   in Denton County in which SB 1's ID number requirements for

21   mail ballots were in effect, is that right?

22   A.  That's correct.

23   Q.  And there was confusion related to SB 1's new ID number

24   requirement in that election?

25   A.  Are you talking about from voters?
```

*Gigi Simcox, RMR, CRR*

FRANK PHILLIPS – CROSS

1  Q.  Yes.

2  A.  I would say that's correct.

3  Q.  And there was — was there also confusion among your

4  staff?

5  A.  I mean, I really don't think so.  I mean, no.

6  Q.  And the voter's — I think you testified on direct that

7  the voter confusion was especially acute for voters who had

8  been voting by mail for many years, is that right?

9  A.  Yes, correct.

10 Q.  And the mail ballot rejection rate for the January 2022

11 Special Election was higher than normal, right?

12 A.  Correct.

13 Q.  The next election in Denton County in which SB 1's new ID

14 requirements were in effect was the March 2022 Primary,

15 correct?

16 A.  Correct.

17 Q.  And the rejection rate for that Primary was initially

18 high?

19 A.  Yes.

20 Q.  And at the end of the voting period for that election, the

21 rejection rate still remained higher overall, correct?

22 A.  Correct.

23 Q.  You testified that your office — you testified in your

24 deposition that your office received complaints from voters

25 during the March 2022 Primary about SB 1's ID requirement for

FRANK PHILLIPS – CROSS

1  mail ballots, correct?

2  A.  Complaints, yes.

3  Q.  And the voter that you heard from either had their

4  application rejected or their mail ballot rejected, and they

5  had to cure it, right?

6  A.  That's correct.

7  Q.  And in 2022, you had voters in Denton County who forgot to

8  put any ID number on their mail ballot materials?

9  A.  Correct.

10  Q.  You also had voters who provided their VUID instead of a

11  state ID number for the last four of their social, is that

12  correct?

13  A.  That is correct.

14  Q.  And you also had voters who provided an ID number that was

15  not associated with their voter registration record, right?

16  A.  That's correct.

17  Q.  Your office encountered voters who had typos in their

18  registration records?

19  A.  I'm sure we did, yeah.

20  Q.  And there were instances where voters miswrote or

21  misprinted their ID numbers on their applications for

22  ballot-by-mail or carrier envelopes, right?

23  A.  We did.

24  Q.  And your office communicated to voters about SB 1's new ID

25  requirements for mail ballots through social media; namely, a

FRANK PHILLIPS - CROSS

1  Facebook account, is that right?

2  A.  That's correct.

3  Q.  And your office also put a video on your website about how

4  to complete the ABBM and carrier envelope, is that right?

5  A.  That's correct.

6  Q.  Your office also put an insert into mail ballot carrier

7  envelopes with step-by-step instructions for voters, including

8  little screenshots, correct?

9  A.  Correct.

10  Q.  And your instructions for voters told them to provide both

11  identification numbers just in case your office didn't have

12  the one they decided to put down, is that right?

13  A.  Correct.

14  Q.  And your office began sending out those inserts with mail

15  ballots for the March Primary Election in 2022, is that right?

16  A.  That's correct.

17  Q.  And your office also decided to engage in those efforts

18  because it's easy to miss where it's on the carrier envelope,

19  and so you wanted to make sure that they saw it, right?

20  A.  Correct.

21  Q.  And the reason your office recommended that voters provide

22  both numbers is because you found that some voters would put

23  their driver's license number or state ID number but not their

24  Social Security number, and your office had only their Social,

25  but not there driver's license or vice versa, right?

FRANK PHILLIPS – CROSS

1  A.  That's correct.

2  Q.  Your office created the insert for the mail ballot carrier

3  envelope, is that right?

4  A.  Yes.

5  Q.  And you decided to use the insert that you create instead

6  of the Secretary of State's insert, is that right?

7  A.  Yes.

8  Q.  And at least in March of 2023, your office was still using

9  that insert, is that correct?

10  A.  Yes.

11  Q.  And at that point, you said that your office will probably

12  continue to use the insert, is that right?

