1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3

LA UNION DEL PUEBLO ENTERO,      .
4    ET AL,                          .
                                     .
5              PLAINTIFFS,           .
         vs.                         . DOCKET NO. 5:21-CV-844-XR
6                                    .
GREGORY W. ABBOTT, ET AL,            .
7                                    .
               DEFENDANTS.           .
8

9

10            TRANSCRIPT OF BENCH TRIAL
      BEFORE THE HONORABLE XAVIER RODRIGUEZ
11          UNITED STATES DISTRICT JUDGE
               OCTOBER 16, 2023

12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                            FATIMA MENENDEZ, ESQUIRE
                              JULIA LONGORIA, ESQUIRE
18                            MALDEF
                              110 BROADWAY
19                            SUITE 300
                              SAN ANTONIO TX 78205
20

21

22                            JENNIFER A. HOLMES, ESQUIRE
                              NAACP LEGAL DEFENSE & EDUCATIONAL
23                            FUND INC
                              40 RECTOR STREET, FIFTH FLOOR
24                            NEW YORK NY 10006

25

```
 1

 2

 3

 4

 5

 6   FOR THE DEFENDANTS:      RYAN G. KERCHER, ESQUIRE
                             KATHLEEN HUNKER, ESQUIRE
 7                           WILLIAM WASSDORF, ESQUIRE
                             TEXAS ATTORNEY GENERAL
 8                           P.O. BOX 12548
                             MC 009
 9                           AUSTIN TX 78711

10

11

12

13

14   REPORTED BY:            GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
15                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
16

17

18

19

20

21

22

23

24

25
```

3902

JONATHAN WHITE — DIRECT

1      *(San Antonio, Texas; October 16, 2023, at 9:00 a.m., in*
2  *open court.)*
3          THE COURT:  What do we have?
4          MR. KERCHER:  We have been conferring, Your Honor,
5  with plaintiffs about the best way to proceed.  The parties
6  continue to, let us say, confer about exhibits and
7  admissibility.  There will probably come a time when we need
8  to argue about some remaining set of objections.  We're
9  probably not there yet.
10          So plaintiffs will not rest until they get their
11  exhibits in, as you might well imagine.  We propose moving
12  forward, then, with our next witness, who would be
13  Mr. Jonathan White.
14          THE COURT:  Yeah.  Any problem with that approach?
15          MISS PERALES:  No, Your Honor.
16          THE COURT:  Yeah.  Your witness.
17          MR. KERCHER:  Your Honor, the State defendants call
18  Jonathan White to the stand.
19      (JONATHAN WHITE, having been duly sworn, testified as
20  follows:)
21                      DIRECT EXAMINATION
22  BY MR. KERCHER:
23  Q.  Good morning, sir.  Could you please state your name for
24  the record.
25  A.  Good morning.  My name is Jonathan White, J-O-N-A-T-H-A-N.

JONATHAN WHITE — DIRECT

1  Q.  Mr. White, are you currently an employee of the Office of

2  the Attorney General for the State of Texas?

3  A.  Yes, I am.

4  Q.  How long have you been employed by the OAG?

5  A.  A little over 15 years, 15 and a half years, something

6  like that.

7  Q.  Are you an attorney, sir?

8  A.  Yes, sir.

9  Q.  Has your work with the OAG been primarily in criminal law

10  or civil?

11  A.  Fully in criminal law.

12  Q.  And what was the first division you worked in at the OAG?

13  A.  Criminal Prosecutions Division.

14  Q.  Were elections crimes a part of the work that you did in

15  the Criminal Prosecution Division?

16  A.  That's correct.  They were a part of my caseload in my

17  section, White Collar Crime and Public Integrity.

18  Q.  Did your caseload of election crimes grow, shrink, or stay

19  the same during your time in Criminal Prosecutions?

20  A.  It grew.

21  Q.  And during that time, did Criminal Investigations Division

22  devote more resources to election crimes over time?

23  A.  Yes, they did.

24  Q.  Can you describe for the Court the relationship between

25  the Criminal Prosecutions Division and the Criminal

JONATHAN WHITE — DIRECT

1  Investigations Division?

2  A.  Criminal Prosecutions is an attorney driven division,

3  while Criminal Investigations is law enforcement led and, you

4  know, they investigate certain — certain types of crimes, and

5  we prosecute certain types of crimes and criminal

6  prosecutions.

7  Q.  And we've talked about how the resources that Criminal

8  Investigations —— excuse me.  I thought I was over this —— the

9  Criminal Investigations devoted to elections crimes grew over

10 time as you were in Criminal Prosecutions.  Was there a

11 section in Criminal Investigations that handled these kinds of

12 crimes?

13 A.  Yeah, it started out as the Special Investigations Unit,

14 which became the Election Fraud Unit, and is now the Election

15 Integrity Unit.

16 Q.  And what was your role vis-a-vis this election integrity

17 evolution with Criminal Investigations?

18 A.  Yeah.  As my role turned into a section chief with an

19 Election Fraud Section, which became an Election Integrity

20 Section, and then a stand-alone division, my role was to work

21 directly with those investigators to improving the quality of

22 investigations and coordination between our respective units.

23 Q.  You said eventually your work in Criminal Prosecutions

24 rolled into a separate division.  What division was that?

25 A.  First it was —— it became a section within Criminal

3905

JONATHAN WHITE — DIRECT

1  Prosecutions, and then it became a section within the Special

2  Prosecutions Division, which also held human trafficking,

3  before becoming a stand—alone division, the Election Integrity

4  Division.

5  Q.  And has the human trafficking work at the agency also

6  rolled into its own division?

7  A.  That's correct.

8  Q.  Once the Election Integrity Division was created, what was

9  your role in that division?

10  A.  I was the division chief.

11  Q.  What was the purpose of the Election Integrity Division?

12  A.  To investigate — although, in a sense of investigation

13  was primarily the role of the criminal investigation side, but

14  to prosecute election offenses and pursue justice with regard

15  to those offenses in Texas.

16  Q.  And you used a phrase "pursue justice."  Is that your

17  understanding of the duty of a prosecutor?

18  A.  Correct.

19  Q.  To your understanding as a prosecutor, is the duty to

20  pursue justice different from a duty to pursue convictions?

21  A.  Yes.  I would say that those are different duties, and the

22  duty that a prosecutor is under is to pursue justice, not to

23  seek convictions.

24  Q.  You also noted that the investigation aspect of the

25  Election Integrity Division was largely in the — with the

JONATHAN WHITE — DIRECT

1  investigators.  Can you describe for the Court how as a
2  prosecutor you would gain personal knowledge over cases that
3  your office wound up prosecuting, in a general sense?
4  A.  Sure.  In every case, before a charging decision would be
5  made, I would need to personally lay eyes on the evidence
6  itself, the original election records.  I would need to listen
7  to any interviews.  I would need to see all original evidence
8  of whatever the elements were that needed to be established in
9  those cases before making a charging decision.  I wouldn't be
10  able to take an investigator's word for it.
11  Q.  What were your duties as chief of the Election Integrity
12  Division?
13  A.  To do the things that I just mentioned, as well as to
14  supervise a group of attorneys, legal assistants, research
15  specialists, and to help guide investigations; to identify
16  factual and evidentiary issues at the investigation phase; and
17  to help sort of begin with the end in mind to see if this is a
18  viable case or not.  We're not going to waste resources on
19  pursuing it, so I could try to allocate scarce resources that
20  way.
21  Q.  Without getting into the details of any individual cases,
22  can you help the Court understand what your level of
23  involvement in terms of understanding the caseload and what
24  the facts of cases were that came through your division when
25  you were division chief?

JONATHAN WHITE — DIRECT

1            THE COURT:  And just to be clear, what years are we
2     talking about now?
3            THE WITNESS:  So I would have been chief for — since
4     approximately 2020.  And prior to that, I was a section chief
5     since perhaps 2018 or so, and prior to that I was working
6     these cases primarily as the prosecutor who had sort of a
7     specialty in elections investigations and prosecutions within
8     the Criminal Prosecutions Division.
9            THE COURT:  So in answering his last question, what
10    year are we talking about?
11           THE WITNESS:  This would have been from 2018 forward.
12           THE COURT:  To today?
13           THE WITNESS:  No.  No, sir.  I'm no longer in that
14    role.
15           THE COURT:  So 2018 to when?
16           THE WITNESS:  December 1st of 2022.
17           THE COURT:  And I'm sorry.  Do you remember his last
18    question?
19           THE WITNESS:  I think I do.
20           THE COURT:  Okay.
21           THE WITNESS:  The only thing that I would add is that
22    prior to that, my involvement would have been as the lead
23    prosecutor on a significant number of those cases, perhaps 100
24    or so, in my time from 2008 forward.
25

3908

JONATHAN WHITE - DIRECT

1  BY MR. KERCHER:

2  Q.  And when you were not a lead prosecutor but serving in

3  this more administrative role as a division chief, what level

4  of familiarity did you have with the individual cases that

5  were coming through your division?

6  A.  A very high level of familiarity when it came to the

7  actual elements of the offense.  Those are what would need to

8  be pinned down before we made a charging decision going

9  forward.

10  Q.  And you mentioned to the Court just now you are no longer

11  in that role.  When did you leave that role?

12  A.  December 1st of 2022.

13  Q.  And why did you leave that role?

14  A.  I would say some personal reasons, I guess.  Over the last

15  three years or, really, I don't know, the two years prior,

16  because the last year I've been in Medicaid fraud in my new

17  role, it just became something that I could see myself walking

18  away from.  And when the Court of Criminal Appeals stripped

19  our authority to prosecute, it — it helped with that

20  decision.

21  Q.  And when you mention the Court of Criminal Appeals

22  decision, are you referencing the *Stephens* decision?

23  A.  Yes, sir.

24  Q.  Briefly and generally, what is your understanding of that

25  decision and how it affected the OAG?

3909
JONATHAN WHITE – DIRECT

1  A.  So the *Stephens* decision was that our statutory grant of

2  prosecution authority was unconstitutional based on a

3  separation of powers issue, and that the AG could no longer

4  unilaterally prosecute cases; so we had no authority to

5  prosecute under the law.  Cases would need to be referred to

6  district attorneys, local district attorneys and county

7  attorneys, for prosecution.

8  Q.  And when you say "no longer unilaterally," but these cases

9  would be referred to a local district attorney, does the OAG

10  continue to partner with local district attorneys in the

11  prosecution of election integrity crimes?

12  A.  We would, yes.

13  Q.  And is that a deputization process that an OAG employed

14  that an AAG would go through with the DA?

15  A.  It would either be a deputization process from the DA or

16  an appointment by a district judge if there were a recusal

17  motion, and we would be appointed DA Pro Tem.

18  Q.  If a local being district attorney did not want to charge

19  an election integrity crime but the AAG assigned from the OAG

20  did want to charge an election integrity crime, could the AAG

21  or the OAG move forward with that charge without the DA's

22  consent?

23  A.  No.

24  Q.  You mentioned now that you're in Medicaid fraud.  Can you

25  describe for the Court what you do now.

*Gigi Simcox, RMR, CRR*

3910

JONATHAN WHITE – DIRECT

1  A.  Sure.  Yeah, I'm in charge of the prosecutions in our

2  Medicaid Fraud Control Unit, and I'm a deputy chief over there

3  with responsibility over prosecutions and our small civil

4  unit.

5  Q.  And have you been in that role since leaving the Election

6  Integrity Division?

7  A.  That's correct.  I started December 1st of 2022.

8  Q.  Mr. White, have you read SB 1 that is the subject of this

9  litigation?

10  A.  I have read, I believe, all the pre-curser bills to SB 1

11  and the final bill that was passed, yes.

12  Q.  Brian, could you please bring up State Exhibit 89.

13     Mr. White, do you recognize this document?

14  A.  Yes, I do.

15  Q.  Can you generally describe what it is.

16  A.  This was a presentation given on election integrity that

17  was one of the responsive documents that I provided to the

18  team, that I understand was provided in discovery in this

19  case.

20  Q.  And you mention it being provided in discovery.  If we

21  pull back and look at the full document, you can see there is

22  a Bates number at the bottom of that document.

23     Do you see that?

24  A.  Yes, sir.

25  Q.  And that's State 054622?

JONATHAN WHITE - DIRECT

1    A.  Yes, sir.

2    Q.  If we go to the last page of State 89, you can see there

3    is a Bates label that is State 054677.  Did I read that right?

4    A.  Correct.

5    Q.  Mr. White, who drafted this document, if you remember?

6    A.  Primarily myself, and I would have had some assistance

7    with the presentation from one or two people that were in my

8    division over the years.

9    Q.  Does this document show the activities of the Office of

10   Election Integrity at the OAG?

11   A.  It does discuss those activities and responsibilities, and

12   it was presented to -- I think primarily to the elections

13   administrator as a Secretary of State handling all

14   conferences.

15   Q.  And does it describe matters observed by your office while

16   under a duty to report?

17   A.  Sure.

18           MR. KERCHER:  Your Honor, we offer State 89.

19           THE COURT:  Any objection?

20           MISS PERALES:  No objection, Your Honor.

21           THE COURT:  89 is admitted.

22   BY MR. KERCHER:

23   Q.  Mr. White, you may have noticed that the image quality on

24   your screen has improved.  I'll represent to you that rather

25   now looking at the copy of the exhibit that we have submitted,

JONATHAN WHITE - DIRECT

1  we have now just gone to a PDF so that — with some greater

2  clarity so you can have a better view of the document that has

3  been admitted as State 89.

4      Brian, could we please go to page 5 of State 89.

5      Mr. White, when it says here that "534 election offenses

6  were prosecuted against 155 individuals as of July 29, 2021,"

7  what does that mean?

8  A.  Those numbers represent our prosecutions of various

9  election offenses over the years, and that goes back to

10 inception, at — which was I believe 2005, at least when we

11 started tracking our prosecutions of election offenses.

12 Q.  Okay.  Can you describe what the next bullet means when it

13 says "512 additional offenses currently pending prosecution in

14 court."

15 A.  That was the number of election offenses that we had

16 charged in court, whether district court or county court, but

17 predominantly I believe those were felony offenses, at that

18 time, as of that date.

19 Q.  Does that mean offenses charged but not resolved?

20 A.  Correct.  Charged and pending.  Pending trial, ultimately,

21 in court, and various stages of pretrial.

22 Q.  And the last bullet:  "386 active investigations involving

23 numerous suspects and numerous offenses," does that mean, as

24 of yet, uncharged potential offenses?

25 A.  Potential offenses that were in varying stages of

JONATHAN WHITE - DIRECT

1  investigation that could be referred for prosecution.

2  Q.  Where would you have collected the information to put on

3  this slide?

4  A.  The first two pieces of information would be obtained from

5  the comprehensive spreadsheet that I maintained of our

6  prosecutions pending and resolved, and the second -- the third

7  number came from our Criminal Investigations Division; just

8  the number of open active investigations that they had.

9  Q.  Let's talk a little bit about the investigation charging

10  process in the Election Integrity Division.  How did the OAG

11  receive referrals on election crimes?

12  A.  The investigations unit would receive referrals from a

13  variety of sources, primarily from the Secretary of State, who

14  was kind of a gathering point for election complaints from

15  individuals, election officials, things like that.  We would

16  also receive complaints from local law enforcement offices,

17  local prosecutors, election officials directly.  We welcomed

18  those.  And from citizens.  There was also a path for citizens

19  to refer cases directly to us.

20  Q.  And you mentioned that the Secretary of State's Office

21  served as a sort of gathering point for referrals for the OAG.

22  Did the Secretary of State's Office make prosecuting decisions

23  on the information that it gathered?

24  A.  They did not.

25  Q.  Once the OAG received a referral, would the OAG perform an

3914
JONATHAN WHITE - DIRECT

1  investigation itself?

2  A.  A preliminary investigation would be performed to ensure

3  that the referral actually alleged a crime, the elements of a

4  crime, first and foremost, and to determine whether it was a

5  credible enough allegation to merit a full investigation.  And

6  from there, it would proceed to either full investigation or

7  be closed administratively on this side.

8  Q.  And I think that you have covered this, but now that

9  *Stephens* is the law in Texas, if OAG believes that there is a

10  case that merits charging, what does it do with that case?

11  A.  That case would be referred to a local prosecutor.

12  Q.  And when you described for the Court the limited ability

13  for the OAG to charge an election integrity crime after

14  *Stephens* and how it could only do so with the authorization of

15  a DA, does that apply specifically to the criminal provisions

16  of SB 1?

17  A.  Yes, it would apply to those provisions and any other

18  criminal provisions in the Election Code.

19  Q.  Brian, can we go to page 12, please.

20      Mr. White, how many election offenses can be committed in

21  the state of Texas?

22  A.  Yeah, at the time we put this presentation together, it

23  was over 100, and I suspect that it's probably over 150 or so

24  now.  More than — more than you can shake a stick at.

25  Q.  Brian, can we go to the next page, please.

3915

JONATHAN WHITE - DIRECT

1      In your experience, which of those election crimes are

2  most common?

3  A.  Yeah, we would probably deal with ten or at the most 15 of

4  those statutes.  You know, commonly, most of the rest would be

5  just one-offs.  Some of them you would never see.  And those

6  offenses would revolve around the three areas on the slide,

7  which are:  Vote harvesting, assistance fraud, and illegal

8  voting.  Those were the three main categories.

9  Q.  And we have heard the term "vote harvesting" several times

10  in this trial, and this trial has been going on a long time,

11  but if you could briefly describe for the Court what you mean

12  when you say "vote harvesting."

13  A.  Sure.  "Vote harvesting," sometimes known as "mail ballot

14  fraud," is a process where, you know, typically, campaign

15  workers are paid operatives, proliferate mail ballots through

16  applications for mail ballot, and then go back to collect

17  those ballots from a voter and ensure that those are voted for

18  the candidate.

19  Q.  Okay.  Let's go to page 15, Brian.

20      Now, page 15 of State 89 talks about two parts of vote

21  harvesting.  Can you describe those for the Court, please.

22  A.  Sure.  The first part we would refer to as — or it's

23  commonly referred to as the "seeding phase," and that's the

24  part where you would generate applications for mail ballots in

25  your targeted precincts.  And that really sets the stage for

3916

JONATHAN WHITE — DIRECT

1  the second part of the process, but that also is the number of
2  ballots that are generally going to be in play.  And during
3  the harvesting phase, you would go back to collect those
4  ballots and get those voted for the candidate that you are
5  supporting, and you would get some percentage of what you
6  seeded.
7  Q.  And when you talk about "seeding" the ABBMs how does that
8  happen?
9  A.  I mean, it's a pretty simple process.  It's just a —— I
10  mean, the application for ballot—by—mail or mail ballot
11  application is —— you know, it just requires basic information
12  about the voter and the voter's signature, check boxes for
13  which elections you are requesting mail ballots for.  Contains
14  the eligibility criteria for getting a mail ballot.  And so if
15  you're working this process from a vote—harvesting
16  perspective, you know, you have two basic choices.
17      One is you could actually forge those applications if you
18  wanted to, but it isn't that difficult to go door—to—door if
19  you're willing to do the work, talk to voters, and have them
20  sign up for mail ballots if they are eligible.
21  Q.  Is it right to say or not that the seeding phase pertains
22  to the application for ballot—by—mail and the harvesting phase
23  pertains to the actual ballot itself?
24  A.  Exactly.
25  Q.  Brian, can you please put up page 21.

JONATHAN WHITE — DIRECT

1    Mr. White, what are we looking at on 21 of State
2  Exhibit 89?
3  A.  So, again, this was presented in the context of
4  identifying things that elections officials could look for
5  potentially on the documents that they see to identify signs
6  of potential vote harvesting.  And here you would see the same
7  person filling out applications for mail ballots for voters so
8  that you know that there's some sort of coordinated activity
9  going on here.  You don't know exactly what at this point, but
10 you — similar handwriting would point out the fact that
11 you're dealing with folks that are signing up multiple
12 individuals to vote by mail.
13 Q.  Okay.  Let's go to the next page, please, Brian.
14    And what do we see here, Mr. White?
15 A.  So, again, these are taken from election documents, but
16 this is an example of forged signatures on an application for
17 ballot-by-mail.  Appear to have been done by the same
18 individual.  On the right is the application, and on the left
19 were the actual signatures of the voters that we verified on
20 their carrier envelopes.
21 Q.  And so by comparing the signatures, the putative
22 signatures on the right with the actual signatures on the
23 left, you were able to see, by visually inspecting, that these
24 were dissimilar enough to raise concern?
25 A.  That's right.  These would result in an interview with the

3918

JONATHAN WHITE - DIRECT

1  voter to try to determine what happened.

2  Q.  Brian, let's go to page 23, please.

3      What are we looking at here, sir?

4  A.  These are some kind of -- I think these were a bit

5  historical.  Maybe 2014, there was an effort to collect

6  electronic signatures during the seeding phase of a

7  vote-harvesting operation.  I think this has been preempted by

8  law, but this is an example of potentially electronic

9  signatures appearing on applications, and these were not wet

10 ink signatures.

11 Q.  All right.  Let's go to the next page of State Exhibit 89.

12     Can you describe for the Court what we're seeing on this

13 slide.

14 A.  So this would be an example of electronically completed

15 applications where the text required from the voter is

16 provided in a typed form or computer-entered form.  These

17 would be atypical for something that would actually be filled

18 out by a voter, but we would look for, you know, if these were

19 all coming from the same precinct in large numbers, then that

20 could be evidence that there was some organized, you know,

21 vote-harvesting effort there.

22 Q.  Raise a red flag?

23 A.  Correct.

24 Q.  All right.  The next page please, Brian.  And are we on

25 page 25, Brian?

JONATHAN WHITE – DIRECT

1    So this is page 25 of State Exhibit 89.  What are we
2  looking at here, sir?
3  A.  So these are three examples from different investigations
4  of people who were engaged in vote-harvesting activity.  And
5  if you would have looked through the rest of the records, you
6  would have seen this name, address, signature, appear dozens,
7  and in some cases hundreds, of times.  The ones in the center
8  was, like, 700.  So "frequent flyer assistance" was kind of
9  what we called them.  Or professional assistance or, really,
10  they were vote harvesting.
11    I've — I left out one thing, and that's that, you know,
12  when you see that they are unrelated to the voter, we're not
13  talking about a family member, somebody with a last name
14  that's in common or something that's a one-off in a file.  We
15  wouldn't be interested in any of those.  We would only be
16  looking for those folks that appears dozens or hundreds of
17  times, and that's what we're communicating to the election
18  officials.
19  Q.  Okay.  So we've talked a little bit about the seeding
20  phase which has to do with the ABBMs.  Let's turn now to the
21  harvesting phase.
22    At a very high level of generality, what happens at the
23  harvesting phase?
24  A.  Sure.  The harvesting phase is where —
25  Q.  I'm sorry.  Let me interrupt you.

JONATHAN WHITE — DIRECT

1  Brian, can we go to page 18.

2  All right.  Your answer, sir.  I'm sorry.

3  A.  The harvesting phase is where the — these workers would

4  return to these addresses where they had typically signed

5  folks up to vote already, and they would go back and they

6  would try to walk the voter through that process, either

7  suggest the —

8  MISS PERALES:  Objection, Your Honor.  The "how" is

9  excluded by the Court under the motion in limine.

10  MR. KERCHER:  I'll withdraw the question, Your Honor,

11  and admonish issue the witness.

12  THE COURT:  Thank you.

13  BY MR. KERCHER:

14  Q.  I appreciate the answer you were providing.  As you know,

15  Mr. White, the Court has ruled on a motion in limine, and so

16  we are limited in the level of detail you can provide at this

17  point.  I'm going to reask my question, and I'm going to ask

18  for you to provide only information that the plaintiffs could

19  glean from State Exhibit 89.

20  Does that make sense?

21  A.  Sure.

22  Q.  All right.  With that in mind, Mr. White, can you briefly

23  describe for the Court how the harvesting phase of vote

24  harvesting works.

25  A.  In the presentation I described it as paid operatives

1  going out during the early voting period and filling out and

2  collecting mail ballots from voters to ensure that those votes

3  are cast for certain candidates.

4  Q.  Prior to SB 1, was vote harvesting illegal?

5  A.  Most of the key activities that comprise vote harvesting

6  were prohibited under the Election Code before SB 1, yes.

7  Q.  All right.  I didn't tell you I was going to quiz you, but

8  do you recall which provisions of the Election Code would have

9  been implicated by vote harvesting prior to SB 1?

10 A.  Sure.  Starting at the application phase, Section 84.0041

11 addresses fraud with regard to mail ballot applications.

12      Chapter 64.036, Unlawful Assistance, prohibits voters from

13 being told how to vote or influenced during the voting

14 process.  Chapter 273 –– I'm sorry –– 276.013 also prohibits

15 the influencing of a voter during the voting process, and

16 Chapter 86.0051 and 86.010 govern the handling of mail ballots

17 and prohibit a person from possessing a mail ballot except

18 under certain conditions, and if certain conditions are met;

19 as well as Chapter 86.006, which prohibits of the possession

20 of a ballot.

21 Q.  Something that we have heard about generally in this trial

22 are the different election needs or how they may be the same

23 from county to county across the State of Texas.  When it

24 comes to vote harvesting, are there geographical limitations

25 of where it can occur, in your experience?

3922

JONATHAN WHITE - DIRECT

1   A.   No.

2   Q.   Are there particular types of elections that are more

3   vulnerable to vote harvesting in your experience?

4   A.   Yes.

5   Q.   What kinds?

6   A.   Those would be small elections, local elections, primary

7   elections, particularly run-offs.  School district elections,

8   special district, utility district-type elections, those would

9   be elections where the margins are close enough and the

10  turnout is small enough that vote harvesting could have an

11  impact.

12  Q.   Brian, can we take a look at page 28, please.  And can we

13  pull up whatever bullet points there might be.  Or is that it?

14  Thank you, sir.

15       Does page 28 of State Exhibit 89 describe, generally, your

16  thoughts regarding whether there are geographical limitations

17  to vote harvesting?

18  A.   Yes.

19  Q.   Can we go to page 29, Brian, and pull up all of the

20  bullets there as well.  This is 29?  Thank you, sir.

21       And then page 30.  Is this also page 30?  Perfect.  Thank

22  you, sir.

23       When a county receives applications for ballot-by-mail, is

24  there something that indicates that the ABBM is potentially --

25  may be potentially fraudulent, at a very general level?

JONATHAN WHITE — DIRECT

1    A.   There would be some clues as to whether vote harvesting
2    was involved based on the —— some of the slides that we
3    covered earlier.  Those handwriting clues and signature clues.
4    You know, Elections Office does have possession of prior
5    signatures from a voter that could be compared if they felt
6    like doing that at the application process, but mainly the
7    things that we talked about before, I think.
8    Q.   Brian, can we go to page 31.
9        Can you describe for the Court what information you were
10   providing for election officials on page 31 of State Exhibit
11   89.
12   A.   Sure.  This is based on a situation that came up a number
13   of times.  And if —— we were telling in this slide elections
14   offices that if they received, you know, a FedEx box that was
15   stuffed full of ballot applications, we were asking for them
16   to preserve the original box or envelope that those came in,
17   if they could for us, make a copy of the original batch of
18   ABBMs as it came to them, give us a call, or their local DA to
19   let us know about it, and then process the ABBMs as they
20   normally would, because under the law, those are still valid.
21   Q.   I want to turn your attention now to election integrity
22   cases involving voter assistance or fraud in the assistance
23   process, okay?
24       In your experience, can assistance, can voter assistance
25   be unlawful under the Election Code?

JONATHAN WHITE - DIRECT

1  A.  Sure.

2  Q.  Was that true before SB 1?

3  A.  Yes.

4  Q.  Brian, let's go to page 33, please.

5      Before SB 1, what types of things might have been

6  considered unlawful assistance?

7  A.  Under the statute at the time, assisting a voter who isn't

8  eligible for assistance or did not ask for assistance would

9  be — would violate the law.  Voting a ballot differently than

10 the voter wished or directed the assistant to vote the ballot;

11 if they were actually marking the ballot for the voter.  And

12 that's something that we would look at regularly.  And

13 suggesting to the voter during the voting process how the

14 voter should vote is something we would look at.

15 Q.  Okay.  Brian, let's go to the next page 34, please.

16     Can you describe for the Court, generally, the sequence of

17 events by which voter assistant — excuse me — assistance

18 fraud can occur.

19 A.  Sure.  There are a number of ways.  The one described here

20 is a more organized method, and it starts with a voter being

21 identified by a campaign worker, being transported to the

22 polling place in a van or something of that nature by a

23 campaign worker, given some sort of literature, like, a slate

24 of candidates on a slip of paper or a sample ballot, and then

25 assigned to an assistant at the polling place to take them

JONATHAN WHITE - DIRECT

1  through the process from, you know, the front of the line all
2  the way through voting, and to cast that vote or ensure that
3  the vote is cast for the paying candidates.
4  Q.  Before SB 1, was it illegal for a person who provided
5  assistance to a voter to try to influence or coerce the voter?
6  A.  In terms of the vote, yes.
7  Q.  Let's talk now about illegal voting.  Generally speaking,
8  what does "illegal voting" mean and how is it different from
9  what we've talked about so far?
10 A.  Yeah.  An illegal vote is an illegal vote cast by someone
11 who, you know, knew, had the requisite *mens rea* for the crime.
12 And that could be an ineligible vote or a double vote, voting
13 twice in the same election, impersonating another voter; and a
14 fourth method is to actually mark someone else's ballot in a
15 direction that they did not, I guess, direct or approve.
16 Q.  And I think we are showing you page 36 of 89.  Can we go
17 to 37, please.  And then 38, please.
18     And pages 36, 37, and 38, do these generally lay out the
19 kinds of illegal voting that you just described for the Court?
20 A.  Yes, sir.
21 Q.  Let's go to page 39.
22     What's the difference between voting a ballot of another
23 and marking a ballot of another?
24 A.  The context under voting another person's ballot is an
25 impersonation context, so whether it's in person, which is

3926

JONATHAN WHITE — DIRECT

1 largely subverted by the voter ID law, or with a mail ballot
2 that isn't a person's vote, but they submit it, acting as if
3 they were that voter.
4     The latter situation in the slide that's up on the screen
5 now is marking a person's ballot without their consent or
6 without specific direction, so it's not contained in an
7 impersonation scenario necessarily.
8 Q.  We've walked through ballot harvesting, assistance fraud,
9 and illegal voting.  When people talk about election fraud,
10 are there in your — well, let's see.  When we talk about
11 election fraud in the context of the work that you've done,
12 are there other things that might be included in violations of
13 election integrity?
14 A.  Sure.
15 Q.  Brian, can we go to page 41.
16     Can you describe for the Court generally what the Election
17 Code — what election fraud means under the Texas Election
18 Code.
19 A.  Yes.  Under Chapter 276.013, which is one of the statutes
20 I mentioned earlier, this was sort of a broader provision,
21 which is designed to prohibit influencing a voter during the
22 voting process, causing a voter to register, obtain a ballot
23 or vote under false pretenses, or intentionally making a
24 misleading statement or false statement to election officials.
25 Q.  Brian, could we please pull up Joint Exhibit 1 and go to

JONATHAN WHITE — DIRECT

1    Section 7.03.

2        Mr. White, people have been sitting in that chair and

3    asked this same information over and over again, but you're

4    generally familiar that in legislation, the underlined portion

5    is the verbiage that's added by the legislation?

6    A.   Yes.

7    Q.   We agree, right, that Section 7.03 of SB 1 amends

8    Section 276.013 of the Election Code, which you just described

9    for the Court?

10   A.   Correct.

11   Q.   If you look at 7.03(a), you can see that there were

12   already subsections 1, 2, and 3, correct?

13   A.   Correct.

14   Q.   And if we pull back at look at 7.03 a little bit more

15   broadly, there are several underlined sections, sub (a)(4)

16   through (9).

17   A.   Correct.

18   Q.   Is it your understanding that SB 1 added these additional

19   subsections to 276.013?

20   A.   Yes.

21   Q.   Now let's go back and look at 7.03(a), 1 through 3.

22   7.03 — excuse me — Section 276.013(a)(1) prior to SB 1,

23   would it have been unlawful to influence the independent

24   exercise of the vote of another in the presence of a ballot or

25   during the voter process?

3928

JONATHAN WHITE — DIRECT

1   A.  Yes.

2   Q.  To your knowledge, did SB 1 change that?

3   A.  No.

4   Q.  Now, there's this new language that's underlined.  It

5   says:  "Including by altering the ballot of another or by

6   otherwise causing a ballot not to reflect the intent of the

7   voter."

8       In your experience, was it already a violation of 276.013

9   to alter the ballot of another to not reflect the intent of

10  the voter prior to SB 1?

11  A.  Yes.

12  Q.  All right.  Let's look at 7.03(b).  B describes the type

13  of offense that it is to breach Election Code 276.013.  Is

14  that right?

15  A.  Yes.

16  Q.  Prior to SB 1, what type of an offense was a breach of

17  276.013?

18  A.  Class A misdemeanor.

19  Q.  And after SB 1, how was that changed, if at all?

20  A.  Well, it was changed by reducing an attempt to a Class B

21  misdemeanor, which is kind of tricky, because the entire

22  statute was predicated on a person commits an offense if a

23  person makes any attempt to — or really makes an effort to,

24  which is the same as an attempt; so it muddies the waters on

25  how much of this statute it actually reduces to a Class B, but

3929

JONATHAN WHITE - DIRECT

1   potentially a lot of it, or all of it.

2   Q.  And then is it right to say that (b)(1) elevates the level

3   of offense if the purported -- if the defendant in a case like

4   this is an elected official?

5   A.  That's what it does, yes.

6   Q.  Mr. White, about how many times, if you know, did you give

7   presentations containing the information similar to that in

8   State Exhibit 89?

9   A.  I don't know for sure.  I guess it's probably between five

10  and ten maybe.  I was pretty selective about giving

11  presentations.

12  Q.  Did you ever provide information like what is contained in

13  State Exhibit 89 in public testimony to the legislature?

14  A.  I would say I covered most, if not all, of that material

15  in my testimony before the legislature.

16  Q.  And does that include during the sessions where SB 1 and

17  its predecessors were considered?

18          MISS PERALES:  Your Honor, we would object on hearsay

19  grounds.  This is statements that he's saying he told the

20  legislature out of court and offered for the truth of the

21  matter asserted.

