1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3

LA UNION DEL PUEBLO ENTERO,        .
4  ET AL,                          .
                                   .
5            PLAINTIFFS,           .
        vs.                        . DOCKET NO. 5:21-CV-844-XR
6                                  .
GREGORY W. ABBOTT, ET AL,          .
7                                  .
           DEFENDANTS.             .
8

9

10            TRANSCRIPT OF BENCH TRIAL
      BEFORE THE HONORABLE XAVIER RODRIGUEZ
11          UNITED STATES DISTRICT JUDGE
                 OCTOBER 17, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:     NINA PERALES, ESQUIRE
17                         FATIMA MENENDEZ, ESQUIRE
                           JULIA LONGORIA, ESQUIRE
18                         MALDEF
                           110 BROADWAY
19                         SUITE 300
                           SAN ANTONIO TX 78205
20

21                         AMIR BADAT, ESQUIRE
                           JENNIFER A. HOLMES, ESQUIRE
22                         VICTOR GENECIN, ESQUIRE
                           NAACP LEGAL DEFENSE & EDUCATIONAL
23                         FUND INC
                           40 RECTOR STREET, FIFTH FLOOR
24                         NEW YORK NY 10006

25

```
 1

 2

 3

 4

 5

 6   FOR THE DEFENDANTS:      RYAN G. KERCHER, ESQUIRE
                             KATHLEEN HUNKER, ESQUIRE
 7                           WILLIAM WASSDORF, ESQUIRE
                             DAVID BRYANT, JR., ESQUIRE
 8                           TEXAS ATTORNEY GENERAL
                             P.O. BOX 12548
 9                           MC 009
                             AUSTIN TX 78711
10

11

12

13

14   REPORTED BY:            GIGI SIMCOX, RMR, CRR
                             OFFICIAL COURT REPORTER
15                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
16

17

18

19

20

21

22

23

24

25
```

1      (San Antonio, Texas; October 17, 2023, at 9:00 a.m., in
2  open court.)
3          MISS TULIN:  Good morning, Your Honor.  Thank you for
4  the additional time to confer about exhibits.
5          I believe that the LUPE plaintiffs are now in a
6  position to move in a large number of exhibits that I have
7  provided a list to the Court and have promised to speak slowly
8  as I read the numbers.  There are, I believe, only three
9  exhibits for which we have not been able to come to an
10  agreement with the other side.
11         THE COURT:  So which are the three that you have not
12  agreed to?
13         MISS TULIN:  So they are in the —— I have separated
14  out the lists.  The list that I sent to the Court this morning
15  was before I had had a chance to do a final conference with
16  the defendants, so it's three of them that are in that second
17  category and it's LUPE 218, LUPE 220, and LUPE 084.
18         THE COURT:  So absent those three are you telling me
19  everything else on this list is not objected to now?
20         MISS TULIN:  That is correct.  I hope that I have
21  removed LUPE 178 from that list.  If I have not, we do not
22  plan to seek the admission of that, but I do need to —— I
23  think my agreement with the other side requires that I
24  separate out exhibits that don't have objections and then
25  exhibits that we —— there are hearsay objections and I will

1  explain why we're offering them not for the truth of the
2  matter asserted.  And I think that the other side would like
3  that information in the record.
4        THE COURT:  So that sort of muddies things up.
5        I just asked you if, with the exception of those
6  three, everything else was not objected to.  So you are
7  telling me there are more objections than just those three?
8        MISS TULIN:  Well, subject to the representation we
9  have made about the purpose for which we are admitting them,
10  they do not object.
11        THE COURT:  So which ones have hearsay objections?
12        MISS TULIN:  So I can submit exactly what I sent to
13  the defendants, if that would be helpful.  The — what I sent
14  to the Court this morning, there was the "without objections"
15  category.  That is all of them without any objections.  And
16  then the second half, there were hearsay objections that,
17  subject to me making a representation to the Court this
18  morning, will not be objected to.
19        THE COURT:  Yeah.  So which ones are those?
20        MISS TULIN:  So there are emails that are
21  correspondence between Alan Vera and legislators that are not
22  being offered for the truth of the matter asserted, but to
23  show the effect on the listener, that is LUPE 075, LUPE 082,
24  LUPE 085, LUPE 086, and LUPE 087.
25        THE COURT:  Okay.  Let me ask this side.

1          The first half, I'm assuming — let's try to all work

2   off the same sheet.  I'm assuming the top half of this sheet

3   there are no objections, is that correct?

4          MR. WASSDORF:  I don't have a copy of the sheet that

5   you have, Your Honor, so I —

6          THE COURT:  Let's get a copy.

7          THE DEPUTY CLERK:  I'll print it.

8          MR. WASSDORF:  So, yes, Your Honor, it appears that

9   under the heading Exhibits Without Objections we have no

10   objections to those.

11          THE COURT:  Okay.  Same for everybody?

12          Okay.  So without you reading it and then me reading

13   it twice, I'll just do it this way.  So LUPE 9, 12, 16, 31,

14   32, 66, 67, 89, 92, 93, 96, 99, 108, 109, 111, 124, 145, 146,

15   150, 151, 154, 167, 175, 176, 181, 187, 192, 196, 223, 263,

16   264, 309, 310, 316, 317, 328, 331, 332, 333, 334, 335, 343,

17   344, 347, 353, 354, Joint 11, Joint 30, Joint 43, Joint 44,

18   Joint 45, Joint 53, Joint 61, and Joint 67 are all admitted.

19          So now with regard to the second half of this sheet,

20   with the exceptions of 75, 82, 85, 86, 87, 218, 220, and 84,

21   are there any objections by anybody on this side?

22          MR. WASSDORF:  No, Your Honor.

23          THE COURT:  Okay.  So LUPE 98, LUPE 115, 128, 152,

24   161, 164, 165, 195, 199, 291, 304, 313, 320, 280, 282, 284,

25   285, 286, 287, and 179 are all admitted.

1          So now let's talk about the —

2          MR. NICHOLS:  Your Honor, they are admitted for the

3     limited purpose that counsel said.  They are not admitted for

4     all purposes.

5          THE COURT:  Now, wait a minute here.

6          So this is real easy, guys.  So LUPE 75, 82, 85, 86,

7     and 87 were the ones that had the hearsay objections.  I did

8     not address those.

9          MR. WASSDORF:  There are other categories that she

10    has.

11         THE COURT:  Oh, good Lord.  It's real easy, guys.

12    When I ask you what is not objected to, you tell me what is

13    not objected to.  And when you tell me there's objections —

14    so let's start over.  Let's scratch that last half of the

15    sheet.

16         Let me ask the question again.  Which ones have no

17    objections?  I was under the understanding that with the

18    exception to the top five, 218, 220, and 84, everything else

19    the objections have been resolved.  That obviously is not the

20    case.  So what additional exhibits have objections?

21         MR. WASSDORF:  So everything on the top half of the

22    sheet, Your Honor, under Exhibits Without Objections do not

23    have objections.

24         THE COURT:  So we took care of those.

25         MR. WASSDORF:  You have just admitted those.

1        Everything under the category Exhibits Still Subject
2   to Objections do have objections and Miss Tulin is going to
3   lay out which categories are not being offered for the truth
4   of the matter asserted and explain for what purpose they are
5   being admitted.  Subject to that representation, we have no
6   objections to those.
7        THE COURT:  Okay.  So I thought when you gave me the
8   top five that was it, but apparently that's not it.  So let's
9   start over.  75, 82, 85, 86, and 87 apparently have hearsay
10  objections.  You are saying what in response to that?
11       MISS TULIN:  I think I can make it slightly easier --
12       THE COURT:  Okay.
13       MISS TULIN:  -- and say that there is an additional
14  list from the bottom half that fall into the same category, so
15  hearsay objection, but we are not offering them for the truth
16  of the matter asserted.
17       They -- some portions of them have statements by
18  party opponents and the remainder of what's in it that's
19  hearsay is not being offered for the truth of the matter
20  asserted but to show the effect on the listener or notice.
21       That is LUPE 75, LUPE 82, LUPE 85, LUPE 86, LUPE 87,
22  LUPE 98, LUPE 115, LUPE 128, LUPE 152, LUPE 161, LUPE 164,
23  LUPE 165, LUPE 195, LUPE 199, LUPE 291, LUPE 304, LUPE 313,
24  LUPE 320, and LUPE 179.
25       THE COURT:  With regard to those exhibits, any

1    further response, and do you want to respond to her comment
2    that it's not hearsay and it's otherwise admissible?
3            MR. WASSDORF:  Your Honor, these documents represent
4    either communications to Secretary of State or the legislature
5    to the most point.  You know, we've got our hearsay objection
6    subject to the representation that they are being offered for
7    the effect on those respective parties.  We have no additional
8    objection.
9            THE COURT:  Okay.  Subject to that, any hearsay
10   objections are overruled.  75, 82, 85, 86, 87, 98, 115, 128,
11   152, 161, 164, 165, 195, 199, 291, 304, 313, 320, and 179 are
12   all admitted.
13           MR. KERCHER:  I apologize, Your Honor.  When the
14   Court says those objections are overruled, do I understand the
15   Court is overruling the objection or is admitting the exhibits
16   for the limited purpose stated by counsel?
17           THE COURT:  What is your agreement, limited purpose?
18           MISS TULIN:  Correct.
19           THE COURT:  I'm acknowledging the agreement between
20   the parties.
21           MR. KERCHER:  Thank you, Your Honor.
22           THE COURT:  So now we still have three, four, five,
23   six, seven, eight documents on this list, and what about
24   those?
25           MISS TULIN:  So six of them, Your Honor, are

1    deposition designations that we filed, and subject to our

2    stipulation with the other side, they are identical to what

3    were filed with our pretrial disclosures, but we're simply

4    offering them as exhibits and seeking their admittance, and

5    we've removed any designations for witnesses that ultimately

6    testified at trial.

7          I don't believe that there is an objection on the

8    other side to us admitting them.

9          THE COURT:  So which six are those?

10          MISS TULIN:  LUPE 280, 282, 284, 285, 286, and 287.

11          THE COURT:  Are there any objections to those

12    exhibits?

13          MR. WASSDORF:  Subject to counsel's representation

14    that the exhibits here match the deposition designations that

15    have been previously filed, no further objection.

16          THE COURT:  Thank you.

17          280, 282, 284, 285, 286, and 287 are all admitted.

18          I think on my list I still have four left, is that

19    right?  218, 220, 84, and 179.

20          MISS TULIN:  179 was in the list —

21          THE COURT:  That we resolved?

22          MISS TULIN:  Correct.

23          THE COURT:  Okay.  Then the other three, 218, 220,

24    and 84?

25          MISS TULIN:  Yes.  And I may need our friend John to

1  pull them up, depending on —— so 218 and 220 are exhibits that

2  we are offing to supplement our organizational plaintiffs'

3  testimony regarding standing, Texas Impact.  They are an

4  invoice and Josh Houston provided testimony about Ballot

5  Ready, which is a product that they —— that the organization

6  obtained in response to SB 1, and to help its constituents

7  address the confusion caused by it.

8          There's an invoice and a —— if we can pull up 220,

9  John, that would be great.

10          So that's the invoice and then if we scroll down on

11  LUPE 218 you can see it's essentially the contract.  So it's

12  to supplement his testimony and provide a little bit of

13  concrete information about the expenditure associated with

14  that product, and our view is that these are business records

15  and that they may not be hearsay at all.

16          I believe that the objection that was lodged was

17  hearsay.  We don't believe they are hearsay at all, but if

18  they are hearsay we believe that they are business records.

19  We did not go through and lay that foundation with our

20  organizational plaintiff but we believe that we could easily

21  do that.

22          THE COURT:  What's the response to 218 and 220?

23          MR. WASSDORF:  Two things, Your Honor.

24          With respect to the hearsay, I mean, I do think they

25  are being offered for the truth of the matter asserted.  They

4149

1  are being offered for the truth that they did contract and

2  that there was an amount of money there.

3          As to the business records, these appear to be

4  business records of Ballot Ready, not — was it LUPE?

5          MR. KERCHER:  Texas Impact.

6          MR. WASSDORF:  Texas Impact.

7          THE COURT:  It could be both, right?

8          MR. WASSDORF:  It could be, Your Honor.

9          And then, finally, there's no indication on the face

10 of these documents that this was the contract that Mr. Houston

11 was talking about, and so if they had brought it up during his

12 examination, I don't think we would probably have a problem

13 with it, but doing it after the fact raises a little relevance

14 concern for us.

15         MR. NICHOLS:  Your Honor, from my perspective, if

16 they are not being offered against my client, I won't take a

17 position.

18         THE COURT:  Yeah.  So 218 and 220 could be business

19 records of both Ballot Ready and Texas Impact.  Yeah, the

20 niceties should have been complied with, but since standing is

21 such an issue in this case, there is no prejudice to anyone by

22 the admission of these.  218 and 220 are admitted.

23         MR. NICHOLS:  Your Honor, may I have a representation

24 these are not being offered against my client?

25         MISS TULIN:  They are not.

```
1              THE COURT:  And so 218 and 220 are admitted.

2              Let's tackle 84 now.

3              MISS TULIN:  Yes, Your Honor.

4              LUPE 84 is a poll watcher training that was conducted

5    by Alan Vera who was the ballot security chairman at the

6    Harris County Republican Party and intervenor defendant.  I

7    will just note at the outset that I believe there is no

8    objection to the admission of this by either the State

9    defendants or the intervenor defendants.

10             I believe the only objection that remains is by

11   District Attorney Ogg who — and I'm happy to argue that

12   objection.  It's a hearsay objection.  I will just note that

13   DA Ogg is not adverse to us in this action, but I'm happy to

14   explain why I think that we can overcome the hearsay

15   objection.

16             MR. NICHOLS:  I don't think there is a need for that.

17   Consistent with the last two exhibits, representation is being

18   made this is not being offered against my client DA Ogg, is

19   that correct?

20             I'm sorry, Judge.

21             THE COURT:  That's fine.

22             MISS TULIN:  That is correct.

23             THE COURT:  84 is admitted.

24             MISS TULIN:  Thank you.

25             And if I can just clean up one quick item, which is
```

1   that that first category of emails where I referenced that it
2   was correspondence between Alan Vera and legislators, it's not
3   being offered for the truth the matter asserted, but the —
4   to show that the legislators communicated with Vera.  So I
5   misspoke slightly when I said that it was the effect on the
6   listener, so I still think that it's a nonhearsay purpose but
7   I just wanted to make sure that we're clear on that.
8           THE COURT:  I understood that.
9           Now, what I don't understand is — I thought you-all
10  took my ruling on appeal on the disclosure on all of that.  Is
11  this like a limited disclosure you are making on that?  That's
12  confusing to me.
13          I thought you-all took the position that any — well,
14  I think it was Willett's opinion saying that the ambit of
15  legislative privilege got enlarged.  I don't know how, but
16  they can do it and so they did it.  And so aren't you — is
17  this like a selective disclosure?
18          MR. WASSDORF:  Of the Alan Vera documents, Your
19  Honor?
20          THE COURT:  Yes.
21          MR. WASSDORF:  Legislative privilege was never
22  claimed on those documents.
23          THE COURT:  Okay.  Anything else?
24          MISS TULIN:  One last item.  Well, actually two last
25  items.  So LULAC 61 was an exhibit that was used yesterday

1  with Jonathan White and we would move to admit that.  I don't

2  believe that there's any objection to that.

3           THE COURT:  I already admitted 161.

4           MISS TULIN:  61?

5           THE COURT:  Oh, 61.  I thought you said 161.

6           MISS TULIN:  Yeah, 61.  This is the April 2022 OAG

7  log that the plaintiff spent some time with Mr. White talking

8  about yesterday.

9           THE COURT:  Any objection to 61?

10          MR. WASSDORF:  No objection.

11          THE COURT:  61 is admitted.

12          MISS TULIN:  The last item is that my friends and

13  I — on the other side — have been working very diligently to

14  come to a stipulation regarding census data.  We have come to

15  an agreement about it.  I believe that at least the State

16  defendants and the intervenor defendants will be joining that

17  stipulation.  I'm not sure if other plaintiffs other than LUPE

18  plaintiffs will be joining it or other defendants, but we have

19  it ready to go and plan to file it today.

20          And subject to me just letting you know that that

21  will be coming in, I believe, but I'm going to make one extra

22  look, that I was going to say that the LUPE plaintiffs rest,

23  but I'm — as to phase one.  The LUPE plaintiffs rest as to

24  phase one.

25          THE COURT:  So subject to phase one, subject to that

1    stipulation, and subject to I guess we're still waiting on a
2    Fifth Circuit ruling, LUPE rests.
3              MISS TULIN:  Thank you, Your Honor.
4              THE COURT:  Next plaintiff.
5              MISS HOLMES:  Good morning, Your Honor, on behalf of
6    the HAUL plaintiffs, and I have my list here I can hand up to
7    the Court.  I think I gave the defense a copy yesterday.
8              MR. WASSDORF:  I do not — does this match the email
9    you sent previously?
10              MISS HOLMES:  Yes.  A couple will not be entered, but
11    other than that it matches the email.
12              MR. WASSDORF:  Okay.
13              MISS HOLMES:  The HAUL plaintiffs move to admit
14    exhibits in two categories, the first category are letters or
15    testimony that was presented to the legislature during the
16    2021 session.  We are not moving these in for the truth of
17    these documents, but the effect on the listener and notice,
18    and that — would you like me to read the numbers?
19              THE COURT:  That's all right.  So any objection to
20    that?
21              MR. WASSDORF:  Subject to that representation, no,
22    Your Honor.
23              THE COURT:  Okay.  So subject to that representation:
24    HAUL 16, 44, 123 through 126, 128 through 131, 134 through
25    136, 213 through 216, 223 through 227, 229, 265, 266, 269

1  through 271, 276, 279, 282, and 283 are all admitted.

2        MISS HOLMES:  Thank you, Your Honor.

3        The second category are other exhibits that I believe

4  there is not an objection to and I can read this list because

5  it has some alterations, if I can.

6        THE COURT:  Well, is yours the same as mine or not?

7        MISS HOLMES:  It should be the same as yours.

8        THE COURT:  Do you have a copy?

9        MR. WASSDORF:  I have an email.

10        THE COURT:  So you-all start correcting me if

11  anything is different from what you have:  HAUL 38, 89, 133,

12  179 through 181, 186, 188, 194 through 211, 296 through 299,

13  302, 390 through 393, and 400 are all admitted, is that right?

14        MR. WASSDORF:  Yes, Your Honor.

15        MISS HOLMES:  Thank you.

16        And I wanted to note one other thing related to

17  deposition designations.  The HAUL plaintiffs on, I believe

18  Thursday evening, filed an amended list of our deposition

19  designations.  That's at ECF 800.  This list has been — these

20  designations have been amended to withdraw designations from

21  certain witnesses who testified live at trial, as well as

22  withdraw some page and line designations, but we haven't added

23  anything additional that was not already in our pretrial

24  disclosures.

25        THE COURT:  And so have those been admitted into

1  evidence, or not?

2          MISS HOLMES:  I don't believe we've asked them to be

3  admitted but I will take the opportunity now to —

4          THE COURT:  Do you want them in evidence or not?

5          MISS HOLMES:  We would like them in evidence.

6          MR. NICHOLS:  Your Honor, I will need some time to

7  look at those because I don't know whether there are going to

8  be some lingering objections.  I don't know if they include,

9  for example, folks that are within the plaintiffs control that

10 we have objections to under the Rules of Civil Procedure, so

11 if we could look at those before they get admitted I would

12 appreciate it.

13         MISS HOLMES:  And I imagine that the objections that

14 were made to the previous round probably likely will still be

15 maintained because the actual page and lines of testimony have

16 not changed significantly.  So I understand that the defense

17 needs some time to look at those.

18         THE COURT:  So I guess what I need to have done is

19 the deposition excerpts are going to need to be introduced as

20 an exhibit.  There may be objections to some of the lines and

21 questions and answers in there.  I'm not going to make rulings

22 now, and as I do the findings of fact I'll determine whether

23 or not I'm going to even rely on anything in there.  And if I

24 do rely on anything in there, then on the findings of fact and

25 conclusions of law I will make rulings on any objections.

1          MISS HOLMES:  Okay.  We can give those exhibit
2  numbers and move to admit them.
3          THE COURT:  Okay.  So subject to working out whatever
4  deposition excerpts we need to still tender, subject to the
5  Fifth Circuit ruling on the outstanding discovery dispute,
6  does HAUL rest?
7          MISS HOLMES:  The HAUL plaintiffs rest as to phase
8  one.
9          THE COURT:  Thank you.
10          MISS HOLMES:  Thank you.
11          MR. DOLLING:  Good morning, Your Honor.  Zachary
12  Dolling for the OCA plaintiffs, just a couple of final issues.
13          As we discussed yesterday, the OCA plaintiffs has
14  filled an amended motion for judicial notice that just deals
15  with facts with from one document.  I've conferred with State
16  defendants and counsel for Defendant Ogg and I don't believe
17  they oppose it and I just wanted to flag that.
18          THE COURT:  That was the one that was filed last
19  night?
20          MR. DOLLING:  Yes, that's correct.  It's Docket
21  Number 802.
22          THE COURT:  Thank you.
23          You're in agreement that I can take judicial notice
24  of what was filed in Docket 802?
25          MR. NICHOLS:  We are in agreement that you can take

1    judicial notice of the matters that are stated in the actual

2    motion.

3          MR. KERCHER:  That's right, Your Honor, and I believe

4    the motion — the language in the motion details that.

5          THE COURT:  I'll take judicial notice of that.

6          MR. DOLLING:  Thank you.

7          Second, I would like to move to admit OCA PX 377,

8    which was the September prosecutions spreadsheet that was used

9    in yesterday's examination of Mr. White.

10         THE COURT:  Any objection to OCA 377?

11         MR. WASSDORF:  No objection, Your Honor.

12         THE COURT:  377 is admitted.

13         MR. DOLLING:  And then, finally, Your Honor, I would

14   like to move to withdraw one exhibit that was inadvertently

15   listed when we were listing all these large numbers of

16   exhibits, and that is OCA PX 416.

17         THE COURT:  Any opposition to withdrawing 416?

18         MR. NICHOLS:  Could we just have a second to look at

19   it, Judge?

20         MR. WASSDORF:  No objection from State defendants.

21         MR. NICHOLS:  Yes, we do have an objection to

22   withdrawal of this.  This is a — 416, Your Honor, we can pull

23   it up.

24         Could we pull it up real quick?

25         MR. DOLLING:  I'm not sure.  These are defendant

1  Ogg's discovery responses to the LULAC plaintiffs.

2          MR. NICHOLS:  Yes, but the parties have entered a

3  stipulation, Judge, and I can show you the stipulation if I

4  need to, that the discovery responses that defendant Ogg has

5  made in the case could be used for all purposes.  So, of

6  course, this was admitted as part of the evidence and there's

7  no basis to withdraw it.

8          THE COURT:  So Ogg wants it in.  It remains.

9          The motion to withdraw 416 is denied.

10         MR. NKWONTA:  Your Honor, I apologize, but may I

11 weigh in on this as well?

12         THE COURT:  Yeah.  Come on up.

13         MR. NKWONTA:  Good morning, Your Honor, Uzoma Nkwonta

14 on behalf of LULAC plaintiffs.  I want to clarify one of the

15 comments that Mr. Nichols made.  The stipulation actually

16 stated that the most recent amended interrogatory responses

17 can be used in evidence.  That's not the document we are

18 talking about here.

19         The most recent interrogatory responses I believe is

20 designated as Ogg 3.  So to the extent Ogg wants to admit

21 those responses, Mr. Nichols is welcome to seek to admit them,

22 but beyond that there is no basis for which to oppose or

23 insist on OCA having this document in evidence, and there's no

24 prejudice to withdrawing these documents because they were not

25 introduced as part of any party's case, and it was

```
 1   inadvertently admitted as Mr. Dolling was reading the list of
 2   documents and exhibits, so...
 3        THE COURT:  But you are telling me that when it's
 4   Ogg's turn Ogg can move to admit it and it's going to get
 5   admitted, right?
 6        MR. NKWONTA:  No.  We will object.
 7        THE COURT:  On what basis?
 8        MR. NKWONTA:  Object on hearsay grounds because Ogg
 9   cannot admit her own discovery responses.  And the
10   stipulation —
11        THE COURT:  Let's cut to the chase.  What are we
12   fighting about, guys?  What's in there that you don't want in
13   there anymore?
14        MR. NKWONTA:  Well, what we are fighting about, one,
15   the discovery responses are largely unresponsive.  And Ogg
16   has —
17        THE COURT:  So what's the harm to you to have it in?
18        MR. NKWONTA:  Well, Ogg has also attached to these
19   discovery responses the proposed stipulation that was not
20   entered into by the parties, the proposed stipulation in which
21   Ogg offered to halt enforcement of some of the challenged
22   provisions in exchange for dropping attorneys fees, damages,
23   and other requests.
24        THE COURT:  If there wasn't an agreement among the
25   parties, I can't take into account that.  So I'm still left
```

1    with what is the harm to you-all?

2         MR. NKWONTA:  Well, the harm is introducing that

3    proposed stipulation.  And that proposed stipulation is not

4    evidence.  It's not admissible and it shouldn't come into

5    evidence.

6         THE COURT:  And so when I do the findings of fact and

7    conclusions of law, I just disregard all of this.

8         MR. NKWONTA:  If the Court — if that is the Court's

9    ruling, then we are willing to not withdraw our objection but

10   we are willing to stand down subject to our objection that the

11   proposed stipulation cannot be used as evidence of any intent

12   or lack of intent to prosecute.

13        THE COURT:  Yeah.  So now Ogg's position always — I

14   have never understood.  Your position seems to be -- I mean,

15   all throughout this trial there's been testimony about

16   district attorneys have the ability to prosecute.  So it seems

17   to be Ogg's position that, oh, well, I've said I'm not going

18   to prosecute, but the latest legislation entered by the State

19   of Texas says district attorneys can't make blanket assertions

20   like that.  So I'm left confused with what your client's

21   position is.

22        MR. NICHOLS:  Judge, as soon as the plaintiffs rest

23   we are going to make a motion for judgment and I think

24   hopefully that will be the right time for you and I to have a

25   discussion with what our positions are.

1          But with respect to this particular issue, Judge,

2    this exhibit is in evidence.  They moved to admit it and so

3    now they are asking the Court to un-admit it and we object to

4    that as a procedural matter, that's number one.

5          Number two, if their objection truly is to the

6    existence of the stipulation, Your Honor, you have before you

7    Document 781, it is a stipulation between my client, the DA

8    Ogg, and all of the plaintiffs' groups that embodies the

9    stipulation that's being addressed.

10          In other words, that stipulation, Your Honor, is in

11   front of the Court as evidence.  So if the argument is, is

12   that somehow we need to remove this because of something not

13   in evidence, that's -- respectfully it's not a good argument.

14          MR. NKWONTA:  Your Honor, may I respond to that

15   briefly?

16          THE COURT:  We've had enough.

17          So 416 will not be withdrawn.  I'll give it whatever

18   weight, if any, it's entitled to in the findings of fact and

19   conclusions of law.

20          What else do we have from OCA?

21          MR. DOLLING:  That's it, Your Honor.  Thank you.

22          THE COURT:  So subject to the same limitations, does

23   OCA rest?

24          MR. DOLLING:  Yes, Your Honor.

25          THE COURT:  Thank you.

```
 1              Anybody else?
 2              MR. WATKINS:  Elijah Watkins on behalf of MFV.
 3              Yesterday, Your Honor, MFV rested.  Just to clarify,
 4   we are resting to subject to phase one.  We reserve the right
 5   to bring on evidence at a later phase.
 6              THE COURT:  Thank you.
 7              MR. WATKINS:  Thank you, Your Honor.
 8              THE COURT:  Anybody else on this side?
 9              MISS RODRIGUEZ:  Sorry, Your Honor.
10              With apologies to our colleagues on this side, it
11   took us a little bit longer for LULAC plaintiffs to get this
12   together than we would have liked.  We have a list of exhibits
13   that we would like to move into evidence to which no party has
14   asserted an objection.  If you would like more time to review
15   and confer, we'd completely understand.
16              MR. WASSDORF:  Yes, Your Honor.  This was sent about
17   15 minutes ago while we've been in the middle of this
18   conversation.  I thought yesterday that LULAC represented they
19   were not going to have anymore exhibits to admit and so I'm
20   going to need some time —
21              THE COURT:  I will give you time.
22              MISS RODRIGUEZ:  Thank you very much, Your Honor.
23              THE COURT:  Okay.  We're waiting for a witness.
24              MR. WASSDORF:  Actually, Your Honor, I do have a
25   couple.
```

1            THE COURT:  Go ahead.

2            MR. WASSDORF:  First off, Your Honor, I wanted to

3  point out that State defendants, by my count, have 199

4  exhibits that have yet to be admitted.  Out of the dozen or so

5  yesterday that I moved to admit after objections, additional

6  objections came back.  I only have four to admit now.

7            THE COURT:  So wait a minute.  Out of 199 this side

8  only agrees to 4?

9            MR. WASSDORF:  Yes, Your Honor.

10            THE COURT:  So I'm getting a lot of shaking of the

11  heads here.

12            MISS HOLMES:  Your Honor, I don't believe that's

13  correct.  I believe there are other exhibits that we don't

14  have objections to, but the State has not advised that of this

15  morning or on a certain trial date they intend to move into

16  evidence.

17            MR. WASSDORF:  The issue, Your Honor, is that there

18  are five different plaintiffs' groups over here and when you

19  combine everyone's objections, there are, as is it stands

20  right now, only four that we can move to admit as unobjected.

21            As Your Honor knows, we have a limited number of

22  witnesses in this case.  We don't have 50 witnesses to walk

23  things through, and so we're going to have to start today

24  walking through one by one exhibits to get them admitted

25  unless we get some major movement.

4164

```
 1              THE COURT:  Okay.  So we do have any witnesses we can
 2    do today?
 3              MR. WASSDORF:  Yes, Your Honor.
 4              THE COURT:  So we are going to do witnesses today.
 5              Just so we're not talking over one another, I like
 6    working off a written sheet with exhibit numbers and my
 7    expectation of this side is you better be reasonable on these
 8    objections because I'm not going to sit here all day ruling on
 9    objections.
10              MISS TULIN:  Heard and understood, Your Honor.  I
11    just — I'm not sure what the four that Mr. Wassdorf is
12    referring to but I'm happy to go back, take — we have already
13    admitted a batch of State exhibits without objection and I'm
14    happy — I think we're all happy to go back, confer again, and
15    provide another list just as the State has done.
16              THE COURT:  Why don't you come up with your latest
17    list of 199 or whatever it is, circulate it.  And like I said,
18    I made the expectations clearly known here.
19              MR. WASSDORF:  Yes, Your Honor.
20              MR. NICHOLS:  Your Honor, may I make a housekeeping
21    suggestion?  Would it be a good time to take a break, confer
22    with the LULAC plaintiffs, get that resolved, allow them to
23    rest, because I have a motion that I need to make at the close
24    of plaintiffs' collective cases.  I think the State may or may
25    not have a motion it intends to make, so in kind of the due
```

1  order of proceedings if we could take a short break, get with

2  LULAC plaintiffs, see where we are on that, they can rest and

3  we can move forward.

4          THE COURT:  Well, I mean, subject to them resting,

5  I'll hear your motion now if you want to make your motion.

6          MR. NICHOLS:  Sure.

7          THE COURT:  Go ahead.

8          MR. NICHOLS:  With respect to the due order of

9  pleadings, I don't know if the State has a motion to make.

10          MR. KERCHER:  We will make a motion, but by all

11  means.

12          MR. NICHOLS:  Okay.

13          Your Honor, if I may approach, I'm going to hand a

14  copy of a PowerPoint slide.  And I've got some copies for the

15  other side.  Furthermore, Your Honor, this motion and

16  PowerPoint will be filed with the Court here directly.

17          Good morning, and may it please the Court.

18          Defendant Harris County District Attorney Kim Ogg

19  moves for judgment under Federal Rule of Civil Procedure 52(c)

20  upon the close of the plaintiffs' case, as adjusted by the

21  Court.

22          The Court is well familiar with the standards that

23  apply with respect to a judgment on partial findings, in

24  essence, the equivalent of a motion for directed verdict in a

25  bench trial.  If a party has been fully heard on an issue

1  during a nonjury trial and the Court is to find against that
2  party on that issue, the Court may then enter judgment against
3  the party on that claim or defense that under the controlling
4  law can be maintained or defeated only with a favorable
5  finding on the issue.
6        Obviously, the Court can decline to render any
7  judgment until the close of all evidence, and then there's
8  obviously a requirement for findings of fact and conclusions
9  of law, and I'm going to circle back on that at the end with a
10  respectful suggestion on the procedure going forward.
11        Your Honor, the grounds for the motion for judgment
12  under 52(c) should come as no surprise to the Court.  There
13  are some issues that kind of lapse over into the merits of the
14  plaintiffs' claims, but the bedrock principles that DA Ogg has
15  raised since the inception of this case, if you recall, DA Ogg
16  was not a defendant when this, all this litigation was filed,
17  it was only after *State v Stephens* that she and other DAs were
18  added to the case in midstream, but from the very first
19  appearance that was made in the case by my client she asserted
20  sovereign immunity and the failure of the plaintiffs at that
21  time to plead a basis for standing that would give this Court
22  jurisdiction over the claims made as to my client, and, of
23  course, the plaintiffs bear the burden of proof on both.
24        I'll go through it very briefly, but the Court knows
25  full well the law with respect to standing.  You've evaluated

1 the standing allegations, but once you get to this point in a

2 case, once you get to trial, the standing requirement must be

3 met by the applicable burden of proof at the time where you

4 are in the proceedings, and here we are at the close of the

5 plaintiffs' case.

6          THE COURT:  Are you going to tackle standing?

7          MR. NICHOLS:  I'm going to do both.

8          THE COURT:  Okay.

9          MR. NICHOLS:  And I'm going to go quickly through

10 sovereign immunity because, as the Court knows, the sovereign

11 immunity issue is currently pending before the Fifth Circuit

12 panel.  I know there are other issues relating to discovery,

13 but this is separate from that.

14          And the specific issue that is pending before the

15 Fifth Circuit panel, and it was argued, is what I put on the

16 screen, which is:  Can a Texas DA be sued to have a federal

17 court declare a Texas criminal statute unconstitutional just

18 because she holds her elected office or does *Ex Parte Young*

19 require more?

20          And this issue is before the Fifth Circuit on the

21 plaintiffs' pleadings, not on any evidentiary record, so I

22 wanted to include this point before the Court because there

23 would be an opportunity for the Court to reconsider this issue

24 based on the evidence that plaintiffs have adduced in the

25 case.

1          So with respect to that evidentiary record, you'll

2    remember early on in the trial — I can't remember the name of

3    the plaintiffs' counsel that was sitting here, but remember I

4    was up questioning a witness and someone objected to my asking

5    questions, and at that time I offered to stipulate that there

6    would be no evidence that my client had engaged in enforcement

7    of any of the SB 1 provisions that were at issue in the case

8    in which the Court allowed the case to proceed on through this

9    point in the trial.

10          That offer of stipulation was rather aggressively

11    denied and at certain points in the trial, Judge, I have felt

12    like the defense lawyer who is defending one of those

13    defendants in the mass criminal case waiting for his or her

14    client's name to be called.

15          THE COURT:  It hasn't been that bad.

16          So, to me, the sovereign immunity and the standing

17    seem intertwined and going back to the question I just asked

18    you earlier, because on the third bullet point you have on the

19    screen, the demonstrated willingness to exercise that duty,

20    how does your client not exercise that duty?

21          There's legislation that the Texas Legislature has

22    passed saying your client doesn't have discretion to not

23    exercise prosecutorial duties here in this — in an election

24    fraud case.  So how do you get around that?

25          MR. NICHOLS:  Excellent question.  So let's break it

1    down.  The first point you see from the last bullet on this

2    slide is that there are actually two requirements that are

3    applied by the current law under *Ex Parte Young*, and that's

4    from among other places this *Texas Democratic Party versus*

5    *Abbott* case from 2020.

6            You've got to touch two bases.  You've got to be able

7    to show there's a particular duty and you have to show a

8    demonstrated willingness to exercise that duty.  So there are

9    two separate things that need to be shown.

10           With respect to the first one, this is why, and I

11   appreciate the Court's indulgence — trying to stay in my lane

12   to ask certain questions — but this is why, for example, I

13   went into the issue of duty with Jonathan White who was here

14   yesterday.

15           And the duty that a prosecutor has under Texas law is

16   not to prosecute any particular case, not to prosecute any

17   particular person, not to enforce any particular law against

18   any particular person, it's to see that justice is done.

19           So the idea that there is a — that the plaintiffs

20   have articulated at certain points in time, which I don't

21   think is borne out by the evidence, that a DA has a duty to

22   enforce the law against a — someone who has a concern about

23   an assister assisting them in curbside voting, or that a DA

24   has a duty to address someone's concern about poll watchers

25   is, frankly — there's no basis for that, so...

1              And then the second part of it, that's the issue,

2    Judge, that — that's the issue that really is squarely before

3    the Fifth Circuit right now, which is:  What does demonstrated

4    willingness to exercise that duty mean?

5              THE COURT:  Did my question get asked?  Has oral

6    argument been held in this case?

7              MR. NICHOLS:  It was.

8              THE COURT:  So like was my question asked or

9    addressed in any way?

10             MR. NICHOLS:  It was.

11             THE COURT:  Okay.

12             MR. NICHOLS:  And I'm going to get to 87011, we're

13   going to get — and I apologize, but I am getting there.

14             THE COURT:  Go ahead.

15             MR. NICHOLS:  But this requirement has also been

16   mentioned by the Fifth Circuit.  It was in the *KP versus*

17   *Leblanc* case, 627 F.3d 115 in 2010, and it says that — this

18   is all about the connection to enforcement, and the Court

19   said, quote, "the connection requirement exists to prevent

20   litigants from misusing the exception that is presented by *Ex*

21   *Parte Young*," that is — and if we go back to first

22   principles, Judge, *Ex Parte Young* was a case that involved

23   Minnesota Attorney General.

24             It involved a situation where the Minnesota Attorney

25   General — I don't need to go into it because I see you

1  nodding, you understand the fact pattern there -- but was an

2  actual threat to enforce against folks who weren't complying

3  with railroad regulations.  So there was an actual threat

4  involved here.

