```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3
   LA UNION DEL PUEBLO ENTERO,      .
 4 ET AL,                           .
                                    .
 5              PLAINTIFFS,          .
           vs.                      . DOCKET NO. 5:21-CV-844-XR
 6                                  .
   GREGORY W. ABBOTT, ET AL,        .
 7                                  .
                DEFENDANTS.         .
 8

 9

10                TRANSCRIPT OF BENCH TRIAL
           BEFORE THE HONORABLE XAVIER RODRIGUEZ
11              UNITED STATES DISTRICT JUDGE
                     OCTOBER 18, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                        FATIMA MENENDEZ, ESQUIRE
                          JULIA LONGORIA, ESQUIRE
18                        MALDEF
                          110 BROADWAY
19                        SUITE 300
                          SAN ANTONIO TX 78205
20
21                        AMIR BADAT, ESQUIRE
                          JENNIFER A. HOLMES, ESQUIRE
22                        NAACP LEGAL DEFENSE & EDUCATIONAL
                          FUND INC
23                        40 RECTOR STREET, FIFTH FLOOR
                          NEW YORK NY 10006
24

25
```

```
 1

 2                          ELENA RODRIGUEZ ARMENTA, ESQUIRE
                            NKWONTA, ESQUIRE
 3                          ELIAS LAW GROUP
                            250 MASSACHUSETTS AVENUE NW
 4                          SUITE 400
                            WASHINGTON DC 20001
 5

 6                          ELIJAH WATKINS, ESQUIRE
                            STOEL RIVES LLP
 7                          101 S. CAPITOL BOULEVARD
                            SUITE 1900
 8                          BOISE IDAHO 83702

 9

10

11  FOR THE DEFENDANTS:    RYAN G. KERCHER, ESQUIRE
                            KATHLEEN HUNKER, ESQUIRE
12                          WILLIAM WASSDORF, ESQUIRE
                            ETHAN SZUMANSKI, ESQUIRE
13                          TEXAS ATTORNEY GENERAL
                            P.O. BOX 12548
14                          MC 009
                            AUSTIN TX 78711
15

16                          ERIC J.R. NICHOLS, ESQUIRE
                            BUTLER SNOW LLP
17                          1400 LAVACA STREET, SUITE 1000
                            AUSTIN TX 78701
18

19                          LOUIS J. CAPOZZI, ESQUIRE
                            JONES DAY
20                          51 LOUISIANA AVENUE NW
                            WASHINGTON DC 20001
21

22  REPORTED BY:           GIGI SIMCOX, RMR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            SAN ANTONIO, TEXAS
24

25
```

KEITH INGRAM - DIRECT

```
 1    (San Antonio, Texas; October 18, 2023, at 9:00 a.m., in
 2   open court.)
 3         MR. WASSDORF:  Your Honor, we have a Rule 52(c)
 4   motion for judgment on partial findings to make.  I don't know
 5   if you want to take that up now or wait until Mr. Ingram has
 6   concluded.
 7         THE COURT:  I was thinking we'd try to get Mr. Ingram
 8   in and out of here.
 9         MR. WASSDORF:  That's fine.
10         THE COURT:  Okay.
11    (KEITH INGRAM, having been previously duly sworn,
12   testified as follows:)
13              DIRECT EXAMINATION CONTINUED
14   BY MISS HUNKER:
15   Q.  Good morning, Mr. Ingram.
16   A.  Good morning.
17   Q.  Welcome back.  Yesterday we were discussing Article 5
18   provisions in SB 1 and we're going to continue that discussion
19   before we move on to some of the other articles.
20       Let's pull up State Exhibit 22.  This has been admitted as
21   Joint Exhibit 8, but for clarity we're going to be using the
22   Excel file.
23       Do you recognize this exhibit?
24   A.  I do.  It's something we compiled regarding rejection
25   rates of mail ballots for all of the elections in '22 by
```

KEITH INGRAM – DIRECT

1  county.

2  Q.  And what information can be found in this document?

3  A.  You can see by county how many ballots were accepted, how

4  many ballots by mail were accepted, and how many ballots by

5  mail were rejected, and the resulting percentage rejection by

6  county as I said.

7  Q.  So does it contain the mail ballot projection rates for

8  each Texas county in 2022 elections?

9  A.  For all the elections, yes, beginning with the Primary.

10  Q.  And does it include a statewide rejection rate for each

11  election in 2022 as well?

12  A.  That's right.  And the Primary election is obviously two

13  elections, it's a Democratic Primary and a Republican Primary

14  so they have separate numbers.

15  Q.  Is it true of the Primary run-off?

16  A.  Yes.

17  Q.  Why was this document created?

18  A.  It was created primarily to head off public information

19  requests.  We knew that there was going to be a very healthy

20  appetite for this information so we proactively prepared it.

21  Q.  And how did the Secretary of State's Office obtain this

22  information?

23  A.  We obtained this information from the counties.  They put

24  it in to the Ballot Tracker system and the TEAM system, but we

25  cross-referenced it against the vote history as it was

KEITH INGRAM - DIRECT

1  submitted as well.

2  Q.  What steps did the Secretary of State take to ensure that

3  this information is accurate?

4  A.  So like I said, for the first time what we did is we took

5  the vote history and we made the county tell us about any

6  discrepancies, and if there wasn't a suitable explanation to

7  resolve those discrepancies so that the vote history and the

8  TEAM data regarding the election matched.  That was the first

9  time we had ever done that.

10  Q.  Because of this is the TEAM's data from 2022 rejection

11  rates more accurate than the rejection rates for previous

12  years?

13  A.  Yes.

14  Q.  I want to look at the statewide rejection rates for each

15  election in 2022.  First, let's start with the Democratic

16  Primary.  What was the rejection rate for the Democratic

17  Primary in 2022?

18  A.  Statewide it was 12.9 percent.

19  Q.  And now let's turn to the Republican Primary.  What was

20  the rejection rate for the Republican Primary in 2022?

21  A.  11.8 percent.

22  Q.  Do you consider 12.9 and 11.8 percent rejection rates to

23  be acceptable?

24  A.  No.

25  Q.  Did rejection rates decline after the March primaries?

1  A.  They did.

2  Q.  Let's turn to the May constitutional election.  What was

3  the statewide rejection rate for that election?

4  A.  For the May uniform date it was 5.02 percent.

5  Q.  And now let's turn to the May run-off starting with the

6  Democratic.  What was the statewide rejection rate for the

7  Democratic run-off?

8  A.  3.68 percent.

9  Q.  And what was the statewide rejection rate for the

10  Republican run-off?

11  A.  4.27 percent.

12  Q.  And finally let's look at the November 2022 General

13  Election, what was the rejection rate for that election?

14  A.  I believe it was 2.7.  Yeah, 2.7 percent.

15  Q.  To your knowledge is 2.7 percent comparable to rejection

16  rates in past elections?

17  A.  Yes.

18  Q.  Why did the rejection rates decline?

19  A.  Rejection rates declined because the counties did a better

20  job of notifying the voters of the need to present an ID.  The

21  voters became more accustomed to doing it.  The first election

22  they just didn't fill out the blank on the carrier envelope;

23  thereafter there were inserts reminding them to do so as well

24  as the fact that they had been rejected the first time so they

25  didn't want that to happen again.  The voters got more used to

KEITH INGRAM - DIRECT

1    it.

2    Q.  Do you expect rejection rates to continue to decline?

3    A.  Yes.  For the ID reason I do expect them to decline.

4    There's always a rejection rate of mail ballots for whatever

5    reason, but for ID purposes, I expect that number to continue

6    to decline.

7    Q.  Why do you think the rates will continue to decline for ID

8    reasons?

9    A.  Well, the numbers in TEAM will continue to get more

10   robust, it will have more data points for the voters to hit

11   with, and the voters will get more used to it as they do it

12   more often.

13   Q.  And throughout 2022 did you observe that counties also

14   became more familiar with the process?

15   A.  Yes.  And ballot boards who reviewed the mail ballots.

16   Q.  And do you think that the counties' early voting ballot

17   boards and signature verifications committees' familiarity

18   with the ID number requirement helped reduce the rejection

19   rates?

20   A.  I do, and there were also some tweaks to the corrective

21   action procedure that I think will enhance it and make it more

22   useful and so there will be fewer rejections for that reason

23   as well.

24   Q.  Mr. Ingram, a few witnesses have commented about the

25   timing of SB 1 and the impact that that had on SB 1's early

KEITH INGRAM - DIRECT

1  implementation.  We intend to question your former colleague
2  Christina Adkins on this in more detail but I did want to ask
3  based on your experience, do you believe the timing of SB 1
4  made the law harder to implement?
5  A.  It increased the degree of difficulty very much, yes.
6  Q.  How so?
7  A.  Well, we had to implement the law by December 1st, and
8  then of course the first election after that is the Primary
9  election so there were two problems, we didn't have a county
10 election seminar to teach the law the summer before and we
11 didn't have a November constitutional amendment election to do
12 the trial run the first election with.  So the combination of
13 those two things, and then the fact that we had redistricting
14 because the census was late, all of that piled in at the
15 end-of-the-year time period made it one really awful time to
16 be an election administrator.  It was the perfect storm of
17 events that I would never want to live again.
18 Q.  Why did the Secretary of State's Office not have a seminar
19 to discuss Senate Bill 1?
20 A.  Because it wasn't passed until after the seminar.  The
21 seminar was in July or early August and the bill was passed
22 after that.
23 Q.  And do you usually conduct the seminars in summer?
24 A.  We do.  And it's usually the summer obviously after the
25 legislative session and the primary focus of the odd-numbered

KEITH INGRAM - DIRECT

```
 1  year county election conference is to talk about new laws.
 2  Q.  Are Primaries harder to conduct than other elections?
 3  A.  Yes.  Primaries is the most difficult election we do.
 4  Q.  Why is it the most difficult?
 5  A.  Well, as I mentioned, there's two elections going to
 6  simultaneously, but there really is more than that because
 7  every county party puts on its Primary election, so there's
 8  over 500 elections that are happening at the same time.  And
 9  the voters really don't understand what a Primary election is
10  and how it's different than a General Election, so we have a
11  whole lot more call volume.  We have many more angry callers.
12  And then of course, we've got a whole lot more people trying
13  to run an election that, you know, are part-time volunteers
14  really.
15  Q.  And are the Primaries partially conducted by the parties?
16  A.  Yes.
17  Q.  Do you think that these complications contribute to a
18  higher rejection rate during the Primary?
19  A.  Yes.  I mean, I think that whatever election was first was
20  going to have problems, but the fact that it was the Primary
21  made it worse.
22  Q.  Two final questions on the ID number requirement.  To your
23  knowledge does the Secretary of State's Office receive any
24  request for accommodation regarding the requirement that
25  mail-in voters put their social security number or ID number
```

KEITH INGRAM - DIRECT

1  on their ABBM or mail ballot?

2  A.  We did not.

3  Q.  To your knowledge did the Secretary of State's Office

4  receive any requests for accommodation asking the secretary to

5  change its policies or procedures related to SB 1's ID number

6  requirement?

7  A.  No.

8  Q.  Thank you, Mr. Ingram.  Let's change topics and turn to

9  Article 6 which deals with voting assistance.

10      When is a voter eligible for voter assistance?

11  A.  It's governed by federal law and it has to do with an

12  inability to read or write the ballot, read the ballot or

13  write, an inability to mark the ballot, so if they have some

14  reason to need an assistant to successfully vote, then that's

15  when they're eligible.

16  Q.  If a voter states that he or she is eligible for

17  assistance, does the Secretary of State's Office advise

18  counties that they should accept the representation of the

19  voter?

20  A.  Absolutely.

21  Q.  Is a county or an election worker permitted to question

22  the voter about whether the voter qualifies for assistance?

23  A.  No.

24  Q.  Is a county or election worker permitted to question the

25  voter about the nature of the disability assuming the voter

KEITH INGRAM - DIRECT

1  has one?

2  A.  No.

3  Q.  What constitutes voting assistance under the election

4  code?

5  A.  Whatever the voter needs to successfully vote, whatever

6  assistance the voter requires.  Sometimes that can be helping

7  them mark the ballot, sometimes it can be reading the ballot

8  on them.  It's whatever they need.

9  Q.  If I were at a polling location and I opened the door for

10  a voter in a wheelchair, would that constitute at voting

11  assistance?

12  A.  No.

13  Q.  If I were to wheel a voter to a polling station or help

14  position a voter with a disability such that they could access

15  the voting equipment, would that constitute voting assistance?

16  A.  No.

17  Q.  If a voter was having trouble maneuvering and I helped

18  release the strap on her wheelchair so she could better access

19  the voting equipment, would that constitute voting assistance?

20  A.  No.

21  Q.  Why does that not constitute voting assistance?

22  A.  Because it's not assisting the voter in voting, it's just

23  assisting the voter in moving around.  I'm assuming that the

24  assister is not staying at the voting booth to assist.

25  Q.  Would the assister have to be interacting with the ballot

1  for it to constitute voting assistance?

2  A.  Yes.  I mean, for it to be voting assistance, yes.

3  Q.  This definition of voting assistance, did it predate SB 1?

4  A.  Yes.

5  Q.  In the examples I provided --

6      MS. PERALES:  I'm sorry, Your Honor, these are all

7  legal conclusions that are inappropriate for the witness to be

8  making.

9      MISS HUNKER:  Your Honor, during the direct

10 examination Mr. Kanterman asked multiple hypotheticals in the

11 same vein that I am asking.  They opened the door to this line

12 of questioning and I'm simply following suit to get clarity on

13 the provisions in which he asked those questions.

14     THE COURT:  If this was a jury trial I would be

15 concerned but this is to the bench, so go ahead.

16     MISS HUNKER:  Thank you, Your Honor.

17 BY MISS HUNKER:

18 Q.  In the examples I provided where actions constituted

19 general assistance, not voting assistance, would the person

20 helping the voter need to take the Oath of Assistance?

21 A.  That's a more difficult question because in order to be at

22 the polling place you have to fall within a certain category.

23 You have to have a reason to be there or you can't be there.

24 And so someone that's just a general personal assistant for

25 someone would not, under strict speaking, be able to access

KEITH INGRAM – DIRECT

1  the polling place to help position the voter like you were

2  talking about, so they could either do one of two things.

3      They can request an accommodation from the presiding judge

4  to allow the personal assistant to help them maneuver the

5  polling location or they could fill out the Oath of Assistance

6  so that they would become an official assistant and eligible

7  to be in the polling place.  Those I think would be the two

8  alternatives.

9         THE COURT:  I'm a little confused.  Earlier you just

10 said that it didn't require interaction with a ballot.  So

11 help me understand, if somebody needs to be using a

12 wheelchair, and can the assister wheel them to the actual

13 place where they will touch the screens or does that require

14 the oath before they are able to do even that step?

15        THE WITNESS:  So it's kind of — it's a very gray

16 area and kind of depends on the presiding judge.  It's not

17 voting assistance and it wouldn't strictly require the Oath of

18 Assistance for voting assistance, it's just personal

19 assistance, but in order to be present in the polling location

20 you have to fall in a category.

21        They enumerated those categories in the 2021 regular

22 session, and so if you're not one of those, and personal

23 assistant is not one of those that's allowed, but you could

24 request an accommodation so that I can do what I need to do to

25 get the voter in position to vote without assisting them and

1  without having to take the oath and the presiding judge would
2  have the discretion to allow that.  That's allowed by the
3  election code because of SB 1.
4          But the other way to do it is just take the Oath of
5  Assistance, and whether you help the voter or not, you're in
6  the polling place legally at that point.
7          THE COURT:  I think I understand, but go ahead.
8  BY MISS HUNKER:
9  Q.  With these facts in mind let's jump to the first
10 challenged provision in Article 6 of SB 1.  Mr. Ingram, you
11 should see Section 6.61 of SB 1 on your screen.
12     Can you please summarize what changes 6.01 made to the
13 election code?
14 A.  Well, the part of it that I can see just reminds everyone
15 that a poll watcher is entitled to observe assistance if it's
16 provided by a polling, poll workers.  And then I believe the
17 next part is going to say that if someone brings someone,
18 seven people to curbside vote, that they have to fill out a
19 form.
20 Q.  And the part about transporting to vote curbside, would
21 this provision only apply if the person was transporting seven
22 or more voters to vote curbside?
23 A.  If all seven were going to vote curbside, that's right.
24 Q.  Would it apply if voters entered the polling location?
25 A.  No.

4423

KEITH INGRAM - DIRECT

1   Q.  Has the Secretary of State's Office received concerns

2   about voters' privacy when a person transports voters to vote

3   curbside but does not exit the vehicle?

4   A.  We have heard that concern from poll watchers who have

5   observed the process, yes.

6   Q.  Does section 6.01 address those privacy concerns?

7   A.  I guess so.  I mean that could be one of the reasons for

8   it for doing this is so that if you've got seven people in the

9   car and they are not family, then you want to protect the

10  privacy of the voter, so maybe that's what this is for.

11  Q.  Following SB 1 taking effect has the Secretary of State

12  received any affidavits stipulated by this section?

13  A.  No.  We have asked the counties to provide any that

14  they've received but we didn't receive any.

15  Q.  In your experience is it common for a person to transport

16  seven or more voters to vote curbside?

17  A.  No.

18  Q.  To your knowledge did the Secretary of State's Office

19  receive any requests for accommodation regarding Section 6.01?

20  A.  No.

21  Q.  To your knowledge did the Secretary of State's Office

22  receive any requests for accommodation asking the secretary to

23  change any of its policies or procedures related to

24  Section 601?

25  A.  No.

KEITH INGRAM - DIRECT

1   Q.  Let's turn to Section 6.03.

2       What does Section 6.03 address?

3   A.  The form that an assistant has to provide a voter

4   assistant.

5   Q.  I want to quickly bring up Texas Election Code 64.032

6   Subsection C.

7       Does this provision require an election worker to enter an

8   assister's name and address when the voter is being assisted

9   by a person of their choice?

10  A.  Not the part that I see on the screen here.

11  Q.  Can you -- there we go.

12  A.  Yeah.  D does require that and did require that.

13  Q.  And did this requirement exist pre-SB 1?

14  A.  Yes.

15  Q.  To your knowledge did the Secretary of State's Office

16  receive any request for accommodation regarding Section 6.03?

17  A.  No.

18  Q.  To your knowledge did the Secretary of State's Office

19  receive any requests for accommodation asking the secretary to

20  change any of its policies or procedures related to Section

21  6.03?

22  A.  No.

23  Q.  We're going to move on now to Section 6.04.  In your words

24  what changes did Section 6.40 make to the election code?

25  A.  It changed the oath of office or the oath of an assistant.

*Gigi Simcox, RMR, CRR*

KEITH INGRAM – DIRECT

1  Q.  And I want to quickly bring up State Exhibit 223.

2       Do you see the exhibit on your screen?

3  A.  I do.

4  Q.  And what is — do you recognize this exhibit?

5  A.  I do.

6  Q.  And what is this exhibit?

7  A.  This is an email that I sent notifying the counties about

8  the order in the OCA-Greater Houston case enjoining the

9  portion of the oath that limited the scope of assistance.  Or

10  purported to limit the scope of assistance.

11  Q.  And was this a mass email that went to counties?

12  A.  It was.  It went to all the county election officials.

13  Q.  And is the information in this email accurate?

14  A.  Yes.

15  Q.  What changes were subject to the injunction?

16  A.  It's the oath provision and any limitation or purported

17  limitation on the scope of assistance that can be rendered to

18  a voter.

19  Q.  And through this mass email did you advise county election

20  officers about the injunction?

21  A.  That's right.

22  Q.  And I want to scroll down to the bolded letters.  Bolded

23  text.

24       Did you communicate to election officials in the counties

25  that a voter is eligible to receive assistance from a person

1  of their choice?

2  A.  That's right.

3  Q.  And did you communicate to the counties that voting

4  assistance is not limited to marking or reading the ballot or

5  otherwise limited to conduct that occurs in the voting booth?

6  A.  Agree.

7       MISS HUNKER:  Your Honor, State defendants move to

8  admit State Exhibit 223.

9       THE COURT:  Any objection?

10       MR. KANTERMAN:  No objection, Your Honor.

11       THE COURT:  223 is admitted.

12       MISS HUNKER:  Thank you, Your Honor.

13  BY MISS HUNKER:

14  Q.  Let's go back to the oath and break down the other

15  portions that were changed by SB 1.  Do you see where it says

16  "under penalty of perjury"?

17  A.  Yes.

18  Q.  Was the assisters oath already under the penalty of

19  perjury?

20  A.  It was.

21  Q.  Did the amended language inform assisters of this fact?

22  A.  Yes.

23  Q.  Do you see where the oath says "the voter I am assisting

24  represented to me that they are eligible to receive

25  assistance"?

KEITH INGRAM - DIRECT

1   A.   Yes.

2   Q.   How might a voter represent that they are eligible for

3   assistance?

4   A.   By asking for assistance.

5   Q.   Is requesting assistance enough?

6   A.   I would think so.  I mean I don't think it's any of the

7   assister's business what the reason is.

8   Q.   Was it an offense pre-SB 1 for a person to knowingly

9   provide assistance to a voter who is not eligible for

10  assistance?

11  A.   That was a crime, yes.

12  Q.   And does it remain an offense for a person to knowingly

13  provide assistance to a voter who is not eligible for

14  assistance?

15  A.   Yes.

16  Q.   And did the change to the oath affect those particular

17  provisions?

18  A.   No.

19  Q.   Do you see where it says "did not pressure or coerce the

20  voter into choosing me to provide assistance"?

21  A.   Yes.

22  Q.   Was it already an offense for a person to pressure or

23  coerce a voter into choosing that person as an assister?

24  A.   It was against the law to assist someone that didn't need

25  assistance, and so the thing that this is intended to cut off

1  is people waiting in the parking lot to ambush a voter and

2  demand that they be able to assist them.

3  Q.  I want to direct your attention to Section 64.036 of the

4  election code.  Do you have that on your screen?

5  A.  Yes.

6  Q.  What is unlawful assistance?

7  A.  Unlawful assistance is if you knowingly provide assistance

8  to someone who is not eligible or prepare a ballot when you're

9  assisting other than the way that the voter directs, or while

10 they're assisting, suggesting how the voter should vote.

11 Q.  And what about Subsection 4?

12 A.  So that's if you provide assistance to someone who hasn't

13 asked for it or they haven't selected you to be their

14 assistant.

15 Q.  Is it the Secretary of State's understanding that

16 pressuring or coercing a voter into choosing someone as an

17 assister constitutes unlawful assistance?

18 A.  Yes.

19 Q.  And did the Senate Bill 1 alter the Secretary of State's

20 understanding on that fact?

21 A.  It did not.

22 Q.  And did the change to the oath that we just discussed

23 alter the Secretary of State's understanding of that fact?

24 A.  No.  It just put it up front for the assistant to be aware

25 of it.

1  Q.  Let's move to Section 6.04 again, but now we're going to

2  look at the portion of the oath that says "I will not

3  communicate information about how the voter has voted to

4  another person."  Was it already an offense for an assister to

5  communicate information about how a voter voted?

6  A.  Yes.

7  Q.  Did the amended language in the voting assistance oath

8  inform assisters of that fact?

9  A.  It does.

10 Q.  Now I want to quickly draw your attention to Section

11 61.006 of the election code, which is titled Unlawfully

12 Divulging Vote.  Do you have that on your screen?

13 A.  I do.

14 Q.  Is it the Secretary of State's understanding that if an

15 assister without permission divulged how a voter voted, the

16 assister would be in violation of 61.006?

17 A.  I agree with that.

18 Q.  We can put Section 61.006 down.  And let's go back to

19 Section 6.04 again.  And if we can go to the bottom portion of

20 the oath.

21    Do you see where the oath says "I understand that if

22 assistance is provided to the voter who is not eligible for

23 assistance the voter's ballot may not be counted"?

24 A.  I do.

25 Q.  Did the election code pre-SB 1 provide that if assistance

KEITH INGRAM - DIRECT

1  is provided to a voter who is not eligible for assistance, the

2  voter's ballot may not be counted?

3  A.  Agree it didn't.

4  Q.  Did the amended language in the voting assistance oath

5  inform assisters of this fact?

6  A.  It does.

7  Q.  And let's take a look at Section 64.037 of the election

8  code which is titled Unauthorized Assistance Voids the Ballot.

9  Do you see that on your screen?

10  A.  I do.

11  Q.  Is this the provision in the election code that stipulates

12  that ballots may not be counted if the voter received

13  assistance for which he or she is not eligible?

14  A.  It does.

15  Q.  We can take that section of the election code down.

16      Does the voting assistance oath have an education role?

17  A.  Yes.

18  Q.  And what is that role?

19  A.  To inform the person taking the oath that, you know, this

20  is an important step that they are taking and it has legal,

21  you know, connotations that they need to be aware of.

22  Q.  In your experience does the oath educate assisters on

23  their duties unto the law?

24  A.  It does.

25  Q.  Does it educate voters?

KEITH INGRAM - DIRECT

1   A.  Sure.

2   Q.  Does the amended language in the oath added by SB 1

3   perform that function?

4   A.  It does.

5   Q.  To your knowledge did the Secretary of State's Office

6   receive any request for accommodation regarding Section 6.04?

7   A.  No.

8   Q.  To your knowledge did the Secretary of State's Office

9   receive any request for accommodation asking the secretary to

10  change any of its policies or procedures related to

11  Section 6.04?

12  A.  No.

13  Q.  Mr. Ingram, we're going to turn now to Section 6.06, which

14  you should see on your screen momentarily.  And what does

15  Section 6.06 address?

16  A.  Compensation for people who provide assistance to voters.

17  Q.  Mr. Ingram, you have fulsome discussion of this section

18  during plaintiffs direct examination.  For this reason I'm

19  going to limit my questions to the following.  To your

20  knowledge did the Secretary of State's Office receive any

21  request for accommodation regarding Section 6.06?

22  A.  No.

23  Q.  To your knowledge did the Secretary of State's Office

24  receive any request for accommodation asking the secretary to

25  change any of its policies or procedures related to

KEITH INGRAM - DIRECT

1   Section 6.066?

2   A.  We did not.

3   Q.  Let's move on to Section 6.07.

4       Can you please summarize what changes Section 6.07 made to

5   the election code?

6   A.  It's addressing the spaces for assistance and witnessing

7   on the back of the carrier envelope.

8   Q.  This provision is pretty straightforward so I'm only going

9   to ask you two questions related to it.  To your knowledge did

10  the Secretary of State's Office receive any request for

11  accommodation regarding Section 6.07?

12  A.  No.

13  Q.  To your knowledge did the Secretary of State's Office

14  receive any request for accommodation asking the secretary to

15  change any of its policies or procedures related to

16  Section 6.07?

17  A.  No.

18  Q.  Out of curiosity, has the Secretary of State's Office

19  received any questions about the voting assistance provisions

20  in SB 1?

21  A.  No.

22  Q.  Has the Secretary of State's Office received any questions

23  about the Oath of Assistance specifically?

24  A.  We have not.

25  Q.  And do you advise counties generally that voters may

1  receive assistance from their assister of choice?

2  A.  Absolutely.

3  Q.  In your role as director did you see any evidence that the

4  voting assistance provisions in SB 1 prevented voters from

5  selecting their assister of choice?

6  A.  They do not.

7  Q.  We can move on now to Article 7 provisions.  Starting with

8  Section 7.02.

9      Prior to SB 1 did Texas law require voters to permit

10 voters to take time off of work to vote?

11 A.  This provision pre-SB 1 required employers to allow their

12 employees to vote on Election Day, to have up to two hours to

13 go vote if they were otherwise employed during the election

14 period.

15 Q.  And was that limited to Election Day?

16 A.  It was.

17 Q.  Did Section 7.02 change that rule?

18 A.  It did.

19 Q.  How did Section 7.02 change that rule?

20 A.  It extended the requirement to the early voting period as

21 well so employers are now obligated to allow their employees

22 to go vote.

23 Q.  Did this provision expand protection for voters?

24 A.  It.

25 Q.  What impact did this have on voters?

1  A.  It allowed them to have the option of going to vote during

2  work hours during early voting and not just Election Day.

3  Q.  Did the Elections Division in your time as director ever

4  receive a complaint that an employer would not give employee

5  time to vote?

6  A.  No.

7  Q.  Let's move on to Section 7.04.  This section seems to be

8  divided into two distinct parts, vote harvesting and

9  unsolicited applications.  We are going to address each of

10 these in turn starting with vote harvesting.

11     As a general matter what is vote harvesting?

12 A.  Vote harvesting is when a person is paid by a campaign to

13 make sure that mail ballots are returned favorable to that

14 campaign.

15 Q.  Now, you and plaintiffs' counsel had an extensive exchange

16 on vote harvesting so I just want to ask a few clarifying

17 questions specifically focused on the term "physical presence

18 of the ballot".

19 A.  Okay.

20 Q.  If a person is canvassing a neighborhood, enters the

21 resident's home to discuss a ballot proposition, but

22 unbeknownst to the canvass worker there is a ballot laying on

23 the counter, is that in physical presence of the ballot?

24 A.  No.  The physical presence requirement means the conscious

25 presence.  Both parties need to be aware that the ballot is

1   there and they need to be discussing it.

2   Q.  If a person goes to a candidate forum hosted by a

3   nonprofit organization, but unbeknownst to the organizer has a

4   ballot in the backpack, is that in the physical presence of a

5   ballot?

6   A.  No.  It's not the conscious presence.

7   Q.  And what is the basis for the Secretary of State's

8   position?

9   A.  Because otherwise it would be — it would impossible for

10  this to be used.  I mean it's just — vote harvesting has a

11  meaning and that meaning is when somebody puts pressure on a

12  voter to vote a particular way on a particular race, and

13  that's why the previous provision in this new statutes talk

14  about that, that it has to be focused on one race.  And if

15  somebody just has their ballot with them and the canvasser has

16  no idea that ballot is there and they are just advocating for

17  their candidate like they would anybody else, that's not vote

18  harvesting, that's advocacy, and that is fine.

19          THE COURT:  But who makes that decision?  So let's

20  say someone goes to someone's house and the ballot is on the

21  coffee table.  One party's argument can be I didn't know it

22  was on the coffee table, then another person's argument is

23  going to be well — and so some criminal defense — I mean,

24  pardon me, some criminal prosecutor, district attorney argue

25  oh no, under the totality of the circumstances you must have

1  known that the ballot was there.  Who makes those decisions?

2  Not the Secretary of State apparently.

3        THE WITNESS:  So in the first instance it would be

4  the voter or maybe a voter's family member who feels like

5  their family member got taken advantage of, so somebody has to

6  make a complaint.

7        THE COURT:  And they would make a complaint to who?

8        THE WITNESS:  To the DA, and the DA would have to

9  decide whether the evidence justifies prosecution or not.  But

10  the important thing is somebody has to feel like they were

11  taken advantage of in order to make that complaint, and in

12  order to do that I think that means they had to be coerced

13  into marking the ballot.  That's the way the complaints arise.

14  That's the way we've seen it.

15  BY MISS HUNKER:

16  Q.  Let's move on to it the next section which is Unsolicited

17  Applications.  Which is on page 60 and 61.

18      In the summer of 2020 did it come to the attention of the

19  Elections Division that Harris County intended to send

20  unsolicited mail ballots applications?

21  A.  Yes.

22  Q.  How did the Elections Division learn about Harris County's

23  plan to send unsolicited mail ballot applications?

24  A.  There were two phases.  There was the over 65 phase that

25  we learned about on the advisory committee calls, several

1  counties were doing that.  Subsequently we learned that they

2  were also intending to send it to all the voters, not just

3  those over 65.  And I believe we got that notification in an

4  email from Mr. Hollins.

5  Q.  And did Harris County announce that they intended to send

6  unsolicited mail ballot applications to all voters publicly?

7  A.  Yes.

8  Q.  And how did they do so?

9  A.  Social media and I don't know what else.

10  Q.  Can we briefly bring up State Exhibit 132.

11      And is this among the social media you were speaking

12  about?

13  A.  Yes.

14  Q.  We can take that down.

15      After the Elections Division learned about the plan to

16  send unsolicited applications, what was the offices' response?

17  A.  I sent a letter to Mr. Hollins telling him that he should

18  not do this.

19  Q.  Let's bring up that exhibit, State Exhibit 133.

20      Do you recognize this exhibit?

21  A.  I do.

22  Q.  And what is it?

23  A.  It's my letter to Mr. Hollins.

24  Q.  And were you the signatory of this letter?

25  A.  Yes.

KEITH INGRAM - DIRECT

1  Q.  And do you stand by the contents of this letter?

2  A.  I do.

3  Q.  And is the information provided in this letter accurate

4  and true?

5  A.  Yes.

6  Q.  In this letter did the Elections Division take the

7  position that Harris County's plan to send unsolicited mail

8  ballot application was contrary to your office's guidance on

9  this issue?

10 A.  Yes.

11 Q.  What was your office's guidance at the time?

12 A.  That sending an unsolicited mail ballot application should

13 be done only to those voters who are absolutely eligible.  So

14 in other words, those over 65.

15 Q.  And what was the basis for this guidance?

16 A.  Because we didn't want voters to be confused about whether

17 or not they were eligible to vote by mail, that voting by mail

18 is for specific categories and, you know, in the context of

19 COVID and the pandemic there was a lot of talk on social media

20 about voting by mail and people were confused about whether or

21 not fear of COVID was a disability that allowed them to vote

22 by mail.  There was a lot of confusion about that and several

23 lawsuits that I mentioned in this letter, and so we didn't

24 want voters to be confused by receiving an official

25 communication inviting them to vote by mail into thinking that

1  they qualified for it.

2  Q.  In the letter you sent Mr. Hollins, did you take the

3  position that the unsolicited mail ballot applications were an

4  abuse of voters rights?

5  A.  Yes.

6  Q.  And why did you believe that Harris County's plan was an

7  abuse of voters rights?

8  A.  Because it appeared to me like an official communication

9  from the county inviting a person to vote by mail could

10 deceive voters into believing that they are qualified to vote

11 by mail and thus commit a felony because they are not

12 qualified to vote by mail.

13 Q.  Let's scroll down to the third and fourth paragraphs.

14    Were you concerned that sending the mail ballots would

15 cause voters to provide false information on the ABBMs?

16 A.  Yes.

17 Q.  And what was the basis for this belief?

18 A.  Because they would check the disability box where they are

19 not disabled.

20 Q.  Were you concerned that sending an application to every

21 registered voter would confuse voters about their ability to

22 vote by mail?

23 A.  Yes.

24 Q.  In the letter did you threaten litigation if Harris County

25 did not halt their plans and renounce a retraction?

1  A.  I did.

2  Q.  Did Harris County agree to the retraction?

3  A.  No.

4  Q.  And did the State of Texas proceed to file suit against

5  Harris County?

6  A.  They did.  We did.

7  Q.  I'm going to bring up State Exhibit 134.

8      Do you recognize this exhibit?

9  A.  Yes.

10  Q.  And what is it?

11  A.  It's an original petition for restraining order.

12  Q.  And was this the petition filed in response to Harris

13  County's proposal to send unlisted mail ballot applications?

14  A.  Yes.

15  Q.  Let's scroll to page 6.

16          THE COURT:  Before we do that.  So now I'm confused

17  here.

18          So who is the plaintiff?  Is it the Office of the

19  Secretary of State, the Attorney General, who is the entity

20  that sued?

21          THE WITNESS:  Texas.

22          THE COURT:  So that's why I always get confused in

23  this lawsuit.  Everybody claims they can't be sued, can't be

24  the Secretary of State, can't be the Attorney General, can't

25  be the Governor.  Who authorized this lawsuit to be filed?

4441

KEITH INGRAM – DIRECT

```
 1            THE WITNESS:  That's a good question.  I mean I asked
 2  the Attorney General to file it because 31.005, that's what
 3  I'm supposed to do.  They decided to file it, so whether or
 4  not they got authorization from somebody I don't know, but I
 5  requested it and they did it on my behalf.
 6  BY MISS HUNKER:
 7  Q.  Let's scroll down to page 6.
 8      In this petition and application for temporary restraining
 9  order, did the State argue that sending unsolicited
10  applications was ultra vires, or in other words outside of the
11  county's powers?
12  A.  Yes.
13  Q.  And did you testify in this case?
14  A.  I did.
15  Q.  And what was the position you took during your testimony?
16            MR. KANTERMAN:  Objection, Your Honor.  That's —
17            MISS HUNKER:  It's an in-court statement, Your Honor.
18            THE COURT:  Go ahead.
19            THE WITNESS:  That what they were proposing was
20  illegal and could confuse voters and it would clog the mail
21  system from legitimate mail voters and prevent them from being
22  able to successfully vote.
23  BY MISS HUNKER:
24  Q.  And in the course of litigation did you, Secretary of
25  State's Office, enter into a Rule 11 agreement with Harris
```

KEITH INGRAM - DIRECT

1  County?

2  A.  I don't recall that but maybe we did.

3       MISS HUNKER:  Your Honor, I would like to move into

4  evidence State Exhibits 132, 133, and 134.

