```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3
    LA UNION DEL PUEBLO ENTERO,     .
 4  ET AL,                          .
                                    .
 5            PLAINTIFFS,            .
         vs.                        . DOCKET NO. 5:21-CV-844-XR
 6                                  .
    GREGORY W. ABBOTT, ET AL,       .
 7                                  .
              DEFENDANTS.           .
 8

 9

10                TRANSCRIPT OF BENCH TRIAL
         BEFORE THE HONORABLE XAVIER RODRIGUEZ
11             UNITED STATES DISTRICT JUDGE
                   OCTOBER 19, 2023
12

13

14

15

16  APPEARANCES:
    FOR THE PLAINTIFFS:     NINA PERALES, ESQUIRE
17                          FATIMA MENENDEZ, ESQUIRE
                            JULIA LONGORIA, ESQUIRE
18                          MALDEF
                            110 BROADWAY
19                          SUITE 300
                            SAN ANTONIO TX 78205
20
                            AMIR BADAT, ESQUIRE
21                          JENNIFER A. HOLMES, ESQUIRE
                            NAACP LEGAL DEFENSE & EDUCATIONAL
22                          FUND INC
                            40 RECTOR STREET, FIFTH FLOOR
23                          NEW YORK NY 10006
24

25
```

```
1

2

3

4

5   FOR THE DEFENDANTS:        RYAN G. KERCHER, ESQUIRE
                               KATHLEEN HUNKER, ESQUIRE
6                              WILLIAM WASSDORF, ESQUIRE
                               TEXAS ATTORNEY GENERAL
7                              P.O. BOX 12548
                               MC 009
8                              AUSTIN TX 78711

9

10

11

12

13  REPORTED BY:               GIGI SIMCOX, RMR, CRR
                               OFFICIAL COURT REPORTER
14                             UNITED STATES DISTRICT COURT
                               SAN ANTONIO, TEXAS
15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (San Antonio, Texas; October 19, 2023, at 9:00 a.m., in
 2   open court.)
 3             THE COURT:  Okay, I think we're ready.
 4             Your next witness or housekeeping.
 5             MR. WASSDORF:  Housekeeping.
 6             Your Honor, I think we've got a list of some State
 7   exhibits that there's no objection to and so State would move
 8   into evidence State 26 through 27, 51, 54, 192, 194, 212, 214
 9   through 215, 218, 222, 224 through 226, 228, 241, 271 through
10   272, and 277 through 280, and I would just note, Your Honor,
11   that that leaves at this point I believe approximately 125
12   State defendant's exhibits remaining that we'll have to deal
13   with.
14             MISS RODRIGUEZ:  I just note that Exhibit 51, subject
15   to the agreement between LULAC plaintiffs and the State
16   defendants regarding limited purpose of admission.
17             THE COURT:  All of them or which one?
18             MISS RODRIGUEZ:  No, just 51.
19             THE COURT:  Fifty-one.
20             Are there any objections to any of those exhibits
21   other than the agreement on 51?
22             MISS HOLMES:  No objection, Your Honor.
23             THE COURT:  Twenty-six through 27 is admitted.  51 is
24   admitted with that provision, 54 is admitted, 192, 194, 212,
25   214, 215, 218, 222, 224 through 226, 228, 241, 271 to 272, 266
```

```
 1  through 280 are all admitted.
 2          Next witness.
 3          MR. BRYANT:  Your Honor, State defendants call
 4  Dr. Mark Hoekstra.
 5      (MARK HOEKSTRA, having been duly sworn, testified as
 6  follows:)
 7                  DIRECT EXAMINATION
 8  BY MR. BRYANT:
 9  Q.  Dr. Hoekstra, could you state your name for the record.
10  A.  Mark Hoekstra.
11  Q.  And how do you spell your last name?
12  A.  H-O-E-K-S-T-R-A.
13  Q.  How are you currently employed?
14  A.  I'm a professor of economics at Baylor University.
15  Q.  How long have you held your current position at Baylor
16  University?
17  A.  Started August 1st of this year.
18  Q.  Immediately prior to August of this year what position did
19  you hold?
20  A.  I was a professor of economics at Texas A&M University.
21  Q.  We look at your CV on page 21 of State Defendant's
22  Exhibit 6.
23      Now, is this a CV that you have prepared and was available
24  to plaintiffs at the time of your last deposition in this
25  case?
```

MARK HOEKSTRA - DIRECT

1    A.   Yes, it was.

2    Q.   We'll talk about how what may have happened since this CV

3    that needs to be updated, but could you please briefly

4    summarize your education at the university level?

5    A.   Yeah.  So I did my bachelor's degree at Hope College in

6    Michigan.  I did my Ph.D. at the University of Florida in

7    economics.  I graduated with a Ph.D. in 2006.

8    Q.   And could you please summarize your academic appointments

9    to date?

10   A.   Yeah.  So my first job out of graduate school and was

11   assistant professor at the University of Pittsburgh.  After

12   five years I moved to Texas A&M, became a tenured professor,

13   associate professor of economics at Texas A&M.  I was awarded

14   a research, or I'm sorry, a professorship called the Rex B.

15   Grey professorship in 2015, which I held until I left this

16   summer, and now I'm the George J. Boden Professor of Economics

17   at Baylor.

18   Q.   Have you had a research appointment since 2007 as a

19   research associate with the National Bureau of Economic

20   Research?

21   A.   Yeah.  So —

22   Q.   Could you describe what that is?

23   A.   Yeah, absolutely.  So NBER is kind of a — I don't think

24   it's overstating to say it's a prestigious club of sorts for

25   economist, so you become a member, essentially by having

MARK HOEKSTRA - DIRECT

1  powerful people in the field, you know, say that they think
2  your work is good.  What that means is you get invited to the
3  meetings.  The biggest one is called Summer Institute in the
4  summer.  There's also different program meetings, you know,
5  for different areas, different fields that meet over the
6  course of the year.  You also -- that means they way your way
7  to do those things and so on as well.  You also get your
8  research disseminated that to goes out to, you know, media
9  outlets and everything else.
10      And so I've been, you know, a faculty research fellow
11 first, which is more or less what they give to people who are
12 not yet tenured, and then now a research associate since 2015
13 at NBER.
14 Q.  Okay.  Your CV also indicates that since 2013 you've been
15 a research fellow with IZA.  Could you explain what that
16 means?
17 A.  Yeah.  So IZA is essentially the European equivalent of
18 NBER.  So NBER is based out of Cambridge, Cambridge,
19 Massachusetts.  It's got, you know, strong ties to both
20 Harvard and MIT.
21      IZA is based out of Bonn, Germany, and I might forget the
22 name but I think it's called the Institute for Labor Studies
23 or something like that.  It's essential the labor group out of
24 Europe.  And again, it's sort of similar to NBER in the sense
25 that you get invited to be a member.  They do conferences.

1  It's European so I'm not quite as involved in that because I

2  don't love flying a lot so, but essentially it's like NBER but

3  the European version.

4  Q.  Approximately how many papers have you published in peer

5  reviewed journals?

6  A.  Around 20 or so I believe at this point.

7  Q.  Have you published in the top journal of the American

8  Economics Association, the American Economic Review?

9  A.  Yeah, I've published there twice.

10 Q.  Could you describe some of your academic publications that

11 are relevant to your work in connection with this case?

12 A.  Yeah.  So, you know, so on paper I've been doing more and

13 more research in the area of criminal justice, so one paper is

14 looking at whether race matters for police use of force.

15 That's a hard question to answer for a lot of reasons.  The

16 way we answer it is we essentially ask whether White and Black

17 officers are scaling up force similarly as they go from White

18 to Black neighborhoods, and if say you look at White officers,

19 say they are using more force as they go from Black to White

20 neighborhoods, it could be that there's bias there.  It could

21 be the cops are using too much force in Black neighborhoods.

22 It could of course also be that those type of calls are more

23 dangerous and so the major, you know, the major innovation

24 that we have there is if we look, okay, if it's all about the

25 neighborhoods being more dangerous and race doesn't matter,

1  then we should see Black officers scaling up force the same

2  amount as White officers, and in fact we don't.

3      I turns out —

4  Q.  Dr. Hoekstra, are there any other publications that —

5  academic publications that would be potentially relevant to

6  your work in this case?

7  A.  Yeah.  So there's — so other articles we've looked at,

8  jury bias for example.  Look at gender, gender bias by juries,

9  and there the idea is that the panel that the jury gets pulled

10 from is random so sometimes you're going to have jury panels

11 from which the jury is selected that have more women,

12 sometimes there are fewer women, and we use that to then look

13 at that whether juries with more versus fewer women, you know,

14 treat female versus male defendants differently.  That's

15 another paper and that's relevant in this area.

16     Other — another paper I wrote is, you know, on voter

17 identification laws.  It's published in economics letters

18 where we essentially tried to figure out well, how many people

19 could be impacted by the — by a move from a nonstrict voter

20 identification law to a strict voter identification law, and

21 we did that by getting data from two states where they collect

22 data on those people and so those votes can be cast and

23 counted.  And importantly for us, they actually tracked who

24 did it and so we could count up the people.  And that's, those

25 estates were Michigan and Florida.  And then we documented

MARK HOEKSTRA — DIRECT

1  that essentially very few people were casting ballots in
2  states without ID, even though they were legally able to cast
3  ballots without ID in those states.
4  Q.  What, if any, editorial positions do you hold with respect
5  to scholarly journals?
6  A.  I'm an associate editor at Journal of Labor Economics,
7  which is essentially the top field journal in labor economics
8  which is my area.  And the other top field journal is JHR,
9  Journal of Human Resources, I'm also an associate editor
10 there.
11 Q.  Could you describe briefly some of the courses that you're
12 teaching now at Baylor or have taught at Texas A&M in recent
13 years.
14 A.  Yeah.  So one of the courses that I've taught at the
15 undergraduate level is sports economics, which might seem like
16 it's not immediately relevant to this course, but a big area
17 where economist have used data from sports is testing for
18 discrimination and bias.  And the reason is because one of the
19 things you've got to worry about is people can be different in
20 all kind of ways.  And in sports you typically — pro sports
21 you have really good data on how good guys are, right.  So you
22 have wins above replacement, you have all these good metrics.
23 So I've taught that.
24     I've taught that at A&M.  I'll teach that in the spring at
25 Baylor.

MARK HOEKSTRA - DIRECT

1    At the graduate level I've taught a course on, we've

2  called it varyingly labor economics or public.  It's a field

3  course for Ph.D. students meant to introduce them to the

4  methods people are using in those fields including, you know,

5  testing for bias in different settings.

6    And then I also taught last spring, there's a first year

7  econometrics sequence that you need to pass in order to stay

8  in graduate school essentially.  If you're a Ph.D. student

9  you've got to pass this course as well as a few more, and what

10 I taught is I taught causal inference.  So how economists, how

11 social scientists use observational data to try to get at

12 causality and what the difficulties are, and then what the

13 various solutions are and under what conditions they solve

14 that problem.

15    And so I taught that and wrote obviously part of this exam

16 this past summer to determine whether or not students passed

17 that field and could continue on getting a Ph.D. in economics.

18 That's an econometrics course which is like a fancy word for,

19 you know, it's applying statistics to economic problems and of

20 courses there are also other problems that other social

21 scientists face as well.

22 Q.  Could you describe very briefly your experience to date

23 working as an expert consultant or witness in litigation?

24 A.  Yeah.  So this was the first case I ever took.  And in

25 addition, you know, since this case has been ongoing for a

4674
MARK HOEKSTRA - DIRECT

1   while, this past summer I testified in a case that involved,
2   that was essentially about the death penalty in Arizona.  And
3   then I've also worked as an expert consulting witness on a few
4   of these cases, most that involve the Racial Justice Act in
5   California, and essentially those are -- that act -- I don't
6   know how much detail I plead to get into --
7   Q.  That's plenty.
8   A.  -- and those are listed, I believe that gave that to
9   counsel some time ago.
10  Q.  And have you worked as an expert consultant or witness to
11  date in any other litigation relating to voting rights other
12  than this case?
13  A.  I am involved in one other.  I haven't been deposed yet
14  and I'm not sure exactly what I'm allowed to reveal and not
15  reveal about that.
16  Q.  Please don't get close to anything you shouldn't reveal.
17  A.  The trouble is I don't know what I'm supposed to reveal
18  and I'm not supposed to reveal so I am involved in another
19  case, and beyond that I'm not -- I haven't been deposed and my
20  understanding is -- my understanding at one point was if you
21  haven't been deposed then maybe you don't talk about it, but I
22  don't want to get in trouble.
23  Q.  Very good, thank you.  Since you last submitted your CV to
24  the plaintiffs in this case what, if any, additional work have
25  you done that would update your CV aside from the change from

MARK HOEKSTRA - DIRECT

1   Texas A&M to Baylor?

2   A.   Yeah.  So I believe the one addition would be we've

3   completed a working paper on jury bias as well, so it's a

4   different project on jury bias and here we've talked about

5   this did he deposition so the other side is aware of the

6   project, but essentially in that paper we're using -- we're

7   looking at racial bias by grand jurors.  And the major --

8   there's two major innovations in that paper.  One is that we

9   have a vastly larger sample than anyone else who's ever looked

10  at jury bias because there's a lot of grand jury cases in

11  Texas.

12       And the second thing is because grand jurors don't

13  actually see the defendant, they don't know whether that

14  defendant is Black or White, but they do see the name.  And so

15  what we're using in that case is we're comparing -- we're

16  doing blinded and unblinded comparisons, which is basically

17  one of the best ways you can try to get at racial bias to

18  tease out what racial bias is there, if any at all.

19  Q.   Any other supplements to your CV that you need to mention

20  at this point?

21  A.   Not that I recall.

22  Q.   Okay.  When were you first retained to serve as an expert

23  consultant or witness in this case?

24  A.   It would have been, I believe it would have been 2022 in

25  the spring.  It would have been February, March-ish.  I don't

1 remember the exact date.

2 Q.  Have you prepared and submitted expert reports in

3 connection with this case?

4 A.  Yes, I have.

5        MR. BRYANT:  Your Honor, at this point I will proffer

6 Dr. Hoekstra as an expert witness in this case on the issues

7 that are the subject of his report responding or rebutting the

8 plaintiff's expert reports of Dr. Christian Grose, Dr. Eric

9 McDaniel, and Dr. Mayer.

10        MR. DODGE:  No objection.

11        MR. WATKINS:  No objection.

12        THE COURT:  I'm not sure what I'm recognizing him as

13 an expert in based on that.

14        MR. BRYANT:  I'll be happy to give my version of it

15 or ask the witness.

16        THE COURT:  So, you know, I don't want to be setting

17 a precedent that's unduly large for future courts saying he's

18 been recognized as an expert in the following fields because

19 you haven't given me...

20        Doctor, what do you consider to be your expertise

21 that you're rendering in this case?

22        THE WITNESS:  Yeah.  So I'm an expert in statistics

23 and methodology used to answer questions in economics and

24 other social sciences.

25        THE COURT:  I feel more comfortable in that because

MARK HOEKSTRA - DIRECT

1  to me, I mean, I was just listening to your background and
2  it's like you're a labor and HR economic expert and I was
3  trying to figure out how are you fitting into this case so.
4          THE WITNESS:  Yeah.  Again, I mean if you look at all
5  my work, I mean, one of the big issues that comes up is, you
6  know, you're trying to answer questions that are hard and
7  you're trying to do it with data, right, and there are lots of
8  things that can go wrong.  And if you look, you know, I've
9  worked in a bunch of different areas.  I've done a little bit,
10  obviously, as we've talked about, on voting.  I've worked in
11  other areas, racial bias, education and so on.
12          The tools that we use to answer all those questions,
13  you know, including that political scientists use, they're all
14  the same, and the issues you've got to overcome are the same.
15  And so I'm, you know, if there's one thing in the world that
16  I'm good at it's understanding, you know, what assumptions are
17  required to come to those conclusions, ways to test those
18  assumptions, and thinking about what are the best ways to
19  answer questions and overcome some of these difficult problems
20  that you have to overcome trying to answer questions with
21  data.
22  BY MR. BRYANT:
23  Q.  Dr. Hoekstra, would you say that you have expertise in
24  analysis of data and determination of the presence or absence
25  of causal connection?

4678
MARK HOEKSTRA - DIRECT

1  A.  Yeah, that's exactly right.  This course that we -- I mean
2  the main issue in the field, right, is what we call "causal
3  inference."  And the lingo of that field it's, you know, does
4  some treatment, you know, cause some outcome.  Is there a
5  causal relationship between a treatment and an outcome.
6      And here, you know, a big issue in this case, right, is we
7  see some outcomes, like voting outcomes, and the big issue is
8  well, to what extent did SB 1 cause those outcomes.  And that
9  is exactly the sort of thing that I've been doing for 20 years
10  and been doing, you know, pretty well.
11          THE COURT:  I'm going to recognize him as an expert
12  in statistics and methodology and causal inferences.
13          MR. BRYANT:  Thank you, Your Honor.
14  BY MR. BRYANT:
15  Q.  Could we bring up again the State Defendant's Exhibit 6.
16      Could you identify State's Exhibit Defendant's 6?  You may
17  need to look at more than one page to do it because I know you
18  have multiple reports that have the same date.
19  A.  Yeah.  So this is a report I submitted in March of 2022.
20  It would have been in response to one of these, one of the
21  three experts, and I'm not sure from this one, from this page
22  which one it is.
23  Q.  Could you please show the next page of that exhibit?
24  A.  This would be in response to Professor Grose's report in
25  that same year.

4679
MARK HOEKSTRA – DIRECT

1          MR. BRYANT:  Your Honor, State defendants offer
2   State's Defendant's 6 into evidence?
3          MR. WATKINS:  No objection.
4          THE COURT:  Six is admitted.
5   BY MR. BRYANT:
6   Q.  Could we look at State Defendant's Exhibit 5.
7       And let's look also at the second page of that one.  Can
8   you identify State Defendant's Exhibit 5?
9   A.  Yeah, this is my report and rebuttal to Professor Grose's
10  2023 report.
11  Q.  And what is the date you submitted State Defendant's
12  Exhibit 5?
13  A.  I think we've got to go back to the other page, it's
14  March 3, 2023.
15         MR. BRYANT:  All right.  State defendants offer State
16  Defendant's Exhibit 5 into evidence.
17         MR. WATKINS:  No objection.
18         THE COURT:  Five is admitted.
19  BY MR. BRYANT:
20  Q.  Look at State's Defendant's Exhibit 9?
21  A.  So this is my report and response to Professor McDaniel,
22  and I believe this is the first one, if we go back to the
23  date, the first page.
24      Yeah.  This is a report written in response to Professor
25  McDaniel.  I submitted it March 29, 2022.  It's in rebuttal to

MARK HOEKSTRA — DIRECT

1  his report written that same year.

2          MR. BRYANT:  We offer State Defendant's Exhibit 9

3  into evidence.

4          MR. WATKINS:  No objection.

5          THE COURT:  Nine is admitted.

6  BY MR. BRYANT:

7  Q.  Let's look at State Defendant Exhibit's 8.

8      Can you identify State's Defendant's Exhibit 8?

9  A.  Sure.  This is my report and rebuttal of Professor

10 McDaniel's 2023 report, and I submitted this report as well on

11 March 3, 2023.

12         MR. BRYANT:  We offer State Defendant's Exhibit 8

13 into evidence.

14         MR. WATKINS:  No objection.

15         THE COURT:  Eight is admitted.

16 BY MR. BRYANT:

17 Q.  Can we look at State Defendant's Exhibit 10.

18     Can you identify State Defendant's Exhibit 10?

19 A.  Yeah.  This is my report in rebuttal to Professor Mayer.

20 This was in rebuttal to his March 6 report, 2023.  And this

21 one was submitted on April 5, 2023.  It was submitted by me.

22         MR. BRYANT:  We offer State Defendant's Exhibit 10

23 into evidence.

24         MR. WATKINS:  No objection.

25         THE COURT:  Ten is admitted.

MARK HOEKSTRA - DIRECT

```
 1 | BY MR. BRYANT:
 2 | Q.  Dr. Hoekstra, in this case did you submit some notices of
 3 | correction just before your last deposition in this case?
 4 | A.  I did.
 5 | Q.  Let's look at State Defendant's Exhibit 7.
 6 |     Can you identify State Defendant's Exhibit 7?
 7 | A.  Yeah.  So this a notice of correction regarding my
 8 | March 29, 2022 report, which was written in response to
 9 | Professor Hersh.
10 |         MR. BRYANT:  Offer State Defendant's Exhibit 7 into
11 | evidence.
12 |         MR. DODGE:  Can I just ask for clarification, this is
13 | State's Exhibit 7?
14 |         MR. BRYANT:  Yes.
15 |         MR. DODGE:  Was that in response to Dr. Hersh?
16 |         MR. BRYANT:  It is.
17 |         MR. DODGE:  Professor Grose?
18 |         MR. BRYANT:  We'll cover all three of them.
19 |         MR. DODGE:  There may be a misunderstanding here.
20 |     (Off the record discussion)
21 |         MR. DODGE:  Could we just make the record clear on
22 | that point?
23 |         MR. BRYANT:  Okay.
24 |         THE COURT:  Is it a numbering issue, is that what's
25 | going on?
```

4682
MARK HOEKSTRA – DIRECT

1          MR. DODGE:  It's not a numbering issue.  Well, I'll

2    let counsel handle it.

3          MR. BRYANT:  Fine.

4    BY MR. BRYANT:

5    Q.  So I may have the wrong exhibit number.  Let's look at

6    State Defendant's Exhibit 4.

7        Dr. Hoekstra, could you identify State Defendant's

8    Exhibit 4?

9    A.  Yeah.  This is a notice of correction to my March 29, 2022

10   report that was in response to Professor Grose.

11         MR. WASSDORF:  Your Honor, could we have a moment?

12         THE COURT:  Sure.

13    (Off the record discussion)

14         THE COURT:  I tell you what.  Why don't you just go

15   ahead and just ask him questions and we'll clean all this up

16   later.  Because I'm assuming all these things are going to be

17   unobjected to once it gets cleaned up.

18         MR. DODGE:  That's actually not correct, Your Honor,

19   and I can address that issue if counsel is heading to

20   Exhibit 4.

21         MR. BRYANT:  I tell you what, what I would suggest,

22   Your Honor, is we that just put aside the notices of

23   correction for now, we'll speak at the next break.  We'll

24   clear them up because I do not intend to ask questions about

25   the notices of correction.  I wanted them into evidence so

1  that the Court would know about them and so that plaintiffs

2  can ask any questions on cross they might want.

3  BY MR. BRYANT:

4  Q.  Dr. Hoekstra, have you given your deposition in this case?

5  A.  I have.

6  Q.  How many times?

7  A.  Two times.

8  Q.  Do you recall the dates of those depositions, either

9  actually or approximately?

10 A.  Was it April or May of this year is as close as I can

11 remember to, and then it would have been April or May of 2022

12 I think, but that's -- yeah.

13 Q.  Thank you.  Do you have an estimation as to how many hours

14 you've been deposed in this case by plaintiffs' counsel?

15 A.  I suspect in total it's around 15.

16 Q.  Did your deposition this year take place after all of your

17 reports and all of the notice of correction to your reports

18 have been provided to plaintiffs' counsel?

19 A.  Yes, it did.

20 Q.  Dr. Hoekstra, Dr. Chris Grose has testified in this case

21 as an expert.  Have you reviewed the expert report submitted

22 by Dr. Grose in connection with this case?

23 A.  I have.

24 Q.  And let's look at State Defendant's Exhibit 6, which has

25 been admitted, which is your rebuttal report to the first

4684

MARK HOEKSTRA – DIRECT

1   report by Dr. Grose dated February 28, 2022.  That's the date

2   of his report.

3       Dr. Grose — did Dr. Grose describe in his February 28,

4   2022 report, an audit study in which he or his students sent

5   emails to the email addresses to the members of the Texas

6   legislature in Spanish and English in April of 2020?

7   A.  Yes.

8   Q.  Do you recall reviewing Dr. Grose's description of that

9   audit study?

10  A.  Yes, I do.

11  Q.  Based on responses to those emails and review of the

12  records of the final vote on SB 1 in August of 2021, did

13  Dr. Grose express opinions that those Texas legislators who

14  voted in favor of SB 1 showed evidence of intent to

15  discriminate against Latinos and people of color in voting for

16  SB 1?

17  A.  Professor Grose did assert that.

18  Q.  And did you express any opinions in your rebuttal report

19  that State Defendant's Exhibit 6 as to the overall validity

20  and reliability of that opinion by Dr. Grose?

21  A.  Yes, I expressed that that opinion is wrong.

22  Q.  And do you still hold that same opinion today?

23  A.  I do.

24  Q.  Let's discuss the reasons for your opinion on that

25  subject.  Did you find significant design flaws in the design

MARK HOEKSTRA - DIRECT

1  of Dr. Grose's audit study described in his February 28th,

2  2022 report?

3  A.  Yes.

4  Q.  Could you describe first, any flaws that you found in his

5  use of the Spanish versus the English language as a focus of

6  his audit study?

7  A.  Sure.  And so the first, you know, the first issue with

8  the audit study is obviously it's an obvious one, but you're

9  sending these emails — you're sending these emails to an

10 office, and that legislator may not be the one who responded

11 to the email.  That's an obvious point, but the — potentially

12 an important one.

13     In terms of the design of the study, you know, the way

14 that — the way that most studies would try to get at this

15 question is they would ask — they would random size the

16 ethnicity of the name, and so you would have an email from

17 somebody named, you know, Juan Gonzales and an email from

18 somebody named, you know, some Anglo name.  And then you would

19 look at differential responses to that.

20     Now, even if you do that there are potential issues with

21 interpreting that as evidence of bias, and the best — well,

22 the good research, reliable research takes those threats

23 seriously.  In this case, when it's a political science topic

24 like this you might worry that the legislator in the office is

25 more or less likely to believe that that person is their

MARK HOEKSTRA - DIRECT

1  constituent for example.  Maybe they don't have very many
2  Hispanics in their district and so they might think it's
3  something, if I get an email from a Hispanic name it's not my
4  constituent, it's not my problem, I'm less likely to respond.
5  That's not bias, that's something else, and you need to worry
6  about that.  Even if you had done the study right, which he
7  didn't.
8      The second thing you'd have to worry about that's well
9  recognized in both Professor Grose's previous work and, you
10  know, and work more generally in political science on this
11  question, is that it could be once you start introducing, you
12  know, a different language, now you're introducing another
13  confounder into this experiment.  And so once you send Spanish
14  emails to some office, maybe some office are just less able to
15  respond to Spanish emails.  And that's not bias, that's
16  just -- and you're picking up a language effect, you're not
17  picking up bias.
18      And so again, you know, there's even if he had just
19  randomized name, there are potential problems with it.
20  There's, you know, and a problem I didn't realize or I didn't
21  mention there either here yet is there's a partisanship, so if
22  I don't believe there aren't very many Hispanic supporters of
23  me, but I might be less likely to respond to an email coming
24  from a Hispanic name versus a non-Hispanic name, and that's
25  not bias, that just means I'm, you know, more likely to serve

MARK HOEKSTRA - DIRECT

1  the people who I think like me.

2      And all of those things would be true in his study as

3  well.  But then he made it worse because he randomized

4  language, and so now you're picking up differential response

5  rates to a different language and he's incorrectly inferring

6  that as evidence of intent to discriminate.

7  Q.  Why is lack of Spanish language facility not a valid proxy

8  for intent to discriminate against Latinos or people of color?

9  A.  Yeah.  It's not the same thing, right?  So you might have

10  offices that are able to -- where you have people in that

11  office who can speak Spanish and you might have other offices

12  where they don't.  And just because someone doesn't speak

13  another language doesn't mean -- or and some office can't

14  easily respond to an email written in a foreign language

15  doesn't mean that they have intent to discriminate against

16  those people.  If that were true we would, I guess, all have

17  intent to discriminate against all kinds of people who don't

18  speak the same language as us.  It's a bizarre interpretation.

19  Q.  Now, in Dr. Grose's audit study he indicates that the

20  emails were intended to be identified by the legislative

21  office as coming from constituents.  Was there anything in the

22  emails that would indicate or show to the recipient of the

23  emails that the email was coming from one of their

24  constituents?

25  A.  To be honest I don't recall looking at the emails and I

MARK HOEKSTRA - DIRECT

1  don't recall if they were in his report or not, and so I'm not
2  sure -- I'm not sure I can answer that.
3  Q.  All right.  In Dr. Grose's audit study he used the name
4  Jacob Smith as a proxy for Anglo senders of the email.  Did
5  that seem appropriate or did that seem like a flaw to you?
6  A.  Yeah, I mean, one of the things that you would want to do
7  is, you know, you want to pick -- you would want to pick names
8  that are similar on all other things like socioeconomic
9  status, but are as different as possible with respect to
10 perceived race.  And Smith, you know, there are obviously lots
11 of minorities with a name Smith as well, and so to what
12 extent -- to my knowledge in his report he didn't document the
13 extent to which this as great proxy or not, but is it a less
14 Hispanic name like then the name he was using for Hispanics,
15 like certainly, you know, is this the best choice he could
16 have made, like perhaps, not just because of there are
17 certainly whiter names for example than Smith.
18 Q.  Dr. Hoekstra, did you identify any errors in the
19 mathematical interpretation of the results of Dr. Grose's
20 audit study?
21 A.  Yeah.  So one of the big problems -- one of the big
22 problems is that he reports the difference in response rates
23 for supporters of SB 1.  In his report I believe he said
24 that -- that the difference in response rates for the
25 nonsupporters was not statistically significant.  That's not

MARK HOEKSTRA – DIRECT

1  true.  And in fact he didn't even show the difference in

2  response rates for nonsupporters.

3      If we scroll to my table we can —

4  Q.  Yeah, let's look at Table 1 on page 7, paragraph 11 in

5  State Defendant's Exhibit 6.

6          THE COURT:  We've got to break here.  Make sure you

7  let him finish the question before you answer because she

8  can't take the two of you talking at the same time.

9          THE WITNESS:  Fair enough.  I'm sorry.

10         MR. BRYANT:  No problem.

11  BY MR. BRYANT:

12  Q.  Could you explain to the Court what Table 1 shows?

13  A.  Yeah.  So Table 1 as a replication using the data that

14  Professor Grose provided to me.  And so essentially in, you

15  know, in column 1, this is a pure replication of what he

16  reported in his paper, and what it shows is that supporters of

17  SB 1 were 29.4 percentage points less likely to respond to a

18  Spanish email than an English email.  And that is, as he

19  reported, that is statistically significant.  You wouldn't

20  have expected to see a difference that large due to chance.

21      What he didn't show you is what's in column 2, and then

22  also what's in column 4, which is just a different way of

23  measuring the response, you know, the first two columns are

24  looking at did they respond at all and the second two columns

25  are trying to classify that response as helpful or not.

1      And what he didn't tell you is that the nonsupporters were
2  22.4 percentage points less likely to respond to a Spanish
3  email than an English email.  That's not supershocking because
4  after all it's written in a different language.  So if he were
5  to apply this test, which to be clear, I think is like very,
6  very wrong, but if you were to apply this test and infer
7  intent to discriminate on the basis of response rates to
8  Spanish versus English emails, then he should also be
9  inferring that nonsupporters of SB 1 have intent to
10  discriminate against Hispanic has well.
11      Now, I don't believe that's true because the test is wrong
12  for the reasons I laid out, but it's — it's not a good thing
13  to not show that result.  And he didn't show it and in fact he
14  didn't — he said that it wasn't statistically significant,
15  and that's not true.  It is significant at the 5 percent level
16  as I indicate in this table.
17  Q.  Dr. Hoekstra, you indicated, you pointed out columns three
18  and four are headed quote, helpful response.  Was that your
19  determination of what was a helpful response or Dr. Grose's?
20  A.  That's Dr. Grose's.  I used the exact same outcomes as he
21  used, I used the exact data that came from him, and I'm just
22  showing you everything instead of only showing you what he
23  showed, which was column 1 and column 3.
24  Q.  Okay.  About two-thirds of the way down the page on
25  Table 1 on the left is the question "is the effect of

1  receiving Spanish email statistically different for supporters

2  of SB 1," meaning those who voted for it, "versus

3  nonsupporters of SB 1," meaning those who voted against SB 1,

4  and what was your conclusion?

5  A.  Yeah.  So the conclusion is that formally you can't reject

6  the null hypothesis that those two estimates, those two

7  reductions in response rates are equal to each other.  And

8  again, what that means in English is that these two groups,

9  supporters and nonsupporters, were statistically similarly

10 unlikely to respond to Spanish emails versus English emails.

11     Again, if you were to give that his incorrect

12 interpretation, then you would have to conclude that

13 essentially everyone had intent to discriminate against

14 Hispanics including nonsupporters.

15 Q.  Now, are your conclusions on that line directly contrary

16 to the conclusions asserted by Dr. Grose?

17 A.  I don't know that he formally asserted that — that the

18 answers were — or that the estimates for these two groups

19 were statistically different, but if he didn't say it directly

20 he certainly seemed to imply it, and certainly what he said

21 about the difference not being statistically significant, you

22 know, that's just not true.  The difference for nonsupporters.

23 Q.  Could we look at paragraphs 14 and 15 of Exhibit 6.

24     These are paragraphs from your report in response to

25 Dr. Grose's 2022 report?

4692

MARK HOEKSTRA - DIRECT

1  A.  Yes.

2  Q.  Could you explain your conclusions as set forth in

3  paragraphs 14 and 15?

4  A.  Yeah.  In paragraph 14 I'm saying that what he didn't tell

5  you is that the response rates to Spanish emails were also

6  lower for nonsupporters and were in fact statistically similar

7  to the difference in response rates among supporters which,

8  you know, he emphasized the latter and left out the former.

9      And paragraph 15, you know, can audit studies be useful to

10  get at causality?  Yes, they can, but you need to take

11  seriously the things that can go wrong with them.  And even if

12  he had implemented the audit study correctly there are things

13  that can go wrong, for example the people who respond aren't

14  the legislators themselves.  And also, you know, what he

15  would, in his own work he would refer to as resource issues,

16  that maybe some office are better resourced than others to

17  respond to, you know, to respond to say Spanish emails versus

18  English emails.

19      And, you know, and also this partisanship thing that maybe

20  offices are more likely to respond to emails that they believe

21  are written by their constituents or by their supporters

22  rather than their nonconstituents or their nonsupporters, and

23  that was not bias or it's not ethnic bias, it's not racial

24  bias, it's a confounder.  And he, you know, he didn't deal

25  with those issues that you would have even if you had just

1  randomized name.  And instead of he introduce he had an

2  additional confounder, language.  And then inappropriately to

3  say the least, interpreted differences in response rates to

4  Spanish versus English emails as evidence of intent to

5  discriminate.

6  Q.  Dr. Hoekstra, have you reviewed studies published or

7  described by Dr. Grose that did not contain these problems

8  that you've just described?

9  A.  I have.

10  Q.  Could you describe an example of Dr. Grose's work that did

11  not contain these problems?

12  A.  Yeah.  So one thing that I saw after his deposition, I

13  became aware of it is he has a study, I believe the first few

14  words are "doubling down," where he performs audit studies.

15  And one of those audit studies he ran — well, in those audit

16  studies he randomized both name and language.  And he's very

17  transparent.  If you were to read that study it would look an

18  awful lot like my report because he's very transparent and

19  frankly correct about how he interprets those things and he

20  says well, even when we just compare within the English

21  language we've got to worry about these other issues like

22  partisanship or whether I believe someone is my constituents.

23  He talks about those kind of problems that can arise, which he

24  never discussed in his report here.  And when he randomized

25  language he recognized that once you introduce a difference in

1  language across these two groups you're picking up the effect
2  of language as well, which I believe he terms it like resource
3  constraints.
4      And so, you know, he's — Professor Grose knows how to do
5  this right.  It's not — frankly, it's not really complicated
6  to understand how to interpret these audit studies and how to
7  implement them in the best way possible.  He's done that in
8  his own work and there's a really big contrast in how he
9  discussed, you know, the audit studies in that paper compared
10 to how he discusses them in his report here.
11     For example, he never uses the term "intent to
12 discriminate" in his academic paper.  He uses it all the time
13 here.  And of course, you can't infer intent anyway, inferring
14 intent is always hard.  And of course as we've talked about,
15 there are other things that can go wrong with the audit
16 studies as he chose to implement it and use it in this case.
17 Q.  You mentioned that you became aware of this study by
18 Dr. Grose when you read his deposition.  Was that his
19 deposition in this case?
20 A.  That was his deposition transcript in this case, yeah.
21 Q.  And did you notice whether or not that study that you have
22 just described was an exhibit to his deposition in this case?
23 A.  I don't recall.  I recall that it came up during the
24 deposition and he was asked, you know, what — have you done
25 audit studies like this, and he was saying yes.  And one of

1  the studies, you know, he mentioned was this one, and I hope I

2  got the name right, but that's how I became aware of it.  I

3  hadn't become aware of it before that.

