IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | CIVIL ACTION NO. |
| | § | 5:21-cv-844-XR |
| v. | § | [Consolidated Action: Lead Case] |
| | § | |
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| HARRIS COUNTY REPUBLICAN PARTY, *et al.*, | § | |
| | § | |
| *Defendant-Intervenors.* | § | |

## LUPE PLAINTIFFS' OPPOSED SECOND MOTION TO STRIKE THE DECLARATION OF JONATHAN WHITE

Plaintiffs La Unión del Pueblo Entero, *et al.* ("LUPE Plaintiffs")[1] file this second motion to strike portions the declaration of Jonathan White filed by State Defendants ("the State"). *See* Dkts. 645-5 at 14-23 and 646-3 at 29-38 (same document).

On September 20, 2023, the Court granted LUPE Plaintiffs' motion *in limine* to exclude similar trial testimony of Mr. White. However, after concluding that "because the defendant's side does not intend to rely on the declaration of Mr. White at all," the Court denied as moot LUPE Plaintiffs' request to strike the declaration. Tr. 1459:19-1460:13. In light of State Defendants' and Intervenor-Defendants' reliance on Mr. White's declaration in their post-trial proposed Findings

---

[1] LUPE Plaintiffs are La Unión del Pueblo Entero, Friendship-West Baptist Church, Southwest Voter Registration Education Project, Texas Impact, Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, William C. Velasquez Institute, FIEL Houston Inc., and James Lewin.

of Fact (Dkt. 861 at ¶¶ 806-808 and 811-812), LUPE Plaintiffs urge the Court to strike the disputed portions of the declaration.

Mr. White is the former Division Chief of the Election Integrity Division of the Texas Office of the Attorney General ("OAG"). *See* Dkts. 645-5 at 14 and 646-3 at 29. Mr. White acknowledged that his declaration testimony relies on information from investigative and prosecution files — information that the State withheld in discovery under claims of privilege. The State also limited Mr. White's deposition testimony to publicly available information about alleged voter fraud. Under the sword-and-shield doctrine, Mr. White should not be permitted to testify outside those bounds in his declaration.

In addition, Mr. White's declaration offers summary testimony without providing any of the information underlying his declaration. And, because Mr. White's declaration is largely not based on his personal knowledge and first-hand observations, his testimony is expert in nature and was not properly disclosed as such. For all of these reasons, LUPE Plaintiffs respectfully request that the Court strike from the record the disputed portions of Mr. White's declaration (*see* Dkts. 645-5 at 14-23 and 646-3 at 29-38) and replace those documents with the redacted document attached as Exhibit A to this motion.

## I.   BACKGROUND

This case involves a challenge by LUPE Plaintiffs to SB1, a 2021 law that makes significant changes to how Texas voters cast ballots in elections. On June 24, 2023, long after the close of discovery and just two and a half months before trial, State Defendants filed a declaration of Jonathan White in support of their responses in opposition to the motions for summary judgment filed by the United States and OCA Plaintiffs. *See* Dkts. 645-5 at 14-23 and 646-3 at 29-38 (same document). Mr. White's declaration, executed June 22, 2023, purported to provide evidence on

three topics: the existence, prevalence and techniques of various types of voter fraud, including "mail ballot fraud and voter assistance fraud schemes"; the inability of current investigative techniques to address voter fraud; and the ways in which SB1 assists in fighting voter fraud. *See* Dkts. 645-5 at 14-23 and 646-3 at 29-38.  In response to the declaration, LUPE Plaintiffs filed a Motion to Strike the Declaration of Jonathan White and Motion *in Limine* to Exclude Testimony About Non-Public Information Relating to Investigations and Prosecutions of Alleged Voter Fraud.  Dkt. 761.

At the Court's September 20, 2023 hearing on LUPE Plaintiffs' motion, State Defendants represented that they would not seek to admit the Jonathan White Declaration into evidence:

> MR. WASSOORF: Your Honor, we can probably shortcut this argument quite a bit. . . . First, striking portions of the declaration of Jonathan White. In that regard, Your Honor, the declaration is moot at this point. . . . We do not plan to admit that declaration into evidence in this trial.  There is really nothing additional to consider with respect to that declaration.

Tr. at 1439:8-1440:1 (September 20, 2023).

The Court subsequently denied as moot LUPE Plaintiffs' motion to strike the declaration:

> So here is the ruling with regard to the []opposed motion to strike the declaration of Mr. White. It's the contention of all sides, correct me if I'm wrong, that this is now moot, because the defendant's side does not intend to rely on the declaration of Mr. White at all, so that's now moot.

*Id.* at 1459:19-1460:13.

The Court granted LUPE Plaintiffs' motion *in limine* to exclude testimony of Mr. White under the sword-and-shield doctrine. Tr. 1459:19-1460:13. The Court explained to Defendants: "Here, I have a real problem that you're using sword-and-shield. You keep asserting all these various privileges, and at the same time then you want to present witnesses who will talk about documents that you deliberately will not provide."  Tr. 1456:1-9.

Following trial, State Defendants and Intervenor Defendants cited and relied on the

Jonathan White Declaration in their proposed Findings of Fact.  Dkt. 861 at ¶¶ 806-808 and 811-812.

### A. In Discovery, the State Consistently Withheld and Failed to Identify Non-public Information Related to Voter Fraud Investigations and Prosecutions.

From the start of discovery, the State withheld, on privilege grounds, documents containing non-public information related to voter fraud investigations and prosecutions. The State also failed to identify on its privilege logs responsive documents that contained similar information.  In depositions, the State objected to, and instructed witnesses not to answer, questions seeking non-public information related to voter fraud investigations and prosecutions.

On November 15, 2021, the State filed its initial disclosures. Dkt. 112-1. In those disclosures, the State identified Jonathan White as an individual likely to have discoverable information that the State may use to support its defenses. *Id.* at 18. Those disclosures stated, in relevant part:

> Mr. White is the Chief of the Office of the Attorney General of Texas, Elections Integrity Division.  He also testified before the Legislature during the consideration of S.B.1. He may have discoverable information on the claims and defenses at issue in this case. He may have information regarding election-related investigations and prosecutions, to the extent those materials are not privileged.

*Id.*

On November 29, 2021, Private Plaintiffs served their First Set of Requests for Production ("First RFPs") on the Attorney General. Ex. B. Private Plaintiffs sought, among other things, "[a]ll documents and communications discussing actual or alleged illegal voting, election fraud, or other criminal conduct in connection with" all methods of voting "during the period from 2016 to present."  *Id.* at 10 (RFP 8).  Private Plaintiffs also sought "[a]ll documents and communications regarding actual or alleged illegal voting, election fraud, or other criminal conduct in connection with voter assistance, including transportation assistance and vote

harvesting, during the period from 2016 to present." *Id.* at 11 (RFP 10).

On December 29, 2021, the State served its Objections and Responses to Private Plaintiffs' First RFPs to the Attorney General. Ex. C. With respect to RFPs 8 and 10, the State objected "to the extent that" the requests call "for the production of full investigative and prosecution case files," noting that, "[s]ince 2016, OAG has investigated hundreds of alleged incidents of election misconduct, each of which is assigned a case file that can span thousands of pages." *Id.* at 18, 21. The State asserted that "the release of non-public information related to these case files could have severe consequences on OAG's ability to safeguard the election and identify and prosecute illegal conduct." *Id.* The State then indicated that it would not produce "full case files," and instead would "produce OAG's prosecution spreadsheet, which details resolved and pending prosecutions, including the name of the defendant, location of the offense, the election involved, the type of conduct alleged, and the charges brought." *Id.* at 19; *see also id.* at 21 (stating that "much of the information relevant to Private Plaintiffs' claims can be obtained from OAG's prosecution spreadsheet, which details OAG's resolved and pending prosecutions"). Further, the State also raised objections based on, among other things, the "investigative privilege, deliberative process privilege, attorney-client privilege," and work product doctrine. *Id.* at 19, 21.

