# EXHIBIT J



# NATIONAL COURT REPORTERS INC

SERVING LEGAL PROFESSIONALS COAST TO COAST AND INTERNATIONALLY

In The Matter Of

La Union Del Pueblo Entero, et al.,

Plaintiffs

v

State Of Texas, et al.,

Defendants

CASE

5:21-cv-844

Date

4-27-2022

Witness

Jonathan Sherman White

**Certified Copy
Transcript**

National Court Reporters Inc.  ·  888.800.9656  ·
NationalCourtReporters.com
NCRNetwork@nationalcourtreporters.com
Serving Legal Professionals From Coast To Coast and Internationally

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION

3    LA UNION DEL PUEBLO        §
     ENTERO, ET AL.,           §
4          Plaintiffs,         §  Civil Action No.
                               §   5:21-cv-844 (XR)
5    VS.                       §  (Consolidated Cases)
                               §
6    STATE OF TEXAS, ET AL.    §
           Defendants.         §
7    ***************************************************

8               ORAL DEPOSITION OF

9          JONATHAN SHERMAN WHITE

10              APRIL 27, 2022

11

12   ***************************************************

13        ORAL DEPOSITION OF JONATHAN SHERMAN WHITE,

14   produced as a witness at the instance of the Plaintiffs

15   and Plaintiff-Intervenors, and duly sworn, was taken in

16   the above-styled and numbered cause on the 27th day of

17   April 2022, from 9:11 a.m. to 5:31 p.m., before Caroline

18   Chapman, CSR in and for the State of Texas, reported by

19   Computerized Stenotype Machine, Computer-Assisted

20   Transcription, held at the William P. Clements Jr. State

21   Office Building, 300 West 15th Street, Hearing Room

22   1001E, Austin, Texas, pursuant to the Federal Rules of

23   Civil Procedure.

24

25
```

1    A.   I suppose that would be me.

2    Q.   And what would be necessary for you to -- to

3    make that approval?

4         MR. HUDSON:  Well, I'm going to object, to

5    the extent that that would call for investigative

6    privilege, attorney work-product or attorney-client

7    communications.  To the extent that you can answer

8    generally without encroaching on any of those

9    privileges, you're free to do so, but otherwise I'm

10   going to instruct you not to answer.

11   A.   I think primarily there would have to be a

12   determination that a criminal statute -- a criminal

13   statute was violated and that there is sufficient

14   evidence to proceed.

15   Q.   And when you say there would be sufficient

16   evidence to proceed, is there a legal standard that

17   would be relevant in you determining whether to proceed

18   with a case?

19   A.   Probable cause, in Texas.

20   Q.   And how long have you been the Division Chief

21   of the Election Integrity Division?

22   A.   I don't recall when exactly it was popped out

23   as a standalone division, but it was prior to that.  I

24   would say that's been in the last year or so, or less

25   than that.  Prior to that, it was a section of the

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

16 Jonathan Sherman White

**Page: 16**

1      A.   I was involved to some degree with, primarily,

2   I believe some of the predecessor bills.

3      Q.   In what way were you involved with the drafting

4   of the predecessor bills of Senate Bill 1?

5      A.   In -- in being requested to provide guidance

6   regarding portions of those bills.

7      Q.   Which portions of the predecessor bills were

8   you asked to provide guidance on?

9           MR. HUDSON:  Object to the extent that it

10   calls for attorney-client privilege, attorney

11   work-product, or legislative privileged information.  To

12   the extent that you can respond without encroaching on

13   any of those privileges, you're free to do so,

14   otherwise, I'm going to instruct you not to answer.

15      A.   I don't know that I can answer that.

16      Q.   Have you been asked -- or were you -- excuse

17   me, were you asked to testify during any hearings on

18   Senate Bill 1 or any of its predecessor bills?

19      A.   I was called as a resource witness on some of

20   those hearings on the predecessor bills, and on SB 1, I

21   believe, actually, as well.

22      Q.   How many times were you asked to provide

23   testimony on Senate Bill 1 or its predecessor bills?

24      A.   As an estimate, I would say I was probably

25   asked to provide testimony or appear as a resource

1    witness maybe 10 times.  And I probably actually

2    testified maybe half of that.

3        Q.   When you testified for -- excuse me --

4    withdrawn.

5            When you were called to testify, what were

6    you asked to testify about?

7            MR. HUDSON:  I'm going to object to the

8    extent that that would encroach on attorney-client or

9    attorney work-product or legislative privilege.  To the

10   extent that you can answer, you can do so.  Otherwise,

11   I'll instruct you not to answer.

12           And just for clarification of the record,

13   is your question directed at what he was asked to

14   testify about in public, or are you asking if there was

15   a specific ask made by legislators?  Because that would

16   help me instruct him so that he can actually answer your

17   question.

18           MS. PAIKOWSKY:  Of course.

19       Q.   (By Ms. Paikowsky)  I think for the moment we

20   can limit it to what you were asked to testify in a

21   public forum.

22       A.   Wow.  I -- I don't think I could even begin to

23   cover all the questions that I was asked publicly.  But

24   generally it pertained to criminal provisions within the

25   bills.

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

24 Jonathan Sherman White

Page: 24

1    Q.   Do you -- withdrawn.  Which criminal provisions

2    within SB 1 or its predecessor bills were you asked to

3    provide testimony on?

4              MR. HUDSON:  Same objections.  To the

5    extent that it's in the public record, you can answer;

6    otherwise, I'm going to instruct you not to answer if

7    it's going to encroach on attorney-client, attorney

8    work-product or legislative privilege.

9    A.   In the -- in the public committee hearings, I

10   don't recall specifically which criminal provisions

11   within the bills I was asked questions about, and a lot

12   of it really ran together.

13   Q.   Do you recall if you were asked to testify on

14   provisions to the voter assistant's oath in Senate

15   Bill 1?

16             MR. HUDSON:  Same objection.

17   A.   I don't --

18             MR. HUDSON:  Same objections.  To the

19   extent that the question is inquiring about public

20   questions, you can answer; otherwise, I'm instructing

21   you not to answer unless you can avoid encroaching on

22   the attorney-client, attorney work-product or

23   legislative privileges.

24   A.   I don't recall being asked about the oath

25   provisions in Senate Bill 1.  I do recall being asked

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

25 Jonathan Sherman White

**Page: 25**

Case 5:21-cv-00844-XR   Document 992-10   Filed 02/20/24   Page 8 of 47

5:21-cv-844 (XR)                    **Entero v Texas**            Jonathan Sherman White 27
4/27/2022              NATIONAL COURT REPORTERS INC 888.800.9656          **27**