13  A.  Yes.

14  Q.  And the video that we mentioned earlier, that's still on

15  your website, right?

16  A.  It is.

17  Q.  And the video still recommends that voters provide both ID

18  number on their ABBMs to reduce the chances of a mismatched ID

19  number, correct?

20  A.  Correct.

21  Q.  And the video also still recommends that voters, before

22  sealing that purple and white carrier envelope, provide both

23  numbers to reduce the chances of a mismatched ID number,

24  right?

25  A.  Correct.

3875

FRANK PHILLIPS — CROSS

1  Q.  You testified on direct that you're a member of the CEO

2  Advisory Group, right?

3  A.  Yes.

4  Q.  And the CEO Advisory Group is a group of election

5  administrators, county clerks, and representatives from the

6  Secretary of State's Office that meets to talk about issues

7  that are happening at the moment related to elections, right?

8  A.  That's correct.

9  Q.  And in the lead-up to an election, the CEO Advisory Group

10  meets weekly, is that right?

11  A.  Typically, weekly, just before an election.  Off election

12  cycle, it may be monthly, yeah.

13  Q.  Brandy Grimes is your Deputy Election Administrator, is

14  that right?

15  A.  That's correct.

16  Q.  And if we can display LUPE 194, please.  I'll give you a

17  minute to take a look at it.

18  A.  Okay.

19  Q.  Okay.  This is an email exchange between Miss Grimes and

20  Christina Adkins, is that right?

21  A.  Correct.

22  Q.  And you are copied on these email exchanges between

23  Miss Grimes and Miss Adkins?

24  A.  Yes.

25  Q.  Miss Grimes was proposing a change to the old ABBM

FRANK PHILLIPS – CROSS

1  rejection notice, is that right?

2  A.  Yes.

3  Q.  And the change that she was suggesting was because "we

4  both know that voters can't remember how they filled out the

5  defective application once it's sent," right?

6  A.  Correct.

7  Q.  And the change she was suggesting was that the notice

8  circle the ID number that was provided on the original

9  application, is that right?

10  A.  That's correct.

11  Q.  And your understanding as to why Miss Grimes proposed that

12  change is that she's very conscientious about how forms work,

13  is that right?

14  A.  She is that, yes.

15  Q.  And you don't recall what happened to this proposal, do

16  you?

17  A.  I do not, no.

18  Q.  We can agree, right, that there will be new voters who

19  qualify to vote by mail in every election, right?

20  A.  True, yeah.

21  Q.  And so those voters would not have experienced any voter

22  ID requirement prior to that time, is that right?

23  A.  That's correct.

24  Q.  There are instances where a voter has a state ID number,

25  but they only have their last four digits of their Social

FRANK PHILLIPS – CROSS

1  Security number in their TEAM record, is that right?

2  A.  That's correct.

3  Q.  And you are aware of instances where a voter would have

4  their — the last four of their Social in their record, but

5  not their state ID number.  Fair?

6  A.  That's correct.

7  Q.  And those voters would be people who follow all of the

8  instructions, including those on your website, and on the

9  insert that your office places in the carrier envelopes, but

10  would nevertheless have their mail ballot rejected because of

11  those issues?

12  A.  It's possible, yes.

13  Q.  Mail voting is increasing over time, is that right?

14  A.  Significantly, yes.

15  Q.  And for some voters in Denton County, voting by mail is

16  the only way for them to vote, agreed?

17  A.  Agreed.

18  Q.  And for some of those voters whose only way to vote by

19  mail, it's because they have a disability.  Do you agree with

20  that?

21  A.  Absolutely.

22  Q.  And for some voters, it would be very difficult for them

23  to cure their mail ballot error, is that right?

24  A.  I believe that's correct, yes.

25  Q.  And sometimes voters don't get notified in time to cure

FRANK PHILLIPS - CROSS

1  their mail ballot in order for their ballot to count, is that

2  right?