22          THE COURT:  That's overruled.

23  BY MR. KERCHER:

24  Q.  So I'll ask my question again.

25      Mr. White, we were talking about information you have

JONATHAN WHITE - DIRECT

1  provided to the legislature like what is contained in State
2  Exhibit 89.  And my follow-up question was whether you had
3  provided that kind of information to the legislature during
4  the sessions where SB 1 and its predecessors were considered?
5  A.  Yes.
6  Q.  Brian, can you please bring up State Exhibit 82.
7      Mr. White, I hope that your eyes will forgive the size of
8  State Exhibit 82.  Do you recognize this document?
9  A.  I do.
10 Q.  Can you tell the Court generally what it is.
11 A.  This is the spreadsheet that I maintained for our election
12 prosecutions.  This one is as of July 15th of 2022, and the
13 first part of the document is resolved prosecutions.  I'm
14 sorry.  This is the portion of the document that's resolved
15 prosecutions, and the second part would be pending
16 prosecutions.
17 Q.  Okay.  And if we look down at the bottom right-hand corner
18 of State Exhibit 82, we can see Bates Number State 112177, is
19 that right?
20 A.  Yes.
21 Q.  If we go through the last page and look at the Bates
22 number there, we see Bates Number State 112193, is that right?
23 A.  That's correct.
24 Q.  Mr. White, was this document made in the regular course of
25 business of the Election Integrity Division?

1  A.  Yes.

2  Q.  Was it kept in the regular course of business?

3  A.  Yes.

4  Q.  Was it made at or near the time of the events or

5  conditions recorded?

6  A.  Yes.

7  Q.  Was it made by or from information transmitted by someone

8  with knowledge of the events or conditions recorded?

9  A.  Yes.

10      MR. KERCHER:  Your Honor, State defendants offer

11  State 82.

12      MISS HOLMES:  The HAUL plaintiffs object to this

13  exhibit on the basis of lack of foundation.

14      THE COURT:  That's overruled.

15      Any other objections?

16      State 82 is admitted.

17  BY MR. KERCHER:

18  Q.  Mr. White, does State 82 provide as complete and accurate

19  a list of resolved prosecutions that the OAG resolved from

20  approximately 2004 through approximately July 2022?

21  A.  Yes, sir.

22  Q.  Approximately how long were you personally responsible for

23  maintaining this list?

24  A.  Since at least 2019.  And I don't recall, there may have

25  been some time before that as well.

JONATHAN WHITE – DIRECT

1  Q.  Do you recall being questioned about what is now State

2  Exhibit 82 at your first deposition in this case?

3  A.  Yes.

4  Q.  And you recall providing general information about cases

5  about which you had personal knowledge in response to

6  questioning by plaintiffs in this case?

7  A.  Yes.

8  Q.  I'm going to remind you of the Court's ruling on a motion

9  in limine.  I'm going to walk through those cases about which

10 you have personal knowledge from this list and admonish you

11 not to provide information beyond what you provided in your

12 deposition.  If you somehow remember information that you did

13 not at the time, we are not to get into that at this time.

14     Do you understand that instruction?

15 A.  Yes.

16 Q.  How familiar are you with the facts that are relevant to

17 the election fraud prosecutions that are reflected on State

18 Exhibit 82?

19 A.  In all the cases since 2018, I would be familiar with all

20 the operative facts pertaining to the elements of the crime.

21 More so if I was the actual prosecutor on these, which I was

22 on many of them, going all the way back to, say, 2008.

23 Q.  And do you have personal knowledge of the underlying

24 operative facts comprising the elements of the crimes charged

25 in any of these cases that have been favorably resolved where

3933

JONATHAN WHITE — DIRECT

1  an assister was providing otherwise lawful in-person

2  assistance, attempted to influence or coerce the voter they

3  were assisting?

4  A.  Yes.

5  Q.  Brian, can we go to page 3.

6        THE COURT:  Before you do that, I guess I have a

7  question, because I'm not sure what a "favorable resolved

8  prosecution" means.  I mean, is that a conviction, or is that

9  a plea, or what is — how are you defining that term?

10        THE WITNESS:  We defined it on this spreadsheet in a

11  notation at the bottom as:  Resulting in a conviction either

12  through plea or jury trial, a deferred adjudication or

13  pretrial diversion or diversion-type program, with a

14  stipulation of guilt or an acknowledgment of the offense.

15  BY MR. KERCHER:

16  Q.  All right.  We are now on page 3 of Exhibit 82.  And I

17  will refer your attention to Christina Lichtenberger.  Do you

18  see that entry?

19  A.  Yes, sir.

20  Q.  Are you familiar with the underlying operative facts of

21  this case?

22  A.  Yes.  I was the prosecutor on this case.

23  Q.  Again, at the same level of generality that you provided

24  information on this case at your deposition in response to

25  plaintiffs questioning, can you give the Court an

JONATHAN WHITE - DIRECT

1  understanding of what this case was about?

2  A.  Sure.  As it indicates on the spreadsheet, this was a

3  vote-harvesting case involving these three ladies.  Mail

4  ballot fraud.  Assistance fraud was also involved.

5  Q.  And you mention "these three ladies."  Are these part of

6  the same case?

7  A.  They stemmed from the same investigation, yes.

8  Q.  What was the final resolution of these cases?

9  A.  The Lichtenberger case, if we can zoom back out.

10  Q.  Take us over to the far right column, Brian.

11  A.  Lichtenberger pled guilty to a count, I believe, of

12  possession of a ballot and a count of unlawful assistance

13  under Chapter 64.036, and received a one-year deferred

14  adjudication and a fine.

15  Q.  And underneath the resolution of Ms. Lichtenberger's case

16  is the resolution of Andrea Campos Bierstedt's case.

17      Can you describe for the Court what the "pretrial

18  diversion of six months" means?

19  A.  That was a resolution with the Court for pretrial

20  diversion probation of six months' -- pretrial diversion

21  program with six months' probation and $3,500 what we called a

22  "donation" to the County.

23  Q.  Now, I think you said this in response to the Court's

24  question a moment ago, but when defendants in election

25  integrity cases charged by your office were put into a

3935
JONATHAN WHITE – DIRECT

1  pretrial diversion, did they have to plea to or acknowledge
2  guilt to some crime in order to get the benefit of that
3  pretrial diversion program?
4  A.  That's correct.
5  Q.  Okay.  And below Ms. Bierstedt's is the resolution of
6  Ms. Alicia Perez, who you told us was also involved in this
7  investigation.
8      What was the resolution of her case?
9  A.  She pled guilty to four counts of possession of a ballot
10  and four counts of unlawful assistance and received probation
11  and fine and court costs.
12  Q.  All right.  Let's go to page 4, please.
13          THE COURT:  Before you leave that, the '06 is that
14  meaning that these events occurred in 2006?
15          MR. KERCHER:  Brian, can you scroll over for the
16  Court, please.
17          THE COURT:  Okay.  Well, then, I guess '10, is that
18  when these violations of the Election Code occurred?
19          THE WITNESS:  This is the date of the resolution of
20  the case, which were pled in Court on that date, and I believe
21  they were stemming from the 2008 Primary Election in Duval
22  County.
23          THE COURT:  Thank you.
24  BY MR. KERCHER:
25  Q.  Mr. White, you, in your deposition, identified a number of

JONATHAN WHITE — DIRECT

1  other defendants for whom —— with whom —— see if I can ask a
2  better question.
3      You have previously testified regarding familiarity with
4  the underlying facts of several other cases on what is now
5  State Exhibit 82, including on page 4, Gilda Hernandez, and
6  Margarita Ozuna, is that right?
7  A.  Yes, sir.
8  Q.  I will highlight those names for the Court to review at
9  its convenience rather than taking up additional time.
10     Can you briefly describe, again at the same level of
11  generality, the facts of those cases.
12  A.  Yes.  The Hernandez case was a Dallas County case, as
13  indicated in the first column, which was tried in Rockwell
14  County under our venue provision.  It was the 2010 Primary
15  election, and she was charged with illegal possession of a
16  ballot, unlawful assistance, and two other of offenses.
17  Q.  Okay.  And Margarita Ozuna in Cameron County?
18  A.  Yes.  That was in the Cameron County 2010 Primary, and she
19  was charged with unlawfully assisting a voter.
20  Q.  Okay.  On page 5, I'll direct your attention to Tomasa
21  Chavez, Facunda Garcia, and Bernice Garcia.
22     Tomasa Chavez, same level of generality.
23  A.  Yes.  Also in Cameron County, but a different election,
24  the 2010 Primary Election Run-off.  Charged with a number of
25  offenses and was convicted.  I believe the last two were

JONATHAN WHITE — DIRECT

1  convicted also of unlawful assistance of a voter.

2  Q.  And I believe you said that the — those charges stemmed

3  from a 2012 election, but we see the resolution dates are in

4  2015.  Why did it take so long, Mr. White?

5  A.  This investigation, I think, took — took quite some time,

6  maybe 18 months or more, and then we got these cases in the

7  system.  And election cases don't tend to float to the top of

8  the docket.  They tend to go the other way.  So, you know,

9  three years for a resolution wasn't uncommon at all.

10 Q.  And when you say "to the top of the docket," do you mean

11 to the top of your offices' docket or the Court's docket?

12 A.  The Court's docket, yeah.

13 Q.  Let's go to page 6.  I'll direct your attention —

14        MISS PERALES:  I'm sorry.  I just have a bit of

15 confusion.  You've referred to this as State's Exhibit 82.

16        THE COURT:  That's what it was admitted under.

17        MISS PERALES:  Okay.  And this chart is dated

18 July 2022?

19        MR. KERCHER:  Yes.

20        MISS PERALES:  Okay.  I'll clear it up on a break

21 with you.

22        MR. KERCHER:  Okay.

23        MISS PERALES:  Thank you.

24 BY MR. KERCHER:

25 Q.  All right.  I was referring your attention to Margarita

JONATHAN WHITE — DIRECT

1  Ozuna now on page 6.  Is this the same Margarita Ozuna who we
2  talked about earlier on page 4?
3  A.  That's correct.
4  Q.  Is she what we might call a repeat offender?
5  A.  She — she was.
6  Q.  Is this a similar operation to what she was charged with
7  previously?
8  A.  Correct.
9  Q.  Okay.  Now, Vicenta Verino?
10  A.  Yes, sir.
11  Q.  Are you familiar with the fact of that case?
12  A.  Yes, sir.  I was the prosecutor on all these cases.
13  Q.  Okay.  Generally, what happened there?
14  A.  Ms. Verino was charged with numerous ballot-harvesting
15  offenses and she pled guilty to unlawful assistance of a
16  voter.
17  Q.  And what about Sarah Perales?
18  A.  Ms. Perales was involved in the same activity and was
19  charged with — let's see.  Looks like two offenses.  Pled
20  guilty to a ballot-handling offense.
21  Q.  All right.  And what about Lupe Rivera?
22  A.  Yes.
23  Q.  Do you recall that case?
24  A.  Yes.
25  Q.  What were the facts of that case?

3939

JONATHAN WHITE - DIRECT

1  A.  It was the 2013 municipal election, which was an election

2  where he was on the ballot, city commissioner.  And he was

3  charged with numerous ballot-handling -- I mean,

4  ballot-harvesting offenses, including unlawful assistance to a

5  voter, which he pled guilty to.

6  Q.  Okay.  Let's skip ahead to page 9, Brian.

7       And I'll draw your attention to Cynthia K. Gonzales.  Are

8  you familiar with the facts of this case, sir?

9  A.  Yes, sir.

10  Q.  What happened here?

11  A.  This was an Oasis County case, was brought in San Patricio

12  County, an adjoining county stemming out of the Roxton 26

13  Primary Run-off, and Ms. Gonzales was convicted of unlawful

14  possession of a ballot.  The statute's called "Carrier

15  Envelope Action," which always gets looks in Court.  What the

16  heck is that?  And unlawfully assisting a voter with a mail

17  ballot under Chapter 86.010.

18  Q.  Of the cases that we've discussed from State 82, did any

19  of these offenses take place at a polling place?

20  A.  I believe all of these so far were with regard to mail

21  ballots.

22  Q.  Okay.  If we go to page 7 and look at Patricia Barton in

23  Medina County.  Did Ms. Barton's case take place at a polling

24  location?

25  A.  Yes, this one did.

JONATHAN WHITE - DIRECT

1  Q.  Can you generally describe with the same level of detail

2  what happened here.

3  A.  Yeah.  This was a violation of Chapter 61.008, which is

4  unlawfully influencing a voter in the polling place, and she

5  was also charged with electioneering.  And this one resulted

6  in a diversion program, but this was not in an assistance — a

7  voter assistance role.

8  Q.  During your time prosecuting election integrity cases for

9  the OAG, would you number the cases that the OAG charged to

10  resolution of plea agreement or conviction or diversion

11  program in the hundreds?

12  A.  Yes.

13  Q.  Brian, could we go to page 11, the Gregg County case for

14  Mr. Brown — or Ms. Brown.  Excuse me.

15      Do you recall — do you have any personal knowledge

16  Mr. White, about the allegations against Ms. Brown in this

17  case?

18  A.  Yes.  It's Mr. Brown.

19  Q.  Mr. Brown.  Sorry.  Shannon.

20      What election was involved, sir?

21  A.  This was the 2018 Gregg County Democratic Primary.  He was

22  the candidate.

23  Q.  And what were the nature of the charges against Mr. Brown?

24  A.  It was an organized vote-harvesting scheme.

25  Q.  And if we scroll over to the right-hand column, what was

3941
JONATHAN WHITE - DIRECT

1  the disposition of that case?

2  A.  Mr. Brown pled guilty and was convicted of election fraud

3  under Chapter 276.013.

4  Q.  Thank you, Mr. White.

5      Brian, could we please bring up State Exhibit 93.

6      Mr. White, are you familiar with this document?

7  A.  Yes.  I drafted this.

8  Q.  Can you describe for the Court what it is.

9  A.  This is the indictment for those charges for Commissioner

10  Brown that we just discussed.

11  Q.  If we go to page 6, was this document signed by the

12  foreperson of the grand jury?

13  A.  Yes, sir.

14  Q.  If we go to page 7, was this document signed by the deputy

15  clerk?

16  A.  Yes.

17  Q.  And Brian, if we can go to the first page Bates number,

18  that's State 098001.

19      Did I read that correctly, sir.

20  A.  Yes.

21  Q.  And the Bates number on the last page.

22      State 098007.  Did I read that correctly?

23  A.  That's correct.

24  Q.  All right.  Brian, can we go to Count 1, please.

25      And before we get into the contents of this document, you

JONATHAN WHITE — DIRECT

1  said that you drafted it.  Did I hear that correctly?

2  A.  Yes.

3  Q.  Is this a case where the Office of the Attorney General

4  was working alongside a local DA, or is this a case that —

5  where the OAG individually prosecuted?

6  A.  Yes, this was prosecuted by the Gregg County District

7  Attorney's Office with our assistance.

8  Q.  Okay.  And does State Exhibit 93 put forth the activities

9  of your office?

10  A.  The results of those activities in — which resulted in

11  a — you know, grand jury charges and an indictment, yes.

12  Q.  And does it put forth matters observed by your office

13  while under a duty to report?

14  A.  Yes.

15        MR. KERCHER:  Your Honor, State defendants offer

16  State Exhibit 93.

17        MS. TULIN:  Your Honor, we would object based on

18  hearsay.

19        MR. KERCHER:  Your Honor, I've laid the predicate

20  that this is an exception to hearsay under 803, public record.

21        THE COURT:  Any other objections?

22        That objection is noted and overruled.  93 is

23  admitted.

24  BY MR. KERCHER:

25  Q.  Mr. White, looking at Count 1, it says, "Engaging in

JONATHAN WHITE — DIRECT

1  organized election fraud with the intent to establish,

2  maintain, and participate in a vote-harvesting organization;

3  said organization consisting of Shannon Brown, Marlena

4  Jackson, DeWayne Ward, and Charlie Burns, who collaborated in

5  committing election offenses under Titles 1 through 7 of the

6  Texas Elections Code."

7      Before I move on, Mr. White, what do you understand that

8  to mean?

9  A.  So this is a violation of Election Code Chapter 276.012, I

10 believe.  It was originally 11, but they passed two sections

11 in the same section, so this, I believe, became 012; and

12 that's organized election fraud.  It was patterned after the

13 State Penal Code offense "Engaging in organized criminal

14 activity," but tuned to deal with election offenses.

15     And so if you engage in offenses under the Election Code,

16 and you are part of a group that is dedicated to achieving

17 those outcomes, then that's where this offense applies.

18 Q.  Okay.  Brian, can we go to Count 2, please.  And let's see

19 the whole count.

20     Generally speaking, Mr. White, what does Count 2 allege?

21 A.  Count 2 alleges a violation of Chapter 84.0041, which is

22 fraudulent use of a mail ballot application, and that's that

23 false information was provided that this voter was disabled,

24 when the voter was not disabled.  That information was

25 provided by the vote harvesters and not the voter.

3944

JONATHAN WHITE – DIRECT

1  Q.  And when we are talking about "the voter" in Count 2,

2  Count 2 mentions Davonia Bradley.  Is that the voter we are

3  talking about?

4  A.  Yes, sir.

5  Q.  Do you understand that Ms. Bradley was disenfranchised by

6  this vote-harvesting scheme?

7  A.  Yes.

8  Q.  Let's go to Count 3, please.

9      What does Count 3 describe, sir?

10  A.  This is the same offense, but for a Yolita Johnson.  It

11  mentions that this offense is enhanced, and it's enhanced to a

12  third degree felony, and that's because it was committed more

13  than once in the same election.

14  Q.  And you mentioned the Yolita Johnson.  Can you tell the

15  Court whether or not you understand Ms. Johnson was

16  disenfranchised by this vote-harvesting scheme?

17  A.  Yes.

18  Q.  Count 4.  Can you describe what this is?

19  A.  Same offense for the voter Terri Thomas.

20  Q.  Count 5.

21  A.  This one is for Ricky Johnson.

22  Q.  Same offense, sir?

23  A.  Yes.

24  Q.  And Count 6?

25  A.  Same offense for Eric Taylor.

JONATHAN WHITE - DIRECT

1  Q.  Count 7?

2  A.  This is for Robert Harvey Jr., same offense.

3  Q.  And Count 8?

4  A.  Same offense for Veronica Moore.

5  Q.  Let's take a look at Counts 9 and 10 now.  These are both

6  entitled "Unlawful possession of a ballot or ballot envelope,"

7  is that right?

8  A.  That's correct.

9  Q.  Can you tell the Court, Mr. White, whether Mr. Brown

10  actually got his hands on ballots or not?

11  A.  That's correct.  That's what these counts indicate.

12  Q.  And Counts 9 and 10 name Davonia Bradley again, as well as

13  Tamika Buchanan, is that right?

14  A.  Correct.

15  Q.  Do you understand Tamika Buchanan was also disenfranchised

16  by this vote-harvesting scheme?

17  A.  Yes.

18  Q.  Let's go to page 5, Counts 19 through 23.  Again, without

19  getting into facts of this case that are not reflected in this

20  exhibit, do these counts share a common scheme?

21  A.  They do.

22  Q.  Generally speaking, what was that scheme as reflected in

23  the exhibit are?

24  A.  The scheme was to -- with intent to harm or defraud the

25  candidate Kasha Williams, who was Mr. Brown's opponent; that

JONATHAN WHITE - DIRECT

1  election records were falsified and submitted to procure mail

2  ballots for voters on the basis of disability when they were

3  not disabled.

4  Q.  Okay.  Brian, if we could go back to State 82 at the top

5  of page 12.

6      Let's look at the first Gregg County case, which you can

7  see refers to Marlena Jackson.  We just read Marlena Jackson's

8  name, is that right?

9  A.  Correct.

10  Q.  What was the allegation against Ms. Jackson?

11  A.  There were more than 100 counts against Ms. Jackson, and

12  they involved the same -- I think the same slate of offenses

13  that Mr. Brown was involved in; all related to an organized

14  vote-harvesting scheme.

15  Q.  Okay.  Brian, can we bring up State 91, please.

16      Do you recognize this document, sir?

17  A.  Yes, I do.  And maybe I misspoke.  This says there were 97

18  counts, so that would not be over 100.

19  Q.  What is this document?

20  A.  This is the indictment that I prepared that was presented

21  to the Gregg County grand jury.

22  Q.  Does this document set forth the activities of your

23  office?

24  A.  Yes.

25  Q.  And does it describe matters observed while under a legal

JONATHAN WHITE - DIRECT

1  duty to report?

2  A.  Yes.

3          MR. KERCHER:  Your Honor, State defendants offer

4  State 91.

5          THE COURT:  Any objection?

6          MS. HOLMES:  We object to this document on hearsay

7  grounds and also relevance, because these are indictments and

8  not convictions.

9          MR. KERCHER:  Your Honor, we've laid the predicate

10  that this as is an exception to hearsay under 8038.  This

11  document is relevant because as we just saw, if we

12  cross-reference this document with State 82, this is not

13  simply an indictment.  This is giving the Court an

14  understanding of what it was that the resolved offenses were

15  charged.

16          THE COURT:  Yeah.  The objection is noted and

17  overruled.  91 is admitted.

18  BY MR. KERCHER:

19  Q.  Brian, can we go back to State 82, please.  Also at

20  page 12.

21      The next Gregg County case is Charlie Burns, Jr. do you

22  see that, Mr. White?

23  A.  Yes.

24  Q.  Are you familiar with that case?

25  A.  Yes, sir.

3948
JONATHAN WHITE – DIRECT

1  Q.  And if we scroll over to the right-hand column of

2  Mr. Burns' case, Mr. Burns was convicted.  Is that your memory

3  as well?

4  A.  That's correct.

5  Q.  Brian, can we pull up State 92.

6      Do you recognize State 92, Mr. White?

7  A.  Yes, sir.

8  Q.  What is it?

9  A.  This is the indictment, also that I drafted, for Charlie

10 Burns, Jr., the same type of vote-harvesting offenses in this

11 same matter that was presented to the Gregg County grand jury.

12 Q.  Does this document set out the activities of your office?

13 A.  Yes, it does.

14 Q.  Does it set out matters observed while under a legal duty

15 to report?

16 A.  Yes.

17         MR. KERCHER:  Your Honor, State offers State 92.

18         THE COURT:  Any objection?

19         MS. HOLMES:  One moment, Your Honor.

20         Same objection.  Hearsay, as well as relevance.

21         THE COURT:  And same ruling.  92 is admitted.

22 BY MR. KERCHER:

23 Q.  All right.  If we go back to State 82 again, page 12, the

24 next Gregg County case is DeWayne Ward.  Do you see that?

25 A.  Yes.

JONATHAN WHITE — DIRECT

1  Q.  Do you recall the disposition of this case?

2  A.  Yes.  He was also convicted of same offense as Mr. Burns.

3  Q.  And one more time -- we'll do this one more time,

4  Mr. White.

5      If we could bring up State 90.

6      Do you recognize this document?

7  A.  Yes, sir.

8  Q.  What is it?

9  A.  This is the indictment pertaining to DeWayne Ward that

10 had, I believe, six counts of similar offenses to what we've

11 talked about.

12 Q.  And does State 90 set forth the activities of your office?

13 A.  Yes, it does.

14 Q.  Does it set forth matters observed while under a legal

15 duty to report?

16 A.  Yes, sir.

17     MR. KERCHER:  Your Honor, State defendants offers

18 State 90.

19     MS. HOLMES:  Same objection.  Hearsay and relevance.

20     THE COURT:  Same objection.  90 is admitted.

21 BY MR. KERCHER:

22 Q.  Brian, will you please pull up State 20199, please.  Thank

23 you.  One step ahead of me.

24     Mr. White, do you recognize this document?

25 A.  Yes, sir.

3950

JONATHAN WHITE – DIRECT

1  Q.  Is this document related to the four convicted persons

2  from Gregg County we just discussed?

3  A.  Yes, sir.

4  Q.  And if we scroll down, we see that it says "This is for

5  immediate release."  What generally is this?

6  A.  This is a press release from the Attorney General's

7  Office.

8  Q.  Do you have personal knowledge of the information in this

9  press release?

10  A.  Yes.

11  Q.  Is the information in this press release true?

12  A.  I would say for the most part yes, sir.

13  Q.  When you say "for the most part," I'm terrified to ask the

14  next question.

15  A.  Sorry.

16  Q.  Is there any portion of this document where the

17  information is not correct or true?

18  A.  You know, I think anytime you have a press release, you

19  have some representations that are up for debate or

20  interpretation, but in terms of the factual statements about

21  the case, yes, they are accurate.

22  Q.  Then I'm going to move along.

23      Brian, can you please pull up LUPE 309.

24      Mr. White, what is this document, if you know?

25  A.  This is a press release involving a case we investigated

JONATHAN WHITE — DIRECT

1  and assisted with Denton County in investigating in Carollton,

2  Texas.

3  Q.  And who was arrested in this case?

4  A.  Zul Mohamed.

5  Q.  Do you have the personal knowledge of the facts related in

6  this press release?

7  A.  Yes, sir.

8  Q.  Is the information in this press release true?

9  A.  Yes.

10  Q.  How did you get personal knowledge about this case,

11  generally speaking?

12  A.  We were — we were asked in by the Denton County Sheriff's

13  Office to assist with an election offense that they were

14  investigating.  I reviewed original election documents and

15  evidence in this case.  I assisted with the preparation of the

16  probable cause affidavit for the search warrant — or search

17  warrants that were run involving this candidate, and we

18  subsequently invested similar allegations in Dallas County,

19  and I was privy to all of those documents as well.  And the

20  original evidence.

21        MR. KERCHER:  Your Honor, State defendants offer

22  LUPE 309.

23        THE COURT:  Any objection?

24        MS. TULIN:  No objection, Your Honor.

25        MS. HOLMES:  I'm sorry.  The HAUL plaintiffs do

JONATHAN WHITE − DIRECT

1  object to the exhibit on hearsay grounds.

2          MR. KERCHER:  Your Honor, we're not offering the

3  document to prove the truth the matter asserted.  Mr. White

4  has testified that the contents of the documents are true, and

5  that testimony we would offer for the truth, but we are not

6  offering the document itself to prove the truth of the matter

7  asserted.

8          THE COURT:  Objection is noted and overruled.

9  LUPE 309 is admitted.

10  BY MR. KERCHER:

11  Q.  Without going outside the facts described in LUPE 309, can

12  you describe for the Court the conduct with which Mr. Zul has

13  been charged?

14  A.  Yes.  Mr. Mohamed, as it says in the press release,

15  obtained a virtual mailbox in one of those mailbox stores

16  using a false ID, and then he had directed mail ballot —— or

17  he submitted mail ballot applications to have mail ballots

18  directed from at least 84 voters to that mailbox, and he was

19  arrested in possession of 25 actual mail ballots.

20  Q.  As reflected in LUPE 309, was Mr. Mohamed —— I'm sorry was

21  Mr. Zul —— I'm sorry.  Can you tell me —— because I have heard

22  it both ways.  Is it Mr. Zul or is it Mr. Mohamed?

23  A.  Zul Mohamed.

24  Q.  Thank you.  Again, without exceeding the contents of

25  LUPE 309, was Mr. Mohamed a candidate for office?

JONATHAN WHITE – DIRECT

1  A.  Yes.

2  Q.  Which office?

3  A.  Mayor of Carrollton.

4  Q.  Thank you, Brian.  We can pull this down.

5      We have so far, Mr. White, been talking about election

6  integrity cases prosecuted either exclusively by your office

7  prior to the *Stephens* decision or in concert with local DAs

8  after the *Stephens* decision.  Do the election integrity cases

9  that we have discussed today include election integrity cases

10 brought exclusively by local DAs?

11 A.  Yes.

12 Q.  To your knowledge, does the federal government also

13 prosecute election integrity cases?

14 A.  Yes.

15 Q.  Generally speaking, is there an overlap in the kind of

16 conduct that is regulated and prosecuted by the federal

17 government and by Texas prosecutors regarding election

18 integrity?

19 A.  Yes.

20 Q.  Brian, could you please bring up Texas Legs 0004047

21 through 49.

22     Mr. White, do you recognize this letter?

23 A.  Yes, sir.

24 Q.  To whom is the letter addressed?

25 A.  This was directed to Senator Bryan Hughes, who was the

JONATHAN WHITE – DIRECT

1   Chair of the Senate Select Commission on election integrity
2   back in 2018.
3   Q.   Who wrote this letter, if you know?
4   A.   That would have been myself and then deputy first
5   assistant, now a district judge in the Northern District,
6   Brantley Starr.
7   Q.   What was the purpose of this letter?
8   A.   We were coming off of SB 5, which was a mail ballot
9   security bill that was passed in the special session of the
10  85th Legislature, and we were directing this committee toward
11  what next steps might be to secure election integrity in
12  Texas.
13  Q.   And we talked about the date of this letter being 2018.
14  Are the concerns about closing loopholes in Texas election
15  integrity laws reflected in this letter the result of anything
16  that happened in the 2020 Election?
17  A.   No.
18  Q.   Do you have personal knowledge of the information
19  reflected in this letter?
20  A.   Yes.
21  Q.   Is that information true?
22  A.   Yes.
23          MR. KERCHER:  Your Honor, State defendants offer
24  Texas Legs 0004047 through 49 as State Exhibit 319 not for the
25  truth of the matter asserted.

JONATHAN WHITE — DIRECT

1           THE COURT:  Any objections?

2           MISS PERALES:  Yes, Your Honor.  It is offered for

3    the truth of the matter asserted and, thus, it's hearsay, but

4    even if it's not offered for the truth of the matter asserted,

5    then, you know, for what purpose is it offered?  If it's

6    offered for its impact on the legislators who received it,

7    then we believe that there's a sword—and—shield issue that

8    comes up because of the assertion of legislative privilege by

9    those legislators.

10          Essentially, we're going to have an exhibit entered

11   into evidence that tells one side of the story, but we're

12   unable to probe the rest of it.

13          MR. KERCHER:  I'll address the hearsay concern first.

14          Mr. White has testified on the stand under oath that

15   the contents of the exhibit are true, and so we do not need to

16   offer it to prove the truth of the matter asserted.  We have

17   that via different testimony.

18          This is not a sword—and—shield problem.  We're not

19   offering this to show the effect on the legislators but to

20   show that there is a state interest by those who prosecute

21   Texas election integrity in closing loopholes in Texas

22   election integrity that have nothing to do with what the

23   plaintiffs have term "the Big Lie."

24          THE COURT:  But doesn't this have to be before the

25   legislature that enacted SB 1?  This is a 2018 letter.  I

JONATHAN WHITE - DIRECT

1  don't understand that.

2       MR. KERCHER:  This is not offered, Your Honor, to

3  show that it was the impetus of SB 1, but rather to show there

4  is an ongoing state interest in closing election law.  It is

5  precisely because these concerns were raised prior to SB 1

6  that it goes to the weight of testimony about valid and good

7  faith concerns about closing loops in Texas election integrity

8  law.

9       MISS PERALES:  Your Honor, with all respect to my

10  friend Mr. White, I don't believe that any interest that

11  Mr. White might have as an individual prosecutor constitutes

12  state interest, as Mr. Kercher has framed it.  The interest

13  would come from Senator Hughes, and this loops back into the

14  sword-and-shield problem.  We're getting one side of it, but

15  we're unable to probe the other side.

16       THE COURT:  Yeah, this is going to need to come from

17  a legislator to say, "I was thinking about these issues as far

18  back as 2018."  I mean, you are presenting argument in the

19  form of sort of evidence.

20       The objections are noted.  Sustained.  319 is not

21  admitted.

22  BY MR. KERCHER:

23  Q.  Brian, can you please bring up State Exhibit 87.

24       Mr. White, do you recognize this document?

25  A.  Yes, sir.

JONATHAN WHITE – DIRECT

1   Q.  What is it?

2   A.  This is the spreadsheet or chart that's kept by our

3   investigative unit of all of the referrals that they receive,

4   whether from the Secretary of State or other sources.

5   Q.  Okay.  Was this document made during the regular course of

6   your Division's business?

7   A.  Yes.

8   Q.  Was it kept in the regular course of business?

9   A.  Yes.

10  Q.  Was it made at or near the time of the event or condition

11  recorded?

12  A.  That's correct.

13  Q.  Was it made by or from information transmitted by someone

14  with knowledge of the event or condition recorded?

15  A.  Yes.

16         MR. KERCHER:  Your Honor, State defendants offer

17  State Exhibit 87.

18         THE COURT:  Any objection?

19         MS. TULIN:  Your Honor, we do object.  We –– I

20  understand that Mr. Kercher has just laid the foundation for

21  the business record exception, but there is still hearsay

22  within hearsay problem.

23         MR. KERCHER:  I believe counsel is referring to ––

24  and Brian, if you could show us the column on the right-hand

25  side, which is the allegations –– these allegations, Your

JONATHAN WHITE – DIRECT

1  Honor, would not be offered to prove the truth of the matter

2  asserted, but merely to show that this is the information that

3  was referred to the Office of the Attorney General.

4          THE COURT:  That objection is noted and overruled.

5          Any other objections?

6          No other objections.  87 is admitted.

7          I'm kind of curious, though, how does 87 differ from

8  89?

9          THE WITNESS:  Would you like me to answer that, Your

10  Honor?

11         THE COURT:  Either way, yeah.

12         THE WITNESS:  So this is a spreadsheet that tracks

13  the referrals that were submitted for potential investigation

14  at the investigation level.  The prosecution spreadsheet is a

15  spreadsheet of prosecution results in court or cases pending

16  in court.

17         THE COURT:  And so both in 87 and 89, I don't see

18  numbers.  I'm assuming there was a lot more of 87 than there

19  was in 89, if we counted them.

20         THE WITNESS:  If we get the numbers correct, yes.

21         THE COURT:  Okay.  Now I get it.

22         THE WITNESS:  More on the referral spreadsheet than

23  the results spreadsheet, yes.

24         MR. KERCHER:  Your Honor, as we described for the

25  Court previously, we are going to break Mr. White's testimony

JONATHAN WHITE - DIRECT

1  into two pieces.  The first will be that evidence which we

2  believe does not infringe upon the Court's ruling on the

3  motion in limine, in which case plaintiffs will now have the

4  opportunity to cross-examine him on this portion of his

5  direct.

6          Following this, we will make our offer of proof.

7  Plaintiffs will ask for some time to prepare their cross and

8  then cross him on that portion.

9          I pass the witness for this purpose, Your Honor.

10          MR. NICHOLS:  If there's additional questions from

11  the defense side, would you like me to ask now?

12          THE COURT:  I don't care.  Go ahead.

13          MR. NICHOLS:  Okay.

14  BY MR. NICHOLS:

15  Q.  Good morning, Mr. White.

16  A.  Good morning.

17  Q.  You and I have known each other a little bit of time, is

18  that right?

19  A.  Going back, yes.

20  Q.  I think at the time you were hired into the AG's office,

21  at that time was -- was I the deputy for criminal justice?

22  A.  That's correct.

23  Q.  Okay.  So just a few follow-up questions on what you've

24  told the Court already.  The first is with respect to your

25  testimony about the duty of a district attorney under Texas

JONATHAN WHITE – DIRECT

1   law.

2       And, Brian, could we pull up Article 201 of the Texas Code

3   of Criminal Procedure?

4       Mr. White, do you see that on your screen?

5   A.   Yes, sir.

6   Q.   You were asked by counsel for the State defendants about

7   the duty of a district attorney in the state of Texas.  Do you

8   remember that?

9   A.   Yes.

10  Q.   If anyone were to ask you:  "Where do I go to find what

11  the duty is of a district attorney," is this the section that

12  you would refer them to?