5          And that's -- but that's the point that we're getting

6  to, which is that that's a type of demonstrated willingness

7  that you need to have evidence on before you can go through

8  that eye of the needle of *Ex Parte Young* to avoid a state

9  officer like my client's sovereign immunity.

10          So 87011, how does that impact on this issue?

11          Respectfully, our position is that it does not.

12  First of all, 87011, I've got it in front of me, you saw it

13  yesterday, is a situation where the legislature in this last

14  legislative session --

15          THE COURT:  Do you need to advance the screen?

16          MR. NICHOLS:  No, sir.  Maybe we can pull it up.

17          Would you mind pulling it up?

18          THE COURT:  That's okay.  I can get it from here.

19          MR. NICHOLS:  We can pull it up.  Local government

20  code 87011.

21          I think the plaintiffs had it up yesterday, so maybe

22  they can pull it up.

23          THE COURT:  I had it before me.  I thought you were

24  intending to put it on the screen.  That's the only reason I

25  asked.

```
1            MR. NICHOLS:  We had it on the screen yesterday but
2    maybe we can -- there we go.
3            So and this doesn't show the changes that were made
4    but I can just read -- I can track those through with you.
5    The changes that were made fall under, you see 870113, it
6    starts at Sub B to that section.
7            So, in other words, this is a definition of official
8    misconduct for purposes of what comes later.  And I can
9    represent to the Court, we don't need to pull it up, 87012 of
10   the local government code is a provision that's entitled
11   Officer Subject to Removal, and then 87013 is a provision that
12   is general grounds for removal and that provision says an
13   officer may be removed for, among other things, official
14   misconduct.
15           So what you were shown yesterday is basically a
16   change to the definition of what may constitute official
17   misconduct for purposes of the removal statute.  So the first
18   response I would add, which you're probably ahead of me as
19   usual, is that this is not imposing a duty on any DA
20   whatsoever.
21           It's merely adding to the removal statute an
22   additional definition of what may constitute official
23   misconduct for purposes of removal, but it does not change the
24   statutory and constitutional, frankly, prosecutorial
25   discretion that any DA in the state has.
```

1          You heard Mr. White testify —

2          THE COURT:  But the plaintiffs are arguing, if I

3    understand them right, that because of the vagueness of some

4    of the statute in their opinion, or the overbreadth, your

5    client may choose to exercise prosecutorial discretion or may

6    not choose to do prosecutorial discretion but she refuses to

7    say so, and so we're left with this lingering, so says

8    plaintiffs, threat.  I mean, so why isn't that enough for

9    their claims against your client to survive?

10          MR. NICHOLS:  So I think you've accurately

11    characterized their argument, and I think by phrasing the

12    argument that way, that illustrates how we're putting the cart

13    before the horse on *Ex Parte Young*.

14          In other words, it's not enough for *Ex Parte Young* to

15    say that in some situation, say as an assister — I don't

16    think you even had any testimony from assisters in Harris

17    County which we'll get to in a second.  But let's just say

18    hypothetically you had an assister in Harris County who says

19    I've got a concern that given what the legislature has done, I

20    may be prosecuted in the future and the plaintiffs would say,

21    well, DA Ogg has not said categorically that she's not going

22    to prosecute people under this provision of law, and,

23    therefore, we can show standing.

24          That's putting the cart before the horse,

25    respectfully.

1          THE COURT:  So your position, or the DA Ogg's
2    position is this is all premature, she's got to arrest them
3    and prosecute them first and then they can bring claims?
4          MR. NICHOLS:  No, I don't think in *Ex Parte Young* it
5    was a situation that you had that, but you did have a
6    demonstrated willingness to enforce that law.
7          THE COURT:  So at what point hypothetically can they
8    sue your client?
9          MR. NICHOLS:  Well, that's exactly the discussion
10   that we had with the Fifth Circuit.  In other words, that's
11   the issue that's before them right now.
12         THE COURT:  So what is your client's position?  At
13   what point can she be sued?
14         MR. NICHOLS:  Yeah.  So it is definitely fact
15   dependent, but you've got to have some facts.  And that's what
16   we argue —
17         THE COURT:  So you are not telling me where the line
18   is, though.
19         MR. NICHOLS:  Well, it's not — you can't say it
20   because in the case with the Minnesota AG, that set of facts
21   was sufficient to represent demonstrated willingness to
22   enforce the law.
23         You may have another situation, but here, and we're
24   going to get back to the PowerPoint in a minute, actually
25   let's — no let's don't get back to the PowerPoint.  Let me

1    hold that, Judge, just to get through this real quick.

2            THE COURT:  Go ahead.

3            MR. NICHOLS:  So you remember during yesterday's

4    discussion I suggested we might want to read the whole

5    statute, and I think you read it anyway so I didn't go back to

6    it and you can read statutes better than, you know --

7            THE COURT:  I don't need suck-up.

8            MR. NICHOLS:  No.  No.  I'm not -- but, you know, we

9    don't need to be spending court time on it, but the point that

10    I was trying to address was this part that comes below, so if

11    you look at B, I think the Court picked up on the class issue.

12            In other words, this is not, you know, this official

13    misconduct does not come into play with respect to a

14    prosecutor's prosecutorial discretion on individual cases.

15            And then, also, we didn't get to the carve-outs where

16    it says accept a policy adopted, and you see that first one

17    which is squarely relevant here to this litigation, which is

18    in compliance with a state law or an injunction judgment or

19    other court order.

20            So, in other words, this gets to my, kind of my

21    closing prematurely, which is that the bottom line is none of

22    the parties -- there's no basis to include DA Ogg as a party

23    to this case and none of the parties really need DA Ogg to be

24    a party to the case.  That's been our position all along.

25            THE COURT:  So let me ask you this.  I mean, but

1  that's been the position of all the State defendants.

2        The Secretary of State says I don't belong.  The

3  Attorney General says I don't belong.  Gregg Abbott says I

4  don't belong.  Then now you tell me a district attorney

5  doesn't belong.  Who gets sued?

6        MR. NICHOLS:  Yeah, and that was another position

7  that we argued to the Fifth Circuit as well.  Again, I feel

8  like you were sitting on that panel.

9        THE COURT:  I have not heard — I have other things

10  to do rather than — I'm waiting for the opinion.

11        MR. NICHOLS:  But the point is, Judge, that federal

12  courts, and it's always difficult to sometimes to address this

13  but I've been before this Court a lot.  I know you don't take

14  offense to this.  Federal courts are limited jurisdiction and

15  you need to touch all those bases before you can get to

16  federal court.  So the concept that if I don't like a statute

17  I have to sue — I have to be able to sue somebody, frankly,

18  just doesn't give enough —

19        THE COURT:  But apart from limited jurisdiction,

20  you're telling me that they have nowhere to go.  They can't go

21  to state court.  They can't go to federal court.  They can't

22  go anywhere.

23        MR. NICHOLS:  I think there are claims that are going

24  to be, sounds to me like, may be fully litigated.

25        THE COURT:  So you want to throw one of your fellow

1   defendants under the bus?

2        MR. NICHOLS:  I'm not throwing anybody under the bus

3   because, as you know, we have not taken a position with

4   respect to the merits or lack thereof of the plaintiffs'

5   constitutional and statutory claims.

6        We have respectfully taken the position that they

7   can't bring those claims against my client on grounds of

8   sovereign immunity, standing, and as a matter of summary

9   judgment because our prediction, frankly, has borne out that

10  there's no evidence to support that my client has engaged in

11  any violation of a federal statute that would somehow give

12  rise to claims against her.

13       So let's go back to the PowerPoint though, if we

14  could.

15       So that was the demonstrated willingness requirement.

16  And this is where, Your Honor, the stipulation comes in, and I

17  apologize for the disconnect between counsel earlier but there

18  is a stipulation that is in evidence and you are aware of this

19  because it was briefed to the Court in connection with the

20  motion to dismiss and a motion for summary judgment that DA

21  Ogg was willing, on a –– during the pendency of the case when

22  you were adjudicating matters with parties other than DA Ogg

23  to stipulate on the absence of any criminal investigations or

24  prosecutions under any SB 1 provision that was being

25  challenged in the case.

1           This has been done, Your Honor, in other cases.  It
2  was done in, for example, in litigation over abortion
3  restrictions.  DA Ogg entered into a stipulation that was
4  agreed to by the parties.  There was a stipulation entered.
5           THE COURT:  Before or after *Stephens*?
6           MR. NICHOLS:  That was before *Stephens* but also —
7           THE COURT:  And was that before or after this latest
8  legislation that allegedly tries to —
9           MR. NICHOLS:  Oh, no.  That legislation just came
10  into effect fairly recently.
11           THE COURT:  Yeah.
12           MR. NICHOLS:  But you'll also remember that there was
13  the kind of the spinoff litigation from this litigation which
14  was the litigation brought by Isabel Longoria, and in that
15  case there was — you never really saw me in that because
16  there was a stipulation that it was agreed to by those
17  plaintiffs that was similar to the one that we offer to agreed
18  to in this case.
19           THE COURT:  What I'm trying to press you for, all
20  those stipulations that Ogg was willing to enter into, was it
21  before this — and I don't remember the number now — the
22  latest legislation.  Can she actually enter into such
23  stipulations now without running afoul of that statute?
24           MR. NICHOLS:  She has entered into a stipulation that
25  basically — with the plaintiffs, where they agree that she

1    is — and I need to pull it real quick.  Hold on, Judge.

2            So the description that's been entered — this is in

3    the record, Your Honor.  It's Document Number 781.  And I'll

4    just read it.  You can pull it up at your leisure, but it's

5    paragraph number five, and it says "the HCDAO" — Harris

6    County District Attorney's Office — "has not, one, adopted a

7    policy refusing to prosecute any type class or type of

8    criminal offenses under state law; number two, instructed law

9    enforcement to refuse to arrest individuals suspected of

10   committing any class or type of offense under state law; or,

11   three, permitted an assistant prosecutor to take either of the

12   foregoing actions."

13           So that is the stipulation that is before the Court

14   with respect to this issue or any other issue but I think you

15   appreciate and understand the argument, which is that this

16   refusing to adopt a policy — I mean, think about the logical

17   extension of that, Judge.

18           So civil rights case gets filed, a DA has a choice,

19   either you disclaim any responsibility to enforce provisions

20   of state law or you get sued.  Respectfully, that's not the

21   law that gives the Court jurisdiction with respect to a

22   lawsuit against a DA.

23           A DA, Your Honor, and there's — I appreciate the

24   effort to go into hypotheticals, but there's no magic line or

25   one size fits all, but what we do know is the plaintiffs do

1  need to first allege something that would meet the

2  demonstrated willingness standard, and then, number two, when

3  you get to trial they've got to prove it.

4          And that's why, I know I'm going a little extreme in

5  saying I'm the guy sitting in the corner waiting for my

6  client's name to be called, but, frankly, the only time my

7  client's name was ever really called by the plaintiffs, I

8  think I asked them questions of witnesses about who — whether

9  they knew who DA Ogg was.  Some people in Harris County knew

10 who she was.  Some people didn't.

11         But the only time the plaintiffs affirmatively

12 invoked DA Ogg was yesterday and that involved what, I think

13 by any objective measure, was an unsuccessful effort to show

14 that there were some public records out there that show that

15 DA Ogg has been enforcing provisions of SB 1.  And I think the

16 Court picked up on that issue too.

17         Whatever they were talking about dealt with cases of

18 illegal voting which is a section that was amended by SB 1,

19 but how was it amended?  It was amended to reduce the penalty

20 from a second degree to a Class A misdemeanor and it was

21 amended to include intentionally as a *mens rea* element in

22 addition to knowingly.

23         And no plaintiff in the case is challenging that for

24 good and valid reasons.  It's been illegal to vote illegally

25 in Texas for a long, long time and no plaintiff would ever

1    suggest, these professionals over here, would ever suggest
2    that they represent an individual, for example, like the guy
3    in Collin County who was alleged to want to be voting in —
4    more than once in the same election.
5            So the only evidence, Your Honor, as we show on the
6    slide here that the plaintiffs have put on about the harm and
7    the threat is — and I've kind of quoted some.  I think one of
8    the organizational reps was asked, why did you sue the DAs,
9    and the answer was, which I thought was pretty telling, we
10   sued them because they would be the ones to enforce SB 1 on
11   the ground.
12           Another witness, I believe from an organization, said
13   that it was SB 1 is the threat.
14           And another one said the Texas Legislature brought us
15   here, and here we are.
16           There is no evidence, Your Honor, that, and I assume
17   that no one is going to argue otherwise, there is no evidence
18   that DA Ogg was somehow involved in the passage of SB 1.  That
19   could be, to answer the Court's question, if you had that
20   hypothetical situation, it would be an interesting question
21   about whether that is demonstrated willingness to enforce the
22   law.  You don't have that evidence.
23           There is no evidence that DA Ogg has been involved in
24   investigations under the provisions, challenged provisions, of
25   SB 1.  There is no evidence that there's been any prosecution

1   of anyone under any of the challenged provisions of SB 1.  And
2   as a matter of fact, it kind of goes to the discussion we were
3   having a few minutes ago about the interrogatories responses
4   in evidence.
5           This is one of the plaintiff's exhibits, it's 416,
6   and so here you see that under the parties' stipulation, and
7   they did stipulate, Your Honor, in 781, that any party may use
8   the HCDAO's most recently amended responses to interrogatories
9   in the trial as evidence with respect to any claim or defense
10  made in the case and can argue from other discovery responses
11  made by the HCDAO in the case.  That's a stipulation on file
12  with the court.
13          And so, here, the only evidence that the Court has
14  about enforcement indicates — and I won't read it, you've got
15  the discovery response in front of you — but the "here,"
16  talks about how none of the — there are no pending
17  investigations or prosecutions at the DAs' Office that relate
18  to any of the provisions that were added or amended by SB 1.
19          And to put further context on that, the Court did
20  grant DA Ogg's motion to dismiss in part, if you recall.  You
21  dismissed any of the plaintiff's claims except those with
22  respect to specifically articulated sections of SB 1, and so
23  this evidence shows that there's no — nothing there.
24          And then if you go down to Response Number 5, you've
25  got that same issue there.  There is a carve-out there but I

1  want to point that out and explain that to the Court.  The
2  plaintiffs asked questions about, do you have any matters
3  pending investigation that relate in any form or fashion to
4  any sections of SB 1 that we're challenging, and so as you
5  know from having looked at SB 1 more than you may have liked,
6  that there are certain provisions of SB 1 that did not create
7  new criminal provisions, they just amended existing
8  provisions.
9         So to be comprehensive in this answer we also
10 included the following, "that there were reports made to the
11 District Attorney's Office on or after September 1, 2021 of
12 twelve instances of which individuals provided the Harris
13 County District Clerk and/or the City of Houston with
14 responses to jury summons indicating a lack of U.S.
15 citizenship that may have been inconsistent representations of
16 citizenship made on previously filed voter registration
17 applications."
18        We included that to be comprehensive, but
19 respectfully that is not conduct that is, in any form or
20 fashion, covered by the changes of SB 1 as opposed to
21 preexisting law.  It was always — if these allegations were
22 true, it would always obviously be inconsistent with Texas law
23 to — for a noncitizen to vote in an election.
24        THE COURT:  Just because we're going to have other
25 witnesses, let's sort of wrap it up.

1           MR. NICHOLS:  Yes, sir.

2           So for purposes of this we incorporate all the

3    authorities in the pending motion for summary judgment the

4    Court has carried with the case.

5           We've also talked about the Minnesota AG.

6           Let's briefly talk about standing.  You obviously

7    denied the motion to dismiss based on the pleadings, but they

8    can't rely on the pleadings at this stage.  We've already

9    talked about, under *TransUnion* and *Lujan*, you have to

10   demonstrate standing with the manner and degree of evidence

11   required at successive stages of litigation.

12          You've got to have a claim-by-claim analysis for each

13   plaintiffs' standing, for each cause of action against each

14   defendant.  So this, Your Honor, is not throwing somebody else

15   under the bus.  It is basically just articulating the

16   well-established standing requirements.

17          It can be tedious, as the Courts have recognized, but

18   this Court appreciates that it is important to engage in that.

19   It's not just an empty formality that could ever be ignored

20   even on important cases like this one.

21          So these are the seven provisions, Judge, that you

22   have allowed the case to go forward on and they obviously do

23   not include 903 which is the one that changed the illegal

24   voting statute, and so the issue before the Court is based on

25   the evidence does any plaintiff have standing to raise any

1    claims on any of these seven SB 1 provisions as to DA Ogg.

2         You know this; you have to have concrete,

3    particularized, and actual imminent injury traceable to the

4    particular defendant.

5         THE COURT:  I'm not sure that's the standard anymore

6    but we'll see.

7         MR. NICHOLS:  I think the —

8         THE COURT:  I have no idea what the standard is.

9         MR. NICHOLS:  I've taken this language, Judge, from

10   the — and I'm not going to take the time to go through all

11   the cases today, but I've actually taken that language from

12   what I believe to be the most recent cases and there's been a

13   lot of litigation over standing, as you know, and recognize.

14        So we've already covered all this I believe.  There

15   is no evidence of prosecution.  Criminal referral for any case

16   for such potential prosecution.  No evidence of any

17   involvement by DA Ogg in passing any of these provisions.

18        And then so the other question that I was sure the

19   Court was going to ask — or you did ask it earlier.  You said

20   does somebody have to wait to get prosecuted before they have

21   standing to challenge a criminal case, and I do believe that

22   this is the most recent law on this.  It's an interesting

23   case.  The Court's familiar with it; I'm sure.  It's the

24   *Clapper* case.

25        THE COURT:  I don't know how you ever find out if you

1  have standing when everything is secret, but, okay.

2          MR. NICHOLS:  But you understand what the Supreme

3  Court did there.

4          THE COURT:  No, I don't, but I know what they said.

5          MR. NICHOLS:  Yes, sir.

6          So this is a pre-enforcement challenge to FISA, which

7  was obviously a very important case to be litigated, but the

8  Supreme Court said that the plaintiffs in that case, who,

9  again, like plaintiffs here, express concern that at some

10 point in time the enforcement agency could enforce the statute

11 against them.  The Supreme Court said that was not enough

12 because the plaintiff had not shown an imminent risk of

13 prosecution that is certainly impending and that the fear of

14 prosecution does not suffice to establish that standing.

15         So, Your Honor, anytime I think that the Court has

16 thought that I have kind of veered out of my lane and not

17 stuck strictly to sovereign immunity or standing, from my

18 perspective it relates to this last portion of the argument,

19 which is, you know, even if you could get past the basic

20 standing threshold on the lack of evidence of enforcement, you

21 know, have the plaintiffs even made out a case for standing

22 against DA Ogg on any of these seven provisions?

23         First point, which I don't think is disputed, her

24 authority is obviously limited to Harris County.  She doesn't

25 have statewide criminal jurisdiction.  She is staffed by the

1 operation of the Texas Constitution and the enabling statute

2 her prosecutorial discretion —

3          THE COURT:  Is larger than some states.

4          MR. NICHOLS:  Sure, but it is limited to the

5 territorial confines of Harris County, so evidence about

6 things that happened in other parts of the state,

7 respectfully, don't apply to her.

8          And so let's go through these provisions real quickly

9 because I know we want to get back to evidence, so the poll

10 watcher provision is the first one that you allowed to go

11 forward into evidence.  And this statute, Your Honor, applies

12 to, only to election officers, and there is zero evidence in

13 the case from any plaintiff, Harris County Election Officer

14 who wants to refuse a poll watcher but will not do so because

15 of imminent risk of prosecution.

16          So even if you were to peel away the layers of the

17 onion, so to speak, you would still find a lack of evidence to

18 support any claim against DA Ogg under this particular statute

19 or provision of the statute.

20          The next one is a language change concerning the poll

21 watchers.  Again, this applies only to election officials and

22 you have zero evidence, Your Honor, from any plaintiff Harris

23 County Election Official who wants to obstruct a poll watcher

24 from observation but will not because of changed language.  So

25 again, there's no basis for standing as a factual matter under

1    409.

2          604, we talked about this a little bit yesterday.

3    It's the change to the in-person assister oath.  And again,

4    our respectful position is this is not a substantive criminal

5    provision, just a change to the language of the oath.  The DA

6    doesn't create the oath, doesn't administer the oath, and you

7    also heard that perjury and tampering with government records,

8    and I think Mr. White mentioned a couple other statutes, were

9    pre-SB 1 criminal provisions.

10         So without regard to the state of mind of persons

11   seeking assistance, which I think is the only evidence you

12   have heard, there is no evidence from which the Court can

13   conclude that there is standing to proceed with a claim that

14   basically says that 604 gave rise to an opportunity for a DA

15   to enforce the criminal law that didn't exist before SB 1.

16         And furthermore, Judge, there's no evidence of any

17   Harris County voter being denied the right to vote as a result

18   of any concerns over this language change, and, again, I

19   mentioned the last bullet about the assisters.

20         Next, the carrier envelope.  This is a little bit of

21   a head scratcher.  There's no new criminal offense created by

22   SB 1 under this, so, again, there's — and again, there's no

23   evidence from any Harris County voter who was or is being

24   denied the right to vote as a result of any concerns over this

25   language change.

1        The statute did add required disclosures on the
2 carrier envelope, but there's no evidence to suggest that any
3 Harris County voter is -- somehow has standing because they've
4 been injured by anything that DA Ogg has done.

5        606.  This is the language change on the mail-in
6 ballot assistance.  And the only evidence, we went through
7 this yesterday with Mr. White, there's an explicit exception
8 to compensated assistance law which says this section does not
9 apply if the person assisting a voter is an attendant or
10 caregiver previously known to the voter.

11        That, if my recollection is correct, and I hope it
12 is, is the only evidence you have heard from anybody in Harris
13 County with respect to assisters dealt with situation where
14 the attendant or caregiver, by definition, would previously be
15 known to the voter.

16        Furthermore, under Section 6.06 there is no evidence
17 from any Harris County plaintiff who wants to compensate
18 someone for providing voter assistance to that plaintiff, who
19 had been an attendant or caregiver, who will not because of
20 the criminal statute, and there is no evidence that any Harris
21 County voter was or is being denied the right to vote because
22 of any such concern.

23        Getting close, Judge.

24        Section 702.  This is the real head scratcher, and I
25 think that the Court would respectfully do well to think about

1  knocking this one out of the case completely.  I don't know at

2  this point whether this claim has been abandoned by all

3  plaintiffs.

4          702 is the –– it extends the offense of refusing to

5  allow an employee to vote during the early voting period in

6  addition to on Election Day.  And this statute, on its face,

7  applies to employers.  No evidence from any Harris County

8  plaintiff employer who has refused or is refusing to allow an

9  employee to vote during the early voting period or wants to

10 because of the language change.  Truly, Judge, truly a head

11 scratcher.

12         Finally, Section 704.  This is the vote harvesting

13 offense.  This statute on its face applies only to certain

14 categories.  It applies to folks who knowingly provide or

15 offer to provide vote harvesting services in exchange for

16 compensation or other benefit, providing or offering to

17 provide compensation or other benefit to another person for

18 vote harvesting services, or knowingly collecting or

19 possessing a mail–in ballot or carrier envelope in connection

20 with vote harvesting services.

21         Just a couple of points.  Obviously, none of these

22 categories apply to the mail–in ballot voter.  And then, Your

23 Honor, there's no evidence in the case from any plaintiff who

24 seeks to provide vote harvesting services.

25         Remember, vote harvesting services is defined as not

1   just talking to somebody in the presence of their mail-in
2   ballot but also to deliver a vote with the intent to deliver a
3   vote for a candidate or a measure.  And there is, frankly, no
4   evidence of any plaintiff in Harris County who would seek to
5   engage in that conduct but will not because of the statute.
6           Then there's a second part which really hasn't been
7   talked about very much in this case for good reason, I think.
8   It relates to the solicitation or distribution of mail-in
9   ballot applications.
10          This statute, like the earlier ones we talked about,
11  applies on its face to public officials or election officials.
12  There is no evidence in the case.  I don't know whether there
13  is any from any Harris County public official or election
14  official who seeks to solicit submissions of mail-in ballot
15  applications, distribute them to people who do not request
16  them, but who will not because of the existence of the
17  offense.
18          The last part, Your Honor, which really hasn't been
19  talked to much at all is the unapplied for distribution of
20  mail-in ballots.  Again, it applies only to public officials
21  or election officials and there's no evidence to support that
22  any plaintiff would have standing on that claim as to DA Ogg.
23          So, Your Honor, to wrap up, no evidence to suggest
24  that any of the plaintiffs are at actual risk of prosecution,
25  much less an imminent risk as the Supreme Court has said needs

1    to be shown for any of the conduct testified to at trial.

2            There's no evidence to support the type of showing of

3    enforcement efforts that can form the basis of a proper way

4    around *Ex Parte Young*, and, as I previewed earlier, DA Ogg's

5    continued presence in the case adds nothing to the resolution

6    of issues presented to the Court by plaintiffs' evidence or

7    the impact of judicial resolution of the plaintiffs' claims.

8            That same statute that the Court has looked at,

9    87011, clearly makes it clear on its face, if a court ever

10   were to enter an injunction that that would be an exception to

11   any finding of official misconduct under that removal statute.

12           And, quite frankly, the kind of picking and choosing

13   by the plaintiffs of who to sue respectfully has been somewhat

14   haphazard.  Not every DA who — that the plaintiffs have

15   testified about conduct in a particular county has been sued.

16           You heard me go through with Jonathan White that if

17   they want to seek to enjoin investigations, they truly want to

18   seek to enjoin investigations of a criminal statute, they

19   have — plaintiffs have not sued the various law enforcement

20   agencies that would be — have jurisdiction to present those.

21           And I'm not criticizing anyone.  I'm just trying to

22   use that as additional support for the idea that the parties

23   and the Court do not need District Attorney Ogg to continue as

24   a defendant in this case incurring attorneys fees, incurring

25   the time and expense and distraction that litigation causes

1    for an office like hers.

2          Your Honor, we had a similar situation.  There was

3    litigation over SB 12 which is a statute that was passed in

4    the last legislative session.  It was called, correctly or

5    incorrectly, the Drag Show Bill.  And that litigation wasn't

6    before you.  It was filed in the Western District in Austin.

7    It was filed — another case was filed in Houston.

8          The Houston case advanced.  Judge David Hittner, my

9    former boss, entered an injunction in that case.  And long

10   story short —

11         THE COURT:  What did he do with the DAs?

12         MR. NICHOLS:  Yeah.  So the DA was — my client was

13   never sued in the case that was pending in Houston, but what

14   did happen is that our case got transferred from the Western

15   District to the Southern District and we filed the same type

16   of motion to dismiss that we filed before you, claiming

17   sovereign immunity and standing deficiencies, but what

18   happened, Judge, is once Judge Hittner entered that injunction

19   we made it very clear in our briefing that, of course, DA Ogg

20   would respect the order of a federal court finding that a

21   statute was unconstitutional.

22         And it's of record in that case, in that litigation,

23   and so there shouldn't be any question of what you would

24   expect, which is there's no need to have a DA involved in

25   litigation like this on a — based on an argument that somehow

1  a DA is not going to respect the order of a federal judge in

2  finding a particular provision of Texas law unconstitutional,

3  if that happens.

4          So for all those reasons, Your Honor, we would

5  suggest this, that I know it's not going to be possible to do

6  in the middle of evidence this week, but we are going to

7  complete phase one, so we would respectfully request that the

8  Court take this matter under consideration and consider

9  whether my client can be excused from further participation in

10  the litigation, especially as you reach the issues in phase

11  two, which I understand will largely be things that happened

12  in the pink building in Austin.

13          Thank you, Judge.

14          THE COURT:  Thank you.

15          Any response?

16          MR. NKWONTA:  Morning, Your Honor, Uzoma Nkwonta on

17  behalf of LULAC plaintiffs.  I just need about five minutes

18  for a quick response.

19          First, most of the arguments that Mr. Nichols made on

20  behalf of District Attorney Ogg has been foreclosed by the

21  Fifth Circuit in a case called *Ostrewich v Tatum*.  That case

22  found that plaintiff had standing to challenge an

23  electioneering law under the First Amendment and has standing

24  to assert claims against District Attorney Ogg, and that case

25  also rejected most of the arguments that you are hearing here

1    today.

2            I have copies of that case.  And it's glaring in that

3    Mr. Nichols did not mention this case at all because it's

4    binding on this Court and it also involved his client.  It

5    also involved electioneering law and involved the First

6    Amendment restriction on speech claims that we assert in this

7    case.

8            And the reason why that case forecloses the argument

9    that Mr. Ogg –– that Mr. Nichols has raised on behalf of

10   District Attorney Ogg is because of what is now Black Letter

11   Law, that when there is a prima facie challenge to a provision

12   asserting a speech-chilling injury, the Court must assume

13   credible threat of enforcement absent contrary evidence –– oh,

14   sorry –– absent compelling contrary evidence.

15           So that's also reflected in *Speech First v Fenves*,

16   979 F.3d 319.  The *Ostrewich* case, by the way, is 72 F.4th 94.

17           THE COURT:  I'm sorry, can you say that again?

18           MR. NKWONTA:  Sure.  72 F.4th 94.

19           THE COURT:  Thank you.

20           MR. NKWONTA:  So Mr. Nichols has his standards

21   entirely backwards here because the plaintiffs have asserted

22   speech-chilling injuries and have asserted claims under the

23   First Amendment, both of which require this Court to presume a

24   threat of enforcement absent compelling contrary evidence.  We

25   have not seen any such compelling contrary evidence.

1          Instead, what we have seen is a series of legally
2   irrelevant questions throughout the course of this case.  In
3   other words, we have seen Mr. Nichols stand up and ask
4   plaintiffs whether they have been prosecuted, or whether they
5   have received –– or heard any statements indicating that
6   District Attorney Ogg was going to prosecute them for filing a
7   Section 7.04.  That is not the point.
8          The question is:  Has District Attorney Ogg
9   disclaimed enforcement?  She has not.  She has not disclaimed
10  any intent to enforce.  And the stipulation that Mr. Nichols
11  keeps raising –– well, there are two stipulations that he has
12  raised.  I'll address the first one which is the proposed
13  stipulation that was ––
14          THE COURT:  So a proposed stipulation is not a
15  stipulation, so we don't have to worry about that.
16          MR. NKWONTA:  Correct.  It's not a stipulation.
17          And I also want to state for the record that even if
18  it is in evidence, under Rule 408 it cannot be considered for
19  the purposes for which Mr. Nichols seeks to admit it.
20          Second, the stipulation that we did file with this
21  Court did not say that we could use any prior discovery
22  response as evidence.  It said that we could only use the most
23  recent amended interrogatories.  And those most recent amended
24  interrogatories were the responses to the interrogatories
25  served by the OCA plaintiffs and did not include any proposed

1  stipulation.

2        So right now what we have is an attempt to shift the

3  standards of proof and to forego and disregard Black Letter

4  Law in the Fifth Circuit, including a case that involved

5  Mr. Nichols' own client, which finds there has to be a

6  presumption of enforcement and "the plaintiff need not show

7  that the authorities have threatened to prosecute him, nor do

8  they need to demonstrate that the threatened injury is

9  sufficiently imminent."

10        And I'll give another case, just in case, you know,

11  we need another to add to this.  *Barilla v City of Houston*, 13

12  F.4th 427.  And the list goes on.

13        So an injunction by this Court, as Mr. Nichols

14  suggested, would prevent District Attorney Ogg from enforcing

15  the law.  That is true.  We agree with that.  The question is:

16  How do we obtain that injunction, if district attorneys

17  continue to claim that they are not proper defendants?

18        In that *Ostrewich* case that I mentioned, the Fifth

19  Circuit held that the Attorney General was not a proper

20  defendant, and that the State defendants were not proper

21  defendants, but found that Miss Ogg was a proper defendant,

22  and so if Miss Ogg is a proper defendant, then it's unclear to

23  me why we cannot obtain an injunction against her.

24        And to Mr. Nichols' point about incurring fees and

25  costs, I mean, this crusade to prevent lawsuits against

 1  district attorneys is misdirected.  We are not the ones who

 2  have established the legal regime that now requires us to sue

 3  local district attorneys.  In fact, the law states and

 4  mandates that the district attorney comply with election code

 5  and enforce violations of the election code.

 6          87.001.  Section 87.001, as Your Honor mentioned,

 7  that law that you-all were discussing was not in place at the

 8  time that District Attorney Ogg offered that proposed

 9  stipulation, but now it is in place and it also forecloses

10  many of the arguments that you have heard today.

11          So for those reasons, Your Honor — oh, and one more

12  thing.  Before I conclude my argument, I also want to point

13  the Court to the testimony of AFT representative Zeph Capo,

14  who clearly spelled out the instances in which AFT has had to

15  refrain from its efforts to conduct in-person advocacy that

16  would violate Section 7.04.

17          Zeph Capo also testified clearly that the majority of

18  his membership, of AFT's membership is in Harris County and

19  that's where the majority of their activity occurs.

20          You also heard testimony about similar conduct from

21  Judy Bryant on behalf of the Texas Alliance for Retired

22  Americans.

23          So not only is there evidence of this conduct

24  occurring under Section 7.04, there is no evidence whatsoever

25  that District Attorney Ogg has disclaimed any enforcement and

1  the Court must presume, according to binding Fifth Circuit
2  law, that she is an appropriate defendant.
3          And I believe some of my colleagues have additional
4  statements to make.
5          Thank you, Your Honor.
6          THE COURT:  Thank you.
7          MR. BADAT:  Morning, Your Honor.  Amir Badat on
8  behalf of the HAUL plaintiffs.  I'll try not to repeat too
9  much of what my colleague just mentioned.
10         I think as an initial matter I just want to orient
11 the Court to a standard under the sovereign immunity case law
12 the Supreme Court held in *Holloman's Health* [phonetic], that
13 an official who may or must take enforcement action has the
14 requisite enforcement connection under the *Ex Parte Young*
15 analysis.
16         And so the Supreme Court also held that plaintiffs
17 may proceed against an official solely because of such
18 statutory authority.  So I want to highlight that DA Ogg does
19 have the requisite enforcement connection to qualify under the
20 *Ex Parte Young* exception.
21         We've already talked about the stipulation that DA
22 Ogg has entered into.  It makes clear that DA Ogg has not
23 adopted a policy refusing to prosecute any type of criminal
24 offenses under state law, has not constructed law enforcement
25 to refuse to arrest individuals suspected of committing any

1    class of type of offense under state law, and has not

2    permitted an assistant prosecutor to take either of the

3    foregoing actions.  So it's clear that DA Ogg refuses to

4    foreclose the prospect of any prosecution under the relevant

5    provisions.

6            We've already talked about 87.0013B.  It makes clear

7    that it would be official misconduct for DA Ogg to adopt such

8    a policy, a blanket policy that would foreclose prosecution.

9            And I also want to make clear that DA Ogg's arguments

10   here under *Ex Parte Young* don't apply to our claims under the

11   VRA, the ADA, and the Rehab Act, which clearly abrogate

12   sovereign immunity.

13           On the standing front, there is Fifth Circuit case

14   law under the *Susan B. Anthony* case that says that a claimant

15   need not first expose himself to actual arrest or prosecution

16   to be entitled to challenge a statute that he claims deters

17   the exercise of his constitutional rights.  And that's exactly

18   what the plaintiffs in this case are asserting, and that's

19   what the evidence has shown throughout the trial before the

20   Court.

21           The plaintiffs, including Delta Sigma Theta, the

22   Houston Area Urban League, have alleged diversion of resources

23   as a result of the criminal provisions of SB 1 that they are

24   challenging.

25           Michelle Brown from Delta Sigma Theta testified that

1    SB 1, Section 6.01, made some Delta Sigma Theta members afraid

2    because poll watchers are entitled to observe them fill out

3    the form and there's a history, a long history of

4    discrimination in the state of Texas with respect to poll

5    watchers.  The evidence in the record is clear on that.

6            Sharon Watkins Jones from Delta Sigma Theta testified

7    that chapters have shied away from actual law involvement

8    systems because of the challenged provisions and have leaned

9    more heavily towards voter education.

10           And the record is replete with evidence just like

11   this from all of the plaintiffs' groups that are challenging

12   these provisions.

13           I also want to make clear that the other DAs that

14   have been named in this case as defendants have stipulated to

15   not enforcing the relevant provisions.  That's why they are

16   not here today.

17           And the stipulation that Mr. Nichols has consistently

18   referred to did not include what these other DAs have

19   stipulated to, and that's why we're having this argument here

20   today.

21           So I just wanted to make a few other things more

22   clear and I think we have some other folks behind me who want

23   to make some statements as well.

24           THE COURT:  Thank you.

25           MISS TULIN:  Your Honor, very briefly.

1          On behalf of the LUPE plaintiffs I just wanted to
2  make the record clear that, as I have, I think, already this
3  morning, we are not adverse to District Attorney Ogg and so we
4  do not understand the current motion to affect anything
5  relating to our case or our plaintiffs.

6          THE COURT:  Thank you.

7          MR. DOLLING:  Zachary Dolling for the OCA-Greater
8  Houston plaintiffs.

9          I think my colleagues have covered the fear of
10  prosecution angle.

11          I just wanted to briefly state that, you know,
12  there's been not too much discussion of the type of injury
13  that comes from a diversion of resources.

14          Mr. Badat just mentioned that a bit but I just wanted
15  to say that, you know, for example, OCA-Greater Houston's
16  representative Miss Chen testified that performing risk
17  assessments on each aspect of their voting related programs
18  has been a complete and utter time suck, requiring OCA-Greater
19  Houston to replan and redesign its programs and retrain its
20  members and volunteers to avoid criminal liability.  This is
21  not in any way routine to their normal activities and has, in
22  fact, resulted in the complete cessation of many of their
23  routine activities.