5       THE COURT:  Any objection to those exhibits?

6       MISS HOLMES:  Objection, Your Honor.  Not to 132,

7  which I believe was the tweet, but we do object to 133 and

8  134.  We don't object to these exhibits just being used to

9  show this letter was sent by the Secretary of State to Chris

10  Hollins, but if they are entering for truth of the matter the

11  statements that are in the letter, that is hearsay.  And for

12  the petition, we don't object on the basis that if it's just

13  being used to show that this petition was filed in court but,

14  of course, these allegations are hearsay and can't be used for

15  the truth.

16       THE COURT:  Is there any objection to 132 from

17  anybody?  No objection to 132.  132 is admitted.

18       What's your response on 133 and is 34?

19       MISS HUNKER:  On 133, Your Honor, the witness on the

20  stand has adopted the contents of the letter, and so therefore

21  it is an in-court statement and the attorneys of course would

22  have plenty of ample opportunity to question Mr. Ingram on the

23  contents of that letter.

24       THE COURT:  Yeah, 133 and 134 are admitted.  These

25  were allegations made by the Secretary of State and then

KEITH INGRAM - DIRECT

1  whatever the entity of the State of Texas is, that's not

2  binding on those whether or not those allegations are correct

3  or not.

4  BY MISS HUNKER:

5  Q.  Did the lawsuit make its way to the Texas Supreme Court?

6  A.  I believe so.

7  Q.  Let's pull up State Exhibit 136.

8      Mr. Ingram, do you recognize this document?

9  A.  I do.

10 Q.  And was this the decision issued by the Texas Supreme

11 Court in this case?

12 A.  It was.

13 Q.  Let's go to the last page.

14     Did the Court hold that the election code did not

15 authorize an early voting clerk to send an application to vote

16 by mail to a voter who was not requested one?

17 A.  They did.

18        MISS HUNKER:  Your Honor, I'd like to move into

19 evidence State 136.

20        THE COURT:  Is that the opinion?

21        MISS HUNKER:  That's the opinion.

22        THE COURT:  136 is admitted.

23        MR. KANTERMAN:  No objection, Your Honor.

24        MISS HUNKER:  Thank you, Your Honor.

25

1  BY MISS HUNKER:

2  Q.  Let's go back to Section 7.04.

3      Does this provision address the legal controversy

4  instigated by Harris County's decision to send unsolicited

5  mail ballot applications to every registered voter in the

6  county?

7  A.  Yes.

8  Q.  Is it your understanding that Section 6.04 clarifies the

9  election code by making explicit limitation that was

10  recognized to already existed by the Texas Supreme Court?

11  A.  I agree with that.

12  Q.  I want to ask a few final questions on this topic before

13  moving on since Judge Rodriguez voiced an interest in the

14  answer very early in this litigation.

15      Section 7.04 only prohibits public officials and election

16  officials from distributing ABBMs when acting in their

17  officially capacity, it does not prohibit political parties

18  from doing the same?

19  A.  I agree with that.

20  Q.  What is the interest prohibiting public officials and

21  election officials from distributing ABBMs when acting in

22  their official capacity but not political parties or

23  candidates?

24          MR. KANTERMAN:  Objection, Your Honor.  That calls

25  for speculation and also calls for a legal conclusion.

KEITH INGRAM - DIRECT

1          THE COURT:  Those are overruled.

2          You can answer.

3          THE WITNESS:  So I think there's probably at least

4  two interests.  Number one is the expense, so a county --

5          THE COURT:  You know, let me just make sure, when I

6  let you answer these questions you keep on giving what's the

7  Secretary of State's position.  I mean is there anything in

8  the legislative history that this was the legislature's

9  interest in passing the bill?

10          THE WITNESS:  With regard to this provision, yes,

11  sir.

12          THE COURT:  Where can I find that?

13          THE WITNESS:  I believe in committee testimony.

14          THE COURT:  Okay.  Is what you're going to offer

15  consistent with the committee testimony or is it different?

16          THE WITNESS:  Well, it's consistent with people

17  who -- I mean we were a resource obviously, we didn't provide

18  testimony for or against a bill, but the provisions that are

19  here about unsolicited mail ballot applications, we were

20  already on the record as being in favor of because of the

21  propensity to confuse voters.  So this is, it's not

22  necessarily that we were in favor of this particular provision

23  but we were strongly in favor of the position that voters

24  didn't need to be confused.

25          THE COURT:  I just want the record clear because I'm

1  letting you ask the questions and letting him answer, but

2  what's of interest is what was before the legislature in their

3  enactment of the bill, not necessarily what was going through

4  the mind of some other agency or division.

5       MISS HUNKER:  So, Your Honor, we do have legislators

6  who are going to appear in phase two of the trial.  Right now

7  there's a special session going on and so a lot of the

8  discussion is being pushed to then.  Our plan is to go through

9  the various transcripts of the committee hearings and the

10 floor hearings for House and Senate, and that will give a much

11 fuller picture of what was actually being discussed on the

12 floor and by legislature at the time.

13      THE COURT:  Like I said, I'm letting you ask the

14 questions but that's not the salient question in my mind.

15 BY MISS HUNKER:

16 Q.  You had mentioned that there were two particular reasons.

17 Can you please articulate those two reasons for the Court?

18 A.  The first one is expense, which is less important reason.

19 The main reason is to prevent confusion of the voters and

20 potentially walking them into committing a felony by providing

21 a false statement on an application that they are not eligible

22 to complete.

23 Q.  Do you think it more likely that a voter would be confused

24 if the form was coming from a public official or election

25 official in their officially capacities?

KEITH INGRAM - DIRECT

1   A.  Yes.

2   Q.  Why do you believe this?

3   A.  Because voters treat official communications from

4   government differently than they treat campaign mail.  They

5   give it a bigger importance than they would a communication

6   from a campaign.

7   Q.  Is this something the Secretary of State's Office takes

8   into consideration when doing its own mailing?

9   A.  Yes.

10  Q.  Has your office had experience where voters made

11  assumptions about their rights or status because the mailing

12  came from the Secretary of State?

13  A.  Yes.

14  Q.  And can you give me an example of that?

15  A.  In 2020 we did the mailing that was required by the

16  Electronic Registration Information Center to unregistered

17  voters inviting them to register to vote and we did it as

18  generic postcard from our office to current residents so

19  nobody in particular was named, but we received, after sending

20  out more than 3 million of those postcards, we received

21  thousands of phone calls from voters who were upset because

22  they thought we were telling them they were not registered to

23  vote when they knew they were.

24  Q.  Do you recall if this was an issue in the litigation with

25  Harris County back in 2020?

4448

KEITH INGRAM - DIRECT

1   A.  I don't recall.

2   Q.  Let's move on to Article 8 provisions.

3       Mr. Ingram, you should see Section 8.01 of SB 1 on your

4   screen.  Can you please summarize what changes Section 8.01

5   made to the election code?

6   A.  It limited the persons who could be performing the duties

7   of an election official if they had a previous conviction for

8   an election-related crime.

9   Q.  And what about the portion that amends Section 31.129 of

10  the election code?

11  A.  It just made sure that they related back to the

12  definition.

13  Q.  Prior to SB 1 were county election officials required to

14  comply with the election code?

15  A.  Yes.

16  Q.  What was the remedy for voters or candidates when an

17  election official violated the election code?

18  A.  They could file an election contest.

19  Q.  Was there remedy besides an election contest?

20  A.  There was not.

21  Q.  Does this mean that voters and candidates did not always

22  have a remedy available when county election officials

23  violated the election code?

24  A.  I would agree with that.  We've had the discussion with a

25  number of candidates that it was a hollow remedy.

1  Q.  Following SB 1's passage are election officials still
2  required to comply with the election code?
3  A.  They are.
4  Q.  But does Section 8.01 provide an additional remedy for
5  when election officials violate the election code?
6  A.  It does.
7  Q.  Mr. Ingram, over the last two days you and I have gone
8  through much of Senate Bill 1.  Before I end the examination I
9  wanted to ask if there were any provision in Senate Bill 1
10 that you thought had a particularly positive impact on Texas
11 elections?
12 A.  Yes.
13 Q.  And what are those provisions?
14         MR. KANTERMAN:  Objection, Your Honor.  Calls for an
15 open narrative.
16         THE COURT:  That's overruled.
17         THE WITNESS:  You know, the one we've discussed
18 before, the reconciliation form I think was probably the most
19 important for transparency.  But in addition to that, for the
20 first time we have a procedure for correcting the rejection of
21 a mail ballot, so we've got a procedure in place that voters
22 can cure a mail ballot rejection and have their vote counted.
23         The other thing is it took the Ballot Tracker from
24 House Bill 1382 regular session and extended it to be able to
25 electronically correct some of the problems with mail ballots

KEITH INGRAM - DIRECT

1  so that they wouldn't be rejected, so anything you can do to

2  increase the electronic ability, ability electronically for

3  disabled voters to correct a mail ballot is better.

4          And finally, you know, the expansion of online voter

5  registration to include any move to a new county for an

6  existing voter, that's online voter registration right there.

7  I mean, it was -- before SB 1, the Texas.Gov address change,

8  you know, update procedure for voter registration was a trap

9  for the unwary.  Because if you moved from Lubbock to Bexar

10 and you tried to use that platform to update your registration

11 in Bexar County, it would cancel your voter registration in

12 Lubbock but it would not registor you to vote in Bexar, so we

13 did not push or encourage anyone to go to Texas.Gov.  That was

14 required to be provided by law but we didn't want to use it

15 because we didn't want voters to be messed up.

16         Now they can update their address into Bexar County

17 online and that was a wonderful change, and now we push

18 Texas.Gov as hard as we can push it because it's a great way

19 for voters to update their information.

20 BY MISS HUNKER:

21 Q.  You mentioned a cure process.  Based on your experience

22 had voters been requesting a cure process for multiple years?

23 A.  Yes.  I had a least two lawsuits on that.

24 Q.  And had there been a request for online voter

25 registration?

KEITH INGRAM - DIRECT

1  A.  Yes.

2  Q.  And did SB 1 provide an advancement in those two areas?

3  A.  Yes.

4          MISS HUNKER:  Thank you, Your Honor.

5          I pass the witness.

6          THE COURT:  Anything else?

7          MR. NICHOLS:  Very briefly.

8  BY MR. NICHOLS:

9  Q.  Mr. Ingram, good morning.

10  A.  Howdy.

11  Q.  I should have said howdy knowing you from A&M.

12      Did I hear you correctly that it's the Secretary of

13  State's position that the vote harvesting offense would not

14  apply to a situation in which a canvasser advocating for a

15  specific candidate or measure was not aware that they were

16  doing so in the presence an official ballot or ballot voted by

17  mail?

18  A.  If they didn't know it's there, that's not vote

19  harvesting, that's canvassing.

20  Q.  Brian, could we pull back up the joint Exhibit Number 1

21  the SB 1.  It's Section 7.04, sir.

22      And, Mr. Ingram, I think you probably know where I'm going

23  but is there a knowingly requirement baked into the language

24  of the offense of vote harvesting?

25          MR. KANTERMAN:  Objection, Your Honor.  Calls for a

 1  legal conclusion.
 2          THE COURT:  That's overruled.  And this is sort of
 3  redundant.
 4          MR. NICHOLS:  I don't think this provision was
 5  covered, Judge, so it will be very brief.
 6  BY MR. NICHOLS:
 7  Q.  So is there a knowingly provision or requirement baked
 8  into this offense as one of the elements of the offense?
 9  A.  There is.
10  Q.  So if we go to Subsection B.
11      And I'll do this very briefly, Judge.
12      Is the knowingly element in B?
13  A.  It is.
14  Q.  If we go to C, is the knowingly element in C?
15  A.  It is.
16  Q.  And in D, is the knowingly element in D?
17  A.  Yes.
18          MR. NICHOLS:  Thank you, Your Honor.  That's all I
19  have.
20          THE COURT:  Anything else?
21          Any additional cross?
22          MR. KANTERMAN:  Yes, Your Honor.
23                      CROSS-EXAMINATION
24  BY MR. KANTERMAN:
25  Q.  Mr. Ingram, good morning, Jason Kanterman, again from the

KEITH INGRAM – CROSS

1  law firm of Fried, Frank, Harris, Shriver & Jacobson on behalf

2  of the LUPE plaintiffs.  Good to see you, sir.

3  A.  Good to see you.

4  Q.  During your more than 11 years with the Secretary of

5  State's Office you were involved in more than a hundred

6  elections throughout the State of Texas, right?

7  A.  I haven't counted but I wouldn't be surprised.

8  Q.  It's probably fair to say that during your ten plus years

9  as director you were aware generally of all of the elections

10 that were going on within the State during that period?

11 A.  I would think most of them.

12 Q.  And if there were significant problems occurring within

13 those elections, you would have known about them, right?

14 A.  I have, yes.

15 Q.  And certainly if fraud was detected in any of those

16 elections, that would have been brought to your attention?

17 A.  Right, and we've referred those complaints to the Attorney

18 General for investigation and prosecution.

19 Q.  And you understand that the State of Texas has taken the

20 position throughout this case, that SB 1 is at least in part

21 enacted as an anti-fraud statute?

22 A.  Sure.

23 Q.  And you understand that the State of Texas has taken the

24 position that SB 1 has tailored access to certain forms of

25 voting such as mail ballot voting, drive-thru voting, or after

KEITH INGRAM - CROSS

1  hours voting because of purported concerns relating to fraud?

2  A.  I don't know if those are the only concerns but that's one

3  of the ones that came up in the committee hearings.

4  Q.  You would agree with me, sir, that the 2020 General

5  Election did not reveal any broad systemic statewide fraud

6  concerning mail ballots in the state of Texas?

7  A.  I agree with that.  We've never had any evidence of a

8  systemic statewide fraud.  We've always had localized fraud in

9  the mail ballots and we did in 2020 as well.

10  Q.  So the answer to my question was that you would agree with

11  my prior statement?

12  A.  Yes.  I just don't want it to leave a false impression.

13  Q.  Now, to your knowledge, the rate of fraud concerning mail

14  ballots did not increase in Texas during the 2020 General

15  Election?

16  A.  I agree with that.

17  Q.  Nor as of July 2021 did you have any evidence of actual

18  fraud relating to drive-thru voting in the State of Texas?

19  A.  No.

20  Q.  No, as in you agree with that statement?

21  A.  I agree that there was no evidence of fraud in drive-thru

22  voting and that's what I testified in front of the Senate as

23  well as the House.

24  Q.  Nor as of July of 2021 were you aware of any fraud that

25  occurred at night during polling places with early voting

1  hours available between say 9:00 p.m. and 6:00 a.m.?

2  A.  I agree with that.

3  Q.  Rather, quite the opposite was true, because even before

4  SB 1 was passed you believe that Texas elections were in good

5  shape?

6  A.  Sure.

7  Q.  And in fact in March of 2021 you told the Texas House

8  committee on elections that you believe Texas elections were

9  in good shape?

10  A.  I did, and I believed it then and I believe it now.  We've

11  got a great election system in Texas.

12  Q.  And so by using the terms "great election system" or "in

13  good shape," you mean to communicate that the elections

14  framework in place within the State is working the way that

15  it's supposed to?

16  A.  I agree with that.

17  Q.  And at least in part, your statement that Texas' elections

18  were in good shape before SB 1 was enacted reflected your

19  views on the security of Texas elections at that time?

20  A.  I agree with that.  Doesn't mean that it can't be more

21  secure, but —

22  Q.  And you shared that view more than five months before SB 1

23  was passed into law?

24  A.  I did.

25  Q.  Elections that are in good shape, sir, in your view are

4456

KEITH INGRAM - CROSS

1  free and fair elections, right?

2  A.  Yes.  But it doesn't mean they don't have problems and it

3  doesn't mean they can't be improved, but yes.

4  Q.  And in your view Texas always has free and fair elections?

5  A.  Since I've been in this job and well before, yes, sir.

6  Q.  With respect to the 2020 Presidential Election you've

7  previously gone on record and said that the election was also

8  smooth and secure, right?

9  A.  I agree with that.

10 Q.  And this election predated the passing of SB 1, didn't it?

11 A.  It did.

12 Q.  And in your view an election is smooth if voters don't

13 have to wait in long lines and are able to successfully cast

14 their vote in a timely manner the way they want to cast it?

15 A.  I agree with that.

16 Q.  And an election is secure if voters can have the

17 confidence their ballot is going to be counted in the way they

18 cast it?

19 A.  I agree.

20 Q.  And if there's widespread fraud in an election, you would

21 not call that election smooth or secure, right?

22 A.  Again, I've been over this in the deposition as well as

23 yesterday.  The smooth and secure was not —

24 Q.  Sir, that's not my question.

25 A.  No, I'm going to answer —

KEITH INGRAM - CROSS

1              THE COURT:  No, you're not, sir.  You're going to

2      answer the question he asked.

3              THE WITNESS:  Yes, but —

4              THE COURT:  Ask your question again.

5              THE WITNESS:  I don't agree with that, but —

6              THE COURT:  You don't agree with me or the question?

7              THE WITNESS:  I don't agree with the question; I'm

8      sorry.  I certainly don't want to — no, I'm fine, yes, sir, I

9      agree with you.

10             THE COURT:  Ask the question again.

11             MR. KANTERMAN:  I will, Your Honor.  Let's make sure

12     the record is clear.

13     BY MR. KANTERMAN:

14     Q.  If there's widespread fraud in an election, you would not

15     have called the election smooth or secure?

16     A.  I don't agree with that.

17     Q.  Okay.  If we can, please, pull Mr. Ingram's deposition

18     transcript April 28, 2022, page 26, lines 4 through 10.

19             MR. KANTERMAN:  Your Honor, I'll note there is an

20     objection in the record to form on the deposition.  Happy to

21     address that if the Court needs me to.

22     BY MR. KANTERMAN:

23     Q.  Mr. Ingram, you gave a deposition in this case — in fact,

24     multiple depositions, correct?

25     A.  I did.

KEITH INGRAM – CROSS

1  Q.  Including one on April 28, 2022?

2  A.  Sure.

3  Q.  You testified under oath during that deposition?

4  A.  I did.

5  Q.  You understood the oath you took during that deposition?

6  A.  I did.

7  Q.  I asked at that deposition:

8      "Question:  And would you say that an election is secure

9  if there's not widespread voter fraud," correct?

10  A.  I agree with that.

11  Q.  And you gave me an answer:

12     "Well, I wouldn't –– I wouldn't quite secure you with

13  fraud, but I can see what you are trying to say.  Yes, if

14  there is widespread fraud, that's not a good election."

15  A.  I agree with that.

16  Q.  Okay, you can take this down.  Thank you.

17     You would agree with me, sir, that there was no widespread

18  fraud in the 2020 General Election, correct?

19  A.  I've already agreed with that, I'll agree with it again.

20  Q.  Let's change subjects if we can.  During your direct

21  examination yesterday you were asked questions about whether

22  you were aware of whether certain prosecutions or

23  investigations had occurred under various sections of SB 1.

24  Do you recall that?

25  A.  I do.

KEITH INGRAM - CROSS

1  Q.  And you told us you were generally not aware of any such

2  investigations or prosecutions?

3  A.  I agree with that.

4  Q.  It's true though that you're not in the business of

5  investigating or prosecuting crimes occurring under SB 1?

6  A.  I agree with that.

7  Q.  You're not employed by the Texas Attorney General's Office

8  as either an investigator or a prosecutor?

9  A.  I'm not.

10 Q.  You're not employed by any local district attorney's

11 office in those same capacities?

12 A.  I'm not.

13 Q.  Indeed you're not currently employed by any branch of the

14 Texas state government?

15 A.  I agree with that.

16 Q.  And so just because you're not aware of any investigations

17 or prosecutions arising under SB 1 it doesn't mean they don't

18 exist, correct?

19 A.  I don't agree with that.

20 Q.  It's your testimony that because you're not aware of any

21 prosecutions or investigations that they don't exist?

22 A.  I think that the odds are that I would have known of it

23 because the law requires local district attorneys to notify

24 our office when they have an investigation under the election

25 code, and we have not received any such notifications, at

4460

KEITH INGRAM - CROSS

1  least as of the day that I left on August 31st.

2  Q.  So that's part of my question, sir.  You are no longer

3  employed by the Secretary of State's Office?

4  A.  I agree with that.

5  Q.  So there's at least some period of time that you may not

6  be aware of any prosecutions or investigations through your

7  employment at the Secretary of State's Office?

8  A.  I agree with that.

9  Q.  So back to my question, isn't it fair to say that just

10  because you're not aware of a particular investigation or

11  prosecution, it's not fair to assume it doesn't exist?

12  A.  With the caveat that that would be since August 31st, yes,

13  sir.

14  Q.  In fact both you and the State have taken the position

15  throughout this case that information relating to ongoing

16  investigations or prosecutions would be covered by the

17  investigative privilege, correct?

18  A.  That's what 31.006 says, yes, sir.

19  Q.  And since you're no longer employed by the Texas Secretary

20  of State's Office, you wouldn't have access to any of that

21  privileged information since the time that you left?

22  A.  I agree with that.

23  Q.  And so again it's at least fair to say that it is possible

24  there are investigations or prosecutions arising under crimes

25  outlined in SB 1 you may not be aware of?

KEITH INGRAM - CROSS

1              MR. NICHOLS:  That's pure speculation, Judge.  How
2    can he possibly testify to something that the question
3    embodies he's not aware of.
4              THE COURT:  I think that's the whole point.
5              THE WITNESS:  Exactly.
6              THE COURT:  Yeah.
7              MR. KANTERMAN:  That is the point, Your Honor.
8              THE COURT:  Yeah.  You don't know, right?
9              THE WITNESS:  I have no idea.  I don't know what I
10   don't know; that's the problem with life.
11   BY MR. KANTERMAN:
12   Q.  Now let's set aside what prosecutors may or may not have
13   done and what they might do.  To your knowledge the Attorney
14   General's Office has not disavowed or refused to participate
15   in any investigation or prosecution relating to crimes arising
16   under SB 1, right?
17   A.  To my knowledge?  No, I have no knowledge of that.
18   Q.  And to your knowledge, other than complying with the
19   Phillips case, the Attorney General and his office have not
20   volunteered to be bound by some decree, some injunctions, or
21   some binding court order limiting their authority to
22   participate in any such investigations or prosecutions of
23   crimes occurring under SB 1?
24   A.  No.
25              MISS HUNKER:  Your Honor, I'm going to object to that

1  question on lack of personal knowledge.  Mr. Ingram is from

2  the Secretary of State's Office but these specific questions

3  are asking about the detailed policies of the Attorney

4  General's office.

5          THE COURT:  Yeah.  Mr. Ingram is really bright, he

6  can say what he knows and what he doesn't know.

7          MISS HUNKER:  Just for the record, is that overruled?

8          THE COURT:  That's overruled.

9          MISS HUNKER:  Thank you, Your Honor.

10          THE COURT:  Of course, if you don't know the answer,

11  just say you don't know the answer.

12          THE WITNESS:  I just don't know.  I agree that I

13  don't know that.

14  BY MR. KANTERMAN:

15  Q.  And so you would agree with me that it's at least possible

16  that prosecutors within the State of Texas will prosecute

17  offenses arising under SB 1?

18          MR. NICHOLS:  Your Honor, possibility of evidence

19  existing is not a competent standard of proof for anything,

20  and this witness has no foundation to answer that question.

21          THE COURT:  He's already answered a couple of those

22  questions.  I posed them myself.  That's overruled.

23          MR. KANTERMAN:  Would you like me to repeat the

24  question?

25          THE WITNESS:  Yes, please, if you would.

4463

KEITH INGRAM - CROSS

1  BY MR. KANTERMAN:
2  Q.  So you agree with me that it is at least possible that
3  prosecutors within the State of Texas will prosecute offenses
4  arising under SB 1 in the future?
5       MR. NICHOLS:  Your Honor, again, objection to
6  relevance.
7       THE COURT:  Overruled.
8       THE WITNESS:  I agree with that.
9  BY MR. KANTERMAN:
10 Q.  Sir, you would agree with me that SB 1's criminal
11 provisions are there to dissuade people from committing fraud?
12 A.  That's an interesting question.  And it gets into the
13 whole determinant effect of law in the first place and I
14 really am not at liberty or able to answer those kind of
15 philosophical questions.
16 Q.  Would you agree with me generally that SB 1's criminal
17 provisions at least aim to serve some deterrence?
18 A.  It's my understanding under criminal law philosophy that
19 that's one of the potential reasons for making something
20 illegal.
21 Q.  And I believe you told me earlier that during your time as
22 the Elections Division Chief of the Secretary of State's
23 Office, that you referred complaints alleging election crimes
24 arising under SB 1 to the Attorney General's Office for
25 investigation?

 1  A.  I don't know, you would have to show me.

 2  Q.  I could do that or I could try and ask this a little bit

 3  differently.  Did you refer, or isn't it true that you

 4  referred complaints to the Attorney General's Office during

 5  your time as Elections Division Chief?

 6  A.  I did.

 7  Q.  And did some of those complaints involve crimes or

 8  activity under SB 1?

 9  A.  Maybe.  I don't know.  I just can't recall it off the top

10  of my head.  If you've got my complaint log we can look, but

11  that would have been, you know, in 2022.

12  Q.  Setting aside the issue of SB 1, going back generally to

13  complaints, when you referred a complaint to the Attorney

14  General's Office or to a local DA, it was your understanding

15  that they would take that complaint and decide whether to

16  investigate and then whether to prosecute?

17  A.  Yes.

18  Q.  Sitting here today you have no reason to believe that that

19  process of referral and then consideration by the prosecutor

20  has changed since you've left office, right?

21  A.  I agree with that, it's still in place.

22  Q.  To your knowledge, never in the history of the State of

23  Texas has voter fraud had an outcome determinative impact on

24  any statewide election?

25  A.  Statewide?  Since I've been in -- no.

KEITH INGRAM - CROSS

1  Q.  Secretary of State's Office does not train local
2  prosecutors on your interpretation of SB 1's criminal
3  provisions, right?
4  A.  No, we haven't done that historically.  We have talked
5  about doing that in the future.  We have answered questions
6  from local DAs obviously.
7  Q.  But you have not provided training to them?
8  A.  Agree with that.
9  Q.  Earlier in your direct examination you spoke about the
10  Secretary of State's Office's creation of a spreadsheet with
11  mail ballot rejection rates, right?
12  A.  Agree.
13  Q.  And you stated that the Secretary of State's Office made
14  the counties put certain information into the Ballot Tracker,
15  right?
16  A.  The law made them but we followed up.
17  Q.  But it was your testimony that it was the Secretary of
18  State's Office that made them do it, correct?
19  A.  Well, we told them what the law required and we hounded
20  them until they did it, yes.  I mean requested and requested
21  and requested.  Sometimes they did.  Most of the times they
22  did.  We always have 14 or 15 counties that don't comply,
23  don't work with us.
24  Q.  And when you say hounded or requested, that's because the
25  Secretary of State's Office cannot make the counties put data

KEITH INGRAM – CROSS

1  into it the Ballot Trackers, right?

2  A.  I agree with that.

3  Q.  You didn't ask the counties to review and approve that

4  spreadsheet, did you?

5  A.  The spreadsheet of rejection rates?

6  Q.  Correct.

7  A.  No.

8  Q.  Sitting here today, are you aware of any testimony by an

9  elections administrator that they had not seen that

10  spreadsheet before?

11  A.  I don't know what an administrator has seen or not seen.

12  Q.  John, if we can pull up what's in evidence as Joint

13  Exhibit 1 and go to Section 7.04 please.

14      Mr. Ingram, on direct examination you were asked questions

15  about the meaning of Section 7.04, correct?

16  A.  One of the provisions in it, 276015 vote harvesting, yes.

17  Q.  And the State asked you about the meaning of in the

18  presence of the ballot?

19  A.  It says "physical presence."

20  Q.  And you testified that section means conscious presence,

21  correct?

22  A.  Conscious physical presence.  Both parties have to be

23  aware the ballot is there and discussing it, and it's right

24  there within intended to deliver vote for a specific candidate

25  or measure.

KEITH INGRAM - CROSS

1  Q.  Not my question, sir.  My question was you testified that

2  it required conscious presence, right?

3  A.  That's right.

4  Q.  And looking at the screen in front of you, you don't see

5  is the word "conscious" anywhere, do you?

6  A.  No.

7           MR. KANTERMAN:  Just a moment if I could, Your Honor.

8              (Off the record discussion.)

9           MR. KANTERMAN:  Thank you, Mr. Ingram.

10          Your Honor, I pass the witness.  I do believe some of

11  my colleagues have additional questions.

12          THE COURT:  Next.

13          MR. GENECIN:  Thank you, Your Honor.  Good morning.

14  Before I cross-examine Mr. Ingram, may suggest this is a good

15  moment for a midmorning break?

16          THE COURT:  Let's take 10 or 15.

17          MR. GENECIN:  Thank you.

18  BY MR. GENECIN:

19  Q.  Good morning, Mr. Ingram.

20  A.  Good morning.

21  Q.  Now, yesterday you recall testifying about inconsistencies

22  between the counties in terms of various election procedures?

23  A.  I agree that we talked about some things needed to be

24  uniform and some things why idiosyncratic based on resources,

25  yes.

KEITH INGRAM - CROSS

1  Q.  And would it be fair to say that after SB 1 there are

2  still inconsistencies say between small counties that neighbor

3  large counties?

4  A.  I agree with that.

5  Q.  And I'd like to focus for a moment on poll watchers and

6  your testimony yesterday about poll watcher appointments.  Am

7  I correct that anytime a voter signs a form in connection with

8  elections, that signature must be what is sometimes referred

9  to as a wet signature?

10 A.  Not always.  I mean when it's required, it's required,

11 but —

12 Q.  Are there any circumstances in which a voter is not

13 required to place his or her actual signature on the document?

14 A.  Sure.

15 Q.  And what are those?

16 A.  Candidate applications that don't require filing fee can

17 be submitted by email or fax.  Voter registration application

18 at the Department of Public Safety doesn't have a wet

19 signature.  A transaction on Texas.Gov doesn't have a wet

20 signature.

21 Q.  And poll watcher appointments don't have a wet signature,

22 do they?

23 A.  I agree with that.

24 Q.  So it is possible for a poll watcher to make any number of

25 photocopies of an appointment, is that right?

KEITH INGRAM - CROSS

1    A.  I agree with that.

2    Q.  And I think you said yesterday that one of the things that

3    must be on the appointment is the place that the poll watcher

4    is appointed to, is that right?

5    A.  I agree with that.

6    Q.  But the candidate or political party can just leave that

7    blank, is that right?

8    A.  They often do.

9    Q.  And so a poll watcher can just fill in a place that he or

10   she wants to watch at, is that right?

11   A.  Yes.

12   Q.  And indeed a poll watcher is free to go from location to

13   location and just fill in a new place of watching on a

14   photocopied form, is that right?

15   A.  Agree.

16   Q.  Now, am I correct that up until this past summer the State

17   of Texas was a member of the Electronic Registration

18   Information Center?

19   A.  That's correct.  I don't mean from — you say until, but

20   it started in 2020.

21   Q.  Right.  You in fact as Director of Elections took Texas

22   into its membership with the Electronic Registration

23   Information Center, is that right?

24   A.  I did.

25   Q.  And am I correct that people refer to that center as ERIC

KEITH INGRAM - CROSS

1  that's E-R-I-C?

2  A.  Agreed.

3  Q.  Okay.  And ERIC is a not-for-profit organization that's

4  financed by the state's that belong to it, is that right?

5  A.  That's correct.

6  Q.  And ERIC uses motor vehicle department data and voter

7  registration data that the state's upload to it, is that

8  right?

9  A.  Agreed.

10  Q.  And ERIC also uses official death data from the Social

11  Security Administration and change of address data from the

12  United States Postal Service, is that right?

13  A.  Agreed we use the death master file and NCOA.

14  Q.  When you say "NCOA"?

15  A.  National Change of Address.

16  Q.  And using those four data sources, ERIC provides its

17  members with reports that identify inaccurate or out-of-date

18  voter registration records, is that right?

19  A.  Agreed.

20  Q.  And it provides reports indicating deceased voters?

21  A.  Agree.

22  Q.  And it also provides reports with the names of individuals

23  who appear to be eligible to vote but were not yet registered,

24  is that right?

25  A.  Agreed.

KEITH INGRAM - CROSS

1  Q.  And ERIC identifies for the states that are members of

2  ERIC, individuals who may be registered to vote in more than

3  one state, doesn't it?

4  A.  It does.

5  Q.  And is it true that in 2022 ERIC helped the State of Texas

6  to identify at least a hundred thousand duplicate voters?

7  A.  I believe that's correct, yes, sir.  There's a difference

8  between what ERIC says is a match and what our state's

9  matching criteria says is a match, so the gross numbers from

10  ERIC I think were 100K for duplicates.  I don't know what the

11  State equivalent was, I think it was less than that, but maybe

12  that is the State equivalent.  I just don't remember right

13  now.

14  Q.  Now, is it also true that also in 2022 ERIC helped the

15  State to identify an additional 100,000 duplicate registration

16  of people who were registered in other states?

17  A.  I think so, yes, sir.

18  Q.  And am I correct that the Texas legislature passed a bill

19  this year requiring the State to withdraw from ERIC?

20  A.  It put limitations on the matching program that we can

21  belong to such that ERIC would be excluded from the list.

22  Q.  And the sponsor of that legislation in the Senate was

23  Senator Bryan Hughes, is that right?

24  A.  Agreed.

25  Q.  And am I correct that the effort to withdraw from ERIC was

1  originally spearheaded by Alan Vera, who was chair of the

2  Harris County Republican Ballot Security Committee?

3  A.  I don't know what you mean by spearheaded.  The one that I

4  heard it from is Tony Andashell [phonetic].

5  Q.  And she was also an active member of the Republican Party,

6  is that right?

7  A.  She's a SREC member, yes.

8  Q.  What's the SREC?

9  A.  State Republican Executive Committee.

10 Q.  And the bill that mandated the withdrawal from ERIC was

11 passed on party lines, is that right?

12 A.  I'm not familiar with the final vote.  I wouldn't be

13 surprised.

14 Q.  Am I correct that you told legislators when they were

15 contemplating withdrawal from ERIC that ERIC is the only

16 option available to ensure that voters aren't registered or

17 voting in more than one state at a time?

18 A.  Agree with that.

19 Q.  And you told the legislators that ERIC was crucial to

20 keeping Texas' voter rolls clean, isn't that right?

21 A.  I don't remember the word "crucial," but I wouldn't be

22 surprised if I said that, that it was true.

23 Q.  So it's true that ERIC is crucial, is that right?

24 A.  At least for those data source for which we have no other

25 source.  The death data, we have lots of other sources so it's

1  not as crucial for that.  But for the cross state movers and

2  the cross state double voters, there's no other source for

3  that.  It was crucial to those efforts.

4  Q.  Am I correct that the reason put forward by the

5  legislature for withdrawing from ERIC was the cost of

6  membership?

7  A.  I don't know what their reason was.

8  Q.  Well, is it true that for an individual state to subscribe

9  to the social security death data in the National Change of

10  Address data would cost several hundred thousand dollars more

11  than ERIC membership?

12  A.  I don't agree with that.  Seems like it's very cheap,

13  death master file was like 3600 a quarter.

14  Q.  And how about the federal data handling requirements,

15  those are expensive to comply with, aren't they?

16  A.  Right, but our database is already secure so we've already

17  complied with that.  That's the sum cost.

18  Q.  Is it true that ERIC helps its state members to discover

19  individuals who have more than one residents who register to

20  vote in each place where they have a residence?

21  A.  Yes.

22  Q.  And would it be fair to say that a high percentage of

23  people who have more than one residence are white?

24  A.  I don't have any data on that and I sure wouldn't want to

25  speculate.

KEITH INGRAM - CROSS

1  Q.  Would it be fair to say that a high percentage of people

2  who have more than one residence are Republicans?

3  A.  No, I don't know about that at all.  I don't know if

4  that's fair or not fair.

5  Q.  Now, turning to identification requirements, am I correct

6  that Texas voters, when they appear in person to vote, are

7  able to identify themselves with one of seven types of

8  identification?