4  Q.  Dr. Hoekstra, your report that's Exhibit 6 discuss the

5  distinct between correlation and causation.  Could you explain

6  how that distinction is relevant to your assessment of the

7  validity or invalidity of Dr. Grose's audit study?

8  A.  Yeah.  So here we clearly have this correlation between,

9  you know, between the likelihood of responding and the emails

10  written in Spanish or English, right?  And then of course what

11  we want to do is we want to infer from that something about,

12  well, was this caused by, you know, by racial animus, was this

13  caused by intent to discriminate.  Professor Grose

14  inappropriately makes that leap even though there are many

15  things that are wrong with making that leap in this case which

16  we've laid out.

17  Q.  Let's look at paragraph 9 of Defendant's Exhibit 6.

18      You mention here a study, an audit study that was written

19  by two economists.  Could you explain the significance of that

20  study to your evaluation of Dr. Grose's audit study.

21  A.  Yeah.  So this study, you know, if it wasn't the first, it

22  was certainly the highest profile example of an audit study

23  where name is randomized to try to get at — to try to get at

24  bias and responses, and this is in the context of employment.

25  And so what they did is they randomized names.  The title of

4696

MARK HOEKSTRA - DIRECT

1  the paper actually sums it up quite nicely, Are Emily and Greg

2  more employable than Lakisha and Jamal.  And so they're

3  looking at whether employers were more likely to call back

4  applicants, you know, who are named Emily and Greg than

5  applicants with otherwise similar resumes who were named

6  Lakisha and Jamal and other similarly, you know, Black

7  sounding names.

8      And then they did a lot of work to try to figure out,

9  okay, if we see a difference in response rates, you know, is

10 that due to bias or could that be due to something else.

11 Q.  And how was the design of that study critically different

12 than the design of the audit study on which Dr. Grose relied

13 in this case?

14 A.  Yeah.  So what Dr. Grose did is he didn't just change the

15 names to cue ethnicity, he changed the language as well.  And

16 so now all the things that you would have worried about

17 before, like is this just about the fact that we think

18 Hispanics are more likely to be our constituents or is this

19 about the fact that we think they are more or less likely to

20 be our supporters, those things are all there, and you've got

21 to deal with those, but then he introduced this other

22 confounder which is language, and so now you're picking up

23 this, you know, the effect of language as well, and he doesn't

24 even acknowledge that even though he has in his previous

25 economic work, which is bad.

4697
MARK HOEKSTRA - DIRECT

1  Q.  And what is the effect of the difference in the design of
2  Dr. Grose's audit study as compared to the one cited in
3  paragraph 9, what is the effect of that difference on the
4  validity or invalidity of the conclusion Dr. Grose drew from
5  his audit study?
6  A.  Yeah.  It means that what he's inferring is wrong.  It's
7  at least unfounded.  There's no good evidence for it, and
8  because he hasn't ruled out language and other factors as
9  being the drivers of that difference that we see.
10  Q.  Let's look at paragraph 10.
11      In the second sentence on paragraph 10 you make a point
12  about the conclusions that the 2004 study, how they describe
13  their conclusions as opposed to the way Dr. Grose did.  Could
14  you explain that significance?
15  A.  Yeah.  And so, you know, one is this the language, right,
16  so when they are describing, you know, their results there,
17  they're careful to say well, this is, you know, we're seeing
18  evidence of differential treatment by race.  They're not
19  calling that, you know, animus.  They're not calling that
20  intent to discriminate.  And they're not doing that because
21  they don't — they don't know that.
22      They're also, you know, again taking seriously this issue
23  of interpreting call back rates.  You know, for example they
24  worry about perhaps that, you know, in the labor context
25  perhaps that employers are less likely to call back Black

MARK HOEKSTRA - DIRECT

1  people or people with Black sounding names because they think
2  they are less likely to take the position and things like
3  that.  And so there's other potential interpretations and the
4  authors of that study are taking those seriously and
5  acknowledging them and attempting to speak to them.  And the
6  same, you know, the same problems are there in the context of
7  the audit study that Dr. Grose used, plus one.  The additional
8  one being, of course, language and, he doesn't acknowledge any
9  of those issues and doesn't attempt to address them at all.
10 Q.  Did Dr. Grose discuss any possible alternative
11 interpretations of the data that he obtained in his audit
12 study?
13 A.  Not to my knowledge.  He was pretty bold and assertive in
14 stating this was Gold Standard evidence of intent to
15 discriminate against Hispanic.
16 Q.  In summary, what's your professional opinion as to the
17 probative value, if any, of the results of Dr. Grose's audit
18 study regarding the presence or absence of intent to
19 discriminate against Latinos or other people of color in SB 1
20 or the Texas legislators who voted to approve SB 1?
21        MR. WATKINS:  Objection, Your Honor.  Calls for a
22 legal conclusion.  What's the probative value?
23        THE COURT:  That's overruled.
24        THE WITNESS:  Can you ask the question one more time?
25 I get distract by the objections.

MARK HOEKSTRA - DIRECT

1          MR. BRYANT:  Sure.  No problem.

2    BY MR. BRYANT:

3    Q.  In summary, what's your professional opinion as to the

4    probative value, if any, of the results of Dr. Grose's audit

5    study regarding the presence or absence of intent to

6    discriminate against Latinos or other people of color in SB 1

7    or the Texas legislators who voted to in favor of SB 1?

8    A.  Yeah.  The results of that study have no value for

9    assessing intent to discriminate.  The only thing we learn is

10   that legislators were less likely — legislators and both

11   supporters and nonsupporters were less likely to respond to

12   Spanish emails, which can be for all sorts of reasons, most

13   notably because they were in Spanish and not English.

14   Q.  Dr. Grose's report also discussed SB 1's, what he

15   described as "surgical and intentional targeting of Harris

16   County" as a possible evidence of intent to discriminate

17   against Latinos and other people of color.

18        Did you review Dr. Grose's opinion on that subject?

19   A.  I did.

20   Q.  Did you identify any errors in his assertion or the data

21   cited by Dr. Grose to support his opinion?

22   A.  Yes, I did.

23   Q.  Could you explain those errors that you identified for the

24   Court, starting with the error discussed at paragraph 17 on

25   page 9 of Defendant's Exhibit 6.

MARK HOEKSTRA - DIRECT

1    Could you please bring paragraph 17 up.

2    So please take a moment to review paragraph 17, and then

3    please explain to the Court what problem it identifies in

4    Dr. Grose's opinion?

5    A.    Yeah.    In Professor Grose's report he talked a lot about

6    Harris County.    He mentioned Harris County a lot in that

7    report.    But his actual data indicate that there were three

8    counties with a population of over 55,000 who were impacted by

9    these restrictions on, I believe it was –– I believe it was

10   early voting hours, if I recall correctly.    And those counties

11   were Hunt and Hardin counties.    I don't think he ever

12   mentioned the name of those counties in his report.    And he

13   certainly also didn't mention that those counties were

14   predominantly White.

15   And so, you know, he's arguing that there's this surgical

16   precision that this was targeting Harris County and he managed

17   to leave out the other two counties that were impacted by it

18   which happened to not be as diverse, to actually be less

19   diverse than Texas as a whole.

20   And of course there's more problems than just that, but

21   those are the problems that I'm laying out in that paragraph

22   there.

23   Q.    Okay.    Let's go to Table 2 on page 12 of State Defendant's

24   Exhibit 6.    All right.

25   Please take whatever time you need to review Table 2, and

1  then I'd ask you to just describe what it shows to the Court.

2  A.  Yeah.  So my philosophy on this whole thing generally is

3  I'm just going to try to show you everything, including stuff

4  that Grose showed, but also stuff that he didn't.  And so, you

5  know, he made much of in column 2, you know, Harris County is

6  more demographically diverse than Texas as a whole, that's a

7  true fact.

8      What he left out, what I just talked about is counts three

9  and four show that Hunt and Hardin counties are actually less

10 diverse than Texas as a whole, and SB 1 is also binding on

11 them.  So this idea that it's surgical precision even amongst

12 counties with more than 55,000 people, it's not.  You wouldn't

13 want that surgeon.

14     The other thing is he inappropriately left out these

15 counties with less than 55,000 people, even though their hours

16 were also impacted by the same restrictions that he's talking

17 about.  And in his data he identifies, you know, what those

18 counties were.  And so I identify there's 21 of those counties

19 per his own data, and so the issue there is that those

20 counties also, as you can see from column 5 which is where

21 each county is receiving equal weight in computing these

22 numbers, you know, 91 percent White, 53 percent White

23 non-Hispanic.  In other words, those counties are also more

24 White, less diverse than Texas as a whole.  And per his own

25 coding, his own classifications, SB 1 was binding on their

MARK HOEKSTRA - DIRECT

1  early voting hours as well.  And he didn't mention that and he
2  left that out.
3  Q.  What does column 6 show as compared with column 5?
4  A.  Yeah.  So there's three different ways of doing this, and
5  so again, you know, my philosophy, I'm going to try to show
6  you everything and every reasonable way of doing it.
7      Count six, what we're doing is instead of giving equal
8  weight to each of the -- in that case each of the 21 counties,
9  what we're doing is weighing by population.  And so if a
10 county is bigger we're going to give them more weight.  I
11 think, you know, there's going to be some differences
12 obviously, when you weight large counties, a little bit more
13 than small counties.  Which one is appropriate?  I mean the
14 reason I put them in there is because I'll let the judge
15 decide ultimately, right, and so when you assign equal weight
16 it's probably most relevant if you're worried about local
17 elections, things like the county level.  Why might you want
18 to weigh by population?  Well, to the extent that you're
19 worried about statewide elections, obviously no more counting
20 votes, and if you're a small county you don't matter quite as
21 much as if you're a larger county with more people.  I'm
22 showing it both ways.
23     And again, here really the answer is, no matter how you do
24 that, overall the counties that he's not talking about which
25 are also impacted, they are less diverse than Texas as a

1  whole.

2      So again, this idea that we had surgical precision

3  targeting a diverse county, it's not true.

4  Q.  Let's look at paragraph 21 on page 11 of Exhibit 6.

5      Please take whatever time you need to review paragraph 21.

6  A.  Yeah.  Essentially what it's saying is in Professor

7  Grose's report he's making a really big deal out of one county

8  out of 24 that per his own data he's saying were impacted by

9  the early voting restrictions.  Harris County is more diverse

10 than Texas as a whole, but he's ignoring the other 23

11 counties.  And in fact, those counties in general are much

12 less diverse than not only Harris County, but also than Texas

13 as a whole.  And so this idea that it was surgically targeting

14 Harris County, well, it impacted 24 counties, most of which

15 were not very diverse.

16 Q.  In his report did Dr. Grose express an opinion that SB 1

17 has led to a reduced Latino or nonwhite percentage of mail

18 voting?

19 A.  Yeah, I believe it does.  We need to probably go to that

20 part of the report so I can have a better recollection.

21 Q.  Paragraph 3 on page 15 of Exhibit 6.

22     Please take whatever time you need to review this table

23 and then could you tell the Court what it depicts or shows?

24 A.  Yeah.  Well, unfortunately we got to the one table where I

25 made a mistake and I kept the wrong column in column 2, and so

1  one of the corrections which I'm not sure where we're at with

2  that, but one of the corrections corrected this, and I don't

3  know if that means we've got to go back to it or I can more or

4  less tell you what the corrected version says you if you like.

5  Q.  Tell, you what, if you know what the corrected version

6  shows, please testify to it.  If not, we can go ahead and pull

7  that one up and have it before you as you testify.

8  A.  Yeah.  The main gist of it is that he has this method, you

9  know, he has a certain statistical model that he's using to

10  try to explain early in-person turnout, and so — and so that

11  is what it is.  There are problems with that model, and

12  essentially it's using a method that's not very good.  And the

13  reason it's not very good is because in order to get it right

14  you need to be controlling for all the other things across

15  counties that can impact turnout, and in general that's a

16  really tough sales pitch to make to anybody, right, to say

17  that we can control for all the other things, we can control

18  for all the factors that impact early in-person turnout,

19  that's a tough sell in general.

20      When I teach my students this I say you're not going to

21  make a living doing that, you're going to get beaten up.

22  That's the first problem.

23      But even if we were to accept that approach, if you say

24  well, the main thing that we worry about is total turnout, the

25  method of voting is arguably less important than does it just

MARK HOEKSTRA - DIRECT

1   impact people's votes overall.  And what the corrected version
2   of this table shows is that if you were to use all the
3   counties and look at total turnout using the exact same model,
4   then he would have to conclude that SB 1 actually increased
5   total turnout.
6        And which to be clear, I don't think that's correct, at
7   least, I don't think that's good evidence because the model is
8   a tough sell for the reasons I discussed.  But if you want to
9   believe that model in his case, then you would also have to
10  believe that SB 1 increased total turnout, and the corrected
11  version of this table makes that clear.
12  Q.  Okay.  We'll come back to that —
13  A.  Fair enough.
14  Q.  — and clarify it.
15       Did Dr. Grose anywhere in his report examine the effect of
16  SB 1 on total voter turnout?
17  A.  I don't believe he did, and that was one of the problems
18  is there can be substitution across voting methods and you
19  want to take that into account if you're trying to get at, you
20  know, whether SB 1 has a burden.
21  Q.  Did you analyze whether SB 1 decreased or increased total
22  voter turnout in Harris, Hunt, and Hardin counties?
23  A.  I'm going to have a hard time remembering all the results
24  so.
25  Q.  Let's look at Table 4 on page 16 of Exhibit 6.

MARK HOEKSTRA - DIRECT

1       Please take whatever time you need to review table 4 and

2   then please explain for the Court what Table 4 shows us.

3   A.   Yeah.  So Professor Grose is focused only on these

4   counties with more than 55,000 people.  That's an unjustified

5   restriction because, in fact, these restrictions on voting

6   hours, you know, were impacting all counties, not just larger

7   counties.  And so the first column is just a replication of

8   what Professor Grose had in his report.  And what he wants you

9   to conclude on the basis of that column is that the counties

10  that were impacted, and that was Harris, Hunt, and Hardin

11  counties in column 1, they had higher early in-person voter

12  turnout in the November 2020 Election, and he wants you to

13  believe that that's caused by the fact that they had — that

14  they had more expansive hours, I guess, than were allowed

15  under SB 1.

16      There's a few problems with that which I lay out in the

17  rest of — in the rest of the table.  So as I mentioned, one

18  problem is that these restrictions also impacted counties, you

19  know, with less than 55,000 people.  And again, that's not

20  even my judgment, that's coming out of his own classification

21  in his own data.  And when you include, you know, when you

22  look just at those you would actually come to the opposite

23  conclusion using exactly the same model, right?  So if Grose

24  wants to think this is a good model for explaining percent,

25  you know, early in-person voter turnout, if it's a good model

MARK HOEKSTRA - DIRECT

1  in column 1 it ought to be a good model in column 2.  And you
2  would conclude the exact opposite, right, that somehow these
3  additional voting hours caused a reduction in early in-person
4  voter turnout.

5      Again, I don't believe the model, I don't think it's a
6  reliable model.  I don't think it's a good approach for trying
7  to get at causality, and essentially what I'm showing you is
8  if you did think it was true you would have to come to this
9  sort of nonsensical conclusion really.

10     And in column 3 I'm showing you what happens when we look
11  at all the counties instead of making this inappropriate cut
12  on counties with more than 55,000 people.  If you look at all
13  the counties together, and again you run the exact same model,
14  use the exact same coding of the laws that came from
15  Professional Grose himself, you would conclude, you know, that
16  having those additional hours actually caused lower turnout,
17  42.8 percent compared to 51.4 percent, that it lowered it by,
18  you know, by around 7 percentage points.

19     And again, like I don't believe any of this is picking up
20  the causal impact of those hours because there are lots of
21  things that can be different across counties that he's not
22  accounting for, that's why in general it's a tough way to make
23  a living using this type of approach.  But if you want to
24  believe that, then you also have to believe that having those
25  additional hours actually lowered turnout overall -- or sorry,

4708
MARK HOEKSTRA - DIRECT

1  lowered early in-person turnout as well and — yeah,

2  obviously, he didn't show columns two and three in his report

3  even though he should have.

4  Q.   In Dr. Grose's report regarding the possible effect of

5  SB 1 on mail voting as opposed to in-person voting, what years

6  did he use to make the comparison?

7  A.   In this report?

8  Q.   Yes.

9  A.   I don't recall.

10  Q.   Okay.

11  A.   I mean this would be just using the 2020.  I believe

12  that's true.  I believe this would just be using the 2020

13  Election.

14  Q.   Of course, we'll get back to that issue when we look at

15  his 2023 report.

16      Let's look at Table 5 on page 18 of Defendant's Exhibit 6.

17      Please take whatever time you need to review Table 5, and

18  when you've completed it please explain the significance of

19  Table 5 for the Court?

20  A.   Okay.  So the first three columns are essentially a

21  replication of what Professor Grose had in his report, and

22  what he's attempting to show here is that the percent of the

23  mail-in early voting electorate that is Latino fell from 2020

24  to 2022.  And so, for example, in that first row you see it

25  goes from 15.68 percent to 14.19 percent.  The difference

MARK HOEKSTRA - DIRECT

1  which in this case he doesn't explicitly compute in his table,
2  but obviously anyone could do the math, is a drop by
3  1.48 percent points.  And so that's what -- and then he's
4  showing the same thing is true if you look not just at Latino,
5  but nonwhite.
6      So what he's arguing is well, I believe that that
7  difference from -- he believes, Professor Grose believes that
8  the difference from 2020 to 2022 was caused by SB 1.  Of
9  course this is, you know, this as causal inference problem.
10  Lots of things could change from 2020 to 2022, and so there
11  are potential issues with that.
12      But one of the things that he doesn't point out at all in
13  his report is whether or not this is the type of drop that you
14  could have expected to see by chance and that's, you know,
15  that's, you know, that is are these two estimates, 1.48 and
16  2.15 percent, are those statistically significant.
17  Q.  And did you attempt to determine whether or not
18  Dr. Grose's reported differences were statistically
19  significant?
20  A.  I did test that and none of them, as I indicated in the
21  note at the bottom of the table, none of those are
22  statistically significant at any conventional level,
23  1 percent, 5 percent, or 10 percent.
24      The second problem, which is like a truly bizarre thing to
25  come across, is that in some of the counties there were no

1    mail-in votes, and so he's defining the outcome as the number

2    of, in the first row, as the number of mail-in votes that came

3    from people he believes are Latino divided by the number of

4    mail-in votes total in that county for that election.  The

5    trouble is his denominator is zero, and somewhere around the

6    third grade most of us learned that anything divided by zero

7    is undefined.  You can't do it.  It's the sort of thing that

8    they stop class for in, you know, middle school or elementary

9    school if a kid does it wrong.

10        And by the way the software won't do it either.  If you

11   ask the software what is zero divided by zero, it will just

12   give you a missing value, right?

13        And what Professor Grose did is he defined it as zero.

14   Which is wrong.  It's literally a violation of like elementary

15   math rules.

16        And what I do in the second three columns is I say okay,

17   given that the outcome as he chose to define it is not defined

18   mathematically, we're not going to break that rule, let's

19   exclude the counties where that's true.  And then I show the

20   estimates, you know, having done that correction.  And what

21   you see is minus, you know .18 percent.  The differences

22   become smaller.  They are also statistically insignificant as

23   they were in his report when he divided by zero.

24        You know, in his deposition he seemed to suggest that it

25   was okay that what he was doing was he wasn't dividing by zero

1  but he was defining the outcome as the numerator for some

2  counties and he was defining it as a fraction for other

3  counties.  You can't do that either.  Like you can't define

4  outcomes differently for some counties than others.  If you do

5  that you literally have no -- you can't interpret the, you

6  know, that fraction that you see that comes out of that.

7          THE COURT:  Yes, sir.

8          MR. WATKINS:  Objection.  Narrative.

9          THE COURT:  Yeah, it is a narrative.  Let's go to Q

10  and A.

11  BY MR. BRYANT:

12  Q.  Dr. Hoekstra, did Dr. Grose express the opinion that the

13  SB 1 caused the percentage of mail-in voting, the voting

14  electorate that is Latino to decline between the 2020

15  Primaries and the 2022 Primaries?

16  A.  He did assert that and he asserted it was due to SB 1.

17  Q.  And what's your opinion as to the validity or reliability

18  of that opinion?

19  A.  It's incorrect.  It's unreliable in part because he's

20  violating a basic math rule when he computed those numbers in

21  part because those, and in part because those changes are

22  consistent with what you would expect to see by chance, and in

23  part because there are clearly lots of things that can be

24  different from the 2020 Primary to the 2022 Primary and he

25  made no attempt to distinguish between the effect of those

1  other factors and the impact of SB 1.

2  Q.  Let's look at State Defendant's Exhibit 5, which is your

3  rebuttal report with respect to Dr. Grose's 2023 opinion.

4      Now, did Dr. Grose, in his 2023 report, compare mail

5  voting by Latinos and non-White Texans in the 2022 General

6  Election to the 2020 General Election?

7  A.  He did.

8  Q.  And did those comparisons lead to the same opinion by

9  Dr. Grose that SB 1 reduced Latino and non-White share of vote

10  by mail?

11  A.  Yes.

12  Q.  What is your opinion as to whether Dr. Grose's conclusions

13  on that subject are or are not reliable and valid?

14  A.  I think again they are unreliable.  We can go through some

15  of the results for why that's the case.

16  Q.  Let's look at Table 1 in Exhibit 5.

17      Please take whatever time you need to review Table 1, and

18  then please explain for the Court the significance of Table 1.

19  A.  Yeah.  So in this case Professor Grose's result is first

20  row, and he's showing that the, again, the Hispanic share of

21  mail-in votes from 2020 to 2022 comparing general elections

22  dropped by 1.7 percentage points.  Again, he didn't report

23  whether or not that's the type of drop that you would expect

24  to see due to chance.

25  Q.  Did you do a determination of statistical significance for

4713
MARK HOEKSTRA - DIRECT

1  the data shown in Table 1?

2  A.  I did.

3  Q.  What was the result?

4  A.  That it's not statistically significant at any

5  conventional level.

6  Q.  All right.  Let's look at -- strike that.

7      Are there -- is there anything else in Table 1 that you

8  believe would be helpful to the Court in assessing this issue?

9  A.  Yeah.  I mean in this case Professor Grose is still

10  assuming -- is still breaking, you know, basic rule of

11  mathematics and assuming that he can define something divided

12  by zero.

13     In this case it doesn't make a practically big difference.

14  That's what I'm showing from the second row to the third row.

15     And, of course, the other point which I'm sure we'll get

16  to is the question of substitutability across voting methods,

17  and he has ignored this issue even though it's a relevant one

18  for assessing burden.

19  Q.  Okay.  Could you explain what you mean by the issue of

20  substitutability?

21  A.  Yeah.  So in a world where you believe that -- well, let

22  me restart.

23     If voters are -- if voters view other forms of voting as,

24  you know, as a perfect substitute or a close to perfect

25  substitute, then even if you make one form of voting more

MARK HOEKSTRA - DIRECT

1  difficult they just switch to the other one and they still
2  vote, and to the extent that they considered that again a
3  perfect or a close to perfect substitute, that would imply
4  that there's little burden on those voters.
5      And it's relevant here because SB 1 is adding, you know,
6  some new rules about mail-in ballots and, you know, if those
7  news rules cause people to be less likely to vote by mail,
8  that by itself doesn't demonstrate any burden.  In fact, if
9  they viewed voting in person as a perfect substitute, they
10 just shift their method of voting and there's no burden at
11 all.  And so Professor Grose doesn't mention this issue at
12 all, but that's why it's relevant.
13 Q.  Okay.  Let's look at paragraphs 14 through 21 of
14 Exhibit 5.
15     Okay, let's move on to -- I think this is the point on
16 statistical significance that you've already made.
17     Would you continue.  Please continue to paragraph 19.
18     Does paragraph 21 summarize your conclusion from Table 1?
19 A.  It does.
20 Q.  Now let's look at Table 2 on page 11.  Table 2 on page 11.
21     Now, in Dr. Grose's 2023 report, did he compare results
22 from 2020 and 2022 and express opinions based on just the
23 comparison of those two years?
24 A.  He did.
25 Q.  Could you explain what Table 2 shows as to the Hispanic

MARK HOEKSTRA - DIRECT

1  share of mail-in votes for a larger group of years?

2  A.  Yeah.  So what table, you know, Table 2 shows, is if you

3  go from 2020 to 2022 and you did have a reduction in the

4  Hispanic share of mail-in votes, now that's what Professor

5  Grose is emphasizing in his report and he is attributing that,

6  you know, casually to SB 1.

7      The basic problem is that there are lots of, as with any

8  question of causality is that there are potentially other

9  things that could have caused that drop as well, and Professor

10 Grose doesn't discuss those things at all.  In this case

11 there's a lot of them.

12     Go ahead.

13 Q.  And in your analysis that led to Table 2, what other years

14 did you examine?

15 A.  Yeah.  So the most obvious other year to use would be 2018

16 because 2018, like 2022, was a mid-term election.  I also

17 looked at 2016.

18 Q.  And what did you learn when you compared the 2018 election

19 and 2016 election to the 2022 election?

20 A.  Yeah.  So his -- if you were to use any other baseline,

21 2016 or 2018 and use the same approach that Professor Grose

22 used, you would conclude that there was an increase in the

23 Hispanic share of mail-in votes.  And this is important in

24 part because again 2020 was a General Election, but also there

25 were a lot of weird things about 2020, and I show it's an

MARK HOEKSTRA - DIRECT

1  outlier for a lot of reasons.

2  Q.  Why do you believe it was an error to use only 2022 to

3  compare with the Hispanic share of mail-in votes in 2022?

4  A.  I do, and that's in part because 2020 was a General

5  Election, 2022 was a mid-term.  We know that different numbers

6  of people turn out and therefore likely different people turn

7  out, we probably have different preferences about voting

8  methods.  In addition, 2020 was in the middle of a pandemic

9  which was a big deal.

10  Q.  And why was it a particular big deal respect to the

11  Hispanic share of mail-in votes?

12  A.  Well, because people, you know, you have a pandemic,

13  obviously, people were scared of being in public places.  They

14  were, you know, they were worried about COVID.  And so the

15  issue then is well, maybe different demographics responded to

16  that differently and, in fact, we know that the risk factors

17  for COVID were different across different populations, and so

18  it's entirely possible that, you know, that in 2020 you had

19  these idiosyncratic factors that drove up the Hispanic share

20  of mail-in votes that you wouldn't see in more normal years.

21  Q.  Would you consider 2022 a more normal year?

22  A.  I think yes, I would.

23  Q.  Let's look at figures one two and three on page 6.  Please

24  review these three figures and then could you explain for the

25  Court what they represent or depict?

4717

MARK HOEKSTRA - DIRECT

1  A.   Yeah.  So if we go back in time we will remember 2020, you
2  know, everybody here knows that it was an unusual year.  Worst
3  pandemic in over a hundred years.  And what figures one, two,
4  and three are showing is that this also, you know, likely made
5  for an unusual year in 2020.  And so Figure 1 is — and we can
6  talk through those.
7  Q.   Please explain what Figure 1 shows and point out where
8  the — what the 2020 result was?
9  A.   Yeah.  So Figure 1 is showing, you know, Texas voter
10  turnout relative to voting age population.  And what you see
11  is that, you know, there's a, you know, there's pretty clear
12  sort of trend and here's a little variation but not a lot.  If
13  you look at the upper right-hand part in red, that shows 2020.
14  Turnout was much higher in 2020 in Texas than it was anywhere
15  else.
16      If you look at Figure 2 —
17  Q.   Let's stick with Figure 1 for a second.  There's a line on
18  Figure 1, and it's indicated to represent, quote, linear fit
19  through 2018.  Could you explain what that means?
20  A.   Yeah.  So basically what I'm doing is I'm just fitting a
21  line using, you know, a typical method for doing that called
22  ^ordinarily squares.  And I'm using all the data through 2018
23  to predict, you know, what would we get, what would we have
24  expected if 2020 had been a normal year and things had sort of
25  stayed on track with previous trends, what would we have

4718

MARK HOEKSTRA - DIRECT

1  expected for turnout, and what that line shows you is that for
2  2020 you would have expected somewhere around maybe 45 percent
3  turnout, and in fact what you saw is somewhere above
4  52 percent.  And so turnout, you know, deviated from trend by
5  a lot.
6  Q.  And does that Figure 1 show total Texas voter turnout
7  including mail-in votes, early votes, in-person and Election
8  Day votes?
9  A.  Yes.
10  Q.  Okay.  Let's look at Figure 2.  Could you explain for the
11  Court what Figure 2 shows us?
12  A.  Yeah.  So this is, you know, among those -- among those
13  votes cast in the Texas elections, you know, what proportion
14  of those votes were cast by mail-in ballot.  And what it shows
15  is that again, you know, there's this historical trend, voting
16  by mail is becoming more popular.  But then in, you know, in
17  2020 you saw many more votes, a much higher proportion of
18  votes being cast by mail-in ballot than you had previously.
19  And then more than you would have expected due to historical
20  trend.
21      What you see then in 2022 is 2022, things kind of reverted
22  back to what you would expect.  And in 2022 that dot is almost
23  right on that line, which is what you would have expected if
24  things should have just followed previous trends.  And this as
25  issue an obviously when we start comparing 2020 to 2022

MARK HOEKSTRA - DIRECT

1   because we certainly — these two years were incomparable for

2   other obvious reasons due to the pandemic.

3   Q.  And so Figure 2 shows a number for 2022, Figure 1 doesn't.

4   Is that because 2022 was not a Presidential Election year so

5   it didn't meet the criteria for inclusion in Figure 1?

6   A.  Yeah, that's right.  So, you know, there's a big

7   difference from, you know, presidential years to mid terms and

8   turnout, and so when, you know, I'm looking at 2020, that's

9   obviously a presidential year.  And so when you look at

10  anything related to turnout, it's easier to make sense of

11  things when you only compare within years of the same that are

12  either presidential or mid term, so Figure 1 is just

13  presidential.

14  Q.  We discussed that Dr. Grose compared Latino and non-White

15  mail-in ballots just for 2022 as compared to 2020?

16  A.  Right.

17  Q.  If he had used any year other than 2020 or the average of

18  the previous years, would he have been able to reach the

19  conclusion that there was a decrease in a Latino share of the

20  mail-in vote?

21  A.  No, I mean — no.  What this shows is you saw a reduction

22  in mail-in votes cast in general, but I think it would be a

23  mistake to say the only thing that changed between 2020 and

24  2022 was SB 1.  A lot of other things were different as well.

25  Q.  Could you explain Figure 3 for the Court?

1  A.  Yeah.  So this is showing the proportion of votes cast

2  early in person.  Again, we see this increasing trend is

3  becoming, you know, more popular to vote in person early.

4  2020, you know, again as outlier year.  People were much more

5  likely to vote early.

6      And then in 2022 things reverted back more or less to what

7  you would have expected based on historical trends.

8  Q.  Let's take a look at Figure 4 on page 12.  Could you

9  explain what Figure 4 shows?

10  A.  Yeah.  So again, Figure 4 is showing Hispanic share of

11  mail-in ballots and it's showing what was true in 2016 and

12  2018, but then also, you know, in 2022 this figure makes it

13  clear that yes, if you do the comparison that Professor Grose

14  would have you do, you see a drop from 2020 to 2022.  He

15  attributes that to SB 1.  Of course a lot of things were

16  different between 2020 and 2022.  If he had chosen a different

17  baseline year such as 2018 he would have concluded the

18  opposite.

19  Q.  What's your opinion as to whether Dr. Grose's reports and

20  opinions in this case provide any reliable or valid evidence

21  that SB 1 reflects any intention by the Texas legislature to

22  discriminate against Latinos, African-Americans, or any other

23  racial or ethnic respect group?

24      MR. WATKINS:  Objection.  Calls for legal conclusion.

25  Begs the province of the Court.

4721
MARK HOEKSTRA — DIRECT

1          THE COURT:  That's overruled.

2          THE WITNESS:  I don't believe he offers any reliable

3  evidence for that conclusion.

4  BY MR. BRYANT:

5  Q.  What's your opinion as to whether Dr. Grose's reports and

6  opinions in this case provide any reliable or valid evidence

7  that SB 1's mail vote ID requirements had any disparate

8  negative impacts on mail voting in Texas in 2022 as to Latinos

9  or any other racial, or other racial or ethnic group?

10          MR. WATKINS:  Same objection.

11          THE COURT:  Same ruling.

12          THE WITNESS:  I don't believe he provided any

13  reliable evidence in support of that assertion.

14          MR. BRYANT:  Your Honor, we're going to move on to

15  the next expert.  Would this be appropriate time for a morning

16  break?

17          THE COURT:  Yeah.  Thank you.  Let's take a 10 or 15.

18      *(Recess)*

19  BY MR. BRYANT:

20  Q.  Dr. Hoekstra, let's talk about your rebuttal reports to

21  the opinions of Dr. Eric McDaniel.  Your rebuttal reports have

22  been admitted into evidence as State's Defendant's 9 and 8.

23      Let's look first at Exhibit 8 — Exhibit 9, excuse me,

24  which is the 2022 rebuttal report.  Did you reviewed

25  Dr. McDaniel's 2022 report?

MARK HOEKSTRA - DIRECT

1  A.  Yes.

2  Q.  And did Dr. McDaniel express opinions regarding the

3  effects of SB 1 on absentee voting by blacks in Texas?

4  A.  He did.

5  Q.  Did you arrive at any opinions based on your analysis as

6  to whether or not Dr. McDaniel's opinion on that subject were

7  reliable or valid?

8  A.  Yeah.  Overall I find his opinions on that subject to be

9  unreliable, and we can layout the reasons in detail.

10  Q.  We will do that.  Before the break we discussed

11  Dr. Grose's use of only 2020 and 2022 as points of comparison

12  did Dr. McDaniel do something different?

13  A.  Yes.  This is a big issue in Professor McDaniel's report.

14  Q.  Could you explain that?

15  A.  Yeah.  He's looking at data from 2020 and attempting to

16  make various points with that.  And one of the big things I do

17  in my report is show that in some cases you get the exact

18  opposite answer if you were to look at 2018 or 2014, and in

19  2016 in general the relationship is much weaker than he would

20  have you believe based on his report.

21  Q.  Let's look at Table 1 on page 3 of Defendant's Exhibit 9.

22     Please take whatever time you need to examine Table 1 and

23  then please explain to the Court what Table 1 shows us?

24  A.  Yeah.  So this is showing, you know, the proportion of

25  text and voters who voted absentee, and it's showing it, you

MARK HOEKSTRA - DIRECT

1  know by, you know, by election year and then also by race and
2  ethnicity.  It's all coming from this survey that's commonly
3  used in political science.
4  Q.  And could you explain the significance of column 5 and
5  column 6?
6  A.  Yeah.  So the big issue — well, so the big issue is that
7  in Professor McDaniel's report, he's only showing results for
8  2020.  I believe he like footnotes 2016 and mentions it sort
9  of casually, but everything is focused on 2020.  For reasons
10 we laid out earlier, 2020 was an unusual year.
11     What I'm showing in column 5 is if we compare across all
12 the election, so in 2014, '16, '18' and '20, how different
13 were these absentee voting rates, you know, by race.  And then
14 what if we look at only 2016 and 2018, which were again both
15 the presidential and a mid-term year, and frankly that were
16 not impacted by the pandemic, and so are likely much more
17 relevant for projecting, you know, going forward what is
18 typical in Texas elections.  And essentially what you see is a
19 distinctly different pattern than what you would see in 2020.
20 Q.  I promised the court reporter I wouldn't use that word on
21 the last line of your note, so I won't.  And I won't even ask
22 you to explain that unless you feel it's necessary for the
23 Court to understand it could.
24     You explain what you mean by the line that is denoted as
25 "observations."  It's I believe the fourth line?

4724

MARK HOEKSTRA – DIRECT

1  A.   Sure.  So observations is the number of survey respondents

2  in that particular year.  The number of people in the sample

3  that we're using to create the numbers above that.

4  Q.   Okay.  And could you explain the significance of the next

5  line as to whether are whites and blacks statistically

6  different?