On December 30, 2021, the State produced a spreadsheet purportedly listing resolved and pending prosecutions by OAG regarding alleged election fraud. *See* Ex. D. The State produced similar lists on the following dates, purportedly providing updated information about OAG's resolved and pending prosecutions: April 26, 2022 (Ex. E) and September 13, 2022 (Ex. F and Ex. G). No further spreadsheets of resolved and pending prosecutions were produced after September

13, 2022.[2]

## B. Mr. White's April and May 2022 Depositions

On April 27, 2022, Plaintiffs deposed Mr. White in his personal capacity. Ex. J. Following numerous objections by OAG counsel, the parties stipulated that OAG counsel could have a running objection and OAG counsel "instruct[ed]" Mr. White "not to provide any answers that would encroach on attorney client, attorney work-product, legislative or investigative privileges, or any other applicable privilege, including deliberative process or any others that ... could conceivably be implicated by the questions." *Id.* at Tr. 43:20-44:21.

OAG counsel asserted privilege objections 29 times over the course of the deposition. *See generally*, *id.* Pursuant to that instruction, Mr. White censored his answers throughout the deposition to avoid discussing, among other things, information that was not public. *See, e.g.*, *id.* at 228:16-229:5 ("I'm not able to discuss any investigations that -- that are not public.")

On May 5, 2022, Plaintiffs deposed Mr. White in his capacity as a representative of the Office of the Attorney General. Ex. K. As in the April 27, 2022 deposition, OAG counsel lodged similar privilege objections and in several instances instructed Mr. White not to answer. *See generally id.* (listing 87 objections). And, as in his prior deposition, Mr. White followed his counsel's instruction and refrained from providing non-public information regarding investigations and prosecutions. *See, e.g.. id.* at Tr. 63:5-23 ("I can't think of any non-privileged answer to that question. I have to follow the advice of counsel . . ."), 97:21-24 ("Without getting into any specific details subject to privilege, we have opened investigations as a result of information received from election officials regarding ineligible voting.").

---

[2] The State also produced a list of complaint referrals from the SOS and a list of instances of suspected illegal voting" on May 5, 2022 and August 31, 2022 respectively. Ex. H and Ex. I.

Indeed, when Plaintiffs' counsel asked Mr. White specifically about evidence he typically finds in an assistance fraud case, OAG counsel objected on the grounds of "attorney work product, attorney/client privilege or investigative privilege" and instructed Mr. White not to answer unless he could avoid those privileges. *Id.* at Tr. 177:3-10. Mr. White followed that instruction and responded, "One thing we normally try not to do is to discuss openly matter -- investigative methods." *Id.* at Tr. 177:3-12. When pressed again, Mr. White similarly limited his answer and responded only generically, "Typically it will be a combination of things, but it will rely heavily on testimony of the victim." *Id.* at Tr. 177:13-179:8.

In response to Private Plaintiffs' First RFPs, the State produced some responsive documents over the course of discovery. All of these documents, in the State's characterization, reflect publicly available information. *See, e.g.*, Dkt. 650 at 2-3. In connection with its production responsive to Private Plaintiffs' First RFPs, the State served a privilege log on July 12, 2022, Ex. L, and amended that log on August 8, 2022, Ex. M (the "August 2022 Privilege Log"). The August 2022 Privilege Log lists two entries withheld by the Office of the Attorney General. *See Id.* at 54.

On February 15, 2023, LUPE Plaintiffs served their Second Set of Requests for Production to Defendant Kenneth Paxton ("Second RFPs"). Ex. N. LUPE Plaintiffs requested, among other things, "[a]ll documents, including but not limited to communications, related to actual, suspected or alleged election fraud, illegal voting, and other criminal conduct related to the 2022 General Election" in Dallas County (RFP 27), El Paso County (RFP 30), Hidalgo County (RFP 33), and Travis County (RFP 36). *Id.* at 9, 10. LUPE Plaintiffs also sought all documents exchanged between or among the Office of the Attorney General, "any Texas county, and/or the Office of the Texas Secretary of State related to criminal conduct that has or may have occurred in connection

with the 2022 General Election[.]" *Id.* at 10 (RFP 37).[3] On March 17, 2023, the State served its objections to LUPE Plaintiffs' Second RFPs to the Attorney General, asserting objections to RFPs 27, 30, 33, 36, and 37 that were similar to the objections the State asserted against RFPs 8 and 10. Ex.O at 5-7, 8-9, 12-14. The State again indicated that it would withhold "non-public information," and noted that it "considers any documents related to its investigative and prosecution case files to be privileged, unduly burdensome, and not proportional to the needs of the case." *See, e.g.*, *id.* at 6 (RFP 27).

In connection with LUPE Plaintiffs' Second RFPs, the State served a privilege log listing documents withheld by the Office of the Secretary of State on May 12, 2023, Ex. P, and served a privilege log listing documents withheld by the Office of the Attorney General on May 19, 2023, Ex. Q. These privilege logs were the subject of LUPE Plaintiffs' June 24, 2023 motion to compel, Dkt. 630, which the Court granted in part and denied in part in its order on July 31, 2023, Dkt. 694.[4]

Over the course of discovery, the State produced fewer than 500 documents associated with OAG custodians, and identified approximately 180 privileged documents held by OAG. Two produced documents are investigation files; these two investigations related to post-SB1 alleged poll watcher obstruction by election officials. The remainder of the produced documents are largely public information, including news articles, copies of public indictments or plea agreements, public legislative transcripts, complaints of purported election irregularities submitted to the

---

[3] In addition, LUPE Plaintiffs sought all documents in possession of OAG that "related to the Texas Secretary of State's determination that possible criminal conduct in connection with the 2022 General Election occurred." Ex. N at 10 (RFP 38).

[4] The parties identified 198 documents for the Court's review of LUPE Plaintiffs' June 24, 2023 motion to compel. *See* Dkt. 667-2. The Court ultimately ordered the production of 51 of these documents. *See* Dkt. 694.

Secretary of State and the OAG, and Secretary of State advisories to election administrators.

On November 29, 2021, Private Plaintiffs served their First Set of Requests for Production ("First RFPs") on the Secretary of State. Ex. R.  Private Plaintiffs sought, among other things, "[a]ll documents and communications discussing actual or alleged illegal voting, election fraud, or other criminal conduct in connection with" all methods of voting "during the period from 2016 to present." *Id.* at 10 (RFP 8). Private Plaintiffs also sought "[a]ll documents and communications regarding actual or alleged illegal voting, election fraud, or other criminal conduct in connection with voter assistance, including transportation assistance and vote harvesting, during the period from 2016 to present." *Id.* at 11 (RFP 10). On December 29, 2021, the State served its Objections and Responses to Private Plaintiffs' First RFPs to the SOS. Ex. S. With respect to RFPs 8 and 10, the State objected "to the extent that it calls for the production of documents that" the "Texas SOS determines that there is reasonable cause to suspect that the alleged criminal conduct occurred…[t]he release of information related to these complaints could compromise and endanger the Attorney General's investigation to the extent it remains ongoing. Defendant therefore considers any documents related to open investigations and prosecutions to be privileged[.]" *Id.* at 16, 19. The SOS did not produce closed case files.