1    that assistance being provide to the voter.

2        Q.   How does your office interpret the mandates of

3    this oath?

4            MR. HUDSON:   Object to the extent that it

5    calls for attorney-client communications or attorney

6    work-product or investigative privilege.  To the extent

7    that you can answer without encroaching on any of those

8    privileges, you're free to do so; otherwise, I instruct

9    you not to answer.

10       A.   I can testify as to how I would interpret the

11   oath.  But could you repeat the last part of your

12   question, though?

13       Q.   How does your office interpret the mandates of

14   this oath?  And to be clear, we're not looking for

15   details of any ongoing investigations, anything like

16   that, just your office's interpretation of this oath.

17       A.   Okay.  Again, I can only speak to my

18   interpretation of the mandates of the oath, but -- do

19   you want to try to take them one by one or -- you know,

20   I would be tempted to say, you know, just exactly what's

21   written there.  I don't -- I think it seems pretty

22   explanatory, but if you have a specific question about

23   any of those elements, I would be happy to weigh in.

24       Q.   So you would say that you understand the oath

25   to adhere strictly to the -- to the text as written

1   within the statute?

2      A.   I think so, if I understand your question

3   correctly, yes.

4      Q.   What kind of assistance is allowed under this

5   oath?

6           MR. HUDSON:  Objection, form, foundation.

7   Objection, form, calls for speculation.  Objection to

8   the extent that it calls for attorney-client, attorney

9   work-product, or investigative privilege.  To the extent

10   you encroach upon any privilege, I instruct you not to

11   answer; otherwise, you're free to do so.

12      A.   I would say, according to the text of the

13   statute, allowable assistance is reading the ballot to

14   the voter, directing the voter to read the ballot,

15   marking the voter's ballot, or directing the voter to

16   mark the ballot, preparing the ballot per the directions

17   of the voter.

18      Q.   Is there any kind of assistance that would not

19   be allowed under this oath?

20           MR. HUDSON:  Same objection.  Same

21   instruction.

22      A.   From my reading of the statute -- I mean, it --

23   what would be unlawful assistance would be marking the

24   ballot contrary to a voter's intentions, suggesting to

25   the voter how they should be voting, assisting an

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

28 Jonathan Sherman White

**Page: 28**

1    **A.   That is my understanding.**

2    Q.   What kind of illegal behavior would this

3  section of the oath be aimed at preventing?

4       MR. HUDSON:  Objection, form.  Asked and

5  answered.  Objection to the extent it encroaches on

6  attorney-client, attorney work-product or investigative

7  privilege, I instruct you not to answer.  To the extent

8  you can answer without encroaching on those privileges,

9  you're free to do so.

10    **A.   I would say what I said before, which is,**

11  **suggesting to the voter any -- in any way how they**

12  **should vote, influencing them in the voting process, or**

13  **marking the ballot contrary to the voter's intentions**

14  **and their independent exercise of the vote.**

15    Q.   I'm going to show you what is being marked as

16  Exhibit 3.

17       (Exhibit No. 3 marked.)

18    Q.   3, you can read for yourself, which I will

19  represent to you is the oath of assistants from before

20  Senate Bill 1.  Again, I'll give you a moment to review.

21  Just let me know when you're finished.

22    **A.   Okay.**

23    Q.   Before Senate Bill 1, how was -- or withdrawn.

24       How was this oath, which is the oath

25  before Senate Bill 1, how was this oath used?

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

30 Jonathan Sherman White

**Page: 30**

Case 5:21-cv-00844-XR   Document 992-10   Filed 02/20/24   Page 11 of 47

5:21-cv-844 (XR)                    **Entero v Texas**              Jonathan Sherman White 31
4/27/2022              NATIONAL COURT REPORTERS INC 888.800.9656           **31**

1      MR. HUDSON:  Objection, form, vague.

2      Objection.  To the extent it encroaches on attorney

3      client or attorney work-product, investigative

4      privilege, I instruct you not to answer.  Otherwise,

5      you're free to answer.

6          A.   This oath would have been administered in the

7      same way, at the polling place to an assistant for

8      providing assistance to a voter.

9          Q.   Based on your understanding, is there any

10     activity that was permitted previously that is barred

11     under the new revised oath?

12             MR. HUDSON:  Objection, form, foundation.

13     Objection to the extent it encroaches on attorney

14     client, attorney work-product, investigative privilege,

15     or legislative privilege, instruct you not to answer.

16     To the extent you can answer without encroaching on

17     those privileges, you're free to do so.

18         A.   Well, I would say that 64.034 never was a

19     criminal statute, it never created an offense, but what

20     it did is it caused the assistant at the polling place

21     to be advised of what activity they can and cannot

22     engage in and require them to, you know, take an oath to

23     that effect.  What was added in the, I guess, SB 1

24     version was behavior that, like the existing version,

25     was already, I believe, prohibited by other parts of the

1   Election Code which might have been criminal provisions,

2   and those pieces would be -- would pertain to

3   eligibility of the voter for assistance and whether the

4   voter had been pressured or coerced into receiving

5   assistance, as well as communicating information about

6   the voter's vote to another person.  Those are all

7   prohibited under other sections of the Election Code,

8   but they were not included in the previous oath.

9       Q.   And so looking at the text of the old oath,

10   starting with "I will confine my assistance to answering

11   the voter's questions, stating propositions on the

12   ballot, naming candidates."  Do you believe that

13   answering questions are allowed under the revised text

14   of the oath?

15          MR. HUDSON:  Objection to the extent that

16   that would call for attorney-client privilege, attorney

17   work-product, or investigative privileged information.

18   To the extent you can answer without encroaching on

19   those privileges, you're free to do so, otherwise, I

20   would instruct you not to answer.

21       A.   I think I can answer that question.  Could you

22   repeat it, though, for me?

23       Q.   Yeah, of course.  So let's see.  Do you believe

24   that the revised text of the oath would prevent an

25   assister who was providing otherwise lawful assistance

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

32 Jonathan Sherman White

Page: 32

1    assistance that were, you know, guaranteed under federal

2    or state law were prohibited by another part of the