3  A.  That's correct.

4  Q.  You don't plan to do anything additional that you haven't

5  already done, going forward, relating to SB 1's mail ballot ID

6  requirements, is that righted?

7  A.  No, not at this time, yeah.

8  Q.  So can we agree that it's possible that SB 1's mail ID

9  requirements will continue to result in the rejection of

10  otherwise valid votes?

11  A.  The possibility is there, yes.

12  Q.  Okay.  Let's talk a little bit about the City of Carollton

13  and voter fraud.

14      You think that SB 1's mail ballot ID requirements could

15  have helped identify the alleged fraud in the City of

16  Carollton case, right?

17  A.  I don't know that I would frame it exactly that way.  I

18  tell you what I do believe.  I believe it would have been

19  harder to commit that with the SB 1 requirements.

20  Q.  Okay.  You also agree that your office was able to prevent

21  mail voter impersonation before SB 1's ID requirements?

22  A.  The ones we know about, yes.

23  Q.  And your office already had processes in place to identify

24  mail-in voter impersonation?

25  A.  Yes, yes.

FRANK PHILLIPS - CROSS

1  Q.  And, in fact, it was those processes that led you to

2  identify these allegedly fraudulent mail ballot applications

3  in the City of Carollton case, right?

4  A.  That's correct.

5  Q.  And just focusing a little bit on the generalities of that

6  case.  In 2020, your office noticed that there were a number

7  of mail ballot applications being sent to a specific address,

8  right?

9  A.  Correct.

10  Q.  And that raised a red flag for your office?

11  A.  Yes.

12  Q.  And that was because they were being sent to a commercial

13  mailbox that wasn't in your voter registration system, right?

14  A.  That's correct.

15  Q.  Once you learned that there were a number of mail ballots

16  being sent to this commercial address, you alerted law

17  enforcement authorities?

18  A.  Correct.

19  Q.  And all of this was before SB 1 was enacted?

20  A.  Yes.

21  Q.  Other than that one case, your office did not contact any

22  law enforcement agency regarding a potential case of voter

23  fraud between October 2020 and going up to the November 2022

24  General Election, is that right?

25  A.  That's correct.

FRANK PHILLIPS — CROSS

1  Q.  Your office has not referred any voter as a potential case
2  of mail voter impersonation since that time, is that correct?
3  A.  That's correct.
4  Q.  And I believe you testified that before you were elections
5  administrator for Denton County —— or in between your periods
6  of being the Denton County elections administrator you also
7  served as the elections administrator in Tarrant County, is
8  that correct?
9  A.  That's correct.
10  Q.  And that was between 2014 and 2016, is that right?
11  A.  Yes.
12  Q.  And you would agree that you spoke with my colleague on
13  the other side a little bit about the size of both Denton
14  County and Tarrant County, right?
15  A.  Right.
16  Q.  And so you agree that in your 14 years serving as an
17  election administrator in those two jurisdictions, you've
18  presided over two of the largest counties in Texas in terms of
19  voting, right?
20  A.  Yes.
21  Q.  And during your time in Tarrant County, your office made
22  no referrals to a law enforcement agency regarding any
23  potential mail voter impersonation fraud, is that right?
24  A.  Not during my time, no, ma'am.
25  Q.  And during your 14 years of service as an elections

FRANK PHILLIPS — CROSS

1  administrator in Tarrant County and Denton County, you only

2  have direct knowledge of the City of Carollton case that we've

3  been talking about, is that right?

4  A.  That's correct.

5  Q.  No one has been referred to law enforcement as a potential

6  case of voter fraud in Denton County based on any of SB 1's

7  mail voting provisions, is that right?

8  A.  That's correct.

9  Q.  But if you had detected any mail voter fraud, you would

10 have referred that case to a law enforcement agency.  Fair?

11 A.  Absolutely, yes.

12 Q.  You testified on direct that it would be difficult to take

13 a voter registration list and track down the Texas ID number

14 or Social Security numbers associated with the entries on that

15 list.  Do you remember that?

16 A.  Yes.

17 Q.  Have you read any studies about the availability of those

18 types of identification numbers on the Dark Web?