13  A.   Yes, this and relevant portions of the Constitution.

14  Q.   Sure.  And you see that in Article 201, the fourth line

15  down, could you please read the sentence beginning "It shall

16  be."

17      Fourth line from the bottom.

18  A.   Ah, fourth from the bottom.  Okay.

19  Q.   My bad.

20  A.   "It shall be the primary duty of all prosecuting

21  attorneys, including any special prosecutors, not to convict

22  but to see that justice is done.  They shall not suppress

23  facts or secrete witnesses capable of establishing the

24  innocence of the accused."

25  Q.   And does Texas law also explicitly, unlike the federal

JONATHAN WHITE – DIRECT

1  Constitution, encapsulate and embody and codify the

2  presumption of innocence?

3          MISS PERALES:  Objection.  Leading.

4          THE COURT:  Sustained.

5  BY MR. NICHOLS:

6  Q.  Can you tell us whether or not Texas law, unlike federal

7  law, explicitly codifies the presumption of innocence?

8  A.  It does.

9  Q.  And Brian, I'm going to test your internet skills, but is

10 it possible for you to pull up Penal Code Section 201?

11      And Mr. White, are we now looking on the screen at

12 Section 201 of the Code of Criminal Procedure?

13 A.  The Texas Penal Code, yes, sir.

14 Q.  I'm sorry.  Texas Penal Code.  Let me get to the Code of

15 Criminal Procedure in a second.

16      But the penal code, Section 201, does it explicitly set

17 out the presumption of innocence under Texas law?

18 A.  Yes, it does.

19 Q.  And I'm going to try you one more time, Brian.  Sorry to

20 put you to the test.  Code of Criminal Procedure, 3803, 38.03.

21      And so does the –– does Texas law –– can you tell me

22 whether or not Texas law codifies the presumption of

23 innocence, unlike the federal system, not just once, but

24 twice?

25 A.  Yes, sir, in Article 38.03.

3962

JONATHAN WHITE — DIRECT

1  Q.  And so do we see in Article 38.03 that:  "All persons are
2  presumed to be innocent, and no person may be convicted of an
3  offense unless each element of the offense is proved beyond a
4  reasonable doubt."
5      Did I read that correctly?
6  A.  Yes, that's correct.
7  Q.  And does Texas law also provide the fact that ——
8  unfortunate choice of gender —— "He has been arrested,
9  confined, or indicted for, or otherwise charged with, the
10 offense gives rise to no inference of guilt at his trial."
11     Did I read that correctly?
12 A.  That's correct.
13 Q.  Now, you also talked a little bit about investigations
14 during your testimony in direct with the counsel for the State
15 defendants, talked a little bit about who prosecutes election
16 code offenses.  We didn't really talk —— you didn't really
17 talk too much about who investigates it or what type of law
18 enforcement agencies investigate offenses in Texas, including
19 Election Code offenses.
20     Do various counties in Texas have a sheriff's office?
21 A.  Yes.
22 Q.  And is the sheriff's office a law enforcement agency in
23 the state of Texas?
24 A.  Yes.
25 Q.  And do sheriff's offices, in your experience across the

JONATHAN WHITE — DIRECT

1  state of Texas, investigate offenses that arise under the

2  Election Code?

3  A.  Occasionally.

4  Q.  And same thing with respect to, do various municipalities

5  and other localities have police departments?

6  A.  Yes, they do.

7  Q.  Are those law enforcement agencies?

8  A.  Yes.

9  Q.  And do those local law enforcement agencies from time to

10  time investigate potential violations of Texas law, including

11  Election Code violations?

12  A.  Yes.  And they have the authority to do so, yes.

13  Q.  And then in various localities in the state of Texas —

14      And Judge, you cut me off if I'm doing too much of a

15  civics lesson.

16      In various counties in the state of Texas, are there

17  officials called "constables"?

18  A.  Yes.

19  Q.  And do constables, depending on the jurisdiction, have

20  criminal jurisdiction over violations of the — of Texas law

21  that occur within their county; in other words, the county in

22  which they sit?

23  A.  I think that's probably true.

24  Q.  Yeah.  And you also mentioned that from time to time that

25  federal authorities look at Election Code or election

JONATHAN WHITE – DIRECT

1  irregularities.  So do those agencies, in your experience,

2  include the Federal Bureau of Investigation, for example?

3  A.  Correct.

4  Q.  Now, you talked a little bit about the authority that the

5  Attorney General's Office has to prosecute cases, so let's

6  just make sure that the record is clear on those.

7      I'm going to –– you were already on the Code of Criminal

8  Procedure, Brian, so could you pull up Article 207.

9      And you referred to a situation called an "attorney pro

10  tem," I believe, Mr. White, during your earlier testimony.

11  Did I hear that correctly?

12  A.  Yes.

13  Q.  Is this the section of Texas law that governs the

14  situation involving attorneys pro tem?

15  A.  That's correct.

16  Q.  And this is Article 207 of the Code of Criminal Procedure?

17  A.  Yes, sir.

18  Q.  And so under this provision, which the Court would look

19  at, read for the Court's –– at the Court's own leisure, under

20  this provision, under certain circumstances under the statute,

21  can the Attorney General's Office, in essence, be appointed as

22  the attorney for the State by a court?

23  A.  Correct.

24  Q.  And in those situations, does the representative of the

25  Attorney General's Office actually act as the attorney for the

JONATHAN WHITE - DIRECT

1  State in that case in which the office is appointed as an
2  attorney pro tem?
3  A.  Yes.  The attorney steps into the shoes of the district
4  attorney and uses that authority, and not the attorney's own
5  authority from wherever that attorney came from.  You
6  essentially step into the shoes of the local DA.
7          THE COURT:  Let me make sure I understand what's
8  happening post-*Stephens* now.  So post-*Stephens*, the Office of
9  the Attorney General or no Assistant Attorney General can
10 prosecute, right?
11         THE WITNESS:  Under their own authority, yes.
12         THE COURT:  Right.  But then under this section, an
13 Assistant Attorney General steps into the shoes of a District
14 Attorney.  Does the Assistant Attorney General still get paid
15 by the Attorney General's Office as they are doing these
16 duties?
17         THE WITNESS:  They would, and we —
18         THE COURT:  So this is like a work-around *Stephens*?
19         THE WITNESS:  Not really.  And *Stephens* didn't
20 actually mention the attorney pro tem scenario specifically.
21 They mention when an AAG might be appointed by a DA as a
22 special ADA and serve that way, but this would be analogous.
23 We have had prosecution assistants divisions going back
24 decades at the AG's office.  We are a resource for local
25 prosecutors when they need special expertise or they need to

3966

JONATHAN WHITE – DIRECT

1  get out of a case because of a court conflict, and so we've

2  done that for many decades.

3       THE COURT:  Just curious to me that under *Stephens*

4  they say, no, you can't do it, but then the Assistant Attorney

5  General is still getting paid by the Attorney General's

6  Office, and they prosecute it.  Just seems odd.

7       And then I guess the other odd part about it is

8  recent legislation passed takes away the power of the district

9  attorney to not prosecute certain matters, so do local

10  district attorneys, if they are presented evidence of ––

11  sufficient evidence of election fraud under this other

12  scenario that I'm thinking about –– I can't remember the

13  legislation –– do they have to prosecute the case?

14       THE WITNESS:  If I'm familiar with the law that was

15  passed, there's still going to be room for prosecutorial

16  discretion, so I don't think there's going to be any situation

17  where a local prosecutor is actually forced to prosecute a

18  case they don't believe should be prosecuted.

19       THE COURT:  But under this legislation, does the

20  Attorney General have the authority to remove the DA if the

21  Attorney General thinks that the DA is abusing its

22  discretionary powers?

23       THE WITNESS:  I have not seen a bill to that effect.

24       MR. NICHOLS:  I think, Judge, if I can help.  I think

25  the statute you are referring to is an amendment in the most

JONATHAN WHITE - DIRECT

1  recent legislative session to the statute under the — I
2  believe it's the local government code that deals with
3  removal.  So it's not — I mean, you can — don't need to take
4  my word for it.  You can go back and look at it, but the
5  concept under that is that a programmatic declaration by a
6  district attorney that he or she will not prosecute any
7  particular class of cases — don't hold me to the exact
8  language — is now included as one of the grounds in which
9  citizens, for example, could file a removal.
10          So it's not an affirmative duty — that's my read of
11  it.  You can read it.  It's not an affirmative duty on the
12  part of a district attorney to prosecute any particular case.
13  BY MR. NICHOLS:
14  Q.  But just to tie the loop together on the Court's
15  questions, so Article 207 still exists under Texas law
16  post-*Stephens*, correct?
17  A.  Correct, that's my understanding.
18  Q.  And so — and just to help with the Court's questions,
19  just to make sure it's clear, if you look at the fifth line or
20  the start of the fourth line to the fifth line, it's actually
21  the Court — the judge of the Court in which the attorney
22  represents the State that enters an order appointing the
23  Attorney General to be pro tem, correct?
24  A.  That's correct.  And it would follow a motion for a
25  recusal by that DA.

JONATHAN WHITE – DIRECT

1  Q.  Right.  So, for example, if there is a situation, an
2  Election Code situation where the person who may be accused of
3  an Election Code violation is a local official and the
4  district attorney feels like there may be a conflict, is that
5  one of the situations in which you might see a — such a
6  recusal motion?
7  A.  Correct.
8  Q.  All right.  And let's tie the Court's question down
9  further.
10      Last time, Brian.  I promise.  Government Code 402.028.
11          MR. NICHOLS:  And Judge while, he's pulling it up, I
12  appreciate the Court's questions, because there's been a lot
13  of talk, especially recently in Texas proceedings, about what
14  an attorney pro tem is, what a special prosecutor is; so I
15  appreciate the Court's questions, because I think there is
16  some uncertainty about what all this means.
17  BY MR. NICHOLS:
18  Q.  So you talked about how a representative of the Attorney
19  General's Office can, in effect, be deputized to serve under
20  the direction of an elected district attorney?
21  A.  Yes.
22  Q.  And is this the section that we're talking about,
23  Government Code Section 402.028?
24  A.  Correct.
25  Q.  And does this make it clear that someone from the Attorney

3969
JONATHAN WHITE - DIRECT

1  General's Office may provide assistance in the prosecution of

2  all manner of criminal cases when appointed to do so by the

3  local prosecutor?

4  A.  That's correct.

5  Q.  Now, with respect to just a couple more subjects, and I'm

6  going to be done.

7      With respect to State 89, could we pull that back up?

8      Now — and then if we go to — and we can look at as much

9  of this as we need to, but was this presentation, as I

10  understand it, State Exhibit 89, was this pre-SB 1?

11 A.  Correct.

12 Q.  In other words, all the information about cases and the

13 types of cases that you're seeing, this all was created before

14 the legislature passed SB 1?

15 A.  That's correct.

16 Q.  Last subject.  You were asked a little bit about illegal

17 voting, and I just want to ask you a few additional questions

18 on that.

19     Has it been — kind of crazy question.  Has it been

20 illegal in the state of Texas to illegally vote for quite a

21 long time?

22 A.  Yes.

23 Q.  And, Brian, if we just pull up Joint Exhibit 1 — and

24 actually, let me grab one other thing, Judge.

25          MR. NICHOLS:  Your Honor, may I approach?

JONATHAN WHITE — DIRECT

1          THE COURT:  Yes.

2    BY MR. NICHOLS:

3    Q.  Mr. White, I'm going to hand you a copy of the Title 6 of

4    the Election Code as printed off of the Texas legislature

5    online website.  And I'm going to direct your attention to

6    page 5 of 9.

7    A.  Yes, sir.

8    Q.  And on page 5 of 9, does that have the Section 64.012?

9    A.  Correct.

10   Q.  What is the title of that provision of law?

11   A.  "Illegal Voting."

12   Q.  Is this the illegal voting offense that you spent time

13   talking to the Court about today?

14   A.  Yes, sir.

15   Q.  And then if you look helpfully at the bottom of the

16   statute, does it have kind of the legislative history in terms

17   of when the statute was first enacted?

18   A.  Correct.

19   Q.  And was the statute of illegal voting under the Election

20   Code -- not even taking into account prior legal provisions --

21   was it enacted in 1985?

22   A.  This version of the statute was, yes.

23   Q.  And, of course, the statute has been amended over the

24   years, correct?

25   A.  Correct.

JONATHAN WHITE - DIRECT

1  Q.  But in terms of the base offense of it being illegal to

2  vote illegally in Texas elections, has that been a part of

3  Election Code since 1985?

4  A.  Yes.  And before that in prior versions.

5  Q.  Yes, sir.  And so now if we go over to Joint Exhibit

6  Number 1, and we go over to — I'm sorry.  It's Joint Exhibit

7  Number 1.  Oh, you got it.  If we go to Section 903.

8      So you see that there's a section of SB 1 entitled

9  "Section 903"?

10  A.  Yes, sir.

11  Q.  And so here the — does this represent one of the

12  amendments to the illegal voting offense that have occurred

13  over the course of Texas history?

14  A.  Correct.  This would be the most recent.

15  Q.  And so let's just walk the Court through the changes that

16  were actually made to the statute in Section 903.  Bottom

17  line, was the one change that the *mens rea* requirement went

18  from just "knowingly" to "knowingly or intentionally"?

19  A.  Correct.

20  Q.  And then was there a second change that included another

21  method of voting illegally.  If one voted or attempted to vote

22  in an election in the State of Texas after voting in another

23  state in an election in which the federal office appears on

24  the ballot and the Election Day for both states is the same

25  day?

JONATHAN WHITE - DIRECT

1  A.  We believe that was always illegal under subsection(a)(1),
2  but this clarifies any issue with that.
3  Q.  Okay.  Then let's go to the rest of Section 903.  And not
4  to hide the headline, but as part of 903, was the penalty for
5  illegal voting, was it actually reduced?
6  A.  Yes.  It was reduced from a second degree felony to a
7  Class A misdemeanor.
8  Q.  And did it also —— in Section C of 903, did it also
9  contain some other protections in terms of not —— a person not
10  being convicted solely upon the fact that a person signed a
11  provisional ballot affidavit?
12  A.  That's correct.
13  Q.  And Mr. White, do you know whether anyone in this
14  courtroom is challenging Section 9.03 of SB 1 as being somehow
15  unconstitutional or violative of some federal statute?
16  A.  I'm not aware of that.
17         MR. NICHOLS:  Thank you, Judge.
18         THE COURT:  Any other questions on this side?
19         Why don't we take a break before we do cross.  So
20  let's take a 10 or 15.
21     (Recess)
22         MR. NICHOLS:  Judge, just one other topic I talked to
23  the other side about just real quick.
24         THE COURT:  Go ahead.
25

3973

JONATHAN WHITE - DIRECT

1  BY MR. NICHOLS:

2  Q.  Mr. White, I wanted to ask you briefly about the oath of

3  assistance that an assister needs to sign at the polling place

4  in order to assist a voter in the actual voting process.  Are

5  you familiar with that general concept?

6  A.  Yes.

7  Q.  And so if we go back — and Brian, if we could go back to

8  Joint Exhibit Number 1.

9      *(Discussion off the record)*

10 BY MR. NICHOLS:

11 Q.  So if we go to — and go to Section 604, please.  And so

12 you see that — are you familiar with the fact that SB 1

13 changed the form of the oath; in other words, added some

14 language, took out some language, that kind of thing?

15 A.  Yes.

16 Q.  And so there's been some testimony to the Court that I

17 wanted to kind of get your vantage point on about the

18 inclusion here.  It says — under the change under SB 1, it

19 says, "I swear or affirm" and the words are added "under

20 penalty of perjury."  Do you see that?

21 A.  Yes, sir.

22 Q.  And then if you look at — could you also pull up HAUL 89.

23      And this is already in it the record, Judge.

24      It says — do you see there under the Oath of Assistance

25 form that a person would actually sign at the polling place,

3974

JONATHAN WHITE - DIRECT

1  it has that language, "I swear or affirm under penalty of
2  perjury"?
3  A.  Yes.
4  Q.  And all I want to ask you is, obviously, there was an oath
5  of assistance that preexisted SB 1, correct?
6  A.  Correct.
7  Q.  And regardless of whether or not it said "Under penalty of
8  perjury," were there provisions of Texas law, criminal law
9  that could be implicated if someone falsified or
10 misrepresented themselves with respect to this oath of
11 assistance?
12 A.  I can think of two off the top of my head.  One would be
13 perjury would have applied, to the original oath, and that's
14 Chapter 37.02, I believe, of the penal code.
15     Also Chapter 276.013, Election Fraud that we discussed
16 earlier, had the text up on the screen, if you provide a false
17 statement or a misleading statement to an election official,
18 then that would be a violation of 276.013 as well.
19 Q.  Regardless of whether you have the language "under penalty
20 of perjury"?
21 A.  Correct.
22 Q.  And let me just test your memory a little bit.  Is there
23 also a Texas Penal Code provision that's called "Tampering
24 with governmental record"?
25 A.  There is.

JONATHAN WHITE - CROSS

1  Q.  And so if someone signed an Oath of Assistance document

2  like one that was kept at a polling place, official

3  governmental record, and falsified that, would that tampering

4  with the governmental record criminal statute also potentially

5  come into play?

6  A.  Correct.  That's Section 37.10, I believe, of the penal

7  code.  Oh, yeah, there it is.

8          MR. NICHOLS:  That is all, Judge.  And I appreciate

9  the indulgence.

10          THE COURT:  Any cross?

11          MISS PERALES:  Yes, Your Honor.  May I approach the

12  witness?

13          THE COURT:  Yes.

14          MISS PERALES:  Your Honor, I request permission to

15  ask leading questions under Federal Rule of Evidence 611(c)(1)

16  because Mr. White is employed by the Texas Attorney General

17  and is thus an adverse party.

18          MR. KERCHER:  No objection.

19          THE COURT:  Go ahead.

20          MISS PERALES:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22  BY MISS PERALES:

23  Q.  Good morning, Mr. White.

24  A.  Good morning.

25  Q.  My name is Nina Perales.  I represent the LUPE plaintiffs,

JONATHAN WHITE — CROSS

1  and we've met more than once at your depositions, is that
2  right?
3  A.  That's right; three times prior to this.
4  Q.  I'm so sorry for that.
5      I'd like to start not with your job responsibilities when
6  you were the chief of the division, but shifting over slightly
7  to something else that you did, which was that when the
8  legislature was in the process of drafting some of Senate Bill
9  1 predecessor bills, you were involved in assisting
10 legislators, is that correct?
11 A.  Yes, I believe I was involved to some degree in that
12 process yes, ma'am.
13 Q.  And you were asked by legislators to provide guidance
14 regarding portions of those bills, correct?
15 A.  I think so, yeah, that would be true.
16 Q.  Thank you.
17     And you take the position that the communications you had
18 in advising legislators with regard to pending legislation is
19 covered by privilege, and that could include things like facts
20 you shared when provided in that context, correct?
21 A.  Yes, I think I would agree with that.
22 Q.  And you also take the position that legislative privilege
23 could also be involved where the legislator's mental
24 impressions could be revealed by the nature of the question
25 the legislator asked you and the answers that you provided

JONATHAN WHITE - CROSS

1  back to the legislator, correct?

2  A.  Yes, ma'am.

3  Q.  Now, you were asked by legislators to testify on SB 1 and

4  its predecessor bills, correct?

5  A.  Yes, ma'am.

6  Q.  But you won't talk about which portions of the SB 1

7  predecessor bills you were asked by legislators to either

8  testify on or provide guidance on, is that right?

9  A.  I don't recall specific — I don't recall whether specific

10  provisions were discussed at this point actually, so...

11  Q.  My question is slightly different.  My question is that

12  you won't, because of the legislative privilege, talk about

13  which portions of the SB 1 predecessor bills you were asked by

14  legislators to provide guidance on, for example?

15  A.  Yeah.  I think there would be two reasons for that, for

16  potentially the privilege that you stated, but also the fact

17  that at this point I don't have a distinct memory of what

18  those sections might have been.

19  Q.  And because of the legislative privilege, you won't tell

20  us what legislators asked you to testify about with respect to

21  SB 1's criminal provisions, correct?

22  A.  Yes, it would be the same answer.

23  Q.  And because of the legislative privilege, you won't tell

24  us what the legislators asked you to testify about with

25  respect to SB 1's assister oath provisions, is that correct?

3978

JONATHAN WHITE - CROSS

1  A.  And I'm just searching to see if I even have a memory of

2  that at all, but I think it would be the same answer.  It

3  would be both privilege and lack of memory as to whether that

4  even occurred.

5  Q.  And then my final similar question.  Because of the

6  legislative privilege, you won't tell us what legislators

7  asked you to testify about with respect to SB 1's mail ballot

8  ID provisions, correct?

9  A.  Same answer.  I don't recall any of that, and I think the

10  privilege would probably apply if I did.

11  Q.  I'd like to display State Exhibit 1, which is SB 1,

12  Section 4.06, page 27, lines 12 through 15.  These are

13  provisions we've gone over with the Court a number of times,

14  so I won't have you read it out loud.

15      But I just want to confirm with you that you understand

16  the term "an election officer" to include the election judge

17  at the polling place, correct?

18  A.  Yes, ma'am.

19  Q.  Let's go to page 29, lines 4 through 11.  That's

20  Section 4.09.

21      You don't know what action would obstruct the view of a

22  watcher, do you?

23  A.  No.  That would be a fact pattern; whatever that action

24  were that the prosecutor would have to consider in this case.

25  Q.  And, in fact, you suppose action that would obstruct the

3979
JONATHAN WHITE - CROSS

1  view of a watcher could be anything, correct?

2  A.  Yeah, any action that fulfills that element of the

3  offense, yes.

4  Q.  And you also don't know what action would be to "distance

5  the watcher" from the activity or procedure, correct?

6  A.  Could be any number of things, I imagine.

7  Q.  And if you learned that in a polling place an election

8  judge had distanced a poll watcher from the voter at a voting

9  machine, that's not enough information upon which you could

10  make a decision whether there was a violation of Section 4.09,

11  correct?

12  A.  That would not reach all of the elements of this offense,

13  that's correct.

14  Q.  And looking at 4.09(a), which is what we are looking at

15  here, you can't give me an example of something that is now

16  unlawful because of this new language, correct?

17  A.  I suppose I could think of something, but these weren't

18  the types of offenses that I have a great deal of experience

19  in prosecuting, so I don't have a whole lot of facts.  But I'm

20  sure I could do so if I needed to.

21  Q.  So do you recall when I took your deposition on April 27,

22  2022?

23  A.  I recall that that happened, yes, ma'am.

24  Q.  All right.  Can we pull up page 134, line 21, to page 135,

25  line 6.  So it's actually line 22.

JONATHAN WHITE - CROSS

1    Do you recall my asking:  "Can you explain to me how this
2    new language in 4.09(a) makes unlawful [verbatim] behavior
3    that previously would have been unlawful?"
4    And your answer is — oh, I'm sorry.  It's page 134, line
5    21.  I asked you:  "So could you give me at least an example
6    of something that might have been lawful before but that is
7    now unlawful."
8    And your answer, which starts on line 24 and runs to 25:
9    "I could try to come up with something, but I typically —
10   that's not what — that's not what — that's not my role.  My
11   role is really to take a set of facts and determine whether or
12   not a law applies, not to do the opposite.  I'm sure there are
13   examples, but I would just — I think I would let the text of
14   the statute sort of have the final word."
15   Was that your answer?
16 A.  Yes, ma'am.
17         MR. KERCHER:  Objection, Your Honor, to the improper
18   impeachment.  We haven't — she failed to establish that there
19   is any contradiction.
20         THE COURT:  There is no contradictions.
21         MISS PERALES:  We can pull that down.  Thank you.
22   BY MISS PERALES:
23 Q.  And although you believe 4.09(a) uses reasonable person
24   standard, you are not comfortable sharing what is the distance
25   of the watcher from an activity at a voting machine that would

1  be reasonable or unreasonable, correct?
2  A.  No.  I don't think I could determine an exact distance
3  that that would be.
4  Q.  Now, in your job as chief of the Election Integrity
5  Division, you dealt with local prosecutors, is that correct?
6  A.  Yes, ma'am.
7  Q.  And you have experienced that local prosecutors have
8  varied interpretations of the same language within the Texas
9  Election Code, correct?
10  A.  I agree with that.
11  Q.  And you agree that if a law is unclear, there are
12  instances where prosecutorial discretion or interpretation
13  might play a role in determining whether a prosecution moves
14  forward, correct?
15  A.  Based on our burden of beyond a reasonable doubt, yes, I
16  think that's true.
17  Q.  Let's display LUPE 182, please.
18      Mr. White, do you recognize this as an investigative
19  report of the Election Integrity Unit?
20  A.  It appears to be yes, ma'am.
21  Q.  And if we look at the synopsis, which is about midway down
22  the page, does it appear to you that this is responding to a
23  complaint by a poll watcher that he was obstructed?
24  A.  Yes, that appears to be the case.
25  Q.  Now, if we scroll down to Bates page 182318, at the top

JONATHAN WHITE – CROSS

1 where it has a paragraph 3 under the words "Introduction,"

2 it's fair to say that the Attorney General investigator

3 recommends prosecuting the county elections administrator, is

4 that right?

5 A.  No.  I don't see that.

6 Q.  Okay.  Do you see here where the investigator from the

7 Office of the Attorney General meets with the Guadalupe County

8 Attorney's Office and presents him with both the physical and

9 digital case file, which included the investigative report and

10 corresponding exhibits?

11 A.  Correct.  That wouldn't be a recommendation for

12 prosecution.

13 Q.  I see.  But —— so thank you ——

14 A.  It's the standard.

15 Q.  —— thank you for the clarification.

16     And so the AG's investigator hands over the material from

17 the investigation to the county attorney, is that right?

18 A.  Correct.

19 Q.  Now, if we go to page 182313, paragraph 1.54, about

20 two-thirds of the way down, do you see the language or the

21 sentence that starts:  "Hayes informed me that she contacted

22 the Texas Secretary of State's Office for guidance on the

23 matter and was told that she did not have to present the tapes

24 to" —— and the name is redacted —— "because the early voting

25 activities were no longer taking place."

JONATHAN WHITE - CROSS

1    Do you see that?

2  A.  I do.

3  Q.  And then the following sentence, "Miss Hayes relayed the

4  information provided by the Secretary of State to" — name

5  redacted — "and he seemed upset that his request was not

6  going to be fulfilled."

7    Do you see that there?

8  A.  I do.

9  Q.  Now, if we go back to page 182318, and we go to the

10  conclusion, paragraph 3.05, we see that ultimately the

11  Guadalupe County Attorney's Office chooses not to prosecute

12  the elections administrator.  Do you see that there?

13  A.  Yes, ma'am.

14  Q.  But it is the case that the elections administrator was

15  investigated by the Attorney General's Office for poll watcher

16  obstruction, based on this report, yes?

17  A.  It appears that an allegation was investigated, and I

18  wasn't familiar with this case because it was after my time,

19  so I don't know the background information here.

20  Q.  Let's take a look at LUPE 183, please.

21    Would you agree with me that this is an investigative

22  report also of the Election Integrity Unit?

23  A.  Yes.  I've not seen this — or I don't recall this

24  document, but that's what it appears to be, yes, ma'am.

25  Q.  And at page 182319 at the synopsis, it also involves the

1  investigation of a complaint regarding obstruction of a poll

2  watcher by an election judge, correct?

3  A.  Not exactly.  A refusal to accept a poll watcher is a

4  different statute, I believe.

5  Q.  It is a different portion of SB 1, isn't it?

6  A.  I would take your word for that, yes, ma'am.  You know the

7  bill a lot better than I do I'm sure.

8  Q.  Possibly not.

9      And here again, if we go to 182331 at the conclusion, the

10 investigator concludes there's not probable cause, is that

11 right?

12 A.  Yes.  In this case, that's what it appears to be.

13 Q.  But the election judge was still investigated and made a

14 part of this investigation.  He was interviewed as part of

15 this, is that right?

16 A.  I would take your word for that on the interview, but,

17 yes, I would agree that an allegation was investigated and

18 came to a "no probable cause" find.

19 Q.  Okay.  We can take that down now.

20     Now, prior to 2020, the Election Integrity Division with

21 respect to complaints from poll watchers that they were being

22 excluded only received a few, a smattering of poll watcher

23 complaints, is that correct?

24 A.  There were a few that I recall.

25 Q.  But then your division saw a spike in 2020 of poll watcher

1  complaining that they had been excluded, is that correct?
2  A.  I'm sorry.  I was referring to 2020 as being the few.  I
3  guess prior to that, pretty few and far between, but there
4  might have been a little bit of a surge there in 2020, yes.
5  Q.  And it's fair to say up until the time that you left the
6  Election Integrity Division that you had not prosecuted any
7  alleged criminal conduct by watchers in the polling place, is
8  that correct?
9  A.  I think neither watchers nor obstruction that I recall.
10  Q.  If we could go back to SB 1, Section 4.01, page 24, line
11  11.  This is the provision where the election judge cannot
12  have the watcher removed other than for a violation of the
13  penal code unless the violation was observed by an election
14  judge or clerk.  Do you see that there?
15  A.  Yes, ma'am.
16  Q.  You would agree with me that there are quite a few
17  offenses that are in the election code that are not in the
18  penal code, correct?
19  A.  Correct.
20  Q.  And you would agree that it's possible to violate a
21  criminal provision of the Election Code without violating the
22  penal code, yes?
23  A.  In general yes, ma'am.
24  Q.  And you agree here in this paragraph G that a presiding
25  judge may not have a duly accepted watcher removed for

JONATHAN WHITE − CROSS

1  violating a criminal provision of the election code unless it

2  was also a violation of the penal code or observed by an

3  election judge or clerk?

4          MR. NICHOLS:  Objection, Your Honor.  That's actually

5  mischaracterizing the provision.  I think it's violating a

6  provision of this code.  I don't think it's limited to —

7          MISS PERALES:  It doesn't say "this code."  It says

8  "Violation of the penal code."

9  BY MISS PERALES:

10  Q.  Do you see that language there, Mr. White, on line 15?

11  A.  I do.  I see a reference on line 13 and line 15 of

12  violations.

13  Q.  Okay.  So would you understand with me that this provision

14  means that unless the act is seen, observed, by an election

15  judge or clerk, the presiding judge may not have the watcher

16  removed for violating the code except if it is a violation of

17  the penal code?

18  A.  I think that's basically correct, yes, ma'am.

19  Q.  So just to put it in real-life terms, if a voter reports

20  to the presiding judge that he saw a watcher trying to

21  influence a voter's vote, which is a crime in the Election

22  Code, but not the penal code, the presiding election judge

23  cannot remove the watcher unless the presiding judge or the

24  election clerk observes that activity?

25  A.  Under this section, I believe so, yes.

JONATHAN WHITE — CROSS

1   Q.  Thank you.

2       Let's go —— I was going to stay in this document.  Let's

3   go to page 51, line 27.  And then flowing on to the next page.

4   Thank you.

5       I'm going to direct your attention to Section 6.03 of SB 1

6   which talks about the submission of information by a voter

7   assister.  With respect to this provision's requirement that

8   assisters provide their relationship to the voter, you believe

9   that having information about assisters who are not related to

10  the voters can help you distinguish between workers with no

11  relationship to the voter versus the folks who are assisted by

12  family members or caregivers, which in your view are the more

13  typical type of legitimate assistance, correct?

14  A.  I think that's basically true, yes.

15  Q.  And when you are talking about normal assistance, you

16  characterize that in terms of voters being assisted by people

17  with whom they have a familial relationship or caregivers,

18  correct?

19  A.  Yes, although a close friend, someone trusted, should be

20  included in that list.  Yes, ma'am.

21  Q.  But, generally, you frame that in terms of caregivers and

22  family members, isn't that right?

23  A.  I think I've said that before, yes, ma'am.

24  Q.  Now, you also agree that you want it to be very easy for

25  people to get the assistance that they need to vote, correct?

JONATHAN WHITE - CROSS

1   A.   Sure.

2   Q.   Nevertheless, there are some situations in which you think

3   there might be -- if we can go down to the oath now.  It's

4   time to go to the oath.  Section 6.04, page 52, line 26, I

5   believe.  Are we on page 52?  I can't tell.  Okay.

6        Starting at line 26 and going over to line 1 of the

7   following page, the oath.  Now, you'll see some of that is in

8   pink, and that was only as a way to mark that some of this is

9   no longer in the statute.

10       There's some language here in the oath:  "I will not

11  suggest by word, sign, or gesture how the voter should vote."

12       Do you see that there?

13  A.   Yes, ma'am.

14  Q.   Now, in a situation where a voter with a memory or

15  cognitive impairment has worked with the assister in advance

16  to go and vote and the assister is in the polling place

17  providing a reminder as to what they had discussed previously,

18  you think that's a tough question whether it violates the

19  oath, isn't that correct?

20  A.    In a technical sense of interpreting this statute to that

21  specific set of facts, yeah, I think that's tough.  In terms

22  of prosecutorial discretion, probably not.

23  Q.   And then you believe that the activity of the assister to

24  provide somebody with a memory or cognitive impairment with a

25  reminder of that or a prompt of that past conversation does

JONATHAN WHITE - CROSS

1  potentially violate that language in the oath:  "I will not

2  suggest by word, sign, or gesture how the voter should vote,"

3  correct?

4  A.  In a technical sense, yes, ma'am.

5  Q.  And you think it's an interesting question whether such

6  assistance would potentially violate the Election Code, right?

7  A.  Yes, because you have to look at what the intent of the

8  law was versus the actual language and see there might be

9  conflict there, yes, ma'am.

10  Q.  And even though you haven't personally come to a

11  conclusion about this question, you would agree with me that

12  an assister, before signing the oath of assistance, has to

13  make that determination for themselves whether that behavior

14  would violate the oath, correct?

15  A.  I think that's fair to say that anyone who takes this oath

16  is determining what that means to them.

17  Q.  Now, I think we've gone you've gone over this a little bit

18  before, but if an assister disregards a voter's preference

19  when marking the ballot, that assister can be charged under

20  464.036, correct?

21  A.  Among others, yes, ma'am.

22  Q.  Yes, unlawful assistance.  Then there's 64.012, "Illegal

23  Voting," yes?

24  A.  Yes, ma'am.

25  Q.  And then also 276.013, "Election Fraud," yes?

JONATHAN WHITE — CROSS

1  A.  Yes, ma'am.

2  Q.  And if an assister tried to influence or coerce a voter's

3  vote, the assister could be charged under 64.036, "Unlawful

4  Assistance," yes?

5  A.  Yes, ma'am.

6  Q.  And possibly 276.013, "Election Fraud," correct?

7  A.  I would agree with that.

8  Q.  And those provisions have all been in the Texas Election

9  Code before SB 1, correct?

10  A.  Yes, ma'am.

11  Q.  Let's look a little higher in the oath.  It's still there.

12  We don't have to move anywhere.

13      On line 26 where it says, "I swear or affirm under penalty

14  of perjury," you see that language — you've already discussed

15  it a little bit with my friend, Mr. Nichols.  Do you see that

16  there?