24          The League of Women Voters similarly, representative
25  Miss Grace Chimene testified that the League has been forced

4203

1  to educate its members and the public about SB 1's criminal

2  laws that directly regulate the league and its members and the

3  public's actions which took away from their routine activities

4  of Get Out the Vote causing them to reach fewer young members

5  who are new to voting and to whom the league would normally

6  focus on.

7       It also wasn't able to do an election security report

8  that it had planned.  It had to hire a new position to handle

9  nonroutine communications about SB 1 to get out the

10 information.

11      REV UP Texas similarly had to answer so many

12 questions about SB 1 from both attendants and voters and

13 produce educational materials about SB 1 that it took away

14 from REV UP's ability to educate its members and the public

15 about the important nonvoting substantive issues that it is

16 interested in and that are a part of its mission.

17      It had to spend so much additional time and resources

18 on those issues, for example, that it was unable to produce

19 podcast episodes about those issues, and instead before the

20 organization what constituted a major expenditure had to

21 dedicate its podcast to SB 1 which were not its routine, the

22 routine issues that it would deal with in its podcast.

23      It also took away time from REV UP's efforts to help

24 individuals register to vote, resulting in REV UP reaching

25 fewer individuals in its voter registration efforts.

1          And also, just with respect to some of the statements

2     Mr. Nichols made about their being no evidence of people in

3     Harris County who were affected by these laws, I think

4     Mr. Badat covered some of it, but, for example, OCA-Greater

5     Houston testified that it does compensate its members for

6     helping people for providing mail ballot assistance and hasn't

7     been able to after SB 1, and, of course, OCA-Greater Houston

8     is active in Harris County.

9          They also testified to supporting ballot measures in

10    the past and feeling that they are unable to do so in the

11    future because of SB 1 Section 7.04, and that SB 1 7.04 is so

12    broad and unclear that they just don't know what they can and

13    can't do.

14         The league testified similarly, the representative

15    Miss Chimene, and REV UP also testified similarly, and also

16    identified members in Harris County such as Miss Landry who

17    had great difficulty voting without the use her assistant due

18    to her fears over the oath under SB 1 Section 6.0.

19         Thank you, Your Honor.

20         THE COURT:  Thank you.

21         Anyone else from plaintiffs' group?

22         MR. WATKINS:  Elijah Watkins with Mi Familia Vota.

23         Your Honor, I don't know if the State of Texas also

24    has a motion that they want to file and so I want to be

25    respectful of the Court's time.  I can do the condensed

1  standing opposition that focuses primarily on the sovereign

2  immunity issue, or I can do the whole shebang and get standing

3  and everything in there at once.  How would you like me to

4  proceed?

5          MR. KERCHER:  We will make a motion, but so that we

6  can get back to evidence today we'll defer that until at least

7  tomorrow.  At this time we are not going to make a motion on

8  standing and sovereign immunity ground and all events.

9          THE COURT:  Thank you.  So for procedural posture,

10  I'm not going to hold that against you and I will let you make

11  your motion tomorrow.  That way, we can get back to trial

12  testimony.

13          MR. WATKINS:  Thank you.  Your Honor, I'll do my

14  standing argument tomorrow.

15          Just then, briefly, on the sovereign immunity issue

16  raised by Mr. Nichols, I think my co-counsel has done an able

17  job on responding to all of this.  I would just point the

18  Court to one other case to answer the question of where is the

19  line?  What does the court do to decide when someone is

20  actually going to act?

21          Not binding precedent, Your Honor, but persuasive

22  nonetheless, out of the Southern District of Texas, *Oracle

23  Elevator v Exodus*, 2021 Westlaw 4077581, in considering a

24  motion for judgment on partial findings, the Court's task is

25  to, quote, "evaluate all the evidence, resolve any conflicts,

1  assess the witness' credibility, and resolve the case on the

2  basis of a preponderance of the evidence."  And it cites to

3  *Wright* and *Miller*.

4        Is it more likely than not that the district attorney

5  will prosecute and actually enforce the law?  I think you have

6  had ample evidence to show that it will.  That would be the

7  same result, if you look at FRE 104(a).  The Court makes these

8  initial evidentiary determinations on a preponderance of the

9  evidence.

10        Second and final point, Your Honor, is what

11  Mr. Nichols called a head scratcher, 7.02, which he

12  characterizes as expanding the ability for employees to go

13  vote.  This is actually an employer friendly law.  If you read

14  702, Your Honor, it has an exception which swallows the rule.

15        Under the exception the employer does not need to let

16  an employee get out of work early to vote, so long as the

17  employee has two hours anytime during the voting period on

18  voting day that they are not at work, then they don't need to

19  let the employee out.  This is problematic for cleaning

20  ladies, garbage truck drivers --

21        THE COURT:  So, yeah, I understand you guys have

22  other problems with 702, but how does 702 implicate a district

23  attorney?

24        MR. WATKINS:  For the same enforcement issues, Your

25  Honor.  A district attorney, if an employee goes and says, I

1  wasn't able to vote, my employer didn't let me out, et cetera,

2  et cetera, the district attorney could get involved in that if

3  the employers aren't enforcing the rule, so it's the same

4  enforcement action.

5         But the point being that there -- I think what

6  Mr. Nichols was saying is that no one put on any evidence.

7  You will recall you heard from Maria Lopez who is Marvin

8  Lopez's daughter about how they had to go vote late on a

9  Saturday because of their work schedules, things like that.

10        Thank you, Your Honor.

11        THE COURT:  Thank you.

12        Anybody else here?

13        I'll take that motion under advisement.  We'll hear

14 the State's --

15        MR. NICHOLS:  Your Honor, if I may be heard.

16        I would just file something with the Court rather

17 than argue today in response to the argument about *Ostrewich*

18 and the other matters.

19        THE COURT:  Thank you.

20        So I'll take this motion under advisement.  We will

21 take the State's and other defendant's motion tomorrow.  We

22 are going to pick up with witnesses.  Why don't we take a

23 break and we'll resume.  Just to let you know where we're at,

24 I do teach tonight so I'll have to be out of here by 5:15.

25        *(Recess)*

4208
JACQUELINE DOYER - DIRECT

1    THE COURT:  And your witness.

2    MR. BRYANT:  Your Honor, State defendants call

3   Jacqueline Hagan Doyer.

4    (JACQUELINE DOYER, having been duly sworn, testified as

5   follows:)

6                    DIRECT EXAMINATION

7   BY MR. BRYANT:

8   Q.  Please state your name for the record.

9   A.  Jacqueline Hagan Doyer.

10  Q.  Could you spell that last name for the court reporter.

11  A.  Yes, sir, D-O-Y-E-R.

12  Q.  Could you describe your education beginning with college?

13  A.  I graduated from the University of Texas at Austin and I

14  received my jurist doctorate from the University of Texas

15  School of Law.

16  Q.  Are you an attorney licensed to practice law in the state

17  of Texas?

18  A.  I am.

19  Q.  When did you become licensed to practice law in the state

20  of Texas?

21  A.  In November of 2013.

22  Q.  What was your first full-time employment after you were

23  licensed to practice law in Texas?

24  A.  I was a misdemeanor prosecutor in Williamson County,

25  Texas.

JACQUELINE DOYER - DIRECT

1  Q.  What was your next full-time employment after your work in
2  Williamson County?
3  A.  I worked in Comal County, and it's New Braunfels, and as a
4  felony prosecutor.
5  Q.  When did you start your work as a felony prosecutor in
6  Comal County, Texas?
7  A.  November 2014.
8  Q.  And how many years did you serve as a felony prosecutor in
9  Comal County, Texas?
10  A.  I was there, all in all, for approximately seven years.  I
11  took a short break.  I went and taught for a bit and then I
12  also served in other capacities in that office.  I was in the
13  appellate division as well as the interim misdemeanor
14  supervisor.
15  Q.  Did there come a time when you became employed by the
16  Office of the Secretary of State of Texas?
17  A.  Yes, sir.
18  Q.  When were you first employed by the Office of the
19  Secretary of State of Texas?
20  A.  I started with the Texas Secretary of State April 2022.
21  Q.  What was your initial position with the Secretary of
22  State's Office?
23  A.  I was the attorney for the Forensic Audit Division.
24  Q.  Could you describe generally for the Court what the
25  Forensic Audit Division did?

4210
JACQUELINE DOYER – DIRECT

1  A.  Yes, sir.  Senate Bill 1 created a requirement for

2  randomized county audits.  Prior to the effective date of

3  Senate Bill 1 an audit of four of Texas' largest counties was

4  ordered by the Texas Secretary of State, being Collin, Dallas,

5  Harris and Tarrant counties, and the Secretary of State's

6  Office created a Forensic Audit Division to conduct that audit

7  as well as the subsequent SB 1 audits.

8  Q.  Did you continue in the same position as you started at

9  the Secretary of State's Office for the full term of your

10 tenure at the Secretary of State's Office?

11 A.  In November of 2022 I became the deputy and legal director

12 for the division.

13 Q.  I'll sometimes refer simply to the Financial Audit

14 Division, or FAD, in describing that office.  In all instances

15 I'll be referring to the division for which you worked at the

16 Secretary of State's Office.

17     MR. GENECIN:  Just to be clear, you said "Financial

18 Audit Division."

19     MR. BRYANT:  I'm sorry.  I keep making that mistake.

20 I mean Forensic Audit Division.

21 BY MR. BRYANT:

22 Q.  Were you a participant in the audit of the 2020 General

23 Election in Texas from the beginning of your employment in the

24 Forensic Audit Division until the final completion of that

25 audit?

4211

JACQUELINE DOYER – DIRECT

1  A.  Yes, sir.

2  Q.  And if I understand your testimony correctly, that was not

3  an audit that was ordered by SB 1, it was separately directed

4  by the Secretary of State of Texas?

5  A.  That's correct.  The section that created the randomized

6  audits did not become effective until December of 2021.

7  Q.  When did the audit of the 2020 General Election in Texas

8  ordered by the Secretary of State begin?

9  A.  There were two phases to the audit.  I believe it was

10  announced in September of 2021.  Phase one was completed prior

11  to my employment there by the Elections Division and phase two

12  began when our division started, the first employees with our

13  division started in February of 2022.

14  Q.  Was your deposition taken by plaintiffs in this case as a

15  part of the Rule 30(b)(6) deposition of the Office of the

16  Secretary of State of Texas?

17  A.  Yes, sir.

18  Q.  And approximately when was your deposition taken by

19  plaintiffs?

20  A.  March or April of this year.

21  Q.  Approximately how many employees were there in the

22  Forensic Audit Division during the period of 2022 when you

23  were working as part of that division?

24  A.  Including myself and the director, I think at one point we

25  got up to 15 employees in the division.

4212

JACQUELINE DOYER - DIRECT

1  Q.  Who was the director of the Forensic Audit Division when
2  you were employed there?
3  A.  Chad Ennis.  It's E-N-N-I-S.
4  Q.  Could we pull up what's been marked as State Defendant's
5  Exhibit 23.
6      Obviously this is the first page only.  Can you identify
7  State Defendant's Exhibit 23?
8  A.  This appears to be the final report issued after our audit
9  of the 2020 Election in the four counties I've previously
10 mentioned:  Collin, Dallas, Harris, and Tarrant.
11 Q.  And approximately how long is the actual document
12 Exhibit 23?
13 A.  359 pages.
14 Q.  Generally what was your role in the creation of State
15 Defendant's Exhibit 23?
16 A.  Well, as the attorney and as the deputy director I
17 assisted with shaping the audit and what we were going to be
18 looking at.  I also was one of the authors of the audit
19 report.
20 Q.  I see that your name appears on the first page of
21 Exhibit 23.
22      MR. BRYANT:  I offer State Defendant's Exhibit 23
23 into evidence.
24      THE COURT:  Any objection?
25      MR. GENECIN:  Yes, Your Honor.

JACQUELINE DOYER - DIRECT

1          Yes.  Your Honor, this is entirely a hearsay
2   document.  It is not within any exception to the hearsay rule.
3   There are multiple layers of hearsay in it and we can start
4   with the fact that this final report was issued, as the cover
5   shows, in December of 2022.
6          It was focused entirely upon events that occurred
7   more than two years earlier.  It is not the basis of any
8   direct observation by anyone.  It is rather a compilation of
9   post-hoc observations and opinions and conclusions offered
10  about it.
11          It's noteworthy that the document was issued by the
12  Secretary of State, which is a litigant here, so it is a
13  self-serving document created in December of 2022, that is to
14  say during the pendency of this case.
15          The document that -- the audit and the documents in
16  support of it were not available to the legislature during the
17  2021 session so they can't be characterized as somehow being
18  part of the notice that the legislature was on about any
19  facts.
20          They are -- it is not a public record.  It's not a
21  record of regularly conducted activity because the very first
22  page of text of this document, and we can look at that if
23  you'd like, but the very first page of text of the document
24  states that this report describes an audit that was the only
25  one of its kind in the nation.

4214

JACQUELINE DOYER - DIRECT

1          So this is an activity that was new to the Secretary
2   of State and activity that was new as well to the -- or
3   according to the Secretary of State, to the country as a
4   whole.
5          So, in addition, the one witness who has been put
6   forward here is Miss Doyer.  Miss Doyer, as the testimony has
7   already shown, is a lawyer, not an auditor.  To the extent
8   that this report could be characterized as anything that's
9   admissible, it would be as an expert report.  Miss Doyer is
10  not an auditor.  She's not an expert able to testify to the
11  audit as such.
12         So for all of those reasons we are moving to exclude
13  23 and 24, which, by the way, Exhibit 24 is duplicative of the
14  executive summary of Exhibit 23.  So we're objecting to both
15  of them.
16         THE COURT:  Any other objections from this side?
17         So your response.
18         MR. BRYANT:  Your Honor, we've already established
19  the witness' direct and substantial involvement in the
20  creation of the document.
21         To the extent there is any hearsay in here, it is
22  subject to the public records exception which covers reports
23  of activities of an office of the government as to matters
24  observed under a duty to report.  And that's exactly what this
25  is, unless the opponent of the document shows that it is

JACQUELINE DOYER - DIRECT

1  untrustworthy.  And there is certainly no such showing.

2         In addition, it's a record of a regularly conducted

3  activity admissible under Federal Rule of Evidence 803

4  subsect.  It's a record kept in the ordinary course of

5  regularly conducted activity, record made as a regular

6  practice of the authority.  We have a qualified witness and

7  its trustworthiness is not disproved.

8         All of the other points that opposing counsel made go

9  to the weight of the evidence.  We're not presenting it as a

10 document that was considered by the legislature in the passage

11 of SB 1 but is quite relevant to the assessment —

12        THE COURT:  To what?

13        MR. BRYANT:  — to the problems they responded to and

14 the solutions that they included in SB 1.

15        THE COURT:  So I'm still stuck on the relevance.

16        So it wasn't before the legislature at the time of

17 the enactment of SB 1, so what is this being offered for?

18        MR. BRYANT:  What it will show is very significant

19 problems in the 2020 General Election.

20        THE COURT:  How is this going to be done, though, by

21 a lawyer?  How is this — how is she drafting this report

22 that's not regularly conducted, it's a one-time deal, how is

23 this evidence going to come in?

24        MR. BRYANT:  Well, Your Honor, she participated in

25 the audit itself.  She didn't simply — she did author part of

JACQUELINE DOYER - DIRECT

1  the document but she also participated extensively in the

2  audit and will —

3           THE COURT:  But how is she qualified to do so?

4           MR. BRYANT:  I'm sorry?

5           THE COURT:  How is she qualified to do so?

6           MR. BRYANT:  When the Court hears that testimony, I

7  think that you will understand that many of the issues had to

8  do with fundamentally obtaining documentation from the

9  counties, analyzing the documentation, and those are all

10  things that we all as lawyers do repeatedly and in quite

11  important matters.

12           THE COURT:  So is she doing statistical analysis?

13  What is she doing?  Is she just gathering — so I haven't seen

14  this, so what's in all these pages?

15           MR. BRYANT:  Okay.  Your Honor, data was requested,

16  obtained, sometimes after substantial difficulties.  The data

17  from the various counties was compared with what the legal

18  requirements were as to the various types of data; for

19  example, we have quite a bit in here as to how the various

20  counties handled votes by mail and problems of identifying the

21  persons who had submitted applications for votes by mail or

22  actual mail ballots.

23           We have testimony as to extensive problems that were

24  created in reconciling the votes cast in the 2020 General

25  Election with the number of people who checked in to vote,

4217

JACQUELINE DOYER – DIRECT

1  particularly at the drive-thru locations in Harris County.

2          THE COURT:  Well, how does this square with the

3  former Secretary of State saying it was the best election

4  ever?

5          MR. BRYANT:  Your Honor ––

6          MR. KERCHER:  That's not –– that is not actually the

7  testimony and I think that Mr. Ingram will address those

8  comments when we put him on the stand a little bit later.

9          MR. BRYANT:  Your Honor, I'm not here to argue

10  about ––

11          THE COURT:  Well, the argument ––

12          MR. BRYANT:  –– that issue, but ––

13          (Crosstalk)

14          THE COURT:  (inaudible) self-serving.  It was made

15  after the fact.  So that's the argument.  So how do you

16  respond to that?

17          MR. BRYANT:  So, Your Honor, I think in general there

18  were many counties where the elections in 2020 went as well as

19  they could, especially given the challenges of COVID.  That

20  doesn't mean that there weren't extensive irregularities that

21  were observed by the Forensic Audit Division of the Secretary

22  of State's Office.  And they are presented here.  Once the

23  Court hears that evidence, the Court can give it the weight

24  that it deems appropriate.

25          THE COURT:  So let me go ahead and hear from her.

4218
JACQUELINE DOYER - DIRECT

1          MR. BRYANT:  I would like the Court to hear the
2    evidence.
3          THE COURT:  I'm going to take the objection under
4    advisement here.  Let me hear her testimony and then let me
5    decide whether this gets in or not.
6          MR. BRYANT:  Very good, Your Honor.
7          Your Honor, I would like to ask the Court to have the
8    same posture with respect to State Defendant's Exhibit 24.
9          THE COURT:  That's the executive summary?
10          MR. BRYANT:  Executive summary, and as counsel noted,
11    the text of that document is included as a small subset of
12    State Exhibit 23.
13          THE COURT:  Yeah.  So 23 and 24, I'll take the
14    objections under advisement and let's see how this goes.
15          MR. BRYANT:  Okay.
16    BY MR. BRYANT:
17    Q.  Could we see State Defendant's 430.
18        Miss Doyer, could you identify State Defendant's Exhibit
19    430?
20    A.  Yes, sir.  This was sent to the four counties, I believe,
21    in regards to the full forensic audit that would be conducted
22    announcing what would be reviewed in both phase one and phase
23    two.
24    Q.  And is Exhibit 430 a document that was used by you in
25    connection with the forensic audit of the 2020 General

1  election?

2  A.  We did review it, yes.

3  Q.  Was this a document that was authored by, generated by the

4  Forensic Audit Division in connection with the audit that it

5  performed related to the 2020 General Election in Texas?

6  A.  It would have been authored before the Forensic Audit

7  Division started because it includes phase one and phase two.

8  Q.  Was it authored by the Forensic Audit Division?

9  A.  I don't know who authored this.

10  Q.  Okay.  Now, was one of the purposes of the audit of the

11  2020 General Election in Texas by the Forensic Audit Division

12  to identify, investigate, or prosecute any vote fraud or

13  election fraud?

14  A.  No.

15  Q.  What was its purpose?

16  A.  To ensure that Texans had confidence in the election

17  systems in the state, and that if there were any

18  irregularities that were identified that there were mechanisms

19  by which the counties could review those, make improvements,

20  that other counties could learn from those and also make

21  improvements if they saw it was applicable to their

22  jurisdiction.

23  Q.  Now, we already have discussed briefly State Defendant's

24  Exhibit 23.  Did State's Defendant's Exhibit 23 pertain to

25  both what you've described as phase one and phase two of the

1  forensic audit of the 2020 General Election?

2  A.  And 23 is the full report, correct?

3  Q.  That's correct.

4  A.  That is only phase two.

5  Q.  Is there a separate report on the results of phase one of

6  the audit of the 2020 General Election?

7  A.  Yes, sir, there is.

8  Q.  Let's talk about phase two of the audit.  Were you

9  involved in conversations that determined what data would be

10 requested and reviewed in phase two of the audit?

11 A.  To some extent, yes, depending on when you are talking

12 about.  A lot of the documents had already been requested

13 before I started.  Once I started and our division got going I

14 was involved in the conversations, the planning, the

15 conversations with the counties, directing the activities of

16 the auditors, et cetera.

17 Q.  How many auditors were -- did you direct in the course of

18 the audit of the phase two of the 2020 General Election audit?

19 A.  I want to say eight.

20 Q.  How were the specific topics for phase two of the audit

21 determined?

22 A.  Well, we reviewed the document requests that had been sent

23 to the counties and we looked at what had initially been sent

24 in, and so it was then data driven and reviewing what data we

25 had received and what procedures in the election code or

4221

JACQUELINE DOYER - DIRECT

1   procedures promulgated through the administrative code or our
2   office that we could then compare and look and see was there
3   compliance with these requirements.
4   Q.  Why were the four counties, if you know, selected as the
5   ones for the 2020 General Election audit, namely Harris,
6   Dallas, Tarrant, and Collin?
7   A.  They were the two largest Republican-controlled county
8   governments and two largest Democratic-controlled county
9   governments to give us a bipartisan look at how elections were
10  run in those two different categories.
11  Q.  Did the financial audit division review documents from
12  each of those four counties?
13  A.  Forensic Audit Division, sir, and yes, we did.
14  Q.  Did the Forensic Audit Division request and review any
15  documents from any other counties, aside from those four
16  counties?
17  A.  With regard to that report, no.
18  Q.  Did the Forensic Audit Division in the course of its audit
19  request and review any documents related to any Texas
20  elections other than the General Election in 2020?
21  A.  Again, with regard to that report, no.  And as I testified
22  at my deposition, Tarrant County accidentally gave us some
23  records related to the 2022 Election.  We didn't use those
24  obviously in the report because they weren't applicable.
25  Q.  Could we have State Defendant's Exhibit 320.

4222

JACQUELINE DOYER — DIRECT

1        Have you seen Defendant's Exhibit 320 before?

2   A.   Yes, sir.

3   Q.   Could you identify it, please.

4   A.   This is the letter that the Secretary of State sent to the

5   election administrators in each of the four counties regarding

6   the forensic audit and an initial request for some information

7   and a list of documents as well.

8   Q.   And did you review and make use of Exhibit 320 in your

9   work in the Forensic Audit Division —

10  A.   Yes, sir.

11  Q.   — on the audit?

12  A.   Yes, sir.  I relied upon it and the responses received

13  from these election administrators in the course of the audit.

14         MR. BRYANT:  Your Honor, I offer State Defendant's

15  Exhibit 320 into evidence.

16         THE COURT:  Any objection to 320?

17         MR. GENECIN:  It's a hearsay document, Your Honor.

18         MISS TULIN:  It's also, I think, part of the

19  supplemental exhibits that we received last week and so we are

20  honestly trying to track it down because we understood that

21  those exhibits were going to be used largely in the intent

22  phase.  So I think we need at least a moment to look at it and

23  track it down.

24         THE COURT:  Let's just stop here.  320 is just a

25  letter to these administrators asking them for information,

JACQUELINE DOYER - DIRECT

1   right?

2           MR. BRYANT:  Yes, Your Honor.

3           THE COURT:  It seems like we're fighting over nothing

4   sometimes.

5           320 is admitted.

6   BY MR. BRYANT:

7   Q.  Okay.  Let's look at first paragraph, last sentence of

8   Exhibit 320.  Does this simply reiterate the purpose of the

9   2020 General Election audit by the Forensic Audit Division?

10          MR. GENECIN:  Objection to the characterization.

11          THE COURT:  It will speak for itself.

12          Next question.

13  BY MR. BRYANT:

14  Q.  Do the remaining pages list in detail the documents and

15  information requested to be provided by the four counties?

16  A.  Yes, sir.

17  Q.  Did the financial -- Forensic Audit Division, in fact,

18  access and examine some or all of those listed categories of

19  documents for each of the four counties?

20  A.  What was provided in response to that request, yes, sir.

21  Q.  Were those documents examined in the audit generally ones

22  that the counties were required by federal or state law to

23  maintain?

24  A.  Yes, sir.

25  Q.  And what was the total volume of documents obtained and

4224
JACQUELINE DOYER - DIRECT

1  reviewed by the Forensic Audit Division over the course of the
2  audit?
3  A.  I believe we got up to 369 gigabytes of data.
4  Q.  Did the Forensic Audit Division encounter any difficulties
5  in getting access to data -- documents or information that it
6  requested?
7  A.  Yes.
8  Q.  Could you describe for the Court those difficulties?
9  A.  In this initial letter response we requested information
10 and you'll see the first bullet point is a list of early
11 voting or Election Day polling locations and it had a
12 discrepancy of one percent or more between the number of
13 voters that checked in and the number of votes cast at that
14 location.  We received that information from Collin, Dallas,
15 and Tarrant counties.  That information was not provided by
16 Harris County.
17 Q.  Did any of the four counties decline to make election
18 staff personnel available to the Forensic Audit Division as
19 requested in the course of the audit?
20 A.  Yes.
21 Q.  What county or counties declined to allow the FAD audit
22 team to speak to their election staff as requested?
23 A.  Harris County.
24 Q.  Let's look at State Defendant's Exhibit 321.  Have you
25 seen that document before?

1  A.  Yes, sir.

2  Q.  What role, if any, did you have in writing or providing

3  information for State Defendant's Exhibit 321?

4  A.  I was involved in the efforts to collect the information

5  related to this letter.  I was also involved in authoring this

6  letter.

7        MR. BRYANT:  I offer State Defendant's Exhibit 321

8  into evidence.

9        THE COURT:  Any objection?

10        MR. GENECIN:  Again, Your Honor, it is hearsay.

11        THE COURT:  Anything else?

12        That's overruled.  321 is admitted.

13  BY MR. BRYANT:

14  Q.  Defendant's Exhibit 321 is addressed to Clifford Tatum.

15  Was he the Harris County Elections Administrator as of

16  October 18th, 2022?

17  A.  He was the election administrator in October of 2022.  I

18  don't know when he started.

19  Q.  I didn't ask you that but thank you.

20        Had Mr. Tatum been the Harris County Election

21  Administrator at the time of the 2020 General Election?

22  A.  No.

23  Q.  Who was?

24  A.  In 2020 they did not have an election administrator.  They

25  were still a — they had the tax assessor collector who

JACQUELINE DOYER – DIRECT

1  operated a portion of the election activities and they had a

2  county clerk that also ran a portion of the election

3  activities.  So immediately preceding Mr. Tatum was Isabel

4  Longoria as the election administrator, and I believe Chris

5  Hollins was the county clerk during the 2020 General Election.

6  Q.  At the time that you began working on the forensic

7  audit — in the Forensic Audit Division on the audit of the

8  2020 General Election, do you recall who was the Harris County

9  Election Administrator at that time?

10  A.  Yes, sir.  When I started, it was Isabel Longoria.

11  Q.  On the first page of State Defendant's Exhibit 321 in the

12  second paragraph — could you bring that up, please — it

13  begins at the third line, "while we've had the benefit of

14  cooperatively working with the other three counties subject to

15  the audit we cannot say the same of our experience working

16  with your predecessor.  The previous Harris County Elections

17  Administrator failed to respond to our initial requests for

18  basic information in our December 10, 2021 letter forcing our

19  team to take extraordinary steps to obtain responsive

20  records."  Was that an accurate statement?

21  A.  Yes, sir.

22  Q.  And what are the extraordinary steps that the Forensic

23  Audit Division took to try to obtain responsive records from

24  Harris County in the course of the audit?

25          THE COURT:  This is where I'm getting confused.

4227
JACQUELINE DOYER - DIRECT

1    What's the relevance to all of that?  So, okay, you are having

2    trouble with Harris County, they are not being cooperative,

3    how that is applicable to this case?

4           MR. BRYANT:  Well, Your Honor, I think as we go

5    forward there's going to be extensive evidence of election

6    irregularities in Harris County.

7           THE COURT:  But that's all that matters then.  Just

8    get to that.

9           MR. BRYANT:  Well, we will do that very quickly.

10          THE COURT:  Well, we're not going to have these

11   questions though because they are not relevant.

12          MR. BRYANT:  Your Honor, I do believe they are

13   relevant because it suggests that the persons making those

14   decisions for Harris County at the time were being

15   unresponsive for a reason, namely they had something that they

16   didn't want the State to learn about.  So it does suggest

17   knowledge of improper activities.

18          THE COURT:  I understand you guys have a beef with

19   Harris.  I get that, but how is that applicable to this case?

20          MR. BRYANT:  Your Honor, we've had quite a bit of

21   testimony from people associated with the Harris County 2020

22   Election in which they painted a rather glowing picture of the

23   quality of the election as it was conducted in Harris County.

24   I think we're entitled to show that that's not perhaps

25   correct.

4228
JACQUELINE DOYER – DIRECT

1      THE COURT:  So are you trying to make the argument --
2  I'm trying to understand where this is going.  So are you
3  trying to make the argument that whatever this audit shows is
4  actually underestimating the amount of problems, is that where
5  you are headed with this argument?
6      MR. BRYANT:  No, Your Honor.
7      THE COURT:  Well, why don't we just get to the
8  analysis of what the audit says.  Why do we need this interim
9  step?
10      MR. BRYANT:  Your Honor, we will get there quickly.
11      THE COURT:  Go ahead.
12      MR. BRYANT:  Thank you.
13  BY MR. BRYANT:
14  Q.  As of the date of the letter that State Defendant's
15  Exhibit 321, which was October 18, 2020, Election Day and the
16  2022 General Election was fast approaching, did that fact
17  cause the Forensic Audit Division of the Secretary of State's
18  Office to write the letter that is Exhibit 321?
19      MR. GENECIN:  Objection to the leading, Your Honor.
20      THE COURT:  That's overruled.
21      THE WITNESS:  There were concerns that the
22  irregularities observed in the 2020 General Election might
23  repeat themselves in the 2022 mid-term elections, so we sought
24  to document this and seek that the administration would ensure
25  that this would not occur in that election.

1  BY MR. BRYANT:

2  Q.  Did Forensic Audit Division send a similar letter in

3  advance of the 2022 Election to any of the other three

4  counties that were the subject of the audit?

5        MR. GENECIN:  Objection.  Relevance.

6        THE COURT:  I'll give him some more leeway.

7        Overruled.

8        THE WITNESS:  No, sir.

9  BY MR. BRYANT:

10  Q.  There are four bullet points listed on page 2 of Exhibit

11  321.  Were each of those problems already identified by the

12  Forensic Audit Division and its audit related to the 2020

13  General Election in Harris County?

14  A.  They were identified.  We were still going through the

15  analysis of that part of it.  The reason it was sort of an

16  interim step was because there was a lack of communication

17  with Harris County, so we were documenting what we were aware

18  of thus far and you'll see that, you know, we were still

19  investigating and things of that nature in the letter.

20  Q.  Now let's go back to the final audit report.  Were there

21  any findings and conclusions of the Forensic Audit Divisions

22  audit that are not documented in Exhibit 23?

23  A.  The division's conclusions are included in the report.

24  Q.  Did the audit identify significant irregularities in the

25  2020 General Election in the counties that were the subject of

JACQUELINE DOYER - DIRECT

1  the audit?

2          MR. GENECIN:  Objection.  What does "significant"

3  mean?  I mean, you know —

4          THE COURT:  You can do all of that in cross.  Sit

5  down.

6          MR. GENECIN:  Thank you.

7          THE WITNESS:  There were irregularities that ranged

8  from small to large in all four counties.

9  BY MR. BRYANT:

10 Q.  Let's first talk about drive-thru voting which was used

11 only in Harris County.  Did the Forensic Audit Division in the

12 audit attempt to reconcile Harris County's data regarding the

13 number of voters who checked in to vote with the number of

14 ballots that were cast, as set forth in the final canvass?

15 A.  Yes.

16 Q.  And did that initial effort include both the conventional

17 polling places and the drive-thru locations?

18 A.  Yes.

19 Q.  Did the Forensic Audit Division obtain any information

20 that caused it to give special attention to the drive-thru

21 locations in Harris County?

22 A.  In the course of attempting to reconcile that data we

23 learned that there were multiple locations that were not

24 appearing in the tally or tabulation software.  That included

25 all drive-thru voting locations.

4231

JACQUELINE DOYER – DIRECT

1  Q.  Once FAD observed that did it take additional steps to

2  obtain the necessary data from Harris County to complete its

3  reconciliation of the number of votes that were actually

4  recorded as being cast and the number of voters who checked in

5  to vote?

6  A.  Yes.

7  Q.  What did FAD do for that purpose?

8  A.  I think it might be helpful to explain a little bit how

9  that process unfolded.

10 Q.  Please do.

11 A.  So because we didn't have the initial response identifying

12 any locations with a discrepancy and we were starting our

13 on-site review of records that the counties had and we just

14 started collecting as much data as we could to be able to

15 conduct and put that together ourselves, and so Harris County

16 had, for early voting, envelopes that would reflect how many

17 access codes had been voted during early voting and Harris

18 County also had packets during Election Day that included

19 polling location, forms, tapes, data regarding check-ins,

20 provisional ballots, and if there were any canceled or spoiled

21 ballots, so we collected all of that and started putting

22 together our own analysis of whether or not we could identify

23 any location that had this discrepancy.

24     We carried that through to the tabulation software to see

25 if there were any — ultimately that's the final number —

4232
JACQUELINE DOYER - DIRECT

1  right? -- what goes through tabulation will populate your
2  canvass reports.
3      So we took that all the way through.  In doing that was
4  when we observed there were multiple locations that were
5  missing.  And so what we did then was to try to go back and
6  see, well, did those cards, electronic storage media, did
7  those cards come back from the polling locations, are we
8  missing something.
9      So we went back to Harris County and tried to identify and
10  catalog every card that came back from a polling location.
11  That is when we discovered further issues with chain of
12  custody and things of that nature.
13  Q.  Now, you used some terms that I don't think everybody
14  would find familiar and I'd like for you to explain a few of
15  them.  Some of these are used in Exhibit 23 as well.  You
16  referred to "access codes" that had been voted.  Could you
17  explain that?
18  A.  Yes.  And I'll start by explaining generally what the
19  system that was in use in Harris County was.  In 2020 Harris
20  County was using Hart's Legacy voting system, which was a DRE,
21  or Direct-Recording Electronic voting system, meaning there
22  was no paper backup that was generated after a voter voted.
23      The ballot was cast on an eSlate, which is the actual
24  machine that the voter voted on, and then it was
25  electronically recorded, both on the eSlate, and it would be

1  transmitted to what they call a JBC, or a Judge's Booth

2  Controller.  Inside the Judge's Booth Controller was a mobile

3  ballot box, what we call an MBB.

4      So as in the set-up could be at a polling location, you

5  would have one JBC daisy-chained to multiple eSlates, and at

6  the end of the voting for the day then all of those Cast Vote

7  Records, or CVRs, would get pulled down from the eSlate into

8  the mobile ballot box housed in the JBC.

9          THE COURT:  Can I stop you for a moment?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Are we talking about in-person voting,

12  what are we talking about?

13         THE WITNESS:  This is in-person voting.  And they

14  used a similar system for drive-thru voting, so it's — I know

15  it gets a little bit —

16         THE COURT:  Yeah.  I'm trying to figure out relevance

17  still so I thought you were talking about just in-person

18  voting and it's like why are we talking about this.

19         MR. BRYANT:  Would you like for me to respond?

20         THE COURT:  No; go ahead.

21         THE WITNESS:  And so —

22  BY MR. BRYANT:

23  Q.  Please continue.

24  A.  So when you asked about access codes, the access code is

25  what the voter gets after they get checked in on the poll

4234

JACQUELINE DOYER - DIRECT

1  book, which is separate from that system.  And the JBC will

2  share an access code.  The voter uses that access code to vote

3  on the eSlate.

4      And drive-thru voting, instead of there being multiple

5  eSlates daisy-chained to a JBC, you have one JBC and one

6  eSlate, or they called it a Disability Access Unit, or a DAU,

7  because that's what they used in drive-thru voting.  A JBC was

8  supposed to be paired with one DAU, and that's how drive-thru

9  voting worked.

10 Q.  There's a reference in the final audit report to something

11 called a JBC reconciliation log, could you describe what that

12 is?

13 A.  Sure.  So in -- during Election Day voting there were

14 paper forms that were kept at the polling location that would

15 record the serial number of the JBC that was at the polling

16 location and how many access codes had been issued and how

17 many ballots had been issued.  And I'm going off memory now.

18 I would have to see the form to tell you specifically, but

19 essentially it's supposed to help your poll workers reconcile

20 voters with ballots cast.

21 Q.  Did the Forensic Audit Division, even after getting the

22 additional information, have difficulties in reconciling the

23 number of voters who checked in to vote and the number of

24 votes that were actually counted in Harris County in the 2020

25 General Election?

JACQUELINE DOYER - DIRECT

1    A.   Yes.

2    Q.   Could you describe those difficulties that you were not

3    able to resolve with additional documentation or information?

4    A.   So the MBBs should —— they have a four-digit code on the

5    front of them, and when the MBB gets turned in to Central

6    Count for tabulation, or basically receiving and assimilating

7    the votes, that four-digit code is what will show up in the

8    tabulation audit log.

9         And as I mentioned before, there were multiple locations

10   that were missing, so we went to try to figure out why that

11   would have been the case.  And we had access to Harris

12   County's warehouse, so that's where we did the looking for

13   these records.  And when we were doing that, we noticed that

14   there were MBBs that had been missing from the Central Count

15   packets.

16        So Harris County had a system where when the JBC came

17   back, the seal that contained the MBB, because they are

18   protected by seals, was broken.  There was a ballot and sealed

19   certificate that had the signature of the presiding judge for

20   that location and the recipient of that MBB card, and so there

21   were records that showed these cards came back; however, when

22   we were looking at the Central Count packets, the MBBs were

23   not in some of those packets.