9  A.  Agree with that.

10  Q.  Okay.  And those types of identification are a Texas

11  driver's license issued by the Texas Department of Public

12  Safety, is that right?

13  A.  Agreed.

14  Q.  Or a Texas election identification certificate issued by

15  the Department of Public Safety?

16  A.  Agreed.

17  Q.  Or a Texas personal identification card?

18  A.  Yes.

19  Q.  Or a Texas handgun license?

20  A.  Handgun license, yes.

21  Q.  Or a United States military identification card?

22  A.  Agreed.

23  Q.  Or a United States citizenship certificate?

24  A.  Yes.

25  Q.  Or a U.S. passport?

KEITH INGRAM - CROSS

1   A.  Yes.

2   Q.  And for that a person can either present the book or the

3   passport card, is that right?

4   A.  Agreed.

5   Q.  And am I correct that of the seven forms of

6   identification, the only ones that a voter can enter the

7   numbers from on the carrier envelope of their ballot-by-mail

8   are the Texas driver's license, the Texas ID, or the Texas

9   identification certificate, and if voter doesn't have those,

10  the last four digits of their social security number?

11  A.  I agree with that.

12  Q.  So is it also true that a voter who goes to the county

13  office or to the election administrator's office as the case

14  may be to file his or her ballot by mail in person could use

15  any one of the seven forms of ID to identify himself or

16  herself?

17  A.  Agreed.

18  Q.  And that voter now under SB 1 must sign the roster, is

19  that right?

20  A.  I agree that that's not legally required but it was

21  already prescribed by our office.

22  Q.  And a voter who goes to one of those offices with his or

23  her ballot by mail and presents his ID or her ID and signs the

24  roster, that's a fully identified voter, right?  Just the same

25  as if that vote are had signed in to vote in person, is that

1  right?

2  A.  Agreed.

3  Q.  Okay.  But am I correct that the election official who

4  takes the ballot-by-mail takes that ballot in its carrier

5  envelope and the carrier envelope is then set aside for review

6  by the early voting ballot board?

7  A.  It's put into the jacket envelope with the application and

8  whatever other materials pertain to that voter and that vote,

9  but yes, it's with the jacket and prepared for the ballot

10  board, yes.

11  Q.  And if the envelope, carrier envelope does not have the

12  numbers entered on to the flap that are in the TEAM system,

13  then that fully identified voter's ballot-by-mail can be

14  rejected, is that right?

15  A.  Agreed.

16  Q.  Now, am I also correct that under the statute that created

17  the Ballot Tracker, access to the Ballot Tracker is limited to

18  persons who enter their Texas driver's license or Texas ID and

19  their social security number?

20  A.  Agree with that.

21  Q.  So you need to put in two numbers in order to access the

22  Ballot Tracker?

23  A.  Yes.

24  Q.  But the purpose of Ballot Tracker, one of the purposes of

25  the Ballot Tracker is to correct missing numbers, is that

KEITH INGRAM - CROSS

 1  right?

 2  A.  The Ballot Tracker can't supply numbers, it can help a

 3  voter if you log into the Ballot Tracker and then you are

 4  presented with the information, this is the number we have for

 5  you, you can click that those are my numbers and your ballot

 6  is now going to be counted.  So the missing number is not

 7  missing from the database, it's missing from the carrier

 8  envelope and that can be supplied by the Ballot Tracker.

 9  Q.  But a person can't access the Ballot Tracker without the

10  two numbers, is that right?

11  A.  Right.  But the point is that the voter registration

12  record can have both numbers and there not be a number on the

13  carrier envelope and so then the voter enters their two

14  numbers, gets into the Ballot Tracker, agrees those are his or

15  her numbers and then that vote counts.

16  Q.  Now, a person who has a Texas election identification

17  certificate issued by the Department of Public Safety, such a

18  person by definition doesn't have a Texas driver's license or

19  a Texas ID, is that right?

20  A.  Agreed.

21  Q.  So people who have a Texas election identification

22  certificate can't use that number to access the Ballot

23  Tracker, can they?

24  A.  If that's the number they registered to vote with, then

25  that's the number that will be on the Ballot Tracker.

KEITH INGRAM - CROSS

1    Q.  It should be, is that right?

2    A.  That's right.

3    Q.  But the statute doesn't provide for the Texas election

4    identification certificate number to be one of the numbers

5    used for access, does it?

6    A.  I don't know.  I mean it's one of the numbers that can be

7    put on the mail ballot.  If their ID number is in the NIC

8    number, then that's the number they access the tracker with.

9    I don't know what you're trying to say.

10   Q.  Well, let's talk about the current registration form.

11   When an individual registers to vote, that form calls for

12   either the voter's Texas driver's license or Texas ID, is that

13   right?

14   A.  Agreed.

15   Q.  And if they don't have that, then their social security

16   number, is that right?

17   A.  The last four, that's HAVA.

18   Q.  So it's and the language on the registration form is Texas

19   driver's license or Texas ID, or last four of the social

20   security number, is that right?

21   A.  Agreed.

22   Q.  So the registration system is not collecting both of the

23   numbers that are needed to access the Ballot Tracker, is it?

24   A.  If they don't use -- I don't know what you mean.  It's

25   going to be one or the other.  Often it's both.  We will

KEITH INGRAM - CROSS

1  harvest the other number out of the DPS data file using the

2  2512 process says.

3  Q.  Now, do you remember testifying yesterday concerning a

4  complaint that was received by the Secretary of State

5  concerning reconciliation issues related to drive-thru voting

6  sites in 2022?

7  A.  Yes.

8  Q.  And, John, would you be able to pull up State 429 for us

9  please.

10      And if you'll look at the first page of Defendant's

11  Exhibit 429, am I correct the name of the complainant is

12  Rachel Palmer Hooper?

13  A.  Yes.

14  Q.  Are you aware that Miss Hooper was a Republican precinct

15  chair for Harris County?

16  A.  I knew she was involved in some way, yes, sir.

17  Q.  Were you aware that she was a member of the advisory

18  council for the Republican National Lawyers Association?

19  A.  I wasn't aware of that.

20  Q.  Are you aware that she was the general counsel of the

21  Texas Republican Party?

22  A.  I knew she was involved with the party, yes, sir.

23  Q.  And do you recall ever hearing the name Hervis,

24  H-E-R-V-I-S, Rogers?

25  A.  Um-hum.

1  Q.  Am I correct that Mr. Rogers is a black resident of Harris

2  County who received some news coverage because he waited in

3  line to vote for more than six hours in the March 2020

4  Primary?

5  A.  Yes, that's my understanding.

6  Q.  And he was the last person waiting in line at his polling

7  place, is that right?

8  A.  That's my understanding.

9  Q.  And more than a year later Mr. Rogers was arrested on

10  charges that he voted in the March 2020 Primary while he was

11  on parole, is that right?

12  A.  I agree with that.

13  Q.  And Attorney General Paxton, who brought the charges,

14  tweeted about the case claiming that he was cracking down on

15  voter fraud, is that right?

16  A.  I don't know what General Paxton tweeted.

17  Q.  All right.  Well, is it true that last year the charges

18  against Mr. Rogers were dropped?

19  A.  I don't know the disposition of the case.

20  Q.  Well, were you aware that Miss Cooper [sic], who filed the

21  drive-thru voting complaint that's here in Defendant's

22  Exhibit 429, was also the person who filed the complaint

23  against Mr. Rogers with the Secretary of State?

24  A.  Her name is Hooper, and yes, I was aware of that.

25  Q.  And that was of the complaint that led to the prosecution

1    of Mr. Rogers?

2    A.   I agree with that.

3    Q.   And you are not aware that that prosecution has now been

4    dismissed?

5    A.   No.

6    Q.   You testified on your direct examination that you thought

7    that drive-thru voting represented a creative approach to the

8    problem of getting people to vote, is that right?

9    A.   To get them to vote safely with a minimum of contact

10   between the poll workers and the voters.

11   Q.   Okay.  And you testified that you didn't think that

12   drive-thru voting impaired any voters rights, is that correct?

13   A.   I agree with that.

14   Q.   And in fact you stated in a hearing in 2020 that

15   drive-thru voting was a creative approach that was probably

16   okay legally, is that right?

17   A.   That's what I said.

18   Q.   If the legislature thought that the election code prior to

19   SB 1 was ambiguous as to whether drive-thru voting were

20   permitted, it could have amended the code to make clear that

21   drive-thru voting was permitted, couldn't it?

22   A.   It could have made it clear that it was or that it wasn't.

23   Q.   And it could have done that for example by defining a

24   moveable structure to include a tent?

25   A.   Sure.

4482

KEITH INGRAM – CROSS

1  Q.  It chose instead of to ban drive-thru voting in SB 1, is

2  that right?

3  A.  It made clear that a polling location has to be in a

4  building and that curbside voters are the only ones who can

5  vote from a car.

6  Q.  You also testified yesterday that the reconciliation forms

7  that are now required under SB 1 have had a positive impact by

8  reducing reconciliation irregularities at polling places, is

9  that right?

10  A.  And central count mainly.

11  Q.  And you testified that counties take the requirement to

12  fill out those reconciliation forms and to reconcile the vote

13  totals very seriously, is that correct?

14  A.  They do indeed.

15  Q.  And the completed forms are posted and available to the

16  public, is that right?

17  A.  That's right.

18  Q.  Those reconciliation forms are used for in-person voting,

19  is that right?

20  A.  Yes.

21  Q.  And they are used for mail-in voting?

22  A.  They are.

23  Q.  And they are used for curbside voting?

24  A.  They are.

25  Q.  And the legislature that passed SB 1 could have enacted

1  reconciliation forms without banning drive-thru voting,

2  couldn't it?

3  A.  They could have.

4  Q.  And in that circumstance, if drive-thru voting were

5  allowed today, the reconciliation forms would apply to help

6  reconcile vote totals at the drive-thru voting location as

7  well, is that correct?

8  A.  Wherever votes are voted would be included in the

9  reconciliation, yes, sir.

10 Q.  Now, you also testified that Harris County had an informal

11 ballot curing process in 2020?

12 A.  I don't know what that means.

13 Q.  Well, you identified some issues with Harris County's

14 approach to curing ballots, is that right?

15 A.  There wasn't a ballot cure in 2020.

16        MISS HUNKER:  Objection, Your Honor.  He's confusing

17 the testimony of Miss Doyer with Mr. Ingram.

18        THE COURT:  Who is, the questioner or the answerer?

19        MISS HUNKER:  He's assigning the testimony to

20 Mr. Ingram.

21        THE COURT:  Why don't you rephrase your question.

22        MR. GENECIN:  Okay.

23 BY MR. GENECIN:

24 Q.  Perhaps I'll just ask this.  Were you aware that Harris

25 County had a ballot curing program in 2020?

KEITH INGRAM – REDIRECT

1  A.  No.  I had heard — there were competing allegations

2  regarding what the ballot board did and didn't do with regard

3  to curing mail ballots.  I heard from a number of people about

4  their concerns but I didn't know what exactly was happening

5  and, of course, we didn't have any audit procedure in place to

6  double check it.

7          MR. GENECIN:  Your Honor, I'll pass the witness.

8          THE COURT:  Anything else on this side?

9          Any redirect.

10          MISS HUNKER:  Yes, Your Honor, very briefly.

11                    REDIRECT EXAMINATION

12  BY MISS HUNKER:

13  Q.  Mr. Ingram, were Texas elections in good shape in

14  November 2022?

15  A.  Yes.

16  Q.  Was the November 2022 General Election smooth and secure?

17  A.  It was.

18  Q.  Do you recall speaking with counsel about the ID numbers

19  that can be used for mail-in votings?

20  A.  Yes.

21  Q.  Can you add ID numbers through Texas.Gov?

22  A.  Yes.

23  Q.  Will that add the numbers to the registration file?

24  A.  It will.

25  Q.  And can a voter add these numbers online?

KEITH INGRAM - REDIRECT

1  A.  Yes.

2  Q.  Can we briefly bring up, I believe it was Section 7.04,

3  vote harvesting.

4      Now we're going to be looking at the codification of Texas

5  Election Code Section 276.015 Subsection(a)(2).  Do you recall

6  speaking with counsel that this particular subsection with

7  referencing to physical presence of the official ballot does

8  not use the word "conscious"?

9  A.  I agree with that.

10  Q.  Does this section include the word "intent"?

11  A.  It does.

12  Q.  And can you have intent to deliver votes for a specific

13  candidate or measure without being conscious of the ballot?

14  A.  Not in the way you think of for vote harvesting.

15  Obviously a canvasser has an intent to deliver as many votes

16  as possible for their candidate or their measure.  They want

17  it to win, that's why they are out and about.

18      But a vote harvester has a more specific intent.  They

19  have an intent to get that ballot marked in such a way that it

20  supports their candidate.  They have promised the candidate a

21  certain number votes for an agreed upon fee and they have a

22  job to get that voter to mark their ballot.

23      So the reason why this has to be conscious physical

24  presence and not just mere presence, and the reason why I

25  think the legislator used the word "physical," they were

1  trying to emphasize it has to be present with them and that

2  means consciously.

3  Q.  Do you recall speaking with counsel regarding whether or

4  not you were aware of voter fraud that had outcome determinant

5  impact on statewide elections?

6  A.  I do.

7  Q.  Are you aware if voter fraud has had an outcome

8  determinant impact on local elections?

9  A.  Yes.

10  Q.  Can you think of an example?

11  A.  Sure.  There was a county commissioner's race in Gregg

12  County, 2018 I think.  Could be wrong about that.  But it was

13  a Democratic Primary and there was pretty strong evidence of

14  mail ballot fraud in one of the commissioner's precincts, and

15  that commissioner who those votes were in favor of won the

16  election by a handful of votes and there was subsequent

17  prosecutions of a number of people in Gregg County.

18  Q.  In your experience does voting fraud usually be directed

19  at local elections?

20  A.  Yes.

21          THE COURT:  Was there any evidence of that in front

22  of the legislature?

23          THE WITNESS:  The local election aspect, yes, sir,

24  that's numerous community testimonies over all five sessions

25  that I was in.

```
1              THE COURT:  I'm just interested in the SB 1 session.
2              THE WITNESS:  Yes, it was repeated in SB 1 sessions
3    as well, yes, sir.
4              MISS HUNKER:  No further questions.
5              THE COURT:  Anything else on this side?  Nothing.
6         Anything further here?
7              MR. KANTERMAN:  No, Your Honor.
8              THE COURT:  You're excused, sir, thank you.
9              THE WITNESS:  Thank you, Judge.
10             MR. WASSDORF:  Your Honor, at this time defendants
11   would like to make a motion under Rule 52(c) for judgment on
12   partial findings.
13             First off, Your Honor, State defendants would move
14   under the ADA and rehab act as to all parties on all
15   provisions of Senate Bill 1.  We have had a parade of
16   individuals in here who have testified that they made no
17   request for accommodation beyond what they were offered at the
18   polling place.  They did testify about a fear of not being
19   able to vote in some future hypothetical circumstance but
20   every single one of them was able to cast their vote.
21             None of them testified that any accommodation was
22   denied to them.  We also heard from numerous county
23   representatives that no requests had been made and no denials
24   of any request for an accommodation had been made.
25             Additionally, we've looked at Section 1.08 of Senate
```

1 Bill 1 which provides that no provision in the entire election

2 code can be interpreted to prohibit or limit any accommodation

3 or modification that an individual is entitled to request

4 under state or federal law.

5        Additionally, when bringing an ADA claim a plaintiff

6 is required to propose a reasonable accommodation.  There has

7 been no such proposal here.  The only request that plaintiffs

8 have made is to enjoin entire provisions of Senate Bill 1

9 under the ADA and rehab act, but that requested injunction is

10 not limited.  It is to all individuals.  It is not limited to

11 disabled individuals.  It is not limited to individuals

12 entitled to request a specific accommodation.  It is not

13 limited to disabled individuals who require a specific

14 accommodation.

15        There is a recent case from September 20th of 2023,

16 out of the Fifth Circuit, United States versus Mississippi

17 that gave us some answers on some of these questions.  It

18 specifically held that prospective risk of discrimination was

19 not sufficient to state a claim under the ADA.  Instead, it

20 requires actual discrimination to have occurred.  And the fact

21 that there has been no denial of accommodation or no denial of

22 an individual's right to vote means there has been no actual

23 discrimination.

24        That case also rejected sweeping program wide

25 injunctions similar to that that there was request here.

1    Instead it required that the injunction be narrowly tailored

2    to remedy individual instances of discrimination.  The

3    requested injunction here cannot meet that standard.

4        Therefore, we believe that all of plaintiffs claims

5    under the ADA and rehab act that judgment should be granted in

6    State defendants favor.

7        The next batch of topics that I'm going to talk about

8    are on a — as opposed to a claim basis like the ADA claim, it

9    is on the basis of the provisions in Senate Bill 1.

10        The first category of those is the provisions of

11    Senate Bill 1 that prohibit a particular method of voting,

12    specifically 24-hour voting, drive-thru voting, and drop box

13    voting.

14        Now, it is undisputed that there is a constitutional

15    right to vote; however, there is not a constitutional right to

16    vote by a particular method.  Some states have no excuse

17    mail-in voting.  Some don't.  Some states have early in-person

18    voting.  Some don't.  Some states have drop box voting and

19    some don't.

20        I've actually done a little looking, Your Honor, and

21    I have not been able to find a single state that has either

22    drive-thru or 24-hour voting as a regular method of voting.

23    We have heard the testimony here that at best these methods of

24    voting 24-hour, drive-thru, and drop box existed in Texas in

25    one or maybe two counties in a single election in Texas.

1          That is just not a sufficient showing to establish a

2    right to vote by those particular methods.

3          THE COURT:  But as I understand the plaintiffs'

4    argument, it's not so much — so the State gets to decide how

5    its elections get to be conducted.  As I understood the

6    allegation was that since 24-hour and drive-thru had been

7    allowed, what they are claiming is the State taking it away is

8    violative and an indication of racial discrimination and it's

9    the taking away of something that was previously provided to

10   them and that's what I thought their argument was.

11         MR. WASSDORF:  I believe that you may be one of their

12   arguments, Your Honor.

13         THE COURT:  So what of that argument?

14         MR. WASSDORF:  Well, I do not believe that we have

15   heard plenty of testimony here that and not only did those

16   methods of voting really not exist prior to the November 2020

17   Election, but that they were not legal.

18         They may have been allowed in that single instance in

19   that emergency situation where the counties without the

20   permission of any State authority undertook these methods of

21   voting without notice to State and in order to avoid

22   interfering with the ongoing election process the State made

23   the decision not to seek injunctive relief to stop them.

24         I don't believe that that could lead to an inference

25   of racial discrimination when subsequently the law is

1  clarified to make absolutely sure that everyone is aware that

2  these methods of voting are not allowed.

3          Additionally, we heard testimony that these methods

4  of voting were relatively loosely correlated to minority

5  voting.  We heard the testimony from Isabel Longoria that she

6  specifically chose some of the 24-hour voting locations on a

7  racial basis to place them in locations with higher

8  populations of minority voters.  That, you know, lessens the

9  other testimony that we may have heard that these methods of

10  voting disproportionately affected minority voters.

11          Because there is no right to vote by a particular

12  method I don't think we can say that the removal of the

13  ability to vote by a particular method on in one election and

14  one or two counties, even if there is some evidence that it

15  had a slightly disproportionate affect on minority voters,

16  constitutes racial discrimination, and therefore we would ask

17  for judgment in favor of State defendants with respect to

18  those provisions which are 3.09, 3.10, 11, 12, 3.04, 3.13, and

19  4.12 of Senate Bill 1.

20          Additionally, there were some provisions of Senate

21  Bill 1 that I'm going to call that had a neutral effect

22  really, and that's the voter registration provisions and the

23  straight-ticket voting provisions.

24          We've heard relatively little about voter

25  registration.  There are three provisions at issue there that

1    are challenged only by a single party in this case.  Those are

2    2.05, 2.06, and 2.07 of Senate Bill 1.  And they establish a

3    requirement that Secretary of State TEAM's database and DPS's

4    database are linked to verify citizenship data where, when a

5    voter interacts with the Department of Public Safety and

6    represents that they are not a citizen of the state or this

7    country, that that information is then transmitted to the

8    TEAM's database.

9        2.07 additionally requires the Secretary of State to

10   be notified when a voter is disqualified from jury service by

11   a court because they are not a citizen.

12       THE COURT:  That could just be indicative of someone

13   trying to get out of jury service, right?

14       MR. WASSDORF:  But, Your Honor, if they represent to

15   a court that they are not a citizen of this state, I think it

16   is completely appropriate for the SOS to notify the voter

17   registrar of that, and we've heard some testimony about the

18   process for canceling a voter's registration and the

19   requirements that exist there.  And this notification process

20   is just the notification to the voter registrar that they need

21   to conduct that follow-up investigation that is required by

22   law.

23       Finally, with respect to the straight-ticket voting

24   provision we've heard from a number of witnesses that

25   straight-ticket voting was prohibited in 2017, that provision

1  went into effect in 2020.  There was I guess the —— I will say

2  the State was alerted to a potential loophole to that with

3  respect to a particular voting machine and the legislature

4  passed a law to make clear that you can't get around the

5  prohibition on straight-ticket voting by using a voting

6  machine that would essentially allow the same thing.

7          But it's undisputed that straight-ticket voting has

8  not existed in Texas for years.  This was not new.  And

9  therefore, Your Honor, we would ask that the claims brought by

10  all parties with respect to 2.05, 2.06, 2.07, and 3.15 which

11  is the straight-ticket voting provision, that judgment be

12  granted in favor of State defendants.

13          Finally, there are three areas of the bill that we

14  are challenging —— well, not of the bill that we are

15  challenging, of plaintiffs' claims that we are challenging

16  that really expanded the rights of voters.  And to enjoin

17  those provisions would put voters in a worse spot now than

18  they were —— than they are under SB 1.

19          That is the cure provisions which are 5.10, 5.12, and

20  5.194.  Those are provision that allow a voter to correct an

21  ID number via the online Ballot Tracker that 5.12 and 14

22  create the cure process for ballot defects identified by

23  either the signature verification committee or the early

24  voting ballot board respectively.

25          As we have heard, Senate Bill 1 created this cure

1  process.  If the Court were to do what plaintiffs ask and

2  enjoin those provisions, there would be no cure process in

3  this state.  The Court cannot rewrite the law.  Its power is

4  to enjoin, and so there would be less opportunity for voters

5  to be able to fix the defects that we have discussed ad

6  nauseam here if the Court were to grant plaintiffs requested

7  relief.

8          Similarly, with respect to Section 5.11, that's the

9  signature comparison — the expansion of the signature

10 comparison process.  It expanded the signatures that the Early

11 Voting Ballot Board and Signature Verification Committee are

12 allowed to compare from two or more signatures within the last

13 six years to any known signature of the voter.  And so by

14 having more signatures to consider in comparing to a signature

15 on an application or ballot, there is more opportunity for the

16 counties to accept a signature as a match.  If the Court were

17 to enjoin that similarly, we would go back to only being able

18 to compare signatures within the prior six years.

19         Lastly, Your Honor, is the time off from work to vote

20 during early voting period.  Prior to Senate Bill 1, employees

21 were entitled to two hours off work on Election Day to go

22 vote.  Section 7.02 of the bill expanded that provision to

23 include the early voting period.

24         We heard some discussion the other day about the

25 "exception," and there is an exception, we'll call it, where

1  if the voter has two hours outside of their work schedule but

2  during the voting hours, they are not entitled to two hours

3  off of work, but that exception was -- is not part of Senate

4  Bill 1.  It preexisted SB 1 by years.  And so to say that that

5  exception somehow makes the expansion not valuable to voters

6  is disingenuous.

7            And again, if the Court were to enjoin that provision

8  voters and workers would go back to only be being entitled to

9  two days off -- or two hours off on Election Day.  Because

10  those provisions expand the rights of voters, we do not

11  believe that they have harmed plaintiffs in any way and would

12  ask that the Court grant judgment in favor of State

13  defendants.

14            THE COURT:  Thank you.

15            MR. WASSDORF:  I was just passed the cite for the

16  *United States versus Mississippi* case.  Last I checked it had

17  not received a federal reporter citation yet, but it is 82

18  Federal 4th 387.

19            THE COURT:  Eighty-two, 387?

20            MR. WASSDORF:  82 Federal 4th 387.

21            THE COURT:  Thank you.

22            Anybody else?

23            MR. CAPOZZI:  Good morning, Your Honor.  Louis

24  Capozzi, Jones Day, for the intervenor defendants.

25            The intervenor defendants join the motion by the

1   State defendants.

2        I just want to address briefly the question that you

3   asked about the challenges to the SB 1 provisions respecting

4   drive-thru, 24-hour, and drop-box voting.

5        The Court asked about the plaintiffs' argument that

6   there was an intent to discriminate on the basis of race with

7   respect to these arguments.  My understanding is that that

8   evidence would be considered in phase two of the trial.

9        The plaintiffs also have claims against these

10  provisions, not soundly, in racial discrimination, in

11  particular the right to vote under the Constitution and the

12  *Anderson-Burdick* framework.  And on those claims, the

13  intervenor defendants think that a verdict would be

14  appropriate.

15       In *McDonald* — I think that's a 1969 case — the

16  Supreme Court held that there is no right to vote by mail.

17  States can deny altogether the right to vote by mail.  The

18  Fifth Circuit reaffirmed that *McDonald* is "good law" just a

19  couple years ago.

20       And as Mr. Wassdorf discussed, the methods of voting

21  regulated drive-thru voting, 24-hour voting, drop-box voting,

22  these are extremely rare methods of voting; and so there's

23  really no presidential support for the idea that there's a

24  constitutional right to vote in those methods.  You know, race

25  discrimination, that's a separate issue.  Those are different

1  claims.  But the Court could consider granting judgment on the

2  *Anderson-Burdick* right-to-vote claims.

3          The other point that intervenor defendants want to

4  make on this is that in *Crawford*, which dealt with the voter

5  ID provision in Indiana, the Supreme Court said that: "The

6  ordinary burdens of voting don't implicate the right to vote,

7  and these sections of SB 1 prohibiting drive-thru, 24-hour,

8  and drop-box voting, quite literally only impose the ordinary

9  burdens of voting on voters."

10          So we would submit that *Crawford* clearly forecloses

11  plaintiffs' claims against 3.09, 3.12, 4.12 and the other

12  related provisions that Mr. Wassdorf discussed.

13          THE COURT:  Thank you.

14          MR. CAPOZZI:  Thank you, Your Honor.

15          THE COURT:  Anybody else on this side?  No one else.

16  Any response?

17          MR. BADAT:  Yes, Your Honor.  Amir Badat for the HAUL

18  plaintiffs.

19          I'm going to start off by addressing the arguments

20  that opposing counsel made with respect on the ADA, and Rehab

21  Act claims, and then I'll move on to some of the specific

22  methods of voting that the HAUL plaintiffs are challenging,

23  and I believe my colleagues will have additional comments

24  related to separate methods of voting that they are

25  challenging.

 1          So first, you know, I want to address the head on the
 2    case that Mr. Wassdorf mentioned, *U.S. versus Mississippi.*
 3    *U.S. versus Mississippi,* it is our position that this is an
 4    entirely irrelevant case to our claims, and we will make
 5    further argument about that in our conclusions of law, but
 6    just wanted to flag that for the Court; that we don't believe
 7    that case is relevant here.
 8          With respect to the argument that plaintiffs were
 9    required to propose some sort of reasonable accommodation in
10    order to meet our — meet the standard under the ADA or Rehab
11    Act claims, I think the defendants are ignoring the extensive
12    evidence in the record that counties did receive complaints
13    from multiple voters and request for help from multiple voters
14    with disabilities about the challenged provisions.
15          Their position is that the ADA requires individuals
16    with disabilities to use the magic word "reasonable
17    accommodations."  That is not what the standard is.  And there
18    is significant testimony in the record that counties received
19    hundreds and, indeed, in Harris County, thousands of calls
20    related to the mail ballot provisions that SB 1 addresses.
21    And that they also received extensive communication from
22    voters about all of the provisions that we're challenging in
23    this case.
24          Jackie Callanen, the Bexar County election
25    administrator, said that her office received significantly

1 │ more complaints and requests for assistance regarding the mail
2 │ ballot ID requirements during the 2022 elections than in
3 │ previous years and that she knew of people who were dissuaded
4 │ of voting because of the ID requirements.
5 │         Rachelle Obakozuwa from Harris County testified that
6 │ the EA's office there received a much higher than normal
7 │ volume of calls.  In just January of 2022 alone, their office
8 │ received 5,000 calls specifically related to mail ballot
9 │ voting, and that was a significantly higher volume than had
10 │ been received in other primary elections for a mid-term in the
11 │ past and even higher than what they received for the
12 │ Presidential General Election in 2020.
13 │         And Isabel Longoria testified to this as well.
14 │ Miss Obakozuwa testified that those complaints largely came
15 │ from voters over 65 or who had a disability.  And
16 │ Miss Longoria testified that voters with disabilities did
17 │ contact the EA's office requesting accommodations.  And the
18 │ calls for assistance, again, were significantly higher in the
19 │ 2022 elections.
20 │         And Miss Longoria testified to a specific instance
21 │ where she raised some of the problems related to the mail
22 │ ballot ID provisions with the Secretary of State, with
23 │ Miss Adkins, at an EA meeting and did not receive a sufficient
24 │ response when asked about what type of accommodations could be
25 │ provided.  So there has been extensive testimony in the record

1  with respect to complaints and requests for help from voters

2  with disabilities.

3         I'd also note that even if the record did not contain

4  this extensive evidence, the Fifth Circuit precedent makes

5  clear that defendants have an affirmative obligation to make

6  reasonable accommodations for disabled voters.  In this

7  circumstance, a plaintiff must show that the public entity

8  knew of the disability and its consequential limitations,

9  because the nature of the limitation was open and obvious.

10         In other words, the ADA requires that public entities

11  take affirmative steps to comply with federal law regardless

12  of whether individual requests are made, and defendants cannot

13  claim in this case that the limitations imposed by SB 1, that

14  multiple witnesses have testified to, on voters with

15  disabilities were not open and obvious.

16         Plaintiffs, their members, other voters with

17  disabilities testified extensively before the legislature and

18  publicly advocated against SB 1 because of the specific

19  burdens that have been testified to in this trial.  After SB 1

20  went into effect, as I just mentioned, counties received

21  numerous hundreds and thousands of complaints about the

22  provisions.

23         There were unprecedented rejection rates that we've

24  heard about during this trial with respect to the mail ballot

25  provisions, and it's important to note that the mail ballot

1  voting in Texas is offered to a very limited category of

2  people, including voters who are over 65 who are — we have

3  heard testimony are more likely to have disabilities, and

4  voters with disability.

5      So these higher rejection rates, I think it was open

6  and obvious — it should have been open and obvious to the

7  defendants that these higher rejection rates would

8  disproportionately impact members — voters with disabilities.

9      And there has been testimony that the Secretary of

10  State's Office was aware of the problems that voters were

11  having.

12      My last point on this issue is that, you know, let's

13  say that, you know, there was not all of this evidence that I

14  just talked about.  Plaintiffs need not show evidence of a

15  reasonable accommodation request where that request would have

16  been futile.

17      And in this case, there has been plenty of evidence

18  in the record that shows that requests would have been futile.

19  Both state and county defendants have testified that they did

20  not believe they could waive the provisions of SB 1, the mail

21  ballot ID provisions, or any of the voter assistance

22  provisions, as an accommodation to individuals with a

23  disability.

24      In addition, several of the voters with disabilities

25  who testified in this trial said that they didn't realize they

1  could ask for a modification or waiver of a law as an

2  accommodation.  And the evidence in this case shows that the

3  State had no system in place to train counties on their

4  obligations to process requests for modifications.  And

5  Mr. Ingram, in the plaintiffs' case, testified that he

6  believed the ADA was not a voting statute and that it only had

7  incidental implications with respect to accessibility of

8  polling locations.

9        So according to his testimony, those implications

10  didn't even touch on mail-in voting.  And we've also heard

11  testimony that counties lack capacity to process the request

12  in a reasonable amount of time.  Defendant counties often

13  didn't have information on their websites about how to request

14  accommodations or what rights voters with disabilities had.

15        And then, finally, at least some of the modification

16  requests to the challenged provisions would have been futile

17  because mail voters would not have even known that they needed

18  an accommodation until their mail ballots were rejected and

19  until it was too late for them to make a request for an

20  accommodation.

21        So that's our argument on why —— on the reasonable

22  accommodation portion.

23        Mr. Wassdorf also mentioned the —— that our proposed

24  accommodation here is not reasonable because we're asking for

25  an injunction against the provisions at issue.

1          I want to kind of orient the Court again to the

2     standard here, which I think the Court is very familiar with,

3     that plaintiffs need only show that their proposed

4     accommodation seems reasonable on its face or is plausible or

5     feasible to implement.

6          And as this Court has explained in previous

7     decisions, the burden of production on this is not a heavy one

8     and merely entails demonstrating the existence of a plausible

9     accommodation, the cost of which facially do not clearly

10    exceed its benefits.  And that initial threshold is a

11    relatively low bar, and we have met that threshold in this

12    case.

13          Plaintiffs do not seek a sweeping accommodation here.

14    Plaintiffs seek an order enjoining specific provisions of SB 1

15    that would simply return the law to the status quo before SB 1

16    was enacted.  The record is replete with evidence of the

17    burdens that the challenged provisions impose on voters with

18    disabilities, and based on this record enjoining those

19    provisions would eliminate these burdens and benefit voters

20    with disabilities.  And in the face of these benefits —

21    which, again, lots of testimony in the record about it —

22    there is scant, if any, evidence in the record indicating what

23    the costs of enjoining these provisions would be.

24          And there is similarly little to no evidence

25    demonstrating that these provisions at issue prevent fraud,

 1   which is what their stated purpose is.  Texas has administered
 2   successful elections with participation by Texans with
 3   disabilities without the challenged provisions in place, and
 4   so it is our position that this would not be a sweeping
 5   accommodation, as the defendants are arguing here.
 6            And we've briefed this in summary judgment, so I
 7   would direct the Court to our summary judgment briefing, but
 8   there is case law that — where courts say that enjoining a
 9   provision is not per se legally — or legally per se
10   unreasonable.  There are several cases where courts enjoin
11   laws as the accommodation hold that that is reasonable, and so
12   I would orient the Court to our briefing for summary judgment,
13   which we'll also do for purposes of our conclusions of law —
14   proposed conclusions of law.
15            And so I'll move on now to talk about the methods of
16   voting, some of the methods of voting that Mr. Wassdorf
17   mentioned.
18            So with respect to 24-hour voting and drive-thru
19   voting.  Again, there is plenty of evidence in the record that
20   the Court has heard both from lay witnesses and expert
21   witnesses about the impact that the elimination of 24-hour and
22   drive-thru voting had on minority voters in Texas.
23            Mr. Wassdorf argued that these methods of voting were
24   not legal prior to SB 1.  I'll point out that there has been
25   no testimony presented, and I believe there have been no cases

1  filed in 2020, challenging the validity of the 24-hour voting;

2  so I don't think that there's an argument that 24-hour voting

3  was not legal prior to SB 1.

4          I'll also point out that with respect to --

5          THE COURT:  The line on that facility building

6  language, right?

7          MR. BADAT:  For 24-hour voting?  I don't believe so.

8          THE COURT:  Oh, that's right.  That's for drive-thru.

9  You're right.

10          MR. BADAT:  24-hour voting was simply an extension of

11  the hour of voting at in-person voting -- early voting

12  locations.  Opposing counsel can correct me if I'm wrong if

13  I'm mischaracterizing their argument.

14          With respect to drive-thru voting, there were several

15  court cases filed in the lead up to the 2020 elections

16  challenging drive-thru voting.  All of those cases were

17  dismissed.  And we heard testimony today that if there were

18  any ambiguity with respect to the validity of drive-thru

19  voting, then the legislature could have resolved that in a way

20  that would have allowed drive-thru voting instead of

21  eliminating it in the face of the extensive testimony and

22  evidence from voters in Texas and from advocacy organizations

23  showing that minority voters disproportionately used

24  drive-thru voting in the lead up to the 2020 Election and in

25  the 2020 Election.

1          I'll also point out that we've heard consistently

2    throughout this trial from the State that drive-thru voting

3    was only used in one election.  There was testimony from

4    Miss Longoria drive-thru voting was used in five elections in

5    2020 and 2021.