7  A.   Exactly.  So a big, you know, point of emphasis in

8  Professor McDaniel's report is that Black non-Hispanics were,

9  you know, more likely to vote absentee than, you know,

10 White —

11 Q.   In what years or comparison of years?

12 A.   His analysis is focused almost entirely on 2020.  Again,

13 he mentioned I think sort of casually 2016, but 2020 was the

14 main, you know, the main results that he showed.  And so I

15 show in column — in the highlighted column that sure enough,

16 in 2020 there was a statistically significant difference in

17 the percent of Texans who voted, you know, Texan voters who

18 voted absentee in 2020 between Black and White.

19      In other words, that 20.1 percent versus the 13.4 percent,

20 you would not expect to see a difference that large due to

21 chance.  The problem is, if you look in 2018, you see, yeah,

22 there's a small difference but it's consistent with what you

23 would expect to see by chance.  If you look at 2016, that

24 difference is also not significant at the 5 percent level

25 between 12.3 and 8.5 percent in 2014.

MARK HOEKSTRA - DIRECT

1    In 2014 it is, although I would note that in 2014, White
2   voters are more likely to vote absentee than Black voters.  In
3   other words, it's the exact opposite result as the result that
4   Professor McDaniel is emphasizing in column 4, and so, again,
5   in the last two columns I'm saying well, let's not, you know,
6   let's not just pick one year, particularly let's not pick one
7   year that's the most unusual year in recent memory, and which
8   we've shown to be an outlier.  What if we group 2014 through
9   2020 altogether, and in fact the difference that you see in
10  the outcomes, the percent of text and voters who voted
11  absentee is not statistically significant.  And if you look at
12  the last two normal elections in Texas, which were 2016 and
13  2018, you also see no statistical difference in the propensity
14  to vote absentee between Black and White voters in Texas.
15  Q.  Okay.  Looking at Table 1, does it appear that Black Texas
16  voters tend to vote absentee at a higher percentage in
17  presidential years than do White non-Hispanic Texas voters?
18  A.  Yes.
19  Q.  And does it appear that in nonpresidential years, on this
20  chart, 2014 and 2018, Black non-Hispanic Texas voters appear
21  to vote absentee in lower percentages than White non-Hispanic
22  Texas voters?
23  A.  Yes.
24  Q.  Does that suggest that the differences in Black and White
25  absentee voting may be related simply to whether a particular

1  year is Presidential Election year or not?

2  A.  It certainly looks that way.  And certainly projecting

3  forward if we only had Presidential Election years, it might

4  be reasonable to focus only on Presidential Election years.

5  but since we're going to have both Presidential Election years

6  and mid terms going forward, seems sensible to look at them

7  both, and McDaniel did not.

8  Q.  Let's look at the next line down from the currently

9  highlighted line.  Are White and Hispanic statistically

10 different?  Could you explain what that shows?

11 A.  Yeah.  So again, in 2020 they were not, so the

12 13.4 percent compared to the 11.2 percent is consistent with

13 what you would expect to see due to chance, but in every other

14 election year, the years not emphasized by Professor McDaniel,

15 you actually do see a difference and specifically, you know, a

16 smaller share of Hispanic voters are voting by mail in

17 typical, you know, in Texas elections.  And so what happens

18 when you put it altogether, in column 5 looking across all

19 four years, what you see is Hispanics are statistically less

20 likely to vote absentee, so if you're worried about having

21 this big impact on Hispanics, it's actually the opposite way.

22 And if we said 2020 is problematic because we it's an outlier

23 for a lot of reasons, if we just look at the two most recent

24 elections before 2020, what you would see is again Hispanic

25 voters are less likely to vote, you know, vote absentee

MARK HOEKSTRA - DIRECT

1  compared to White voters.  That's 9.2 versus 5.2 percent.  And

2  that highlighted column is saying you would not have expected

3  a difference this large due to chance, we think that's real

4  essentially that White and Hispanic voters are doing something

5  different.  Hispanic voters are just less likely to vote by

6  mail.

7  Q.  And all of this data is prior to SB 1 being in existence?

8  A.  Correct.

9  Q.  Okay.  Now, let's look at paragraph 7 of this exhibit.

10      Now, in paragraph A, I think you cover the point that we

11  have just discussed.

12      Could you move on to subparagraph B -- Okay.  Let's go

13  back up, I'm sorry.  I didn't -- let's go back up to -- there

14  you go.  All right.

15      Now, you discussed some additional findings.  Referring

16  subparagraph 3III to what to you as is a simple interval

17  regression model, could you explain what you mean by that and

18  what you learned from using it?

19  A.  Yeah.  So a big part of Professor McDaniel's report was

20  about whether or not Black voters are waiting longer to vote

21  than White voters.  He's using, you know, a different model,

22  and frankly a model that's a little bit harder to interpret

23  and a model that doesn't use all the information that you

24  have.  And so one of the things that it's hard to get a feel

25  for, if you were to read McDaniel's report is just how

MARK HOEKSTRA - DIRECT

1  different are the average weighting times for, you know, Black
2  voters versus White voters in Texas.  And so what I do is use
3  an interval regression model which is literally like it's
4  designed for data like this where you'll ask people a question
5  and they will say I didn't wait at all, or I waited zero to
6  ten the point minutes or ten to 30 minutes, or 30 minutes to
7  an hour, or more than an hour, right?  And essentially the
8  model that he's using doesn't account for the fact that we
9  have these intervals and we know what they mean.  We know what
10  ten to 30 minutes means, it's in between 10 and 30, and the
11  interval regression model just takes that into account, and
12  it's been around a long time.
13      It's not that the model he uses is wrong, it's just not as
14  informative as this one because it's not using all the
15  information that's there.  And when you use that simple
16  interval regression model, what you see is that even the
17  differences that he's emphasizing, on average you're talking I
18  think it's 2.7 minutes in 2020, where Black voters waited
19  longer than White voters an average of 2.7 minutes.
20      And again, one of the problems there as well is he only
21  looked at 2020, he didn't look at other years.  I show results
22  for all those years.
23  Q.  All right.  Before we get any further on the wait time
24  issue, could we look at Figure 4 on page 9 of Exhibit 8.
25      Okay.  Could you review Figure 4 and then explain for the

MARK HOEKSTRA - DIRECT

1  Court what this depicts?

2  A.  Yeah.  So what this shows is it shows voter turnout, you

3  know, in Texas and Texas is given by the blue line versus

4  everywhere else in the country excluding Texas.  And what it

5  shows is that in general what happens in Texas is Texas is

6  tracking the U.S. pretty well.  So obviously, you know, the

7  sawtooth pattern here is driven by the fact that turnout in

8  mid terms is lower than turn out in presidential years.

9      And, you know, the most important part of this figure is

10  when you compare 2020 to 2022, much of what McDaniel is doing

11  is he's arguing that we saw this reduction in voting from 2020

12  to 2022, and he's attributing that causally to SB 1.  That's

13  inappropriate.  That's wrong.

14      There are other things that change between 2020 and 2022

15  and what this figure shows is that in fact what happened in

16  Texas, the decline in voting is exactly what happened

17  everywhere else in the country as well who did not pass SB 1,

18  and so it would be a mistake to attribute that decline in

19  turnout to SB 1 when it was happening in places that did not

20  pass SB 1.

21  Q.  And so Figure 4 compares total votes to the voting aging

22  population?

23  A.  That's right.

24  Q.  And, of course, Dr. McDaniel is not the only expert for of

25  the plaintiffs who has opinions as to the effects of SB 1 on

 1  voting in Texas.  Does the point that you just made, namely

 2  that the difference between 2020 and 2022 in Texas doesn't

 3  look dramatically different than the differences between

 4  voting in 2020 and 2022 in the other 49 states, does that

 5  apply as well to other experts for the plaintiffs and their

 6  opinions?

 7  A.  Yes.  It's going to apply to anybody who is trying to

 8  compare what's happening in 2020 versus 2022 and attributing

 9  that to SB 1 as opposed to other things that changed

10  everywhere, including Texas.

11  Q.  And did voting decline more or less in Texas as voting

12  declined in the rest of the United States between '20 and

13  '22 — 2020 and 2022?

14  A.  Yeah.  This is in the table and the report, so I believe

15  the result is that voting declined a little bit more in Texas

16  than it did in the rest — I'm sorry, that voting declined a

17  little bit less in Texas than it did in the rest of the

18  country, but the numbers are in a table and I haven't

19  memorized all those numbers certainly.

20  Q.  Well, let's look at Table 1 on page 10 of Exhibit 8.

21       Is that the table to which you refer?

22  A.  Yes.

23  Q.  Could you explain that for the Court?

24  A.  Yeah.  So, you know, in the fourth column again is what is

25  essentially what is driving much of what Professor McDaniel is

1  writing about in his report.

2      If you look at the first row it shows that you did have

3  this 29.3 percent change in turnout, and so that's a big drop

4  in turnout.  If that were due to SB 1 it would be, you know,

5  we'd be really worried about SB 1, and if it caused that big

6  of a turnout.

7      Of course we know other things can change as well and

8  that's why we look elsewhere.  And so if you look at the other

9  49 states, what you saw is there was a 30.2 percent drop in

10 turnout.  And then we show results for the other years as

11 well, if you were to use other years as a baseline rather than

12 2020, how Texas compares to the rest of the country.

13 Q.  I believe you stated in your report, quote, what is clear

14 is that the decline in voter turnout between 2020 and 2022 was

15 not due to SB 1 which could possibly have affected only Texas.

16 Is that still your opinion?

17 A.  It is.

18 Q.  Let's look at Figure 5 on page 12 of Exhibit 8.

19      Now, could you explain what Figure 5 shows?

20 A.  Yeah.  Figure 5 is showing the, you know, the fraction of

21 early votes relative to total votes in Texas, you know, by

22 year, and I believe this would be showing just the mid term

23 years, and go ahead.

24 Q.  Yes.  And so looking at the fraction of early voting in

25 mid-term elections, do you see any indication that SB 1, which

MARK HOEKSTRA - DIRECT

1  was effective only for the 2022 year, caused any decrease in
2  early voting in Texas as compared to the historical trend for
3  mid-year elections?
4  A.  No.  And again, that line is using data through 2018 to
5  predict what would have happened.  If anything, fraction early
6  voting in 2022 is a little bit higher than that line.  The
7  significance of that is if you read Professor McDaniel's
8  report, it would be easy to get the impression that, you know,
9  voting early became less popular as a result of SB 1.  That's
10 not what happened.  What happened is turnout declined, and in
11 fact, turnout declined everywhere, it declined a little bit
12 more in the rest of the country compared to Texas as we just
13 saw.  But it's not as though people, you know, it's not as
14 though early voting became less popular than you would have
15 expected based on historical trends.
16 Q.  Was there any difference in the Texas general elections in
17 2020 and 2022 in terms of whether or not there was a Senate
18 election in Texas in those years?
19 A.  Yeah.  I'm going to forget this, but I believe that there
20 is no Senate election in 2022 and there was in 2020.  So you
21 have a difference in that presidential versus nonpresidential
22 also, you know, whether there was a Senate.  I believe that's
23 correct.
24 Q.  Based on all the data you've examined and the expert
25 reports of Dr. Grose and Dr. McDaniel, is there any reasonable

MARK HOEKSTRA - DIRECT

1   basis to conclude that SB 1 had any significant adverse impact

2   on overall voter turnout in Texas?

3   A.  No.

4   Q.  Is there any reasonable basis to conclude that SB 1 had

5   any significant impact on early voting turnout in Texas?

6   A.  No.

7   Q.  Is there any reasonable basis to conclude that SB 1 had

8   any significant impact on absentee ballot or mail-in voting in

9   Texas?

10  A.  No.

11  Q.  Now, let's talk about wait times briefly.  Do you have any

12  opinions as to the reliability or validity of Dr. McDaniel's

13  opinions related to wait times?

14  A.  I do.

15  Q.  What is your opinion?

16  A.  He focused on wait times in 2020.  There was some

17  difference in reported wait times in 2020, but I show that

18  it's about, I think it's 2.7 minutes on average.  And in fact,

19  2020, as it is in many dimensions, seemed to be an anomaly for

20  wait times as well, and I show that wait times were — that

21  there were no differences in earlier elections and --

22  Q.  I tell you what, let's go into the specifics.  I'll get

23  the tables that you prepared that will assist us.

24      But what's your overall opinion as to the -- whether

25  Dr. McDaniel's opinion on wait times are reliable and valid?

4734

MARK HOEKSTRA - DIRECT

1  A.  I don't think he has any reliable or valid results to

2  indicate that Black voters wait longer than White voters on

3  average.

4  Q.  Let's look at table 2 on page 10.

5     Could you review table 2 and then explain for the Court

6  what it depicts?

7  A.  Yeah.  So again, here we're looking at — these are

8  differences relative to whites, and so the number in the first

9  column is going to be how many additional minutes do Black

10 non-Hispanic voters wait to vote or how much longer did they

11 report waiting compared to non-Hispanic Whites, and I'm

12 showing this, again I'm showing you everything.  So you get to

13 see from 2014 all the way through 2020, and then we're

14 grouping things together in ways that are arguably sensible

15 there in the last two columns.

16 Q.  And what, if any, conclusions do you draw from the data in

17 Table 2 as to racial or ethnic differences in wait time as a

18 result of or between races?

19 A.  Yeah.  So if you look, again it you look at 2020, which is

20 what McDaniel really only looked at, what you see is, sure

21 enough, there was a difference in wait times and it's

22 statistically significant, it's 2.7 minutes on average.  So

23 Black voters on average reported waiting 2.7 minutes longer

24 than whites in the 2020 Election.

25    The trouble is he didn't show us anything from 2018, even

MARK HOEKSTRA - DIRECT

1  though there's an election, right?  It's still a big election.
2  And there Black voters reported waiting about half a minute
3  less, nonstatistically different from whites.
4      What you see in 2016 and 2014, there are small differences
5  as well.  And so what happens is well, let's, instead of just
6  picking one year, especially picking the most unusual year
7  that's probably least predictive of what we'd likely see going
8  forward, what happens if we group 2014 through 2020 together,
9  what we see is we see a difference of about a minute and a
10 half.  So you're talking about, you know, there's about a
11 minute and a half wait time difference for blacks versus
12 whites.  But if you look only at the most recent elections
13 2016 and 2018, you're seeing half a minute, you know, Black
14 voters are on average waiting about 30 seconds longer than
15 White voters.  It's obviously nonstatistically different.
16     I'm showing you Hispanic differences here as well, which
17 are about a minute and a half even when you aggregate across,
18 so Hispanic voters are waiting a little bit longer on average.
19     Of course all these are from self-reported wait times.
20 And I also brought some evidence to bear on the credibility of
21 that which we can talk about.
22 Q.  Okay.  If you look at 2016 and 2018 which were not
23 affected by COVID, were there any statistically significant
24 differences in waiting times between Black Texans and White
25 non-Hispanic Texans?

1  A.  Yeah.  In 2018 there were not.  In fact the estimate goes

2  the wrong direction as McDaniel would assert.  In 2016 that

3  1.3 minutes, in the second column and the top row, we would

4  call that marginally significant in my business, so it's

5  significant at the 10 percent level but not at the 5 percent

6  level and so, you know, it's basically right on the edge of

7  being statistically significant at the level most people use

8  which is the 5 percent level.

9  Q.  Okay.  Let's look at Figure 3 on page 11.

10     This again shows that in terms of the proportion of votes

11  cast early in person, 2020 was an outlier compared with all

12  previous Texas election years?

13  A.  That's right.

14  Q.  Back to 2000.  And is 2020 the single year that

15  Dr. McDaniel chose to rely on for his opinions on wait time?

16  A.  It is.  And again, it's important because 2020, you know,

17  we had a lot more people voting in person than normal and so

18  if you're talking about wait times, there's reasons to expect

19  wait times might be different in that year than they would be

20  in other years.

21  Q.  In your rebuttal report in Exhibit 8, you refer to a study

22  and the review of economics and statistics.  Could you explain

23  for the Court what that significance of that study was?

24  A.  Yeah.  As, you know, the view from 10,000 feet in general

25  is that oftentimes we worry about whether what people report

MARK HOEKSTRA - DIRECT

1   to us in a survey is true, and you might worry about
2   especially in a case where I'm asking you how long did you
3   wait to vote.  Well, you probably didn't have a stopwatch
4   going, and so we worry about, you know, errors in that, in
5   those reports.
6       And so the nice thing about that review of economics and
7   statistics study is they said well, let's not rely on what
8   people tell us, let's rely on what their smartphones tell us,
9   and so essentially they got smartphone data and were able to
10  estimate wait times, you know, in Black versus White
11  neighborhoods.  And if you look, you know, in that study they
12  report estimates in the appendix, they report estimates
13  specifically by state.  And if you look at Texas in I believe
14  it was 2016 election, what you see is that Black votes were --
15  actually waited less time according to their smartphones than
16  White voters did according to their smartphones.
17      And the reason that's important is because if we go back
18  to that table we were at, the survey is suggesting I believe
19  it's --
20  Q.  Let's go back to Table 2 on page 10.
21  A.  Yeah.  The survey is suggesting that Black voters reported
22  waiting .3 minutes longer than White voters in 2016.  But if
23  you say well, maybe they are just having a harder time
24  remembering it and maybe some voters understate or overstate
25  differently, and maybe that's correlated with race, if you

1  just trust their smartphones for judging how long they were in
2  a certain place you would conclude I think the estimate was
3  about one minute less.  And those estimates are statistically
4  different, right?  They are giving you a meaningfully
5  different answer when you trust people's smartphones to give
6  you the answer versus when you trust them to correctly report
7  how long they waited.  And that suggests that, you know, that
8  there's some evidence that perhaps Black voters are, relative
9  to White voters are overstating how long they wait, again
10  compared to what we would get if we used data from their
11  smartphones and where their start phones were.
12  Q.  In Exhibit H you express the view that Dr. McDaniel in his
13  report made assertions that had little or no actual support in
14  his data.
15      Do you recall whether any of the specific problems with
16  Dr. McDaniel's assertions as to drop boxes?
17  A.  Yeah.  I believe he was asserting that minorities were
18  using drop boxes at -- or were using dropoff places at higher
19  rates than were whites, and therefore SB 1, you know, would
20  have a disparate impact on those voters.  I believe that was
21  the assertion.
22  Q.  Do you recall an assertion in Dr. McDaniel's report
23  regarding alleged voter intimidation?
24  A.  I do.
25  Q.  Could you explain what you recall of that assertion?

MARK HOEKSTRA - DIRECT

1  A.  Yeah.  I would like to get the quote right if we can.  I

2  mention the quote in my paper and I don't want to -- I want to

3  be very careful with how I characterize that so --

4  Q.  Okay.

5  A.  -- I'm not sure exactly what paragraph that's in but I

6  believe the quote was something to the effect of that voter

7  intimidation, you know, had increased in 2020.  Voter

8  intimidations incidents had increased, but I know I quoted it

9  in my report and I haven't memorized it.

10  Q.  I'll tell you what.  We'll leave it to your report for

11  now.

12      Could we look at page 17 of your --

13  A.  I would --

14  Q.  -- Exhibit 8?

15  A.  I can say one other thing, I would like to say one other

16  thing about what he said on the voter intimidation.  So he

17  made this claim, and I believe it was a claim to the effect of

18  an increase of voter intimidation in 2020.

19      If you read his report he cited in support of that claim

20  an opinion article from USA Today that basically had that as

21  the headline, as the title of the paper.  I think it even said

22  voter intimidation incidents are surging or something like

23  that, and so I looked and said okay, what are they citing for

24  evidence as that fact.

25      Well, what they cite, I believe that article was written

MARK HOEKSTRA — DIRECT

1  in October of 2020, and what they cite as evidence for this

2  surge in — this surge in voter intimidation incidents is they

3  cited a New York Times article that was written in September,

4  before early voting even began.  And so there's evidence of

5  this increase in voter intimidation literally came from an

6  article that was written before voting had even started and it

7  was about, you know, poll watchers and these sorts of things.

8  And that's really bad evidence obviously.

9  Q.  And in fact paragraph 31 of Exhibit 8 is now on the screen

10  thanks to Brian.

11     And does this describe the asserted evidence for voter

12  intimidation that Dr. McDaniel had relied?

13  A.  Yeah, that's right.  And the quote is "an increased number

14  of reported incidents" which would make you believe that there

15  were more reported incidents during the election in 2020, but

16  again, the evidence comes from this op-ed title, this op-ed

17  article from U.S.A. Today, which their evidence came from a

18  New York Times article that was written before the election

19  had even started, before the voting had even started.  He has

20  no evidence of an increased number of incidents of voter

21  intimidation.

22  Q.  Is it fair to say that in any event it has nothing to do

23  with any possible effects of SB 1 which was enacted for the

24  2020 Election year?

25  A.  That's correct.

4741

MARK HOEKSTRA — DIRECT

1  Q.  Okay.  Let's look at page 17, paragraph 36.

2      That states that your overall view of Dr. McDaniel's

3  report in your own analysis is there's little to no evidence

4  that SB 1 would report disproportionately negatively impact

5  the voting of Black and Hispanic Texans.  Was that your

6  opinion then and now?

7  A.  Yes.

8  Q.  Okay.  Let's look at Exhibit 9, which is —— sorry, let's

9  look at paragraph 4 at paragraph A there.

10      In paragraph A you discuss numerous one—time factors that

11  you believe boosted turnout in 2020.  In this paragraph,

12  second paragraph in paragraph A, you go into some additional

13  reasons beyond those which I believe you've touched on already

14  in your testimony.

15      Could you point out any additional reasons why 2020 was an

16  anomalous election in Texas and American history?

17  A.  Yeah, that's right.  So the first thing is you had this

18  guy named Donald Trump who was running.  Donald Trump seems to

19  get people on both sides of the aisle pretty excited.  And so

20  that's a unique thing.  It's I guess a unique candidate, to

21  put it lightly.

22      You had the pandemic which we've touched on which

23  obviously impacted how people worked.  It impacted, you know,

24  whether they worked.  It impacted, you know, their receive

25  presence on how they were likely to want to vote.

*Gigi Simcox, RMR, CRR*

MARK HOEKSTRA - DIRECT

1    You also had the, you know, the horrible murder of George

2  Floyd in the spring of 2020.  That, as a result of that you

3  had a lot of racial protests.  You had this big emphasis in

4  general on those racial issues.

5    You also had Kamala Harris on the ticket, this Black

6  vice-presidential candidate.  And so, you know, you had a lot

7  of things that were truly unique about that 2020 Election.

8  And that make it potentially problematic for, you know,

9  serving as a baseline.

10  Q.  Now, Dr. McDaniel included in his 2023 report an assertion

11  that Texas counties with larger Black populations shares

12  experience larger declines in voter turnout.  Do you recall

13  that assertion?

14  A.  I do.

15  Q.  Did you identify errors or limitation in Dr. McDaniel's

16  analysis on this subject?

17  A.  I did.

18  Q.  Could you explain those errors and limitations that you

19  identified?  If you like we can look at Table 2 on page 14 of

20  your 2023 rebuttal report.

21  A.  That would be helpful to make sure I don't miss anything.

22  Q.  Please take whatever time you need to exam Table 2 and

23  please explain to the Court the significance of the work shown

24  in Table 2.

25  A.  Yeah.  So in column 1 I'm replicating what Professor

MARK HOEKSTRA – DIRECT

1  McDaniel did.  In panel A it's an exact replication of what he
2  did, and again he's just trying to show this correlation
3  between the percent change in turnout from 2020 to 2022 with
4  the percent Black of the county.
5      And the first problem, I mean, I don't want to beat on
6  McDaniel for this because people make mistakes, everybody is
7  human so he made a little mistake where he used the wrong
8  baseline year, and he used 2022 as the baseline year for that
9  percent change when he should have used 2020.  So panel A is
10 replicating what he did.  I assume that's an honest mistake by
11 Professor McDaniel.
12     In panel B I fixed that mistake and I computed correctly
13 and what you see is there was a decline in turnout, you know,
14 from 2020 to 2022 and you saw somewhat larger declines in
15 counties with larger Black populations.
16     Now, what I go do after that is I try to figure out well,
17 what's driving this.  So in column 2, one of the possible
18 reasons for why you could have that reduction is well, maybe
19 there was a change in mail voting turnout.  And so in column 2
20 I show that doesn't seem to be driving things, the estimate is
21 tiny, and not statistically significant.  And so then what I
22 go and look at is okay, it turns out but if this is not
23 about — if it's not about mail voting then unless if it's
24 being driven by SB 1 it must be about early voting.  It must
25 be about other forms of voting.

1      And so if we look at what Professor Grose did, and I

2   believe it was his — I believe it was his first report, he

3   identified counties whose early voting hours were impacted by

4   SB 1.  We went through that earlier this morning.  And so he

5   identified in his code 24 counties where these restrictions

6   were binding, where they were going to have to change their

7   early voting policies as a result of SB 1.

8      And so if you — if you — these are the only counties

9   that should be impacted by SB 1.  You shouldn't be impacted by

10  SB 1 if it wasn't binding on you or if had no impact on mail

11  voting, which is what I show in column 2, and if it did not —

12  and the early voting hours were not impact by SB 1.

13     And so this is where we should see the effect and in fact

14  what we see is there's no statistical difference, you know,

15  and there's no relationship between the percent Black of the

16  county and the change in voting from 2020 to 2022, and rather

17  with where all that statistical significance is coming from is

18  it's coming from this relationship, you know, between change

19  in turnout in percent Black in counties that, according to the

20  other plaintiff expert, were not even impacted by this policy.

21  And that's what column 4 is showing.

22     And, you know, one of the ways that researchers try to

23  show like are you getting —

24          MR. WATKINS:  Objection.  Narrative.

25          THE COURT:  Sustained.

MARK HOEKSTRA - DIRECT

1  BY MR. BRYANT:

2  Q.  Okay.  Was it your conclusion from table 2 in the other

3  data that you analyzed that the differences in Black voter

4  turnout that Dr. McDaniel observed were driven almost entirely

5  by the 229 counties that were not affected by SB 1?

6  A.  Yes.  The statistical significance of that estimate is

7  driven almost entirely by those counties that never should

8  have been impacted by SB 1.

9  Q.  Let's look at Table 3 on page 17.

10      Okay, please take a look at Table 3, and when you are

11  ready to do so, explain for the Court the significance of what

12  is shown in Table 3.

13  A.  Yeah.  So what McDaniel is showing is essentially, you

14  know, it's a replication again from his report in columns 1

15  and 2.  He's showing that in 2020 there was this statistically

16  significant relationship between the proportion of Black

17  voters in the county and the proportion of voters who used

18  early in-person voting.  And then he shows that in 2022 that

19  that correlation was no longer significant, and he is arguing

20  that SB 1 caused, I believe he says it breaks the link or

21  something like that, between race and early in-person voting.

22  And one of the themes again of probably this whole day is when

23  we have statistical uncertainly, we need to account for that

24  if we're going to do things right.  And he never stopped to

25  ask are these two estimates statistically different from each

MARK HOEKSTRA - DIRECT

1  other, and the answer is they are not.

2      In other words, we would expect to see changes from one

3  year to the next of this magnitude just due to chance.  And we

4  ought not attribute something that could be due to chance to

5  SB 1.

6  Q.  Could we look at Table 4 on page 18.

7      Please examine Table 4, and when you're ready explain to

8  the Court what Table 4 depicts and its significance?

9  A.  Yeah.  So this goes back, again the same question.  You

10 know, did SB 1 break the link between the percent Black and

11 the county and the proportion of voters using early in-person

12 voting, but again remember that the, you know, the main, you

13 know, the -- if SB 1 did cause something, it should only cause

14 something in the counties whose early voting hours were

15 impacted by SB 1, and so in the first three columns I'm

16 showing what happens if you focus entirely on those counties

17 and in fact what we see is we don't see any evidence, like

18 none of those estimates are significant.  And so, you know,

19 neither of them are different from zero.  There's no

20 statistical correlation between these things.

21     And when we look at those counties, you know, that are --

22 whose early voting hours are impacted, the last three columns

23 I'm showing that, again, this breaking of the link, which

24 isn't statistically significant but is emphasized by Professor

25 McDaniel, this breaking of the link is driven entirely by

MARK HOEKSTRA - DIRECT

1    counties unaffected by those restrictions, which suggest this

2    is obviously not about SB 1, it's about something else.

3    Q.  Let's look at paragraph 46 on page 21 of your 2023

4    rebuttal report.

5        I want to give you a few seconds to review paragraph 46.

6    A.  Yeah.

7    Q.  Let me ask you a question.

8    A.  I've read it, go ahead.

9    Q.  Okay.  You note in paragraph 46 two statements in

10   Dr. McDaniel's report that do not seem to you to be consistent

11   with his later conclusion.  Could you explain why that's so?

12   A.  Yeah.  Early in his report he's I think properly

13   apprehensive about giving this causal interpretation to what

14   he's doing for all the reasons that we've laid out.  So for

15   example he said, you know, that whether this thing was caused

16   by SB 1 cannot be discerned from these data, and that quote is

17   not clear.  The extent to which these changes brought by SB 1

18   contributed to this deeper drop in turnout in counties with a

19   larger proportion of Black residents, unquote, he seems to

20   dispense with that caution later in his report when he makes

21   his conclusions, which I don't think are merited by the work

22   that he did in the approach that he was using.

23   Q.  Okay.  In the last sentence of paragraph 46 you state,

24   quote, indeed based on both his analysis of the data and mine

25   I find no evidence that suggests that SB 1 reduced overall

MARK HOEKSTRA - DIRECT

1  turnout or early voter turnout or caused disproportionately
2  large reductions in overall turnout or early voting among
3  counties with larger Black population shares.
4      Is that still your opinion today?
5  A.  Yes.
6  Q.  Okay.  Let's go back briefly and try to clear up this
7  issue we had this morning with respect to the notices of
8  correction.  Could we take a look at Exhibit 7.
9      Okay.  Can you identify Exhibit 7?
10 A.  Yeah.  This is a notice of correction to my report in
11 response to Professor Grose's first report, and yeah.
12 Q.  Okay.  And when did you submit that?
13 A.  That would have been submitted, I believe it was the day
14 before my deposition.
15     MR. BRYANT:  We offer Exhibit 7, State Defendant's
16 Exhibit 7 into evidence.
17     MR. WATKINS:  No objection.
18     THE COURT:  Seven is admitted.
19 BY MR. BRYANT:
20 Q.  Can we look at State's Exhibit 10.
21     Can you identify State's Exhibit — oh sorry, 11.  Can you
22 identify State Defendant's Exhibit 11?
23 A.  Yeah.  This as a notice of correction written in
24 response — or I'm sorry, to my report written in response to
25 Professor Mayor's report of this year.

4749
MARK HOEKSTRA − DIRECT

1  Q.  Did you also submit that notice of correction shortly

2  before your last deposition in this case?

3  A.  Yes.

4          MR. BRYANT:  We offer State Defendant's Exhibit 11

5  into evidence.

6          MR. WATKINS:  No objection.

7          THE COURT:  Eleven is admitted.

8          MR. BRYANT:  Your Honor, we're about to move on to

9  the reports pertaining to Dr. Mayer.  Would the Court like to

10  take an early lunch break or —

11          THE COURT:  If we can push till right — I've got

12  another phone call at 12:00 if we can push at least to 11:55.

13          MR. BRYANT:  Very good.

14  BY MR. BRYANT:

15  Q.  Now, did you review Dr. Mayer's opinions in this case as

16  expressed in his reports?

17  A.  I did.

18  Q.  Now, did Dr. Mayer assert in his opinion dated March 6,

19  2023, that 2,949 voters in Dallas, Harris, and Hidalgo

20  counties of Texas were quote, disenfranchised, unquote,

21  because of the mail−in voter ID requirements of SB 1?

22  A.  He did.

23  Q.  And did you identify flaws in that opinion in your

24  rebuttal report to Dr. Mayer that was Defendant's Exhibit 10

25  dated April 5, 2023?

1  A.  Yes.

2  Q.  Let's look at table 1 in that rebuttal report.

3     I would like for you to review Table 1, and when you've

4  fully reviewed it please explain to the Court what's depicted

5  and the significance of Table 1.

6  A.  Yeah.  So in Table 1 I'm showing, you know, I'm showing

7  the number of mail absentee ballots rejected on account of

8  SB 1, that's in column 2.  That's according to Professor

9  Mayor's analysis.

10     I'm also showing, you know, how large that is relative to

11  the number of votes cast and the answer of course that is it's

12  a tiny fraction, you know, of the votes cast in those

13  counties.

14  Q.  Now, in the column to the far right -- actually, the last

15  two columns there's a reference to these votes being reject --

16  quote, rejected due to SB 1.  Could you explain how, first how

17  Dr. Mayer used that term in his report?

18  A.  Yeah.  Professor Mayer is a little bit unclear about

19  exactly how, you know, how that was computed.  It's clear he's

20  trying to get at some form of some type of rejections

21  associated with the types of reasons that have to do with the

22  identification requirement of SB 1.  It's not, it was not

23  clear to me whether these were initial rejections or whether

24  any of these people voted subsequently.

25     You know, what I know from another expert who is no longer

1  in this case, Professor Hersh, was quite clear about this in
2  contrast.  And in that case statewide I believe the number was
3  6,355 votes were cast and rejected for a reason that has to do
4  with SB 1, and those individuals did not subsequently cast a
5  vote that counted either by mail or in person.  And that's for
6  the entire state of Texas, not just for these three counties.
7      And I understand, just to be clear, I understand where
8  that number came from.  I don't — Professor Mayer wasn't that
9  clear about it in his report for these three counties.
10  Q.  Is Dr. Mayer's number of 2,949 votes for just those three
11  counties, Dallas, Harris, and Hidalgo, roughly proportional to
12  the 6,355 vote number that Dr. Hersh identified statewide?
13  A.  Yeah.
14  Q.  For the entire state?
15  A.  Off the top of my head I'm not quite sure if, you know, if
16  about half of the Texas population lives in those three
17  counties, then it would be.  If less than, you know, half of
18  the population lives in these three counties, then his number
19  seems high, but I haven't done that calculation and I haven't
20  memorized population figures.
21  Q.  Did you use that number of 6,355 in your report rebutting
22  Dr. Mayer's report that's Exhibit 10?
23      MR. DODGE:  Your Honor, we object to this line of
24  questioning because Professor Hersh's report is not in
25  evidence.  Professor Hersh did not testify in this trial.

 1  There's a lack of foundation for this number so we object to
 2  this line of questioning on that basis.
 3          MR. BRYANT:  Dr. Hersh was an expert witness for the
 4  United States in this case.  He was fully deposed by all
 5  parties and his testimony was used by this witness as part of
 6  his — as part of the information that he relied on in
 7  arriving at his opinions.  I can see an objection that his
 8  evidence was hearsay, but experts can rely on hearsay in
 9  formulating their opinions.
10          His evidence was under oath and all parties had an
11  opportunity to test that evidence, dispute it if they wanted
12  to, challenge it if they wanted to, so we believe it's a
13  proper —
14          THE COURT:  Yeah.
15          MR. BRYANT:  — piece of information for Dr. Hoekstra
16  to consider in arriving at his opinions and his rebuttal of
17  Dr. Mayer.
18          THE COURT:  The objection is noted and overruled.
19  BY MR. BRYANT:
20  Q.  How, if at all, have you used the 204,949 number and the
21  6,355 number from Dr. Mayer and Dr. Hersh in arriving at your
22  opinions in this case?
23  A.  Yeah.  I primarily used the 6,355 number because I know
24  exactly, you know, I understand exactly where that number came
25  from, and so one of — the main way in which I've used it is

4753
MARK HOEKSTRA – DIRECT

1  if you want to think about whether this policy burdens Texas

2  voters, you know, one major component of that, I think the

3  most significant component of that is, did it –– did burden

4  voters so much that they weren't able to cast their ballot in

5  using any method.  And so that number, you know, in fact the

6  maximum that that number can be is 6,355 according to

7  Professor Hersh's own analysis, and that number came from the

8  fact that I believe there was 13,000 and some individuals

9  whose ballots were rejected for reasons that Professor Hersh

10  believed were due to SB 1, and then about half of those people

11  were still able to vote using some other method.  And so that

12  6,355 number is the most, the maximum number of Texas voters

13  out of the 8.1 million, you know, votes cast in that election

14  that could have been burdened so much that they did not ––

15  that they were unable to vote using any method.

16      Of course, the other thing I point out here and in my

17  response to Professor Mayer, is that for all we know, those

18  6,355 votes or the 2,949 votes, they could have been cast

19  illegitimately.  These could be exactly the types of votes

20  that SB 1 was designed to –– was designed to prevent the types

21  of fraudulent votes that are not allowed under Texas law.  And

22  there's nothing that Professor Mayer nor I have or any other

23  expert I've seen has that speaks to, you know, which of those

24  two possibilities is true.  Is it that they were all –– that

25  they were all legitimate voters who were just so burdened that

1  they couldn't get a vote cast some way or is it that they were

2  all illegitimate votes that all of us would agree if we knew

3  the underlying facts ought not to be counted, or is somewhere

4  in between, and I don't have a position on that.