On April 28, 2022, Plaintiffs deposed Keith Ingram, SOS Elections Director, in his personal capacity. Ex. T. When Plaintiffs' counsel questioned Mr. Ingram about specific examples of fraud, Mr. Ingram refused to discuss the "particulars because [the cases] are over with the Attorney General and they are not public record under 31.006[.]" *Id.* at 147:11-23.  During his testimony, Mr. Ingram described an "election complaint log" kept by the SOS. *See Id.* at Tr. 148:20-149:22. When Plaintiffs' counsel inquired if this election complaint had been produced to the plaintiffs in discovery, Mr. Ingram responded, "I would be surprised if it had." *Id.* at Tr. 149:2-

6.

### C. Mr. White's June 22, 2023 Declaration

On June 24, 2023, the State filed its responses in opposition to the United States' motion for summary judgment, Dkt. 645, and to OCA Plaintiffs' motion for summary judgment, Dkt. 646. As an exhibit to each opposition brief, the State attached a declaration signed by Jonathan White on June 22, 2023 (the "June 22, 2023 Declaration" or the "Jonathan White Declaration"). Dkts. 645-5 at 14-23 and 646-3 at 29-38. In that declaration, Mr. White provided detailed descriptions of various types of voter fraud and offered opinions on the extent to which SB1 helps fight mail ballot fraud.

In light of Jonathan White's testimony in his June 22, 2023 Declaration, LUPE Plaintiffs raised sword-and-shield concerns in their June 24, 2023 motion to compel, Dkt. 655 at 3-4,[5] and the United States filed a notice raising similar concerns related to belated and selective disclosure of information, Dkt. 656. At the July 11, 2023 hearing on that motion, LUPE Plaintiffs informed the Court that the relief sought in that motion did not resolve the entire dispute created by the Jonathan White Declaration, Ex. U at Tr. 44:8-14, and counsel for LUPE Plaintiffs, the State, and the United States indicated that the parties were in the midst of meeting and conferring regarding Plaintiffs' concerns.

The Court expressed that, in light of the concerns raised by LUPE Plaintiffs and the United States, "[t]he appropriate remedy may be redepose [Jonathan White], maybe under a limited number of questions to be asked, but that's what I would highly suggest." *Id.* at Tr. 45:20-22. And emphasizing that the State had been "overly aggressive" in some of its privilege assertions during

---

[5] LUPE Plaintiffs reiterated these concerns in their July 19, 2023 advisory regarding this motion to Compel. Dkt. 674 at 6-9.

Mr. White's depositions, the Court also stated that, if "the State[] doesn't make some accommodations here . . . you're ultimately going to be leading me down the road where I'm going to have to strike or limit portions of this testimony[.]" *Id.* at Tr. 47:3-8.

### D. Mr. White's August 11, 2023 Deposition

Following back and forth between the parties, the State agreed to make Mr. White available for a three-hour, topic-limited deposition on August 11, 2023. Ex. V. But in responding to deposition topics proposed by the United States, the State emphasized limitations it would place on Mr. White's testimony. *Id.* at 3. For example, the State asserted that Plaintiffs must refrain from asking about non-public information related to active investigations or cases. *Id.* at 3. Instead, as to those investigations and cases, the State indicated that Plaintiffs may ask about case details only to the extent that Plaintiffs could demonstrate the matters are public, either through public records or produced discovery. *Id.* at 3. Although "State Defendants agree[d] that Mr. White may be asked about any closed investigation and cases of voter fraud," *see id.* at 3, the State neither identified closed investigations nor produced investigatory materials prior to the deposition that would allow Plaintiffs' counsel to prepare questions about closed matters.

On August 11, 2023, LUPE Plaintiffs and the United States deposed Mr. White. Ex. W. On August 17, 2023, the Court issued an order regarding the motions for summary judgment filed by the United States and OCA Plaintiffs.  Dkt.724.

## II.    LEGAL STANDARD

### A. Federal Rule of Civil Procedure 37

"The Federal Rules of Civil Procedure state that '[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure

was substantially justified or is harmless.'" *Holcombe v. United States*, 516 F. Supp. 3d 660, 669 (W.D. Tex. 2021) (quoting Fed. R. Civ. P. 37(c)(1)). "[T]he language of Rule 37 does not require a motion to compel before its exclusion sanction may apply." *Hovanec v. Miller*, 331 F.R.D. 624, 634 (W.D. Tex. 2019).

Rule 26(a) requires a party to provide to the other parties "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to supports its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Rule 26(a) also "requires testifying experts to provide an expert report that includes 'a complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; [and] any exhibits that will be used to summarize or support them,' among other things." *Holcombe*, 516 F. Supp. 3d at 669 (quoting Fed. R. Civ. P. 26(a)(2)(B)).

"Rule 26(e) requires that a party who has responded to an interrogatory or request for production must supplement or correct its disclosure or response 'in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.'" *Sumrall v. Ensco Offshore Co.*, No. 2:17-CV-48-KS-MTP, 2018 WL 2224074, at *2 (S.D. Miss. May 15, 2018) (quoting Fed. R. Civ. P. 26(e)(1)(A)); *see also Holcombe*, 516 F. Supp. 3d at 669. This duty to supplement disclosures "extends to information included in expert reports and given during expert depositions." *Holcombe*, 516 F. Supp. 3d at 669 (citing Fed. R. Civ. P. 26(e)(2)).

"Generally, the burden of proving substantial justification or harmlessness is on the

nondisclosing party." *Hovanec*, 331 F.R.D. at 637. "To determine whether a failure to disclose was harmless, the Court evaluates four factors: (1) the explanation for the failure to disclose; (2) the importance of the information; (3) potential prejudice to the opposing party of including the evidence; and (4) the availability of a continuance to cure such prejudice." *Id.* (citing *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir. 2009)). "Substantial justification for the failure to make a required disclosure has been regarded as justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure obligation." *Olivarez v. GEO Grp., Inc.*, 844 F.3d 200, 205 (5th Cir. 2016) (cleaned up).

"The court, on motion and after giving an opportunity to be heard," "may order payment of the reasonable expenses, including attorney's fees, caused by the failure" of the nondisclosing party. Fed. R. Civ. P. 37(c)(1)(A).

### B.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 requires that "[a]n affidavit or declaration used to . . . oppose a motion" for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). As such, "[t]he substance of an affidavit must demonstrate the affiant has personal knowledge of the facts contained therein." *Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 846 (S.D. Tex. 2011).  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). To that end, if an "affidavit fails to meet any of the procedural requirements" under Rule 56(c)(4), "a motion to strike that sets forth specific objections is the proper method" for a party "to challenge the affidavit." *See Wojciechowski*, 763 F. Supp. 2d at 846.

### III.   ARGUMENT

**A.   The Jonathan White Declaration is Properly Struck Because the State Failed to Produce—and in Several Instances, Failed Even to Identify—Evidence That Forms the Basis of the Testimony in the Declaration.**

> *1.   The Sword-and-Shield Doctrine Bars Testimony That is Based on Information Withheld by the State.*

The testimony in the Jonathan White Declaration is subject to exclusion for the same sword-and-shield reasons as those relied upon by the Court when it excluded certain testimony by Jonathan White at trial.

Under the sword-and-shield doctrine, "a party may not use privileged information both offensively and defensively at the same time." *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th Cir. 2005); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) (emphasizing "a client's inability to, at once, employ the [attorney-client] privilege as both a sword and shield."). As the Fifth Circuit has emphasized, allowing a party to do so "would be manifestly unfair to the opposing party." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989). "When a party puts privileged matter in issue as evidence in a case, it thereby waives the privilege as to all related privileged matters on the same subject." *See* 8 Charles Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2016.2 (3d ed. 2023); *see also Willy*, 423 F.3d at 497; *Doe 1 v. Baylor Univ.*, 320 F.R.D. 430, 439 (W.D. Tex. 2017).