3    Election Code.

4        Q.   Would your office have concerns if it received

5    a report of an assister who was providing otherwise

6    lawful assistance, clarified the translation of ballot

7    language after receiving a question from a limited

8    English proficiency voter who didn't understand the

9    first translation?

10            MR. HUDSON:  Objection, form, foundation.

11   Objection, form, incomplete hypothetical.

12       A.   I can only speak for myself.  And if I

13   understand the question correctly, I would not have a

14   problem with a clarifying question being asked about

15   lawful assistance, or answered, I guess.

16       Q.   Do you believe that the revised oath would

17   allow an assister to provide that kind of clarifying

18   information or answer a clarifying question about a

19   translation?

20            MR. HUDSON:  Objection, form.  Calls for

21   attorney-client privilege, attorney work-product, or

22   investigative privilege.  To the extent you can answer

23   that without encroaching on those, feel free to do so.

24       A.   I would personally not interpret the law,

25   although I see the section that you're referring to, I

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

35 Jonathan Sherman White

**Page: 35**

1  see that language, I would -- I would not -- in my

2  practice of enforcing the code, I would not interpret

3  this as prohibiting that type of interaction involving

4  lawful assistance activities.

5      Q.  Could you -- or withdrawn.

6          Do you believe that -- but you do believe

7  that that is an interpretation that someone could make

8  reading the oath?

9      A.  I guess it's really hard for me to determine

10  how any reasonable or unreasonable person might

11  interpret the language of this oath.

12      Q.  But you could see a situation where someone who

13  reads the text, "I'll confine my assistance to reading

14  the ballot to the voter, directing the voter to read the

15  ballot, marking the voter's ballot, or directing the

16  voter to mark the ballot," could understand that

17  providing translation clarifications might fall outside

18  of the confines of permitted activity?

19          MR. HUDSON:  Objection, form.  Foundation.

20  Incomplete hypothetical, speculation.

21      A.  I guess I don't think that that would be the

22  most reasonable interpretation of this provision, but I

23  can see how someone could unreasonably or less

24  reasonably construe that one language in isolation of

25  the rest of the oath and take it very narrowly and come

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

36 Jonathan Sherman White

**Page: 36**

1   I can't think of a situation that would kind of help me

2   put it into context where a word on the ballot would

3   need to be defined for a voter.

4       Q.   But you would only be concerned with that

5   activity insofar as it violated a different section of

6   the oath, which is to say, it indicated how a voter

7   should vote?

8       A.   Correct, yes.  I can't think of another section

9   that it would potentially violate, that would be the one

10   that would come to mind as a concern.

11       Q.   Would your office have concerns if a voter with

12   a memory or cognitive impairment asked an assister who

13   had worked with them in advance to prepare to go vote

14   for a reminder as to what they had discussed previously

15   and the assister faithfully recounted that conversation?

16           MR. HUDSON:  Objection, form, foundation.

17   Objection, incomplete hypothetical.  Object to the

18   extent it would encroach on attorney-client, attorney

19   work-product, investigative privilege.  To the extent

20   you can answer without encroaching on those privileges,

21   you're free to do so.

22       A.   That's a tough question.  There's another

23   section of the code that prevents in the polling place

24   any communication regarding how a voter should vote, and

25   I have never looked at that specifically in the

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

39 Jonathan Sherman White

Page: 39

1     disability contest -- context.  But, you know, but if

2     I -- if I'm voting with my wife and she's in the -- the

3     voting booth next to me, I can't tell her, "Hey,

4     remember that race we talked about before, you know,

5     it's -- you know, the one with the two guys with the

6     same last name, it was this other one that" -- I can't

7     do that, and I know I can't do that, or it's like a

8     Class B misdemeanor or Class A misdemeanor.  So I don't

9     know.  That's a good question.

10         Q.   Do you believe that activity -- excuse me.  Do

11     you believe that activity of providing somebody with

12     memory or cognitive impairments with a reminder or

13     prompt of a past conversation would fall outside of the

14     permissible activities in the revised oath?

15          MR. HUDSON:  Objection, form, foundation.

16     Objection, incomplete hypothetical.  Same objection and

17     instruction as to attorney-client, attorney

18     work-product, investigative privilege.  To the extent

19     you can answer without encroaching, you're free to do

20     so.  Otherwise, I'm going to instruct you not to answer.

21         A.   I mean, it's potentially violative of the

22     language.  "I will not suggest by word, sign or gesture

23     how the voter should vote," which has been in the oath

24     and it's been in Section 64.036 of the code, the

25     unlawful assistance provision, for as long as I can

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

40 Jonathan Sherman White

**Page: 40**

Case 5:21-cv-00844-XR   Document 992-10   Filed 02/20/24   Page 17 of 47

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 41

41

1   remember.  And so that's an interesting question.  I

2   think it would potentially violate -- you would have to

3   look at it and determine whether it violates a number of

4   sections of the code that have existed for many years.

5       Q.   So to be clear, your concerns about that kind

6   of activity would be whether it violates a separate part

7   of this oath or existing parts of the criminal code, in

8   that it is instructing a voter to vote rather than

9   providing the voter with information that they're

10  requesting?

11      A.   Correct.  I think that's how I would look at it

12  primarily, yes.

13      Q.   To determine whether or not that was

14  permissible activity?

15      A.   Right.  Whether they had suggested how the

16  voter should vote or influenced the vote of the voter

17  during the voting process.

18      Q.   Uh-huh.  Would your office have concerns if an

19  assister who was providing otherwise lawful assistance

20  answered the voter who had visual impairments request

21  for confirmation that the ballot was marked as intended?

22          MR. HUDSON:  Objection, form, foundation.

23  Objection, incomplete hypothetical.  Objection to the

24  extent it would encroach on attorney-client, attorney

25  work-product, or investigative privilege.  To the extent

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

41 Jonathan Sherman White