19 A.  I have not.

20 Q.  So you're in favor of anything that can be done to

21 strengthen the integrity of the election system, right?

22 A.  I am, yeah.

23 Q.  Even if it's just to strengthen the appearance of the

24 election integrity?

25 A.  Well, in my opinion, I'm not aware of anything that has

FRANK PHILLIPS - CROSS

1  done it for the appearance, but that's my opinion on it, so...

2  Q.  Okay.  If we — you — we're going to pull up your

3  deposition — the transcript of your deposition.

4  A.  Okay.

5  Q.  And if we can go to page 31, and if we can look at lines 3

6  through 7.  This is not the right citation.  I am sorry.

7  Let's pull that down and move on.

8      Oh, I'm sorry.  Let's actually do that again.  Let's try

9  page 98.  And go to lines 1 to 3, and if this doesn't work, I

10 will, in fact, move on.

11     And actually, let's go back to page 97, so that you can

12 read the question.

13     So you said:  "In my mind, that doesn't mean you don't add

14 another security — another level of security, especially when

15 it comes to what you were just talking about, about the

16 perception of the integrity of the voting process.  And

17 anything we can do to strengthen the integrity of the voting

18 process or even the appearance of it, I'm for."

19     Do you remember that?

20 A.  I do.  I do now, yes.

21 Q.  You agree that most of the concerns that you hear about in

22 terms of election integrity are not about mail ballots?

23 A.  Correct.

24 Q.  Only about 10 percent of the concerns that you hear about

25 with respect to election integrity are about mail ballots?

3883
FRANK PHILLIPS - CROSS

1  A.  I would say that's fair, yeah.

2  Q.  And the remaining 90 percent are about voting systems more

3  generally?

4  A.  Correct.

5  Q.  When you started out as an election administrator back in

6  2009, you didn't really hear anything questioning the

7  integrity of the electoral system.  Is that fair?

8  A.  That's fair, yeah.

9  Q.  And you only started hearing about those types of concerns

10  in 2016?

11  A.  That's when it started, correct.

12  Q.  And it was amplified in 2020?

13  A.  Yes, it was.

14  Q.  So much so that now you spend the majority of your time

15  debunking conspiracy theories or answering public information

16  requests relating to conspiracy theories?

17  A.  That's correct.

18  Q.  And you think those concerns are based on national events

19  rather than anything that's happening in Denton County?

20  A.  I do, yes.

21  Q.  You also think that SB 1's new ID requirements for mail

22  ballots help address the concerns of some of the people who

23  contact your office about mail voting fraud, is that right?

24  A.  That's correct.

25  Q.  But you also think that no matter what safeguards are

FRANK PHILLIPS - CROSS

1  implemented, you — let me rephrase that.

2      No matter what safeguards are implemented, you don't think

3  that anything you do will totally convince some people.  Is

4  that fair?

5  A.  Absolutely.

6  Q.  Voter fraud can impact the outcome of close elections, is

7  that right?

8  A.  It can.

9  Q.  But you also agree that rejecting valid mail ballots

10 because of a mismatched ID number can also impact the outcome

11 of close elections, right?

12 A.  Yes.

13 Q.  You think mail voting is more vulnerable to fraud than

14 in-person voting?

15 A.  I do.

16 Q.  And that is because there's a period of time when the

17 ballot is out of the control of your office or the poll

18 workers who are working?

19 A.  Correct, yes.

20 Q.  But you agree that even after SB 1, mail ballots are

21 sometimes outside of the control of your office or poll

22 workers, right?

23 A.  Absolutely.  That hasn't changed because of SB 1 at all,

24 yes.

25 Q.  Right.  And in fact, it's an inherent part of the mail

FRANK PHILLIPS — CROSS

1  ballot process?

2  A.  Correct.

3  Q.  So short of banning mail ballots, there's no way you can

4  maintain control of those ballots at all times, correct?

5  A.  That's right.

6  Q.  You're not in favor of banning vote-by-mail, are you?

7  A.  No.

8  Q.  Just a little bit longer.  I'd like to ask you a little

9  bit more about Denton County.