17  A.  Yes, ma'am.

18  Q.  Now, you agree that the new language, quote, "under

19  penalty of perjury," unquote, does alert the assistant that

20  the oath that they are making is subject to penalty of perjury

21  and they may or may not have thought of that when they took an

22  oath previously, and you think it does put them on some sort

23  of notice, correct?

24  A.  Yeah, for those not familiar, then, yes, I think it

25  absolutely would.

JONATHAN WHITE - CROSS

1  Q.  And now, with respect to the representation of eligibility

2  for assistance, that's on line 27 and 1, you think that the

3  oath probably requires the assistant to obtain a

4  representation of eligibility from the voter, correct?

5  A.  Yes, ma'am.

6  Q.  And you agree with me that the assister oath does not set

7  out the criteria for eligibility for assistance for a voter,

8  correct?

9  A.  Not directly, no, ma'am.

10  Q.  And you would agree that you cannot look at someone and

11  know whether or not they have a disability, correct?

12  A.  I would agree with that.  Some disabilities are certainly

13  invisible.

14  Q.  And you would agree that some eligible voters receiving

15  assistance at the polling place appear to be able-bodied, and

16  thus there appears to be nothing wrong with them, correct?

17  A.  Yes, ma'am.

18  Q.  Let's go a little bit further down to Section 6.06,

19  page 54, line 20.  There we go.

20      This goes on for a little bit below that, but this is the

21  important part that I want to draw your attention to.  Looking

22  at the language that's been crossed out and the language

23  that's new, would you agree with me that the pre-SB 1 language

24  of this statute which includes the words "Performance-based

25  compensation," criminalized paying someone to assist mail

JONATHAN WHITE - CROSS

1  voters on a quota basis, correct?

2  A.  Yes, if all of the other elements are met, yes, ma'am.

3  Q.  And SB 1 expanded the offense to include not just

4  compensating somebody but also to offer compensation to

5  somebody for mail ballot assistance, is that right?

6  A.  Yes.  I would review the rest of the statute, but I think

7  what you are saying is correct, yes, ma'am.

8  Q.  And SB 1 also expanded the offense by eliminating the

9  requirement that the payment be for performance-based work,

10 right, or payment per head, correct?

11 A.  Correct.

12 Q.  And so now it is an offense to pay an individual to assist

13 voters by mail regardless of whether it is on a per capita

14 system, correct?

15 A.  I agree with that.

16 Q.  And then also it is an offense to receive or ask for

17 compensation to assist vote by mail, correct?

18 A.  Yes.  And if there was anything that came after that I'm

19 not sure.

20 Q.  Let's go to page 54, line 13, to the definition of

21 compensation.  Page 54, line 13.  Look at that, that's the

22 wrong page number.  All right.  Well, let me just look and see

23 if I can find it.  It might be on the next page.  It might be

24 a different provision.  Let's just talk about compensation.

25     While I make John's life very difficult over there in the

JONATHAN WHITE – CROSS

1  corner we might not be able to find it with respect to SB 1's
2  language with compensation.
3      It does refer to Section 38.01 of the penal code which
4  defines an economic benefit as anything reasonably regarded as
5  an economic gain or advantage, including accepting or offering
6  to accept employment for a fee, accepting or offering to
7  accept a fee, entering into a fee contract, and then at the
8  end, quote, "or accepting or agreeing to accept money or
9  anything of value," unquote.
10     Are you familiar with that provision in the penal code?
11 A.  I've reviewed that before, yes, ma'am.
12 Q.  And if you were asked whether anything of value could
13 encompass a gift bag, for example, with a T-shirt in it, you
14 would normally go and do some research and see if there's any
15 case law to flesh that out because you don't know the answer,
16 is that right?
17 A.  I mean, I think reviewing case law would always be a good
18 decision in that context.
19 Q.  And you would have the same answer with respect to a mail
20 ballot assister receiving a meal or a bus fair, correct?
21 A.  Potentially.
22 Q.  Now, with respect to this provision here that we see in
23 front of us, you are not sure that you can answer whether a
24 paid canvasser for a nonprofit Get Out the Vote organization
25 can enter a voter's home and assist the voter in completing

JONATHAN WHITE – CROSS

 1  the mail ballot, correct?

 2  A.  I don't think I understand the question.  I'm sorry.

 3  Q.  So if we take a situation where a paid canvasser for a

 4  nonprofit Get Out the Vote organization needs to know if

 5  entering a voter's home and assisting the voter with the mail

 6  ballot is an offense or not under this section, you are not

 7  sure you can answer that question, correct?

 8  A.  And we're talking about which section?

 9  Q.  Oh.  We have to go back up.  Thank you, John, for finding

10  the other provision.

11      Page 54, line 20.  If we expand that a little bit and onto

12  page 55 so the witness can see a little bit more, flowing over

13  a little bit on to page 55.

14      So looking at Section 6.06 which creates the offense of

15  being paid to assist a mail ballot voter and we take the

16  question whether a paid canvasser for a nonprofit Get Out the

17  Vote organization can enter a voter's home and assist the

18  voter completing the mail ballot, you are not sure whether you

19  can answer the question whether that's an offense or not, is

20  that right?

21  A.  Based on the facts that you gave which did not include

22  compensation in exchange for assisting voters, I would say

23  there's no offense in your scenario.

24  Q.  But, we, in the scenario, this is a paid canvasser who is

25  going door to door, so if you will agree with me that this

3995
JONATHAN WHITE – CROSS

1  person is being paid to knock doors, engage with voters and

2  provide assistance if requested, it's also true that you're

3  not sure whether you can answer the question whether that is

4  an offense under this provision?

5  A.  Zooming in doesn't exactly help.  I'm sorry.

6     Yeah.  I mean, if you're telling me that a person is being

7  paid, being compensated to assist voters subject to Section

8  86.010, which has very specific elements in the Election Code,

9  then, yes, this statute would appear to apply to that

10  scenario.

11  Q.  But it's also true that you haven't seen that fact pattern

12  before, when you were with the Election Integrity Division, is

13  that right?

14  A.  I don't recall ever seeing a situation where we were

15  dealing with people just trying to provide a public service

16  who weren't also trying to sway the direction those votes were

17  cast.  So I think the answer is, no, I haven't seen that.

18  Q.  But you would be concerned with that because your concern

19  would be whether or not some of these types of hypotheticals

20  are used as subterfuge for the actual activity, which would be

21  voter fraud, correct?

22  A.  Yeah.  I think if I understand your question correctly,

23  I'd agree with that, that we'd be looking for the fraud at the

24  bottom of things, yes, ma'am.

25  Q.  So we've talked a lot about different offenses for marking

JONATHAN WHITE - CROSS

1  the ballot in a way that is against the wishes of the voter

2  and you've talked about that extensively today and I won't go

3  over it with you, but you would agree with me that this

4  provision, Section 6.06 criminalizes the assistance itself and

5  not fraud in the assistance?

6  A.  I would say that it criminalizes compensation for

7  assistance.

8  Q.  Okay.  Thank you.

9      If we can go to page 54, line 23, which I think is right

10 there near the bottom of the page.  Oh, it says a person

11 commits an offense, but you're aware that in paragraph C it

12 does say that the offense is a state jail felony, correct?

13     A little bit onto the next page, if you wouldn't mind, to

14 paragraph C.

15     Do you see on there on line 9?

16 A.  Yes, I do see that section.

17 Q.  Okay.  And you know that a state jail felony means a jail

18 sentence of up to two years and not less than six months,

19 correct?

20 A.  Yes, ma'am, or probation would always be an option without

21 a criminal record.

22 Q.  And thus, under Section 6.06, providing assistance for

23 compensation even without fraud is a state jail felony?

24 A.  I think I agree with your question.  Compensation for

25 assistance under the statute is -- offering or accepting is

JONATHAN WHITE – CROSS

1  covered by the statute, yes, ma'am.

2  Q.  Regardless of whether the assister marks the ballot

3  consistent with the wishes of the voter or inconsistent with

4  the wishes of the voter, correct?

5  A.  Correct.  Those elements are not in the statute.

6  Q.  You understand that the Voting Rights Act provides a

7  framework where a voter can choose any person to assist the

8  voter, correct?

9  A.  Correct.

10  Q.  And under that framework you understand that we can't

11  categorically restrict certain people from assisting voters,

12  correct?

13  A.  Certain groups of people and types of people, yes, that's

14  correct, aside from employers and labor unions.

15  Q.  Right.  And as the chief prosecutor of election law

16  violations in Texas, which you were, you would have been

17  concerned if assistance that was guaranteed under federal or

18  state law were prohibited by another part of the election

19  code, correct?

20  A.  I agree any assistance that's guaranteed under federal or

21  state law, I would be concerned with that not being provided.

22  Q.  And you believe that a system that arbitrarily

23  disenfranchises eligible voters who cast lawful ballots and

24  follow the rules erodes public confidence in the integrity of

25  elections, don't you?

JONATHAN WHITE — CROSS

1  A.  I think in a general sense I would have to agree with that

2  statement.

3  Q.  Shifting away from the vote by mail for just a quick

4  moment, you believe that voting by personal appearance is less

5  vulnerable to fraud than mail voting, correct?

6  A.  Correct.

7  Q.  And you believe that because the security feature that are

8  present in in-person voting are better than those present in

9  vote by mail, correct?

10  A.  Essentially, yes, ma'am.

11  Q.  Let's go forward to Section 7.04 of SB 1 the vote

12  harvesting provision that's page 58 line 26.  Flowing over to

13  page 59 line 2.  Now, again, you went over this with

14  Mr. Nichols I believe but Section 7.03(a) creates offenses

15  like marking the ballot inconsistent with the voter's wishes,

16  do you recall that conversation you had a few minutes ago?

17  A.  Is that the additions to Chapter 276.013.

18  Q.  Yes, sir.

19  A.  Yes.  I saw some of those.

20  Q.  So now we are going to shift to 7.04 which is about vote

21  harvesting.  In your view, vote harvesters could show up at a

22  voter's house and inform the voter that they can vote by mail,

23  tell them all they need to do is vote by mail, and that the

24  individual is available to assist the voter, correct?

25  A.  Under this specific statute or the election code as a

3999

JONATHAN WHITE — CROSS

1  whole?

2  Q.  No, just stepping back.  Do you remember your slide show

3  from earlier today, you talked about the seeding phase of vote

4  harvesting.  This is where purportedly the harvester goes to

5  the voter's house and says, you can vote by mail, I'd like to

6  help you do that, do you recall that?

7  A.  Yes, ma'am.

8  Q.  Okay.  And so you do believe that that's part of an

9  illegal vote harvesting seeding phase, right?

10  A.  No, I wouldn't agree with that.

11  Q.  Okay.  Do you believe that in the seeding phase it's easy

12  to get an actual signature from the voter because the

13  harvester is just helping the voter get a mail ballot?

14  A.  Yes.  I think it's relatively easy to obtain a signature

15  from a voter for an application for mail ballot versus the

16  mail ballot itself.  It's relatively easier, yes, ma'am.

17  Q.  But you would agree with me that it's not illegal or

18  fraudulent to show up at a voter's house and offer to help the

19  voter complete an application for ballot by mail, correct?

20  A.  I don't believe that, based on just those facts, it

21  violates any provision in the election code that I'm aware of.

22  Q.  Now let's go to how vote harvesting is defined in this new

23  part of the election code which was brought in by SB 1.

24      Here, you see the creation of an offense of vote

25  harvesting, right, and at line 7 it says "vote harvesting

JONATHAN WHITE — CROSS

1  services means," and then it talks about the in-person

2  interaction with one or more voters in the physical presence

3  of an official ballot, do you see that there?

4  A.  Yes, ma'am.

5  Q.  And you believe that if an organizer for a community

6  organization is paid to persuade mail ballot voters in person

7  in the presence of the ballot to vote for a ballot measure,

8  that comes awfully close to paid vote harvesting efforts,

9  correct?

10  A.  I think so, yes, if I understand your hypothetical.

11  Q.  But in your work with the Election Integrity Division you

12  never dealt with circumstances in which community

13  organizations did this kind of voter outreach, correct?

14  A.  All of the investigations in cases I recall had to --

15  dealt with paid vote harvesters working for a candidate or a

16  slate of candidates or family of the candidate or the

17  candidate themselves, that I recall.

18  Q.  Thank you for anticipating my next question.

19      And, in fact, you can't recall any instances in which your

20  office prosecuted a defendant when that person was not working

21  for a candidate campaign, slate of candidates, or family

22  member, correct?

23  A.  Correct; although that's not one of the elements of any of

24  the offenses that we prosecuted under, we tended to have

25  knowledge that that was the case.

4001

JONATHAN WHITE - CROSS

1   Q.  But you would agree with me that the definition of vote

2   harvesting here that we see in front of us is not limited to

3   individuals who are working for a campaign, a candidate, or

4   who are a family member, correct?

5   A.  Well, the criminal activity is covered in subsections B, C

6   and following, so the entirety of the statute isn't under

7   subsection 2 there.  I mean, I think there might be an

8   implication that we are talking about paid activity to deliver

9   votes, right, for a specific candidate, or a specific measure.

10      So I suppose it would be possible for an outside

11  organization that's not directly affiliated with the campaign,

12  say, a political action committee, or something like that, to

13  commit this offense as well.

14  Q.  Or even a nonprofit nonPAC, correct?

15  A.  That's probably true, yes, if all the other elements are

16  met.

17  Q.  But you would agree with me, and if we zoom out a little

18  bit for Section 7.04, you don't see anything in this statute

19  that limits the offense to persons who are being paid by a

20  candidate, campaign, or PAC, correct?

21  A.  I think that's correct.  It's just whether the crux of

22  this is to deliver votes for a candidate or a measure, and we

23  don't define who that entity or person would be.

24  Q.  You do agree that paid — the definition of paid vote

25  harvesting should be defined narrowly enough so that it covers

JONATHAN WHITE – CROSS

1  only objectionable behavior and not political speech, correct?
2  A.  I would agree with that.
3  Q.  And in your view, political speech is fine and encouraged,
4  correct?
5  A.  I would agree with that.
6  Q.  I'm going to shift a little bit to a slightly different
7  topic now.  You say that the typical demographics of voters
8  targeted by mail ballot fraud include low income and minority,
9  is that right?
10  A.  I think what I've usually said is low income and elderly,
11  but I have been asked before whether that includes minorities,
12  and it often does.
13  Q.  And you've also said minority communities are typically
14  the target for vote harvesting schemes, correct?
15  A.  They are a frequent target, yes, ma'am.
16  Q.  And some moments ago you spent some time talking about
17  your prosecution of voter fraud in Gregg County, Texas,
18  against four defendants, is that correct?
19  A.  Yes, ma'am.
20  Q.  And all four of those defendants were Black, were they
21  not?
22  A.  That's correct.
23  Q.  Is it also the case that the majority of defendants you've
24  prosecuted that are listed on your prosecution sheet are
25  Hispanic?

4003

JONATHAN WHITE – CROSS

1  A.  I'm not sure of the answer to that.  I don't track any —

2  we never tracked race in terms of our prosecutions or

3  investigations.  You could be right.  It's not something I

4  track.

5  Q.  Okay.  Now, earlier with my friend Mr. Kercher you looked

6  at State Exhibit 89 and I'd like to ask you a couple of

7  questions about that.

8  A.  Yes, ma'am.

9  Q.  If we could bring up this Exhibit, 89, and scroll to Bates

10  stamp page 054655, which is one of the slides that you

11  reviewed with Mr. Kercher.  This is the unlawful assistance,

12  how it works slide, do you recognize it?

13  A.  Yes, ma'am.

14  Q.  You would agree with me that for one individual to

15  encourage another individual to vote is legal, and it's even

16  political speech, correct?

17  A.  With certain limitations like electioneering, for example,

18  and during the voting process, yes, ma'am, that's correct.

19  Q.  And it's also legal for an individual to offer to provide

20  a ride to the voter to get them to the polling place, correct?

21  A.  I think that's true.

22  Q.  You would agree with me that it is legal to offer to

23  provide assistance to the voter in the polling place, correct,

24  as long as the voter is eligible for assistance?

25  A.  Yeah.  We'd like to see the voter seeking out the

4004
JONATHAN WHITE — CROSS

1  assistance rather than the other way around, but in terms of
2  the legality of it, that's something that I would look, you
3  know, very specifically at the statutes on.
4  Q.  You would agree with me that it is legal for me to offer
5  to provide voter assistance to a voter, correct?
6  A.  I don't think there is an offense for making the offer,
7  no.
8  Q.  And then, of course, you would agree that it is legal for
9  me to provide that assistance to the voter who is eligible for
10  assistance, as long as I make sure I carry out the voter's
11  wishes, correct?
12  A.  And the voter is eligible for that assistance, yes, ma'am,
13  and all of the other requirements are met, I would agree.
14  Q.  But you put all of these lawful acts on your slide:
15  Offering assistance, providing assistance, transporting a
16  voter, and approaching a voter to assist them, isn't that
17  true?
18  A.  Those are on the page with the elements of the statute
19  that actually comprise the elements of a criminal activity,
20  yes, ma'am.
21  Q.  And you believe the illegal part comes in when an assister
22  casts a vote or makes sure the vote is cast for a particular
23  candidate, is that right?
24  A.  Yes, because I think there's some gray area in the process
25  where campaign literature is provided and the voter is handed

1  off to an assistant.  That's not something that's ever going
2  to get prosecuted, so it would be the point of the vote, or
3  that vote is either cast by the assistant or with influence
4  from the assistant.
5  Q.  Do you think it's illegal for a nonprofit organization to
6  provide campaign literature to a voter who is going to vote in
7  the polling place, as long as it's outside the hundred-foot
8  election area perimeter?
9  A.  No, ma'am.
10  Q.  Do you think it's illegal for a nonprofit organization to
11  make available assisters for the voter to use when going into
12  the polling place?
13  A.  Not to my knowledge.
14  Q.  So would it be fair then to say that the point at which it
15  becomes illegal is where a fraudulent assister marks the
16  ballot inconsistent with the wishes of the voter?
17  A.  That's correct, or suggests to the voter how to vote.
18         MISS PERALES:  Your Honor, I have a longer
19  examination but can stop at any time.
20         THE COURT:  Yeah, I've got to take a phone call at
21  12:15 so this is probably a good time to stop.
22         Let's resume at 1:00.
23     (Recess)
24     (Change in reporter)
25

Jonathan White - Examination                4006

1          *(1:05 p.m.)*

2          COURT SECURITY OFFICER:  All rise.

3          THE COURT:  Thank you.  Please be seated.

4          Ms. Perales.

5          MS. PERALES:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7   BY MS. PERALES:

8   Q.  Good afternoon, Mr. White.

9   A.  Good afternoon.

10  Q.  We continue.  I would like to put up if we could SB1, the

11  statute, we were in Section 7.04, but would it be too much to

12  ask, John, to put up Joint Exhibit 1?  Is that something you

13  might be able to get?

14      7.04, which is page 60, line 22.  Okay.  Line 15, and this

15  is the other part of Section 7.04*, "The Unlawful Solicitation*

16  *and Distribution of Application to Vote-By-Mail.*"

17      Do you see that there, Mr. White?

18  A.  Yes, ma'am.

19  Q.  Now, we see here the addition of a new section, 276.016; is

20  that right?

21  A.  Yes, ma'am.

22  Q.  And you'll agree with me that SB1 adds an offense for an

23  election official to solicit the submission of an application

24  for ballot-by-mail from somebody who didn't request it; is that

25  right?

Jonathan White - Examination                    4007

1    A.   Yes, ma'am, that's one of the subsections.

2    Q.   But the provision does not apply to party officials; is

3    that right?

4    A.   I believe that's correct, although I don't think it's on

5    this screen.

6    Q.   Yeah, can we go over to page 61?

7         Okay.  I know somewhere that you and I at one point agreed

8    that party officials were not covered by this provision.

9    A.   Is it a candidate?

10   Q.   Is it a candidate?

11   A.   I'm just -- I'm trying to remember.

12   Q.   Can we go and see them side-by-side, please?  We'll have to

13   go forward.

14        If you recall agreeing with me about that -- and if you

15   don't, just let me know if you don't; but at least at one point

16   we agreed that the statute was written to exclude actions by

17   campaign or candidate.  Do you remember at one point having

18   that understanding?

19   A.   I remember something about that, but I don't remember the

20   specific group that we were talking about.

21   Q.   But you'll agree with me that it does stop election

22   officials from sending out applications for ballot-by-mail,

23   right?

24   A.   Under certain conditions, yes, ma'am.

25   Q.   And if candidates are still allowed to send out unsolicited

Jonathan White - Examination                    4008

1   applications for ballot-by-mail, this would mean that a

2   candidate could still, for example, flood a certain area with

3   applications for a ballot-by-mail that had not been requested

4   by the voter initially, correct?

5   A.   Through the mail, yes, ma'am.

6   Q.   Yes.  Okay.  Now, moving on, I just want to ask you a

7   question about the ID number requirement for an application for

8   ballot-by-mail, Section 5 of the statute.  And I don't have

9   much for you here.

10       Would you agree with me that if a vote harvester has

11  personal identifying information about a voter, that person

12  could forge a registration application and forge application

13  for ballot-by-mail for that individual, correct?

14  A.   Ostensibly, the signatures would match, and if they already

15  had those identifying numbers, they could provide them, yes,

16  and those should be processed.

17  Q.   Thank you.  Now, I think you mentioned earlier that when

18  the Election Integrity Division would receive complaints

19  regarding voter fraud, that primarily it would come through the

20  Secretary of State.  Is that right?

21  A.   Yes, ma'am.  I'd say more than 50 percent of our referrals

22  came through there.

23  Q.   And, in fact, the vast majority of complaints would come to

24  the Election Integrity Division through official channels,

25  correct?

Jonathan White - Examination                4009

1    A.  I'm not sure what we mean by "official channels."

2    Q.  Well, for example, the Secretary of State's office, you

3    mentioned.  How about local prosecutors and law enforcement?

4    A.  Correct, with the caveat that it would go to the

5    Investigations Division, not the Prosecution Division.

6    Q.  That's right.  Okay.  And so because of that, complaints

7    about alleged voter fraud didn't come directly to you, correct?

8    A.  Generally, no.

9    Q.  And you also would not have seen every investigation

10   referral request, correct?

11   A.  No, I wouldn't see every single referral.  Ones that didn't

12   have merit might not come my way.

13   Q.  And investigators in the Criminal Investigations Division

14   are the ones who would make an initial evaluation of a

15   complaint, correct?

16   A.  More so the lieutenant, who is the -- who's supervising

17   that section, and he would consult with me on a number of those

18   issues.

19   Q.  If he needed to?

20   A.  If he needed to.  And we were working toward that being a

21   more normal part of the process.

22   Q.  And his evaluation would include seeing if there's even a

23   criminal allegation on the surface of the complaint, correct?

24   A.  It would include that, yes, ma'am.

25   Q.  Now, the investigators from the Criminal Investigations

Jonathan White - Examination                    4010

1    Division were not in your chain of command, correct?

2    A.  Correct.

3    Q.  And you did not have direct supervisory authority over

4    those investigators, correct?

5    A.  That's correct, not any official chain of command.

6    Q.  And thus, ultimately, the determination whether a complaint

7    merited investigation would be made by someone other than you

8    at the Office of the Attorney General?

9    A.  To accept a case for -- to an open an investigation, I

10   would not always have a role in that; and frequently I would

11   not.

12   Q.  And, generally, when you learned about the outcome of an

13   investigator's efforts, you would learn about that outcome

14   through one-on-one conversations, correct?

15   A.  One-on-one conversations would be a part of it, yes, ma'am.

16   Q.  Is it true that an investigator would generally not write

17   up their notes?

18   A.  Usually investigators would limit their write-ups to the

19   official narrative or official report, if one existed in the

20   case.

21   Q.  Now, you would generally not question witnesses before a

22   prosecution had been recommended for a case, correct?

23   A.  In most cases, no, I wouldn't be the one questioning them,

24   but that did happen on occasion.

25   Q.  And you didn't always read an entire investigative report

Jonathan White - Examination                    4011

1   if one was provided, correct?

2   A.  No.  I preferred to skip to the actual evidence and get my

3   eyes on that if I -- If I could do that.

4   Q.  And a lot of the information you gathered about an

5   investigation would be based on the conversation with the

6   investigator, correct?

7   A.  Some of it, yeah.  The -- as to the exact elements of the

8   offense, I would make sure that I saw -- put my eyes on the

9   actual evidence or listened to the interviews or whatever the

10  evidence was in that case, the official election records.

11  Q.  And when you were supervising the Election Integrity

12  Division or its predecessor, so from 2018 until you left there,

13  you would generally be referring cases to other attorneys in

14  the division, correct?

15  A.  I would refer cases to my line prosecutors after I had made

16  an evaluation of whether we would proceed.

17  Q.  Let's go back to LUPE 182, please.

18     Now, it's correct, isn't it, that if you saw something like

19  this investigative report, this report would probably -- well,

20  let me scratch that and start with a better question.

21     Looking at this type of document, the investigative report,

22  this would not probably even have come to you, correct?

23  A.  No, I wouldn't say that.  But, again, I would get reports,

24  and I would see reports, but my preference would be to actually

25  lay eyes on the evidence so that I could ensure that elements

Jonathan White - Examination                    4012

1    were there.  This particular report, I -- report never came to

2    me.  It was after my -- my time, I believe.

3    Q.  But in terms of the typical practices of your office,

4    wouldn't you agree that the report would probably have just

5    gone to the line attorney?

6    A.  No.  The case would always come to me for assignment to a

7    line attorney, so the report would be available to me.  I would

8    have conversation with the investigator; probably would have

9    had a conversation with the lieutenant, as well as looking at

10   the evidence, to make sure that the elements were there before

11   signing it.

12   Q.  Let's see if we can go -- do you remember having a

13   conversation like this when I took your deposition in August of

14   this year?

15   A.  Yes.  I remember I told you something about not liking to

16   read long-winded reports.  I recall that.  That was true.

17   Q.  Do you recall when I asked you about something like this

18   report, you said it probably wouldn't even come to you?

19   A.  Something -- was it this particular report?

20   Q.  Well, because this report is -- I think its final days are

21   just after you left, I think you spoke more in terms of the

22   general practices of your office; that something like this

23   investigative report would probably not even come to you.  Do

24   you recall that?

25   A.  I mean, I might recall something like that if it had to do

Jonathan White - Examination                    4013

1  with either this specific report in the time or if this was a

2  report that really didn't -- it -- you know, it was an

3  investigation that didn't really produce anything notable that

4  could have just been closed administratively, it's possible

5  that I wouldn't see something like this.  I don't know what

6  context I was talking about at the time.

7  Q.  Do you recall saying the report would probably go to the

8  line attorney and not you?

9  A.  I could have said that.  It's possible that I would just

10 route this directly -- this type of investigation directly to a

11 line attorney once I understood what was there.

12 Q.  Okay.  And as the head of the Election Integrity Division,

13 you would generally make a decision about whether a case was

14 worth going forward or not fairly quickly; is that right?

15 A.  I would have an idea fairly quickly if it was a case that

16 could go forward, and there would be some additional analysis

17 before actually charging.

18 Q.  And you would engage in field work generally only when you

19 had a role in the prosecution of the case; is that right?

20 A.  I think that's probably true in terms of getting out in the

21 field, maybe going to an elections office, putting my hands on

22 the records there, talking to witnesses, that sort of thing.

23 Typically, it would be when I was involved as a lead prosecutor

24 in the case or part of the prosecution team.

25 Q.  Do you recall how many times in the last year that you

1   served in your position at the Election Integrity Division, how
2   many times you served as the lead prosecutor?
3   A.  I don't really.  It wouldn't be more than once or twice,
4   though.
5   Q.  Now, with respect to signature matching to process a mail
6   ballot, for example, you would agree that your knowledge about
7   the signature-matching process is secondary, correct?
8   A.  To the extent that it's not based on actually reviewing
9   original election records and what types of ballots were
10  accepted versus not accepted, which I've seen, you know, pretty
11  significant number over my career, I would say that -- and the
12  Election Code itself, and the election law and procedures in
13  there, I would say that a lot of my -- a lot of the things that
14  I learned, I learned from other people like the Secretary of
15  State's office and the elections administrators and things that
16  were uncovered in the course of investigations, so partial.
17  Q.  But you've never served on a signature verification
18  committee, right?
19  A.  Absolutely correct, yes.
20  Q.  You haven't served on an early voting ballot board?
21  A.  That's correct.
22  Q.  You've never been a county elections official?
23  A.  Correct.
24  Q.  And you don't have firsthand knowledge about how ballot
25  boards operate in the 254 counties in Texas, correct?

Jonathan White - Examination                4015

1    A.  Well, other than I know from the Election Code what the
2    actual procedures that they should be following is, I have not
3    personally witnessed the way that one of those entities
4    operates in person.
5    Q.  I want to shift now to just a few questions about Zul
6    Mohamed.  It's correct to say that you did not question any
7    witnesses in connection with the case against Zul Mohamed; is
8    that right?
9    A.  No, ma'am.  I wasn't the one questioning the witnesses.
10   Q.  And you primarily found out about evidence about
11   Zul Mohamed through an investigator updating you; is that
12   correct?
13   A.  My investigator provided me with those records, which I
14   reviewed.
15   Q.  And you were not personally involved in making sure, for
16   example, that Dallas County or Denton County received materials
17   that you thought might suggest fraud, correct?  That was your
18   investigator?
19   A.  For the most part, I was involved in attempting to get
20   records from the elections office in Dallas, that we actually
21   had some dealings with the D.A.'s Office, but other than that,
22   my investigator primarily was the one who provided those
23   records to the appropriate offices.
24   Q.  And you did not go to Dallas County in connection with
25   Mr. Mohamed's case, correct?

Jonathan White - Examination                 4016

1    A.  No, ma'am.  I had phone calls but did not travel.

2    Q.  And in connection with that case, you didn't talk with the

3    affected families or voters yourself, correct?

4    A.  No, ma'am.  I listened to those interviews, but I did not

5    conduct them myself.

6    Q.  And the illegal act that Zul Mohamed is charged with having

7    committed, those acts were illegal before SB1, correct?

8    A.  Correct.

9    Q.  Now, besides the presentation that we saw, which was the

10   slide show, it's correct, isn't it, that the Election Integrity

11   Division does not do any type of training for election workers,

12   yes?

13   A.  No.  We -- that training is limited to those modules that I

14   provided at the Secretary of State's annual conferences for

15   election officials, so that was it, that you were looking at.

16   Q.  And you agree that any question about whether SB1 would

17   necessitate additional training for election workers would be a

18   little outside of your wheelhouse; is that correct?

19   A.  I would defer to the Secretary of State's office on that.

20   Q.  And similarly, whether SB1 would necessitate additional

21   training of poll watchers would also be a little bit out of

22   your wheelhouse, correct?

23   A.  I would defer on that as well, yes, ma'am.

24   Q.  Earlier in your examination, one of the documents that was

25   shown was just a list of complaints.  Do you recall that?

Jonathan White - Examination                    4017

1    A.  Yes, ma'am.  Referrals?

2    Q.  Referrals.  You did not personally review all the referrals

3    that came in; is that correct?

4    A.  Not all of them, no, ma'am.

5    Q.  And there were referrals that would come in that would not

6    be brought to your attention, correct?

7    A.  That was especially true in the past, earlier in time.

8    Q.  And if there was a referred complaint that didn't merit

9    investigation, it's unlikely that that complaint would be

10   brought to your attention, correct?

11   A.  Right.  There would probably be some notable circumstances

12   that brought it to my attention, if it did.

13   Q.  And you would also receive an investigative report if it

14   was turned over to you from the Criminal Investigations

15   Division; is that right?

16   A.  That's right.  I didn't have direct access to their

17   CrimeStar reporting system, so those would have to be provided

18   to us on the prosecution side.

19   Q.  In your role as chief of the Election Integrity Division,

20   you only wanted to prosecute those cases that you believed you

21   could convict on; is that right?

22   A.  I think that that is pretty accurate.

23   Q.  And with respect to the flow of complaints, referrals to

24   the Election Integrity Division, the Division received on

25   average less than 50 referrals per year going back to 2016; is

Jonathan White - Examination                    4018

1    that right?

2    A.  I'm not sure what that number would be, but I don't imagine

3    it would be too far off of that.

4    Q.  Now, it is the case that your office undertook

5    investigations that did not lead to prosecution, correct?

6    A.  Correct.

7    Q.  But you can't tell us how often that happened because that

8    would require you to review quite a few records; is that right?

9    A.  Yeah, at minimum, it would require that, yes, ma'am.

10   Q.  But you can say that fairly often you decided an

11   investigation should not be a prosecution, correct?

12   A.  I would say that, yes, it was common for us to not proceed

13   with the prosecution on a given investigation.

14   Q.  And the top two reasons for not pursuing it from

15   investigation to prosecution would be first that a crime did

16   not occur, or second, there's insufficient evidence that a

17   crime occurred; is that right?

18   A.  That's probably accurate.  I would include in there

19   insufficient facts or evidence or also just legal and factual

20   evidentiary type issues that could result in that as well.

21   Q.  You agree that a lot of investigations of alleged voter

22   fraud are shut down on the investigation side and don't become

23   prosecutions because of a lack of evidence, yes?

24   A.  Could you repeat just the first few words of that question?

25   Q.  You agree that a lot of investigations --

Jonathan White - Examination                4019

```
 1   A.   Okay.
 2   Q.   -- of alleged voter fraud are shut down on the
 3   investigation side and don't become prosecutions because of a
 4   lack of evidence, correct?
 5   A.   I think a significant number do, yes, ma'am.
 6   Q.   And also a lot of investigations of alleged voter fraud are
 7   shut down on the investigation side and don't become
 8   prosecutions because no offense occurred, correct?
 9   A.   I would agree with that.
10   Q.   And also a lot of investigations -- oh, no, you already
11   gave that reason.  I'm just going to stop here so we're not
12   here tomorrow the same time.  Moving along.
13        I would like to display LULAC 61, if we could.
14        In the morning, Mr. White, you went through a chart of
15   pending and resolved prosecutions with Mr. Kercher, and he
16   chose a chart from July of 2022.  Do you recall that?
17   A.   Yes, ma'am.
18   Q.   So there are a number of these charts; is that correct?
19   A.   A number of versions that were updated in time, yes, ma'am.
20   Q.   And so I'm going to start with a slightly earlier chart
21   from Mr. Kercher's, and then I'm going to end with a slightly
22   later chart with Mr. Kercher's, just to -- just to orient you
23   here.
24        You prepared this spreadsheet; is that right?
25   A.   Yes, ma'am, I maintained the spreadsheet.
```

Jonathan White - Examination                    4020

1  Q.  And you've done your very best to maintain it accurately

2  since the time that you took over in the Division in 2018,

3  correct?