24        We found them in other locations and haphazardly stored in

25   manila envelopes, rubber banded together.  Some were in

4236

JACQUELINE DOYER - DIRECT

1   envelopes that said "do not read" on them, and so then we were
2   trying to figure out, well, why would that have happened.
3           THE COURT:  Translate this into English for me.
4           So these discrepancies you find in the counties and
5   you try to reconcile them, right?  Do I have that so far?
6           THE WITNESS:  Yes, sir.
7           THE COURT:  And then what's your results from all of
8   that?  Is it because it was in-person voting that took place
9   that somehow or another there was an inaccurate tabulation, or
10  if it was a combination of in-person and drive-thru do you
11  have an understanding of just how much of it is attributable
12  to an undercount of in-person versus drive-thru?
13          THE WITNESS:  It was in both, in-person locations and
14  drive-thru voting.  And ultimately the reconciliation showed
15  that some locations had too many ballots according to records
16  of how many voters should have been there and some locations
17  had too few ballots.
18          THE COURT:  So let's try to cut to the chase.  So
19  in-person voting is not the subject of anything here that I'm
20  aware of, except for assisters, and that doesn't have anything
21  to do with what you are talking about.  So the drive-thru
22  voting, what was your analysis of that?  What happened there?
23          THE WITNESS:  So the set-up there was, there was one
24  JBC paired with one eSlate.  In Harris County's training was
25  that it would stay that way, one JBC paired with one eSlate.

4237

JACQUELINE DOYER − DIRECT

1          What ended up happening was the eSlates, they were

2     connected with a cord that had a port, and when they tried to

3     reconnect them sometimes the pins got bent and so then the

4     vote would not download from the eSlate and that resulted in

5     what was termed a "stranded" vote.

6          And the only way to get what was a stranded vote was

7     to create an essentially another electronic mobile ballot box

8     from a backup from the eSlates.  And so that was one of the

9     issues was the pins that got bent which caused an issue in

10    retrieving the ballots, or the cast vote records.

11          And another issue was that the eSlates were crossed,

12    so while they were supposed to be paired one and one, they

13    would get crossed between JBCs, which resulted in inaccurate

14    information on the tapes.  Each JBC will print a tape at the

15    end of the day that shows how many ballots were cast and that

16    was not consistent because these were getting switched.

17          THE COURT:  So is the bottom line, as to your review

18    of all of this, as to drive−thru voting because of the

19    technology that was used and the way it was tied to how you

20    reconciled votes cast versus records that there was — that

21    the equipment didn't operate properly, or are you saying that

22    there was fraudulent activity as a result of the drive−thru

23    voting?

24          THE WITNESS:  I would not be able to make any

25    assessment of fraud.  You know, that requires intent and I'm

4238

JACQUELINE DOYER – DIRECT

 1  not in a position to assess that.  What I can say is —

 2          THE COURT:  So the point of your testimony is because

 3  of the technology and the technology was not up to snuff at

 4  the 2020, the paper trail was less desirable than we would all

 5  like?

 6          THE WITNESS:  Yes.  There were also issues with

 7  equipment that had been destroyed or lost and so you couldn't

 8  verify the contents of the mobile ballot boxes.  The system

 9  that they used to back up the eSlates was called SERVO,

10  S-E-R-V-O, and that equipment would have given you an audit

11  log to show you, here's the card we created, here are the

12  eSlates that are attached to it, and here's how many cast vote

13  records there should be.

14          And we were only able to obtain a subset of those

15  from Harris County, so there were several polling locations

16  that had mobile ballot boxes that we couldn't verify the

17  origin of those cards.

18          THE COURT:  Thank you.

19          THE WITNESS:  Yes, Your Honor.

20  BY MR. BRYANT:

21  Q.  In addition to the problem with the damage to connector

22  pins you described also the problem that's referred to in

23  State Defendant's 321 related to crossed eSlates.  What

24  problem did that create specifically, with respect to the

25  reconciliation?

4239

JACQUELINE DOYER — DIRECT

1  A.  So that would essentially make the tape internally

2  inconsistent.  If the eSlate was switching between different

3  JBCs, it would not match the number of — cast vote records on

4  an eSlate would not necessarily match the number of access

5  codes or ballots voted according to the JBC because it was

6  being switched around.

7     The only time that the JBC would recognize the eSlate is

8  during a power-up or power-down operation.  So if you had a

9  JBC that was paired with eSlate A at the beginning of the day

10  and somehow someone accidently plugs in eSlate B during the

11  day and then they plug A back in, they are never going to see

12  that eSlate B was ever connected to the JBC.

13  Q.  Now, State Defendant's Exhibit 321 also refers to chain of

14  custody problems identified by the Forensic Audit Division

15  with respect to the mobile ballot boxes associated with

16  drive-thru locations in Harris County.  Could you explain the

17  chain of custody problems that the Forensic Audit Division

18  identified in that regard?

19  A.  The election code requires that there be chain of custody

20  for electronic storage media all the way through the end of

21  the election up to storage.  And as I mentioned, when they

22  were inspecting the records there were many Central Count

23  packets that were missing mobile ballot boxes and we located

24  several that were stored in other locations with no

25  documentation or explanation for why that had occurred.

4240

JACQUELINE DOYER - DIRECT

1    There was one polling location that Harris County did

2  document properly and we referred to that in the report.  So

3  there is a process that they could have engaged in for that,

4  but that was not done for all these other locations.

5  Q.  Did the Forensic Audit Division find mobile ballot boxes

6  from drive-thru locations in Harris County that were not

7  ultimately tabulated?

8  A.  Yes.

9  Q.  What are the implications of having mobile ballot boxes

10  that were not ultimately tabulated?

11  A.  Well, it causes questions about what was tabulated and

12  whether or not we can verify it's the same records that came

13  from the polling location.

14  Q.  As a result of all the problems at the Harris County

15  drive-thru locations, is it possible that some of the ballots

16  that voters cast in their vehicles at those locations were

17  never actually counted in the final canvass of the 2020

18  General Election?

19  A.  So in our analysis when we were trying to determine how

20  many cast vote records should have come from each polling

21  location, there were several locations that had a negative

22  value, meaning you had more voters that were checked in than

23  you had ballots.  So there were — you know, we were negative

24  ballots, meaning there were probably voters that didn't have

25  their ballots cast likely given the records.

4241
JACQUELINE DOYER – DIRECT

1  Q.  And if that occurred, is there any way those voters whose

2  votes were not counted would ever have learned that?

3  A.  That's — I have no way of knowing that.

4  Q.  Now let's go back to State Defendant's Exhibit 23, the

5  final audit report, and look at the chart beginning on page

6  165.  What does that chart tell us?

7  A.  So once we were able to talk to Harris County they

8  provided additional records and they provided us with some of

9  the audit logs and some records that showed us which mobile

10  ballot boxes came from SERVO, came from these backups.

11      And because were a DRE county, meaning there were no paper

12  ballots, when someone voted provisionally that was included on

13  the mobile ballot box but it wasn't necessarily processed

14  until a later time when the Ballot Board would say, yes, this

15  ballot should count or not, but it was included in the number

16  of cast vote records because somebody did cast a ballot.

17      So to determine how many cast vote records should be

18  expected, you would take the number of poll book check-ins

19  plus the number of provisional cast vote records and that

20  would give you the number of expected cast vote records.

21      And we confirmed with Harris County that provisionals not

22  included in poll book check-ins, so you added those numbers

23  together.  That would give you 5800 expected from this

24  drive-thru voting location, but the number of cast vote

25  records that were actually in the tabulation software was

JACQUELINE DOYER - DIRECT

1  5,775, meaning they were 25 short.

2  Q.  And does tally refer to the tabulation software that

3  Harris County was using for that election?

4  A.  Yes, sir.

5  Q.  On the far left there's a poll code that includes the

6  letters D-T-V, what does that mean?

7  A.  Drive-thru voting.  That was their poll code.

8  Q.  So is this particular line of numbers that we see before

9  us at the moment beginning with DTV 131K, the results for a

10  particular drive-thru location — drive-thru voting location

11  in Harris County?

12  A.  Yes, sir.

13  Q.  And what does the difference in the far right column

14  indicate?

15  A.  There are 25 fewer cast vote records than expected from

16  that location.

17  Q.  Now, looking through the chart beginning on 165 of State

18  Defendant's Exhibit 3 [verbatim], did any of the ten

19  drive-thru locations listed on the chart have the same number

20  of CVRs in the tally as compared to the total CVRs expected?

21  A.  No.

22  Q.  So is it fair to say that every one of those drive-thru

23  locations had either a positive or negative difference between

24  the number of vote records that should have been recorded and

25  the number of vote records that actually were recorded?

4243
JACQUELINE DOYER - DIRECT

1   A.  Yes.

2   Q.  You've already covered what a positive and negative

3   difference indicate.  Where there is a negative difference, is

4   there any way to know whether those voters associated with a

5   negative vote ever had their ballots counted in the 2020

6   General Election?

7   A.  No.  And that's further complicated by the absence of any

8   audit logs to tell us, which some of these didn't have audit

9   logs to which eSlates were backed up.

10  Q.  In total, about how many vote discrepancies, either

11  positive or negative, at drive-thru locations did Forensic

12  Audit Division identify in the 2020 General Election in Harris

13  County?

14  A.  Over 800, just looking at those two larger numbers.

15  Q.  Let's look back at Exhibit 321, page 4.  This portion of

16  that document says FAD discovered 14 locations where multiple

17  MBBs were created without explanation.  Does this also refer

18  to Harris County?

19  A.  Yes.

20  Q.  Could you explain for the Court what Forensic Audit

21  Division observed in that regard?

22  A.  So when we were doing the reconciliation there were 14

23  early voting locations that we had records that there were

24  these polling locations, there were voters that voted, we had

25  tapes and we had records regarding MBBs; however, those MBBs

4244

JACQUELINE DOYER - DIRECT

1  were not the MBBs that were ultimately tabulated.

2      As I mentioned there were four-digit identifiers, those

3  four-digit identifiers never showed up in the tabulation audit

4  log.  So when we went to the warehouse to locate them, we did

5  find some of those in different locations, but there was no

6  chain of custody to explain why the original MBB from the

7  polling location wasn't read, weren't tabulated, or how Harris

8  County ensured that those votes from that particular location

9  had been tabulated.

10 Q.  Does footnote ten identify where those mobile ballot box

11 problems occurred?

12 A.  Yes.  There is attached an appendix, Appendix B.

13 Q.  Let's go to Appendix B, please.  Looking at Appendix B of

14 Exhibit 321, how many of the 14 locations were the problem

15 that you've described occurred were drive-thru locations?

16 A.  Nine.

17 Q.  So is it correct that over half of the voting locations

18 where the problem you described occurred were drive-thru

19 locations?

20 A.  Yes.

21 Q.  And did drive-thru locations comprise only about one- to

22 two-percent of the total voting locations in Harris County for

23 the 2020 General Election?

24 A.  They were a small portion.  Harris County had over 700

25 voting locations for Election Day and over 100 locations for

JACQUELINE DOYER - DIRECT

1  early voting.

2  Q.  When there's an unexplained discrepancy between the number

3  of voters who checked in to vote and the number of votes

4  actually counted in the canvass, does it tend to undermine

5  public confidence in the election process?

6          MR. GENECIN:  Objection.  How would the witness know?

7          THE COURT:  That's overruled.

8          THE WITNESS:  It does.

9  BY MR. BRYANT:

10  Q.  Would you consider the 800-plus vote discrepancy in the

11  drive-thru votes an irregularity in the 2020 General Election

12  in Harris County?

13  A.  Yes.

14  Q.  Did SB 1, which the Texas Legislature passed in 2021,

15  address that irregularity that the Forensic Audit Division

16  identified?

17  A.  Yes.

18  Q.  How did it do so?

19  A.  Multiple ways, but the most obvious would be by

20  eliminating drive-thru voting.

21  Q.  What other ways did SB 1 help address that irregularity

22  that FAD found in the 2020 General Election?

23  A.  One way would be requiring the paper-backed ballots, so

24  the voter verified paper audit trail.  We could not access

25  those mobile ballot boxes to verify contents of them, and so

4246

JACQUELINE DOYER - DIRECT

 1  to have that paper backup would have been helpful in ensuring
 2  that the vote that was tabulated was actually what came from
 3  the polling location.
 4      SB 1 requires the printing of a zero tape or an opening
 5  and closing tape that can assist with ensuring that you have
 6  the right piece of equipment at that polling location, as well
 7  as a closing tape, and so looking at that tape at the end of
 8  the day to see the ballots cast you can see that there would
 9  have been a discrepancy.  That's fairly obvious on the tapes
10  that we observed in 2020.  So that would address that issue.
11      And the counties are now required to submit a tabulation
12  audit log to the Secretary of State within five days of an
13  election.  That's an additional level of oversight and
14  reporting that usually causes the counties to look twice at
15  things.
16      The reconciliation forms that are now required as well,
17  there's an unofficial and an official reconciliation form that
18  are required by virtue of SB 1 that looks at number of voters
19  and ballots cast.  That's already proven useful.
20      You know, Harris County during the Primary in 2022, they
21  discovered a 10,000 vote discrepancy — or 10,000 ballot
22  discrepancy and that was able to be rectified before election
23  results were certified.
24      There is a requirement for video surveillance over ballots
25  and things that are coming back from the polling location.

4247

JACQUELINE DOYER – DIRECT

 1  While we couldn't explain what was going on in 2020 and there

 2  were chain of custody issues, at least there is that video

 3  surveillance that now exists for counties of a certain

 4  population that would assist with any questions regarding the

 5  integrity of the ballots.

 6      The Secretary of State put together an open and closed

 7  polling checklist that was required by SB 1 to standardized

 8  the procedures in polling locations across the state.

 9      Those are a few that I know off the top of my head.

10  Q.  Okay.  You mentioned a 10,000 vote discrepancy in

11  March 2022 Primaries and that it was caught before the vote

12  results were certified, is that right?

13  A.  Yes, sir.

14  Q.  Were the unofficial reports –– results reported that were

15  off by 10,000 ballots because of that issue prior to the

16  certification?

17          MR. GENECIN:  Objection to the relevance of this,

18  Your Honor.

19          THE COURT:  What is the relevance?

20          MR. BRYANT:  Your Honor, the witness has already

21  described this incident, and fortunately because of what

22  occurred in SB 1 it was caught before the certification, but

23  the fact –– I believe that the answer will be that incorrect

24  results were reported that would perhaps not have been caught

25  but for SB 1 and were reported to the public.

JACQUELINE DOYER - DIRECT

1            THE COURT:  Yeah, but those provisions aren't
2    challenged in this case, but I'll let you bring it in.  I'll
3    give it little weight though.
4            You can answer.
5            THE WITNESS:  Would you mind repeating question?
6    BY MR. BRYANT:
7    Q.  The Court is going to give it little weight; I'm not sure
8    I want to ask the question.  Thank you.
9        Let's look at the portion of Exhibit 23 that is headed
10   Findings Across Counties.  It's also part of the executive
11   summary that's Exhibit 24.
12       One of the findings is headed Unaccepted Applications for
13   Ballots by Mail.  Specifically with respect to Dallas County,
14   did Forensic Audit Division identify a problem with respect to
15   unaccepted applications for ballot by mail?
16   A.  The reconciliation was also a part of the analysis for
17   ballots by mail and wanted to start with the first number,
18   which was how many applications for a ballot-by-mail came in,
19   but what we learned in the course of the audit was that no
20   county really started tracking the number or meaningfully
21   tracked an application unless and until a ballot was issued
22   and so there was no initial data point for that.
23   Q.  Did Forensic Audit Division identify something that was
24   referred to by Dallas County as, quote, "bad mail," unquote?
25   A.  Yes.

4249

JACQUELINE DOYER - DIRECT

1   Q.  Would you describe what that was?

2   A.  As a part of the audit we did interviews out at the

3   locations and in speaking with Dallas County regarding

4   applications for ballots by mail, they told us that —

5           MR. GENECIN:  Objection, Your Honor, to this hearsay.

6           THE COURT:  That's sustained.

7   BY MR. BRYANT:

8   Q.  Could you describe what was in the container or folders

9   marked as bad mail by Dallas County?

10  A.  Yes.  We were provided with an inventory of

11  Dallas County's records and in the inventory was a box labeled

12  Bad Mail.  Bad mail contained certain rejected applications

13  for ballot-by-mail.

14  Q.  Did — strike that.

15      At the bottom of page 8 over to page 9, I'm not sure

16  whether it will show that here, but there's a heading that

17  says, quote, "The Records Reflect the Incorrect Reason for

18  Voting by Mail Eligibility."  What were the problems that the

19  Forensic Audit Division identified within this heading?

20  A.  Texas has certain enumerated reasons why voters can vote

21  by mail, one being voters would be eligible due to age, and so

22  we looked at whether the voters who voted by mail and the

23  reason they requested to vote by mail was for age to see

24  whether date of birth records actually indicated they were 65

25  or older at the time of the election.

JACQUELINE DOYER - DIRECT

1      In that analysis we identified that there were voters who
2  were coded in the county records as having voted by mail due
3  to age eligibility criteria but records showed they were not,
4  in fact, 65 or older.
5      Further analysis, in conversations with the counties,
6  revealed that a lot of that had to do with coding, that the
7  ballots were -- or the reason was miscoded in the county
8  system, but that there were also voters who received
9  ballot-by-mail for the age reason that shouldn't have received
10 those ballots or didn't have a date of birth at all and
11 wouldn't have been eligible to receive one.
12 Q.  Did Forensic Audit Division verify that some of these
13 ineligible voters actually did vote by mail in the 2020
14 General Election?
15 A.  Yes.
16 Q.  Now, the chart that is in front of you now, comes from the
17 executive summary.  What does this chart show?
18 A.  This is the voters that received ballots based on -- they
19 were -- appeared in the county records to have been voting due
20 to age but they were not eligible to vote by mail due to age.
21 Q.  Did you consider counties sending mail-in ballots to
22 voters who were either ineligible to vote by mail or whose
23 eligibility could not be verified as an irregularity in the
24 2020 General Election?
25 A.  Yes.

4251

JACQUELINE DOYER – DIRECT

1  Q.  Are you familiar with the changes made by SB 1 in 2021
2  that added an ID number requirement for voting by mail?
3  A.  Yes.
4  Q.  Did that change in SB 1 help address the irregularities
5  that the Forensic Audit Division observed in the audit of the
6  2020 General Election, specifically the problem of providing
7  mail ballots to voters who were ineligible to vote by mail or
8  whose eligibility could not be determined by the Forensic
9  Audit Division?
10        MR. GENECIN:  Objection, Your Honor.  That calls for
11  the witness' opinion and it is not even an opinion that is
12  discussed in the audit report.
13        THE COURT:  That's noted and overruled.
14        THE WITNESS:  For example, one of the situations we
15  saw in Collin and Tarrant County was where the county's record
16  reflected that a voter was not 65 and that they had requested
17  a mail ballot, but upon further review it was actually the
18  father or parents with the same name, so a junior-senior
19  situation, but who had actually requested the ballot and who
20  had voted the ballot and returned it.
21        And so the identifier would help clean up that issue
22  in the county's records and you're not going to be attaching
23  it to the Jr. because you would have the actual identifier to
24  assist with that.
25

4252
JACQUELINE DOYER – DIRECT

1  BY MR. BRYANT:
2  Q.  Did the Forensic Audit Division in its audit observe the
3  problem of counties attaching a record to the wrong voter?
4  A.  Yes.
5  Q.  Could you describe more fully what that problem was?
6  A.  That would be like a situation I just described where, you
7  know, John Smith, Jr. appears to have been the person to vote
8  by mail, but it was really John Smith, Sr.
9  Q.  Okay.  Let's look at the final audit Exhibit 23 at page
10  223.  As part of the audit of the 2020 General Election did
11  the Forensic Audit Division assess the procedures of the four
12  counties used for tracking ABBMs, applications for
13  ballot-by-mail, and mail ballots that were initially rejected?
14  A.  We received information from the counties about how they
15  processed those.
16  Q.  Did the Forensic Audit Division determine that none of the
17  four counties had any system to track ABBMs that were
18  initially rejected?
19  A.  That's correct.
20  Q.  And let's look briefly at page 210, the statement that's
21  highlighted, namely that, "the counties were uniform in that
22  they did not have a system or spreadsheet in place for
23  tracking some rejected ABBMs," was that a correct statement
24  based on your observations in the audit?
25  A.  Yes.

4253
JACQUELINE DOYER – DIRECT

1  Q.  What was the significance of that finding for the Forensic

2  Audit Division?

3  A.  Well, it didn't -- again, it limited our review so we

4  could not look at that initial figure, how many total

5  applications came in, how many had been rejected, because they

6  weren't tracked meaningfully in any way.  So that was the main

7  effect it had on the audit.

8  Q.  To the extent that the four counties kept track of

9  rejected ABBMs at all were their procedures for doing so

10 inconsistent with each other?

11 A.  It depended on the type of system the county had and how

12 the county used it.  Tarrant County, for example, scanned

13 everything into their voter registration system, so when a

14 rejection notice went out to a voter they were able to provide

15 or they offered to provide all of the rejection notices and we

16 could analyze that.  But it depended on how the county used

17 their software and what software they had.

18 Q.  Could the inconsistencies between the four counties have

19 affected the accuracy of determining mail ballot rejection

20 rates for the 2020 General Election?

21 A.  For applications?

22 Q.  Yes.

23 A.  Yes.

24 Q.  And would that inconsistency have lowered the reported

25 mail ballot rejection rates for the 2020 General Election as

4254
JACQUELINE DOYER - DIRECT

1  compared to the actual rejection rates?

2  A.  Again, with regard to applications or with regard to

3  actual?

4  Q.  First applications.

5  A.  I can't speak to applications because I don't know enough

6  about what that would look like.

7  Q.  Okay.  Did the Forensic Audit Division also observe

8  instances where the four counties failed to report the final

9  disposition of ballots by mail to the statewide TEAM's

10 database?

11 A.  Yes.  All four counties are what we call off-line

12 counties, meaning they use a different software or vendor for

13 voter registration for ballot-by-mail activities.  So the

14 statewide database depends on uploads from the counties to

15 populate that information and there were instances where the

16 statewide database did not match the counties' records.

17 Q.  Did the introduction since the 2020 General Election in

18 Texas of a Ballot Tracker help address any of the problems

19 that you just discussed?

20 A.  Yes.

21 Q.  Could you describe how?

22 A.  Well, the Ballot Tracker requires a county official to

23 enter basically every step of the application for

24 ballot-by-mail process and so you're going to have one central

25 number, and as we noticed throughout the audit there were

4255

JACQUELINE DOYER – DIRECT

1  varying, greatly varying figures about applications, actual
2  ballots cast, ballots rejected, and so having one central
3  reliable number would improve with that and streamlining it
4  and promote integrity.
5  Q.  Since the 2020 General Election did Texas in SB 1
6  introduce a corrective action process sometimes referred to as
7  a cure process for mail ballots?
8  A.  Yes, it did.
9  Q.  Did that change help address any of the irregularities
10  that the Forensic Audit Division identified in the 2020
11  General Election?
12  A.  Yes.
13  Q.  How did it do that?
14  A.  In the course of the audit we reviewed records in Harris
15  County that were called VBM review worksheets, I believe, and
16  those worksheets were essentially Harris County's mechanism of
17  an informal cure process.  If there was a statement of
18  residence that was required, if there was an issue with
19  signatures, if it looked like the carrier envelopes got
20  switched and maybe a husband's name swiped for the wife,
21  something of that nature, they kept track of that using those
22  forms.
23      But one irregularity that we noticed on these forms is
24  they were marked "unresolved," meaning they couldn't contact
25  the voter and resolve it; however, those voters had credit and

JACQUELINE DOYER - DIRECT

1  showed up as having vote history.  They had credit for voting

2  despite the issue being unresolved according to their paper

3  records and a more formal cure process would hopefully

4  alleviate that.

5  Q.  In those instances where you found in your audit that

6  problems were recorded as unresolved but the voter was marked

7  as having voted successfully, did that indicate that the

8  ballot had been counted, even though a defect was not cured?

9  A.  According to the records reviewed, that's what would be

10 the logical deduction.

11 Q.  Was that an additional irregularity that the Forensic

12 Audit Division identified in the 2020 General Election?

13 A.  Yes.

14 Q.  And let's look briefly at page 250 of Exhibit 23.  Does

15 this section of the final audit report provide more detail on

16 the problem that you've just described?

17 A.  Yes.

18 Q.  Let's look at page 229 of the final audit report, and

19 looks like the top of that page also has further discussion

20 about the bad mail issue that you touched on earlier, but

21 could you look, please, at the section on the bottom of that

22 page.

23     Okay.  This refers to bulk applications for ballots by

24 mail.  Did you, in the Forensic Audit Divisions, audit,

25 observe, particularly in Dallas County, that they had

JACQUELINE DOYER – DIRECT

1   collected boxes containing applications for ballot-by-mail
2   that were received in bundles?
3   A.  Yes.
4   Q.  And did any of the other counties besides Dallas County go
5   to that step of segregating bulk applications or applications
6   for ballots by mail that they had received in large bundles?
7   A.  To the best of my recollection Dallas was unique in that.
8   Q.  Did the Forensic Audit Division in its audit find
9   instances of a large number of ABBMs associated with a single
10  assister?
11  A.  Yes.
12  Q.  What was the largest number of ABBMs that FAD identified
13  as being submitted by a single assister?
14  A.  There were applications that came with — so we had three
15  assistants that assisted on 469 ABBMs, but we had one
16  assistant that appeared to have assisted with 393 ABBMs, or
17  application for ballots by mail.
18  Q.  What, if any, significance did that observation have for
19  the forensic audit team?
20  A.  We were just reporting on what was found, like additional
21  irregularities with regard to this finding were that there
22  were repeated requests, so it was not just 393 voters.  It was
23  multiple requests for the same voter, and as well as traveling
24  to different locations.  So this particular assistant, we had
25  one assistant that got 55 from an assisted living facility.

4258

JACQUELINE DOYER – DIRECT

1          THE COURT:  When you say he "got," I mean, how do you
2  know he went over there?  How do you know that he wasn't — or
3  she wasn't an employee of that facility?  How much of this are
4  you guessing about and how much of this have you done some
5  investigation?
6          THE WITNESS:  I can speak to what was included on the
7  applications, and so for this particular assistant there were
8  two locations, one was an assisted living facility where that
9  name is listed on 55 applications, and there's also an
10 affordable housing complex in Dallas where that name is listed
11 as the assistant on another 58 applications.
12         THE COURT:  It's the same person for both those
13 facilities?
14         THE WITNESS:  Same name.
15         THE COURT:  Same name; thank you.
16 BY MR. BRYANT:
17 Q.  Did Forensic Audit Division also see instances of a person
18 being the assister for both an application for ballot-by-mail
19 and the mail ballot itself?
20 A.  We were able to identify that through a discrete sample of
21 the carrier envelopes review, yes.
22 Q.  And what, if any, significance does that have to you as an
23 attorney for the Forensic Audit Division?
24 A.  That the assistant went back to assist with the execution
25 of the carrier envelope.

JACQUELINE DOYER - DIRECT

1  Q.  As a result of what Forensic Audit Division observed in

2  its audit with respect to these bulk or bundled ABBM

3  applications, did that cause you any concern with respect to

4  possible vote harvesting?

5  A.  It did.

6          MR. GENECIN:  Objection.

7          THE COURT:  What's the objection?

8          MR. GENECIN:  Again, this is seeking the witness'

9  speculation about something that is not in the audit report.

10         THE COURT:  That's noted and overruled.

11 BY MR. BRYANT:

12 Q.  Let's look at page 6 of Exhibit 23, the final audit

13 report.  I may have the wrong page.  I'm looking for the

14 portion that's headed Legislative Changes.

15     Looking at the second paragraph before you, the

16 highlighted language is, quote, "Many of the irregularities

17 observed in the audit are less likely to occur in future

18 elections due to legislative changes made following the 2020

19 General Election, including Senate Bill 1," is that correct to

20 the best of your knowledge and understanding?

21 A.  Yes.

22 Q.  And are there other pieces of legislation that were passed

23 by the legislature in 2021, in addition to SB 1 that reduced

24 the possibility of irregularities in future Texas elections?

25 A.  Yes.  House Bill 1382 [phonetic] established the online

4260
JACQUELINE DOYER - DIRECT

1  mail Ballot Tracker and Senate Bill 1111 assisted with
2  essentially where voters can be registered at and what actions
3  election officials can take to confirm addresses are proper.
4  Q.  You mentioned earlier in your testimony the provision for
5  randomized county audits that was included in SB 1.  Does
6  that, in your judgment, reduce the possibility of future
7  irregularities in Texas elections?
8  A.  The randomized county audits provide counties to show
9  their work essentially, to show all the good things that they
10 are doing and how elections are run in the state of Texas.  It
11 varies widely across the state, you know, depending on the
12 size of the county, but to be able to show voters in those
13 jurisdictions that they can have confidence in the results.
14      And moreover, because of the population that's set out in
15 this statute, it allows small counties to learn from small
16 counties, and also big counties to learn from big counties, so
17 it promotes those things for election officials and election
18 administrators, but it also has the effect of just allowing
19 more transparency and accountability for the voters to have
20 more confidence in those systems.
21 Q.  We've used the term "irregularities" with respect to
22 voting, and is it possible that those irregularities may have
23 not indicated possible fraud but they may also have indicated
24 possible fraud?
25      MR. GENECIN:  Objection.  Speculation.

*Gigi Simcox, RMR, CRR*

4261
JACQUELINE DOYER – DIRECT

1          THE COURT:  That's overruled.

2          MR. GENECIN:  Legal conclusion as well.

3          THE COURT:  That's overruled.

4          THE WITNESS:  I would say fraud is a loaded term and

5    one that generally requires intent and I was not in a position

6    nor was our division in a position to make any assessments

7    about intent.

8    BY MR. BRYANT:

9    Q.  I understand that and I'm glad you made that point.

10        When the Forensic Audit Division saw an irregularity, was

11   it possible that the irregularities were either not associated

12   with fraud or associated with fraud?

13         MR. GENECIN:  Objection.

14         THE COURT:  She already said she can't answer that.

15         Next question.

16   BY MR. BRYANT:

17   Q.  Based on the Forensic Audit Division's audit of the 2020

18   General Election and the irregularities that were identified

19   in that audit, are the improvements caused by SB 1 likely to

20   significantly improve the quality of elections in Texas after

21   SB 1's passage as compared to the 2020 General Election?

22         MR. GENECIN:  Objection.

23         THE COURT:  Sustained to that one as well.

24         MR. BRYANT:  Pass the witness.

25         THE COURT:  Anything else from this side?

*Gigi Simcox, RMR, CRR*

4262

JACQUELINE DOYER – DIRECT

1           MR. BRYANT:  Your Honor, could I re-move for

2   admission into evidence State's Exhibits 23 and 24?

3           THE COURT:  23 and 24 are admitted.  I'll give it

4   whatever weight it deserves.

5           MR. BRYANT:  Thank you, Your Honor.

6           THE COURT:  Is there going to be any cross?

7           MR. GENECIN:  There will be, Your Honor.

8           THE COURT:  Do you want it now or do you want to take

9   a break?

10          MR. GENECIN:  Why don't we take a break and after

11  lunch.

12          THE COURT:  We'll come back at 1:15, quarter past the

13  hour.

14      *(Recess)*

15

16

17

18

19

20

21

22

23

24

25

4263

JACQUELINE DOYER – DIRECT

1        (Change in reporter)

2        (1:15 p.m.)

3        COURT SECURITY OFFICER:  All rise.

4        THE COURT:  Thank you, please be seated.  Your cross.

5        MR. GENECIN:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7   BY MR. GENECIN::

8   Q.  Good afternoon, Ms. Doyer, I'm Victor Genecin.  We had the

9   opportunity to meet briefly online, is that correct?

10  A.  Yes, sir.

11  Q.  Now, can we agree that when I refer to the final report

12  you'll know that I'm speaking about State Exhibits 23 and 24?

13  A.  Yes.

14  Q.  And the final report concerns the election of

15  November 2020 as that election was held in four Texas

16  counties, is that right?

17  A.  Yes, sir.

18  Q.  And the final report was not published until the latter

19  part of December of 2022, is that right?

20  A.  That's correct.

21  Q.  Okay.  It was written during the autumn of 2022?

22  A.  I'm sorry, can you repeat that?

23  Q.  Was it written during the autumn of 2022?

24  A.  It was written throughout the course of the audit so it

25  was in iterations.

4264

JACQUELINE DOYER – DIRECT

1  Q.  So it was written during 2022?

2  A.  Yes, sir.

3  Q.  So it was prepared and finalized approximately two years

4  after the events that it describes, is that right?

5  A.  Yes.

6  Q.  And the final report consists of auditors observations

7  concerning documents that were provided to the auditors, is

8  that right?

9  A.  Auditors, myself, research specialists, the director.

10  Q.  And the forensic audit division itself was created --

11  well, little more than a year after the general election of

12  November of 2022, is that right?

13  A.  Yes, because the first staff didn't really start until

14  February of 2022.

15  Q.  So it's about 15 months, right, after the election?

16  A.  Give or take, yes, sir.

17  Q.  And is it true that the project that resulted in the final

18  report was the very first project that was undertaken by the

19  forensic audit division?

20  A.  There had been an additional irregularity in Brazos County

21  in March of 2022 that they asked the division to look into.

22  Q.  And did the division look into that?

23  A.  Yes.

24  Q.  Now, back at the time of the final report, am I correct

25  that the Secretary of State's office considered the project

4265

JACQUELINE DOYER - DIRECT

1  that resulted in it to be unique, is that right?

2  A.  What do you mean by that?

3  Q.  Well, could we look at the final report, please, at

4  page five, that's the very beginning of the executive summary.

5  And if we go down to the second sentence under the words

6  "methodology."  Go down a little further.  That sentence reads

7  "audit of this nature has not been undertaken anywhere in the

8  country," did I read that correctly?

9  A.  You did.

10  Q.  So am I correct that Secretary of State considered this

11  project to be unique at the time that it was undertaken?

12  A.  I would say I would stick to what the report says, an

13  audit of that nature had not been undertaken anywhere in the

14  country.

15  Q.  Now, the final report includes some unattributed

16  statements by people the auditor spoke with, is that correct?

17  A.  Could you give me more specific or give me an example,

18  please.

19  Q.  Well, I believe -- why don't we look at page 27 of

20  Ms. Doyer's deposition, will refresh your recollection.  All

21  right, have a look at lines two through ten.

22  A.  Yes, sir, I've reviewed it.

23  Q.  And so in the report from time to time would it be fair to

24  say that the report uses words from people that were spoken to

25  but those people are not named?

4266

JACQUELINE DOYER – DIRECT

1  A.  Correct, the names are not identified.

2  Q.  And indeed the statements that are taken are paraphrases

3  and not direct quotes, is that right?

4  A.  Sometimes there's direct quotes, but a lot of times it was

5  paraphrased.

6  Q.  Now, if we go back to the final report, and specifically

7  to the front cover, I see there are three individuals whose

8  names are listed there, is that right?

9  A.  Yes, sir.

10  Q.  And the name that's on the bottom is yours, is that

11  correct?

12  A.  That's correct.

13  Q.  And am I correct that you joined the Secretary of State's

14  office in April of 2022?

15  A.  Yes, sir.

16  Q.  And so during the November 2020 election, you were still a

17  prosecutor in Comal County?

18  A.  I was, yes, sir.

19  Q.  So at that time you had no involvement in making any

20  observation for the Secretary of State concerning the

21  administration of the November 2020 election in Harris or

22  Dallas or Tarrant or Collin counties, did you?

23  A.  I want to make sure I understand your question.  Are you

24  asking me did I have any personal observation of the 2020

25  general election in –– as an employee of the Secretary of

4267

JACQUELINE DOYER – DIRECT

1  State?

2  Q.  Correct.

3  A.  I did not.

4  Q.  And the name right above yours on the cover is the name

5  Chad Ennis, is that right?

6  A.  Yes, sir.

7  Q.  And am I correct that Mr. Ennis jointed the Secretary of

8  State's office just a couple of months before you in February

9  of 2022?

10  A.  Yes.

11  Q.  And so it would be fair to say that during the November of

12  2020 election, Mr. Ennis had no involvement in making any

13  observations for the Secretary of State's office concerning

14  the administration of elections in Harris or Dallas or Tarrant

15  or Collin counties, did he?

16  A.  I don't believe he did.

17  Q.  Okay.  He certainly wasn't the Secretary of State's

18  employee at that time, was he?

19  A.  No.

20  Q.  And how about the name at the top of the list, that's John

21  B. Scott?

22  A.  Yes, sir.

23  Q.  And at the time of the issuance of the final report

24  Mr. Scott was the Secretary of State, is that right?

25  A.  Yes, sir.

4268

JACQUELINE DOYER - DIRECT

1  Q.  And am I correct that he became the Secretary of State in

2  October of 2021?

3  A.  I actually don't know when he became the Secretary of

4  State.

5  Q.  Well, do you recall that Ruth Hughes was the Secretary of

6  State during the November of 2020 election?

7  A.  I had heard that, but I honestly don't know.

8  Q.  Do you believe the Secretary Scott had any involvement in

9  making observations for the Secretary of State during the

10 November 2020 election?

11 A.  If what you're telling me about when he started is true,

12 then I would answer he wouldn't have been observing those

13 events, but I don't know that, it's not within my personal

14 knowledge.

15 Q.  Now, in fact, neither you, nor Mr. Ennis, nor Secretary

16 Scott is an auditor, are you?

17 A.  We are not auditors, no.

18 Q.  In fact, each of you is a lawyer, is that right?

19 A.  We all have licenses, yes.

20 Q.  And you have a law license, is that right?

21 A.  Yes, sir.

22 Q.  And so is auditing a specialty within the legal

23 profession?

24 A.  What do you mean by that?

25 Q.  Well, you are certified in criminal law by the Texas Board

4269

JACQUELINE DOYER - DIRECT

1  of Legal Specialization, aren't you?

2  A.  I am, yes.

3  Q.  And does the Texas Board of Legal Specialization certify

4  lawyers in auditing?