6          And I also want to correct one other

7    mischaracterization that we've heard throughout this trial

8    that Miss Longoria testified that 24-hour voting and

9    drive-thru voting were — the selection of the locations were

10   race-based decisions.  That is not the case.  Miss Longoria's

11   testimony with respect to drive-thru voting was explicitly

12   that it was not — that she did not take into account race.

13   With respect to —

14          THE COURT:  I was going to ask for citations on that.

15          (Court reporter clarification.)

16          THE COURT:  Oh, I'm too far away from the mike.  I'm

17   sorry.

18          I was going to ask all sides to give me citations to

19   that testimony, because I was wondering about that, too.

20          MR. BADAT:  I can provide the citations right now,

21   Judge.  With respect to drive-thru voting, the relevant

22   testimony was on page —

23          THE COURT:  No.  What I'm curious about is the

24   argument that she specifically stated that she picked the

25   locations for drive-thru voting based on racial

1    considerations.

2          MR. BADAT:  Sure.  And that — I specifically asked

3    her that question — or I asked her what her considerations

4    were.

5          On direct, she testified that the considerations were

6    where there was a big enough parking lot to be able to use,

7    where there were significant concentrations of voters,

8    generally, so that they could — and where there were central

9    locations to voters generally.  She did not testify that her

10    considerations were race, and she provided consistent

11    testimony on cross-examination that she did not take into

12    account race.  That's on page 1396 of the trial record.

13          With respect to 24-hour voting, I think a little bit

14    of context here is important.  Miss Longoria did — opposing

15    counsel questioned Miss Longoria and asked:  "Was that a

16    race-based decision?"  She said, "No.  It was a race-informed

17    decision," which means that — and what her full testimony was

18    that their considerations for picking 24-hour voting locations

19    were, where are there voters who would need to be able to vote

20    outside of the traditional hours of early voting, so where are

21    there shift workers, where are there law enforcement officers,

22    where are there medical workers that need to be able to access

23    a polling location outside of those traditional hours.

24          And what she testified to was that there was an

25    understanding that people who normally do those types of jobs

1  are usually minority voters, but that the fact that they were

2  minority voters was not the driving factor in selecting those

3  locations.

4         I'll also mention to the Court that Dr. Smith, in his

5  PowerPoint slides, which are in evidence, specifically had

6  maps showing the concentration of minority voters by precinct

7  in Texas and put those next to the drive-thru voting locations

8  and the early voting locations that were selected in 2020.

9         And just looking at that comparison shows that those

10  locations were not in — were not — were not predominantly in

11  areas that were predominantly minority areas of Harris County.

12  And we can provide further argument on that if the Court would

13  like.  And so, again, significant evidence of the impact on

14  minority voters.

15         With respect to the argument on undue burden and the

16  *Anderson-Burdick* claims that we're bringing with respect to

17  these methods of voting, *Anderson-Burdick* requires a balancing

18  test.  A balancing test that also does take into account the

19  disproportionate impact on minority voters, so that is a

20  relevant concern that the Court must take into account when

21  evaluating our *Anderson-Burdick* claims, but it's a balancing

22  test.  It's a fact-heavy test, and the Court must weigh all

23  the facts that have been presented in this case in order to be

24  able to resolve that, and our position is that we have

25  demonstrated that these methods of voting — the elimination

1    of these methods of voting, was an undue burden on minority

2    voters and on voters --

3              THE COURT:  Where was the evidence of that on drop

4    box?

5              MR. BADAT:  On drop box?  Ray Shackelford testified

6    and Michelle Brown from Delta Sigma Theta, Ray Shackelford

7    from the Houston Area Urban League testified that drop-off

8    locations were important for the communities that they served

9    and the members of Delta Sigma Theta; that there were

10   individuals who used mail-in voting where it was important for

11   them to be able to drop off their ballots if they needed to.

12             And the additional process that has been created by

13   Section 4.12 was a burden on those voters' ability to be able

14   to cast their ballots in an efficient way.

15             Touching real briefly on straight-ticket voting, we

16   are bringing intent claims with respect to straight-ticket

17   voting, and so it might be better for us to address these

18   arguments for phase two of the trial when we do talk about

19   straight-ticket voting, but I'm happy to answer any questions

20   that the Court might have with respect to that.

21             THE COURT:  I guess the only question I have on that

22   is it was banned pre-SB 1.  How do you get around that?

23             MR. BADAT:  Well, we've heard testimony that SB 1's

24   provision Section 3.15 was intended to essentially complete

25   the ban on straight-ticket voting; that there was the ability

1  for voting machines to be configured in a way that would allow

2  for voting in one motion or gesture, and that the intent of

3  the legislature was to complete that ban.

4          We've also heard testimony from Dr. Kousser that

5  straight-ticket voting was used by minority communities to

6  reduce long lines.  And particularly in Harris County where

7  the ballot is very long, it was useful to help increase access

8  for minority communities, and so this gets to our intent claim

9  that eliminating straight ticket was motivated by an intent to

10 discriminate against minority voters in Texas.

11         I've got a note.  Let me just read it real quick.

12                    *(Pause in proceedings.)*

13         MR. BADAT:  Going back really quickly to our ADA

14 argument.  Defendants argue that there's no discrimination

15 against disabled voters because none were prevented altogether

16 from voting.  Again, that is not the standard.  It is not a

17 complete prohibition on voting that gives rise to a ADA claim.

18         The standard is denial of equal access, and I think

19 we've heard, like I said, plenty of testimony from voters with

20 disabilities that they faced significant burdens, in addition

21 to the ones that they already face, with respect to voting

22 because of the provisions of SB 1 that we're challenging.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.

25         Anybody else on this side?

1          MR. NKWONTA:  Good morning, Your Honor.  Uzoma
2     Nkwonta on behalf of the LULAC plaintiffs.  I'll try not to
3     repeat much of what my colleagues have said.  And instead, I
4     just want to focus on a few of the legal areas that I think
5     form the basis of some of the arguments that you've heard on
6     the motion for directed verdict.
7          The first is a suggestion that because there is no
8     right to vote absentee or right to 24-hour voting or
9     drive-thru voting, then there can be no constitutional
10    violation by either eliminating those methods or restricting
11    those methods because of race.  Now, that argument has been
12    rejected by a number of courts.  I think the clearest example
13    is *NAACP v McCrory*.  That was a Fourth Circuit decision from
14    2016.  The cite is 831 F.3d, 204.
15         The reason I cite that case is because the law in
16    North Carolina involved a number of different methods of
17    voting that some would even refer to as "progressive" or
18    "expansive," including restrictions to same-day registration,
19    restrictions to preregistration before a voter turns 18, and
20    yet the Court found that in cutting back and not even
21    eliminating entirely, by just cutting back some of those
22    measures, the legislature took race into account, and they
23    were motivated, at least in part, by race.
24         Because of that motivation, that action of cutting
25    back same-day registration and some of these other

1  ameliorative provisions was unconstitutional.  And that is a

2  similar approach that courts have taken in addressing

3  restrictions on different forms of absentee voting as well.

4       The second point I wanted to address is I believe

5  counsel for intervenors mentioned the *McDonald* case to

6  demonstrate that there was no right to absentee voting, and

7  therefore no constitutional right to challenge restrictions on

8  absentee voting.  That is incorrect.  *McDonald* is a case that

9  came down in 1969, which predates both *Anderson* and *Burdick*

10  and *Crawford*, so the *Anderson–Burdick* test that we are

11  presenting in this case.  And, just to clarify, the LULAC

12  plaintiffs are challenging Sections 5.02, 5.03, 5.07, and 5.08

13  under the *Anderson–Burdick* test.

14       That *Anderson–Burdick* test was developed after

15  *McDonald*, many years after *McDonald*, in fact.  And even after

16  *McDonald*, courts have applied both the *Equal Protection Clause*

17  standards and the *Anderson–Burdick* standards to challenges to

18  restrictions on absentee voting.  And I believe counsel for

19  intervenors suggested that the Fifth Circuit has recognized

20  that *McDonald* was "good law."

21       I'm not sure what he means by that.  He may be

22  referring to *Texas Democratic Party v Abbott 1* where a Motions

23  Panel suggested that restrictions on absentee voting were

24  absolved from legal challenge or that there was no viable

25  legal challenge restrictions from absentee ballot voting.

1    That case is 961 F. 3rd 389; however, after the Motions Panel
2    issued that ruling, a subsequent panel in that same case, the
3    Merits Panel, in *Texas Democratic Party v Abbott,* vacated the
4    specific portion of that ruling that sought to uphold *McDonald*
5    and use *McDonald* as the test, and that was 978 F.3rd 168, and
6    the specific pin cites were 193 to 194.  That was the —
7                *(Court reporter clarification.)*
8              MR. NKWONTA:  The pin cites 193 to 194 just as an
9    example.  That was a specific portion of the Fifth Circuit
10   decision that vacated the prior motions panels attempts to
11   uphold *McDonald* as a standard.
12             So as we know, and until today, *Anderson-Burdick*
13   remains a standard, and it makes sense because, again,
14   *McDonald,* the 1969 opinion, predates Anderson and Burdick, and
15   *McDonald* never said anything about what the standard should be
16   when measuring restrictions on voting.
17             And moving on, now that we've talked about the
18   *McDonald* case that they cited, I believe opposing counsel also
19   cited *Crawford* to demonstrate that the — to demonstrate that
20   ordinary burdens are not unconstitutional.  Well, there are
21   several responses to that.
22             First, the burdens that we've identified in this case
23   are not ordinary burdens.  There are numerous witnesses who
24   have testified about how the restrictions on — whether it's
25   the hours of voting or whether it's the absentee rules impact

```
 1  voters who work long hours.  In fact, teachers, who sometimes
 2  have parent/teacher interviews and events that prevent them
 3  from being able to get to the polling locations until very
 4  late at night or early in the morning.
 5          And Crawford -- I do want to remind the Court that
 6  one of the issues in Crawford was the fact that there was no
 7  evidence of the burden caused by the lack of ID, so that's why
 8  the Court referred to the burdens as "ordinary burdens."
 9          It does not mean that the Court would have
10  disregarded the burdens to any subset of the population that
11  was uniquely burdened.  In fact, the Court in Crawford said
12  the exact opposite.  As this Court may recall, the voter ID
13  provision in Crawford involved a situation where in Indiana,
14  over 95 percent of Indiana residents possess the required ID
15  to vote.
16          And the Supreme Court, in assessing and measuring the
17  burden on the right to vote, did not focus on everybody, did
18  not focus on the 95 percent.  It focused on the 3 to 5 percent
19  that lacked ID.  And I'll give the Court specific pin cites
20  for that focus so that the cite for the Crawford case is 553
21  U.S. 181, but the portion of Crawford that discussions the
22  focus of the Court's inquiry in that plurality opinion was on
23  pages 198 and 205.  There, the Court makes clear that the
24  focus of its Anderson-Burdick inquiry when deciding where to
25  assess the burden is on that 3 to 5 percent that lack ID.
```

1           The same goes here.  The focus is on the people who
2  have got up on that stand and explained to the Court why these
3  provisions were burdensome and why it was difficult to
4  overcome them in order to vote.  And I will also point the
5  Court and reiterate something that my colleague mentioned
6  here, that when assessing these burdens, disparate impact
7  matters.
8           In *Crawford*, again, at least six justices recognized
9  disparate impact matters.  The plurality opinion recognized
10 it, and the concurring opinions of Justice Breyer and Souter
11 recognize it as well.
12          So going back to the claims that you've heard about
13 the fact that there's no right to vote absentee or there's no
14 right to 24-hour voting or that *Anderson-Burdick* should not
15 apply because of *McDonald* or that the burdens on the
16 individuals who have got up on the stand here are not within
17 this Court's purview, all of those are legally incorrect.  All
18 of those arguments are legally incorrect and have been
19 disproven by the case law.
20          And lastly, I will go back to the premise, which in
21 of itself is false.  The premise that you have heard is that
22 there's no right to absentee ballot voting.  Even that's not
23 true, Your Honor.  There are some instances in which Congress
24 has conferred a federal right on some categories of
25 individuals to vote absentee; namely, for instance, in a

1  Presidential Election, for individuals who are away from home.

2  That's Section 202 of the Voting Rights Act.

3          So it's not even true to say that there is no right

4  to absentee voting.  Some individuals actually do have a

5  right, but that does not even matter, because that is not how

6  the *Anderson—Burdick* test works.

7          And finally, I do want to respond to a question Your

8  Honor had about the drop box provision and how the drop box

9  provision factors in here.  And Your Honor, I think it's a

10  mistake to try to disentangle and slice and dice these

11  provisions, because as the LULAC plaintiffs have alleged and

12  some other plaintiffs have alleged as well, these are

13  cumulative burdens.  And the drop box provision and the

14  mail—ballot provision in particular, go hand in hand.

15          The reason they go hand in hand is because they

16  restrict the ability of individuals to submit their mail

17  ballots and have them counted.  It starts off with the ID

18  restrictions that make it difficult for individuals to obtain

19  a mail ballot to begin with.

20          THE COURT:  But don't I have to take them on

21  individually?  I mean, if I'm going to do a weighing and a

22  balancing, don't I have to take the balancing interest of the

23  State as well the box drop would have to be secured, there

24  would have to be a guard, all that kind of stuff?  Don't I

25  have to take this individually?

4517

1          MR. NKWONTA:  Absolutely not.  You may have to take
2     them individually when considering standing, and I believe
3     that was a specific argument the defendants have made, but in
4     the past, and it's staying as provision by provision.  But
5     when assessing the actual cumulative impact, when plaintiffs
6     have alleged a cumulative impact, then the Court needs to
7     assess the impact of those provisions cumulatively and how
8     they intersect.
9          That's what the Court in the case I just mentioned,
10    *NAACP v McCrory* has done, and courts in other jurisdictions
11    have done the same as well, and rather than slice and dice a
12    different provision, because context matters.  And just going
13    back to what I was saying about the context.  For the drop box
14    provisions, when you look at, you know, the provisions
15    restricting the ability to get a mail ballot, the ID
16    requirements, and then restricting the ability to have that
17    mail ballot counted when the IDs don't match, but they also
18    then restrict the ability to drop off an individual's ballot
19    in order to avoid that potential mismatch.
20         When an individual drops off their mail ballot in
21    person, under the new rules, under SB 1, that individual has
22    to show ID.  And that in-person proffer of ID is what
23    defendants have been saying is the most secure form of voting,
24    but even when that individual shows ID to potentially avoid
25    the ID mismatch issues that appear on a mail ballot, they

1 still have to pass the ID matching, and their ballot can still

2 be rejected, even after they have shown ID to drop off their

3 mail ballot to begin with.

4         In other words, SB 1 has cut off all possible methods

5 of returning a mail ballot and have their mail ballot counted

6 without complying with this onerous ID-matching provision that

7 can be, A, error prone, and that can disenfranchise voters not

8 because they are not who they say they are, not because they

9 have the wrong ID, but for some reason, the ID — the correct

10 ID on their page does not match what's in the State system.

11         And I will turn the rest of my time over to my

12 colleagues.  Thank you, Your Honor.

13         MR. WATKINS:  Good afternoon, Your Honor.  Elijah

14 Watkins with Mi Familia Vota.  I want to be brief.  I just

15 want to hit three points.

16         I recognize that we are going to have an intent

17 phase, but I just want to remind the Court of Dean Tolson's

18 testimony.  When we're talked about 24-hour voting, when we

19 are talking about drop boxes, saying, well, it's not a

20 disparate impact or it doesn't impact a certain population,

21 Dean Tolson testified, I think, very convincingly about

22 colorblind targeting:  Geography, timing, and method, after an

23 increase in a minority voting population strength, a targeted

24 type of voting law that specifies an area where most

25 minorities live and taking away a method.

1          She went from reconstructing the present and showing
2   this, and I think this is indicative of these methods of
3   voting that are being taken away here.  The second point, Your
4   Honor, as to the cure provisions and the voter purge
5   provisions, as well as these methods of voting.
6          Just briefly on Mi Familia Vota, the mission of
7   Mi Familia Vota is to empower and build a culture of voter
8   rights for the Latina community and to educate voters to get
9   involved in elections.  One of the ways they do that is by
10  staffing a hotline where voters, primarily Latino voters, can
11  call in and come up with a voting plan.  Where to vote, how to
12  vote, when to vote.
13         You heard from Marla Lopez as well as Angela Razo
14  that prior to SB 1, that phone call took about five minutes.
15  You vote, go to this location, you can vote.  After SB 1, that
16  call now takes about 20 minutes.  So just doing some quick
17  math, before SB 1, Mi Familia Vota could talk to twelve
18  different voters, have twelve different Latinos go out and
19  vote.  After SB 1, they can talk to three.  It's a 75 percent
20  reduction.  Under OCA, under Louisiana Fair Housing, under —
21  I think it's Haden's Realty, that is standing, having that
22  reduction in the amount of people that you can contact.
23         And third and finally, Your Honor, on 7.02, this is
24  the two hours off work provision.  I want to quibble a little
25  bit with what the State said.  Here the exception truly does

```
 1  swallow the rule.  Prior to SB 1, an employee that had
 2  two hours off of work during Election Day.  The employer did
 3  not need to give them an additional two hours off to go vote
 4  on Election Day.  After SB 1, if the employee has a two-hour
 5  period off of work at any time during early voting or on
 6  Election Day, the employer does not need to give them time
 7  off.
 8          So there is a bigger swath of time where an employer
 9  can get out of giving an employee time off of work.  Who is
10  that problematic for?  People who have two jobs.  People that
11  are going to be waiting in line that's four to six hours in
12  order to vote.  Caretakers, gig workers, people in school.
13  Populations that are historically more minority driven.  And
14  so as a result of this, it disparately impacts minorities
15  because those minorities have less time off work, and
16  therefore less ability to vote.
17          With that, Your Honor, those are all the statements I
18  wanted to make.
19          THE COURT:  Thank you.
20          MS. PERALES:  Your Honor, the LUPE plaintiffs don't
21  have argument.  We understand the State's motion for directed
22  verdict to only apply to our ADA claims.  That seems to be the
23  overlap.  And so we would like to join the arguments of the
24  other plaintiffs made with respect to the ADA claims.
25          Thank you.
```

```
 1              THE COURT:  Thank you.
 2              MR. DOLLING:  Good morning, Your Honor.  Zachary
 3    Dolling for the OCA plaintiffs.
 4              Our understanding is similar to what Miss Perales
 5    just said regarding LUPE plaintiffs, so we just want to
 6    formally join the arguments with respect to the ADA and Rehab
 7    Act claims.
 8              Thank you.
 9              THE COURT:  Thank you.  Okay.  With that, the motion
10    will be under advisement.
11              MR. CAPOZZI:  Your Honor, is it possible for us to
12    say a couple things in response?
13              THE COURT:  Very briefly.  I've got to take a 12:10
14    phone call, so...
15              MR. CAPOZZI:  I will be quick, Your Honor.
16              On the Constitutional right to vote claims under
17    Anderson-Burdick, I just want to be clear, you know, there are
18    different claims from the plaintiffs here.  Some soundly under
19    the Equal Protection Clause.  I was talking about the right to
20    vote, the Anderson-Burdick, the undue burden claims.
21              Just a couple of points on those.  The evidence of
22    disparate impact and race discrimination, our contention is
23    that that evidence is not relevant to Anderson-Burdick claims.
24    In Crawford, the Supreme Court considered, I guess I'll call
25    it "subgroup analysis," and it said explicitly — and I'll
```

```
 1  refer the Court to 553 U.S. at 199 to 200 and 202 to 203; that
 2  the plaintiffs could not win, even assuming that burdens may
 3  not be justified as to a few voters.  The Courts said, "That
 4  conclusion is by no means sufficient to establish petitioners'
 5  right to the relief they seek."
 6          And so I would submit in Crawford, the Court rejected
 7  a subgroup analysis.  The focus is on the general burden on
 8  voters, not on particular subgroups.  If there is a disparate
 9  impact, if there is racially discriminatory intent, that's
10  where I went to the 14th Amendment equal protection claims,
11  not Anderson-Burdick.
12          On McDonald, I find it strange that my friends on the
13  other said say the Supreme Court has abrogated or overruled
14  this case in Anderson-Burdick.  In Burdick, you know, the
15  second case in Anderson-Burdick, the Supreme Court cited and
16  relied on McDonald, and the Fifth Circuit, as counsel
17  acknowledged, in 2020 said, quote, "McDonald lives."  That's
18  961 F.3d F 406.  The Court did subsequently vacate that part
19  of the opinion.
20          I would encourage the Court to look at that
21  discussion.  The Court was talking about the 26th Amendment in
22  particular.
23          THE COURT:  The first opinion or the ——
24          MR. CAPOZZI:  The one vacating.  I think the first
25  opinion is pretty reflective of what the Fifth Circuit would
```

1  say on the *Anderson–Burdick* claims in particular.

2          And the second opinion, the Court was talking in

3  particular about the 26th Amendment, I believe.  And so

4  intervenor defendants would maintain the Supreme Court has

5  never overruled *McDonald*.  The Fifth Circuit relied on it

6  recently.  The Supreme Court itself relied on *McDonald* in

7  *Burdick*, and what *McDonald* teaches is that states, "The right

8  to vote guarantees the right to vote.  Not the right to vote

9  in a particular way."

10          *McDonald* dealt with a very common way of voting, the

11  right to vote by mail.  That really makes this an officiary

12  [phonetic] case when it comes to the *Anderson–Burdick* claims,

13  because we're talking about are common ways to vote.  We're

14  talking about extremely unusual and rare ways to vote:

15  Drive–thru voting, 24–hour voting, drop box voting.  The

16  plaintiffs' theory would effectively establish a right to vote

17  in any particular way once a jurisdiction tries it out once.

18  That could even dis–incentivize emergency responses in

19  immigration.  There is no support for that in the case law.

20          And then second, I already referred the Court to a

21  couple passages in *Crawford*.  *Crawford* does not support the

22  idea of focusing on the burdens on particular subgroups.  In

23  order to establish the right to the relief they seek, they

24  have to show burdens on broader groups of voters.  And, you

25  know, in *Crawford* the Court said, "The ordinary burdens of

1  voting are not sufficient to establish a right-to-vote claim."

2  The Court said that "The obligation to travel to the County

3  Clerk's Office to cure," in the *Crawford* case, "was fine

4  unless the State interests were wholly unjustified."  That's

5  another quote from *Crawford*.

6          And so here, getting rid of drive-thru voting,

7  24-hour voting, drop box voting, this leaves voters the

8  ability to vote in person for two weeks of early voting, in

9  person on Election Day, for certain groups by mail.  I mean,

10  this is very quite literally the ordinary burdens of voting.

11  And so we would submit that *Crawford* governs the plaintiffs'

12  *Anderson-Burdick* claims and forecloses them.

13          THE COURT:  Thank you.

14          MR. CAPOZZI:  Thank you, Your Honor.

15          THE COURT:  Okay.  This motion is under

16  consideration, and we'll resume again with testimony after

17  lunch.  Let's break until 1:00.

18          THE DEPUTY CLERK:  All rise.

19          *(Recess.)*

20          MISS HOLMES:  Your Honor, would now be an okay time

21  to do some very quick housekeeping?

22          THE COURT:  Yes.

23          MISS HOLMES:  So for the HAUL plaintiffs, during the

24  argument on the motion for judgment just now, you had asked

25  for citations about Isabel Longoria's testimony about how

1  drive-thru voting and 24-hour voting were cited, and we gave
2  you one citation, but just for completeness, I wanted to give
3  you the other ones that we identified.  And that's on day five
4  of trial, pages 1239 through 1240.  On day six of trial,
5  pages 1263 through 1265, as well as pages 1393 through 1397.
6         The second item was about the HAUL plaintiffs'
7  deposition designations, and you asked that those be made into
8  exhibits, and so I have those exhibit numbers for you, and
9  that's HAUL MFV 403 through 416.
10         THE COURT:  416?
11         MISS HOLMES:  Yes.  And those exhibits are the same
12  as what was filed as attachments to ECF 800.
13         THE COURT:  Any objection to HAUL 403 to 416?
14         MR. KERCHER:  My understanding from the Courts
15  comments yesterday is it will take under consideration the
16  objections we previously filed, so we would incorporate those
17  objections into the trial record by reference.  We stand on
18  those objections.
19         THE COURT:  Thank you.  So 403 to 416 are admitted.
20  I'll look at any objections in the event that I cite or rely
21  on any of that.
22         MR. CAPOZZI:  Your Honor, just same note.  The
23  intervenor defendants also have objections to the various
24  plaintiffs' deposition designations.  We would ask that those
25  objections also be considered.

4526

CHRISTINA ADKINS - DIRECT

1          THE COURT:  And same ruling.  Thank you.

2          MISS HOLMES:  Last item, we notice that Defendant Ogg

3    filed their motion for judgment on partial findings on the

4    docket.  That's ECF 804.  I was just wondering if Your Honor

5    is expecting the plaintiffs to file anything in writing in

6    response?

7          THE COURT:  You are welcome to but not required to.

8          MISS HOLMES:  Thank you, Your Honor.

9          THE COURT:  Anything else?

10         MR. WASSDORF:  I'm ready for the next witness.

11         THE COURT:  You're ready for a witness?  Okay.  Go

12   ahead.

13         MR. WASSDORF:  State defendants call Christina

14   Adkins.

15         While I'm here, Your Honor, with respect to the

16   Longoria cites to the record, we have an additional one.  It

17   will be page 1394, lines 2 through 17.

18         THE COURT:  Yeah.  I've got 1393 through 1397, so

19   I'll look at it all.

20       (CHRISTINA ADKINS, having been duly sworn, testified as

21   follows:)

22                     DIRECT EXAMINATION

23   BY MR. WASSDORF:

24   Q.  Good afternoon, Miss Adkins.  Could you please describe

25   your educational background for the Court?

4527
CHRISTINA ADKINS - DIRECT

1  A.  Of course.  I attended the University of Texas at Austin

2  for my undergraduate degree.  I have a degree at — it's a

3  liberal arts degree.  Double major in English, and

4  Mexican-American studies.

5              *(Court reporter clarification.)*

6          THE WITNESS:  After my undergraduate degree, I worked

7  for a few years, and then I went to law school at Southern

8  Methodist University in Dallas, and then I finished law school

9  in 2008.

10  BY MR. WASSDORF:

11  Q.  So when did you start at the Secretary of State's Office?

12  A.  In June of 2012 is when I began my employment there.

13  Q.  And in what position was that?

14  A.  I started out as a staff attorney in the Elections

15  Division.

16  Q.  And were you promoted?

17  A.  I was.

18  Q.  To what position?

19  A.  In December of 2017, I was named legal director for the

20  Elections Division.

21  Q.  And what does the legal director do?

22  A.  The legal director oversees the legal staff that we have

23  in the Elections Division, which would be a team of attorneys.

24  About a year or two after that, we expanded the legal staff to

25  include some trainers, some folks that do — provide training

4528
CHRISTINA ADKINS – DIRECT

1  on election-related policies and procedures; and so during

2  that time, I would oversee both groups.

3      And then the legal team itself, primarily with the

4  attorneys, we provided advice and assistance to election

5  officials, candidates, members of the public, anybody that has

6  questions about the laws that pertain to elections in Texas.

7  Q.  And what is your position now?

8  A.  I'm currently the Director of Elections.

9  Q.  Generally speaking, what does the Elections Division of

10  the Secretary of State's Office do?

11  A.  Well, the Secretary of State is the chief election

12  official for the State of Texas, and they are a statutory

13  authority to have an Elections Division, to provide support,

14  and to helpful fulfill the duties that are assigned to the

15  Secretary of State as chief election official.

16  Q.  And since you began your employment with the Secretary of

17  State in 2012, have you worked in the elections area that

18  entire time?

19  A.  Yes, the entire time.

20  Q.  You said that one of the responsibilities of the Election

21  Division was to provide advice and assistance.  How do you do

22  that?

23  A.  We provide advice and assistance in a number of different

24  ways.  A lot of times we get calls and emails that are

25  specific to different issues or specific to different

4529
CHRISTINA ADKINS - DIRECT

1  officials, you know, in the questions that they have, with the
2  work that they do on a day-to-day basis.  In addition to that
3  we issue election law calendars.  We issue election law
4  advisories, which provide some additional guidance and
5  procedures, when appropriate.  And we provide a lot of
6  training.  You know, we teach on the law.  Election law is
7  rather complicated, and there's not a lot of attorneys in the
8  state that do election law, so we do a lot of training as
9  well.
10  Q.  When you are doing that training, do you give
11  presentations to various groups?
12  A.  Yes, we do.  You know, we offer our own training.  We
13  provide -- we have election law seminars that are targeted to
14  election officials.  We do a lot of web-based training,
15  webinars as well.  That's just a good way to reach a broad
16  number of folks that may not to be able to travel to Austin.
17  And then beyond that, we're often asked by different groups to
18  present on different aspects of election law.
19  Q.  Brian, could you bring up State 248.
20      Is this an example of one of the presentations that you
21  give?
22  A.  Yes, it is.
23  Q.  And what does -- what information does this presentation
24  present?
25  A.  I believe this was a presentation that we gave in December

CHRISTINA ADKINS - DIRECT

1  of 2021, either December or January.  "Frequently asked
2  questions on applications for ballot-by-mail."  It's about the
3  application for ballot-by-mail form.  I think -- if I remember
4  correctly, it's just generally discussing how one reviews what
5  we call an "ABBM," and just questions that we had been
6  receiving around that time related to that issue.
7  Q.  And is procuring these educational materials a regular
8  practice of the Secretary of State's Office?
9  A.  Yes.
10  Q.  Was this presentation and others prepared by someone with
11  knowledge of these issues?
12  A.  Yes.  Typically, all of our presentations -- I would say
13  the great majority of them are prepared by attorneys and given
14  by attorneys.  And if they are not prepared by attorneys, they
15  are always reviewed by an attorney before the presentation is
16  given.
17       MS. TULIN:  Your Honor, and Counsel, I don't know if
18  this is where this is going, but we don't have an objection to
19  this exhibit, if you want to cut to the chase.
20       MR. WASSDORF:  That is -- that is where this is
21  going.
22       THE COURT:  Thank you.
23       What's the number?
24       MR. WASSDORF:  This is Exhibit 248, Your Honor.
25  However, we've got several presentations that the Secretary of

4531
CHRISTINA ADKINS – DIRECT

1  State has prepared, and if we can shortcut this, I'd like to

2  introduce them all at once.  And that would be 243 through

3  257.

4          THE COURT:  So are 243 through 257 all training

5  materials done by the Secretary of State's Office post

6  enactment of SB 1?

7          MR. WASSDORF:  Pre and post.

8          THE COURT:  Any objection to 243 to 257?

9          MISS TULIN:  Your Honor, we do not object to 245,

10  246, 247, 248, 249, 250, 251, 252, 253, 254, and 255.

11          What was the other?

12          THE COURT:  So 245 through 255 are admitted.  What's

13  the problem with 243 and 244?  I thought 243 is what is on the

14  screen.

15          MR. WASSDORF:  248.

16          THE COURT:  Oh, that's 248.  Okay.

17          MISS TULIN:  So I believe HAUL may have an objection

18  to 243.

19          MISS HOLMES:  I'm happy to address that, Your Honor.

20  And we are withdrawing that objection.  So no objection to 243

21  from the HAUL plaintiffs.

22          THE COURT:  Anybody, objection to 243?

23          MISS RODRIGUEZ:  No.

24          THE COURT:  243 is admitted.  So where are we at on

25  244?  Does anybody have an objection to 244?

4532

CHRISTINA ADKINS – DIRECT

1        MISS RODRIGUEZ:  One second, Your Honor.  Sorry.  No,

2  we don't have an objection to that.

3        THE COURT:  244 is admitted.

4        What's the problem with 256 and 257?

5        MISS TULIN:  There's no objection to 257 and 256.

6        MISS RODRIGUEZ:  No.

7        THE COURT:  256 and 257 are admitted.

8        MR. WASSDORF:  Thank you, Your Honor.

9  BY MR. WASSDORF:

10  Q.  Need to catch up to where I was now.  Shortcut all of

11  that.

12      As the legal director of the Elections Division, did you

13  oversee the attorneys that prepared these educational

14  materials?

15  A.  Yes.

16  Q.  And did you oversee the election security trainers, I

17  believe they are called?

18  A.  That's correct, yes.

19  Q.  What is an election security trainer?

20  A.  Those are individuals that we brought on our team to

21  provide training to election officials on specific policies

22  and procedures with an emphasis on the security aspect, so

23  chain of custody, documentation, and then, of course, some

24  cybersecurity and physical security issues related to

25  elections as well.  They are primarily former election

4533
CHRISTINA ADKINS – DIRECT

1  officials, so they have more practical experience, which we
2  find to be a nice compliment to the legal support that our
3  attorneys provide.
4  Q.  And what are some of the areas in which you provide
5  training?
6  A.  Well, primarily, I think first and foremost we provide
7  training over the law.  I think we have a statutory obligation
8  to do so.  The Election Code says that we provide advice and
9  assistance.  We also have an obligation to maintain and obtain
10  uniformity in the administration of the laws as they pertain
11  to elections in Texas.  And so we provide training on the —
12  specifically on the law itself.
13      In addition to that, we provide training on procedural
14  issues as well.  We may have a law — there may be additional
15  details or additional procedures that are prescribed by the
16  Secretary of State's Office, and we will train on those
17  additional procedures as well.
18  Q.  More specifically, do you — I think we looked at one,
19  Exhibit 248, that was providing training on applications for
20  ballot-by-mail, is that right?
21  A.  That's correct.
22  Q.  And do you also provide training about poll watchers?
23  A.  Yes.
24  Q.  And ballot cure provisions?
25  A.  That's correct, yes.

4534

CHRISTINA ADKINS – DIRECT

1  Q.  Updates after the legislative session?

2  A.  Definitely.

3  Q.  Who are these trainings presented to?

4  A.  Most of our trainings, our target audience will be local

5  election officials.  That would be the individuals in

6  specifically county election offices, county election and

7  voter registration offices; the ones that are carrying out the

8  day-to-day operations related to law.

9      We also offer trainings that are directed to election

10  officials, you know, for cities and school districts, all of

11  these other local political subdivisions, but though our

12  training may be targeted to those individuals, most of our

13  trainings are available on our website.  So any individual can

14  watch or view our training.

15      I would also add to that during the Primary season or

16  particularly leading up to a Primary, we do a lot of training

17  for the party officials, since it's the party officials that

18  administer the Primary.

19  Q.  And do you also occasionally provide training to

20  candidates and members of the public?

21  A.  We do, yes.

22  Q.  Have the duties of election security trainers changed

23  since 2021?

24  A.  When we originally brought our trainers on board, it was

25  with federal funding, and so they had a very, very specific

4535

CHRISTINA ADKINS - DIRECT

1  security focus.  As we received state funding for the

2  trainers, we were able to broaden the topics that they can

3  train on.  We still have an emphasis on security, because

4  that's very much procedure-based, and so we want to make sure

5  that that's definitely a priority in the trainings they offer,

6  but they also provide some training on some more general

7  election concepts as well.

8  Q.  And when was it that you originally created the election

9  security training team?

10  A.  I believe it was in late 2018 or 2019.  And I'm sorry, I

11  can't remember the exact date, but it was right around that

12  time.  It was in response to a number of security concerns

13  that the election community had resulting from the 2016

14  election.

15  Q.  And when did that change expanding their focus occur?

16  A.  In 2021, I believe it is, is when we received state

17  funding to keep those positions on board.  So, you know,

18  beyond -- you know, if our federal funds ran out, we would be

19  able to keep these folks.  And at that time we added

20  additional trainers to our program as we had funding for more

21  people and, again, kind of broaden their focus out so that

22  they can speak to other issues beyond things that just relate

23  to security based procedures.

24  Q.  In addition to these educational presentations, you also

25  mentioned election advisories.  What is an election advisory?