5  Q.  So do you accept either the 2949 number or the 6,355

6  number as being an accurate statement of how many votes,

7  legitimate votes were rejected due to SB 1's voter ID

8  requirements?

9  A.  No.  And the reason is we don't know whether these were

10  legitimate voters or whether these were, you know, fraudulent

11  votes, and there's nothing in the data to know.  And in my

12  opinion none of the experts should be asserting something

13  other than we know this would be the maximum number of

14  fraudulent votes or we know it would be the maximum number of

15  voters, you know, burdened so much they couldn't vote but we

16  don't know whether the true number is zero, 6,355, or anywhere

17  in between.

18  Q.  Dr. Hoekstra, do you know whether Dr. Hersh got his 6,355

19  vote number from an examination of the actual Texas TEAM's

20  database?

21  A.  Yes, he did.  I believe he was the only expert provided

22  with that database.

23  Q.  Do you know why he was the only expert provided with the

24  TEAM's database?

25  A.  I don't think I do.

4755

MARK HOEKSTRA - DIRECT

1  Q.  Okay.  In any event, is it your understanding that

2  Dr. McDaniel and Dr. Mayer did not have access to that actual

3  database?

4  A.  They certainly didn't use it in their reports.

5  Q.  And let's look at Table 2 on page 9.

6      Please take a moment to look at Table 2 and when you're

7  ready please explain to the Court what Table 2 depicts and the

8  significance of data in Table 2 for this case.

9  A.  Yeah.  So one of the core assertions in Professor Mayer's

10 report is that you have this increase in rejections and the

11 rejection rates for absentee ballots in 2022 compared to 2020.

12 And obviously there's things that can — when you make that

13 comparison and you want to attribute it to SB 1, we need to

14 worry about well, for example, you know, are there other

15 things that were changing or especially like were the data

16 changing over time.

17     And so what I show in this table is let's use Professor

18 Mayer's, let's use his own classifications of whether a ballot

19 was rejected for an SB 1 reason or for a reason that had,

20 according to Professor Mayer, nothing to do with SB 1.  And

21 let's look to see, do we see an increase in the rejection

22 rates for these reasons that have nothing to do with SB 1

23 according to Professor Mayer's own classifications.

24     And so in column — let's see, in columns 3 and 4, I'm

25 computing those rejection rates, and what I show and this is

MARK HOEKSTRA - DIRECT

1  one of my corrections is through some like evil magic, the
2  decimals disappeared in this table, and I don't know how that
3  happened.  It happened when it got turned into a PDF from a
4  Word document, but where you see those little gaps there
5  should be a decimal point.
6  Q.  For example, next to Dallas it says 00166, where should
7  the decimal point appear on that column?
8  A.  It should be 0.0166.
9  Q.  And is that the same for the rest of the numbers in
10  columns 3 and 4 and 5?
11  A.  That's right.  And so in the last column there's these,
12  you know, essentially these odds ratios so that should be 2.7,
13  2.8, 0.6, and 2.4.  And what, you know, what we see, you know,
14  what column 5 is showing you is that you're having, in
15  Dallas County you're having 2.7 times as many -- times -- let
16  me say this again.
17      The rejection rate for non-SB 1 reasons in 2022 was 2.7
18  times as high as the rejection rate was in 2020 before SB 1.
19  And so what everyone ought to be asking themselves is like why
20  did we see an increase in rejection rates that had nothing to
21  do with SB 1, and I think the answer is it's pretty clear when
22  you make -- that there's something wrong with the data or
23  there's something wrong with the comparison that maybe we're
24  picking up something else, but again, that's -- this is how we
25  try to validate different research designs is we say -- we say

1  well, if our research design is right, we should do this other
2  comparison and we should estimate a zero, but if you don't
3  estimate a zero it suggests that you're doing things wrong and
4  that's what I'm doing here.
5        THE COURT:  Maybe I missed a step.  How did you
6  determine this was not associated with SB 1?
7        THE WITNESS:  So those are computed from Professor
8  Mayer's table where he laid out the total number of rejections
9  and he also laid out the number of rejections that he believes
10  were an attributed to SB 1, and the difference between those
11  two is the number of rejections that were for other reasons
12  that he says that according to his own classification were not
13  due to SB 1.
14  BY MR. BRYANT:
15  Q.  So does Table 2 indicate that you believe that there's
16  something wrong with either the data or the design of
17  Dr. Mayer's study with respect to this subject?
18  A.  Yes, I think it's clear that one of those two things is
19  true.
20        MR. BRYANT:  Your Honor, might this be an appropriate
21  break time?
22        THE COURT:  Yeah.  Thank you so much.
23        Let's return just shortly before 1:00
24     (Recess)
25

MARK HOEKSTRA - DIRECT

 1  BY MR. BRYANT:
 2  Q.  Dr. Hoekstra, we are still talking about your rebuttal
 3  report to Dr. Mayer's reports, which is State Defendant's
 4  Exhibit 11.
 5      Do you have any opinion as to — well, strike that.
 6      Did Dr. Mayer take into account in his work the
 7  possibility that brand-new election law requirements like
 8  those in SB 1 involve a learning curve and that mail-in ballot
 9  rejection rates naturally will diminish over time?
10  A.  No.
11  Q.  Do you have an opinion as to whether it's possible, if not
12  likely, that mail ballot rejection rates in Texas will decline
13  going forward as compared to the rejection rates in
14  November 2022?
15  A.  I believe it's likely, so what we saw from —
16  Q.  What are the reasons for your opinion?
17  A.  Fair enough.
18      From 2020 to 2022, the ballot rejection rates fell from
19  over 10 percent — I'm going to forget the exact number —
20  down to, I think, 2.7 percent.  It's pretty clear people —
21  and you can read anecdotally — people were figuring out,
22  election administrators were figuring out how to inform
23  people, how to do things right, and the voters themselves were
24  learning how to do things right.  I won't pretend to claim how
25  further those rejection rates would decline.

MARK HOEKSTRA - DIRECT

```
 1      But, in general, you know, there are large literatures on
 2  learning by doing.  When people do things more and more, they
 3  learn how to do them better, and I think it's likely not to be
 4  true in this case where you might see rejection rates continue
 5  to fall below what we saw in the 2022 General Election.
 6  Q.  Dr. Mayer expresses in his report a view that voter ID
 7  requirements for mail-in ballots in SB 1 lack legitimate
 8  justification.  Can you identify any reasons why you view that
 9  assertion is less than reliable or valid?
10  A.  I think I'm going to ask you to ask the question one more
11  time.
12  Q.  Okay.  Can you identify any reasons why you have a view
13  that that assertion of lack of legitimate justification is
14  valid?
15  A.  I think it might be helpful if we looked at that part of
16  that -- of his report, maybe, where he said that or --
17  Q.  Let's look at paragraph 16 --
18  A.  Yeah.
19  Q.  -- on page 10 of your rebuttal report.  Let's look at
20  page 17, which discusses Dr. -- Professor Mayer's argument on
21  that point.
22  A.  Do you mean page 17 or paragraph 17?
23  Q.  Paragraph 17.  I'm sorry.  And this discusses the
24  proposition that absence of evidence is evidence of absence.
25      Could you explain your view on that subject?
```

4760

MARK HOEKSTRA – DIRECT

1  A.  Yeah, correct.  So Professor Mayer's view on this subject

2  of the 2,900 and some, you know, ballot rejections is that,

3  you know, those were people whose ballot should have been

4  counted and that, you know, that they were — you know, that

5  they were not counted improperly because of the rules of SB 1.

6      He also makes — you know, he also makes an argument that

7  there's no justification for that, and his argument

8  essentially hinges on the idea that there are relatively few

9  prosecutions for voter fraud in — you know, in Texas, and

10  where he makes the mistake is he then leaps and says, well,

11  therefore, there's no — therefore, there's not fraud in

12  Texas.  And that's a problem, because just because we don't

13  have evidence on something, it doesn't mean, you know, that

14  there's not something there.  It just means we don't have

15  evidence on it.  And that's — you know, that's the core

16  problem with — you know, with his assertion that there's no

17  potential justification for this.  In addition, you know, he's

18  ignoring, you know, some pretty clear evidence that there are

19  perceptions of voter fraud in the U.S.

20  Q.  Do you have any view as to whether it's difficult to

21  detect and measure election fraud in general and the type of

22  fraud that would be prevented by SB 1's mail-in voter ID

23  requirements?

24  A.  Yeah.  I think the simplest way to think about it is

25  comparatively, and so if you think about other forms of crime,

MARK HOEKSTRA – DIRECT

1  there's often a victim.  There might be some property that you

2  got stolen.  You might have a chance of getting back, and so

3  there's incentive.  There's — you might know about it.  You

4  might, therefore, report it to police, and police might do

5  something about it.  There's more likely to be evidence.

6        If you look at this setting, you know, the person who, you

7  know — talking about voter impersonation.  The person whose

8  name was on that ballot might not know, and election officials

9  might not know, and clearly anybody who is doing it isn't

10  going to shout from the roof — from the mountain tops that

11  they are engaging in fraud, so this is well-recognized in the

12  literature that looks at this issue; that it's going to be

13  hard to detect.  That doesn't mean it exists or it exists at a

14  grand scale.  It just means it's hard to detect, and you ought

15  not interpret that as evidence that there's — you ought not

16  interpret a lack of prosecutions as evidence that this thing

17  doesn't exist.

18  Q.  Are you aware of data with respect to the frequency of

19  prosecution of crimes that have no direct victims?

20  A.  Yeah.  So if you were —

21        MISS PERALES:  Excuse me, Your Honor.  I have to

22  object.  The witness is not qualified as an expert on voter

23  fraud.  It's in his relationship to prosecutions.

24        MR. BRYANT:  Your Honor, what he's testifying on this

25  question about is data as to crimes as general.  He is not

MARK HOEKSTRA - DIRECT

1  purporting to render an expert opinion as to the prevalence or
2  lack of prevalence of voter fraud.  He is pointing out that
3  there's a lot of data that indicates that many crimes — only
4  a very small percentage of them are ever prosecuted.
5          MISS PERALES:  That's my point, Your Honor.  He's not
6  qualified as an expert to offer an opinion that the lack of a
7  prosecution is evidence or nonevidence or has any relationship
8  to the incidents of voter fraud.
9          THE COURT:  That's sustained.
10  BY MR. BRYANT:
11  Q.  Are you aware of any data as to the belief of the public
12  as to whether there is or is not significant voter fraud?
13  A.  Yes, I am aware.
14  Q.  Could you describe that data to which you are aware?
15  A.  Yeah.  It would be most helpful if we could pull up the
16  paragraph, but in general, there's both a 2016 and a 2020
17  survey that I — you know, that I — that I report on in my
18  report here.
19  Q.  I believe if you look at paragraph 20 in front of you,
20  that may be what you are referring to.
21  A.  That's right.  So in 2016, you know, there's a survey that
22  indicated 35 percent of Americans say, you know, there's a
23  great deal of election fraud in the U.S.  And so if you say,
24  think about the fact that there's roughly, what, 17 million
25  registered voters in Texas.  If you were to apply that number

1  to Texas, it's 35 percent of 17 million.  You're going to be

2  in the ballpark of, you know 5, 6 million voters who believe

3  there's a great deal of election fraud in the U.S.

4      If you look at this 2020 survey, you know, there's, you

5  know, 15 percent of registered voters believe that absentee

6  ballot impersonation is very common.  Another 15 percent

7  believe there's occasional absentee ballot impersonation, and

8  if you look at the literature in political science, everybody

9  agrees that when you have people who don't believe in the

10 integrity of elections, that's a bad thing.  It's a bad thing

11 for turn-out.  It's a bad thing for democracy.  I don't think

12 that's a controversial statement.  And so it's relevant that

13 those views are out there if you're assessing the benefits and

14 costs of a bill that is attempting to — you know, to make one

15 form of fraud, you know, harder to do.

16 Q.  Did —

17     THE COURT:  Isn't it just as valid to say that

18 35 percent of Americans are going to still believe that

19 there's fraud in elections regardless of what activity is

20 done?  Because just 35 percent of Americans are going to

21 always have that hard, fast viewpoint.  You can't distinguish

22 how far down that could potentially go, could you?

23     THE WITNESS:  Yeah, so the best — the best evidence

24 I would have on that would be there's a study by Andreas Panag

25 [phonetic] P-A-N-A-G — it's a Greek name — where they did —

1  you know, they did an experiment where they sent out
2  information to voters where they said — and this was about
3  voter identification, so they said one of the troubles of
4  identifying the effective voter identification laws is that
5  people don't always know what law is in effect in their state,
6  and that's especially true given all the litigation.
7          So what they did is sent cards out to people and they
8  said, Hey, just so you know, there's this voter identification
9  law in your state for this election.  Other people got an
10 informational card that did not indicate that information, and
11 then they surveyed them afterwards, and they did find that
12 there is an increase — you know, increased voter perception
13 of electoral integrity when they got this information that
14 there was — you know, that there was this safeguard in place.
15         I don't claim to know what happened, you know, to
16 these 35 percent of Americans.  Maybe they won't change their
17 views at all.  Maybe some of them will.  I don't know.  I
18 don't claim to know, but there is certainly potential —
19         THE COURT:  Maybe 35 percent of Americans were
20 uneducated about what the level of ballot integrity already
21 existed, and so they said, unknowingly or uninformed, that
22 there was a great deal of election fraud.  Is that fair?
23         THE WITNESS:  So it could — your interpretation
24 could be true.  You know, again, I'm not going to sit here and
25 claim to know what the impact of SB 1 is going to be on that

MARK HOEKSTRA - DIRECT

1  35 percent number within the State of Texas, but there's

2  clearly scope to move perceptions.  Whether this moves them is

3  an open question.  Again, the best evidence is what I — is

4  what I talk to you about.

5        THE COURT:  Thank you.

6  BY MR. BRYANT:

7  Q.  Dr. Hoekstra, did Dr. Mayer assert that the ID

8  requirements for mail-in ballots in SB 1 disproportionately

9  affect minority voters?

10  A.  Yes, he did.

11  Q.  And did you conclude from your analysis that Dr. Mayer

12  computed disparate impacting correctly?

13  A.  He did.

14  Q.  Let's look at Table 3 on page 13.

15      Could you please look at Table 3 as fully as you would

16  like to, and then explain to the Court what it shows.

17  A.  Yeah.  So as a broad overview, I mean, if you were to

18  think about where, you know, disparate impact comes from, it

19  might come from a place where you might, you know, worry that

20  a state would — you know, if they can't say, "Well, Black

21  people can't vote" or "Hispanic people can't vote," what can

22  they do?  Well, they could choose — you know, they could find

23  a method of voting that was commonly used by that group and

24  make it harder, and that would have disparate impact.

25      And then, of course, the question will be is that

4766

MARK HOEKSTRA - DIRECT

1  sufficiently justified or not.  The problem with what

2  Professor Mayer did here is when he computed whether there was

3  disparate impact, he only looked at that subset of people who

4  chose to vote by mail.  And what I'm doing in Table 3 is I'm

5  illustrating how that's wrong.  And so what I have, just to

6  make it as simple of an illustration as I can, column 1 shows

7  that we've got a thousand people in each group, so the groups

8  are of identical size, just to make sure that the numbers are

9  simple.  I'm going to assume that group A, everybody votes by

10  mail, right?  And in group B, only two people vote by mail.

11  The rest of them vote in person.

12  Q.  Dr. Hoekstra, does Table 3 — simply an illustration as

13  opposed to using actual data?

14  A.  Correct.  It's an illustration to make a point —

15  Q.  Okay.

16  A.  — in as simple of a way as I can.

17  Q.  Please continue.

18  A.  And so then let's suppose that, you know, in column 3, you

19  know, we have essentially a 10 percent rejection rate for

20  group A, so 900 of those ballots get accepted.  100 get

21  rejected.  And in group B, we're going to say, well, suppose

22  that there is a 50 percent rejection rate conditional on

23  voting by mail, so now one of those two ballots gets accepted;

24  one of them does not.

25      So what Professor Mayer did in his report, or what he

4767

MARK HOEKSTRA - DIRECT

1  would do in a simple example like this, is he looked only at
2  the people who voted by mail.  And what he found — you know,
3  in this case, what you would find is that, well, you're
4  rejecting 50 percent of people in group B and 10 percent of
5  absentee voters in group A.  And so Professor Mayer is going
6  to say, well, this is disparate impact against group B.  And
7  he would compute this odds ratio in column 6 of 5, which is
8  just 50 percent divided by 10 percent.
9      Now, on you ought to look at this example and say there's
10 something that's clearly wrong, because we've got two
11 populations of the same size.  We impose the same restriction
12 on both groups, and we're only having one guy get his ballot
13 rejected in group B, and we're getting a hundred times that
14 rejected in group A.  And so how is it that you would conclude
15 that there's this disparate impact on group B?  Like, it's
16 nonsensical.
17     And the reason why Professor Mayer is getting that wrong
18 in his report and the reason why it would be wrong in this
19 illustration is because he's not taking into account how often
20 different groups choose to vote by mail.  And so in the last
21 two columns, I show when you do it right, when you are using
22 the full sample of people, in fact, you know, you're losing
23 10 percent of your votes from group A.  You're only losing
24 .1 percent from group B.  So this thing is having a disparate
25 impact on group A.

MARK HOEKSTRA – DIRECT

1    And it's just an example to show that the way that

2   Professor Mayer is doing it, he's accounting for the

3   difference in rejection rates, but he's not accounting for the

4   fact that some populations might use this voting method more

5   than others, and he's going to get it wrong.  And, yeah, I'll

6   stop there.

7   Q.  Okay.  Let's go to Table 4 on page 15.  Please take a look

8   at Table 4, and when you've done so, explain what Table 4

9   shows as pertains to Harris County numbers for the 2022

10  General Election.

11  A.   Yeah.  So we have –– we have –– by –– this is by separate

12  group.  Predicted whites, predicted blacks, predicted

13  Hispanics and so on.  This all comes from this algorithm.

14  We're going to talk more about that probably in a minute,

15  but –– and then it shows the number of mail-in ballots

16  rejected, the proportion of total votes rejected for SB 1

17  reasons again.  This is per Professor Mayer's classification

18  of what an SB 1 reason is.

19      And then in column 4, I'm computing the correct odds

20  ratios, and so in column 5, I'm replicating what he did.  And

21  again, I showed in the previous illustration that can give you

22  some nonsensical results when you do it the way that

23  Professor Mayer did it.  And the big –– you know, the big

24  takeaway is Professor Mayer would have you believe that there

25  is disparate impact against predicted Hispanics and against

1  predicted Asians.  You can see that in column 5.
2      In fact, if you do it right, you find there is no
3  disparate impact against those two groups and, actually, if
4  anything, you're having disparate impact against Whites
5  relative to Hispanics, and then, of course, the predicted
6  Black, you know, stays roughly the same.
7  Q.  Okay.  In your answer, you used the term "Predicted White,
8  Predicted Black, Predicted Hispanic, Predicted Asian, and
9  Predicted Others."  And that label appears on Table 4.
10     Why did you use those terms instead of simply White,
11  Black, Hispanic, Asian and Others?
12  A.  Well, no one — no one, including Professor Mayer or
13  myself observes the race of the people who voted, and so
14  nobody knows with certainty whether someone is White, Black,
15  Hispanic, other.  And so what Professor Mayer is doing in his
16  report is using an algorithm that attempts to predict the race
17  or ethnicity of each voter in the election.  And so, you know,
18  if you read his report, he'll just call people "White" and
19  "Black."  Of course, it turns out there's pretty big
20  classification errors, if you believe the authors of that
21  algorithm.  And I'm just — to make things as clear and
22  possible and as transparent as possible I'm calling them
23  predicted White, because that's what they are.
24  Q.  Okay.  Could you explain what we know about the extent of
25  the classification errors that are inherent in Dr. Mayer's

MARK HOEKSTRA - DIRECT

1  methodology of using surnames to predict race or ethnicity?

2  A.  My understanding of that method comes from this Science

3  Advances article that described it, and what it's doing

4  essentially is it's using both census data and data from these

5  six southern states, none of which is Texas, to predict based

6  on both your surname and your -- and where you live, your

7  census block, to predict your race or ethnicity.  And

8  literally what it does is it spits out -- you know, it spits

9  out these different probabilities when you run the data

10  through this algorithm.

11      And if you read that same paper, one of the things that

12  the authors do is they, you know, use the data from these six

13  states where voters are observed with -- they report their

14  race, and so you have self-reported race, which you don't have

15  in Texas, but you do have it in these other states.  And they

16  use that to compute, well, how well do our predictions do?

17  What do we get right; what do we get wrong.  And the way that

18  statisticians think about this is they -- we compute type 1

19  and type 2 error, and that's, like, false positives and false

20  negatives.

21  Q.  Could you explain a little more what you mean by type 1

22  errors and type 2 errors in terms of using the algorithm

23  Dr. Mayer uses to predict race and ethnicity?

24  A.  Yeah.  So a type -- a type 1 error, a false positive,

25  would be when Dr. Mayer predicts somebody to be Black but, in

4771
MARK HOEKSTRA – DIRECT

1   fact –– but, in fact, they are not Black.  And so that's a
2   falls positive a false negative would be if we –– if
3   Professor Mayer predicted someone to be, say, White, but
4   really that person was Black.
5   Q.  Is the classification problem you identified especially
6   large for Black voters?
7   A.  Yeah, it's larger for ––
8   Q.  And why so?
9   A.  Yeah.  It's larger for Black voters than for Hispanic
10  voters, and I think a big part of that is surnames are less
11  informative of race for Blacks and Whites versus for
12  Hispanics.  There are sort of known Hispanic surnames.  It
13  doesn't mean you do it perfectly for Hispanics.  You don't.
14  But, in general, it's worse when you compare Black versus
15  White.
16  Q.  In paragraph 34 of Defendant's Exhibit 11, you discuss
17  something referred to as a "bounding exercise."
18      We have 34 before us all now.
19      Could you explain what the bounding exercise refers to and
20  what it accomplishes?
21  A.  Yeah.  So, you know, from a –– the broad overview of it is
22  that when you're dealing with statistics, you need to account
23  for statistical uncertainty, and we do that, for example, and
24  we ask whether the mean of one group is different from the
25  mean –– than the mean from another.  You look for statistical

4772
MARK HOEKSTRA – DIRECT

1  significance.  We've talked about that earlier today.

2      In this case, there is substantial uncertainty regarding,

3  you know, the classification of — you know, of Black people

4  versus White people versus Hispanic people, and there's

5  varying ways of dealing with that uncertainty in this context.

6  It's actually a pretty hard problem in this context.

7      The way I'm addressing it here is to say, let's put bounds

8  on what the true answer would be.  And then we know that the

9  true answer is going to lie within these bounds.  And so we'll

10  have a lower bound, and we'll have an upper bound, and then

11  we'll know that the true answer is somewhere in between.  And

12  if — when you do bounding exercises, what you really like is

13  you really like when there's this thing that you're putting

14  bounds on, and those bounds are really tight.  So there's not

15  a big difference between the lower bound and the upper

16  bound —

17          MR. WATKINS:  Objection.  Narrative response.

18          THE COURT:  Finish up your thought, and let's go back

19  to Q and A.

20          THE WITNESS:  — and the bounds that really small.

21  On the other hand, if your bounds are wide, then it doesn't —

22  then what you — you don't know very much about what the real

23  answer is, because the real answer lies somewhere between

24  really wide bounds.

25

MARK HOEKSTRA - DIRECT

1  BY MR. BRYANT:

2  Q.  Okay.  Let's look at Table 5 on page 18 of Exhibit 11.

3  Please take a look at Table 5, and when you've completed

4  reviewing it, could you explain to the Court what it shows and

5  what significance the results have for this case.

6  A.  Yeah.  So in Table 5, we're looking at Harris County only.

7  In Professor Mayer's analysis, he predicts that there are

8  187,416 Black voters in Harris County.  That comes straight

9  out of this — out of this prediction algorithm.

10      Now, we don't know the true error rates here.  Nobody, to

11  my knowledge, has computed error rates in Harris County.  But

12  what we do know is we do know the error rates that they found

13  when they did it in these other counties, and so their type 1

14  error, the false positive rate, is 4.28 percent.  That

15  suggests that 4.28 percent of those people they predict to be

16  as Black, if the error rate is the same in Harris County as it

17  is everywhere else, which we can talk more about later, they

18  believe that there's 4.28 percent of them who aren't actually

19  Black.

20      If you look in panel B, this is the really important

21  error, is what's called the false negative error, and so we

22  have — they have 915,000 people that they predict to be not

23  Black.  The problem is if you believe the authors of the

24  algorithm, on average — it may or may not be true in Harris

25  County, but on average when they tested their algorithm, they

MARK HOEKSTRA – DIRECT

1  found that 17.7 percent of those people were not actually

2  Black.

3         MR. DODGE:  Object, again, as a narrative response.

4         THE WITNESS:  I don't know how to answer the

5  question.  I mean, I'm answering the question of what I did in

6  the table, and it's not something I can answer in, like,

7  two — two minutes.

8         THE COURT:  Your lawyer will get you the chance to

9  get you to expand on your answers if it's necessary.  You're

10 going on at quite some length.  You would be surprised if you

11 read it back to see how long you're going.

12 BY MR. BRYANT:

13 Q.  Dr. Hoekstra, what conclusions do you draw from Table 5?

14 A.  I mean, the short version is that we don't know what the

15 true difference between Black and White rejection rates are,

16 once you take into account the uncertainty inherit in these

17 predictions as documented by the authors of the algorithm.

18 Q.  What does Table 5 tell us about the level of confidence,

19 if any, that we can have in Dr. Mayer's assertions as to the

20 actual rejection rate for mail-in votes for Black voters in

21 Harris County in 2022?

22 A.  I mean, without some additional evidence on what the —

23 you know, what the — what we're getting wrong and in what

24 way, I don't think you can take anything away from that

25 analysis.  I don't think we know anything, because there's so

MARK HOEKSTRA - DIRECT

1  much error in how we try to predict actual Black people and

2  actual White people.

3  Q.  And would it be any different with respect to the lack of

4  confidence that you would have about Dr. Mayer's views on

5  actual rejection rates for mail-in ballots of Hispanic voters

6  in Harris County?

7  A.  I'm sorry.  Can you ask that one more time?

8  Q.  Okay.  Is there any reason to believe that we could have

9  significantly more confidence in any assertions as to mail-in

10 ballot rejection rates for Hispanics in Harris County?

11 A.  Yeah.  In general, you're still going — you're going to

12 have problems, and the reason why is because — you know, to

13 lay it out here in the first row, you've got 782 people who

14 were rejected, and you don't know if those were the — you

15 know, the actual Black guys or if those are the guys that you

16 thought were Black and weren't.  And the same thing is true

17 for all these people who are, according to the authors of the

18 algorithm, actually Black.  You don't know whether they are

19 responsible for the rejections in column B or if it was the

20 people you correctly predicted in column B who were

21 responsible for those rejections.

22      That same problem will come up with Hispanics, and I don't

23 think we learn much from it.

24 Q.  All right.  Is the algorithm that was used by Dr. Mayer

25 one that is based on the State of Texas?

4776

MARK HOEKSTRA — DIRECT

1  A.  To my knowledge, it would be using some census data from

2  the State of Texas, but it'd also be using data from these

3  other counties, not Texas.

4  Q.  What, if anything, if the significance of the fact that

5  the algorithm used was not limited to Texas, but you included

6  a broad array of states?

7  A.  Yeah.  In general, whenever you train, you know, an

8  algorithm, you train a statistical model on one sample, and

9  then you use it out of sample, and generally, your error rates

10 are going to be worse.

11 Q.  In your report you use the term "Out of sample error

12 rates."  Could you explain what that means?

13 A.  Yeah.  Again, in general, when you — you know, if you

14 were to take a model that was trained in part on, you know,

15 data from other states, and you then use it on a different

16 state, in general, you would expect your out-of-sample, you

17 know, error rates to be higher.  And that matters here,

18 because, you know, Texas is not one of — Texas is not one of

19 the States that records data of voter — records the race of

20 voters, which means they couldn't use it to correct — or to

21 generate the algorithm.

22 Q.  Did Dr. Mayer examine and take into account the issue of

23 substitutability in his disparate impact analysis?

24 A.  No, he did not.

25 Q.  What's the significance of his failure to consider

4777

MARK HOEKSTRA - DIRECT

 1  substitutability as to the reliability and validity of
 2  Dr. Mayer's analysis and conclusions?
 3  A.   Yeah.  So again, if — you know, if you want to think
 4  about burden, you know, the biggest burden on voters would be
 5  one where you made voting so difficult by this method, and
 6  that method was so important to them, that they weren't able
 7  to cast a ballot at all.  The other extreme would be you'd
 8  have voters who are perfect substitutes or who view different
 9  voting methods as perfect substitutes.  If that's the case,
10  you made voting with one method harder.  They just substitute
11  to the other method, and there's no burden at all.
12       And Professor Mayer doesn't discuss the issue at all,
13  certainly doesn't account for the fact that there can be
14  substitutability across methods of voting.
15  Q.   Okay.  Let's look at Figure 1 on page 26 of your report.
16  Please review Figure 1, and then could you explain to the
17  Court what Figure 1 shows.
18  A.   Yeah.  So Figure 1 is a replication of a figure from a
19  published paper in a journal called "Science Advances."  The
20  backdrop for it is if you want to try to, you know, cleanly
21  test substitutability, what you'd ideally like is an
22  experiment where we randomly make voting harder for one group
23  and not harder for another group, and then we see to what
24  extent do those people we made, you know, absentee voting
25  harder for substitute to another method.

4778
MARK HOEKSTRA - DIRECT

1    They identify this really clean setting in Texas and
2   Indiana, where at age 65 in Texas, it becomes very easy --
3          *(Court reporter clarification.)*
4          THE WITNESS:  Well, maybe I'll stop there, and you
5   can ask a follow-up.
6   BY MR. BRYANT:
7   Q.  Okay.  You have references to Texas and Indiana in
8   Figure 1.  What was the significance of using those two
9   states?
10  A.  Yeah, those two states both make it much easier to vote
11  absentee once people turn 65, so the people who are — who
12  turn 65 just before the election can vote absentee ballot very
13  easily.  The people who turn — sorry, the people who turn 65
14  just before the election can vote absentee very easily.  The
15  people who turn 65 just after the election could not, and so
16  you have — you know, it's, like, the experiment.
17      And so what we see on the left-hand side is that these
18  voters are much more likely to vote absentee, and if we think,
19  you know — and then we look at overall turnout, and we say,
20  well, if substitutability is a big deal, then we should see no
21  effect on turnout.  And, in fact, that's what we see.  So it
22  affects how people vote.  When you make SB 1 — or when you
23  make absentee voting much harder, it does not affect whether
24  they vote, which suggests that those people who are just
25  younger than 65 were willing and able to switch to other

*Gigi Simcox, RMR, CRR*

MARK HOEKSTRA – DIRECT

1  methods.

2  Q.  Dr. Mayer also says in his report that the elimination of

3  drive-thru voting had a disproportional effect on non-White

4  voters who cast early drive-thru votes in the 2020 General

5  Election.  Did you engage in any analysis to determine whether

6  that assertion was or was not correct?

7  A.  Yes, I did.

8  Q.  What was your conclusion from that analysis?

9  A.  There are multiple problems with that.  I'm going to see

10  if I can remember them all off the top of my head.

11  Q.  Okay.  And let's look at paragraph 61 and 62.  Let's look

12  at 62.

13  A.  Yeah.  And so what this paragraph says is the first

14  problem is if you want to argue that there's this disparate

15  impact, disparate impact refers to an adverse effect.  And so

16  Professor Mayer doesn't show any evidence of an adverse

17  effect.  I show that these people are actually more likely to

18  vote than everybody else in subsequent elections.

19      You know, the second problem —

20  Q.  "These people" being who?

21  A.  Sorry.  "These people" being the people who use drive-thru

22  voting in 2020.  That's the first — that's the first problem.

23  Q.  Okay.  Please continue as to the second problem.

24  A.  Yeah.  So the second problem is obviously we need to worry

25  about how we're computing disparate impact, and that's what we

MARK HOEKSTRA - DIRECT

```
 1  went through before.  And I showed the illustration of how he
 2  was doing it wrong, and you can lead to nonsensical results.
 3  Q.  Let's look at Table 8 on page 28 of the report.  It's
 4  Defendant's Exhibit 11.  Just please look at Table 8, and when
 5  you've had a chance to review it, describe what it shows.
 6  A.  What Table 8 shows is specifically in column 2, I'm not
 7  quite able to replicate what Professor Mayer got from
 8  column 1, but I'm really close.  And so I show the subsequent
 9  voting rates of these people who voted with drive-thru voting
10  in 2020, and then I show the subsequent voting rates of other
11  early voters from the same county.  And what we see is that,
12  in general, those people who voted drive-thru in 2020 were
13  actually more likely to vote, subsequently, than these other
14  people who used a method of voting that was not impacted by
15  SB 1.  They didn't use the drive-thru voting option.
16      And so there's — it's not immediately obvious why
17  Professor Mayer would believe that there's an adverse impact
18  on these drive-thru voters, because you can't see it when you
19  look at their voting outcomes.
20  Q.  In summary, did you find any evidence of adverse impact on
21  the subsequent voting of 2020 drive-thru voters based on any
22  predicted race or predicted ethnic category?
23  A.  No.
24  Q.  You also referred in your report to a mistaken conclusion
25  of disparate impact by Dr. Mayer based on his use of a
```

4781

MARK HOEKSTRA - DIRECT

1  Chi-square statistical test.  Could you explain what you
2  observed in that regard?
3  A.  Yeah, so the -- you know, the third -- you know, the third
4  problem with what he's doing is he's using this test to try to
5  test for disparate impact.  Now, again, in line with some
6  other things that we've talked about, one way that we can
7  assess the validity of tests is to perform the same test on a
8  sample where we think we should -- we know what the answer
9  should be.
10      In this case, we can perform the same test on
11  nondrive-thru voters who were not impacted by the elimination
12  of drive-thru voting in this county, and if you were to
13  perform the exact same test as Professor Mayer performs, you
14  would come to the exact same conclusion as him, which is SB 1,
15  you know, had this disparate impact on minorities, but that,
16  of course, cannot be true, because those voters did not vote
17  through the drive-thru.  They should have been unaffected by
18  this change, and it suggests -- well, it indicates that his
19  test is flawed.
20  Q.  And did you also cite the same classification error
21  problem that you discussed earlier in your testimony?  Would
22  that also exist with respect to Dr. Mayer's prediction of
23  future voting of drive-thru voters?
24  A.  It would.
25  Q.  Now, let's look at page 32, paragraph 74 and 75.  And

4782
MARK HOEKSTRA - DIRECT

1  there you give an example of the problems associated with

2  predicting ethnicity.  Could you explain the example that you

3  used in that analysis, please.  Take whatever time you need to

4  review paragraph 74 and 75.

5  A.  Yeah, in general, you know, I went through the other table

6  apparently too long with respect to Harris County.  We can't

7  do things exactly the same way for Harris and Dallas County

8  because I don't have all the underlying data to do it the

9  right way, to account for all voters, so I performed

10  disparate —— I estimate disparate impact in the same way as

11  Professor Mayer does, and I show that once you account for the

12  statistical uncertainty in predicting race and ethnicity, we

13  really can't say anything without imposing assumptions.  And

14  it's not even clear what assumptions we're imposing to try and

15  say something about racial disparities and disparate impact

16  using that flawed approach.

17  Q.  Let's look at the conclusion of your report that is at

18  paragraph 77 through 80.

19  A.  Yeah.

20  Q.  And please take whatever time you need to review this, but

21  the question I'm going to ask you is whether it's still your

22  opinion today that the assertions by Dr. Mayer that are

23  described in paragraph 77 through 80 are not reliable or valid

24  for the reasons set forth in your report?

25  A.  My opinions are the same.

4783
MARK HOEKSTRA - DIRECT

1  Q.  Okay.

2      Now, we spoke earlier in your testimony about that figure

3  of 6,355 mail-in votes that was derived from Dr. Hersh's

4  report, and I recall you accepted that as a possible maximum

5  number, but not as the accurate number, is that correct?

6  A.  That's correct.  I believe that's the maximum number of

7  Texas voters who could have been burdened so much by the SB 1

8  safeguards that they were unable to get any vote cast and

9  counted at all.