In lieu of compelling further discovery, courts regularly exclude evidence where there is a sword-and-shield violation. *See, e.g.*, *Beach Mart, Inc. v. L&L Wings, Inc.*, No. 2:11-cv-44-FL, 2020 WL 6708236, at *2 (E.D.N.C. Nov. 13, 2020) ("Where [the deponent] refused to answer this question during his deposition, he may not answer this question at trial, or otherwise allow [the defendant] to use the attorney-client privilege impermissibly as a sword and shield."); *Mahli, LLC*

*v. Admiral Ins. Co.*, No. 1:14-cv-175-KS-MTP, 2015 WL 5024197, at *5 (S.D. Miss. Aug. 25, 2015) ("The Court finds that it would be patently unfair for [the defendant] to hide the substance of [other witnesses'] statements to [an individual] behind the attorney-client privilege or work-product doctrine during discovery, and to allow [the defendant] to use the statements against [the plaintiff] at trial."); *Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, No. 1:13-cv-296-BLW, 2015 WL 1020644, at *1 (D. Idaho Mar. 9, 2015) (precluding a party from introducing emails at trial that it previously claimed were subject to the attorney-client privilege). That includes striking evidence from the record at the summary judgment stage. *See, e.g., In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991) ("But the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion."); *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990) (affirming district court order to strike affidavit in support of opposition to summary judgment where affiant previously withheld testimony based on Fifth Amendment privilege); *Martin v. New York City Transit Auth.*, 148 F.R.D. 56, 64 (E.D.N.Y. 1993) ("The [Department of Labor] cannot hide behind the informants' privilege and prevent the disclosure of interview notes and then choose to include declarations authored by the same interviewees in support of a motion for summary judgment."). After all, the "power to strike is grounded in the principle that once a witness testifies, she may not invoke" a "privilege so as to shield that testimony from scrutiny." *Parcels of Land*, 903 F.2d at 43.

The State consistently withheld evidence that it characterized as non-public, including investigative and prosecution files in the possession of the Office of the Attorney General and the information in those files. *See, e.g.*, Dkt. 650 at 2, 7; Ex. J at Tr. 21:11-13 ("I wouldn't be able to speak about the facts of those ongoing cases other than what's been made public[.]"). In addition,

the State sought to "maintain[] the confidentiality of [the] investigative methods" of the Office of the Attorney General and the Office of the Secretary of State by withholding information the State considered revealing of that information, *see* Dkt. 650 at 3. The State claimed to produce information about "criminal investigation[s]" that "no longer remain active." *See* Dkt. 650 at 7; *see also id.* at 2-3. Even then, Jonathan White claimed in his deposition to testify only to "public information" "about closed cases." *See, e.g.*, Ex. W at Tr. 120:19-121:9.

By filing and relying on the Jonathan White Declaration, the State attempts to use (sword) the information it previously withheld under claims of privilege (shield).

For example, the Jonathan White Declaration claims that some individuals provide illegal voter assistance. Dkts. 645-5 at 14-23 and 646-3 at 29-38. Mr. White offers detailed descriptions of the techniques he claims are used by fraudsters to approach voters, gain voter trust, and vote ballots for voters. Jonathan White Dec. ¶¶ 8, 10, 11, 14, 15. However, in his April 27, 2022 deposition, when Plaintiffs' counsel asked Mr. White to describe a particular example of illegal assistance, Mr. White first refused to answer ("I can't go into that case due to -- "), then OAG counsel objected and stated "I'm instructing you -- to the extent that there's anything in the public record about the case, I'm instructing you to testify about that."  Ex. J at Tr. 185:14-187:23. Mr. White then identified a case of alleged voter registration fraud and explained, "The case that came to mind does not actually involve ballot assistance, it involved voter registration, and so it may not be directly applicable to your -- your question, and I think it may not.  But if something is in the public record, I would make that available to you." *Id.* Tr. 188:2-16. Mr. White also acknowledged that he could point to no prosecutions for illegal voter assistance in the polling place. *Id.* at Tr. 75:13-76:14.

Plaintiffs' counsel  tried  to  obtain  information  about  the  statements  in  Mr.  White's

declaration by questioning him in the August 11, 2023 deposition about his claims of voter assistance fraud in the polling place. Again, Mr. White limited his answers to public information. Ex. W at Tr. 120:19-121:9. When Plaintiffs' counsel asked him for the basis of his detailed statement about illegal assistance in the polling place, Mr. White referenced a civil election contest in which subsequent criminal charges were later dismissed and a 2019 voter fraud prosecution in which the defendant was acquitted. Ex. W at Tr. 89:4-91:14; 92:19-93:18.

Unable to identify any successful prosecutions or documents produced in discovery to support the claims in his declaration, Mr. White fell back on information never provided to Plaintiffs, explaining, "my recollection is based on generally [sic] anecdotes that I might have spoken with an investigator about or just general memories of an investigation and wouldn't be tied to any particular document." Ex. W at Tr. 89:23-90:5. The same is true for the Jonathan White Declaration's descriptions of the techniques employed in alleged fraud related to mail ballots (*id.* ¶¶ 11, 17-22, 25, 30, 31, 35, 42, 46), vote harvesting (*id.* ¶¶ 12, 13, 24, 26, 27, 28, 29, 32, 34, 37, 38, 39, 44, 45), and other election-related issues (*id.* ¶ 16), as well as the declaration's opinion that "the ID requirement of SB1 with regard to applications for ballots by mail and mail-in ballots is both reasonably calculated and necessary to eliminate several common types of voter fraud." *Id.* ¶ 6.  *See* Ex. W at Tr. 82:13-21; 85:7-24; 86:5-25; 89:4-90:5; 93:14-18; 93:22-94:6; 95:1-96:4.

 Indeed, subsequent testimony by Mr. White confirms that the declaration relies on information previously withheld by the State.  Although the State withheld all but two investigative reports, as well as documents related to its investigations and prosecutions, Mr. White testified that he based his declaration testimony on those same records.  Dkt. 666-2 ¶ 6. Mr. White acknowledged, for example, that his statements in the June 22, 2023 declaration regarding the prosecution of Zul Mohamed "relate to [his] understanding of ballot harvesting" gained through

his "criminal investigative experience." *Id.* In his August 11, 2023 deposition, Mr. White acknowledged that the statements in his declaration are based at least in part on the investigative and prosecution case files that he reviewed as part of his work at the Election Integrity Division. *See* Ex. W at Tr. 110:5-18.

The State should have disclosed these records initially under Rule 26(a), and then supplemented its discovery production in accordance with Rule 26(e). But it did not. And the State cannot show that its failure to disclose is harmless. *See Hovanec*, 331 F.R.D. at 637.

Regarding the first factor, the State fails to offer a satisfactory explanation for its non-disclosure. The State has previously asserted that the withheld evidence was privileged, that disclosure of the withheld information would compromise ongoing investigations, and that reviewing documents was unduly burdensome given the number of case files in the possession of OAG. *See, e.g.*, Ex. C at 18-19, 21. Regardless of whether those arguments were valid prior to the State's inclusion of the Jonathan White Declaration—and they were not—the State affirmatively chose to rely on that withheld information through its use of the declaration. The State therefore cannot rely on those shields as it uses withheld information as a sword in support of its defense. *See Doe 1 v. Baylor Univ.,* 335 F.R.D. 476, 496 (W.D. Tex. 2020).