**Page: 41**

1   you can answer without encroaching on those privileges,

2   you're free to do so.  Otherwise, I'll instruct you not

3   to answer.

4       A.   I would not have any concerns about that.  In

5   fact, a portion of the oath is, "I will prepare the

6   voter's ballot as the voter directs," so I think

7   confirming that to the voter would not be violative of

8   the oath or any other portion of the Election Code that

9   I'm aware of.

10      Q.   Do you consult with the Secretary of State's

11   Office in determining how to interpret these provisions

12   of the law?

13      A.   Provisions in general, or specifically the

14   provision that we've been talking about?

15      Q.   Let's start with provisions in general.

16      A.   If there's an area of the code that the

17   situation, you know, warrants it, I might discuss with

18   the Secretary of State's Office what their

19   interpretation of the code is.  Under Section 31.003 of

20   the code, the Secretary of State is tasked with the

21   interpretation and the uniform application of the code,

22   so that is their proper role, and I would, under the

23   right circumstances, probably do that.

24      Q.   And what would those circumstances be?

25      A.   Just if -- if there's enough question about how

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

42 Jonathan Sherman White

Page: 42

1    a section should be interpreted, or if, for example,

2    we -- there's a provision in the code that -- I think

3    it's voting day procedures apply to early voting, if

4    possible.  In other words, there are some things about

5    early voting that make it different from election day

6    where that's not possible, and so when there's a

7    conflict, that has to be resolved in an interpretive

8    way, and the Secretary of State would certainly be the

9    go to for that since they're responsible for the

10   administration of elections, or at least the

11   interpretation of how elections should be administered.

12   So we would go to them on something like that.

13        Q.   So if you had questions about one of the kinds

14   of hypotheticals I mentioned, an assister answers a

15   voter's question --

16             THE REPORTER:  We just lost everyone.

17             MR. DELLHEIM:  Should we go off the record

18   for a second?

19             (Brief recess.)

20             MR. HUDSON:  This is Eric Hudson on behalf

21   of the Office of Attorney General.  During the break,

22   counsel discussed entering a stipulation on the record.

23   The stipulation, as I understand it, I'll allow counsel

24   to speak for themselves, is that my client is instructed

25   to avoid -- for the purposes of avoiding duplicative

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

43 Jonathan Sherman White

**Page: 43**

1    objections or lengthy objections, we're stipulating on

2    the record that my client is instructed not to provide

3    any answers that would encroach on attorney client,

4    attorney work-product, legislative or investigative

5    privileges, or any other applicable privilege, including

6    deliberative process or any others that would be -- that

7    could conceivably be implicated by the questions.

8             Do you understand that instruction,

9    Jonathan?

10      A.  Yes.

11           MR. HUDSON:  Okay.  And I understand that

12   all counsel are going to stipulate to that?

13           MS. PAIKOWSKY:  Yes.

14           MR. HUDSON:  Okay.

15           MS. PERALES:  If I might -- am I

16   stipulating to your instruction to the witness?

17           MR. HUDSON:  Stipulating that the -- I'm

18   not going to have to continue making the objection;

19   basically that we have a running objection.

20           MS. PERALES:  Yes.  We can stipulate to

21   that, to the extent that it applies, yes.

22           MR. HUDSON:  Sure.  We also understand,

23   though, by way of the stipulation, if my client has any

24   questions about whether there's any kind of privileged

25   information that he needs guidance on, we can still go

1      A.   Not for me to tell you today.

2      Q.   Does the way that you charge these cases change

3   if the voter was eligible for assistance?

4          MR. HUDSON:  I'm going remind you of the

5   ongoing -- the running objection, specifically to the

6   parties concerning attorney work product,

7   attorney-client privilege, investigative privilege.

8      A.   I think -- yeah, I think that that would

9   probably involve our internal thought processes about

10  how we might charge a case depending on specific

11  factors, so I might not be able to answer that.

12     Q.   In the statutes is there -- are there criminal

13  violations that are specific to people providing -- or

14  withdrawn.

15          Is there a way in the statutes to

16  distinguish between unlawful assistance, meaning

17  assistance that is provided to voters who are not

18  entitled to it, and unlawful assistance that is

19  influencing a voter who is entitled to and seeks

20  assistance?

21     A.   It's a violation under a different subsection

22  of Chapter 64.036.  But I don't know that we get into

23  that much detail on the spreadsheet.  My recollection

24  would be that we typically, or we charged more cases,

25  and the lion's share of these would have been unlawful

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

53 Jonathan Sherman White

Page: 53

1   A.   Obviously the same provisions are there.  I

2   think the same applicable provisions are there, but, I

3   mean, other than that, the only thing that could

4   potentially be applicable is the provision -- that I'm

5   seeing right now is the provision that you mentioned

6   earlier, which is confining assistance to reading the

7   ballot to the voter, directing the voter to read the

8   ballot, marking the voter's ballot or directing the

9   voter to mark the ballot, although I guess you could

10  say, literally if you take a look at that, then if they

11  marked the voter's ballot, even if the voter didn't

12  direct them to do so, that was allowable by this new

13  oath, so I don't know.

14      Q.   So is it fair to say that you think -- in your

15  opinion, both oaths don't have specific provisions that

16  get at this activity?

17         MR. HUDSON:  I'll remind you of the

18  running objection that has been stipulated to by the

19  counsel present.

20      A.   Yeah.  I think both -- both those contain

21  language that potentially certainly could be applicable

22  to the activity, and under a different interpretation

23  perhaps neither one have something that's 100 percent on

24  point.  The only thing I would add to that is that we've

25  never prosecuted based on an oath.  The oath is

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

67 Jonathan Sherman White

Page: 67

1    informative to the assistant of allowable behavior and

2    prohibited behavior, particularly prohibited behavior,

3    and hopefully also instructive to the voter of what the

4    assistant should and should not be doing.

5                It's the underlying offenses in the

6    Election Code that we would look at.