10  A.  Okay.

11  Q.  I don't think that this was covered on direct or in your

12  deposition, but you live in Denton County?

13  A.  I do.

14  Q.  And how long have you lived there?

15  A.  Since 1990, so 33 years.

16  Q.  And so both in your personal experience and in your

17  professional experience, you have some familiarity with the

18  demographics of the people who live in Denton County, right?

19  A.  Correct.

20  Q.  And I believe we established this earlier, but it's one of

21  the largest counties in Texas, right?

22  A.  Yes.

23  Q.  So I'd like to ask you some questions about how Denton

24  County residents compare to Texas residents over all.

25  A.  Okay.

3886
FRANK PHILLIPS - CROSS

1  Q.  You agree that Denton County residents tend to have a

2  higher level of educational attainment than Texans across the

3  State?

4  A.  I do.

5  Q.  And that they are more likely to have a high school degree

6  or higher?

7  A.  I would think so.

8  Q.  And Denton County residents are also more likely than

9  Texas residents as a whole to have a bachelor's degree or

10  higher?

11  A.  I think that's accurate.

12  Q.  And they're also more likely to have a graduate or

13  professional degree?

14  A.  I would think that's accurate also.

15  Q.  Denton County residents are less likely to have a

16  disability than Texans across the State, is that correct?

17  A.  I don't know.  I don't know that.  I would think not, but

18  that's okay.

19  Q.  So what I would like to do is pull up a demonstrative —

20  A.  Okay.

21  Q.  — which is data from the U.S. Census Bureau.

22      And this is going to be demonstrative 1, John.  And I will

23  represent to you that this is a table pulled from the Census

24  Bureau that compares from — specifically from the American

25  Community Survey five-year estimates data profiles, Table DP02

*Gigi Simcox, RMR, CRR*

FRANK PHILLIPS — CROSS

1  from 2021.

2      And on the left side, you can see Texas numbers, and then

3  on the right side, it takes Denton County numbers.  Do you see

4  that?

5  A.  I do.

6  Q.  And you don't have any reason to dispute the accuracy of

7  these estimates?

8  A.  No.

9  Q.  So if you look at row 84, which is going to have to make

10  us go down a few pages, did you see where it says with the

11  disability — the header is actually in row 82.  It's

12  "Disability Status of the Civilian Noninstitutionalized

13  Population."

14      Do you see that?

15  A.  I do.

16  Q.  And do you see where the Texas statewide number for what

17  the — the percentage with a disability is 11.4 percent?

18  A.  Okay.

19  Q.  And then you see where the Denton County number percentage

20  is 8.5 percent?

21  A.  Okay.

22  Q.  And Denton County residents are also more likely to speak

23  English only at home than Texans across the State.  Are you

24  aware of that?

25  A.  It's not surprising, yes.

3888
FRANK PHILLIPS - CROSS

1  Q.  Can we take a very quick look at row 131 of this

2  demonstrative.

3      And do you see where this is for the population of five

4  years and older, that English only in Texas is 64.9 percent,

5  and in Denton County it's 76.6 percent.  Do you see that?

6  A.  I do.

7  Q.  And then if you -- if we can scroll down briefly to row

8  174.

9      Oh, I'm sorry, before we do that -- thank you, John.

10     If you just go two rows down to where it says "Speak

11 English less than very well," you see that Denton County

12 residents are also less likely than Texas residents as a whole

13 to be what I think is referred to as "limited English

14 proficient"?

15 A.  Right.

16 Q.  And then now if we can go to row 174.  The very last line

17 on this spreadsheet, do you see that Denton County residents

18 are more likely than Texas residents as a whole to live in a

19 household that has a broadband internet subscription.  Do you

20 see that?

21 A.  I do.

22     MISS HUNKER:  Your Honor, I'm just going to object to

23 this line of questioning since I don't think it's within the

24 personal knowledge of the witness.  I waited to see if he had

25 personal knowledge, but it seems to be he's just going by

FRANK PHILLIPS – CROSS

1   whatever is on the screen.