4  A.  Yes, ma'am.

5  Q.  And to your knowledge, the document provides a complete and

6  accurate list of the cases that have been charged by your

7  office and prosecutions pending for election fraud violations;

8  is that right?

9  A.  I would say so, yes, ma'am.

10 Q.  And on the first page of the document, we see the words

11 "*Prosecutions Resolved*" up in the title; is that right?

12 A.  Yes, ma'am.

13 Q.  And then at the very bottom, we'll see the date?

14 A.  Yes, ma'am.

15 Q.  There we go.  So just to get you oriented on here.

16      Now, on page 12 of the document, you would agree with me

17 that the title changes over to "*Prosecutions Pending.*"  So if I

18 wanted to know generally -- if we could just return to the

19 first page of the document and see the whole first page.

20      If I wanted to know how many defendants are involved in

21 either pending or resolved prosecutions, I would add up the

22 names of the people who are listed in the rows of the chart; is

23 that right?

24 A.  That's right, count the rows.

25 Q.  So, for example, we could use the chart to look at the

Jonathan White - Examination                    4021

1   average number of defendants charged with an election offense

2   or election offenses in any given year, correct?

3   A.  Yes, ma'am.

4   Q.  So if we went, for example, to -- if we wanted to look at

5   how many defendants were charged with offenses related to the

6   2020 election cycle, we could just flip forward and start

7   finding elections from 2020, and we could count up the number

8   of defendants involved, correct?

9   A.  Correct.  You'd probably find those on both sides of the

10  spreadsheet, the resolved, as well as the pending.  Mostly

11  probably would be on the pending, I'm guessing.

12  Q.  And if we just wanted to look at how many -- well, if we do

13  pending -- except the resolves are first, so let's do -- let's

14  go to page 11 and maybe page 12 internally of this document.

15  And I think we have one defendant with a resolved prosecution

16  at this point.

17      If we could go to the next page.  Oh, there we go.  Look at

18  that.  John found it before I did.

19      So there's one person here with a resolved from Medina

20  County, and then we also have -- on the pending, I think at

21  that point we had about five defendants with pending

22  prosecutions, and that would be farther down in this chart.

23  And you and I established together that every page in the

24  pending prosecutions on this chart is page 17, so I'm not going

25  to have us count our way through it.

1    Now, this number of one resolved and five pending, it
2    doesn't seam particularly high or low to you, correct?
3    A.  Correct.  I think there might have been two on the
4    resolved.  But, yes -- no, it's not a particularly high number.
5    Not particularly low number in my experience either.
6    Q.  And I will give you that there may have been two resolved;
7    one for primary, and one for the general, that may be.
8    Now, the Office of the Attorney General agrees that until a
9    conviction is reached, a person is presumed innocent legally,
10   correct?
11   A.  Correct.
12   Q.  And I'd like to talk through some of the people that you
13   discussed with Mr. Kercher starting with, in resolved
14   prosecutions, Christina Lichtenberger, who you talked about
15   earlier this morning.  She's -- these are three cases in
16   Duval/Live Oak County.
17   Let me see if maybe if my friend Mr. Kanterman can help
18   John find Duval/Live Oak County on the left-hand column for
19   Prosecutions Resolved.  You're in Pending now, but if you start
20   in Resolved, you might find them, but we can talk about them
21   without -- there they are.
22   You can't tell us any specific facts about
23   Ms. Lichtenberger's case without reviewing the file, isn't that
24   correct?
25   A.  Yeah.  I don't recall much beyond what's on this document.

Jonathan White - Examination                    4023

1    I think that's primarily because it was in 2008 when I took

2    these pleas and reviewed these cases, but it was a

3    vote-harvesting scheme, it was in Duval County, in the 2008

4    primary.  We prosecuted it in Live Oak County under our venue

5    provision.

6    Q.  Understood.  Going forward to Brazos County, and Christine

7    Thomas Shank, who you discussed earlier today with Mr. Kercher.

8    It's also true that beyond what's on the face of the chart, you

9    don't have a specific recollection of this case, so you

10   wouldn't be able to give us any more detail; is that correct?

11   A.  On that particular case, I don't remember a whole lot of

12   details, and I think that that case may not have even been as

13   developed as the Duval County case.

14   Q.  And if we go forward to Dallas/Rockwall County, Gilda

15   Hernandez, it's also true you don't recall much specific

16   information about the fact pattern of that case; is that

17   correct?

18   A.  I think my memory has been refreshed a little bit since we

19   last talked, but I don't know that what I have to share would

20   be particularly helpful for you; but it was associated with the

21   Medrano prosecutions, but she was one of the vote harvesters in

22   this Dallas County election that we tried in Rockwall County,

23   and she pled to these vote-harvesting offenses -- or at least

24   one count.

25   Q.  Now, we have seven Cameron County prosecutions.

Jonathan White - Examination                    4024

1    A.  Might be eight.

2    Q.  We could have eight.  If we zoom back out, we're going to

3    see some resolved prosecutions from Cameron County.  And I'd

4    like to start with Margarita Ozuna.  You don't have a specific

5    recollection of what Ms. Ozuna did to influence the voter; is

6    that correct?

7    A.  This one would have either been suggesting to the voter how

8    to vote, or -- I think it was suggesting the voter how to vote

9    and not marking the ballot against the direction of the voter,

10   so that would be the answer on this one.  Ms. Ozuna I remember

11   quite well.

12   Q.  But you don't have a specific recollection of what

13   Ms. Ozuna did to influence the voter, correct?

14   A.  No.  Just what I told you about suggesting which candidate

15   to vote for.

16   Q.  Let's go forward to Facunda Garcia, also Cameron County.

17   It's true you would have to review the specific facts to know

18   if the voters that she assisted were entitled to assistance or

19   not, correct?

20   A.  My recollection today is that they probably were not, which

21   would be pretty common for this type of case.

22   Q.  Is your recollection different today than a year and some

23   months earlier when I took your deposition?

24   A.  It's not significantly different, but I do remember a few

25   more facts about some of these cases now that we've, you know,

Jonathan White - Examination                4025

1    refreshed the mental pathway a couple of times.

2    Q.  Now that 14 months have passed or that you studied up for

3    your testimony?

4    A.  No.  I reviewed my deposition transcript and the

5    spreadsheet.

6    Q.  Do you recall saying in your deposition transcript with

7    respect to Facunda Garcia that you would have to review the

8    specific facts to know if the voters she assisted were entitled

9    to assistance?

10   A.  Right.  That was based on my memory on that day, and I

11   hadn't really thought about these cases in a number of years at

12   that time.

13   Q.  Now, with respect to Bernice Garcia, who you discussed

14   earlier with Mr. Kercher, you aren't completely sure if she

15   suggested to the voter how to vote because you hadn't looked at

16   the file -- or haven't looked at the file since 2015; is that

17   right?

18   A.  All of that was true on that day, yes, ma'am.

19   Q.  And with respect now going -- let's pass through Cameron

20   County and go to Hidalgo County.  You discussed Lupe Rivera

21   from Hidalgo County.

22       It would be on the next page.

23       And in order to tell us the specific activity that Lupe

24   Rivera engaged in to influence voters, as with all of these,

25   you would have to refresh your recollection deeper than the

Jonathan White - Examination                    4026

1   information on the spreadsheet, isn't that right?

2   A.  To get deeper than suggesting to the voter how to vote in

3   that election, to get any more level of detail, I would

4   probably have to review the file.

5   Q.  And same with Nueces County, Rosita Torres Flores, you

6   would have to review the file to say for sure more details

7   beyond what's in the chart, correct?

8   A.  I'd like to take a look at her entry if possible.  Thank

9   you.

10  Q.  Should be second from the top.

11      Thank you, John.

12      And the question is that in order to give us more detail

13  than what's on the chart, you would have to review the file?

14  A.  What I remember that may not specifically be on this chart

15  is that she voted this ballot without the direction of the

16  voter.  I recall that.  But I do recall that the day in

17  question at the deposition, I testified to what you said.

18  Q.  And then second to last, the two Frio County cases for

19  which there is a diversion program, you don't know what the

20  basis of that was without reviewing the file, so you can't

21  really tell much more about it; is that right?

22  A.  Yes, ma'am.  We didn't discuss these today, but I don't

23  have much recollection of these cases beyond what's on this

24  chart here; that's correct.

25  Q.  And then last, Nueces County, Cynthia Gonzales, in order to

Jonathan White - Examination                    4027

1    talk about more details, you would have to refresh your
2    recollection as to the specifics of the case, correct?
3    A.   Just reviewing these notes.
4        (Pause.)
5        On this one similar to Rosa Flores, we had an instance
6    where she had actually voted the ballot contrary to the voter's
7    wishes, and that I can tell you -- which is implied by this
8    information, but not directly stated on this, and I'm not sure
9    whether or not I told you that at the deposition or not.
10   Q.   Because we see a charge there under Section 64.012,
11   correct?
12   A.   Yes, ma'am.
13   Q.   Illegal voting.
14       But beyond what we see here, you would have to refresh your
15   recollection as to the specifics of the case, correct?
16   A.   Yes, ma'am, I would.
17   Q.   All of these things that we've reviewed just now, these
18   charges, these were all charges under criminal statutes that
19   existed before SB1; is that correct?
20   A.   Correct.
21   Q.   Now, one thing that you do know is that none of the
22   resolved prosecutions of unlawful voter assistance in this
23   chart happened in the polling place, correct?
24   A.   I don't believe any of the ones that we've covered did.  We
25   had some instances of those on the other spreadsheet, I

Jonathan White - Examination                   4028

 1  believe, but none of these, you're correct.

 2  Q.  So with respect to this spreadsheet, there are no resolved

 3  prosecutions of unlawful voter assistance that happened inside

 4  the polling place, correct?

 5  A.  Not the ones that we've covered, correct.

 6  Q.  Well, even beyond the ones that we've discussed

 7  specifically, if we just look at this document "Resolved

 8  Prosecutions," none of these resolved prosecutions involved

 9  unlawful voter assistance in the polling place, correct?

10  A.  I'm not sure about that.  I'm sorry.  And I'll probably

11  have to review those earlier cases in a little more detail just

12  to make sure, but you're probably pretty close to it.  If there

13  aren't any, then it's not going to be very many.

14  Q.  Would it be helpful to review your deposition to refresh

15  your recollection with respect to this question?

16  A.  Probably would be more helpful to review the actual

17  spreadsheet itself if you want an answer today, but I'll

18  certainly take your word for whatever I testified to at the

19  deposition.

20  Q.  Well, I'd rather you not take my word for it.  I would like

21  to get a firm answer to this question.  So if you're hesitant

22  about it, I'd like to refresh your recollection.

23      If we could pull up April 27, 2022, page 75, line 13.  Go

24  to the next page, if you would, page 76.  Starting on line 5 of

25  page 76, if you wouldn't mind looking there.

Jonathan White - Examination                    4029

1          Did you testify at that time that it's your recollection
2    that besides Ms. Barton, which did not involve voter
3    assistance, as you've testified earlier, none of the cases in
4    the exhibit took place in person at the polling place?
5    A.   Yes.  I answered that I wasn't recalling any from my
6    memory, and I agreed with that, to avoid having to look through
7    each of the offenses again.
8    Q.   And then if we can do line 12 through just the end of that,
9    the Patricia Barton case did not involve assistance.  You
10   recall that?
11   A.   Correct.
12   Q.   So let's go back to the chart.
13          Do you recall, with respect to this chart overall, that
14   there are about 74 defendants who are either convicted or go
15   into deferred adjudication or diversion programs?
16   A.   I don't know that, but --
17   Q.   Okay.  Do you recall knowing at any point that 16
18   defendants were convicted as opposed to deferred adjudication
19   or diversion agreements?
20   A.   That sounds probably in the ballpark.
21   Q.   When a case is resolved by a plea, that doesn't require any
22   witness to take the stand; is that right?
23   A.   Correct.  They're making a judicial stipulation of guilt at
24   the time that they take the plea, and that would be the same,
25   whether it's a conviction or deferred adjudication, or in the

Jonathan White - Examination                    4030

1    case of the diversion program; that they're making a

2    stipulation or acknowledgment of the offense.

3    Q.  But not for a no-contest; is that right?

4    A.  No contest would be the one exception to that, yes, ma'am.

5    Q.  Now, for any single defendant who pleaded guilty or had

6    been convicted of harvesting, it would probably be a small

7    number of ballots, correct?

8    A.  In the scheme overall, not necessarily.  In terms of what

9    we made our case on, yes, it's very likely that it would be.

10   You know, I guess what your definition of "a small number of

11   ballots" might be.

12   Q.  Do you recall in the past testifying that when you did do

13   one of these pleas or convictions, it was generally a

14   relatively small number of ballots?

15   A.  Yes.  When we do a plea, we would normally not even -- it

16   would normally be a reduced counts, reduced number of counts

17   from what was originally charged, yes, ma'am.  Sorry if I

18   misunderstood your initial question.

19   Q.  I'm sure it was my fault.

20       Now, generally, you understand that there are over

21   16 million registered voters in Texas, correct?

22   A.  That sounds right.

23   Q.  So if we do the math on the 76 defendants in the chart, in

24   the 16 million, it's a very, very, very small fraction of a

25   percent.  Would you agree?

Jonathan White - Examination                4031

1   A.  Yes, ma'am.

2   Q.  And if we take out the deferred adjudications and diversion

3   program results, we have --

4          THE COURT:  You need to turn off your phone.  That's a

5   number of times that that's happened with you.

6          MS. PERALES:  I will move on.

7   BY MS. PERALES:

8   Q.  A moment ago you said it sounded more or less reasonable

9   that there would have been 16 defendants who were convicted

10  once we take out the diversion agreements and the deferred

11  adjudications.

12     Would it be your view, then, that we can look at, for

13  example, the number of counts charged, which is the way the

14  spreadsheet is done?  And it's a very high number, over 500,

15  but we can also look at the roughly 16 defendants who are

16  actually convicted, and that would show or tend to show that

17  voter fraud is not that big a deal?

18  A.  I think I've got something for everyone on this

19  spreadsheet.  Whatever you want to see, I would agree that you

20  can probably see it.

21  Q.  And you know the line.  I'm reading from when you testified

22  in the legislature, you said something similar; is that right?

23  A.  I have testified to that, yes, ma'am.

24  Q.  You were having a colloquy with Representative Bucy, and

25  when he started to just focus on the convictions, you did, in

1  fact, say *"This can be stuff to show that voter fraud is not a*
2  *big deal"*?
3  A.  I said I was just glad that I can make everyone happy, both
4  sides of the aisle.
5  Q.  Can we look now at OCA Exhibit 377, please.
6      Now, here we are in some months after the chart that
7  Mr. Kercher showed you from July of 2022.  Now we're in
8  September of 2022.  Do you see that there?
9  A.  Yes, ma'am.
10 Q.  Now, your office had confidentiality -- or maintained some
11 kind of confidentiality in terms of public release of
12 information regarding cases that didn't result in a conviction
13 or deferred adjudication; is that right?
14 A.  I'm not sure what the position was in terms of this
15 litigation, but I'm aware that under the Texas Public
16 Information Act, those are confidential under law in terms of
17 public release.
18 Q.  And you would release this chart, wouldn't you, in -- for
19 example, in response to a request for public records?
20 A.  Correct.  It was the file itself that would be privileged
21 under the law -- or confidential under Texas law.
22 Q.  So if a defendant is acquitted or the charges were dropped,
23 we might not see that outcome reported on, for example, this
24 chart, even though the person might have appeared on an earlier
25 chart, isn't that right?

Jonathan White - Examination                    4033

1    A.   It's possible.  You know, it's happened both ways.

2    Sometimes we've left those on the chart, and I think sometimes

3    they may have been removed; and yes, you're correct on that,

4    though.

5    Q.   So, for example, Mr. Ricardo Molina, he was on the July 15

6    chart, but he has vanished from the September 6, 2022 chart,

7    isn't that right?  That was 2017 City of Edinburg?

8    A.   I'm not sure how to handle testimony that might cover a

9    situation where there's been an expunction, and so it's

10   possible that when a record has been expunged, that there would

11   have been an existing spreadsheet that could have been

12   requested through a public information request, but if we

13   receive a notice of expunction, then we would be required by

14   law to destroy any records pertaining to an arrest or

15   prosecution afterward.  We could still maintain an

16   investigative file about the activity, but no record of arrest

17   or subsequent prosecution.

18   Q.   Do you recall that Mr. Molina was acquitted of engaging in

19   organized election fraud and eleven counts of illegal voting in

20   the 2017 City of Edinburg election?

21   A.   Yes, ma'am, I do.

22   Q.   Do you agree with me that he appears nowhere on the

23   September 62022 chart for resolved prosecutions?

24   A.   He probably should not appear on this chart.

25   Q.   Let's go down to page 11, which is Bates 112170.

1         We have some cases that are additional from the chart that
2    we discussed earlier from April.  By my count there are seven
3    additional cases.  They start here at the bottom of the chart,
4    Gregg County, Shannon Everett Brown?
5    A.  Yes, ma'am.
6    Q.  You discussed that one with Mr. Kercher.  And then the next
7    page we have several more people there, to the bottom?
8    A.  Yes, ma'am.
9    Q.  Where I think we end with Brewster County.  Would you agree
10   with me that none of those new cases involve unlawful
11   assistance?
12   A.  I don't recall any of them involving unlawful assistance.
13   And on the prior version of the spreadsheet, they would have
14   been on the pending sheet, and they would have moved over to
15   "resolved" on this copy.
16   Q.  Would you agree with me that with respect to this chart
17   here, which is current as of September 6, 2022, the resolved
18   voter assistance fraud cases only relate to mail ballots and
19   not assistance in the polling place?
20   A.  I think -- I think that that's true.  I think my answer is
21   going to be about the same as my answer in the deposition, is
22   without going through this with a fine-tooth comb, I would be
23   inclined to agree with you -- I have -- I have recollections of
24   cases that happened, but I don't recall the outcomes, so I'm
25   going to go with your proposed question there.

Jonathan White - Examination                4035

1   Q.  And if we go forward in this chart here, we see some

2   pending prosecutions that are related to the 2017 City of

3   Edinburg election.  They would be -- there we go.

4       If you would just stay there, John.  We have a number of

5   them.  Can we see the next page, please.  Ah, yes.  Several

6   more.  If you could highlight them.

7       Those were all dismissed, weren't they?

8   A.  I believe these were dismissed by the Hidalgo County

9   District Attorney's Office.

10  Q.  And if we take those out, we've got roughly 19 defendants

11  left in pending prosecutions as of the most recent chart; is

12  that right?

13  A.  I would have to trust you on the math, but I don't have any

14  reason to disagree with you.

15  Q.  If we go to the first page of Pending Prosecutions, we see

16  three women from Hidalgo County on the left-hand side:  Marcela

17  Gutierrez, Sara Ornelas, and Sylvia Arjona in Hidalgo County.

18  Do you see them there?

19  A.  Yes, ma'am, I do.

20  Q.  They were charged with unlawful assistance of voters.

21  Isn't that right?

22  A.  That's correct.  Those were in the polling place.

23  Q.  That was from the 2016 election?

24  A.  Yes, ma'am.

25  Q.  Those cases were all dismissed, weren't they?

Jonathan White - Examination                    4036

1   A.  I believe they were also dismissed by Hidalgo County

2   subsequent to the *Stephens* decision.  In fact, if it's helpful,

3   I think the majority of these cases were dismissed as a result

4   of the *Stephens* decision.

5   Q.  Now, you recall a case in Nueces County specifically in

6   Robstown -- you've spoken of this before -- where the candidate

7   was accused of attaching himself to voters outside the polling

8   place and taking them through the voting process and voting

9   their ballots, correct?

10  A.  Yes, ma'am, that's correct.

11  Q.  That was Mr. Robert Gonzales, I believe you told me; is

12  that right?

13  A.  Yes, it was.  An attorney from the Criminal Prosecutions

14  Division actually handled that case at trial.

15  Q.  And Mr. Gonzales was acquitted, wasn't he?

16  A.  He was acquitted not of the unlawful assistance of voters

17  or the loitering in the polling place, but he was charged with

18  divulging information about an election, and he was acquitted

19  of that.

20  Q.  So he wasn't charged with unlawful assistance.  You just

21  mentioned that there was unlawful assistance in your view,

22  correct?

23  A.  Yes.  That was the entire scheme, and the choice to go

24  after the felony instead of the misdemeanor, unlawful

25  assistance offenses, was probably a mistake, in retrospect.

Jonathan White - Examination                4037

1  Q.  Nevertheless, he was acquitted of what he was a charged of,

2  yes?

3  A.  Indeed, indeed.

4  Q.  And acquitted on May 5, 2019, is that correct, thereabouts?

5  A.  I don't have a recollection.

6  Q.  But more than two years later, in July of 2021 when you

7  were testifying on the legislature on SB1 and its predecessors,

8  you continued to mention Mr. Gonzalez and that you felt that he

9  had delivered unlawful assistance in the polling place,

10  correct?

11  A.  I don't recall testifying to that.  But, I mean, you know,

12  I do feel -- I do feel that that's exactly what happened, and

13  we had video of it.

14  Q.  It doesn't bother you that although he was acquitted, you

15  still went to the legislature and testified that he did these

16  crimes?

17  A.  I don't recall ever naming him.  And, no, it doesn't bother

18  me that he was acquitted of a different charge.

19  Q.  Can we pull up the July 10, 2021 Senate Affairs transcript,

20  please.

21      Now, we know Mr. Gonzalez was -- his contest was the only

22  one on the ballot, correct?

23  A.  That's correct.  It was a run-off for his election.

24  Q.  If we can go to July 10, 2021, Senate Affairs, page 117.

25          You don't have the transcript?

 1          I believe, Mr. White, we may have to go to the binders that
 2   I handed you.  There's one binder that is labeled *Legislative*
 3   *Testimony*."  If you could turn to the transcript July 10, 2021,
 4   Senate Affairs.
 5   A.  Yes, ma'am.
 6   Q.  Page 117, line 17, if you could read from there until the
 7   first line of the next page, 118.
 8   A.  Yes, ma'am.  I think this agrees with my testimony.
 9   Q.  Can you read what you said there, starting 117.
10          If we could pull it up, please, page 117, line 17?
11   A.  It says, *"We've seen the candidate themselves get involved*
12   *in certain cases where, you know, for example, a run-off*
13   *election in a county towards South Texas, but not in South*
14   *Texas, we had a campaign -- we had a -- the candidate that was*
15   *on the ballot in a run-off election literally the only race on*
16   *the ballot was his race, bringing voter after voter after voter*
17   *into the polling place and assisting them with their ballots."*
18   Q.  Okay.
19   A.  Do you want me to continue on?
20   Q.  No.  But you did deliver that testimony in July of 2021; is
21   that correct?
22   A.  That appears to be correct, yes, ma'am.
23   Q.  Thank you.
24          MS. PERALES:  One moment, Your Honor.
25          I have no further questions.  Thank you, Mr. White,

Jonathan White - Examination                    4039

1    for your time.

2              THE COURT:  Anything else on this side?

3              MS. HARRIS:  Yes, sir.

4                        CROSS-EXAMINATION

5    BY MS. HARRIS:

6    Q.  Good afternoon, Mr. White.  My name is Ashley Harris.  I

7    represent the OCAGH plaintiffs.  I have a few more questions

8    for you about the OAG's investigations and prosecutions.

9         You stated you were previously the division chief of the

10   Election Integrity Division, correct?

11   A.  Yes, ma'am.

12   Q.  And you left that position on December 1, 2022?

13   A.  Yes, ma'am.

14   Q.  That division handles elections-related prosecutions,

15   right?

16   A.  I think that's fair.

17   Q.  And the majority of things that the division works on are

18   related to elections?

19   A.  Yes, I think that's fair, also, though we have taken some

20   overflow cases from the Criminal Prosecutions Division from

21   time to time.

22   Q.  In that position, you were generally aware of all

23   prosecutions by the division, correct?

24   A.  Correct.

25   Q.  Geoff Barr leads the division today, correct?

1  A.  Correct.

2  Q.  I'm going to turn to discussing the Court of Criminal

3  Appeals case *State v. Stephens*, which you are familiar with,

4  correct?

5  A.  Yes, ma'am.

6  Q.  The decision in *State v. Stephens* was initially issued by

7  the Court of Criminal Appeals on December 15, 2021, correct?

8  A.  That sounds correct, yes, ma'am.

9  Q.  If I refer to that initial order as *"Stephens 1,"* will you

10  understand that to mean this initial order from December 20,

11  2021?

12  A.  Yes, ma'am.

13  Q.  You were working in the Election Integrity Division when

14  *Stephens 1* was issued, correct?

15  A.  Correct.

16  Q.  And OAG's office subsequently filed a motion for rehearing

17  of the *Stephens 1* decision, correct?

18  A.  That's correct.

19  Q.  And that motion was denied on September 28, 2022?

20  A.  That sounds correct, yes, ma'am.

21  Q.  If I refer to that denial as *"Stephens 2,"* will you

22  understand that to mean the rehearing denial issued in

23  September 2022?

24  A.  Yes.

25  Q.  And you were still working in the Election Integrity

Jonathan White - Examination                    4041

1  Division when *Stephens 2* was issued, correct?

2  A.  That's correct.

3  Q.  *Stephens* held that it was unlawful for the OAG to

4  unilaterally prosecute election-related allegations, correct?

5  A.  Correct.

6  Q.  With that in mind, I want to turn to discussing

7  investigations by the OAG.  The Election Integrity Unit handles

8  investigations of potential election-related violations,

9  correct?

10  A.  Yes, ma'am.

11  Q.  And your understanding is that *Stephens* did not alter the

12  OAG's ability to investigate alleged election-related crimes,

13  correct?

14  A.  Correct.  Same authority as state police, just like the

15  Department Public Safety and Texas Rangers.

16  Q.  So they have the same investigative powers as state police?

17  A.  Agreed.

18  Q.  And under certain circumstances, the OAG is statutorily

19  required to investigate election-related allegations, correct?

20  A.  I believe there is a "shall investigate" attached to the

21  provision that allows citizens to make a complaint with two

22  sworn affidavits.  I believe that's correct, yes.

23  Q.  And the OAG considers that "shall" language to make

24  investigation mandatory in those situations, correct?

25  A.  Yes.  I think it requires us to at least make it p

Jonathan White - Examination                    4042

1  investigation into the matter.

2  Q.  Does the OAG have subpoena power while interviewing

3  investigation witnesses or suspects?

4  A.  I would say not any more, because *Stephens* has -- some of

5  the language in *Stephens* was so broad that it assumes, I think,

6  that any grand jury activity is initiating a prosecution.  We

7  don't have any authority over a grand jury.  Even though we

8  have specific authority to appear before a grand jury, I don't

9  think we have grand jury subpoena power any more now.

10  Q.  We'll come back to that discussion of grand juries.

11      The OAG has initiated investigations of alleged elections

12  violations after *Stephens 2*, correct?

13  A.  I would imagine they have.

14  Q.  And to the best of your knowledge, the Election Integrity

15  Unit is still investigating alleged elections violations,

16  correct?

17  A.  As far as I know, yes, ma'am.

18  Q.  It is the OAG's practice to communicate with local

19  prosecutors if the OAG is undertaking an investigation of an

20  alleged election violation in that county, correct?

21  A.  I would say particularly now.  At some point in the process

22  the local prosecutor would be brought in, yes, ma'am.

23  Q.  And so that has continued to be the OAG's practice,

24  particularly after *Stephens*?

25  A.  Particularly after.

Jonathan White - Examination                    4043

1   Q.  After an investigation, there is typically a referral

2   either for local prosecution or an offer made by the OAG to

3   assist with that prosecution, correct?

4   A.  Could you repeat that?  I'm sorry.

5   Q.  After an investigation, there is typically a referral

6   either for local prosecution or an offer made by the OAG to

7   assist with that prosecution?

8   A.  I'm not advised as to the last part of that, but I would

9   agree with the referral for prosecution would be made,

10  typically, after a case.  Although it may have -- it may just

11  be presenting a case without a push to prosecute, if that makes

12  sense.  Just, Here is the case for your review.  That would

13  typically be made, as far as I know.

14  Q.  And you remember being deposed in August 2023, correct?

15  A.  Yes, ma'am.

16  Q.  I'd like to pull up your deposition testimony from

17  August 2023, page 78, line six through eleven.  And do you see

18  where it says, *"The Election Integrity Unit would investigate,*

19  *and there would be a referral"* -- or your answer was -- there

20  would be -- let me start again.

21      Your answer was, *"The Election Integrity Unit would*

22  *investigate, and then there would be a referral either for*

23  *local prosecution or an offer made for us to assist with that*

24  *prosecution, typically."*

25              MR. KERCHER:  Your Honor, if the witness could have

Jonathan White - Examination                    4044

```
 1    the opportunity to read the question, that he's answering in
 2    the transcript so he could have the full context?
 3            MS. HARRIS:  Sure.
 4            (Pause)
 5            THE WITNESS:  Yes, ma'am, I see.
 6    BY MS. HARRIS:
 7    Q.  Okay.  And then it asks:  "And that is still the case
 8    today?"
 9        And you said, "I believe it is."
10    A.  Correct, yes, ma'am.
11    Q.  Do you stand by that testimony today?
12            MR. KERCHER:  Your Honor, I'd object to an improper
13    impeachment.  No contradiction has been established.
14            THE COURT:  I don't think she's trying to -- what are
15    you trying to do here?
16            MS. HARRIS:  Your Honor, I believe he said that he's
17    not sure whether the OAG still offers to assist with that
18    prosecution today, and in his deposition testimony he said, I
19    believe that that is the case still.
20            THE COURT:  That's noted and overruled.
21            THE WITNESS:  Is the answer if I stand by this
22    statement?
23    BY MS. HARRIS:
24    Q.  Yes.
25    A.  I think I was speaking pretty generally at the time, so I
```

Jonathan White - Examination                    4045

1    do not know whether an offer is made to assist every time one

2    of these cases is referred, but that is something that could

3    very possibly happen.  I just don't know that it happens every

4    time, so...

5    Q.  And so in your deposition testimony when you said, *"I*

6    *believe it is,"* referring to the fact that an offer is made to

7    assist with that prosecution typically, which you had

8    mentioned, was that incorrect at that time?

9    A.  I was referring in general to the general statement that

10   there would be a referral either for local prosecution or an

11   offer made to assist with the prosecution, typically; just a

12   general statement.

13   Q.  And you're no longer sure if that is typically the case

14   today?

15   A.  I said at the time *"I believe it is,"* which didn't express

16   certainty, because I don't have certainty about exactly how the

17   Election Integrity Division is being conducted, so the answer

18   would be the same today.

19   Q.  And you don't have any specific knowledge that indicates

20   that that is not the case today?

21   A.  No.

22   Q.  I want to now discuss prosecutions more specifically.  Your

23   understand is that *Stephens* did not alter the OAG's ability to

24   concurrently prosecute election-related crimes with the County,

25   correct?

Jonathan White - Examination                4046

1   A.  Could you define what you mean by "concurrent"?

2   Q.  If they are, for example, deputized or it is done alongside

3   the local prosecuting attorney with their participation?

4   A.  So not exactly.  I think *Stephens* made clear that we would

5   need a deputization from the D.A. before we could proceed, and

6   the Court of Criminal Appeals didn't even reference the Article

7   2.07 of the Code of Criminal Procedure, which allows us to be

8   appointed D.A. pro tem, so it was a written deputization of

9   that D.A. is required for us to be involved in any case.

10  Q.  So those methods through written deputization and being

11  appointed attorney pro tem are unchanged by *Stephens*, correct?

12  A.  In my opinion, yes.

13  Q.  Generally speaking, would you agree that cases with alleged

14  elections violations are political hot potatoes for local DAs?

15  A.  Probably.

16  Q.  And when you say "probably," is there -- do you have a

17  reason to doubt that, or is that a yes?

18  A.  I think in a lot of cases, and in most cases, it probably

19  is, yes, ma'am.

20  Q.  Prior to *Stephens*, in your view, the OAG frequently,

21  independently prosecuted alleged elections violations because

22  local prosecutors found them to be too high profile, correct?

23  A.  Not always.  Occasionally, that would be true.

24  Q.  Would you say that that has been true primarily across the

25  board?

Jonathan White - Examination                    4047

```
 1   A.   No, I wouldn't say across the board.
 2           MS. HARRIS:  One moment, Your Honor.
 3   BY MS. HARRIS:
 4   Q.   I may come back to that in a moment.
 5       In your view, in most counties where the OAG has prosecuted
 6   elections allegations, the OAG has working relationships with
 7   local prosecutors, correct?
 8   A.   In many cases that's true, yes.
 9   Q.   Would you say it is fair to say the majority of cases?
10   A.   Maybe.
11   Q.   I'd like to pull up your deposition testimony from
12   May 2022, page 61, lines 18 through 22, and I'll give you a
13   chance to read the question before it.
14       (Pause.)
15       Let me know when you're ready.
16   A.   Okay.
17   Q.   Do you see where your answer says on -- starting on line
18   18:  "I don't think I can characterize relationships without
19   getting into privilege materials.  But if you do look at our
20   prosecution spreadsheets, so the majority of counties where we
21   have prosecuted cases indicate a working relationship with
22   local prosecutors."
23       Do you agree with that statement today?
24   A.   For the most part, yeah, I think I do.
25   Q.   And I would like to turn to your deposition testimony
```

1    from -- I'd like to turn to your May 5, 2022 deposition

2    testimony on page 43.  And I'll give you a moment to read the

3    question, starting on line page 22.

4    A.  Okay.

5    Q.  And do you see where the question says:  *"Is it accurate to*

6    *say that the OAG before Stephens has taken cases from local*

7    *county prosecutors and prosecuted them sort of independently on*

8    *behalf of the county prosecutor because the county prosecutor*

9    *did not want to handle, like, the political hot potato?"*

10       And you answered:  *"That's been true in a number of cases,*

11   *and we have -- yeah, I think that's been true primarily across*

12   *the board."*

13       Do you still agree with that today?

14   A.  Yeah, so this is a different question than the one you

15   asked, because this is the subset of cases that were brought to

16   us by prosecutors to get them off their plate.  And so I would

17   say that that's probably true in a great many cases, maybe

18   across the board.  I would basically agree with that, yes.

19           MS. HARRIS:  We can take that down.

20   BY MS. HARRIS:

21   Q.  Even prior to *Stephens,* the OAG generally had some form of

22   cooperation from local prosecutors in each prosecution about

23   alleged elections violations, correct?

24   A.  Could you repeat that?

25   Q.  Even prior to *Stephens,* the OAG generally had some form of

Jonathan White - Examination                    4049

1    cooperation from local prosecutors in each prosecution about

2    alleged election violations?

3    A.  If you're referring to each of our prosecutions that was

4    listed on that spreadsheet, then I think I would agree with

5    that.