5  A.  No, not that I am aware of.

6  Q.  And does the Texas Board of Legal Specialization certify

7  lawyers in forensic auditing?

8  A.  Not that I am aware of.

9  Q.  In fact, auditing and forensic auditing are specialties in

10  the accounting profession, aren't they?

11  A.  Generally, but not with regard to elections.

12  Q.  Neither you, nor Mr. Ennis, nor Secretary Scott has ever

13  been certified as an auditor or forensic auditor by any

14  governing body of the accounting profession have you?

15  A.  No.

16  Q.  And can you tell us the names of the boards or

17  professional organization that govern the profession of

18  accounting and auditing?

19  A.  For election auditing?  I don't know that one exists.

20  Q.  Well, are you aware of government auditing?

21  A.  I am.

22  Q.  And are you aware of generally accepted government

23  auditing standards?

24  A.  To some extent, my father is an auditor.

25  Q.  So are you aware that the United States general accounting

JACQUELINE DOYER - DIRECT

1  accountability office issues the generally accepted government
2  auditing standards used by state governments throughout the
3  United States including by Texas?
4  A.  I'm not specifically aware of that, but I have no reason
5  to doubt that there are standards that apply to financial
6  audits.
7  Q.  And are you aware of the other things that generally
8  accepted government auditing standards apply to?
9  A.  No.
10  Q.  Do you know what a performance audit is?
11  A.  I have heard of one, yes.
12  Q.  Do you know that the generally accepted government
13  auditing standards include standards for performance audits?
14  A.  I don't know that.
15  Q.  So in the course of your work for the forensic audit
16  division of the Secretary of State's office, you did not look
17  into generally accepted government auditing standards as they
18  might apply to the conduct of elections, did you?
19  A.  I wouldn't agree with that characterization.
20  Q.  Are you aware of the existence of the American Board of
21  Forensic Accounting?
22  A.  No.
23  Q.  So you're not aware that the American Board of Forensic
24  Accounting evaluates credentials, gives training courses,
25  administers examinations, and certifies individuals as

JACQUELINE DOYER – DIRECT

1  certified forensic auditors who are entitled to use the
2  initial CRFAU after their name?
3  A.  No.
4  Q.  And so, of course, you're not aware that only a certified
5  public accountant can become a certified forensic auditor, is
6  that right?
7  A.  I'm not aware of that, no.
8  Q.  And so as legal director of the Secretary of State's
9  forensic audit division, you're also not aware that the
10  American Board of Forensic Accounting evaluates credentials,
11  gives training courses, administers examinations, and
12  certifies individuals as government forensic accountants
13  entitled to use the initials ABGOV after their name?
14  A.  I'm not aware of that.  We were not accountants.
15  Q.  You're auditors?
16  A.  We were a forensic audit division.
17  Q.  And you yourself are not an auditor at all, are you?
18  A.  I'm not an auditor, no.
19  Q.  And are you aware that under the rules of the accounting
20  profession, accountants and auditors must complete minimum
21  requirements for continuing professional education?
22        MR. BRYANT:  Objection, Your Honor, irrelevant.
23        THE COURT:  That's overruled.
24  A.  I have no knowledge of that, no.
25  BY MR. GENECIN::

4272

JACQUELINE DOYER – DIRECT

1  Q.  In the final report, no auditors' names appear, do they?
2  A.  No.
3  Q.  Not one auditor has signed this final report, is that
4  right?
5  A.  Right.
6  Q.  And the Secretary of State's office has never disclosed
7  the names or the credentials of any auditor who may have
8  worked on the project that led to the final report, has it?
9  A.  I don't know the answer to that question.
10  Q.  Still the title here is Final Report of Audit, isn't that
11  right?
12  A.  Correct.
13  Q.  Now, the division you worked in within the Secretary of
14  State's office, that was called the Forensic Audit Division,
15  is that right?
16  A.  Yes, sir.
17  Q.  Who named it that?
18  A.  I don't know.
19  Q.  And am I correct that the Forensic Audit Division was
20  established in late 2021 with assistance from the state
21  legislature in order to comply with section 127.351 of the
22  election code?
23  A.  Yes.
24  Q.  And Section 127.351 is the section that governs election
25  audits, is that right?

4273

JACQUELINE DOYER – DIRECT

1    A.  The randomized county audits, yes.

2    Q.  And that section was enacted as part of SB1, is that

3    right?

4    A.  Yes, sir.

5    Q.  Okay.  And am I correct that one of the missions of the

6    Secretary of State's office is to ensure compliance with the

7    Texas Election Code?

8    A.  Yes, sir.

9    Q.  And do you agree that strict compliance with the Election

10   Code by all relevant parts of the Secretary of State's office

11   is necessary?

12   A.  Yes.

13   Q.  And the Forensic Audit Division of course is required to

14   follow Section 127.351 of the Texas Election Code when it

15   conducts audits, is that right?

16   A.  Yes.

17   Q.  So what is the authority under which this final report and

18   the project that led to it were carried out?

19   A.  I did not order the audit, the Secretary of State ordered

20   the audit by virtue of his position as the chief election

21   officer of the state and his requirement that is legislative

22   mandate to ensure uniformity in the application of the code.

23   We actually got an Attorney General ruling on something of

24   this nature with regard to open record request.  There's an AG

25   ruling that goes through the authority for this.

4274

JACQUELINE DOYER – DIRECT

1  Q.  Did you get authority from the AG to conduct this audit?

2  A.  No.  I'm just saying this analysis has already been

3  conducted and it's a matter of public record his authority to

4  order the audit.

5  Q.  And you would agree with me this audit was not conducted

6  pursuant to section 127.351 of the Election Code, is that

7  right?

8  A.  That's correct, this was ordered before the effective

9  date.

10  Q.  Now, was it your understanding as legal director of the

11  Forensic Audit Division that audits are generally conducted in

12  accordance with authoritative standards and guidelines that

13  are published by organizations within the accounting

14  profession?

15  A.  What —— I don't know what you mean by that question.

16  Q.  Well, are you aware, for example, the Texas law mandates

17  that —— internal audits within Texas government conform to the

18  standards for professional practice of internal auditing, the

19  code of ethics contained in the professional practices

20  framework as promulgated by the Institute of Internal Auditors

21  and the generally accepted government acting auditing

22  standards that are issued by the United States general

23  accounting office?

24  A.  I am not aware of that.  We were not internal auditors, we

25  were auditing counties, we were not auditing Secretary of

4275
JACQUELINE DOYER - DIRECT

1  State's office.

2  Q.  And you didn't look to analogous state law for sources of

3  authority for the conduct of this audit?

4  A.  What do you mean when you say "for sources of authority"?

5  Q.  I'm wondering what standards, if any, were applied to the

6  conduct of this audit?

7  A.  When you say "standards," what do you mean?

8  Q.  I mean accounting standards?

9  A.  We didn't use accounting standards because this was not an

10  accounting or financial audit.

11  Q.  So this was an audit that was conducted without reference

12  to any standards?

13  A.  I wouldn't say it was conducted without reference to any

14  standards.

15  Q.  What were the standards?

16  A.  You've used the word "standard" and you've referenced the

17  word "accounting," but I don't know what you mean when you say

18  "standards."

19  Q.  Well, to your knowledge, what standards do auditors use if

20  they don't use standards that are promulgated by organizations

21  within the accounting profession?

22  A.  There are no election auditors or election audit

23  certificates or certification bodies.  What we use was the

24  Texas Election Code, an authority that's been promulgated by

25  the Texas Secretary of State's office to identify areas of

4276

JACQUELINE DOYER - DIRECT

1  procedure and data that we could then match up against those

2  areas of procedure to see if that had been complied with.

3  Q.  Did you have auditors who actually worked on the project

4  that resulted in the final report?

5  A.  Yes.

6  Q.  And those auditors, are they members of the accounting

7  profession?

8  A.  No.

9      We had one who I think had prior auditing experience maybe

10  with the Texas education agency, so more specific to that area

11  you're thinking of but, again, there were -- there's no

12  election auditor certification.  This was truly the first in

13  the country of this nature.

14  Q.  So you made it up as you went along?

15  A.  No.

16  Q.  So is it your testimony that the standards of competence

17  that the accounting profession requires when an organization

18  conducts audits were not applicable to this audit?

19  A.  I'm not familiar with the standards of competence for the

20  accounting profession.

21  Q.  And as legal director of the Forensic Audit Division, you

22  did not deem it to be part of your role to research that

23  issue, did you?

24  A.  I never looked at that.

25  Q.  Okay.  And so the question of who is competent to conduct

4277

JACQUELINE DOYER - DIRECT

1  an audit under the rules governing auditors in the accounting

2  profession is simply not something that was examined by your

3  Forensic Audit Division in connection with this audit?

4  A.  I'm not sure I understand the question.

5  Q.  Would you know whether the professional standards of the

6  auditing profession require an audit organization to establish

7  policies and procedures that require audit team members to

8  have appropriate levels of skill and proficiency in order to

9  supervise the audit and review the work that's performed by

10 other team members?

11 A.  Are you asking me if I'm aware of those things with

12 respect to accounting audit -- no, I don't know those things.

13 Q.  Do you know whether it's true that the professional

14 standards governing audits require auditors and auditor

15 organizations to be independent and capable of exercising

16 objective and impartial judgment on all issues associated with

17 conducting the audit and reporting on the work?

18 A.  I have no personal knowledge of those standards.

19 Q.  So you have no knowledge of what the concept of

20 independence means in the auditing profession, do you?

21 A.  I have a concept of what independence would contribute to

22 an audit.

23 Q.  Do you understand the concept of audit of independence to

24 mean that an audit is conducted without being affected by

25 influences that compromise professional judgment and thereby

*Gigi Simcox, RMR, CRR*

4278

JACQUELINE DOYER - DIRECT

1  allow each auditor to act with integrity and exercise

2  objectivity and professional scepticism?

3  A.  I have no reason to disagree with that definition.

4  Q.  And would you also agree that the other component of

5  independence is independence in appearance, which means that

6  there must not be circumstances that would cause a reasonable

7  and informed third party to reasonably conclude that the

8  integrity, objectivity, or professional scepticism of an audit

9  organization or member of the engagement team has been

10  compromised?

11  A.  Again, I don't have any reason to disagree with that being

12  applicable.

13  Q.  And as legal director of the forensic accounting bureau,

14  were you aware that the professional standards of the auditing

15  profession require an audit organization to obtain an external

16  peer review?

17  A.  Again, I don't know the standards that you're referring to

18  so I'm not familiar with the requirements that those standards

19  would have.

20  Q.  Did your division maintain records of the continuing

21  professional education that the auditors receive?

22  A.  If they had certifications or continuing education that

23  they engaged in, yeah, they had records of it.

24  Q.  When you say "they," you mean the individual auditors?

25  A.  Yes.

4279
JACQUELINE DOYER — DIRECT

1  Q.  But the division didn't keep those records?

2  A.  I didn't keep them, they showed them to us.

3  Q.  So I take it you'd agree with me that in connection with

4  the project that resulted in the final report, the final

5  report makes no mention of any auditing standards prescribed

6  by any professionally recognized entity of the accounting

7  profession?

8  A.  The accounting profession?  No.

9  Q.  The final report contains no statement concerning what the

10  auditing standards were that were used to plan, direct, or

11  perform the procedures that were followed, is that right?

12  A.  Can you ask that one more time?

13  Q.  The final report contains no statement concerning what the

14  auditing standards were that were used to plan, direct, or

15  perform the procedures that were followed?

16  A.  I couldn't agree with that just based on some of the

17  statements that are in the report.

18  Q.  Now, are you aware that in order to conform to generally

19  accepted government auditing standards a report of an audit

20  conducted pursuant to those standards must state that it's

21  following those standards?

22  A.  I'm not aware of the standards.

23  Q.  So you agree, right, that generally accepted government

24  auditing standards were not used in either the project or the

25  final report here?

4280

JACQUELINE DOYER - DIRECT

1  A.  Because I'm not familiar with them, I can't tell you that
2  I agree with them because there may be overlap in how we
3  executed the audit and what those standards were.
4  Q.  Certainly looked for that, didn't you?
5  A.  I wouldn't agree with that either.
6  Q.  Well, you didn't -- did you try to apply any of the
7  generally accepted government auditing standards?
8  A.  Again, I didn't look for those specific accounting
9  standards but we did plan out and plot out the audit, how it
10  was going to be conducted and concerns about independence and
11  all those things that you described, but the election code was
12  our base line because this had never been done before and
13  there is no governing certifying body.
14  Q.  So let's look at Section 127.351 of the Election Code, and
15  specifically that's -- John, for your benefit, that's item D,
16  page 27 of 28.
17      And that's the section governing the activities of the
18  Forensic Audit Division, is that right?
19  A.  Yes.
20  Q.  And I'd like to direct your attention to sub paragraph F?
21  A.  I see it, yes, sir.
22  Q.  "Secretary of State shall adopt rules as necessary to
23  implement this section." Did I read that correctly?
24  A.  You did.
25  Q.  Now, at the time of your departure from the Secretary of

4281

JACQUELINE DOYER - DIRECT

1  State's office, am I correct that the Secretary had not

2  adopted any rules to implement Section 127.351?

3  A.  Formal rules?

4  Q.  Correct.

5  A.  No.

6  Q.  Indeed, there are no rules to implement that section even

7  today, are there?

8  A.  I don't have any knowledge of that.

9  Q.  Well, if I said to you that I checked the Texas

10  compilation of rules yesterday and found none, would you have

11  any reason to doubt that?

12  A.  I don't know you, sir, so I can't say.

13  Q.  That's perhaps a display of appropriate scepticism.

14      As a practical matter, is it the divisions of the

15  Secretary of State's office that prepare and propose rules to

16  the Secretary for adoption?

17  A.  Honestly I don't know the answer to that question.

18  Q.  So you yourself were not involved in the proposal of any

19  rules to implement section 127.351, is that right?

20  A.  We did not propose any rules for 127.351.

21  Q.  So would it be fair to say the entirety of the project

22  that resulted in the final report was conducted without the

23  Secretary's having adopted rules to govern the activity of the

24  Forensic Audit Division?

25  A.  There were no rules that had been adopted.

4282

JACQUELINE DOYER – DIRECT

1  Q.  The Secretary did not deem it necessary to adopt any

2  rules, is that correct?

3  A.  I don't know if the Secretary deemed it necessary.

4  Q.  Well, your division didn't deem it necessary to propose

5  any rules, did you?

6  A.  It -- none were adopted.

7  Q.  And none were proposed, were they?

8  A.  Not that I am aware of, no.

9  Q.  As legal director you would have been aware of any rules

10  proposed, wouldn't you?

11  A.  I should have been, yes.

12  Q.  So there were no rules concerning any auditing standards

13  to be applied by the Forensic Audit Division, were there?

14  A.  For the SB1 audits?  By the time I left?  That's correct.

15  Q.  And neither your division nor the Secretary deemed it

16  necessary to adopt any rules concerning qualifications of

17  auditors working within the division, did you?

18  A.  Are you --

19  Q.  I'm asking you, I'm asking you if your division proposed

20  any rules to the Secretary concerning the qualification of

21  auditors working in the Forensic Audit Division?

22  A.  We had sent -- any time we created a job posting we had to

23  put all the desired qualifications and all those types of

24  things in a job description, I mean, I was involved in that

25  process.

*Gigi Simcox, RMR, CRR*

4283

JACQUELINE DOYER – DIRECT

1  Q.  But you weren't involved in any rule-making process, were

2  you?

3  A.  I wasn't involved in any rules that were proposed or

4  adopted, but again, this is SB1 audits, we weren't conducting

5  SB1 audit, we were doing an audit that was ordered prior to

6  the effective date of SB1.

7  Q.  You did have a division, right?

8  A.  We did have a division, yes.

9  Q.  And it was called the Forensic Audit Division?

10  A.  Yes, sir.

11  Q.  And as such, it did not propose any rules concerning the

12  qualifications of auditors who would work in that division,

13  did it?

14  A.  There were no formal rules proposed.

15  Q.  And the division did not propose any rules and the

16  Secretary didn't adopt any rules concerning continuing

17  professional education required of auditors, did it?

18  A.  To my knowledge, no.

19  Q.  And the division didn't propose and the Secretary didn't

20  adopt any rules to ensure that professionals were with

21  appropriate levels of skills and proficiency in auditing were

22  the individuals who supervised audits conducted by the

23  Forensic Audit Division?

24  A.  Formal rules?  No.

25  Q.  And the Secretary didn't adopt and indeed your division

4284

JACQUELINE DOYER – DIRECT

1  did not propose any rules providing for external peer review

2  of the Forensic Audit Division to provide reasonable assurance

3  that the audit division was performing in conformity with

4  professional standards, did you?

5  A.  Again, the formal rules and standards, no formal rules

6  that I am aware of were proposed regarding the 2020 audit

7  which is what I understood I was testifying about.  And with

8  regard to anything from that point forward, again, I don't

9  have personal knowledge of the auditing standards.

10  Q.  And your division did not propose and the Secretary did

11  not deem it necessary to adopt any rules to guarantee the

12  independence of the auditors working in the Forensic Audit

13  Division, did you?

14  A.  Formal rules?

15  Q.  Correct.

16  A.  Not that I am aware of.

17  Q.  Now, am I correct that the final report was reviewed by

18  the Governor's office before it was issued?

19  A.  When you say "the final report," you mean the entirety of

20  the report?

21  Q.  Yes.

22  A.  No.

23  Q.  There were sections of it that were?

24  A.  To my knowledge there were –– the executive summary was

25  reviewed.

4285

JACQUELINE DOYER - DIRECT

1  Q.  Am I correct the Governor's office recommended changes?

2  A.  To my knowledge, yes.

3  Q.  All right.  And the final report was issued with the

4  changes that the Governor's office recommended, is that right?

5  A.  I don't remember the nature of those changes so I honestly

6  can't answer that question.

7        THE COURT:  I was just going to ask you what changes

8  did they recommend?

9        THE WITNESS:  I wasn't part of those conversations so

10  I don't remember.

11        THE COURT:  You were in charge of this effort and you

12  weren't kept in the loop?

13        THE WITNESS:  I was not part of the conversations

14  with Governor's office regarding executive summary and things

15  of that nature.

16        MR. GENECIN:  Just one moment, Your Honor.

17        (Pause.)

18        THE COURT:  So if you weren't part of those

19  conversations, who was?

20        THE WITNESS:  Our director, the Secretary, general

21  counsel.

22        THE COURT:  Anyone else?

23        THE WITNESS:  That's the best I can recall, Your

24  Honor.

25        THE COURT:  How would you know that and not

JACQUELINE DOYER – DIRECT

1  everything else?

2          THE WITNESS:  Because that's who we were

3  communicating with as we finalized the report.

4          THE COURT:  And so your boss didn't get —— didn't

5  allow you to participate or what happened there?

6          THE WITNESS:  It just didn't —— I just wasn't present

7  for them or those conversations happened when I wasn't there

8  and so those edits were not necessarily something that I was

9  working on.

10          THE COURT:  And you don't recall the edits?

11          THE WITNESS:  I don't.

12  BY MR. GENECIN::

13  Q.  Now, am I correct that the Governor's office did not

14  participate in the planning, direction, or performance of the

15  procedures that were undertaken during the project that

16  resulted in the final report, did it?

17  A.  That's correct.

18  Q.  And to your knowledge was there anyone in the Governor's

19  office who was an auditor with supervisory responsibility for

20  the project that resulted in this final report?

21  A.  No one from the Governor's office was employed by the

22  Forensic Audit Division.

23  Q.  So whatever the Governor's office provided, it did not

24  provide professionally qualified audit opinions, did it?

25  A.  I don't know exactly what they recommended.

4287

JACQUELINE DOYER — DIRECT

1  Q.  The involvement of Governor's office is not disclosed

2  anywhere in the report, is it?

3  A.  No.

4  Q.  So would it be fair to say that the undisclosed

5  involvement of the Governor's office at the very least gives

6  an appearance that the final report may not be the product of

7  the independent professional judgment of the auditors

8  involved?

9  A.  I don't know what you mean by that.

10  Q.  Now, the reason for the project that resulted in the final

11  report, and here we can look at page five, beginning of the

12  executive summary.  Very first sentence, the reason for the

13  audit is stated to be in order to, quote, *ensure that all*

14  *Texas voters can have confidence in the elections systems in*

15  *our state,* closed quote?

16  A.  Yes, sir.

17  Q.  Did I read that correctly?

18  A.  You did.

19  Q.  The words "to ensure that all Texas voters can have

20  confidence in the election systems in our state" are in

21  quotation marks, is that right?

22  A.  Yes, sir.

23  Q.  And there's no attribution of that statement here to

24  anybody, is that right?

25  A.  That's correct, yes, sir.

4288

JACQUELINE DOYER - DIRECT

1  Q.  Okay.  And whose words are being quoted here?

2  A.  I believe -- our director worked primarily on this portion

3  and I believe this was from one of the earlier press releases

4  or statements by the Secretary of State when the audit was

5  ordered.

6  Q.  So this is not a statement of purpose that was framed by

7  an auditor, is it?

8  A.  What do you mean when you say that?

9  Q.  Well, you haven't named anyone who was involved in writing

10 these words who was an auditor and not, you know, a lawyer, is

11 that right?

12 A.  I mean there's no name there.

13 Q.  And you don't know the name?

14 A.  I'm pretty sure it was in one of the earlier press

15 releases but I'm not 100 percent certain on that.

16 Q.  So maybe it was a somebody in communications?

17 A.  I don't know.

18 Q.  But are there any auditors working in communications?

19 A.  I don't know.

20 Q.  In -- before undertaking this project, did the Forensic

21 Audit Division have any specific information that voters did

22 not have confidence in the election system in Texas?

23 A.  Not that I am aware of.

24 Q.  And this project that resulted in the final report, did it

25 actually measure the levels of voter confidence in Texas

4289

JACQUELINE DOYER – DIRECT

1  election system?

2  A.  Did the report measure voter confidence?

3  Q.  Yes.

4  A.  No.

5  Q.  The audit didn't conduct any polling or surveys about

6  voter confidence, did it?

7  A.  No.

8  Q.  The audit didn't measure voter confidence in any other

9  way, did it?

10  A.  No.

11  Q.  And in fact, the audit draws no conclusions about the

12  level of voter confidence in Texas election systems, does it?

13  A.  No.

14  Q.  And am I correct that the Secretary of State's office when

15  you were there had no official position concerning whether

16  voters had confidence or not?

17  A.  I'm not aware of whether they had an official position on

18  the level of confidence.

19  Q.  Could we have a look at page 13 of Ms. Doyer's deposition.

20  And I'm going to call your attention, ma'am, to lines 22 to

21  25, and then page 14, lines one and two.

22      Do you recall being asked whether the Secretary of State's

23  office and the Forensic Audit Division have any specific

24  information that voters didn't have confidence?  And you

25  answered, "I don't believe the agency has an official position

JACQUELINE DOYER - DIRECT

1  on that."

2  A.  Yes, sir.

3  Q.  Were you asked that question and did you give that answer?

4  A.  Yes, sir.

5  Q.  And do you agree with that answer today?

6  A.  Yes, sir.

7  Q.  And in fact, there was no specific issue, error, or

8  mistake in the 2020 election that was the reason for the

9  audit, is that right?

10 A.  I don't know.

11 Q.  Well, am I correct that the final report sets forth the

12 reasons for the audit?

13 A.  The final report -- can you put it back up there, if you

14 don't mind?

15 Q.  Sure.

16 A.  I mean like you have highlighted there "was to ensure

17 voters can have confidence in the elections systems in our

18 state."  I don't know if there was something that triggered or

19 led to that.

20 Q.  As far as you know, is the statement here the full

21 statement of the reason for the audit?

22 A.  It's the reason that's in the report which contains the

23 conclusions and findings of the Audit Division.

24 Q.  Now, am I also correct that the final report does not set

25 forth any conclusions about how the processes or procedures

JACQUELINE DOYER - DIRECT

1  that the project evaluated would comply with SB1?

2  A.  That's correct.  This was all related to the laws that

3  existed in 2020.

4  Q.  And is it also correct that the project that resulted in

5  the final report did not evaluate the accuracy of the records

6  in the Texas election administration system?

7  A.  No.  There were -- like I mentioned during my direct,

8  there was some instances where a county might not upload voter

9  history and then that would make the data in TEAM not have the

10  correct information about a valid disposition, for example, so

11  we really didn't look at-- we weren't auditing TEAM, but there

12  were instances where we would see data in TEAM based on the

13  upload from the county might not be correct.

14  Q.  So, in fact, you found that there were instances where the

15  voter history in TEAM was incorrect?

16  A.  That is -- yes, that's correct.

17  Q.  But the frequency of inaccuracy in TEAM is not something

18  that is in this final report, is it?

19  A.  That's correct.

20  Q.  Did your division consider whether the accuracy or

21  inaccuracy of the Secretary of State's voter history records

22  might have an effect on the confidence of Texas voters in

23  election systems in this state?

24  A.  Yes.

25  Q.  But you did not report on the level of accuracy of TEAM,

JACQUELINE DOYER – DIRECT

1  did you?

2  A.  Well, we reported on the fact that these counties are

3  offline counties, TEAM depends on the county to upload

4  accurate data and when the county doesn't do that, that can in

5  turn negatively affect TEAM.

6  Q.  And did you describe the extent to which that occurred?

7  A.  Sounds like you're asking me about frequency and we didn't

8  evaluate frequency.

9  Q.  And the project that resulted in the final report looked

10  at complaints received about the 2020 general election in four

11  counties, is that right?

12  A.  Yes.

13  Q.  And across the four counties, there were approximately

14  4 million votes cast, is that right?

15  A.  I don't know.

16  Q.  You think that number is roughly accurate?

17  A.  Honestly, I don't know.

18  Q.  There were 138 complaints all together?

19  A.  Could I see the report?  Or do you have a source that I

20  could look at for that?

21  Q.  It is in the report.  We have the complaint page, which I

22  think is 165.  351, sorry.

23     Page 351 of the report, John.

24  A.  Okay.  Yes, 138 received by Secretary of State's office.

25  Q.  And those were complaints were characterized into

4293

JACQUELINE DOYER - DIRECT

1  different categories, is that right?

2  A.  Yes.

3  Q.  There were complaints about procedures, there were

4  complaints about conduct, there were complaints about

5  intimidation, complaints about fraud, and complaints about

6  technology, is that right?

7  A.  Yes.

8  Q.  And the complaints section is based on data about

9  complaints that were provided to the Forensic Audit Division

10  from the elections division, is that right?

11  A.  Yes.

12  Q.  And in the fraud category, that's a category that could

13  include complaints about events that weren't in themselves

14  fraudulent activity but that were suspected might lead to

15  fraud, is that right?

16  A.  Could you go down on the page a little bit so I could

17  refresh my memory?

18      Okay, it's probably on the next page talking about the

19  categories.

20      Keep going.

21      Yeah, fraud was just if the voter reported something that

22  was suspected, essentially suspected fraud.

23  Q.  And the final report, am I correct -- well, let's go back

24  here for a moment.  In the course of the project that resulted

25  in the final report, the Forensic Audit Division did not

4294
JACQUELINE DOYER – DIRECT

1  evaluate the accuracy of the substance of the complaints, did

2  it?

3  A.  No.

4  Q.  And the final report doesn't present any determinations

5  about whether any of the complaints was credible, does it?

6  A.  No.

7  Q.  The final report certainly presents no determination

8  whether any complaint described a proven violation of the

9  election code or of any proven voter fraud?

10  A.  No.

11  Q.  And the final report does list some complaints that were

12  referred to the office of the Attorney General?

13  A.  Yes.

14  Q.  And the expectation was that those would be investigated

15  by the office of the Attorney General?

16  A.  I don't know what the expectation was, those are referred

17  by the Elections Division.

18  Q.  And out of 138 total complaints, 18 were referred to the

19  office of the Attorney General?

20  A.  That's what the records reflect.

21  Q.  And referring a complaint to the Attorney General doesn't

22  necessarily indicate that any criminal charges were ever

23  brought relating to that complaint, right?

24  A.  I have no knowledge of what happens once it goes to the

25  Attorney General's Office.

4295

JACQUELINE DOYER – DIRECT

1  Q.  And the report doesn't indicate final resolution of any of
2  the 18 complaints, does it?
3  A.  Some of those are marked final because those have reached
4  the final point in the process in terms of the elections
5  division review so that's the final point in the process for
6  those.
7  Q.  But in terms of those that were referred?
8  A.  No, again, we have no knowledge of what happens to them
9  once they go to the Attorney General's Office.
10  Q.  Now, you testified this morning about discrepancies
11  between numbers of voters checked in at polling places and the
12  numbers of voters whose votes ultimately were counted, is that
13  right?
14  A.  Yes.
15  Q.  And are you aware that after the first two or three days
16  of drive in voting -- of drive through voting, sorry, that
17  Harris County kept the voting machines plugged in?
18  A.  When you say kept them plugged in, what do you mean by
19  that?
20  Q.  I mean that they got longer cords and made sure that the
21  machines were at all times plugged in.
22  A.  The eSlates were always plugged in?
23  Q.  Yes.
24  A.  I am not aware of that.
25  Q.  Am I correct that it's your understanding that keeping the

*Gigi Simcox, RMR, CRR*

4296

1  eSlates plugged in would avoid the stranded vote problem?

2  A.  As long as the pins were all reading correctly, it should

3  avoid those stranded vote issue.

4  Q.  And keeping them plugged in would also avoid the crossed

5  eSlate problem, is that right?

6  A.  It should.

7  Q.  And that bent pins issue that you described, that's

8  something that could happen with curbside voting as well, is

9  that right?

10  A.  It could.

11  Q.  Now, am I correct the discrepancies between check-in

12  numbers and ballots tabulated were not unique to drive through

13  voting locations, is that correct?

14  A.  That's correct.

15  Q.  And they weren't unique to Harris County, were they?

16  A.  No.

17  Q.  So let's take a look at page 166 of State 23.  Now, the

18  very bottom of the chart, there's a poll code for Kingwood

19  Community Center, that's SRC127Y, do you see that?

20  A.  Yes, sir.

21  Q.  And that's not a drive through location, is that right?

22  A.  No, that's an early voting location.

23  Q.  And that had a discrepancy of 115 votes between those who

24  were checked in and those who voted, is that right?

25  A.  Yes.

4297

JACQUELINE DOYER - DIRECT

1   Q.  And could we go to the next page, please.  And am I
2   correct that over here each of the entries in the table page
3   167, is a polling site that had discrepancies between voters
4   checked in and voters who voted?
5   A.  Yes.
6   Q.  And not one of these sites is drive through voting, is it?
7   A.  These are all early voting.  In person, like regular
8   polling places.  Sorry.
9   Q.  So now let's go to page 172, John, if you would.
10      And now we're talking about Collin County, is that right?
11  A.  Yes.
12  Q.  And if we go to the next page, so page 173 of Exhibit 23,
13  it shows that there were discrepancies between check ins and
14  ballots tabulated in Collin County, is that right?
15  A.  Yes.
16  Q.  Including four polling places that had discrepancies
17  between 51 and 101 voters, is that right?
18  A.  Yes.
19  Q.  And if we go to page 174, here's Dallas County, is that
20  right?
21  A.  Yes.
22  Q.  And again we see that there are discrepancies between
23  check-ins and ballots tabulated?
24  A.  Yes.
25  Q.  And indeed in Dallas County, there were six polling

4298

JACQUELINE DOYER - DIRECT

1  locations that had discrepancies of 151 up to 2083 voters, is
2  that right?
3  A.  That's what the table says, yes, sir.
4  Q.  In fact, 2083 voters is more than any polling place in
5  Harris County, isn't that right?
6  A.  Any individual location in Harris County?
7  Q.  Yes.
8  A.  Yes.
9  Q.  In fact, 2083 may be more than they were all collectively,
10  wouldn't that be?
11  A.  I'm not sure about that, I'd have to do the math.
12  Q.  Why don't we go to page 178.  And this is Tarrant County?
13  A.  Yes.
14  Q.  Right.  And there were discrepancies there in nearly all
15  polling locations, is that right?
16  A.  Yes.
17  Q.  Including 25 polling locations in which there was a
18  discrepancy of between 11 and 50 voters, is that right?
19  A.  Yes.
20  Q.  Now, it's true, isn't it, that Collin County and Dallas
21  County and Tarrant County did not have drive through voting in
22  the November 2020 election, is that right?
23  A.  They did not.
24  Q.  And yet every one of these counties had discrepancies in
25  many or all of their polling locations, isn't that right?

JACQUELINE DOYER - DIRECT

1  A.  Not all of their polling locations, but there were

2  discrepancies.

3  Q.  There were a lot of discrepancies at a lot of polling

4  locations, weren't there, without any drive-through voting, is

5  that right?

6  A.  When you say "a lot," are you talking about just in like

7  when you're adding all of these up or are you saying in

8  general?  What do you mean by that?

9  Q.  I'm talking about in a lot of polling locations and large

10  numbers of discrepancies.

11  A.  You'd have to be just cautious about using the word

12  "large", I guess.  I want to look at each individual location.

13  Some discrepancies are really easy to explain, it's a fleeing

14  voter, so you might have 26 locations that have a discrepancy

15  of one, but that's not going to be very significant.

16  Q.  And you mentioned in your testimony an initial discrepancy

17  that was corrected in Harris County in 2022 in March, that's a

18  discrepancy of approximately 10,000 votes?

19  A.  Yes, sir.

20  Q.  It was caught and it was corrected, is that right?

21  A.  Yes, sir.

22  Q.  And in that March 2022 election, Harris County wasn't

23  using drive-through voting, was it?

24  A.  Not that I am aware of.

25  Q.  So that discrepancy for the period of time when it was a

4300

JACQUELINE DOYER - DIRECT

1  discrepancy occurred despite the fact that there was no

2  drive-through voting?

3  A.  Yes.

4  Q.  And the discrepancies in Harris that occurred in polling

5  places that were not drive-through polling places occurred

6  without any drive-through voting being done there, is that

7  right?

8  A.  Yes.

9  Q.  And the discrepancies that occurred in Collin and Dallas

10  and Tarrant Counties occurred without there being

11  drive-through voting there, right?

12  A.  Yes.

13  Q.  Now, am I correct that the final report and the project

14  that resulted in it focused strictly on election practices in

15  the four counties during the 2020 election?

16  A.  Yes.

17  Q.  And for that project the Forensic Audit Division did not

18  collect any information concerning any election in 2022, is

19  that right?

20  A.  Again, just with the caveat that Tarrant accidentally gave

21  us the records from '22.

22  Q.  And the Forensic Audit Division did not examine the 2022

23  material from Tarrant, did it?

24  A.  We opened it, but we didn't use it.

25  Q.  You didn't use it.  And in fact, the final report does not

JACQUELINE DOYER – DIRECT

1  reflect any study of any election after November of 2020, is

2  that right?

3  A.  That's correct.

4  Q.  So the project that resulted in the final report certainly

5  did not evaluate election practices during the 2022 primary,

6  in March of 2022?

7  A.  No.

8  Q.  And the project that resulted in the final report

9  certainly did not evaluate any election practices that

10  occurred in the general election that occurred in November of

11  2022?

12  A.  When we finished the audit we met with the counties, went

13  over findings with them, and to the extent they amended

14  anything or changed processes or procedures, you know, to

15  address any of the irregularities, we tried to reflect that in

16  the report.  So there was some assessment in that regard.

17  Q.  So now am I correct that the final report discusses the

18  effect of legislative changes?

19  A.  Can you maybe direct me to where you're referring to?

20  Q.  Sure.  That's at page 11 of the report, it's part of the

21  executive summary.

22  A.  Yes.

23  Q.  And if you look about four lines down, there's a sentence

24  that begins SB1 created a new election night reconciliation

25  form that counties are required to complete.  This form has

4302

JACQUELINE DOYER – DIRECT

1  already proven quite useful to catch reconciliation mistakes.

2  Do you see that?

3  A.  I do.

4  Q.  And John, if you'd just go over to page 12 so we can be

5  sure of the full content here.  Right.

6      Am I correct that the only effect listed for SB1 is that

7  one sentence that I just read?

8  A.  There was another reference that in the report that talks

9  about irregularities that would be hopefully minimized or

10  reduce by virtue of SB1, but I don't know the page number.

11  Q.  Do you have any sense of where it might be?

12  A.  I thought it was in the executive summary, but maybe page

13  six.

14  Q.  Well, let's judge look at page six, give it a chance.

15  A.  Yes.  They're right above county specific findings.

16  Q.  Right there you said many of the irregularities observed

17  in this audit are less likely to occur in future elections due

18  to legislative changes made following the 2020 election

19  including Senate Bill One.  Do I see that sentence?

20  A.  Yes, sir.

21  Q.  Do you list in the report which irregularities are less

22  likely to occur?

23  A.  Not specifically and not like in a detailed list.  I know

24  when we talked about the corrective action process there's a

25  reference in a footnote to that process, somewhere in the

4303
JACQUELINE DOYER - DIRECT

1  voting by mail section.

2  Q.  But you don't actually discuss in the report any of the

3  things that you testified to here this morning about potential

4  effects of SB1, do you?

5  A.  Right.  We weren't asked to do that in the report.

6  Q.  You weren't asked to and it's not part of the report, is

7  it?

8  A.  That's correct.

9  Q.  And it's also true, isn't it, that the final report sets

10  forth no conclusions as to whether there was any fraud in

11  connection with drive-through voting in Harris County?

12  A.  We were not in a position to evaluate whether there was

13  fraud.  I can't say whether any irregularity raises to the

14  level that it becomes fraud.

15  Q.  And just to focus for a moment on your discussion of the

16  multiple applications for ballots by mail that where there was

17  a single assister in Dallas County, I think you said that

18  Dallas was unique in segregating bundles of applications, is

19  that right?

20  A.  In that it stored those together and kept them in the

21  original envelopes, yes, sir.

22  Q.  Do you have any reason to think that any of the other

23  counties received bundles that they didn't store?

24  A.  I have no knowledge of that.

25  Q.  And it's not illegal, is it, to assist multiple voters?

4304
JACQUELINE DOYER – DIRECT

1  A.  It is not.

2  Q.  And in fact, someone who went to an assisted living center

3  might have the opportunity to assist a great many voters,

4  isn't that right?