4536

CHRISTINA ADKINS – DIRECT

1   A.  An election advisory is guidance that our office puts out
2   with respect to different issues under the law.  There are a
3   number of times where the legislature may put in a bill that
4   the Secretary of State, you know, shall prescribe procedures
5   related to this provision.  And oftentimes, we are left to
6   fill in the gaps or to provide details on how a particular
7   provision of law interacts with the rest of the Election Code.
8        And so we will provide advisories for that purpose, for
9   the express reason of providing that additional guidance.  We
10  also issue advisories from time to time related to reoccurring
11  questions that come up under the law.  You know, we may have
12  issues where we're seeing a lot of questions in a particular
13  area.
14       Again, I go back to the fact that election law, it can be
15  a touch complicated, because it involves so many other areas
16  of law as well, and so we will provide advisories to issues
17  guidance or to provide interpretation so that individuals that
18  are actually putting the law into practice, our local election
19  officials, have some guidance, and we have some uniformity in
20  how they are reading the laws.
21  Q.  What is the legal nature of an election advisory?
22  A.  Most of our advisories are based off of the Texas Election
23  Code.  That's our starting point, because most of the laws in
24  Texas that are govern –– governing our election are Texas
25  Election Code provisions, so it typically relates back to

4537
CHRISTINA ADKINS - DIRECT

 1  either specific items or concepts under the Election Code that
 2  we expand upon from there.
 3  Q.  Who is the intended audience of an election advisory?
 4  A.  Almost all of our election advisories, it's going to be
 5  election officials in some capacity.  That could be our county
 6  election and voter registration officials.  It could be local
 7  election officials, cities and school districts.  It could be
 8  our political party chairs.
 9      I would even go so far as to say to can also oftentimes
10  be, like, a county or district attorney or a school board
11  attorney.  You know, those individuals that may provide legal
12  guidance to the local election officials, they often rely on
13  our advisories as well in helping guide and advise their
14  clients.
15  Q.  Are election advisories binding on election officials?
16  A.  We like to think that our advisories do have some kind of
17  binding authority, specifically when we have a law that says
18  that the SOS shall prescribe procedures, so when we have a
19  specific legislative direction to add some additional steps,
20  you know, we believe that that means that we're providing
21  these procedures so that we have some uniformity, and we have
22  some clarity in the law.
23      I think when it comes down to it, while we like to think
24  of our advisories as binding, if a local jurisdiction, you
25  know, looks at the law, and they see something different and

CHRISTINA ADKINS – DIRECT

1  they feel that they can, you know, confidently support a

2  different interpretation or a different course of action — I

3  mean, that's ultimately their decision to make.  But, again,

4  we would always — our recommendation is always going to be to

5  follow the guidance that our office provides.

6  Q.  How are the election advisories disseminated to the

7  election officials?

8  A.  They are disseminated in two different ways.  The first is

9  that we email them out to everybody that's on our different

10  distribution lists, to whichever group is appropriate to

11  receive that advisory.  But we also post them on our website,

12  because we want them to be publically available, because we

13  understand that there are other individuals that may have an

14  interest in election law or may want to understand what those

15  procedures are, and so we make sure that they are posted so

16  that anybody that wants to see what my office has said has the

17  ability to view and review that guidance.

18  Q.  And who actually creates or drafts the election advisory?

19  A.  The advisories are typically drafted by attorneys.  Almost

20  all of them are drafted by attorneys.  Occasionally, we may

21  have something that another individual has assisted on, and if

22  that's the case, it's usually heavily edited or very much

23  involved with an attorney, more like a joint effort between

24  the attorney and the nonattorney.  But since it is — since we

25  do call them "Election Law Advisories," and they are based on

4539

CHRISTINA ADKINS - DIRECT

1  the laws themselves, that -- I believe that falls kind of

2  under the purview of our legal department, so our attorneys.

3  Q.  How do you determine whether an election advisory needs to

4  be issued or not?

5  A.  Again, we'll look at a number of different factors.  I

6  would say there's probably three things that we look at.

7      First, there are advisories that we issue that are

8  standard advisories every year.  There are standard advisories

9  for every election, helping to provide dates and deadlines,

10  helping remind election officials of their obligations under

11  the law; sometimes reporting obligations that they have to our

12  office.  That's kind of the first group of advisories that we

13  have.

14      The second group I would say are those where there's an

15  expectation on my office to provide some additional guidance.

16  Typically, when a new law passes, there may be language in the

17  law, in the new law, that directs us to provide additional

18  guidance, and in reviewing the law, if we determine that

19  that's necessary, you know, if the law is broad enough where

20  we need to provide some additional procedures, then we will

21  issue an advisory usually in order to accomplish that task.

22      And then I think, finally, we just have a number of

23  advisories that we've issued to inform election officials, I

24  think, on obligations or to help answer questions about the

25  law.  If we have conflicting views out there or if we have

4540
CHRISTINA ADKINS - DIRECT

1  counties that are reading the law in different ways, again, we

2  have a statutory obligation to maintain and obtain uniformity,

3  so we will issue those election advisories to pursue that

4  goal, to try to make sure that the laws applied as

5  consistently across the board as possible.

6  Q.  And what is the Secretary of State's process for

7  determining what legal position an advisory is going to take?

8  A.  So our office is very collaborative.  Very rarely does

9  anybody make a decision in isolation.  I think that's just

10  across the board on many legal issues, but advisories in

11  particular.  We generally meet as a team.

12      The attorneys and I will meet to discuss whatever

13  topics -- whatever the topic is at hand that we're looking

14  to -- to review or to issue guidance on, and we work together

15  to go through either the bill or the issue to look at the

16  different code provisions, to formulate a plan or to kind of

17  formulate the guidance that we want to offer.

18      So it's definitely based on a lot of collaboration between

19  the attorneys.  Occasionally, if it's something that's very

20  procedure-based, we will invite the election trainers to

21  participate in these discussions with us.  Oftentimes, those

22  folks that have practical experience on the election side can

23  offer some perspectives that we may not have, just looking at

24  the law itself.

25      And then at that point, once we kind of generally have a

4541
CHRISTINA ADKINS – DIRECT

1  consensus as to what our understanding of the issue is or what
2  the guidance needs to be, somebody will draft the original
3  opinion — or advisory, rather; will draft that advisory, and
4  then it's circulated again.  There's always revisions.
5  Sometimes we meet as a group to go over the advisories
6  paragraph by paragraph in some cases, if necessary, and —
7  until we feel like we have a final product.
8  Q.  And as the legal director or the division director, do you
9  review every election advisory that goes out?
10 A.  I do.
11       MR. WASSDORF:  Your Honor, perhaps we can shortcut
12 this again.  At this time, State would move to admit State
13 Exhibits 14, 16, 18, 20, 202, 203, 204, 205, 206, 207, 209,
14 and 210.  Those are all various election advisories.
15       THE COURT:  Any objection to any of those?
16       MISS RODRIGUEZ:  No objection from LULAC plaintiffs,
17 but we know that, as per an agreement that LULAC plaintiffs
18 have with State defendants — and Mr. Wassdorf, rather, do you
19 want to speak on this?  State Defendants Exhibits 14 and 16
20 are subject to an agreement between LULAC and state
21 defendants.
22       State Exhibits 14 and 16 are subject to an agreement
23 between LULAC plaintiffs and State defendants in that they are
24 not being offered to prove the contents of the bill of the law
25 referenced in the documents or motivation behind those laws

4542
CHRISTINA ADKINS - DIRECT

1   referenced in the documents.

2            MR. WASSDORF:  That's an accurate representation,

3   Your Honor.  They contain characterization of various laws,

4   and we agree that the laws themselves are the best evidence of

5   their meaning.

6            THE COURT:  Subject to that agreement, 14 and 16 are

7   admitted.  Eighteen, 20, 202 through 207 are admitted, 209 and

8   210.

9            MISS RODRIGUEZ:  Your Honor, I'm so sorry.

10  Exhibit 20 is subject to the same agreement.

11           THE COURT:  Twenty, same ruling.

12  BY MR. WASSDORF:

13  Q.  I think we also discussed a moment ago about poll watcher

14  trainings.  Prior to SB 1, was there a training requirement

15  for poll watchers?

16  A.  No.

17  Q.  Post-SB 1, is there a training requirement for poll

18  watchers?

19  A.  Yes, there is.

20  Q.  What does that training include?

21  A.  So after the passage of SB 1, our office was required to

22  create a training for poll watchers.  That training had to be

23  available on demand, and it was required to specifically train

24  on the requirements of being a poll watcher and proper

25  procedure for poll watchers.  We have had guidance that our

CHRISTINA ADKINS – DIRECT

1  office has issued for a number of years, we call it our "Poll

2  Watcher's Guide."  It's a little handbook that we put together

3  that summarizes the law as it relates to poll watching.

4      So we use that as the basis for our training.  We took

5  selected pieces of content from that poll watcher's guide, and

6  we created an online training, as we were required to do.

7  That, again, is directed toward the poll watchers on, I think,

8  their — the actions and the things that pertain to them, that

9  they are allowed to do and in some cases not allowed to do,

10  under the election code.

11  Q.  You mentioned a "Poll Watcher Guide."  Just to clarify,

12  that was a resource that existed, but were poll watchers

13  required to review it at all?

14  A.  No.  It was something that we've had for many, many years.

15  I think the original guide predated even my tenure at the

16  Secretary of State's Office.  We updated it.  It was there and

17  available on our website.  We tried to provide it when

18  questions came up, but poll watchers were not required to

19  refer to it or use it in any way.

20  Q.  Brian, could we bring up State Exhibit 29.

21      Do you recognize this document?

22  A.  I do.

23  Q.  And what is it?

24  A.  It appears to be the content that's contained within our

25  poll watcher training.

CHRISTINA ADKINS - DIRECT

1  Q.  And so this is the content in documentary form, but it is

2  a web-based training system?

3  A.  It is a web-based training system, that the content here

4  is reflective of what's contained in the system.

5  Q.  And between -- let me back up.

6    When was this poll watcher training implemented?

7  A.  The requirement was from SB 1, and so it was implemented

8  immediately following SB 1, so I believe the first election to

9  which this would have applied broadly would have been the

10  March 2022 Primary, so I believe this went live on our website

11  in December of 2021.

12  Q.  And how did the procedure for poll watchers in taking this

13  training change between the March 2022 Primary to today?

14  A.  So when we initially issued the training, it was

15  reflective of the guidance that we had.  You know, I think

16  oftentimes the legislature is very clear when they want us to

17  put a quiz or a test in the training, so we did not have

18  anything to that effect in the training because there were no

19  statutory direction to have any kind of pass-or-fail system

20  with the training itself.

21    However, after of the Primary, we received quite a bit of

22  feedback from election officials, from candidates, even from a

23  number of poll watcher groups out there -- some of the ones

24  that are a little bit more organized, that they were concerned

25  that their needed to be something else to ensure that people

CHRISTINA ADKINS – DIRECT

1  were reading the content of the training itself.

2      There was actually an interim House Elections Committee on

3  some of these issues, and it was very clear at that committee

4  hearing that there was a desire for us to do a little bit more

5  to ensure that folks are, in fact, reading and taking in the

6  content of the training itself.

7      So while we didn't have statutory authority to add a quiz,

8  we did add some questions at the end of each module that a

9  person has to answer in order to get to the next module, and

10  that's just to ensure that they are retaining and reading the

11  content of each section.

12  Q.  Prior to Senate Bill 1, did the Secretary of State's

13  Office receive complaints about or from poll watchers?

14  A.  Yes.  I think we did receive complaints either about poll

15  watchers or oftentimes from poll watchers as well.

16  Q.  And how has — how have the complaints changed since the

17  poll watcher training was implemented?

18  A.  I would say that the complaints have changed in two ways.

19  One, I believe we received four complaints than we did before.

20  I think there's just a little bit more clarity now as to what

21  those expectations are with respect to poll watchers, I

22  believe in large part because of the training itself.  So I

23  would say overall, we received fewer in that area.

24      And then I would say the second way that the complaints

25  have changed is that they are a lot more specific.  We very

4546
CHRISTINA ADKINS - DIRECT

1  rarely get complaints about polling place activities.  It's

2  typically activities that occur in the Central Counting

3  Station, our activities that occur in the Ballot Board, and so

4  it's more specific to that type of content.

5         MR. WASSDORF:  Your Honor, State defendants would

6  move to admit State Exhibit 29.

7         THE COURT:  Any objection to 29?

8         MISS TULIN:  No objection.

9         THE COURT:  Twenty-nine is admitted.

10        Is there anything in 29 or any of the other documents

11 that talk about what poll watchers can do in the warehouse?

12        THE WITNESS:  So that's an interesting question, Your

13 Honor, because there are some conflicting views about what

14 poll watchers can and can't do in those locations, and that's

15 because poll watcher activities are defined by the type of —

16 or poll watcher allowances are defined by what's taking place.

17 It's defined by, is it the Central Counting Station?  Is it

18 the Ballot Board?  Is it, you know, a polling place?

19        So a poll watcher has to have a certificate of

20 appointment for a directed activity, and there has to be a

21 presiding judge there to sign it.

22        THE COURT:  And there is no presiding judge at the

23 warehouse.

24        THE WITNESS:  So, generally speaking — for example,

25 on Election Day, Your Honor, if you have your Central Counting

4547

CHRISTINA ADKINS – DIRECT

1  Station convened at that location where equipment is coming

2  back, then there is the ability for a poll watcher to show up,

3  provide a certificate of appointment, and be able to view some

4  of those activities that are taking place there.

5          THE COURT:  Provided to who?

6          THE WITNESS:  So a poll watcher can follow the

7  equipment from the polling location ——

8          THE COURT:  I'm sorry.  Provide their credentials to

9  who at warehouse?

10          THE WITNESS:  The presiding judge at the Central

11  Counting Station.  If those activities are going in that ——

12  that's typically a Central Counting Station activity, intake

13  from Election Day.

14          Where we have seen some differing views —— and I

15  think differing procedures, is where it relates to early

16  voting.  Because if a poll watcher just shows up at the end of

17  early voting, they don't have the right to walk into that

18  warehouse or walk into that place to view the activities that

19  are taking place, because typically counties aren't convening

20  their Central Counting Station.  They aren't convening their

21  Ballot Boards, so they have no right to be there.

22          THE COURT:  So does that explained to poll watchers

23  now?

24          THE WITNESS:  Well, there is a specific provision of

25  law that talks about the intake, how they are able to view

4548
CHRISTINA ADKINS – DIRECT

1  intake.  We have had to provide some additional guidance in
2  this area, because I think a lot of –– well, because a lot of
3  poll watchers have taken that provision to think it gives them
4  free access, and so we've had to provide some additional
5  guidance that says it does not.
6  BY MR. WASSDORF:
7  Q.  Let's back up a little bit and talk about SB 1
8  specifically and its timing.
9      When was Senate Bill 1 enacted?
10 A.  So the effective date on SB 1 was December 1st or the very
11 beginning of December of 2021.
12 Q.  When was it enacted by the legislature?
13 A.  Oh, excuse me, at the end –– in September, in September of
14 2021.
15 Q.  What other major item was up for consideration in the
16 legislature at that time?
17 A.  So in the fall of 2021, you know, we had a number of
18 different special sessions.  One of the big issues that was
19 being addressed during those special sessions was
20 redistricting.
21 Q.  And did –– were you receiving questions from counties
22 about drawing election precincts and voter registration?
23 A.  Yes.
24 Q.  When was the first election under which SB 1 was going to
25 govern to occur?

CHRISTINA ADKINS – DIRECT

1  A.  That would be the Primary in 2022.

2  Q.  And do you feel that between September of 2021 and March

3  of 2022 was sufficient time to implement all of the changes

4  created by SB 1?

5  A.  No, I don't.  I think that while, typically, we do have,

6  you know, approximately the same amount of time from a regular

7  session until implementation, the timing for SB 1 was very

8  different, because right after the bill passed, after its

9  enaction date, we had to change quite literally every piece of

10  guidance, every handbook, hundreds of forms, to comport with

11  the requirements in SB 1.

12      But we also had to do that at the same time that we were

13  helping counties with redistricting.  We had to do that at the

14  same time we were helping, you know, 500 political party

15  chairs with candidate filings related to the Primary Election,

16  and we had to support the November Constitutional Amendment

17  Election as well.

18      I don't know that in my time at the Secretary of State's

19  Office we've ever had to do so much in such a short period of

20  time.

21  Q.  Does the Elections Division host an annual Election Law

22  Seminar?

23  A.  We do, yes.

24  Q.  And when did it fall with respect to the implementation of

25  SB 1?

4550
CHRISTINA ADKINS - DIRECT

1   A.  Our annual Election Law Seminar that's targeted toward our
2   county election officials occurs in the summertime.  It's
3   usually the beginning of August each year, and so we had our
4   annual seminar in early August of 2021 before we knew what was
5   happening with SB 1, so we did not have that in-person
6   training opportunity with our election officials, which is
7   very unfortunate.  That's a time where we can train directly
8   on issues and answer questions and help craft guidance in some
9   cases, based on questions that are being asked.
10      And so we were not able to train in person during this
11  annual gathering.  We were left to do most of our training as
12  web-based trainings.
13  Q.  How many people usually attend that annual seminar?
14  A.  We usually have about 800 people.
15  Q.  Is that a significant portion of the county election
16  officials that you are targeting with that seminar?
17  A.  Yes, very much so.
18  Q.  How impactful was the fact that SB 1 did not come out
19  until after you had presented at that seminar?
20  A.  It was very significant that we were not able to offer
21  in-person training.  Those seminars that we provide, not only
22  do we have the opportunity to teach and train on the law, but
23  some of the great value in those seminars and the reason why
24  they are timed to occur in the summer before the effective
25  date of a bill, is because it's in that training that we often

CHRISTINA ADKINS - DIRECT

1  find specific areas that we need to address in any guidance

2  that we're offering.

3      It's — our Election Law Seminars are very interactive.

4  Lots of questions and answering — or Q and A from the

5  audience itself.  Lots of discussions.  It's a very

6  collaborative experience, as well, I think between us and our

7  election officials.  And oftentimes it's during the course of

8  those question-and-answer events where we're looking at

9  different issues or where counties are bringing issues to our

10 consideration, things they may know from their practical

11 experience, that we finalize whatever guidance we're going to

12 be offering.  It gives us a sense of where we need to answer

13 questions and what are the concerns that the election

14 community has that it would be helpful for us to address.

15 Q.  Since the passage of Senate Bill 1, have your subsequent

16 annual Election Law Seminars included information about the

17 implementation of Senate Bill 1?

18 A.  Yes.

19 Q.  When was the — your first opportunity to present training

20 materials on the effects of SB 1?

21 A.  If we're talking about just training, in general, we

22 started doing some web-based training in December of 2021.  We

23 had a very unique situation in that we had to train on what

24 the law was from September to December, because we had an

25 election taking place, and there had been other law changes

CHRISTINA ADKINS - DIRECT

1  from the regular session.  And so we had to train on those

2  issues, and that's primarily what we did during the

3  summertime.  But we had to be very cautious about beginning

4  training on any other issues because we had an ongoing

5  election, and we had run-off elections that were pertaining to

6  that original November election, and there was a change in the

7  law, you know, in December that impacted not that ongoing

8  election, but impacted future elections.

9      We also had forums that were in effect for one election

10  with changes that we had to make to some of our official

11  forms.  But then we had to turn around and make additional

12  changes that -- for example, the application for

13  ballot-by-mail form, but then those forms weren't valid for

14  the Primary until January 1, because of the way the law works

15  with respect to annual applications.

16      So it was a very complicated time in trying to train in a

17  way that would prepare folks for the Primary, but wouldn't

18  interfere and impose -- or allow counties to read more into it

19  and impose some of those laws for the November election that

20  was taking place at that time.

21  Q.  That concerns would you have had if you conducted training

22  on Senate Bill 1 before the completion of the elections to

23  which Senate Bill 1 did not apply?

24  A.  I think the biggest concern that I would have had would

25  have been with respect to the proper forms that were used and

4553

CHRISTINA ADKINS – DIRECT

1  how the law applies to those forms.  You know, we already,

2  during the course of that election, received a lot of

3  questions.  There was, you know, confusion as to what — what

4  was the law for that election.  Because folks had been hearing

5  about the passage of Senate Bill 1, we had, you know, maybe

6  ballot boards, individuals, that were not part of the

7  day-to-day operations of elections, but can be, you know,

8  brought together for a specific election purpose.

9      People were calling and asking us, you know, about what

10  they thought the requirements were, because they heard news

11  reports of changes, but that's not what our training material

12  said.  And so I think, you know, our election officials, they

13  have a very hard job.  And they do the best they can, and they

14  have to focus on that immediate election at hand.  And it's

15  important to make sure that the right law was applied to that

16  election so that we don't create election challenges.

17  Q.  You've talked some about forms.  What exactly is an

18  election form?

19  A.  So the Texas Election Code requires my office to prescribe

20  official forms.  It's probably the most bureaucratic thing

21  that we do, but we have over 500 election forms that we issue.

22  There are a number of forms that election officials are

23  required to use.  There are many that we offer as a template.

24  You know, many that are samples, but there are a good number

25  of forms that are — by law, required to be the ones that our

1  office prescribes the content specifically.

2  Q.  And how many election forms does the Secretary of State's

3  Office create, I guess?

4  A.  So, I mean, we have hundreds and hundreds of forms.  I

5  believe we have over 500 listed.  I think 500 in our files.  I

6  think there's about 350 that are on our website, but in

7  addition to that, for things like voter registration

8  applications, we do the artwork for all 254 counties, and so,

9  you know, for many counties we are the ones that are making

10  modifications to the official voter registration form that

11  they print up and use on their own.

12      So it's a huge number of forms that we're responsible for

13  maintaining and updating.

14  Q.  Brian, could you pull up State Exhibit 277 that's already

15  been admitted.  Could we look at page 3.

16      Is this a description of some of the uses of election

17  forms?

18  A.  Yes, definitely.

19  Q.  And Brian, move to page 4.

20      And does this describe why forms are important to the

21  election process?

22  A.  Yes.  I think one of the things that I tell our folks when

23  we're working on forms is that a form is a summary of the law,

24  and it's, for many voters, their way of interacting with the

25  law, and that's why it's very critical that we put a lot of

4555
CHRISTINA ADKINS – DIRECT

 1  care and effort into creating a form.

 2  Q.  Brian, let's look at page 6.

 3     Does this summarize some of the many changes that were

 4  made to the forms that SOS administers?

 5  A.  Yes.  I would say this is a good summary.  I would say

 6  where it says "There were about 100 forms that had to be

 7  updated or created," I would say that's true, but I'd also add

 8  on to it again, all the voter registration applications that

 9  we had to modify.  It's a manual process, and we had to do,

10  you know, over 500 different voter registration application

11  variations on top of the other forms that we had to do.

12  Q.  And from the implementation —— or enactment of Senate

13  Bill 1 in September of 2021, where between there and the March

14  Primary did you need to get these hundreds of forms finalized?

15  A.  Well, for the great majority of those forms, we needed to

16  have them ready no later than December, the beginning of

17  December, because of the effective date of the bill.  We had a

18  number that we were continuing to work on even post that

19  effective date, just because we could not physically get

20  everything done by that time.

21     At that time I only had 32 people in the Elections

22  Division, and so it was a lot that we were having to do.  We

23  kind of took a triage approach.  We looked at what —— you

24  know, laid out all of the things that we had to create and

25  modify and started with the ones that were the most time

4556
CHRISTINA ADKINS – DIRECT

1  sensitive.  Specifically, our ballot-by-mail envelopes.  We
2  knew in talking to vendors that that was going to be a very
3  difficult form to get the ball rolling on, because we were
4  creating a brand-new version of it.  There were some
5  modifications not just to the content, to the substance, but
6  the format of the document itself.  And so we had to start
7  working with vendors immediately to come up with a new format,
8  and, of course, we had to preview it with counties.
9      I don't typically issue a major form change unless it's
10 been reviewed by a number of counties to get county feedback,
11 so we had to prioritize those type of things, the voter
12 registration applications, all of these big things that had
13 more immediate deadlines; and then continue to work on forms
14 as they relate to the election process.
15 Q.  Does state law require that all voter-facing forms be
16 provided in both English and Spanish?
17 A.  That's correct.
18 Q.  Do you ever produce election forms in any other language?
19 A.  We have some counties that have some individual language
20 requirements, and we do provide some resources to them with
21 those specific language requirements.  Vietnamese is one — I
22 think we have three counties that have Vietnamese.  I believe
23 Harris County also has Mandarin requirements.  We do for some
24 of our more forward-facing forms that need to be uniform
25 across those counties.  Many of those counties have told us

4557
CHRISTINA ADKINS – DIRECT

1  that sometimes there's differences between the different
2  counties in translation based on different dialects in some of
3  the different languages, so there are some things that they
4  handle on their own to be more specific to the voters in their
5  community.
6  Q.  Did SB 1 change any of Secretary of State's processes
7  about producing forms in different languages?
8  A.  I don't think that SB 1 made any changes with respect to
9  that particular issue.  That obligation, you know, to provide
10 most of our –– all of our voter-facing forms in Spanish
11 already existed.
12 Q.  I think we discussed that one of the reasons that a form
13 can change is because the law changes.  Is –– who do you talk
14 to in determining how to change a form in response to the
15 change in a law?
16 A.  Well, specifically, I think our legal team will meet to
17 evaluate what the requirements are to determine what the
18 change needs to be and how that language needs to be phrased
19 so that we're consistent with the law itself.
20     And then, again, sometimes beyond that, depending on the
21 type of form and depending on what the change is, I typically
22 provide samples to different county election officials to see
23 if there's anything specific to the given form that they need
24 to provide us feedback on, that we need to be aware of before
25 we finalize.

4558
CHRISTINA ADKINS − DIRECT

1  Q.  And do you have an advisory group composed of county

2  election officials?

3  A.  Yes, I do.  I have an advisory group that I meet with

4  typically every other week or about two times a month.  It's

5  election officials from all over the State.  All of our large

6  urban counties are involved in the group, but we also have

7  more rural counties, you know, small, mid−sized counties, and

8  we meet to discuss different election topics.  And I relied on

9  them very heavily in the development of forms relating −− from

10  SB 1.

11  Q.  Do you ever consult the U.S. Postal Service with respect

12  to changing your forms?

13  A.  Absolutely.  Anything that goes through the mail, we

14  definitely provide copies of to the Post Office and try to get

15  feedback from them on it.  And then specifically our

16  counties −− the post office has directed us to tell them to

17  also work with their local post office representatives on

18  local issues related to forms.

19  Q.  What is the Center for Civic Design?

20  A.  The Center for Civic Design is an organization that makes

21  sure that design −− as it relates specifically to elections,

22  in this circumstance, that the design is done in a way that's

23  user−friendly and accessible.

24  Q.  And do you ever consult with the Center for Civic Design

25  in terms of changing your forms?

4559
CHRISTINA ADKINS – DIRECT

1    A.  Absolutely.  It's a great organization, and they've put

2    out a lot of resources that we have used ourself and that

3    we've trained on and provided to our local officials for when

4    they customize -- or create forms that are specific to their

5    elections.

6        And with our carrier envelope, the envelope that is used

7    to -- by a voter to return their voted mail ballot, the Center

8    for Civic Design had worked with the U.S. Postal Service to

9    come up with templates, recommended templates that they were

10   wanting election officials to move toward so that it would be

11   easier to identify election mail.

12       And so when we had to make changes to our carrier

13   envelope, I thought this was a good opportunity to incorporate

14   some of the design elements that they were asking us all to

15   move towards.  So definitely use their resources and their

16   templates in our redesign of the carrier envelope.

17   Q.  So let me just be clear with respect to this carrier

18   envelope.  The Center for Civic Design, do they have,

19   essentially, model forms?

20   A.  For the carrier envelope, they did.  They definitely have

21   some model forms that I believe are available on their

22   website.  Also through the USPS.  They actually have a -- some

23   resources designed to -- or specific to election forms that go

24   through the mail, and those templates are available on the

25   USPS website as well.

4560
CHRISTINA ADKINS – DIRECT

1  Q.  So it was essentially one of these model forms that you

2  adopted for the carrier envelope?

3  A.  That's correct.  We had actually discussed incorporating

4  some of their design elements earlier prior to SB 1, but our

5  counties had expressed a strong concern for us — or a strong

6  desire for us not to make those changes because of educational

7  efforts.  And so once we knew we had to make a big change to

8  the carrier envelope, it was a good opportunity to incorporate

9  these new design requests.

10  Q.  Is one of the reasons that you might update a form to make

11  it more accessible to voters?

12  A.  That's correct, yes.

13  Q.  Could you give me an example of a form update that makes

14  it more accessible?

15  A.  There are a couple of things.  Like, the font that's used

16  on a form.  There's recommendations on the types of font that

17  you use.  You know, san serif fonts in particular.  There's

18  recommendations on sizing of the font that's contained on a

19  form itself.  The use of graphics or boxes to delineate

20  different parts of a form; a number of different items like

21  that that, you know, we've taken into consideration when we

22  redesign different forms that we have.

23  Q.  We've already talked about how Senate Bill 1 required the

24  Secretary of State's Office to update some of its forms.  Was

25  the application for ballot-by-mail one of the forms that you

4561

CHRISTINA ADKINS - DIRECT

1  had to update due to SB 1?

2  A.  Yes, that's correct.

3  Q.  What would you say was the main updates that were required

4  to the application for ballot-by-mail?

5  A.  The application for ballot-by-mail, the primary update

6  that occurred with respect to SB 1 was the addition of the

7  boxes that pertain to the personal identification number.

8  Q.  I think you discussed earlier that there are some forms

9  that the Secretary of State — and the local election

10  officials have to use the Secretary of States forms, correct?

11  A.  That's correct.

12  Q.  Are there forms that the Secretary of State provides a

13  template for the content, but officials are allowed to use

14  other forms as long as they contain the same content?

15  A.  That's correct.  And I think that application for

16  ballot-by-mail form is an example of where our office is

17  required to prescribe a form, but voters don't have to use our

18  form.  As long as their application for ballot-by-mail

19  contains the required elements, then it doesn't have to be on

20  the form we prescribe.  And I think a lot of organizations and

21  campaigns — there are a lot of groups that will prescribe a

22  form that's a little bit different from ours, because they

23  have different requirements than the official prescribed form.

24  They don't have to include quite as much as we do on the

25  prescribed form.

4562

CHRISTINA ADKINS - DIRECT

1  Q.  And so can counties or voters or campaigns create their
2  own applications for ballot-by-mail with whatever appearance
3  they wish as long as it contains the appropriate information?
4  A.  Yes.  And that's a very common occurrence.
5  Q.  Do you ever change forms without any change in the law?
6  A.  Occasionally we will, yes.
7  Q.  Why would you do that?
8  A.  Anytime we change a form outside of, I think, the
9  legislative cycle, it's typically due to feedback we get from
10 election officials.  There may be times where they have a form
11 that we've used, and based on, you know, policy or procedure
12 or even unrelated changes in the law, they may have some
13 feedback or suggestions from us to make the form work a little
14 bit better, make it work a little bit better for their
15 workers.
16      So when those suggestions come in if, it's something that
17 we feel like we have — we can do and it doesn't change
18 legally what's required on that form, we will consider that.
19 Again, I very rarely, though, make a change to any form unless
20 I've consulted with multiple counties on it, and I'm also very
21 conscious about making changes to forms in the middle of an
22 election cycle.
23 Q.  When updating forms, are you mindful of where you are in
24 the election calendar?
25 A.  Absolutely.  The closer you are to an election, the harder

4563
CHRISTINA ADKINS - DIRECT

1   it is to change a form.

2   Q.  What is the process by which the Secretary of State's

3   Office provides new or updated forms to the counties?

4   A.  Anytime we make a change to a form, we will send out,

5   again, a mass email, is what we call it, where we email out a

6   template of the form.  Sometimes we'll include both a Word

7   document and a pdf, if it's a sample form where they might

8   want to be making some modifications to the format itself.

9       We also have a forms manual, and so we have an index of

10  forms on our website, and so we keep that updated with the

11  form itself and instructions on use of that form.

12  Q.  Besides counties, who might these forms be distributed to?

13  A.  Well, we have a number of forms that are voter-facing, a

14  number of forms that voters interact with directly, and so

15  that there are voter-specific forms that are located on our

16  website.  Oftentimes, those forms are not just in our forms

17  index but might be in the other appropriate places on our

18  website that voters interact with a little bit more.

19  Oftentimes, campaigns -- again, for example, the application

20  for ballot-by-mail form, they might use elements of that in

21  campaign mailings that they do.  Candidates oftentimes

22  interact with our forms, specifically with candidate

23  applications, so we've got a lot of individuals beyond county

24  election officials that interact with and use the forms that

25  we prescribe.

CHRISTINA ADKINS - DIRECT

1  Q.  When a form changes, does your office ever educate on

2  those changes in the election advisories or presentations or

3  other trainings that we have discussed?

4  A.  Yes.  Particularly, if it's a very prominent form or

5  something that may impact procedure, then we will offer

6  guidance and training on it.  We may send out information via

7  email.  I try really hard to accompany web-based trainings at

8  least when we have big changes to policy, procedure, and in

9  some cases, forms.  That way our election officials have the

10 opportunity to ask questions in realtime about what we're

11 training on.  And then, of course, at our seminars that we

12 have, our election law seminars.  We try to always include

13 updates to forms.

14 Q.  In addition to Secretary of State forms, do counties

15 sometimes submit forms to your division for review?

16 A.  Yes.  It happens quite frequently where counties will

17 either want to take an official form, and they might want to

18 make some modification.  The most common modification is

19 adding county specific information.  It may be their contact

20 information if it's an application for ballot-by-mail form —

21        THE COURT:  You're going too fast.

22        THE WITNESS:  Sorry.  I'm so sorry.

23        They may wish to add instructions about the voter

24 being able to contact them directly.  Those are the types of

25 things that we typically see.

4565
CHRISTINA ADKINS - DIRECT

1  BY MR. WASSDORF:

2  Q.  And in that situation, if you saw a major problem with a

3  form that a county submitted, would you flag that problem for

4  them?

5  A.  Yes.  If we saw something that was not compliant with the

6  law, we would let them know.

7  Q.  And do they usually correct that problem?

8  A.  Yes.

9  Q.  Previously, we've heard some testimony from county

10  witnesses about some inserts that were included in the

11  applications for ballot-by-mail and ballot-by-mails to inform

12  voters of the ID requirement.  Did you have any counties

13  submit those to you for review?

14  A.  I believe there were a handful of counties that provided

15  samples to let us know what they were using or to see if we

16  saw any major problems with what they were wanting to include.

17  That's not a SOS prescribed form, and it's not like a polling

18  place form, where postings in a polling place, you know,

19  anything beyond the required postings have to be approved by

20  our office.  So it was not something they were required to do,

21  but we were happy to look at it if they sent it our way.

22  Q.  Brian, could we take a look at State Exhibit 73.

23     Is this one of those inserts that we were just discussing?

24  A.  This looks like something that would have been an insert

25  to a ballot-by-mail, probably the balloting materials that

1    were sent out.

2    Q.  And can you tell what county it's from?

3    A.  It appears to be from Harris County.

4            MR. WASSDORF:  Your Honor, I would move to admit

5    State 73, 74, 75, 79, 80, and 81.  These are all various

6    inserts provided by counties.

7            THE COURT:  Any objections?

8            MISS TULIN:  No objections.  And in case you wanted

9    76, there's also no objection.

10            MR. WASSDORF:  We'll also do 76, Your Honor.

11            THE COURT:  Thank you.  73 through 76, 79 through 81

12    are admitted.

13    BY MR. WASSDORF:

14    Q.  Would it be correct to say that once the Secretary of

15    State's Office had — I'm going to use the word "approve"

16    loosely here — one of these inserts, that counties may

17    circulate it amongst themselves?

18    A.  Yes.  That very commonly happens.  Anytime somebody gets a

19    variation of a form approved, they often immediately send it

20    out to all county friends just so folks know it's something

21    our office has looked at.

22    Q.  Are when counties modify an official SOS form, do you

23    require them to obtain an approval to use it?

24    A.  Yes, that's correct.

25    Q.  Would you also require a county to then remove language on

4567

CHRISTINA ADKINS – DIRECT

1  a form that indicates that it was prescribed by the Secretary

2  of State after they have changed it?

3  A.  Our standard practice is to tell a county that if they are

4  modifying a prescribed form so that it's not exactly modeling

5  our form, that they can't say it's prescribed by the Secretary

6  of State's Office.  If they would like to include some kind of

7  designation, then our instruction is to say "approved by the

8  Secretary of State's Office."

9  Q.  Is your team also responsible for updating election

10  handbooks?

11  A.  Yes.  That would be the legal department's purview.

12  Q.  What is an election handbook?

13  A.  We have a number of handbooks that we've provided over the

14  years that provide guidance to specific officials in how they

15  conduct their responsibilities in a given election.

16      Specifically, it's — they are geared towards those

17  individuals that may not be full-time election workers or

18  full-time employees of the Elections Office in a county, and

19  so it provides guidance, typically, to, like, election judges

20  and clerks.  We have handbooks for Election Day procedures,

21  polling place procedures on Election Day.  We also have a

22  handbook — well, at the time — if post-SB 1, we had

23  handbooks related to the early voting ballot board as well.