10 Q.  And did you write or submit a report in this case that

11 explained your reasons for your conclusions as to the fact

12 that the 6355 vote number was a maximum number, but the real

13 number was something lower that?

14 A.  I did.

15 Q.  And was that your rebuttal report to Dr. Hersh's

16 assertions dated March 23, 2023?

17 A.  Yes.

18 Q.  Let me show you what's been marked as Exhibit 2.  Could

19 you identify Exhibit 2.  Let's also look at the second page of

20 the exhibit.

21 A.  Yeah, that is my rebuttal report and response to

22 Professor Hersh's report that he submitted in 2023.

23 Q.  And does this Exhibit 2 set forth more fully the reasons

24 your assessment of the 6355 vote number statewide for alleged

25 rejections of mail-in ballots?

MARK HOEKSTRA — DIRECT

1    A.  It does.

2            MR. BRYANT:  Offer into evidence Exhibit 2.

3            MR. DODGE:  Your Honor, we object to the introduction

4    of this exhibit.  It is a rebuttal report.  It is a report not

5    in evidence, rebutting an expert who did not testify and whose

6    report was pertaining to claims that have already been

7    resolved by this Court and are not at issue at trial, so this

8    report is hearsay, this report is irrelevant, and it's

9    prejudicial to the plaintiffs because we do not have an expert

10   here to contextualize and respond to this rebuttal report.

11           MR. WATKINS:  Enjoin.

12           MR. BRYANT:  Your Honor, first of all, the fact that

13   it's hearsay does not prevent Dr. Hoekstra from both

14   responding — relying on it to the extent he wants to and also

15   responding to that number.  He has been allowed properly to

16   testify at some length about that number, and I'm really just

17   trying to put in front of the Court his full assessment of the

18   value and also the limitations of the 6355 vote number.

19           This rebuttal report, as Dr. Hoekstra's testified,

20   was provided in March.  He was fully deposed by all parties on

21   April 26th, 2023.  So all parties have had an opportunity to

22   ask him any questions they might have about that number.  And

23   Dr. Hersh also gave testimony under oath as to the 6355 vote

24   number, and we think it's highly relevant and would like for

25   the Court allow that to be admitted so it can consider that

MARK HOEKSTRA — CROSS

1   Exhibit 2.

2           THE COURT:  Objections are noted, overruled.  2 is

3   admitted.

4           MR. BRYANT:  Pass the witness, Your Honor.

5           THE COURT:  Anything further on this side?  Any

6   cross?

7                   CROSS-EXAMINATION

8   BY MR. DODGE:

9   Q.  Good afternoon, Dr. Hoekstra.  You have the privilege of

10  being the last witness, so far as I know, in a five-week

11  trial, so I'm going to try and keep this as quick as possible.

12  I'd like to start by discussing some of your background.

13  You're trained as a economist?

14  A.  Yes.

15  Q.  And your research areas of interest are things like

16  applied microeconomics.

17              (Court reporter clarification.)

18  BY MR. DODGE:

19  Q.  Applied microeconomics, labor economics, law and

20  economics, and the economics of education?

21  A.  Yes.  I would add the economics of crime to that, which

22  some might include under law and econ, but yeah.

23  Q.  You never taught any courses on political science or

24  elections?

25  A.  I have not taught a course.  I have -- I have taught

4786
MARK HOEKSTRA − CROSS

1  papers on political science topics as part of my course.

2  Q.  You haven't ever given any presentations on political

3  science or elections?

4  A.  Except to the extent that I would have presented that

5  paper, which was a while ago, so I don't remember.

6  Q.  I'm sorry, what paper are you referring to?

7  A.  The paper on voter identification laws.

8  Q.  Do you recall whether you ever presented that paper?

9  A.  I don't recall.  That was a while ago.

10  Q.  Have you ever been asked to serve as a referee for a

11  political science journal?

12  A.  I don't remember.  I get to — for context, I get asked

13  probably 25, 30 times a year, times however many years I've

14  been doing this.  I probably would have said no if they did

15  ask me, but I'm not going to claim to remember.

16  Q.  So you have never served as a referee for a political

17  science —

18  A.  If I have, it would be listed on my CV, and you can look

19  at that.

20  Q.  And you don't formally study elections?

21  A.  I've studied — you know, I've studied voting in the

22  context of the paper that you're aware of.  As you know, the

23  list of things I've written papers on is on my CV.

24  Q.  Could we pull up the April 26, 2023 transcript?

25      Do you recall, as has been discussed, you were deposed in

MARK HOEKSTRA — CROSS

1  April of 2023?

2  A.  I do recall.

3  Q.  You were under oath at that time?  You had counsel present

4  at that time?

5       If we could go to page 95.

6       You remember that you were under oath at that time?

7  A.  Yes, I do remember.  I wasn't sure if you were asking me a

8  question or not.

9  Q.  If we could go to page 95, line 22.

10      And you were asked:  "Are you an expert in election

11  administration?"

12      And you responded:  "I'm familiar with how elections

13  happen.  I don't formally study election administration."

14      Was that true and accurate testimony?

15  A.  Yes.

16  Q.  Okay.  We can take that down.

17      You've never attended a political science conference?

18  A.  I don't think so, no.

19  Q.  And you've published just a single paper on elections?

20  A.  That's correct.

21  Q.  And that was in the journal called "*Economic Letters*"?

22  A.  Yes.

23  Q.  *Economic Letters* is not a political science journal?

24  A.  Correct.

25  Q.  And it publishes short-form papers?

MARK HOEKSTRA — CROSS

1  A.  Correct.

2  Q.  Your article published in *Economic Letters* was three pages

3  long?

4  A.  Correct.

5  Q.  Other than your article in *Economic Letters*, none of your

6  published academic work involves voting or elections?

7  A.  I believe that's correct.

8  Q.  I believe you said this earlier, but this litigation is

9  also your first time testifying as an expert witness?

10  A.  Yeah.  It's now my second time, because I did another case

11  that resolved sooner than this one, but at the time I was

12  deposed and at the time I took the case, this was the first

13  one.

14  Q.  I'd like to now understand better the scope of what you

15  did in your rebuttal reports.  You were retained by the

16  defendants to serve as a rebuttal witness?

17  A.  I was retained to analyze and respond to those reports.

18  Q.  So you weren't asked to affirmatively reach any

19  conclusions about SB 1's impacts?

20  A.  I was not.

21  Q.  You didn't ——

22  A.  Well, I'd like to elaborate on that.  In fact, that was a

23  point of issue.  When I was called, I never been involved in

24  this, and I was a bit nervous about whether —— you know,

25  whether I should take a case.  I'm not very political.  I'm

1  not super into these topics, to be honest, and I don't feel as
2  strongly about these topics as most people do, and I got their
3  assurance up front that there — you know, that there was
4  going to be no pushing and — about what I say.  I say what I
5  say, and that's it, and that's how it's played out.
6  Q.  You didn't conduct your own independent analysis of any
7  burden that SB 1 imposes on voters in Texas?
8  A.  I mean, I performed a lot of analyses.
9  Q.  But none that were your own.  They were all in response to
10  reports.
11        MR. BRYANT:  Your Honor, I would like to object that
12  the counsel cut off the witness.
13        MR. DODGE:  Yeah, so I'm going to get him to answer
14  the question posed.
15        THE COURT:  The answer [sic] posed is has he ever
16  done one — his own independent analysis.
17        Have you ever done your own?
18        THE WITNESS:  So all the analyses I've done, you've
19  seen in my reports.  I don't want to get trapped into saying I
20  didn't do something that's in my report.
21        THE COURT:  I'm more curious if you did one and you
22  found stuff that you — was a surprise to your client.
23        THE WITNESS:  Oh, fair enough.  No, I have not done
24  that.
25        THE COURT:  Next question.

MARK HOEKSTRA - CROSS

1    BY MR. DODGE:

2    Q.   I'd like to ask you a couple questions specifically about

3    the scope of your response to Dr. Mayer.  Do you have that in

4    mind?

5    A.   Okay.

6    Q.   Could we please pull up State's Exhibit 10.

7         This is your response to Dr. Mayer's March 6, 2023 report.

8    A.   Okay.

9    Q.   This report does not address any earlier reports that

10   Dr. Mayer prepared in this case?

11   A.   It doesn't address them directly.  I don't know what those

12   reports say, because I haven't read them; but, obviously, the

13   points I raise here may well be relevant to points he has —

14   things he has done prior to this report.

15   Q.   So you are not offering any opinions today on Dr. Mayer's

16   February 2022 report or April 2022 report?

17   A.   Not directly, just as I stated.

18   Q.   Okay.  I'd like to now turn to some of the substance of

19   your testimony, specifically about mail ballots rejected due

20   to SB 1's mail ID requirements.  Do you have that in mind?

21   A.   Sure.  It would be helpful if we could pull up a table or

22   paragraph.

23   Q.   You're ahead me.  If we could pull up paragraph 8(a) on

24   page 4, State's Exhibit 10.

25        In this paragraph, you say, "Professor Mayer repeatedly

 1 misinterprets ballots not counted due to the identification

 2 requirements as disenfranchised voters.  In fact, an

 3 alternative interpretation equally consistent with the facts

 4 is that these 2,949 voters in question were illegitimate."

 5     Did I get that right?

 6 A.  Yes.

 7 Q.  So you concluded that Dr. Mayer incorrectly —

 8             (Court reporter clarification.)

 9         MR. DODGE:  I'll restart the question.

10 BY MR. DODGE:

11 Q.  So you concluded that Dr. Mayer incorrectly interpreted

12 ballots that were not counted due to ID requirements as

13 disenfranchised voters?

14 A.  Yes.  I think the correct interpretation is they could be

15 either of the two or some mix of the two.

16 Q.  And you suggest that the same facts could equally support

17 a finding that these 2,949 voters were illegitimate?

18 A.  I wrote that it's equally consistent with the facts, yes.

19 Q.  You agree it would be speculation to conclude that any of

20 these ballots were fraudulently cast?

21 A.  I believe it's speculation to conclude, you know, what

22 fraction are fraudulently cast and what aren't.  I don't think

23 there's anything in the data that Mayer or I have to indicate

24 that.

25 Q.  You offer no opinion on the likelihood that a mail ballot

MARK HOEKSTRA - CROSS

1  rejected due to SB 1 was cast either by a legitimate voter

2  vote or an illegitimate voter?

3  A.  I don't have the basis for making that speculation.  I

4  don't believe Mayer does either.

5  Q.  So your view is the number of illegitimate, rejected mail

6  ballots could be anywhere between zero and 2,949?

7  A.  Yeah.  And just to be clear, I don't know that —

8  Professor Mayer wasn't very clear where that 2,949 number came

9  from.  I don't really understand where it came from.  And so

10 that's why in the report I talk about the 6,355 number,

11 because that number is clear.  I don't — it's hard for me to

12 answer questions about this number, because I don't believe he

13 was clear in his report about exactly how he got there.

14      If he got there the same way as Hersh did, got to the

15 6,355, then fine.  But that's not clear in his report.

16          MR. DODGE:  I'm going to object as nonresponsive.

17          THE COURT:  That's overruled.

18 BY MR. DODGE:

19 Q.  We can use the number you just gave.  So it would be your

20 view that the number of illegitimate, rejected mail ballots in

21 Texas could be anywhere —

22              (Court reporter clarification.)

23 BY MR. DODGE:

24 Q.  So it's your view that the number of illegitimate,

25 rejected mail ballots could be anywhere between zero and 6,300

1  approximately?

2  A.  Yes, I believe that's right.

3  Q.  And you know — you have no way of telling us if the

4  number is closer to zero or 6,300?

5  A.  I don't think anything I've seen in these reports speaks

6  to that.  I don't think any of us would know, any of the

7  experts.

8  Q.  And you also have no opinion about the likelihood that all

9  of those 6,300 ballots were cast illegitimately?

10 A.  I don't know, yeah.  I don't think there's any way to

11 know.

12 Q.  Would your opinion change if you had heard testimony from

13 legally registered voters who had their ballots rejected due

14 to SB 1?

15 A.  I mean, certainly, if you were to track down all of these

16 6,355 people which may or may not be the same as the people

17 you are referring to, if you were to track them down and

18 figure out exactly what happened in that case, then that would

19 speak to it.  I don't know if those people are in that number

20 or not.

21 Q.  So if you heard from fewer than 6,300 or so individuals

22 who had their mail ballots rejected and heard their testimony

23 that they were lawfully registered voters who had their mail

24 ballots rejected, that would not impact your view on the

25 probability that all rejected mail ballots in Texas were cast

MARK HOEKSTRA - CROSS

1  illegitimately?

2  A.  No.  That's not what I said.  So, again, if you — if you

3  showed — if we knew from those 6,355 voters that some of them

4  had cast valid votes and that those were not counted, that

5  would suggest that that many of them were — you know, should

6  have been — you know, ideally should have been counted, but

7  for SB 1.  And, of course, we can figure out is that because

8  they made a mistake?  They didn't write down a number?  They

9  wrote down the wrong number?  Is it due to some database

10  issue?  There's obviously different explanations for that,

11  which have relevance going forward.

12  Q.  You didn't conduct any analysis in your response to

13  Dr. Mayer about whether mail ballots rejected due to SB 1 were

14  legally cast?

15  A.  Can you ask that question again?

16  Q.  You did not conduct any analysis in your response to

17  Dr. Mayer about whether mail ballots rejected due to SB 1 were

18  legally cast?

19  A.  No, I did not.

20  Q.  In your analysis of the 2022 General Election, you did not

21  identify any illegitimate voters among those who had their

22  mail ballots rejected due to SB 1?

23  A.  I did not attempt to identify any.

24  Q.  So, for example, you didn't speak with county election

25  officials about whether any rejected ballots in those counties

4795

MARK HOEKSTRA — CROSS

1  were illegitimate?

2  A.  I did not.

3  Q.  You didn't speak with any law enforcement officials about

4  whether any rejected ballots were illegitimate?

5  A.  I did not.

6  Q.  You didn't try to find out if there were any criminal

7  investigations into voters who had mail ballots rejected due

8  to SB 1?

9  A.  I did not.

10  Q.  You also don't know whether officials in Harris, Dallas,

11  or Hidalgo Counties filed any criminal charges against

12  individuals who had mail ballots rejected due to SB 1?

13  A.  Yeah.  The most I would have seen about the criminal

14  charges part is to the extent it was written in

15  Professor Mayer's report.

16  Q.  Do you think it's likely that thousands of fraudulent mail

17  ballots were cast in tax in 2022 without a single one being

18  detected?

19  A.  So do you mean — what do you mean by "detected"?  Do you

20  mean prosecuted?  What do you mean — what do you mean by

21  "detected"?

22  Q.  It's the ordinary meaning of detected.

23  A.  Well, I guess who is doing the detecting?

24  Q.  Detected by anyone.

25  A.  I don't know that we know that there were none that were

4796
MARK HOEKSTRA — CROSS

1  defected by anyone.  What you gave me were numbers about — I

2  believe it was prosecutions.

3  Q.  I didn't give you any numbers.  And my question —

4  A.  You referenced earlier, numbers.

5          THE COURT:  Just restate your question.

6  BY MR. DODGE:

7  Q.  Do you think it's likely that thousands of fraudulent mail

8  ballots were cast in Texas in 2022 without a single one being

9  detected?

10  A.  I don't know how to answer your question without knowing

11  what you are talking about when you say "detected."  Detected

12  by whom?

13  Q.  Prosecuted.

14  A.  I mean, in general, I think it's possible that there were

15  votes that were not detected by prosecutors.  I don't know.

16  I'm not asserting that there were, but is it possible?  Like,

17  I believe lots of things are possible.

18  Q.  Did anyone at the Secretary of State's Office tell you

19  rejected ballots may have been illegitimate?

20  A.  I missed the last part of your question.  Did anybody tell

21  me?

22  Q.  Did anyone at the Secretary of State's Office tell you

23  rejected ballots may have been illegitimate?

24  A.  I don't think I asked them that.  I don't think they

25  volunteered that, to my recollection.

4797

MARK HOEKSTRA — CROSS

1  Q.  You are aware that the Texas Attorney General maintains

2  data tracking election law-related criminal prosecutions?

3  A.  Yes.

4  Q.  You are aware of that data when drafting your reports?

5  A.  Yes.

6  Q.  But you did not look at that data in preparing your

7  reports?

8  A.  I did not look at it carefully.  I had some awareness of

9  it, as we mentioned earlier, in general, I have concerns that

10 when -- just because you have an absence of prosecutions

11 doesn't mean that something happened.  And I introduced

12 evidence to suggest that's true in other context, like

13 property crimes.

14 Q.  Did you identify anyone in your report from Harris,

15 Dallas, or Hidalgo Counties who tried voting in person during

16 the 2022 General Election but was told that a mail ballot had

17 already been cast in their name?

18 A.  I did not attempt to figure that out.

19 Q.  Do you recall what the statewide mail ballot rejection

20 rate was for the 2022 Primary election?

21 A.  I believe it was 12-point something percent, but that's

22 going off of memory.

23 Q.  And you are not able to say one way or the other whether

24 every single one of those rejected ballots was fraudulent?

25 A.  Well, given what happened in the subsequent election, we

4798
MARK HOEKSTRA – CROSS

1  can use that to sort of update our priors, so I would
2  certainly expect that many of those rejections in the Primary
3  were due to people making mistakes because they were
4  unfamiliar with the process, not that they were illegitimate.
5  I'm not claiming that on all of them, but certainly the
6  subsequent experience indicates that people figured this out.
7  Q.  But you have no view on the likelihood of that?
8  A.  I don't know how to assess the likelihood of that.
9  Q.  Could we go to page 8, paragraph 12 of Exhibit 10.
10      In this paragraph you suggest there are reasons to doubt
11  the quality of mail ballot rejection data before SB 1.
12  A.  Yes.
13  Q.  Are you familiar with what data sources Dr. Mayer relied
14  upon for pre–SB 1 mail ballot rejection data?
15  A.  I'm not going to remember at this moment, no.
16  Q.  Would you accept my representation that it was the EAVS
17  survey published by the U.S. Election Assistance Commission?
18  A.  Well, you did misrepresent something once in the
19  deposition, but I guess I'll take your word for it.
20  Q.  I don't recall what you are talking about.
21      You would agree with me that you're generally not familiar
22  with the EAVS survey?
23  A.  Yeah, so I remember being asked about this when I read the
24  transcript.  I mean, I think my familiarity with that — I
25  don't remember the names of these things very well, but I did

1  go and look up at one point, you know, numbers that came out

2  of this survey, and I believe it was that survey.  I was just

3  making sure somebody recorded the correct number, and so that

4  was my familiarity with that.

5  Q.  Sir, I just want to make sure I get an answer to my

6  question.  You agree you're not generally familiar with EAVS

7  surveys?

8  A.  I described my familiarity, which was, you know, during of

9  the course of writing my responses, I believe I pulled that

10 survey.  I didn't remember it by name when you asked me this

11 spring, but I believe I pulled that survey, so that's the

12 extent of my familiarity.

13 Q.  You would agree with me you don't have an understanding

14 what the U.S. Election Assistance Commission does?

15 A.  No, I don't.  Not offhand, anyway.

16 Q.  You would agree with me that you are not familiar with how

17 data is collected for the EAVS survey?

18 A.  Well, I presume it's collected from the states, and I have

19 a general awareness of how, you know, data get collected in

20 general, but for that particular example, could I tell you

21 anything?  No.

22 Q.  In your work as an economist, you never reviewed any

23 survey or an EAVS report until you were retained in this case?

24 A.  That would be correct.

25 Q.  You also don't know whether political scientists consider

4800
MARK HOEKSTRA - CROSS

1  the EAVS survey to be a reliable source of data?

2  A.  Yeah.  I haven't read — I haven't read things that use it

3  or don't use it and say one thing one way or the other.

4  Q.  You're also not aware of any specific reasons to doubt the

5  accuracy of data contained in an EAVS report?

6  A.  I don't think that's true.  I don't think that's fair.

7  So, in general, all these data are ultimately going to be

8  coming from the counties, and so the question is going to be

9  to what extent, you know, are the underlying data good.  And

10 the underlying data are coming from the counties, and what we

11 know for sure is that ballot-tracking and other things were

12 introduced with SB 1, so there's reasons to believe they were

13 probably collecting better data after SB 1 on rejections than

14 they were before.  So, yeah, stop there.

15 Q.  But you didn't know, for example, when drafting your

16 report, that the Texas Secretary of State has to certify that

17 the states' EAVS data are true and accurate to the best of

18 their knowledge?

19 A.  I don't doubt that that's true.  And my guess is that

20 those data probably were, to the best of their knowledge,

21 accurate.  That's — you know, that's — it depends on how

22 good their recordkeeping was, though.  I mean, we would — we

23 have to do this all the time as professors.  We have to

24 certify was this person in class.  Well, if you don't know

25 anything, you have to say something.

MARK HOEKSTRA - CROSS

1    And so the question is — you know, the question is how

2  good were those data beforehand?  They might have been the

3  best to their knowledge, but that doesn't mean that they were

4  right.

5  Q.  You weren't specifically aware of that fact, though, when

6  drafting your report?

7  A.  Ask that again.

8  Q.  You weren't specifically aware of that fact, meaning the

9  Secretary's certification at the time you prepared your

10  report?

11  A.  No.  But I have a general awareness of when you ask people

12  for data, you want them to submit stuff that's true, so I'm

13  not surprised that that's there.

14  Q.  You also didn't know, when drafting your report, whether

15  the U.S. Election Assistance Commission required counties to

16  submit mail ballot rejection data before SB 1?

17  A.  Ask that one more time.

18  Q.  You did not know when drafting your report whether the

19  U.S. Election Assistance Commission required counties to

20  submit mail ballot rejection data prior to SB 1?

21  A.  Yeah, so prior to my report, I wouldn't have looked into

22  these things at all.  That's true.

23  Q.  Do you know how many counties in Texas reported mail

24  ballot rejection data for the 2018 EAVS survey?

25  A.  I don't.

1  Q.  Do you know how many counties in Texas reported mail
2  ballot rejection data for the 2020 General Election EAVS
3  survey?
4  A.  I don't.  I hope all of them, but I don't know.
5  Q.  Do you know how many counties in Texas reported mail
6  ballot rejection data for the 2022 EAVS survey?
7  A.  No.
8  Q.  So you're not sure then whether the number of counties
9  reporting mail ballot rejection data for the EAVS increased or
10 decreased after enactment of SB 1?
11 A.  Yeah, I don't know that.  I've not made any assertions
12 about that.  I don't know.
13 Q.  Could we please go to paragraph 13 of Dr. Hoekstra's
14 report now.
15     In this paragraph, you explain your view that pre-SB 1
16 mail ballot data was unreliable because the mail ballot
17 rejection rate for reasons other than SB 1 increased after
18 enactment of SB 1.  Fair?
19 A.  I think the fair way is to say that we think there's — I
20 believe that there's problems with either the data or with the
21 comparison as a way of assessing the impact of SB 1 on
22 rejections.
23 Q.  You didn't investigate, however, how counties in Texas
24 recorded mail ballot rejection data prior to SB 1?
25 A.  I did not.  My awareness is simply about the fact that

MARK HOEKSTRA - CROSS

1  some of these things change like the Ballot Tracker, and so

2  on, with SB 1, coincident with SB 1.

3  Q.  And so you don't know anything about how well they

4  recorded data prior to SB 1?

5  A.  I know that they were required to do things with SB 1 that

6  they weren't required to do before.  That gives me some reason

7  to believe that they were doing a better job afterwards.  I

8  don't know how to — certainly, in a time frame given, there

9  was no way I was going to prove that that was true or not

10  true.  And I haven't asserted whether that it's definitely

11  true or not true.

12  Q.  Could we pull up page 206 of the April 26 deposition, line

13  7 to 12.  Thank you.

14      Your testimony in your deposition was:  "I don't know

15  anything about how well or not well they could record the data

16  before SB 1."  Fair?

17  A.  That's what that answer is.  If we — I don't know if

18  there's a broader context for that that's relevant or not.

19      For example, certainly in the deposition I would have

20  mentioned the fact that I was aware that these things changed,

21  that these Ballot Tracker and so on, changed coincident with

22  SB 1.

23  Q.  You didn't consider in your report whether SB 1 may have

24  had indirect effects on mail ballot rejection rates even for

25  non-SB 1 reasons?

MARK HOEKSTRA - CROSS

1  A.  I used Professor Mayer's definition of what he believed a

2  SB 1 reason was.  I did not independently do that.  I didn't

3  even have the data, I don't think, so I used his definition in

4  doing that.

5  Q.  Right.  My question as little different.  Even using

6  Dr. Mayer's data, you did not consider in your report whether

7  SB 1 may have had other indirect effects on mail ballot

8  rejection rates even for non-SB 1 reasons, true?

9  A.  I am presuming that Professor Mayer correctly coded things

10 as being a SB 1 reason or not.  However, SB 1 could have

11 impacted those ballots.

12     I mean, directly or indirectly, it doesn't matter, right?

13 What matters is was it caused by SB 1.  I'm relying on

14 Professor Mayer's definition of that.

15 Q.  I'm still not sure I've gotten an answer to my question.

16     Even with Dr. Mayer's data, you did not consider whether

17 SB 1 had indirect effects on mail ballot rejection rates for

18 non-SB 1 reasons?

19 A.  To the extent I considered that it — whether it had

20 direct or indirect effects, I took Professor Mayer's

21 classification at his word and said I'm going to use his

22 classification.

23 Q.  And so for those ballots he identified as being rejected

24 not for SB 1 reasons, you did not investigate whether those

25 rejections may have been caused by an indirect effect of SB 1?

MARK HOEKSTRA – CROSS

1    A.  I did not attempt to -- I don't have his underlying data,

2    so I didn't attempt to assess whether Professor Mayer

3    classified these reasons correctly or not.

4    Q.  You did not consider in your report whether the increase

5    in mail ballots rejected for non-SB 1 reasons may have been

6    due to late-arriving ballots from voters trying to cure an

7    SB 1 rejection?

8    A.  Again, I don't have the data.  I'm relying on his

9    classification for -- he called that -- if he included that as

10   non-SB 1, if it was late, then I counted it as a non-SB 1

11   reason, because that's his classification.

12   Q.  But you do agree it could be true the delays caused by the

13   need to cure rejected mail ballots increased the number of

14   mail ballots received after the deadline in 2022?

15   A.  So, in theory, what you are suggesting is possible.  What

16   I don't -- what I'm not certain from memory is exactly how he

17   classified things into SB 1 reasons versus not.  So I don't

18   know exactly what he -- I don't remember if he put that in his

19   report or not, and I didn't have the data, so I couldn't see

20   it.  So I'm not -- it's, of course, possible.  What I don't

21   know is whether he's counting that as an SB 1 reason or a

22   non-SB 1 reason.

23   Q.  Setting aside Dr. Mayer's data, you do agree it could be

24   true that delays caused by the need to cure rejected mail

25   ballots increased the number of mail ballots received after

MARK HOEKSTRA − CROSS

1  the deadline in 2022?

2  A.  It is possible for that to be true.  I don't know how he's

3  classifying rejections for that reason, because I don't recall

4  that his report, and I don't have the data.

5  Q.  You agree there are newly eligible mail ballot voters in

6  each election in Texas?

7  A.  Yes.  Most of them would be people who turn 65.

8  Q.  So you agree there will always be voters countering

9  Texas's mail ballot rules for the first time?

10  A.  I presume that's likely.  You know, in theory, it's

11  possible those people could have — the people who want to

12  vote absentee would have figured out a reason to do it before,

13  but I suspect that's likely.

14  Q.  If we could we pull up paragraph 17 on page 10 of this

15  exhibit.

16      Just take a brief moment to review this, Dr. Hoekstra.  In

17  this paragraph, you provide a partial quote from an article

18  published by Dr. Mayer.

19  A.  Correct.

20  Q.  Specifically in article published in the *Election Law*

21  *Journal*?

22  A.  That's right.

23  Q.  You quote him as writing, quote, "The prevalence of

24  fraudulent voting, as with any illegal or largely private

25  matter, is difficult to measure."

MARK HOEKSTRA - CROSS

1        Did I get that right?

2    A.   That's right.

3    Q.   Your report does not address any of the conclusions

4    Dr. Mayer actually reached in that article.

5    A.   That's right.

6    Q.   In fact, the only portion of Dr. Mayer's article you quote

7    is that single sentence fragment.

8    A.   That's right.

9    Q.   You acknowledge that you did not read Dr. Mayer's article

10   carefully prior to quoting it in your report.

11   A.   I had looked through it.  I think I told you I looked

12   through it to see what he was doing, and —— but I hadn't read

13   through it carefully, and now I have, and I believe that paper

14   is deeply problematic.

15   Q.   You didn't include that opinion in your report.

16   A.   I wasn't —— I came across this, you know, during the

17   course of other work unrelated to this case, and I took a

18   closer look at that paper, and we can talk about the problems.

19   Q.   Dr. Mayer's article, in fact, conclude there's very little

20   voter impersonation in the United States.

21   A.   That's correct.  The problem is he wouldn't be able to

22   detect voter impersonation unless it was 18 percent of the

23   electorate.

24   Q.   That's not an opinion you disclosed in this case, correct?

25   A.   That's —— I mean, that's a true fact about the paper.

4808
MARK HOEKSTRA — CROSS

1    Q.  But it's not an opinion you disclosed in this case?

2    A.  I had not put it in any report because I hadn't read that

3    part of it carefully at that point.  I have now.

4              THE COURT:  New question.

5    BY MR. DODGE:

6    Q.  You agree that the probability of a single ballot

7    determining the outcome of an election is very, very low?

8    A.  Yes.  Well, yeah, I should qualify that with, certainly,

9    when we think about larger elections.  If we think about

10   smaller elections, local elections, the probability is still

11   small, but obviously higher.

12   Q.  Your report cites to surveys indicating that some portion

13   of Americans believe that mail ballot impersonation is common?

14   A.  Yes.

15   Q.  Specifically, you cite two polls reporting to show as much

16   in your report?

17   A.  Yeah, I think the first poll was — didn't directly talk

18   about voter impersonation, and the second one did, is my

19   recollection.

20   Q.  Neither of those polls was specific to Texas?

21   A.  To my knowledge, they were both national.

22   Q.  And you didn't try in your report to answer the question

23   of why some percentage of Americans believe that mail ballot

24   impersonation is common?

25   A.  I did not.

4809
MARK HOEKSTRA - CROSS

1  Q.  And you agree your report does not identify any change in
2  the Texas public perception of the frequency of voter fraud
3  after the enactment of SB 1?
4  A.  I didn't attempt to do that.
5  Q.  You also don't know whether the public's view on the
6  frequency of voter fraud are based on real facts or data?
7  A.  Yeah.  Obviously, I don't know how people are basing their
8  opinions on it, except to the extent of the study that we
9  mentioned earlier, which suggests that when you made it
10 salient to people that there was voter identification laws in
11 place, you saw an increase in voter perceptions about election
12 integrity.
13 Q.  You didn't cite that study in your report, correct?
14 A.  I believe that's correct.
15 Q.  And —
16 A.  I cite — the reason I hesitated is because I believe I
17 cited another paper by the same authors, but I don't believe I
18 cited that paper.
19 Q.  And I believe you explained to the Judge earlier in
20 describing that paper that the experiment involved sending out
21 note cards to voters somewhere, correct?
22 A.  That's right.
23 Q.  Nothing similar was done for SB 1, correct?
24 A.  To my knowledge, no.
25 Q.  And you don't know the public's familiarity with the

1  provision of SB 1 either, correct?

2  A.  Yeah, I don't know the public's familiarity with the

3  provisions, and I don't know what the public believes about

4  whether the provisions are in effect or not, which is always

5  up in the air with lawsuits like this.

6  Q.  You also agree there was a lot of disinformation put out

7  to the public about voter fraud in the aftermath of the 2020

8  Presidential Election.

9  A.  I'm aware, for example, that President Trump made a lot of

10 pretty — yeah, pretty wild accusations about the extent of

11 voter fraud and that those were unsubstantiated.

12 Q.  And you agree that such disinformation could contribute to

13 the public's perception of how common such fraud actually is?

14 A.  It could, indeed, contribute.  I haven't studied the

15 evidence on that, and so I don't know what the literature has

16 found overall on that, but that's certainly one factor that

17 could lead to this.

18 Q.  You didn't do any analysis in your report of whether SB 1

19 laws actually reduced public perceptions of voter fraud?

20 A.  I did not.  I mean, to the extent I'm aware of some of

21 those things, it's what I — what we talked about earlier.

22 And that awareness came from an unrelated matter.

23 Q.  And you didn't investigate whether SB 1 itself reduced

24 public perception of voter fraud?

25 A.  I did not attempt to do that.

MARK HOEKSTRA — CROSS

1  Q.  Your sole basis for concluding SB 1 may reduce perceptions

2  of voter fraud is your own personal view that such a belief is

3  reasonable?

4  A.  Certainly, I think it's reasonable that when you — when

5  precautions are taken to make something more difficult, people

6  might very well believe that that thing is less — is now less

7  likely to happen.

8  Q.  And that view is not based on any training in political

9  science?

10 A.  I haven't had any training in political science.  And so,

11 of course, none of my views are based on training in political

12 science per se.

13 Q.  I'd like to turn to disparate impact now.  Let me start

14 with just sort of a basic question.  You don't take any issue

15 in your report with any of the arithmetic Dr. Mayer performed

16 in his March 2023 report?

17 A.  With any arithmetic.  No, not with any arithmetic.

18 Q.  Will you please pull up Table 3 from page 13 of

19 Dr. Hoekstra's report.

20     I believe you testified earlier that this table is meant

21 to illustrate your disagreement with Dr. Mayer about the

22 appropriate question to ask about whether SB 1's mail ballot

23 rules impose a disparate impact?

24 A.  I mean, it's — we have a disagreement about how to

25 compute disparate impact, not a — yeah.

MARK HOEKSTRA - CROSS

1  Q.  And this table is meant to illustrate your view on the

2  matter?

3  A.  Correct.

4  Q.  You agree that the data in this table are not reflective

5  of the different rates at which racial groups in Texas vote by

6  mail?

7  A.  The purpose of this table is not for it to be reflective.

8  It was to point out that you could get nonsensical answers if

9  you were to use the wrong approach like Mayer.

10 Q.  You'd agree there's no racial group in Texas —

11     (Court reporter clarification.)

12 BY MR. DODGE:

13 Q.  Fair to say there's no racial group in Texas that votes by

14 mail at 500 times the rate of any other group?

15 A.  That's correct.

16 Q.  Your report does not assign any statistical significance

17 to the example in Table 3?

18 A.  The purpose of Table 3 was to — you know, was to

19 illustrate the problem, not to focus on statistical

20 significance.  If we wanted to do that, like we talked about

21 before, we could multiply every number in there by a hundred,

22 and we could show that these are statistically different.

23 Q.  A person who casts a ballot-by-mail will, by definition —

24 strike that question.

25     A person who casts a ballot in person will, by definition,

MARK HOEKSTRA — CROSS

```
 1  not have it rejected due to SB 1's mail ballot ID
 2  requirements?
 3  A.  That's correct.
 4  Q.  The risk to an in-person voter of having their ballot
 5  rejected due to SB 1's mail ballot rules is zero?
 6  A.  That's correct.  Which is why it's important to take those
 7  people into account when we think about whether a policy has a
 8  disparate impact on a group.
 9  Q.  You would agree with me that SB 1's mail ballot rules do
10  impact voters who do not cast ballots by mail?
11  A.  Yeah, not directly anyway.
12  Q.  I'd like to shift to a discussion of what's been called
13  "BISG."  That stands for "Bayesian Improved Surname and
14  Geocoding"?
15  A.  That's right.
16  Q.  You have some familiarity with BISG prior to being engaged
17  in this litigation?
18  A.  That's correct.
19  Q.  I'd like to talk about some of your own work with respect
20  to predicting race.  In at least one of your working papers,
21  you used the last name of police officers to predict their
22  race?
23  A.  We attempted to do that, and we've tossed that out,
24  because we didn't think it predicted very well.  And instead,
25  we just looked up all the people; but, yes, we had initially
```

MARK HOEKSTRA — CROSS

1   attempted to do that.

2   Q.  You weren't able to rely on anything about the address of

3   those officers, because police departments don't release the

4   addresses of officers?

5   A.  That's correct.

6   Q.  So that data was not available to you for that paper?

7   A.  Correct.  So the — so we used surname — for example, I

8   think Grose did something similar in one of the reports here

9   as well, but we did not use address.

10  Q.  Since you were hired as an expert for this matter, you've

11  actually used BISG in another working paper of yours?