The third factor—potential prejudice—likewise weighs strongly against the State. After withholding evidence as privileged for over a year and a half, the State filed the Jonathan White Declaration with its responses in opposition to motions for summary judgment—after discovery closed and just two and a half months before trial. Although the State offered up Mr. White for a limited deposition (upon the Court's recommendation) on August 11, 2023, the State produced no documents related to the statements in Mr. White's declaration and did not permit Mr. White to testify about the information it had withheld on the basis of privilege. Ex. V at 3. And during that

18

deposition, Mr. White acknowledged that the withheld information informed the testimony in his June 22, 2023 Declaration. Ex. W at Tr. 110:5-18. For this reason, the Court limited Mr. White's trial testimony.  And LUPE Plaintiffs will be significantly prejudiced in any potential appeal because they have not had the opportunity to review, much less challenge, information that informed Mr. White's declaration.

The fourth factor—the availability of a continuance to cure the prejudice—also weighs strongly against the State because trial in this case has already occurred. Thus, regardless of the second factor—the importance of the information—the State cannot meet its burden to show that its failure to disclose is harmless.

For similar reasons, the State also cannot show that its failure to disclose was substantially justified. *Olivarez*, 844 F.3d at 205. Given the State's affirmative use of information it previously withheld or otherwise failed to produce, there is "no factual or legal basis for its position that the alleged burden of" disclosure could "excuse its non-compliance with its obligations under Rule 26(a) and Rule 26(e)." *Flores v. AT&T Corp.*, No. 3:17-cv-00318-DB-ATB, 2019 WL 2746774, at *8 (W.D. Tex. Mar. 27, 2019).

Accordingly, under Rule 37(c), the presumptive sanction of exclusion applies, *see Honey-Love v. United States*, 664 F. App'x 358, 361–62 (5th Cir. 2016), and the redacted paragraphs in Exhibit A should be struck from the Jonathan White Declaration, Dkts. 645-5 at 14-23 and 646-3 at 29-38.

2. *The State Failed Even to Identify Investigative and Prosecution Files Related to Active or Closed Investigations.*

Worse, the State failed even to identify an unknown number of OAG investigative reports or other case files on which Mr. White relied on to draft his declaration. Because the State failed

to identify— much less produce or offer testimony about—these documents, it cannot rely on the information included in them in Mr. White's declaration.

Mr. White testified that he would receive an investigative report "on the completion of any investigation that was referred for prosecution," Ex. W at Tr. 25:18-26:-2, and he acknowledged that he would generally review "this document at some point in time" if the Criminal Investigations Division referred an investigation to the Election Integrity Division for prosecution, Ex. W at Tr. 24:14-18. Mr. White also acknowledged that, after receiving an investigative report, he would not always decide to prosecute the case, and he stated that "it wasn't infrequent that a case . . . wouldn't be viable in court." Ex. W at Tr. 26:3-9.

In his August 11, 2023 deposition, Mr. White identified one document as an investigative report (Ex. W at Tr. 23:15-24:18), and testified that this document was missing exhibits that would typically be considered part of an investigative file. Ex. W at Tr. 117:21-118:7. However, the State did not produce those exhibits to the investigative report.

The State repeatedly objected to the production of full investigative and prosecution case files, *see, e.g.*, Ex. C at 18-19, 21; Ex. O at 6. Further, despite the fact that "typically these [documents] would stay with the Criminal Investigations Division" and that Mr. White would "[v]ery likely have a copy" of the investigative file if the investigation resulted in a prosecution, Ex. W at Tr. 26:10-21, the State's privilege logs omit investigative reports—whether for closed or purportedly active investigations, Ex. M at 54 (listing 2 documents withheld by OA custodians); Ex. Q. Indeed, when shown OAG's May 19, 2023 privilege log, Mr. White testified that he did not "see[] investigation files" on that log; Mr. White further testified "that there are investigative files in the Election Integrity Division that would be relevant to voter fraud investigations but" that "are not on [the] privilege log[,]" (Ex. W at Tr. 116:20-117:4), and shared his assessment that "any

investigative files that [the Criminal Investigations Division] has would be relevant to voter fraud investigations," *Id*.

During his August 11, 2023 deposition, Mr. White testified that the statements in his declaration are informed by the investigative and prosecution case files that he reviewed through his work at the Election Integrity Division. *See* Ex. W at Tr. 110:5-18; 116:20-117:2. Because the State relies on this information for its defense, it had a continuing duty to disclose these documents pursuant to Rule 26(a)(1). *Brown v. AT & T Servs. Inc.*, 236 F. Supp. 3d 1000, 1005 (S.D. Tex. 2017). Further, "[u]nder Rule 26(e)(1), a party is obligated to supplement its response to discovery production requests in a timely manner when it learns that the response is incomplete or incorrect in some material respect and the information has not otherwise been made available." *Flores*, 2019 WL 2746774, at *5. Because the State failed to identify— much less produce—all but two investigative reports, and case files of investigations and prosecutions, and withheld testimony related to such information, the State's reliance on that information through the Jonathan White Declaration violates Rule 26(a) and (e). *See id.* at *5, 9; *see also Brown v. AT & T Servs. Inc.*, 236 F. Supp. 3d 1000, 1005 (S.D. Tex. 2017); *see also Textron Innovations Inc. v. SJ DJI Tech. Co.*, No. W-21-cv-00740-ADA, 2023 WL 3681712, at *2 (W.D. Tex. Mar. 29, 2023), *report and recommendation adopted sub nom. Textron Innovations Inc. v. SZ DJI Tech. Co.*, No. 6:21-CV-00740-ADA, 2023 WL 4084509 (W.D. Tex. June 20, 2023); *Sumrall v. Ensco Offshore Co.*, No. 2:17-CV-48-KS-MTP, 2018 WL 2224074, at *3 (S.D. Miss. May 15, 2018)).

*Flores* is instructive. In that case, the plaintiff alleged that the defendant improperly terminated his employment in violation of the Family and Medical Leave Act; the defendant contended that the plaintiff was terminated because he failed to meet the defendant's performance standards. *Flores*, 2019 WL 2746774, at *1. To assess whether an employee met performance

standards, the defendant gave each employee a performance score based on "various types of data." *Id.* Through discovery, the plaintiff sought the defendant's raw data in native electronic format relating to its evaluation of the plaintiff's performance. *Id.*

The defendant did not produce this raw data but instead produced a spreadsheet that constituted "a *summary* of the raw data underlying" the plaintiff's performance score, and that didn't "reflect everything in the" defendant's database. *Id.* at *2 The defendant in turn relied on that spreadsheet in support of its motion for summary judgment, and the plaintiff moved to exclude that spreadsheet because of the defendant's failure to provide the requested raw data and to provide data in its native form. *Id.* at *3.

The *Flores* court concluded that, "in accordance with Rule 26(e), [the defendant] was required to supplement its discovery response and produce the raw data in its native form," but failed to do so. *Id.* at *5. And noting that the defendant acknowledged the information "was not made available to" the plaintiff, the court held that the defendant "should not be allowed to use the [s]preadsheet . . . because [the defendant] failed to supplement its disclosures with the [underlying] data in its native form," even though "some" of the underlying data "was produced in the [s]preadsheet." *Id.* at *5, 9-10.