7        Q.   So do you believe that an assister who reads,

8    you know, the text of this oath, "I will confine my

9    assistance to reading the ballot to the voter, directing

10   the voter to read the ballot, marking the voter's

11   ballot, and directing the voter to mark the ballot,"

12   would govern the assister's behavior?

13               MR. HUDSON:  Objection, form, foundation.

14   Objection, form, incomplete hypothetical.

15       A.   Only in the most practical sense, because a

16   person's understanding is going to govern their

17   behavior.  Again, I'm, you know, answering a

18   hypothetical.  I think in an objective sense, obviously

19   the law says what it says.

20       Q.   Could a voter who reads this assistance -- or,

21   sorry, an assister who reads this oath understand it to

22   sort of strictly govern their permissible behaviors?

23               MR. HUDSON:  Objection, form, foundation.

24   Objection, form, speculation.  Objection, form,

25   incomplete hypothetical.

1    situations where voters were -- voters may have been

2    approached and pressured into receiving assistance

3    outside of a polling place or even with regards to mail

4    ballots, and we did not have an adequate statute to

5    address that interaction at that time.  However, I do

6    believe there was a -- possibly an amendment made to

7    Chapter 64.036 that helped in that area, possibly with

8    SB 5 in the special session of the 85th Legislature that

9    helped in that regard, so these may have been older

10   cases.

11        Q.   So was that in 2017?

12        A.   Uh-huh.  Yes, ma'am.

13        Q.   And of all of the cases that you have pointed

14   out to me today, which of these, if any, to your

15   knowledge took place in person at a polling place?

16        A.   The case that certainly didn't involve mail

17   ballots, and it was the violation of Chapter 61.008,

18   would have happened at a polling place for sure, and

19   I -- I don't recall specifically any others.  I'm not

20   saying there weren't any, but I don't recall

21   specifically any others that happened at a polling place

22   that I can tell just based on these notes and without

23   refreshing my recollection.

24        Q.   Sorry.  One moment.

25             MS. PERALES:  And just so I'm not lost,

1   you're talking about Patricia Barton in Medina County on

2   Page 7?

3           THE WITNESS:  That's the one that jumps

4   out to memory, yes, ma'am.

5       Q.   (By Ms. Paikowsky)  So based on your knowledge

6   today, other than that one case, none of those cases

7   listed in the exhibit took place in person at a polling

8   place?

9       A.   I'm not recalling any from my memory, so I

10  would agree to that, to avoid having to look through

11  each one of them again, but that's my recollection.

12      Q.   And the Patricia Barton case, that one you

13  noted did not involve assistance?

14      A.   I don't believe it did involve assistance, no.

15      Q.   And all of the cases that we discussed involved

16  violations of existing statutes that predated SB 1?

17      A.   Correct, which are still in place today.

18      Q.   They're still in place today.  Thank you.

19           Just one minute.  Okay.  So I'm going to

20  move on to the mail -- the mail ballot identification

21  provisions of Senate Bill 1.  So first of all, do you

22  believe that all eligible voters who want to participate

23  in an election should be able to cast a ballot and have

24  their ballot counted?

25      A.   Yes.

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

76 Jonathan Sherman White

**Page: 76**

1    Q.   So I'm going to show you a document that we're

2   going to mark as Exhibit -- that we're going to mark as

3   Exhibit -- what are we on?  4?

4          MR. HUDSON:  Yes.

5          (Exhibit No. 4 marked.)

6    Q.   Can you look at Section A3 or, sorry, A4, and

7   tell me what that -- what that provision means?

8          MR. HUDSON:  I'll just remind you of the

9   running objection concerning privileges.

10    A.   So this is a -- it says it's a new provision.

11   A person commits an offense if a person knowingly or

12   intentionally makes any effort to prevent a voter from

13   casting a legal ballot in an election in which the voter

14   is eligible to vote.

15          I'm not sure how to interpret that, aside

16   from its statutory language, but I would be happy to

17   answer any specific questions you have about it.

18    Q.   Do you believe that this law furthers the

19   interest of election integrity?

20          MR. HUDSON:  Same objections, including

21   the running objections.

22    A.   I -- I imagine that is the intent.

23    Q.   In what way do you think this law would further

24   the interests of election integrity?

25    A.   I think it's designed -- it seems designed to

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

77 Jonathan Sherman White

**Page: 77**

1    information to continue the process.  That's not to say

2    that a harvesting crew that's well connected with a good

3    database couldn't obtain some of those numbers, but it

4    would be more difficult and it would be above the

5    sophistication level of a lot of harvesting crews that

6    we've dealt with.

7        Q.   Okay.  And so we talked about vote harvesting.

8    Are there different types of vote harvesting crimes?

9        A.   There are a handful of specific offenses in the

10   Election Code that are invoked kind of in the vote

11   harvesting activity.

12       Q.   And is vote harvesting illegal at all stages of

13   the voting process?

14       A.   It really kind of depends on how you define

15   vote harvesting.

16       Q.   Would you mind clarifying for me the different

17   types of vote harvesting crimes that could be deterred

18   by the -- by SB1's new mail ballot ID requirement?

19            MR. HUDSON:  Remind you of the running

20   objections.

21       A.   Starting at the beginning with vote harvesting,

22   you have a seeding phase or an application phase that

23   focuses on applications for mail ballots, and fraudulent

24   submission of mail ballots on behalf of a voter could be

25   hampered by the requirement to include a piece of

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

84 Jonathan Sherman White

Page: 84

Case 5:21-cv-00844-XR   Document 992-10   Filed 02/20/24   Page 28 of 47

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 85

85

1   identifying information, or an identifier such as a DL

2   or the last four of the social.  That could be an

3   obstacle to a vote harvesting crew that wishes to bypass

4   the voter.

5          And then, as I already stated, it could

6   also be an obstacle to gaining the voter's compliance,

7   because here's a stranger asking for my DL number so

8   that they can complete these documents on my behalf or

9   submit this, you know, carrier envelope on my behalf, so

10  it -- by putting the control of the interaction more in

11  the voter's hands because those are -- those are numbers

12  that the voter has access to that the harvester is less

13  likely to have access to, I think it promotes security

14  in that fashion.