2          THE COURT:  That's correct.  If you're going to get

3   this in, you need to follow up with "Does that comport with

4   your general understanding," but there's been no connection

5   made.

6          MS. TULIN:  Well — and Your Honor, what I plan to do

7   at the end of this is just to ask the Court to take judicial

8   notice of this census data, and we can move these

9   demonstratives into evidence, if you like.

10          THE COURT:  We can take that up on Monday.

11          MS. TULIN:  Okay.  Thank you.

12          MISS HUNKER:  Your Honor, if I could, I move to

13   strike those questions since the witness did not have personal

14   knowledge.

15          THE COURT:  Sustained.

16      *(Off the record discussion)*

17   BY MS. TULIN:

18   Q.  I'd like to ask you a few questions, Mr. Phillips, about

19   whether what I just showed you comports with your knowledge.

20   Is that okay?

21   A.  I guess.  What do you mean by "comport"?

22          MS. TULIN:  May I have a little bit of leeway, Your

23   Honor, just to —

24          THE COURT:  Ask him a question, and we'll see where

25   this goes.

3890

FRANK PHILLIPS — CROSS

1  BY MS. TULIN:

2  Q.  Are you aware that Denton County residents are less likely

3  to be limited English proficient than Texas residents as a

4  whole?

5  A.  I would say I was aware of that, yes.

6  Q.  And were you also aware that Denton County residents are

7  more likely to speak English only at home than Texas residents

8  as a whole?

9  A.  I guess I'm aware in the sense of it's not surprising, but

10  I was not aware of any of the stats that are in front of me.

11  Q.  What about broadband internet access.  Did you know

12  anything about that?

13  A.  Not the specific numbers, but this does not surprise me.

14  I mean, it's just — it's what I would expect.  Let's put it

15  that way.

16  Q.  And do you know whether the median household income in

17  Denton County is higher than that of households across Texas?

18  A.  I don't know.  I suspect.

19  Q.  And do you know whether Denton County households are

20  likely to have — less likely to have income below the poverty

21  level than Texas households as a whole?

22  A.  I would say I know it in the general sense.  I mean, I've

23  worked elsewhere within elections in the county, so these

24  things are not surprising at all.

25      MS. TULIN:  No further questions, Your Honor.

*Gigi Simcox, RMR, CRR*

3891
FRANK PHILLIPS – CROSS

1       *(Off the record discussion)*
2               MS. TULIN:  I'm sorry.
3    BY MS. TULIN:
4    Q.  Could we pull up State Exhibit 22, John.  That is an
5    exhibit that I believe my friend across the aisle showed you,
6    and I think you may have also looked at this during your
7    deposition.
8    A.  Yes, I think so.
9    Q.  Do you know what this document is?
10   A.  I believe this is from the State, correct?  That shows the
11   number of mail ballots accepted and the number of mail ballots
12   rejected in each county with a percentage rejection rate.
13   Q.  Fair to say you did not prepare this spreadsheet yourself?
14   A.  Correct.
15   Q.  And focusing in on the —— we'll have to scroll down a
16   little bit to Denton —— that 1.66 ——
17               MISS HUNKER:  You are looking at the wrong ——
18               MS. TULIN:  We are looking at the wrong tab.
19               Thank you.
20   BY MS. TULIN:
21   Q.  So if we can go to the tab for —— I think we're going to
22   have to go all the way to the end.  Well, I'll just ask you a
23   general question and see if we can move this along.
24       I believe in your direct examination you —— your
25   referenced a 1.66 percent number from the November 2022

3892
FRANK PHILLIPS — CROSS

1  General Election.

2      Do you recall that?

3  A.  I do.

4  Q.  And did you prepare that number?

5  A.  No.  Those were from the State also.

6  Q.  Okay.  And you don't know where these numbers come from,

7  right?

8  A.  Well, they would have to come from the data that we enter

9  into our voter registration system that's transferred to TEAM.