6    Q.  And that is still true after *Stephens,* correct?

7    A.  I couldn't speak to that.

8    Q.  So after *Stephens 2*, the way that it changed how the law is

9    understood by the OAG's office, it must be true that local

10   prosecutors participate in all prosecutions the OAG conducts,

11   to some extent, correct?

12   A.  To the extent that the D.A. does not recuse, and we're not

13   appointed D.A. pro tem under Article 2.07, then we would have

14   to be deputized by that D.A., and the D.A. would be the one

15   initiating the prosecution, yes, ma'am.

16   Q.  And even in those appointments, there's some involvement

17   between the local prosecuting attorney and the OAG's office to

18   initiate that transition, correct?

19   A.  I couldn't really speak to that, but there would have to be

20   someone.

21   Q.  The OAG still works jointly with local prosecutors on

22   elections prosecutions, correct?

23   A.  I imagine they do.

24   Q.  And you don't have any reason to dispute that they still do

25   that?

Jonathan White - Examination                    4050

 1    A.  Where those opportunities exist, I imagine that they do,
 2    and I don't have any reason to think otherwise.
 3    Q.  And that brings me to my next question.  It is the OAG's
 4    practice to obtain appointments for elections-related
 5    prosecutions from local prosecutors if there is an opportunity,
 6    correct?
 7    A.  I can't speak to what their policy is, but that would be a
 8    wise policy going forward after *Stephens*.
 9    Q.  And that was the practice of the OAG while you were there,
10    correct?
11    A.  No, ma'am.
12    Q.  I would like to pull up your deposition testimony from
13    May 5, 2022 on page 60.  Looking at lines 7 through 11, do you
14    see where starting on line 8, you say:  *"Our practice has been*
15    *where there's an opportunity to obtain appointment or obtain a*
16    *prosecution from a local prosecutor, that we would seek that"*?
17            MR. KERCHER:  Your Honor, I object under the rule of
18    optional completeness.  If we are going to read this into the
19    record, the entire record should be read.
20            MS. HARRIS:  I can read the whole answer.
21    BY MS. HARRIS:
22    Q.  Starting from the beginning:  "We haven't formulated an
23    official policy on that, but our practice has been where
24    there's an opportunity to obtain appointment or obtain a
25    prosecution from a local prosecutor," --

Jonathan White - Examination                        4051

1   A.  So when you asked your question earlier, I thought you were

2   referring to our practice going back historically.  Yes, since

3   *Stephens 1* came down, out of abundance of caution, that

4   certainly it was very possible that that would remain the law,

5   and that our motion for rehearing would be denied, I did start

6   working more closely with local DAs during that period of time.

7   Q.  And so after *Stephens 1,* your practice became to seek

8   opportunities to obtain appointments from local prosecutors

9   where there was that opportunity?

10  A.  Yes, ma'am.

11  Q.  After *Stephens,* did the OAG communicate with local

12  prosecutors to encourage them to invite the OAG to assist with

13  elections-related prosecutions?

14  A.  Are we talking about *Stephens 1* or 2?

15  Q.  Let's start with *Stephens 1.*

16  A.  I think we would have those conversations when there was an

17  opportunity to have those conversations with regard to a

18  specific case.  I don't recall going on any sort of road show

19  to try to promote, you know, our services in working together

20  and things like that.  I don't recall anything like that

21  happening.

22  Q.  So more so if you were having a conversation, you would

23  explain the *Stephens* situation and say that the OAG would need

24  to be invited by the local prosecutor?

25  A.  While discussing a case, yes, ma'am.

Jonathan White - Examination                4052

1          MS. HARRIS:  Your Honor, the next set of documents
2   that I would like to discuss are publicly available records
3   that we're seeking judicial notice of and have filed a motion
4   on the docket late last night that we had -- when we filed,
5   that I had not had time to confer with the parties, but this
6   morning for this new set, which deal only with the Attorney
7   General and a County -- that is not a party.  The state
8   defendants indicated they are not opposed to judicial notice of
9   certain facts that we are seeking.
10          THE COURT:  So what documents are these?
11          MS. HARRIS:  They are court criminal records, and this
12   set is from Collin County.
13          THE COURT:  Any objection to me taking judicial notice
14   of those?
15          MR. KERCHER:  Of?
16          MS. HARRIS:  Of certain facts within them.
17          MR. KERCHER:  That accurately describes our agreement.
18   I think Mr. Nichols' position is slightly different.
19          MR. NICHOLS:  It's a little different, because I
20   represent the Harris County D.A., and I'm trying to stay in my
21   lane.
22          THE COURT:  Not successfully.
23          MR. NICHOLS:  I always told the Court if you thought I
24   was straying, you could always put me back in my lane.  So I
25   don't want to stray out of my lane.  You tell me I am, if I am,

Jonathan White - Examination                    4053

 1   but these are materials that were -- just so the record is
 2   clear, these are materials that were provided to all
 3   defendants, I believe at 5:15 p.m. last Friday, after the
 4   plaintiffs had indicated they were calling no more witnesses,
 5   and the only thing that was going to be left was the
 6   introduction of exhibits.
 7          So just to make sure the record is clear, we never had
 8   these materials until Friday at 5:15 p.m., which kind of puts
 9   everybody -- I'm speaking on behalf of all defendants.
10          THE COURT:  How does this prejudice your client?
11          MR. NICHOLS:  Again, I don't know how they're going to
12   argue things.  I think the Court knows where I'm coming from.
13   I don't think it does hurt us to talk about something that
14   happened in Collin County, so -- but I want to make sure the
15   record is clear that as to why we have an issue procedurally
16   and perhaps otherwise with respect to Harris County if they --
17   if you decide to use those.
18          THE COURT:  So for now, I'm going to take judicial
19   notice.  I'll see where this goes and see if anybody's
20   prejudiced that causes me to reconsider.
21          MS. HARRIS:  Your Honor, I can also answer some of
22   those timing questions now or as they come up.
23          THE COURT:  Go ahead.  Just continue.
24          MS. HARRIS:  Okay.
25   BY MS. HARRIS:

Jonathan White - Examination                    4054

1    Q.  I would like to first pull up some public criminal records

2    from Mark Whitaker.  Namely, his investigation in Collin

3    County.  And it's labeled "Whitaker Investigation."  It is a

4    different document entitled "Whitaker Investigation."

5        (Pause.)

6            MS. HARRIS:  Your Honor, I can also offer the witness

7    a hard copy, and I have hard copies for other parties as well.

8            THE COURT:  Why don't you go ahead and do that.

9    BY MS. HARRIS:

10   Q.  Mr. White, do you have the investigation in front of you?

11   A.  I have the documents I was provided.  The first thing I'm

12   seeing is a docket sheet.

13   Q.  Yes.  If you flip towards Exhibit 7, you should see an

14   incident report.

15   A.  Yes, ma'am.

16   Q.  Looking at page one of this incident report, this is an

17   Election Integrity Division investigation for an election code

18   violation, correct?

19   A.  Yes.  I have no knowledge of this document, but that

20   appears to be the case.

21   Q.  And under *"Synopsis"* in the middle of the page, it's dated

22   6/14/2022, correct?

23   A.  That date appears in the synopsis, yes, ma'am.

24   Q.  And you were still at the Election Integrity Division on

25   that date, correct?

Jonathan White - Examination                    4055

1    A.  I would have been, yes, ma'am.

2    Q.  Do you see in the middle of the synopsis it says, *"This*

3    *case was referred by the Secretary of State's Office"*?

4    A.  Yes, ma'am.

5    Q.  And you've testified that investigations and prosecutions

6    often originate with referrals from the Secretary of State's

7    office, correct?

8    A.  Correct.

9    Q.  I want to now turn to page 5 of this incident report.  Do

10   you see where in -- towards the top of the page, it says,

11   "1.26," and then, *On 8/17/2022, Sergeant James Quinn and I met*

12   *with Taylor Reese with the Collin County District Attorney's*

13   *Office to discuss the investigation"*?

14   A.  Yes, ma'am.

15   Q.  This is an example of the Attorney General looping in local

16   prosecutors during elections investigations, correct?

17   A.  It appears to be, yes, ma'am.

18   Q.  I would like to next turn to the indictment filed in this

19   case, which is labeled *"Whitaker Indictment,"* John.

20       And looking at the screen before you, this is an indictment

21   for an election related allegation in the same case, correct?

22   A.  Yes, ma'am, for an offense occurring in November 2020, it

23   appears.

24   Q.  And the indictment itself is dated July 2022, correct?

25   A.  That's right.

Jonathan White - Examination                    4056

1    Q.  And the Attorney General is listed as the agency on this
2    indictment?
3    A.  I'm sorry.  I may have misstated the date.  I think it was
4    filed on October 13th of 2022.  I'm not sure what we just
5    talked about.
6    Q.  Yes.  Below where it says *"True Bill of Indictment,"* the
7    date listed is July 2022 before the grand jury, correct?
8    A.  That's when the grand jury was impaneled.  And they would
9    have served six months to the end of year, so the date of this
10   document was actually October 13 of 2022; but, yes, ma'am.
11   Q.  Thank you.  And you were still in the Election Integrity
12   Division in October 2022, correct?
13   A.  That's correct.  I would have been handing off duties to
14   several of my attorneys at that time, and Joseph O'Neill would
15   have been one of them.
16   Q.  And Joseph O'Neill is an OAG attorney listed as the witness
17   on this indictment, correct?
18   A.  He is, yes, ma'am.
19   Q.  So the public record indicates that the OAG brought this
20   indictment, correct?
21   A.  No.  I think that it would be more accurate to say that
22   this -- this field here indicates the law enforcement agency
23   that conducted the investigation.  That's what that field
24   notates.  And that CX number is the case report number, and
25   should match up with the report that you just showed as

Jonathan White - Examination                4057

1   Exhibit 7 or whatever it was.

2   Q.  I would next like to pull up a document listed in this case

3   as *"Whitaker/O'Neill Deputation."*

4       Do you see that this document was filed on October 24,

5   2022, in the top right corner?

6   A.  Yes, ma'am.

7   Q.  And signed on October 6, 2022?

8   A.  Yes, ma'am.

9   Q.  And you were still working in the Election Integrity

10  Division on that date, correct?

11  A.  Yes, ma'am.  I was on my way out.

12  Q.  And this document says that Joseph O'Neill was appointed as

13  special prosecutor for the Collin County criminal District

14  Attorney in this case, correct?

15  A.  Yes, ma'am.

16  Q.  And this was after the *Stephens 2* decision, correct?

17  A.  Yes, ma'am, that would be correct.

18  Q.  I now want to pull up a document labeled *"Whitaker/Barr*

19  *Deputation."*

20      And this is labeled on the public criminal docket as

21  State's Notice of Appearance of Counsel.  This document says

22  that Geoff Barr was appointed as special prosecutor for the

23  Collin County criminal district attorney in this case, correct?

24  A.  That's what this indicates, yes, ma'am.

25  Q.  And Geoff Barr is the current director of the Election

Jonathan White - Examination                4058

1    Integrity Division?

2    A.   Yes, ma'am.

3    Q.   And this document was signed on August 8, 2023, correct?

4    A.   Correct.

5    Q.   So this appears based on the public record and your

6    understanding of documents like this to be an example of a

7    local prosecutor deputizing the OAG to prosecute an allegation

8    of an election-related crime, correct?

9    A.   Yes, ma'am, that's what happened in this case.

10   Q.   And this deputation was after *Stephens 2* as well, correct?

11   A.   Correct.

12   Q.   We can pull that down.

13        I would like to turn to discussing referrals.

14        The OAG can refer cases to local prosecutors for

15   prosecution, correct?

16   A.   Of course.

17   Q.   I would like to refer to OCA 377, which is the

18   September 2022 version of the spreadsheet you've been

19   discussing.  Turning to page 16, on the last row, do you see

20   Rogers listed?

21   A.   Yes, ma'am.

22   Q.   This was an OAG prosecution for an election-related

23   allegation, correct?

24   A.   That's correct.

25   Q.   And that case was initially filed by the OAG in Montgomery

Jonathan White - Examination                    4059

1  County, correct?

2  A.  That's correct.

3  Q.  That was despite Mr. Rogers residing and allegedly voting

4  in Harris County, correct?

5  A.  That is correct.  It was prosecuted under Chapter 273.024

6  of the Election Code.

7  Q.  And I believe you earlier referred to that as the "Venue

8  Provision"?

9  A.  Yes, ma'am.

10  Q.  Prior to *Stephens,* the OAG understood itself to have

11  jurisdiction to independently prosecute elections-related

12  offenses in counties adjacent to where the offense allegedly

13  occurred, correct?

14  A.  Correct.

15  Q.  Mr. Rogers's case was dismissed in Montgomery County in

16  October 2022, correct?

17  A.  Very possible, yes, ma'am.  I don't know the date.  I know

18  that it was dismissed, yes.

19  Q.  Okay.  That dismissal occurred while you were at the

20  Election Integrity Division, correct?

21  A.  Sure.

22  Q.  The OAG referred these charges to the Harris County

23  District Attorney's Office subsequently, correct?

24  A.  That may have been the case.

25  Q.  Would it be helpful to refresh your recollection about

Jonathan White - Examination                4060

1    that?

2    A.  If you think I need to be refreshed, then please do.

3    Q.  We can try.  I would like to pull up a document entitled

4    "Hervis Rogers Article" on page two.

5         Do you see in the second half of the page where it says,

6    *"Joe Steinbaker, a spokesperson for OGG's office said the AG's*

7    *office --"*

8              MR. KERCHER:  Objection, Your Honor.  And apologize

9    for interrupting.  This is not a document that I am aware of as

10   having been previously disclosed.  It's not marked as an

11   exhibit, and before begin reading contents into the record, I

12   object to it as hearsay and on the basis that we have no notice

13   of it.

14             MS. HARRIS:  A couple things, Your Honor.  The witness

15   can review it just to refresh his memory.  But it's also not

16   hearsay, because it is the statement of a party opponent,

17   because it was stated by a spokesperson for Harris County

18   District Attorney's office.

19             THE COURT:  So let's take this down and back up and

20   ask your question to the witness.

21             MS. HARRIS:  Okay.

22   BY MS. HARRIS:

23   Q.  The OAG referred these charges to the Harris County

24   District Attorney's Office, correct?

25   A.  I believe that is correct.

Jonathan White - Examination                    4061

1   Q.  And the Harris County District Attorney did not prosecute

2   this case before the OAG dismissed it in Montgomery County,

3   correct?

4   A.  Correct.

5          MS. HARRIS:  I am now going to seek to pull up a

6   public criminal document from Harris County, which I believe

7   Mr. Nichols does have an objection to, and it is also included

8   in our motion filed last night.  It is grand jury documents

9   publicly available from Harris County.  It did -- we weren't

10  aware of them until after they happened relatively recently.

11  We also believe that they likely should have been produced in

12  discovery, and we kind of came about them by happenstance.

13         THE COURT:  Is it for the same proposition that

14  assistant attorney generals are prosecuting cases in counties?

15  Is that where this is going?

16         MS. HARRIS:  It is to show that the Attorney General

17  is referring these cases to local prosecutors post-*Stephens* and

18  therefore feel obligated to take these cases in a way that they

19  did not prior to *Stephens.*  And local district attorneys are

20  still enforcing these as well.

21         THE COURT:  How is he going to testify to what

22  pressured local district attorneys may feel?

23         MS. HARRIS:  Yeah, not to feeling, but the fact that

24  he has stated that they did refer the case.  And just to show

25  that Harris County subsequently did prosecute this case.

Jonathan White - Examination                4062

```
 1              THE COURT:  Without showing the document, which
 2   Mr. Nichols is already going to object to, why can't you just
 3   ask him questions?
 4              MS. HARRIS:  I can ask.
 5   BY MS. HARRIS:
 6   Q.  Mr. White, are you -- let me start again.
 7       The Harris County District Attorney brought charges against
 8   Mr. Rogers to a grand jury, correct?
 9   A.  Yes, I believe it was "no-billed."
10   Q.  It was "no-billed."  And that occurred after the OAG
11   referred the case to Harris County, correct?
12   A.  Correct.
13   Q.  Okay.  And last question on this case.  To your knowledge,
14   the Harris County District Attorney would not have attempted to
15   prosecute this case against Hervis Rogers if it had not been
16   referred by the OAG first, correct?
17              MR. NICHOLS:  Objection.  Speculation as to what was
18   in the mind of Harris County District Attorney's Office.
19              THE COURT:  That's sustained.
20              MS. HARRIS:  I'll rephrase.
21   BY MS. HARRIS:
22   Q.  To your knowledge, the Harris County District Attorney did
23   not attempt to prosecute this case against Hervis Rogers before
24   it was referred to the OAG?
25   A.  I disagree with the assumption that there was an attempt
```

Jonathan White - Examination                4063

1   ever to prosecute Hervis Rogers, who simply presented to a

2   grand jury.

3   Q.  I would like to look at another case.  Pulling up OCA377,

4   going to the top of page 17, do you see Ignacio Gonzalez

5   Beltran listed?

6   A.  Yes, I do.

7   Q.  Similar to Mr. Rogers's case, this alleged election

8   violation occurred in Harris County, but was prosecuted by the

9   OAG in Montgomery County, correct?

10  A.  Correct.

11  Q.  Mr. Gonzalez's case was also dismissed in Montgomery County

12  in October 2022, correct?

13  A.  I believe that's correct, yes, ma'am.

14  Q.  And the OAG referred these charges to the Harris County

15  District Attorney's Office subsequently, correct?

16  A.  I believe that's true.

17  Q.  And Harris County subsequently brought these charges

18  against Mr. Gonzalez to a grand jury, correct?

19          MR. NICHOLS:  Objection.  Form.  Mischaracterizes the

20  evidence.

21          THE COURT:  That's overruled.

22          THE WITNESS:  I think -- I'm aware that -- I believe

23  I'm aware that the charges were presented to a grand jury -- or

24  that the matter was.  I don't know if an indictment was ever

25  presented or not.

Jonathan White - Examination                    4064

 1  BY MS. HARRIS
 2  Q.  In Harris County?
 3  A.  Yes, ma'am.
 4  Q.  If I represented to you that that grand jury returned a "No
 5  Bill," would that sound correct?
 6  A.  Yes, ma'am.
 7  Q.  The Harris County District Attorney did not take any
 8  prosecutorial action on this case before it was referred by the
 9  OAG, correct?
10  A.  I don't think they took prosecutorial action at any point.
11  Q.  Let me put it another way.  The Harris County District
12  Attorney did not bring these charges to a grand jury before it
13  was referred by the OAG, correct?
14       MR. NICHOLS:  Your Honor, he's already testified that
15  he doesn't know whether any charges were actually brought to
16  grand jury.
17       THE COURT:  Do you recall that?
18       THE WITNESS:  I don't know.
19       THE COURT:  Next question.
20  BY MS. HARRIS:
21  Q.  I would last like to pull up House Bill 17, or HB17, which
22  was passed by the 88th Legislature in 2023.
23       Are you familiar with this bill?  I believe it was
24  discussed earlier.
25  A.  I'm familiar with this bill conceptually, but I have not

Jonathan White - Examination                 4065

1   had an opportunity to read it.

2   Q.  Okay.  Let's take a look at Section 1 where in parentheses

3   3 it defines "Official Misconduct."  And then looking at

4   Subsection b, *"Included in official misconduct is a prosecuting*

5   *attorney's adoption or enforcement of a policy of refusing to*

6   *prosecute a class or type of criminal offense in state law or*

7   *instructing law enforcement to refuse to arrest individuals*

8   *suspected of committing a class or type of offense under state*

9   *law."*

10       Did I read that correctly?

11  A.  Yes, ma'am.

12       MR. NICHOLS:  You need to read the rest of it.

13       THE COURT:  Next question.

14  BY MS. HARRIS:

15  Q.  Is it your understanding that this bill changed the law

16  such that it is official misconduct for local prosecutors to

17  have a policy of refusing to prosecute certain offenses?

18       MR. NICHOLS:  Objection.  Form.  Mischaracterizes the

19  plain text of the statute.

20       THE COURT:  Yeah, I'm not sure where you're headed

21  with this.

22       THE COURT:  This says it's "complete class or type."

23       MS. HARRIS:  I can rephrase.

24  BY MS. HARRIS:

25  Q.  So considering this bill, a prosecuting attorney's -- if a

1   prosecuting attorney had a policy of refusing to prosecute

2   election-related crimes, that could be considered official

3   misconduct, correct?

4   A.   Yeah, to the extent that that's a class offense, like

5   shoplifting or something like that, yeah, I agree that this

6   opens that up, subject to the exceptions noted there afterward.

7   Q.   And so that would apply more specifically as well if a

8   certain election-related offense -- there was a policy in a

9   local prosecutor's office to not prosecute that specific

10  elections offense, correct?

11  A.   I don't know about that, because the wording is "*committing*

12  *a class of type of offense,*" so perhaps it would be, but it's

13  certainly a blanket policy that regardless of the facts of an

14  individual case, this type of crime will not be prosecuted.

15  That's the way I read that.

16          MS. HARRIS:  I have no more questions.  Thank you.

17          THE COURT:  Anything else from this side?

18                  CROSS-EXAMINATION

19  BY MR. WATKINS:

20  Q.   Mr. White, how are you?

21  A.   Good.  Thank you.

22  Q.   My name is Elijah Watkins.  I'm with the law firm of Stoel

23  Rives, and I represent Mi Familia.  You and I have never had

24  the opportunity to meet before, have we?

25  A.   I don't think so.

Jonathan White - Examination                    4067

1    Q.  Let me get a little background from you then.  You have

2    been prosecuting election-type cases since in or around 2008;

3    is that right?

4    A.  Yes, sir.

5    Q.  And before going to the OAG's office, were you a county

6    prosecutor?

7    A.  No, sir.  I came straight on to the Attorney General's

8    Office from law school.

9    Q.  So you've been a prosecutor for approximately 20 years or

10   so?

11   A.  Sixteenish, 15, 16 years.

12   Q.  During those 15 to 16 years, you've charged many cases?

13   A.  That's probably fair to say.

14   Q.  Hundreds?

15   A.  Not sure about hundreds.

16   Q.  And you've done that by way of a complaint?

17   A.  We would -- you know, I don't know if the majority would be

18   by indictment, but probably so, probably more indictments than

19   charging by complaint and information.

20   Q.  I want to get a sense of what goes into your thinking in

21   charging these cases over the last 15 to 16 years by way of

22   indictment.

23       You make charging decisions based on investigative reports,

24   right?

25   A.  No, not exclusively.

Jonathan White - Examination                    4068

1    Q.  You make some of your charging decisions based off

2    investigative reports, right?

3    A.  I would say kind of the opposite.  Investigative reports

4    may inform a charging decision, among other things.

5    Q.  And that's fair.  The criminal investigator brings

6    information to you, and then you do some extra, additional

7    digging before you make your charging decision; is that fair?

8    A.  Correct.  And hopefully he would also bring original

9    exhibits -- not exhibits -- sorry -- evidence, election

10   records, recorded interviews; all of those sorts of things with

11   the report.

12   Q.  And that's a great point.  You just don't take the criminal

13   investigator's word for it, right?

14   A.  Correct.

15   Q.  You want to see the proof and evidence that they are making

16   their recommendation on, correct?

17   A.  That's right.

18   Q.  You would expect their report to be written up?

19   A.  In most cases, yeah, the report will be written up before

20   we go to grand jury.  I would say almost always.

21   Q.  And in those reports, sometimes there's witnesses who have

22   been interviewed?

23   A.  Correct.

24   Q.  There might be a written summary of that interview?

25   A.  Yes.

Jonathan White – Examination                          4069

1   Q.   That interview may have been recorded?

2   A.   Yes.

3   Q.   And there might be physical evidence involved as well,

4   correct?

5   A.   That is true.  Documentary evidence, typically, but yes.

6   Q.   There would be documents?

7   A.   Yes.

8   Q.   Potentially, photographs?

9   A.   Depending on the case, there could be.

10  Q.   Potentially, video?

11  A.   Depending on the case, there might be.

12  Q.   Potentially, computer data, like, search history?

13  A.   Generally not, but that's possible.

14  Q.   Regardless, that evidence and those written reports are

15  recorded in some form or fashion, correct?

16  A.   For the investigations that are referred for prosecution,

17  yes, they would be.

18  Q.   And you take your job seriously?

19  A.   Well, I do.

20  Q.   And so this is a thorough process that you're engaged in?

21  A.   Prior to December 1 of 2022, I was in this role, yes, sir.

22  Q.   There's considerable energy and resources put into this

23  investigatory process and the decision whether or not to charge

24  someone?

25  A.   Depending on the situation.  And I think the question was

Jonathan White - Examination                    4070

1  investigative resources, yes; although sometimes we were

2  providing investigative resources on our side, taking the ball

3  from law enforcement and doing a lot of heavy lifting

4  ourselves, but...

5  Q.  And whether or not it's law enforcement doing the

6  investigation or the OAG's office doing the investigation, you

7  would agree that it's taxpayer dollars that are being expended?

8  A.  Certainly.

9  Q.  And you're not here to waste the taxpayers' money, right?

10  A.  That is not one of my goals in life, sir.

11  Q.  And it's important for you to have that physical evidence

12  and that actual report in case the case goes to trial?

13  A.  In most cases, that would be true.

14  Q.  You're not going to try a case without evidence, are you?

15  A.  Certainly I wouldn't try a case without evidence.

16  Q.  Do you ever prosecute people without evidence?

17  A.  I have never been to trial without evidence.

18  Q.  My question was:  Do you ever prosecute people without

19  evidence?

20  A.  Same answer.

21  Q.  So it's important for you to have that evidence.  It's

22  important for you to have those reports, because you don't

23  prosecute people without evidence, and you don't go to trial

24  without evidence, right?

25  A.  I think that's pretty fair.

Jonathan White - Examination                    4071

1    Q.  When we -- throughout the testimony today, you've been
2    talking about various cases that you recall or have worked on.
3    You didn't provide any of the underlying evidence that supports
4    those cases, did you?
5    A.  I was -- I provided what I was asked to provide by counsel,
6    but those investigative files were not in the care, custody,
7    and control of my division in the Election Integrity Division,
8    so I'm not aware what was provided and from where.
9    Q.  You did not provide the investigative files to plaintiffs
10   in this case, right?
11             MR. KERCHER:  Objection.  Asked and answered.
12             THE COURT:  That is overruled.  He can answer.
13             THE WITNESS:  No, my team -- I'm sorry, not my team,
14   but the litigation team would have provided whatever documents
15   that were provided to the plaintiffs in this case.
16   BY MR. WATKINS:
17   Q.  So you also didn't provide those investigative files to the
18   court, right?
19   A.  I didn't directly provide anything to anyone but counsel.
20   Q.  So plaintiffs in this case and the Court, they haven't had
21   the opportunity to review witness statements, for instance?
22   A.  I don't know.
23   Q.  And they haven't had any opportunity to review any
24   documentary evidence that supports your claims of criminality?
25   A.  I don't know.

Jonathan White - Examination                      4072

1   Q.  I want to talk about the standards you employ in
2   determining whether or not to prosecute.  You're obviously
3   familiar with the probable cause standard, right?
4   A.  Yes.
5   Q.  That means that something is more probable than not?
6   A.  Yes, sir.
7   Q.  It's probable that a person named in a charging document
8   committed the offense.  That's probable cause?
9   A.  Sure.
10  Q.  You're also familiar with "beyond a reasonable doubt"?
11  A.  Yes, sir.
12  Q.  Texas has a specific jury instruction which lays out what
13  "beyond a reasonable doubt" means?
14  A.  To some degree.
15  Q.  You would agree that there's a big difference between
16  probable cause and beyond a reasonable doubt, right?
17  A.  Yes.  I agree there's a difference.
18  Q.  Beyond a reasonable doubt is the highest standard in our
19  legal system?
20  A.  Correct.
21  Q.  In Texas, beyond a reasonable doubt is a doubt that would
22  cause a reasonable person to hesitate before acting?
23  A.  We didn't use to define it for juries, but that sounds
24  reasonably accurate.
25  Q.  And the burden is on the State at all stages to prove its

Jonathan White - Examination                4073

1    case?

2    A.  That's right.

3    Q.  And if a person is charged, they're still presumed

4    innocent, correct?

5    A.  That's correct.

6          THE COURT:  Sir, you have to remember you're doing

7    this at the bench.  This is all kind of -- I mean, unless you

8    think the Fifth Circuit is not smart enough to understand all

9    this, why are we doing this?

10         MR. WATKINS:  I certainly appreciate Your Honor.  I

11   can move on.

12   BY MR. WATKINS:

13   Q.  So just to clarify, on that Exhibit 82, where there's

14   pending prosecutions, those pending prosecutions, you're not

15   representing to the Court that there's a conviction there, but

16   it's just that someone is presumed innocent but you're

17   investigating them?

18   A.  Correct.  And I believe I testified that most of those I

19   believe have been dismissed subsequent to *Stephens*.

20   Q.  On Exhibit 82, all of the cases that were listed there,

21   those were pre-SB1 cases, correct?

22   A.  Yes, I believe that's true.  I might have to look at those

23   pending cases to be sure.  Depending on the date of the

24   document, but at least the resolved ones should have been.

25   Q.  And when you're charging individuals, you use probable

Jonathan White - Examination                4074

1    cause as your standard whether or not to them and not beyond a

2    reasonable doubt?

3    A.  That's the legal standard for charging, yes.

4    Q.  So my question is, you, in your position as division chief

5    at the time, you -- and you instructed those in your division

6    to use the probable-cause standard and not the

7    beyond-a-reasonable-doubt standard in determining whether or

8    not to prosecute?

9    A.  We were probably, to be perfectly honest, looking for

10   something a little bit more than probable cause and something a

11   little bit closer to beyond a reasonable doubt before bringing

12   a case.

13   Q.  I want to make sure I get your testimony correctly.  So the

14   standard that you employed on whether or not to bring

15   prosecution was -- whether to proceed with a case was probable

16   cause, right?

17   A.  That's the legal standard for an indictment or an

18   information.

19   Q.  And I appreciate that.  My question to you is, is that the

20   standard you and your office employed?

21   A.  As I previously testified we were looking probably for

22   something a little higher than probable cause.  We wanted to

23   ensure that we were bringing good cases.

24   Q.  You gave a deposition in this case?

25   A.  Three.

Jonathan White - Examination                    4075

1    Q.  You gave three depositions in this case?

2    A.  Yes, sir.

3    Q.  Including one in April of 2022?

4    A.  Yes, sir.

5    Q.  Told the truth in that deposition?

6    A.  I'm sure I did the best to my ability.

7    Q.  I'm sure you did.

8        Can we pull up April 27, 2022 deposition, please.  And

9    we're looking for page 16, lines 15 through 19.  Go ahead and

10   highlight that.

11       Said -- *"Question:  And when you say there would be*

12   *sufficient evidence to proceed, is there a legal standard that*

13   *would be relevant in you determining whether to proceed with a*

14   *case?"*

15           MR. KERCHER:  Objection.

16   BY MR. WATKINS:

17   Q.  *"Answer:  Probable cause in Texas."*

18           THE COURT:  One second.

19           MR. KERCHER:  Objection, Your Honor.  Improper

20   impeachment.  There's been no contradiction.

21           THE COURT:  That's sustained.

22   BY MR. WATKINS:

23   Q.  You're aware, of course, though, that other offices have

24   different standards that they employ, right?

25   A.  Well, probable cause is the legal standard, but offices may

Jonathan White - Examination                      4076

1  look at a higher level of proof than just probable cause

2  depending on the type of case, the difficulty of that case, and

3  other factors.  Election cases would probably be on that list.

4  Q.  Okay.  And that's fair.  So other -- other prosecutor's

5  offices may look and say, *Even though I can charge with*

6  *probable cause, I'm going to look for reasonable doubt, because*

7  *even if I can see probable cause here, if I can't get to*

8  *reasonable doubt, what's the point?*

9  A.  I think that's probably fair.  That probably happens quite

10  a bit.

11  Q.  And is that what happened in your office?

12  A.  With regard to certain decisions, I'm sure that did happen,

13  yes.

14  Q.  Did you have a policy that was written or stated --

15  A.  No.

16  Q.  Let me -- let me get my question out.

17      Was there a policy that you had written or stated for the

18  attorneys in your office that instructed them to look for

19  beyond a reasonable doubt and not probable cause?

20  A.  Still no.

21  Q.  You're aware, of course, that an investigation of a crime

22  of an individual, even one that does not lead -- that does not

23  lead to an indictment can negatively impact that person's life?

24  A.  Yes, yeah.  In some cases, that's unavoidable.

25  Q.  It can impact their career?

Jonathan White - Examination                    4077

```
 1   A.   Could, depending on the circumstances.

 2   Q.   Impact social and family standing?

 3   A.   I assume that's possible in some cases.

 4   Q.   But nonetheless, in your mind, you're pursuing justice in

 5   these cases, so you proceed regardless if there's reasonable

 6   doubt?

 7   A.   With an investigation?

 8   Q.   Yes, sir.

 9           MR. KERCHER:  Objection.  Misstates his testimony,

10   Your Honor.

11           THE COURT:  That's sustained.

12   BY MR. WATKINS:

13   Q.   You started in 2008 at the AG's office?

14   A.   Yes, sir.

15   Q.   And you were initially part of the White Collar Crime

16   Division; is that correct?

17   A.   Section.  White Collar Crime and Public Integrity Section

18   of the Criminal Prosecutions Division.

19   Q.   Thank you for the clarification.

20        And up until recently, you were the division chief for the

21   Election Integrity Division; is that right?

22   A.   That's correct.

23   Q.   That was somewhat of an administrative role?

24   A.   There were certainly administrative aspects of it, yes.

25   Q.   Had to maybe deal with HR issues?
```

Jonathan White - Examination                4078

1   A.   I was a little lucky on that front.  We're a small group.

2   Q.   Performance issues of the attorneys in your office?

3   A.   Things like that.

4   Q.   Budgetary issues?

5   A.   Sure.

6   Q.   In fact, there's a separate line item in the AG's budget

7   for the Election Integrity Division; is that right?

8   A.   That may be the case.  I'm not advised on that.

9   Q.   Well, did you ever submit information in order to get your

10  budget set?

11  A.   That's not exactly how it worked, no.

12  Q.   There was no information that you provided that would

13  impact your budget one way or the other?

14  A.   The budget is sort of given to you by the agency.

15  Q.   Well, this budget is approved by the legislature, right?

16  A.   Right.  And so if you're talking about what our agency

17  submitted to the legislature, I am not advised of that.

18  Q.   Did you ever report on the number of prosecutions that your

19  office engaged in?

20  A.   Internally?

21  Q.   Yes, internally.

22  A.   Yes.

23  Q.   And then did you ever publish that information to others

24  that could determine your budget?

25  A.   I imagine that was provided somewhere in the process.  I

Jonathan White - Examination                4079

1    don't know if I did that directly, though.

2    Q.  The busier you are, you would expect that to impact your

3    budget, right?

4    A.  No, not necessarily.  This is state government.

5    Q.  Well, in a fiscally conservative place like Texas, you

6    would hope that the legislature is not looking to waste

7    taxpayer dollar, right?