5  A.  Yes.

6  Q.  And it's also not illegal for the same person who helps a

7  voter with an application for ballot-by-mail to help them with

8  their ballot-by-mail, is it?

9  A.  It is not illegal in those circumstances, no.

10 Q.  All right.  Now, it's also true that the final report sets

11 forth no conclusions about whether there was any fraud in

12 connection with 24-hour voting in Harris County?

13 A.  That's correct.

14 Q.  And the final report sets forth no conclusions as to

15 whether there was mail ballot fraud in any of the four subject

16 counties in the 2020 general election?

17 A.  Again, we weren't in a position to evaluate fraud.

18 Q.  And there's no discussion in the final report of any other

19 way that SB1 might address any issue studied in the project

20 that resulted in the final report, is there?

21 A.  Can you ask that again?

22 Q.  Am I correct that there's no discussion in the final

23 report of any way that SB1 might address any issue that was

24 studied in the project that resulted in the final report other

25 than the one sentence about the effect of legislation?

4305
JACQUELINE DOYER – DIRECT

1  A.  Like I said, the couple of those references where we talk

2  about that SB1 should preclude some of these irregularities,

3  some of those examples that you referenced on page 11, the

4  reference I'm thinking of with the corrective action process.

5  Q.  And am I correct that this report was not seen by the

6  legislature when it passed SB1?

7  A.  It couldn't have been.

8  Q.  Okay.

9        MR. GENECIN:  Your Honor, I pass the witness.

10        THE COURT:  Anything else on this side?  Any

11  redirect?

12        MR. BRYANT:  Your Honor, just a few questions.

13                  REDIRECT EXAMINATION

14  BY MR. BRYANT::

15  Q.  Ms. Doyer, you mentioned in response to some questions by

16  plaintiff's counsel that you understand there was some input

17  from the governor's office with respect to the executive

18  summary, is that right?

19  A.  That's to the best of my knowledge, yes, sir.

20  Q.  Are you aware of any input by the governor's office to the

21  body of the report apart from the executive summary?

22  A.  No, sir.

23        THE COURT:  Do you know whether -- you don't know

24  whether they did it or they didn't do it?  You don't know

25  either way?

4306

JACQUELINE DOYER - DIRECT

1        THE WITNESS:  I don't know either way.  The best I

2   can recall is with regard to the executive summary.

3   BY MR. BRYANT::

4   Q.  Okay.  And the executive summary is contained in pages

5   five through 13 of Exhibit 23?

6   A.  I don't know the specific pages, but the executive summary

7   is the very, very beginning of the report.

8   Q.  And is it roughly seven or eight pages?

9   A.  Yes.

10  Q.  Out of a 359-page report?

11  A.  Yes, sir.

12  Q.  And I believe also in response to some questions on cross

13  you testified that not all of the polling locations in Collin,

14  Dallas and Tarrant County had discrepancies, right?

15  A.  That's correct.

16  Q.  And it's also true that not all the polling locations in

17  Harris County had discrepancies, is that right?

18  A.  That's correct.

19  Q.  But is it correct that all of the drive-through voting

20  locations in Harris County did have discrepancies?

21  A.  That is also correct.

22        MR. BRYANT:  Pass the witness.

23        THE COURT:  Anything else based on those?

24        MR. GENECIN:  No, Your Honor.

25        THE COURT:  Thank you, ma'am, you can step down.

4307
JACQUELINE DOYER – DIRECT

1          THE WITNESS:  Thank you.

2          THE COURT:  Do you want a break or next witness?

3          MR. KERCHER:  The next direct will be pretty lengthy,

4   Your Honor, now seems like a good time.

5          THE COURT:  We'll take ten or 15-minute.

6          COURT SECURITY OFFICER:  All rise.

7          *(2:20 p.m.)*

8                              *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4308
JACQUELINE DOYER – DIRECT

1    *(Change in reporter)*

2         MISS RODRIGUEZ:  The LULAC plaintiffs are prepared to

3    rest, if that works for you.

4         We have some exhibits to admit, to which there is no

5    opposition.  So, again, in advance of resting we have some

6    exhibits to admit to which there is no opposition or objection

7    rather.  LULAC 15, 16 —

8         THE COURT:  So everything on this list?

9         MISS RODRIGUEZ:  Yes, these are all LULAC exhibits.

10        THE COURT:  Do they have a copy?

11        MISS RODRIGUEZ:  They have a copy, yes.

12        THE COURT:  Is there any objection to anything on

13   this list?

14        MR. WASSDORF:  No objections.

15        THE COURT:  LULAC 15, 16, 18, 19, 22, 25, 26, 29, 39,

16   40, 41, 42, 44, 45, 46, 49, 51, 52, 55, 78, 79, 82, 83, 85,

17   86, 87, 89, 90, 93, 94, 95, 96, 97, 98, 100, 101, and 102 are

18   all admitted.

19        MISS RODRIGUEZ:  Thank you, Your Honor.

20        A couple of other housekeeping matters.  We

21   previously identified provisions of SB 1 that we are no longer

22   challenging in both the JPTO and reiterated the same on day

23   one of trial.  We are happy to repeat that for the record now

24   if Your Honor would like or if defendants would like to file

25   something more formal on the record.

                                                                4309

 1           THE COURT:  I don't see a necessity of restating it.

 2           Does anybody?

 3           MR. KERCHER:  It's our understanding the Court has

 4  dismissed those provisions that were not listed among those

 5  they are challenging, and so I think we probably have the

 6  record we need, Your Honor.

 7           THE COURT:  I think so.

 8           MISS RODRIGUEZ:  Great, thank you, just to be sure.

 9           So with that, LULAC plaintiffs rest with regard to

10  phase one.

11           THE COURT:  LULAC rests now, thank you.

12           MISS HUNKER:  Your Honor, Kathleen Hunker with the

13  State defendants.  The State defendants call Keith Ingram to

14  the stand.

15           THE COURT:  You remain under oath, thank you.

16           THE WITNESS:  Yes, sir.

17    (KEITH INGRAM, having been previously duly sworn,

18  testified as follows:)

19                      DIRECT EXAMINATION

20  BY MISS HUNKER:

21  Q.  Good afternoon, Mr. Ingram.  Could you please state your

22  name for the record.

23  A.  My name is Brian Keith Ingram.

24  Q.  What is your educational background starting after high

25  school and going forward?

4310
KEITH INGRAM - DIRECT

1  A.  I went to Texas A&M University, graduated with a

2  bachelor's in political science in 1989, and I went to UT law

3  and graduated with a JD in 1993.

4  Q.  Are you licensed to practice law?

5  A.  I am.

6  Q.  Were you at one point employed by the office of the Texas

7  Secretary of state?

8  A.  I was.

9  Q.  What was your job title when you worked at the office of

10 the Secretary of State?

11 A.  My initial job title was director of the Elections

12 Division, my final title was Attorney 5.

13 Q.  How long were you the elections director?

14 A.  Eleven years, 2 months.

15 Q.  When did you leave your position as Director of Elections?

16 A.  March 10th, 2023.

17 Q.  When did you leave your — the office of the Secretary of

18 State?

19 A.  August 31st, 2023.

20 Q.  Are you since received an offer for new employment?

21 A.  I have.

22 Q.  And what is the —

23 A.  The cybersecurity and infrastructure security agency has

24 made a tentative offer for me to be the election administrator

25 for region six.

KEITH INGRAM - DIRECT

1  Q.  What would you be doing in that position?

2  A.  I would be assisting state and local officials in making

3  sure their elections are as secure as they can be, both from a

4  cybersecurity perspective as well as a physical security

5  perspective.

6  Q.  Out of curiosity —

7  A.  And by the way, that's five states, it's New Mexico,

8  Oklahoma, Arkansas, Louisiana, and Texas.

9  Q.  Out of curiosity, before you left the Secretary of State's

10 Office how many elections would you have overseen as Director

11 of Elections?

12 A.  I don't know.  A lot.  Every even numbered year there's at

13 least four and plus special elections, and odd numbered years

14 we have at least two plus special elections.  There were

15 numerous special elections to fill a vacancy in the

16 legislature.  There was a couple of special elections to fill

17 congressional seats, so a lot of elections.

18 Q.  Would it number in the hundreds?

19 A.  Well, if you include all of the local elections on the May

20 uniform date it would be much more than that.

21 Q.  What were your responsibilities as Director of Elections?

22 A.  The office's job is to obtain and maintain uniformity in

23 the interpretation, application, and operation of election

24 code and other election laws in Texas, and to give advice and

25 assistance to election officials deferred to that end.

KEITH INGRAM - DIRECT

1  Q.  Now, you touched a bit on this in your previous answer but

2  for clarity can you please explain what the election division

3  is and what duties it performs for the Secretary of State?

4  A.  So the Secretary of State is the chief election officer

5  for the State of Texas, and I told every secretary that came

6  into the office that that was going to be frustrating for them

7  because they had all the responsibility but very little

8  authority, and so the object of the division was to assist the

9  secretary in carrying out the role of chief election official.

10  Q.  Does the Elections Division conduct elections?

11  A.  No.

12  Q.  Who conducts elections in Texas?

13  A.  For state and county elections the county election

14  officials do it, and for the Primary Election the political

15  parties do it, and for local entity elections they are

16  responsible for their own election but they sometimes contract

17  with a county to have assistance with the election.

18  Q.  To that end does the Elections Division make decisions on

19  where polling places should be located within a jurisdiction?

20  A.  We do not.

21  Q.  Does the Elections Division make decisions on what hours a

22  polling location will be open in jurisdiction?

23  A.  No.  If a county has a question about whether their hours

24  are appropriate we will tell them what the law says and they

25  have to set their own hours.

4313
KEITH INGRAM - DIRECT

1  Q.  Does the Elections Division make decisions on how polling
2  places will be set up?
3  A.  No.
4  Q.  And who makes these decisions?
5  A.  The local election holding entity, so whatever election it
6  is, emergency service district, county, they are the ones who
7  make the decision for their own polling places.  Like I said,
8  local subdivisions can contract that away to a county and then
9  the county will do all of the selecting for all of the
10  entities holding an election that date.
11  Q.  Does the Elections Division provide advice and assistance
12  to local election offices?
13  A.  Yes.
14  Q.  As director were you involved in the development of the
15  advice and assistance the Elections Division provided local
16  election offices?
17  A.  Yes.
18  Q.  How were you involved?
19  A.  It could come about several ways, but I was one of the
20  lawyers in the office and so it was usually our legal team
21  that was formulating what the advice and assistance our office
22  was going to be and I went to those meetings and participated
23  as a lawyer.
24  Q.  Did you sign off on the office's interpretation of new
25  election related laws before it was communicated to the

4314
KEITH INGRAM - DIRECT

1  public?

2  A.  Yes.

3  Q.  Are you familiar with the Elections Division's process for

4  developing communicating advice and assistance to counties?

5  A.  For new law obviously we have to determine whether or not

6  the proper communication is going to be a mass email or an

7  election advisory specific to that topic, and once that

8  decision is made we decide, you know, what we think needs to

9  be communicated and then it's assigned to a drafting attorney

10  and reviewed by the rest of us.

11  Q.  Are you familiar with the substance of the advice and

12  assistance that the elections division communicated to

13  counties while you were director?

14  A.  Yes.

15  Q.  Does this include the advice and assistance the election

16  division provided regarding SB 1?

17  A.  Yes.

18  Q.  This might go without saying but does the Elections

19  Division provide advice and assistance to local election

20  office on occasions where the Texas legislature amended the

21  election code or enacted legislation that affected Texas

22  elections?

23  A.  Yes.

24  Q.  In those instances where the legislature enacted new

25  legislation, were you involved in developing the Secretary of

1  State's interpretation of that law?

2  A.  I was.

3  Q.  Christina Adkins will address this in more detail later

4  on, but can you briefly explain to the Court how does the

5  Elections Division go about interpreting new law?

6  A.  Well, you know, the starting point of any interpretation

7  is the text of the statute, what does the legislature

8  communicate through the words they used in the law and, you

9  know, sometimes you look at a statute and you know that a

10  preexisting law might have an apparent conflict with it so we

11  have to come up with a way to harmonize those two to give them

12  both effect, and so a lot of the things that we do start with

13  the plain language of the statute and then anything that needs

14  to be harmonized, we do that.  Anything that needs to be

15  explained so that the election officials will know what's

16  expected of them, sometimes we do that.  We try not to stray

17  very far from the text.

18  Q.  Did you sign off on the office's interpretation of the new

19  election related laws before it was communicated to the

20  public?

21  A.  Yes.

22  Q.  Did this include the Election Division's interpretation of

23  Senate Bill 1?

24  A.  Yes.

25      I don't know at what point it's appropriate, it wasn't

4316
KEITH INGRAM – DIRECT

1  just the Elections Division that did these things.  If there

2  was something major that, you know, we thought might be an

3  issue, we wanted to make sure that all the other people

4  needed — who needed to know, knew what we were thinking and

5  agreed with it.  So that would include your office, the

6  Attorney General's office, it would also include the

7  Governor's office, and sometimes the legislative offices.

8  Q.  Does the Elections Division provide certain administrative

9  support to local election offices?

10  A.  We have that capability now that we didn't use to have.

11  You know, when you say "administrative support," I assume you

12  mean, you know, help them set up their office in determining

13  all of that.  So what we did a couple years ago, or several

14  years ago now, is come up with election security best

15  practices, and part of that was a data classification so we

16  want to make sure the counties know what to do with different

17  kinds of data and how sensitive it is.

18      But the biggest difference is that now we have election

19  security trainers, and whenever there's an office turnover in

20  Caldwell County they had a new EA a couple years ago and we

21  all heard about Gillespie County and its turnover in election

22  staff, we will go over and spend as much time as necessary

23  helping that office get up and running with the new

24  leadership.

25  Q.  As director did you oversee the administrative support

KEITH INGRAM - DIRECT

1  offered to local election officials?

2  A.  Yes.

3  Q.  And are you familiar with the administrative support the

4  Elections Division offered counties?

5  A.  Yes.

6  Q.  Does the Election Division maintain the State's official

7  voter registration list?

8  A.  We do.  That's one of the obligations we have under state

9  and federal law.

10 Q.  We'll discuss this more later in your examination, but can

11 you briefly explain how the Elections Division manages the

12 voter registration list?

13 A.  So the Help America Vote Act of 2022 is that every state

14 have an electronic database of the voter registrations in the

15 state and their current status.  Our office maintains that

16 database for the State.

17 Q.  Is there a group within the Elections Division that is

18 assigned responsibility over voter registration?

19 A.  Yes, they're a subset of the administrative section,

20 they're the voter registration team.

21 Q.  As director did the group that matched the voter

22 registration in TEAM's database report to you?

23 A.  They did through their manager.

24 Q.  Are you familiar with the Secretary of State's role in

25 voter registration?

KEITH INGRAM - DIRECT

1   A.  Yes.

2   Q.  And as a general matter are you familiar with the TEAM'S

3   database such as the information contained within the sources

4   from which this data is derived and the actions that the

5   Secretary of State's Office takes to ensure that the database

6   is accurate and up to date?

7   A.  Yes.

8   Q.  Does the Elections Division approve of and inspect voting

9   systems and equipment?

10  A.  That is one of our roles, yes, we certify voting systems.

11  Q.  Because of this are you familiar with the type of voting

12  systems and equipment used throughout the State of Texas?

13  A.  Yes.

14  Q.  Is the Secretary of State including the Elections Division

15  responsible for maintaining uniformity in Texas elections?

16  A.  Yes.

17  Q.  And how does the Elections Division maintain its

18  uniformity?

19  A.  Through our advice and assistance that we've talked about

20  before, election advisories, mass emails.  We make sure that

21  all of the counties and cities and schools and other political

22  subdivisions know what's expected of them in a particular

23  circumstance.

24      So whenever we're at candidate filing time and we do

25  trainings and put out materials regarding candidate filing,

4319

KEITH INGRAM – DIRECT

1  when it's time for the canvass we put out materials regarding
2  the canvass.  When it's time for election we put out materials
3  about activities in the polling place.
4  Q.  As part of its effort at maintaining uniformity, does the
5  Elections Division issue written directives and instructions
6  relating to state and federal election laws?
7  A.  Yes.
8  Q.  Does this include election advisories?
9  A.  It does.
10  Q.  Does the Elections Division draft advisories for every
11  provision in the election code?
12  A.  We do not.
13  Q.  In what circumstances does the Elections Division find it
14  necessary to issue election advisory?
15  A.  Usually advisories are reserved for more complicated
16  things we feel like are going to provoke on lot of questions
17  so if it's a change to the law, if we prophylactically believe
18  that it will have a lot of questions from the counties on
19  local election officials we'll do an advisory.  That's one of
20  the characteristics of an advisory that we believe it's a
21  topic that will generate questions.
22      The other way we do it is if we are getting a lot of
23  questions on a topic that we didn't necessarily expect but
24  it's clear that there's a need for more information on that
25  topic, then we'll do an advisory after the fact.

KEITH INGRAM - DIRECT

1  Q.  Are there any other directive the Secretary of State's
2  Office issues outside of election advisories?
3  A.  We also do mass emails, and then of course, one-on-one
4  emails from different counties about a particular matter.
5  Q.  Does the Elections Division publish election calendars?
6  A.  We do.
7  Q.  And what is an election calendar?
8  A.  An election calendar is a form of election advisory and it
9  is very detailed and gives all of the steps that a local
10  election official would need in order to hold a successful
11  election by date, so everything that has to happen to pull off
12  an election is put into the calendar with notes so that they
13  know, and the statutory reference so that they know what they
14  have to do throughout the entire election period.  It is
15  designed to be a roadmap for the election.
16  Q.  And does the Elections Division routinely make and keep in
17  the course of business election calendars?
18  A.  We do.
19  Q.  Brian, can you please pull up State Exhibit 15.
20      Do you have the document on your screen?
21  A.  I do.
22  Q.  Do you recognize this document?
23  A.  I do.
24  Q.  Can you please identify it?
25  A.  It looks like it's the election law calendar for the

KEITH INGRAM - DIRECT

1   May 7th uniform election date.

2   Q.  And is this a record that was made and kept in the course

3   of regularly conducted business activity?

4   A.  Yes.

5   Q.  And is it in the same or substantially similar condition

6   as when it would have been first created?

7   A.  Yes.

8   Q.  Was the record made at or near the time of the event that

9   it describes?

10  A.  It was.

11  Q.  And was the record made by a person with knowledge or

12  information transmitted by a person with knowledge and who

13  reported it?

14  A.  Yes.

15          MISS HUNKER:  Your Honor the State would like to move

16  to introduce State Exhibit 15.

17          THE COURT:  Fifteen, one five?

18          MISS HUNKER:  Correct.

19          THE COURT:  Any objection?

20          MR. KANTERMAN:  No, Your Honor.

21  BY MISS HUNKER:

22  Q.  Brian, can you please pull up State Exhibit 1.

23      Do you have the document on your screen?

24  A.  I do.

25  Q.  Do you recognize this document?

4322

KEITH INGRAM - DIRECT

1  A.  I do.

2  Q.  And can you please identify this document?

3  A.  This is the election law calendar for the November 8, 2022

4  General Election date.

5  Q.  Was this document routinely made and kept in the course of

6  business of the Secretary of State?

7          THE COURT:  Is there any objection to 21?

8          MR. KANTERMAN:  I don't believe so, Your Honor.

9          THE COURT:  Twenty-one is admitted.

10          MISS HUNKER:  Thank you, Your Honor.

11  BY MISS HUNKER:

12  Q.  As part of its efforts at maintaining uniformity, does the

13  Elections Division maintain an informal hotline to answer

14  inquiries from local election officials about election

15  administration?

16  A.  We do, we have a 1(800) number for the public and we have

17  a separate 1(800) number for election officials.

18  Q.  I think you may have hinted to the answer, but is this

19  hotline open to voters who have questions about voting?

20  A.  If they call on either one we'll answer the question.  The

21  one that's directed to the public is 252-vote, and that's the

22  one that's printed on all the materials every voter has in

23  their hand.

24  Q.  Through this hotline do elections officials contact you

25  when they have a question or a concern regarding the

4323
KEITH INGRAM - DIRECT

1  application, operation, or interpretation of election laws?

2  A.  I'm sorry, I missed the first part.

3  Q.  Sure.  Did election officials contact you through this

4  hotline directly when they had a question or concern regarding

5  application, operation, or interpretation of election laws?

6  A.  Yes.  They also sometimes have our direct lines and call

7  those.

8  Q.  And would election officials email the Secretary of

9  State's Office when they had a question or concern regarding

10  the application, operation, or interpretation of election law?

11  A.  Yes.

12  Q.  How frequently would county election officials contact you

13  with questions about Texas elections?

14  A.  We heard from counties every day.

15  Q.  Would the Election Division respond to these questions as

16  part of its regular course of business?

17  A.  Yes.

18  Q.  As part of its efforts maintaining uniformity, does the

19  Elections Division conduct seminars, conferences, and training

20  for election officials about election administration?

21  A.  We do.

22  Q.  Do these seminars, conferences, and trainings cover the

23  interpretation and implementation of new laws?

24  A.  They do.

25  Q.  As director were you present at these seminars and

KEITH INGRAM — DIRECT

1   conferences?

2   A.  I was.

3   Q.  What sort of topics did you present on?

4   A.  I would usually present on the legislative update.  When

5   voter ID was a new thing in the state, I insisted on doing

6   those talks myself as well because there were points I wanted

7   to make sure we emphasized.

8   Q.  And through these seminars did you instruct county and

9   other local election officials on proper interpretation of the

10  election code?

11  A.  Yes.

12  Q.  And through these seminars did you instruct county and

13  other election officials on best practices when conducting

14  elections?

15  A.  Yes.

16  Q.  Now we're going to discuss this more with Miss Adkins

17  later in the trial, but did the Elections Division conduct

18  seminars, conferences, and trainings for election officials

19  about Senate Bill 1?

20  A.  Yes.

21  Q.  You and I discussed the actions the Election Division

22  takes to promote uniformity.  Why does the Elections Division

23  work to advance uniformity in Texas elections?

24  A.  It's important for voters who move within the state to

25  have a uniform experience when they vote.  If they experience

4325

KEITH INGRAM - DIRECT

1  something different in the Panhandle than they do in San

2  Antonio, that might cause them concern.  So the idea is to

3  have the voting experience to be as uniform as possible so

4  that voters don't question what they see in a new place.

5      And it's important for the substantive reasons as well,

6  that the voter should have exactly the same opportunity and

7  experience to vote whenever they are in the state.

8  Q.  At the same time do all counties have the same needs and

9  resources?

10  A.  No.  There are vast differences in resource needs,

11  resources available.

12  Q.  Can there be benefits to giving counties some degree of

13  flexibility in how they conduct their elections?

14  A.  Sure.

15  Q.  Are there provisions in the election code that expressly

16  grant counties flexibility in how they conduct their

17  elections?

18  A.  Sure.

19  Q.  Can you provide me an example?

20  A.  Well, it's -- the one that's been in the statute the

21  longest is early voting hours.  You know, the first week it's

22  pretty uniform throughout the State.  The second week bigger

23  counties have more hours required and smaller counties don't

24  because they don't have as many voters and they don't need as

25  many hours.

4326

KEITH INGRAM - DIRECT

1  Q.  Are there provisions in the election code that impose
2  different obligations on counties based on their
3  characteristics such as population size?
4  A.  Yes.
5  Q.  Finally, are there provisions in the election code that
6  require counties to follow uniform policies and procedures?
7  A.  Yes.
8  Q.  And can you offer an example of that as well?
9  A.  Well, for instance, mail ballots.  There's a few specific
10 ways to return a mail ballot and it doesn't matter which
11 county you're in, that's the way mail ballots have to be
12 returned.
13 Q.  Under the election code does the Secretary of State's
14 office have the authority to receive complaints alleging
15 criminal conduct in connection with a Texas election?
16 A.  We do.
17 Q.  Would these complaints be handled by the Election
18 Division?
19 A.  They would.
20 Q.  Under the election code who had authority to submit an
21 election complaint?
22 A.  Anybody that had a complaint.
23 Q.  Once the Election Division received the complaint, how
24 would it process the complaint?
25 A.  It would first get logged into our complaint log by my

1  assistant and then my assistant would scan it in and email it

2  to me for review and a preliminary disposition.

3  Q.  While you were director who would review the complaint?

4  A.  I did.

5  Q.  When you conducted this review what were you looking for?

6  A.  I was looking for a prima facie case of an election crime,

7  so the specific standard in 31006 is reasonable cause to

8  suspect that a crime has occurred.  And, you know, since we

9  don't have any investigatory power, we take the facts in the

10  complaint as they are stated on their face.  We don't look

11  behind them.

12  Q.  When would your office refer an election complaint to the

13  Attorney General office?

14  A.  When we had reasonable cause to suspect that a crime had

15  occurred if everything in that complaint was true.

16  Q.  Mr. Ingram, I'm going to direct your attention to State

17  Exhibit 86, which begins with Bates number State 078237,

18  however we are providing the Excel version on the screen.  Do

19  you have that in front of you?

20  A.  I do.

21  Q.  Do you recognize this document?

22  A.  I do.  It looks like our complaint log for 2016, 2017.

23  Q.  And do you see the tabs on the bottom?

24  A.  I do.

25  Q.  And what years are there?

KEITH INGRAM – DIRECT

1   A.  There's also a tab for 2018 and 2019.

2   Q.  What information can be found in this document?

3   A.  So the — if we got the information from the complainant

4   we would have the date that we received it, the name of the

5   person making the complaint, a general statement of the nature

6   of the complaint, and then how it was resolved.

7   Q.  Is the complaint log in the same or substantially similar

8   condition as when it was prepared?

9   A.  Yes.

10  Q.  Was this document made and kept in the course of regularly

11  conducted activity of the Elections Division?

12  A.  It was.

13  Q.  Is it the regular practice of the Elections Division to

14  make and keep such records?

15  A.  It is.

16  Q.  Was this record created by a person with knowledge and was

17  acting in the course of regular course of business?

18  A.  Yes.

19       MISS HUNKER:  Your Honor, I move to admit State

20  Exhibit 86 into evidence.

21       THE COURT:  Any objection?

22       MR. KANTERMAN:  Yes, Your Honor, I think there are

23  several.  The first is hearsay.  This is clearly an

24  out-of-court statement being offered for the truth of the

25  matter asserted in it, number one.  Number two, the witness

1  testified that this is in the same or similar form as when it

2  was created, but looking at this document I see large swaths

3  of it which are either redacted or blanked out in some way, so

4  I suspect that it's inaccurate.  And on those basis I think at

5  the moment, Your Honor, I would object.

6          MISS HUNKER:  May I respond, Your Honor?

7          THE COURT:  Let's here them all.

8          MISS HOLMES:  I just also want the hearsay within

9  hearsay in the document and a description of the complaint.

10          MISS HUNKER:  So a couple things, Your Honor.  First,

11  this is a business record that's kept in the ordinary course.

12  The redacted versions are the entries that were not yet

13  resolved when this document was produced and therefore we are

14  claiming investigative privilege on those documents.  Now,

15  that's not going to be admitted through the course of evidence

16  because they are again redacted where the information can't be

17  obtained.

18          In addition, we're not asking for the truth of the

19  matter asserted, we're simply stating that the descriptions is

20  an accurate description of the complaint itself, not that the

21  complaint had information that is going to be true or

22  accurate.

23          What we're trying to show are the different types of

24  complaints that the election office receives, how they process

25  that and how that kind of influences how they conduct their

4330
KEITH INGRAM - DIRECT

1  advisories, as well as some of the actions that they'll take
2  throughout the course of either implementing SB 1 and other
3  legislation.
4          THE COURT:  So, just to be clear, this wasn't before
5  the legislature and these are just complaints and these aren't
6  final resolutions?
7          MISS HUNKER:  That's correct, Your Honor.
8          THE COURT:  I'll take this for what it's worth and
9  it's admitted.
10          MISS HUNKER:  Thank you, Your Honor Hunker.
11 BY MISS HUNKER:
12 Q.  Mr. Ingram, I'm going to direct your attention to the next
13 exhibit, specifically we'll be discussing State Exhibit 85
14 which has the Bates Number State 078234.
15     Do you have that on your screen?
16 A.  I do.
17 Q.  Do you recognize this document?
18 A.  It appears to be the complaint log for 2020.
19 Q.  And what information can be found in this document?
20 A.  The same sort of information that we discussed for the
21 other years, the date it was received, the name of the
22 complainant, the nature, general nature of the complaint, how
23 it was resolved, and when.
24          MISS HUNKER:  Your Honor, I plan on offering this for
25 the same purpose as the previous document but to save time

KEITH INGRAM - DIRECT

1  instead of going through the predicate I thought I would make

2  the same motion.

3         THE COURT:  Yeah, thank you.  I didn't get a number

4  on this one.

5         MISS HUNKER:  This is State Exhibit 85.

6         THE COURT:  Eighty-five.  Same objection, same

7  ruling.

8  BY MISS HUNKER:

9  Q.  Mr. Ingram, do all violations of the Texas Election Code

10 constitute voter fraud?

11 A.  No.

12 Q.  Are all violations of the election code criminal offenses?

13 A.  No.

14 Q.  Nevertheless, can a violation of the election code

15 constitute an irregularity?

16 A.  Yes.

17 Q.  Can violations of the election code undermine confidence

18 in election results?

19 A.  Yes.

20 Q.  Is this true even if the violation did not constitute

21 criminal conduct?

22 A.  Yes.

23 Q.  When you receive complaints do many of the complaints

24 concern alleged irregularities in violation of the election

25 code as opposed to criminal offenses?

4332

KEITH INGRAM — DIRECT

1   A.  I agree with that.

2   Q.  In the event you received a complaint alleging

3   irregularity or noncriminal violation of the election code,

4   how would the Elections Division handle the complaint?

5   A.  You know, if it's something that — you know, it just

6   depends kind of on the facts that are presented, but usually

7   if it's something that's correctable for the next election we

8   would send a response back to the complainant saying we

9   understand your concerns in this, we're concerned as well,

10  we're sending a copy of this complaint to the election

11  administrator of that county so that it can be addressed in

12  training of her staff or poll workers in the future.

13  Q.  Would the complaint be forwarded to the Attorney General?

14  A.  No.

15  Q.  Is this true even if the complaint contained evidence that

16  the violation occurred?

17  A.  Right.  I mean that's sort of what an irregularity is.

18  It's when a violation of an election code occurs that's

19  thought criminal.

20  Q.  And what is the purpose of taking these actions of

21  forwarding the complaint to the counties?

22  A.  So they can address it and it won't happen again so we

23  won't get further complaints regarding that issue from that

24  county.

25  Q.  Mr. Ingram, we have discussed at length the duties

KEITH INGRAM — DIRECT

1  performed by the Election Division and the Secretary of State

2  as well as the role you played as director.  I only have a few

3  more questions on this subject and then we can move on to the

4  next topic.

5  A.  Okay.

6  Q.  Through your work at the Secretary of State's Office have

7  you become familiar with the tasks and responsibilities that

8  county election offices must perform to run a successful

9  election?

10  A.  Yes.

11  Q.  Are you familiar with the dates those tasks and

12  responsibilities must be completed by?

13  A.  Yes.

14  Q.  Are you familiar with the time, money, and manpower it

15  takes for county election offices to meet those tasks and

16  responsibilities?

17  A.  In a general sense.  I don't have their schedule in front

18  of me, but yeah, the things that are more task and time

19  pressured and time sensitive I have a feel for.

20  Q.  Are you familiar with the laws and regulations with which

21  county offices must comply to plan, coordinate, manage, and

22  execute a successful election?

23  A.  Yes.

24  Q.  Mr. Ingram, we're going to be moving on to Senate Bill 1

25  and the events that led to its passage.  To facilitate our

4334

KEITH INGRAM - DIRECT

1  conversation I'm going to group the challenged provision for

2  SB 1 together and then proceed to discuss the disputed

3  controversies that prompted the change, the substance of the

4  change itself, followed by the law's implementation; however

5  before we begin that section, I wanted to give you the

6  opportunity to address a quote of yours that's been cited

7  multiple times in this litigation.

8      While you were Director of Elections did you on occasion

9  testify to legislature on behalf of the Secretary of State?

10 A.  I did.

11 Q.  What were some of the reasons you would testify before the

12 legislature?

13 A.  If they had a reason they would give an invitation, so

14 invited testimony, and then also as a resource witness.

15 Q.  In March 2021, were you invited by the election committee

16 to give an update on Texas elections?

17 A.  I was.

18 Q.  What was the subject of that testimony?

19 A.  How the elections went in 2020.

20 Q.  During your testimony did you say that "in spite of all

21 the circumstances Texas had an election that was smooth and

22 secure"?

23 A.  I did.

24 Q.  What did you mean by that sentence?

25 A.  I meant that in the middle of a pandemic the counties

KEITH INGRAM - DIRECT

1  successfully pulled off an election that was safe for the

2  voters and safe for the workers and was not a superspreader

3  event.  It was a remarkable performance of grace under

4  pressure, and I wanted to make sure that the counties got the

5  commendation that they be deserved.

6      You know, most of the time when you have an election, what

7  you read about the next day is the results, and that's the way

8  it should be.  That means the election went well.  But these

9  people worked their guts out for that to happen, for the news

10 to be the results and not anything that happened in their

11 office.  And I wanted make sure that they got the commendation

12 that so they richly deserved for pulling off, in a

13 presidential year, a safe, secure election, that that doesn't

14 mean it didn't have its share of issues throughout the state,

15 but in general it was a wonderful, wonderful example of

16 citizens doing everything they could to make it work.

17     It was wonderful.

18 Q.  By saying that the November 2020 election was smooth and

19 secure, did you mean to imply that there weren't any problems

20 or irregularity that arose that election?

21 A.  No.

22 Q.  Did you mean to imply that there weren't any

23 vulnerabilities in Texas elections that could be addressed?

24 A.  Absolutely not.

25 Q.  Did you mean to imply that there was no room for

KEITH INGRAM – DIRECT

1   improvement in how Texas runs its elections?

2   A.  No.

3   Q.  All right.  With that, let's move on to discuss the

4   articles of Senate Bill 1.

5       Brian, can you please pull up Joint Exhibit 1 and we'll

6   look at Article 2 first.

7       Mr. Ingram, what is the subject addressed by Article 2?

8   A.  Registration, voter registration.

9   Q.  And provisions in Article 2 deal with voter registration?

10  A.  Correct.

11  Q.  It seems as if we're going to understand how Senate Bill 1

12  changed voter registration it would be helpful to know how

13  voter registration works in Texas.  To that end, how does one

14  register to vote in Texas?

15  A.  Most people who register to vote in Texas do it at the

16  time they have a transaction with the driver's license

17  department of — the department — Department of Public

18  Safety.

19      Anyway, whenever anybody gets a driver's license they've

20  got the opportunity to use that information to register to

21  vote or to update their voter registration, and that is by far

22  the most common way we get voter registrations in Texas.  It's

23  up to ten times as many as the mail-in forms.

24      But we also have, as required by federal law, a postcard

25  that's already prepaid postage for people to fill out and send

KEITH INGRAM - DIRECT

1  to their voter registrar to register to vote as well.

2  Q.  Do you consider it easy to register to vote in Texas?

3  A.  Yes.

4  Q.  Why do you think it is easy to register?

5  A.  Well, because we've got the ability to use a driver's

6  license transaction and those are communicated to our office

7  electronically every day.  We also have, since SB 1, the

8  ability to do an online voter registration into a new county

9  that we didn't have before, so that's online voter

10  registration for new registrants.

11      And then of course we've got all of the Chapter 19

12  agencies that provide assistance to Texans, if they have a

13  disability or some other issue that requires them with every

14  transaction that they have with the welfare agency to be

15  offered the opportunity to register to vote.

16      And then of course we've got the postcard that the federal

17  law requires us to have, so we've got the national voter

18  registration card as well as a Texas specific one, we accept

19  both of those.

20  Q.  I want to break down your answer some.  If a voter wishes

21  to register to vote can they request a voter registration

22  form?

23  A.  Yes.

24  Q.  From whom might they request a voter registration form?

25  A.  They can request it from our office.  We send out

KEITH INGRAM - DIRECT

1  thousands of them every month.  Or they can request it from

2  their local voter registrar.

3  Q.  Can they also pick up a form at a library or other voter

4  registration entity?

5  A.  They can.

6  Q.  To whom should the voter send the registration form?

7  A.  It needs to go to the voter registrar of the county where

8  they reside.

9  Q.  What is a deputy voter registrar?

10 A.  A deputy voter registrar is somebody that has undertaken

11 the responsibility to accept completed voter registration

12 applications from voters and personally deliver them to the

13 election voter registrar.

14 Q.  And what role do they play in registering voters?

15 A.  They are volunteers who are interested in having as many

16 people register to vote as possible so they greatly increase

17 the number of registered voters and are useful addition to the

18 arsenal.

19 Q.  Do deputy voter registrars register voters out in the

20 community?

21 A.  Yes.

22 Q.  And you mentioned Chapter 19 organizations.  Can you

23 please tell us what this is?

24 A.  It's the organizations that, you know, federal law, the

25 National Voter Registration Act requires that all of the

KEITH INGRAM - DIRECT

1  agencies in the state that deal with poor and the disabled, to

2  provide an opportunity to register to vote with each

3  transaction of those folks.

4  Q.  You mentioned that voters were able to register to vote at

5  the Department of Public Safety.  How does registering at DPS

6  work?

7  A.  They are asked a question on the form, either online or in

8  an in-person transaction, if they want to use the information

9  that they have provided to register to vote or update their

10  voter registration.  If they say yes, the information is

11  automatically transmitted to us from either source.

12  Q.  And when might a voter register to vote through DPS?

13  A.  Anytime they have a transaction there.  If it's a new

14  license, if it's a renewal, if it's an update of their

15  address, if it's a change of name, any time they have a reason

16  to go to the DPS.  You know, older folks, when they don't

17  drive anymore, they can surrender their driver's license and

18  get an ID card instead.  All of those transactions would be a

19  voter registration transaction.