24  We've actually since expanded our handbook offerings.

25  Q.  How often are the handbooks typically updated?

CHRISTINA ADKINS – DIRECT

1  A.  They are updated at a minimum after every legislative

2  session.  Even if there haven't been substantive changes, we

3  typically review and reissue so that it has an indication that

4  it was reviewed within this cycle.  If there are other things

5  that we need to change, if something is brought to our

6  attention or something happens where we need to or are

7  required to make a change, then we will update them

8  post-legislative updates, at some other point in the cycle.

9  Q.  After SB 1 was enacted, did you update your election

10  handbooks to reflect those changes?

11  A.  We did.

12  Q.  And were those updated handbooks available prior to the

13  March 2022 Primary?

14  A.  They were.

15  Q.  We've talked some about election workers and poll

16  watchers.  If an election worker or a poll watcher had a

17  question for the Secretary of State's Office, could they get

18  in touch with you?

19  A.  Yes.  We have a number of different phone numbers that

20  individuals can call us on.  We have our public-facing number,

21  the voter hotline, we call it.  We also have a direct line for

22  election officials so that those folks can get to us and get

23  to maybe the legal staff or our voter registration department

24  a little bit more quickly.

25       My office line is published online in a number of places,

4569

CHRISTINA ADKINS - DIRECT

1  and I've been in elections long enough that I think most
2  election officials in the state can reach me after hours if
3  they need to.  Either they have my cell phone number or they
4  know somebody who has it.
5  Q.  Can poll watchers also reach you?
6  A.  Yes, they can.  Again, I think people are not shy about
7  giving out my phone number, for better or for worse.  And so,
8  yes, I get calls from other folks beyond election officials.
9  Poll watchers, candidates, different interest groups that are
10 out there will sometimes call me if they need assistance with,
11 like, a voter issue during the election process.
12 Q.  And do local political parties on both sides occasionally
13 share your cell phone information with their poll watchers?
14 A.  Oh, yes.  I think both the Democratic, Republican Party.
15 I think even the Libertarian party in some counties, most of
16 those local officials have my contact information.  And when
17 there's a problem; for example, if there's something going on
18 in a polling place or they have got somebody that has some
19 very persistent questions, I'll tell them they can share my
20 number.  I don't mind answering questions.
21     I mean, whoever calls, I'm going to answer.  I'm going to
22 answer the question whoever calls me, but I know that during
23 an election season, particularly when it's not during business
24 hours, there may be folks that need some questions, and I'm
25 happy to help out when I can.

4570

CHRISTINA ADKINS – DIRECT

1  Q.  And regardless of how they are reaching the Secretary of

2  State's Office, whether through the voter hotline or to you

3  directly, what is the process for answering election officials

4  or poll watchers or whoever questions?

5  A.  We'll answer questions from whoever calls us.  We don't —

6  we don't filter our questions or we don't, you know, select

7  which ones to answer or not answer.  If you call with a

8  question, we have a statutory obligation to answer that

9  question, I think, to provide advice and assistance.

10      You know, I think if it's during business hours, I

11  typically direct people to call our main line, because I have

12  a team of attorneys that can help, rather than just calling me

13  directly.  But again, I know some people need assistance after

14  hours.  And, again, I think folks are not shy about calling me

15  when they need me, even directly at times.

16  Q.  And are, at least during business hours, questions

17  answered in realtime?

18  A.  Absolutely, to the extent that we can.  If it's something

19  somebody in my office can answer in that moment, that's the

20  goal is to do that; particularly in the middle of an election

21  where timeliness is very important with answers to questions.

22  You know, occasionally we get questions where we need to do a

23  little research or we need to discuss things as a group, and

24  so, you know, we may have the question that comes up here and

25  there where we have to discuss it before we can return the

4571
CHRISTINA ADKINS - DIRECT

1  call.

2  Q.  And if it's one of those situations where you can't give

3  them an answer immediately, how soon do you get them an

4  answer?

5  A.  I mean, relatively quickly.  Again, depending on where we

6  are in the election cycle, if it's something happening -- you

7  know, if we're talking about a ballot board that's meeting

8  over the weekend, we're going to get them that answer as

9  quickly as we can.  We try to have a very quick turnaround,

10 particularly on election-specific questions.  But, again,

11 occasionally, we have something that requires more research.

12 Q.  I'd like to talk briefly about some of the legislative

13 changes post-SB 1.  Are you familiar with the post-SB 1

14 changes that the legislature has made?

15 A.  I am.

16 Q.  Brian, can we pull up State's Exhibit 197, which has

17 already been admitted.

18     So what is this?

19 A.  This appears to be a copy of Senate Bill 1599.

20 Q.  And what changes did Senate Bill 1599 effectuate?

21 A.  Senate Bill 1599, from this most recent regular session,

22 made a number of changes that related to the ballot-by-mail

23 process; things that specifically related back to some of the

24 requirements from SB 1.  I would characterize this bill as it

25 was a bipartisan bill where we had some legislators that

4572

CHRISTINA ADKINS — DIRECT

1  received feedback from voters and from election officials and
2  tried to tweak some of the provision in SB 1 to make it a
3  little bit more effective.
4  Q.  And how exactly did Senate Bill 1599 assist voters in
5  correcting their application for ballot-by-mail and mail
6  ballots?
7  A.  Senate Bill 1599 made some very big changes in that area.
8  One of the things that we heard quite frequently from voters
9  was that it was difficult to access the electronic
10 ballot-by-mail tracker, and that's because there were very
11 specific statutory requirements on authentication for the
12 tracker, what data points a voter had to enter to get into the
13 tracker; specifically, residence address was a very tricky
14 address — or a very tricky authentication measure, because
15 residence address is oftentimes a manual entry by individuals
16 within an office.  And so you have a transposed letter or you
17 have extra spaces, it — you know, it wouldn't find a match in
18 the system.
19    So Senate Bill 1599 removed the requirements for residence
20 address and changed that to date of birth, something that's
21 much easier from a data entry perspective, and arguably more
22 secure, because it's not public information.  So it modified
23 that requirement so individuals could get into the tracker
24 more easily.
25    Senate Bill 1599 also did a couple other things that I

4573
CHRISTINA ADKINS – DIRECT

1  think are very helpful.  One of the things 1599 did is it
2  changed the first day that a Ballot Board can meet.  Under
3  prior law, the Ballot Board had a much shorter time for
4  reviewing mail ballots that came in, and so it was harder
5  to — voters had less time for the corrective action process.
6  This removed the first day by which a Ballot Board can meet,
7  so they can start meeting now immediately when they start
8  receiving mail ballots.
9      So that has lengthened the time that voters may have for
10  the corrective action process, and this bill also standardized
11  the time frame for executing a corrective action.  There were
12  some varying dates, depending on how that correct action was
13  initiated, but they standardized it to make everything fall on
14  the sixth day after Election Day.
15  Q.  You mentioned the Ballot Tracker, and we heard some
16  testimony earlier about using an election identification
17  certificate, I believe, to access the Ballot Tracker.  What is
18  an election identification certificate?
19  A.  An election identification certificate is a type of ID.
20  It's a photo ID.  It came about a number of years ago with
21  legislation related to voter ID requirements and people that
22  are voting in person.  It was for individuals that may not be
23  able to obtain — for whatever reason may not have what we
24  call our "List A IDs," the election identification
25  certificate.  It predated some changes to voter ID law, so I

4574
CHRISTINA ADKINS - DIRECT

1  think there are now alternatives that more people use rather
2  than the election identification certificate, but it is a form
3  of a voter — a photo ID for in-person voting.
4  Q.  Can an election identification certificate be used to
5  access the Ballot Tracker?
6  A.  I don't believe the certificate can be used.  I don't
7  think that the number formatting is aligned with a Texas
8  driver's license or ID card.
9  Q.  How many people in this state have an election
10  identification certificate?
11  A.  So the last time we reviewed that, I think as of July of
12  this year, it was read around a thousand voters in Texas had
13  the election identification certificate.  And I believe most
14  of those individuals obtained it, I think, around the time
15  that voter ID took effect.  You know, within the first few
16  years after that.
17  Q.  And could you remind us approximately how many voters,
18  registered voters, are there in the state of Texas?
19  A.  A little over 17 million right now.
20  Q.  Did Senate Bill 1599 also expand the amount of the time
21  voters could correct their mail ballots?
22  A.  It did.  It expanded it both on the front end and I think
23  on the back end.  On the front end, if Ballot Boards can meet
24  sooner, than voters have significantly more time to perform
25  the corrective action process if they are notified sooner.

CHRISTINA ADKINS — DIRECT

1  And then, again, on the back end, previously, the dates didn't
2  line up.  For certain parts of SB 1, voters had to complete it
3  by Election Day, corrective action by Election Day.  For other
4  parts of the bill, they had until the sixth day after Election
5  Day, and this standardized it; so everybody has until the
6  sixth day after Election Day.
7  Q.  And did Senate Bill 1599 also change the materials an
8  early voting ballot board or signature verification committee
9  would send to a voter who submits a defective carrier
10 envelope?
11 A.  It did.  There — in the original version of the
12 corrective action process in SB 1, voters — I'm sorry, Ballot
13 Boards were actually required to physically mail back the
14 voted ballot back to the voter for them to institute some kind
15 of corrective action by mail.  And there were a lot of folks
16 that had very serious concerns about putting that ballot back
17 into the mail stream and the timeliness issue, you know,
18 related to be able to mail a voted ballot back and forth.  And
19 the security issues mailing a ballot back and forth.
20     This modified that aspect of the corrective action process
21 to no longer require that the actual mail ballot be sent back.
22 Now our Ballot Boards can just send a form notifying a voter
23 of the corrective action options — or, rather, notifying them
24 of the defect and then providing a form so that they can
25 complete the corrective action process and just mail a form

4576

CHRISTINA ADKINS – DIRECT

1  back if they are not able to go in person.

2  Q.  Brian, can we see State Exhibit 195.

3      Is this another bill that modified the Election Code

4  post-SB 1?

5  A.  Yes, it did.

6  Q.  And what did this bill do?

7  A.  This bill also had language, same language that was in

8  Senate Bill 1599, about modifying the authentication

9  requirements for the ballot-by-mail tracker.

10  Q.  And its provision is -- with respect to that aspect, is

11  the pretty much identical to that of 1599?

12  A.  It is.  The essence of these two changes is to remove the

13  residence box, of the residence requirement as an

14  authentication measure for the ballot-by-mail tracker and

15  replace that with date of birth.

16  Q.  And Brian, let's see State Exhibit 193.

17      And what is this bill?

18  A.  This is a bill that made a modification to the application

19  for ballot-by-mail form.  I believe it's requiring that we

20  include a statement on there instructing the voter as to what

21  the benefits are of providing telephone number, email address.

22  Q.  So let's back up real quick to make sure we have this in

23  context.  What contact information is required to be included

24  on an application for ballot-by-mail?

25  A.  For an application by ballot-by-mail, a voter is required

CHRISTINA ADKINS – DIRECT

1  to put their residence address.  And in certain circumstances,

2  they can provide an alternative mailing address if it's for

3  one of those qualifying reasons.  But there is no requirement

4  that they include a telephone or email on the form itself.  We

5  have those boxes, but they are marked "optional."  Because a

6  voter doesn't include it, it's not going to impact the

7  acceptance of an otherwise valid form.

8       But with the corrective action process now, since voters

9  can be notified of a defect in their mail ballot, by phone or

10  email — we would like the voters to —

11                  *(Court reporter clarification.)*

12             THE WITNESS:  With the corrective action process,

13  since voters now can be notified of a defect by phone or

14  email, it's beneficial to the voters to include that

15  information, because if they have a problem, this provides an

16  additional way for the Ballot Board to reach out to the voter.

17  BY MR. WASSDORF:

18  Q.  And this bill requires you to explain the benefits of

19  including that additional contact information?

20  A.  That's correct.

21  Q.  Brian, let's see State Exhibit 199.

22       So what is this bill?

23  A.  This bill was actually codifying a procedure and providing

24  some clarity to a procedure that's already in place.  It has

25  to do with when an individual may have had a driver's license

4578

CHRISTINA ADKINS – DIRECT

1 but surrenders that driver's license instead to get a personal

2 identification card.  It's just ensuring that that number gets

3 updated in the system so that the voter with that personal

4 identification card, if that's now their primary form of ID,

5 that number will be assigned to their record.

6 Q.  When you say "the system," what do you mean?

7 A.  I apologize.  To our —— it requires that this be

8 transferred to the Secretary of State's Office so that the

9 Statewide Voter Registration system contains the more recent

10 number.

11 Q.  And that would be TEAM?

12 A.  That would be what we refer to as "TEAM."

13 Q.  Brian, let's see State Exhibit 198.

14     So what does this bill do?

15 A.  This is Senate Bill 477.  It was a larger bill that

16 contained a number of provisions relating to individuals with

17 disabilities; to provide better access to voting activities or

18 election—related activities for individuals with disabilities.

19 Q.  Does it change the minimum required parking space at a

20 polling place?

21 A.  It does.  This bill provides some express language on what

22 needs to happen with curbside voting and ensuring that we have

23 proper spots designated for curbside voters and proper signage

24 so that voters are aware of how to access and use curbside

25 voting.

4579
CHRISTINA ADKINS – DIRECT

1          MR. WASSDORF:  Your Honor, I move to admit State

2    Exhibit 198.

3          THE COURT:  Any objection?

4          MISS TULIN:  No objection.

5          THE COURT:  198 is admitted.  Just to be clear, you

6    keep calling it "bills."  Were these things actually enacted

7    and signed by the governor?

8          MR. WASSDORF:  Yes, Your Honor.

9    BY MR. WASSDORF:

10   Q.  Brian, let's pull up State Exhibit 423.

11       Now, we just looked at a set of bills that were enacted

12   post-SB 1.  Have you also issued some election advisories at

13   this point on some of that newer legislation?

14   A.  Yes, we have.

15   Q.  And is this one of those election advisories?

16   A.  This is an election advisory that we've issued in June of

17   this past year.

18   Q.  And what did this election advisory advise?

19   A.  This is one of those election advisories that we issue

20   typically every year.  The content may change slightly

21   depending on the year and the type of election that's coming

22   up, but it is informing and educating election officials on

23   what the requirements are for appointing election workers, for

24   different elections and in different roles.

25         MR. WASSDORF:  Your Honor, I would move to admit

4580
CHRISTINA ADKINS − DIRECT

1  State Exhibits 423 through 425, all of which were election

2  advisories on legislation from this past legislative session.

3          THE COURT:  Any objection?

4          MISS RODRIGUEZ:  One moment, Your Honor.

5  Mr. Wassdorf, what were they again?

6          MR. WASSDORF:  423 through 425.  It's part of the

7  State supplemental exhibit list.

8          MISS RODRIGUEZ:  Your Honor, I don't believe this is

9  subject to the same agreement that we had, if you would move

10  this for the limited purpose of showing this advisory was sent

11  out and not to prove the contents of the −−

12          (Court reporter clarification.)

13          MISS RODRIGUEZ:  This is not part of the agreement

14  that we have between LULAC plaintiffs and the State

15  defendants, but if you would offer this exhibit for the

16  limited purpose of showing that the advisory went out and not

17  to prove the contents of the bill reference or the motivations

18  of the bill.

19          MR. WASSDORF:  I think we can agree to that, Your

20  Honor.

21          THE COURT:  With that understanding, 423 through 425

22  are admitted.

23  BY MR. WASSDORF:

24  Q.  Changing subjects a little bit, Miss Adkins.  What is a

25  "military" or "overseas voter"?

4581

CHRISTINA ADKINS - DIRECT

1  A.  Those are individuals that are either in the military or
2  for whatever reason are nonmilitary but living overseas, so in
3  other countries.  Those individuals have special laws
4  pertaining to their ability to vote by mail.
5  Q.  And are there any differences in how those individuals
6  might register to vote compared to other voters?
7  A.  Yes.  This is where we have an intersection of federal and
8  state law, to provide support to these individuals.  Those
9  individuals in the qualifying groups can register to vote and
10 request a ballot-by-mail through something that's called the
11 "Federal Postcard Application."  It's a combined document that
12 serves both purposes.
13     The Federal Postcard Application contains the requirements
14 of a voter registration application, but also contains
15 information necessary for voting by mail.
16 Q.  And Brian, would it be possible to bring up State's
17 Exhibits 32 and 33 side-by-side?
18     And so what is the document on your left?
19 A.  On my left it appears to be a copy.  I believe it's the
20 most recent Federal Postcard Application.
21 Q.  And what is the document on the right?
22 A.  The document on the right is a copy of the requirements
23 and information relating to what we call the "Federal Write-in
24 Absentee Ballot."  It's a specific type of ballot for
25 individuals that may not have received their balloting

4582
CHRISTINA ADKINS – DIRECT

1  materials in time to mail it back to their local jurisdiction,
2  so they have a separate write-in process where they can write
3  out their candidate choices rather than waiting for the
4  official ballot, and then mail that back to their local
5  election jurisdiction.
6  Q.  And so how do these two forms different from each other?
7  A.  The first form what we refer to as the "Federal Postcard
8  Application," or "FPCA," this is the document that serves as
9  both a voter registration application and a request to receive
10 a ballot-by-mail for those voters that may not already be
11 registered.  This will register them and give them the mail
12 ballot.
13     For those individuals that are already registered, then
14 they can use this form to request their balloting materials.
15 There are a number of advantages for voters that fall under
16 these categories, military and overseas voters.  The greatest
17 advantage -- I'll say there's a number of advantages to using
18 this form.
19     The primary advantage for using this form as opposed to
20 just a regular application for ballot-by-mail form is that
21 they have more options in how to receive their balloting
22 materials; whereas a regular ballot-by-mail voter has to
23 receive hard copies of their balloting materials, individuals
24 using the Federal Postcard Application may receive their
25 balloting materials by email.

4583

CHRISTINA ADKINS - DIRECT

1  Q.  What options exist for correcting a defect for a military

2  or overseas voter?

3  A.  So for military and overseas voters, oftentimes they are

4  in a unique situation because they don't have — being able to

5  access reliable mail service is not always easy for those

6  individuals, and just because of the general nature of it

7  taking more time for ballots to get back and forth,

8  particularly those voters that are overseas or in hostile fire

9  zones.  There are some difficulties for them that other voters

10 may not experience.

11     So for those individuals, oftentimes if they have their

12 balloting materials emailed to them, they are not using a

13 traditional carrier envelope.  They use a separate signature

14 sheet, and that signature sheet contains the information

15 that's required on a carrier envelope, but it's just a

16 separate piece of paper.  And the voter can complete and

17 execute that document and include that in a regular envelope

18 with their mail ballot to send back to their election office.

19     So for corrective action, because the document itself, the

20 signature sheet, you know, is formatted differently; it's not

21 required to be on an envelope itself, we have indicated that

22 for those FPCA voters, if they have a corrective action or if

23 there's a corrective action process that they are eligible

24 for, that they can complete that corrective action form and

25 return that form by email.

4584
CHRISTINA ADKINS - DIRECT

1  Q.  And so they actually have an additional corrective action

2  option from more traditional voters?

3  A.  That's correct.  And that's because there is some express

4  law regarding the ability to email balloting materials back

5  and forth for voters that are in this situation, and so that

6  is why we indicated in our materials that for these voters,

7  that email option would exist for corrective action as well.

8  Q.  Brian, could we stay on page 1 on the left, but move to

9  page 2 on the right.  Thank you.

10      Do both of these documents require a Social Security

11  number or a driver's license or state ID number?

12  A.  That's correct.  On both forms, that box is listed, Social

13  Security number or driver's license.

14  Q.  And why is that?

15  A.  That's required because those are pieces of information

16  that are necessary for voter registration under state and

17  federal law.

18  Q.  If a FPCA voter provides a missing or incorrect ID

19  information on their carrier envelope or didn't include the

20  election signature sheet, would that voter be notified of a

21  defect?

22  A.  For voters using FPCA, if they -- if their information was

23  defective or the Ballot Board indicated or saw that there was

24  a defect that was eligible for corrective action, yes, those

25  individuals would also be notified of the right to correct

4585
CHRISTINA ADKINS - DIRECT

1  that defect.

2  Q.  And they would be notified in the same manner as a

3  traditional ABBM voter?

4  A.  That's correct.

5  Q.  Are there provisions in the law which require that voters

6  in similar circumstances be treated as uniformly as possible?

7  A.  Yes.  That concept is in the Election Code.  I think it

8  specifically mentioned with respect to the corrective action

9  process.  And even beyond that, that's just a general

10 principal that we try to employ with respect to elections and

11 making interpretations of the law, that we do our best to make

12 sure that voters are treated as uniformly as possible; you

13 know, voters in certain circumstances are treated, you know,

14 uniformly to people with respect to their circumstances.

15 Q.  And that includes uniformly between FPCA voters and

16 traditional voters?

17 A.  Correct.  To the extent that — to the extent allowed

18 under the law, we treat them and uniformly as possible.

19 Q.  Did the Federal Voting Assistance Program reach out to

20 your office with questions about what to include in their

21 voting guide on their website about the ID number

22 requirements?

23 A.  Yes.  We work with the Federal Voter Assistance Program,

24 or "FVAP," as we commonly refer to them, pretty regularly on

25 making sure that the materials they provide to, for example,

4586

CHRISTINA ADKINS - DIRECT

1  voting assistance officers on military bases, any overseas

2  citizens looking at their website, that that information is

3  accurate and up-to-date as possible so that those voters that

4  are relying on that information can make sure that they are

5  complying with the law.

6  Q.  And did they have any specific concerns about the ID

7  number requirement?

8  A.  If I recall, they were asking about voters -- whether they

9  could list, I think, one or both numbers on the form itself,

10  and so we did provide some information, some guidance, to them

11  on that.

12  Q.  And what guidance did you provide to them on that subject?

13  A.  We told them that the voter could list one or both

14  numbers.  They are not required to list both, but they could

15  list both if they would like.

16  Q.  And by listing both numbers, would that cause an ABBM or a

17  ballot to be rejected?

18  A.  No.

19  Q.  In fact, does your office expressly recommend to voters

20  and counties that voters include both ID numbers on their

21  application or ballot?

22  A.  When a voter calls us with concerns or questions about

23  filling out the documentation, we always tell them they are

24  not required to put both if they don't want to, but they can

25  put both in order to maximize their chances of the application

4587
CHRISTINA ADKINS - DIRECT

1  being processed without issue.

2          MR. WASSDORF:  Your Honor, I would move to admit

3  State Exhibits 23 -- or 32 and 33, excuse me.

4          THE COURT:  Any objection to 32 and 33?

5          MISS TULIN:  No objection, Your Honor.

6          THE COURT:  Thirty-two and 33 are admitted.

7          And why don't we take a break.  Just to let you know,

8  we will not have any court reporters available after 5:00

9  today, so.  Let's come back in about 15.

10          *(Recess)*

11  BY MR. WASSDORF:

12  Q.  Brian, could can you pull up State Exhibits 174 and 188.

13      Miss Adkins, do you recognize these documents?

14  A.  I do.  This is the -- it appears to the Texas-specific

15  page in the guidance that FVAP provides, or the Federal Voter

16  Assistant Program.

17          MR. WASSDORF:  Your Honor, I would move to admit

18  State Exhibits 174 and 188.

19          THE COURT:  Any objection?

20          MISS TULIN:  No objection to either, Your Honor.

21  Thank you.

22          THE COURT:  174 and 188 are admitted.

23  BY MR. WASSDORF:

24  Q.  Let's move on to a different topic.  Who is Dana

25  DeBeauvoir?

4588
CHRISTINA ADKINS - DIRECT

1  A.  Dana DeBeauvoir was the County Clerk in Travis County for

2  a number of years.  She has since retired.

3  Q.  Was she involved in a controversy during the 2020

4  Election?

5  A.  The 2020 Election?  Yes.

6  Q.  What was that controversy?

7  A.  Well, there were a number of concerns regarding poll

8  watchers in her county.

9  Q.  For the 2020 Election, did Travis County have a new

10 central count set up?

11 A.  So for that particular election, because we were operating

12 under COVID at the time — it was so prevalent — many of our

13 counties had to rearrange their offices to account for

14 social-distancing requirements, providing more space to their

15 workers; just issues related to protecting the health and

16 safety of their workers.  And one of the things that they did

17 in Travis County is they rearranged their Central Counting

18 Station, so when I say "Central Counting Station," I'm

19 referring to the place where vote totals are counted and

20 accumulated on election night.

21      MISS HOLMES:  I'm very sorry, Will, but I got a

22 message from some of the counsel who are observing via Zoom

23 that the Court is muted.

24      THE DEPUTY CLERK:  Thank you.

25      MR. WASSDORF:  No problem.

*Gigi Simcox, RMR, CRR*

4589

CHRISTINA ADKINS — DIRECT

1  BY MR. WASSDORF:

2  Q.  Did you have the opportunity to inspect the Central Count

3  set up in Travis County to prior to the 2020 Election?

4  A.  I did.  I went to the county office with our Secretary of

5  State at the time.  She was visiting some offices.  And I met

6  her out at that office just to be present and just to, you

7  know, accompany her on the county visit.  They very graciously

8  gave us a tour of their office and showed us their operations

9  and how they were handling all of these changes with respect

10  to their program in light of all the COVID restrictions that

11  were in place.

12      So during that time, you know, I did see where their

13  ballot board was meeting, how ballots were handled for intake,

14  and I also observed their new arrangements for their Central

15  Counting Station.

16  Q.  And did their new arrangement include a room with windows

17  for the poll watchers to observe?

18  A.  It did.  They did show us where they had stationed

19  their — some of their central scanners and where they had

20  stationed the main computer that they used to accumulate vote

21  totals.  At that time, the election director for Travis County

22  also showed us how this was set up in a new place by a glass

23  wall or window, and that they had tables set up on the other

24  side of that glass wall so that poll watchers would be

25  permitted to observe what was happening in that main part of

CHRISTINA ADKINS - DIRECT

1  their central count room.

2  Q.  And what was your opinion on whether this set-up would

3  comply with the Texas Election Code?

4  A.  Well, at the time that they were describing to us the

5  set-up and describing where the poll watchers would be, I

6  turned to the election director, and I said, "That's great.  I

7  appreciate what you're doing, but where in this room are poll

8  watchers going to be allowed to be present?  Because you know

9  you have to have them in here, as well," you know.

10      And she said, "Yes, of course," and at that time -- again,

11  this was not Dana.  This was her election director.  She said

12  her plan was to have them in a particular designated location.

13  She showed me where she was planning on stationing some chairs

14  so that they could be present in that room and rotate in and

15  out, which is typically what we advise counties to do when

16  they don't have sufficient space in their small central count

17  room where the main computer is if they have more poll

18  watchers than are permitted to be in that room, oftentimes

19  because of things like fire safety regulations; that they

20  allow them to rotate in and out of that room.

21  Q.  And did you advise Travis County election officials of all

22  this information?

23  A.  Yes.  And I have worked with this election director for a

24  number of years, both in Travis County and when she was in

25  a -- Bastrop County as well, so she was very familiar with

CHRISTINA ADKINS - DIRECT

1  this requirement.

2  Q.  During the 2020 Election, did the Secretary of State's

3  Office receive complaints about how Travis County handled poll

4  watchers at that Central Count Station that you had previously

5  observed?

6  A.  Yes, we did.

7  Q.  And did you refer those complaints to the Attorney

8  General's Office?

9  A.  I believe so.

10  Q.  And were those complaints and the incident that occurred

11  well publicized in the State of Texas?

12  A.  I think they were, yes, at least publicized within the

13  election community.

14  Q.  Going to change subjects a little bit.

15     What is a "Spanish surname"?

16  A.  A Spanish surname would re — the way we use that term in

17  the election world or in my office is we have some

18  requirements to send certain types of mailers that are

19  translated into Spanish to individuals that have Hispanic

20  surname, and that the mail — the mail-outs I'm referring to

21  are — it's related to our Constitutional amendment election,

22  so we are required to send out physically a mailer to those

23  individuals that have what's classified as a Hispanic surname.

24  It's a list that's obtained from the U.S. Census Department.

25  Q.  And I believe — do you have in your voter registration

CHRISTINA ADKINS - DIRECT

1  system a — called it a "flag" for a Spanish surname?

2  A.  Because of the requirement for this mailer, we do have to

3  identify those individuals that have a Hispanic surname as

4  defined by the census department and send that mailer to them,

5  so there is that logic built into the system to obtain that

6  list and to be able to identify those voters for the purpose

7  of the mailer.

8  Q.  Does the Secretary of State's Office ever change that

9  field on a voter's registration record?

10 A.  Yes.  We oftentimes get calls from voters that are unhappy

11 about receiving the mailers, so they may request that they are

12 removed from the mailer, that list itself, and so if a voter

13 requests to be removed, then that flag is removed from that

14 voter's record.

15 Q.  Does the Spanish surname flag in the Texas voter

16 registration system represent every voter who has a Spanish

17 surname?

18 A.  No.

19 Q.  If someone assumed that the Spanish surname flag

20 represented individuals, all individuals with Spanish

21 surnames, would that assumption be correct?

22     MISS PERALES:  Objection.  Lack of foundation.  Lack

23 of knowledge.

24     THE COURT:  Can you answer that?

25     THE WITNESS:  Can you repeat the question?

4593
CHRISTINA ADKINS — DIRECT

 1  BY MR. WASSDORF:

 2  Q.  If someone assumed that the Spanish surname flag in the

 3  Texas voter registration system recorded every individual with

 4  a Hispanic surname in that system, would that assumption be

 5  correct?

 6          MISS TULIN:  Same objection, Your Honor.  The

 7  question itself calls for her to assume facts not in evidence.

 8          THE COURT:  You can answer if you know.

 9          THE WITNESS:  I think that assumption would be

10  incorrect because there are individuals that opt to remove

11  themselves from that list.

12  BY MR. WASSDORF:

13  Q.  Let's talk briefly about the Americans with Disability

14  Act.  What type of laws does the Secretary of State

15  administer?

16  A.  Our office can provide guidance with respect to the laws

17  in Texas that relate to elections, primarily the Texas

18  Election Code.  There are a handful of other statutes that

19  speak to election-related issues or very specific election

20  issues, and that's what we advise on.

21  Q.  Is the Americans with Disability Act an election law?

22  A.  I would say no.

23  Q.  What involvement does the Secretary of State have with

24  complying with ADA requirements?

25  A.  So I always tell my attorneys to be very cautious with

4594
CHRISTINA ADKINS – DIRECT

1  making any recommendations or statements or offering guidance

2  with respect to ADA issues, because we are not ADA experts.  I

3  know there are many attorneys out there that have devoted

4  their time and energy to just ADA issues, and that's not where

5  our expertise lies.

6       My understanding of the Americans with Disabilities Act

7  is, you know, there's the ability for individuals to request

8  accommodations.  Since we are not the ones administering

9  elections, you know, we would always direct those individuals

10  to the specific county or specific individual that does have

11  the authority to make that determination.

12  Q.  So does the Secretary of State's Office conduct elections

13  in the state of Texas?

14  A.  We do not.

15  Q.  Who conducts elections in the state of Texas?

16  A.  In Texas, we're very decentralized.  Elections are

17  conducted, for most of our large elections, by county election

18  officials.

19  Q.  Do many counties have a designated disability officer in

20  their elections department?

21  A.  I don't know the answer to that.  We typically, when get

22  questions of law that pertain to issues outside of elections,

23  advise the county election official that's asking us to

24  consult with their local county or district attorney or

25  whoever advises on this area of law.

4595

CHRISTINA ADKINS — DIRECT

1  Q.  If a disabled individual wanted to request an

2  accommodation, would the Secretary of State's Office be an

3  appropriate entity to which to direct that request?

4  A.  Not to direct the request.  I think we can answer the

5  question that, yes, you can ask for an accommodation, because

6  generally we know that the ADA allows for accommodations.

7      And now we have an express provision in the law that it

8  was actually from SB 1, that talks about disability

9  accommodations, so I can direct them to the fact that this is

10  codified in the Election Code, but we're not the one that

11  makes that accommodation, so they would have to direct a

12  request specifically to the entity that is conducting the

13  election.

14  Q.  And does that provision that you're speaking of, does that

15  provision prohibit the Election Code from being interpreted in

16  a way which would limit someone's ability to request an

17  accommodation?

18  A.  I don't think that it limits the ability to ask for an

19  accommodation.  I think it has language that says it has to be

20  a reasonable accommodation.

21  Q.  Brian, could we pull up Section 1.08 of Senate Bill 1,

22  Joint Exhibit 1.

23      So under this provision, could the Election Code be

24  interpreted to prohibit somebody from obtaining an

25  accommodation which they were entitled to request under state

4596
CHRISTINA ADKINS – DIRECT

1  or federal law?

2  A.  As long as the accommodation is a reasonable

3  accommodation, this does not prohibit anyone from meeting that

4  request.  I think there may be a question —

5          THE COURT:  "Meeting that request"?

6          THE WITNESS:  I'm sorry, Your Honor?

7          THE COURT:  When you said, "Meeting that request"?

8          THE WITNESS:  Or I think —

9          THE COURT:  Do you mean requesting or — the way I

10  see that law is "anyone can request" doesn't mean that the

11  request has to be granted.

12          THE WITNESS:  Yes, sir.  I think that's — that's

13  what I meant to articulate.  Anybody can make that request,

14  but I see the term "reasonable accommodation" or

15  "modification," so I think that's something where I would — I

16  don't know what would be a reasonable accommodation or

17  modification for a specific election office.  What's

18  reasonable for an office that has 50 people supporting

19  elections may be different than a one-man shop, but I would

20  definitely point to this provision as something that makes it

21  clear that a reasonable accommodation can be requested and, I

22  think, by extension, granted.

23          MR. WASSDORF:  Did you have anything further, Your

24  Honor?

25          THE COURT:  No.

4597

CHRISTINA ADKINS – DIRECT

```
 1  BY MR. WASSDORF:
 2  Q.  Does the Secretary of State's Office invite experts from
 3  the disability community to join in their educational
 4  presentations to county officials?
 5  A.  We do.
 6  Q.  All right.  I've just got a couple of cleanups here.
 7      We heard from Mr. Ingram earlier about investigation of
 8  crimes under Senate Bill 1.  He could only testify obviously
 9  to what he was aware through the time that he left the
10  Secretary of State's Office, so I'm going to ask you.
11      Since August 31st of this year, are you aware if there
12  have been any investigation of any crimes under SB 1?
13  A.  I'm not aware of any current investigations, no.
14  Q.  Are elections ever close?
15  A.  Yes, quite frequently.
16  Q.  Can elections be within a vote?
17  A.  Yes, that happens, I think, more often than people
18  realize.
19  Q.  Can elections be ties?
20  A.  Yes.  That happens very regularly as well.
21  Q.  Could one illegal vote change the result of an election?
22  A.  Yes.  We had a question just post my office regarding a
23  bond election that was decided by one vote, and it appears as
24  though they may have some evidence to indicate that that voter
25  was not eligible for that election.
```

4598
CHRISTINA ADKINS - CROSS

1  Q.  If a fraudulent vote changes the result of an election,

2  does that disenfranchise the legitimate votes that were cast

3  in that election?

4  A.  It could, yes.

5       MR. WASSDORF:  Pass the witness, Your Honor.

6       THE COURT:  Anything else on this side?  Nothing.

7       Anything else over here?

8       MISS TULIN:  Yes, Your Honor.

9                    CROSS-EXAMINATION

10 BY MISS TULIN:

11 Q.  Good afternoon, Miss Adkins.

12 A.  Good afternoon.

13 Q.  It's good to see you again.  We are both going to speak

14 slowly, keep each other honest.

15     I'd like to ask you a few questions about the application,

16 the ABBM —

17 A.  Of course.

18 Q.  — form.  The ABBM form does not — sorry.  Let's start

19 over.

20     The ABBM form doesn't indicate that a voter can put both

21 the last four of their Social Security number and their

22 driver's license number on the form.  Do you agree with that?

23 A.  Yes, ma'am, I do.

24 Q.  Okay.  And you testified on direct that when voters call

25 your office, you always tell them that they are not required

CHRISTINA ADKINS - CROSS

1  to put both numbers, but that they can, and that that will

2  increase the chance of their application being accepted?

3  A.  Yes, ma'am.

4  Q.  You haven't added any language to the form indicating that

5  the voter can put both.  That's right?

6  A.  That's correct.

7  Q.  You also talked about tweaks that the legislature — you

8  talked about several tweaks, I think was the word, that you

9  used that the legislature has made to help smooth the

10  implementation of SB 1.  Do you recall that?