12  A.  That's correct.

13  Q.  Specifically, you used it as a way to predict how members

14  of a grand jury might predict the race of a criminal defendant

15  whose race they couldn't directly see?

16  A.  That's correct.  So we do that on the basis of first name,

17  last name, and residence, and then some combination of all

18  those things in that paper.

19      So again, we are using it — we know race, in that paper.

20  And the whole point is we have unblind and blinded

21  comparisons, and so we are using those predictions not to

22  predict actual race, but to try to predict perceptions, which

23  is a pretty different context than what we are talking about

24  in Professor Mayer's report.

25  Q.  The idea to use BISG in that paper came from your work in

1  this case, in fact, correct?

2  A.  Well, that's not true.  So the idea -- well, let me

3  clarify.  I've certainly been aware of things that could be

4  used to predict race.  I was aware of this particular method

5  from this case, and so I used that, but we've also used other

6  ones in the same paper.

7  Q.  You became aware of the data package for BISG through your

8  work on this case?

9  A.  To the best of my memory, yes.  I mean, I don't know if I

10  would have remembered this R package otherwise.

11  Q.  You've also published a paper looking at police use of

12  force in response to 9-1-1 calls based on the racial

13  composition of the neighborhood they were called to respond

14  to?

15  A.  That's right.

16  Q.  It's titled *"Does Race Matter For Police Use Of Force?*

17  *Evidence From 9-1-1 Calls."*

18  A.  Correct.

19  Q.  That was published in the *American Economic Review* about

20  around the time you were engaged for this litigation?

21  A.  Yeah, I don't remember what year it was published.  I'll

22  take your word for that.

23  Q.  In this paper, you knew the race of police officers?

24  A.  That's correct.

25  Q.  But you did not know the race of the civilians that the

MARK HOEKSTRA — CROSS

1  police officers were responding to after getting 9-1-1 calls?

2  A.  That's correct.

3  Q.  In that paper you geo-coded the address from which the

4  9-1-1 call originated into a census block and assigned a

5  civilian race?

6  A.  Yeah, we assigned — yeah, that's right.  I mean — and I

7  think in some cases we called it "civilian race."  We really

8  think of it as a neighborhood race.  You know, components of

9  people who are on average of that racial composition.

10  Q.  The purpose of doing that was to assign how likely it was

11  that the police officer was going to interact with a Black

12  person or a White person?

13  A.  That's right.

14  Q.  But again, you didn't know the actual race of the people

15  the police officers interacted with?

16  A.  Only — not for the full sample of calls.  We would have

17  only known that conditional on an arrest or use of force.

18  Q.  But you assumed it was more likely that a police officer

19  interacts with a Black person in a Black neighborhood and a

20  White person in a White neighborhood?

21  A.  That's correct.

22  Q.  You would agree there are sometimes White people living in

23  sometimes predominantly Black neighborhoods?

24  A.  Yes.

25  Q.  You would also agree there are sometimes Black people

MARK HOEKSTRA - CROSS

1  living in predominantly White neighborhoods?

2  A.  Yes.  And one thing about our study is we are not claiming

3  to say anything about differences across race within a

4  neighborhood.  That's pretty clear from our paper.  We're only

5  attempting to speak to different -- to the impacts across

6  neighborhoods, which is a big difference with what Mayer is

7  trying to do here.

8  Q.  But you were using neighborhood race as a proxy for the

9  race of the person interacting with a police officer?

10  A.  Yes.  And what that means is we're only using the

11  variation and race that comes across neighborhoods.  We're not

12  attempting to do a full census of everybody or speak to, you

13  know, racial difference within a neighborhood.

14  Q.  You didn't rely upon any surname data in that paper?

15  A.  No.

16  Q.  In that paper, you acknowledge that using neighborhood

17  race as a proxy for civilian race might create measurement

18  error?

19  A.  That's correct.

20  Q.  You also indicated in that paper that the most likely type

21  of measurement error would lead you to understate effects,

22  correct?

23  A.  That's correct.  And the reason why is because if you

24  think -- you know, basically that the question is, does the

25  probability of dealing with a Black guy go from zero to one as

4818
MARK HOEKSTRA – CROSS

1  you go from a White to Black neighborhood or does it go from
2  something a little bigger than a zero to maybe a little bit —
3  something a little bit less than one —
4              (Court reporter clarification.)
5         THE WITNESS:  And to the extent that that is true,
6  then you just need to rescale estimates accordingly.
7  BY MR. DODGE:
8  Q.  You agree in an ideal world, researchers would be able to
9  directly see something like race?
10  A.  Sure.
11  Q.  But you agree also that researchers often use predictive
12  methods in the absence of being able to directly see
13  something?
14  A.  Certainly, in some cases.  And hopefully, they correctly
15  account for how that measurement error could impact things.
16  Q.  Most, if not all, predictive methods are going to have
17  some kind of an error rate?
18  A.  Yes.
19  Q.  Fair to say, then, that the fact that a predictive method
20  has an error rate is not itself a reason to find that
21  methodology unreliable?
22  A.  That fact — yeah, certainly, that fact by itself is not
23  going to be enough.  We need to account for how big of a deal
24  that error rate is in that context.
25  Q.  You've discussed certain known error rates for BISG today?

4819
MARK HOEKSTRA - CROSS

1  A.  Yeah.  Just to be clear, they are known with whatever
2  sample data they tested them on.  And obviously, it's unknown
3  for Harris County.
4  Q.  In your report you criticize Dr. Mayer for not, in your
5  view, properly accounting for those error rates?
6  A.  That's right.
7  Q.  You agree it's possible those error rates for BISG could
8  understate group differences, however?
9  A.  All kinds of things are possible with those error rates.
10  Q.  In your report, you do not exclude the possibility that
11  BISG's error rates would tend to understate group differences?
12  A.  I don't know how to assess the likelihood of that versus
13  the likelihood hood of other things.  You know, the one -- the
14  most concerning type of example I think would be one where you
15  say who are you missing?  You are missing Black guys who, say,
16  live in White neighborhoods and don't have distinctively Black
17  surnames.  And the reason why the direction might go the
18  opposite way is because if those Black guys behave -- have
19  rates more like White guys, then you're going to end up
20  overstating the difference between Black and White.
21  Q.  But again, you didn't exclude the possibility that BISG's
22  error rates would understate effects in your report?
23  A.  I point out the full range of possibilities that you can
24  get when I do the bounding exercise, and that goes, you know,
25  both directions.

MARK HOEKSTRA - CROSS

1  Q.  I'd like to talk about your bounding exercise.

2     Could we pull up Table 5 on page 18, Exhibit 10.

3     In this Table you applied error rates for BISG

4  specifically to identifying Black individuals in Harris

5  County?

6  A.  Yeah, that's right.  So I — you know, one of the things I

7  point out in my report is that we really need to do this for

8  both Black and White.  It's a complicated exercise to do it

9  both at the same time, so I'm only doing it for Black, but

10 obviously the same thing, you're going to have to go through

11 when you do it for White.

12 Q.  Panel A, row 1 reflects Dr. Mayer's conclusion that

13 187,416 voters in Harris County in the 2022 General Election

14 were Black and that 782 had mail ballots rejected?

15 A.  That's right.

16 Q.  On your view, this number does not account for error rates

17 for BISG?

18 A.  Well, it's not just in my view.  It would be in the view

19 of the authors of the algorithm of our BISG as well; would say

20 that that number, you know, is not going to be the same as the

21 number of actual Black people, because there is error.

22 Q.  Looking at row 2 of the same panel, you have applied BISG

23 published false positive error rate for identifying Black

24 individuals to Dr. Mayer's number?

25 A.  That's right.

4821
MARK HOEKSTRA - CROSS

1  Q.  So your table suggesting that of the 187,000 or so Black
2  voters predicted by Dr. Mayer, in fact, only 179,000 or so of
3  those voters are Black?
4  A.  Yeah, assuming the published error rate is correct, then
5  that would be a correct conclusion.
6  Q.  Your table labels these, quote, "Actual Black voters who
7  are predicted to be Black"?
8  A.  That's right.  That's how my table lays it out.
9  Q.  So panel A is indicating that the false positive error
10  rate for BISG means that about 8,000 of Dr. Mayer's predicted
11  Black voters are not actually Black?
12  A.  That's correct.
13  Q.  And then you are saying that among those 782 rejected mail
14  ballots, you don't have any idea how many were cast by actual
15  Black voters?
16  A.  I mean, certainly people can make assumptions about that,
17  but we don't know at the end of the day because we don't know
18  which are the 8,000 and which are the 179,000.
19  Q.  Can we pull up paragraphs 35 and 36, which I believe begin
20  on page 17.
21      In these paragraphs you are discussing panel A that we
22  were just looking at, fair?
23  A.  Yes.
24  Q.  And specifically, you are discussing the voters Dr. Mayer
25  predicted to be Black and to which you have applied the false

MARK HOEKSTRA - CROSS

1  positive error rate for BISG?

2  A.  That's correct.

3  Q.  And you write:  "Of those, how many had their absentee

4  ballots rejected due to SB 1?  The answer is there is no way

5  for me or Professor Mayer to know.  The answer is that perhaps

6  all 782 rejections and perhaps none."

7      Did I get that right?

8  A.  That's right.

9  Q.  Could we bring back up Table 5 and look again at panel A.

10     So it's your view, applying the false positive error rate

11  to Dr. Mayer's analysis, that it could be not even a single

12  one of the remaining 179,000, quote, "actual Black voters" had

13  their mail ballots rejected due to SB 1?

14  A.  I mean, it's possible.

15  Q.  And you're unable to tell us how likely it is that not a

16  single one of those 782 rejected mail ballots was cast by,

17  quote, "an actual Black voter"?

18  A.  Yeah, not without doing some validation exercise.  I mean,

19  the best thing would be to do some validation exercise where

20  you actually knew the underlying race and you did this, and

21  then you could try to speak to, you know, what's true of the

22  people you predicted to be Black and were right about versus

23  the people you predicted to be Black and were wrong about, but

24  no one — Mayer didn't do that exercise.  I didn't either.

25  Q.   You're unable to tell the Court anything about the

4823

MARK HOEKSTRA - CROSS

1  likelihood that the number of rejected ballots among those

2  179,000 Black voters is zero, 782, or anywhere in between?

3  A.  I mean, anything we say, you know, on that is going to be

4  speculative.  And so we could all take our guesses as to, you

5  know, how many.  Obviously, one might guess that there's more

6  among the 179,000, but I don't think anybody wants me up here

7  to be making guesses about things, so I'm just saying this is

8  the range of possibilities.

9  Q.  So you're not even willing to say it's unlikely that none

10  of those 782 rejected mail ballots were passed by Black

11  voters?

12  A.  I mean, yeah, if you gave me even odds and you said, Mark,

13  you want to put some money down on is it zero?  I would say,

14  like, well, It's probably not zero.  You know, but I — but

15  it's all speculative, right?  Like, it's all a guess.  And,

16  you know, ultimately the judge can look at this and make

17  whatever guess he wants to make, and I just make it clear what

18  the range of responsibilities is.

19  Q.  Turning to panel B, row 1, that 915,481 figure is the

20  number of predicted nonBlack voters in Dr. Mayer's report in

21  Harris County?

22  A.  That's right.

23  Q.  And Dr. Mayer found that 1,753 ballots were rejected among

24  those voters, which would include predicted White, Hispanic,

25  Asian, and other voters?

4824

MARK HOEKSTRA — CROSS

1   A.  That's right.

2   Q.  You applied the published false negative rate for BISG to

3   this figure to calculate how many of those predicted nonBlack

4   voters are, quote, "actually Black"?

5   A.  That's right.  And again, it's actually Black, assuming

6   that the error rates that they published in that paper would

7   apply to Harris County.

8   Q.  That leads to the suggestion in this table that about

9   162,000 voters predicted not to be Black in Dr. Mayer's

10  analysis; you say, in fact, actually Black?

11  A.  To be clear, that's not just me.  Again, that's based on

12  the published error rates from the author of the algorithm.

13  This is not something I — all I did is multiply one number by

14  another, but this is what the authors would predict — the

15  authors of the algorithm would predict in this context.

16  Q.  In panel C, you combine the results of applying both the

17  false negative and false positive error rates for predicting

18  Black individuals in BISG?

19  A.  That's right.

20  Q.  The number of, quote, "actual Black voters" in your table

21  based on application of the BISG error rates to Dr. Mayer's

22  number is about 342,000?

23  A.  That's right.

24  Q.  That number represents to you, based on the error rates,

25  the number of voters who, if given the opportunity to

1  self-report, would self-report as Black?

2  A.  Yeah, assuming the error rates in Harris County are the

3  same as the published error rates in that paper, that's what

4  this would conclude.

5  Q.  You didn't actually check that number against any

6  population or voter demographic data for Harris County?

7  A.  When I wrote the report, I did not.  I mean, the purpose

8  of this exercise is to essentially show how important that

9  type 2 error is.  And that's — you know, the part where we've

10  got a lot of people you are predicting not to be Black, and

11  you're getting it wrong.  And it adds up to be a lot of

12  people.  Because that type 2 error rate, with this algorithm,

13  is pretty high.

14      So at the end of the day, we're missing — you know, we're

15  grouping a whole lot of Black people with the other group, and

16  that's going to create problems.  Or at least it could create

17  problems.

18  Q.  My question was lot narrower, which is just you didn't

19  check that number in panel C against any population or voter

20  demographic data in Harris County?

21  A.  Not at the time I had written my report.

22  Q.  At the time of your report, you did not know how close the

23  number of, quote, "actual Black voters" in your Table 5 was to

24  the actual true number of Black voters in Harris County?

25  A.  I don't know what the actual true number of Black voters

4826

MARK HOEKSTRA - CROSS

1  is in Harris County, and neither does Mayer.  If we knew that,
2  we wouldn't have to do any of this prediction nonsense.
3  Q.  But suffice to say you don't know whose prediction is
4  closer to the true number, whatever it may be?
5  A.  I mean, yeah, I don't know what the true number is.  I
6  mean, so — we could try to back that out in various ways,
7  but — you know, but it's hard to know what that true number
8  is.
9  Q.  You didn't independently investigate what share of the
10  Harris County 2022 electorate was Black, right?
11  A.  At the time of the report, no.  I've looked into it a bit
12  since.
13  Q.  You agree with me that knowing the actual population share
14  of Black people in Harris County would be useful in assessing
15  the accuracy of a predictive method like BISG?
16  A.  Well, I would want to know the number for registered
17  voters ideally.  And if not that, I would want to know the
18  number for citizens, as opposed to the full population.
19  Q.  And you agree such data could be useful in assessing the
20  accuracy of a predictive method, yes?
21  A.  The important issue — so, I don't think I would agree
22  with that.  The issue is that we're not correctly trying to
23  predict the number.  We're trying to pinpoint who is Black and
24  who is White and then compute rejection rates for each group.
25  And even if we get the number right, we could get that

MARK HOEKSTRA — CROSS

1  comparison really, really wrong.  So it's not enough to get

2  the number right.

3  Q.  Looking back at Table 5, the number of predicted Black and

4  predicted not Black voters on this table indicates that about

5  1.1 million people voted in Harris County in the 2022

6  Election?

7  A.  That's correct.

8  Q.  If 342,000 or so of those voters are Black, that would

9  mean a bit over 30 percent of the electorate would have been

10  Black?

11  A.  That sounds right.

12        THE COURT:  Do you have aways to go?

13        MR. DODGE:  No, but it's mostly on this topic.

14        THE COURT:  I think we all need a break.

15     (Recess.)

16  BY MR. DODGE:

17  Q.  Welcome back, Dr. Hoekstra.

18     If we could pull up Table 5 again from Exhibit 10 and

19  highlight panel C.

20     In panel C, you indicate that the number of rejected mail

21  ballots due to SB 1 among the group of, quote, "actual Black

22  voters" could be anywhere between zero and 2,535?

23  A.  Yes.  And again, that's assuming the error rates from the

24  published paper.

25  Q.  Could we pull up paragraph 40 now of Dr. Hoekstra's

4828

MARK HOEKSTRA − CROSS

1  report.

2      And here you write −− referring to panel C −− quote,

3  "Those Black voters were associated with somewhere between

4  zero and 2,535 rejected mail-in ballots.  That means the

5  rejection rate could be zero, which is obviously less than

6  that of predicted Whites or .0074, which is 3.71 times the

7  rate for predicted Whites.  There's no way to know without

8  imposing impossible-to-justify assumptions where in the range

9  that true disparity lies"?

10      Did I read that right?

11 A.  Yes.

12 Q.  You can't tell us anything about the likelihood that the

13 mail ballot rejection rate for Black people in Harris County

14 is zero percent.

15 A.  I mean, I can guess, just as anybody else in this room can

16 guess, but I don't think my role here is to guess.

17 Q.  So the answer is "yes"?

18 A.  Can you state your question again?

19 Q.  You cannot tell us anything about the likelihood that the

20 mail ballot rejection rate for Black people in Harris County

21 is zero percent?

22 A.  I can only guess, just as anybody else would.  I think

23 that's pretty clear.

24 Q.  You're not able to tell the Court anything about the

25 likelihood that the rejection rate for Black voters in Harris

1  County is zero times or 3.71 times greater from the rejection

2  rate for predicted Whites in Harris County?

3  A.  All I know is that the true answer lies somewhere, you

4  know, in between those two numbers, and I don't have any basis

5  for –– and neither does Mayer –– for asserting where in that

6  range the true number is.

7  Q.  Could we pull up Table 6 and 7.

8      In these tables you replicate your bounding analysis from

9  Table 5, but for Black and Hispanic voters in Dallas County

10  from the 2022 General Election?

11  A.  I replicated except that I'm not able to do it to compute

12  disparate impact correctly, because I didn't have the data to

13  do it, some I'm using the incorrect Mayer approach of

14  computing disparate impact.

15  Q.  Could we pull up paragraph 46 now.

16      And here you say that Table 6 and 7 show, quote, "It is

17  possible that the ballot rejection rates of actual Black and

18  Hispanic voters are much lower, even zero, compared to the

19  ballot rejection rate of White voters."

20      Did I read that correctly?

21  A.  Yes.

22  Q.  And so again, you're suggesting it's possible, given the

23  BISG error rates, that the rejection rates for Black and

24  Hispanic voters in Dallas County is zero percent?

25  A.  I'm saying it's possible yes I'm not asserting that it's

MARK HOEKSTRA — CROSS

1  likely.

2  Q.  You can't tell us the likelihood that the ballot rejection

3  rates of actual Black and Hispanic voters are much lower than

4  the ballot rejection rate of actual White voters?

5  A.  I don't think Mayer ——

6      *(Court reporter clarification.)*

7          THE WITNESS:  Sorry.

8  BY MR. DODGE:

9  Q.  You cannot tell at the time us the likelihood that the

10 ballot rejection rates of actual Black and Hispanic voters are

11 much lower than the ballot rejection rate of White voters?

12 A.  Neither I nor Mayer have a way of assessing that

13 likelihood.

14 Q.  You also didn't look at any population or voter

15 demographic data for Dallas County in preparing Table 6 and 7?

16 A.  That's correct.

17 Q.  So you don't know how the number of predicted Black and

18 Hispanic mail ballot voters in Table 6 and 7 compared to the

19 true numbers in Dallas County?

20 A.  I don't think anyone knows.  If we knew that, we wouldn't

21 have to do the prediction exercise.

22 Q.  I have a few questions on the concept of burden now.  Do

23 you have that in mind?

24 A.  Okay.

25 Q.  You don't employ any legal definition of the term "burden"

MARK HOEKSTRA - CROSS

1    in your report?

2    A.  No.

3    Q.  You employ an economic definition of the term "burden"?

4    A.  Yeah, that's right.  Although I believe that the

5    definition would be the same whether we're in economics or in

6    political science or whatever world.

7    Q.  You agree with me that a voter who has their mail ballot

8    rejected and not counted due to SB 1 has been burdened?

9    A.  Well, do we know — so if we're assume — are we assuming

10   it was a legitimate voter whose vote ought to be counted?

11   Q.  Sure.

12   A.  If we were to assume that, and if their ballot was

13   rejected, I don't know how you want to deal with the fact of

14   the possibility that they might have made a mistake or not.  I

15   guess that would just — it wouldn't impact whether they were

16   burdened.  It might impact whether you think it was reasonable

17   they were burdened, but with that caveat, yes, I agree.

18   Q.  You didn't consider —

19   A.  Let me clarify one thing.  I haven't seen any evidence to

20   suggest, like, the size of that burden in any of the expert

21   reports, you know, that I mentioned; so, you know, is that a

22   big burden?  Is that a little burden?  I don't know.

23   Q.  My question was just whether that voter was burdened.

24   A.  Yeah, fair enough.

25   Q.  You also didn't consider the cost on a voter of having to

4832
MARK HOEKSTRA – CROSS

1  cure a mail ballot application for a ballot rejected due to

2  SB 1?

3  A.  Yeah, I didn't assess any evidence on that, and I didn't

4  do it independently myself.

5  Q.  You're not sure whether there's a cost imposed on a voter

6  who has to cure a rejected ballot for application?

7  A.  I assume there is some cost.  I've not seen any attempt to

8  quantify that cost, and I've not attempted to quantify it

9  myself.

10  Q.  You agree that some voters are able to cure a rejected

11  ballot or application?

12  A.  Yes, I'm aware of that.

13  Q.  But the ability of one voter to cure a ballot does not

14  impact the cost or burden imposed on another voter who had

15  their ballot rejected?

16  A.  Can you ask that question again?

17  Q.  The ability of one voter to cure a ballot does not impact

18  the cost or burden imposed on another voter who had their

19  ballot rejected?

20  A.  Not directly.  The most it would do is speak to, you know,

21  the likely difficulty of having cured that.  To the extent

22  people are able to cure their ballots, it suggests that it's

23  possible for people to do that.  That tells you something

24  about likely burden.

25  Q.  So is that a "no"?

4833
MARK HOEKSTRA – CROSS

1  A.  Was my answer not clear?

2  Q.  Well, it's different than the answer you gave in your

3  deposition.  We can pull that up.

4  A.  Well, then let's pull that up.

5  Q.  Can we pull up the April 26, 2023 deposition at page 67,

6  line 9.

7      And the question first posed to you is:  "Does the number

8  of mail voters who successfully navigate the SB 1

9  identification requirements reduce the impact of SB 1 on those

10  individual voters who failed to navigate the SB 1 mail ballot

11  application and mail ballot county requirements?"

12      You respond:  "You're asking me, does the fact that some

13  voters — does the fact that some voters are able to vote by

14  mail" — goes on like this.

15      I clarify — Mr. Freeman clarifies — "on those who don't

16  make it through?"

17      Your response:  "I don't believe it does."

18      So the answer is "no"?

19  A.  The answer would be not directly.  The most it would do is

20  it would speak to the — how difficult that process was, which

21  is relevant, and which I probably didn't think of at that

22  moment in a seven and a half hour deposition.

23  Q.  So you are changing the answer from your deposition?

24  A.  I'm providing a more complete answer, no.

25  Q.  You agree some voters are able to successfully vote in

4834

MARK HOEKSTRA – CROSS

1  person?

2  A.  Yes.

3  Q.  But the ability of one voter to successfully vote in

4  person does not impact the cost or burden imposed on another

5  voter who had their ballot rejected?

6  A.  Only, again, to the extent it tells us something about

7  voting in person, but not directly.

8  Q.  You discussed with Mr. Bryant a study just a moment ago

9  published by Mr. Yoder.

10      Do you recall that?

11  A.  Is this the study on age 65?

12  Q.  Correct.

13  A.  Yes, I recall.

14  Q.  That study did not look at turnout rates amongst voters

15  absent from their county on Election Day, correct?

16  A.  I believe it looked at total turnout, so those people

17  would be included in total turnout.

18  Q.  But the study did not measure the change in turnout

19  amongst voters not present in their county on Election Day?

20  A.  It would have grouped them together with everybody else

21  when it looked at overall turnout.  It's not like it excluded

22  them.

23  Q.  If we could pull up Mr. Hoekstra's May 25th, 2022

24  deposition at page 123.

25      You recall that you were — prior to April of 2023, you

MARK HOEKSTRA — CROSS

1  were deposed the first time in May of 2022?

2  A.  I do.

3  Q.  You were under oath?

4  A.  Yes.

5  Q.  You were accompanied by counsel?

6  A.  Yes.

7  Q.  Could we go to line 18.

8     Question put to you is:  "Did the Hall study" —— that was

9  another author on the report, correct, Mr. Hall, in addition

10  to Yoder?

11  A.  Yes, that's right.

12  Q.  "Did the Hall study consider the impact of eliminating

13  mail voting for voters who were out of the county during the

14  early voting period" —— "country during the early voting

15  period?"

16     "No.  It looks at the impact of, you know, making it much

17  more difficult at age 64 versus 65."

18     Correct?

19  A.  That's right.

20  Q.  The Yoder study also did not look at the impact for

21  eliminating mail voting for voters who were sick or disabled?

22  A.  Again, it didn't look at that subgroup of voters.  That

23  subgroup was included in the total voters when it looked at

24  aggregate turnout.

25  Q.  But the study doesn't look at such impact on such voter,

MARK HOEKSTRA — CROSS

1  correct?

2  A.  It doesn't look at the impact on only those voters.

3  That's correct.

4  Q.  And the Yoder study also found that there was

5  statistically significant positive effects on turnout from

6  mail voting in multiple other elections in Texas, correct?

7  A.  Can you ask that again?

8  Q.  The Yoder study also found that there was statistically

9  significant effects of mail voting on turnout in other

10  elections in Texas, correct?

11  A.  I don't think that's true.  They — I don't think that's

12  true.  Maybe you can show me what you are referring to.

13  Q.  Could we pull up the Yoder report.  Go to page 19.

14      Second line at the top paragraph says, "The RD estimates

15  are not terribly stable looking across the columns, but do

16  support the idea of a meaningful and positive effect on

17  turnout in 2018 and 2014 with more modest and possibly null

18  effects in 2016 and 2012."

19      Did I read that correctly?

20  A.  Yeah, that's correct.  You read that correctly.

21  Q.  Okay.

22          MR. DODGE:  Pass the witness.

23          THE COURT:  Anything else on this side?

24

25

4837

MARK HOEKSTRA — CROSS

1                    CROSS-EXAMINATION

2  BY MR. WATKINS:

3  Q.  Professor Hoekstra, how are you?

4  A.  I'm doing great.  How are you?

5  Q.  I'm well.  I'm well.  My name is Elijah Watkins.  Unlike

6  Mr. Dodge, you and I have never had the chance to meet before,

7  have we, sir?

8  A.  We have not.

9  Q.  Okay.  I can assure you I'm an actual Black man, so you

10  need not guess, okay?

11  A.  I was going to not guess anyway, but, okay.

12  Q.  All right.  All right.  I want to first talk to you about

13  your critiques of Mr. McDaniels, Professor McDaniels, and I

14  want to talk to you about your critique of Professor Grose,

15  okay?

16  A.  Okay.

17  Q.  Before I do that, I want it get a sense of kind of your

18  academic sense.  You would agree with me that good academia

19  requires that you support your assumptions or the theories

20  that you're putting forth, right?

21  A.  Yes.

22  Q.  And it requires or suggests that one ought to cite the

23  positions and the factual assertions they are making?

24  A.  What do you mean by cite the assertions?

25  Q.  Good academia is not based on one's opinion or their gut

1  thoughts about how something should occur, right?

2  A.  We should have evidence.

3  Q.  Precisely.  You back it up with evidence and research?

4  A.  Yes.  And we should have good evidence.

5  Q.  Good evidence and good research, right?

6  A.  Yes.

7  Q.  And not just the opinion of the person whoever is writing

8  the academic paper, correct?

9  A.  As a general matter, that seems reasonable.

10 Q.  You took issue with Professor McDaniel's citation to a *USA*

11 *Today* article which cited a *New York Times* article about the

12 increase of voter intimidation during the 2020 Election.

13     Do you generally remember answering questions on that

14 regard?

15 A.  Yes.

16 Q.  And your issue was that I think the title of the article

17 was something to the effect of voter intimidation on the rise

18 or something along those lines, right?

19 A.  Of the *USA Today* opinion piece?

20 Q.  Yes, sir.

21 A.  Yes, that's right.

22 Q.  And the *USA Today* opinion piece cited a *New York Times*

23 article, correct?

24 A.  That's correct.

25 Q.  Did you read *The New York Times* article?

4839
MARK HOEKSTRA - CROSS

1   A.  I did.

2   Q.  I want to talk to you then about the reason you believe

3   that the year 2020 was an outlier in terms of using it as an

4   adequate comparator, is that right?

5   A.  Yes.

6   Q.  Can we pull up Exhibit 9, Defendant's Exhibit 9, which is

7   your 2022 response to McDaniel's.

8       Do you have that on the screen in front of you, sir?

9   A.  I'm not sure which one from the first page, but I trust

10  it's the right one.

11  Q.  Sure.  I want to see why you believe that 2020 was an

12  outlier.  All right?

13  A.  Okay.

14  Q.  Let's go to paragraphs 8 through 9.  Can you blow that up,

15  please.

16      In paragraph 8, you say, "While I hate to bring bad

17  memories to the forefront, it is important that remember that

18  2020 was an unusual year.  First and foremost, it featured the

19  worst pandemic in at least 100 years, which led to sickness,

20  death, and economic shutdowns and more generally transformed

21  the way most people lived their lives.  In addition, the 2020

22  Election featured many elements that may or may not be present

23  in future elections.  These include, among others, the

24  candidacy of Donald Trump and the intense social focus on

25  racial justice."

MARK HOEKSTRA – CROSS

1    Did I read that correctly?

2  A.  That's right.

3  Q.  Now, Professor, you don't cite anything in paragraph 8,

4  right?  There's no footnotes that I'm missing?

5  A.  Yeah, I don't think I needed to footnote those things.

6  Q.  Okay.

7  A.  I think the fact that there was a pandemic in 2020, I

8  assume we all will take that as a given.

9        THE COURT:  Next question.

10  BY MR. WATKINS:

11  Q.  Let's go ahead and look at the first sentence of

12  paragraph 9.

13    "These factors generated voting behavior that was far

14  outside the norm for a Presidential Election."

15    Do you see that?

16  A.  Yes.

17  Q.  You don't cite to any research or studies that suggest

18  that the pandemic resulted in voting factors that were far

19  outside the norm?

20  A.  I don't cite it right there, no.

21  Q.  And you don't cite to any academic research or reports

22  that say that the presidency of Donald Trump impacted voting

23  behavior for outside the norm, correct?

24  A.  That's correct.

25  Q.  And fair to say that Donald Trump was on the ballot in the

MARK HOEKSTRA - CROSS

1  2016 Presidential Election, right?

2  A.  He was.

3  Q.  And Donald Trump was the president during the 2018 midterm

4  elections, right?

5  A.  Fair enough.  Although, people might have had a somewhat

6  different view of him after having seen him in office four

7  years than they did in 2016.

8  Q.  Another factor you identified is the focus on racial

9  justice in 2020.  You didn't provide any citation and you did

10  not do any independent analysis to determine what, if any,

11  percentage of the increase in voter turnout in 2020 was due to

12  the focus on racial justice, right?

13  A.  That's correct.  I'm documenting that there were unusual

14  things about 2020, and then I document that 2020 was an

15  outlier along lots of dimensions.

16  Q.  Well, I don't know that that's entirely true, Professor.

17  What you say is, "These factors" — meaning the factors you

18  cite in paragraph 8 -- "generated voting behavior that was far

19  outside the norm for a Presidential Election."

20      Now, I've just walked you through, and you say you don't

21  cite to any support for that sentence, right?

22  A.  Yes.

23  Q.  You would agree with me, Professor, that presidential

24  elections have higher voter turnout than midterm elections?

25  A.  Yes.

4842

MARK HOEKSTRA — CROSS

1  Q.  And that there may be a different racial makeup of the

2  electorate who turns out for a Presidential Election versus a

3  midterm election?

4  A.  Yes.

5  Q.  And you would also agree with me that 2016 was the last

6  Presidential Election before the 2020 Presidential Election,

7  right?

8  A.  Yes.

9  Q.  And you would also agree that SB 1 was passed in response

10 to accusations of impropriety during the Presidential

11 Election, correct?

12 A.  I don't know exactly what the reasons are -- were -- that

13 SB 1 was passed.  I haven't looked into that.  I'm not willing

14 to make any assertions one way or the other on that.

15 Q.  So you did not read any legislative histories or committee

16 minutes from the Texas legislature saying that some of the

17 reasons they passed SB 1 were due to perceived fraud or

18 improprieties in the 2020 Presidential Election, did you?

19 A.  I did not read those things.  I didn't attempt to look

20 into the reason for why SB 1 was passed.

21 Q.  That didn't factor into your analysis?

22 A.  No.

23 Q.  Would you at least agree with me, Professor, that the

24 general statement that perception equals reality?

25 A.  I know the expression "perception equals reality,"

1  perceptions can matter.  I believe perceptions can matter, but

2  you know, if we think about a certain context we can talk

3  about this more.

4  Q.  Sure, but you've talked so far in your direct examination,

5  and I believe also on the cross from Mr. Dodge about the

6  percentage of Americans that believe there is voter fraud

7  going on in America.  Do you generally remember those

8  questions?

9  A.  I do.

10  Q.  And that perception exists whether or not the data

11  actually demonstrates that there is in fact voter fraud,

12  right?

13  A.  Yeah.  Well, one issue of course is like is how good are

14  the data are voter fraud and so that depends on how easily do

15  you think people can detect it.

16  Q.  Okay.  So my question was that perception of the American

17  population exists regardless of what the data says, right?

18  A.  I mean, I don't know what that means.  What does that

19  mean, it exists — I don't know what it means that it's

20  regardless of the data.

21  Q.  We can agree that it exists?

22  A.  It exists.  The surveys indicate people think there is

23  voter fraud.

24  Q.  And you would agree that how people believe that there's

25  voter fraud, that might impact the way they vote or how they

MARK HOEKSTRA - CROSS

1   conduct themselves?

2   A.   Yes, I believe that and I believe that's a consensus view.

3   Q.   And so you would also believe — you would also agree

4   then, Professor, that regardless of whether or not an influx

5   in minority voters has been present in the state of Texas,

6   what matters is whether or not the Texas legislature believes

7   that there has been an influx of minority voters in Texas and

8   that somehow impacts their power?

9   A.   I wouldn't know one way or the other what the Texas

10  legislature believed or not about whether there was an influx

11  of minority voting or not.

12  Q.   So regardless of what —

13  A.   I don't know what they thought.

14  Q.   So regardless of what your data says — strike that.

15      What the Texas legislature perceives may or may not be

16  impacted by the actual data that you're discussing in your

17  report, is that fair?

18  A.   I mean I guess — I don't know what drives their

19  perceptions one way or another.

20  Q.   I want to talk to you a little bit about mail-in voting.

21  Dr. McDaniel's results as to mail-in voting are consistent

22  across the 2016 Presidential Election and the 2020

23  Presidential Election, is that right?

24  A.   We'd have to go pull up those results.

25  Q.   Okay.  Can we look at MFV 333?  It's the 2020 — it's the

MARK HOEKSTRA - CROSS

```
 1  February 28th, 2022 report.  Do you see that?
 2  A.  I see that.
 3  Q.  Okay.  Let's go ahead and look at Figure 1 on page 7.
 4      Do you have that in front of you, sir?
 5  A.  I do.
 6  Q.  Pull that up?
 7  A.  Yeah, that's better.
 8  Q.  Do you see at the bottom of this graphic, bottom right it
 9  says "vote by mail" and that's in gray.  Do you see that?
10  A.  Yes.
11  Q.  And then if you look to the left-hand side which lists
12  various races, White, Black, Hispanic, et cetera, you can
13  follow Black under all voters and it says 21.6.  Do you see
14  that in gray?
15  A.  Twenty-one, yes, I see that.
16  Q.  And that's more than White voters, right?
17  A.  In 2020, that's right.
18  Q.  And that's more than Hispanic voters, right?
19  A.  That's right.
20  Q.  The only group that out paces are Native Americans,
21  correct?
22  A.  Yeah, that's correct.
23  Q.  So at least with respect to 2020, according to Professor
24  McDaniel, more Black people used mail-in voting than White
25  people?
```

4846

MARK HOEKSTRA – CROSS

1    A.   I think the right way to say that is a higher fraction.

2    Q.   A higher fraction of a Black people used mail-in voting

3    than White people used mail-in voting?

4    A.   A higher fraction of Black voters used it, that's correct.

5    Q.   So that was for 2022.  Let's look at 2016.

6    A.   That was 2020.

7    Q.   I'm sorry, thank you.  That was 2020, let's look at 2016,

8    by which is Figure 3, page 9 in the same document.