With the introduction of the Jonathan White Declaration, the State likewise failed to comply with Rule 26(a) and (e) by relying on information in the investigative and prosecution files that it failed to identify—much less produce.[6] And for the reasons discussed regarding the State's violation of the sword-and-shield doctrine, the State cannot show that its failure to comply with Rule 26(a) and Rule 26(e) was substantially justified or harmless. *See* Section III.A.1. Indeed, the prejudice is even greater for this violation, as the State's failure even to identify this information prevents LUPE Plaintiffs from assessing the nature of the information and  the

propriety of any privilege assertions by the State. Accordingly, the redacted paragraphs in Exhibit A must be struck from the Jonathan White Declaration, Dkts. 645-5 at 14-23 and 646-3 at 29-38.

**B. The Jonathan White Declaration Constitutes Inadmissible Summary Evidence.**

Mr. White's June 22, 2023 declaration constitutes inadmissible summary testimony in violation of Federal Rule of Evidence 1006. Federal Rule of Evidence 1006 provides:

"The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court[;]" however, "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006.

The Fifth Circuit's analysis in *United States v. Nguyen* is instructive for why the Jonathan White Declaration violates Rule 1006. 504 F.3d 561 (5th Cir. 2007). In that case, the government introduced testimony of an FBI financial analyst. That analyst "provided a summary of her investigation and authenticated a summary chart that described the operation." *Id.* at 572.

The Fifth Circuit concluded that the analyst's testimony "exceeded the bounds of Rule 1006 because she stated that her testimony was premised, in part, on out-of-court statements that unspecified witnesses made to FBI agents during the investigation." *Id.* The Fifth Circuit emphasized that "[t]his testimony was in error because the supporting evidence must have been '*presented previously* to the [factfinder] to establish any assumptions reflected in the summary.'"

---

[1]    To the extent that the State asserts any privilege over that information, the State's introduction of the Jonathan White Declaration violates the sword-and-shield doctrine, and that doctrine bars the State's reliance on that information for its defense, for the reasons expressed in Section III.A.1.

*Id.* As the Fifth Circuit went on to note, "[t]he out-of-court statements to which [the analyst] referred may have been in general agreement with the evidence that the government had presented, but these statements were not in fact presented previously to the [factfinder]." *Id.* Accordingly, the Fifth Circuit held that the government violated Rule 1006 by offering the analyst's summary testimony. *Id.*

The Jonathan White Declaration presents an even greater misuse of summary testimony than the testimony at issue in *Nguyen*. In his declaration, Mr. White emphasizes that, during his time at OAG, he has "reviewed hundreds of investigations and handled approximately 100 prosecutions, many of which were complex[.]" Jonathan White Dec. ¶ 3. During his August 11, 2023 deposition, when asked if that investigative experience "form[s] the basis of your knowledge of the topics that you testify about in your declaration," Mr. White answered, "[c]ertainly a large portion of it." Ex. W at Tr. 71:8-21.

Based on that experience, Mr White repeatedly makes summary statements about alleged mail ballot and voter-assistance fraud schemes. *See* Jonathan White Dec. ¶ 6. For example, Mr. White provides a breakdown of the proportion of investigations and prosecutions in his office dealing with "mail-in ballot fraud," "illegal voting, and voter assistance." *Id.* ¶ 7. Mr. White also summarizes what, in his estimation, are common features of alleged mail ballot fraud, vote harvesting fraud, and voter assistance fraud schemes. *Id.* ¶¶ 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 24, 25, 26, 27, 28, 29, 30, 31, 31, 34, 35, 36, 37, 38, 40, 43, 42, 44, 45.  And in several  instances,

Mr. White notes what he believes are "common" features (*e.g.*, ¶¶ 6, 7, 20, 27, 28, 29, 30) or phenomena that "often" (*e.g.*, ¶¶ 14, 15, 25, 29, 35, 38), "normally" (*e.g.*, ¶¶ 11, 12, 14, 39, 45), "usually" (*e.g.*, ¶¶ 11, 14), or "typically" (*e.g.*, ¶¶ 13, 25, 45) occur.

But despite the summary nature of the Jonathan White Declaration, the State withheld as

privileged underlying information that is non-public, *see* Section III.A.1, and failed even to identify investigation or prosecution files relating to both active and closed investigations, *see* Section III.A.2. Because this "supporting evidence must have been '*presented previously*,'" the State cannot now rely on Mr. White's summary testimony in his June 22, 2023 declaration. *Nguyen*, 504 F.3d at 572; *cf. United States v. Valencia*, 600 F.3d 389, 417-18 (5th Cir. 2010) (no violation of Rule 1006 where government provided opposing counsel with underlying records one month before trial).

The State's production of spreadsheets that purportedly list all election fraud prosecutions by the Office of the Attorney General, and its limited production of public information related to cases, do not change that outcome. *See, e.g.*, Ex. D, E, F, G. As Mr. White testified in his August 11, 2023 deposition, he provided only "public information about the[se] cases" when asked by counsel, and he provided information about closed cases only to the extent that the information was "publicly available." Ex. W at Tr. 120:10-121:9; *see also* Ex. J at Tr. 185:14-188:16.

But as Mr. White acknowledged, his statements in his declaration are informed by the non-public investigative and prosecution case files that he reviewed through his work at the Election Integrity Division. *See* Ex. W at Tr. 110:5-18. The declaration therefore goes beyond addressing publicly available information regarding active or closed investigations. As such, the State failed to provide all of the "supporting evidence" underlying even the spreadsheets. *Nguyen*, 504 F.3d at 572.

Further, Mr. White's summary testimony "also exceed[s] the bounds of Rule 1006 because [he] stated that [his] testimony was premised, in part, on out-of-court statements" not presented to the factfinder. *Id.* Mr. White acknowledged that he did not personally review all complaints that came into the Office of the Attorney General. Ex. W at Tr. 17:12-14. Mr. White also stated that he

did not have "direct supervisory authority" over the investigators from the Criminal Investigations Division, Ex. W at Tr. 18:9-19, and that generally he did not question witnesses before the Criminal Investigations Division referred an investigation for prosecution. *Id*. at Tr. 21:9-20.

Rather, Mr. White testified that he learned about the outcomes of an investigator's efforts "[g]enerally" through "one-on-one conversations." Ex. W at Tr. 20:8-17. For example, when asked how he came to the conclusion that "Dallas County received and counted fraudulent ballots from [Zul] Mohamed," Mr. White testified that "I believe that was told to me by my investigator." Ex. W at Tr. 59:17-21. And when asked if he was "personally involved in investigating and making that determination," he replied, "No. I did not go to Dallas County, and I didn't talk with the families and the voters myself." Ex. W at Tr. 59:22-60:2.

Further, when asked about "[h]ow much of an investigative file [came] to [his] attention," Mr. White testified that he might see the report written by an investigator, or he "might just verbally be told about election records that were obtained," or "might be told about . . . witness interviews or things that the investigator had learned or researched." Ex. W at Tr. 26:22-27:11. Indeed, Mr. White acknowledged that he "didn't always need to read an entire investigative report if one was provided," as "a lot of it would be based on the conversation . . . with the investigator so I could cut to the chase. Especially if the investigator . . . wasn't that good of a writer, I might get the information out of him just via conversation." Ex. W at Tr. 27:25-28:13.

In addition, even for cases that the Election Integrity Division worked on following a referral by the Criminal Investigations Division, Mr. White's testimony relies on out-of-court statements by other OAG employees. Mr. White acknowledged that, since he became a supervisor in 2018, he "would generally be referring [] cases to other attorneys" in the Election Integrity Division. Ex. W at Tr. 29:3-15. Mr. White also testified that an investigative report "would

probably not even come to me. I mean, it would probably go to the attorney, and I would just know what the basic case is from talking to the prosecutor and the investigator." Ex. W at Tr. 29:3-15.