15     Q.   So if I, moving forward, refer to the activity

16  you described of collecting as many absentee ballots and

17  collecting and submitting ballots by mail as illegal

18  vote harvesting, will you understand what I'm referring

19  to?

20     A.   Sure.  And if for some reason that definition

21  needs clarifying, then I'll bring it up at that time.

22     Q.   You mentioned that SB1's mail ballot

23  identification requirements would be more effective in

24  preventing some vote harvesting more so than others.

25  Are there instances you can think of where SB1's mail

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

85 Jonathan Sherman White

Page: 85

1   or have the voter fill out their own identification

2   number?

3       **A.  That's right.  Absolutely.**

4           MS. PAIKOWSKY:  If it's okay, can I take a

5   five-minute break?

6       **A.  Sure.**

7           MR. HUDSON:  No objection.

8           (Lunch recess.)

9       Q.  (By Ms. Paikowsky)  Mr. White, I'm going to go

10  back to asking questions about SB1's mail ballot

11  identification provisions.  Without SB1's mail ballot

12  identification provisions, would your office have other

13  means of detecting vote harvesting?

14          MR. HUDSON:  Object to the extent that

15  that would encroach on investigator privilege, and

16  remind you of the stipulation concerning the running

17  objection.  Just instruct the witness, to the extent

18  that that would encroach on methods of investigation or

19  practices, I'll instruct you not to answer.

20      A.  Yeah.  Without going into our mental

21  impressions and our investigative practices, I guess I

22  could say we have prosecuted vote harvesting cases in

23  the past.

24      Q.  And this, again, is not seeking specific

25  information about any investigation, but do you have --

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

89 Jonathan Sherman White

**Page: 89**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 124

**124**

1   interpreting the statute?

2                HUDSON:  Objection, form, foundation.

3   Calls for speculation.  Incomplete hypothetical.

4      **A.   Yeah, I don't know if I could -- if I could**

5   **answer how a county might or might not interpret or**

6   **enforce the statute.**

7      Q.   Do you think counties might vary in their

8   interpretation of Paragraph G, refusal to accept a

9   watcher?

10               MR. HUDSON:  Same objections.

11     **A.   I don't know.**

12     Q.   You do deal with local prosecutors in your

13  current work; is that correct?

14     **A.   Yes, ma'am.**

15     Q.   Has it ever been your experience that local

16  prosecutors have varied interpretations of the same

17  language within the Texas Election Code?

18     **A.   I have experienced that before.**

19     Q.   Have you ever advised a local prosecutor that

20  something the prosecutor thought was unlawful was not

21  unlawful in your view?

22     A.   I don't --

23               MR. HUDSON:  I would remind you of the

24  running objection that the parties have stipulated to.

25  Otherwise, you're free to answer.

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

124 Jonathan Sherman White

**Page: 124**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 125

125

1    A.   Yeah.  I probably couldn't go into those types

2    of communications, but I don't recall specific

3    situations.

4    Q.   Do you have an attorney-client relationship

5    with local prosecutors?

6    A.   If they approach me in an advisory capacity,

7    depending on the situation, I could, but I don't have

8    a -- like a freestanding relationship.

9    Q.   Let me ask the question slightly differently.

10   Have you ever stepped in to prosecute an election

11   offense when the local county prosecutor declined to do

12   so?

13   A.   I don't have a specific recollection of any

14   time that we have prosecuted a offense where we have had

15   a conversation with a District Attorney who has taken

16   that position.

17   Q.   Now, prior to December --

18   A.   Uh-huh.

19   Q.   -- it was true, then, that sometimes your

20   office would secure an indictment of a defendant for

21   election fraud without working in cooperation with the

22   local prosecutor; is that right?

23   A.   Without working directly with that office,

24   that's correct, we could do that.

25   Q.   And so I believe you had testified previously

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

125 Jonathan Sherman White

Page: 125

1          MR. HUDSON:  Objection, form, foundation.

2     Objection, calls for speculation.

3          **A.   I don't know what that -- that action would be.**

4     **Could be anything, I suppose.**

5          Q.   Okay.  Do you know what action would be to

6     distance the watcher from the activity or procedure?

7          MR. HUDSON:  Same objections.

8          **A.   I don't.  I don't have a list of examples of**

9     **that off the top of my head, no, ma'am.**

10          Q.   Do you know what would -- do you know what

11    would constitute a manner that would make observation

12    not reasonably effective?

13          MR. HUDSON:  Same objections.

14          **A.   No.  We would -- we would take a set of facts**

15    **that we were given in a complaint and then we would try**

16    **to apply the law, and I don't typically work in reverse.**

17          Q.   Have you developed any standards at this point

18    for deciding what would be an action that would obstruct

19    the view of a watcher?

20          **A.   No, ma'am.**

21          Q.   Have you developed any standards that would

22    allow you to decide whether a poll official had

23    distanced the watcher from the activity?

24          MR. HUDSON:  I'll just remind you of the

25    running objection that we have concerning privileges,

Entero v Texas 5:21-cv-844 (XR)              **Entero v Texas**              129 Jonathan Sherman White
4/27/2022                    National Court Reporters Inc. 888.800.9656

**Page: 129**

1   and also note the deliberative process privilege is one

2   of those.

3       THE REPORTER:  I'm sorry, I couldn't hear

4   you.

5       MR. HUDSON:  Deliberative process

6   privilege is also one of those.  Instruct you not to

7   answer to the extent you would be encroaching on any

8   privileges.

9       A.  I'll follow that advice.

10      Q.  Do you have a distance -- let's just talk about

11  the voting machine.  Do you vote here in Travis County?

12      A.  No, ma'am.

13      Q.  Tell me about the -- tell me about the voting

14  apparatus in the county where you do vote.

15      A.  Just a typical hard voting system, prints a

16  paper ballot and you scan it in at the door on your way

17  out.

18      Q.  So it's a DRE.  You use a touchscreen; is that

19  right?

20      A.  You use a -- I can't remember if it's a

21  touchscreen or if it's --

22      Q.  It's a wheel?

23      A.  I can't remember if it's still a wheel, but

24  you -- it will print the ballot for you after you've

25  entered it electronically.  And then you turn it in or

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 131

**131**