10  Q.  Do you know that for sure?

11  A.  No.

12      MS. TULIN:  I pass the witness.

13      THE COURT:  Anything else on this side?

14      MISS ARMENTA:  Very briefly.

15  BY MISS ARMENTA:

16  Q.  Hi, Mr. Phillips.  I'm Elena Rodriguez Armenta for the

17  LULAC plaintiffs.

18      You talked about the very limited instances of alleged

19  voter fraud that you are aware of personally with my

20  colleague, Miss Tulin, is that right?

21  A.  Yes, ma'am.

22  Q.  So overall, you agree that voter fraud is rare, right?

23  A.  I would agree with that.

24  Q.  Yeah.  And, in general, in your personal experience,

25  elections are secure?

FRANK PHILLIPS – CROSS

1  A.  Yes.

2  Q.  And switching gears now to talk about the new voter

3  identification requirements under SB 1.  Processing

4  applications and carrier envelopes for ballots-by-mail took

5  longer after your office after SB 1 was implemented, right?

6  A.  Repeat it one more time.  Sorry.

7  Q.  Sure.  Processing applications and carrier envelopes for

8  ballots to vote by mail took longer for your office after SB 1

9  was implemented, right?

10  A.  Yes.

11  Q.  And in 2022, some voters in Denton County had issues

12  complying with SB 1's ID number requirements, right?

13  A.  Yes.

14  Q.  And in 2022, some Denton County voters were not notified

15  in time to cure their issues with their mail ballots, right?

16  A.  I'm not sure I know that specifically, but I would say

17  probably so, because if we get it in the last minute, there's

18  not enough time to turn around and notify them, so...

19  Q.  Sure.

20      John, would you mind bringing up Mr. Phillips's deposition

21  transcript March 31, 2023 at page 95, please.  Lines 4 to 11,

22  if you wouldn't mind.  If you're able to highlight that for

23  me.

24      And you testified on March 31st, 20 –– sorry –– March 31,

25  2023, when you were asked the following question:  "Okay.  And

FRANK PHILLIPS - CROSS

1  I think you testified earlier –– and correct me if I'm

2  wrong –– that sometimes folks don't get notified in time to

3  cure their mail ballot in order for their ballot to count, is

4  that right?"

5      And you answered:  "Yeah, especially if they turn it in

6  near the end, you know, the last day of early voting, then

7  it's going to be tough."

8  A.  Yeah.

9  Q.  Thank you.  And for some voters in your county, it's very

10  difficult for them to cure their mail-in ballots at all,

11  right?

12          MISS HUNKER:  I'm going to object to that, Your

13  Honor.  It's improper impeachment.  She didn't actually get

14  the witness to confirm that was his testimony and whatnot.  It

15  seemed to be she was ––

16          THE COURT:  Are you talking about the last set of

17  questions or are you talking about this ––

18          MISS HUNKER:  The one where she was bringing up the

19  specific ––

20          THE COURT:  That objection is kind of late.

21          MISS HUNKER:  Thank you.

22  BY MISS ARMENTA:

23  Q.  I'll ask the question again.  For some voters in your

24  county, it's very difficult for them to cure their ballots by

25  mail at all, right?

FRANK PHILLIPS – CROSS

1   A.  I would assume so, yes.

2           MISS ARMENTA:  Thank you.  No further questions.

3           Actually, one moment, Your Honor.  So sorry.

4           Does anyone need to confer about anything?

5           MR. BADAT:  Just a question real quick.

6                      CROSS-EXAMINATION

7   BY MR. BADAT:

8   Q.  Mr. Phillips, my name is Amir Badat.  I represent the HAUL

9   plaintiffs in this litigation.  You testified on direct about

10  why Denton County did not implement 24-hour voting in 2020.

11      Do you remember that?

12  A.  I do.

13  Q.  And one of the considerations you laid out was staffing,

14  right?  Is that a "yes"?

15  A.  Yes.

16  Q.  And another one was budget, correct?

17  A.  Yes.

18  Q.  And another one was that you anticipated only a small

19  number of people would actually use 24-hour voting, right?

20  A.  Correct.

21  Q.  And those are each considerations that, like, vary from

22  county to county, right?