8    A.  I believe that's a fact.

9    Q.  They're not looking to spend money in a division that's not

10   working?

11   A.  I couldn't say.  Probably not.

12   Q.  Okay.  And so you would report how busy you are?

13   A.  Not as such, no.

14   Q.  The election integrity and voter fraud cases that you would

15   charge, those usually have multiple counts in a single

16   complaint, right?

17   A.  A good number of them did.  Probably a majority did.

18   Q.  And I think we looked at some of those already throughout

19   the day?

20   A.  Yes, sir.

21   Q.  The unit of prosecution is typically a single ballot,

22   though, correct?

23   A.  The unit of prosecution is a ballot?

24   Q.  There is a ballot, and something happened in that ballot

25   that results in some sort of prosecution or charge?

Jonathan White - Examination                4080

1    A.   No, no.  We wouldn't -- a ballot wouldn't be the unit of

2    prosecution.  It would be the -- an offense under the election

3    code would be a unit of prosecution.

4    Q.   And sometimes those offenses are because of what happened

5    on the ballot; for example, what you believe would be a forged

6    signature?

7    A.   Sure.

8    Q.   And in your experience, charged voter fraud cases typically

9    involve more than one vote, right?

10   A.   In the case of illegal voting, it would be very common that

11   it is one single vote at issue; but in ballot-harvesting cases,

12   there would most often be more than one vote included.  That

13   doesn't mean we always got there with a prosecution.  All we

14   might have is that one vote.  But, yes, in general.

15   Q.   Well, and that -- and the reason you say "Yes, in general,"

16   that's because if someone is actually trying to affect an

17   election, the person needs more than one vote or one ballot to

18   impact the election, right?

19   A.   In most cases, yes.

20   Q.   And the election integrity voter fraud cases you charge

21   sometimes involve more than one person engaging in conduct,

22   right?

23   A.   That's true.

24   Q.   There might be one offense but multiple people committing

25   that same instance of offense?

Jonathan White - Examination                    4081

1   A.  If they were acting in concert, yes, that could happen.

2   Q.  And if there's more than one person acting in concert, you

3   charge them in separate charging documents, right?

4   A.  In Texas, we generally charge all defendants separately.

5   We don't charge co-defendants in the same indictment.

6   Q.  So that would result in two entries on your spreadsheet?

7   A.  For each individual?

8   Q.  Yes, sir.

9   A.  Under the scenario that you described, yes; although, I

10  don't recall that specific scenario occurring with a single

11  vote.

12  Q.  Let's talk about specific scenarios then.  I believe in

13  your testimony you referenced a few different cases where you

14  yourself had personal knowledge of the underlying facts of the

15  case.  Do you remember that?

16  A.  Yes, sir.

17  Q.  I think there was an individual named Burns that you talked

18  about?

19  A.  Yes, sir.

20  Q.  And there was an individual named Brown that you talked

21  about?

22  A.  Yes.

23  Q.  And an individual named Ward that you talked about?

24  A.  Yes.

25  Q.  And a fourth individual named Jackson.  Do you remember

Jonathan White - Examination                    4082

1   testifying about that?

2   A.  Yes, sir.

3   Q.  In the case of Burns, there were seven counts brought

4   against Burns; is that right?

5   A.  I'll take your word for it.

6   Q.  And in the Burns case, those seven counts, some of which

7   were felonies, resulted in one misdemeanor.  Is that what you

8   recall?

9   A.  In terms of the plea deal at the end of the case?

10  Q.  The result of the case, you brought seven counts.  You

11  ended up with one misdemeanor, right?

12  A.  Well, the Gregg County District Attorney's Office

13  prosecuted this case, yes.

14  Q.  And the result was one misdemeanor, right?

15  A.  It was a plea agreement to whatever that offense was.  I

16  think it was 86.006, possession of a ballot in that case.

17  Q.  Is that Class A misdemeanor?

18  A.  It depends.

19  Q.  At the time that the plea deal was reached, did you have a

20  recollection of what the result of the plea deal was?

21  A.  Yes, I think I did.

22  Q.  Do you -- as you sit here today, do you remember what the

23  result of that plea deal was?

24  A.  It -- I think in that case, it was a guilty plea to

25  possession of a ballot under 86.006 of the Election Code.

Jonathan White - Examination                4083

1  Q.  And do you recall, as you sit here today, whether or not
2  possession of the ballot under that provision that you cited
3  was found to be a Class A misdemeanor that was pled to?
4  A.  I don't.  I'll take your word for it.  In this case, it
5  could be a number of categories based on enhancements, if they
6  reached state jail felony or even a third degree felony based
7  on the facts, so I don't know what they reached in this case.
8  If I looked at the spreadsheet and said Class A, then that's
9  what it is.
10 Q.  Would it help to refresh your recollection if you were able
11 to review the docket from the Burns case?
12 A.  I don't know that it would help me, but if it helps you,
13 I'm happy to do it.
14 Q.  I'm just trying to make sure that you understand it was a
15 misdemeanor, that's all.
16 A.  I don't have any problem with that.
17 Q.  Talking about the Brown indictment, in that case, there
18 were 23 counts of fraud that were brought, correct?
19 A.  That sounds correct.
20 Q.  And that resulted in one misdemeanor, right?
21 A.  That was the plea agreement with the Gregg County District
22 Attorney's Office, and we deferred to them on that.
23 Q.  And the Brown case, that was notable because I believe that
24 was the one that Senator Hughes mentioned in the signing of SB1
25 saying if somebody tells you voter fraud doesn't exist, don't

Jonathan White - Examination                4084

1  believe them, because of that case, right?

2  A.  I think he did cite that case from his jurisdiction.

3  Q.  And then in the Ward case, in that case there was six

4  counts brought, right?

5  A.  Sounds correct.

6  Q.  Some of those were fraud.  I mean -- strike that.

7      Some of those were felonies?

8  A.  I think they were enhanced to a state jail felony, pretty

9  sure.

10  Q.  And that prosecution resulted in one misdemeanor, right?

11  A.  That sounds correct.

12  Q.  And then in the Jackson indictment, that one, there were 97

13  counts of fraud brought, correct?

14  A.  Yes, sir, I remember that.

15  Q.  And those were felonies as well?  Or many of them were

16  felonies as well?

17  A.  I think they might have all been felonies, yes.

18  Q.  And out of those 97 counts, which you believe all of them

19  were felonies, that result in one misdemeanor conviction,

20  right?

21  A.  Yes, I recall that was the plea agreement.

22  Q.  I went ahead, and I did the math.  Maybe you're like me and

23  went to law school because you're no good at math, so I used my

24  phone.  But out of those four cases that you have personal

25  knowledge about, that's 133 counts that were brought.  Of those

Jonathan White - Examination                 4085

1   133 counts, across four individuals, that resulted in four

2   misdemeanor convictions.  Does that sound right to you?

3   A.  I have no problem with your math.

4   Q.  And I went further and did a little bit harder math, and

5   that shows about a 3 percent conviction rate.  Any reason to

6   disagree with me on that math?

7   A.  Yeah, depending on how you're defining "conviction," yeah,

8   if you'd put it in terms of the four defendants all taking a

9   plea, that would be a hundred percent.  The number that you

10  chose would be 3 percent, I take your word for it.

11  Q.  If you take the four misdemeanors, the four counts of

12  misdemeanor and divide them by the 133 counts brought, it's

13  3 percent, right?

14        MR. KERCHER:  Objection, Your Honor.  It's attorney

15  testifying.

16        THE COURT:  That's overruled.

17  BY MR. WATKINS:

18  Q.  Is that right?

19  A.  Sounds correct.

20  Q.  And I think we've already established there's about

21  16 million registered voters in Texas?

22  A.  Yes, sir.

23  Q.  It's fair to -- it would be incorrect to say that hundreds

24  of convictions have resulted as a result of election fraud

25  cases, right?

Jonathan White - Examination                    4086

1    A.  Convictions specifically, yeah, that would probably be

2    incorrect in terms of our prosecutions.  I can't speak for

3    local and federal.

4    Q.  And I just want to make sure that I heard your testimony

5    correctly when you were speaking with Ms. Perales.  These four

6    individual defendants in which you brought 133 counts, many of

7    them felonies, which resulted in four misdemeanors, those were

8    all Black defendants, right?

9    A.  That's what I recall testifying.

10   Q.  Counsel on the other side at one point showed you a press

11   release from the Secretary of State's office.  Do you remember

12   that?

13   A.  Could you refresh my memory on what the press release

14   involved?

15   Q.  Certainly.  I believe there was a press release shown to

16   you, and you said some sort of quip about press release have

17   some room for interpretation, and then the attorney said,

18   *"Well, we'll leave it at that,"* and moved on.  You generally

19   remember that?

20   A.  I remember that.

21   Q.  Okay.  You would agree that press releases sometimes put

22   positive spins on facts, right?

23   A.  That's probably true, yeah.

24   Q.  And so it would not be surprising to you if occasionally a

25   press release, say, from the Secretary of State's office, that

Jonathan White - Examination                    4087

1    puts a positive spin on the number of voter fraud prosecutions
2    in the State of Texas, right?
3    A.   That's certainly possible.
4    Q.   Now, you believe that voting in person is better or more
5    secure than voting by mail?
6    A.   Correct.
7    Q.   And you're aware of drive-through voting?  You know what
8    drive-through voting is, sir?
9    A.   I'm aware of an attempt that was made in Harris County,
10   yes.
11   Q.   Well, drive-through voting did, in fact, occur in Harris
12   County.  It wasn't attempted, right?
13   A.   That's probably true.  I'm not an expert on what happened
14   exactly in that election.  I'm just generally aware.
15   Q.   Let's break it down this way.
16       Would you agree with me that in drive-through voting, a
17   voter shows up in person and votes?
18   A.   Yes.
19   Q.   And you're aware that in Harris County, drive-through
20   voting was employed in the November 2020 election, right?
21   A.   Yes, I believe that's the case.
22   Q.   And you're aware that voter turnout in Harris County
23   increased during the November 2020 election, right?
24   A.   I'm not.
25   Q.   In exhibit, I believe it was 82, which is your spreadsheet,

Jonathan White - Examination                    4088

1   there is no cases of voter fraud arising out of use of

2   drive-through voting in Harris County, are there?

3   A.  No.

4   Q.  In fact, there's no instances of voter fraud arising from

5   drive-through voting anywhere on your spreadsheet, correct?

6   A.  I'm not advised if drive-through voting happened anywhere

7   but Harris County.

8   Q.  With drive-through voting, election workers would go up to

9   the car and check in with the voter, right?

10  A.  I'd have to take your word for the process.

11  Q.  To confirm whether the voter is eligible to vote?

12  A.  I'm not sure, but presumably.

13  Q.  You're familiar with curbside voting?

14  A.  Yes.

15  Q.  Curbside voting existed before SB1, right?

16  A.  Correct.

17  Q.  And that was for people that have some sort of mobility

18  issue?

19  A.  Yes.

20  Q.  And in curbside voting, a person shows up in person to

21  vote?

22  A.  Correct.

23  Q.  And you believe that in-person voting is more secure than

24  mail-in voting, right?

25  A.  Yes.

Jonathan White - Examination                    4089

1    Q.  And you're not aware of any case of voter fraud arising
2    from curbside voting anywhere in the State of Texas, right?
3    A.  We've had investigations that involve curbside voting.
4    Q.  Have you had any convictions that resulted in curbside
5    voting?
6    A.  Yes, sir.
7    Q.  And you're aware that SB1 eliminated drive-through voting
8    as a form of in-person voting that you believe is more secure
9    that mail-in voting, correct?
10   A.  I think it clarified --
11        MR. KERCHER:  Objection.  Misstates his testimony,
12   Your Honor.
13        THE COURT:  One second.  You both talked at the same
14   time.  That's overruled.
15        What's your answer?
16        THE WITNESS:  My answer is, I believe it clarified the
17   law in regard to drive-through voting.
18   BY MR. WATKINS:
19   Q.  You're also aware that SB1 removed curbside voting for
20   several types of participants, correct?
21   A.  I'm not advised.  I don't recall.
22   Q.  And curbside voting, I think we established, is a form of
23   in-person voting?
24   A.  Is that a question?
25   Q.  Yes, it is.

Jonathan White - Examination                    4090

1   A.   Yes, sir.

2   Q.   Are you familiar with the idea of 24-hour voting?

3   A.   I'm familiar with what happened in Harris County in 2020.

4   Q.   And in 24-hour voting, a person shows up to vote?

5   A.   Correct.

6   Q.   This is a type of in-person voting?

7   A.   It was something that was done in Harris County.

8   Q.   I appreciate that.  Try to focus on the question that I

9   asked.

10      The question I asked is, is 24-hour voting a type of

11  in-person voting?

12  A.   I don't want to testify that it's a valid form of voting in

13  Texas, but if you're asking me does it take place in person,

14  yes, it does.

15  Q.   And you're aware that it happened in Harris County in 2020,

16  right?

17  A.   Generally.

18  Q.   And was there any cases of voter fraud arising from 24-hour

19  voting in Harris County from 2020 that appear on your

20  spreadsheet?

21  A.   Not that I'm aware of.

22  Q.   Are there any cases of voter -- in-person voter fraud

23  occurring from 24-hour voting appearing anywhere in the State

24  of Texas on your spreadsheet?

25  A.   Not aware of any 24-hour voting elsewhere in Texas.

Jonathan White - Examination                    4091

```
 1   Q.  Now, when somebody votes in a 24-hour setting, the process
 2   is the same as voting during what I'll call "work hours,"
 3   right?
 4   A.  Not an expert.
 5   Q.  A voter comes to a polling place, at least.  Can we agree
 6   on that?
 7   A.  We would have to assume so, yes.
 8   Q.  And you would anticipate that the voter would need to show
 9   ID?
10   A.  I would assume so, yes.
11   Q.  And you would also assume that a poll worker verifies the
12   voter's information?
13   A.  I would have to assume they're abiding by other procedures
14   in the Election Code.
15   Q.  And the voter would be given a single ballot to vote that
16   one ballot, right?
17            MR. KERCHER:  Objection, Your Honor.  The witness has
18   testified this is beyond the scope of his personal knowledge.
19            THE COURT:  Yeah, it's very odd.  The man charged with
20   prosecuting doesn't have firsthand knowledge about how it
21   actually operates.  So what are you trying to do?
22            MR. WATKINS:  I think to establish that very point,
23   Your Honor.
24            THE COURT:  Well, then just ask him that.
25   BY MR. WATKINS:
```

Jonathan White - Examination                    4092

1    Q.  As the man tasked with prosecuting voter fraud in the State

2    of Texas, is it fair to say that you're not aware of all the

3    ways that voting occurs in the State of Texas?

4    A.  I'm not advised upon reading the Election Code of how

5    24-hour voting is supposed to work in Texas.

6    Q.  And by "not advised," you mean you don't know?

7    A.  I don't believe it's in there.

8    Q.  You testified earlier -- strike that.

9        You testified earlier that the special division receives

10   complaints of voter fraud issues typically through the

11   Secretary of State's office; is that right?

12   A.  Which division?

13   Q.  The special Election Integrity Division?

14   A.  The Election Integrity Unit of the Criminal Investigations

15   Division would receive those referrals.

16   Q.  Typically, from the Secretary of State's office?

17   A.  Usually, yes.

18   Q.  I think you testified earlier that it's more than

19   50 percent comes from --

20   A.  I believe that's correct.

21   Q.  Let me get my question out of the way.

22       I think you testified earlier that it's more than

23   50 percent of the complaints come in from the Secretary of

24   State's office?

25   A.  I believe that's correct.

Jonathan White - Examination                4093

1   Q.  And with respect to the other less than 50 percent --

2   percentage, the vast majority of those complaints come from

3   other official channels, such as prosecutors or whatnot?

4   A.  Those are the options, yes, sir.

5   Q.  And as you sit here today, you don't recall receiving any

6   complaints about inappropriate conduct by poll watchers; is

7   that right?

8   A.  I didn't personally receive any of those complaints that I

9   can recall.

10  Q.  And are you aware of your office receiving any of those

11  complaints, as much as you can recall?

12  A.  I can't think of any right now.

13  Q.  And you're, likewise, not aware of receiving any complaints

14  about voter harassment or intimidation, are you?

15  A.  I did not receive any of those complaints.

16  Q.  Would it surprise you to know that some Texas residents are

17  afraid of or distrust the government?

18  A.  I wouldn't know.

19  Q.  No opinion one way or the other of whether or not voters in

20  the State of Texas, some voters in the State of Texas, might

21  distrust the government?

22  A.  I imagine some do, yes.

23  Q.  Would it surprise you to know that some voters in Texas

24  might have a concern about approaching the Secretary of State's

25  office or law enforcement or a prosecutor if some issue arose

Jonathan White - Examination                    4094

1    with respect to their efforts to vote?

2    A.  I don't know whether that's a fact or not.

3    Q.  I'm not asking if you know it's a fact or not.  I'm asking

4    would it surprise you to know that some voters might find it

5    difficult or be afraid of approaching the Secretary of State's

6    Office, law enforcement, or a prosecutor with respect to some

7    voter impropriety that occurred to them as a voter?

8            MR. NICHOLS:  Objection.  Lack of foundation as the

9    witness has testified.

10           THE COURT:  Yes, he's speculating.  Next question.

11   BY MR. WATKINS:

12   Q.  As the division chief for the unit that you were the chief

13   over until just recently, did you undertake any effort to

14   determine whether or not there was complaints that existed with

15   respect to voter fraud or voter intimidation that were coming

16   in -- that existed outside of the Secretary of State or

17   official channels realm?

18   A.  We reviewed the complaints that were sent to us and

19   processed those.  That's all we did.

20   Q.  You did not go out and independently look to see if people

21   that might be afraid to report still, nonetheless, had

22   violations of law occurring to them?

23   A.  That would not be my job.  I did not do that.

24   Q.  So if it didn't come in through the Secretary of State's

25   office or through official law enforcement channels, you

Jonathan White - Examination                    4095

1    wouldn't know about it?

2    A.  I think that's accurate.

3    Q.  And for the people who were most likely to have harassment

4    and intimidation occurring on them, are also the ones that are

5    most likely to be afraid of reporting, you didn't do anything

6    to follow up with those individuals, did you?

7            MR. NICHOLS:  Objection.  Lack of foundation,

8    speculation.

9            THE COURT:  That's overruled.

10           THE WITNESS:  Could you repeat the question?

11   BY MR. WATKINS:

12   Q.  Sure.  The individuals that are perhaps the most

13   intimidated and the most harassed at voting places and also the

14   ones that are the most afraid of reporting to official

15   channels, you didn't do anything to follow up with that body of

16   voters to see if there was any illegality occurring with

17   respect to them?

18           MR. NICHOLS:  Same objection.

19           THE COURT:  You're right.  That's sustained.

20           Next question.

21   BY MR. WATKINS:

22   Q.  Your office wasn't focused on pursuing justice for those

23   intimidated voters, were they?

24           THE COURT:  That's sustained.  Same question, same

25   line.

Jonathan White - Examination                4096

```
 1              MR. WATKINS:  No more questions, Your Honor.  Thank
 2    you.
 3              THE COURT:  Anyone else from this side?  Anything else
 4    by redirect?
 5              MR. KERCHER:  A few questions, Your Honor.  Probably
 6    good time for a break.
 7              THE COURT:  That's fine.  Let's take ten or 15.
 8              COURT SECURITY OFFICER:  All rise.
 9              (3:24 p.m.)
10                                  *   *   *
11              (3:38 p.m.)
12              COURT SECURITY OFFICER:  All rise.
13              THE COURT:  Thank you.  Please be seated.
14              MR. KERCHER:  Your Honor, I have redirect, which I
15    won't call brief, because we've all done that, and I -- who
16    knows how long it's going to go.  I don't think it will take
17    very long.  I will tell the Court that there's been some
18    conference among the parties, and there is a willingness, the
19    Court's schedule allowing, to go late this evening, so that we
20    can ensure that we finish with Mr. White today.
21              THE COURT:  Take us all day to go through one witness?
22              MR. KERCHER:  So far, so good, right, Judge?
23              THE COURT:  So they're asking about letting the
24    security downstairs know, what, 6:00, 6:30?
25              MR. KERCHER:  I think 6:00 or 6:30 would be about
```

Jonathan White - Examination                    4097

```
 1  right.
 2                  REDIRECT EXAMINATION
 3  BY MR. KERCHER:
 4  Q.  All right, Mr. White, on direct -- or on cross-examination,
 5  you were talked to about Section 4.09 of SB1 and asked a
 6  question in the abstract about whether a particular action
 7  might obstruct the view of a poll watcher.  Do you remember
 8  that?
 9  A.  Yes, sir.
10  Q.  As a prosecutor looking at a statute trying to figure out
11  what the elements are, what they might look like, are you able
12  to do that in the abstract without having the benefit of
13  specific facts to apply to the statute?
14  A.  No.  That's typically not how we work.
15  Q.  Does -- to your knowledge, does the Texas Penal Code
16  describe all of the ways that one person could murder another?
17  A.  No.
18  Q.  Is it a matter of taking facts as reported or investigated
19  and seeing whether or not they fit under a particular statutory
20  definition or not?
21  A.  Correct.
22  Q.  You were also asked about Section 6.04 of SB1, the portion
23  of the oath that reads:  *I will not suggest by word, sign, or
24  gesture how the voter should vote.*
25      Do you recall that?
```

Jonathan White - Examination                    4098

1    A.   Yes, sir.

2    Q.   Ms. Perales asked you a question about cueing a voter who

3    perhaps had autism or another disability.  Do you recall that?

4    A.   Yes.

5    Q.   And my memory of your testimony is that you said it might

6    be a tough call whether or not that kind of cuing to a disabled

7    voter might technically violate Section 6.04.

8        Did I understand that correctly or did I misunderstand?

9    A.   Yes.  But I had also said that it wouldn't be violative of

10   the spirit of the law.

11   Q.   That's what I was going to ask you about.  I think you said

12   it was a tough question of whether it was a technical

13   violation, but not a tough question under prosecutorial

14   discretion.  Can you describe to the Court briefly what you

15   meant?

16   A.   Yeah, that's correct.  It's -- those are situations that

17   could be very easily, you know, eliminated and weeded out by

18   prosecutorial discretion.  Those aren't going to get

19   prosecuted.

20   Q.   If a case comes in where someone has complained about a

21   situation, like the hypothetical Ms. Perales gave you, and that

22   case goes to trial, who will ultimately make the decision about

23   whether the defendant is guilty?

24   A.   A jury would.  And, of course, our burden of proof is

25   beyond a reasonable doubt, so if there's any ambiguity, that

Jonathan White - Examination                4099

1  will be doubt, and that would accrue to the favor of the

2  defendant.

3  Q.  As a prosecutor, if you are concerned that a jury might not

4  convict on a charge of violating that voter assistance oath

5  because the voter had autism, is that a case you're likely to

6  move forward with?

7  A.  There's no chance of that going forward.

8  Q.  Brian, can we bring up State Exhibit 89.  Go to page 34,

9  please.

10     On cross-examination, Ms. Perales asked you whether this

11  slide describes numerous activities that are, by themselves,

12  lawful.  Do you remember that?

13  A.  Yes.

14  Q.  Is it lawful in the State of Texas to purchase a knife?

15  A.  Yes.

16  Q.  Is it lawful in the State of Texas to use a knife to slice?

17  A.  Sure.

18  Q.  Is it lawful in the State of Texas to use a knife to slice

19  another person with the intent to cause bodily injury?

20  A.  Negative.

21        MR. KERCHER:  Your Honor, I'll pass the witness.

22  Unless there are no additional cross questions, in which case

23  I'll move to my proffer.

24        THE COURT:  Anything else?

25        MR. NICHOLS:  Just very briefly, Judge, if I might.

Jonathan White - Examination                4100

1                      FURTHER CROSS-EXAMINATION

2    BY MR. NICHOLS:

3    Q.  Mr. White, just three subjects real quick.  First one, I

4    neglected -- in my earlier question, I neglected our friends in

5    state law enforcement from my list.  Remember I asked you about

6    sheriffs and local PDs and constables?  Remember that?

7    A.  Yes.

8    Q.  But are there state agencies, law enforcement agencies with

9    statewide criminal investigation jurisdiction?

10   A.  Yes.  DPS, Rangers, among others.

11   Q.  Okay.  Second topic.  You were asked about three cases:

12   Mark Alfred Whitaker, Gonzalez Beltran, Ignacio, and Hervis

13   Rogers.

14      Do you remember that?

15   A.  Yes, sir.

16   Q.  Okay.  Let's talk about each one of those cases.  Do you

17   still have that binder with you?  I think it was the OCA

18   plaintiffs.  It's the skinny one.

19   A.  Yes.  This has the Whitaker file.

20   Q.  Yes, sir.  So let's talk about Whitaker just for a second.

21   So the Whitaker case -- and if you need to refresh your

22   recollection, you can look at Exhibit 2, the actual indictment

23   charge in that case.

24      Was that charge filed against Mr. Whitaker a charge of

25   illegal voting under the 64.012 statute that I thought we

Jonathan White - Examination                4101

1  agreed earlier no one is challenging in this case?

2  A.  Yes, it is.

3  Q.  And specifically, was Mr. Whitaker charged with knowingly

4  voting or attempting to vote more than once in an election?

5  A.  That's correct.

6  Q.  Was that an offense, if it could be proven beyond a

7  reasonable doubt, that was an offense under the State of Texas

8  long before SB1?

9  A.  That's correct.

10  Q.  And, in fact, did that charge concern an election that

11  occurred before the effective date of SB1?

12  A.  I believe that's correct, yes.

13  Q.  Okay.  And let's deal with these other two cases similarly

14  very quickly.  Gonzalez Beltran Ignacio and Hervis Rogers, were

15  those both cases involving this same statute of illegal voting,

16  64.012?

17  A.  Yes.

18  Q.  And did both of those cases concern alleged activities that

19  were involved in elections before SB1 ever came into being?

20  A.  Yes, sir.

21  Q.  And if we look quickly, Brian, at exhibit -- State

22  Exhibit 82 and go to the very last page.  So we can go to the

23  top of that very last page.

24      Is that the information that you presented to the Court on

25  the Ignacio Gonzales Beltran matter?

Jonathan White - Examination                4102

1    A.   Yes.  We discussed that earlier.

2    Q.   And so the Court will have for its reference what charge

3    was involved in that matter as well as the statute, if you look

4    at the far right, 64.012?

5    A.   Yes, sir.  This was a case referred to us by the U.S. State

6    Department.

7    Q.   Okay.

8    A.   Yes, sir.

9    Q.   Okay.  Interesting.  And it shows that it was a -- the "F2"

10   that the Court would see on there, that means second degree

11   felony?

12   A.   Correct.

13   Q.   Okay.  Now let's go to the prior page.  I don't want to

14   lose that.  So the case was referred to your office by the

15   Justice Department?

16   A.   U.S. -- the State Department, the Diplomatic Services Unit,

17   and it was an identity theft by a noncitizen case.

18   Q.   Okay.  And if we look at the second-to-the-last page, the

19   very bottom, that last line there, Brian.

20        Is that the information you provided to the Court with

21   respect to the Hervis Rogers case?

22   A.   Yes, sir.

23   Q.   And again, do we see that as being a case that involved

24   allegations of illegal voting under 64.012?

25   A.   Correct.

Jonathan White - Examination                    4103

1   Q.  Second degree felonies?

2   A.  Yes, sir.

3   Q.  Last subject is with respect to -- you were asked questions

4   a while ago about Section 6.06.  If you can pull up Joint

5   Exhibit 1, please.  Section 6.06 of SB1.

6         MS. PERALES:  Your Honor, 6.06 is outside the scope of

7   redirect.

8         MR. NICHOLS:  No, no.  She asked questions about 6.06.

9         You did, Ms. Perales.

10        THE COURT:  I remember.  Someone talked about

11  compensation.  Go ahead.

12        FURTHER CROSS-EXAMINATION

13  BY MR. NICHOLS:

14  Q.  Yes.  And so on 6.06, you remember you were asked certain

15  questions by Ms. Perales about this provision and how it would

16  work and so forth?

17  A.  Yes, sir.

18  Q.  If you want to go to the very -- let me just represent to

19  you that the Court may have heard some testimony from a Harris

20  County voter who uses a caretaker or a person who assists him

21  regularly in assisting with voting, so I just want to show you.

22      Is there a provision of the changes to 86.0105 that affects

23  a carve-out from prosecution for situations where the person

24  assisting the voter is an attendant or caregiver previously

25  known to the voter?

Jonathan White - Examination                4104

1   A.  Yes, sir.

2   Q.  So if you go to the bottom, Brian, if you don't mind, just

3   real quick.

4       And is that additional language added by SB1 in the form of

5   what would ultimately be codified as 86.0105, Sub F?

6   A.  Yes, Subsection F.

7   Q.  And so could any -- would any attendant or caregiver

8   previously known to the voter be in any form of harm's way

9   under this statute, as amended, for assisting the person that

10  they give care or attendance to in voting?

11  A.  No.

12          MR. NICHOLS:  Thank you, Judge.

13          THE COURT:  Anything else on this side?  Anything else

14  based on those questions -- last set of questions?

15          MS. PERALES:  Just a couple.  And I'm sorry about that

16  objection before.  I was completely wrong and just haven't

17  gotten enough sleep.  I'm sorry.

18                  FURTHER CROSS-EXAMINATION

19  BY MS. PERALES:

20  Q.  Mr. White, you mentioned, of course, the very important

21  concept of prosecutorial discretion earlier on redirect.  Do

22  you remember that?

23  A.  Yes, ma'am.

24  Q.  And, in fact, you used the words *"those aren't going to get*

25  *prosecuted."*  Is that right?

Jonathan White - Examination                    4105

1    A.   Yes, ma'am.

2    Q.   You are no longer in charge of making prosecutorial

3    decisions for the Election Integrity Division; is that right?

4    A.   Right.   And after *Stephens,* we're all in the same boat.

5    Q.   And thus, it's perhaps largely a very large group of

6    district attorneys who are going to be exercising that

7    discretion in the future; is that right?

8    A.   That's correct.

9         MS. PERALES:  No more questions.

10         THE COURT:  Anything else?

11         FURTHER CROSS-EXAMINATION

12   BY MR. WATKINS:

13   Q.   Just briefly on that.  With respect to those tough cases

14   that Ms. Perales was just asking about, prosecutorial

15   discretion, it is up to the assister to decide whether or not

16   they want to see if it's luck of the draw if they get a

17   prosecutor who exercises that discretion to bring the case or

18   doesn't exercise that discretion to bring the case, right?

19   A.   Yeah, it would certainly be the interpretation of the D.A.

20   in that county where that offense took place.  Potential

21   offense.

22   Q.   And if the assister was unlucky and got the prosecutor that

23   decided to bring the case in the tough cases, the jury would --

24   or, strike that.

25         The assister would go in front of the jury, which would

Jonathan White - Examination                4106

 1  then be faced with a beyond-a-reasonable-doubt standard, right?
 2  A.  Well, if we're talking about a hypothetical where this
 3  might happen, my experience would tell me that that wouldn't
 4  happen.  But you're correct in your argument.  I understand
 5  what you're saying.
 6  Q.  And would it surprise you to know if there are assisters
 7  that may not want to take the risk of a jury trial, even if
 8  they think they could win it?
 9          MR. NICHOLS:  Objection, Your Honor.  Lack of
10  foundation.  Pure speculation.
11          THE COURT:  Sustained.
12  BY MR. WATKINS:
13  Q.  You testified earlier that you agree that a system that
14  arbitrarily disenfranchises voters could undermine public
15  confidence, right?
16  A.  Yes.  I generally agree with that statement.
17          MR. WATKINS:  No further questions.
18          THE COURT:  Anything based on those last sets?
19          And now we turn to the proffer.
20          MR. KERCHER:  Yes, Your Honor.
21                      PROFFER
22  BY MR. KERCHER:
23  Q.  Mr. White, you've previously testified that mail ballot
24  fraud was the most common type of voting fraud prosecuted by
25  the OAG.  Do I remember that correctly?

Jonathan White - Examination                    4107

1   A.  You're correct.

2   Q.  Why do you believe mail fraud is more likely to occur than

3   other forms of voter fraud?

4   A.  I think the reason that's reflected in the numbers is

5   because of the lack of security mechanisms that are in place

6   for mail ballots that are in place for other forms of voting;

7   in-person voting, namely.  And there are quite -- there are

8   quite a few of those.

9           THE COURT:  Let me interject right now.  So why is

10  that question in a proffer?  Why wasn't that particular

11  question okay for you to ask in direct?

12          MR. KERCHER:  My understanding of the plaintiff's

13  position is that Mr. White's experience with why certain kinds

14  of fraud may be more prominent or prevalent, more likely to

15  happen, certain kinds of election integrity offenses may be

16  more difficult to spot or to investigate or to prove, would

17  have been beyond the scope of information provided by the OAG

18  and the SOS, and so to the --

19          THE COURT:  Because he didn't provide all the backup

20  for that statement?  Is that the argument?

21          MR. KERCHER:  I will allow plaintiffs counsel to make

22  their own argument, but that is my understanding.  And in order

23  to ensure that the Court didn't misinterpret our questions as

24  trying to skirt the previous order, we wanted to, out of an

25  abundance of caution, ask these questions under the offer of

Jonathan White - Examination                4108

1   proof.

2           THE COURT:  So, I mean, I don't want this to get sent

3   back down on stuff that ultimately people weren't going to

4   complain about.

5           MS. PERALES:  We weren't going to complain about that,

6   but we thought that counsel was just easing into something that

7   was going to be more problematic.

8           THE COURT:  So other questions may become more

9   problematic, but I was trying to analyze this on a

10  question-by-question basis, so if you don't have any objection

11  to that question, if anybody has no objection to that question,

12  I'm going to consider that as if it was a direct examination

13  question and allow the answer to that question.  We're taking

14  this question-by-question basis.

15          MR. KERCHER:  I understand.  Thank you, Your Honor.

16                          PROFFER

17  BY MR. KERCHER:

18  Q.  In your experience prosecuting these kinds of cases, what

19  do mail ballot fraud and voter assistance fraud have in common,

20  if anything?

21  A.  The core element of both is getting between a voter and

22  their ballot in order to influence the outcome of that vote.

23  Q.  Does it matter in your experience that mail ballot fraud

24  and voter assistance fraud may happen outside of a polling

25  place or not?

Jonathan White - Examination                4109

1    A.  What was the first part, does it matter?

2    Q.  Does it matter in your experience, in terms of whether --

3    in terms of how easy it may be or in terms of the prevalence of

4    those kinds of election integrity crimes?

5    A.  I think I would have to say, yes, because of the controls

6    that are in place in a polling place, the number of observers

7    that might be there, election officials that are present;

8    versus mail ballots, which happen in a completely uncontrolled

9    environment, and we typically have no witnesses, no video, none

10   of that, of the harvester/voter interaction.