20  Q.  So if a voter is turning in their driver's license for a

21  personal identification card would they be given the option to

22  register to vote?

23  A.  Sure.

24  Q.  In the examples of when a voter could register to vote

25  that you gave, is that true even if the change is occurring

KEITH INGRAM - DIRECT

1  online?

2  A.  Yes.

3  Q.  In addition to registering to vote can a voter amend their

4  registration records at DPS as well?

5  A.  They can.

6  Q.  When might a voter amend their registration information?

7  A.  Whenever they have a transaction with DPS, so if they are

8  updating their name and their address, they can update their

9  voter record at the same time.

10 Q.  So does that mean if an older voter is going to DPS to

11 turn in their driver's license for a personal identification

12 card, they can be given the option to update their ID numbers?

13 A.  Sure.

14 Q.  In the other instances where a voter updates their voter

15 registration record, would they also have the opportunity to

16 update their social security number and Texas ID number?

17 A.  Yes.

18 Q.  The information the voter provides to DPS, is that

19 information sent to the Secretary of State?

20 A.  Yes.

21 Q.  Will it be added to TEAMs?

22 A.  Yes.  I mean, if it's a straight duplicate, then nothing

23 will change, but that happens sometimes.

24 Q.  So we talked about how and where a person may register to

25 vote.  I now want to ask what information must a voter include

KEITH INGRAM - DIRECT

1  on the registration form?

2  A.  They need their name and address.  If their mailing

3  address is different they need to supply it.  Their date of

4  birth.  And then of course Help America Vote Act requires

5  driver's license number, and if you don't have a driver's

6  license, the last four of your social.  And they've got to

7  aver that they are a citizen, over the age of 18, and not a

8  felon, on paper.

9  Q.  So to break that down, are voters required to enter their

10  state ID number if they haven't been — if they've been issued

11  one?

12  A.  Yes.

13  Q.  If a voter has not been issued a state ID number are

14  voters required to enter their social security numbers?

15  A.  Yes, the last four.

16  Q.  In the hierarchy we just discussed, was that stipulated in

17  the Help America Vote Act?

18  A.  It was, it's a part of HAVA.

19  Q.  What happens once a voter has submitted a complete

20  registration form to the county registrar?

21  A.  The county will enter that information.  Most counties

22  enter it directly into the TEAM database, but the off-line

23  counties will put it into their proprietary system for the

24  online counties, the live check will occur that night.  For

25  the off-line counties, the live check will occur the next

4342
KEITH INGRAM - DIRECT

1  night.

2  Q.  If an off-line county enters the data into their own

3  registration database, is that data communicated to TEAM?

4  A.  It is.

5  Q.  How is that data transferred to TEAM?

6  A.  There's a batch process overnight where it changes both

7  ways, so if we've got a change that the county needs and then

8  do any changes and updates that they've done during the day.

9  Q.  Is there also a monthly sync that occurs?

10  A.  There is a sync process, it only became monthly as a

11  result of SB 1.

12  Q.  And why did the Secretary of State's Office change the

13  frequency in which the sync process occurred?

14  A.  Sure.  The sync process covers any other differences in

15  the databases that aren't necessarily covered by the batch

16  process overnight.  So if we've got different precincts than

17  the county has, that's not going to show up unless we sync the

18  data, and so we need to make sure that everything that we've

19  got is what they've got and everything that they've got is

20  what we've got.

21      And that became more important obviously whenever we are

22  talking about DL numbers and social security numbers that are

23  required for voting by mail and the opportunity that we had to

24  collect numbers that we then had to transmit to the counties,

25  the most effective way to transmit them is through the sync

KEITH INGRAM - DIRECT

1  process to make sure that all the data is exactly the same.

2  Q.  You used the term "live check" earlier.  What is live

3  check?

4  A.  Live check is the identity check that's also required by

5  the Help America Vote Act.  It is a thing where we send to the

6  DPS the person's last name, former last name, date or birth,

7  and the number that they registered to vote with, and see if

8  it's the same data that DPS has in their database.  If they

9  use the last four of social, then DPS transmits it on through

10 their system to the Social Security Administration to do the

11 same check on former last name, last name, date of birth, and

12 the number provided to make sure they match.  If they match,

13 then the voter will be registered.

14 Q.  What happens if the State is unable to verify the State ID

15 or partial security number provided by the voter when

16 registering?

17 A.  Then the voter will get a notice of incomplete and has

18 ten days to either respond with different information or to

19 say no, that's the number that I have.

20 Q.  Who is eligible to vote in Texas?

21 A.  Citizens over 18 that aren't a felon on paper.

22 Q.  We spoke earlier about your office's management of the

23 voter registration database.  As part of your maintenance of

24 the registration list TEAM, does the Secretary of State remove

25 ineligible voters from the role?

KEITH INGRAM - DIRECT

1   A.  No.  We will send information to the counties to remove.

2   The only voters that the Secretary of State actually removes

3   themselves are strong match deceased.  Every other match,

4   strong or weak for any other category goes to the counties for

5   investigation.

6   Q.  You mentioned with the strong matched deceased voters, is

7   the Secretary of State required to remove those voters from

8   the rolls under federal law?

9   A.  Yes.

10      More specifically, the National Voter Registration Act

11  requires us to have a general program to remove ineligible

12  voters, including deceased, from the rolls.  It also requires

13  the State to undertake efforts to increase voter registration,

14  so it both requires us to keep the roles as clean as we can

15  and have programs in place to do so as well as to be able to

16  register new voters.

17  Q.  And how might a person become ineligible to vote?

18  A.  Usually by dieing.  Sometimes by changing address without

19  letting the registrar's office know, and then occasionally by

20  becoming a felon.

21  Q.  Outside of the fact that the maintenance of the rolls is

22  mandated by law, are there practical reasons why voter

23  registrars clean up their registration list?

24  A.  Absolutely.  It's in everybody's interest to have as

25  current and up-to-date voting list as you can have.  It's

4345

KEITH INGRAM - DIRECT

1  better for the voters, it's better for the poll workers, it's
2  better for the whole experience.
3  Q.  Does removal process vary depending on the reason a person
4  is removed from the rolls?
5  A.  Yes.
6  Q.  How does it vary?
7  A.  Well, there are, you know, the federal requirements in
8  NVRA for a change of address, so that's the longest time
9  period.  If someone does not respond to a notice of address
10 confirmation, then they will become a suspense voter and they
11 will stay in suspense for two federal elections until they are
12 removed from the rolls.  If they show up to vote anytime
13 during that suspense period they will be able to vote if they
14 fill out a statement of residence updating their address
15 information.
16     For any other reason, notice of examination for deceased,
17 citizenship, whatever else, if they don't respond within
18 30 days their voter registration will be canceled.
19 Importantly though, if they do show up to vote thereafter,
20 under 16037D they are to be reinstated immediately if their
21 cancellation was a mistake.
22 Q.  Brian, can you please pull up the National Voter
23 Registration Act.
24     Specifically we are looking at Section 20507.  And we're
25 going to be probably discussing subsection D.

KEITH INGRAM - DIRECT

1    Does the National Voter Registration Act lay out the

2  procedures that a state must follow to remove a voter from the

3  rolls?

4  A.  Yes.

5  Q.  In what circumstances are these procedures required?

6  A.  All of them.

7  Q.  What processes does the National Voter Registration Act

8  stipulate?

9  A.  Well, this is about the address change and what it

10 requires that a voter be inactive and remain inactive for two

11 federal elections before they can be removed from the rolls to

12 give them an opportunity to come back.

13 Q.  Does Texas comply with these procedures?

14 A.  Yes.

15 Q.  Focusing on noncitizens, does Texas remove noncitizens

16 from the State's registration rolls?

17 A.  We do.

18 Q.  In the past has the Secretary of State mistakenly

19 challenged a voter registration on the genuine belief that a

20 voter was a noncitizen?

21 A.  We have.

22 Q.  Can you please offer an example of when this occurred?

23      MR. KANTERMAN:  I'm going to object, Your Honor.  I'm

24 not sure this is particularly relevant.

25      MISS HUNKER:  Your Honor, there's still a claim on

4347
KEITH INGRAM – DIRECT

 1 | Section 2, Article 2.5, 06 and 07, and that all has to do with
 2 | cleaning of the voter registration rolls as well as the voter
 3 | registration process.
 4 |         THE COURT:  The objection is overruled.
 5 | BY MISS HUNKER:
 6 | Q.  I don't think I heard your answer.  Can you please offer
 7 | an example of when this occurred?
 8 | A.  In 2019 at the beginning of the year we engaged in a
 9 | process that we discovered very quickly had some issues with
10 | the data and that some voters would have received a notice.
11 | We put the word out pretty quickly not to send notices to any
12 | voters but some of them might have been challenged that
13 | shouldn't have been.
14 | Q.  Did this mistake lead to litigation?
15 | A.  Yes.
16 | Q.  And how did the litigation end?
17 | A.  It ended with a settlement agreement.
18 | Q.  What was the substance of the settlement agreement?
19 | A.  So the settlement agreement was that we could continue
20 | this process, this proactive removal of noncitizens from the
21 | list but that we needed to do it with some changes.  So if a
22 | voter under Real ID when they go to the DPS for a driver's
23 | license transaction, they have to either prove citizenship or
24 | lawful presence with documents.  And so if they say they are
25 | not a citizen and they prove it with a Visa, a Green Card, or

1  whatever else they've got that proves lawful presence, then

2  they can get a driver's license but we will get that

3  information that a voter came last week, a person came last

4  week and said "I'm not a citizen," we will then match that

5  information against our voter list, and if it's somebody that

6  was already registered to vote before their trip to DPS, they

7  are the ones who will be sent to the counties and sent a

8  notice of examination for citizenship.

9  Q.  And in response to the settlement agreement did the

10  Secretary of State's Office change its procedures?

11  A.  Yes.

12  Q.  Let's put up SB 1, Senate Bill Section 2.05.

13      Do you have that on your screen?

14  A.  Yes.

15  Q.  Can you please summarize what changes Section 2.05 made to

16  the election code?

17  A.  So this is the enactment into the code of the settlement

18  agreement.  It's putting into place what we had agreed to with

19  the plaintiffs after that litigation.

20  Q.  Did the Secretary of State change any of its practices,

21  procedures, or policies in response to Section 2.05?

22  A.  No.  We had already made those changes in response to the

23  settlement agreement.

24  Q.  And I want to address the two paragraphs of Section 2.05.

25  First the change that's made to Election Code Section 16.0332,

4349

KEITH INGRAM - DIRECT

1  subsection A.  It should be on the top.

2  A.  Yeah, I gotta go back.

3  Q.  Next page up.  Thank you.

4     How does the person indicate a lack of citizenship status

5  in connection with a motor vehicle or Department of Public

6  Safety record?

7  A.  Well, with the institution of Real ID they have to show

8  that they are eligible to be driver in the state of Texas, and

9  they either do that by showing citizenship or noncitizenship

10  but lawful presence.

11  Q.  Does a person have to positively assert that he or she is

12  not a citizen?

13  A.  They do.

14  Q.  In the event a person does indicate lack of citizenship,

15  what happens?

16  A.  Every week we get the information from statewide how many

17  of those people or who they are, we get that information and

18  compare it to the voter list to see if any of them were

19  previously registered to vote before the transaction of DPS.

20  Q.  And what role do the counties play?

21  A.  The counties do a notice of examination.  We send the

22  information to the counties and they will send the voter a

23  notice that says, you know, it appears that you're not a

24  citizen.  If you are a citizen, prove it within the next

25  30 days.

4350

KEITH INGRAM - DIRECT

1  Q.  So the changes made to the Texas Election Code

2  Section 16.033, subsection A, was that a codification of the

3  settlement agreement?

4  A.  It was.

5  Q.  Let's move on to the next paragraph.  And we're going to

6  be looking at the changes made to Section 16.0332(a)(1).

7      Was the Secretary of State already in agreement with the

8  Department of Public Safety to verify the accuracy of

9  citizenship status prior to the passage of Senate Bill 1?

10  A.  Yes.

11  Q.  When did the secretary enter into this agreement?

12  A.  It was subsequent to the settlement agreement.  We had to

13  come up with all the business practices.  I don't know for

14  sure when it was done.  Probably — it was sometime in the

15  winter of 1920.

16  Q.  Was it in response to SB 1?

17  A.  No.

18  Q.  The change is made to Texas Election Code Section 16.00 —

19  let me restate that.  The change is made to Section 16.0332,

20  subsection (a)(1) of the election code.  Was that in response

21  to the settlement agreement?

22  A.  It's a codification of the settlement agreement, yes.

23  Q.  And let's jump to the last next paragraph where it's

24  subsection D.  If we look at it, it states that the Secretary

25  of State shall prescribe rules.  Has the secretary done so?

KEITH INGRAM - DIRECT

1  A.  No.

2  Q.  Does it intend to do so?

3  A.  No.

4  Q.  Let's move on to Section 2.06, which is pages 8 and 10 in

5  SB 1.

6      And if you can please go to the next page, Brian.

7      Mr. Ingram, can you summarize what changes Section 2.06

8  made to the election code?

9  A.  Well, this part is a process for ensuring compliance by

10 voter registrars with things that occur that are requirements

11 imposed by subsection A.  I don't have subsection A in front

12 of me, but I believe it's three things that the counties could

13 trigger this process if they engaged in.

14 Q.  Let's take a look then at Texas Election Code 16 — sorry

15 18.065(a).

16     And so I see it has reference to three sections.  What are

17 those sections?

18 A.  So 18061 is the batch processing that we do with off-line

19 counties overnight.  15083, if I remember correctly, is the

20 counties are required to send us a list of voters that they

21 have in suspense.  And 16032 is the requirement to purge the

22 voters after they haven't voted in two federal elections after

23 being in suspense for two federal elections.

24     I could be wrong about 083 and 16032, but I think that's

25 what they are.

1  Q.  And so did Section 16.032 of SB 1 refer to compliance with

2  these three provisions?

3  A.  It did.

4  Q.  As a general matter did counties stay in substantial

5  compliance with obligations under Section 15.083, 16.032, and

6  18.061?

7  A.  Yes.  Yeah.  The suspense voters are now reported to us in

8  realtime.  We don't have separate lists that have to be

9  submitted, it's all in the electronic database.  16032, the

10 purge we did ourselves.  We're the ones that actually purge

11 those voters once we've finalized everything with the county

12 and they tell us they're ready to go, so there is no danger

13 that the county is not going to do that, we do it for them.

14     And then the last one, if they don't batch process

15 overnight, we, as a matter of course, send out a letter the

16 next day that says we didn't get a batch, you're in

17 noncompliance, you're not getting any Chapter 19 money, and

18 they always fix it quickly.

19 Q.  Were counties in substantial compliance with their

20 obligations under Section 15.083, 16.032, and 18.061 before

21 SB 1?

22 A.  Yes.

23 Q.  And did they remain in compliance after SB 1?

24 A.  Yes.

25 Q.  Why do counties as a rule remain in compliance with these

1  obligations?

2  A.  I mean the only one that they can really mess up is the

3  batch processing and that's the one that we send them a notice

4  and they fix because they want to keep their Chapter 19 money

5  coming.

6  Q.  To your knowledge has Section 2.06 prompted counties to

7  change their policies, practices, or procedures?

8  A.  No.

9  Q.  Since SB 1's enactment, has the secretary had to inform

10 the State that a county may be subject to a civil penalty?

11 A.  No.

12 Q.  Are you aware of any county that was, in fact, subject to

13 a civil penalty because they failed to be insubstantially

14 compliant with Sections 15.083, 16.032, and 18.061?

15 A.  No.

16 Q.  Let's move on then to Section 2.07 and Senate Bill 1.  Can

17 you please summarize what changes Section 2.07 made to the

18 election code?

19 A.  So the thing that they are adding here is to require

20 counties to provide information to us in the voter registrar.

21 If a voter — if a person reports that they are ineligible for

22 jury duty because they have moved out of the county.

23 Q.  And, Brian, can you take away the blow-up feature?

24      I see that the language in this section that refers to

25 noncitizens isn't underlined.  Did the election code already

4354

KEITH INGRAM - DIRECT

1  require the Secretary of State to compare its voter

2  registration list with the list of Texans exempted from jury

3  service due to a lack of citizenship prior to SB 1?

4  A.  Yes.

5  Q.  As such, did the Secretary of State make any changes to

6  policies, practices, or procedures regarding noncitizens in

7  response to Section 2.07?

8  A.  We did not.

9  Q.  To your knowledge did Section 2.07 prompt any change in

10 counties' policies, practices, or procedures regarding

11 noncitizens?

12 A.  No.

13 Q.  Was the change prompted by Section 2.07 instead focused on

14 residency?

15 A.  It was.

16 Q.  We discussed earlier the process for removing a voter due

17 to a possible change in residency.  To confirm, if a voter is

18 identified as being exempted from jury service due to

19 residency will the county follow the procedure stipulated in

20 the National Voter Registration Act?

21 A.  Yes.

22 Q.  Will the Secretary of State's Office?

23 A.  Of course.

24 Q.  Does this mean that the voter will still be able to vote

25 in the next election?

4355

KEITH INGRAM - DIRECT

1  A.  Yes.

2  Q.  And you've talked a little bit earlier about the suspense

3  process.  Can a suspense voter still vote?

4  A.  Yes.

5  Q.  What responsibilities does the Secretary of State have if

6  it should be determined that the voter is exempted from jury

7  service due to citizenship status or residency?

8  A.  I'm sorry, what?

9  Q.  What responsibilities does the Secretary of State's office

10 have if it should be determined that the voter is exempted

11 from jury service due to citizenship, status, or residency?

12 A.  Send the information to the counties for investigation.

13 Q.  Has the Secretary of State conducted any purges of state's

14 voter registration rolls in response to Section 2.05, 2.06, or

15 2.07?

16 A.  I don't know what you mean by "purge."  We have not done

17 any mass cancellations if that's what you mean.

18 Q.  That was, so thank you.

19     Let's move on to the Article 3 provisions.  We're going to

20 start with Sections 3.04, 3.12, and 3.13, which all deal with

21 drive-thru voting.

22     What is the difference between curbside voting and

23 drive-thru voting?

24 A.  Curbside voting is available to all voters at every

25 polling place and early voting on Election Day if they are

4356

KEITH INGRAM - DIRECT

1  unable to safely enter the polling place, it's under 61.009
2  under the code.
3  Q.  And how does drive-thru voting differ?
4  A.  Drive-thru voting, you don't have to have any sort of
5  issue with entering a polling place, it's just more convenient
6  to vote from your car.
7  Q.  Are you aware of any county that offered drive-thru voting
8  prior to 2020?
9  A.  No.
10  Q.  When did you first become aware of Harris County's
11  intention to offer drive-thru voting?
12  A.  In the middle of the 2020 pandemic situation we began an
13  advisory group with 30 or so counties, 31, including Harris
14  County, but a number of other large counties and small
15  counties with a good mixture of different voting equipment so
16  that we could get a good perspective, and it was during those
17  discussions, we would have a meeting every other Wednesday
18  unless there was a reason to be more often, and it was during
19  those discussions when these election administrators who we
20  felt were the cream of the crop if their going to be on our
21  advisory council, we are talked about different ways to
22  creatively make sure that voters and poll workers were safe
23  during this election process.
24      We got the opportunity to delay the Primary Run-off and to
25  delay the May elections because of the Governor's

4357

KEITH INGRAM - DIRECT

1  proclamations, and so that window of opportunity gave us the
2  time that we could plan for both the run-off and then for the
3  November Election.
4          THE COURT:  Was there anything in statute that
5  prohibited a county from doing drive-thru voting?
6          THE WITNESS:  No, sir.  What we told the counties is
7  the law says for early voting, that early voting has to be in
8  a structure and then the law says on Election Day it has to be
9  in a building.  It says if you're in a building and it's open
10 to all comers and, you know, if they get there by bicycle,
11 walking, or by car, then you should be able to do it.  That
12 was our office's position.  There were other people didn't
13 agree with us on that but we thought it was a creative way to
14 try to minimize contact between poll workers and voters.
15 BY MISS HUNKER:
16 Q.  When you first learned of Harris County's plan to offer
17 drive-thru voting, did you know at the time that Harris County
18 planned on using tents to host drive-thru voting?
19 A.  We did not.
20 Q.  Was it the Secretary of State's position that hosting
21 drive-thru voting in tents would not be in compliance with
22 election code?
23 A.  That I didn't think met the definition of a building.
24 That was a very interesting interpretation on their part, but
25 it just didn't really pass the smell test.

4358
KEITH INGRAM — DIRECT

1        THE COURT:  If that was the case why didn't you-all
2   seek injunctive relief at that point?
3        THE WITNESS:  Because the standard that we have to
4   use whenever we ask the Attorney General to get a mandamus or
5   injunction is whether or not the voters' rights are being
6   abused.  We didn't see any way in the world that drive-thru
7   voting was abusing voters' rights so we didn't think that
8   there was any way for us to act in that regard.
9   BY MISS HUNKER:
10  Q.  What was the basis for your interpretation that a
11  stationary structure would not encompass a tent?
12  A.  Because the Election Day provisions specifically says
13  "building," and we are supposed to interpret the early voting
14  provisions of the code in the same way as we do the Election
15  Day provisions, unless they are inconsistent with each other
16  or not, cannot feasibly be applied.  And so if the building is
17  the more strict standard, that applies to early voting as well
18  because it's not inconsistent and it can be feasibly applied.
19  Q.  Was it the secretary's understanding that Harris County's
20  drive-thru voting program violated the election code as
21  designed?
22  A.  We didn't have any idea that they were doing it that way
23  until our deputy secretary went down there for early voting
24  and put eyes on it.  So we didn't know ahead of time.
25  Q.  I'm going to introduce State Exhibit 138 on the screen.

KEITH INGRAM - DIRECT

1       Do you have that up on the screen in front of you?

2   A.  I do.

3   Q.  Do you recognize this exhibit?

4   A.  I do.

5   Q.  What is it?

6   A.  It's a letter from General Paxton to Texas election

7   officials calling into question whether or not drive-thru

8   voting was legal if it's not curbside voting.

9   Q.  And what position did the Attorney General take?

10  A.  That it was not legal.

11  Q.  Were you aware that the Attorney General issued a letter

12  to county election officials advising them that polling

13  locations must be located inside a building and that voting

14  from a car should be limited to those qualified to drive

15  curbside?

16  A.  Yes, I was aware of the letter.

17          MISS HUNKER:  Your Honor, I would like to introduce

18  State Exhibit 138 into the record.

19          THE COURT:  Any objection?

20          MISS TULIN:  It may already be admitted.

21          MR. WASSDORF:  That's what I have in my records as

22  well, Your Honor.

23          THE COURT:  Next question.

24          MISS HUNKER:  My apologies.

25

1  BY MISS HUNKER:

2  Q.  Let's pull up State Exhibit 140.

3      Mr. Ingram, I ask that you turn your attention to the

4  screen.  Do you recognize this exhibit?

5  A.  Yes.

6  Q.  What is it?

7  A.  It's Justice Devine's dissent from the order that denied

8  the petition for writ of mandamus on the drive-thru voting

9  lawsuit that was filed by Dr. Hoekstra.

10 Q.  Were you aware that litigation was filed against Harris

11 County challenging the county drive-thru's voting program?

12 A.  I was.

13 Q.  Were you aware that the petition for writ of mandamus made

14 it all the way up to the Texas Supreme Court?

15 A.  I was.

16 Q.  I'm going to have —— Brian, if you can highlight the text.

17     Can you please read that sentence?

18 A.  Yes.  You want me to read it out loud?

19 Q.  Yes, please.

20 A.  "Hollins contends that rows of semipermanent tents where

21 election officers stand awaiting dozens of cars inside of

22 which any voter may cast a ballot qualify as a polling place.

23 I struggle to see how the election code contemplates such a

24 novel concoction."

25 Q.  And let's go down to the first sentence the next

1  paragraph.  Can you please read out loud the highlighted text?

2  A.  "Hollins stretches the text of the code beyond its

3  historical and commonsense understanding."

4  Q.  Did the 2020 Election reveal a disagreement over whether

5  the election code permitted drive-thru voting?

6  A.  Yes.

7  Q.  And you can take that down, Brian.  Thank you.

8      And let's pull up Section 3.04.

9      Can you please tell me what changes Section 3.04 made to

10  the election code?

11  A.  It made it very clear that only curbside voters could vote

12  from their car.

13  Q.  And let's take a look at Section 312 on page 19 of SB 1.

14  Can you please summarize what changes Section 3.12 made to the

15  election code?

16  A.  It sort of changed the definition of the main early voting

17  location to be inside of the building instead of just at it.

18  And then if there was not a suitable building, then it needed

19  to be in another room inside the same building.

20  Q.  And finally, let's look at Section 3.13.  Can you please

21  summarize what changes 3.13 made to the election code?

22  A.  It got rid of the stationary structure language and made

23  it comport with Chapter 43 of the code that it's going to be

24  in a building for early voting as well.

25  Q.  Do these three provisions address the alleged ambiguity in

1  the Election Code of whether the Election Code permitted

2  drive-thru voting?

3  A.  Yes.

4  Q.  And did these provisions resolve that dispute?

5  A.  Yes.

6  Q.  Let's pull up State Exhibit 429.  Earlier in your

7  testimony you explained the complaint process.  I want to talk

8  about a complaint that your office received about drive-thru

9  voting.  And do you have that document on your screen?

10  A.  I do.

11  Q.  Do you recognize this document?

12  A.  I do.

13  Q.  What is it?

14  A.  It's a complaint from Rachel Hooper about the drive-thru

15  voting in Harris County that was sent to us after the

16  election.

17  Q.  Was this received by your office?

18  A.  It was.

19  Q.  Let's turn to page 2 in the complaint.  Was the Secretary

20  of State's Office alerted there was a potential reconciliation

21  problem at Harris County drive-thru voting locations?

22  A.  Yes.  We were informed about that, I believe it was in the

23  gap between early voting and Election Day.

24  Q.  And what was the alleged problem?

25  A.  There was a discrepancy between the people who had checked

KEITH INGRAM – DIRECT

1  in through drive-thru voting, the number of those versus the

2  number of votes that were showing up on what we call the JBC,

3  the judge booth controller, so the judge booth controller is

4  the thing that collects votes for several different voting

5  machines and it's what is scanned as a first instance for

6  unofficial vote results.

7  Q.  And did you hear about the potential reconciliation

8  problem from other sources as well?

9  A.  Yes.

10  Q.  And who were some of those sources?

11  A.  I'm not sure who all called me but it was several people

12  from Harris County.  Ed Johnson called me.  Alan vera called

13  me.  I believe I heard from Senator Bettencourt's office.

14  There were several people concerned at the time that there was

15  a discrepancy and there was a worry that votes hadn't been

16  properly accounted for.

17  Q.  Was this the same reconciliation problem identified by the

18  2020 audit conducted by the Secretary of State's Office?

19  A.  Yes.

20  Q.  And does the elimination of drive-thru voting through

21  Senate Bill 1 resolve the reconciliation problem identified in

22  the complaint?

23  A.  Yes.  I mean you can still have reconciliation issues but

24  what SB 1 did in addition to making sure that polling places

25  were located inside a building is it also requires a

KEITH INGRAM – DIRECT

1  reconciliation form be filled out at central count on the
2  night of the election as well as at the end of the canvass
3  period.  And that reconciliation form has been transformative
4  in the implementation of Texas elections and transparency.  It
5  is such a great thing that they put into law.
6  Q.  You state that the reconciliation form was transformative,
7  how it was transformative?
8  A.  Because now when election officials, after they finish
9  their count on election night, have to deliberately go through
10  and figure out how many mail ballots were sent out, how many
11  were accepted, how many people showed up to vote in person,
12  how many votes were counted, how many mail ballots have we not
13  received yet, how many provisional ballots were cast, and they
14  have to reconcile all those numbers.
15      Even though they are tired and have been working into the
16  night, they have to reconcile those numbers before we go home.
17  And we get a call at the end of the election night nowadays
18  that says I'm two off, I can't figure out where I'm two off,
19  help me walk through this.
20      And so the election officials take this form very
21  seriously and they do their best to make sure that all their
22  numbers reconcile.  It's a very — and then of course the law
23  requires that we post it on their website on the front page so
24  there's no hiding.
25              MISS HUNKER:  Your Honor, I would like to admit State

1  Exhibit 429 into evidence.

2       THE COURT:  Which one was 429?

3       MISS HUNKER:  That was the election complaint that we

4  just had on the screen regarding drive-thru voting.

5       THE COURT:  Any objection?

6       MISS HOLMES:  Yes, Your Honor.  We object on the

7  grounds of hearsay.

8       MISS HUNKER:  So, Your Honor, this isn't going to be

9  for the truth of the matter asserted.

10       If you can please put it up again.

11       There's a couple of purposes for us submitting it

12  into evidence.  If you notice on the bottom it has a Bates

13  number from the Texas legislature.  This was in fact part of

14  the legislative record and was referenced multiple times

15  during the course of the consideration of Senate Bill 1 as

16  well as the consideration of Senate Bill 7 before that, so

17  this sort of establishes that this concern of the

18  reconciliation was a matter before the legislature and again

19  as part of the consideration into SB 1.

20       It also shows that the audit was identifying a

21  concern that was raised before and so it goes to the weight of

22  credibility for the audit as well.

23       Now, we are not offering it for the truth of the

24  matter asserted, and we're certainly willing to state that as

25  part of an agreement with plaintiffs.  We already have the

KEITH INGRAM - DIRECT

1  testimony of Miss Doyer, which we think is far better evidence

2  than a complaint that was submitted a couple years ago.

3          THE COURT:  Anything else?

4          MISS HOLMES:  No, Your Honor.  If they are not

5  asserting it for the truth of the hearsay within the hearsay

6  document then —

7          THE COURT:  429 is admitted under that.

8          MISS HUNKER:  Thank you, Your Honor.  Also if I can

9  just request that as part of the record we redact the address

10 for Miss Hooper.

11         THE COURT:  We're not redacting anything, that's on

12 you-all.

13         MISS HUNKER:  Understood.

14         THE COURT:  You need to, when we get to the end of

15 this, submit a redacted version.

16         MISS HUNKER:  Thank you, Your Honor.

17 BY MISS HUNKER:

18 Q.  Mr. Ingram, I want to shift our focus to 24-hour voting

19 now.  Were you and the Elections Division aware that Harris

20 County kept several of its polling locations open for 24 hours

21 during part of the early voting period in November 2020?

22 A.  We were.

23 Q.  Is the Elections Division aware of any other county that

24 offered 24-hour voting that election?

25 A.  I'm not aware of any other county.  I know Bexar County

KEITH INGRAM – DIRECT

1  considered it but I don't think they did it.

2  Q.  Is the Election Division aware of any county that offered

3  24-hour voting prior to 2020?

4  A.  No.

5  Q.  In your experience, when do counties typically schedule

6  their voting hours?

7  A.  Usually in that second week of early voting.  The large

8  counties that are required to have 12 hours do it from 7 to 7.

9  Q.  And why do counties schedule voting hours this way, if you

10  know?

11  A.  I think it's just meant to match Election Day.  Election

12  Day specifically statutorily has to be from 7 to 7.

13  Q.  Based on your experience, are there practical problems to

14  having a polling place open for 24 hours?

15  A.  Yes.  Elections are logistically complex and there's a

16  number of scenarios that come up as voters present themselves

17  to vote that the processes could be impaired as people become

18  more fatigued throughout the night.  So the remedy for that

19  would be to swap in new poll workers which would require more

20  poll workers for early voting than you would normally have to

21  pay.

22  Q.  Can voters be confused when counties have different hours?

23  A.  Oh yes.

24  Q.  Can you think of examples of when voters would be confused

25  because counties had different hours?

KEITH INGRAM - DIRECT

1   A.  We found it a lot where there's a large county surrounded
2   by several rural counties that aren't covered by the same
3   statutory requirements, so they expect 12 hours of voting the
4   second week of early voting in their county and they are under
5   the 55,000 population threshold so they don't have it.  And
6   it's more exacerbated, the problem is more exacerbated when a
7   school district goes across county lines that have different
8   voting hours.
9   Q.  I'm going to pull up Section 3.09 of Senate Bill 1.  Can
10  you summarize the changes made to Section 3.09?
11  A.  So what they're trying to do is say that you've got to do
12  it for 12 hours and that those hours can only be between the
13  hours of 6:00 a.m. and 10:00 p.m.
14  Q.  And let's take a look at Section 3.10.  And what changes
15  were made by Section 3.10?
16  A.  It dropped the population threshold for extended hours the
17  second week from 100,000 to 55,000 so that more counties are
18  covered automatically by the longer voting hours.  And then it
19  also did the same change so that the 12 hours have to fall
20  between the hours of 6:00 a.m. and 10:00 p.m.
21  Q.  In your experience --
22  A.  One more thing it did.  It extended the Sunday voting from
23  five hours to six hours.
24  Q.  In your experience, do the hours of 6:00 a.m. and
25  10:00 p.m. capture the vast majority of voters?

4369

KEITH INGRAM - DIRECT

1  A.  I would think so, yes.

2  Q.  In your experience, do most counties offer hours that fall

3  within that range?

4  A.  Yes.

5  Q.  Do these two provisions increase the minimum number of

6  hours a polling place must be open during early voting?

7  A.  Yes.  And it also kept the language of at least 12 hours

8  to stipulate that if you do more than 12 hours you can't go

9  later than 10:00 p.m. or earlier than 6:00 a.m.

10  Q.  I think you mentioned earlier but did these provisions

11  lower the population threshold a county must meet before it

12  provides residents with 12 hours of voting on the last week of

13  early voting?

14  A.  That's right.

15  Q.  And do these provisions increase hours of voting over the

16  weekend?

17  A.  Yes.

18  Q.  When we discussed uniformity earlier you explained that

19  certain provisions in the election code give counties

20  flexibility in how they conduct their elections.  Do Sections

21  3.09 and 3.10 grant some counties some flexibility in what

22  hours they keep their polling locations open?

23  A.  Yes.

24  Q.  Do Sections 3.09 and 3.10 take into account counties

25  population size when donating the minimum and maximum hours

1  polling places should remain open?

2  A.  Yes.

3  Q.  Based on your experience, do the provisions balance the

4  State interest in uniformity with the recognition that

5  counties may have varying needs and resources?

6  A.  That balancing act is always present in elections.  It's a

7  policy decision for the legislature to decide where to draw

8  that balance.  This is one way to do it, yes.

9  Q.  Mr. Ingram, before we move on I want to draw your

10  attention to one more section or paragraph in Section 3.09.

11  Specifically the last paragraph which adds Section 85.005,

12  subsection D to the election code.  What is the effect of this

13  paragraph?

14  A.  So there's an Election Day rule that the voters in line to

15  vote at 7:00 p.m. get the opportunity to vote, so at the end

16  of the line they will place a placard that says nobody else

17  after this one.  They extended that to early voting as well.

18  Q.  And this increased the opportunity for voters to cast a

19  ballot?

20  A.  Yes.  If they arrive at the early voting location in time

21  to vote but they didn't make it in the door they will be

22  included in voting that day.

23  Q.  Let's move on to Section 3.15, which deals with

24  straight-ticket voting.  When did the legislature eliminate

25  straight-ticket voting?

KEITH INGRAM - DIRECT

1  A.  A long time ago, 2017 maybe.

2  Q.  When did that law take effect, if you remember?

3  A.  Before the 2020 Election, I believe.

4  Q.  Are you —

5  A.  '19, I don't know.  It was in the future and it was out by

6  2020.

7  Q.  Are you aware of any counties that offered straight-ticket

8  voting in November 2020?

9  A.  No.

10  Q.  Are you aware of any counties that offered straight-ticket

11  voting when SB 1 took effect?

12  A.  No.

13  Q.  Can you please explain what changes Section 3.15 made to

14  the election code?

15  A.  So it says a voting system ballot can't be arranged in a

16  manner that, you know, you can't do a swipe down the screen

17  and straight-ticket vote.  So it's kind of an emphasis on the

18  fact that straight-ticket voting, one punch straight-ticket

19  voting is not legal and you can't do the same thing in a

20  different way I think is what this was for.  There was —

21  anyway — that's it.

22  Q.  Are you aware of any county that has voting equipment that

23  allow a political party's candidate to be selected in one

24  motion or gesture?

25  A.  No.  I know that the ExpressVote XL is a system that is

4372

KEITH INGRAM - DIRECT

1  certified for use in Texas could be arranged in this way but

2  no county uses that system.

3  Q.  Are you aware of any county that is currently considering

4  purchasing that system that would allow a political party's

5  candidates to be selected in one motion or gesture?

6  A.  No.  And it's not that the system allows it.  It's that

7  the ballot can be arranged on the screen to allow it.  And

8  that's what this would prohibit.  So if somebody had that

9  system, our office would have to review the ballot because

10  it's a condition of certification now that it can't arrange

11  the candidates in this way.

12  Q.  Let's turn our attention to Article 4 in Senate Bill 1.

13  We're going to discuss poll watchers first then we will

14  address article 4.12 which deals with in-person delivery of

15  mail ballots.  Before Senate Bill 1's passage did the

16  Secretary of State's Office understand poll watchers to have

17  the right to observe election-related activity?

18  A.  Yes.

19  Q.  Before Senate Bill 1's passage did the Secretary of

20  State's Office understand it being an offense to knowingly

21  prevent a poll watcher from observing election-related

22  activity that they were entitled to observe?

23  A.  Yes.

24  Q.  Before Senate Bill 1's passage did the Secretary of

25  State's Office understand poll watchers to have the right to

KEITH INGRAM - DIRECT

1  free movement or where election activity was occurring?

2  A.  Yes.  They needed to be able to get conveniently near

3  enough to observe the activity wherever it was in the

4  location.

5  Q.  What was the basis for these beliefs?

6  A.  What was the basis for what?

7  Q.  What was the basis for this understanding of the

8  election —

9  A.   It's because they have the right and the duty to observe

10 election activities in either a polling place or central count

11 or the ballot board, whatever they are, and the law at the

12 time said that they could be conveniently near enough to

13 observe the activity, and so that's always been our position,

14 that you can't put them in a designated location where they

15 can't see what's going on.