11  A.  Yes, ma'am.

12  Q.  None of those changes have changed any of the language in

13  the statute about putting identification numbers on the

14  application for vote-by-mail.  Do you agree with that?

15  A.  Yes, ma'am, that's correct.

16  Q.  Okay.  And you also talked with my friend — and we've

17  talked before — about the inserts that some of the counties

18  have used, and I believe you said a couple weeks ago — I

19  think it was a couple weeks ago — that you haven't — your

20  office hasn't issued an insert, an official insert, from the

21  Secretary of State, is that right?

22  A.  That's correct.

23  Q.  And you also talked about how you had reviewed what some

24  of the counties had come up with?

25  A.  That's correct.

4600
CHRISTINA ADKINS - CROSS

1  Q.  And I think at that point you said that once the county

2  officials get something reviewed by your office, that they

3  share it with their friends, right?

4  A.  Yes, they do.

5  Q.  But you don't know how many of those inserts have been

6  shared among county officials, is that right?

7  A.  That's correct.

8  Q.  Okay.  And you don't know how many counties of the 245

9  counties in Texas actually include an insert about the

10  identification numbers in the application for ballot-by-mail?

11  A.  That's correct.

12  Q.  Election advisories.  You talked with my friend on the

13  other side about when the Secretary of State's office issues

14  election advisories.  And I believe you described a few

15  factors that you consider in deciding when an election

16  advisory should be issued.  Do you recall that?

17  A.  Yes, ma'am.

18  Q.  And ultimately, it's the Secretary of State's Office or

19  the Elections Division that evaluates those factors and

20  decides whether to issue an election advisory, correct?

21  A.  That's correct.

22  Q.  Okay.  And your office hasn't issued an election advisory

23  that tells voters or counties that both the last four of a

24  Social and the driver's license number can be included on the

25  application for ballot-by-mail, is that right?

CHRISTINA ADKINS - CROSS

1  A.  I believe that's correct.  I don't recall that we've

2  issued anything that specifically states that in advisory

3  form.

4  Q.  Thank you.  Staying a little bit on -- well, maybe

5  returning to the topic of forms.  SB 1 added a provision, the

6  cure provisions, and those included requirements that a voter

7  be notified of the rejection of their ABBM, right?

8  A.  That's correct.

9  Q.  Okay.  And that required the creation of a new form, is

10 that right?

11 A.  Yes.

12 Q.  Okay.  And your office created a new form for that,

13 correct?

14 A.  We did.

15 Q.  And if we can take a look at State 40, which has been

16 admitted.

17     Is that the form that your office created that we just

18 talked about?

19 A.  Yes.  It looks like it was the one in effect in January of

20 2022.

21 Q.  Okay.

22 A.  It was issued in January of 2022.

23 Q.  Sorry to talk over you.  If we can just zoom into that

24 very top left small writing at the top.  That language that

25 says that the form is "prescribed by the Secretary of State,"

1  is that — that's what you were talking about earlier that

2  indicates that this is a form that was prescribed by the

3  Secretary of State, right?

4  A.  Yes, that's correct.

5  Q.  And the legal citations below that, those are the ones

6  that indicate what statutory authority is being — well, I

7  think I'll just ask you to explain what those are.

8  A.  Those would include the — those are the references that

9  are relevant to that form.  Either it's based on statutory

10  authority or a statutory requirement to issue the form or it's

11  just information that relates back to the content of the form

12  itself.  It may not have an express direction to create a

13  form, but we want voters, election officials, whoever is using

14  the form, to understand where to go to the law if they have

15  questions.

16  Q.  Understood.  And if we can now — thank you, John.  I'm

17  going to ask you to pull up Joint Exhibit 1, and I'm going to

18  try to give you a page reference.  I believe it's 38 and 39.

19  We can try that.  And if we can look to the bottom and maybe

20  look at the bottom of 38, Section 507, and the top of 39.

21      Miss Adkins, is this some of the language in SB 1 that

22  required the Secretary of State's Office to provide a form

23  that gave voters notice that their application for

24  ballot-by-mail had been rejected?

25  A.  Yes.  This provision specifically references providing

CHRISTINA ADKINS - CROSS

1  notice to the voter of the rejection.

2  Q.  Okay.  And if you remember —— I assume you do, but this is

3  one of —— Section 86.001 of the Election Code is one of those

4  statutory references on the form that we just looked at,

5  right?

6  A.  I believe so.

7  Q.  And there —— we can agree that there's nothing in this

8  provision that prevents —— well, let's just read it.  If we

9  look at F-1, it says:  "If an application is rejected under

10  subsection F the Court shall provide notice" —— I'm slowing

11  down —— "of the rejection in accordance with subsection C.

12  The notice must include information regarding the ability to

13  correct or add information required under Section

14  84.002 (A)(1)(A) through the online tool described by

15  Section 86.015(c)."  And then more provisions.

16      Do you agree that there's nothing in this provision that

17  prevents a county from providing information to the voter

18  about which identification number was included on their

19  original ABBM?

20  A.  I agree with that.

21  Q.  Okay.  And without going through the remainder of the

22  provisions of the Texas Election Code, do you agree that

23  there's nothing in the Texas Election Code that prevents the

24  Secretary of State providing a form that indicates a place for

25  the county to include that information; in other words, the ——

4604
CHRISTINA ADKINS - CROSS

1  which ID number was used in the application?

2  A.  I believe there's — that's correct, that there's nothing

3  in the law that would prohibit that, but — and that was

4  something discussed with our advisory group as to whether or

5  not to include that information on the notice.

6  Q.  And you haven't included that on — that's not part of

7  Form 6-3, correct?

8  A.  That's correct.  Many of our counties indicated concerns

9  with putting that information on the form itself.

10  Q.  And I understand you testified on direct that you almost

11  never change forms or maybe never change forms without

12  consulting with county officials, right?

13  A.  That's correct.  We try very hard to include them in

14  discussions for forms that have a significant impact on the

15  process.

16  Q.  But you do also agree that it is ultimately the Secretary

17  of State's statutory responsibility to prescribe the form,

18  correct?

19  A.  Absolutely.

20  Q.  Switching gears a little bit.  You talked a little bit on

21  direct about — generally about phone calls and questions that

22  come into your office.  Do you remember that?

23  A.  I do, yes.

24  Q.  Earlier today, Mr. Ingram, who I know you know, testified

25  that your office didn't receive any calls about particular

CHRISTINA ADKINS - CROSS

1  provisions of SB 1, and he also testified that your office had
2  received thousands of calls about other provisions of SB 1.
3  Your office doesn't track the calls that it received, right?
4  A.  That's correct.
5  Q.  Okay.  And so you can't say, sitting here today, how many
6  questions your office has received about a particular topic or
7  another topic.  Do you agree with that?
8  A.  I would agree that I can't give you a definitive number.
9  I can tell you anecdotally what I know and what's been
10 reported to me by my team.
11 Q.  Thank you.  Briefly switching gears to talk about Dana
12 DeBeauvoir in Travis County and the poll watchers at Central
13 Count.
14      Just so I understand, you were not — you testified that
15 you had toured the Central Count location before the election,
16 is that right?
17 A.  That's correct.
18 Q.  Okay.  And — but you weren't at Central Count in
19 Travis County on Election Day or when the counting was taking
20 place, right?
21 A.  That's correct.
22 Q.  And so you don't know if watchers were rotated in and out
23 of that Central Count room, is that fair?
24 A.  I don't have personal knowledge.  I only know what was
25 reported to me.

4606
CHRISTINA ADKINS — REDIRECT

1    Q.   Okay.

2            MISS TULIN:  One moment, please.

3                 (Off the record discussion.)

4            MISS TULIN:  I have no further questions.  Pass the

5    witness.

6            Thank you, Miss Adkins.

7            THE COURT:  Anyone else?  No one else?

8            MR. BADAT:  No, Your Honor.

9            THE COURT:  Any redirect?

10           MR. WASSDORF:  Sorry, Your Honor.  I was thrown off

11   by the sudden stoppage over there.  I've just got one point I

12   wanted to make, Miss Adkins.

13                      REDIRECT EXAMINATION

14   BY MR. WASSDORF:

15   Q.   The — I believe you discussed briefly the pry or time

16   ultimately decision between when an individual is required to

17   use a driver's license versus a social security number versus

18   some other means of establishing their identification, do you

19   recall that?

20   A.   Yes, sir.

21   Q.   Are you aware of the Help America Vote Act?

22   A.   Yes.

23   Q.   Does the Help America Vote Act contain a similar

24   requirement for all voter registrations for federal elections?

25   A.   It does.

SAM TAYLOR - DIRECT

1          MR. WASSDORF:  Pass the witness, Your Honor.

2          THE COURT:  Anything based on those?

3          MISS TULIN:  No, Your Honor.

4          THE COURT:  You may step down.  Thank you.

5          THE WITNESS:  Thank you.

6          THE COURT:  Any other witnesses?

7          MR. KERCHER:  Yes, Your Honor.  The State defendants

8   call Sam Taylor.  We are retrieving both the witness and the

9   attorney.  They'll be in shortly.

10          MR. SZUMANSKI:  Your Honor, May I proceed?

11          THE COURT:  Yes, thank you.

12      (SAM TAYLOR, having been duly sworn, testified as

13   follows:)

14                    DIRECT EXAMINATION

15   BY MR. SZUMANSKI:

16   Q.  Good afternoon, Mr. Taylor.  Thank you for being here

17   today.

18      Now, for the record, what's your full name?

19   A.  My full name is Samuel Matthew Taylor.

20   Q.  Now, Mr. Taylor, are you aware of Senate Bill 1, which is

21   the omnibus election bill that passed during the Second

22   Special Session of the 87th legislature?

23   A.  I am.

24   Q.  So if I use the term "SB 1" throughout the rest of this

25   conversation, you would understand what I mean by "SB 1"?

4608

SAM TAYLOR – DIRECT

1   A.   Yes.

2   Q.   Great.  Now, Mr. Taylor, let's learn a little bit more

3   about you.  Did you ever work at the Texas Secretary of

4   State's Office?

5   A.   I did.

6   Q.   What was your job there?

7   A.   I was the head of communications, communications director,

8   and then those recently, my title was "Assistant Secretary of

9   State for Communications."

10  Q.   When did you start that role there?

11  A.   I started in January of 2017 through June of 2019.  I left

12  for about two years.  I came back in September of 2021 and

13  left in March of 2023.

14  Q.   So what were your responsibilities as the Assistant

15  Secretary of State for Communications?

16  A.   My responsibilities were being the spokesperson on behalf

17  of the agency, communicating all of our agency services to the

18  public, and, namely, voter education.

19  Q.   All right.  Let's jump right into this, Mr. Taylor.  Let's

20  talk about voter education by the Texas Secretary of State.

21       Did the Texas Secretary of State's Office engage in voter

22  education efforts around the ID provisions of Senate Bill 1?

23  A.   Yes, we did.

24  Q.   What were those education efforts?

25  A.   So there was a large campaign throughout the 2022 cycle

4609

SAM TAYLOR - DIRECT

1  both for the Primary and the General Election.  We received

2  approximately 3.5 million — actually, exactly $3.5 million

3  appropriated from the legislature to hire an outside firm to

4  conduct a state-wide voter education campaign, and that

5  involved both the in-person ID requirements, which we'd be

6  educating on for several cycles now, as well as the new ID

7  requirements for voting by mail.

8      So the entirety of the campaign throughout the 2022 cycle,

9  both the Primary, Primary run-off, and General Election in

10  November, involved educational efforts in English and Spanish

11  and the other languages, when appropriate, in certain counties

12  that had those certain language thresholds, to educate them

13  about both the in-person voter ID requirements and the new

14  requirements for voting by mail, the ID requirements related

15  to voting by mail for those who were eligible.

16  Q.  When did that statewide voter education campaign

17  officially start?

18  A.  So the statewide campaign officially started early in

19  2022, in January of 2022.  We had — we executed a contract

20  with a third-party vendor after a competitive bidding process.

21  The vendor then began developing materials for the campaign

22  and for the Primary Election.  We had radio ads that were live

23  in markets all over Texas, so we quickly wrote, approved, and

24  sort of executing on ad-buys for radio advertisements ahead of

25  the Primary Election in March of 2022, and those were both in

4610

SAM TAYLOR – DIRECT

1  English and Spanish.

2  Q.  So Mr. Taylor, you mentioned a third-party vendor.  Let's

3  talk about that.

4  A.  Yes.

5  Q.  In fact, I want to direct your attention to what has been

6  premarked as State's Exhibit 227.

7      Do you see this on the screen in front of you?

8  A.  Yes.

9  Q.  Do you recognize this?

10  A.  Yes.

11  Q.  What is this?

12  A.  It is the request for proposal for our 2022 voter

13  education campaign.

14  Q.  Is this request for proposal in the same or substantially

15  similar condition as when it was first executed?

16  A.  Sorry.  "When it was first executed"?

17  Q.  When you first saw this.  Is it — is it in the same or

18  substantially similar condition?

19  A.  Yes.

20  Q.  Is this a type of document that was made at or near the

21  time of the agreement between the Texas Secretary of State's

22  Office and this third-party vendor?

23  A.  These — this request for proposal was released, and

24  third-party vendors, different vendors, had the opportunity to

25  submit a proposal on it.  The closing date here is

SAM TAYLOR - DIRECT

1  January 4th.  That was the deadline by which they had to

2  submit those proposals.  And then once they submitted those

3  proposals, we reviewed them through a competitive bidding

4  process, and the vendor that had the highest score objectively

5  won that process.

6  Q.  Are these requests for proposals a regular part of the

7  Secretary of State's business?

8  A.  They are.

9  Q.  And these requests for proposals — are these request for

10  proposal documents regularly kept as part of the Texas

11  Secretary of State's business records?

12  A.  They are.

13  Q.  And do you know if the information in this exhibit is true

14  and correct based on your personal knowledge?

15  A.  Yes.

16  Q.  Okay.  Is it?

17  A.  Yes, it is correct.

18         MR. SZUMANSKI:  Your Honor, at this time, I would

19  like to offer State's Exhibit 227 into evidence.

20         MR. WATKINS:  No objection.

21         THE COURT:  227 is admitted.

22  BY MR. SZUMANSKI:

23  Q.  All right.  Mr. Taylor, looking at State's Exhibit 227, I

24  want to direct your attention to page 4 of this document.  Do

25  you see the heading titled "1.2 Purpose"?

4612
SAM TAYLOR - DIRECT

1  A.  Yes, I do.

2  Q.  And do you see the paragraph underneath that heading?

3  A.  Yes.

4  Q.  Okay.  So briefly, what was the purpose of this request

5  for proposal?

6  A.  The purpose was to receive a comprehensive proposal from a

7  public relations advertising marketing firm to conduct and

8  execute a statewide voter education campaign that would reach

9  as many voters as possible and educate them on the ID

10  requirements for voting; both the ID requirements for voting

11  in person and for voting by mail, which was new under SB 1.

12  So we evaluated the proposals based on their ability to

13  effectively reach the largest amount of Texans, as well as

14  Texans who -- whose, you know, English was not their first

15  language, so it was hard-to-reach Texans.  First-time voters

16  and other categories of Texans who are eligible to vote who

17  needed to be made aware of the ID requirements and just voting

18  generally.

19  Q.  Okay.  Mr. Taylor, you may see here in the last sentence

20  of this paragraph, it references a Section 1.5 of this RFP.

21  Do you see that?

22  A.  Yes, I do.

23  Q.  Okay.  Well, let's go to that particular section, "Section

24  1.5 Scope of Work."  Do you see that?

25  A.  Yes.

4613

SAM TAYLOR – DIRECT

1  Q.  And you see this big, long paragraph underneath that

2  particular "Scope of Work" heading and then the "General Scope

3  and Requirements" heading.

4      Do you see that?

5  A.  Yes.

6  Q.  So just generally, what did this statewide voter education

7  campaign involve?

8  A.  It involved primarily paid media, which are traditional

9  TV, radio advertisements purchased, purchasing air time for

10  those advertisements to run.  Again, both in English and in

11  Spanish on those paid advertisements, as well as digital

12  advertisements; some of which were also paid for, again, both

13  in English and in Spanish.  It also involved an outdoor

14  advertisement such as billboards, bus stops, gas pump toppers

15  that you see at the gas station that display the advertising

16  or play the radio audio and draw people's attention to "Vote

17  Texas.Gov."

18      The primary purpose of this was to make sure that all

19  Texans who were eligible to vote under simply VoteTexas.Gov

20  was the clearinghouse for all voter information in the state

21  of Texas, and that that was the website to which they were to

22  visit to learn about ID requirements, including ID

23  requirements for voting by mail.

24      There was also a statewide grassroots tour that was a part

25  of this where our vendor hired a team to go around to

SAM TAYLOR - DIRECT

1   community events across the State and visit in local

2   communities at county fairs, at farmers markets, at senior

3   expos, all kinds of different events, to display the "Vote

4   Texas" messaging and also to distribute materials in the forms

5   of flyers, handouts, and pamphlets.  Again, both in English

6   and Spanish, for all those to people who came up to that booth

7   at those community events.

8        So there was an, again, a broadcast element.  There was a

9   digital element.  And then there was a grassroots, in-person

10  element physically distributing those materials at events

11  throughout the State.

12  Q.  All right.  So Mr. Taylor, there's a lot to unpack there,

13  so let's take that little bit by little bit.

14  A.  Sure.

15  Q.  Before we go generally through that answer and kind of

16  break that down, I do want to ask you one particular question,

17  and that is:  Did the Texas Secretary of State's Office face

18  any challenges as part of this voter education campaign?

19  A.  I think the timeline was a challenge.  You know, not

20  having a lot of time to ramp up before the Primary, Texas was

21  the first in the Nation Primary in 2022.  So, again, all eyes

22  were on the State of Texas, and we were the first major

23  Primary election to occur that year on March 1st, I believe,

24  and we did not have a lot of time to ramp up a massive

25  statewide voter education campaign before the Primary, which

4615

SAM TAYLOR — DIRECT

1  is why for the Primary election we did not have television

2  advertisements.

3      There was — we had not done that in previous cycles, and

4  it there simply no time to do it in the 2022 Election cycle

5  before the Primary.  We did have radio advertisements, because

6  those are relatively easier to produce, because they just

7  involve audio.  With TV advertisements, sometimes you have to

8  hire actors and get certain resources that it just was not

9  possible to record and produce and then purchase the ad space

10  on TV with sufficient enough time to actually educate voters

11  before the March 1st Primary Election.

12      We did have a longer lead time to do that before the

13  General Election.  However, for the Primary election, it's

14  important to distinguish the timeline there.

15          THE COURT:  One second.

16          MR. WATKINS:  Objection, Your Honor.  It's getting to

17  be a bit of a narrative.

18          THE COURT:  Yeah, let's go to Q and A.

19          MR. SZUMANSKI:  Understood, Your Honor.

20  BY MR. SZUMANSKI:

21  Q.  All right.  So, Mr. Taylor, I particularly want to focus

22  on one particular challenge.  And in fact, I'm going to direct

23  your attention to what's actually been preadmitted already as

24  State's Exhibit 244.

25      So if we can bring that up.

*Gigi Simcox, RMR, CRR*

4616

SAM TAYLOR – DIRECT

1    Mr. Taylor, do you see this exhibit in front of you?

2  A.  Yes.

3  Q.  Do you recognize it?

4  A.  I do.

5  Q.  Okay.  All right.  Now I want to go to the fourth slide,

6  actually, of this PowerPoint presentation.

7    Do you see where it says "Public Communication

8  Challenges"?

9  A.  Yes.

10  Q.  Now, here it lists several challenges, but do you see

11  where it says "False narrative repeated in media," bolded and

12  underlined?

13  A.  Yes.

14  Q.  And then above that, do you see where it says "Misleading

15  messages in the public sphere"?

16  A.  Yes.

17  Q.  What do you mean by "misleading messages" and "false

18  narratives" in the media?

19  A.  There were reports, several reports that were repeated in

20  news reports that the number that a person provided on their

21  mail ballot application for ballot-by-mail or their carrier

22  envelope had to match the number that they originally

23  registered with.  That was not true.  It had to match a number

24  that was on the voter's registration record, which not

25  necessarily would have been the number they originally

SAM TAYLOR - DIRECT

1   registered with, because many voters either provided both

2   numbers or through a process that I understand we had with a

3   Department of Public Safety, if somebody provided their

4   Social, the last four of their Social, we were able to pull in

5   their driver's license number, for example.  And vice versa.

6       So there was a way through that process with the

7   Department of Public Safety to bring in -- to complete and

8   have both numbers on the voters record, so it was simply not

9   true that it had to match the number that was originally on

10  the voter's voter registration application.

11      Nevertheless, a lot of, you know, political talking heads

12  even journalists would repeat that, and as the spokesperson

13  for the agency, I had to repeatedly correct the record and

14  call the journalists and tell them that that is not true.

15  You're giving inaccurate information to voters, and you're

16  giving an inaccurate perception of what it takes to vote by

17  mail, if you are eligible to do so.

18  Q.  Okay.  So Mr. Taylor, I want to briefly turn your

19  attention now to a specific example of this, and I want to

20  direct your attention to what's been premarked as State's

21  Exhibit 233.

22      Do you see it on the screen if front of you?

23  A.  I do.

24  Q.  Do you recognize this exhibit?

25  A.  Yes.  It was an email that I sent to a reporter at CNN who

SAM TAYLOR – DIRECT

1  frequently covered Texas voting issues.

2  Q.  Now, is this email exchange in the same or substantially

3  similar condition as when you wrote this email or received

4  these emails?

5  A.  Yes.

6  Q.  Okay.

7      MR. SZUMANSKI:  Your Honor, I would like to — well,

8  before I do that.

9  BY MR. SZUMANSKI:

10  Q.  Mr. Taylor, do you know if the information in this email

11  is true and correct?

12      THE COURT:  What's the relevance to this?

13      MR. SZUMANSKI:  Your Honor, I believe the relevance

14  is actually three-pronged, generally, as to the line of

15  questioning we're going down.  The first prong is trying to

16  contextualize SB 1 in its implementation and how the Secretary

17  of State's Office was trying to educate voters.

18      THE COURT:  I got that part.

19      MR. SZUMANSKI:  And alleviate the burden, generally,

20  Your Honor, to show that this voter education campaign that

21  was undertaken by the Secretary of State's Office was

22  effective in alleviating that burden.  And also to kind of

23  bring some context to some contentions provided by opposing

24  counsel during this lawsuit so far.

25      THE COURT:  I got that part, but what's tit-for-tat

SAM TAYLOR – DIRECT

1    with CNN have to do with anything?  That's –– I'm just

2    limiting on that one issue.  What's that have to do with

3    anything?

4          MR. SZUMANSKI:  Your Honor, I believe the relevance

5    to this particular line of questioning, this specific line of

6    questioning, is to show that the Secretary of State's Office

7    was heavily involved in assisting with the accurate portrayal

8    of the implementation of SB 1 since the very beginning, to

9    provide context.

10          THE COURT:  So he already said he was in contact with

11   media outlets telling them that, Hey, you guys are

12   misreporting.  Okay?  So you got that.  Why do you need this

13   exhibit, and I don't understand why you need to pursue it

14   further.

15          MR. SZUMANSKI:  Yes, Your Honor.  This exhibit is

16   just to essentially provide further context in a specific

17   example of how that happened, to show that the Secretary of

18   State's Office was in constant contact with media sources and

19   how to correct information that was being portrayed to the

20   public at that time.

21          MR. WATKINS:  Your Honor, you're right.  They don't

22   need this exhibit.  He's already testified to it.  I would

23   also add additionally, this is hearsay specifically brought in

24   for the truth.  The CNN reporter is saying, Here's what you

25   need to do to vote in Texas.  He's responding and saying, No,

4620

SAM TAYLOR – DIRECT

1  you're wrong.  This is what you need to do in Texas, and I am

2  right, and I am speaking the truth.  So it's specifically

3  coming in as a hearsay purpose without an exception.  And for

4  the reasons you stated, Your Honor.  It's simply not relevant.

5       MR. SZUMANSKI:  Your Honor, may I have a brief

6  response to the hearsay objection?

7       THE COURT:  No.  It's not relevant.  Let's move on.

8       MR. SZUMANSKI:  Understood, Your Honor.

9  BY MR. SZUMANSKI:

10 Q.  All right.  Mr. Taylor, was there a phase one and a phase

11 two to this voter education campaign?

12 A.  Yes.

13 Q.  Let's focus first on phase one.

14 A.  Sure.

15 Q.  What did phase one of the voter education campaign

16 generally involve?

17 A.  Phase one was –– in terms of time, it was the Primary and

18 the Primary Run-Off was phase one.  It involved paid media

19 advertisements totaling a little under 1 million.  The

20 entirety of the phase one campaign, if I remember correctly,

21 was about 1.3 million of that 3.5 total budget, and it

22 involved radio advertisements in English and Spanish.  It

23 involved some digital advertisements as well, and it involved

24 a grassroot tour by our "Vote Texas" truck, which had digital

25 display ads on the outside, both in English and in Spanish,

4621
SAM TAYLOR – DIRECT

1  which traveled around to various parts of the State and

2  advertised "Vote Texas.Gov" as the source for all information

3  you needed to know about voting, specifically about what IDs

4  you need to bring and what ID information you can provide

5  on — if you're eligible to vote by mail.

6  Q.  Okay.  And how much again of that $3.5 million budget was

7  slotted to phase one of the voter education campaign?

8  A.  Approximately 1.3 million total.  Just under 1 million of

9  that was for paid advertisements, meaning radio and digital

10  advertisements in some cases.

11  Q.  And now let's talk briefly about phase two just very

12  briefly.  What, generally and briefly, did phase two of the

13  voter education campaign involve?

14  A.  Phase two involved focus groups, so research on our

15  creative to make sure that it was impactful.  It involved

16  regular organic social media posts, graphics development.  And

17  then finally all of the same paid media activities as phase

18  one, with the addition of television advertisements as well.

19  And then that grassroots tour that I mentioned.  We did

20  another grassroots tour for phase two, and at the General

21  Election and that tour involved a lot of these community

22  events that I mentioned earlier where we had a "Vote Texas"

23  booth.  We visited a lot of different community events,

24  farmer's markets, county fairs, senior expos.  I actually went

25  and worked one of the booths myself at a senior expo up in the

SAM TAYLOR – DIRECT

1  Dallas area at the Arboretum, and so I could see the voter

2  education campaign, the grassroots portion of it in person

3  myself, and there's a TV –– there's a television broadcast

4  from CPFCFW with me doing an interview at that senior expo

5  educating people about the new requirement for voting by mail.

6  Q.  Now, you mentioned social media posts.  And just to make

7  it clear for the record, what social media channels or mediums

8  does the Secretary of State's Office use?

9  A.  Twitter, Facebook, and Instagram.  And YouTube as well.

10  Q.  All right.  Now, Mr. Taylor, I want to discuss some

11  specific topics during phase two of the voter education

12  campaign, so I'm going to direct your attention to what has

13  been premarked as State's Exhibit 321.

14      Do you see it in front of you?

15  A.  Yes.

16  Q.  Do you recognize this?

17  A.  I do.

18  Q.  What is it?

19  A.  It's a press release that we issued on September 20th,

20  which is National Voter Registration Day, and that was the day

21  that we officially kicked off the phase two portion of –– the

22  General Election portion of the campaign, "Vote Ready," and it

23  involved a press conference that Secretary Scott held at a

24  local senior center in east Austin, and we had a lot of the

25  media there, and Secretary Scott gave interviews, and it was a

SAM TAYLOR - DIRECT

1  media event surrounding National Voter Registration Day to

2  announce the official kickoff of the campaign.

3  Q.  Now, Mr. Taylor, just a few short questions on this.  Was

4  this -- or is this press release in the same or substantially

5  similar condition as when you first saw it?

6  A.  Yes.

7  Q.  Is -- are these types of press release kept in the regular

8  course of a regularly conduct activity of the Secretary of

9  State's Office?

10  A.  Yes.  And they are available online as well.

11  Q.  So is it the regular practice of the Secretary of State to

12  make and create and keep these press releases?

13  A.  Yes, it is.

14  Q.  And do you know if the information in this press release

15  is true and correct?

16  A.  It's all correct.

17        MR. SZUMANSKI:  Your Honor, at this time, I would

18  like to offer State's Exhibit 231 into evidence.

19        MR. WATKINS:  Your Honor, I believe that's already

20  been admitted as Joint 60.  Regardless, we have no objection.

21        THE COURT:  231 is admitted.

22  BY MR. SZUMANSKI:

23  Q.  So Mr. Taylor, we've already been talking about the Vote

24  Ready campaign and some of the topics generally discussed, but

25  I do have one question.

4624

SAM TAYLOR - DIRECT

1    As a part of this highlighting the National Voter

2  Registration Day, do you know if this voter education campaign

3  also addressed the cure process or how to correct any defect

4  during the vote-by-mail process in Texas?

5  A.  It did.  Specifically, there was both a digital and a

6  physical element of this, both in English and in Spanish with

7  our Vote Texas and Vote Ready materials.  On "Vote Texas.Gov,"

8  we have a page that is specifically about using the mail

9  Ballot Tracker and correcting any mismatched or incorrect ID

10  information.  And again, that's digitally available on "Vote

11  Texas.Gov."  There's a whole page dedicated to it.

12    And in these grassroots tours, we have pamphlet made in

13  English and Spanish, and in those pamphlets it had a section

14  that described how to track your ballot-by-mail and how to

15  enter the mail Ballot Tracker to correct any missing or

16  mismatched ID information that the voter might not have

17  provided whenever they applied to vote-by-mail or when they

18  were filling out their carrier envelope.

19  Q.  And Mr. Taylor, in addition to these ID requirement

20  educational materials, do you know if the Texas Secretary of

21  State's Office also did any voter education regarding just the

22  logistics of Election Day?

23  A.  Yes, we did.  That was separate from the Vote Ready

24  campaign, but that was part of a lot of our normal

25  communication and outreach that me and Secretary Scott and

4625
SAM TAYLOR – DIRECT

1  previous secretaries have done for several cycles.

2  Q.  Let's talk just very briefly about that particular topic.

3  And I'm going to direct your attention to what's been

4  premarked as State's Exhibit 232.

5      Do you see this in front of you?

6  A.  Yes.

7  Q.  Do you recognize it?

8  A.  I do.

9  Q.  What is it?

10  A.  It's a press release from –– I believe this is the day

11  before Election Day, if I'm correct.  November 7th would have

12  been the day before Election Day, November of 2022.  It was

13  setting expectations for the public and the media as to, you

14  know, what was going to happen on Election Day when results ––

15  unofficial results would be made available, when the statewide

16  election night returns portal was going to go live, and the

17  public had started seeing the results rolling in after the

18  polls closed.

19  Q.  So just, again, very briefly, was this document –– or is

20  this document the same or substantially similar condition as

21  when you first saw it?

22  A.  Yes, it is.

23  Q.  And is this –– are these types of press releases made and

24  kept in the regular course of the Texas Secretary of State's

25  business?

4626
SAM TAYLOR – DIRECT

1  A.  Yes.

2  Q.  And is it the regular practice of the Texas Secretary of

3  State to keep these types of press releases?

4  A.  Yes.

5  Q.  And do you know if the information in this press release

6  is true and correct?

7  A.  Yes, it is.

8          MR. SZUMANSKI:  Your Honor, at this time, I would

9  like to offer State's Exhibit 232 into evidence.

10          MR. WATKINS:  No objection.

11          THE COURT:  232 is admitted.

12  BY MR. SZUMANSKI:

13  Q.  Mr. Taylor, since you already generally described what

14  this exhibit is about, I just have one question.  Do you know

15  why the Texas Secretary of State created this press release

16  the day before the General Election — before Election Day on

17  the General Election in 2022?

18          MR. WATKINS:  Objection.  Calls for speculation.

19          THE COURT:  Do you know?  Or otherwise just say you

20  don't know.

21          THE WITNESS:  Yeah.  Yes, I know.

22  BY MR. SZUMANSKI:

23  Q.  So why did the Texas Secretary of State create this

24  particular press release the day before Election Day in the

25  November 2022 General Election?

SAM TAYLOR – DIRECT

1   A.  To make sure the public and was aware of how events would

2   unfold on Election Day because, quite frankly, in this day and

3   age, there can be a lot of misinformation about elections and

4   what happens on Election Day.  And I felt the need — we all

5   felt the need to manage expectations accordingly so that

6   everybody knew how election results are recorded in Texas,

7   both for the general public and for the media, because the way

8   the Texas reports results is not the same as it is in other

9   states.

10  Q.  So Mr. Taylor, let's switch gears a little bit and talk

11  about the groups of people that the Vote Ready campaign

12  specifically reached out to.

13      So, in fact, let's go back, if possible, to State's

14  Exhibit 227.

15      So Mr. Taylor, do you see what's been preadmitted as

16  State's Exhibit 227, and specifically subparagraph 3?

17  A.  Yes.

18  Q.  Do you see where it mentions several sub groups?

19  A.  Yes.

20  Q.  Okay.  So did the Texas Secretary of State, through the

21  Vote Ready campaign specifically target sub groups of voters?

22  A.  Yes, we did.

23  Q.  What were those sub groups?

24  A.  We made sure that our vendor created material that

25  targeted all these sub groups listed here:  Spanish-speaking,

SAM TAYLOR - DIRECT

1  voters with disability, minority communities, including
2  African-American community, Vietnamese-speaking community,
3  Mandarin-speaking community, voters with disabilities,
4  students — younger voters, first-time voters, elderly voters,
5  people who were new to Texas, as well as people who were not
6  yet registered to vote but were eligible.
7  Q.  All right.  So let's take these sub groups in turn.  So
8  first, minority communities.  How did the Texas Secretary of
9  State office target minority communities through the Vote
10 Ready voter education campaign?
11 A.  So we made sure that all of our voter education materials
12 were available in English and Spanish, and for certain
13 counties, Harris County, for example, we had to take out ads
14 in Vietnamese and Mandarin as well, because the Harris County
15 has long been past the census threshold where you have to
16 provide all the voter education materials in languages to
17 those population.
18      Additionally, Tarrant County, we had to provide Vietnamese
19 language advertisements, and then in Dallas County we also had
20 to provide Vietnamese language advertisements.  And we
21 specifically targeted Vietnamese language and Mandarin —— in
22 the case of Harris County Mandarin language newspapers to take
23 out Vote Ready ads.  We had our voter professional translator
24 and translate the Vote Ready ads that we had developed in
25 English and Spanish into Vietnamese and Mandarin, and place

4629

SAM TAYLOR – DIRECT

1  those advertisements in newspapers that were specific to those

2  communities in Harris, Dallas, and Tarrant Counties.

3  Q.  So you mentioned several types of sources that are unique

4  to particular communities.

5  A.  Right.

6  Q.  Such as medium channels and –– or media channels and like

7  that.  What media channels are you referring to?

8  A.  Print newspapers, community newspapers.  Yeah, that was ––

9  and those –– in the cases of those three counties, yes.

10  Q.  Are there any other media channels they were specific to

11  particular communities.

12              *(Court reporter clarification.)*

13  BY MR. SZUMANSKI:

14  Q.  Are you aware of any other media channels that the Texas

15  Secretary of State used that was particular to any particular

16  minority community?

17  A.  Yes.  We also took out advertisements on, Univision and

18  Telemundo in Spanish, and we had for radio advertisements, a

19  partnership with Univision radio that our vendors secured,

20  that they have done in past cycles as well.  So there was also

21  a broadcast element of that for Spanish-speaking audiences,

22  yes.

23  Q.  Why did the Secretary of State target minority communities

24  as part of this voter education campaign?

25              MR. WATKINS:  Objection.  Speculation.

*Gigi Simcox, RMR, CRR*

SAM TAYLOR - DIRECT

1    THE COURT:  Answer only if you know.

2    THE WITNESS:  Because these —

3    THE COURT:  Do you know?

4    THE WITNESS:  Yes, I do.

5    THE COURT:  How do you know?

6    THE WITNESS:  Because I developed the content for the

7  campaign.

8    THE COURT:  Go ahead.

9    MR. WATKINS:  And, Your Honor, if I might, I think

10 the confusion I'm running into, when he says, "Did the

11 Secretary of State do..." I don't know if the witness is

12 saying he spoke to the Secretary of State and the Secretary of

13 State said do this or he's referring to the Office of the

14 Secretary the State making the decision.

15    MR. SZUMANSKI:  I'd be glad to rephrase my question

16 to clarify.