9        Can we blow up that graphic, please.

10       And do you see the bottom there when where it says

11   "absentee"?

12   A.   Yes.

13   Q.   And it shows that Black voters voted absentee at a higher

14   level than White or Hispanic voters.  Do you see that?

15   A.   Yeah.  Give me a second to digest the figure.

16   Q.   Sure.

17   A.   Are you looking at the lower left-hand graph or which of

18   those three graphs are you looking at?

19   Q.   I'm focused on the middle one, but on either graph the

20   black absentee voters are higher than the other categories,

21   right?  Even by a small amount it looks like on the very

22   right?

23   A.   Yeah, they are definitely higher.  It's hard for me to

24   tell whether they would be statistically different in the one

25   on the left and the one on the right.

Gigi Simcox, RMR, CRR

MARK HOEKSTRA - CROSS

1  Q.  Let's look at the one in the middle, voters 65 or older,

2  Black voters that are 65 or older you would agree vote at a

3  higher rate in 2016 by mail than other non-Black voters?

4  A.  Yes, that's correct.

5  Q.  Now I want to look at your report to see what you said

6  about Professor McDaniel's conclusions on this.  Let's pull up

7  your 2022 rebuttal, it's Exhibit 9.

8      All right.  And we're going to go to I believe it's

9  page 8, paragraph 14.

10     Amongst voters — sorry, page 9, Table 1.  My bad.

11     And this is percent of text and voters who voted absentee

12  by year and race ethnicity.  Do you see column 4 where it says

13  "2020"?

14  A.  Yes.

15  Q.  And it lists White non-Hispanic voters at 13.4 percent.

16  Do you see that?

17  A.  Yes.

18  Q.  And Black non-Hispanic voters after the 20.1 percent,

19  right?

20  A.  That's right.

21  Q.  And that's a higher number than Hispanic voters as well,

22  correct?

23  A.  Correct.

24  Q.  So your data agrees with Professor McDaniel's data that at

25  least in 2020 Black voters used mail-in voting more than White

MARK HOEKSTRA - CROSS

1  or Hispanic voters, correct?

2  A.  That's correct.

3  Q.  Now let's look at 2016, which is column 2.  And column 2

4  lists White non-Hispanic voters at 8.5 percent using absentee,

5  do you see that?

6  A.  Yes.

7  Q.  And Black non-Hispanic voters using at a rate of

8  12.3 percent?

9  A.  Yes.

10  Q.  And that's more than double Hispanic voters at 4.6, right?

11  A.  Correct.

12  Q.  So you and Professor McDaniel agree that in presidential

13  elections, 2016 and 2020, Black voters in Texas used mail-in

14  voting more than their non-Black counterparts, right?

15  A.  So I would agree that if you were to aggregate those two

16  together you would get a statistically significant difference.

17  I haven't done that but I believe that would be true.  The

18  difference in 2016 is not statistically significant --

19  Q.  And because --

20  A.  -- between Black and White, just to be clear.

21  Q.  And you are aware, aren't you, Professor, that SB 1 puts

22  greater restrictions on mail-in voting since its passage?

23  A.  I am.

24  Q.  And so based off of numbers that we've looked at because

25  Black voters use vote by mail at a higher rate than other

4849
MARK HOEKSTRA - CROSS

1  races, they will be affected by a higher rate by SB 1's
2  changes to vote by mail, right?
3  A.  Unfortunately you're making the same mistake that McDaniel
4  made and that you're ignoring the other years where the
5  pattern is nonexistence or in the exact opposite direction.
6  Q.  So, Professor, I'm focused on presidential elections,
7  which we've agreed have high turnouts and different racial
8  makeups.
9      Looking at president amount elections in 2016 and 2020,
10 Black voters are going to be impacted at a greater degree than
11 nonblack voters in presidential elections, right, based on the
12 data?
13 A.  In presidential elections in 2016 and 20 -- if you were to
14 combine 2016 and 2020, you would expect Black voters to be
15 more impacted by anything that impacted mail-in voting.  Of
16 course we would love to know reelection rates and all of that.
17 As I described earlier, this is kind of half of the equation,
18 but that's true.
19 Q.  And after SB 1 passed, voter turnout went down, correct?
20 And I understand we can quibble with why, I'm just saying
21 after the date SB 1 passed, voter turnout went down, correct?
22 A.  Voter turnout went down everywhere from 2020 to 2022,
23 including outside of Texas.
24 Q.  So that's a yes to my question, after SB 1 passed voter
25 turnout went down, right?

MARK HOEKSTRA – CROSS

1  A.  Voter turnout went down everywhere in Texas and everywhere
2  else from 2020 to 2022.
3  Q.  Let's look at Exhibit 8.  And we want to go to page 10,
4  Table 1.  This is your 2023 report.
5      Can we blow that up please.
6      Table 1 is showing the change in turnout in 2022 versus
7  previous years, do you see that?
8  A.  Yes.
9  Q.  So turnout in 2022 was about 20 percent less than in 2016,
10  right?
11  A.  Correct.
12  Q.  And it was about 29 percent less in 2022 than it was in
13  2020, correct?
14  A.  That's correct.
15  Q.  You can go ahead and take that down.
16      During your direct questioning you said a statement that I
17  wrote down.  "Learning by doing," and I think that was in
18  reference to when there's changes in voter laws people will
19  eventually learn and so you would expect to see what I'll call
20  bad numbers going down because people kind of figure out how
21  to do mail-in voting and rejections of ballots.  Do you
22  generally remember those questions?
23  A.  Yes.
24  Q.  You are aware, aren't you, Professor, that the State of
25  Texas passed voter ID laws that have nothing to do with SB 1

MARK HOEKSTRA - CROSS

1  about a decade ago.  Did you know that?

2  A.  I wouldn't have been able to tell you the date, but I'm

3  aware of that Texas passed these laws and it was some time

4  ago.

5  Q.  And even though it was some time ago, are you also aware

6  that Texas continues to see issues with voter ID laws and

7  needs to send out advertisements to teach people about how to

8  comply with voter ID laws in Texas?

9  A.  I haven't looked into that at all and I wouldn't know

10  whether that information they send out is a proactive measure

11  or as a reactive measure.

12  Q.  Can we agree at least that getting 17 million people to

13  change their behavior make take some time?

14  A.  I mean of course, it's possible.  I wouldn't know how long

15  it would take them to change behavior.

16  Q.  I want to talk about wait times.  You opine that in 2020

17  Blacks waited an average of 2.7 minutes longer to vote

18  compared to White voters, right?

19  A.  Yes.

20  Q.  And that is statistically significant?

21  A.  In 2020 I believe that's true.

22  Q.  And just so we understand a working definition of

23  "statistically significant," that means that it is not a

24  matter of random chance that Blacks have to wait longer --

25  have longer with the wait times than Whites, right?

4852

MARK HOEKSTRA — CROSS

1    A.  I think the right way to say it would be that the

2    difference you see in the surveys is not the type of

3    difference that you would have expected to see just due you

4    sampling error and who you surveyed and so on.

5    Q.  So the fact that Blacks have to wait longer in lines to

6    vote is not the result of a sampling error?

7    A.  That's right, we — in 2020, we think that, you know,

8    using that survey — and again, I've cast some doubts on that

9    survey with the study based on smartphones; but based on that

10   survey, you would conclude that Black people waited 2.7

11   minutes longer than White people in 2020.

12   Q.  And you would agree that Professor McDaniels also says

13   that Black people waited longer than White people in line to

14   vote, right?

15   A.  Yes.  And he's saying that again in 2020, and he's

16   ignoring 2018 and 2016 and 2014 and so on.

17   Q.  I get you don't like Professor McDaniels.  I get it.

18   A.  Oh, it's not personal.  I just don't like that he didn't

19   report data from other years.

20   Q.  And you're fine.  The attorney's going to have a lot of

21   opportunities to get you to say that on his direct.  I just

22   want to kind of get the answers to my questions here.

23       Both you and Professor McDaniels agree that there are

24   longer wait times for Black voters in 2020, right?

25   A.  For that survey, yes.

4853

MARK HOEKSTRA - CROSS

1  Q.  You didn't try to replicate Professor McDaniel's

2  calculation, did you?

3  A.  Which calculations are you referring to?

4  Q.  Well, you used your regression model, right?

5  A.  Yes.  I did not do a -- I didn't -- believe he did an

6  ordered logit model.

7  Q.  He did a logit model, L-O-G-I-T, right?

8  A.  Yeah, it's more than that.  I think it's an ordered logit,

9  which is a little bit different.

10  Q.  Okay.  You did a regression model.  He did an ordered

11  logit model. You used two different models.

12  A.  Yeah.  I may have done an ordered logit.  I don't recall

13  if I did that.  I'm sure I checked to make sure that it was

14  giving me more or less what he was getting, but I didn't

15  report it, in part, because it's hard to interpret.

16  Q.  That's fine.  So you -- using two different models, you

17  both came to the same conclusion; it might be a matter of

18  degree, but you both came to the same conclusion that Blacks

19  have to wait longer than Whites?

20  A.  That's right, the difference --

21  Q.  Okay.

22  A.  -- you know, the difference is I'm sort of able to

23  quantify it in terms of minutes.

24  Q.  Sure.  Let's talk about drop boxes.  You also responded to

25  Professor McDaniel's opinions on the rates that Hispanic

MARK HOEKSTRA – CROSS

1  voters cast their ballots using drop boxes, right?

2  A.  Can you ask one more time?

3  Q.  Sure.  You responded to Dr. McDaniel's opinions on the

4  rates that Hispanic voters cast their ballots by using

5  drop-box voting, right?

6  A.  Yeah, that's right.

7  Q.  And you examined data from the 2020 Cooperative Election

8  Survey, or CES?

9  A.  That's right.

10 Q.  And you have no reason to challenge the reliability of the

11 CES data, right?

12 A.  I mean, in general, we're relying on surveys, so it's

13 always possible that people don't respond correctly.  And

14 certainly, we've gone over that in the other context of wait

15 times, but it is what it is.  It's the survey.  It's the best

16 you've got to get at that.

17 Q.  And in the CES survey, 14.3 percent of Hispanic voters

18 dropped off their ballot at drop boxes compared to 2.4 percent

19 of White voters, is that right?

20 A.  Are you referring to of all voters?  And I'd like to see

21 those numbers, because I haven't committed those numbers to

22 memory.  Those numbers seem high.

23 Q.  Let's go ahead and pull up Exhibit 9.  And this is your

24 2022 rebuttal.  Let's go to paragraph 28.

25    And if you look at the last sentence, it says, "Of all the

MARK HOEKSTRA – CROSS

1  CES survey respondents who voted absentee, only 14.3 percent

2  of Hispanic voter respondents said they dropped off their

3  ballot at a drop box compared to 9.2 and 2.4 percent of Black

4  and White voters respectively."

5      Did I read that correctly?

6  A.  That's right.

7  Q.  So 14.3 percent of Hispanic voters dropped off their

8  ballots at drop boxes compared to 2.4 of Whites, right?

9  A.  Hispanic absentee voters.

10  Q.  And 9.2 compared to Blacks?

11  A.  Again, among absentee voters.

12  Q.  Regardless, you agree that among absentee voters,

13  Hispanics used drop boxes more than twice the amount of

14  Whites?

15  A.  Conditional on voting absentee, that's true.

16  Q.  So SB 1's removal of drop boxes would impact Hispanics

17  more than twice as much as Whites, right?

18  A.  Not necessarily.

19  Q.  Well, Hispanics use drop boxes twice as much as Whites,

20  Right?

21  A.  There's –– yeah, there's two –– there's two mistakes

22  you're making, if you let me explain that.

23  Q.  I will in a second.

24      SB 1 –– strike that.

25      Hispanics use drop boxes twice as much as Whites, correct?

4856
MARK HOEKSTRA - CROSS

1  A.  Hispanic absentee voters use drop boxes, which is an
2  important distinction.
3  Q.  And when Hispanic absentee voters who use drop boxes twice
4  as much as Whites are prevented from doing that because of
5  SB 1, they will be twice as likely to be impacted by SB 1?
6  A.  The absentee voters would be, but if we're interested in
7  disparate impact, we've got to make sure we don't make the
8  same mistake that Mayer made, which is we need to account for
9  differences in the likelihood that Hispanics versus Whites
10  choose to vote absentee.  And that's — you know, once you
11  condition on absentee voters, you can get things wrong.
12      The second issue, of course, is we need to deal with
13  substitutability, so if we want to think about burden, we have
14  to think how willing and able —
15              (Court reporter clarification.)
16          THE WITNESS:  If we want to think about burden, we
17  need to consider how willing and able, you know, these voters
18  are to vote using other methods.  Or in this case, to drop off
19  at one of the existing places that's still there under SB 1.
20  BY MR. WATKINS:
21  Q.  I've got a whole section about substitutability.  I
22  promise I'll get there, okay?
23  A.  Okay.
24  Q.  Okay.  I want to move on to Professor Grose, okay?
25      As part of your opinions you submitted in this case, you

MARK HOEKSTRA − CROSS

1  responded to Professor Grose expert reports, right?

2  A.  Yes, I did.

3  Q.  And you addressed Dr. Grose's 2020 audit study in your

4  reports, correct?

5  A.  I did.

6  Q.  And you agree that audit studies are a good way to assess

7  causality, correct?

8  A.  If implemented correctly, they can be.

9  Q.  So that's a yes; if done properly, they are a proper way

10  to assess causality?

11  A.  Yes.

12  Q.  You have concern, though, because you question whether or

13  not the actual legislator read the email that was sent to him

14  or staff in his office, right?

15  A.  I mean, that's one of the issues.

16  Q.  And you have concern that perhaps the reason the

17  legislator didn't respond is because they just don't speak

18  Spanish?

19  A.  That's one of the issues as well.

20  Q.  And another issue you have is perhaps the legislator's

21  office isn't as well staffed and has the resources as other

22  offices to respond, right?

23  A.  That's correct.  That's another one.

24  Q.  And perhaps another issue is that the legislator may not

25  believe that someone who speaks Spanish is a voter or one of

4858

MARK HOEKSTRA – CROSS

1  their constituents that would vote for them, right?

2  A.  That's correct.

3  Q.  Okay.  Are you familiar with randomized drug samples or

4  randomized drug testing?

5  A.  Are we talking about FDA trials or —

6  Q.  Yes, sir.

7  A.  — drug testing people for work?

8  Q.  FDA trials.

9  A.  Got it.  I'm familiar with that, yes.

10 Q.  High level, that would be where there would be one drug,

11 the actual drug we want to test, and then a placebo, a drug

12 that's just a sugar pill that has no effect, and you would

13 give that to a population to see how they react, right?

14 A.  That's right.

15 Q.  And the key to that today study is that you randomize the

16 people who take the pill, right?

17 A.  That's right.

18 Q.  So, for example, some people in the drug trial might have

19 a high caloric diet, and others might have a low caloric diet,

20 right?

21 A.  That's right.

22 Q.  Some might make more than 100,000 a year, others might

23 make less?

24 A.  That's right.

25 Q.  Some might have brown eyes, others blue eyes?

4859

MARK HOEKSTRA - CROSS

1    A.   Sure.

2    Q.   And if you randomize the sample, what happens is that they

3    be approximately an equal number of high caloric folks on both

4    sides of the placebo versus controlled drug, right?

5    A.   Yes.

6    Q.   And same thing with brown eyes, blue eyes, socioeconomic

7    status, correct?

8    A.   Yes.

9    Q.   And by controlling that way, you can isolate and say the

10   only difference between these two populations is the pill they

11   are receiving, correct?

12   A.   That's right.

13   Q.   And so as long as we randomize a study, when reaching out

14   to legislators, it would make the — suggest that the offices

15   that are receiving those emails would be generally equal on

16   each side on whether or not they respond to the email or don't

17   respond to the email, right?

18   A.   So you would know that the offices would be similar in

19   other dimensions.

20   Q.   So whether or not the actual legislator read the email

21   versus a staffer, that possibility would remain true on the

22   respond-to-the-Spanish email and the not-respond-to-Spanish

23   email category, right?

24   A.   That's true, but to the extent that staffers are the ones

25   responding to it, then you're picking up the impact on staff

MARK HOEKSTRA — CROSS

1  responses, not on legislator responses, and so that matters

2  for interpretation.

3          *(Court reporter clarification.)*

4          THE WITNESS:  Then you're pickup up affects on staff

5  responses, not on legislature responses.

6          I'll try to slow down.  He's speeding me up.  I'm

7  blaming him a little bit.

8  BY MR. WATKINS:

9  Q.  And we've already established you're not a political

10 scientist?

11 A.  Correct.

12 Q.  So you don't have any opinion as to whether or not a voter

13 views the office of an elected official or the elected

14 official itself as the one speaking to them, right?

15 A.  I don't know.  I mean, I presume these emails are signed

16 by somebody when they get an email response, and so I would

17 assume the voter would correctly interpret who that is when

18 they ask for a response.

19 Q.  That's an assumption on your part?

20 A.  Sure.  I assume that when someone signs an email, that you

21 think that that email comes from them.

22 Q.  You're guessing?

23 A.  Sure.

24 Q.  Let's go ahead and look at Professor Grose's study, a HAUL

25 MFV 350, please.  And we want to go to Table 1 on page 15.

MARK HOEKSTRA - CROSS

1      All right.  So these are the results of that randomized
2  study.  And if we look at column 1(a), that shows the
3  legislators who voted for SB 1, in favor of SB 1, were
4  29.4 percent less likely to respond to an email in Spanish
5  seeking information about voting than in English, right?
6  A.  Yes, 29.4 percentage points, but yes.
7  Q.  My apologies.  29.4.  And that's based on 85 observations.
8  Do you see that at the bottom?
9  A.  Yes.
10  Q.  So that's the number of legislators that responded in that
11  fashion, right?
12  A.  I believe that would be the number of legislators who were
13  sent the request at all.
14  Q.  It's the number of legislators who voted for SB 1 that
15  way, right?
16  A.  Yes.
17  Q.  And in forming your opinions in response to Dr. Grose, you
18  didn't conduct your own study, right?
19  A.  That's correct.
20  Q.  You didn't send emails out or anything like that?
21  A.  Did not.
22  Q.  And, in fact, you've never conducted an audit study of any
23  kind?
24  A.  No, I haven't.
25  Q.  Instead, you attempted to replicate Dr. Grose's study by

*Gigi Simcox, RMR, CRR*

4862
MARK HOEKSTRA − CROSS

1  reviewing his data?

2  A.  I did replicate his study using his data.

3  Q.  And by — you attempted to replicate his study by looking

4  at the code that he used?

5  A.  Yes.  I did replicate the study.

6  Q.  Before I move on, on that point, I just a question.  There

7  was some issue you took with Dr. Grose's study by saying that

8  he was equating Spanish language speaking with being a

9  minority.  Did I get that right?

10  A.  Are we talking about something I said or something I

11  wrote?

12  Q.  Something you said on your direct.

13  A.  Oh, goodness.  I don't remember what all I said.

14  Q.  It was several hours ago.

15     You would agree that someone can be a language minority,

16  right?

17  A.  I'm not sure if I know what "language minority" means.

18  Q.  That's because you're not a political scientist or a

19  sociologist or anything like that, right?

20  A.  I mean, I don't know if I would know what it means then

21  either.

22  Q.  To the extent that —

23  A.  What I'm saying is I don't know how to answer your

24  question, so if you can explain that term, I'll answer your

25  question.

4863
MARK HOEKSTRA — CROSS

1    Q.  To the extent that Dr. Grose was testing to see how Texas
2    legislators responded to Spanish speakers sending an email in
3    a different language other than English, meaning in Spanish,
4    would get at that question, right?
5    A.  So it's fair enough to interpret his study as what is the
6    difference in response rates to a Spanish email versus an
7    English email.  That's what it is.  The egregious error is in
8    interpreting that as evidence of intent to discriminate.
9    There's no basis for that conclusion.
10   Q.  Looking back at your screen again, 29.4 percent in the
11   statistical model of 1.86 of the legislators who voted for
12   SB 1, whether they responded to the request for voting
13   assistance.  Do you see that?
14   A.  Yes.
15   Q.  Okay.  And now I want to compare with what Dr. Grose said
16   to what you said in your report.
17       Can we pull up Hoekstra 2022.  It's Exhibit 6.  And I want
18   to go to Table 1 on page 8.
19       Do you see "Any responses, supporters of SB 1" in
20   column 1?
21   A.  Yes.
22   Q.  And it says:  Difference in English minus Spanish,
23   29.4 percent — or negative 0.294?
24   A.  Percentage points, right.
25   Q.  So running Dr. Grose's data using his code, you come up

4864

MARK HOEKSTRA — CROSS

1  with the same number?

2  A.  Correct.

3  Q.  And you did that using the same 85 legislators, right?

4  A.  Correct.

5  Q.  On the observations?

6  A.  Correct.

7  Q.  I now want to go over to the next column where it says

8  "Nonsupporters," column 2.  Do you see that?

9  A.  Yes.

10  Q.  And there you say the difference is .224 percent — or

11  22.4 percent.  Do you see that?

12  A.  I do.

13  Q.  And I think on direct you said that the number of

14  supporters of SB 1 versus nonsupporters of SB 1 was

15  functionally the same based off these percentages, right?

16  A.  Statistically, those numbers are equivalent.

17  Q.  If you look at the observation line, you put down 68

18  observed.  Do you see that?

19  A.  I do.

20  Q.  Okay.  So you are saying that you looked at 68 people that

21  voted no or did not support SB 1, right?

22  A.  So I'm defining it the same way he said he defined it in

23  his report.  So if you go back — and I think he defines it in

24  a footnote.  I'm defining nonsupporters in the same way he is.

25  Q.  Which is what?

4865

MARK HOEKSTRA - CROSS

1  A.  I don't remember that footnote.

2  Q.  Let's go back to Dr. Grose's report.  I believe it was

3  MFV 350, back to Table 1.

4      So the number of legislators that Dr. Grose mentions in 1B

5  is 50, not 68.  Do you see that?

6  A.  So just to be clear, this is his response to my rebuttal,

7  is that right?  Because he's talking about me.

8  Q.  I believed that's correct, yeah.

9  A.  Yeah.  So I would like you to pull up the first report

10 that -- I was responding not to this.  I was responding to a

11 report that he wrote.  And I would like you to pull that up so

12 that we can show the Court what that is.

13 Q.  Right now your counselor is furiously taking notes.  I'm

14 sure he's going to give you that opportunity.  I'm focused on

15 this number.

16     The reason he has 50 and you have 68 is because Dr. Grose

17 only counted those who voted no on SB 1 whereas you counted

18 those who voted no or didn't vote at all, is that right?

19 A.  I counted them the way that he said he counted them in his

20 report, which you don't want to pull up.

21          THE COURT:  Sir, just answer the questions.  It goes

22 a lot easier that way.

23          THE WITNESS:  I'm explaining what --

24          THE COURT:  No, you're not.  Just answer the

25 question, and your lawyer will have the opportunity to ask you

4866

MARK HOEKSTRA — CROSS

1   some more questions.

2   BY MR. WATKINS:

3   Q.   So the difference is that in your 68 count versus

4   Professor Grose's 50 count, is you counted those who may not

5   have even been in the State house that day, right?  But you

6   counted them as a no?

7   A.   In order to remember exactly how I counted them, I'd like

8   to pull up the footnote.  I mean, I — if you are asserting

9   that, that may be true.  I haven't read that footnote for a

10  while.

11  Q.   You would agree that if you overcounted the numbers of

12  noes by including in the "no count" people that weren't even

13  voting on the bill, that might mess your data up?

14  A.   I don't believe I counted them.  I don't believe I was

15  attempting to count the "no votes."  If we go back to my

16  table, you can see what I was attempting to count.  I believe

17  you termed it "nonsupporters," and I defined it the way he

18  said he defined it in his report.  He came back in response,

19  and he changed how he wanted to define it.

20  Q.   I want to talk to you about voting methods.  You used the

21  word "substitutability," is that right?

22  A.   Yes.

23  Q.   And substitutability is the concept that if a voter has a

24  different way to vote and one method of voting is taken away,

25  they will substitute for the other method?

4867
MARK HOEKSTRA - CROSS

1   A.  Yeah, to the extent they are substitutes, then, yes.

2   Q.  Can we go to Exhibit 6, paragraph 23.  Can you pull up 23,

3   please.

4       Looking at this first sentence -- I'm sorry.  Halfway

5   down, where it says "the fundamental issue."

6       It says, "The fundamental issue for assessing the effect

7   of SB 1 on voter participation is whether it impact -- is

8   whether it impacts whether citizens vote at all, not whether

9   they use one method or another."

10      Did I read that correctly?

11  A.  Yes.

12  Q.  So you're interested in whether citizens are voting and

13  not how they are voting, right?

14  A.  I've obviously looked at both, but I think the core issue

15  for burden is assessing whether it impacts votes.

16  Q.  And you believe that substitutability is the extent to

17  which voters are willing to able to vote using a different

18  method when one method is taken away?

19  A.  Or even if one method is made a little bit more difficult

20  in this case, yes.

21  Q.  And you believe there is a one-to-one substitution and

22  that voters will always shift to another form of voting when

23  one is taken away?

24  A.  I don't think I wrote that anywhere.  I don't think I

25  believe that.

4868

MARK HOEKSTRA – CROSS

1  Q.  Okay.  So you believe that there are instances where if

2  one form of voting is taken away or made more difficult, that

3  that voter will not go and vote in another form, right?

4  A.  So it's certainly possible as a hypothetical issue.

5  Q.  So a homebound, elderly person, if mail-in voting is taken

6  away from them, they may not actually show up to the polls.

7  They just won't vote, right?

8  A.  It's possible.  And we want to assess empirical evidence

9  on that.

10  Q.  But you didn't actually look at that, did you?

11  A.  We looked — I've shown the paper, you know, across the

12  age 65 threshold where you see — you see jumps in how people

13  are voting.  It's clearly becoming easier, and you're not

14  seeing any — any impact on turnout.

15  Q.  You didn't do any independent research to see how voter

16  turnout would be affected by the changes made by SB 1,

17  correct?

18  A.  That's correct.

19  Q.  But you believe that voters are indifferent between

20  different methods of voting, is that right?

21  A.  That's not what I said.

22  Q.  It is not your opinion that voters are indifferent with

23  respect to different methods of voting?

24  A.  Voters can be indifferent.  As a general — if we're

25  talking about the context of the Yoder paper, it certainly

*Gigi Simcox, RMR, CRR*

MARK HOEKSTRA - CROSS

1  appears as those voters were largely indifferent between, you

2  know, voting some other way and voting by absentee, but I've

3  not made that general assertion as you just did.

4  Q.  Let's go ahead and look at your deposition, the 2022

5  deposition, please.  Go to page 203, lines 1 through 10.

6      "What's your basis for that?"

7      "Again, it comes down to the same issue we've talked about

8  earlier, which is to the extent that — the extent that voters

9  are indifferent between different forms of voting, if you —

10 if a policy causes them to shift from one to another, there's

11 no harm done.  And so you would need to demonstrate that those

12 voters are not indifferent, and certainly you need to account

13 for this issue, which he does not at all in his initial

14 report."

15     Did I read that correctly?

16         MR. BRYANT:  Objection, improper impeachment.  The

17 testimony is consistent with the witness's testimony on the

18 stand.

19         THE COURT:  That's denied.

20 BY MR. WATKINS:

21 Q.  Did I read that correctly, sir?

22 A.  Yes, you did.

23 Q.  And you base this opinion on an article in *Science*

24 *Advance*, correct.

25 A.  To be clear, the opinion in that deposition, I wasn't

4870
MARK HOEKSTRA - CROSS

1  making a blanket statement.  I was talked about to the extent
2  which —— and I'm basing that in large part on that article,
3  yes.
4  Q.  The *Science Advance* article?
5  A.  Yes, using Texas voters.
6  Q.  And that *Science Advance* article, that involved a study of
7  the 2020 Election, right?
8  A.  They show data from multiple elections including 20 —— I'm
9  going to forget.  We showed that graph earlier.
10 Q.  But I think you've already opined that you believe the
11 2020 Election was an outlier, correct?
12 A.  Yes.
13 Q.  So other than the *Science Advance*'s article, you don't
14 cite to any other support regarding your opinion of
15 substitutability, right?
16 A.  That's —— yeah, that's the only article I support that ——
17 or of the article I cited that addresses that issue.
18 Q.  I want to talk to you about Harris, Hunt, and Hardin
19 Counties, okay?
20 A.  Great.
21 Q.  You discussed on direct that Dr. Grose's analysis of the
22 impacts of SB 1 on counties impacted by SB 1 restrictions on
23 earlier voting hours, right?
24 A.  Can you ask that again?
25 Q.  Sure.  You discussed on direct that SB 1's impact on early

4871
MARK HOEKSTRA - CROSS

1  voting hours impacted Harris, Harden, and Hunt Counties,
2  right?
3  A.  Those were the three counties with the population over
4  55,000.  It impacted others as well.
5  Q.  But the ones over 55,000?
6  A.  Those were the three.
7  Q.  And SB 1 prohibits counties with population over 55,000
8  from providing early voting during the weekdays and on
9  Saturday before 6:00 a.m. and after 10:00 p.m.  Are you aware
10 of that?
11 A.  So we would have to go back and look at exactly — I don't
12 recall.  My recollection is that that was binding on all
13 counties.  But I would have to go back and look at my report
14 because I don't recall exactly.
15 Q.  I'll represent to you that SB 1 prohibit — or requires
16 early voting during the weekdays and on Saturdays before
17 6:00 a.m. and after 10:00 p.m.  It requires that.  Okay?
18 A.  It requires there not be before those hours.  Is that
19 right?
20 Q.  That you can only vote between 6:00 a.m. and 10.
21 A.  Right.  Okay.
22 Q.  And it prohibits counties with populations over 55,000
23 from providing early voting on Sundays before 9:00 a.m.  Okay?
24 A.  Okay.  And again, my recollection is that it's more than
25 just the counties over 55,000, but we'd have to go back and

4872
MARK HOEKSTRA – CROSS

1  look.

2  Q.  We can go read the bill, right?

3  A.  Sure.

4  Q.  Okay.  And you discuss the impact of those provisions on

5  these counties with greater than 55,000 in population.  That's

6  why you discuss Harris and Hunt and Hardin?

7  A.  Yes.

8  Q.  And you identify these counties in addition to Harris,

9  whose early voting hours would be impacted by the SB 1

10  provisions?

11  A.  Ask that again.

12  Q.  Sure.  You identified Hunt and Hardin counties as counties

13  that are in addition to Harris whose early voting hours were

14  impacted by these early voting provisions?

15  A.  Yeah, that came directly from Professor Grose.  I didn't

16  independently do that.

17  Q.  Okay.  Let's talk about Hardin County specifically.  You

18  are aware, aren't you, that Hardin County did not offer early

19  voting in 2020's General Election on weekdays or Saturdays

20  before 6:00 a.m. or after 10:00 p.m.?

21  A.  I didn't independently attempt to assess which counties,

22  you know, offered which hours.  I was using Professor Grose's

23  data where he indicated that it was impacted by SB 1.

24  Q.  So we can read Professor — the professor's report, but

25  you did not do anything independently to determine which

4873

MARK HOEKSTRA – CROSS

1  counties were actually impacted by SB 1 early voting

2  restrictions?

3  A.  Yeah, I assume that Professor Grose did that correctly in

4  this data when we coded it.

5  Q.  So because you didn't do any independent research to

6  verify which counties were impacted by SB 1's hours, you're

7  not aware that Hardin County's early start times that are set

8  up by SB 1 only meant that on one Sunday there was one hour

9  that they would have to open up at a later time, right?

10 A.  Yeah, I didn't look into the individual hours.

11 Q.  And so you don't know if that's the only impact that SB 1

12 had on Hardin County?

13 A.  Yeah.  I didn't look into the hours.  I don't know.

14 Q.  And so you don't know if it also didn't reduce the number

15 of early voting hours in Hardin?

16 A.  I don't know the extent to which — I believe there was a

17 column in Professor Grose's spreadsheet that might have

18 indicated number of hours.  It's been a minute since I've

19 looked at it.

20 Q.  Do you know the population of Hardin County is?

21 A.  No.

22 Q.  Would it surprise to you learn that Hardin County,

23 according to the 2020 census, has a population of 56,000?

24 A.  I mean, I'll take your word for it.

25 Q.  Let's look at Hunt County.  So again, you didn't do any

4874
MARK HOEKSTRA - CROSS

1  independent research on this, so you don't know how SB 1

2  impacted the early voting times of Hunt County?

3  A.  Only to the extent it was in Professor Grose's data.  I

4  took his data, you know, as a given.

5  Q.  And that's an assumption that you read the data right,

6  fair?

7  A.  I mean, I'm sure I read the data right, but whether he

8  coded it right is -- I didn't attempt to independently assess

9  that.

10  Q.  So you don't know if Hunt County even offered early

11  voting?

12  A.  What I know is that Professor Grose coded it as having

13  been impacted by SB 1's restrictions on early voting hours.

14  Q.  And I assume you also don't known the population of Hunt

15  County?

16  A.  Yeah, I haven't memorized population numbers by county.

17  Q.  I'll represent to you that according to the 2020 census

18  data, it's about 100,000.

19  A.  Okay.

20  Q.  You do know that SB 1 eliminated 24-hour voting, right?

21  A.  I do know that.

22  Q.  And you do -- and you also know that Harris County is the

23  only county that offered 24-hour voting in 2020, correct?

24  A.  Yes.

25  Q.  And you know that Harris County has the highest population

MARK HOEKSTRA – CROSS

1  of Black people in the state of Texas?

2  A.  I wouldn't have –– of all the counties, I wouldn't have

3  known that, but that may well be true.

4  Q.  Are you aware that Harris County has the highest number of

5  Latinos in the state of Texas?

6  A.  No.

7  Q.  Do you know that Harris County's population is

8  4.73 million?  According to the 2020 census data.

9  A.  I believe I do know that, but, yes.

10  Q.  So as opposed to Hunt and Hardin Counties, SB 1 did reduce

11  the numbers of hours that Harris County could offer early

12  voting on, right?

13  A.  You're asserting that it didn't affect the early voting

14  hours of these other two, and Grose's data indicated that it

15  did, so I don't know how to agree with you on that because I

16  took his data as a given.  I agree that Harris County's voting

17  hours were impacted by SB 1.

18  Q.  You've testified that you did not read any legislative

19  histories or committee reports about SB 1, right?

20  A.  That's correct.

21  Q.  So you don't know whether or not Hunt County and Hardin

22  County was discussed at all in the Texas legislation leading

23  up to whether or not SB 1 was passed?

24  A.  I don't.

25  Q.  Do you know whether or not the largest county in Texas, at

MARK HOEKSTRA - CROSS

1  4.73 million, was discussed by the Texas legislature prior to
2  the passage of SB 1?
3  A.  I didn't -- I didn't read that stuff, as you mentioned, so
4  no.
5  Q.  Do you know whether or not the Texas legislature was aware
6  that Harris County, which has the largest percentage of Black
7  and Latino voters, was doing 24-hour voting prior to the
8  passage of SB 1.?
9  A.  I don't know if they were aware.  I suspect they were
10  aware, but obviously I haven't talked to them.  I don't know.
11  Q.  You also addressed Dr. Grose's opinions regarding the
12  Latino share of vote-by-mail, is that right?
13  A.  Yes.
14  Q.  And you agree with Dr. Grose that Hispanic voting-by-mail
15  was lower in 2022 than it was in 2020?
16  A.  The share was lower overall, but it was also consistent
17  with what we would expect to see due to chance.
18  Q.  And you conducted your own analysis of 2020 and 2022?
19  A.  I believe so, but I don't -- I mean, I'm going to have a
20  hard time remembering all the things that I did, so I believe
21  I tried to replicate that, but --
22  Q.  We'll look at the report.
23  A.  -- it would be easier if we pulled it up.
24  Q.  Sure, sure, let's do that.  Exhibit 5, please.  Let's go
25  to page 10, Table 1.

MARK HOEKSTRA - CROSS

1    This shows the results of your comparison between the

2  Hispanic share of the mail-in votes in 2020 and 2022, correct?

3  A.  Yes.

4  Q.  And you show that in 2022, Hispanic's share of mail-in

5  votes fell by 1.4 percent compared to 2020, is that right?

6  A.  Yes.

7  Q.  But are you — but you're also aware that the overall

8  population of the voting-eligible Hispanic public increased

9  over that same time period, right?

10  A.  I suspect that's true.  I don't have the numbers off the

11  top of my head.