"The out-of-court statements" on which Mr. White relied, and to which he "referred" in his deposition, "were not in fact presented previously" to Plaintiffs or to the Court. *Nguyen*, 504 F.3d at 572. Because the testimony in the Jonathan White Declaration is "premised, in part, on those out-of-court statements," the State's introduction of the Jonathan White Declaration violates Rule 1006. *Id.*

Accordingly, because the Jonathan White Declaration is inadmissible summary testimony and relies on out-of-court statements, the Court should exclude Mr. White's declaration testimony that is summary testimony about non-public information related to investigations or prosecutions of alleged voter fraud.

### C. The Jonathan White Declaration is Improper Lay Opinion Testimony.

The testimony in the Jonathan White Declaration is improper lay testimony in contravention of Federal Rules of Evidence 701 and Federal Rule of Civil Procedure 56(c)(4).

The State consistently identified Mr. White as a lay witness.  However, "it is the content of testimony, not a witness's formal designation as an expert witness, which determines whether Rule 702 applies." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 198 (5th Cir. 2016). "That rule must be used to assess 'any part of a witness's opinion that rests on scientific, technical, or specialized knowledge[.]'" *Id.* (quoting *United States v. Cooks*, 589 F.3d 173, 180 (5th Cir. 2009)).

"Under [Federal Rule of Evidence] 701, a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the" factfinder. *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011) (quoting *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997)). A lay witness's "testimony in the form

of an opinion is limited to one that is . . . not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 264-65 (5th Cir. 2022) (quoting Fed. R. Evid. 701(c)). Of course, "[t]estimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required," but the testimony still must be "based on *first-hand observations in a specific investigation.*" *El-Mezain*, 664 F.3d at 514 (emphasis added). That means that, "[i]n particular, the witness must have personalized knowledge of the facts underlying the opinion and the opinion must have a rational connection to those facts." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 265 (emphasis added) (quoting *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002)). Further, that personal knowledge must be "direct and particularized," *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 686 (5th Cir. 2003), and "it has always been the rule that lay opinion testimony may be elicited only if it is based on the witness's first-hand knowledge or observations," *id.* at 685.

Fifth Circuit precedent is instructive for the degree of personal knowledge necessary for a lay witness to offer opinion testimony. For example, in *El-Mezain*, the Fifth Circuit emphasized that testimony by FBI agents was proper lay testimony because those agents "were extensively involved in the investigation" at issue, and "their testimony was either descriptive or based on their *participation* in, and understanding of, the events in" that case. *El-Mezain*, 664 F.3d at 514 (empahsis added). In *United States v. Ebron*, the Fifth Circuit emphasized that Bureau of Prison officials provided proper lay testimony regarding various aspects of penitentiary life and prisoner behavior because their testimony was "based on their past experiences formed from *firsthand observation.*" 683 F.3d 105, 122, 138 (5th Cir. 2012) (emphasis added). And in *United States v. Keys*, the Fifth Circuit emphasized that a police detective could offer lay opinion testimony

28

regarding the veracity of the defendant's statement to police because "the testimony was certainly based on his personal perceptions," as he "was one of the three agents present when law enforcement interviewed" the defendant, "[h]e participated actively in the questioning," "and he was able to observe, over some time, [the defendant's] demeanor and the inconsistencies in his story." 747 F. App'x 198, 210 (5th Cir. 2018).

By contrast, lay opinion testimony is improper when a witness does "not have the requisite first-hand, personal knowledge" of the specific information about which he opines. *DIJO, Inc.*, 351 F.3d at 686. So, for example, a company's CEO cannot provide opinion testimony about the value of collateral where he did not participate in the "purchase of the particular items in question, and his affidavit belie[d] any contention that he based his . . . opinion on personal knowledge of the collateral." *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 560 (7th Cir. 2008).

Here, Mr. White lacks first-hand, personal knowledge about investigations and prosecutions purportedly informing his testimony in his June 22, 2023 declaration. As discussed above, and as he repeatedly acknowledged in his August 11, 2023 deposition, Mr. White did not participate in investigations performed by the Criminal Investigations Division, and he relied almost exclusively on investigators and prosecutors to gather information about any investigations and prosecutions that actually did come to his attention. *See supra*, Section III.B. Moreover, Mr. White admitted that he lacks personal knowledge over the vast majority of matters that never proceeded past the investigation stage. Ex. W at Tr. 18:23-19:6 ("[I]f there was a complaint that didn't require further investigation—that didn't merit investigation[—] it's unlikely that that would be brought to my attention.").

Further, of the investigations that actually were referred to the Election Integrity Division,

Mr. White frequently did not even review portions of the investigative reports or case files for those matters, instead relying on conversations with investigators and prosecutors working on those matters. *See supra*, Section III.B. Indeed, when deciding to move forward with the prosecution of a matter referred by the Criminal Investigations Division, Mr. White would make a decision "fairly quickly" and then "would refer the file to the prosecutor and connect him with the investigator." Ex. W at Tr. 29:16-24.

Thus, Mr. White's testimony is not "based on first-hand observations" regarding "specific investigation[s]." *El-Mezain*, 664 F.3d at 514. As such, Mr. White's statements regarding the methods and prevalence of voter fraud, the efficacy of pre-SB1 investigative techniques and the extent to which SB1 aids in combating voter fraud "did not merely draw straightforward conclusions from observations informed by *his own* experience," *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) (emphasis added). Those opinions "cannot be admitted under Rule 701 because [they are] not based on personal knowledge and would instead have to be based on specialized knowledge." *Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, 84 F. Supp. 3d 553, 564 (S.D. Tex. 2015). Because the State attempts to rely on Mr White's "specialized knowledge," "not simply lay opinion testimony based on his perceptions," the Jonathan White Declaration cannot be lay opinion testimony. *See In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 267; *see also* Fed. R. Evid. 701.

Because the Jonathan White Declaration constitutes inadmissible lay opinion testimony—including because his testimony is not based on personal knowledge and relies on inadmissible hearsay—the declaration violates Federal Rule of Civil Procedure 56(c)(4) and must be struck. *See* Fed. R. Civ. P. 56(c)(4) (requiring that affidavit used to "oppose a motion must be made on personal knowledge" and "set out facts that would be admissible in evidence").

### D. The Jonathan White Declaration and Any Other Similar Testimony Fails to Satisfy the Disclosure and Reliability Requirements for Expert Testimony.

If considered expert testimony, Mr. White's declaration testimony would have to satisfy the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2), and the reliability requirements of Federal Rule of Evidence 702. It satisfies neither.

First, the State never designated Mr. White as an expert witness. To the extent the Court construes Mr. White's June 22, 2023 Declaration as an expert report, the declaration was served after the close of discovery, and the State failed to comply with the requirements of an expert report under Rule 26(a)(2)(B), including by failing to produce all of "the facts or data considered by the witness" in forming his opinion. Fed. R. Civ. P. 26(a)(2)(B)(ii); *see also* Section III.A (listing examples of documents and testimony never produced or identified by the State).

The State therefore failed to comply with Rule 26(a). "Under Rule 37(c), the presumptive sanction for failing to disclose a testifying expert or supply a required expert report or summary disclosures is to exclude or limit the expert's testimony unless the failure was substantially justified or harmless." *Honey-Love v. United States*, 664 F. App'x 358, 362 (5thCir. 2016). For the reasons expressed in Section III.A, the State cannot show that the failure was substantially justified or harmless; accordingly, on this basis alone, the Jonathan White Declaration must be excluded.