```
1    scan it at the door on your way out.
2        Q.   Okay.  So generally you vote on a machine that
3    has a screen and it's sitting on a little table with
4    some long legs on it; is that right?
5        A.   Yes, ma'am.
6        Q.   Okay.  And then you're going to take the piece
7    of paper that it gives you, and you're going to walk
8    over to that receptacle and put your piece of paper in
9    there; is that right?
10       A.   Yes, ma'am.  Place it in the receptacle.
11       Q.   Okay.  Sometimes called a tabulator.  Okay.  So
12   let's take the instance of a voter who is standing at
13   one of those voting machines like the kind that you vote
14   on, Mr. White.  How close -- let me ask the question
15   this way.  How far could a watcher be placed by the
16   election judge such that it would violate Section
17   4.09(a) in SB 1?
18             MR. HUDSON:  Objection.  Incomplete
19   hypothetical.  Objection, calls for speculation.
20       A.   I don't think I could answer that.
21       Q.   Is it because you don't know?
22       A.   I couldn't --
23             MR. HUDSON:  Objection, calls for an
24   incomplete hypothetical.  Calls for speculation.
25       A.   Yeah.  I don't have enough facts to -- to
```

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

131 Jonathan Sherman White

**Page: 131**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 132

**132**

1    answer that question.  And even if I did have enough
2    facts, it would probably involve me going into my
3    thought processes about -- about the offense, and so I
4    don't think I could answer that.
5         Q.   Okay.  At this point, I would like to say on
6    the record that you should listen to your counsel, and
7    especially if he instructs you not to answer the
8    question.  But counsel is limited to making form
9    objections and not speaking objections.  And so in order
10   to avoid any appearance of coaching the witness, which I
11   know counsel would never do, his form objections --
12        MR. HUDSON:  Well, I'll just go ahead and
13   stop you right there and say you're tossing out coaching
14   on the record.  Nobody is coaching by giving form and
15   giving the description of what the objection is, which
16   I've been limiting to one word.  We also have a standing
17   objection, our standing or running objection based on
18   privileges.  And I would point out that some of your
19   questions are clearly targeted at getting at privileged
20   information, so I'm simply reminding the witness of the
21   stipulation that you made early on so that I wouldn't
22   give long objections based on privilege.
23        If you want me to go ahead and start
24   making all formal objections because you're concerned
25   that I'm giving speaking objections, I'm happy to do

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

132 Jonathan Sherman White

**Page: 132**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 133

**133**

1  that.  I'm just trying to make sure that my client isn't

2  reaching out and expanding beyond the privilege

3  stipulation that we've already made.

4            MS. PERALES:  You have your running

5  stipulation, and we've agreed to that.  I just want to

6  make sure that the form objections are stated as

7  succinctly as the rules hope we do.

8      Q.   (By Ms. Perales)  So let's go back to the

9  voting machine scenario.  Mr. White, you're familiar

10 with your own voting machine that you use in the polling

11 place in your home county.  If we have a situation where

12 there's a watcher and a voter, and an election judge,

13 and the election judge has distanced the watcher from

14 that machine and the activity of the voter at that

15 machine, is it your testimony that -- that that is still

16 not enough information upon which you could make a

17 decision whether there is a violation of 4.09 of SB 1?

18           MR. HUDSON:  Objection, speculation.

19 Incomplete hypothetical.

20     A.   I think that's correct, that I wouldn't have

21 enough information.

22     Q.   Could you explain to me how this new language

23 in 4.09(a) makes unlawful behavior that previously would

24 have been lawful?

25     A.   I would say the plain text that was added adds

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

133 Jonathan Sherman White

**Page: 133**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 184

**184**

1    Q.   Understood.  In your experience, does vote

2   harvesting occur in the context of paid campaign workers

3   or otherwise compensated individuals working on behalf

4   of a campaign?

5    **A.   Generally, yes.**

6    Q.   Have you ever encountered an instance of

7   improper voter assistance carried out by an individual

8   who is not working for a political campaign?

9    **A.   If so, it would be quite rare.**

10    Q.   Have you ever encountered that instance?

11    A.   Example -- an example or examples that come to

12   mind would be subject to privilege for an ongoing

13   investigation or prosecution, so I wouldn't want to talk

14   specifically about them, but --

15       MR. HUDSON:  I'll make a formal objection

16   based on that, to the extent it would encroach on

17   attorney-client, work-product, investigative privilege,

18   or any other stipulated objection, I would instruct you

19   not to answer.  But to the extent that you can go ahead

20   and respond, please do so.

21    A.   I think -- I think the answer would be

22   possibly, yes, without getting into any detail.

23    Q.   Okay.  So let me ask a question that might not

24   encroach on privilege.  Have you ever yourself or your

25   office brought charges against an individual for

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

184 Jonathan Sherman White

**Page: 184**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 185

**185**

1    unlawful voter assistance when that individual was not

2    working for a political campaign?

3        A.   And by "unlawful assistance," you mean a

4    violation of 64.036.

5        Q.   Or the other measures that we have discussed

6    before, 64.012, 276.013.

7        A.   I'm not sure.  I'm not sure on those specific

8    statutes.  But what I could tell you is that almost all

9    of the cases that we see that involve assistance fraud

10   involve individuals that we believed were associated

11   with campaigns or working directly for a candidate or a

12   slate of candidates, or were relatives of candidates or

13   the candidates themselves.

14       Q.   Thank you.  And so sitting here today, you

15   cannot recall an instance in which your office has

16   brought charges against an individual for violating

17   either 64.036 or 64.012, or 276.013, when that defendant

18   was not working for a candidate or campaign or slate of

19   candidates, correct?

20       A.   Or a relative of the candidate or the candidate

21   themself?

22       Q.   Right.

23       A.   If you include those -- if you can give me one

24   moment.  I can --

25            MR. HUDSON:  For purposes of the record, I

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

185 Jonathan Sherman White

**Page: 185**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 186

186

1   would point out that you were referencing -- would you

2   identify that by exhibit number?

3           THE WITNESS:  That's Exhibit 6, which is

4   the list of our pending -- includes a list of our

5   pending prosecutions.

6       A.   I can think of -- I could think of one --

7       Q.   Where you brought charges?

8       A.   -- case where charges have been brought.  There

9   could be more, but I don't have a recollection of them

10  at this time.

11      Q.   Tell me about that one case.

12      A.   I can't go into that case due to --

13      Q.   If charges have been brought, wouldn't that be

14  a public record?

15      A.   There's a pending prosecution.

16      Q.   I see.  Are there charging documents?

17      A.   There are.

18      Q.   Have they been filed?

19      A.   They have.

20      Q.   Where have they been filed?

21      A.   In the district court where the case is

22  charged.

23      Q.   What is that district court?  If it's a public

24  record, I'm entitled to know about it.

25           MR. HUDSON:  If I could have just a minute

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

186 Jonathan Sherman White

Page: 186

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 187

187

1   to advise him on what he can and can't talk about.  If

2   we can go off the record just a moment.

3             (Brief recess.)

4             MR. HUDSON:  Mr. White, so I understand,

5   the case that you're referring to is on Exhibit --

6             THE WITNESS:  6.

7             MR. HUDSON:  Exhibit 6.  I'm instructing

8   you -- to the extent that there's anything in the public

9   record about the case, I'm instructing you to testify

10  about that.  To the extent that there are details that

11  are part of ongoing investigative processes,

12  attorney-client privilege, attorney work product, or any

13  other applicable privileges, I'm instructing you not to

14  answer.  But to the extent it's on the public record,

15  I'm instructing you to answer.

16     A.   The case --