23  A.  100 percent, yeah.

24  Q.  So a county that has a bigger staff or a bigger budget or

25  a voting population that has different needs may choose to

FRANK PHILLIPS – CROSS

1  implement 24-hour voting, right?

2  A.  Well, sure, they can.  But every county has budgetary

3  concerns, I mean, regardless of their size.

4  Q.  Right.  It depends on the county?

5  A.  Sure.

6  Q.  You always testified on direct about why Denton County did

7  not implement drive-thru voting, right?

8  A.  Yes.

9  Q.  And you said it was for many of the same reasons that you

10  didn't implement 24-hour voting, as well as lacking a place

11  big enough to actually do it, right?

12  A.  Yes.

13  Q.  And so you said it was impractical for Denton County to

14  actually implement drive-through?

15  A.  Yes.

16  Q.  But it might be practical for another county to do it,

17  right?

18  A.  Might be, yes.

19  Q.  Another county may have the staff or the budget or a

20  large-enough facility to actually implement drive-through

21  voting?

22  A.  Yes.

23        MR. BADAT:  Thank you.  That's all for me.  Thank you

24  Your Honor.

25        THE COURT:  Anything else on this side?

FRANK PHILLIPS – REDIRECT

1          Anything further?

2          MISS HUNKER:  Very brief redirect.

3          THE COURT:  Yes, ma'am.

4                    REDIRECT EXAMINATION

5  BY MISS HUNKER:

6  Q.  Do you recall discussing with counsel the 1.66 percent

7  rejection rate for the November 2022 General Election?

8  A.  I do.

9  Q.  And do you recall discussing the exhibit provided by the

10  Secretary of State's Office?

11  A.  Yes.

12  Q.  Did the 1.66 percent rejection rate match your

13  recollection of what the rejection rate was for Denton County

14  in November of 2022?

15  A.  Yes.

16  Q.  Do you recall talking to counsel about how sometimes

17  notice of defects arrive too late for the voter to cure?

18  A.  Yes.

19  Q.  Would that have been true of voters whose ballots were

20  rejected for reasons other than a mail ID number requirement?

21  A.  Yeah, for any reason.

22  Q.  Would that be true of voters whose ballots were rejected

23  for defects prior to SB 1?

24  A.  Yes.

25  Q.  Are you aware of any election where the rejection rate was

1  zero?

2  A.  No.

3  Q.  If SB 1 was enjoined or repealed tomorrow, would the next

4  election have a rejection rate of zero percent?

5  A.  I wouldn't expect it to, no.

6  Q.  Do you know if other counties follow the same procedures

7  or processes of identifying fraud?

8  A.  I don't know what other counties do in that regard.

9  Q.  And do you know if other counties follow the same

10  processes or procedures that helped identify the alleged fraud

11  that occurred in November 2020 in Denton County?

12  A.  I don't know.

13        MISS HUNKER:  Thank you, Your Honor.

14        THE COURT:  Anything else on this side?  Nothing

15  else.

16        Anything else here?  Nothing else.

17        You are excused, sir.  Thank you.

18        So we'll resume Monday at 9.

19        In the event that we get some agreements on these

20  exhibits that are outstanding, please provide me a copy, a

21  written copy of that and Miss Fernandez, so we don't make any

22  mistakes in having put into the record whatever exhibits are

23  going to be tendered.

24        Anything else we need to take up today?

25        MR. KERCHER:  Safe journeys, Your Honor.

FRANK PHILLIPS - REDIRECT

1          THE COURT:  Thank you.

2          Anything else?

3          I'll see you Monday.

4                         -o0o-

5    I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.  I

7  further certify that the transcript fees and format comply

8  with those prescribed by the Court and the Judicial Conference

9  of the United States.

10

11  Date:  10/12/23              /s/ *Gigi Simcox*
                                United States Court Reporter
12                              262 West Nueve Street
                                San Antonio TX 78207
13                              Telephone:  (210)244-5037

14

15

16

17

18

19

20

21

22

23

24

25

*Gigi Simcox, RMR, CRR*