11   Q.  In your experience in a case of mail ballot fraud, is it

12   possible that some voters may never find out that their

13   identity has been used?

14   A.  Absolutely.

15   Q.  Can you tell the Court whether there is a profile of voter

16   that is disproportionately targeted for mail-ballot fraud in

17   assistance based on your experience prosecuting these cases?

18   A.  Elderly, sometimes disabilities, low-income communities are

19   often targeted for vote harvesting.

20   Q.  Do you know why, based on your experience, those

21   communities tend to be targeted?

22   A.  That's a tough question.  One aspect that makes vote

23   harvesting easier is when voters are not truly engaged with the

24   process.  They're not that concerned with voting.  If you can

25   get them to sign up for a ballot that they didn't want in the

Jonathan White - Examination                4110

1  first place, they're very likely to turn that over to you or be

2  susceptible to influence during the vote.

3  Q.  In your experience, are vote harvesters or assistance

4  fraudsters typically associated with a campaign?

5  A.  Yes.

6  Q.  And when they are associated with a campaign, in your

7  experience, how are they compensated?

8  A.  Typically cash, off book.  Though, occasionally you may see

9  in the campaign finance reports a paper trail showing something

10 that says something other than vote harvesting, says something

11 like "canvassing, get-out-the-vote," something like that.

12 Q.  When you say "off book," do you mean they may be

13 compensated in a way that's not reflected in election -- in

14 campaign finance reports?

15 A.  Correct.

16 Q.  We have talked extensively at this point about the Gregg

17 County scheme where --

18         THE COURT:  Let me stop you here.  So everything I've

19 heard up to this point, is there any objection to having this

20 considered as direct testimony?

21         MS. PERALES:  Interspersed, Your Honor.  I didn't

22 think it was appropriate to hop up the couple of times that I

23 thought we had tread into the area that's not permissible, but

24 there are other questions that we would not object to.

25         THE COURT:  So --

1          MS. PERALES:  Should I object each time, Your Honor?

2          THE COURT:  Well, you know, again, I don't want this

3    thing sent down on something that we could have resolved now.

4    I haven't heard anything that was objectionable.  What did you

5    think you heard objectionable?

6          MS. PERALES:  "Some voters may never find out their

7    identity has been used" was the answer to one question.

8          THE COURT:  That's probably accurate.

9          MS. PERALES:  Well, it would be speculation unless we

10   had something from the witness that supported that statement.

11   And that was in response to, "Why is mail ballot voting less

12   secure," I think he said there were more controls in the

13   polling place.  Mail ballots happen in uncontrolled

14   environment.  We wouldn't contest that mail voting and

15   in-person voting are subject to different procedures, but the

16   testimony that a voter may never find out their identity has

17   been used, we would object to that question, and then --

18          THE COURT:  So, you know, what we're missing is,

19   though, he gets to opine.  That doesn't mean the Court has to

20   believe it or give it all the weight that they would like it to

21   be deserved.  The question becomes does it get admissible as

22   direct examination testimony?

23          So everything I've heard up to right now, I'm going to

24   consider as if it was direct examination testimony.

25          Now you're getting into specifics, I think.

Jonathan White - Examination                4112

1          MS. PERALES:  Yes, the most recent question regarding

2    how are harvesters typically compensated by a campaign, the

3    testimony regarding cash off book, called "canvassers" or

4    "GOTV," we would object to that as carrying the kind of

5    specificity that we were denied during the discovery phase.

6          THE COURT:  Now, that's going to be all overruled.

7          So up to now, this is all considered direct testimony,

8    and if the plaintiffs later want to cross-examine on those

9    points, I'll let them do that later.

10          Now, your next question.

11          MR. KERCHER:  And I believe, Your Honor, that because

12    we are doing this in question-and-answer, we need not be

13    fearful that this will come back down from the Fifth Circuit.

14    Because we are making a record, the Court can accept it or not

15    but maybe I'm misunderstanding procedurally.

16          THE COURT:  This is a proffer, though.  So this is

17    stuff that you-all are going to argue I excluded from evidence.

18    And so what I'm trying to say is, No, I'm not excluding

19    everything I've heard right now.

20          MR. KERCHER:  I see.  I see.  I take your point.

21    Thank you, Your Honor, for the clarification.

22                              PROFFER

23    BY MR. KERCHER:

24    Q.  Mr. White, we've talked about the Gregg County scheme that

25    you've discussed now with a half-dozen lawyers or so where the

1    ABBM were fraudulently filed under the name of young,

2    able-bodied people who did not qualify to vote-by-mail.

3        Do you remember that?

4    A.  Yes, sir.

5    Q.  Is that a common strategy in your experience?

6    A.  Not super common.  It's certainly not at least in the

7    numbers that we saw in this case.  You know, you might see

8    small numbers of that in other types of cases, but in this case

9    where it was 47 percent of the mail ballots returned, that's

10   very unusual.

11   Q.  You've also testified about ballot harvesting and the

12   seeding and harvesting phase.  When harvesters are in the

13   seeding phase and speaking with voters, what tactics do they

14   use to lower the defenses of voters to get access to those

15   applications?

16          MS. PERALES:  Your Honor, we object to that as being

17   squarely within the scope of the motion in limine.

18          THE COURT:  Yeah, so all this is part of the proffer.

19   I guess what I need to hear from you-all is when do you think

20   that was okay, is really -- because all this -- right now from

21   this point forward, we're excluding stuff.  It's not being

22   considered by the Court as evidence.  But if he asks a question

23   that you think should not be excluded and should have been

24   considered as direct testimony, then I need you-all to say "We

25   don't object to that question."

1    BY MR. KERCHER:

2    Q.   Do you need for me to ask the question again, sir?

3    A.   No, I recall.  But just let me clarify that you were asking

4    about the seeding phase and not the harvesting phase of the

5    operation.

6    Q.   Yes, sir.

7    A.   The seeding phase isn't -- my opinion -- too difficult to

8    achieve some rapport with the voter.  You know, go up, you

9    know, *Ms. Smith, would you like to sign up for a mail ballot,*

10   *so you don't have to go to the polling place?  It's very easy.*

11   *Just need a signature from you."*

12      You're going to fill out the paperwork to make it easy for

13   the voter and that sort of thing.  And provided they comply

14   with the law and provide their information on that application,

15   they've done nothing illegal at that point.  So nothing too

16   complicated.

17   Q.   What about at the harvesting phase, what tactics might a

18   vote harvester use to win a voter's trust during the harvester

19   phase?

20   A.   So that would take a little bit more skill because of what

21   you're asking for.  But something like, *"Hello, Mrs. Smith.*

22   *I'm with the Elections Department"* or *"I'm here to help you*

23   *vote your mail ballot,"* some approach like that that presents

24   you an official or semi-official capacity or you wouldn't even

25   necessarily have to do that part.  You're just here to help

Jonathan White - Examination                    4115

1    with the vote, help with their ballot.  Bring a stamp with you.
2    *"Do you have your ballot?  Could you go inside and get it?"*
3    And walk them through the process of voting that ballot.  You
4    would normally, you know, if you could, offer to fill that
5    ballot out for them.  *"I see you have some eyeglasses there.*
6    *Let me help you read that ballot."*
7        And from there they could discuss some other races.  They
8    could discuss all of the races, they could discuss the top line
9    race and ask them who they wanted to vote for for president or
10   whatever that line is and then vote the down-ballot candidates
11   that the voter is actually -- or the harvester is actually
12   working for.
13   Q.  In your experience, might vote harvesters use gifts or
14   trinkets in order to win the voter's trust?
15   A.  Yes, we've seen that.
16   Q.  Do you have any experience with mail ballot fraud involving
17   deceased voters?
18   A.  Yes.  We've seen a number of deceased voters get swept up
19   in mail-ballot harvesting scheme.
20   Q.  Can you describe briefly for the Court what that looks
21   like?
22   A.  It could be as simple as a mistake by the harvesting crew
23   not knowing that they've swept up a deceased voter, but they
24   requested an application for a voter that is still on the rolls
25   and shouldn't be, because they weren't removed.  Or it could be

Jonathan White - Examination                4116

1    purposeful like what we saw in the Mohamed Zul case where he

2    was targeting voters that had -- didn't have any recent voter

3    history and, in doing so -- and also elderly, the older voters,

4    the oldest of the elderly voters.  By doing that, he got a

5    chunk of deceased voters.

6            THE COURT:  Now, let me make sure I understand where

7    we're at from this point.  From this point, you haven't given

8    the plaintiff's group any documents or evidence to support any

9    of that; is that correct?

10           THE WITNESS:  I would have to defer to counsel on --

11           THE COURT:  So as far as you know, the State

12   defendants have not provided any documents to support anything

13   you're saying?

14           THE WITNESS:  I honestly don't know, Your Honor.

15           THE COURT:  Okay.  And with regard to what you're

16   saying -- so you're not a frontline investigator, so how are

17   you opining to all this?

18           THE WITNESS:  Based on my review of the election

19   records themselves, the applications for ballot-by-mail that

20   were filled out for these individuals, the voter roll from that

21   county and, where applicable, the carrier envelopes for the

22   mail ballots themselves.  The address where those applications

23   had the ballots sent to and what that location is.  Primarily,

24   that's some of my original evidence review.

25           THE COURT:  So assuming that the plaintiff's group

Jonathan White - Examination                4117

1    haven't received those underlying documents to test that, they

2    have no way of challenging what you say; is that fair?

3         THE WITNESS:  That seems to be the argument.

4    BY MR. KERCHER:

5    Q.  In the example that you provided, Mr. White, of the

6    Zul Mohamed case, is that a case that was prosecuted

7    specifically by your office or was it prosecuted by a local

8    D.A.?

9    A.  Denton County prosecuted the Denton County piece.  We

10   conducted a separate Dallas County investigation on our own,

11   and that was not accepted for prosecution by Dallas County.

12   Q.  The Denton County D.A. investigatory records, are those in

13   your possession, custody, or control?

14   A.  Not in mine, no.

15   Q.  You were talking about your experience generally with

16   mail-ballot fraud involving deceased voters.  Have you as a

17   prosecutor interacted with the families of those deceased

18   voters whose identities were used to cast fraudulent ballots?

19   A.  Our office has, yes.

20   Q.  What is your office's experience in dealing with those

21   families?

22   A.  They're often upset that their deceased relative was used

23   for this purpose.

24   Q.  Let's talk about the Zul Mohammed case.  You talked about

25   how the OAG performed an investigation alongside Dallas County;

Jonathan White - Examination                4118

1   is that right?

2   A.  No, Denton County.  We worked with Dallas County, we did on

3   our own, referred it, and they rejected it.

4   Q.  How did your office first come into contact with that case?

5   A.  We received a call from Denton County Sheriff's Office who

6   was investigating at the behest of their election

7   administrator, who had reported the -- some suspicious

8   activity.

9   Q.  Can you describe generally the kinds of communications your

10  office had with the Dallas County DA's office regarding the

11  prosecu -- regarding the investigation of Zul Mohamed?

12  A.  Yes, sir.  We were initially dealing with evidence issues.

13  We were trying to get documents from the election's office, but

14  the election's office is under instruction from Commissioner's

15  Court and ADA that represent Commissioner's Court not to

16  release records without their permission, so...

17  Q.  And before you go on, I should warn you, sir, that not

18  to -- in response to my question, not to provide answers that

19  are not -- that are not publicly available, since this is an

20  ongoing prosecution.

21  A.  Okay.  I think it may not be ongoing at this point, because

22  there's no path to prosecution here.  We've referred the case,

23  it was rejected, and I believe that's the end of it.

24  Q.  Okay.  With that in mind, complete your answer about your

25  office's communications with Dallas County DA's office.

Jonathan White - Examination                    4119

```
 1              MS. PERALES:  Just want to lodge a hearsay objection,
 2    Your Honor.
 3              MR. KERCHER:  Just asking for the kinds of
 4    interactions that his office had.  We won't be eliciting any
 5    specific statements, Your Honor.
 6    A.  I can do that.  Conversations regarding obtaining records,
 7    elections records, and conversations regarding the case itself
 8    and referring it for potential prosecution.
 9    BY MR. KERCHER:
10    Q.  And as I understand your testimony, this is an
11    investigation that the OAG conducted by -- that the Dallas
12    County DA's office elected not to take; is that right?
13    A.  Correct.
14    Q.  What is your understanding, if any, of the reasons the
15    Dallas County District Attorney's office chose not to take it?
16              MS. PERALES:  Objection.  Hearsay.
17              THE COURT:  That's going to be sustained.  Since it's
18    a proffer, you can go ahead and get an answer.
19              MR. KERCHER:  I like that idea, Your Honor.
20    BY MR. KERCHER:
21    Q.  Mr. White, if you would please.
22    A.  Our understanding is that Dallas County DA's office will
23    accept no case for prosecution that comes from the Attorney
24    General's Office.
25    Q.  Can you generally describe to the Court what role signature
```

Jonathan White - Examination                    4120

1    verification, if any, played in preventing Mr. Mohamed from

2    completing his alleged fraud?

3    A.  Signature verification did not help in that case, because

4    he was the one providing the signature on both the application

5    and the carrier envelope, potentially, of those votes, so they

6    would have matched ostensibly.

7    Q.  Do you know how Denton County was able to identify

8    Mr. Mohamed's alleged fraud?

9    A.  The elections office did some additional research when they

10   saw a large number of ballots going to a single address, and

11   they looked up what type of entity it was and found that it was

12   a mailbox store as opposed to a group living facility or

13   something like that.

14   Q.  And how many fraudulent votes or false votes did

15   Mr. Mohamed's allegedly cast?

16          MS. PERALES:  Objection.  Lacks foundation.

17          THE COURT:  How do you know?  Do you know?

18          MR. KERCHER:  I'll ask him that question, Your Honor.

19   BY MR. KERCHER:

20   Q.  Mr. White, if you know, how many votes did Mr. Mohamed

21   allegedly wrongfully cast?

22   A.  In Denton County, because he was arrested in the act and in

23   possession of those envelopes, none of those votes in Denton

24   County were cast, but some were in Dallas.

25          MS. PERALES:  Objection.  Lack of foundation.

```
 1            THE COURT:  How do you know?
 2            THE WITNESS:  I'm familiar with the election records
 3    of those -- the applications that were submitted for that
 4    address that he used as well as the carrier envelopes that were
 5    returned and ultimately counted in Dallas County.
 6            THE COURT:  That's overruled.
 7    BY MR. KERCHER:
 8    Q.  Turning back to that Gregg County case that you discussed
 9    earlier.  In that case, do you know, did the vote harvesting
10    affect the results of the election?
11    A.  It did in that election, yes.
12    Q.  How so?
13    A.  The candidate who lost the race had won in-person voting by
14    a margin of 60 percent to 40 percent, including early voting
15    and on Election Day.  There were so many mail ballots
16    proliferated in that election, and those ballots were cast in
17    favor of Shannon Brown, 75 percent to 25 percent, that he ended
18    up winning the election by six votes.
19            MR. KERCHER:  Thank you, Your Honor.  This ends our
20    offer of proof.
21            MS. PERALES:  Your Honor, we need some time to regroup
22    for examination.  We had talked about an hour.  I think given
23    the shortness of this, perhaps we could do it in 45 minutes?
24            THE COURT:  Yeah.  Well, we're here until -- we're
25    here to finish him up.  So the record is clear, so everything
```

1    else I've heard so far, I've excluded, and I've excluded from

2    consideration as evidence because of the failure of the State's

3    defendant's to provide to the plaintiff's group the underlying

4    documents to support the contentions that were made here.

5            Okay.  You-all want how much time right now?

6            MS. PERALES:  If we could have 45 minutes, we would be

7    ready at 5:00 p.m.

8            THE COURT:  Why are we breaking for 45 minutes?

9            MS. PERALES:  Oh, because previously we asked Your

10   Honor if we could have time to assemble our cross-examination

11   on the proffer testimony having -- by definition, we have not

12   heard about this testimony before, although it turns out it

13   tracks very closely with the declaration that Mr. White

14   submitted in support of their response to the motion for

15   summary judgment.

16           THE COURT:  So you want 45 minutes to discuss among

17   yourselves the questions you want to ask?  Is that what you

18   want?

19           MS. PERALES:  Yes, if the Court is willing to give it

20   to us.  If the Court is willing to give us 30 minutes, we would

21   appreciate that.

22           THE COURT:  Okay.  Back in 30.

23           COURT SECURITY OFFICER:  All rise.

24           *(4:16 p.m.)*

25                         *   *   *

1          *(4:46 p.m.)*

2              COURT SECURITY OFFICER:  All rise.

3              THE COURT:  Thank you.  Please be seated.

4              MS. PERALES:  Thank you, Your Honor.

5    BY MS. PERALES:

6    Q.  Good afternoon again, Mr. White.

7    A.  Good afternoon.

8    Q.  With respect to your testimony regarding Gregg County and

9    the prosecutions of the four defendants there, you mentioned

10   something about 47 percent of the mail ballots.  Were you

11   saying 48 percent of the mail ballots were cast by able-bodied

12   voters?

13   A.  No.  47 percent is the number that I recall.  It was close

14   to 50 percent of the applications for mail ballot in that

15   commissioner precinct were for on the basis of disability, and

16   the rest of the precincts combined, the other four precincts, I

17   think had eight disabled voters versus almost 300 in that one

18   precinct that we're talking about.

19   Q.  Understood.  During the time that the Gregg County

20   investigation was coming together and then a prosecution

21   decision was made, you were in the office at that time?

22   A.  Yes, ma'am.

23   Q.  Okay.  So now during this litigation, up until December of

24   2022, so through the discovery period, you were the senior

25   official of the Election Integrity Division; is that right?

Jonathan White - Examination                4124

1    A.   That's correct.

2    Q.   You were also aware that were discovery requests from

3    plaintiffs in this case related to voter fraud and the work of

4    your division, correct?

5    A.   I was aware that there were discovery requests in place,

6    yes, in general.

7    Q.   And you testified that you were not aware of what

8    information was produced by State defendants to plaintiffs from

9    your office; is that right?

10   A.   Correct.

11   Q.   So that means you're not aware if State defendants produced

12   case investigation files related to Gregg County and the four

13   defendants we were discussing a moment ago; is that right?

14   A.   Correct.

15   Q.   And you're also not aware if State defendants produced

16   election records such as ones you mentioned a moment ago, the

17   very high number of applications for ballot-by-mail on the

18   basis of disability for at that case; is that correct?

19   A.   Correct.

20   Q.   And you're also not aware if State defendants produced any

21   witness statements related to the Gregg County case --

22   A.   Correct.

23   Q.   -- cases, right?

24   A.   I'm sorry.  Correct.

25   Q.   I'm sorry too.

Jonathan White - Examination                4125

1        And you're not aware whether State defendants produced

2   records accounting for the margin of victory that you described

3   by the alleged vote-harvester candidate; is that right?

4   A.   That's correct.

5   Q.   Now, moving along to your discussion of the vote harvesting

6   and the harvesting phase of mail ballots, again, because you're

7   not aware of what information was produced by State defendants

8   to plaintiffs, you're not aware if State defendants turned over

9   any information showing that vote harvesters impersonate

10  election officials during their activities; is that correct?

11  A.   Correct.

12  Q.   And you're not aware if State defendants produced any

13  information about vote harvesters bringing a stamp to the home;

14  is that right?

15  A.   Correct.

16  Q.   And you're not aware whether State defendants produced any

17  information regarding how harvesters convince voters to bring

18  out the ballot and allow the harvester to mark the ballot; is

19  that correct?

20  A.   Correct.

21  Q.   And you're also not aware whether State defendants produced

22  any information showing that harvesters used gifts or trinkets,

23  as you call them, in their operations; is that right?

24  A.   Correct.

25  Q.   You're also not aware whether State defendants produced any

Jonathan White - Examination                    4126

```
 1   case investigation files containing information that I've just
 2   listed; is that correct?
 3   A.  That's correct.
 4   Q.  Now, moving on to deceased voters and the Mohamed Zul case,
 5   or the Zul Mohamed case.  Because you're not aware of what was
 6   produced by State defendants, you're also not aware whether
 7   State defendants produced any information about Zul Mohamed's
 8   use of deceased voters in his operation; is that correct?
 9   A.  Correct.
10   Q.  Now, you said that when you were doing your work as the
11   head prosecutor of your division, you would look at records
12   such as applications for ballot-by-mail, addresses, voter
13   registration records, and documents along those lines.  Do you
14   remember that testimony?
15   A.  Yes, ma'am.
16   Q.  Do you know if any of that type of -- let me rephrase.
17       Because you don't know what was turned over by State
18   defendants in this case, you also don't know if any of those
19   types of records, ABBM's voter registration, ballot addresses,
20   were turned over to plaintiffs in connection with Mohamed Zul;
21   is that right?
22   A.  Correct.
23   Q.  Would it also be fair, though, that some of what you
24   testified about in this proffer phase, such as things like
25   trinkets or impersonating election officials, that doesn't come
```

Jonathan White - Examination                    4127

1   from an ABBM or a ballot carrier envelope; that comes from
2   investigator notes, witness statements, and so forth.  Is that
3   right?
4   A.  Among other things, yes, ma'am.
5   Q.  And because you're not aware of what the State defendants
6   have turned over to plaintiffs in this case, you're not aware
7   whether any of those types of materials were turned over to
8   plaintiffs in connection with vote harvesting; is that right?
9   A.  Correct.
10  Q.  Now, at your deposition on August 11, 2023 -- if we could
11  get the August 11, 2023, just in case.
12      You were instructed -- well, actually prior to that, in
13  your prior depositions and particularly -- I still want August
14  11.  I'm sorry.
15      In your various depositions, there were times where you
16  were advised and even instructed to assert various privileges.
17  Do you remember that?
18  A.  I remember being advised particularly in the early
19  depositions, the first two depositions.
20  Q.  Our friend, Mr. Hudson, advised you a number of times
21  regarding the investigative privilege, right?  And you asserted
22  that privilege and didn't testify to certain things.  Do you
23  recall that?
24  A.  I recall following the advice of counsel on a number of
25  occasions, yes, ma'am.

Jonathan White - Examination                4128

1   Q.  And you did that at times so as not to talk about pending

2   or open investigations.  Do you recall that?

3   A.  Yes.  At the time of those depositions, yes, ma'am.

4   Q.  And you also asserted those privileges with respect to even

5   closed investigations and nonpublic information.  Do you recall

6   that?

7   A.  If you're talking about cases that did not result in a

8   deferred prosecution -- sorry, in a conviction or deferred

9   adjudication, then it's possible that that happened, yes,

10  ma'am.

11  Q.  Do you recall testifying that you were going to assert and

12  rest on the privilege with respect to closed investigations and

13  nonpublic information?

14  A.  If it was in the context I described earlier, then I would

15  take your word for that.

16  Q.  But even beyond that context, would it help if I refresh

17  your recollection?

18  A.  Sure.

19  Q.  This is the only cite I have, but if we could go to

20  page 121, lines 4 through 9.

21          MR. KERCHER:  Your Honor, at this point, I'll

22  interpose an objection as to relevance.  Ms. Perales has

23  already received the ruling I think she hoped to get on the

24  motion in limine, and this line of questioning seems to

25  re-litigate whether she would be entitled to that, so we would

1    object to relevance.

2            MS. PERALES:  Well, Your Honor, we -- if this is going

3    to go as a package, we just want to make sure -- and this is,

4    of course, my last question -- that the examination is complete

5    both as to the proffer and as to plaintiff's position as to

6    what was not turned over.

7            THE COURT:  Yes.  I want the record clear this goes

8    up -- and it's going up -- why things were excluded and not

9    excluded, so that's overruled.

10   BY MS. PERALES:

11   Q.  Mr. White, hopefully this will refresh your recollection,

12   but do you recall being asked:  *To the extent that you were*

13   *asked during your deposition, did you provide all information*

14   *about closed cases?"*

15       Do you recall answering:  Quote, *"To the extent that they*

16   *existed on the spreadsheet and the publicly available*

17   *information, I did, yes,"* closed quote?

18   A.  Yes.  You're reading that correctly, and I don't know what

19   the context was above this, but -- but that sounds like

20   something I said.

21   Q.  And it was your testimony on that day, correct?

22   A.  I believe so.

23           MS. PERALES:  Thank you.  I have no further questions.

24           THE COURT:  Anything else on this side?  Are we ending

25   an hour early?

Jonathan White - Examination                    4130

1              MR. KERCHER:  Or right on time, depending on how

2     hopeful one watches the time.  I'll be happy to say we've

3     over-delivered by one hour.

4              We have nothing further.  May the witness be excused?

5              THE COURT:  Yes.  You're excused, sir.

6              So where are we at for tomorrow?  Or am I -- did you

7     need him?

8              MS. PERALES:  We do not.  We also wanted to wish the

9     witness a Happy Birthday tomorrow.

10             MS. HOLMES:  I believe tomorrow -- I don't want to

11    steal your thunder, but I believe tomorrow we're hearing from

12    Jacqueline Doyer and Keith Ingram.

13             MR. KERCHER:  Correct.

14             MS. HOLMES:  But for my part, for the HAUL plaintiffs,

15    I have some exhibits to move into evidence since it seems like

16    we have some time.

17             THE COURT:  Yes.

18             MS. HOLMES:  Okay.  And I believe, Your Honor, you

19    asked for a written list, which I have for you just to follow

20    along, if I may.

21             I've been advised by counsel that maybe it would be

22    unwise to do this at the moment.  I'm sorry.  There's a

23    miscommunication.  So can I do this tomorrow?  My apologies,

24    Your Honor.

25             THE COURT:  Anything else we need to take up today?

 1          MR. NICHOLS:  Your Honor, if I might be heard.

 2          I mean, cases do need to come to an end, so just want

 3   to get the Court's -- to weigh in if the Court is willing to do

 4   it, on the fact that we need to get these, whatever the exhibit

 5   issues are, resolved, because the plaintiffs at some point do

 6   need to close their case.  And we're willing to work tonight.

 7   We've got extra time, so if we can just commit among all

 8   parties that we're going to take up the remainder of whatever

 9   the plaintiffs think their case-in-chief is tomorrow morning

10   first thing, we'll get their case closed.

11          MS. PERALES:  Your Honor, we're happy to work with

12   Mr. Nichols, especially, and State defendants, to clear out the

13   last of the exhibit issues and the outstanding objections.

14          THE COURT:  Will you all be in a position to close

15   tomorrow?

16          MS. PERALES:  If we reach agreement on the exhibits,

17   yes, Your Honor.  If not, we may have to have -- I believe

18   Ms. Tulin mentioned earlier today we may have to have oral

19   argument on some of the exhibits.

20          THE COURT:  So this list, can we take care of this

21   list at least today or not?

22          MS. PERALES:  First thing in the morning, Your Honor?

23          THE COURT:  Okay.

24          MS. HARRIS:  Your Honor, if it's helpful, I have a

25   couple of small housekeeping matters from OCA plaintiffs that

Jonathan White - Examination                4132

1    might help get some things out of the way now.

2          MS. TULIN:  And we also -- there certainly are a

3    category of LUPE exhibits that I think we know that there --

4    I'm happy to redo that list and provide a copy to the Court as

5    well.

6          THE COURT:  Okay.  So tomorrow first thing we're going

7    to tackle the HAUL remaining exhibits, and we're going to

8    tackle the LUPE remaining exhibits.  And do any other

9    plaintiffs have exhibits that need to be admitted or not?

10         MS. ARMENTA:  No, Your Honor.

11         MR. WATKINS:  Mi Familia does, Your Honor.

12         THE COURT:  Mi Familia does.  So where are you all?

13         MR. WATKINS:  We have four exhibits.

14         THE COURT:  Are you prepared to do that now?

15         MR. WATKINS:  I am.

16         THE COURT:  Okay.  You're after her.

17         MS. HARRIS:  Your Honor, I have two unopposed

18    documents that are the State's admissions during discovery that

19    we'd like to offer to be marked as OCA 472 and 473, and then we

20    can file them electronically this evening.

21         THE COURT:  Any objections to OCA 472 and 473?

22         MR. KERCHER:  No objections, Your Honor.

23         THE COURT:  472 and 473 are admitted.

24         MS. HARRIS:  Thank you, Your Honor.  And the last

25    thing is the motion we filed last night seeking judicial notice

Jonathan White - Examination                4133

1    on documents.  We want to fix a couple of clerical errors and

2    update the certificate of conference and file that tonight, and

3    it will be ready to discuss tomorrow.  Those are the ones we

4    already discussed.

5                THE COURT:  Thank you.

6                MR. NICHOLS:  I think the Court's probably already

7    dealt --

8                THE COURT:  Sounds like most of it is mooted.

9                MS. HARRIS:  There are -- there is at least one

10   document that was not discussed during today's testimony, but

11   it is a public document.

12               THE COURT:  So --

13               MS. HARRIS:  But we can update the motion with today's

14   testimony in mind as well.

15               THE COURT:  So first thing tomorrow morning, then, is

16   OCA going to be in a position to offer your exhibit, and then I

17   make a ruling on it?

18               MS. HARRIS:  Yes, to the extent that it is not an

19   exhibit.  It is seeking judicial notice, but yes.

20               THE COURT:  So you're going to do that, and he'll be

21   in a position to rest.

22               MS. HARRIS:  Yes.

23               THE COURT:  Yes, sir, you're next.

24               MR. WATKINS:  Elijah Watkins for Mi Familia Vota.

25   Your Honor, my understanding is that the State is

Jonathan White - Examination                4134

1    double-checking some of these exhibits to see if we can

2    stipulate, but until then, it's HAUL MFV 362, 370, 372 and 388.

3    And per the Court's instruction, we have a notice that lists

4    those exhibits for admission.

5              MR. WASSDORF:  Your Honor, we've got a hearsay

6    objection on 362.  This is a Mi Familia Vota pamphlet that I

7    don't have in front of me, but that's what we've got marked

8    down.

9              THE COURT:  What about 370, 372 or 388?  Any

10   objections.

11             MR. WASSDORF:  No objections.

12             THE COURT:  370, 372 and 388 are admitted.  I guess I

13   need to see 362.

14             MR. WATKINS:  Can you pull up 362?

15             THE COURT:  So the objection is hearsay.  What's your

16   response?

17             MR. WATKINS:  Well, we're not bringing it in for the

18   truth.  I mean, we're not -- we certainly have other evidence

19   to say that the 2022 mid-terms are set to begin in Texas, but

20   it's simply an internal document to show that Mi Familia Vota

21   was responding to SB1.

22             MR. WASSDORF:  Your Honor, I don't see anything on

23   there that says it's about responding to Senate Bill 1.  It

24   looks like a standard Get-Out-The-Vote pamphlet.

25             THE COURT:  How is this not duplicative of the

Jonathan White - Examination                    4135

```
 1   testimony your representatives gave about trying to get people
 2   to vote?
 3              MR. WATKINS:  It's not critical, Your Honor.  We can
 4   withdraw it.
 5              THE COURT:  362 is not admitted.
 6              MR. WATKINS:  Thank you, Your Honor.
 7              THE COURT:  Is Mi Familia Vota now able to rest?
 8              MR. WATKINS:  Mi Familia Vota rests, Your Honor.
 9              THE COURT:  Thank you.
10              MR. WATKINS:  Thank you, Your Honor.
11              THE COURT:  And so the two other groups, then, are
12   going to work on this, then, and we'll take care of you-all
13   first thing in the morning as far as last admissions -- or
14   whatever judicial notices, and then you-all will rest, correct?
15              MS. HOLMES:  Yes, Your Honor.
16              THE COURT:  Okay.
17              MS. ARMENTA:  Sorry, Your Honor.  LULAC plaintiffs
18   will be double-checking some exhibits, and then we'll also plan
19   to rest tomorrow morning.
20              MR. WASSDORF:  Your Honor, State would move to admit
21   Exhibits 3 through 11, which are Dr. Hoekstra's report.  He was
22   the State's expert that will be testifying on Wednesday.
23              MS. PERALES:  I'm sorry.  We have an agreement that if
24   the witness comes and testifies, we would not object or have a
25   hearsay objection, so --
```

Jonathan White - Examination                    4136

```
 1            THE COURT:  So, premature?
 2            MS. PERALES:  Yes, Your Honor.
 3            MR. WASSDORF:  Okay.  We'll just hold off on those
 4   until he actually does show up, I guess.  Other than that, it
 5   would be State's Exhibits 14, 16, 18, 20, 27, 51, 245, 247,
 6   248, 252, 253 and 255.
 7            MS. TULIN:  Can I just clarify a question?  When I
 8   thought you were standing up, it was going to be based on the
 9   list that you circulated last night.  Is that the list that you
10   circulated last night?
11            MR. WASSDORF:  That's the list I circulated last
12   night.
13            MS. TULIN:  Okay.  I think it's true for all
14   plaintiffs that -- well, there's a couple of HAUL objections, I
15   think, and I think a couple of them may have already been
16   admitted.  That was the other piece of that.
17            MR. WASSDORF:  We've already resolved all that.
18            MS. TULIN:  Okay.
19            THE COURT:  Are there any objections to the numbers
20   that were just stated?
21            MS. ARMENTA:  Yes, Your Honor, for LULAC plaintiffs
22   and Mr. Wassdorf, are you just going to ask to confer about
23   this tonight?
24            THE COURT:  Which number were you objecting to?
25            MS. ARMENTA:  We might have objections.
```

Jonathan White - Examination                4137

1          THE COURT:  Well, I'd like to admit what we can admit,
2    so tell me which one --
3          MS. ARMENTA:  We don't have objections to -- sorry.
4    We haven't had sufficient time to review, Your Honor.  We have
5    to hold off until tomorrow.  My apologies.
6          THE COURT:  Nice try.
7          Anything else to take up before we leave tonight?
8          MS. TULIN:  Just again there are LUPE exhibits that I
9    know there are no objections to, and so I could read that list
10   now or we can wait.  There's a category that we're still
11   working on resolving, so happy to do it piecemeal, if you want
12   to stay and do it now, or I'm happy to do it tomorrow once
13   we've resolved everything.  And we're arguing over some subset.
14         THE COURT:  We'll do it tomorrow.
15         MS. TULIN:  Thank you, Your Honor.
16         THE COURT:  Anything else to take up today?
17         MR. KERCHER:  Not from State defendants, Your Honor.
18         THE COURT:  We'll see you all at 9:00 tomorrow.
19         COURT SECURITY OFFICER:  All rise.
20         *(5:07 p.m.)*
21                              *   *   *
22
23
24
25                         *   *   *   *   *

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF TEXAS

3

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.  I

6    further certify that the transcript fees and format comply with

7    those prescribed by the Court and the Judicial Conference of

8    the United States.

9

10   Date signed:  October 16, 2023

11   /s/ Gigi Simcox

12   /s/ Angela M. Hailey

13   _____
     United States District Court
     Official Court Reporters
14   262 West Nueva Street
     San Antonio, Texas  78207
15   (210)244-5048

16

17

18

19

20

21

22

23

24

25