16 Q.  Does the Secretary of State's Office advise county

17 election officials and county poll workers that poll watchers

18 have the right to view election-related activity without being

19 obstructed?

20 A.  Yes.

21 Q.  Did the Secretary of State's Office advise county election

22 officials and poll workers that poll watchers had the right to

23 move around the area to view election-related activity?

24 A.  Yes, we did.

25 Q.  Despite this advice did you receive complaints alleging

KEITH INGRAM - DIRECT

 1 | that a county or election worker would prevent poll watchers
 2 | from observing appropriate election-related activity?
 3 | A.  Yes.
 4 | Q.  Did your office receive complaints alleging that either a
 5 | county or election worker would deny poll watchers' free
 6 | movement?
 7 | A.  Yes.
 8 | Q.  Did your office receive complaints alleging county or
 9 | election workers would sequester the poll watchers where the
10 | election activities were taking place?
11 | A.  Yes.
12 | Q.  Can you please provide an example of these instances.
13 | A.  Sure.  It seemed to be in central count more than in
14 | polling places, but occasionally we would get a call from a
15 | polling place.
16 |     In central count, some counties, the larger counties,
17 | Dallas, Travis, Bexar, they would put the poll watchers
18 | outside of the central count room and let them watch through
19 | glass the central count activities.
20 |     And we consistently told those counties that is not okay.
21 | You can't do that.  You have to let the poll watchers into the
22 | room to observe the activity upclose.  You can't keep them
23 | behind glass.
24 |     In 2020 the six-foot rule was in the guidelines that
25 | everybody needed to be six feet away from each other and so

4375
KEITH INGRAM - DIRECT

1  when a poll worker would get closer — or a poll watcher would
2  get closer than six foot to either a poll worker or voters in
3  the polling location, we got complaints about that.  That was
4  the first time we had really heard about complaints in the
5  polling location but it was because of the pandemic.
6  Q.  Did these incidents arise from disputes on how to
7  interpret the election code?
8  A.  Well, these disputes arose because watchers wanted to
9  watch and people didn't want them to watch.
10  Q.  Were there disputes over how to interpret the word
11  "conveniently?"
12  A.  You know, I don't remember any specific disputes about
13  conveniently near, but our position was when we talked to the
14  county election officials you can't keep them sequestered in
15  the corner, they need to be able to go.  If you don't have
16  enough room in the room for all the poll watchers at once then
17  you need to come up with a rotation schedule.
18  Q.  Based on your observations did these disputes intensify
19  during the November 2020 General Election?
20  A.  Yes.
21  Q.  What form did these disputes take?
22  A.  A call to our office in the first instance and then
23  subsequent to the election complaint, election law complaints
24  filed with our office.
25  Q.  Did any litigation result from these disputes?

KEITH INGRAM - DIRECT

1  A.  I believe so.  I think there was a Travis County case that
2  went up the chain.
3  Q.  Were these disputes publicized in newspapers?
4  A.  Yes.
5  Q.  Are there benefits to having poll watchers observe
6  elections?
7  A.  Yes.
8  Q.  What are those benefits?
9  A.  Well, I mean, it's kind of twofold.  If there's a problem
10  in the election the poll watchers can identify it, report on
11  it, and it can be the basis for an election contest, but more
12  often the -- what results is the poll watcher comes in with
13  suspicion and the belief that things were going to be
14  nefarious and they walk away impressed at how many procedures
15  and mechanisms are in place to prevent problems, and so you
16  know that's the whole notion of transparency as I've been
17  teaching it in my role as director of the Elections Division
18  was, counties, you're doing good work on the elections, and
19  you're doing good work on election security, let people see
20  it.  Let them see it.  Right up close.  Don't hide.  When you
21  hide, they think you're doing something wrong.  Don't hide.
22  Be open.
23  Q.  What consequences can result when poll watchers are
24  prevented from observing the election?
25  A.  They can believe that something is going on behind that

KEITH INGRAM – DIRECT

1  closed door that they can't see.

2  Q.  Mr. Ingram, I'm going to bring up State Exhibit 146.  Do

3  you have that on your screen?

4  A.  Yes.

5  Q.  Do you recognize this exhibit?

6  A.  Yes.

7  Q.  And what is it?

8  A.  It looks like it's a filed Rule 11 agreement on the

9  Travis County litigation.

10  Q.  And do you see the top where it says "Ken Paxton?"

11  A.  Yes.

12  Q.  Let's go to the last page.  The signature page.  I should

13  have specified.

14      And who was this particular letter signed by?

15  A.  Oh, okay.  So it was an amicus.  My mistake.

16  Q.  And so who signed this particular document?

17  A.  It looks like Kyle Hawkins.

18  Q.  Was Kyle Hawkins the solicitor general of Texas at the

19  time?

20  A.  He was.

21  Q.  And can you just describe this letter once more, since it

22  seems you have a —

23  A.  Yeah.  It appears that there was litigation going on

24  between the Republican Party of Travis County and Dana

25  DeBeauvoir and this was the Attorney General expressing their

4378

KEITH INGRAM - DIRECT

1  view on the matter in the amicus form.

2  Q.  And, Brian, can you please go to the highlighted sentence.

3      And can you please read the highlighted sentence,

4  Mr. Ingram?

5  A.  "Poll watchers decrease the opportunity for fraud."

6  Q.  Does the Secretary of State's Office agree with this

7  statement?

8  A.  Yes.

9  Q.  Why does the Secretary of State's Office agree?

10  A.  Because when you've got sunshine on the process it

11  prevents badness.

12  Q.  Let's go to another section.  Can you please read out loud

13  this sentence, Mr. Ingram?

14  A.  Yes.  It says, "poll watchers are also valuable even when

15  nothing nefarious is afoot.  Their presence allows courts to

16  dispel doubts about election integrity."

17  Q.  Does the Secretary of State's Office agree with this

18  statement?

19  A.  I agree.

20  Q.  Why does the Secretary of State's Office agree?

21  A.  Because it's for the reasons that I told you before that

22  if you've got a partisan poll watcher from both sides watching

23  the process and then they come to court and say, you know,

24  everything was above board and I got it see it all, then that

25  allows the Court to dispel doubts.

4379

1  Q.  Are you aware of occasions where poll watchers vouched for

2  the integrity of the election process?

3  A.  Yes.

4  Q.  Are poll watchers able to vouch the integrity of an

5  election if they are prevented from observing what is

6  happening?

7  A.  They are not.

8          MR. KANTERMAN:  Objection, Your Honor.  Calls for

9  speculation.

10          THE COURT:  That's overruled.

11          THE WITNESS:  They are not.

12  BY MISS HUNKER:

13  Q.  As a rule, does the election code make it a point to

14  promote transparency?

15  A.  Yes.

16  Q.  And do poll watchers advance transparency?

17  A.  They do.

18  Q.  What other provisions advance transparency in the election

19  code regarding poll watchers provisions?

20  A.  The reconciliation form that I've discussed before, the

21  fact that all the logic and accuracy testing before an

22  election is a public event and must be given proper notice

23  under the Open Meetings Act, the fact that we have a public

24  hearing with regard to certification of new voting systems

25  that anybody can walk in and participate in, and believe me,

KEITH INGRAM - DIRECT

1  sometimes they do.

2      And all of those things are designed so that the public is

3  aware of what's going on in their election system and have the

4  opportunity for input if they think it's not good.

5  Q.  Did you sit on the committee hearings involving Senate

6  Bill 1 and its predecessor bills?

7  A.  Yes.

8  Q.  Did witnesses and members of the public raise concerns

9  about poll watchers being obstructed from watching

10 election-related activities during those hearings?

11 A.  Yes.

12 Q.  Mr. Ingram, let's talk about Section 4.01.  What does this

13 provision address?

14 A.  It's adding to the provision in the election code that

15 says that a presiding judge has the power of a district judge

16 on Election Day and is responsible for keeping the peace.

17 This is adding a couple of subsections to that piece of

18 statute.

19 Q.  I notice that the entirety of this section is underlined.

20 Did this add a new subsection to the election code?

21 A.  Two of them.

22 Q.  Prior to Section 4.01 of SB 1 was there a provision that

23 expressly granted a presiding judge authority to remove a poll

24 watcher?

25 A.  No.  It said that he had the — or she, has the power of

4381
KEITH INGRAM - DIRECT

1  the district judge on Election Day and they're responsible for
2  keeping the peace, and if there's a breach of the peace for
3  removing the ones that are responsible.  So if a poll watcher
4  was breaching the peace they could remove them under that
5  provision, the previous version 32075.
6  Q.  Is it that the authority was implied elsewhere in the
7  code?
8  A.  Yeah.  I mean the question would have been what's a breach
9  of the peace, but, you know, if it's a breach of the peace the
10  authority was explicit that they had the authority to eject
11  whoever it was.  The only constrain on that was if it was a
12  voter and they hadn't voted yet, they had to be allowed to
13  vote before they were ejected.
14  Q.  Did the code prior to SB 1 stipulate the specific
15  conditions that must be met before a presiding judge could
16  remove a poll watcher without being guilty of obstruction?
17  A.  No.
18  Q.  Did Section 4.01 address that uncertainty?
19  A.  Yes.
20  Q.  How did it do so?
21  A.  It provides sort of two different ways to justify ejecting
22  a poll watcher.  One of them is if there is a breach of the
23  peace or violation of the law, penal code, and the other one
24  is if there is a violation of the election code that's
25  observed.

4382
KEITH INGRAM - DIRECT

1  Q.  In the Secretary of State's view is the provision giving

2  presiding judges more authority to remove poll watchers or

3  less?

4  A.  From our point of view it's the same as it was before with

5  more words.

6  Q.  Are you aware of any reported incident where an election

7  judge wished to remove a poll watcher because of a poll

8  watcher's behavior but was unable to do so because of Senate

9  Bill 1?

10  A.  No.

11  Q.  Are you aware of any election judge that is being

12  prosecuted for improperly removing a poll watcher on account

13  of Senate Bill 1?

14  A.  No.

15  Q.  Let's move on to Section 4.06.  You should see it on your

16  screen momentarily.  Based on prior testimony plaintiffs

17  appear to object specifically to the provision codified as

18  Texas Election Code Section 33.051G.  Let's take a look at

19  that.  Can you please explain what, if anything, this

20  provision changed?

21  A.  I don't see it.

22  Q.  Should be page — there we go.

23  A.  Okay.

24  Q.  Can you please explain what, if anything, this provision

25  changed?

4383
KEITH INGRAM - DIRECT

1  A.  It made what I would consider one of the forms of

2  obstructing a poll watcher, not accepting for service a

3  specific crime and made it a Class A misdemeanor, regular

4  instruction of a poll watcher was a Class B misdemeanor.

5  Q.  Brian, can you please put up the Senate Bill 1 version of

6  the provision.  It should be on page 27 line 12 through 15.

7  And why do you say that it didn't really change anything?

8  A.  Because if you refuse to allow a poll watcher into your

9  location that's properly appointed, that's obstructing a poll

10 watcher.  It's a Class B misdemeanor.  I would have referred

11 that to the Attorney General.

12 Q.  Was it the Secretary of State's understanding that denying

13 a duly-appointed poll watcher was a criminal offense pre-SB 1?

14 A.  Yes.

15 Q.  Did the Elections Division advise counties and election

16 workers that failing to accept a duly-appointed poll watcher

17 was a criminal offense?

18 A.  Yes.

19 Q.  What are the requirements that a poll watcher must meet to

20 be accepted for service?

21 A.  They have to be properly appointed by an appropriate

22 participant in the election and they have to have completed

23 Secretary of State training and have a certificate of

24 completion.

25 Q.  Are these requirements expressly stipulated in the

1  election code?

2  A.  Yes.

3  Q.  Are you aware of any election judge that is being

4  prosecuted for knowingly denying a poll watcher for service on

5  account of SB 1?

6  A.  No.  We had a complaint about it in Hays County but those

7  watchers we didn't believe were properly appointed.

8          THE COURT:  Let me make sure I understand that.  So

9  these poll watchers were complaining that they were —

10          THE WITNESS:  Obstructed.

11          THE COURT:  — obstructed from — and you determined

12  that they were not actually a certified poll watcher?

13          THE WITNESS:  That's correct.  What they were trying

14  to do is they had a blank certificate of appointment that was

15  signed by the candidate but it didn't specify a location and

16  so they were walking into a location that they hadn't been

17  appointed to specifically.  They didn't even — you know, they

18  could have filled that part out in their car and walked in and

19  that would have been fine, but it was blank and we didn't

20  believe that was a proper certificate of appointment for that

21  particular location.

22          THE COURT:  So this was against the election judge?

23          THE WITNESS:  I don't know if it was central count or

24  ballot board or the polling place.  It was in Hays County and

25  there was a group of poll watchers who all had these blank

KEITH INGRAM – DIRECT

1   certificates.  We did not refer to the Attorney General.

2           THE COURT:  Why not?

3           THE WITNESS:  Because we explained to the

4   complainants that they needed to be — to be a proper

5   appointment they needed to be appointed to each location and

6   they needed to have a separate appointment sheet for each

7   location.

8           THE COURT:  But weren't they interfering with the

9   election judge or the officials in the central ballot area?

10          THE WITNESS:  Not if the poll watcher is not properly

11  appointed, no, sir.  The appointment procedure is pretty

12  specific in —

13          THE COURT:  But if they are causing a disturbance and

14  saying, I'm a poll watcher, the election judge has to deal

15  with that, don't they?

16          THE WITNESS:  Sure.  Absolutely.

17          THE COURT:  And so there are no ramifications that

18  occur under that scenario?

19          THE WITNESS:  Not usually.  I don't know if you mean

20  ramifications for the election worker or the poll watcher.

21          THE COURT:  The unauthorized poll watcher.

22          THE WITNESS:  Usually they are just ejected from the

23  premises.  If they won't leave voluntarily, the sheriff is

24  called or a constable is called and they are forcibly removed.

25  That's what normally happens.  The situation in Travis County

1  that Jennifer Fleck filed a complaint with our office about

2  that we did refer to the Attorney General, she was removed

3  forcibly by the constables.

4  BY MISS HUNKER:

5  Q.  Let's move on to Section 4.07.  Based on prior testimony

6  plaintiffs appear to have objected to provisions, the

7  provision codified as Texas Election Code, Section 33.06A and

8  the provision codified as Texas Election Code 33.056E and

9  we're going to address those in turn.

10     The provision codified as Texas Election Code Section

11  33.056A, states that a poll watcher is entitled to sit or

12  stand near enough to see or hear, did it expand a poll

13  watcher's prerogative to observe election-related activity?

14  A.  No.  From our perspective, conveniently near and near

15  enough to see and hear were the same thing.

16  Q.  Did it expand the activities that a poll watcher could

17  observe?

18  A.  No.

19  Q.  Did it change where a poll watcher could position

20  themselves at a polling election or central count?

21  A.  No.

22  Q.  What effect, then, did it have?

23  A.  I don't know that it had any substantive effect.  It

24  changed the standard from conveniently near to near enough to

25  see and hear.  Substantively to our mind, that's the same

1  thing.

2  Q.  Was it the Secretary of State's understanding that poll

3  watchers were already entitled to sit or stand near enough to

4  see and hear election-related activities pre-SB 1?

5  A.  Yes.

6  Q.  What is the basis for this position?

7  A.  Because they have to be able to usefully observe the

8  activities and useful observation includes both seeing and

9  hearing.

10  Q.  The provision codified as Texas Election Code Section

11  33.056E which states that a poll watcher may not be denied

12  free movement, did that expand a poll watcher's prerogative to

13  observe election-related activity?

14  A.  No.

15  Q.  What effect did it have?

16  A.  No substantive change.  It's just spelling out that

17  sometimes they need to move around.  We already believed that

18  to be the case.

19  Q.  And what was the basis for this position?

20  A.  Because if they are going to be close enough to observe

21  election activities that means they need to get around to see

22  it.  What they can't see is the same thing they couldn't see

23  before, which is voters voting.  That was against the law

24  before and it's against the law now.

25  Q.  Looking beyond Section 4.07 in SB 1, does the election

KEITH INGRAM - DIRECT

1  code specify actions that a poll watcher cannot take?

2  A.  Yes.

3  Q.  Were these prohibitions affected by Section 4.07 in Senate

4  Bill 1?

5  A.  No.

6  Q.  Are you aware of any election judge that is being

7  prosecuted for violating Section 4.07?

8  A.  No.

9  Q.  I want to quickly go back to Section 4.06 which had to do

10  with certification of a poll watcher.  Did Senate Bill 1 add

11  more requirements to the certification process of this poll

12  watcher or did it lesson them or have no effect?

13  A.  No.  It increased the requirements by making them sit

14  through a training that's produced by our office.

15  Q.  Let's go to Section 4.09.  Can you please explain what, if

16  anything, this provision changed?

17  A.  I don't believe it made a substantive change.  I think it

18  just spells out what obstruction means.  It's just keeping

19  them from useful observation.

20  Q.  As understood by the secretary has the language in

21  Section 4.09 altered the standard had that would govern the

22  obstruction of poll watchers?

23  A.  No.

24  Q.  What is the basis for this position?

25  A.  Because that's the whole point of obstruction of a poll

4389
KEITH INGRAM - DIRECT

1  watcher is that you're keeping them from observing the
2  activity.  This makes that explicit but it didn't change what
3  was obstruction before.
4  Q.  What does Section 4.09 do then?
5  A.  It just makes clear that if you're keeping a poll watcher
6  from reasonably observing activity, then you're going to be
7  guilty of obstruction so it puts more meat on the bone, more
8  words.
9  Q.  Are you aware of any election judges currently being
10 prosecuted for violating Section 4.09?
11 A.  No.
12 Q.  Did the Election Division notice a drop in the number of
13 disputes between poll watchers and election workers following
14 the passage of Senate Bill 1?
15 A.  Yes.
16 Q.  And what do you attribute the decline to?
17 A.  I attribute the decline to the training.  I think that
18 poll watchers didn't really understand their role and they
19 were coming into a polling place thinking that they were
20 supposed to -- I don't know, audit the election in realtime,
21 and the training makes clear that the law says their role is
22 to see and hear, to watch.  That's right there in the name,
23 poll watchers.
24     And so if they are using their mouth and obstructing and
25 disrupting, they are not doing their job.  Their job is to

1  listen, observe, make notes.  If they do see something that

2  needs to be corrected, to approach the presiding judge about

3  it, but never ever ever harass voters, never ever talk to

4  voters.

5      So the fact that all of that is made explicit in our

6  training gave them a very clear expectation of what their role

7  is and it reduced the number of conflicts dramatically.

8  Q.  Based on your observations did poll watchers have a better

9  understanding of their responsibilities and limitations under

10 the election code following the training?

11 A.  Exactly, yes.

12 Q.  Mr. Ingram, I want to shift topics now to Section 4.12,

13 which unlike the previous sections in Article 4, deal with

14 in-person delivery of mail voting.  Prior to SB 1 what options

15 did a voter have to return their marked mail ballot?

16 A.  They could return it by mail.  They could return it by

17 common or contract carrier or they could personally deliver

18 their own ballot to the main early voting location on Election

19 Day.

20 Q.  Not including mail boxes, was utilizing a drop box one of

21 those options?

22 A.  No.

23 Q.  Has Texas ever allowed drop boxes?

24 A.  No.

25 Q.  Can you please explain the difference between a drop box

1  and the in-person delivery of a mail ballot?

2  A.  The in-person delivery of a mail ballot that can be done

3  is your own ballot and you have to show ID and sign a roster

4  when you turn it in.  Before SB 1 the roster signing — the ID

5  requirement was there but the roster signing was something

6  that our office recommended as a best practice.  It's now in

7  the law.  But it's not taking a bunch of mail ballots to a

8  drop box and anonymously putting them in the slot.  That's

9  never been allowed in Texas.  And it's still not.

10  Q.  So when Harris County organized multiple in-person

11  delivery locations during the 2020 Election were these sites

12  located at a county clerk's office?

13  A.  Yes.

14  Q.  Let's pull up Senate Bill 1 once more, looking at Section

15  4.12.  Prior to SB 1 when a voter returned their marked ballot

16  in person, were the ballots received by an election official

17  at the time of delivery?

18  A.  Yes.

19  Q.  And prior to SB 1 did your office advise counties to

20  record the voter's name, signature, and type of

21  identification?

22  A.  Definitely their name and signature.  I don't know if we

23  required the type of ID.

24  Q.  Why did your office advise counties to do this?

25  A.  So that they would have a record of how those ballots were

KEITH INGRAM - DIRECT

1  delivered.  Usually we want to make sure in an election that
2  there's a record of every transaction so that if anybody wants
3  to look at it later they can go back and satisfy themselves
4  that everything was done correctly.  You know, the whole point
5  of having a challenge-free election is to have a transparent
6  election.
7  Q.  Was this a best practice?
8  A.  Yes.
9  Q.  What effect did Section 4.12 have?
10 A.  As I said, it codified our requirement that the counties
11 provide a roster for hand-delivery of mail ballots.
12 Q.  Did it codify a best practice?
13 A.  Yes.
14 Q.  If Section 4.12 were enjoined would counties be permitted
15 to introduce drop boxes into their elections under Texas
16 Election Code?
17 A.  No.
18 Q.  One last point on this provision.  We referenced multiple
19 in-person delivery sites organized by Harris County in 2020,
20 who was the early voting clerk in Harris County during that
21 election?
22 A.  Chris Hollins, the county clerk.
23 Q.  Is that different than an election administrator?
24 A.  It is.
25 Q.  Were there different implications or limitations for

KEITH INGRAM - DIRECT

1   election administrators when it comes to in-person delivery as

2   compared to a county clerk?

3   A.  Yes.  I mean, counties have branch offices so you can

4   argue that any of those offices is an office for in-person

5   delivery.  An EA doesn't have branch offices.  They've got one

6   office and so there's only one place that mail ballot can be

7   delivered.

8   Q.  In 2020 did counties with an election administrator try to

9   set up multiple in-person delivery sites?

10  A.  The only one I heard about was Fort Bend County.

11  Q.  Did the Secretary of State's Office consider this a

12  violation of the election code?

13  A.  We did.

14  Q.  Was there litigation in 2020 regarding in-person delivery

15  of mail ballots at election sites?

16  A.  I think so.

17  Q.  Do you recall submitting a declaration?

18  A.  Probably I did.

19  Q.  Can we pull up State Exhibit 282.

20      And do you have this on your screen?

21  A.  I do.

22  Q.  And do you recognize this exhibit?

23  A.  I do.

24  Q.  And what is it?

25  A.  It's a declaration that I drafted.

KEITH INGRAM – DIRECT

1  Q.  And what was the lawsuit, if you can read the title?

2  A.  *LULAC versus Abbott.*

3  Q.  And in this declaration did you discuss in-person delivery

4  of mail ballots?

5  A.  Yes.

6  Q.  And in this declaration did you discuss counties proposal

7  to have multiple on site delivery locations during the

8  November 2020 Election?

9  A.  Yes.

10  Q.  Is the information in this document accurate?

11  A.  Yes.

12  Q.  Let's go to the next page.

13      And so do you see paragraph 10?

14  A.  Yes.

15  Q.  And in this paragraph did you state that Fort Bend County

16  intended to have multiple in-person delivery locations?

17  A.  I did.

18  Q.  And what was your understanding of the legality according

19  to the declaration?

20  A.  That it would not be legal.  And that's an important

21  thing, because unlike drive-thru voting, if a mail ballot is

22  improperly delivered it cannot be counted and so this would

23  directly effect voters' rights.

24          MISS HUNKER:  Your Honor, I would like to introduce

25  State Exhibit 282 into the record.

KEITH INGRAM - DIRECT

1          THE COURT:  Any objection?

2          MISS HOLMES:  Yes, Your Honor.  We object on the

3   grounds of hearsay.

4          THE COURT:  Any other objections?

5          Your response.

6          MISS HUNKER:  Couple of responses, Your Honor.

7          First, it is a sworn statement.  Second, he has

8   adopted the statements within the declaration as his own

9   testifying as to its accuracy so plaintiffs will have the

10  opportunity to question him on any of the validity of the

11  statements that are asserted.

12         More importantly, there are additional reasons

13  besides the truth of the matter that we would like to have

14  this exhibit in specifically showing the legal dispute that

15  existed at the time in 2020 that preceded the 2021

16  legislature.  It goes toward state interests.

17         THE COURT:  It goes toward what?

18         MISS HUNKER:  Towards state interests, Your Honor.

19         THE COURT:  Where was the evidence that this was

20  before the legislature?

21         MISS HUNKER:  I believe it was discussed during the

22  committee hearings, but unlike drive-thru, I don't have a

23  citation that I could give you at this particular time.

24         THE COURT:  282 is admitted.

25

4396

KEITH INGRAM - DIRECT

1  BY MISS HUNKER:

2  Q.  Let's move on to Article 5 provisions which deal with mail

3  voting, specifically the ID number requirement and corrective

4  action process.  For the most part the provisions are pretty

5  straightforward, so instead of diving into their

6  interpretation we're going to address some of the State

7  interest behind the provision as well as its implementation.

8      In your experience, is voting by mail more vulnerable to

9  fraud than in-person voting?

10 A.  Yes.

11 Q.  In what ways is voting by mail more vulnerable?

12 A.  Well, it's a transaction that's happening away from

13 partisan poll watchers.  It's a process that's happening away

14 from the presence of poll workers that are picked by parties,

15 so it's an unobserved process so that makes it susceptible.

16     In addition, the persons who are most eligible to vote by

17 mail are elderly and sometimes, unfortunately, they are

18 susceptible to influence, improper influence.

19 BY MISS HUNKER:

20 Q.  In your time as Director of Elections would witnesses and

21 members of the public raise concern at legislative hearings

22 about the vulnerabilities of mail voting to fraud?

23 A.  Yes.

24 Q.  Would legislators also raise similar concerns at the

25 hearings?

KEITH INGRAM - DIRECT

1  A.  Regularly.

2  Q.  Would your office field calls from voters concerned about

3  the vulnerabilities of mail voting?

4  A.  Yes.

5  Q.  Prior to SB 1 did Texas utilize signature comparison to

6  help verify a voter's identity should the voter choose to vote

7  by mail?

8  A.  Yes.

9  Q.  What standard did the signature verification committee and

10 early voting ballot board apply when comparing signatures?

11 A.  The point of the signature comparison is -- or the

12 question they had to ask is are these the signatures of the

13 voter, and they were allowed to compare other signatures on

14 file for the voter in making that determination, but the thing

15 that they are supposed to decide is, is this the signature of

16 the voter.

17     Our office told them that they should approach it with the

18 idea of could these signatures have been made by the same

19 voter instead of any other more negative way.

20 Q.  When signature verification committees and early voting

21 ballot boards looked at additional signatures were they

22 looking for additional reasons to accept the ballot?

23 A.  Or reject it.  They are looking for more evidence either

24 way.

25 Q.  Did SB 1 change that standard?

KEITH INGRAM - DIRECT

1   A.   Yes.

2   Q.   How did it do so?

3   A.   It said that if a number matches a number in the voter's

4   record, a number provided, then there's a rebuttal presumption

5   that the signature is by the voter.

6   Q.   And did SB 1 change the emphasis of the voter verification

7   method used by the early voting ballot board and signature

8   verification committee?

9   A.   Yes.  The objective standard of an ID number was to

10  replace or supersede the rebuttable presumption of the

11  signature that's less reliable.  It's more subjective.

12  Q.   Are there any benefits to emphasizing an ID number as

13  compared to a signature?

14  A.   Sure.  It's more objective.  It's less subject to

15  interpretation.

16  Q.   Are ID numbers less likely to change than a person's

17  signature?

18  A.   Yes.

19  Q.   How can that affect the efficacy of an ID number

20  requirement as compared to a signature comparison?

21  A.   Well, if your signature changes over time then it's harder

22  to say that they are by the same voter.  The number stays the

23  same.

24  Q.   Are you aware of any elections that were decided by one or

25  two votes?

KEITH INGRAM – DIRECT

1    A.   Yes.

2    Q.   Can you offer an example?

3    A.   Sure.  Every election we get the call the next day after

4    the election that says we've got a tie vote.

5         There was one specific one that I remember because there

6    was a YouTube video, but it was two Democratic Primary

7    candidates for county commissioner in Pecos County, I

8    believe -- could have been Reeves County, anyway, don't get me

9    started on that -- but they agreed to cast lots to resolve the

10   election since it was tied and they decided they would flip a

11   coin, but they did not agree on rules for the coin flip before

12   they started and when they flipped the coin it went off the

13   table.

14        Well, they hadn't addressed how this was going to be

15   treated and there was much enthusiastic arguing that

16   immediately ensued.  It was quite entertaining.  But, no, we

17   have a tie election every Election Day, at least one somewhere

18   in the state.

19   Q.   Let's shift to discuss TEAM.  How might a voter update

20   their ID number in TEAM?

21   A.   They can submit a paper application with the ID number on

22   it, a paper voter registration application.  They can log into

23   texas.gov, and if they log into texas.gov for a voter

24   registration change then they've got a message, this is by

25   logging in you're updating your information to the Secretary

4400

KEITH INGRAM - DIRECT

1  of State's Office and we'll get the number that they provide

2  when they log in.

3  Q.  What is the HB 2512 process?

4  A.  HB 2512 was in the 2013 legislative session and it allows

5  the Secretary of State's Office to use a driver's license

6  information for voter registration and so we've used that to

7  harvest as many full nines of social security as we could out

8  of the driver file and add them to the voter file because the

9  full nine of social allows us to make much better matches so

10  that we have many more strong matches and much fewer weak

11  matches.  And then, of course, SB 1 came along and we also

12  used that process to get as many driver's license numbers as

13  possible.

14  Q.  Does the Secretary of State's Office adopt the HB 2512

15  process in preparation for the implementation of Senate

16  Bill 1?

17  A.  Yes.

18  Q.  How did the Secretary of State's Office adopt the process?

19  A.  Like I said, we win both ways.  Instead of just trying to

20  get full nines, we try to get as many driver's licenses as

21  possible as well.

22  Q.  Why did the Secretary of State's Office adopt the process?

23  A.  We wanted to reduce the number of voter records that

24  didn't have either one of the numbers and we wanted to reduce

25  the number of voter records that had one number but not the

KEITH INGRAM - DIRECT

1  other.

2  Q.  Was this an attempt by the Secretary of State to help

3  voters navigate SB 1's ID number requirement?

4  A.  Right.  It's both to help the voters and the election

5  offices when they are doing the mail ballots because we wanted

6  to make sure there were as many numbers as we could get for

7  them to look at.

8  Q.  How many times has the Secretary of State utilized the HB

9  2512 process since SB 1 was enacted?

10  A.  I don't know about this year, but if we are going to do

11  it, it will probably be in December so I would say twice.

12  Q.  And how often does the HB 2512 process occur?

13  A.  It's usually every year in December.

14  Q.  After the Secretary of State harvested numbers from DPS

15  did the number of voters without an ID number in TEAMs

16  decrease?

17  A.  Yes.

18  Q.  Does the Secretary of State's Office plan on performing

19  the HB 2512 process later this year?

20  A.  As far as I know, yes.

21  Q.  And based on your observations, has the none of voters

22  without either a Texas ID number or social security number in

23  TEAMs gone down?

24  A.  It has.

25  Q.  Based on your observation has the number of voters with

1  only one ID number in TEAM but not the other declined as well?

2  A.  It has.

3  Q.  Do you expect the numbers of voters without either number

4  in the system to ever increase?

5  A.  No, they will only go down.  The number without a number

6  will only decrease.

7  Q.  And why is this the case?

8  A.  Because Help America Vote Act has required every new

9  registration to have one or the other of those numbers.  The

10 ones that we've got that don't have a number were legacy

11 registrations from before then.

12 Q.  Do you expect the number of voters with only one ID number

13 in TEAM but not the other to ever increase?

14 A.  No.

15 Q.  And do you expect that number to decline as well?

16 A.  I do.

17 Q.  And do you expect that number to decline for the same

18 reason?

19 A.  True, for the same reason and the addition of what our

20 office does when we compare the driver's license data to get

21 the other number if they only provided one.

22 Q.  Mr. Ingram, a frequent topic in this trial has been the

23 Ballot Tracker so I wanted so discuss that next.  When was the

24 Ballot Tracker enacted into law?

25 A.  In the regular session in '21.  It was House Bill 1382.

4403
KEITH INGRAM — DIRECT

1  Q.  Would the March 2022 Primary have been the first election
2  the Ballot Tracker was active?
3  A.  Yes.  I think the effective date of 1382 was January 1st,
4  so, yes.
5  Q.  Was the Ballot Tracker the first of its kind or was it
6  replacing some other service?
7  A.  It was the first of its kind for general mail ballot
8  voting.  We had a federally required FPCA Ballot Tracker
9  before then.  FPCAs are military and overseas voters who vote
10  by mail.
11  Q.  Does this mean the Secretary of State had to design the
12  tracker?
13  A.  We had a tracker in place.  We had to expand it and make
14  it part of the My Voter Page that we have on our Am I
15  Registered Page to look yourself up and so we had to do quite
16  a few different things that we couldn't just import the
17  existing tracker because the identity management on the front
18  end was quite a bit different.
19  Q.  When did the Ballot Tracker become active?
20  A.  I don't know.  Before the Primary in March.
21  Q.  After it became active did your office become aware of
22  technical issues that were preventing voters from logging on?
23  A.  Yes.  I mean the identity management requirements were out
24  of statute and were difficult to comply with.
25  Q.  What were some of those issues?

KEITH INGRAM – DIRECT

1   A.  That the main one was the residence address requirement

2   because addresses can be written in any number of ways, and if

3   the voter didn't enter it exactly as it is in TEAM then they

4   wouldn't be successful in logging in.

5   Q.  And a requirement that a voter provide their residential

6   address, has that since been changed?

7   A.  Yes.

8   Q.  Does a voter need to use their address to log onto the

9   Ballot Tracker?

10  A.  Not currently.  Now they can use date of birth.

11  Q.  Were there any problems regarding syncing that occurred

12  with off-line counties?

13  A.  Yes.  We had obviously done our best to harvest as many

14  full nines and driver's license numbers as we could get.  We

15  transmitted that information to the off-line counties, which

16  is where the majority of the voters are, and their system

17  didn't import it.  So the VOTEC system that most of the

18  off-line counties use didn't absorb the data.  We sent them a

19  separate spreadsheet so they could enter the information

20  manually but some of them didn't want to do that.

21  Q.  Did the Secretary of State reach out to VOTEC to address

22  the problem?

23  A.  Oh yes.

24  Q.  And what was VOTEC's response?

25  A.  They fixed it.

KEITH INGRAM - DIRECT

1  Q.  Were the technical problems resolved by the May and

2  November elections?

3  A.  Yes.

4  Q.  Mr. Ingram, were you the elections director when Texas

5  introduced the annual application for ballot-by-mail?

6  A.  I was.

7  Q.  When the annual application was first introduced did the

8  State experience problems implementing it?

9  A.  It was one of the most complicated things we've ever had

10 to implement.  It was a very short bill.  It was House Bill

11 666 in the 83rd Session and it was a real problem to implement

12 because there were a lot of implications that weren't covered

13 by the words of the statute.  We had to suggest changes over

14 the next two sessions to get that process lined up.

15 Q.  Was the State able to fix those snags, once it had time to

16 test the program and consider reforms in the legislature?

17 A.  Absolutely.

18 Q.  Do you view the Ballot Tracker as being analogous to the

19 annual application in that regard?

20 A.  Ballot Tracker is much more straightforward.  Now that the

21 identity management has been fixed, I don't think there will

22 be any problems with that going forward at all.  There were a

23 lot of things that are new, have some growing pains that have

24 to be ironed out and that's one of them.

25 Q.  Was the creation of the Ballot Tracker an improvement to

4406

KEITH INGRAM – DIRECT

1  Texas elections?

2  A.  Absolutely.

3  Q.  How it was an improvement?

4  A.  Well, again, it's transparency.  If a voter can log in and

5  see that my application has been accepted by the early voting

6  clerk, my ballot has been mailed, then they know to start

7  checking their mail box.

8      When they return the ballot, they can see it got received.

9  They can see it got accepted or rejected.  I mean it's all

10  right there in front of them.  It's a very strong improvement

11  for transparency.

12  Q.  Does it allow voters to know more information about their

13  mail ballot?

14  A.  They could find out the same information by calling the

15  early voting clerk.  What it's done is it's reduced the

16  numbers of calls that the election offices have to deal with

17  and it's made the information more readily accessible to the

18  voters.

19  Q.  Does it provide voters with an online cure option for

20  certain defects?

21  A.  Yes, and that was as a result of committee testimony from

22  Chase Bierton [phonetic].

23  Q.  To your knowledge has voters taken advantage of the Ballot

24  Tracker to cure their ABBMs and mail ballots?

25  A.  Yes, and I expect that they will continue to do so on an

4407

KEITH INGRAM – DIRECT

1  increasing basis going forward.

2          MISS HUNKER:  Your Honor, I want to be respectful of

3  your time since I know you have a deadline.

4          THE COURT:  Thank you.

5          MISS HUNKER:  Is this a good time to break?

6          THE COURT:  So how much more do you think you have?

7          MISS HUNKER:  There was one subsection I was hoping

8  to finish with Article 5, but after that I have Article 6, 7

9  and 8, which are much smaller, but this will take longer than

10  I think you have.

11          THE COURT:  We'll resume tomorrow morning at 9.

12          I'm sure this wasn't a communication from

13  Governor Abbott personally to me, but I received on my

14  government cell phone, "Governor Abbott:  I will continue

15  busing immigrants to sanctuary cities until Joe Biden secures

16  the border."

17          I'm sure Governor Abbott did not send that to me.

18          See you-all in the morning.

19

20

21

22

23

24

25

-oOo-

   I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.


Date:  10/17/23          /s/ *Gigi Simcox*
                         United States Court Reporter
                         262 West Nueve Street
                         San Antonio TX 78207


                         /s/ *Angela Hailey*
                         United States Court Reporter
                         262 West Nueve Street
                         San Antonio TX 78207