17    THE COURT:  Thank you.

18 BY MR. SZUMANSKI:

19 Q.  All right.  So, Mr. Taylor, why did — based on your

20 personal knowledge — did the office of the Texas Secretary of

21 State target minority communities as a part of this 2022 voter

22 education campaign?

23 A.  Because we wanted to make sure that those communities had

24 information about the new requirements for voting by mail to

25 the extent that they were eligible to vote by mail.  We wanted

SAM TAYLOR — DIRECT

1  to make sure all Texas voters who were eligible to vote by

2  mail regardless of what language they spoke, regardless of

3  what background they came from, if they were eligible to vote

4  by mail and they were U.S. citizens, they have the same rights

5  as everybody else to understand in plain language how they can

6  successfully vote by mail if they are eligible to do so.

7      So we wanted to make sure that every language category,

8  every minority group, and however we could reach them, we

9  found ways within that budget to reach those communities and

10  make sure they had the same educational information as all

11  eligible Texas voters.

12  Q.  Now, let's move on to a different sub group:  Voters with

13  disabilities.  How did the Office of the Texas Secretary of

14  State target voters with disabilities as part of its 2022

15  voter education campaign?

16  A.  Sure.  So we developed a great deal of content both on

17  social media and just in our voter education materials,

18  generally, that featured the "Vote Texas.Gov" page for voters

19  with disabilities.  There's a specific page that outlines all

20  the rights that people with disability have, what they can

21  expect at the polls, what rights they have at the polls,

22  including that curbside voting is still available.

23      And I would note that — I mentioned earlier we engaged in

24  some research to develop the content for this campaign.  Our

25  vendor worked with CTV, Coalition for Texans with

4632

SAM TAYLOR - DIRECT

1  Disabilities.  It's a nonprofit organization.  Our vendor

2  worked with them to have a specific focus group where we

3  tested our advertisements to voters with disabilities and got

4  specific feedback from those voters in order to improve our

5  creative and improve the contempt o our educational material

6  to make sure that voters with disabilities found it helpful

7  and found it educational.

8     And we have the results of those focus groups that guided

9  how we executed the content and the delivery of that content

10 for the remainder of the campaign.

11 Q.  And, Mr. Taylor, we're going to get to those focus groups

12 here in the next few minutes.  But generally, I just want to

13 ask again kind of a similar question with what I did with —

14 when we were talking about the minority communities.

15    Based on your personal understanding, why did the Office

16 of the Texas Secretary of State specifically target voters

17 with disabilities as part of this voter education campaign?

18 A.  Because we wanted to make sure that voters with

19 disabilities had the same information, accurate information,

20 so that they could vote independently or with the assistance

21 that they needed to cast a ballot in Texas elections.

22 Assuming that they were eligible.  Just like any other

23 eligible Texas voter, we want to make sure they had all the

24 same opportunities.  And specifically, we wanted to make sure

25 that the advertisements and the messaging that we were

4633

SAM TAYLOR - DIRECT

1  providing them made sense and was helpful and educational,

2  because if the -- if we had tested it in the focus group and

3  the information wasn't helpful to them, then it's not going to

4  be helpful to them in going and eventually casting their

5  ballot.

6      So it was to test -- it was to make sure that our

7  messaging was effective for -- specifically for voters with

8  disabilities.

9  Q.  All right.  Now, Mr. Taylor, switching gears yet again.  I

10  want to talk about the Texas Secretary of State's Office, SOS

11  101 Series.

12  A.  Sure.

13  Q.  Are you aware of the SOS 101 series?

14  A.  I am.  It was my idea.

15  Q.  And what is this video series?

16  A.  It's a video series that Secretary Scott and myself

17  undertook to address some major portions of the Texas election

18  process.  We began with a video on voter registration.  We

19  went to Trudy Hancock in Brazos County, and we filmed a

20  portion of that video with her to explain how voter

21  registration in Texas works.

22      The second one in the series, we went to Hays County, with

23  Elections Administrator Jennifer Doinoff, and we filmed a

24  portion of a logic and accuracy test to demonstrate how a

25  voter machine worked, and Secretary Scott explained the safety

SAM TAYLOR – DIRECT

1  and accessibility of voting machines.

2      The third series we went to Parker County, and we visited

3  with Crickett Miller, the Parker County Elections

4  Administrator, and we filmed a video specifically about voting

5  by mail and what the new ID requirements were, and had her

6  explain in her own words how those mail ballots are processed,

7  and Secretary Scott explained how the new ID requirements work

8  in Texas.

9      And then for the fourth video, called "Casting and

10  Counting Your Ballot," we went and visited with Heider Garcia

11  who was the Tarrant County elections administrator, to

12  demonstrate how ballots are cast and counted and how results

13  are recorded on election night, similar to that earlier press

14  release that you referenced to a set expectations about what

15  is going to happen on Election Day.

16      So it was a four-part educational series, each of the

17  videos were, I think, between -- somewhere between six and

18  nine minutes long.  They all had sub titles on them, and they

19  had graphics and pictures representing various parts of the

20  voting process.

21  Q.  All right.  So, Mr. Taylor, were these videos a part of

22  the Vote Ready campaign?

23  A.  They were not.  They were in addition to the Vote Ready

24  campaign.  They were done in-house with in-house resources.  A

25  lot of it was done on my own personal time and Secretary

SAM TAYLOR — DIRECT

1  Scott's own personal time, weekends, evenings, and editing the

2  videos myself, personally.  Did not outsource to a third party

3  firm.  Did not use a single taxpayer dime to produce these

4  videos.  Because most of it was done at either — outside of

5  work hours or just in addition to my — the normal duties that

6  I was doing at the Secretary of State's Office.

7  Q.  All right.  So Mr. Taylor, I wanted to focus just on two

8  of those four-part video series you are referencing.  I want

9  to direct your attention to what's been premarked as State's

10 Exhibit 229.

11      Do you see it in front of you?

12 A.  Yes, I do.

13 Q.  Do you recognize it?

14 A.  Yes, I do.

15 Q.  What is the date on this exhibit?

16 A.  September 8, 2022.

17 Q.  Would that have been before the General Election in 2022?

18 A.  Yes.  And it was before the voter registration deadline as

19 well.

20 Q.  Was this, as a result, a part of the Phase 2 of the Vote

21 Ready campaign?

22 A.  It was not.  It was on top of it.  It was in addition to

23 it.

24 Q.  And is this first series in this four-part video series in

25 the same or substantial similar condition as when you first

SAM TAYLOR – DIRECT

1  saw it?

2  A.  Yes.

3  Q.  Was this a regular practice of the Office of the Texas

4  Secretary of State to create these types of press releases?

5  A.  To create these types of press releases, yes.

6  Q.  And do you know if this press release was created by

7  someone with knowledge?

8  A.  It was created by me.

9  Q.  And do you know if the information in this press release

10  is true and correct?

11  A.  Yes, it is.

12          MR. SZUMANSKI:  Your Honor, I offer State's Exhibit

13  229 into evidence.

14          MR. WATKINS:  No objection.  I believe it's already

15  in evidence.

16          THE COURT:  229 is admitted.

17  BY MR. SZUMANSKI:

18  Q.  And then now I want to turn your attention again to

19  State's Exhibit 230.

20      Do you see this in front of your screen, Mr. Taylor?

21  A.  Yes, I do.

22  Q.  Do you recognize it?

23  A.  Yes, I do.

24  Q.  Is this very is similar to what we just saw in

25  Exhibit 229?

SAM TAYLOR – DIRECT

1   A.  Yes.

2   Q.  State's Exhibit 229 for the record.

3       Now, is State's Exhibit 230 in the same or substantially

4   similar condition as when you first saw it?

5   A.  Yes.

6   Q.  And as a press release, was this document regularly kept

7   as part of the Office of the Texas Secretary of State's

8   business?

9   A.  Yes.

10  Q.  And was this press release created by someone who had

11  knowledge of the press release and underlying information?

12  A.  Yes.  It was created by me.

13  Q.  And do you know if the information in this exhibit is true

14  and correct?

15  A.  Yes.

16          MR. SZUMANSKI:  Your Honor, I offer State's

17  Exhibit 230 into evidence.

18          MR. WATKINS:  It's Joint Exhibit 59.  No objection.

19          THE COURT:  Admitted.

20  BY MR. SZUMANSKI:

21  Q.  Where did the Texas Secretary of State's Office post this

22  SOS 101 series?

23  A.  We posted it on YouTube, our YouTube channel.

24  Q.  Was there any particular reason why the office posted it

25  on YouTube?

SAM TAYLOR − DIRECT

1  A.  YouTube is a very user friendly and accessible medium, and

2  it allows for subtitles in the form of close−captioning to be

3  translated into many, many different languages.  YouTube is

4  owned by Google, so it essentially has the same language

5  translation capabilities to add subtitles for accessibility

6  purposes and also for nonEnglish speakers, for as many

7  languages as Google Translate has.

8  Q.  All right.  Mr. Taylor, let's change course a little bit

9  and talk about now the effectiveness of the entire voter

10  education campaign.

11      Just briefly, did the Office of the Texas Secretary of

12  State engage in any type of focus groups or studies to

13  determine the effectiveness of its voter education efforts —

14  A.  Yes.

15  Q.  — in the 2022 Election cycle?

16  A.  Yes, we did.

17  Q.  What type of focus groups or studies did the office engage

18  in?

19  A.  There was both quantitative and qualitative research.

20  Quantitative research was a — there was a tracking and then a

21  benchmark poll.  Sorry, benchmark first, and then a tracking

22  poll.  The benchmark poll was done at the outset of the

23  campaign, so it would have been in the winter of 2022.  Phone

24  calls and emails — online responses to questions about an

25  awareness around Texas's voter ID requirements, to gauge

SAM TAYLOR — DIRECT

 1  awareness.  And then a benchmark poll is done at the end of

 2  the campaign to see, you know, whether or not voters were more

 3  aware of those requirements or if they had seen, read, or

 4  heard more information about those requirements over the

 5  course of the cycle.  That's the quantitative piece.

 6      The qualitative piece were the focus groups that I've

 7  mentioned a couple of different times, but focus groups that

 8  targeted small groups of younger voters, middle-aged voters,

 9  older voters, as well as Spanish-dominant voters, voters with

10  disabilities.  And those were done behind what's called a

11  two-way mirror, so that us and our vendor can watch them and

12  see the reaction of people, of voters, to our creative

13  advertisements.

14      So they would listen to the radio advertisement, tell us

15  whether or not they liked it, and then we would take that

16  feedback into account when finalizing that content.  And then

17  show them the different versions of the TV advertisement, and

18  we'd take that feedback into account in order to determine

19  whether or not we needed to make any changes for it, and I

20  would note that.

21          MR. WATKINS:  Objection.  Narrative.

22          THE COURT:  Yeah, we need to go to Q and A.

23          MR. SZUMANSKI:  Understood, Your Honor.

24  BY MR. SZUMANSKI:

25  Q.  So, Mr. Taylor, let's talk about one of those focus groups

SAM TAYLOR – DIRECT

1  in particular right now.  So I want to direct your attention

2  to what's already been admitted into evidence as, I believe,

3  Joint Exhibit 58.

4      Do you see this on your screen?

5  A.  Yes, I do.

6  Q.  Do you recognize this?

7  A.  Yes, I do.

8  Q.  All right.  Let's go to page 3.  Do you see the heading

9  titled "Focus Groups, Coalition of Texans With Disabilities"?

10  A.  Yes.

11  Q.  What was this particular focus group about, briefly?

12  A.  This focus group was to test our advertising and creative

13  for Texans, Texas voters with disabilities, to determine the

14  effectiveness of that content and whether or not we needed to

15  make any changes so that it was effective educational material

16  for the disability — the voting — Texans with disabilities

17  who were active voters or eligible voters.

18  Q.  And what did this particular focus group demonstrate to

19  the Office of the Texas Secretary of State about the

20  campaign's effectiveness?

21  A.  The feedback that we got was generally very positive about

22  the content, and I don't think that there were many major

23  changes, if any, to the creative.  It was sort of a

24  verification that we were on the right track in terms of our

25  messaging and in making sure that the content was appropriate,

4641

SAM TAYLOR — DIRECT

1  effective, and helpful for Texas voters with disabilities.

2  Q.  Now, Mr. Taylor, we're almost done.  I just have a couple

3  more questions, and then I'll let you go.

4      Particularly, I wanted to talk about your experience,

5  generally, with just voter awareness.  In addition to this

6  voter education campaign by the Office of the Secretary of

7  State, do you know other ways that voters generally become

8  aware of the information they need for a particular election?

9  A.  Yes.  Sometimes there is a community or family element.

10  Sometimes friends, family members, share information with one

11  another, so there may be a case where an older voter, a

12  grandmother, grandfather, who is not online, not on social

13  media, doesn't watch a lot of television, it's possible for

14  them to get some of those resources and voter information from

15  a younger family member who is engaged on all those digital

16  channels, and watches TV or listens to the radio regularly.

17      So there's a bit of a secondary educational effect

18  sometimes within communities if one person who is typically

19  pretty informed and engaged in social media and digital media

20  a lot and already knows about the ID requirements for voting

21  and/or the ID requirements for voting by mail, and they are

22  well familiar with it themselves, but they have a parent or a

23  grandparent or a family member or a friend who might not be,

24  and they can share that information with them simply by

25  sending them a link or providing them with some of the

SAM TAYLOR – CROSS

1  pamphlets that we made available, the physical pamphlets.

2  Q.  Now, Mr. Taylor, you have mentioned throughout this

3  conversation a lot of different pieces of educational

4  materials.  Did the Secretary of State's Office in Texas make

5  these educational materials in 2022 available to counties?

6  A.  We did.

7        MR. SZUMANSKI:  Thank you, Mr. Taylor, for your time.

8  At this time I pass the witness.

9        THE COURT:  Anything else on this side, nothing

10  further.

11        Any cross?

12                    CROSS-EXAMINATION

13  BY MR. WATKINS:

14  Q.  Mr. Taylor, good afternoon.  My name is Elijah Watkins.  I

15  represent Mi Familia Vota.  You have the dubious distinction

16  after three days of testimony from the State, you are the

17  first witness that is not a lawyer, so congratulations, sir.

18  A.  Great.

19  Q.  You had your job until recently was to make sure that the

20  17 million-plus registered voters in the State of Texas knew

21  how to vote, right?

22  A.  Correct.

23  Q.  And you also needed to make sure that those who weren't

24  registered to vote knew how to register attorney to vote,

25  correct?

SAM TAYLOR – CROSS

1   A.  Correct.

2   Q.  And you would agree that in that process it's very

3   important to provide accurate information?

4   A.  Yes.

5   Q.  If inaccurate information is provided to a registered

6   voter they might make a mistake when trying to vote, right?

7   A.  If inaccurate information about voting is provided to a

8   registered voter, then they might make a mistake?

9   Q.  Yes.

10  A.  Yes.

11  Q.  And depending on the mistake their vote might not be

12  counted?

13  A.  Depending on the mistake, yes.

14  Q.  And if inaccurate information is provided to someone about

15  how to register to vote, they may not register to vote, right?

16  A.  That's correct.

17  Q.  And if they don't register they can't vote?

18  A.  That's correct.

19  Q.  So your job is pretty important?

20  A.  Yes.

21  Q.  I want to talk to you about your budget a little bit.  The

22  legislature sets your budget, is that correct?

23  A.  They do.

24  Q.  And that comes to the Secretary of State's Office?

25  A.  Yes.  That's appropriated for voter education

SAM TAYLOR — CROSS

1  specifically.

2  Q.  And the amount of the budget controls the extent and the

3  type of the ad campaign that you're able to put on, right?

4  A.  Yes, that's correct, although I would add there is

5  something called earned media where you can get value that is

6  actually quantifiable by engaging in things that are outside

7  the paid media landscape.

8  Q.  Sounds like somebody doing an interview on the news?

9  A.  Like go on a local TV station and do an interview, I did

10  not have to pay a dime to do an interview.

11  Q.  But you still get the advertisement?

12  A.  But the value of that is worth, you know, a two-minute ad

13  spot on TV which is very expensive.

14  Q.  Perfect.  I'm focusing right now on your paid

15  advertisements, okay?

16  A.  Yes.

17  Q.  You had a budget in 2018?

18  A.  Yes.

19  Q.  The budget appropriated to your office by the legislature

20  in 2018 was $4 million, right?

21  A.  That's correct.

22  Q.  And then I think you already testified that in 2022 the

23  budget that the legislature gave you was 3.5 million, right?

24  A.  That's correct.

25  Q.  So after the passage of SB 1 the legislature cut your

SAM TAYLOR – CROSS

1  budget in half by $500,000?

2  A.  Did not cut in half ––

3  Q.  Strike that.

4      After the passage of SB 1 the legislature cut your budget

5  by $500,000, right?

6  A.  The budget went down by half a million dollars, that's

7  correct.

8  Q.  And that budget, the $3.5 million budget needed to be used

9  to inform the public about some of the changes from SB 1,

10  right?

11  A.  Um-hum.

12  Q.  Is that a yes?

13  A.  Yes.

14  Q.  And that budget was also necessary to inform voters about

15  other provisions that had nothing to do with SB 1, correct?

16  A.  That's correct, including the ID requirement for voting in

17  person which had been well-established for several cycles ––

18  Q.  I want to talk to you about that a little bit, okay?

19  A.  Sure.

20  Q.  Talking about that ID requirement, Texas passed voter ID

21  laws ten years ago or so?

22  A.  2013, if I remember correctly.

23  Q.  2013?  And so those ID law requirements have been

24  advertised before your office since before you have joined the

25  Secretary of State's Office, correct?

4646

SAM TAYLOR — CROSS

1  A.  Correct.  I joined in 2017, and the first advertising

2  campaign was -- there was one in the 2016 cycle.  There might

3  have been some before that as well.

4  Q.  So if voter ID laws that had nothing to do with SB 1 have

5  been out since 2013 and have been advertised since 2013 to

6  this day, why does the Secretary of State's Office need to

7  keep advertising that?  Haven't Texas voters learned their

8  lesson, they know everything they need to know about voter ID

9  laws?

10  A.  There are thousands of people moving to Texas on a regular

11  daily basis so there are lots of new voters that might not be

12  familiar with our voter ID laws, so there is a necessity to

13  keep educating people because we understand that there are

14  going to be new voters who aren't familiar with those

15  in-person ID requirements, especially if they are coming from

16  another state where they don't have the same requirement, so

17  there is still a necessity to education --

18  Q.  Would you also agree with me, sir, that in addition to

19  those new voters coming in, it's also just hard to get

20  $17 million registered voters to change their behavior, right?

21  A.  17 million voters to change, yeah, it is.

22  Q.  It's a big boat to turn?

23  A.  Correct.

24  Q.  And so that would be the same case with SB 1, wouldn't it?

25  That even though SB 1 was passed, you would not anticipate

SAM TAYLOR - CROSS

1  that 17 million voters would be able to conform their behavior

2  to SB 1 in just one election cycle, right?

3  A.  Not all -- the major changes under SB 1 related to voting

4  by mail and not all Texans are eligible to vote by mail.  The

5  vast majority of Texans vote in person and therefore they are

6  subject to those in-person voter ID requirements which did not

7  change under SB 1.  What did change under SB 1 were the ID

8  requirements for voting by mail, so that's a much smaller

9  portion of that larger 17 million registered Texas voters.  A

10  much smaller portion of that are actually eligible to vote by

11  mail.

12  Q.  Regardless, you would agree with me that whatever that

13  portion is, they're not going to change their behavior

14  overnight, right?

15  A.  It takes some time.  Is takes some time to educate them --

16  Q.  It's going to take some time of advertisements by your

17  office?

18  A.  That's correct.

19  Q.  I want to break down those phases.  So there was phase

20  one, and you had about $1.3 million to put towards phase one,

21  correct?

22  A.  That's correct, that's how much we spent.

23  Q.  That's how much you spent.  And phase one covered the

24  Primary election?

25  A.  Yeah.

4648

SAM TAYLOR - CROSS

1  Q.  And run up to the Primaries?

2  A.  And the run-off as well, the May 24th, 2022 run-off.

3  Q.  And phase two, the 2.2 million, that covered the General

4  Election, right?

5  A.  That's correct.

6  Q.  Focusing just on phase one, in phase one you did not run

7  any TV advertisements, correct?

8  A.  That's correct.

9  Q.  So after the passage of SB 1 and before the Primary and

10  the run-off, the public was not educated, at least through TV

11  ads, about SB 1, is that fair?

12  A.  Not through TV, no.

13  Q.  Okay.  And the — one of the reasons that you didn't place

14  TV advertisements in the first phase was because you didn't

15  have the budget to place those TV ads, right?

16  A.  Right, because if we would have spent all that money on

17  placing TV ads before the Primary there would have been less

18  money left over for the general when you are trying to reach a

19  much wider audience.  More people vote in the General Election

20  so we had to sort of triage to make sure that we had budget

21  left over for that TV ad buy in general?

22  Q.  I appreciate the explantation.  My question is a shorter

23  one though.  You didn't put ads in the phase one because of

24  budget, right?

25  A.  And time as well.

SAM TAYLOR - CROSS

1  Q.  That was going to be my next question.  The other reason

2  was from the passage of SB 1 to the Primaries, you didn't have

3  enough time to write, shoot, produce approve a TV ad spot,

4  right?

5  A.  That's correct.

6  Q.  And that also goes for the other materials that you

7  prepared for the Primary such as print or social media, you

8  had to get that going in a fairly fast clip to push it out to

9  the public before the Primaries, right?

10  A.  We did but those materials are easier to develop and get

11  approval on and get out to the public in comparison to TV

12  advertisements which take longer —

13  Q.  Let me ask you this question.  The advertisements, not the

14  TV ads, but the materials that you prepared in phase one after

15  the passage of SB 1 in that phase one period, you used

16  those — some of those same materials in phase two, correct?

17  A.  Correct.

18  Q.  The ones that you were somewhat time crunched to produce,

19  right?

20  A.  That's correct.

21  Q.  It's fair to say that different voters may be influenced

22  by different types of advertising, correct?

23  A.  Yes.

24  Q.  A low income elderly voter may not be as influenced by a

25  Secretary of State post on Twitter as they would by a TV add?

SAM TAYLOR — CROSS

1  A.  That's correct.

2  Q.  Some voters may not even have a computer?

3  A.  That's right.

4  Q.  Or access to the internet?

5  A.  That's right.

6  Q.  So it's important for the Secretary of State's Office to

7  run campaigns across multiple modalities, fair?

8  A.  Yes.

9  Q.  You said in your direct examination that the focus, one of

10  the main focuses of your ad campaign from gas pump toppers to

11  billboards was to direct traffic to Vote Texas.Gov, right?

12  A.  Yes.

13  Q.  And Vote Texas.Gov served as a clearing house of sorts for

14  all things voting in Texas, right?

15  A.  That's correct.

16  Q.  You also — did you do any research to see what percentage

17  of Texas voters do not have access to the internet?

18  A.  I didn't do any research —

19  Q.  Next question.  Did you do anything to make sure — to see

20  what percentage of Texas voters were elderly and might be

21  uncomfortable or unfamiliar with using the internet?

22  A.  I didn't do any research personally, no.

23  Q.  I want to talk about targeting a little bit.  You are

24  aware, of course, that advertisers will sometimes use

25  targeting in their ads to make sure that their ads are pointed

SAM TAYLOR - CROSS

1  towards the demographic that they want to address?

2  A.  Yes.

3  Q.  A TV commercial on MTV might be different than a

4  commercial you would find on Nickelodeon?

5  A.  Sure.  Yeah.

6  Q.  And the same is true with social media as well?

7  A.  Yes.

8  Q.  Despite this knowledge, the Secretary of State's Office

9  did not use targeting criteria for social media posts, is that

10  correct?

11  A.  We did not --

12  Q.  And you had a social media vendor?

13  A.  We had a third-party vendor that ran the targeting and

14  this was for amplification, there's things you pay for that

15  are for impressions versus clicks.

16  Q.  Well, hold on a second.  That vendor did not use targeting

17  in its social media post as well, right?

18  A.  Not that I'm aware of.

19  Q.  The most targeting they did was simply to make sure that

20  the person receiving the social media lived within Texas?

21  A.  They advertised to Texas, yeah, to Texas residents only.

22  Q.  It was geographic targeting, not demographic targeting?

23  A.  Correct.

24  Q.  And as far as you are aware, neither the Secretary of

25  State's Office nor the third-party vendor used language

SAM TAYLOR - CROSS

1  criteria to target certain audiences, right?

2  A.  Actually, we did have a specific Spanish language Facebook

3  page for the Secretary of State's Office so the followers of

4  that page, you know, presumably may have been Spanish dominant

5  and we only put Spanish content on that page.  We also had an

6  English Facebook page.  But then our Twitter and Instagram

7  channels we had a specific Vote Texas channels that posted

8  both English and Spanish content side by side.

9  Q.  And I appreciate that.  So if someone is a Spanish

10  speaker, they could go to the Secretary of State's Spanish

11  Facebook page and get Spanish information, right?

12  A.  Correct.

13  Q.  But you didn't do anything, meaning the Secretary of

14  State's Office, nor your vendor didn't do anything in pushing

15  out content to see that ads were targeted to Spanish speakers

16  based off their language, right?

17  A.  No, they would — they would amplify the content from

18  those pages to get more impressions.

19  Q.  By amplify you mean clicks and likes and things like that?

20  A.  So there's a cost for impressions which is roughly I think

21  $12 for a thousand impressions.  And then there's the cost per

22  click, which is a little bit more expensive, and that's for

23  people to engage to actually click on the content.  So

24  depending, you sort of put a budget down and you run the ads

25  and you amplify it for a certain period of time, so that's

SAM TAYLOR - CROSS

1  what our vendor does, they are the experts at that.  And

2  afterwards, depending on how many clicks you got or how many

3  impressions you got, then if you, you know, we would pay for

4  the amplification there.

5  Q.  The Secretary of State's Office doesn't have a written

6  policy that would require or guide outreached to certain

7  demographic groups, does it?

8  A.  Not that I'm aware of other than the laws that are on the

9  books for, I mentioned earlier Harris County, Dallas County,

10  and Tarrant County having certain census populations over

11  certain threshold, in which case we needed to provide voter

12  education materials in those additional languages.  So I don't

13  know if it's written down anywhere, but it's just something

14  that I've always been aware of and consulted with our

15  attorneys to make sure that we were providing those in those

16  appropriate languages.

17  Q.  So that would be a no to my question.  You are not aware

18  of any written policy from the Secretary of State's Office

19  that directs that certain sort of demographic information,

20  right?

21  A.  Not aware of a written policy, no.

22  Q.  When you created social media content you would try to use

23  pictures of diverse individuals in those posts, right?

24  A.  Correct.

25  Q.  And the goal was to represent racial minorities in your

4654

SAM TAYLOR — CROSS

1   posts?

2   A.   Racial minorities, people with disabilities, older people,

3   younger people, students in some cases, so a variety of

4   different groups, yes.

5   Q.   But other than including those minority pictures or people

6   that are disabled, et cetera, you did not otherwise do now

7   social media outreach or voter education aimed specifically at

8   racial minority voters?

9   A.   Other than that, I'm not sure — you mean on social media?

10  Q.   Correct.

11  A.   I don't even know if that's possible.

12  Q.   Okay.  And your TV advertisements didn't show any people,

13  right?

14  A.   No, they were just graphics.

15  Q.   So in your TV advertisements there would be no pictures of

16  individuals where you would then be reaching out to minorities

17  via those pictures?

18  A.   That's correct.

19  Q.   I want to talk about the mail-in ballot ad campaigns.  So

20  we talked about the existing voter ID laws and that SB 1

21  created new voter ID laws with respect to mail-in ballots,

22  right?

23  A.   Yes.

24  Q.   You had to — you were fighting kind of a two-pronged

25  approach here.  How much of your budget was dedicated to

4655
SAM TAYLOR - CROSS

1  addressing old voter ID laws that predated SB 1 versus SB 1
2  mail-in ballot voter ID laws?
3  A.  I don't know if there's any way to itemize or break that
4  down.
5  Q.  You didn't break that down, did you?
6  A.  No, I did not.
7  Q.  And you didn't instruct anyone in your office to break
8  that down, right?
9  A.  I did not.
10 Q.  Okay.  And when you were speaking to your vendor you
11 didn't direct your vendor to allocate a certain amount of
12 resources to just addressing many SB 1 mail-in ballot
13 provisions versus voter — voter ID provisions, right?
14 A.  I did not, but I told them that they needed to address it
15 and they need to make it a quite prominent portion of this
16 campaign because it was new, and to your point earlier about
17 people being familiar with voter ID laws for several cycles
18 now, we thought it was important to devote extra resources to
19 this new requirement.
20 Q.  Let's use a specific example, okay?  You guys had a —
21 focusing on phase two now, in phase two you did produce some
22 TV commercials, right?
23 A.  Yes.
24 Q.  And one of those TV commercials dealt with ID
25 requirements, correct?

4656

SAM TAYLOR — CROSS

1  A.  Yes.

2  Q.  That was a 30-second spot?

3  A.  Yes.

4  Q.  And that same 30-second spot also dealt with mail-in

5  ballot requirements, right?

6  A.  It had both, correct.

7  Q.  What was the breakdown in those 30 seconds between old

8  voter ID laws and mail-in ballots?

9  A.  I never calculated that.  Within 30 seconds I would have

10  to go watch it again to —

11  Q.  You would be guessing?

12  A.  I would be guessing if I told you right now so I would

13  have to go back and watch it, but they are available online.

14  They're available on our social media channels.

15  Q.  And these advertisements ran for about two to three weeks

16  before the election?

17  A.  Correct.

18  Q.  And they run on different networks?

19  A.  Yes.

20  Q.  And you didn't do anything, did you, to figure out the

21  breakdown of where those advertisements were run vis-a-vis

22  various networks, right?

23  A.  We received confirmation after the fact in our invoices

24  from our vendor of proof of placement that's required for any

25  kind of state contract like this that, for example, if they

SAM TAYLOR - CROSS

1  say they bought a billboard, we have to get a picture of the
2  billboard.  If they say they bought 30-seconds worth of
3  advertising on this TV station, they have to provide us with
4  those receipts.  So we went back to verify where all those
5  advertisements ran, yes.
6  Q.  As you sit here today, do you know the breakdown between
7  say Fox News or CNN, where those ads ran more?
8  A.  I do not know.
9  Q.  There was some back and forth on several different press
10 releases that you authenticated and were admitted as exhibits
11 during your direct exam, do you remember that?
12 A.  Yes, I do.
13 Q.  And I think you testified repeatedly that press releases
14 were something that you would regularly do as part of your
15 work, right?
16 A.  Yes.
17 Q.  And that those press releases are all authentic, correct?
18 A.  Yes.
19         MR. WATKINS:  Your Honor, may I approach?
20         THE COURT:  Do you think you're going to finish up by
21 today?
22         MR. WATKINS:  Yes.
23 BY MR. WATKINS:
24 Q.  I've handed you a copy of a press release that would be
25 marked as LUPE 355.  This as press release with your name on

SAM TAYLOR - CROSS

1  it in the middle upper right corner, is that right?

2  A.  That's correct.

3  Q.  And that's your phone number?

4  A.  That was my land line in the Secretary of State's Office,

5  yes.

6  Q.  And does this appear to be a true and accurate copy of a

7  press release that was produced by the Secretary of State's

8  Office while you were there?

9  A.  It appears to be, yes.

10 Q.  And based on your understanding, do you believe that

11 everything in here to be true and accurate?

12 A.  I believe at the time it was issued it was truth and

13 accurate, yes.

14         MR. WATKINS:  Move to admit LUPE 355, Your Honor.

15         THE COURT:  Any objection?

16         MR. SZUMANSKI:  No objection, Your Honor.

17         THE COURT:  355 is admitted.

18 BY MR. WATKINS:

19 Q.  In addition to TV commercials, you also prepared printed

20 pamphlets, is that right?

21 A.  Yes.

22 Q.  And I think you had one printed pamphlet that dealt with

23 old voter ID laws and a second printed pamphlet that dealt

24 with mail-in ballots, right?

25 A.  That's correct.  So the in-person voter ID laws was a

SAM TAYLOR - CROSS

1  front and back foldout sort of brochure.

2  Q.  Just a yes or no, you did have those two ads?

3  A.  Yes, they were two different types, yes.

4  Q.  And those printed materials, those were available for pick

5  up at in-person community events, right?

6  A.  Correct, like a booth.

7  Q.  Fair to say if someone is going to an in-person community

8  voter event they are probably a good candidate as someone who

9  is going to vote?

10  A.  Hopefully.

11  Q.  If they are taking that time?

12  A.  Yes.

13  Q.  And did you — counties could also request copies of those

14  pamphlets, right?

15  A.  Correct.

16  Q.  But you didn't push out the pamphlets to all 254 counties,

17  did you —

18  A.  We made them available.  We let them know and many of them

19  did order, and I can't remember exactly how many, but we made

20  them available to any county who wanted them.  In fact we had

21  to order some extra stock because we ran out of our first

22  tranche.

23  Q.  It was up to the counties to order them?

24  A.  It was.

25  Q.  Focusing on online materials, there was the SOS 101 series

SAM TAYLOR – CROSS

1  that was referenced, right?

2  A.  Yes.

3  Q.  And those were four YouTube videos, correct?

4  A.  Yes.

5  Q.  And out of those four videos only one of those videos

6  dealt with mail-in ballot ID requirements, correct?

7  A.  Yes.

8  Q.  And those were all recorded in English?

9  A.  Correct.

10  Q.  And I think you testified that you were relying on users

11  to use the Google translate subtitle feature if they wanted to

12  hear it in a different language or read it in a different

13  language, right?

14  A.  On YouTube, yes, there's a subtitle feature.

15  Q.  Did you provide any commentary in the title or language

16  section of the YouTube video that you control in instructing

17  people how to put Spanish language or other language subtitles

18  on it?

19  A.  No, it was just the title of the video and a link to the

20  full press release.

21  Q.  Did you do any research to see what percentage of Texas

22  YouTube users know how to turn on Spanish language subtitles?

23  A.  I did not do any research on that.

24  Q.  Did you yourself or did you instruct anyone from your

25  office to observe the Spanish subtitles on YouTube to see that

1  they were accurate with respect to these videos?

2  A.  No, I didn't instruct anybody else in the office.  I

3  reviewed them myself to the extent I could and made sure that

4  they were accurate translations because I input, manually

5  input the script into the subtitles and the translation is

6  done based on that — that manual transcription that I input

7  myself —

8  Q.  Are you fluent in Spanish, sir?

9  A.  I'm not a native speaker but I can speak enough Spanish to

10  have a conversation.

11  Q.  You did not shoot any — strike that.

12     Did you — you did not produce any videos with native

13  Spanish speakers to post on YouTube, right?

14  A.  Well, no, I did not.

15  Q.  You could have though?

16  A.  It was — it would have been — it would have taken a lot

17  of addition time and resources and I said this was already

18  something I was doing on any own time and my own dime.

19  Q.  And that was going to be my follow-up question.  You were

20  capable to produce YouTube videos with native Spanish speakers

21  but you chose not to because it would take more time?

22  A.  I wouldn't have been able to sleep for about the

23  two months leading up to the election if I had done that, so

24  no, I did not do that.

25  Q.  And you didn't take the YouTube videos you made and dub

SAM TAYLOR – CROSS

1  over them with Spanish speakers, right?

2  A.  Did not do that.

3  Q.  Again, that's something you could have done but you didn't

4  have the time to or chose not to?

5  A.  There was no way I had the resource or the capacity to do

6  that, no.

7          MR. WATKINS:  That's all the questions I have.

8          Pass the witness.

9          THE COURT:  Anything else on this side?  Nothing.

10          Anything else here?

11          MR. SZUMANSKI:  No redirect, Your Honor.

12          THE COURT:  Thank you.  You are excused, sir.  Thank

13  you.

14          We'll resume tomorrow morning at 9:00.  I've got a

15  short civil hearing at 8:30 so you can make room on the tables

16  for that; and then, otherwise, anything else before we leave

17  for the day?

18          MR. WATKINS:  No, Your Honor.

19          MR. KERCHER:  See you tomorrow.

20          THE COURT:  Thank you.

21

22

23

24

25

4663

SAM TAYLOR — CROSS

1                                  —o0o—

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.   I

4    further certify that the transcript fees and format comply

5    with those prescribed by the Court and the Judicial Conference

6    of the United States.

7

8    Date:  10/18/23              /s/  *Gigi Simcox*
                                  United States Court Reporter
9                                 262 West Nueve Street
                                  San Antonio TX 78207
10                                Telephone:  (210)244-5037

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Gigi Simcox, RMR, CRR*