12  Q.  So you have more Hispanics in Texas that are eligible to

13  vote, but less Hispanics using mail-in voting over the same

14  period of time?

15  A.  I suspect that's true.

16  Q.  And that occurred after the passage of SB 1, right?

17  A.  Yeah.  And again, you know, that 1.4 percentage points is

18  nowhere close to being statistically significant, so it could

19  have just been by random chance.

20  Q.  I guess we can ask those voters if they care about that or

21  not.

22         MR. WATKINS:  I'll pass the witness.

23         THE COURT:  Anything else on this side?  Any

24  redirect?

25         MR. BRYANT:  Your Honor, just a few questions.

4878
MARK HOEKSTRA – REDIRECT

1    REDIRECT EXAMINATION

2    BY MR. BRYANT:

3    Q.  Could we bring up page 5 on Exhibit 9.  All right.

4       I believe that Mr. Watkins asked you about paragraph 9 and

5    your statement that these factors generated voting behavior

6    that was far outside the norm for a Presidential Election, and

7    he asked you whether or not you had cited data for that

8    proposition.  I believe your answer was "not there."

9       Could we look at page 6 and Figure 1.  We can blow up

10   Figure 1.  Okay.

11      Does Figure 1 provide data about the status of 2020 as an

12   outlier among presidential year elections?

13   A.  It does.  It shows that 2020 was off the charts as an

14   outlier.

15   Q.  Mr. Watkins also asked you about whether you were aware

16   that Harris County was the largest county in Texas and whether

17   it has the largest number of Black voters and Hispanic voters.

18   Do you recall that question?

19   A.  I do.

20   Q.  And does Harris County also have the largest number of

21   White voters?

22   A.  It may.

23   Q.  Now, Mr. Watkins also asked you about randomized drug

24   trials and your familiarity with those in the context of FDA

25   approvals, and you indicated you were familiar with that.

Gigi Simcox, RMR, CRR

4879
MARK HOEKSTRA - REDIRECT

1    Typically, in general, what are the sample sizes for such
2  randomized drug trials?
3  A.  I think they would generally be over a thousand.
4  Typically, these things are reasonably big.  Certainly much
5  bigger than 85 or whatever we were talking about here.
6  Q.  So based on that, would you consider the sample in
7  Dr. Grose's audit study not fairly described as a randomized
8  audit study?
9  A.  I mean, it's a randomized study.  It's just done on a much
10  smaller sample, and, you know, which limits, what you can
11  learn from that.
12  Q.  Mr. Dodge asked you about a paper that's not in evidence
13  in this case where you and your coauthors used BISG.  How, if
14  at all, was your use of BISG different from the use of BISG by
15  Professor Mayer?
16  A.   Yeah.  Professor Mayer is attempting to do a census and
17  compare for every Black voter versus every White voter, and
18  that's what we want to know.  We want to compare rejection
19  rates, for example, across both of those groups.
20    In our paper, we're not attempting to identify differences
21  in use of force across all Blacks versus all Whites.  We're
22  only comparing across neighborhoods, and we're very
23  transparent about that.  If we — and that's the biggest
24  difference, and I think that's pretty clear to anybody who
25  reads our study.

4880
MARK HOEKSTRA - REDIRECT

1          MR. BRYANT:  Your Honor, pass the witness.

2          THE COURT:  Anything based on those?

3          MR. DODGE:  No, Your Honor.

4          THE COURT:  Nothing further.  Thank you, Doctor.

5          THE WITNESS:  Thank you.

6          THE COURT:  I was caught surprised.  Did I hear that

7   was the last witness?

8          MR. KERCHER:  Hallelujah, Your Honor.

9          We have -- we are working right now with plaintiffs'

10  counsel on the remainder of our exhibits.  If we could maybe

11  take a short break and talk with plaintiffs about how best to

12  use the remainder of today.  We may need a little of the

13  Court's time tomorrow to finish out exhibits before defendants

14  can rest.  We'll have some, I think, housekeeping issues to

15  address both on upcoming briefing and also on, you know, what

16  happens next phase of trial and closing arguments, et cetera.

17         THE COURT:  So I've got class tonight, so I've got to

18  leave by 5:00.  Do we call it a day and just show up again

19  tomorrow, or can you work things out?  How long is this fight

20  going to be?

21         MISS PERALES:  Your Honor, I think if we had ten

22  minutes to confer, we could say whether we'd be able to wrap

23  it up today or come back tomorrow.

24         THE COURT:  Okay.  I'll come back at 4:30.

25         MISS PERALES:  Or 4:15?

MARK HOEKSTRA — REDIRECT

1          THE COURT:  If you think that's going to work it,
2    then I'll come back at 4:15.
3          MISS PERALES:  Thank you.
4      (Recess)
5          MISS PERALES:  Your Honor, as an initial matter, we
6    would like to use the full day until 5:00 p.m. to talk with
7    the Court about a number of matters.  The first one, which is
8    not related to exhibits, is related to the timing or the
9    schedule of findings of fact and conclusion of law and closing
10   arguments.  We have different positions to express to the
11   Court.
12         On the plaintiffs' side, we would like a deadline of
13   findings of fact and conclusions of law of November 20th and
14   oral argument suggested to the Court.  We understand the Court
15   needs time to digest.  The suggestion from the plaintiffs'
16   side is oral argument mid-December.  Defendants have a
17   different position, so I'll step back for that.
18         MR. KERCHER:  We have gone back and forth a little
19   bit with plaintiffs, and we were originally thinking we would
20   ask the Court for 45 days as opposed to the 30 that
21   plaintiffs' have asked.  After conferring with a lot of people
22   who will be doing them, I think we have to ask for 60 days.
23   For clarity, the record as of yesterday was at 4600 pages of
24   testimony.  We've got 850 exhibits, 66 witnesses.  Defendants
25   are in the unique -- State defendants are in the unique

MARK HOEKSTRA - REDIRECT

1  position of having to respond or put together findings of fact

2  and conclusions on all of the claims as to all of the

3  provisions, and that comes out to something like a little over

4  130 claims.  I think it's not feasible for us to put that

5  together.

6        I also am looking back at the amount of ink spilled

7  just over the summary judgment briefing in this case, Your

8  Honor, and by my count, it was about 650 pages.  I think the

9  Court should anticipate several hundreds pages' worth of

10 finding of fact.  And as a result, even if it's November 20th,

11 I don't think that the Court would likely be prepared to hear

12 argument on it by mid-December.  I joined plaintiffs in the

13 hope that we would have closings before Christmas when we

14 spoke yesterday evening, but I just don't think it's feasible.

15       So State defendants would ask for 60 days, which

16 would be December 19th or December 20th, and then we are

17 absolutely amenable to schedule closing arguments at the

18 Court's earliest convenience after the Court gets the

19 opportunity to review and digest those.

20       MR. DODGE:  Your Honor, if I could just briefly add

21 on behalf of LULAC plaintiffs, we broadly join the plaintiffs'

22 proposal, but given the need to resolve this case ahead of the

23 2024 elections, given the need to provide clarity to county

24 officials about the rules of the road for very large and

25 important elections next year in Texas, we would respectfully

MARK HOEKSTRA – REDIRECT

1  ask for oral argument no later than December 11th, which is

2  broadly consistent with the request from Miss Perales.

3       THE COURT:  So let's be realistic about this.  I have

4  no illusion that I'm going to be the final word on this, so

5  let's just assume hypothetically that the plaintiffs succeed

6  on some or all of their claims.  What is going to happen is

7  there will be an appeal, and there will be a stay requested

8  from the State, which if I don't grant, the Fifth Circuit will

9  grant, right?  So, I mean, I'm under no illusion that this

10 thing is going to be in play for the March election cycle.  Am

11 I wrong?

12      MR. KERCHER:  Your Honor, that's certainly the way

13 that we would anticipate it playing out, and you've got a lot

14 of experience.

15      THE COURT:  On being reversed?

16      MR. KERCHER:  I was going to say on important

17 electoral matters, but I take your point.

18      THE COURT:  So that's what's going to happen, so

19 when —— you know, the question becomes should we just do this

20 up where everybody is not rushed.  There's a Thanksgiving

21 break in between all of this, and that we get materials that

22 are adequate with pinpoint cites that doesn't require me

23 having to hunt for everything, even though I'm going to hunt

24 on my own.  And so to force everybody to do their work and

25 then not intrude on Thanksgiving, I'm thinking findings of

4884

MARK HOEKSTRA − REDIRECT

1  fact and conclusion of law due no later than December 15th.

2  Anybody see a problem with that?

3      MR. KERCHER:  State defendants will comply, Your

4  Honor.

5      THE COURT:  Okay.  So it's going to be December 15th.

6      Now, as to the plaintiff groups, I'm just speaking

7  out loud.  I'm not making any rulings.  Does it behoove your

8  team if one of the folks on this side is more attuned to the

9  ADA claims —— let me ask the question this way.

10      I was assuming out of this side I'd be getting one

11  set, a collective, uniformed submission from you-all, or are

12  you-all going to do independent?

13      MISS PERALES:  Your Honor, based on our experience

14  preparing for trial, it almost doubles the amount of work to

15  try to produce one document.  So plaintiffs contemplate

16  separate submissions, but coordinating to reduce overlap.

17      THE COURT:  Okay.  Well, I'll let you turn it out

18  anyway you want, but certainly don't want to be reading things

19  twice if I don't —— or three times or four times or five times

20  if I don't have to, so try to coordinate as much as you can.

21      What I was going to suggest, if a party or parties on

22  this side are more focused on the ADA issues, it seems to me

23  that you-all submit something on the ADA issues, and then you

24  break it out as you see fit, but seems to me that's your

25  stronger case.  I'm not making any rulings.  So if you-all

MARK HOEKSTRA - REDIRECT

1  wanted to focus on the ADA matters and some finding of fact

2  and then a separate set of findings of fact on all the other

3  issues, it seems to me that that's more helpful.  But I will

4  let you-all — you just take that as guidance, because it's

5  not a ruling.  And you-all see what you do, but whatever you

6  do, it's due no later than December 15th.

7       And then for oral argument, though some of you are

8  traveling, does it matter if it's a Monday through Thursday or

9  do you want a Friday or what's the best deal for that?

10      MR. KERCHER:  State defendants have no preference,

11  Your Honor.

12      THE COURT:  Anybody traveling over here?  I don't

13  even know.

14      MISS PERALES:  Well, they all travel, but they would

15  defer to the Court's judgment.

16      THE COURT:  For now, just so we have something on the

17  calendar, oral argument will be on January 12th at 10:00.  And

18  I'll give you all day, and I'll give equal amount of time.

19  You figure out how much you want.  Do you want six hours, four

20  hours, whatever you want, you figure it out.  You-all have all

21  day, but it starts at 10:00.

22      Okay.  That's that.

23      MISS PERALES:  Now —

24      THE COURT:  What else do we have?

25      MISS PERALES:  — we get to exhibits, and it might

4886
MARK HOEKSTRA - REDIRECT

1  make the most — well, we'd like to use the time that we have

2  today.  We think it makes most sense to possibly deal with

3  them in batches as opposed to just running them through by

4  numbers, and so the first, which is promised to Mr. Capozzi,

5  who has to return to Washington D.C. he would like to move

6  some exhibits.

7           MR. CAPOZZI:  Thank you, Your Honor.  I'll keep this

8  brief.  The only exhibits that we want to move are our

9  deposition designations.  We designated parts of three

10 depositions for Alan Vera, Cindy Segal, and Susan Fountain.

11 My understanding is the plaintiffs don't object to our

12 designations with respect to the Vera deposition, but that

13 they do have objections to the other two, so I'll let them

14 state what their objection is, and then I'll have a response.

15          THE COURT:  Give me numbers.  What are you going to

16 call Vera?

17          MR. CAPOZZI:  So this would be Intervenor-Defendant

18 Exhibit 7, 8, and 9.  It's a separate exhibit for each

19 transcript.

20          THE COURT:  Is Vera 7?

21          MR. CAPOZZI:  Let's say that Vera is 7.  Segal is 8

22 and Fountain is 9.

23          THE COURT:  So is it true on this side no one objects

24 to the Vera?

25          MISS HOLMES:  I don't think that's accurate, Your

MARK HOEKSTRA - REDIRECT

1  Honor.  I think we do have some page — objections to

2  particular page and lines of testimony for Vera.

3          THE COURT:  So why don't we operate just the way we

4  were operating with all the rest of them.  Why don't we just

5  admit 7, 8, and 9.  I'll rule on any objections that you

6  lodged in the event that I rely on any of those.

7          MISS HOLMES:  If I may, Your Honor.  So I think the

8  issue is different to Susan Fountain and Cindy Segal, because

9  at least the HAUL plaintiffs object to those designations in

10 full.  Those are 30(b)(6) witnesses who are party

11 representatives on behalf of the Harris County Republican

12 Party and the Dallas County Republican Party, and we don't

13 believe they qualify as unavailable under Rule 32, because

14 they are within the control of parties in this case, and so

15 the fact that they were not attending trial, we think that

16 that absence was procured by those parties, and their

17 deposition transcripts cannot be admitted.

18          THE COURT:  Did you have the opportunity to

19 cross-examine them?

20          MISS HOLMES:  At the deposition?

21          THE COURT:  Yes.

22          MISS HOLMES:  Yes, Your Honor.

23          THE COURT:  Yeah, 7, 8, and 9 are all admitted.

24          What else do we got?

25          MISS PERALES:  Your Honor, there is a batch of about

MARK HOEKSTRA - REDIRECT

1  14 exhibits; some admitted, some not yet admitted, that LUPE

2  plaintiffs seek a limiting instruction or limitation on.

3  These approximately 14 exhibits are public hearings before the

4  Texas legislature where members of the public came and

5  testified.  These are not floor debates or legislative

6  proceedings where legislators are speaking, but transcripts

7  that involve members of the public coming forward and speaking

8  about their thoughts about voter fraud, SB 1, the impact, et

9  cetera, et cetera.

10        We would seek two limitations on the use of those

11 legislative hearing transcripts.  The first — and I think

12 this is unopposed — is that because these are out-of-court

13 statements, that they should not be used for the truth of the

14 matter asserted by the people who are giving the testimony.

15        And then the second — and I don't think there's any

16 objection to that.

17        MR. KERCHER:  We agree on that part so far, Your

18 Honor.

19        MISS PERALES:  There's a second limitation that is

20 opposed, and that is — and the limitation we seek is that the

21 testimony cannot be used to show legislative intent.  And that

22 is because of some sword-and-shield issues involved with the

23 assertion of legislative privilege during discovery by

24 legislators.  Essentially, that legislators should not be able

25 to point to certain statements and say "this is evidence of my

MARK HOEKSTRA – REDIRECT

1  intent," but then hide from us or not give us the ability to

2  question or get documents about their intent.

3          THE COURT:  So it's not for their intent, right?

4  It's just to show that this concern or whatever the issue was

5  before the legislature, right?

6          MISS PERALES:  Well, that's the type of order we're

7  seeking from the Court, but I think there may be folks who

8  want to say, you know, because so-and-so came and said these

9  things about voter fraud, that is evidence of what I relied on

10 when I was making my decision.

11         THE COURT:  But no one has testified to that effect

12 here.

13         MISS PERALES:  Not yet.

14         THE COURT:  Well, you know, so —

15         MR. KERCHER:  I think I see this issue the same way

16 the Court has drawn it, which is there is a difference between

17 what information was before the legislature as opposed to a

18 legislator taking the stand and saying, "I relied on this,"

19 when we have withheld that information at deposition.  Who did

20 you talk to?  Did you rely on that?

21         I do think that the Court can take into consideration

22 as a part of its, you know, consideration of various claims

23 and concerning intent what information was in front of the

24 legislature, but a legislator testifying, yes, that made a

25 difference to me, would be a more difficult argument for us to

MARK HOEKSTRA — REDIRECT

1  make.  Without continuing, we would lose it.

2          THE COURT:  Yeah, I'm not going to use any of that

3  for purposes of what the legislature intent was.

4          MISS PERALES:  Thank you, Your Honor.

5          THE COURT:  So what numbers are we talking about?

6          MISS PERALES:  Well, there's quite a bit of overlap

7  in the exhibits, and so we could provide the Court with a

8  chart that shows this where sometimes it's a state exhibit.

9  Sometimes it's a HAUL exhibit.  Sometimes it's both, because

10 of the way that it was presented to the Court.  I can read

11 them now.  It would take time.

12          THE COURT:  So is it more helpful for us to just have

13 a discussion about the issues on these batches and then we

14 come back tomorrow and enter this stuff into evidence, or how

15 is this all going to play out?

16          MISS PERALES:  I can read them now for the Court if

17 that would be the easiest.

18          THE COURT:  Whatever you think.

19          MISS PERALES:  HAUL 228 —

20          THE COURT:  I thought these were State exhibits we

21 were entering.

22          MISS PERALES:  Some of them are.

23          MR. KERCHER:  Predominantly, Your Honor.  I think

24 there are a couple of exhibits that are already on the record

25 that plaintiffs would like to have on the record.

MARK HOEKSTRA – REDIRECT

1        THE COURT:  Okay.  HAUL 228.

2        MISS PERALES:  HAUL 273, HAUL 263, State 293,

3   State 294, HAUL 264, HAUL 174, State 379, HAUL 183, State 349,

4   HAUL 175, HAUL 176, State 297, State 298, HAUL 177, HAUL 178,

5   State 371, HAUL 109, HAUL 110, OCA 442, State 124, State 383,

6   State 393.

7        THE COURT:  Anybody have an objection to OCA 442 with

8   those two limitations:  Not for the truth of the matter

9   asserted, and not used for purposes of whether or not there

10  was legislative intent?

11        MR. KERCHER:  I think, Your Honor, that we disagree

12  with the Court's ruling, as I understand it; that the Court

13  should not consider it for purposes of intent.  So, for

14  example, there have been experts who have relied on the

15  legislative record in order to try and glean legislative

16  intent, so I do think that the Court can consider these for

17  purposes of legislative intent, and I believe Miss Perales

18  disagrees with me on that.

19        The distinction I would draw is that while the

20  legislative record is not subject to legislative privilege,

21  because it is by nature public, the Court may consider it for

22  purposes of intent.  We would likely run into a

23  sword-and-shield problem if we were to have a legislator

24  testify what he did –– he or she did or did not rely on, so I

25  do think it is evidence of intent, and the Court can consider

4892
MARK HOEKSTRA - REDIRECT

1  it that way, if that answers your question.

2          MISS PERALES:  And so perhaps, Your Honor, we could

3  brief this for the Court.

4          THE COURT:  Well, I'm still stuck on how I can —

5  just because some person — let's just use city hall as an

6  example, right?  Just because somebody gets up in front of

7  city hall in the citizen's right to speak moments, that

8  before that legislative body, but that doesn't mean that any

9  of the legislators actually decided to use whatever was

10  presented to them as part of their intent.  And so I'm

11  extrapolating the same way here.  Just because someone

12  testified before a committee and was given their little three

13  minutes and they say whatever they say, that was before the

14  legislature, but I don't see how I can use that and jump to

15  the next step without somebody from the legislature testifying

16  that I actually decided to use that statement in adopting and

17  ruling — I mean, in voting than the way I did.

18          Does that make sense?

19          MR. KERCHER:  I take your point.  What I would point

20  the Court to is that at least some of the claims, the intent

21  claims that we're talking about, are supposed to be totality

22  of the circumstances tests, and so the way that I would

23  characterize the description the Court just provided is that

24  it may be the case the Court could look through some of this

25  evidence and find that none of it perhaps or only some of it

4893

MARK HOEKSTRA – REDIRECT

1  is dispositive, but I do think that it does bear on that

2  question, and it does evidence intent.  And part of the reason

3  that I would suggest that that's true –– or some of the

4  comments the Court has made as we have gone through the

5  testimony, where the Court has asked, okay, but was this in

6  front of the legislature.  The fact that that kind of evidence

7  would be in from of the legislature and available to them and

8  that we can understand the subsequent legislation will be a

9  response again to that totality of evidence, I do think is

10  relevant evidence on legislative intent, even if the Court

11  does not ultimately find it to be dispositive.

12           MISS PERALES:  And that is the crux of the

13  disagreement, Your Honor.  We've been prevented throughout the

14  litigation from asking questions about legislative intent or

15  receiving documents about legislative intent, and we haven't

16  even been able to explore –– for example, when Jonathan White

17  testified on Monday, he said he was asked to testify.  He said

18  he would not, because of legislative privilege, tell us what

19  the legislators had asked him to talk about when they

20  testified; so some of this perhaps even involves choreographed

21  public testimony.  So we don't see the distinction ––

22  respectfully –– disagree with the State on the distinction

23  that the State draws between things that were said in public

24  and things that were not said in public.

25           THE COURT:  So now I'm going to enter this stuff in

4894
MARK HOEKSTRA - REDIRECT

1  evidence not for the truth of the matter asserted.  I'm going

2  to use it just to show that this was — or demonstrate that

3  this was before of the legislative body.  At this point, I'm

4  not going to have it introduced for purposes of intent.  If it

5  turns out that during our analysis and all your findings of

6  fact, someone actually relies on something here, then we can

7  open this up for further briefing as to how exactly that

8  exhibit can be used.

9          So to the extent that this is a conditional ruling, I

10 guess it's a conditional ruling.

11         MR. KERCHER:  I understand.  Thank you.

12         THE COURT:  So with that, with regard to any of these

13 documents, does anybody have an objection?  Okay.

14         So OCA 442 is admitted.

15         State 293 through 294, 379, 349, 297, 298, 371, 124,

16 383 and 393 are all admitted.

17         HAUL 228, 273, 263, 264, 174, 183, 175 through 178,

18 109 and 110 are admitted.

19         MISS PERALES:  Thank you, Your Honor.  At this point,

20 being local, I wanted to defer to other plaintiffs who might

21 be able to resolve their exhibit objections and fly tomorrow

22 if that could be done, so I'm going to step back now and let

23 other plaintiffs — or perhaps let the State begin to suggest

24 exhibits that it would like to move into evidence.

25         THE COURT:  What do we have left?

MARK HOEKSTRA – REDIRECT

1          MR. WASSDORF:  I mean we've got a chunk of exhibits,
2     Your Honor.  If any of the plaintiff groups have, like, sets
3     such as that, that would be more efficient; otherwise, I have
4     to go through them one at a time.
5          MISS HOLMES:  I think one issue is even while we've
6     been having this discussion —
7          THE COURT:  Why don't you get closer to the mike.
8          MISS HOLMES:  Your Honor, even since we came back
9     from our break and have been having this discussion, we've got
10    an updated list of what the State wants to move in, so we are
11    trying to look at that universe.
12         MR. WASSDORF:  That's the same list that I circulated
13    to Miss Perales.
14         MISS HOLMES:  It's the same one as — from a couple
15    hours ago.
16         MR. WASSDORF:  The only changes that have been made
17    possibly is some additional ones have been taken off that we
18    are not intending to move into evidence, so your job has been
19    made easier.  Congratulations.
20         MISS HOLMES:  That is great.  But we do have an
21    updated list that we are now working off of.
22         THE COURT:  So with regard to that updated list, if I
23    enter them with that same limitations, does that take care of
24    your issues, or are there additional types of objections?
25         MISS HOLMES:  I think, when you refer to "the same

4896
MARK HOEKSTRA – REDIRECT

1    limitations" ––

2            THE COURT:  Not being offered for the truth of the

3    matter asserted, not being used for intent purposes.  Or do we

4    have some other type of objections?

5            MISS HOLMES:  There are other types of objections.

6            MR. KERCHER:  Other exhibits altogether, Your Honor.

7            THE COURT:  So we've got 22 minutes.  Are we going to

8    do this today or tomorrow?

9            MISS HOLMES:  I do think we are fairly close, Your

10   Honor, and so I think if you can indulge us for five more

11   minutes to double-check that list, I think we would have at

12   least a batch prepared to –– and perhaps all of them prepared

13   to ––

14           THE COURT:  I'll wait here and read emails.

15       (Pause in proceedings.)

16           MR. DOLLING:  Back on the record for a quick issue

17   that doesn't have to do with exhibits, Your Honor.  Earlier we

18   were talking about the likelihood of timing of relief and all

19   that sort of thing, and so I just thought I might inquire ––

20   not to be presumptuous, but wondering if the Court might have

21   an estimate of whether it might be able to issue an order and

22   opinion on the materiality ruling prior to 2024?

23           THE COURT:  Yeah.  No, I'll have the ruling on

24   materiality out.

25           MR. DOLLING:  Okay.  Thank you.

4897
MARK HOEKSTRA − REDIRECT

1          MR. WASSDORF:  I do believe I have a list now of some

2   State exhibits that do not have objections that we can go

3   ahead and move in.  That is State Exhibits 127, 129, 131, 135,

4   140, 148, 149, 234, 235, 237, 242, 259, 260, 263, 264, 274,

5   275, 276, 281, and 286.

6          THE COURT:  Any objections from this side on any of

7   those?

8          MISS RODRIGUEZ:  No, Your Honor.

9          THE COURT:  127, 129, 131 and 135, 140, 148, 149,

10  234, 235, 237, 242, 259, 260, 263, 264, 274, 275, 276, 281,

11  and 286 are all admitted.

12         MR. WASSDORF:  Your Honor, I also have here, as some

13  other parties have done — making exhibits out of deposition

14  designations with the understanding that the Court will deal

15  with the objections later, we would also move State 431, 432,

16  433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444

17  into evidence.

18         THE COURT:  With that, any objection to 431 to 444?

19         MISS PERALES:  Your Honor, we just received this at

20  4:00 p.m., but at least for LUPE plaintiffs, they appear to be

21  witnesses who were deposed but who did not come and testify.

22  Some are legislators that I think might appear in phase 2, so

23  perhaps a conditional admission of 431, 432, 433, because

24  those are legislators.

25         MR. WASSDORF:  If they intend to appear at the second

4898
MARK HOEKSTRA - REDIRECT

1    phase of trial, I think we can agree to that.

2            THE COURT:  431 to 444 are all admitted with those

3    conditions.

4            And what else do we have?

5            MR. WASSDORF:  Well, at this point, Your Honor, I

6    would be dependent on plaintiffs to tell me which ones are

7    remaining that they have objections to.

8            MISS PERALES:  We're ready to do some, Your Honor.

9    If Mr. Wassdorf doesn't mind that they will be somewhat out of

10   order, as we're still trying to batch them.

11           I believe Miss Holmes has a few that she would like

12   to —

13           MR. WASSDORF:  I don't mind.  It would be better if

14   Miss Hunker was here.  She is more familiar with the substance

15   of the exhibits than I am.  But if you want to go ahead with a

16   batch.

17           MISS HOLMES:  Just to confirm, you are planning on

18   moving in the rest of the list?  I don't want to get ahead of

19   you and propose ones that you are not.

20           MR. WASSDORF:  Yes.  Yes.

21           MISS HOLMES:  Okay.  So the HAUL plaintiffs have

22   objections to State Exhibits 130, 139, 145, and 146.  I

23   believe all of those are either petitions or legal briefs that

24   were filed in other cases, and those are hearsay and contain

25   allegations that cannot be considered for their truth.  And so

1  I'm not entirely sure what the purpose of those exhibits are,

2  but we would not like those to be admitted for their truth.

3          THE COURT:  What's the purpose?

4          MISS HUNKER:  Your Honor, the purpose is not to

5  assert the truth of the matter, but rather to show that there

6  was a disagreement in how to legally interpret many of the

7  innovations that were pushed forward by Harris County in 2020.

8  So, Your Honor, you would have heard multiple witnesses sort

9  of testify to that.  These are documents that help

10 substantiate that disagreement, the fact that they are, in

11 fact, was disputes over how a stationary structure would be

12 interpreted or whether mail ballot delivery in-person, how

13 that would be interpreted within the law.  And so these are

14 disputes that were very heavily litigated throughout 2020, and

15 we kind of just wanted to have Your Honor to kind of see the

16 scale of that disagreement.

17         THE COURT:  So I don't have trouble introducing them

18 for that purpose.  Again, I have trouble, though, if you're

19 going to try to argue later that this was then before the

20 legislature, because I need testimony from the record about

21 what was before the legislature.  The mere fact that there was

22 a litigation dispute somewhere down in — it might have been

23 awareness by the Attorney General, but I can't impute that to

24 be awareness by the legislature.

25         MISS HUNKER:  And, Your Honor, when we get to

4900
MARK HOEKSTRA – REDIRECT

1  phase 2, we'll have our legislators.  We will be going through
2  the record in detail with things that were said, both on the
3  committees and on the floors as well as the comments and
4  submissions that were entered into the legislative record.
5  That has been produced in this case.  Many of the exhibits are
6  going to be in our revised list that we filed with the Court
7  earlier last week and we'll be introducing through the second
8  phase of trial.
9        THE COURT:  So with that condition, 130, 139, 145 and
10  146 are admitted.
11        What else do we have?
12        MISS PERALES:  Your Honor, there are two exhibits 83
13  and 84.  These are what appear to be sheets of complaints or
14  suspected voter fraud from maybe the Office of the Attorney
15  General.  The objection is there's no foundation.
16  Jonathan White didn't testify about them.  They are hearsay to
17  the extent that they contain within them short descriptions of
18  alleged —
19        MR. WASSDORF:  We won't move to admit those, Your
20  Honor.
21        THE COURT:  83 and 84 are withdrawn.
22        MISS PERALES:  Number 22, State 22 is a spreadsheet
23  created by — not sure.  I guess Mr. Ingram testified — by
24  the Secretary of State with mail ballot rejection rates from
25  the counties.  Mr. Phillips, who did come and testify, said he

1  didn't know where those numbers came from.  Mr. Ingram said

2  they weren't verified with the counties, and the objection is

3  that we don't know who created it, where the numbers came

4  from; so foundation, and we just don't know where it came

5  from.

6          MISS HUNKER:  Two responses, Your Honor.  First, this

7  has already been admitted as Joint Exhibit 8.

8          THE COURT:  Well, then we don't need it.

9          Next.

10         MISS PERALES:  Can you confirm whether you have

11 withdrawn State 117?

12         If not, we could argue an objection to State 117, an

13 order on a recount.

14         MISS HUNKER:  Your Honor, State Exhibit 117 is a

15 final judgment in a state court case decided in Webb County.

16 This was an election contest that was — election results were

17 overturned as a result of the Court identifying voter fraud.

18 We're not using it to show the actual allegations in the

19 contest, but rather to show that, in fact, an election was

20 overturned because the Court had found that there was voter

21 fraud.

22         MISS PERALES:  The objection, Your Honor, is

23 relevance.  The dispute was about people who are registered to

24 vote and an address that was not in the jurisdiction where

25 they voted.  And thus, it has absolutely nothing to do with

4902
MARK HOEKSTRA – REDIRECT

1  SB 1, and so it's a relevance objection as well as a hearsay

2  objection.

3       MISS HUNKER:  To respond, again, we're not asserting

4  for the truth of the matter.  In terms of relevance, multiple

5  witnesses have testified that they believed from plaintiffs

6  that election fraud being able to overturn election result

7  would be a very rare occurrence.  In fact, that was part of

8  the cross-examination of Dr. Hoekstra.  You had also counter

9  testimony from Jonathan White as well as Keith Ingram and

10  Christina Adkins that that could happen particularly with

11  local races.  This sort of substantiates that dispute.

12       MISS PERALES:  Only if it's bootstrapping, Your

13  Honor, since it's not election fraud related to SB 1.

14       THE COURT:  I'll make that distinction.  If I use

15  117, I'll notice the difference in the allegations and how

16  it's not related to anything SB 1 accomplished.  Actually, I

17  could see that undercutting the State, actually, but if you

18  want it in, it's in.

19       117 is admitted.  And just for the record, 22 was

20  withdrawn.

21       What else do we have?

22       MISS HUNKER:  Twenty-two is already in.

23       THE COURT:  Twenty-two is withdrawn as duplicative of

24  another exhibit.

25       MISS HUNKER:  Thank you, Your Honor.

4903
MARK HOEKSTRA - REDIRECT

1          MR. WASSDORF:  Sounds like we have agreement a State

2     Exhibit 67, Your Honor.

3          THE COURT:  Any objection?  Sixty-seven is admitted.

4          What else do you have left on your list?  Are you

5     keeping a tally?

6          MR. WASSDORF:  I haven't been able to keep track of

7     what is left, Your Honor.

8          MR. DODGE:  There may not be any remaining exhibit

9     where only a single plaintiff group has an objection.  It's an

10    objection shared amongst the plaintiffs.  So to make progress

11    with our remaining time, the State might just start trying to

12    move in exhibits.  We can have that discussion.

13         MISS RODRIGUEZ:  That is correct, I think, with

14    regard to most of them.  Where I think there is one more to

15    which only we had an objection, I can address that now.

16         MR. WASSDORF:  Yeah, sure.

17         MISS RODRIGUEZ:  That's State Exhibit 428.  Is

18    that -- are you trying to move that in?

19         MR. WASSDORF:  That's a Kathleen exhibit.

20         MISS RODRIGUEZ:  Sure.

21         MISS HUNKER:  Give me a second, Your Honor.  I only

22    had the first roundup.  Can you repeat the number?

23         THE COURT:  428.

24         MR. WASSDORF:  Your Honor, this is an educational

25    presentation from the Secretary of State's Office just like

4904
MARK HOEKSTRA - REDIRECT

1  the ones that we admitted yesterday during Christina Adkins'

2  direct.

3          MISS RODRIGUEZ:  So LULAC plaintiffs have a

4  hearsay — have hearsay and best evidence rule objections, but

5  we are willing to withdraw them if this is admitted for the

6  limited purpose of showing that the presentation occurred,

7  similar to the agreement that we discussed yesterday.

8          THE COURT:  So just to summarize what the concession

9  was, 428, as long as it's not being used for the truth of the

10 matter asserted and for the purpose of just training took

11 place.

12         MISS HUNKER:  Yes, Your Honor.  And just to show the

13 number of different laws that were passed and what the

14 Secretary of State's Office was responding to during the

15 course of implementation.

16         THE COURT:  428 is admitted with that understanding.

17         MISS RODRIGUEZ:  Thank you.

18         MISS HUNKER:  Your Honor, I do want to point that out

19 that we submitted earlier today a request for judicial notice.

20         THE COURT:  I granted it.

21         MISS HUNKER:  You did?  Forgive me, Your Honor.  I

22 may not have seen that.

23         THE COURT:  I text-ordered while we were waiting

24 here.

25         MISS HUNKER:  Thank you, Your Honor.

*Gigi Simcox, RMR, CRR*

4905
MARK HOEKSTRA - REDIRECT

1    MISS PERALES:  I have a couple more.

2    MISS HUNKER:  One last thing, Your Honor.  Probably

3  early tomorrow there is one other request for judicial notice.

4  We are waiting on one last plaintiff to give their position,

5  and then we will present that to the Court.

6    THE COURT:  I feel like I'm rushing you-all.  I get a

7  sense that you-all have not been checking off what's left.  Do

8  we need to stop, you-all regroup, and figure out what's left;

9  and can Miss Perales handle everything else on behalf of this

10  side tomorrow?

11    You said you were local.

12    MISS HUNKER:  State defendants would be happy with

13  that, Your Honor.

14    THE COURT:  Because I just — there's something

15  that's going to slip through the cracks.  I can feel it.

16    MR. WASSDORF:  I agree.

17    THE COURT:  Okay.  Why don't we resume — your

18  preference, is it 11:00 or do it right after lunch at 1:00?

19    MR. KERCHER:  Let's do it at 1:00.  That may resolve

20  some of the parking —

21    MISS PERALES:  Actually, Your Honor, to the extent

22  our out-of-town friends would like to try to —

23    MISS RODRIGUEZ:  We would prefer 11:00.

24    MISS PERALES:  Yes, 11:00 a.m., in case they can make

25  an afternoon flight.

4906

MARK HOEKSTRA - REDIRECT

1           THE COURT:  We can do 11:00.  Just be aware parking

2    is going to be a mess around here.  How big is the group

3    around here?

4           THE DEPUTY CLERK:  200 applicants.

5           THE COURT:  And their family members will have a

6    crowd of 600, 650 here tomorrow.  So good luck on parking.

7    We'll see you-all at 11:00.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4907

MARK HOEKSTRA – REDIRECT

1                              –o0o–

2      I certify that the foregoing is a correct transcript from

3  the record of proceedings in the above–entitled matter.  I

4  further certify that the transcript fees and format comply

5  with those prescribed by the Court and the Judicial Conference

6  of the United States.

7

8  Date:  10/19/23              /s/  *Gigi Simcox*
                                United States Court Reporter
9                               262 West Nueve Street
                                San Antonio TX 78207
10                              Telephone:  (210)244–5037

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Gigi Simcox, RMR, CRR*