Second, Mr. White's testimony is not reliable under Rule 702 and the analytical framework of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Rule 702 provides that an expert testimony may testify only if, among other things, "the testimony is based on sufficient facts or data" and "the testimony is the product of reliable principles and methods[.]" Fed. R. Evid. 702(b) and (c). "The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue." *Holcombe v. United States*, 516 F. Supp. 3d 660, 673 (W.D. Tex. 2021).

Regardless of whether an expert witness is "well-qualified by experience," the expert's testimony "still may be barred if it is not based on sound data." *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). "The party offering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible." *Holcombe*, 516 F. Supp. 3d at 673.

The State cannot meet that burden, as neither Mr. White's methodology nor the underlying data are sound. As an initial matter, LUPE Plaintiffs cannot address fully the deficiencies with Mr. White's analysis because of the State's failure to produce information underlying his testimony, such as investigation and prosecution files. *See supra*, Section III.A and B. To the extent that Mr. White has indicated what data underlie his testimony, Mr. White acknowledged that he rarely, if ever, learned information about investigations that were not referred for prosecution. *See supra*, Section III.B. Thus, Mr. White's assessment of the nature and frequency of voter fraud, the efficacy of investigative techniques, and the purported efficacy, necessity, and reasonableness of the measures introduced by SB1, are based on an incomplete and "skewed dataset." *See Falcon v. State Farm Lloyds*, No. 1:12-CV-491-DAE, 2014 WL 2711849, at *13 (W.D. Tex. June 16, 2014) ("Rather than sending a variety of samples in an attempt to evaluate the actual condition of the [] residence, [the expert] sent samples which appeared to show smoke contamination."); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 233 (S.D.N.Y. 2004). That "inherent bias" in the dataset alone renders Mr. White's testimony "unreliable." *Falcon*, 2014 WL 2711849, at *13.

Mr. White's methodology of reviewing investigations and prosecutions is also improper. For example, Mr. White testified in his declaration regarding techniques employed by fraudulent voter assistors. Jonathan White Dec. ¶ 10. When asked in his August 11, 2023 deposition about

any prosecutions that reflected those facts, Mr. White pointed to a prosecution in Nueces County, but described the prosecution as "not a successful one."  Ex. W at Tr. 90:21-91:14.  In other words, Mr. White has classified as voter fraud instances where an individual has not been convicted—and with this particular example, where an individual has in fact been *acquitted*. Those cannot count as instances of voter fraud.

Mr. White's discussion of the prosecution of Zul Mohamed indicates that he relies on inapposite examples to conclude that measures introduced by SB1 would prevent voter fraud. *See* Jonathan White Dec. ¶¶ 18-23.  For example, Mr. White refers to the prosecution of Zul Mohamed as an example of the mail ballot fraud that, in his assessment, SB1 would have prevented (¶ 18) and pre-SB1 signature verification did not reveal the fraud.  *Id.* ¶ 21. Mr. White concluded that had an ID number requirement been in place for mail ballots, Mr. Mohamed would not have been able to, as alleged, fraudulently secure the mail ballots of voters.    *Id.*

But based on public statements by OAG about Mr. Mohamed's case, Mr. White has the facts wrong.  According to an October 8, 2020 press release by the Office of the Attorney General, Mr. Mohamed "allegedly obtained a virtual mailbox using a false identity, forged at least 84 *voter registration applications . . .. ,* and had them sent to a fraudulent location." Ex. X at 2  (emphasis added).  To have registered voters with those voter registration applications, Mr. Mohamed necessarily would have had access to the identification numbers for those voters.  *See* Ex. W at Tr. 106 at 10-13 ("So, to the extent that any vote harvester has . . . personal identifying information[] of a voter, they could . . . forge a registration application and the following documents to vote."). And since he had identification numbers, a mail ballot requirement for those numbers would not have prevented Mr. Mohamed's allegedly fraudulent actions. Thus, contrary to Mr. White's assessment, Mr. Mohamed's prosecution in no way supports the contention that an identification

number requirement for mail ballot applications or carrier envelopes prevents fraud.

Thus, because Mr. White's testimony is based on incomplete—and in an unknown number of cases, incorrect—data, along with flawed reasoning, his testimony about both the characteristics of voter fraud and any measures that would address such fraud are unreliable under Rule 702 and the *Daubert* framework.

### E. The Jonathan White Declaration Offers Inadmissible Legal Opinions.

Whether construed as lay or expert testimony, the Jonathan White Declaration offers improper legal conclusions that must be struck. "Experts cannot 'render conclusions of law' or provide opinions on legal issues." *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) (quoting *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009)). "It is also generally prohibited for a lay witness to interpret statutes and to give legal opinions." *El-Mezain*, 664 F.3d at 511; *see also Keys*, 747 F. App'x at 207 (5th Cir. 2018) ("[T]estimony that amounts to a legal conclusion is improper.").

Mr. White offers legal conclusions in violation of the Federal Rules of Evidence in the following paragraphs of his declaration: ¶ 6, ¶ 31, ¶ 41, ¶ 42 and ¶ 48. Because these excerpts constitute inadmissible legal conclusions, they must be struck from the Jonathan White Declaration.

### IV.    CONCLUSION

For the foregoing reasons, LUPE Plaintiffs respectfully request that the Court strike from the record the disputed portions of Mr. White's declaration (filed at Dkts. 645-5 at 14-23 and 646-3 at 29-38) and replace the declaration with the redacted document provided in Exhibit A to this motion.

Dated:  February 20, 2024                              Respectfully submitted,

/s/ *Nina Perales*
Nina Perales (TX Bar No. 24005046)
Julia R. Longoria (TX Bar No. 24070166)
Fátima L. Menéndez (TX Bar No. 24090260)
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Tel: (210) 224-5476; Fax: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Tel: (212) 859-8000; Fax: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

**Attorneys for Plaintiffs**

**LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT, MEXICAN
AMERICAN BAR ASSOCIATION OF
TEXAS, TEXAS HISPANICS ORGANIZED
FOR POLITICAL EDUCATION, JOLT
ACTION, WILLIAM C. VELASQUEZ
INSTITUTE, FIEL HOUSTON INC.**

*Admitted pro hac vice*

/s/ *Sean Morales-Doyle*
Sean Morales-Doyle
Patrick A. Berry*
Jasleen K. Singh*
Robyn N. Sanders*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310; Fax: (212) 463-7308
sean.morales-doyle@nyu.edu
patrick.berry@nyu.edu
jasleen.singh@nyu.edu
rs8592@nyu.edu

Leah J. Tulin*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW, Suite 1150
Washington, DC 20036
(202) 650-6397
tulinl@brennan.law.nyu.edu

Elizabeth Y. Ryan (TX Bar No. 24067758)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Tel: (214) 746-8158; Fax: (214)746-7777
liz.ryan@weil.com

**Attorneys for Plaintiffs**

**FRIENDSHIP-WEST BAPTIST CHURCH,
TEXAS IMPACT, JAMES LEWIN**

*Admitted pro hac vice*

## CERTIFICATE OF CONFERENCE

I hereby certify that, on February 15, 2024, counsel for LUPE Plaintiffs conferred with counsel for all parties concerning the subject of the instant motion. On February 16, 2024, counsel for State Defendants and Defendant Intervenors indicated that they oppose the motion.  On February 15 and February 16, 2024, counsel for the following defendants indicated they do not oppose the motion:  Hidalgo County, El Paso County Elections Administrator, Bexar County Defendants, Harris County Clerk, Travis County Defendants and Dallas County Defendants.  Counsel for Harris County District Attorney Ogg responded that she took no position on the motion.

*/s/ Nina Perales*
Nina Perales

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 20th day of February, 2024.

*/s/ Nina Perales*
Nina Perales