17             MR. HUDSON:  Let her ask her question.

18     A.   Go ahead.

19     Q.   (By Ms. Perales)  I think we were out there,

20  the question was half answered.  But I'll go ahead and

21  make a new question for you.

22             MR. HUDSON:  Sorry about that.

23             THE WITNESS:  Sure.

24     Q.   Please describe for me the charges that you

25  mentioned a few minutes ago related to a particular

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

187 Jonathan Sherman White

Page: 187

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 188

188

1  defendant and the scenario that I was describing.

2     A.  Okay.  The case that came to mind does not

3  actually involve ballot assistance, it involved voter

4  registration, and so it may not be directly applicable

5  to your -- your question, and I think it may not.  It --

6  what sparked my memory is that it did involve an offense

7  under 276.013, but it was not under the influencing the

8  voter subsection, so I don't think that it would be

9  responsive, but I have been instructed that, if it were

10  responsive, I would disclose to you --

11          MR. HUDSON:  Well, don't tell her what I

12  instructed you.

13          THE WITNESS:  I'm sorry.  I'm sorry.

14          MR. HUDSON:  That's on the record.

15     A.  But if something is in the public record, I

16  would make that available to you.

17     Q.  Yes.  So is there a reference to that on the

18  Exhibit 6 somewhere?

19     A.  The case is one of our pending -- one of our

20  pending prosecutions.

21     Q.  And since charges have been filed, can you

22  point to me which page that pending prosecution is on in

23  the exhibit?

24     A.  It's -- well, it's -- again, it's not

25  responsive to the -- to the subject area that we were

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

188 Jonathan Sherman White

Page: 188

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 204

**204**

1    Q.   Thank you.  Do you know who Omar Escobar is

2    from Starr County?

3    **A.   I do.**

4    Q.   Would you consider him a friend?

5    **A.   Consider him a former colleague.**

6    Q.   Because he's not the DA anymore, correct?

7    **A.   Correct.**

8    Q.   Do you -- do you receive complaints about

9    public officials coercing votes from their employees

10   unlawfully?

11   **A.   We would receive those.**

12   MR. HUDSON:  I'll just remind you of the

13   running stipulation.  You can answer generally, but to

14   the extent it encroaches on privileges, please bear that

15   in mind.

16   Q.   (By Ms. Perales)  Have you ever prosecuted a

17   public official for coercing votes from public

18   employees?

19   **A.   Not that I can recall.**

20   Q.   Are you aware of any public information

21   suggesting that Omar Escobar has coerced public

22   employees unlawfully with respect to their political

23   support or their votes?

24   **A.   I'm not aware of any -- I'm not aware of any**

25   **public information to that effect.**

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

204 Jonathan Sherman White

**Page: 204**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 228

**228**

1     Mr. White, my name is Laura Rosenbaum.  I

2   am one of the attorneys for the Mi Familia Vota

3   plaintiffs in this case.  So nice to meet you.  And I

4   know it's late in the afternoon.  I won't take too much

5   of your time.  And hopefully I won't be repeating

6   questions that have already been asked today.  There

7   have been a little bit of issues with the Zoom

8   connection, but I just have a couple of topics that I

9   don't, don't think have been fully addressed.  Can you

10   hear me okay?

11     **A.   Yes, ma'am.**

12     Q.   Okay.  Thank you.  Have you or has your office

13   been involved in any prosecutions for fraud that relate

14   to drive-through voting?

15     **A.   No, ma'am.**

16     Q.   Are you aware of any investigations into

17   allegations of fraud that relate to drive-through

18   voting?

19          MR. HUDSON:  Object to the extent that it

20   would call for attorney-client, attorney work-product or

21   investigative privilege.  If you can answer without

22   encroaching on those, you're free to do so.  Otherwise,

23   I'm instructing you not to answer.

24          THE REPORTER:  I'm sorry, you'll have to

25   slow down.  Work product or investigative privilege?

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

228 Jonathan Sherman White

**Page: 228**

Case 5:21-cv-00844-XR   Document 992-10   Filed 02/20/24   Page 44 of 47

5:21-cv-844 (XR)                 **Entero v Texas**            Jonathan Sherman White 229
4/27/2022            NATIONAL COURT REPORTERS INC 888.800.9656        **229**

1          MR. HUDSON:  To the extent you can answer

2     without encroaching on any of those privileges, you're

3     free to do so.

4     A.    I'm not able to discuss any investigations

5     that -- that are not public.

6     Q.    Are you aware of any complaints of voter fraud

7     that relate to drive-through voting?

8              MR. HUDSON:  Same objection.  Same

9     instruction.

10    **A.    Same answer to the extent that those would have**

11    **sparked an investigation.**

12    Q.    So you don't have access to complaints that

13    you've received, that your office has received that

14    relate to drive-through voting?  Because if they were

15    received from the public -- from members of the public,

16    they would not be attorney-client privileged.

17             MR. HUDSON:  Objection, argumentative.

18    Objection, same instruction.  Same objections with

19    regard to privilege.

20    Q.    (By Ms. Rosenbaum)  The question is, has your

21    office received any complaints from the public that

22    relate to allegations of fraud that involve

23    drive-through voting?

24             MR. HUDSON:  Same objection.  Same

25    instructions.

1  _____

2  _____

3  _____

4  _____

5  _____

6          I, JONATHAN S. WHITE, have read the

7  foregoing deposition and hereby affix my signature that

8  same is true and correct, except as noted above.

9

10          _____
           JONATHAN S. WHITE

11  STATE OF TEXAS    )

12  COUNTY OF TRAVIS  )

13          Before me,_____, on this

14  the day personally appeared JONATHAN S. WHITE known to

15  me to be the person whose name is subscribed to the

16  foregoing instrument and acknowledge to me that they

17  executed the same for the purposes and consideration

18  therein expressed.

19          Given under my hand and seal of office

20  this ____ day of _____, 2022.

21

22

23          _____
           NOTARY PUBLIC IN AND FOR

24          THE STATE OF_____

25

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 236

**236**

1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE WESTERN DISTRICT OF TEXAS
              SAN ANTONIO DIVISION

3     LA UNION DEL PUEBLO        §
      ENTERO, ET AL.,            §
4          Plaintiffs,       § Civil Action No.
                             §  5:21-cv-844 (XR)
5     VS.                    §  (Consolidated Cases)
                             §
6     STATE OF TEXAS, ET AL.     §
           Defendants.      §
7     ************************************************

8               ORAL DEPOSITION OF

9           JONATHAN SHERMAN WHITE

10              APRIL 27, 2022

11    ************************************************

12         I, CAROLINE CHAPMAN, Certified Shorthand

13    Reporter in and for the State of Texas, hereby certify

14    to the following:

15         That the witness, JONATHAN S. WHITE was duly

16    sworn by the officer and that the transcript of the oral

17    deposition is a true record of the testimony given by

18    the witness;

19         That the deposition transcript was

20    submitted on May ____, 2022 to the witness or to the

21    attorney for the witness for examination, signature, and

22    return to me within 20 days;

23         That the amount of time used by each party

24    at the deposition is as follows:

25         Honorable Dana Paikowsky - Three hours and

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

236 Jonathan Sherman White

**Page: 236**

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 237

**237**

1   seventeen minutes.

2            Honorable Nina Perales - Three hours and

3   fifty-six minutes.

4            Honorable Laura E. Rosenbaum - Six

5   minutes.

6            That pursuant to information given to the

7   deposition officer at the time said testimony was taken,

8   the appearance pages include all parties of record.

9            I further certify that I am neither

10  counsel for, related to, nor employed by any of the

11  parties or attorneys in the action in which this

12  proceeding was taken, and further that I am not

13  financially or otherwise interested in the outcome of

14  the action.

15           Certified to by me on May 2, 2022.

16

17

        _____
18      CAROLINE CHAPMAN, Texas CSR 467
        Expiration Date:  03/31/2023
        Firm Registration No. 223
19      WORLDWIDE COURT REPORTERS
        3000 Weslayan, Suite 235
20      Houston, Texas 77027
        (713) 572-2000
21

22

23

24

25

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

237 Jonathan Sherman White

**Page: 237**