```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                        SAN ANTONIO DIVISION

 3
    LA UNION DEL PUEBLO ENTERO,    .
 4  ET AL,                         .
                                   .
 5           PLAINTIFFS,           .
         vs.                       . DOCKET NO. 5:21-CV-844-XR
 6                                 .
    GREGORY W. ABBOTT, ET AL,      .
 7                                 .
             DEFENDANTS.           .
 8

 9

10              TRANSCRIPT OF CLOSING ARGUMENTS
            BEFORE THE HONORABLE XAVIER RODRIGUEZ
11              UNITED STATES DISTRICT JUDGE
                    FEBRUARY 13, 2024
12

13

14

15

16  APPEARANCES:
    FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                         MALDEF
                           110 BROADWAY
18                         SUITE 300
                           SAN ANTONIO TX 78205
19

20                         JENNIFER A. HOLMES, ESQUIRE
                           NAACP LEGAL DEFENSE & EDUCATIONAL
21                         FUND INC
                           700 14TH STREET NW, SUITE 600
22                         WASHINGTON DC 20005

23

24

25
```

SHIRA WAKSCHLAG, ESQUIRE
THE ARC OF THE UNITED STATES
1825 K STREET NW, SUITE 1200
WASHINGTON DC 20006


LEAH TULIN, ESQUIRE
BRENNAN CENTER FOR JUSTICE
 AT NYU SCHOOL OF LAW
1400 CONNECTICUT AVE, NW, SUITE 1150
WASHINGTON DC 20036


COURTNEY M. HOSTETLER, ESQUIRE
FREE SPEECH FOR PEOPLE
1320 CENTRE STREET, #405
NEWTON MA 02459


WENDY OLSON, ESQUIRE
STOEL RIVES LLP
101 S. CAPITOL BLVD, SUITE 1900
BOISE ID 83702


ASHLEY HARRIS, ESQUIRE
ACLU FOUNDATION OF TEXAS
PO BOX 8306
HOUSTON TX 77288


ZACHARY DOLLING, ESQUIRE
TEXAS CIVIL RIGHTS PROJECT
1405 MONTOPOLIS DRIVE
AUSTIN TX 78741


UZOMA NKWONTA, ESQUIRE
ELIAS LAW GROUP, LLP
250 MASSACHUSETTS AVE, NW, SUITE 400
WASHINGTON DC 20001

```
 1
 2   FOR THE DEFENDANTS:        RYAN G. KERCHER, ESQUIRE
                                KATHLEEN HUNKER, ESQUIRE
 3                              TEXAS ATTORNEY GENERAL
                                P.O. BOX 12548
 4                              MC 009
                                AUSTIN TX 78711
 5

 6                              JOHN GORE, ESQUIRE
 7                              LOUIS CAPOZZI, ESQUIRE
                                JONES DAY
 8                              51 LOUISIANA AVENUE NW
                                WASHINGTON DC 20001
 9

10

11

12

13

14

15

16

17

18

19

20

21   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                                OFFICIAL COURT REPORTER
22                              UNITED STATES DISTRICT COURT
                                SAN ANTONIO, TEXAS
23

24

25
```

1    *(San Antonio, Texas; February 13, 2024, at 9:00 a.m., in*
2    *open court.)*
3         THE COURT:  I'm just letting everybody get settled
4    back there.
5         Good morning.  We'll resume with the final closing
6    arguments in 21 civil 844, LUPE and others versus Abbott and
7    others.
8         Just a few housekeeping matters before we recognize
9    the attorneys for closing arguments.  So there's one pending
10   motion, docket number 844, a motion asking for the
11   authorization of destruction of certain ballots and election
12   materials.
13        Does anyone oppose that?
14        MR. KERCHER:  State defendants do not, Your Honor.
15        MS. HOLMES:  And the plaintiffs do not oppose.
16        THE COURT:  Okay.  So that is granted.
17        And then for the Mi Familia Vota plaintiff, are you
18   dropping your challenges to Section 2 of SB 1?  Or are you
19   reserving them for the intentional discrimination phase?
20        What are we doing there?
21        MS. OLSON:  Your Honor, Wendy Olson on behalf of Mi
22   Familia Vota.  We are reserving those for the intentional
23   discrimination phase.  Thank you, Your Honor.
24        THE COURT:  Thank you.
25        And then for the defendants, I know the answer to

1  this, but my chambers thinks there's a dispute here.

2        Are you conceding any claims and conceding that the

3  parties have standing to bring certain claims, or are you

4  still challenging standing on all claims?

5        MR. CAPOZZI:  Good morning, Your Honor.  Louis

6  Capozzi, intervenor defendants.  We are not conceding standing

7  on any claims.  Although we didn't address every claim in our

8  brief; I'm happy to speak to that.

9        THE COURT:  That's all right, no.  So that's the

10 understanding I had.  Okay.

11       So then with that, 9:00, on target.

12       Miss Holmes.

13       And then, I didn't ask for appearances for everybody.

14 So whoever takes up the podium, make your appearance and state

15 your name.

16       MS. PERALES:  Your Honor, if it would be possible to

17 address another housekeeping matter at the end of closing?

18       THE COURT:  Yes.

19       MS. PERALES:  Thank you.

20       MS. HOLMES:  Good morning, Your Honor, and may it

21 please the Court.  I'm Jennifer Holmes for the HAUL plaintiffs

22 and I will be addressing plaintiffs' claims under Section 2 of

23 the Voting Rights Act.  We've provided Miss Fernandez a run of

24 show on the plaintiffs' side, so I hope you have that as well.

25       THE COURT:  I do.

1          MS. HOLMES:  Could we go to the next slide, please?

2          The HAUL plaintiffs, MFV plaintiffs, and LUPE

3  plaintiffs bring Section 2 results claims against SB 1 and I

4  have listed the challenged provisions on the slide here.

5          Next slide, please.

6          Together, these claims challenge SB 1's provisions

7  related to voter assistance, drive-thru voting, 24-hour

8  voting, poll watchers, mail voting identification

9  requirements, mail ballot drop-off restrictions, time off to

10 vote, and the vote harvesting restrictions on canvassing, as

11 well as the prohibition on the distribution of applications

12 for ballot by mail, or ABBMs.

13         I will focus primarily on the first three on this

14 list, but I'm happy to take the Court's questions about any of

15 them.

16         Next slide, please.

17         The essence of a Section 2 claim is that an election

18 law interacts with the social and historical conditions to

19 cause an inequality in the opportunities of minorities versus

20 nonminority voters to elect their preferred representative.

21         And I start with this touchstone of a Section 2 claim

22 because the evidence at trial demonstrates that this is

23 precisely how Section 2 works -- precisely how SB 1 works,

24 operating in the social and historical context of Texas where

25 Black and Latino Texans have higher rates of disability, less

1  English proficiency, or in less-flexible wage earning jobs,

2  face more aggressive policing and law enforcement, and have a

3  legacy of being the targets of voter intimidation, including

4  by poll watchers.  The challenged provisions of SB 1 make it

5  harder for these groups to participate in the political

6  process.

7          THE COURT:  Are you satisfied that your evidence at

8  trial meets the sort of recency kind of standard that the

9  higher courts seem to be applying here?  They seem to suggest

10 that going back more than 50 years, or so forth, is too stale.

11 Is your evidence here current?

12          MS. HOLMES:  Yes, Your Honor.

13          And if we could go to the next slide.

14          You'll see here that *Brnovich* reaffirmed the

15 importance of the history of discrimination and the ongoing

16 effects of that discrimination.  And that includes so-called

17 long-ago history.

18          Can I have the next slide, please.

19          That includes so-called long-ago history --

20          THE COURT:  Is there someone participating remotely?

21          So whoever is here remotely, if you will -- anyone

22 who is not in the courtroom, let's just put it that way,

23 please place yourself on mute.

24          MS. HOLMES:  Thank you, Your Honor.

25          And that includes so-called long-ago history of

1  discrimination, which the en banc Fifth Circuit made clear
2  cannot be ignored in a Section 2 results claim.  Now, there
3  may be some dispute about its relevancy in an intent claim,
4  but as to Section 2, as the quote on the slide shows, it is
5  still very relevant.

6         And plaintiffs' submissions include extensive
7  evidence related to the history of discrimination and its
8  modern day effects, and so even though I won't be discussing
9  that at length today, we urge the Court to give it weight
10 because that standard is still good law.  Good Section 2 law.

11        Two more points before I'm diving into the different
12 provisions here.

13        First, if we could have the next slide, please.

14        Full disenfranchisement is not required to find a
15 Section 2 violation.  An abridgment of the right to vote under
16 Section 2 does not require outright denial of the right.

17        And in this case, we have evidence of both.

18        We have thousands of voters who had their mail
19 ballots rejected due to SB 1's mail ID — mail identification
20 requirements.  They were fully disenfranchised.

21        We also have evidence that voters' rights were
22 impaired because of the many burdens and obstacles that they
23 faced, even if they were ultimately able to vote.  And that's
24 burdens like voting without an assister of their choice, the
25 burden of waiting in long lines, the burden of being harassed

1    or intimidated by a poll watcher, such as Sharon Watkins-Jones
2    experienced, the burden of having a mail ballot rejected
3    multiple times even if the voter is ultimately able to cure,
4    and the burden of losing the support of organizations that
5    serve Black and Latino voters but have curtailed those voters,
6    those efforts in voter assistance, transportation, canvassing,
7    and advocacy in the wake of SB 1.

8          So these burdens show that the system is not equally
9    open to them.

10          Last overarching point.  We must look at Texas'
11    entire system of voting because it's an important backdrop to
12    consider because it's the context in which SB 1 operates, and
13    *Brnovich* also tells us that it's relevant to consider.  And
14    that's *Brnovich* guidepost 4.

15          Studies cited by the plaintiffs' expert show that
16    Texas is the most difficult state to vote in.

17          THE COURT:  And you are relying on which expert?

18          MS. HOLMES:  I believe Dr. Kousser cited certain
19    studies, and Professor Tolson as well.  Those could be found
20    at the HAUL plaintiffs' findings of fact, paragraphs 241 and
21    242.

22          For example, Texas has no universal vote by mail.  If
23    you can vote by mail and want to drop off your ballot, you can
24    only do so on Election Day, at a single location in the
25    county, for your own ballot only, and you still must show ID,

1  even though the ballot itself, the carrier envelope, contains

2  the identification numbers already.

3            There's also a very strict in-person voter ID law.

4            And I could go on about these strictures, but the

5  point is that many of the features in Arizona's voting law

6  that the *Brnovich* court considered that made it relatively

7  easy to vote in Arizona are not present in Texas.

8            And the evidence shows that when voters in Texas have

9  difficulty voting by a certain method, they often cannot or do

10  not switch to an alternative method.  Dr. Smith showed that

11  nearly 60 percent of voters who had their ABBMs rejected in

12  the March 2022 Primary did not ultimately vote by any method.

13  They did not cure.  They did not vote in person.  They were

14  simply disenfranchised.  So they are not substituting

15  alternative methods of voting.

16            In some instances substitution is not possible.  For

17  example, if a voter has limited English proficiency or

18  disabilities.

19            THE COURT:  Sorry.

20            I know we're out of room.  Feel free to take the jury

21  box, if you don't feel uncomfortable being up there.

22            Go ahead.  You can make the ruling, if you like.

23            MS. HOLMES:  I better be nice to that guy.

24            If a voter needs assistance for reasons of language

25  or disability, there may be no alternative way to vote, if

1  that assistance –– if they cannot get that assistance.  And so
2  this low–substitution effect shows, it's an indication, that
3  the voting system does not provide ample opportunities to
4  vote.
5       I'd like to turn first to SB 1's restrictions on
6  voter assistance.  These restrictions deny Black and Latino
7  voters an equal opportunity to vote.  And here, I would
8  emphasize the huge racial disparities in Texas voters who rely
9  on assistance, the decades' long pedigree of the right to
10 unfettered assistance, and the tenuous state interest
11 underlying these provisions.
12      So, first, looking at the racial disparities.  There
13 are voters who need language assistance and voters who need
14 assistance by reason of disability, and both of these groups
15 are disproportionately Black and Latino.
16      There are 2.9 million Latinos in Texas who speak
17 English, quote, "less than very well."  That's the definition
18 for limited English proficiency.  And that is 27 percent of
19 Latinos in the entire state.  That's compared to only
20 1.1 percent of Anglos who meet the definition of limited
21 English proficient.
22      And when you look at Latinos, and also non–White
23 Texans, they make up more than 96 percent of the limited
24 English proficient population in the state of Texas.  Anglos
25 are only 3 percent.

1          So when we talk about the groups that are burdened by

2    these restrictions on language assistance, there is a massive

3    disparity.  And many of these voters live in counties that are

4    not covered by Section 203 of the Voting Rights Act, which

5    requires counties to provide non-English language voting

6    materials.  So they are even more reliant on language

7    assistance when voting.

8          When we look solely at the non-covered counties, so

9    the counties not subject to 203, the disparity is even more

10   stark.  In raw numbers, the total Latino and non-White limited

11   English proficient population in non-covered counties is

12   merely 600,000 people.

13          In those counties, the Latino and non-White — Latino

14   and non-White Texans are more than 21 times more likely to be

15   limited English proficient than the White population.  So we

16   do have — so we have large disparities that satisfy the

17   *Brnovich* standard.

18          Looking at disability assistance, Black Texans are

19   more likely to have a disability than non-Hispanic White

20   Texans.  And although the Latino population skews younger in

21   Texas when you adjust for age, this population too has a

22   higher prevalence of disabilities than White Texans.

23          And these statistics are borne out by the evidence

24   from plaintiffs' organizations about the members they serve in

25   the Black and Latino community.  Many members of LUPE and of

1  DST, Delta Sigma Theta, are disabled or elderly and reliant on
2  such assistance.
3          But these organizations, as well as individuals,
4  testified at trial that because of SB 1 they have curtailed
5  their assistance to voters.  Multiple chapters of DST no
6  longer organize transportation to the polls, due to 6.01.
7          MFV no longer encourages voters to use trusted
8  advisers when voting.  LUPE no longer helps community members
9  with their mail ballots, due to 6.06, the prohibition on
10 compensation, as well as 7.04, the vote harvesting definition.
11         And Marla Lopez, Maria Gomez, and Cris Rocha no
12 longer provide assistance to voters and have turned down
13 voters who ask them.  This evidence shows that SB 1's
14 restrictions on assistance are resulting in the denial of
15 assistance.
16         Turning to *Brnovich*, guidepost 2 here, and this is
17 the long pedigree issue, the guarantee of a voter's right to
18 assistance from a person of their choice has a 50-year long
19 pedigree in this country.  It was recognized by courts in the
20 1970s, and it was enshrined in Section 208 of the Voting
21 Rights Act in the 1982 amendments to the law.
22         And one reason for this right that was recognized by
23 those courts is that when you have a secret ballot and you do
24 not allow voters to receive assistance with completing that
25 ballot, it operates as a literacy test.  And you may recall

1  the testimony about the history of this from Professor Tolson

2  and Dr. Kousser.  And so the 1982 amendments were intended to

3  put an end to all such restrictions and not allow them to take

4  root in the future.

5       THE COURT:  So let me focus on the 24-hour voting and

6  the drive-thru voting.  *Brnovich*; how do I square the burden

7  on minority voters with the instructions in *Brnovich*, consider

8  the degree to which a voting rule departs from all the

9  standard practice when Section 2 was amended in 1982?

10      MS. HOLMES:  Yes, Your Honor.

11      And we admit that drive-thru voting did not exist in

12  1982, but, again, that's only one factor in the totality of

13  the circumstances analysis.

14      In fact, Texas did allow voting from a vehicle in

15  1982 through curbside voting.  So this practice, although we

16  can see it as not identical, this practice was in place in

17  1982 in Texas, but it was limited just to curbside voting.  So

18  it's not a brand new concept in Texas.

19      As for 24-hour voting, again, we can see that it did

20  not exist in 1982; however, that's just one piece of the

21  analysis here.  If you look at the other factors in the

22  totality of the circumstances analysis, we think those

23  outweigh that single *Brnovich* factor.

24      And, most importantly, regarding 24-hour voting, I

25  would point to the complete lack of a state interest that is

achieved by the law.  There is zero evidence of fraud
associated with 24-hour voting in the 2020 election.  You may
recall Jonathan White had those charts of prosecutions.  None
of those entries related to 24-hour voting or drive-thru
voting.  The State's forensic audit didn't even discuss
24-hour voting.  So fraud is simply not an issue here.

In addition, there are no privacy concerns or
administrability concerns, because 24-hour voting is the exact
same thing as voting during regular hours:  The same
equipment, the same procedures.  Everything is the same.  The
security is the same.  And so, there's no — the State
interest having to do with administering it just doesn't hold
water here.

I think the only interest that may be somewhat
disputed in this case is the State — that the State
proffered, is that — the interest in promoting uniformity and
reducing voter confusion.  But here, those are not actually
served by SB 1's ban on 24-hour voting because SB 1 did not
actually standardize polling place hours.

Under SB 1, there's a lot of variety in the hours
that polling places may be open, depending on the population
size of the county.  For counties under 1,000 people, or under
55,000 people, or over 55,000 people, they can be open for a
different minimum number of hours:  Four hours, nine hours, 12
hours.  So there's a lot of variety in the system that SB 1

1  maintained.

2          And the testimony that the State cites to support

3  their argument that the ban on 24-hour voting promoted or

4  produced voter confusion, that testimony was from Keith

5  Ingram.  And that testimony actually is not about 24-hour

6  voting.  It's about the scene that I just described in which

7  counties of different population can be open for different

8  hours.

9          So we don't think it supports their argument for the

10  ban on 24-hour voting.  The State justification here of

11  uniformity or reducing voter confusion is extremely tenuous

12  because it's not actually achieved by banning 24-hour voting.

13          Again, another important factor to look at when

14  considering the 24-hour voting ban is that the disparities in

15  the usage rates of 24-hour voting are sizeable.

16          Leah, can I ask you to go two slides forward, please.

17          You'll see on this chart here that Black Texans and

18  Latino Texans use 24-hour voting at higher rates than White

19  voters.  If you look here, you can tell that the share of

20  White voters who voted during traditional voting hours was

21  much greater than the share of those voters who make up the

22  overnight hour voters.

23          But the reverse is true for Blacks and Latinos.

24  Their share of regular hours voters is lower than their share

25  of 24-hour voters.  So we have disparities in the usage rates.

And this makes sense because it's linked to the social
conditions in Texas.

THE COURT:  So there's your evidence of 24-hour
voting, but what about straight-ticket voting?  Is there any
evidence in the record about the racial impact of that?

MS. HOLMES:  For straight-ticket voting, I should
flag that the plaintiffs -- I think it's only the HAUL
plaintiffs that challenged that, and we are not pursuing that
claim under the Section 2 results theory, simply under the
intent theory of our claim.

And so, Your Honor, I'd like to turn to the poll
watcher provisions, if I may.  Concerning the poll watcher
provisions, and here we are challenging 4.01 and 4.07, there
is a well-established history of poll watchers targeting Black
and Latino voters and that ties into the disparities we see,
or the -- in how these provisions burden those voters.

And here, the State interests are also weak because
there's no evidence in the record from county officials that
poll watchers have actually deterred fraud.  And the
clarifications to the law that the State claims were necessary
did not need to be made in a way that accrues to the detriment
of the voter.

So we have here a well-established history of poll
watchers intimidating Black and Latino voters up to and
including the 2000s and the 2010s.  So this is not long ago,

1  this solely long-ago history.  We heard that from
2  Professor Tolson, Dr. Kousser.  We heard personal anecdotes
3  from Sharon Watkins-Jones, and it's also in the legislative
4  record during the passage of SB 1.
5         For example, there's a group called the King Street
6  Patriots which later became True the Vote and trained hundreds
7  of poll watchers and sent them into minority precincts in
8  Harris County in the 2010s.
9         And it's clear, also from the trial record, that
10  misbehavior by poll watchers, by rogue poll watchers at least,
11  has not gone away.  There was plenty of evidence of complaints
12  during the 2020 election, during the 2022 election, and so,
13  given this history, and given both the history and present day
14  incidents, many Black and Latino voters are reasonably wary of
15  poll watchers.  And this is the modern day effect of the past
16  discrimination that must be considered under Section 2.
17         Against this context it's no surprise that SB 1's
18  changes that give poll watchers greater authority, vis a vis,
19  poll workers, have the effect of discouraging Black and Latino
20  voters from participating, both as voters, and both as poll
21  watchers.
22         For example, MFV abandoned its program recruiting
23  election judges who would work in the Latino community due to
24  the poll watcher provisions.  Marla Lopez testified that she
25  stopped serving as an election judge.  Jeffrey Clemmons

1  testified that he is very wary of continuing to serve.  And
2  many members of DST also stopped working as election workers.
3          We also have examples of post-SB 1 voters being
4  exposed to intimidation or misconduct by poll watchers and SB
5  1 making it more difficult for election workers to address
6  this behavior.
7          Isabel Longoria testified that aggressive conduct by
8  poll watchers occurred especially in Black and brown
9  communities in 2022.  However, Harris County and Dallas County
10 now advise their election workers to not intervene if a poll
11 watcher is making a voter uncomfortable.  So SB 1 has
12 restrained them in helping address that disparate intimidation
13 that is occurring.
14         And just as an example, Sharon Watkins-Jones had a
15 poll watcher loom over her as she was voting in the November
16 2022 election, about a foot away, and that person followed her
17 to the tabulator as she inserted her ballot.  She felt like
18 she didn't have privacy of her ballot and she felt unsafe, but
19 she didn't think an election worker could assist her because
20 now election workers have to personally witness violations of
21 the election code before they can remove a poll watcher.  And
22 that's SB 1 4.01.
23         It also ties into 4.07, the free movement provision,
24 which, as we will hear later, does not define exactly how
25 close a poll watcher can get to a voter.  These provisions

1  directly affected Ms. Watkins-Jones' experience when voting.

2        Here, the State interest is also tenuous.  There's no

3  evidence in the record that poll watchers have detected or

4  deterred fraud.  And, indeed, Ms. Callanen and Ms. Wise

5  testified that they couldn't recall a single instance when a

6  poll watcher reported an irregularity to their counties that

7  was substantiated.

8        And there's certainly no evidence that these specific

9  changes to the law that SB 1 made are somehow tied to

10 preventing fraud.  And that disconnect is what makes the law

11 tenuous.

12       And, finally, as I mentioned, the State has said they

13 needed to clarify the law related to poll watchers.  You will

14 hear my colleague Leah Tulin talk about how the provisions

15 don't actually clarify the law.  They make it more vague.  So

16 I will let her go into the details on that, but this was also

17 not achieved by SB 1.

18       So considering these factors along with the others

19 discussed in plaintiffs' submissions, SB 1's poll watcher

20 provisions violated Section 2.

21       THE COURT:  Are you going to be addressing the voter

22 purge?

23       MS. HOLMES:  Your Honor, I will not be addressing the

24 voter purge provisions which I believe are under Article 2 of

25 SB 1, because we're no longer maintaining the Section 2

1  results claim under that provision.

2         THE COURT:  You are reserving that for the intent

3  only phase?

4         MS. HOLMES:  That's correct.  And so I'd like to turn

5  to the mail ID requirements, if I may.

6         The main points here are that there were many

7  thousands of people affected statewide by these mail ID

8  requirements.  And even as the rejection rates fell, there

9  continued to be a disparate impact in who was affected by the

10  rejections of mail ballots.

11         And, again, the State's fraud interest relies –– is

12  weak here because it relies primarily on charges and

13  unadjudicated allegations, not convictions, for mail ballot

14  fraud.

15         The Court will hear from my colleagues about some of

16  the burdens associated with the mail ID provisions, so I'm

17  just going to focus on the racial disparities.

18         Black and Latino voters are more likely to vote by

19  mail and they are more likely to have their ballots rejected.

20         Dr. McDaniel found that half of Black voters and

21  almost 37 percent of Hispanic voters over the age of 65 vote

22  by mail, compared to only 33 percent of White voters.  And

23  this is likely related to social conditions in Texas, the

24  higher rates of disability in the Black and Latino

25  communities, as well as having less flexible schedules to vote

1  due to disproportionately working in wage earning jobs where

2  it's not as easy to take off time from work to vote.

3         Dr. Smith, Dr. Mayer, and Dr. McDaniel all found that

4  the mail ballot rejection rates were higher for Black voters

5  than they were for White voters.

6         Looking at both statewide data and county data,

7  Dr. Smith found that as the Black voting age population

8  increased in a certain census block, so too did the rate of

9  rejection -- rate of ballot rejections due to SB 1's ID

10  requirements.

11         For example, looking at TEAM data, which is

12  statewide, census blocks that were basically all Black voting

13  age population had a 20 percent rejection rate of their

14  ballots.  Census blocks that were -- had essentially no Black

15  voting-age population had only a 13 percent rejection rate.

16  This is from the March primary.

17         In the November 2022 general election, the rates were

18  8 percent in the all-Black census blocks, and 2 percent in the

19  non-Black census blocks.

20         And the State has often reminded us that a simple

21  handful of fraudulent votes can alter the outcome of an

22  election.  We would submit here that the thousands of ballot

23  rejections due to the mail ID requirements that are

24  disproportionately borne by Black residents could also have

25  that same effect.  There is the -- what *Brnovich* called the

1 | practical significance in that disparity.

2 | One side note about Dr. Smith's analysis.  The State

3 | has pointed out that some of Dr. Smith's analyses did not find

4 | disparity.  Those results are almost exclusively confined to

5 | his analysis of applications for ballot by mail.

6 | What really matters here, we submit, is the racial

7 | disparity and rejections of the ballots themselves, because

8 | that is what causes voters to be disenfranchised.  And those

9 | voters were disenfranchised despite having overcome the ABBM

10 | hurdle, despite having been essentially approved by the State

11 | to vote by mail.  So we would focus the Court's analysis on

12 | the ballot rejections that Dr. Smith found.

13 | THE COURT:  You have two minutes.

14 | MS. HOLMES:  Okay.

15 | Quickly addressing the State interest here, which

16 | they primarily point to an interest in deterring mail ballot

17 | fraud, but we have seen those charts from the Attorney

18 | General's Office, they are, by and large, charges,

19 | prosecutions -- unresolved prosecutions, and not actual

20 | convictions.

21 | I believe we only have 16 defendants who have been

22 | convicted at trial of election crimes related to mail ballot

23 | voting.  And only one of those incidents in the tracker

24 | relates to mail ballot fraud in the 2020 election and that was

25 | one in Medina County, despite the fact that in that election

1  that there was an exponential increase in voting by mail.  So
2  what we have here is evidence that this type of voting is
3  simply not rife with widespread fraud.  Far from it.
4         The State also spent time discussing the Zul Mohamed
5  case.  And the only point I would make here is that, that case
6  falls in the category of unresolved, unconvicted prosecutions.
7  Mr. Mohamed has been convicted of nothing and the evidence
8  related to the charges, allegations, and investigations
9  against him is weak evidence, given the presumption of
10 innocence in our system.
11        I'd like to address a question that came up during
12 the trial here about should the Court be looking at the
13 burdens from various provisions of SB 1 individually or
14 cumulatively.
15        And under a Section 2 results claim we submit that
16 the Court must consider the cumulative burdens.  Focusing only
17 on the burden of a particular provision in a vacuum runs
18 counter to the totality of the circumstances analysis, and
19 also runs counter to *Brnovich* guidepost 4, which is the one
20 about the opportunities to vote in the entire system.
21        And, in fact, the Fourth Circuit held in 2014 that
22 considering each challenged piece of a voting law only
23 separately but failing to account for the sum of its parts was
24 a misapplication of Section 2 law and reversible error.  And
25 that case was League of Women Voters versus North Carolina —

1  sorry.  *League of Women Voters of North Carolina versus North*
2  *Carolina*.  It's at 769, F.3d 224.
3      Here, we have seen from the evidence that we have
4  overlapping and cumulative burdens.  A shift worker who relied
5  on 24-hour voting to make it to the polls now cannot vote
6  during traditional hours.  So perhaps if they are eligible
7  they turn to mail voting, but now they are burdened with the
8  mail ID requirements that SB 1 has incorporated.
9      THE COURT:  Your time has expired.
10     MS. HOLMES:  So to just sum up, we respectfully ask
11  the Court to find that the challenged provisions of SB 1 deny
12  Black and Latino voters equal opportunity to participate and
13  violate Section 2 of the Voting Rights Act.
14     Thank you.
15     THE COURT:  Thank you.
16     Who is going —
17     MS. HOLMES:  We have Uzoma Nkwonta.
18     MR. NKWONTA:  Good morning, Your Honor.  Uzoma
19  Nkwonta from Elias Law Group on behalf of the LULAC
20  plaintiffs.  I will address the *Anderson-Burdick* claims
21  focusing on the legal standard and the mail ballot provisions.
22     Your Honor's undoubtedly familiar with the
23  *Anderson-Burdick* test.  I'd like to focus my presentation on
24  some of the main disagreements between plaintiffs and State
25  defendants on how that test is to be applied to the facts of

1  this case.

2       So, first, starting with the origins of

3  *Anderson-Burdick*, as the Fifth Circuit explained in *Steen*,

4  this balancing test is derived from two cases:  *Anderson v.*

5  *Celebrezze* and *Burdick v. Takushi*.  And the Supreme Court

6  applied this test in *Crawford v. Marion County Election Board*,

7  and when you look to those cases, they make clear that the

8  *Anderson-Burdick* test requires a flexible standard.

9       The Court must consider the character and magnitude

10  of the burden, the precise interest put forward by the State,

11  and the extent to which those interests make it necessary to

12  burden the plaintiffs' rights; but more importantly, there's

13  no litmus test, so all burdens, even slight burdens, must be

14  justified by interests sufficiently weighed to justify the

15  limitation.

16       Now, I want to outline some of the key disagreements

17  that we have with the defendants about the *Anderson-Burdick*

18  test.  First, there's -- the test focuses on impacted voters,

19  not the general population as defendants suggest; second,

20  absentee voting rules are not exempt from *Anderson-Burdick*,

21  and they have been never been; third, cumulative impact

22  matters; fourth, disparate impact matters; and five, there's

23  no litmus test, so the State's important regulatory

24  considerations and regulatory justifications must still be

25  necessary to justify the burden on the right to vote.

1    So starting with the focus on impacted voters.

2  Defendants argue that when assessing claim burdens on voting

3  rights, the courts must assess the provisions -- must assess

4  the burdens the provisions place on all Texas voters.  Well,

5  that's incorrect for several reasons.

6    First, the case that they cite, *NEOCH*, doesn't

7  actually hold that.  The quote leaves out the preceding

8  sentence, which says:  "The record here is the void of

9  quantifiable evidence from which an arbiter could gauge the

10  frequency with which the narrow class of voters has been

11  disenfranchised."  That's why the Sixth Circuit focused on the

12  burden to all voters, because of the lack of evidence.

13    And let's go to *Crawford*, what the Supreme Court

14  actually said and what the Supreme Court did.  In *Crawford*,

15  the issue was an ID provision that impacted approximately 1

16  percent of the population, because 99 percent of Indiana

17  voters, according to the record, likely possessed the required

18  ID.  And yet the Court said:  "The burdens that are relevant

19  to the issue before us are those imposed on persons who are

20  eligible to vote but do not possess a current photo

21  identification that complies with the requirements."

22    In other words, the 1 percent that did not possess

23  ID, that is the group — the population that the Court in

24  *Crawford* focused its analysis on.  And then the very next

25  sentence to that cite, the very next sentence said that the

1  fact that most voters possess ID would not have saved the
2  statute, would not have saved the ID requirement.
3          Next, we turn to another one of the pillars of the
4  *Anderson-Burdick* test, *Anderson* itself.  There, the Court
5  said:  "It is clear that the March filing deadline places a
6  particular burden on an identifiable segment of Ohio's
7  independent-minded voters."
8          The issue in that case, the plaintiffs challenged the
9  early filing deadline for independent candidates.  And in this
10 statement here, the Court is focusing its burden analysis on
11 the identifiable segment of Ohio's independent-minded voters,
12 not on all voters.  That sounds a lot like a focus on the
13 impacted voters, not a focus on every voter in Ohio.
14         Next, defendants argue that the ID numbers — that
15 the ID number requirement for the mail ballot provisions do
16 not implicate the right to vote.  And they argue it doesn't
17 implicate the right to vote relying on *Texas Democratic Party*
18 *v. Abbott*, called *TDP I*, and by extension, that case's
19 reliance on *McDonald*.
20         Now, *McDonald v. Board of Election*, which is a case
21 you will hear, no doubt, from State defendants, does not stand
22 for the proposition that restrictions on absentee voting are
23 exempt from constitutional scrutiny.  Rather, that case was
24 about unsentenced inmates who were not entitled to vote
25 absentee under state law; in other words, there were limited

1 categories of individuals who were permitted under state law
2 to vote absentee.  The Illinois law did not extend that
3 provision to unsentenced inmates.  And that was the nature of
4 the constitutional challenge in *McDonald*.
5        But that's very different from this case.  And it's
6 different from this case because we're only talking about
7 voters who have been granted the right to vote absentee,
8 voters who meet the requirements to vote absentee.  Those are
9 the ones who are having their ABBMs rejected, who are having
10 their absentee ballots rejected.  So this case doesn't
11 implicate the right to receive an absentee ballot.  We've
12 already passed that point.  We are talking about a group that
13 has that right.
14        This case implicates a different principle, which is:
15 Once a state confers a right to vote or confers a voting
16 procedure, the state must administer that right and administer
17 that procedure in accordance with federal law.  And you will
18 see that theme, that principle, in several cases, Your Honor,
19 starting with *McDonald* itself.
20        And you'll see that on page 806 of the *McDonald's*
21 opinion:  "While states have long been held to have broad
22 powers to determine the conditions under which the right of
23 suffrage may be exercised, we have held that once states grant
24 the franchise, they must not do in a discriminatory manner."
25        And then, most recently, the Middle District of North

1   Carolina in *Voto Latino v. Hirsch*, again assessing

2   restrictions on same-day registration found that it is true

3   that voters in North Carolina have other ways of voting, but

4   the state having offered same-day registration must offer a

5   process that is not unconstitutional.

6          And courts have found unconstitutional burdens in a

7   number of cases, despite alternative methods of voting,

8   without having to find that in-person voting has been

9   foreclosed, and they have done that again because of this

10  principle, that once the state creates this procedure for

11  voting, and once the state grants its citizens the right to

12  vote in a certain manner, it must administer that procedure

13  consistent with the Constitution.

14         So, for instance —

15         THE COURT:  What do I make of the Supreme Court's

16  order in *Merrill v. People First of Alabama*?  They banned

17  curbside voting there, and the Supreme Court seems to have

18  agreed with them.  What do I make of that?

19         MR. NKWONTA:  Well, the ban on curbside voting is

20  distinct here, because the reason for the ban on curbside

21  voting and the analysis there was not supported necessarily by

22  the fact that *McDonald* somehow trumps the *Anderson-Burdick*

23  test.

24         And that's where we are trying to bring the Court to

25  here, is that regardless of what — how the Court comes out on

1  the test, the Court has to apply the test.  The Court has to

2  apply the *Anderson–Burdick* test and determine whether the

3  restrictions are justified by any state interest.

4          And as I'll get to that later, I'll explain that

5  these restrictions are not justified by the State's interest

6  in whether it's uniformity, whether it's fraud prevention, or

7  whether it's maintaining confidence in the electoral — in the

8  elections itself.

9          Now, going back to these cases in which numerous

10 courts have found unconstitutional burdens despite alternative

11 methods of voting, one of those cases includes *Anderson v.*

12 *Celebrezze* itself.  Again, in finding that the early filing

13 deadline imposed an unconstitutional burden, the voters there

14 still had the opportunity to vote for write-in candidates and

15 to vote for other candidates, but that did not prevent the

16 court from finding it an unconstitutional burden.

17         And then you'll see the other cases I've listed, *Voto*

18 *Latino v. Hirsch*, Democratic Exec —  which involved same-day

19 registration, *Democratic Executive Committee of Florida v.*

20 *Lee*, which involves signature-matching procedures.  The same

21 thing with *League of Women Voters v. Andino*.

22         But, most importantly, the Fifth Circuit has

23 effectively walked back its analysis on *McDonald*, the analysis

24 that State defendants rely upon now.  The Fifth Circuit has

25 walked that back.  And specifically referencing *TDP I*, the

1  court said, "We have uncertainties about *McDonald*, and we,

2  therefore, declare that the holdings in the motion panel

3  opinion" — which was *TDP I* — "are not precedent."

4       So the court zeroed in — this was the merit's panel

5  decision — zeroed in on *TDP I*, the case that defendants rely

6  on; zeroed in on that decision, and not just the decision

7  generally, but specifically on its discussion of *McDonald* and

8  its attempt to use *McDonald* to determine that individuals did

9  not have a right to vote absentee, and thus, the court did not

10 need to apply the *Anderson–Burdick* test as set forth in

11 *Anderson–Burdick* and *Crawford*.

12      The next key disagreement is cumulative impact.  And

13 cumulative impact matters, not just for the Section 2 claim,

14 as Ms. Holmes mentioned, but also for the *Anderson–Burdick*

15 claim.

16      Now, you see the defendants' argument cites *Eu v. San*

17 *Francisco County Democratic Committee*.  That case says nothing

18 about cumulative impact.  There is no analysis in that case

19 about cumulative impact.  But other cases have addressed this

20 more directly, other cases that were not included in

21 defendants' proposed conclusions of law.

22      For instance, courts have noted that the panoply of

23 restrictions that result in greater disenfranchisement than

24 any of the law's provisions individually must be considered.

25 That's true of the Section 2 claim.  The Fourth Circuit found

1  that in *North Carolina State Conference of NAACP v. McCrory*.
2  That's true of constitutional claims under the First and
3  Fourteenth Amendment, like the Sixth Circuit found in
4  *Graveline v. Benson*.
5          And in Justice O'Connor's concurrence, she also —
6  the court also recognized that when there is an allegation
7  that the statutory scheme collectively imposes an undue
8  burden, the Court should consider that statutory scheme and
9  should consider the other restrictions that come along with
10 that.
11         Next, disparate impact matters under
12 *Anderson–Burdick*.  Now, defendants suggest that disparate
13 impact does not matter, citing a paneled opinion in
14 *Richardson*, but if we go back to the pillars of the
15 *Anderson–Burdick* test, including the Supreme Court's decision
16 in *Anderson*, we will see specific references to what can only
17 be described as disparate impact.
18         In *Anderson*, the Court said:  "As our cases have
19 held, it is especially difficult for the State to justify
20 restriction that limits political participation by an
21 identifiable political group whose members share a particular
22 viewpoint, associational preference, or economic status."
23 That sounds a lot like disparate impact.
24         And in another quote, the Supreme Court focuses or
25 uses as an example filing fees that bear more heavily on

1  certain members of the community.  Again, it sounds a lot like
2  disparate impact.
3      And *Crawford* analyzed the heavier burden placed on a
4  limited number of persons, and I believe voters, homeless
5  persons, people with economic limitations.  The reason why the
6  Court did not find an unconstitutional burden is because of
7  the lack of evidence of the scope of that burden and the
8  impact on those individuals.
9      But we have that evidence here, and *Crawford*,
10 *Anderson*, and other cases have found disparate impact matters.
11     *Richardson*, by the way, did not say that disparate
12 impact does not matter.  Instead, *Richardson* said that
13 disparate impact, or an impact on plaintiffs, or a small
14 number of individuals, cannot be used to determine if there's
15 a severe burden.  But we're not solely relying on the impact
16 on limited individuals to demonstrate that there's a severe
17 burden.  As you will see, the evidence establishes that
18 without any resort to limiting focus on individual plaintiffs.
19     So let's talk about that evidence and apply the
20 *Anderson–Burdick* test.  What is the character and the
21 magnitude of the burden?  Well, we'll start off with the
22 threat, right?  There are two elements of this.  There's the
23 threat of disenfranchisement and actual disenfranchisement
24 that has already occurred.
25     Talking about the threat.  More than 2.6 million

1    voters in Texas, approximately 15 percent of Texas voters, are
2    at risk of having an absentee application or ballot rejected
3    because of deficiencies in the Secretary of State's records,
4    and this is in State Exhibit 200, and that's because, for
5    instance, approximately 190,000 had a driver's license number
6    not reflected in TEAM.  Why is that significant?

7            Because when an individual has a driver's license
8    number, both SB 1 and the instructions received tell that
9    individual that they must enter that driver's license number.
10   And they can enter their Social Security number, the last four
11   digits, if they do not have a driver's license number.

12           Approximately 62,000 voters had typographical errors
13   in a driver's license.  44,000 had typographical errors in
14   their Social Security numbers.  These individuals are highly
15   likely to have their ABBMs or ballots rejected when they enter
16   those numbers in order to attempt to cast an absentee ballot.

17           Next, approximately 94,000 voters have neither a
18   driver's license number nor a Social Security number on their
19   voter record.  These voters are almost certain to have their
20   ballots rejected.

21           And looking at what has actually happened, 25,000
22   ballots rejected in March of 2022, over 25,000.  Over 11,000
23   rejected in November of 2022.  What does that mean?  Because
24   in that instance, we're focusing specifically on rejected
25   ballots.  That means these are individuals who have already

1    completed the process correctly when applying for absentee

2    ballots, yet when it came to applying for the ballots

3    themselves, these individuals were still unable to get past

4    the State's hurdle.  And that is the danger of imposing hurdle

5    after hurdle after hurdle with no justifying state interests.

6            Now, my time is short.  I just wanted to point the

7    Court to a couple of important pieces of evidence.  First, the

8    provisions of Section 5.02 of SB 1, which requires the

9    individual to enter their driver's license number, the

10   applicants enter the driver's license number, and allows the

11   applicant to enter their last four digits of the Social

12   Security number if they do not have — or have not been issued

13   a driver's license number.

14           In other words, a voter following those instructions

15   as they appear, and who doesn't have a driver's license number

16   listed in the system, is almost certain to have their

17   application or ballot rejected.

18           And when you look at the State interests here, the

19   State interests don't justify any of this.  The State

20   interests, first, in promoting voter fraud, or promoting

21   confidence in elections, or promoting uniformity in election

22   administration, those interests go by the wayside, because

23   what we're talking about here is we are talking about ID

24   matching for the sake of ID matching.

25           In other words, the absence of an ID match will deny

1    a voter or deny an individual the right to vote, deny them
2    their absentee ballot, even if they are able to demonstrate
3    that their ID correctly identifies them.
4         And we see this, not only because voters who submit
5    their correct ID numbers and who submit their correct SSN
6    numbers are still having their ballots rejected, but we also
7    see this with the in-person delivery provision, which requires
8    a voter to provide ID, or to present ID when they drop off
9    their own ballots, and requires election officials to review
10   that ID and to review the signature and to mark down the
11   actual ID that the voter presented.
12        And yet, if the ID number on the absentee ballot does
13   not match what is in the voter records, that ballot gets
14   rejected.  That demonstrates that what the State is interested
15   in here is not identifying the voter; in other words, the
16   interest implicated by these ID matching provisions are not
17   verifying identity; it's matching for the sake of matching.
18   And those abstract interests, without any real practical
19   import, cannot be justified.
20        And, lastly, I want to talk about the interest in
21   uniformity.  Now, the interest in uniformity cannot justify
22   these ID matching provisions, nor can it be reconciled with
23   the Texas election system, which is meant to allow counties to
24   implement different procedures in order to -- that best suit
25   their electorate.

1      And I'll turn the Court, in closing, back to a
2  statement from *Anderson* itself, which is:  "Sometimes the
3  grossest discrimination can lie in treating things that are
4  different as though they were exactly alike."
5      In other words, when there is no need for uniformity
6  and when the election code itself does not contemplate
7  uniformity, imposing uniformity for the sake of uniformity
8  with no practical end is not a justifiable State interest and
9  sometimes it results in the grossest form of discrimination.
10      Thank you, Your Honor.
11      THE COURT:  Thank you.
12      MS. HOSTETLER:  Good morning, Your Honor.  Courtney
13  Hostetler for the Mi Familia Vota plaintiffs, and I will be,
14  in the remaining seven minutes, talking about the burdens
15  imposed upon voters by the remaining challenged provisions of
16  SB 1, which would include drive-thru voting, and 24-hour
17  voting, the limitation to voter's access to assistance, and
18  the poll watcher provisions that empower poll watchers at the
19  expense of both polling place operations and voter safety and
20  ballot secrecy, and finally, that limit vulnerable voters'
21  access to vital information like curtailing in-person voter
22  education and canvassing.  And I will be as quick as possible.
23      With drive-thru — one of the things I do want to say
24  is that these challenged provisions, as my colleague
25  mentioned, both separately and cumulatively burden the right

1  to vote in Texas and have a disparate impact specifically on
2  voters of color.  And the defendants' stated interest, fraud,
3  uniformity, the public confidence in elections, simply do not
4  justify the burdens placed upon voters.
5       Looking at fraud.  The challenged provisions are not
6  rationally related to the purported State interest.  Pre-SB 1
7  law already addressed the few instances of voter fraud the
8  State identified.  And there's no connection between the
9  challenged provisions and the fraud that the State purportedly
10  wants to avoid.
11       With uniformity, while we heard from county and state
12  election officials that some uniformity can be valuable, that
13  actually it is important to permit counties to adopt voting
14  practices that work best for their voters, and that uniformity
15  can undermine fairness and access to the polls which is
16  exactly what we have seen.
17       And in terms of public confidence in the election, we
18  heard from the State's own witnesses that there was high
19  confidence in Texas' elections after 2020, and that there was
20  a movement of misinformation.  But, again, the challenged
21  provisions don't change the fact that there are,
22  unfortunately, parties who are interested in spreading
23  misinformation about the elections, and the provisions, again,
24  do nothing to attack that.  And what you end up with is
25  actually an undermining public confidence of elections because

1  we have seen these provisions take away the right to vote and

2  burden voters, particularly Black and Latino voters and

3  vulnerable voters who require extra assistance.

4          I don't want to be too repetitive of what Ms. Holmes

5  already said about drive-thru voting and 24-hour voting, but

6  we did see that a tremendous number of Black and Latino voters

7  in Harris County took advantage of these opportunities.  We

8  saw Professor Smith and Mayer testify that they

9  disproportionately relied on drive-thru voting during that

10 election.

11         And that opportunity to do that actually, in

12 Professor Smith's words, "reduced the cost of voting," which

13 benefited not only those voters who could only vote at 2:00 in

14 the morning because of shift work, because of multiple jobs,

15 because of the many burdens that they face in getting to the

16 polls, but it also benefits folks who might be voting at

17 4:00 in the afternoon and who now because of these

18 opportunities were not facing the extensive wait times that

19 they have faced in prior elections.

20         THE COURT:  Are you familiar with that *Griffin versus*

21 *Roupas* case out of the Seventh Circuit?

22         MS. HOSTETLER:  I'm sorry; I'm not.

23         THE COURT:  Go ahead.

24         MS. HOSTETLER:  Going back again briefly on the

25 fraud, which Ms. Holmes already addressed, there's no

1  difference between drive-thru voting and curbside voting and

2  the type of the voting machine used, how voters mark their

3  ballots, how election officials process their ballots.

4      We have also seen that in terms of some

5  irregularities that were potentially identified.  Again, in a

6  problematic audit that was done two years after the 2020

7  election, what we know is that some of the irregularities and

8  the issues with ballot counting came from the fact that they

9  were unplugging the eSlates from the JBCs, and so it was

10  causing some issues with the pins.

11      That was very quickly resolved by Harris County

12  during the drive-thru voting process by giving everyone longer

13  cables so that you didn't have to deal with the unplugging and

14  that absolutely resolved the issue.  Notably, with curbside

15  voting, that issue actually still exists because you're still

16  doing the unplugging and bringing the machines out.

17      With regard to 24-hour voting, there is absolutely no

18  difference in the way that people vote at 1:00 in the morning

19  and the way they vote at 1:00 in the afternoon.

20      THE COURT:  Are you familiar with that Alabama case

21  that's at the Supreme Court on curbside voting?

22      MS. HOSTETLER:  Yes, but —

23      THE COURT:  How do we reconcile all of that?

24      MS. HOSTETLER:  What I think, and I know my colleague

25  covered this a little bit, with curbside voting you have

1  the — what you have with the — I'm sorry.  I completely lost

2  — sorry.  What was your question?

3       THE COURT:  Yeah.  So the Alabama matter.  So it

4  upholds the Alabama Secretary of State's decision to ban

5  curbside voting, at least the stay order did.  It's, I guess,

6  one of those shadow docket orders.

7       I mean, what am I to make of this?

8       MS. HOSTETLER:  I think one thing to take into

9  account is that this — when we are looking at undue burden,

10  it should be very specific to the facts of the state, not

11  necessarily the facts of Alabama and the access of voting in

12  Alabama doesn't necessarily — doesn't necessarily apply to

13  the facts of Texas and the burden that Texas voters might face

14  and the opportunities that should be made available to them to

15  ensure that they have equal access to the ballot.

16       And I have two minutes.  I'm going to go quite

17  quickly.

18       Looking at poll watchers, one of the things that did

19  mar voting in Texas in 2020 was aggressive poll watchers and

20  who were undermining voters' feelings of safety, it was

21  undermining election officials' ability to control and ensure

22  that poll watchers had access while voters were able to vote

23  securely and in privacy.

24       What SB 1 did is expand the rights to poll watchers

25  at the expense of poll workers and at election officials and

1    voters.  And we heard that a number of people who previously

2    had worked polls are no longer doing it.  We heard that voters

3    feel vulnerable when voting.

4           And again going back to the State's interest, nothing

5    is answered here.  Poll watchers already had access to the

6    polls.  What these new provisions do is simply burden voters,

7    burden election workers, and prevent them from being able to

8    protect voters and keeps them from feeling safe in carrying

9    out this incredibly important role in helping maintain our

10   polling locations.

11          Looking at — going to the vote harvesting

12   provisions.  In some ways, it's very similar.  The state

13   already had laws that made vote harvesting illegal.  What 704

14   does is it prevents people who are bringing important

15   information to voters from getting that information.  And it

16   has nothing to do with vote harvesting.  That was already

17   illegal.  It's about burdening people's access to information.

18   It's about burdening their access to the community.

19          And that's happening at a time where we're also

20   seeing SB 1 make it more difficult for counties to provide

21   opportunities to vote to voters, for counties to provide

22   information to voters.  So it's really restricting voters'

23   access to the information they need to vote.

24          And finally, I do just want to mention voter

25   assistance.  Again, voter assistance has been an incredibly

1  important mechanism that allows people to vote, those who

2  require language assistance, as well as those who require

3  physical assistance; using trusted members of their community

4  has been an important way these people feel comfortable voting

5  are able to access the polls.

6          The State has not provided any information of any

7  examples of fraud based on the provision of assistance.  They

8  mention a quote from Dana DeBeauvoir, but actually what she

9  said is although she's received a few third-party voters

10 complaining about possible intimidation, when they

11 investigated what they actually found was that being a

12 situation like a child translating for a grandmother.  And

13 that this actually goes to what we see, Latino people already

14 feeling attacked and pressured and people making assumptions

15 about speaking Spanish at the polls.

16         What this these assistance provisions do, they don't

17 stop fraud.  There is no fraud cases the State has identified

18 that has to do with intimidation by a trusted assister.  It is

19 everything to do with scaring assisters away from being able

20 to provide this important opportunity.

21         That is my time.  Thank you.

22         THE COURT:  Thank you.

23         MS. HOLMES:  The next speaker will be appearing by

24 Zoom, Your Honor.

25         THE COURT:  So I think it's Ms. Wakschlag?

1          MS. HOLMES:  Yes, Your Honor.

2          MS. WAKSCHLAG:  Good morning, Your Honor.  I'm Shira

3     Wakschlag with The Arc of the United States.  We represent the

4     HAUL plaintiffs, and I'm delivering the closing on behalf of

5     all plaintiffs' groups with claims under the Americans with

6     Disabilities Act, and Section 504 of the Rehabilitation Act.

7          The relevant challenged provisions and plaintiffs'

8     groups are listed on the slide.

9          Throughout trial, plaintiffs presented evidence that

10    the challenged provisions make it harder for voters with

11    disabilities to vote by mail and receive the help they need to

12    vote, deny plaintiffs and their members an equal opportunity

13    to participate in and benefit from defendants' voting programs

14    in violation of ADA.

15         Voters with disabilities should not experience ballot

16    rejections due to every stage of mail voting and curing mail

17    ballots being inaccessible to voters with vision disabilities.

18    But this is what happened to Ms. Iglesias, Ms. Guerrero Mata,

19    and Ms. Saltzman post-SB 1.  This is not equal opportunity.

20         Voters with disabilities should not be forced to

21    experience physical pain while voting, significantly lengthier

22    voting times, or the loss of privacy, as Ms. Halvorson, Ms.

23    Litzinger, and Ms. Nunez Landry testified they did when voting

24    without the assistance they needed post-SB 1.  This is not

25    equal opportunity.

1          Voters with disabilities should not have to work

2    twice as hard as everyone else to vote after experiencing

3    physical pain and enduring multiple access barriers as

4    Ms. Halvorson did post-SB 1.  This is not equal opportunity.

5          If a wheelchair user faces an inaccessible building

6    and can slowly and with great hardship get herself out of her

7    wheelchair and crawl up the stairs to get inside, no one can

8    credibly argue that this is the equal opportunity the ADA was

9    enacted to provide.

10          The challenged provisions force voters with

11    disabilities to rely on burdensome work-arounds in order to

12    vote, including experiencing — including expending

13    significant additional time, subjecting themselves to physical

14    pain and mental stress, experiencing multiple ballot

15    rejections, and working twice as hard as nondisabled voters.

16    In other words, the challenged provisions force voters with

17    disabilities to figuratively crawl up the steps to access the

18    franchise.  This is not equal opportunity.

19          As plaintiffs' expert, Dr. Kruse testified, voters

20    with disabilities are four times more likely to vote by mail,

21    and among the limited categories of voters Texas allows to do

22    so.  Many of them, due to these disabilities have no other way

23    to vote.

24          Voters with disabilities are twice as likely to need

25    assistance voting in person and ten times more likely to need

1  assistance voting by mail than those without disabilities.

2  Their disabilities make such assistance essential.

3    Dr. Kruse testified that the challenged provisions

4  raised the cost of voting for people with disabilities, making

5  them less likely to vote, and more likely to face significant

6  barriers, even if they ultimately are able to vote.

7    As Ms. Nunez Landry testified, "I just don't

8  understand why disabled people couldn't be extended comparable

9  rights of citizenship to do something so basic as vote in the

10  United States."

11    As I'll discuss in more detail, plaintiffs have met

12  their ADA burden in their equal opportunity, methods of

13  administration, and reasonable modification claims and the

14  relief plaintiffs seek is reasonable.

15    So let's start with plaintiffs' equal opportunity

16  claim.  The ADA requires public entities to provide qualified

17  individuals with disabilities an equal opportunity to benefit

18  from state and local government programs, such as voting.  The

19  question is not whether voters with disabilities have merely

20  the opportunity to vote at some time and in some way, but

21  whether they had an equal opportunity to vote in person or by

22  mail as those without disabilities.

23    In *Luke*, the Fifth Circuit held that a quote, "no

24  harm, no foul theory is inconsistent with the ADA because

25  nothing in the statute's text or the case law applying it

1    requires the plaintiff to have alleged a bad outcome, and for
2    good reason lack of meaningful access is itself the harm under
3    Title II, regardless of whether any additional injury
4    follows," end quote.
5          In *Frame*, the Fifth Circuit explained that ADA
6    obligations, quote, "extend beyond cases of actual exclusion
7    to cases of constructive exclusion.  A plaintiff need not show
8    it is impossible to access the benefits, but only if there is
9    an unreasonable level of difficulty in accessing benefits,"
10   end quote.
11         In the voting context, courts, including Fourth and
12   Sixth Circuits in *Lamone* and *Hindel*, and other courts, in
13   cases like *Democracy North Carolina*, and others, have
14   repeatedly required modifications to state law requirements
15   that made voting more difficult for voters with disabilities,
16   even though these voters were not always entirely prevented
17   from voting.
18         Defendants asked the Court to focus only on whether a
19   ballot was ultimately cast by each of plaintiff's witnesses,
20   but this exclusive focus on ultimate results to the complete
21   exclusion of the overall experience of voting for voters with
22   disabilities is simply not the standard under the ADA.  The
23   ADA demands more.
24         Let's turn to mail voting.  The Section 5 mail voting
25   restrictions require that voters include their driver's

1  license number or the last four digits of their Social
2  Security number on mail ballots.  Dr. Kruse testified that
3  voters with disabilities are four times more likely to vote by
4  mail than voters without disabilities, that they will have
5  greater difficulty in remembering and retrieving their ID
6  numbers, and as they encounter these difficulties disabled
7  voters will have greater difficulty accessing the cure
8  process.

9         Curing in person poses barriers since voters with
10  disabilities are more likely to face transportation barriers
11  in getting to the precinct and physical barriers once at the
12  precinct.  Curing a ballot online can also pose barriers since
13  voters with disabilities are less likely to have internet and
14  the online form may be inaccessible.

15         THE COURT:  Let me stop you here and ask you about
16  the relief and the extended relief.  So on the mail-in voting,
17  the applications and the rejections for the failure to meet
18  the ID matching, I mean, is it enough just for me to enjoin
19  507 and 513 without addressing any ADA claims, or do I need to
20  address the ADA claims?

21         MS. WAKSCHLAG:  Sorry, Your Honor.  So do you mean
22  enjoining them on other grounds?

23         THE COURT:  Yes.

24         MS. WAKSCHLAG:  I mean, I think as long as the
25  provisions are enjoined, I guess it would depend on if it

1    was —

2          THE COURT:  Let me tell you where I'm concerned about

3    all of this, okay?  So we are talking about the flap and the

4    fonts and everything else for ADA issues.  I mean, am I going

5    to be a perpetual arbiter of what the appropriate size font

6    is, and whether the envelopes are structured correctly?  And

7    am I going to need some ADA experts to be now special masters

8    for the court?  This is where I'm concerned about where the

9    relief goes.

10         MS. WAKSCHLAG:  Thank you for clarifying, Your Honor.

11         So the relief sought has to do with enjoining the

12   challenged provisions.  The plaintiffs are not requesting

13   anything like what Your Honor is describing around court

14   monitor or changing the font.  That has to do with general

15   accessibility barriers of the ballots.

16         Those are not specifically at issue in this case.

17   What's specifically at issue in this case is the accessibility

18   issues pertaining to the challenged provisions of SB 1, which

19   are the mail ID requirements and the cure process.

20         And so the court would not have to play any role in

21   specific accessibility of mail ballots for blind voters.

22   That, of course, is at issue in another case before this

23   Court, but that is not pertaining to the specific challenged

24   provisions of SB 1, but it is important for the Court to be

25   informed by the overall experience that voters with

1  disabilities are having when trying to vote by mail —

2            THE COURT:  Thank you.

3            MS. WAKSCHLAG:  — and how SB 1 has compounded that.

4            Going back to the mail voting testimony, Ms. Martinez

5  and Mr. Kafka testified that they heard from multiple members

6  of The Arc and REVUP about these difficulties in voting by

7  mail and curing mail ballots due to the challenged provisions.

8            Counties testified that these restrictions led to a

9  dramatic increase in mail ballot rejections, and significantly

10 more voter complaints and requests for help with ID-related

11 issues.

12           Voters with disabilities testified that the

13 challenged provisions made their voting experience more

14 onerous and burdensome.  Ms. Iglesias testified that her mail

15 ballot applications were rejected multiple times due to ID

16 related reasons.

17           Ms. Saltzman testified that the barriers posed by

18 these provisions are compounded by the general accessibility

19 barriers voters with disabilities face.  She testified that

20 the March 2022 primary was, quote, "The worst experience I

21 ever had in my whole life of voting," end quote, due to every

22 state of the process being inaccessible to her as a voter with

23 vision disabilities and having multiple mail ballot

24 applications and ballots rejected.

25           Ms. Saltzman and Ms. Guerrero Mata faced significant

1  barriers when attempting to cure their mail ballot

2  applications and ballots due to both the in-person and online

3  curing options being inaccessible to them as individuals with

4  vision disabilities.

5       Ms. Miller testified that her daughter's autism and

6  other developmental disabilities would make it difficult for

7  her to remember her ID numbers.

8       Ms. Cranston testified that she works with disabled

9  voters who have difficulty remembering where their ID is

10  located and voters who have trouble writing their ID numbers

11  legibly.

12       County and state officials, including Ms. Escobedo,

13  and Ms. Wise, and Mr. Scarpello, and Ms. Adkins testified that

14  they knew of voters who were unable to cure problems with

15  their mail ballot applications, or ballots, related to the ID

16  requirements and some were unable to vote at all.

17       These barriers will be ongoing since there will be

18  new voters and newly disabled voters in every election.

19       Now let's turn to voter assistance.

20       Dr. Kruse explained that voters with disabilities are

21  twice as likely to require assistance when voting in person

22  and ten times more likely when voting by mail, and that the

23  penalty of perjury, vague language, and extra requirements

24  within the oath of assistance posed significant obstacles for

25  voters with disabilities that make it, quote, "difficult or

1  impossible for them to get the assistance they need to vote."

2          THE COURT:  So what do I make of that oath?  I mean,

3  it basically pre-existed SB 1.  It didn't have the word

4  "perjury," in it, but what do I make of that?

5          MS. WAKSCHLAG:  So Section 604, the challenged

6  provisions that plaintiffs are challenging here, both the oath

7  itself and regarding the oath, actually do make a significant

8  number of changes.  It's — I know defendants had attempted to

9  frame it as everything is exactly as it was previously.

10          I think the first thing we have seen is, as I'll go

11  through the witness testimony, is the harm that has been

12  imposed by the changes in the oath that we have seen.  So it

13  certainly is not as it was before, but — and, you know,

14  voters testifying to assistance that they did not receive

15  which they were able to previously receive.

16          But in addition to that, it's not just that things

17  are as they were before.  The oath has, one, has been added

18  to — the penalty of perjury has been added to the oath of

19  assistance itself, but other things have also been added that

20  compound that addition of the penalty; and, two, the oath

21  itself.

22          For example, the pressure or coerce language not

23  suggesting by word, sign, or gesture; adding, you know, a

24  number of different requirements around the assister providing

25  their information, their personal information, their

1  relationship to the voter and compensation, how they were
2  compensated or not.  So there's a number of other provisions
3  related to the oath of assistance that have changed how this
4  is impacting voters.
5        And again, we've also seen this through voter
6  testimony itself, that there is actual harm from the changes
7  that have been made.
8        THE COURT:  And again, going back to the extent of
9  relief that you-all might be seeking, so the oath says that
10 you can't communicate how the voter has voted to another
11 person.  I mean, are you actually challenging that?  What's
12 the problem with that part of it?
13       MS. WAKSCHLAG:  The focus is on the penalty of
14 perjury within the oath, and then all of the -- the language
15 pertaining to the penalty of perjury, that's where the concern
16 is, because if there's -- if you added all this information
17 around requiring the assister to provide information about
18 themselves and their relationship to the voter and things
19 like, don't pressure or coerce, and, you know, adjoin to the
20 penalty of perjury and sitting right next to it, and all these
21 additional requirements around representing eligibility, all
22 of those things in combination with each other are creating a
23 chilling effect on voters.
24       THE COURT:  Yeah.  No, I understand the argument as
25 to all those other segments.  I'm just talking merely upon

1  that last one.  Don't we want to protect the voter's privacy
2  rights on how they voted?
3          MS. WAKSCHLAG:  Yes.  I mean, that specific —
4          THE COURT:  That tiny little bit, yes.
5          MS. WAKSCHLAG:  Yes.  That is not the focus of —
6          THE COURT:  Well, you keep on saying "the focus."
7  I'm asking you to pin you down.  Are you actually challenging
8  that little part of it?
9          MS. WAKSCHLAG:  That specific clause, I believe that
10 Ms. Miller did have some testimony around that language but
11 the primary language that we're concerned about has to do with
12 representing eligibility, has to do with pressure, pressure
13 and coercing the voter, penalty of perjury.
14         THE COURT:  No, I understand all of that.
15         And again, I'm trying to make clear what we're
16 arguing about in this case and what we're not.  So you are not
17 challenging that small little segment of the oath on not
18 disclosing how someone voted, is that correct or not?
19         MS. WAKSCHLAG:  Correct.
20         THE COURT:  Thank you.
21         MS. WAKSCHLAG:  Under the ADA.  I don't want to say
22 that for any of other our claims.
23         So going to voter testimony — going to witness
24 testimony on voter assistance, Ms. Martinez, Mr. Kafka, and
25 Ms. Chavez Camacho testified that the oath's penalty of

perjury and requirements to include the assister's personal
information scared people away from assisting members of The
Arc, REVUP, and LUPE when voting.

Ms. Litzinger, Ms. Halvorson, Ms. Nunez Landry, and
Ms. Crowther testified that they were not able to receive the
assistance they needed, leading to physical pain while voting,
lengthier voting times and loss of privacy.

Ms. Miller, Ms. Cranston, and Ms. Rocha testified
that as assisters to voters with disabilities, the oath
intimidated them and made them nervous to provide assistance
as they had prior to SB 1.

Mr. Cole and Ms. Nunez Landry testified that the oath
imposed an extra burden on them to represent their eligibility
and disclose private medical information to their assisters.
The vagueness of the definition of eligibility adds to the
fear and confusion around these provisions.

Ms. Litzinger, Ms. Halvorson, Mr. Cole, and Ms. Nunez
Landry testified to the importance of receiving assistance
from trusted assisters and how SB 1 has prevented this.

Ms. Martinez explained that The Arc's members do not
want assistance from a stranger but from trusted attendants
who know what their needs are, what their wants are, to make
sure that they are being seen and heard.

Harris County officials Ms. Longoria and Ms.
Obakozuwa testified that the county received complaints from

1  voters with disabilities that these provisions scared them

2  away from receiving needed assistance.

3          And the State has conceded that the oath is vague and

4  confusing.  Mr. Ingram referred to what constitutes assistance

5  under the oath as a, quote, "very gray area," and Mr. White

6  testified that, quote, "anyone who takes this oath is

7  determining what that means to them."

8          Turning to the other voter assistance restrictions.

9  Section 6.06 prohibits voters who need assistance with their

10 mail ballots from receiving that assistance from compensated

11 individuals.

12         Section 704 prohibits mail ballot assistance by

13 people who are compensated to advocate for a specific

14 candidate or measure.

15         As Dr. Kruse explained, voters with disabilities are

16 more likely to vote by mail and be socially isolated, and a

17 worker or volunteer with a community organization or other

18 non-family member may be the best and only option to assist

19 them with voting by mail.

20         Ms. Chavez Camacho testified that before SB 1, LUPE

21 paid staff to provide mail ballot assistance to members with

22 disabilities, but SB 1 has caused LUPE to stop providing this

23 assistance due to fear of prosecution.

24         Turning to plaintiffs' methods of administration

25 claim.  The ADA prohibits public entities from utilizing

criteria or methods of administration that have the purpose or
effect of defeating or substantially impairing accomplishment
of the objective of the public entity's program with respect
to individuals with disabilities.

In *Dunn*, the district court explained that a, quote,
"know-nothing-do-nothing policy of nonadministration is a
privately actionable violation of the ADA.  Under the ADA, a
public entity must be proactive," end quote.

But testimony from the State suggests precisely this
know-nothing-do-nothing policy of nonadministration.  Ms.
Adkins conceded that the State has no expertise in the ADA,
that it does not understand how the ADA applies to voting, and
that any modification requests the State receives are
redirected to the counties.

Mr. Ingram testified that he does not know what
Section 504 is, does not know in detail how the ADA applies to
elections, that the Secretary's Office has no written policies
on the State's obligations under the ADA regarding the
administration of elections, that the Secretary's Office had
no one responsible for monitoring compliance with the ADA for
over a year, has not conducted any training of county
officials on their obligations under the ADA apart from
consulting with them on physical polling place accessibility,
and is unaware of any efforts to educate voters about their
rights to reasonable modifications.

1          In response to a question about his familiarity with

2    the ADA, Mr. Ingram stated that his office, quote, "depended

3    on outside disability advocacy organizations to conduct

4    polling place accessibility surveys."

5          County officials testified that they did not receive

6    guidance or training from the Secretary's Office regarding how

7    the ADA applies to the challenged provisions.

8          Voters with disabilities testified that they received

9    no information from defendants regarding their rights under

10    the ADA, that they trusted disability advocacy groups more

11    than defendants to provide them with the assistance and

12    information they needed to vote, and that when they did

13    request help defendants did not respond to them in a timely

14    way.

15          Turning to plaintiffs' reasonable modifications

16    claim.  The ADA requires public entities to make reasonable

17    modifications and policies, practices, or procedures when

18    necessary to avoid discrimination.

19          Plaintiffs' modifications claim prevailed because

20    plaintiffs have shown that defendants received and denied

21    modification requests related to the challenged provisions.

22    Plaintiffs' members need not make modification requests where

23    such requests would be futile, and defendants have affirmative

24    obligations to provide modifications when the need is open and

25    obvious.

1    Counties testified that they received multiple

2  modification requests including complaints and requests for

3  assistance related to the challenged provisions but were

4  unable to provide them due to their understanding based on

5  State guidance that the Texas Election Code would not permit

6  such modifications.

7    Ms. Callanen and Ms. Longoria testified that Bexar

8  and Harris Counties saw a huge increase in voter complaints

9  and requests for assistance regarding SB 1's mail ID

10  requirements, and saw voters who had their mail ballots

11  rejected, rendering some completely unable to vote.

12    Ms. Phillips testified that Dallas County received

13  and denied requests of disabled voters who asked for

14  modifications to the cure process for mail ballots.

15    As a result of being unable to grant modifications to

16  voters with disabilities, Ms. Callanen testified, quote,

17  "sometimes there's the right thing to do, and SB 1 has really

18  tied our hands on that," end quote.

19    Ms. Longoria testified that voters with disabilities

20  asked Harris County for modifications to SB 1's mail ballot

21  cure provision.  In response to whether such modifications

22  were possible, the Secretary's Office told Ms. Longoria to,

23  quote, "read the law."  This was understood to mean the

24  modification could not be granted, resulting in some voters

25  not being able to cure ballots and being unable to vote.

1        Ms. Longoria testified, quote, "it was excruciating

2  to know that there were tools at our disposal that we were not

3  allowed to apply as a reasonable accommodation to voters with

4  disabilities."

5        Ms. Adkins conceded that the Secretary's Office

6  received complaints from voters who could not use the Ballot

7  Tracker to cure their mail ballot application.

8        And we also heard from plaintiffs' members.

9        Ms. Saltzman testified that she tried to get

10  assistance from Travis County several times over three

11  elections when her mail ballot applications and ballots were

12  rejected.  She explained that she had a vision disability that

13  prevented her from curing in-person and via the inaccessible

14  online form.  The county did not offer modifications to

15  Ms. Saltzman.

16        When Ms. Nunez Landry called Harris County to gain

17  clarity on the meaning of eligibility and code, the county

18  provided no guidance.

19        Ms. Litzinger and Ms. Saltzman testified that they

20  did not receive any information about how to request a

21  reasonable modification when voting, nor did they locate any

22  information on Travis County's website.

23        Plaintiffs' evidence has made clear that requesting

24  modifications to the challenged provisions would be futile.

25  As the Fifth Circuit held in *Smith* and *Frame*, quote, "a

1  disabled individual need not engage in futile gestures before

2  seeking an injunction under the ADA," end quote.

3       In *Rowe*, the district court held that voters with

4  disabilities under guardianship knew they were prohibited from

5  voting, need not subject themselves to criminal liability in

6  order to demonstrate injury under the ADA.

7       Defendant counties testified that they will not

8  provide modifications to SB 1, per their understanding of

9  state guidance on this issue.  Voters may not know that they

10  require a modification to ID requirements or be able to

11  request one until their ballot has been rejected, when it may

12  be too late to vote by mail.

13       In light of the testimony that counties often failed

14  to respond to modification requests in a timely way, or at

15  all, there is no reason for voters with disabilities to

16  believe they could receive requested modifications in time.

17       Turning to defendants' affirmative obligations to

18  provide modifications, the Fifth Circuit held in

19  *Bennett-Nelson* and *Delano-Pyle*, that the ADA requires public

20  entities to take affirmative steps to proactively make and

21  meet modifications.

22       *In Cadena*, the Fifth Circuit explained that where the

23  individual's disability is quote, "open and obvious," public

24  entities must make modifications regardless of whether

25  individual requests are made.

1          As now Justice Jackson held in *Pierce*, quote,

2     "Nothing in the disability discrimination statute remotely

3     suggests that covered entities have the option of being

4     passive in their approach to disabled individuals, as far as

5     the provision of accommodations is concerned.  No matter how

6     fervently defendants hold the belief that a couple of entities

7     do need to provide accommodations arises only by request.

8     There is neither legal nor logical support without

9     proposition," end quote.

10         That the challenged provisions burden voters with

11    disabilities is open and obvious.  As we have discussed,

12    counties testified that they received extensive complaints and

13    requests for assistance from voters with disabilities

14    regarding the challenged provisions.

15         They testified that they were aware of voters with

16    disabilities who faced barriers due to the oath and who were

17    unable to vote because of county's failure to provide

18    modifications to the mail ballot ID requirements.

19         In addition, plaintiffs in some counties provided

20    testimony before the legislature to the harms the challenged

21    provisions would impose on voters with disabilities before SB

22    1 was enacted.  It is open and obvious that a disproportionate

23    number of eligible mail voters are voters with disabilities,

24    including those who mark age as their reason for mail voting.

25         The correlation between voter assistance and

1  disability is also open and obvious.  Voter assistance is also

2  a limited eligibility option and voters with disabilities are

3  significantly more likely to need assistance than those

4  without disabilities.

5       In the face of this open and obvious injury to

6  millions of voters with disabilities, defendants must

7  proactively make reasonable modifications to avoid

8  discrimination.  Voters with disabilities are not required to

9  request modifications during each election to a law that

10 systematically burdens and disenfranchises them.

11      The relief plaintiffs seek and order enjoining the

12 challenged provisions is reasonable because it would return

13 the law to the previous status quo and plaintiffs have shown

14 that restrictions on mail voting and voter assistance

15 primarily target disabled voters.

16      Plaintiffs also ask defendants to meet their ADA

17 obligations by using methods of administering their voting

18 programs to avoid discrimination.

19      In failing to offer any substantive evidence

20 regarding how plaintiffs proposed modifications would

21 fundamentally alter defendants' voting programs, or offer any

22 alternative reasonable modifications to the ones plaintiffs

23 have proposed, defendants have not met their burden in raising

24 a fundamental alteration defense.

25      Instead, defendants have simply made conclusory

1  statements that modifications to any state law are

2  unreasonable, but extensive case law holds that an injunction

3  of state law can be a reasonable modification under the ADA,

4  when necessary, to avoid discrimination.

5        THE COURT:  So you have gone slightly over time.  I'm

6  going to give you one minute to wrap.

7        MS. WAKSCHLAG:  Oh, sorry.  Okay; thank you.

8        This Court has held in *Johnson*, that if — quote, "if

9  the Election Code conflicts with ADA then federal law would

10 preempt state law."

11       And courts in *Lamone*, *Hindel*, *Democracy North*

12 *Carolina* and others have each granted plaintiffs' requests to

13 modify state election code requirements where they found that

14 voters with disabilities were denied equal opportunity.

15       As the Sixth Circuit explained in *Hindel*, quote, "A

16 state procedural requirement may not excuse a substantive ADA

17 violation.  Requiring public entities to make changes to

18 rules, policies, practices, or services is exactly what the

19 ADA does."

20       To conclude, individually and cumulatively, the

21 challenged provisions have discriminated against plaintiffs

22 and their members by raising the cost of voting for voters

23 with disabilities.

24       The testimony we heard at trial about the

25 unreasonable level of difficulty faced by voters with

1    disabilities cannot possibly be consistent with the ADA's

2    clear and comprehensive mandate to ensure that people with

3    disabilities have an equal opportunity to vote, to be counted,

4    and to be integrated into the mainstream of American life.

5            Thank you.

6            THE COURT:  Thank you.

7            With that, let's take a break.  We'll resume at

8    10:45.

9        (Recess)

10            MS. PERALES:  Good morning, Your Honor.

11            Nina Perales on behalf of LUPE.  Before I start, I'd

12    like to hand the Court a copy of a chart.  I'd also like to

13    hand the Court an additional copy of our closing on

14    Section 208.  My time allotment is 25 minutes, Your Honor.

15            Private plaintiffs challenge various provisions of

16    SB 1, as violating Section 208 of the Voting Rights Act.  They

17    are primarily voter assistance provisions; and 7.04 to the

18    extent that it impairs voter assistance.  The relevant docket

19    entry numbers are 846, 850, and 852.

20            Section 208 is a simple statute.  It's one sentence

21    long.  It says that:  "Any voter who requires assistance to

22    vote by reason of blindness, disability, or inability to read

23    or write may be given assistance by a person of the voter's

24    choice."  And then it provides two exceptions:  The voter's

25    employer or agent or officer or agent of the voter's union.

1          The lead case here, Your Honor, is *OCA-Greater*
2     *Houston v. Texas*.  It's a Fifth Circuit decision from 2017,
3     and it was a Section 208 challenge to a provision in the Texas
4     Election Code involving restrictions on who could serve as an
5     interpreter.  The case involved Mallika Das, a registered
6     voter of Williamson County, who didn't speak English very
7     well.  She was a naturalized U.S. citizen from India.  She
8     brought her son to assist her as an interpreter.  At that
9     time, there was a provision in the Election Code that barred
10    the son from interpreting for his mother because he was
11    registered to vote in a different county.
12          The interpreter provision, as it existed in that
13    time, said that in order to be eligible to serve as an
14    interpreter, a person must be a registered voter of the county
15    in which the voter needing the interpreter resides.
16          The Court will -- the question before the Court was
17    whether this limit on who could assist as an interpreter
18    abridged the rights under 208.  In order to answer that
19    question, the Court had to get past the question:  What is
20    voting?  Because, obviously, 208 allows somebody to receive
21    assistance in voting.
22          The Voting Rights Act itself answered that question,
23    gives an expansive understanding of what it means to vote.  So
24    the Court got past that question, what does it mean to assist
25    in voting; and then answered the ultimate question in the

1  case, which was whether this type of categorical exclusion

2  violated 208.  And the Court, then, after concluding that

3  Ms. Das' son's assistance fell under voting, concluded that

4  the statute violated 208.

5         The Fifth Circuit concludes that:  "The limitation on

6  voter choice, expressed in the interpreter provision,

7  impermissibly narrows the right guaranteed by Section 208."

8         The reason that I went over that as carefully as I

9  did is that Texas misreads the statute and then also offers

10  legal standards that don't apply to 208.

11         So just starting with this debate about the definite

12  versus the indefinite article, Texas points to the fact that

13  the statute says "a" person of the voter's choice, to suggest

14  that Texas can add limitations because Congress chose not to

15  use the word "the" person of the voter's choice.  There is an

16  indefinite versus definite article here.

17         We would suggest that this is the only way to write

18  the statute, because there are exceptions that come after,

19  right?  The employer, the union representative.  You wouldn't

20  say, for example, You can be assisted by a person -- or you

21  would say, You can be assisted by a person who is not your

22  union representative.  What you wouldn't say is, You can be

23  assisted by the person who is not your union representative.

24         It's a matter, simply, of drafting.  The indefinite

25  article is used here because the identity of the person is not

known.  It's not the use of "a" versus "the" because somehow
Congress intended to imply by that, that a state could layer
on more and more categorical exclusions.

I love a phrase that was used in the State's
conclusions of law:  "Congress doesn't hide elephants in mouse
holes"; except it applies better to our interpretation of 208
than that offered by the State.  The statute has two
exclusions from assisters:  Employers and union
representatives.  In doing that, Congress intended that no
other exclusions be applied by the state.

Texas also suggests that there's a balancing test
under 208 that is nowhere to be found in the statute.  It was
not applied by the Fifth Circuit in *OCA versus Texas*, and that
is the case that really dictates the outcome here.  The State
also argues that Section 208 incorporated the *Anderson–Burdick*
standard, but Section 208 was enacted before *Anderson* and
before *Burdick*, so whatever reference there was in legislative
history to state statutes being preempted if they unduly
burden or don't protect voters, it was not a reference to
either *Anderson* or *Burdick* or what has later come to be known
as the *Anderson–Burdick* test.

Texas also leans on *Ray versus Texas,* a 2008 case
about witnesses, not assisters.  That case preceded *OCA*, and
to the extent that it's — says something different, it was
overruled by the *OCA* decision.

1          Texas also points to out-of-circuit District Court

2    case *Nessel*, also unhelpful.  It was a preemption case but

3    ultimately concluded that there just wasn't enough evidence

4    offered by the plaintiffs to even conduct a preemption

5    analysis.  If we are looking out of circuit at District Court

6    cases, which the Court doesn't need to do, because the Fifth

7    Circuit has already set the standards here; but there are two

8    other cases, and they both found that categorical restriction

9    on who can serve as an assister violate 208.  That's *Arkansas*

10   *United and Democracy North Carolina*.

11         Going now to specific provisions in the statute.  Two

12   parts of SB 1 prohibit mail ballot voters from choosing

13   certain categories of assisters.  Section 6.06 says that:  "A

14   voter cannot receive assistance with the mail ballot from

15   anybody who either received compensation or anything

16   reasonably regarded as an economic gain or advantage."  This

17   sweeps well beyond someone like a LUPE employee who is paid to

18   provide mail ballot assistance, but also scoops in other

19   individuals like volunteers for organizations.

20         And then 7.04 categorically excludes as somebody who

21   would be assisting, someone who received compensation or

22   another benefit to advocate on a ballot measure.  And as the

23   Court heard from Ms. Tania Chavez, there are LUPE canvassers

24   out in the community, in the colonias, door-knocking, urging

25   people to vote a certain way on infrastructure measures like

1  drainage.  And they have been, in the past, invited in by
2  voters who asked for help with mail ballot.  They now cannot
3  go in and provide that assistance because of 7.04.
4          Compensation, even according to the State's
5  witnesses, is broadly defined.  Keith Ingram said that a blind
6  voter who buys lunch for a friend in exchange for assistance
7  would be referable to the Attorney General.  County elections
8  officials also recognized that things as simple as a cup of
9  tea, a parking spot, or anything else could run afoul of the
10 statute.
11         LUPE encounters its members and others who ask its
12 paid employees for assistance in a variety of settings.
13 People come to the office.  People come to meetings at the
14 union hall.  People come to house meetings in the colonias and
15 ask for help with their mail ballots, and they also call LUPE
16 and ask for an organizer or another paid employee to come and
17 help them in their home.  These individuals are the chosen
18 assisters of the voters.  Now LUPE does not provide this
19 assistance to its members or others who have asked for help.
20         The Court asked earlier about standing.  We do note
21 that State defendants do not contest the standing of LUPE to
22 challenge either 6.06 or 7.04 under Section 208.  Similarly,
23 *OCA-Greater Houston* volunteers receive, you know, small items.
24 They also provide language assistance and are really the only
25 large organization that does provide mail ballot assistance

1  for its members.  They've also stopped doing that.

2          7.04 also creates a third-degree felony for the

3  in-person advocacy, and we challenge this provision under

4  other — other statutes, other constitutional provisions.  But

5  I did want to take a moment to note that it also impairs

6  rights to voter assistance in the way that I've described

7  earlier.

8          LULAC also presented testimony that it compensates

9  its volunteers with food, gasoline, sports tickets, and has

10  now, because of that and their issue advocacy, ceased

11  canvassing senior citizens under fear of prosecution under

12  7.04.

13          I'd like to move now to 6.04, which is the assister

14  oath.  And to answer a question from the Court earlier about

15  6.04, yes, there was an assister oath prior to SB 1.  SB 1

16  added four new things to the assister oath that weren't there

17  before.  So before, you took an oath.  You swore you weren't

18  going to tell the vote of the person to anybody else.  You

19  also swore to other things as well.

20          But the four new elements that we challenge in the

21  oath are, one, the language regarding penalty of perjury; two,

22  the requirement that the voter make a statement of eligibility

23  for assistance; three, new language that the assister did not

24  pressure the voter; four, language that the ballot will not be

25  counted if the voter is not eligible.  That's an

1  acknowledgment that has to come from the assister.

2         With respect to the penalty of perjury language which

3  is new, and then what follows; the representation that the

4  voter has to make that they are eligible for assistance before

5  they can receive assistance.  The impact here is on the voter.

6  6.04 conditions assistance on the voter making this

7  representation; otherwise, they cannot receive assistance.

8         Jonathan White said, Yes, the new oath probably does

9  require the assistant to obtain representation of eligibility.

10  Elections Administrator Lisa Wise said, Yes, the assister will

11  have to secure this representation from the voter.  There's no

12  definition here.  Nevertheless, the voter has to make this

13  statement of eligibility.  There's nothing in 208 that

14  authorizes states to require voters to take additional steps

15  before they can vote with the assistance of their chosen

16  assister.

17         To make matters worse, the voter information flyer,

18  which is posted in every polling place, says at Number 6, a

19  very, very narrow scope of who is eligible for assistance.

20  It's basically people who can't see or who can't speak English

21  or only communicate with sign language.  That cuts out an

22  enormous, vast swath of eligibility for assistance.

23         THE COURT:  Was that in the record?

24         MS. PERALES:  Yes, it is in the record, Your Honor.

25  And I can -- in the many hundreds of pages, I will get you

1    that cite.

2         This form, which I'm showing the Court here, is also

3    provided through its web address, because it was updated

4    during the trial; nevertheless, this is the updated version

5    that we're showing the Court right now, but the previous

6    version is one of the exhibits.  So the Court can take

7    judicial notice — we would urge the Court to take judicial

8    notice of the updated form.

9         So then in addition to the impact on the voter, which

10   is, I believe, by itself — in and of itself, violative of

11   208.

12        The next slide, Leah.  There we go.

13        604 and its associated provisions deter assisters and

14   deprive voters of their chosen assisters.

15        These are the other provisions that we believe have a

16   deterrent effect on assisters.  And when you deter assisters,

17   you then deprive voters of the ability to vote with their

18   chosen assister.  This includes requirements for mail

19   balloting, 6.03 and 6.05, as well as other things that happen

20   at the polling place.

21        I'm sure that the State will offer that assisters

22   don't need to be afraid.  They don't need to be deterred.  But

23   Jonathan White himself gave a prospective on this, said:

24   "Normal assistance is a voter being assisted by a caregiver or

25   a family member, and if it's not a caregiver or a family

1  member, it's not normal."

2         He testified that the new information that's being

3  asked of assisters helps determine whether the assistance is

4  legitimate.  Assisters are also deterred by the vague and

5  confusing terms in the statute by "pressure."  What does it

6  mean to pressure?  What does it mean to acknowledge that the

7  ballot won't be counted if the voter is not eligible?

8         A voter, Toby Cole, testified that he's very afraid

9  of this provision because he's afraid somebody is going to

10  come along later and decide that he is not eligible for

11  assistance.  But it also deters the assister, who is now

12  wondering whether they should or shouldn't provide this

13  assistance because they don't know if the voter is later going

14  to be determined ineligible.

15         This perspective that assistance is normal when it's

16  given by a family member or caregiver, but not normal and not

17  legitimate when it's given by somebody else, means that

18  community-based organizations like OCA, like LUPE, and anybody

19  who doesn't fall into these categories who helps voters who

20  require assistance, they are in the crosshairs.

21         Next, please.

22         The Court has heard extensive testimony from voters

23  with disabilities:  Ms. Nunez-Landry, Ms. Litzinger,

24  Ms. Halvorson, and then people who work in the community or

25  for community organizations that voters, as a result of SB 1,

1  are voting without their chosen assister or they are voting

2  without assistance.

3      There's no connection here between the work of

4  community organizations and voter fraud.  Nothing in this

5  Court's record connects those two things.  Jonathan White

6  testified he had not seen mail ballot assistance fraud by a

7  community organization.  He only ever said that he saw mail

8  ballot assistance fraud, in his mind, by people working for

9  candidates and campaigns.

10      The spreadsheet from the Office of the Attorney

11  General showed no convictions for polling place assistance

12  fraud.  Not a single one.  The County Elections officials

13  testified they had never seen voter fraud by community

14  organizations.

15      What's important here is that legislators knew how to

16  limit the statute; they did in other parts of SB 1 where they

17  require an assister to say whether they are being paid by a

18  candidate or a campaign.  That's where SB 1 really zeros in on

19  this problem.  But when it comes to categorically banning

20  assistance and also adding all of this confusing and

21  intimidating language in the oath, it's not narrowed.

22      And we have to understand that the Texas legislature

23  meant what it was doing.  It knew and did, in other places,

24  choose to narrow the statute to either criminalize or provide

25  more information from people working for candidates and

1  campaigns, but wrote the language broadly enough to sweep in

2  community-based organizations like LUPE, like OCA, like FIEL,

3  like MABA, and all of the others.

4          The last thing that I want to touch on, Your Honor,

5  is a rather obvious proposition that stereotypes are not

6  evidence.  Keith Ingram came and talked about the

7  politiqueras.  "Politiqueras" is not a Spanish word.  It's a

8  made-up word in English, and it's a derogatory term in most

9  contexts that specifically references when it's — thank

10 you — specifically references when its politiqueras, women in

11 the Latino community, Latina women, who do politicking, but

12 the inference there is that they are also committing voter

13 fraud.

14         And when Keith Ingram was testifying and he was sort

15 of re-reading the statute around 7.04, and he said, You know,

16 this is really First Amendment protected activity, we agree

17 with him on that.  And the Court will hear more about that

18 later.  But he said, But that's not really what we're aiming

19 at here.  We're aiming at the politiqueras, the ones that are

20 sitting at the kitchen table, the ones that are filling out

21 the ballots for the voters, the ones that are making sure the

22 voters vote a certain way.  That's a stereotype.

23         There are also stereotypes about the victims.

24 Jonathan White's slide presentation about voters being marched

25 into the polling place by assisters who direct their voting.

1    Again, I'd like to point out the OAG spreadsheet doesn't have

2    a single instance of polling place assister fraud and

3    conviction.

4          This is a narrative about Latinos and other voters

5    who lack mental capacity or who give their votes away.  The

6    stereotype on which these provisions are built that restrict

7    assistance, that deter assisters, is that somehow voters who

8    are illiterate or limited-English proficient or who are

9    disabled have to have decisions made for them because they

10   can't make their own decisions.  And that is a faulty premise

11   for the statute.  And even putting all of that aside, what the

12   statute does, plainly by its own terms, violates 208.

13         Thank you, Your Honor.

14         THE COURT:  Thank you.

15         MS. PERALES:  Oh, and I did have a citation for the

16   Court.  I'm sorry.  I said thank you, and I didn't mean it.

17   This form of the voter information that goes in all the

18   polling places is LUPE Exhibit 265.

19         THE COURT:  Thank you.

20         MR. NKWONTA:  Hello, again, Your Honor.  Uzoma

21   Nkwonta from the Elias Law Group on behalf of the LULAC

22   plaintiffs.

23         Your Honor, I'm going to address the First Amendment

24   claim against Section 7.04, which prohibits a person from

25   knowingly offering or receiving or providing vote-harvesting

1   services in exchange for compensation or other benefit.

2            I will address the legal standard in the first

3   eight minutes, and my co-counsel will address the substantive

4   claims.

5            In discussing the legal standard, I'll focus again on

6   the areas of disagreement we have with defendants, and I'll

7   focus on three key areas.  The first is what standard applies

8   to the First Amendment claim against Section 7.04.

9            This is an easy one, because it's a content-based

10  restriction.  And how do we know it's a content-based

11  restriction?  Because it singles out a single subject matter.

12  And to determine whether there is liability, you have to know

13  what these individuals are discussing and whether it's

14  intended to solicit votes or to deliver votes for a specific

15  candidate or initiative.

16           Intervenors, I believe, have conceded that it's

17  content based in their reply in support for a motion for

18  summary judgment, but to the extent that they don't, there's

19  little ground to dispute this, because, again, a content-based

20  restriction applies even if -- even if there is no distinction

21  within the subject between support for a specific candidate or

22  a support for a specific measure.  The fact that the Court

23  needs to focus on the actual content of the discussion makes

24  it content based.

25           Second -- and because it's content based, it's

1 subject to strict scrutiny.

2          Second, the challenge is also asserted — is also

3 reviewed under strict scrutiny because it targets political

4 speech.  And it targets political speech because it seeks to

5 prevent speech that is tailored toward delivering votes for a

6 specific political outcome.  In other words, this is precisely

7 the type of interactive communication concerning political

8 change that courts have granted the strongest protection to.

9          So when AFT's block-walkers, for instance, and

10 temporary political organizers, as you heard from Mr. Zeph

11 Capo, when they are persuading voters to support candidates

12 aligned with AFT's mission, that is core political speech, and

13 that is subject to strict scrutiny.

14          Defendants will suggest that *Anderson-Burdick* applies

15 to this claim, and that misreads the governing precedence for

16 a couple of different reasons.  First, the language of the

17 provision itself only restricts the speaker.  It tells the

18 speaker what they can say, when they can say it, and for what

19 purpose.  It doesn't restrict the voter.  It doesn't have

20 anything to do with the ballot itself other than the fact that

21 the ballot cannot be present.  So this is a pure regulation of

22 speech.  And the Supreme Court has recognized this

23 distinction, along with other courts.

24          In *McIntyre v. Ohio,* for instance, the Supreme Court

25 found unconstitutional an Ohio law prohibiting distribution of

1    anonymous campaign literature designed to influence voters in
2    an election.  The Court applied the First Amendment.  The
3    Court recognized that there is a distinction between
4    regulations that govern pure speech and regulations that
5    govern the mechanics of the voting process.
6            Section 7.04 strictly governs, and simply governs,
7    what individuals can say, to whom, and for what purpose.  And
8    it would make little sense to apply *Anderson–Burdick* here,
9    because that would mean that political speech would receive
10   the least amount of protection during campaigns for an
11   election.
12           In other words, the least amount of protection when
13   the First Amendment interest is at its apex, and that result
14   is counterproductive and does not comport with any of the
15   governing standards.
16           Defendants seem to believe that a Fifth Circuit
17   decision *voting for America v. Steen* compels the application
18   of *Anderson–Burdick*, but that case says no such thing.  In
19   fact, the case first determined that there was no speech
20   involved in the conduct of returning voter registration
21   applications.
22           Second, when the case did get around to discussing
23   speech, it determined that the volunteer deputy registrars
24   were not speaking necessarily on their own behalf the entire
25   time.  Volunteer deputy registrars were acting on behalf of

1    the State as agents of the State.

2            So because of that, they are not like petition

3    circulators.  They act as agents of the State in registering

4    voters, and they have to comply with state regulations in

5    returning those votes and make sure those voters get

6    registered.  That distinction has no application here.  The

7    block-walkers that AFT uses, the political organizers that our

8    plaintiffs have hired or that volunteer for our plaintiffs,

9    they are more akin to petition circulators.  They are

10   advancing and promoting the message of those plaintiffs, of

11   AFT, of the Alliance for Retired Americans, and the other

12   plaintiffs who engage in that type of advocacy.

13           So *Voting for America v. Steen* simply recognizes that

14   when a volunteer deputy registrar is acting as an agent for

15   the State, the restriction on their activities does not

16   necessarily implicate the First Amendment.  Does not

17   necessarily implicate speech.

18           Lastly, the facial versus as-applied distinction that

19   the defendants rely on heavily does not actually have the

20   impact that they think it does.  The Supreme Court has

21   recognized that this distinction merely determines the scope

22   of the relief and not necessarily whether plaintiffs have

23   stated a claim.  It's not an automatic bar on any claim.

24           And here, as plaintiffs have made clear, we have

25   asserted claims both as-applied and facially; as-applied

1  because plaintiffs themselves have had their speech impaired.

2  Plaintiffs themselves have had to refrain from speaking with

3  voters.

4         And you heard this when Zeph Capo testified, and you

5  heard this when Ms. Judy Bryant testified on behalf of the

6  Alliance for Retired Americans.  And plaintiffs speech can be

7  construed as facial and as-applied under the Supreme Court's

8  precedent in *Susan B. Anthony List v. Driehaus.*

9         So because -- for those reasons, strict scrutiny

10  applies to the 7.04 challenge, and whether it's facial --

11  whether the challenge is facial or as-applied may determine

12  the scope of this Court's relief.  Plaintiff has asserted

13  both, and if neither formulation requires dismissal of this

14  claim; and under both formulations, plaintiffs are entitled to

15  relief.

16         Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MS. HARRIS:  Good morning, Your Honor.  Ashley Harris

19  for OCA plaintiffs.  I will also be addressing plaintiffs'

20  challenge to Section 7.04, the Voter Interaction Ban.  I will

21  be addressing the claim that 7.04 is overly broad and void for

22  vagueness.

23         Turning to the next slide, we can see the text of the

24  statute for the Court's reference.  And turning to slide 3 is

25  plaintiffs' claim of overbreadth under the First Amendment.

In the First Amendment context:  "A law may be invalidated as overbroad if a substantial number of its applications are unconstitutional."

As my colleague just outlined, 7.04 is overbroad because it strikes at countless conversations about candidates and ballot measures that are not improper but are instead content based and core political speech protected by the First Amendment.

Every application of the statute to interactions that are not improperly pressuring voters are content-based regulations on speech that cannot satisfy strict scrutiny. This provision broadly restricts protected in-person interactions, advocating for a ballot measure with any voter in any location, just because a ballot happens to be present, even if the ballot is nearby in the same room or in the voter's bag.

Even if an actor knows the ballot is nearby, 7.04 is still overly broad, because it does not require that someone intends to mislead or improperly influence a voter.

Turning to slide 4.  State and intervenor defendants concede that interactions between canvassers and voters are protected by the First Amendment.  Defendants attempt to save 7.04 by relying on an interpretation by Keith Ingram of the Secretary of State's Office that the provision only applies if so-called harvesters ensure a vote is cast a particular way

while reviewing the ballot with the voter, but this
interpretation is entirely divorced from the text of
Section 7.04, which says nothing about intimidation, nothing
about pressuring a voter, and nothing about making sure that
the voter marked the ballot a certain way.

This interpretation is not reflected in any legal
authority or any SOS advisory, directive, or instruction, and
instead has only been provided within the confines of this
case. Indeed, the more narrow definition that Mr. Ingram
offers instead describes activity that was already previously
illegal under the Election Code, which defendants concede at
ECF 861 pages 101 to 102.

On slide 5, Mr. Ingram goes on to testify that
nothing requires prosecutors to agree with this more narrow
interpretation of 7.04, which State defendants likewise
concede in their post-trial briefing at ECF 861, page 204.

Instead, the actual text of 7.04 is so broadly
written that it permits prosecutions of routine political
speech if it happens to be in the presence of a ballot, and is
therefore unconstitutionally overbroad.

Turning to slide 6. The overbreadth of 7.04 is
compounded by the unscavenged scope of compensation of
benefit, which broadly reaches plaintiffs who have both paid
canvassers and to provide volunteers things like food,
beverages, T-shirts, letters of recommendation, and gas cards.

1        7.04 is also overbroad because it reaches countless

2  protected interactions where voters are likely to have a

3  ballot, including during canvassing and at candidate forums

4  and candidate meet-and-greets.

5        Turning to slide 7.  The severe consequences of

6  7.04's overbreadth have chilled plaintiff organization's

7  political speech, because of the risk that a voter will have a

8  ballot with them.  OCA testified that they no longer offer

9  voter assistance with mail ballots at in-person events, and

10  paid canvassers no longer communicate with voters in any

11  meaningful way, including no longer offering voter assistance

12  and not offering seniors rides to their polling places.

13        OCA serves Asian voters in the Houston area and has

14  historically held AAPI candidate meet-and-greets as an

15  opportunity for community members to get to know candidates

16  and to serve as role models in their community.

17        But OCA has converted these meet-and-greets to be

18  virtual for fear that attendees would bring their ballots with

19  them, which was previously common.  Turnout has been abysmal,

20  compared to prior in-person events; while the league testified

21  that if a candidate forum attendee brought their mail-in

22  ballot, they would have to turn them away.

23        And turning to the next slide, we see that LUPE

24  organizers, both paid and volunteer, who are canvassing

25  door-to-door, are trained to stop advocating on a ballot

 1  measure upon learning that they are in the presence of a
 2  ballot.
 3         In the November 2023 election, LUPE's advocacy was
 4  limited at community events and during canvassing on ballot
 5  measures that would have brought broadband access and water
 6  infrastructure to colonias in South Texas.  This overbroad
 7  application of 7.04 goes beyond plaintiffs and extends to
 8  chill anyone in Texas who may be interacting with voters in
 9  the presence of a ballot, including any organizers or any
10  political canvassers who received so-called compensation.
11         Turning to the next slide, Number 9.  I will now turn
12  to plaintiffs' void-for-vagueness claim under the
13  Fourteenth Amendment.  "A statute is impermissibly vague when
14  it fails to provide a person of ordinary intelligence fair
15  notice of what is prohibited or is so standardless that it
16  authorizes or encourages seriously discriminatory
17  enforcement."
18         Defendants, on slide 10, incorrectly rely on the case
19  *Hoffman Estates* and claim that vague laws must be
20  impermissibly vague in all of their applications.  But the
21  Supreme Court has explained clearly that its holdings squarely
22  contradict the theory that a vague provision is constitutional
23  merely because there is some criminal conduct that falls
24  within the provision's grasp.
25         And whereas here, a statute interferes with the right

1  of free speech or association, a more stringent vagueness test

2  applies.  And we see that 7.04 uses several vague and

3  undefined terms that independently and cumulatively contribute

4  to the statute's vagueness.

5          Turning to slide 11.  "Compensation" is undefined in

6  the statute under 7.04.  While "benefit" is defined equally as

7  vaguely as "anything reasonably regarded as a gain or

8  advantage."  Again, testimony here shows that plaintiffs

9  provide a variety of things to volunteers who interact with

10 voters that could be considered compensation or a benefit,

11 including food, drinks, T-shirts, and gas cards.

12         But Section 7.04 does not provide guidance about when

13 they are subject to liability.  And if it is the case that any

14 of these benefits triggers 7.04, no matter how trivial, then

15 that only makes the statute more clearly overbroad and

16 unconstitutional.  But as it stands, plaintiffs have no way of

17 knowing when they are subject to liability.

18         On slide 12, the language of 7.04 is so broad that

19 even Jonathan White of the Attorney General's Office conceded

20 that he would need to do legal research to determine what

21 types of items would constitute a benefit.

22         Likewise, on the next slide, Section 7.04

23 criminalizes actions that occur in the physical presence of a

24 ballot, but there is no definition or limiting guidance about

25 how to interpret "in the physical presence."  Plaintiffs and

1  voters are unable to determine whether a conversation between

2  a voter and a canvasser while a ballot happens to be on the

3  kitchen table or in a ballot nearby — in a bag nearby will

4  lead to criminal liability.

5          Defendants insist that prosecutions under 7.04

6  require knowledge, but even if a person knows that a ballot is

7  nearby in the vicinity, they don't know how close the ballot

8  must be in order to trigger 7.04.  And if any distance is

9  sufficient, then it's once again overbroad.

10          Advancing the PowerPoint twice, we see that State and

11  intervenor defendants rely on Keith Ingram's testimony to try

12  to define "physical proximity to the ballot."  Here, we can

13  see that State and intervenor defendants rely on Keith

14  Ingram's testimony again to try to define "physical proximity

15  to the ballot" by claiming that "it requires that an actor

16  verifies that someone votes a particular way and that both

17  people can see the ballot," but these requirements are simply

18  not reflected by the text of 7.04, and defendants do not

19  provide any legal authority to justify this interpretation.

20          7.04 says nothing about how close a ballot must be.

21  And, again, Defendants concede that nothing requires

22  prosecutors to follow the more narrow interpretation that they

23  offer in this case.  Defendants' attempt to impose a baseless

24  definition of physical proximity proves the point that this

25  language in 7.04 is impermissibly vague.

1    On slide 14, as discussed earlier, testimony shows
2    that plaintiffs are chilled because of 7.04's vague
3    application and have been unable to determine the parameters
4    of what is prohibited and, as a result, have been chilled by
5    the threat of enforcement against them.  Even elections
6    administrators, as we see before us, are unable to interpret
7    7.04.  This is precisely the sort of amorphous statute that
8    should be struck down as excessively vague.
9    These outstanding questions discussed about the reach
10   of 7.04 are not farfetched, but are, instead, basic instances
11   of political speech that Texans engage in daily.  7.04's broad
12   and vague terms doom its constitutionality by chilling these
13   interactions and limiting core political speech in Texas.
14   Plaintiff organizations including the League, OCA, and LUPE
15   achieve their mission by empowering voters in the democratic
16   process to ensure fair and equal access to the ballot.
17   If we're to hold true the promise of a democracy that
18   is for the people, by the people, and of the people, then we
19   must ensure that our voting laws do not unfairly restrict our
20   speech.
21   Section 7.04 is overly broad and vague and should be
22   struck down as an unconstitutional infringement on our most
23   fundamental right.
24   THE COURT:  Thank you.
25   MS. TULIN:  Good morning, Your Honor.  Leah Tulin.  I

1  represent the LUPE plaintiffs and will be discussing the LUPE
2  plaintiffs' and HAUL plaintiffs' challenges to the poll
3  watcher provisions under our void-for-vagueness challenges
4  under the Due Process Clause of the Fourteenth Amendment.
5          I have included here a slide with all of the
6  provisions that are relevant to the plaintiffs'
7  void-for-vagueness challenges.  My presentation will focus on
8  4.06, 4.07, and 4.09, which are revisions and amendments to
9  the poll watcher provisions in the Election Code.
10         The poll watcher provisions challenged by plaintiffs
11 have all the hallmarks of laws that courts have invalidated as
12 void for vagueness.  They fail to give ordinary people
13 reasonable notice of what conduct is prohibited.  They premise
14 criminal liability for election workers on subjective
15 standards that depend on the judgment of third parties, and
16 they invite arbitrary and discriminatory enforcement.
17         In *Women's Medical Center of Northwest Houston versus*
18 *Bell*, a Fifth Circuit case from 2001, the Fifth Circuit
19 explained that a law is unconstitutionally vague when it
20 subjects people to sanctions not on their own objective
21 behavior, but on the subjective viewpoint of others.  That is
22 precisely what these provisions do.
23         As my colleague Ms. Harris explained, these
24 provisions challenged are entitled to the most stringent form
25 of review, both because they have criminal and quasi-criminal

1  penalties and because of the constitutional interests that are
2  at play; specifically, the right to vote and the First
3  Amendment interests at play.
4          The Court heard from numerous county election
5  officials.  These are officials with decades of experience and
6  expertise in administering Texas elections; that the changes
7  to the poll watcher provisions have already impacted election
8  workers and the voters whose rights they work hard to protect.
9          Before moving on, I would just like to make two brief
10  notes about the displayed slide.  You have already heard about
11  7.04 from Ms. Harris, so I won't be covering any more about
12  that.
13          The second point I would just like to make is that
14  Section 8.01 is the new civil penalty added by SB 1 for
15  violations of the Election Code.  The LUPE plaintiffs do not
16  directly challenge that provision as being unconstitutionally
17  vague; rather, what we seek is an injunction against
18  enforcement of Section 31.129 of the Texas Election Code,
19  which is what was added by 8.01, as applied to a violation of
20  Section 33.061(a), which is what was revised by Section 4.09
21  of SB 1.  And this Court provided exactly that type of relief
22  in *Longoria versus Paxton*.
23          The roles and responsibilities of election workers on
24  the one hand and poll watchers on the other are codified in
25  the Election Code and had been codified for decades prior to

1  the passage of SB 1.  The Election Code vests election workers

2  with the important responsibility of managing and conducting

3  elections.  They are specifically charged with preserving

4  order in the polling places, preventing breaches of the peace,

5  and preventing violations of the Election Code.

6           Those responsibilities include both making sure that

7  qualified voters can cast their ballots and that poll watchers

8  are able to fulfill their role of observing election

9  activities.

10          As the Court heard during trial, balancing these

11  responsibilities is not always easy.  Still, election

12  officials such as Dana DeBeauvoir and Jackie Callanen

13  explained to the Court that they welcome poll watchers and

14  understand the important role they play in maintaining public

15  confidence in the integrity of elections.

16          The Court also heard from election administrators

17  that tension between election workers and poll watchers has

18  increased in recent years.  Tensions were especially acute

19  during the 2020 general election, which was highly contested

20  and took place during the height of the COVID-19 pandemic.

21  Several election administrators testified about the challenges

22  associated with managing elections during this period and

23  their attempt to balance the interests of poll workers,

24  voters, and poll watchers.

25          The Court also heard from two election

94

administrators, Dana DeBeauvoir and Lisa Wise, about being
accused of wrongdoing by unruly poll watchers during the 2020
election.  The Court also heard that both of these public
servants were ultimately absolved of any liability.  Against
this backdrop, the Texas legislature amended the Election Code
to expand the freedom of poll watchers and to limit election
officials' discretion to take steps that they believe
necessary to conduct orderly elections and protect their
colleagues and voters from harassment and intimidation.

Numerous witnesses, including county election
officials with years of experience administering elections,
testified at trial that in the wake of SB 1, they witnessed
poll watchers behave in ways that made both election workers
and voters feel uncomfortable, harassed, and intimidated.

And you heard briefly earlier from Ms. Holmes about
the testimony of Sharon Watkins-Jones, a black voter, who is a
Delta Sigma Theta member, who testified to her discomfort
during the November 2022 election with poll watchers who were
getting too close and following her as she deposited her
ballot in the tabulator.

Ms. Watkins-Jones described the experience as
"unsettling" because of the freedom with which the poll
watcher could loom behind voters.  And as she explained, "It
was a totally different experience as from voting before."

And I'll return to Ms. Watkins-Jones' testimony a bit

1    later in talking about other provisions of the Election Code

2    and why they do not limit the -- or cabin the scope of the

3    vague provisions that the plaintiffs are challenging.

4         Because these provisions make criminal or civil

5    liability dependent on the poll watchers' subjective judgment

6    about their own ability to observe election activity, election

7    workers fear that they will face sanctions for trying to carry

8    out their responsibility to protect voters and maintain

9    orderly polling places.

10        Again, the Court heard from numerous witnesses that

11   these challenged provisions have increased confusion and

12   chilled the conduct of election workers who fear criminal

13   prosecution and civil penalties if they instruct a poll

14   watcher to stand in the wrong place or give a voter some

15   additional space.  The harms that these provisions have caused

16   are actual and concrete.  County election officials and poll

17   workers testified about the ways in which they have changed

18   their behavior as a result of the amendments to the poll

19   watcher provisions.

20        For example, Dallas County Election Administrator

21   Mike Scarpello testified that because of the potential for

22   criminal penalties, his office advises poll workers not to

23   intervene, even when the poll watcher knows that a voter is

24   uncomfortable.

25        Jim Lewin, who has served as an election judge both

1  before and after the passage of SB 1, explained the additional

2  job stress that comes from knowing that the poll watcher

3  provisions have criminal penalties.

4        And several witnesses testified that people do not

5  want to serve as election judges with the threat of

6  prosecution hanging over their heads.

7        Sections 4.07 and 4.09 are paradigmatic examples of

8  provisions that fail to give adequate notice of what conduct

9  is prohibited.  Poll workers, county election officials, and

10  the defendants' own witnesses all testified at trial that

11  determining whether a poll watcher can see and hear and

12  whether their observation is, quote, "reasonably effective" is

13  a subject of judgment that only a poll watcher can make.

14        Because the law fails to provide a meaningful

15  standard, county election officials have struggled to provide

16  guidance to election workers about how to comply with these

17  requirements or to answer questions from election workers

18  about what they mean.

19        The State has not offered a limiting instruction for

20  any of these provisions.  Indeed, the State's witnesses don't

21  even agree on how to interpret the standards in the challenged

22  provisions.  Jonathan White testified that he thinks

23  Section 4.09 has an objective standard, but he couldn't say

24  with certainty how much distance would render observation not

25  reasonably effective.

1       In contrast, Keith Ingram testified that evaluating
2   whether a poll watcher's observation is reasonably effective
3   requires a subjective assessment.  Mr. Ingram also confirmed
4   that the Secretary of State's Office does not have an
5   interpretation of that phrase beyond the statutory language.
6       He testified that when asked for guidance from
7   election officials, the election officials — the Elections
8   Division gives, quote, "Their best guess about what to do,"
9   and cautions election judges to, quote, "Be careful because
10  they could be charged with a crime if they obstruct a poll
11  watcher."
12      Mr. Ingram also recommends that election judges
13  consult with the county attorney, quote, "If they have that
14  luxury."
15      Courts have consistently found that laws that require
16  regulated parties to guess at what might be prohibited fail to
17  give fair notice and invite arbitrary and discriminatory
18  enforcement.
19      The case I mentioned earlier, *Women's Medical Center*
20  *of Northwest Houston versus Bell,* the Fifth Circuit in that
21  case emphasized that even a state's witness, as here, conceded
22  that there are no objective criteria for assessing compliance.
23      There are many other examples of cases in which laws
24  have been determined to be vague.  I would point the Court's
25  attention to one recent case from the Eleventh Circuit, *League*

1  *of Women Voters of Florida versus Lee*, which was similar to

2  this case in that it included challenges to a number of

3  provisions on a number of theories.

4          The one violation that the Eleventh Circuit upheld in

5  that case was a finding that a provision banning conduct that

6  would have, quote, "the effect of influencing voters" was void

7  for vagueness.

8          And the fact that law enforcement is left, in Texas,

9  to numerous local prosecutors increases the risk of arbitrary

10 and discriminatory enforcement.  And I'm sure the Court

11 recalls the testimony of Dana DeBeauvoir about being

12 prosecuted under the previous iteration of Section 4.09.  The

13 language that was added by the legislature only increases the

14 risk that a rogue prosecutor will come after an election

15 worker for obstructing a poll watcher who, in the election

16 officer's view, is doing something untoward or unruly and

17 disrupting the polling place.

18         And in the example of Dana DeBeauvoir, you may recall

19 that the poll watcher was banging on glass and windows, and

20 her fellow poll watchers were complaining about her conduct.

21         Poll watchers are also being given the message by

22 SB 1, by these provisions, that the law empowers them to

23 decide whether their observation is effective.  Alan Vera, who

24 trained republican poll watchers in Harris County, explained

25 that he told poll watchers to stand as close as they need to

1   in order to observe.

2          Sorry, Your Honor.  Excuse me.

3     *(Pause in proceedings)*

4          MS. TULIN:  Sorry, Your Honor.  I'll move on.  It is

5   in the hard copy that you have.

6          Mr. Vera's testimony on this point is particularly

7   illuminating in light of the questions that Your Honor asked

8   during the trial, which related to how Sections 4.07 and 4.09

9   of SB 1 interact with Section 33.057 of the Election Code,

10  which says that, "A poll watcher cannot be present at the

11  voting station when a voter is preparing the voter's ballot or

12  being assisted by an assister of the voter's choice."

13         According to the State, Section 33.057 resolves the

14  concern, expressed by numerous witnesses, that they don't

15  understand from Sections 4.07 and 4.09 how much distance a

16  poll worker can require between poll watcher and a voter.

17         But Section 33.057 simply says that the watcher can't

18  be present, quote, "at the voting station."  It doesn't say

19  that a poll watcher can't observe the act of voting.  In fact,

20  the Secretary of State's poll watcher training, which is at

21  Joint Exhibit 13, gives, quote, "unlawfully influencing voters

22  and coercing voters as examples of activities that a watcher

23  should report to an election judge."

24         Under the subjective standards set forth in

25  Sections 4.07 and 4.09, an election worker could be accused of

1  rendering a poll watcher's observation not reasonably

2  effective if the poll worker insists that a watcher take a

3  step back and stand a couple feet away from the voter and the

4  assister.

5          And here, Ms. Watkins-Jones' testimony becomes highly

6  relevant.  She did not testify that the poll watcher was

7  looming over her at the voting station, but after she

8  completed the -- her ballot and was walking down the narrow

9  passage to put her ballot in the tabulator.  And so the

10  section that the State points to as ameliorating the problems

11  associated with Sections 4.07 and 4.09, by its terms do

12  nothing to limit a poll watcher in those circumstances.

13          It's also worth emphasizing that there is no penalty,

14  whether civil or criminal, for a poll watcher who violates

15  Section 33.057 by standing at the voting station when they are

16  not allowed to do so.  And Section 32.075 prohibits an

17  election judge from removing a poll watcher who violated

18  33.057 unless the election judge or clerk saw that violation

19  take place.

20          And so, of course, the prohibition on being present

21  at the voting station says absolutely nothing about all the

22  other locations in a polling place where a poll watcher might

23  get uncomfortably close to election workers and voters,

24  whether standing right behind an election worker while they

25  are operating a laptop, or an e-pollbook, or trailing a voter

1  who is waiting in line to check in to vote.

2          The other — just on that point, briefly.  The Court,

3  Your Honor, asked a question about the oath that the poll

4  watcher is now required to take when they check in and are

5  certified to be — to serve in a polling place.  And the

6  question that Your Honor asked was, the oath requires that the

7  watcher say that they will not disrupt or harass.

8          And the question asked was:  How is the poll

9  watcher — who decides what that means, and how is the poll

10  watcher informed about harassing or disruptive conduct?  And

11  my friends on the other side responded that this would be

12  covered later in the trial.

13          And I think the answer, ultimately, was the poll

14  watcher training.  But, again, if you look at Joint Exhibit

15  13, which is a copy of the poll watcher training, it just uses

16  the same language as the statute.  There's no explanation of

17  what constitutes disruption or harassment.

18          Examples like this also help shed light on why

19  Section 4.06 fails to give notice of what conduct is

20  prohibited.  Under Section 4.06, an election worker can now be

21  subjected to a criminal penalty for refusing to accept a

22  watcher for service when acceptance of the watcher is required

23  by Section 33.08 of the Election Code.  That section of the

24  Election Code talks about that the watcher has to have a

25  certificate of completion and a certificate of training.  It

1  says nothing about any requirement about how the watcher must

2  conduct themselves.

3         And so suppose an election judge presiding over early

4  voting receives reports throughout the day on Wednesday of a

5  poll watcher like the one Ms. Jones-Watkins described who's

6  intimidating voters by getting uncomfortably close and

7  trailing them around, but the election judge doesn't remove

8  the watcher on Wednesday because she hasn't directly observed

9  that behavior, can she refuse to accept the watcher when that

10 watcher shows up on Thursday, or must she accept the watcher

11 and wait for him to do the same thing and follow him around

12 trying to directly observe a violation?  Can he come back yet

13 again on Friday?  There are numerous examples in the record of

14 exactly this type of behavior.

15        Another example I would point to is the poll watcher

16 who followed Ms. Callanen into the Central Count location with

17 a weapon, which was prohibited by the signs and by Texas law.

18 If that same watcher shows up at a polling place the next day,

19 do — does that watcher have to be accepted for service,

20 notwithstanding previous knowledge that the watcher has done

21 something that violates the law?  None of this is covered by

22 the revisions to SB 1.

23        So the LUPE plaintiffs and the HAUL plaintiffs would

24 respectfully request that the revisions contained in SB 1 to

25 the poll watcher provisions be enjoined.  Thank you.

1           THE COURT:  Thank you.  It's noon.  We'll break for
2    an hour.  We'll resume with the State's closing arguments, and
3    the plaintiffs have reserved 30 minutes for rebuttal after
4    that.
5           We're in recess.
6            *(Recess)*
7           MR. KERCHER:  Good afternoon, Your Honor.
8           Ryan Kercher on behalf of State defendants.  I'll
9    offer some brief prefatory remarks and then we'll get into the
10   substance and merits of our arguments.
11          Importantly in this case, parties on both sides of
12   the "V" agree that everyone who can vote should.  And that
13   every voter should have confidence that their vote counts.
14   Part of the challenge, though, is that voters who worry that
15   their vote doesn't count may worry that their vote does not
16   count for different reasons.
17          We know that in the past several years there has been
18   a decrease in public trust in civic institutions.  That came
19   to something of a head in the 2020 election when, despite
20   record turnout, there was also record unrest about the results
21   of that election.
22          There were people who were skeptical of the results.
23   There were people who were skeptical of the sceptics.  And
24   whether you agree with either side or neither side, there's no
25   question that that mistrust of our elections presents a real

1    problem for our civil society.  It is little wonder, then,

2    that state legislators like Texas took up the pen and

3    attempted to address that concern.

4            Those concerns centered around questions about voter

5    fraud, hidden information, secret motivations.  What's really

6    happening in the ballot box or where the ballots are being

7    counted?  It's little wonder that the Texas legislator sought

8    to bring transparency to the voting process by taking down

9    additional information, by making sure we had the names of

10   folks who are supposed to be helping other voters, by trying

11   to clarify provisions of existing law or give notice to those

12   obligations under the existing election laws of the State to

13   the folks who need it to follow them.

14           That balance, among the concerns, for example, that

15   plaintiffs bring in their many causes of action, and the

16   concerns that are addressed specifically in SB 1, is a

17   challenge, but it is one most correctly reserved for the

18   legislature.

19           The plaintiffs argue that SB 1 gets the balance

20   wrong.  They argue, for example, that provisions that sought

21   to clarify what does it mean for a poll watcher to be close

22   but not too close, they argue that provisions like that are

23   not sufficiently clear.  They argue in some cases that the

24   clarifying aspects of SB 1 cause concerns because they alert

25   voters to obligations that were pre-existing, but that that

1  alerting causes a chilling effect.

2          We appreciate the plaintiffs' concerns.  We just

3  disagree with them.

4          After me, Your Honor, Mr. Capozzi will speak on

5  behalf of defendants regarding standing, followed by —

6  following Mr. Capozzi will be Ms. Hunker, who will speak to

7  *Anderson–Burdick.*  Then I'll be up again.  I'll talk about

8  ADA, Section 504 and Section 208.

9          Excuse me.  Before me, Mr. Nichols is going to get a

10 word in edgewise, as I understand it.  Then I will speak.

11 Then Mr. Gore will address Section 2 of the VRA, and then

12 Mr. Capozzi will wrap up with a First Amendment and for void

13 for vagueness.

14         THE COURT:  So unlike the plaintiffs, you didn't

15 provide minutes allotted to each side, so I'm going to count

16 on you-all to check yourself, and one of you-all might have to

17 check Mr. Nichols.

18         MR. KERCHER:  I'm laughing with you, Mr. Nichols.

19         Yes, Your Honor, we will.

20         MR. NICHOLS:  We're all laughing, including me.

21         MR. KERCHER:  We have made provisions to keep our own

22 time.  Thank you, Your Honor.

23         MR. CAPOZZI:  Good afternoon, Your Honor.  Louis

24 Capozzi from Jones Day on behalf of the intervenor defendants.

25 My plan is to take 30 minutes, and I will keep time, but that

1    is the plan.

2           In our briefs, the State and intervenor defendants

3    presented a variety of arguments as to how plaintiffs have

4    failed to carry their burden to prove standing.  Plaintiffs

5    have not tried to prove their standing today, even though the

6    burden is on them to do so.  I'd like to highlight some of the

7    plaintiffs' bigger-picture standing problems.

8           To aid the Court during this portion of the

9    arguments, this is a chart showing which provisions are

10   challenged by which plaintiffs.  This chart does not break it

11   down by different legal theory, but for purposes of standing,

12   I think it's more helpful to highlight provisions and parties.

13          So we can come back to this, if necessary.

14          THE COURT:  Well, you might want to -- what is the

15   colors?  What are you trying to say by this?

16          MR. CAPOZZI:  I don't think the colors actually

17   indicate anything other than they are meant to match the

18   plaintiff group.  So yellow is the LUPE plaintiff group and

19   orange is the HAUL plaintiff group and so on.

20          THE COURT:  Okay.  I thought this was, like, showing

21   deficiency and standing.

22          MR. CAPOZZI:  Sorry.  No.  We would need a big

23   three-dimensional chart for that.  That's beyond my

24   capabilities.

25          First, plaintiffs lack standing to challenge several

1    provisions of SB 1 on redressability grounds.  A Court cannot
2    adjudicate a claim unless it can give a remedy that is likely
3    to address a plaintiff's injury, but that is impossible for
4    several of plaintiffs' claims.
5         Start with straight-ticket voting.  The Texas
6    legislature prohibited straight-ticket voting in 2017, years
7    before SB 1 was enacted.  That's in the Texas Election Code
8    52.071.
9         Consequently, straight-strict voting was not allowed
10    before SB 1.  The Fifth Circuit acknowledged this point in the
11    case cited on the slide.  And several plaintiffs' witnesses,
12    including Sharon Watkins-Jones from Delta, acknowledged that
13    straight-ticket voting was not allowed in the 2020 election.
14         Because plaintiffs do not challenge the pre-SB 1
15    statute prohibiting straight-ticket voting, any injury caused
16    by Section 3.15 is not redressable by this Court.
17         THE COURT:  But why not?  I mean, was there a statute
18    of limitations problem or something?  I don't understand why
19    they can't bring a challenge now.
20         MR. CAPOZZI:  Well, they haven't challenged the other
21    separate statute which prohibits straight-ticket voting.  So
22    the problem is that even if the Court enjoined Section 3.15,
23    the pre-SB 1 statute will remain in effect.  They didn't
24    challenge it in this case.
25         THE COURT:  I understand now.

1          MR. CAPOZZI:  So there's an independent state law

2    barrier to the relief that they are asking for; therefore, the

3    Court should dismiss the claims against Section 3.15.

4          Next, I would like to address the challenges to

5    Section 5.04 and 7.04 insofar as they prohibit local officials

6    from sending unsolicited mail ballot applications.  These are

7    also not redressable.

8          In 2020, the Texas Supreme Court held that local

9    election officials lacked authority to send unsolicited mail

10   ballot applications to voters.  SB 1 merely codified that

11   holding in Sections 5.04 and 7.04.  So even if the Court

12   enjoins those sections, local officials will still lack

13   authority, under state law, to send unsolicited mail ballot

14   applications.  So any injury caused by these provisions is not

15   redressable.

16         I would encourage the Court to just look at *State v.*

17   *Hollins*, which is cited in the slides, which explains why

18   before SB 1 local officials lacked authority, under state law,

19   to send unlisted ABBMs.

20         Third, plaintiffs challenges to Section 6.04's voter

21   assistance oath are not redressable.  Plaintiffs' primary

22   theory of injury is that people are afraid they will be

23   charged with perjury if they provide voter assistance.

24         Laura Halvorson, for example, testified that she did

25   not ask her attendant to provide voter assistance because she

1  worried he could face perjury charges, but the voter

2  assistance oath was under penalty of perjury before SB 1.  And

3  it is still under penalty of perjury post-SB 1 because of

4  Penal Code Section 37.02.  That provision is not challenged by

5  plaintiffs in this case.

6          As Keith Ingram explained at trial, the oath was

7  merely updated to educate people as to the fact that the voter

8  assistance oath is, in fact, and was, under penalty of

9  perjury.  That's the October 18th transcript at 4426.  Indeed,

10  plaintiff witness Cathy Cranston also acknowledged the voter

11  assistance oath was under penalty of perjury before SB 1.

12          THE COURT:  What do we make of the other three

13  factors that the plaintiffs identified this morning, the

14  statement of eligibility, pressure voter, and the statement

15  that the ballot will not be counted?

16          MR. CAPOZZI:  Yes, Your Honor.

17          Our position is that, as with the penalty of perjury

18  language, those additions, those revisions to the oath, merely

19  educate voters as to pre-existing laws not challenged in this

20  case.

21          So take the, you know, "represents that they are

22  eligible for assistance language," under pre-SB 1 law, it was,

23  and remains, a crime to knowingly provide voter assistance to

24  someone who is not eligible for assistance.  That provision is

25  not challenged here, and the oath requirement just educates

1   voters that they are supposed to be careful to only assist
2   eligible people.
3           Keith Ingram explains how this revision to the oath
4   merely educates voters about pre-existing law, the October 18
5   transcript at 4427.
6           As for the pressuring voters provision, the Secretary
7   of State's Office understood the pre-SB 1 unlawful voter
8   assistance provision to prohibit would-be assistance from
9   pressuring people to accept them as assisters.
10          Keith Ingram again explained that this part of the
11  oath did not change the law, and that it merely educates
12  voters on that point.  That's the October 18th transcript at
13  4428.
14          And then they said that they are not challenging the
15  part of the oath which speaks to divulging voter — how voters
16  voted, so I won't address that; but that, too, was merely
17  educating voters about pre-SB 1 law.
18          So, in short, all the revisions to the oath merely
19  educate voters about unchallenged pre-SB 1 laws regulating
20  voter assistance.  So if the Court enjoins the revisions to
21  the oath, that doesn't leave plaintiffs any better off.  In
22  fact, it leaves them worse off, because people will be
23  providing assistance, and they won't be getting that education
24  before they take the oath about what they are signing up for.
25          THE COURT:  Well, I'm confused about that.  If it's

1  all pre-existing, why — isn't the test-taker still getting
2  information?  I'm not sure I understood that last point.
3       MR. CAPOZZI:  So the point of the revisions to the
4  oath is merely to educate would-be assisters about what voter
5  assistance laws they are going to be subject to.  These are
6  pre-SB 1 laws.  So it's just giving them information.
7       I mean, it is already a crime to do the things
8  discussed in the oath.  That was true before SB 1.  It will
9  remain true after SB 1.  And so if someone pressures a voter
10 to let them be the voter assistant, that's still a crime under
11 pre-SB 1 law.  The revision to the oath merely is designed to
12 educate the would-be assister as to that fact.
13      And so, you know, the injuries that plaintiffs claim
14 here, they are not traceable, really, to the revisions to the
15 oath, but to these unchallenged pre-SB 1 laws substantively
16 defining and regulating voter assistance.
17      Finally, plaintiffs' section — to Section 4.12,
18 which deals with drop boxes, is also not redressable.
19 Plaintiffs claim to be injured by this section because it
20 prevents voters from dropping their mail ballots at unmanned
21 drop boxes.  The example of that is the LULAC brief, page 50.
22      But as Keith Ingram explained at trial, the Election
23 Code already prohibited drop boxes when voters hand-deliver
24 their mail ballots; indeed, unmanned drop boxes have never
25 been permitted in Texas.

1          Pre-SB 1 law, not challenged in this case, requires

2   voters dropping off their mail ballots to show ID to election

3   officials when doing so.  So unmanned drop boxes are not

4   allowed because of that pre-SB 1 law.  Pre-SB 1 law required

5   the voter to show their ID to an election official.  That's

6   not compatible with unmanned drop boxes.

7          The only change that Section 4.12 made was to require

8   the election official receiving the ballot and seeing the

9   voter's ID to keep a record of what is dropped off and by who,

10  but plaintiffs have not explained how that change in the law

11  injures them.  They have tried to trace their injury to

12  unmanned drop boxes, but that was not permitted due to

13  unchallenged pre-SB 1 law.  So any remedy against Section 4.12

14  would not redress that claimed injury.

15         Next, I want to move to causation.  Many plaintiffs

16  lack organizational standing because they fail to prove

17  causation.  Many organizational plaintiffs are trying to prove

18  standing by claiming they diverted resources in response to

19  SB 1.  Basic idea is the organizations educated voters about

20  SB 1, so they diverted resources from other activities.  HAUL,

21  Mi Familia Vota, and Voto Latino, for example, assert standing

22  only on this basis.  They do not assert associational

23  standing.

24         The particular form of resource diversion that the

25  organizational plaintiffs allege is a diversion of resources

1  to educate voters about SB 1.  But claiming you diverted

2  resources in response to SB 1 is not enough to prove standing.

3  Plaintiffs have to prove they diverted resources in response

4  to each challenged provision within SB 1.

5          In *In re Gee*, the Fifth Circuit rejected a similar

6  attempt to trace injuries to a challenged omnibus bill as a

7  whole, insisting instead that plaintiffs trace injuries to

8  specific challenged provisions within the law.  The Court

9  held, quote, "To ensure that standing is not dispensed in

10  gross, the district court must analyze plaintiff's standing to

11  challenge each provision of law at issue," end quote.

12          The Court also demonstrated how to do this at the

13  proper, quote, "Level of granularity," end quote,

14  acknowledging this, quote, "Can be tedious in a sweeping

15  challenge," end quote.  Here —

16          THE COURT:  How do we reconcile all that with Voting

17  Rights Section 2 allowing for cumulative burdens?  How do we

18  pair that up?

19          MR. CAPOZZI:  Well, whether accumulative burdens are

20  allowed in the Section 2 VRA context, that's a merits question

21  for Section 2 VRA I'll defer to my colleague on, but for

22  standing, the Court has been clear.  You have to prove the

23  elements of standing for each of your challenged claims.

24          And so *In re Gee* —

25          THE COURT:  I'm sorry.  Isn't it — if it's good

114

1   enough to cumulate for the burden and the merits, I don't
2   understand why you have to have separate -- in the standing
3   analysis.
4           MR. CAPOZZI:  Well, the requirements of standing come
5   from Article III of the Constitution, and so, you know, the
6   requirements of standing can't be shaped by the -- or lessened
7   by the requirements of a statute.
8           And, again, you know, in *In re Gee*, the plaintiffs
9   tried to do something similar.  The Fifth Circuit
10  characterized what they were bringing as a quote, "cumulative
11  effects challenge," end quote, and they tried to say all these
12  different provisions in this omnibus together and cumulatively
13  they cause our injury, but that's not good enough.  You have
14  to trace your injury to each challenged provision.
15          THE COURT:  So how did your client, in specific, the
16  intervenors, get standing?
17          MR. CAPOZZI:  Well, Your Honor, we weren't given
18  standing.  We're a defendant, so defendants don't have to have
19  standing; but the plaintiffs as the one who activated the
20  judicial machinery in this case, they are the ones that bear
21  the burden of proving standing.
22          THE COURT:  Didn't you have any crossclaims?
23          MR. CAPOZZI:  We do not have crossclaims, Your Honor.
24          And here, the problem is that plaintiffs frequently
25  don't even try to meet their burden to trace their injuries to

 1  specific challenged provisions.  During trial, many

 2  organizational witnesses testified that SB 1, as a whole,

 3  caused the alleged organizational harms and diversion of

 4  resources.

 5         For example, Angelica Razo from Mi Familia Vota

 6  testified that MFV changed its, quote, "allocation of

 7  resources because of SB 1," end quote.  And we continue to see

 8  such claims throughout plaintiffs' proposed conclusions of

 9  law.

10         This slide contains some typical examples, and they

11  are only typical.  There are hundreds of such examples

12  throughout plaintiffs' briefs.

13         Mi Familia Vota is a good example of a plaintiff that

14  has a causation problem.  On page 252 of the HAUL plaintiff's

15  brief, MFV argues, quote, "SB 1 being the direct cause of the

16  diversion of MFV's resources and the decrease in the number of

17  community members that it can reach, MFV has sufficiently

18  established traceability between the challenged law and its

19  injuries," end quote.

20         But the challenged law is too high a level of

21  generality.  That's not the level of granularity that the

22  Fifth Circuit prescribed in *In re Gee*.  And MFV plaintiffs

23  make no attempt to explain how many of the challenged

24  provisions caused them to divert resources.

25         Similarly, on pages 245 to 247 of the HAUL brief,

1  HAUL repeatedly refers to SB 1 as a whole causing its various
2  organizational injuries, and it doesn't try to explain which
3  parts of SB 1 caused those injuries.

4        Again, there are more examples on the slide, but
5  those examples can be found throughout plaintiffs' briefs, and
6  I would just encourage you, Your Honor, when you are reading
7  the plaintiffs' briefs, whenever you see a claim that a
8  particular harm was caused by SB 1, not a specific challenged
9  provision, that's a clear red flag that the plaintiff at issue
10 has failed to prove causation.

11       And the likely reason the organizational plaintiffs
12 argue at this high level of generality, the law as a whole, as
13 opposed to specific challenged previsions, is that there is no
14 evidence that they educated voters about some of the
15 challenged provisions.  For example, there was no need to
16 educate voters about Section 4.12's ban on using unmanned drop
17 boxes for dropping off ballots, because unmanned drop boxes
18 were never used or even permitted in Texas.

19       And it's also hard to imagine plaintiffs diverted
20 resources to educating voters about Section 6.01's requirement
21 that individuals transporting seven or more voters to vote
22 curbside fill out a form.  Plaintiffs did not identify during
23 trial any specific person who actually transported seven or
24 more voters to vote curbside, either before or after SB 1, and
25 there's no evidence that they educated voters about that

1  provision, which applies in a very narrow set of

2  circumstances, Your Honor.

3      THE COURT:  So in your theory, then, it's just an

4  attack on associations, and the individual plaintiffs,

5  especially the disability plaintiffs, they have standing?

6      MR. CAPOZZI:  Well, I'm going to address some issues

7  with individual and associational standing in a few minutes.

8  These are primarily issues for the organizational plaintiffs.

9  And so let me just kind of briefly address the "so what," you

10  know, what is the take-away from this causation problem?

11      Some organizational plaintiffs should be dismissed

12  altogether, because they did not try to trace their injuries

13  to two specific challenged provisions.  Mi Familia Vota, HAUL,

14  and Voto Latino have failed to prove organizational standing

15  on that basis.  And these groups don't have members; and thus,

16  they can't have associational standing.  And so those three

17  litigants should be dismissed.

18      I will note, too, that Mi Familia Vota is solely

19  responsible for several of the challenged provisions in the

20  case, including the Section 2 provisions, and a few others as

21  well.  So dismissing them would take some provisions out of

22  the case.

23      One more implication is that the Court should dismiss

24  all challenges related to drive-thru voting, 24-hour voting

25  and drop boxes.  In order to — so again, each of the

1    individual organizations that challenge these provisions did
2    not offer a specific explanation as to how they diverted
3    resources to educate voters about these specific provisions.
4           That means they have to prove associational standing.
5    And to prove associational standing, plaintiffs must point to
6    specific members harmed by each challenged provision.  That,
7    for example, comes from *Summers*, 555 U.S. at 498 to 99, and
8    *City of Kyle*, 626 F.3d at 237.
9           For the challenges related to drive-thru voting,
10   24-hour voting and drop-box voting, the relevant plaintiffs
11   cannot meet that burden.  The only groups with members to
12   challenge these provisions are Texas AFT, LULAC, Delta, and
13   TARA.  The witnesses for Texas AFT, LULAC and Delta admitted
14   on cross-examination that they could not identify members
15   harmed by these provisions.  And the witness for TARA said
16   nothing about these provisions at all.
17          Page 253 of the HAUL brief claims that individual
18   plaintiff Marlin Lopez was not able to vote in the 2022
19   general election because there was no drive-thru voting.  But
20   they have not proven that.  Marlin Lopez did not testify at
21   trial.  His daughter testified, and his daughter, Marla Lopez,
22   admitted that she did not actually know whether her father
23   voted after SB 1 was enacted.
24          That's the October 10 transcript at 3381 and 3409.
25   She admitted that she -- she said she didn't think so, but she

1  didn't know, and because she didn't know whether her father

2  actually voted, she certainly cannot establish why he might

3  not have voted, let alone that drive-thru voting was the

4  reason that he might not have voted.  Therefore, because no

5  plaintiff or plaintiff member alleged or proved they were

6  harmed, the Court should dismiss the claims related to

7  drive-thru voting, 24-hour voting, and drop boxes.

8          Next, plaintiffs fail to make out fear of prosecution

9  injuries for some of their challenges.  They failed to make

10  these out for their challenges to SB 1's poll watcher

11  provisions and most of the voter assistance provisions.

12          So now, Your Honor, we are moving to individual and

13  associational standing.

14          Let's start with the poll watcher provisions.  James

15  Lewin, Jeffrey Clemmons, and organizational witnesses like

16  Richard Ertel claim standing because they are afraid of being

17  prosecuted under Sections 4.01, 4.06, 4.07, and 4.09.

18          Plaintiffs argue they fear prosecution because they

19  will end up in a dispute with a poll watcher over where the

20  watcher can stand due to the challenged laws being allegedly

21  unclear on this point.  HAUL brief 151 is a good example of

22  that argument.

23          On the voter assistance provisions in Sections 6.01,

24  6.03, 6.04, 6.05, 6.06, and 6.07, plaintiffs point to evidence

25  that some people are afraid to provide voter assistance

1  because of potential perjury charges or other criminal
2  prosecutions.
3      For example, Ms. Ortega of MABA-Texas testified she
4  was afraid of perjury charges for providing voter assistance.
5  But both sets of fear of prosecution claims are far too
6  speculative to establish standing for at least three reasons.
7      First, there's no evidence, there is no record of
8  evidence of anyone, including any plaintiff, plaintiff member
9  or witness here being investigated, prosecuted, or threatened
10  with prosecution under any of the poll watchers were voter
11  assistance provisions.
12      Just a few weeks ago –– this case post-dates our
13  brief being filed –– the Fifth Circuit found no standing under
14  similar circumstances where no plaintiff had been prosecuted
15  or threatened with prosecution.  That's the *National Press*
16  *Photographers Association* case.
17      THE COURT:  Is that a First Amendment case?
18      MR. CAPOZZI:  So *National Press Photographers* dealt
19  with both First Amendment and void-for-vagueness challenges,
20  and it recognized that the standards are different, for First
21  Amendment speech challenges, chilled injuries.  The fact that
22  you're being chilled can provide a basis for standing.
23      THE COURT:  So why is that not the case here?
24      MR. CAPOZZI:  Well, for the First Amendment challenge
25  to Section 7.04, it is the case, but the void-for-vagueness

1  challenges and the voter assistance challenges are not First

2  Amendment challenges; they are like the void-for-vagueness

3  challenges the Fifth Circuit considered in *National Press*

4  *Photographers*.

5          And so *National Press Photographers* is a good example

6  of a case that recognizes there are two different standards.

7  The First Amendment free speech is relatively relaxed on

8  standing.  For not free speech, it's very demanding.

9          THE COURT:  So let's go back to this case.  Why isn't

10  there standing here at least for the First Amendment claim?

11          MR. CAPOZZI:  We did not contest standing as to

12  Section 7.04 in our brief because we recognize that there is a

13  relaxed standing standard.

14          Now, the reason why I'm hesitant to make a concession

15  on this is because most of the activities that plaintiffs

16  allege come within the reach of Section 7.04 clearly do not,

17  and I'll get to that when I discuss the merits of 7.04, but I

18  think that starts to blend into the merits; so we didn't think

19  it was particularly helpful to make a standing argument there.

20          THE COURT:  Help me understand.  Why are you making a

21  minor concession on 704 but not the other sections?

22          MR. CAPOZZI:  Well, the other sections don't involve

23  free speech claims.  Only one provision is challenged under

24  free speech theory.  The rest are challenged under the

25  void-for-vagueness theory, which again was exactly what was at

1  issue in *National Press Photographers Association.*

2  And the Fifth Circuit said there's no evidence that

3  the plaintiffs have been prosecuted or threatened with

4  prosecution.  Oh, and for that matter, no one else has been

5  prosecuted under these provisions either.  That's a

6  hypothetical dispute, no standing.  And so *National Press*

7  *Photographers* governs on the fear of prosecution injuries

8  aside from Section 7.04.

9  Second, if somehow *National Press Photographers* does

10 not control, the Fifth Circuit's decision in *Texas State LULAC*

11 forecloses plaintiffs' claims too.  There, the Court held that

12 fear of prosecution injuries are too speculative, when it,

13 quote, "depends on a highly attenuated chain of

14 possibilities," end quote.

15 And, third, plaintiffs' fear of prosecution claims

16 rely on the actions of third parties not before the Court;

17 another reason they don't have standing under Fifth Circuit

18 law.  I'll provide a copy of examples to prove the attenuated

19 chain of possibilities point.

20 Consider plaintiff James Lewin and what it would take

21 for him to be prosecuted for a distancing dispute under

22 Section 4.07 or — 4.07 is a civil provision, but under

23 Section 4.09.  He would need to serve as an election worker

24 again.  He would need to serve in a location with a poll

25 watcher.  There would need to be a dispute over where a poll

1    watcher is allowed to sit or stand.  And no witness in this

2    trial has ever been part of such a dispute.  Indeed, Mr. Lewin

3    testified he has only ever had positive experiences with poll

4    watchers.

5        In fact, I don't think plaintiffs have identified a

6    single distancing dispute between poll workers and poll

7    watchers in all of Texas since SB 1 was passed.  The LUPE

8    plaintiffs, on page 38 of their brief, claim that LUPE Exhibit

9    182 provides hearsay evidence of a distancing dispute.  But

10   when you look at the exhibit, you'll see the dispute was

11   actually over whether a poll watcher could view early voting

12   recordings.  That dispute had nothing to do with distancing.

13       Number 4, the election worker would need to fail to

14   mediate with the poll watcher.  You know, the way this would

15   work in practice is, a poll watcher would stand where they

16   think they need to stand in order to see, and the election

17   worker can — or the voter, but usually the election worker —

18   can ask the poll watcher, Hey, do you mind stepping back a

19   couple of feet.  A lot of the time, the poll watcher will just

20   do so.  People tend to be adverse to confrontation and there's

21   not reason to assume that those poll watchers —

22       THE COURT:  None of that is in the record.

23       MR. CAPOZZI:  Well, I don't think there's any reason

24   to assume, Your Honor, that most poll watchers are inherently

25   bad people that are incapable of being reasoned with.  You

know, plaintiffs have presented a handful of examples from
across a very large state of poll watchers misbehaving, but
it's noteworthy that the rate of incidence involving poll
watchers has decreased considerably from 2020 to 2022, so the
vast majority of poll watchers, they are just regular people.
There is no reason to assume that they are incapable of being
reasoned with.

       But that's not the end of chain of possibilities.
Mr. Lewin would need to follow through with rejecting the poll
watcher's representation that he needs to stand in a certain
place in order to see.  You know, you ask the poll watcher to
step back.  The poll watcher has to say no, and Mr. Lewin
says, No, really, you need to.

       Someone would then need to report Mr. Lewin to a
prosecutor.  That hasn't happened in Texas since SB 1 was
passed.  A prosecutor would have to choose to bring charges,
knowing the burden is that they have to show that Mr. Lewin
knowingly distanced a poll watcher so that they could not
reasonably see.  Again, this has not happened in Texas
post-SB 1.

       I'm running short on time, so I won't go through the
chain of possibilities for the voter assistance provisions,
but it's quite similar.  No plaintiff has come in here and
testified that they plan to take any action that violates the
voter assistance oath.  There's no evidence of prosecutions or

1  investigations under the challenged provisions, and so

2  *National Press Photographers* or *Texas State LULAC* govern those

3  claims.

4          THE COURT:  So how do we reconcile the Americans with

5  Disability Act claims with the slide before — go back to 14.

6  How is there not standing for the ADA claims?

7          MR. CAPOZZI:  Well, I'm only addressing the fear of

8  prosecution theory of injury.  If plaintiffs want to argue

9  that they have a different theory of standing under the ADA,

10 they can do that.  I will just —

11         THE COURT:  Haven't they done that?

12         MR. CAPOZZI:  So what I read is either fear of

13 prosecution or chilled.  You know, people are not getting

14 voter assistance because people are afraid of prosecution.

15 Miss Halvorson, for example, said that she didn't ask her

16 attendant to help her because she was worried about the fear

17 of prosecution, but in *Taren v. Latum* [phonetic] and *Clapper*

18 *v. Amnesty International,* the Supreme Court considered and

19 rejected the exact same argument.

20         You can't re-brand a fear of prosecution injury as a

21 chilled conduct injury, because the chilled conduct is not

22 caused by the fear of prosecution unless you can show the fear

23 of prosecution is sufficiently imminent.  And so I would refer

24 the Court to *Clapper*, which rejected that same argument.

25         So other than fear of prosecution and chilled actions

1  because of the fear of prosecution, I'm not sure what their

2  theory of standing could be.  I don't think they have stated

3  that.

4          And then my time is up, Your Honor, but I'll just

5  make three quick points.  It's in the slides.  These three

6  challenged provisions only expand opportunities for voters,

7  expand opportunities for people to vote.

8          Section 5.06 gives people who have received mail

9  ballots another way to vote in person.

10          Section 5.12's cure process only expands

11  opportunities for people, including to fix mistakes on mail

12  ballots not caused by SB 1 provisions.

13          And Section 7.02 expands the right to time off.

14  Plaintiffs have not explained how any of these provisions can

15  or did injure anyone, let alone their members.  And with 7.02,

16  only Mi Familia Vota challenges that provision, and they don't

17  have members, so we would submit that these three challenges

18  should also be dismissed.

19          THE COURT:  So since you have the standing segment of

20  this, I want to make sure I understand.  So as to 7.04, you

21  are conceding, in part, there's standing, but not for the void

22  for vagueness.  As to individual plaintiffs asserting

23  disability claims, you are acknowledging that they have

24  standing; is that correct?

25          MR. CAPOZZI:  No, Your Honor.  Well, in part.

1          On 7.04, there is a relaxed standing standard for
2    free speech and the void-for-vagueness challenge because it's
3    a speech claim.  And for the void-for-vagueness standard of
4    review, the Court has recognized that where a statute reaches
5    a substantial amount of free speech activities, that there is
6    a somewhat relaxed standing standard.
7          So for 7.04, we're not really contesting standing.
8    We think that the merits are the points to rebut plaintiffs.
9          As for the ADA and voter assistance claims, we do not
10   concede that the individuals have injuries because those
11   individuals were unable to receive assistance solely because
12   of an unreasonable fear of prosecution.  And *Clapper* --
13         THE COURT:  I'm talking about just the ADA claim in
14   total.  So the plaintiffs argue that the State independently
15   has a right -- pardon me -- a duty or a responsibility to make
16   concessions to them for purposes of reasonable accommodation,
17   and so don't they have standing on all those kind of claims?
18         MR. CAPOZZI:  I'm not sure plaintiffs have cited a
19   case to prove they have standing on that point.  I mean, it's
20   a little tricky for me, Your Honor, because I'm sort of having
21   to anticipate what they could say.  I don't believe they cited
22   a case for standing on that proposition, but if they can come
23   up with a case, I would consider it.
24         THE COURT:  Thank you.
25         MR. CAPOZZI:  Thank you, Your Honor.

1          MR. NICHOLS:  May I proceed, Your Honor?

2          THE COURT:  Yes.  Thank you.

3          MR. NICHOLS:  Eric Nichols here on behalf of Harris

4  County District Attorney Kim Ogg.  I am going to be very brief

5  in line with the conversation we had with the Court the last

6  status conference.

7          I have provided the Court with an updated section

8  of — or updated slide presentation that basically takes the

9  presentation that we did during the trial on the motion for

10  judgment after the conclusion of the plaintiffs' evidence and

11  adds a few slides to address matters that were raised in the

12  parties' filings of proposed findings of fact and conclusions

13  of law.

14          But to give a very brief overview of these additions,

15  obviously, Your Honor, you know that we have been trying to

16  stay in our lane in terms of sticking with the standing rubric

17  that my co-counsel just mentioned about analyzing standing,

18  one plaintiff, one claim, one defendant at a time and also

19  analyzing it in the context of the stage of the proceeding.

20          In other words, there are a lot of cases out there

21  that dealt with standing on a motion to dismiss but,

22  obviously, we've tried the case, and so as the Supreme Court

23  has said, we have to look at the exacting standards applicable

24  to trial to see exactly what has been proved.

25          So, Your Honor, very briefly, in the new slides, we

1  have identified the plaintiffs on Slide 2 that actually refer
2  to DA Ogg by name.  There are only two sets, the OCA and then
3  the HAUL, and then the Mi Familia Vota plaintiffs that have
4  done that.  And if you look at the references, we've got them
5  listed there.  The Court can review it at its leisure, but,
6  obviously, those represent five pages out of what we count as
7  556 pages of proposed findings of fact.

8          Your Honor, the summary of that evidence, or what
9  they are claiming to be evidence, with respect to support — a
10  standing with respect to DA Ogg, is what we have talked about
11  pretty much through the entirety of the trial, both the motion
12  to dismiss stage and at the motion for judgment stage, which
13  is, number one, it's not really an evidentiary issue; it's
14  just a fact, as a matter of law, that she is tasked with
15  enforcing the state's criminal laws in Harris County.

16          The other thing we've talked about many times is that
17  the plaintiffs are claiming that she has not adopted a
18  categorical policy of declining to enforce any class or type
19  of criminal offense.  We've talked about that many times;
20  don't need to dwell on that.

21          Then, also, there's two more that are based on the
22  evidence.  The plaintiffs — these plaintiffs claim that the
23  Harris County District Attorney's Office has brought cases in
24  the past under the Texas Election Code, but not under any
25  challenged provisions of SB 1, and that the DA's Office has

1   been presented with referrals under provisions of the Election
2   Code that were amended by SB 1.
3          So these are the four tenets, if you will, of the
4   plaintiffs — the limited plaintiffs who have sued DA Ogg and
5   have now submitted proposed findings on DA Ogg.  They all kind
6   of boil down to these categories.
7          And with respect to these, Your Honor, we know that
8   the Court will carefully look at the record; and if we look at
9   the record, there really is no support for the idea that
10  somehow because DA Ogg has received reports of Election Code
11  violations in the past, that somehow that is — that gives
12  rise to a credible threat of prosecution or reasonable fear of
13  prosecution with respect to any provisions that are challenged
14  before you currently.
15         And this is a great example.  We have a slide here.
16  Don't need to go through it, but it compares their allegation.
17  They say, just in general, that DA Ogg received twelve reports
18  of alleged violations of criminal sections in the Election
19  Code that were changed or added by SB 1, but if you actually
20  look at those, you actually see in the interrogatory response
21  that those dealt with situations that have nothing to do with
22  any amendments or new provisions of SB 1.
23         Those have to do with the fact that under a certain
24  situation, that there was a concern that responses to jury
25  summons may — that indicated a lack of U.S. citizenship —

 1 Court can appreciate that there may be times when people claim
 2 not to be a citizen to avoid jury service; and that the
 3 concern was these are inconsistent with affirmative
 4 representations that I am a citizen on a previously filed
 5 voter registration application.
 6         And so the reason why this was included as part of
 7 our discovery — and the way that you tailored it —- is
 8 because Section 704, which is challenged, contains a
 9 provision, which you see here on slide 5, that talks about
10 perjury in connection with certain election procedures.
11         Your Honor, this has been kind of swept into the case
12 because it's part of 704.  I don't think any of the plaintiffs
13 are challenging this provision, and how could they, because —-
14 because it has always been the law to — always been against
15 the law to falsify information that is part of the election
16 process.  And as we show on slide 6, we talk about Penal Code
17 37.10, tampering with a governmental record, and a provisional
18 Election Code which prescribes illegal voting.
19         So, Your Honor, that evidence is not really evidence
20 that ties standing on any plaintiff to my client with respect
21 to any provision of SB 1.
22         They also indicate in their findings of fact and
23 conclusions of law that Ms. Ogg has also — I'm quoting — has
24 also "displayed a willingness to enforce SB 1."  There is no
25 citation to the record for that, Your Honor, and as my

1  counsel — co-counsel just said, there's no evidence in the

2  record of any attempted enforcement or threat of enforcement

3  with respect to any provision of SB 1.

4        As a matter of fact — I won't read it all; you've

5  got it — you know about the proposed stipulation and the

6  representations that were made to the Court with respect to

7  the fact that she not only respected the federal court's

8  authority, she would follow the federal court's authority in

9  terms of whatever ruling the Court makes in terms of any of

10  these provisions of law.

11        And we also include a little snippet of some

12  testimony, again, just reinforcing the idea that no one has

13  been able to identify any investigation or enforcement

14  pursuant to any provision of SB 1, and with all these lawyers

15  and all these parties involved, I think that's pretty telling.

16        And then, again, to show that this — that,

17  Judge Ogg — I mean, DA Ogg, at the end of the day, fully

18  respects the authority of federal courts to determine whether

19  laws enacted by a state violate a federal — the federal

20  Constitution or federal statutes.  And the reality is that no

21  state court would have the authority to enforce a law through

22  prosecution that a federal court decided could not be enforced

23  because of the federal Constitution or the federal statutes.

24        Your Honor, the idea that somehow we're going to say

25  that because the DA's Office in Harris County has been

1  involved in prosecutions under the Election Code in the past

2  means that there is a credible threat of prosecution for a new

3  provision under SB 1 is like saying because you — she

4  violate — she prosecutes criminal cases, that somehow she is

5  going to prosecute every case under SB 1 or will prosecute

6  cases under SB 1.

7        Well, if you look at the plain record of Texas law,

8  you know how many offenses exist under the Election Code,

9  under the Penal Code, and there are over 2500 criminal

10  offenses here in the state of Texas.

11        So, Your Honor, the only additional cases that have

12  been identified as representing what the plaintiffs claim are

13  efforts to prosecute — I'm not going to go through all of

14  those today.  You have seen the record, but the record shows,

15  for example, that — they cite to prosecution of an

16  individual, Anthony Rodriguez.  Well, the facts are that

17  Anthony Rodriguez sought financial compensation for two family

18  members who didn't work a runoff election.  How does that have

19  to do with SB 1?

20        Avery Ayers, who was accused of tampering with a

21  petition for a candidate by forging signatures.  How does that

22  have to do with SB 1?

23        Two others, Bonton and Demming, that was a case that

24  actually involved an effort to defeat a long-time state

25  representative in the state of Texas, Harold Dutton, who also

1 happens to be a black man, and — by falsifying a candidate in

2 a way that was trying to get Mr. Dutton out of office.

3         So, Your Honor, I do agree that stereotypes are

4 wrong.  They are pernicious.  They are not the basis on which

5 we should conduct ourselves or make legal rulings, and so when

6 someone says that the Court needs to do something because

7 of — and I'm quoting from this morning — "rogue prosecutor,"

8 close quote, that is exactly the type of stereotype that does

9 not allow for a finding of standing with respect to my client.

10         So, Your Honor, for those reasons — you also have

11 the rest of the slides that deal with our sovereign immunity

12 arguments.  You know those arguments backwards and forwards.

13 I won't take up anymore of the Court's time.

14         Very much appreciate the Court's consideration of the

15 arguments that relate specifically to my client.  Thank you.

16         THE COURT:  Thank you.

17         MS. HUNKER:  Thank you, Your Honor.  My name is

18 Kathleen Hunker from the State defendants.

19         Before I move into my substantive section, which is

20 going to be on the *Anderson–Burdick* claims, I just want to

21 quickly reiterate that the State does have sovereign immunity

22 jurisdictional arguments.  Those were brought before the Court

23 through earlier briefing.

24         The Court has made its decision and opinion known on

25 those arguments, and that is currently in front of the Fifth

1  Circuit, has been fully briefed and argued, and we are waiting

2  for resolution.  Because of that, we are not going to bring

3  that up during our closing arguments and instead rest on the

4  papers and the briefings that we have previously submitted.

5           And so with that, I am going to be moving on to the

6  next substantive section, which is going to focus on the undue

7  burden claims.

8           I want to begin by first addressing the legal

9  framework that governs *Anderson-Burdick,* because while the

10  parties appear to agree on the core balancing test in that the

11  Court weighs the character and magnitude of the asserted

12  injury against the precise interest put forward by the State,

13  the Supreme Court and Fifth Circuit have laid down additional

14  rules and standards that govern the test, which plaintiffs

15  have mischaracterized, and, in fact, articulated a plain

16  error.

17          The U.S. Constitution gives states the power to

18  regulate elections; thus, while states may not impose

19  arbitrary, undue burdens, the states do have considerable

20  discretion over the time, place, and manner that elections are

21  held and courts recognize a general rule that even-handed

22  restrictions that protect the integrity and reliability of the

23  electoral process itself are not invidious.

24          Because of this, ordinary inconveniences of voting do

25  not violate constitutional limits.  In addition, because

1  plaintiffs bring facial challenges, they bear the heavy burden
2  of persuasion.  Laws will only be invalidated when it is clear
3  that there is no plainly legitimate sweep of that regulation.
4          In short, plaintiffs have a very high wall to climb
5  when establishing an *Anderson–Burdick* claim, and plaintiffs
6  recognize this fact, and so to make their climb easier,
7  plaintiffs urge the Court to depart from established rules
8  governing *Anderson–Burdick*, and there are four specific ones
9  that I want to address.
10         First, plaintiffs argue that the *Anderson–Burdick*
11 analysis must account for heightened burdens encountered by
12 identified subgroups; however, this is belied by decades of
13 case law in the Fifth Circuit and elsewhere.  Contrary to
14 plaintiffs' assertions, precedent firmly establishes that the
15 Court must access the burden that the provisions place on all
16 Texas voters.  Courts cannot zoom in on particular
17 subgroups —
18         THE COURT:  But is that what *Anderson* did?
19         MS. HUNKER:  That is what *Crawford* did.
20         THE COURT:  No.  But I'm going back to what did
21 *Anderson* do, though?  Isn't that exactly what *Anderson* did?
22 Wasn't that about independent voters, and they focused on
23 that?
24         MS. HUNKER:  To my recollection, Your Honor, it did
25 not, and I would cite you recent case law within the Fifth

1   Circuit where the Court was invited to look at subgroup

2   analysis and rejected that as being inappropriate for

3   *Anderson–Burdick*, and that's specifically with *Vote.Org v.*

4   *Callanen.*

5        And the Court, like I said, was specifically invited

6   by the plaintiffs to assess whether or not the wet signature

7   requirement fell more heavily on voters, such as voters with

8   disabilities, voters without printers, voters who didn't have

9   necessarily access of being able to produce a wet signature.

10  And the *Vote.Org* panel decided that was not the case, and

11  instead a generally applicable law with disparate impact is

12  not unconstitutional.

13       And we see additional cases within the Fifth Circuit

14  taking the same stance.  So in *Richardson v. Texas Secretary*

15  *of State* -- this is another recent opinion, this time from

16  2020 -- a District Court had determined that the

17  signature-matching requirement posed a severe burden on

18  certain voters' right to vote, specifically the elderly and

19  the disabled.

20       And the Fifth Circuit panel rejected that reasoning

21  stating that the severity analysis is not limited to the

22  impact that a law has on a small number of voters.  The

23  *Richardson* court also gave a more detailed analysis of why it

24  came to this specific provision -- I'm sorry -- position.

25       And explicitly, it examined binding precedent such as

1  *Crawford,* which rejected disparate impact analysis; but then
2  it also said that if you were examining burdens on a
3  group-by-group basis, that would effectively turn back decades
4  of equal protection jurisprudence where there are explicit
5  claims that plaintiffs can bring, and have brought, that focus
6  on disparate impact, such as Section 2 of the VRA, which was
7  specifically amended to allow disparate impact.

8          Second, examining burden on a group-by-group basis
9  would hamper the ability of states to run elections.  And this
10 is just practical.  There are 17 million registered voters in
11 Texas, and there are an infinite number of ways to be able to
12 divide those groups into specific subcategories who, perhaps,
13 because of personal circumstances, would find a heavy burden
14 for a very reasonable, nondiscriminatory law.

15         And so in order to avoid the Courts second-guessing
16 the states and, in fact, legislating through the states, there
17 needs to be an understanding that you are looking at the
18 electorate as a whole as opposed to discrete categories.

19         And if we look — if courts were to deem ordinary and
20 widespread burdens like the severe based solely on the impact
21 of a small number of voters, we would subject virtually every
22 regulation to strict scrutiny, hamper the ability of states to
23 run efficient and equitable elections, and compel federal
24 courts to rewrite state electoral codes.  And that is
25 expressly from the *Richardson* opinion that the Fifth Circuit

1  panel published in 2020.

2       I want to then move on to error two, which is

3  plaintiffs argue that the Court should consider the cumulative

4  impact of the challenged provisions; however, this proposal

5  would make a mess of the current balancing test and finds no

6  support in existing case law besides; specifically the case

7  that law that governs this jurisdiction.

8       The *Anderson–Burdick* test requires the Court to

9  evaluate the precise interest put forward by the state as

10  justifications for the burden imposed by its rule.  This

11  requirement would be difficult in the context of cumulative

12  effects because the state can have different justifications

13  for different rules with varying levels of importance and

14  persuasion.

15       Plaintiffs do not tender a legal framework that would

16  enable the Court to disentangle legitimate from illegitimate

17  restrictions when conducting such an analysis and have not

18  offered a specific citation or authority that would provide

19  the Court with that type of framework.

20       In addition, plaintiffs have yet to identify a single

21  opinion in the Fifth Circuit or Western District that

22  considered the cumulative impact of time, place, and manner of

23  election laws when assessing burden.  Recent cases that dealt

24  with multiple Election Code provisions addressed each one

25  separately.  And for this, Your Honor, I would direct your

1    attention to *Texas State LULAC v. Elfant,* which is 629 F.3d

2    527.  This was decided in the Western District in 2022.

3        Now, when the Western District was considering these

4    regulations regarding residency, it looked at the three

5    provisions separately, not together.  And we see this again

6    and again when it comes to multiple provisions of the Election

7    Code being considered.

8        For example, the Texas — this is also *Texas LULAC v.*

9    *Hughs,* the Fifth Circuit considered a provision of — sorry —

10   a proclamation by the governor that changed the rules

11   regarding the delivery of in-person ballot locations, and

12   there were two parts of the provision — of the proclamation

13   that the plaintiffs objected to:  One dealing with poll

14   watchers; the other dealing with the number of in-person

15   delivery locations.  And yet, again, we see the Fifth Circuit

16   addressing each one individually as opposed to cumulatively.

17       The only case plaintiffs cite in support, or I should

18   say their primary case that they cite in support for

19   cumulative impact approach in their conclusions of law is

20   *Storer v. Brown,* and this comes from a pre-*Anderson-Burdick*

21   ballot-analysis case that didn't even apply the standard that

22   plaintiffs asked the Court to adopt.

23       To the contrary, the Court — the *Storer* Court merely

24   described the concept of totality.  It recognized, in the very

25   next sentence, that the challenged regulation did not change

1  its character when combined with other provisions of the
2  Electoral Code, and you can see that is the part that is
3  bolded in the slide presentation.

4          So for that, I want to look at the full quote,
5  because it has to be read in context.  The Court is describing
6  the concept of totality, but it also recognizes that a valid
7  regulation does not suddenly become invalid because there
8  happens to be another provision that plaintiffs might object
9  to.

10          Also in later cases, when confronted with multiple
11  election laws, the Supreme Court evaluated those burdens of
12  each restriction separately, and for that *Eu v. San Francisco*
13  *County Democratic Central Committee* is a good example of that,
14  and that is 49 -- sorry -- 489 U.S. 214.

15          And that actually leads very neatly into the third
16  error.  This comes from the plaintiffs' conclusions of law.
17  Plaintiffs argue that the Court must consider only the impact
18  of the challenged provisions.  But this directly contradicts
19  the Fifth Circuit.  And so we do take the position that the
20  Court needs to assess the burdens of each provision
21  individually, but we also recognize that statutes should not
22  operate in a vacuum; they build off and they interact with
23  pre-existing rules and regulations.

24          And for this reason, courts, when assessing burden,
25  they do not view the Election Code provision in isolation, but

1    rather consider the electoral plan of the state as a whole,
2    and this was recently done in *Texas Democratic Party v. Scott,*
3    which is a Western District Court opinion.

4            To hold otherwise would lead to absurd results, such
5    as where the Court would consider the ID number requirements
6    but ignore the cure provisions that were enacted by the same
7    statute, or would assess changes to curbside voting and
8    pretend that these voters did not have the option to vote
9    inside a polling place or by mail.

10           Simply put, *Anderson—Burdick* demands that the Court
11   evaluate laws based on how they operate in life, as opposed to
12   crafting a legal fiction that pretends that voters do not have
13   substitutes available to them.

14           THE COURT:  So let me make sure I understand your
15   argument.  Under your theory error number two, the Court
16   should not consider cumulative impact, but for your argument
17   in error three, I should?

18           MS. HUNKER:  No, Your Honor.

19           So understand it's a fine distinction.  What we're
20   saying is the burden has to be provision by provision, but to
21   understand the burden for a specific provision, it has to be
22   read in context.  And that would mean, for example, when you
23   are looking at curbside voting, you have provision
24   Section 6.01 that deals with curbside voting; however, there
25   is also additional options that a voter has, such as being

1    able to enter the polling location.

2          And so understanding the context of the burden in

3    that specific case is looking at the Election Code.  That's

4    not to say that you would combine Section 6.01 and 7.04 and

5    maybe the other Article 6 provisions together and saying,

6    well, this is the injury.  The burden has to still be done on

7    a provision-by-provision basis.

8          THE COURT:  So the plaintiffs argue under the Voting

9    Rights Act — and I know you are here on *Anderson-Burdick,* but

10   under the Voting Rights Act, Section 2, you do apply a

11   cumulative effect.  If, indeed, that's the law, why the

12   inconsistent analysis for *Anderson-Burdick?*

13         MS. HUNKER:  Well, understand, Your Honor, that

14   Section 2 of the VRA is a statutory right and standard,

15   whereas this is coming from the Constitution, and a specific

16   test that was done first in *Anderson* and then in *Burdick.*  And

17   that's looking at matching a burden with a precise interest.

18         And the way that that looks is you can only really

19   look at one burden, one precise interest at the same time,

20   because if you start trying to mix and match where provisions

21   have different explanations, it becomes quite a mess to

22   determine, well, what was the state trying to do?  Because

23   there could be certain state interests that have more force

24   than others, that are much more apparent; and in that case,

25   again, there would have to be some way of disentangling.

1          Now, in the VRA, there is robust case law on how the

2     Court should be tackling claims under that.  Plaintiffs have

3     not cited to something similar for *Anderson-Burdick,* and I

4     think that is very clearly evident that this is not something

5     that courts typically do, and, in fact, should not do because

6     it does make a mess of how you would proceed with the standard

7     outline in both *Anderson* and *Burdick.*

8          And I also want to just state that the *Vote.Org*

9     opinion provides a good example of this, because in that case,

10    the District Court found that Texas's original signature

11    requirement imposed a burden that was more than slight;

12    however, when making this determination, the District Court

13    focused on the rule in isolation, which the Fifth Circuit

14    expressly deemed in error —— or the Fifth Circuit held that

15    the original signature requirement must be in —— and this is a

16    quote —— "viewed in light of other available registration

17    options, including submissions via Department of Public

18    Safety, direct mail, personal delivery, and voluntary deputy

19    registrars."

20         And the Fifth Circuit applied this framework in *Texas*

21    *LULAC v. Hughs,* as well.  It noted that the drastic picture

22    painted by the District Court failed to account for the

23    numerous ways Texans can vote early and absentee.

24         And here, plaintiffs are trying the same thing.  They

25    are trying to paint a drastic picture by cherrypicking

1  provisions that they bring before the Court.  But the image is

2  skewed because it doesn't take into account, for example, the

3  full plethora of voting opportunities that available in Texas

4  when SB 1 was enacted.

5          So, for example, we have in-person voting on Election

6  Day, but as well we have two weeks of no-excuse, in-person

7  early voting, countywide voting places, curbside voting for

8  those with disabilities or who need assistance, accessible

9  voting locations.

10         We have expanded mail voting for certain qualified

11  voters and, in fact, expanded it further in 2021.  We have

12  annual applications for ballot-by-mail for voters over 65 who

13  have a disability, so they don't have to constantly submit the

14  same application over and over again in the course of a year.

15         You have multiple delivery options for returning mail

16  ballots that were expanded in 2015.

17         And we have minority language requirements mandating

18  that election materials and voting assistance be available in

19  both English and Spanish across the state.

20         Second, plaintiffs ignore other provisions in SB 1

21  that expand voter access or mitigate the concerns that

22  plaintiffs raise.  Again, it's looking at a small picture in a

23  mosaic.  We have the introduction of a uniform cure process

24  for mail voters, and that is Sections 510, 512, 514.

25         Higher minimum number of hours for early voting

1  locations must be open.  Lower population thresholds before
2  counties must offer longer hours of voting.  Ability to update
3  voter registration online.

4        We have additional poll watcher oath and training
5  requirements that got a lot of praise from the counties
6  throughout this trial.

7        Express authorization for judges to remove a poll
8  watcher in the event of misconduct.  And I'll talk about that
9  in a little bit, but that express authorization was not in the
10 Election Code pre-SB 1.

11       We also have a codification in state law that
12 election authorities must accommodate voters with
13 disabilities.  This was a very big win from
14 Representative Bucy, a Democrat, through the course of the
15 legislative process and is designed to expand access of voting
16 for voters with disabilities within SB 1.

17       And then, of course, we have expanded protection for
18 employees to take time off of work during the early voting
19 period.

20       Although I'm not going to go detail by detail, the
21 plaintiffs also ignore the actions taken by the state and
22 various counties to mitigate many of the concerns raised by
23 plaintiffs in their claims.  And this includes the additional
24 round of legislation that was enacted in 2023; specifically,
25 SB 1599 and SB 477, which addressed the cure provisions, made

1    it much more simplified, and also worked to expand how

2    accessible curbside voting would be.

3            And we would argue, Your Honor, that once the

4    entirety of Texas voting machine is taking into account, it

5    becomes clear that the challenged provisions at most impose

6    minimal burdens on voters, and in many cases do not implicate

7    the right to vote, as understood by the Fifth Circuit, and

8    this brings me to the fourth legal error.

9            Plaintiffs argue that *McDonald v. Board of Election*

10   *Commissioners of Chicago* does not control, but this is belied

11   by multiple Fifth Circuit opinions released in the last four

12   years.

13           Now, in McDonald, as opposing counsel stated, the

14   Court distinguished between the right to vote from the claimed

15   right to receive absentee ballots, and the Fifth Circuit has

16   interpreted this to be a claimed right to a specific method of

17   voting.

18           Now, plaintiffs argue that *McDonald* should not

19   control because the first recent Fifth Circuit decision

20   addressing *McDonald* was a state panel, and the merits panel

21   later on decided that they did not need to go as far as the

22   state panel did with respect to *McDonald.*

23           But this ignores the subsequent decisions that were

24   issued by the Fifth Circuit, including *LULAC v. Hughs*, which

25   stated that the secretary persuasively argued that *McDonald*

1  applied and that should be — include early voting in addition

2  to absentee voting, because that was an affirmative

3  accommodation offered by the state, designed to make voting

4  easier and, in itself, could not restrict the right to vote.

5        And *LULAC v. Hughs* is not the only decision that is

6  also cited favorably in *McDonald*.  We have *Richardson v. Texas*

7  *Secretary of State,* which looked at *McDonald* in a certain

8  context.  We have the *Texas Democratic Party v. Scott,* which

9  is the Western District opinion after the case was remanded

10 from the Fifth Circuit also adopted *McDonald* as being good

11 law.

12       And more recently, we have — as I'm sure Your Honor

13 is aware — *United States v. Paxton,* where the state panel in

14 this proceeding, following the materiality decision, also

15 cited *McDonald* as being live and good law.

16       And the specific quote that I have here:  "We have

17 held voting by mail is a privilege that can be limited without

18 infringing the right to vote."  So to quote *Texas Democratic*

19 *Party, "McDonald* lives," and it controls the current

20 proceedings.

21       THE COURT:  So let's talk about the placement of the

22 numbers on the ballot.  So once the State's made the decision

23 it's going to allow voting by mail, what's reasonable about

24 requiring voters to specifically put the exact numbers on

25 that?  Where is the reasonableness in that?

1    MS. HUNKER:  Well, a couple of points, Your Honor.

2    The first is that this standard is actually adopted

3  from the Help America Vote Act, which required voters to

4  provide their driver's license, Texas -- their state ID

5  number, or their Social Security number.  It even includes a

6  hierarchy.  And a voter has to provide one of those two

7  numbers in order for them to be registered to vote, so what

8  the legislature did was basically take that standard and apply

9  it to mail voting, adopting effectively an ID requirement that

10  is already utilized --

11    THE COURT:  The language was problematic, right?

12  They didn't say you could provide either.  The statute says

13  you provide the first one first, so you've got to remember

14  which one was your first one.

15    MS. HUNKER:  There are two relevant provisions within

16  the ID number requirement.  The first one is directed at

17  voters, and we will admit is awkwardly phrased, in part

18  because it's taken from the Help America Vote Act, which had

19  that hierarchy.

20    But the second provisions, which are addressed to the

21  Early Voting Ballot Board and Signature Verification

22  Committee, those expressly state that a ballot or application

23  for ballot-by-mail must be accepted if the number matches the

24  voter registration record, or the word I think that is used is

25  "identifies the voter" on the registration record.

1          And so there is no hierarchy when it's being assessed
2     by the Early Voting Ballot Board, when it's being assessed by
3     the Signature Verification Committee, and for applications for
4     ballot-by-mail when it's assessed by the early voting clerk.
5          And, again, this is language that's taken, really,
6     directly from our federal law with the Help America Vote Act.
7     And the reason why the legislature is looking to the Help
8     America Vote Act is a couple of reasons.
9          One, it's because there is indication from Congress
10    that this is something that is important to ensure security in
11    the registration roles, and therefore would also be equally
12    important to confirm for security within applications and mail
13    ballots.
14         THE COURT:  Well, wasn't that sort of premised on the
15    Secretary of State's Office having reliable databases?  I'm
16    looking for the number.  I might be getting the number right.
17    What did I hear this morning?  74,000?  94,000 people were
18    unable to vote because of this?
19         MS. HUNKER:  So a couple of responses, Your Honor.
20         The first is, is that the Help America Vote Act
21    required the ID number requirement starting in the 2000s,
22    early 2000s, and so there are a number of individuals who were
23    grandfathered in that did not have ID numbers.  That's in the
24    record.  However, the State has taken efforts to mitigate that
25    by doing a process of harvesting numbers from DPS.

1          In addition, when it comes to —

2          THE COURT:  But don't we still have several thousands

3   of people who have neither number in the SOS database?

4          MS. HUNKER:  Despite the fact that there are

5   thousands, what the standard requires is to look at what is

6   the burden of compliance.  In this case, a voter can update

7   their registration record simply by submitting a voter

8   registration form; so the same burden to register to vote, and

9   that will update the registration records.

10         THE COURT:  But doesn't that imply now that someone

11  loses at least one opportunity to vote, then does a cure, so

12  now the next election, they'll be able to vote?

13         MS. HUNKER:  I don't think so, Your Honor, because

14  voters are not inert blocks of wood.  They understand that if

15  they're voting by mail, now that they understand the

16  requirement, that they can contact the office to see whether

17  the number is on their record.

18             They also now have access to, through Texas.Gov, of

19  being able to update their numbers electronically online

20  through the State system or through DPS.  There are multiple

21  ways the State has given voters to be able to update their

22  numbers.

23         THE COURT:  So how are we protecting the sanctity of

24  the ballot by doing that?  Anybody gets to enter numbers in

25  the database?  And I thought we heard evidence in this case

1   that, you know, this was all just matching numbers to numbers,

2   not actually verifying that this is the individual who is

3   eligible to vote.

4          MS. HUNKER:  So prior to SB 1, all of the facts that

5   were needed to fill out an application for ballot-by-mail,

6   and, indeed, a ballot, were available through a public

7   information request to the county, and multiple counties,

8   including Michael Scarpello, have testified to that fact.

9          Now, with SB 1, because of specific provisions within

10  the Election Code and Government Code, the ID number is not

11  available through a public information request.  Now, perhaps

12  there is some manner in the dark web that an individual could

13  secure, but it is a far harder endeavor to achieve.  And what

14  I think the record shows is that fact, is that it's much

15  harder now to impersonate a voter.

16         And this also gets towards the skewing in

17  Denton County where you had an individual submit applications

18  for ballot-by-mail, some of which were accepted, because he

19  had access to public information.  ID numbers, such as Social

20  Security number, Texas driver's license, are not publicly

21  available, and therefore can act as an independent

22  verification that the person who is submitting this form is,

23  in fact, the qualified voter who is eligible to vote by mail.

24         That was not fair.  Mr. Scarpello and Mr. Phillips

25  both testified that when an application for ballot-by-mail was

1  submitted, there was no independent way to verify, because you
2  didn't have a signature requirement for an application for
3  ballot-by-mail.
4          In addition, when it comes to the ballot-by-mail,
5  that signature is compared to the application, and so if an
6  individual was impersonating a voter with the application for
7  ballot-by-mail, the signature would match the ballot, because
8  that's the first signature that the Early Voting Ballot Board
9  and Signature Verification Committee are looking at.
10         I also want to point out, Your Honor, that we have
11 now had three -- sorry, four statewide elections before this
12 trial.  What we saw in November was that the rejection rate
13 had declined sufficiently to where it was either at or lower
14 than previous elections pre-SB 1, and so even though there
15 were allegedly thousands of voters who don't have an ID number
16 in the system, at the end of the day, because of their
17 education, because people become familiar with the process,
18 they were able to comply with that regulation.  And you have,
19 again, now a 2.7 rejection rate, which is comparable to
20 previous elections.
21         And I would also point Your Honor to Ms. Callanen's
22 testimony where she stated that her specific county had a
23 lower rejection rate in November 2022 than it did in
24 November 2020 prior to SB 1.  And so this is something that
25 voters have shown that they are able to comply with readily,

1  and it is becoming part of the normal election process.

2          The last point I want to address there is the actual

3  number of voters who had their ID — had their ballot rejected

4  because of an ID number issue, because it's actually less than

5  the 2.7 percent.

6          So Mr. Hirsch, he was an expert for the United

7  States, his — he was given a copy of the TEAM's database and

8  assessed how many voters actually had their ballot rejected

9  because of an ID number-related issue from SB 1, and he had

10 determined it was 6,355.

11         Now, that's in comparison to the number of voters who

12 actually cast a ballot both in person and through absentee.

13 And that, we think, is a credit to the State and a credit to

14 the counties for being able to basically implement the law

15 successfully.

16         I do want to move on, Your Honor, to a couple of the

17 other provisions unless you have additional questions.

18         THE COURT:  Go ahead.

19         MS. HUNKER:  So the first is drive-thru voting.

20         Entering a polling place to cast a ballot is a

21 quintessential ordinary inconvenience of voting that does not

22 trigger constitutional scrutiny.  There is nothing more

23 quintessential about going into a polling place and casting a

24 ballot.

25         There's been a lot of talk about some other options

1  of voting such as drive—thru, curbside, absentee, but those

2  are modern inventions.  At the end of the day, American

3  democracy has always been entering a polling place and casting

4  a ballot.  And, indeed, there's no evidence that any Texas

5  county offered drive—thru voting at scale before 2020.  And

6  only three counties, at most, offered drive—thru voting in

7  2020, which was Harris County, Tom Green County, and Bee

8  County.

9         Plaintiffs argue that Harris County's increase in

10  voter turnout November 2020 was due to the introduction of

11  drive—thru voting as well as some other innovations; however,

12  that is not the case, because if you look at various other

13  counties, they all had similar increases in voter turnout.

14  None of them offered drive—thru voting.

15         This was simply a matter of the election itself

16  having a lot of interest.  I think COVID as well as what was

17  occurring over the summer of 2020 just inspiring a lot of

18  interest in civic responsibility through voting.  Any burden

19  imposed by Sections 3.04, 312, and 313 are de minimis and

20  justified by state interest.  And first, this is because

21  drive—thru voting was arguably illegal.

22         There are two ways in which it was arguably illegal.

23  The first is that counties are limited entities.  They only

24  have the authority that's granted by the state expressly or

25  necessarily implied.

1          The Election Code gives an explicit authorization for
2  limited curbside voting, casting a ballot in the vehicle,
3  under Section 64.009, but that is limited to a specific
4  category of voters.  The Texas Attorney General in 2020 took
5  the position that because the Election Code specified the
6  requirements that a voter would have to meet to cast a ballot
7  through a car, that drive-thru voting at scale for voters who
8  didn't meet that qualification was illegal.

9          The Secretary of State took a slightly different
10 position.  Their position was focused instead on the method
11 and manner in which drive-thru voting was conducted, and this
12 was a dispute over immoveable structures or whether it had to
13 be done inside.

14         Now, we are not here to relitigate whether or not
15 Harris County's policy in 2020 did, in fact, comply with the
16 Election Code.  Our position is simply that the State had an
17 important regulatory interest in providing that clarity.  If
18 you have two competing -- two State officials having competing
19 interpretations of Election Code provision, there needs to be
20 an understanding of what that provision actually stated.  And
21 in the case in SB 1, they determined that drive-thru voting
22 was, in fact, not permitted under the Election Code.

23         There is also an interest in preserving secrecy of
24 the ballot.  Jacquelyn Callanen, as well as Remi Garza, from
25 Cameron County both stated that they actually had concerns

1    regarding privacy in the context of curbside voting, because

2    there are occasions where individuals who are not casting a

3    ballot refuse to exit the vehicle and can be seen as

4    interrupting the privacy of the voter, able to hear the

5    instructions given by the election worker, and possibly

6    pressuring the voter to vote a certain way.

7            Now, the way that drive-thru voting worked in Harris

8    County is that you did not have to be casting a ballot in the

9    car in order to stay in the car and vehicle, and so multiple

10   individuals could be in the car, including employers,

11   including union bosses, who might exert influence over the

12   voter.

13           And, in fact, we have Zeph Capo from AFT, who is a

14   union leader, and stated that him, as well as other union

15   members, would drive people in the union to vote drive-thru,

16   and not exit the vehicle, even though they were not casting a

17   ballot themselves.

18           Now, there's no indication that these individuals

19   acted, you know, improperly in trying to assert influence.

20   But their mere presence can exert that pressure because of a

21   power dynamic, and the State has a very high interest, and, in

22   fact, compelling interest, to ensure that a voter, when they

23   are in the middle of casting a ballot, is not exerted by undue

24   influence; that the ballot is instead a reflection of their

25   own will.

1          Moving on to voting hours.  Section 3.09 and 3.10

2    expanded voting opportunities to vote in person.  It increased

3    the minimum number of hours from 8 to 9.  It lowered the

4    population threshold from 100,000 to 55,000 before a county

5    had to offer 12-hour voting.  It also said that voters in line

6    when polls closed on early voting period, even if, again, the

7    polls had closed, they were able to cast their ballot.

8          THE COURT:  If you can go back to the other slide.

9          So one of the articulated reasons for the State about

10   passing all this was it wanted to establish uniformity.  How

11   is — with all the counties having different times, how does

12   that advance uniformity?

13         MS. HUNKER:  So a couple ways, Your Honor.

14         First, the Fifth Circuit and Supreme Court in

15   *McDonald* actually acknowledged that states can take these

16   matters one step at a time.  And there's a recognition, I

17   think, with a lot of these, such as voting hours, that there

18   are competing interests.  There's a recognition that some

19   counties are smaller.  Some are large.  Some have more

20   resources.

21         And you want to have baselines, or guardrails, so

22   that voters are able to exercise a little less confusion in

23   what they can expect location to location.  And always that

24   they don't feel like they are being disenfranchised, because

25   they are not being given the opportunity that perhaps a more

1  heavily resourced county would be offered.

2          And this is what SB 1 does.  It gives guardrails.  So

3  16 hours — a possible 16 hours of voting, from 6:00 a.m. to

4  10:00 p.m.  But it does, again, try to put the options within

5  a framework.  And so you don't have very dramatic differences

6  in voting habits between the counties.  And I will say, Your

7  Honor, that the way that the hours work, hours in the last

8  week of early voting are actually specified to be a minimum of

9  12 hours.

10          So there's a little bit more complexity than is

11 probably being addressed by both myself and by plaintiffs; but

12 overall, there's been an acknowledgment that voters do get

13 confused when neighboring counties have very drastically

14 different hours, particularly in jurisdictions that are — or

15 cross multiple counties.

16          And that was acknowledged by Jacquelyn Callanen as

17 well as by a few others.  This is targeted specifically at

18 that to, again, give at least some sort of guidance of what

19 the counties can do so voters have similar expectations when

20 they change county lines.

21          And I do want to emphasize even for 24-hour voting in

22 Harris County, which was only offered in 2020, November,

23 you're talking about 24-hour voting on a single night on seven

24 polling locations.  And this is out of 112 early voting

25 locations that election.  So it's a very narrow context.  And

1  it was only utilized by 3,462 voters, so less than 4,000 in

2  Harris County between 10:00 p.m. and 6:00 a.m.

3        And this has come from Dr. Mayer's report who is a

4  plaintiffs' expert.  Altogether, that's .28 percent of early

5  voters in Harris County.  So in all of Texas history, there's

6  been about 3,500 voters who have cast a ballot between

7  10:00 p.m. and 6:00 a.m., and we don't think eliminating that

8  option in any manner undo the burdens of voters.  Instead, it

9  is aligning with the ordinary and usual burdens of voters that

10  is typical in any election across the state.

11        I want to quickly address poll watchers.  So

12  poll-watching provisions and poll watchers as an institution

13  is not on trial, and the reason is, is because plaintiffs have

14  not actually targeted the underlying provisions that allow

15  poll watchers to observe and be part of the election process.

16        Instead, they are specifically focused on

17  *Anderson-Burdick* 4.01 and 4.07.  And these provisions are

18  quite minor.  It was already an offense to obstruct a poll

19  watcher, and the Secretary of State had interpreted that to

20  mean if you ejected a poll watcher without grounds, and it

21  also meant that if you were to prevent a poll watcher from

22  walking around, the Secretary of State has constantly issued

23  guidance saying, no, you have to allow poll watchers to move.

24  They have to be able to see and hear the activities in order

25  for them to perform their function, which is to be the eyes

1  and ears of the public.

2         Section 4.01, interestingly, gives power expressly to

3  election workers that they did not already — they did not

4  previously have.  Prior to SB 1, there was no express

5  authority in the Election Code that would allow an election

6  judge to expel poll watchers.

7         Now, that was arguably implied by Chapter 32 of the

8  Election Code, which states that election judges are peace

9  officers and, therefore, can remove people for breaches of the

10 peace.  But what Section 4.01 did, it actually gave a standard

11 that they could follow, the election judges could follow, in

12 order to not be in violation of obstruction.

13        In addition, I want to talk about some of the other

14 provisions in the Election Code that are not part of SB 1,

15 because they preexisted.  And these are numerous safeguards to

16 protect voters and election workers from poll watcher

17 misconduct.  And, again, none of them were amended.  This

18 includes 33.057:  "A watcher may not be present at the voting

19 station when a voter is preparing the voter's ballot, or is

20 being assisted by the person of the voter's choice" —

21        THE COURT:  Aren't those arguably inconsistent with

22 each other?

23        MS. HUNKER:  No, Your Honor.  The specific —

24        THE COURT:  They have to be reasonably close to

25 watch.  So, I mean, how do we pair those things up?

1          MS. HUNKER:  Well, the previous standard was
2    conveniently, and also would have allowed a poll watcher to
3    become reasonably close so they could conveniently watch the
4    proceedings.  There is a tension, of course, but that's the
5    tension that, really semi and transparency always has when
6    government proceedings are being scrutinized, such as sort of
7    with the free press and with the voter mentoring, the public
8    information requests.

9          In this case, poll watchers do need to be able to see
10   and hear the proceedings, but there is a reasonableness
11   component that's absorbed within the statute.  And again,
12   these provisions preexisted and have worked well even in the
13   2022 election.

14         Dana DeBeauvoir, when she was describing the
15   misconduct of Jennifer Fleck by hitting and banging the glass
16   in the Central Count described her as a unicorn.  And there's
17   a reason for that, because we are focusing on the very rare
18   instances of misconduct, rather than the fact that you have
19   254 counties across the state of Texas with multiple ballot
20   and polling locations, as well as Central Count in all of
21   them.

22         And only a few occasions where poll watchers and
23   election workers come into conflict.  And if you take a look
24   at the record, Your Honor, those numbers have declined in
25   response to SB 1, not increased.

1          The number of occasions that we have seen is part of

2   the natural tension between poll watchers and election workers

3   and will not be resolved by eliminating these provisions.

4   And, in fact, that would simply take away clarity of some

5   objective standards, which is seeing and hearing; or the

6   objective clarity of when a poll — election worker can eject

7   a poll watcher for that misconduct.

8          THE COURT:  So the example, if I heard it — or

9   understood it right this morning, was, let's say it's a

10  Monday, and there's a poll watcher engaged in some kind of

11  inappropriate activity, but it wasn't seen by the election

12  official, but it's reported to the election official; so then

13  come Wednesday, that poll watcher returns.  What happens in

14  that scenario?

15          MS. HUNKER:  Well, in that scenario, there are a

16  couple of mediations.  First is by going to the appointing

17  party, such as — if it's a campaign, a specific candidate,

18  very often — this has been — this was testimony in the

19  record that a campaign does not want that type of misconduct

20  associated with them, and so will not appoint that individual

21  in future occasions.

22          You also have the option of referring to a peace

23  officer, and you also have the fact that if it is a breach of

24  the peace, which constitutes a criminal — a criminal — penal

25  crime, then the election judge has the authority to accept the

1  poll watcher and immediately eject them.

2          THE COURT:  But nothing under the hypo that I -- at

3  least the way I understood it this morning is nothing has

4  happened on Wednesday yet.

5          MS. HUNKER:  Yes, Your Honor.

6          But if there was a breach of the peace, we would

7  argue that both Chapter 32 and Chapter 33 allow that type of

8  action taken by the election judge.

9          THE COURT:  So what you are saying is we have to wait

10 for a breach of the peace?

11         MS. HUNKER:  Your Honor, typically, we wait for

12 somebody to engage in misconduct before we take action against

13 them, and that would be the same with poll watchers.

14         So I'm running out of time, Your Honor, and so I

15 simply want to quickly bring up Section 7.02, which had to do

16 with worker -- time off work.  Because Section 7.02 did not

17 make it more difficult to vote relative to baseline, it has

18 not abridged the right to vote in violation of the

19 Constitution, even if the plaintiffs take a specific unusual

20 interpretation.

21         This is still an affirmative accommodation that makes

22 it easier for individuals to cast a ballot, and they have not

23 established a single employer, prosecutor, election worker,

24 state or county, who has taken the very obscure

25 interpretation.

1          Overall, everybody agrees this was to expand time off
2    of work for voters and should easily satisfy *Anderson-Burdick,*
3    because it does not abridge the right to vote.
4          THE COURT:  Thank you.
5          Do you want to break now?
6          MR. KERCHER:  I think the next piece will be
7    30 minutes.  So I think we have an hour and 15 or so total, so
8    now seems like a good time.
9          THE COURT:  Let's take a break.
10   *(Recess)*
11         MR. KERCHER:  If it please, the Court, Your Honor,
12   I'll first address Section 208 claims and then move into the
13   ADA claims.
14         Regarding Section 208, the State defendants have
15   briefed as extensively as we're going to the idea that
16   Section 208 does not entitle a voter to "any" assister of
17   their choice, but, rather, "an" assister of their choice or a
18   person to assist them.
19         Ms. Perales set out the opposing view.  I will mostly
20   leave it to the papers without belaboring points, because as
21   you know, there is precious little case law on this point.
22         THE COURT:  Is there any case law on this point?
23   When you say "precious little," is there any?
24         MR. KERCHER:  The first case that I would point you
25   to is one cited by Ms. Perales, which is the *Arkansas United*

1    case.  As you know — or maybe you don't, if you haven't been

2    through that case, that case involves two voting provisions;

3    one for assisters.  One of them said that an assister who had

4    assisted six people could not assist more people.  The Court

5    enjoined enforcement of that provision saying it created a

6    category of person who could no longer act as an assister.

7         The other provision required assisters to write their

8    name down, and the Court noted that that provided some useful

9    information about who the assister was in the event that there

10   were subsequent problems or concerns about the conduct of that

11   assister, and the Court noted that there are going to be some

12   commonsense limitations on who may assist.  And I think the

13   example the Court gives is, for example, the assister can't be

14   in prison.  They have to be physically able to assist.  They

15   have to be willing to assist.

16        Another example I think I would give you is, in

17   Texas, and under our own election scheme, it seems

18   straightforward that a voter could not insist that their one

19   and only assister be someone who, for example, simply refused

20   to abide by electioneering laws.  Said, "I won't assist you

21   unless I can wear my Vote Yes On Prop A shirt."

22        Likewise, if the polling location has a 30-06 notice

23   on there to firearms owners, to those who were carrying

24   firearms, and the voter says, "My assister is a person who

25   refuses to go into a location with a 30-06 notice, because

1 they always want to have their personal firearm on them."  If

2 that were the case, Your Honor, that would give individual

3 assisters a veto over duly enacted legislation.

4         I don't think, though, that the Court will have to

5 decide that issue of an assister or the assister of their

6 choice, because if we look at *OCA-Greater Houston* -- and we

7 agree that's an important case -- I think we can understand

8 *OCA-Greater Houston* in a way that allows for some

9 modification, some limitation on who may assist; some of these

10 reasonable limitations, commonsense limitations while still

11 understanding what *OCA-Greater Houston* was doing.

12        At least you know *OCA-Greater Houston* was the then

13 Texas law that required the assister be registered to vote in

14 the same county as the voter they assisted.  Not everybody can

15 do that.  Not everybody can register to vote in the county

16 where someone -- the person who may want them to assist is

17 registered to vote.  They may not be eligible to vote at all.

18 Maybe they are not from around here.  Maybe they live in

19 another county.  Maybe they're a felon.  There is a felon

20 disenfranchisement statute.

21        Because that -- that statute at issue in the

22 *OCA-Greater Houston* created a class of people who could not

23 help.  That's why *OCA-Greater Houston* enjoined enforcement of

24 that statute.

25        SB 1 does not do that.  Everyone, for example, can

1  give basic identifying information.  They can write their name

2  down.  They can write their relationship down to the assister.

3  And those are more the kinds of categories of statutes that

4  are at issue and that the plaintiffs challenge under

5  Section 208.

6        If you look at Section 6.01 that is information —

7  that sort of is an information plus provision.  There are

8  already some requirements about writing down the name of the

9  assister and the assister's relationship to the voter they

10 assist.  6.01 says that if there's an assister who is

11 transporting seven or more curbside voters, that they've got

12 to provide additional information.  That's just giving

13 information.  Anybody can give that information.

14       In fact, that's awfully similar to the *Arkansas*

15 *United* provision that was upheld.  That doesn't create a class

16 of people who cannot assist voters.  In fact, this provision

17 also notably falls short of the *Arkansas United* provision that

18 was enjoined, because in *Arkansas United,* of course, they had

19 a, once you have helped so many voters, you may not help

20 anymore.

21       Texas law, SB 1, doesn't say that.  They just say if

22 you are going to help more than seven in this way, you just

23 have to provide some additional information.

24       Plaintiffs' concerns that those claims of provisions

25 are going to result in delays in voting have largely proven

untrue; albeit, they can point to delays and slow-downs and
confusions in March of 2022, when SB 1 was brand-new.  We know
that those were almost uniformly, across the state, resolved
by the November 2022 election.

Mr. Scarpello, from Dallas County, specifically
testified that wait times in early voting in November of '22
were under a minute, and in the general, regular voting, they
were under four minutes.

Section 6.03 is a similar requirement.  Again, basic
info about who the assister is.  That doesn't create a class
of people who, after they have done something, can no longer
assist folks like that provision in *Arkansas United.*  That
doesn't create a set category like the provision that was
enjoined in *OCA-Greater Houston*, where unless you pick up and
move and register to vote in a county where you are assisting,
then you're not going to be able to do it.

6.05, similarly, basic information, but for mail
ballot assisters.

6.07, surely this provision does not violate
Section 208.  All it does is create a space on the mail ballot
for the assister to give the required information under 6.05.

These are simple transparency provisions of the
nature that *Arkansas United* recognized the value in.  These
are addressing those concerns or helping to address some of
those concerns that we talked about at the beginning of State

1  defendants closing argument.

2        People are concerned about what happens in elections.

3  Who is helping?  What are their motivations?  Are they

4  following the rules?  If they are not following the rules, how

5  do we find out -- how do we find out who they are?  These

6  provisions directly address precisely those kind of concerns,

7  and they do so with very little, if any, burden to the voter.

8        And, in fact, they further Section 208's specified

9  purpose of safeguarding voters from manipulation and

10  intimidation.

11        There are some harder provisions, some heavier lifts

12  for State defendants under Section 6.  6.06 is the assister

13  compensation provision.  And that's where Ms. Perales spent, I

14  think, the bulk of her argument on Section 208.  It's a higher

15  procedural hurdle.  It does not, though, exclude a class of

16  assisters.  And the only way that Ms. Perales was able to

17  suggest that it does is by citing to one line provided -- of

18  testimony by Mr. White that talks about what assistance

19  ordinarily looks like.

20        If you look at Mr. Ingram's testimony, both when he

21  was called by the plaintiffs in their case-in-chief on

22  September 22nd at pages 902 through 904, and also when State

23  defendants called him on October 16th, at page 3994, his

24  comments about the extent of the voter compensation are quite

25  telling, because he talks about the importance of why an

1   assister might be paid, and if they are not paid for valid

2   assistance, then they are not going to get in trouble.

3          This is important, Your Honor, because as you know,

4   there has been an argument, as among the parties, about the

5   role that SOS and the OAG play in enforcement of the

6   provisions of SB 1, and I don't want to rehash all of that

7   now.  Most of that has already been decided, at least in the

8   short term, but if plaintiffs are right and the Secretary of

9   State is the agency charged with administering and enforcing

10  SB 1, then the sworn testimony in six depositions and two days

11  of trial from someone like Mr. Ingram, from the duly

12  authorized 30(b)(6) witness from the Secretary of State's

13  Office, specifically disavowing the kind of enforcement that

14  plaintiffs say chills their voting rights —

15         THE COURT:  That's just him talking.  I'm looking at

16  the text.

17         MR. KERCHER:  Well, it's just him talking unless he

18  is the enforcing agency; in which case, how they enforce

19  matters, because — and let's be clear —

20         THE COURT:  He could be replaced.  He could resign.

21  He could die.  He could — anything could happen to him, and

22  so what do we make of the next guy?

23         MR. KERCHER:  Well, some of that is going to go to

24  the imminence of injury, Your Honor, without meaning to step

25  on Mr. Capozzi's toes, but if you look at the *Shrimpers* case,

1  for example, or if you look at *E.T. versus Paxton* where you

2  have children with disabilities who were concerned about COVID

3  and the gubernatorial mandate that public schools and other

4  public buildings could not have mask mandates, these children,

5  because they said they were highly susceptible to COVID,

6  simply refused to go to school and said that was an ADA

7  violation because they were being deprived of participation in

8  education.

9          The Fifth Circuit said, in *E.T. versus Paxton*, that's

10  not how imminent injury works.  That's also not how

11  traceability or redressability works.  Simply refusing to go,

12  rather than looking at -- and that was an ADA case, so they

13  also look at accommodations -- is how we evaluate injury.

14          Right now the plaintiffs have no basis to say that

15  they fear prosecution.  Not only, Your Honor, should

16  Mr. Ingram's testimony and Ms. Adkins' testimony as well be

17  sufficient to demonstrate whether and how this will be

18  enforced, if they are right that the SOS is the enforcing

19  agency, they had more than that.  Because they have now two

20  full years of Texas elections, and despite dozens of parties

21  and scores of attorneys, each of whom I love dearly at this

22  point, they have not been able to find a single case of

23  enforcement of the sort they say they fear.

24          THE COURT:  So if we are just focusing on the ADA

25  claims here --

1          MR. KERCHER:  I'm sorry.  I've been talking about
2     Section 208, but yes, sir.
3          THE COURT:  So if we are talking about the ADA
4     claims, though, I mean, does that all still apply?  I mean,
5     doesn't the State have a higher obligation under the ADA?
6          MR. KERCHER:  No, Your Honor.  The State does have
7     affirmative obligations, but that depends, at least in part,
8     on what the State knows.  Some of that will go to whether
9     there was a request for an accommodation or whether the
10    plaintiffs' disability —
11         THE COURT:  Suggest they don't even have to request
12    an accommodation.  You, upon knowing there's a problem, have
13    an automatic duty to do something.
14         MR. KERCHER:  Well, I think they make that — as I
15    understand their argument — and to the extent they say this
16    is the framework — if they say it this way, we agree.  If
17    there's not an accommodation, then the injury and its
18    limitation and the necessary reasonable accommodation must be
19    open and obvious.  They can't make that showing in this case
20    under the ADA.
21         I'll shift forward to the ADA.
22         The reason they can't make that is, because if you
23    look at — it's ECF 352, which is the findings of fact and
24    conclusions of law from the plaintiffs on their ADA claims
25    among others, it's on page 88 at paragraph 365 —

1           THE COURT:  Impressive.

2           MR. KERCHER:  Well, I wrote it down, Judge.

3           That's where they talk about the type of request for

4    accommodation, and they point to testimony — I believe it's

5    from Ms. Callanen — about how they got — about how the

6    County, Bexar County, got more requests and concerns and phone

7    calls about SB 1 than usual.  That's not sufficient to meet

8    their burden of open and obvious.  It certainly doesn't count

9    as a request for accommodation which we know under Fifth

10   Circuit precedent —

11          THE COURT:  The County officials are calling the SOS

12   asking for something, and the SOS just responds "read the

13   statute."

14          MR. KERCHER:  Well, so — two pieces.

15          First, what the counties are getting is not

16   sufficient either for a request for accommodation or for open

17   and obvious.

18          The Fifth Circuit says that whether it's open and

19   obvious or a request for accommodation, there has to be notice

20   not just of a disability, not just of disability at large,

21   which is, with respect to my colleagues on the other side,

22   sort of an ableist argument that they make by conflating all

23   disability, anywhere, everywhere, in the state of Texas, as if

24   it's the same thing.  First, that's not how disability works,

25   and it's not how the ADA works.

1          THE COURT:  But the local election officials are

2    getting enough information that they feel the necessity to

3    call the SOS for some guidance.  They are getting something,

4    right?

5          MR. KERCHER:  I don't think there's a record of that,

6    Your Honor, which is why I point you specifically to that

7    paragraph which is where I think that the plaintiffs are

8    really summing up their argument for the information that's

9    being provided.

10          Another place that they make the argument is that the

11    State must have known, writ large, because there was testimony

12    about disability rights advocacy groups concerns about SB 1

13    and its predecessors during the legislative process.  But, of

14    course, the legislature is not the enforcer of SB 1, and so we

15    cannot impute whatever that knowledge is.

16          Moreover, that kind of information that is broad —

17    it's general, it's not specific, it conflates all disability

18    as if it's all the same — does not meet the strictures of the

19    ADA, both under the open and obvious requirement and under the

20    request for accommodation.

21          I will tell you that the person who comes closest, I

22    think, from the plaintiffs, to having a cognizable claim is

23    Ms. Guerrero Mata.  She testified that she could not see the

24    information she was required to provide on the ballot.  She

25    testified that she called Travis County and asked them for

1    help, and that Travis County did not give her help.

2           She doesn't say —— her testimony does not clearly

3    reflect what it is she said or what it is Travis County

4    refused to do, if anything; and in addition to being required

5    to say, "I have a disability," she would also have to say,

6    "This disability is causing this specific limitation," and

7    then there would have to be a rejection of a specific,

8    reasonable accommodation.  And the record just doesn't reflect

9    that kind of specificity.

10          And the reason I call out Ms. Guerrero Mata, in

11   particular, is because of plaintiffs' parties or witnesses

12   with disabilities who claim difficulty with SB 1, I believe

13   Ms. Guerrero Mata was the first —— was the only one who was

14   unsuccessful in voting altogether, both in March and November

15   of 2022.  She did say, though, on the stand, under

16   cross-examination —— in fact, thanks to cross-examination ——

17   that she now understood how she should vote using the ballot

18   envelope.

19          THE COURT:  So if I understand you right, you are

20   saying Ms. Mata may have a claim if she actually was denied

21   the right to vote, but everybody else doesn't because we

22   didn't get to that stage?

23          MR. KERCHER:  I think that's right, Your Honor.

24          THE COURT:  So is that that no harm, no foul theory.

25          MR. KERCHER:  No.  It's not a no harm, no foul

1  theory.  It's — I think it's something that plaintiffs'

2  counsel said in her closing argument on the ADA is really

3  telling.  She said that the plaintiffs in this case — or

4  voters in Texas don't even know whether they need an

5  accommodation under the ADA, according to SB 1 provisions.

6        Look, I agree.  That's a profound problem, but fixing

7  that problem is not simply rolling back all of the provision,

8  the challenged provisions, in SB 1; particularly because —

9  and this goes to the scope of the remedy that the plaintiffs

10 seek — particularly because what the plaintiffs are asking

11 for is that you roll back all of the challenged provisions for

12 everybody.  That's not the way the ADA typically works.

13        We have all been reading, with baited breath, Your

14 Honor, your opinions in *Johnson v. Callanen*.  We were all

15 listening closely to the hearing in that case that preceded

16 one of the trial days here.  Something that you said in one of

17 those opinions — and I used to do ADA cases on the employment

18 side in OAG, and I've seen this kind of language and opinions

19 before; but we talk about that interactive process, right,

20 that is endemic to the ADA process.

21        There is no showing that any of the plaintiffs in

22 this case, other than arguably — even there, I don't think

23 she meets her evidentiary burden — arguably, Ms. Guerrero

24 Mata engaged in anything like that or that there is any other

25 evidence in the record that the State defendants — or indeed

 1  any of the defendants — had sufficient information to act.
 2  That's not no harm, no foul.
 3          In fact, Mr. Ingram testified that the SOS
 4  specifically works with disability advocacy rights groups in
 5  order to make sure that their messaging about how voting
 6  restrictions under the Election Code and even specifically
 7  under SB 1 when the SOS put together its communications blitz
 8  for voter education, making sure that those communication
 9  efforts speak to the challenges of the disability community.
10          THE COURT:  So wasn't it kind of futile, though, to
11  go through all that interactive process if all they were going
12  to get back is "read the statute"?
13          MR. KERCHER:  No.  The "read the statute" piece, of
14  course, comes down to — at least in part — our enforcement
15  argument, and it also comes down to our disagreement on the
16  *Lightbourn* case, Your Honor.
17          I know the Court has already considered the
18  *Lightbourn* case and whether or not the ADA is an election law,
19  and so it would fall under the province of the SOS, but I
20  would point out that when the Court distinguishes *Lightbourn*
21  from this case, you did so on the basis that, you know,
22  *Lightbourn* talks about holding the Secretary of State's Office
23  accountable for the actions of local counties as they
24  administer pieces of the election, and that's not what this
25  case is about.

```
 1          I think, though, that the question that you ask now
 2  gets at the larger point; that this case does implicate
 3  precisely that relationship, at least to some degree,
 4  particularly when we look at, for example, Section 5.07, which
 5  provides specifically and exclusively for county action, where
 6  counties are supposed to send out notice about cure process in
 7  the event that a voter's ABBM has been rejected.
 8          So the short answer is, no, it's not futile.  We know
 9  that the Secretary — we know that the State defendants are
10  taking actions to make sure that they are engaging with
11  stakeholders in the disability community, but whether or not
12  those actions prove futile, we cannot tell until we have
13  gotten further down the road of providing that kind — the
14  kind of information necessary for a reasonable accommodation
15  to the parties that are going to be held accountable for
16  administering this program.
17          THE COURT:  So I'm looking for the exact language,
18  and I can't find it right now, but if memory serves me right;
19  so under your theory, the voter's got to tell the election
20  official with more specificity the disability, and so when
21  that happens, then the election official, from what I remember
22  the trial testimony being:  Well, we can't do anything about
23  it.  This is all controlled by statute.
24          And so then when we go up to — upstairs to the
25  Secretary of State's Office, they say, Well, read the statute.
```

 1  But at the same time, there's a provision in the section that
 2  I can't find right now, right ahead of it — thank you.
 3          Ready law clerk here.
 4          So 704 prohibits election officials from:  "Creating,
 5  altering, modifying, waiving, or suspending any election
 6  standard, practice, or procedure in a manner not expressly
 7  authorized by Code," and so what are we supposed to do with
 8  that?  What's the purpose of interaction, when they can't do
 9  anything about it?
10          MR. KERCHER:  Well, the flip side to that is, Your
11  Honor, that Section 1.08 of SB 1 expressly provides that
12  accommodations under the Election Code must be provided where
13  they are reasonable.
14          THE COURT:  So we have one statute saying one thing,
15  and another piece of the statute saying another thing.
16          MR. KERCHER:  Sounds like we need to find a way to
17  harmonize those.
18          THE COURT:  You keep on complaining I can't do that,
19  though.
20          MR. KERCHER:  Well, I think that canons of
21  construction require that we read those as being harmonizable,
22  for lack of a better word —
23          THE COURT:  Like would I say the first one's meant to
24  encompass the second part, and the second part is superfluous?
25          MR. KERCHER:  No.  And that's why I say harmonize

1  rather than reading the two statutes and just casting one out.

2        I think that what Section 7.04 speaks to is the

3  interactive process, and there's not a per-se change of the

4  statute.  An election official at the county level cannot say,

5  Okay, guys, now, you don't have to use — or you don't have to

6  provide this kind of information across the board.

7        THE COURT:  The statute says they can't.

8        MR. KERCHER:  That's what I'm saying.  They cannot do

9  that.  That doesn't say —

10        THE COURT:  So then why do we have an interactive

11  process again?

12        MR. KERCHER:  Because I think there's a difference

13  between making an across-the-board change, right, just

14  changing the rule at all, and making a reasonable

15  accommodation under the rule.

16        THE COURT:  But the statute — the express terms of

17  the statute doesn't even allow them to make it — a

18  modification for one person, as opposed to across the board.

19        MR. KERCHER:  I'm not sure I agree with your reading

20  on that, Your Honor.

21        THE COURT:  704 prohibits election officials from:

22  "Creating, altering, modifying, waiving, or suspending any

23  election standard, practice, or procedure in a manner not

24  expressly authorized by Code."

25        So where in the Code does it expressly authorize

1    someone to do something else?

2              MR. KERCHER:  Section 1.08.

3              THE COURT:  So that's the express provision?

4              MR. KERCHER:  That's correct.

5              THE COURT:  Okay.

6              MR. KERCHER:  I'm almost out of time.  I'm sure you

7    are tired of hearing that — or maybe you're excited to hear

8    that.

9              THE COURT:  Oh, wait a minute.  1022 —

10             Thank you.

11             "A provision of this code may not be interpreted to

12   prohibit or limit the right of a qualified individual with

13   disability from requesting a reasonable accommodation or

14   modification to any election standard, practice, or procedure

15   mandated by law or rule that the individual is entitled to

16   request under federal or state law."

17             But where is the Texas employment statute that says

18   that the accommodation must be granted?  All it says is

19   someone can request.  Where does it say someone must grant the

20   request?

21             MR. KERCHER:  I believe Section 1.08 provides that

22   the — nothing in the Election Code is to — is to be

23   understood — and certainly nothing in SB 1 is to be

24   understood to limit the procedures under the ADA.

25             THE COURT:  We imply it in there?  Okay.

1          MR. KERCHER:  Before I sit down, Your Honor, I want
2     to address the oath just briefly.
3          Plaintiffs' challenge to the provisions of the oath
4     strikes me as challenging the placement of speed limit signs
5     without challenging the speed limit itself.  They are saying,
6     Because I can see the speed limit is 55, I am now afraid to
7     drive.  And so, Judge, please make them take the speed limit
8     signs down.  Even though that would mean that should they
9     exceed 55 miles an hour, they will, nevertheless, be
10    criminally liable for violating the underlying statute that is
11    not at issue.
12         Plaintiffs' counsel this morning in their closing
13    argument did a good job of identifying those four provisions
14    under the oath that were added under SB 1 that they challenge.
15    Each of those four provisions is simply notice of an extant
16    pre-SB 1 statute that plaintiffs do not challenge.
17         In other words, even if the Court grants the relief,
18    the plaintiffs will still be subject to the same consequences.
19    They will still be subject to the penalty of perjury.  There
20    is still the possibility that providing assistance and sharing
21    information or pressuring the voter will result in the voter's
22    vote not counting.  So the request that the plaintiffs are
23    making under the oath does not solve the problem because they
24    do not challenge the heart of the provisions that are read in
25    the oath.

184

1          With that, Your Honor, I'm going to --

2          THE COURT:  One more question for you.

3          MR. KERCHER:  Sure, sure.

4          THE COURT:  So with regard to, you know, the ability

5     to sue the Secretary of State in this reasonable

6     accommodation, I want to make sure I understand how this

7     argument is going.

8          So plaintiffs complain that an individual with

9     disabilities will make a request, the county official needs to

10    find out with more specificity what the extent of the

11    disability is.  There's got to be some interactive dialogue

12    between the two.  The county official or the local election

13    official has no authority to do anything.

14         As I read Election Code 61.013(c), then the county

15    official would bring it up to the Secretary of State, and

16    61.013(c) says the Secretary of State shall determine whether

17    compliance is an undue burden for the county or political

18    subdivision.

19         So isn't the Secretary of State on the hook for at

20    least the ADA claims, considering that language?

21         MR. KERCHER:  So the way that I read that provision,

22    Your Honor, is for -- is that the Secretary of State -- first

23    of all, the county makes the most sense to be part of that

24    interactive process, because the county is the closest to the

25    voter and is most likely to able to provide the kinds of

1  accommodations that will actually help the voter, as opposed

2  to moving up.

3          But to answer your question, as you know, the ADA

4  requires that accommodations be reasonable; that they not —

5  I'm sorry.  I've lost — all of a sudden — but they cannot

6  cause an undue burden.  So if the Secretary of State is asked

7  whether or not a particular kind of accommodation will cause

8  an undue burden, then the Secretary of State may be able to

9  provide input on that, but that is the extent to which I think

10 the Secretary of State could be said to be on the hook for the

11 ADA.

12         Lastly, Your Honor, I would point out, as the Court

13 knows, the Court previously dismissed the ADA causes of action

14 against the Office of the Attorney General leaving in place

15 the Rehabilitation Act claim.

16         The Rehabilitation Act requires a showing that the

17 public entity receives federal funds for the program at issue,

18 and there is no record evidence of the OAG receiving federal

19 funds for that purpose.  Plaintiffs did adduce the receipt of

20 HAVA funds by SOS, but there is no evidence regarding receipt

21 of federal funds by the OAG for the administration of

22 elections or of SB 1.

23         THE COURT:  So now you rely on 1.022 to be this

24 catchall, and so under your argument, the local election

25 official has the ability, under 1.022, to give a reasonable

1    accommodation to a qualified individual with a disability?

2            MR. KERCHER:  Yes.

3            THE COURT:  Then what's the purpose, then, of 61.013

4    and the language that "the Secretary of State shall determine

5    whether compliance is an undue burden"?

6            MR. KERCHER:  Again, I think we are taking the

7    process in layers.  The initial interaction should be at the

8    county level ——

9            THE COURT:  But according to you, 1.022 is it.  The

10   county has the authority —— the local election official has

11   the authority under that section to make the accommodation.

12           MR. KERCHER:  Right.  And if they can ——

13           THE COURT:  But that's not what the language of

14   61.013(c) says.

15           MR. KERCHER:  Well, I think they are speaking to

16   different aspects of the ADA process.  In the first instance,

17   the county makes the determination about whether or not to

18   provide a modification.  If they have a question about whether

19   or not that modification provides an undue burden, then that

20   goes upstairs to the SOS.

21           THE COURT:  And so who has the final word, the local

22   official or SOS?

23           MR. KERCHER:  It will —— they have the final word on

24   different aspects.  If there is no question about whether or

25   not the modification provides an undue burden, the SOS will

1  not get involved.  If there is a question about whether or not
2  the modification will result in an undue burden, then the SOS
3  will have final authority on that piece.
4          THE COURT:  Thank you.
5          MR. GORE:  Good afternoon, Your Honor.  John Gore for
6  intervenor defendants.  I'll be addressing plaintiffs' claims
7  under Section 2 of the Voting Rights Act.
8          For several reasons, the plaintiffs have failed to
9  carry their burden on those claims.  We begin with the
10  language of the statute.  Section 2, violation is established
11  if, based on the totality of the circumstances, it is shown
12  that the political processes leading to nomination or election
13  in the state are not equally open to participation by members
14  of a protected class of citizens.
15          The touchstone of the analysis is whether the State's
16  political processes are equally open, as the bolded language
17  shows.  The governing case for challenges like this that are
18  brought to time, place, and manner restrictions is *Brnovich,*
19  which the Court has mentioned a couple times earlier today.
20          Supreme Court has decided many cases involving
21  redistricting and vote dilution claims, but *Brnovich* is the
22  only one that's decided involving challenges to time, place,
23  and manner restrictions like SB 1.
24          *Brnovich* identified five main guideposts for
25  analyzing such claims, and plaintiffs' claims fail all five

1    here.

2          The first guidepost is the size of the burden imposed

3    by the challenged rule, which the Supreme Court said was

4    highly relevant.  And not just any burden will do.  The

5    burdens have to block or seriously hinder voting.  The usual

6    burdens of voting, and any mere inconvenience, are not enough

7    to demonstrate a Section 2 violation.

8          THE COURT:  So how large does the racial disparity

9    have to be?

10         MR. GORE:  That's analyzed under *Brnovich* guidepost

11   number 3, which we'll get to in a minute.  This is just a

12   question of how hard is it actually to comply with the rule

13   itself, as opposed to what effect does it have on members of

14   different classes.

15         The second guidepost is one Your Honor mentioned

16   earlier today, which is the degree to which a voting rule

17   departs from what was standard practice when Section 2 was

18   amended to add the effects to 1982.  And one important

19   baseline from 1982 is that states typically required all

20   voters to vote in person on Election Day and did not widely

21   offer absentee voting at that time.

22         Another key point is that Section 2 does not uproot

23   facial and neutral time, place, and manner regulations that

24   are long-standing or have widespread use.

25         The third guidepost is the one that Your Honor was

1  just asking about, which is the size of disparities in a

2  rule's impact on members of different racial and ethnic

3  groups.  The mere fact that there is some disparity and impact

4  is not enough.  It does not mean that the system is not

5  equally open, because, of course, even a facial and neutral

6  rule may result in disparate impact because of things like

7  education level and socioeconomics and other things that are

8  not controlled by Section 2.

9          THE COURT:  So if some is not enough, when do we get

10  to what is enough?

11          MR. GORE:  So, happy to answer that now, Your Honor.

12          Couple of things are very important.  The first is,

13  if we go to the next slide, what we see is that a policy that

14  appears to work for the vast majority of voters of all races

15  is unlikely to render a system unequally open.

16          The example from *Brnovich* is that there was a

17  challenged rule that was complied with about 98 percent of the

18  time by all voters, and the Supreme Court held that that was

19  not sufficient -- that that could not be the basis of a

20  Section 2 claim, even though minority voters were about twice

21  as likely not to comply with it as White voters.

22          The Supreme Court said, Well, look, if you have a

23  policy that appears to work for everybody, or virtually

24  everybody, that's not actionable under Section 2, even if

25  there is some disparity between racial groups in terms of a

1  level of compliance with that rule.

2          An important point on that is that the Court

3  specifically cautioned courts from elevating a distorted

4  picture that could be created by dividing one percentage by

5  another.  So, for example, to use the *Brnovich* example again,

6  it was a little over 1 percent of minority voters who didn't

7  comply with the rule and only about a half a percent of White

8  voters.  And the plaintiffs argued, Well, that's a disparity

9  of two times; it's twice as likely for minority voters not to

10  comply as it is for White voters.

11          And the Supreme Court held that that was simply

12  insufficient in that case because the vast majority of voters

13  were able to comply, and the difference between the two was

14  negligible on that record.

15          The fourth guidepost is one we've talked about today,

16  which is a consideration of all the opportunities provided by

17  the state system of voting.  And as Ms. Hunker highlighted

18  during the right-to-vote discussion, Texas offers a variety of

19  methods to vote that are more generous than the 1982 baseline;

20  that includes in-person voting on Election Day, two weeks of

21  early voting for everyone, and mail voting for particular

22  groups.

23          The final guidepost is the strength of the State's

24  interest served by the challenged rule, and the Supreme Court

25  specifically noted that one entirely legitimate interest is

1  the prevention of fraud, which the State can pursue without

2  awaiting fraud to occur within its own borders.

3        THE COURT:  But in this case, you know, it just seems

4  the State is acting on the base of speculation.  I mean, does

5  it —— doesn't there have to be some objectivity to this?

6        MR. GORE:  In *Brnovich* itself, the Supreme Court has

7  held that even though there is no record of fraud in Arizona,

8  Arizona could still adopt methods and rules to prevent fraud

9  based on the risk of fraud happening in Arizona or fraud that

10 had happened in other states.

11       THE COURT:  Regardless of how speculative or

12 conspiratorial it is.

13       MR. GORE:  I don't know that the record shows it's

14 speculative or conspiratorial here.  I think there was a

15 legislative record assembled about concerns with certain

16 voting practices and vulnerabilities in the voting system that

17 the State took steps to remediate.

18       Another important interest is ensuring that every

19 vote is cast freely without intimidation or undue influence.

20 And when analyzing State interests under Section 2, there is

21 no least restrictive means test.  The State does not need to

22 show that a less restrictive means would not adequately

23 observe —— would not adequately serve its objectives.

24       THE COURT:  But here —— now, going back to poll

25 watchers, I mean, isn't that running against that interest?  I

1  mean, they are actually letting poll watchers get closer to

2  where —— to voters than they have ever been.

3       MR. GORE:  I think the record is clear that the vast

4  majority of poll watchers conduct themselves within the

5  constraints of the law.  We've also heard testimony in this

6  trial from County election officials that poll watchers serve

7  a useful purpose.  And poll watchers here can also help ensure

8  that there's no intimidation or undue influence from voter

9  assistance, or others in a polling place, in an attempt to

10 unduly influence voters.

11      So, in fact, clarifying the rights of poll watchers

12 and clarifying their obligations and making them now go

13 through training and swear an oath that they won't harass

14 voters or interfere with the voting process, are all positive

15 developments that allow poll watchers to function within their

16 proper purpose in the polling place, which includes observing

17 voting to make sure that no intimidation or undue influence

18 has occurred.

19      I want to address a couple of other points that have

20 been raised so far today.  The plaintiffs, in their briefs,

21 and again today, have pointed to the evidence of a regrettable

22 history of discrimination and its ongoing effects in Texas and

23 elsewhere.  That evidence is, as I said, very regrettable, but

24 it alone does not establish a Section 2 violation.  If it did,

25 every election law would violate Section 2.

1          A history of discrimination and ongoing effects are

2     not one of the Brnovich guideposts.  They are a factor that

3     can be considered, but a showing on that factor alone cannot

4     overcome a failure of evidence on the other guidepost, such as

5     the burden and disparity on the 1982 baseline.

6          Your Honor's also asked some questions about

7     cumulative effect that I would like to try to answer as well.

8          The plaintiffs cite two cases for this cumulative

9     effect analysis.  One is a concurring opinion from Justice

10    O'Connor and Justice Breyer joined as well in the *Clingman*

11    case.  That's actually not a Section 2 case.  That's an

12    *Anderson-Burdick* case.

13         The other is a case from the Fourth Circuit where the

14    Fourth Circuit did hold that the district court should

15    consider the cumulative effect of various challenged

16    provisions in determining, as part of the totality of the

17    circumstances, whether a Section 2 violation had been shown;

18    but the issue in that case was that each of those various

19    provisions had been shown to impose a burden that was a

20    cognizable burden, and to result in some kind of disparate

21    impact.

22         THE COURT:  Let me make sure I understand the

23    arguments that were made previously.  Wasn't your colleague

24    implying that cumulative effects was not to be taken into

25    consideration for *Anderson-Burdick*?

194

1          MR. GORE:  I believe she did say that for

2   *Anderson–Burdick,* right.

3          THE COURT:  So you are telling me that Justice --

4          MR. GORE:  O'Connor.

5          THE COURT:  -- O'Connor -- thank you -- in the

6   concurrence opinion did allow for cumulative effects?

7          MR. GORE:  It was in a case where the Court didn't --

8   the majority didn't actually engage in that analysis for

9   reasons of waiver and issue preservation.

10          THE COURT:  So it's dicta on her part?

11          MR. GORE:  It's a dicta on her part and was only

12   joined by Justice Breyer.  And in any event, in the Section 2

13   case what we have is this Fourth Circuit decision, which is

14   distinguishable from the case here for a couple of reasons.

15          One, each of the provisions in that case had been

16   shown to impose some kind of burden that, on its own, might be

17   cognizable under Section 2, and the District Court at *Trevor*

18   [phonetic] explained all that away and kind of missed the

19   forest for the trees.  And that was the concern animating the

20   Fourth Circuit.

21          A consideration to cumulative effect can't turn a

22   provision that's not burdensome or that doesn't violate

23   Section 2 into a Section 2 violation.  As we saw on

24   guidepost 4, the Court will consider all of the opportunities

25   to vote that the State makes available, and so even where

 1  there's one provision that imposes some kind of burden, that

 2  doesn't necessarily mean that the system as a whole violates

 3  Section 2.  So the cumulative effect analysis comes in when

 4  there have been showings of burden or other violations with

 5  respect to more than one provision, and the question is

 6  whether in the totality of the circumstances, a violation of

 7  Section 2 has been shown.

 8        Here, however, there has been no showing of a

 9  Section 2 violation on any of the challenged provisions, so

10  there is no occasion or basis to conduct that kind of

11  cumulative analysis, because each of the challenges fails

12  under the five *Brnovich* guideposts.

13        Let's go to drive-thru voting.  Any burden imposed

14  here is just the usual burden of voting.  It's the burden of

15  an in-person voter parking their car, entering the polling

16  place, and voting inside.

17        These provisions are also more generous than the 1982

18  baseline, because Texas provides curbside voting more

19  generously than it did in 1982.  And there is no evidence that

20  in 1982, other states widely permitted voting from inside

21  cars; similar to the drive-thru set-up that was used in Harris

22  County in 2020.

23        So this is not a cognizable burden, because it's

24  nothing more than the usual burden of voting.  And it's more

25  generous than the 1982 baseline.  Even assuming that there was

1  some cognizable burden, the evidence doesn't show a cognizable

2  disparity based on race.

3        What the plaintiffs have provided is limited evidence

4  regarding the usage of drive-thru voting in Harris County in

5  2020, but that evidence doesn't prove a cognizable burden from

6  the removal of drive-thru voting.  It doesn't show that

7  removing drive-thru voting somehow makes it particularly more

8  difficult for members of minority groups to vote compared to

9  members of the nonminority group.

10        And second, the evidence they did provide is not

11  probative in any event.  They provided no analysis of two

12  majority White counties, Tom Green County and Bee County, that

13  allowed drive-thru voting in some form in 2020.  Moreover,

14  Dr. Mayer conducted an analysis of Calhoun County, but he

15  admitted on the stand that that analysis was flawed.  And that

16  leaves the analysis of drive-thru voting in Harris County.

17        The former Harris County Elections Administrator,

18  Ms. Longoria, testified that the County made a, quote,

19  "Race-informed decision as to the placement of drive-thru

20  voting locations," but the plaintiffs' experts didn't control

21  for that.  Moreover, the plaintiffs' experts didn't control

22  for the underlying demographics of Harris County.

23        Harris County is a majority minority county.  It's

24  not a majority White county.  Even in Harris County, though,

25  White voters were disproportionally likely to use drive-thru

1  voting in 2020.  They used it at a higher rate than their rate

2  of the population as a whole.  And Dr. Mayer admitted to that

3  as well.  That's on pages 2041 through 2046 of the transcript.

4         Texas law also provides ample alternatives to

5  drive-thru voting.  There's voting in person in the polling

6  place.  There's early voting.  There's curbside voting for

7  qualified voters.  And there's absentee voters who qualify for

8  that method.

9         And the ban on drive-thru voting advances the State's

10  interest.  It prevents fraud and undue influence.  It

11  secures — or at least contributes to — statewide uniformity.

12  It facilitates orderly elections, and it otherwise allows poll

13  watchers the access they are allowed to have under other

14  provisions of Texas law.

15         There were complaints that were discussed by

16  Ms. Longoria, Pages 1408 and 1409 of the transcript, of poll

17  watchers being unable to observe activities they were entitled

18  to observe because they couldn't get close enough to the cars,

19  or they couldn't see up in a high-profile car to observe the

20  voting activities the Code otherwise allows them to observe.

21         Results of the 2020 audit conducted by the Secretary

22  of State, which revealed some irregularities in the

23  recordkeeping with respect to the drive-thru voting locations.

24         Let's move on to 24-hour voting, which I think maybe,

25  at least for my mind, is a little bit better understood as

1  overnight voting.  Sections 3.09 and 3.10 expand polling place

2  hours in Texas, and they reiterate the ban on voting between

3  10:00 p.m. and 6:00 a.m., which had not been previously

4  allowed under Texas law.

5          These provisions also don't create a cognizable

6  burden.  Voting between 6:00 a.m. and 10:00 p.m. are the usual

7  burdens of voting.  Polling places generally are not open

8  between 10:00 p.m. and 6:00 a.m.  So the burden, such as it

9  is, to appear outside of those hours is just the usual burden

10  of voting.

11          There is no evidence that overnight voting was widely

12  permitted in 1982, because it wasn't in Texas or elsewhere.

13  And SB 1's expansion of in-person voting hours makes current

14  Texas law more generous than the 1982 baseline.  These

15  provisions also create no cognizable disparity based on race.

16          The plaintiffs' experts did not analyze the effect of

17  increasing voting hours to comply with these provisions, such

18  as happened in Hidalgo County.  We heard testimony Hidalgo

19  County actually had to expand its voting hours to come into

20  compliance with the law, in the expansion under SB 1.

21          Moreover, only .28 percent of Harris County early

22  voters utilized 24-hour voting.  The vast majority are served

23  by regular voting hours, and that harkens back to the

24  discussion we had about *Brnovich*, where the Court said if the

25  rule works for the vast majority of voters of all races, then

1    it's not actionable under Section 2.  That's precisely what we

2    have here.

3           Moreover, again, Harris County placed the voting

4    locations in predominantly minority neighborhoods, but experts

5    didn't control for that location.  And once again, as

6    Dr. Mayer admitted, White voters disproportionately used

7    drive-thru voting in Harris County compared to their

8    percentage of the population as a whole.  There also, ample

9    opportunities and alternatives are available to vote:  That's

10   early voting.  There's countywide voting in certain counties.

11   There is curbside voting and absentee voting for voters who

12   qualify.

13          And there are also important State interests that are

14   served by these provisions:  Preventing voter confusion,

15   securing uniformity, and facilitating orderly, cost-efficient,

16   and safe elections.

17          And that last interest in particular is borne out by

18   the record.  Ms. Callanen, who is the elections administrator

19   right here in Bexar County, testified that she opposes 24-hour

20   voting because of concerns for the physical security of

21   election workers late at night.  She also said she believes

22   the law already provides more than enough hours for early

23   voting.  That's all in the transcript at 1021 to 1022 from

24   September 19th.

25          We also heard testimony from Mr. Phillips from

1    Denton County.  He also expressed safety concerns from

2    late-at-night voting.  That's at the October 12 transcript,

3    page 3857.

4         Let's move now to poll watcher claims, to challenges

5    to Section 401 and 407.  These provisions did not meaningfully

6    change Texas law.  In fact, if anything, they strengthened

7    protections against poll watchers by requiring them to

8    complete the training and swear an oath that they would not

9    harass voters or interfere with the voting process.

10        There is no evidence of widespread misconduct or of

11   election judges being unable to remove poll watchers.  They

12   presented no evidence of any voter being unable to vote and

13   any burdens presented have not changed and are certainly no

14   change from the 1982 baseline.

15        The plaintiffs also presented no evidence of

16   cognizable disparity.  They are concerned about poll watchers

17   looming around polling places or otherwise coming across in an

18   intimidating manner, but they have provided no evidence of

19   poll watcher activities with respect to White voters or in

20   precincts that are predominantly White.

21        So we can't show any disparity in the activities

22   between poll watchers in one location, say, that's

23   predominantly a minority location, and one that's a

24   predominantly White location.

25        And a similar failure of proof foreclosed the Section

2 claim in *Brnovich*.  At issue in *Brnovich* was an Arizona
prohibition on third-party ballot collection.  And the
plaintiffs in that case adduced evidence that third-party
ballot collectors operated in minority neighborhoods, but they
have no comparator evidence.  They have no qualitative or
statistical evidence to compare those ballot collection
activities in those neighborhoods to ballot collection
activities among White voters.

        And so the Supreme Court held that the plaintiffs
failed to show a cognizable disparity.  That's on pages 2335,
2346 and 2347 of *Brnovich*.  So similar failure of proof here.
They have no comparator evidence, so it's impossible to know
whether there is a disparity between minority voters and White
voters with respect to these particular provisions.

        One more point on that.  The plaintiffs brought
Dr. Mayer to court, and Dr. Mayer expressed concern that poll
watchers might target or disproportionately object to minority
voters in a manner that interfered with their right to vote,
but he admitted that he has no evidence of poll watchers doing
that since SB 1's enactment.

        There's no evidence that any poll watcher has
targeted minority voters or that poll watchers have
disproportionately objected to the qualifications of minority
voters.  And this led to experiments under SB 1 as highly
irrelevant.  That's at Pages 2049 and 2050 of the transcript.

1    Again, Texas law provides alternatives to vote, and

2    these provisions advance the State's interests listed here.

3    Let's move to ID numbers.  These are challenges to

4    the ID number requirements for applications for

5    ballots-by-mail and absentee ballots.  The evidence focused

6    from the plaintiffs on the applications and ballots, the

7    number that have been rejected, but that number continues to

8    decline as voters become more familiar with the requirements.

9    And it's also simply the wrong question.  The

10    question is not whether there is a consequence for

11    noncompliance with the challenged rule, but instead how

12    burdensome compliance is, and plaintiffs' evidence fails to

13    show cognizable burden on compliance.

14    Dr. Mayer admitted that he did not even consider that

15    question.  He didn't consider how hard it was to fill out the

16    number on the form.  That's at Pages 2053 and 2054 of the

17    transcript.

18    THE COURT:  Didn't we hear a lot of evidence of

19    people having their ballots rejected?  I mean, why isn't that

20    enough?

21    MR. GORE:  That, in and of itself, doesn't show that

22    there is a burden on compliance, as much as it shows that it

23    was a new requirement.  And as voters have learned about the

24    requirement and election administrators have learned how to

25    administer the requirement, that rate continues to go down.

1          The requirement itself is not particularly
2   burdensome.  On any form related to absentee voting, voters
3   have to fill out information and fill out lines.  It's the
4   same burden that these provisions impose here.  It's also more
5   generous than the 1982 baseline when states did generally not
6   permit voters to vote by mail.
7          The plaintiffs also didn't show a cognizable
8   disparity.  We've heard about Professor Smith this morning.
9   He had some statewide analyses, but his data were incomplete.
10  Many of his data sets excluded up to 87 of Texas' counties.
11         There was some discussion of Dr. Mayer.  He did
12  analyses of Harris and Tarrant Counties in March 2022, and
13  Harris and Dallas counties in November 2022; obviously,
14  doesn't supply data for Texas as a whole.  And he did exactly
15  what the Supreme Court warned against in *Brnovich.*  He divides
16  percentages in a way that distorts the disparity.
17         I mentioned before an example from *Brnovich* on
18  page 2345 of that opinion.  The Court held that even a
19  300 percent disparity would not be enough to show a Section 2
20  violation necessarily, and here the disparities generated by
21  dividing the percentages are even smaller and they're,
22  likewise, not cognizable.
23         These provisions also advance Texas' interest in
24  preventing fraud and promoting public confidence.  It also
25  cites, Your Honor, to page 137 of our proposed findings of

1  fact.  These numbers prevent ineligible people with the same

2  name as an eligible person from voting absentee.  That had

3  occurred in Collin County in 2020.  And Mr. Phillips again

4  testified that these requirements would have helped deter a

5  fraudulent mail ballot scheme in 2020.

6          Let's move to the ABBM rules.  This is a Section 2

7  challenge to Sections 504 and 704 to the extent they prohibit

8  distribution of unsolicited application for ballots-by-mail.

9  They impose no cognizable burden because the requirement to

10 request an application is a usual burden of voting.  They also

11 just clarify pre-existing Texas law, as we've mentioned

12 earlier today.

13         And these provisions are more generous than the 1982

14 baseline, and there's no evidence that States sent unsolicited

15 applications for ballots-by-mail in 1982.  There's also no

16 evidence of a cognizable disparity from this provision.  I

17 don't believe there's even really been an attempt to show that

18 there is an impact of these rules that's different from

19 minority voters than nonminority voters.

20         These provisions also advance State interests.  I'll

21 mention the one, avoiding voter confusion, which happened when

22 Harris County sent out these ABBMs unsolicited in 2020.

23         Next is the ban on vote harvesting, while we're on

24 Section 704.  This already was illegal.  Under Texas law, it's

25 illegal to unduly influence voters during the voting process.

1  Plaintiffs have not shown any individual who was unable to

2  vote because of this provision, and voters still have all the

3  same options for completing and returning their mail ballots

4  now that they had prior to SB 1.

5          The requirement to complete the ballot without undue

6  influence is a usual burden of voting, and that does not

7  deviate from the 1982 baseline.

8          Plaintiffs have adduced no evidence of a cognizable

9  disparity because, once again, they haven't produced any

10 evidence of voters who have been unable to vote or face

11 difficulty voting because of this vote-harvesting ban.  There

12 are — ample opportunities for voting remain available,

13 including all the same options for completing and returning

14 ballots that preexisted Section 704.

15         Section 704 also advances important State interests,

16 including preventing fraud and undue influence, preserving

17 election integrity, and promoting public confidence.

18 Section 704 is no different from the laws in all 50 states

19 that prohibit electioneering at the polling place.  It creates

20 an island of calm around the ballot and insulates voters from

21 undue influence.

22         The next challenges are to the voter assistance

23 provisions in Chapter 6.  Requiring assistants to fill out

24 forms and swear an oath; particularly, an oath that doesn't

25 change the assister's substantive obligations compared to

1  pre—SB 1 law are the usual burdens of voting and don't depart
2  from the 1982 baseline.
3        These provisions — plaintiffs have also failed to
4  show any — provide any comparator evidence or other evidence
5  to show a cognizable disparity.  There's no evidence that the
6  rules have a different or greater impact on minority voters.
7        We point to demographic evidence about the rates of
8  disabilities and limited English proficiency, but that
9  evidence doesn't show that there's been a resulting difference
10 of less opportunity from minority voters than nonminority
11 voters, let alone in a cognizable way.  It's the same issue we
12 talked about before, the lack of comparator evidence in
13 *Brnovich*.
14        And if that demographic evidence were enough, Texas
15 could not regulate voter assistance at all, but even
16 plaintiffs concede that pre—SB 1 regulations are valid.
17        And finally, let me briefly address Section 702,
18 which expands the right to time off to vote.  This does not
19 impose a burden.  It removes a burden, because it grants
20 workers two hours —— a right to two hours off of work in order
21 to vote.
22        That right has existed in Election Day since 1985.
23 SB 1 now expands it to early voting period as well, so this is
24 more generous than the 1982 baseline.  There's no evidence of
25 voters unable to vote, no evidence of a cognizable disparity

1  and, of course, this advances the State's important interest

2  in promoting voting.

3          So the Court should enter judgment for defendants on

4  the Section 2 claims.

5          THE COURT:  Thank you.

6          One question for you, and more intellectually -- just

7  curious about this.  You and your bright colleagues know more

8  about this than I do.

9          So I'm still stuck on this whole issue of standing.

10  Your colleague earlier said, Well, the intervenors didn't have

11  to have an established standing for Article III purposes to be

12  here.  Yet the Fifth Circuit allowed you-all to be in here.

13  It's -- it's -- doesn't it strike you ironic that you-all

14  don't have to establish standing, and you have an intervention

15  as a matter of right; whereas plaintiffs have to go through

16  all these hoops to prove standing?

17          MR. GORE:  I don't believe it's ironic.  I just

18  believe they're different standards.

19          THE COURT:  But, I mean, isn't the result absurd and

20  unjust?

21          MR. GORE:  I don't think so.

22          THE COURT:  Why?

23          MR. GORE:  The federal rules establish a standard for

24  intervention when an intervenor claims an interest.

25          THE COURT:  Does it make sense to you, though, that

1  you get to come in here and they don't?

2      MR. GORE:  I think it makes sense that each of us had

3  a burden to fulfill in order to be here.  The Fifth Circuit

4  held that we satisfied that standard.  And to the extent the

5  plaintiffs have met their burden, they have satisfied the

6  standard as well.

7      THE COURT:  But your burden was so minimal.

8      MR. GORE:  It's a different burden because we aren't

9  affirmatively asking the Court for judicial relief.  We're not

10  invoking the Article III power of this Court or any other

11  federal court to enjoin any other party.

12      THE COURT:  But you have taken the war — leading war

13  in this case, in many respects, to defeat the plaintiffs'

14  challenges.

15      MR. GORE:  That's because we have an interest that

16  allowed to us intervene, and an interest in defending SB 1 and

17  Texas' election laws, more generally; but that — we fulfilled

18  that interest that allowed us to intervene.

19      We have not asked the Court to enter any kind of

20  injunction or court order which changes the legal rights or

21  obligations of any party, which is what has to happen for a

22  party to be required to show standing, as plaintiffs are

23  required to show here.

24      THE COURT:  Thank you.

25      MR. CAPOZZI:  Your Honor, Louis Capozzi again from

1  Jones Day for intervenor defendants.  Can I just ask the Court
2  before I begin how much time we have left?
3          THE COURT:  So y'all started at 1:00.  And when we
4  broke — one second.  Let me go to my notes.
5          MR. KERCHER:  Your Honor, according to my esteemed
6  colleague and time-keeper, we are at 150 minutes and
7  9 seconds, so we have just under 29 minutes — just under 30.
8          MR. CAPOZZI:  I would like to reserve 9 minutes for
9  my colleague for closing, so if you could just stop me.
10         THE COURT:  I'll stop you after 12.
11         MR. CAPOZZI:  So I've got two sections here.  I would
12  also ask for just a brief break in between them so I can
13  switch slide shows.
14         First, I'd like to address the void-for-vagueness
15  challenges to Sections 4.06, 4.07, and 4.09.  These are the
16  challenged provisions.  All of these challenges are premature
17  and also meritless, in any event.
18         THE COURT:  But how do you really feel?
19         MR. CAPOZZI:  Well, Your Honor, just to start, I —
20  you know, no person anywhere in Texas has been investigated,
21  prosecuted, or threatened with prosecution under any of these
22  challenged provisions.  Moreover, neither plaintiffs nor
23  anyone else have asked the state courts for a definitive
24  construction of these provisions.  Instead, plaintiffs are
25  bringing pre-enforcement facial vagueness challenges.

1          I think the easiest way to resolve these claims is on

2    standing grounds.  The *National Press Photographers* case is

3    exactly on point; dealt with the exact same types of claims,

4    exact same circumstances as this case.  That's 90 F.4th at

5    782, and I don't see how plaintiffs get around that case.

6          But even if they do, the Supreme Court has held

7    repeatedly that pre-enforcement facial vagueness challenges

8    against state laws are not appropriate until state courts have

9    been given the chance to interpret the challenged laws.

10         Accordingly, plaintiffs facial challenges -- you

11   know, they would fail on the merits right out of the gates,

12   because Texas's state courts have had no occasion to constrain

13   the provisions and adopt a limiting construction to avoid

14   constitutional questions.

15         If the Court does press on to the merits, the

16   plaintiffs have one of the most daunting standards of proof in

17   American law, and they cannot satisfy it.  As the Fifth

18   Circuit has explained, plaintiffs must prove the challenged

19   provisions are impermissibly vague in all their applications.

20   That's the standard for civil vagueness challenges like

21   *Village of Hoffman* for a criminal provision like Section 4.09,

22   you still have to prove that it's substantially vague in many

23   or most of its application.

24         Here, no challenged provision is unconstitutionally

25   vague.  Let's start with Section 4.06, which requires election

officials to accept poll watchers for service when they
present a certificate of appointment and a certification that
they have completed training.  This is not vague at all.  It's
a simple instruction.

There are many applications of Section 4.06 that are
not vague.  For example, if an election official declines to
accept for service a poll watcher with the required
certificates, she has violated Section 4.06.  This alone
proves that Section 4.06 is not impermissibly vague in all or
most of its application and that the facial vagueness
challenge must fail.

Plaintiffs' main complaint about Section 4.06 is
their hypothetical.  What happens if you have a poll watcher
who was disruptive on prior days?  Do you have to accept them
and then wait for them to misbehave.  You know, this is a
hypothetical situation that hasn't happened in Texas.

In *Roark & Hardee,* the Fifth Circuit warned against
relying on hypotheticals that haven't happened for
pre-enforcement facial vagueness challenges.  But the
hypothetical is not that hard.  You do — I think, reading
Section 4.06 literally, you have to accept the poll watcher
for service, and if they misbehave, you expel them.  That's
addressed by other sections of the law.

Now, in the unusual situation where someone has
behaved badly in prior days and a poll worker refuses to

1  accept that person in the first instance, that's an unusual

2  situation.  I'm skeptical anybody would prosecute in that

3  situation.  There's certainly no evidence that anyone has, but

4  if you wanted to be safe, accepts the poll watcher, wait till

5  they misbehave, and then promptly expel them.  That's what the

6  election judge is supposed to do.

7         Let's talk about Section 4.09.  You know, as a

8  preliminary point, I question whether plaintiffs have standing

9  to challenge this provision also in redressability grounds.

10  The old law prohibited knowingly preventing a poll watcher

11  from observing an election activity the watcher is entitled to

12  observe.

13         Section 4.09, which, you know, is the bolded language

14  on this slide, just provides a couple of examples of what

15  constitutes the old offense.  I think the old —— you know,

16  Keith Ingram testified that obstructing the view of a poll

17  watcher or distancing them would have been considered

18  obstructing the poll watcher under the pre-SB 1 language.

19         So I question whether there's standing to challenge

20  4.09.  Keith Ingram testified that the section, quote,

21  "doesn't change anything substantively," end quote.

22         But, in any event, Section 4.09 is not vague.

23  Plaintiffs' main challenge is that Section 4.09 uses the term

24  "reasonably effective" without defining it, but that doesn't

25  make Section 4.09 vague for several reasons.

1           First, Section 4.09 has plenty of applications that
2    are not vague at all.  As Keith Ingram explained at trial,
3    Section 4.09 was enacted in response to election officials,
4    such as in Travis County, placing poll watchers in a separate
5    room or in a pen where they couldn't see.  That's the
6    September 22nd transcript at 1887 and 1888.  And there is no
7    dispute that Section 4.09 prohibits that.  So, once again,
8    Section 4.09 is not impermissibly vague in a substantial
9    number of its applications.

10          Moreover, "reasonably effective" — that's the
11   language plaintiffs target — is an objective standard.  They
12   say it's a subjective standard, but reasonableness is always
13   objective in American law, not subjective.

14          As the Ninth Circuit explained in *Weddington v.*
15   *United National Insurance Corp,* quote, "The term 'reasonably'
16   indicates that an objective standard should apply.  The word
17   'reasonably' is not ambiguous," end quote.

18          And the Supreme Court has held that the use of a
19   reasonableness standard does not make a statute
20   unconstitutionally vague.  That's the *Cameron v. Johnson* case
21   where the Court upheld a criminal statute that prohibited
22   unreasonably interfering with access to a courthouse.

23          The appellants there argued it was unclear what
24   "unreasonably" meant.  The Court said, quote, "It is a widely
25   used and well—understood word in American law," end quote.

1  And, indeed, American law is full of objective reasonableness

2  standards, from the right to self-defense in a murder case, to

3  most of tort law.

4          Finally, Section 4.09 has a knowingly scienter

5  requirement, which alleviates any vagueness concerns.  Even

6  the HAUL plaintiffs acknowledge that point on page 340 of

7  their brief.  Now, plaintiffs say this is a subjective

8  standard.  We think the statute unambiguously forecloses that

9  reading, but even if you disagree, that just reinforces why

10 the Court has to let the state courts interpret this provision

11 before striking it down.

12         The Supreme Court has repeatedly held that — and

13 also the Fifth Circuit has held that if you're not going to

14 wait, the federal court has an obligation to adopt a narrowing

15 construction in order to save the statute's constitutionality.

16         Here, adopting an objective reasonableness standard

17 is, we think, the best reading of the statute.  It's supported

18 by the canon of constitutional avoidance, by the rule of

19 lenity.  So we would encourage the Court to defer to the state

20 courts or to adopt this construction in the first instance and

21 reject the vagueness challenge.

22         Finally, Section 4.07.  Again, this provision does

23 not really change the law, so I question whether there is

24 standing here.  The pre-SB 1 law said that a poll worker was

25 entitled to sit or stand conveniently near an election

1  activity.  "Near enough to see and hear" has replaced

2  "conveniently near."  Keith Ingram said those are the same

3  things.

4         In any event, the facial challenge to Section 4.07

5  must fail.  Again, state courts never had a chance to

6  interpret this provision.  The Court should defer.

7         Plaintiffs' primary argument is that Section 4.07

8  adopts a subjective standard.  We understand this provision to

9  create an objective reasonableness standard.  We think this

10 should be read together with Section 4.09.  We would encourage

11 the Court to either adopt that narrowing construction or to

12 defer to the state courts so they can adopt it.

13        Plaintiffs cite a variety of cases that say that

14 subjective standards are problematic under the

15 void-for-vagueness doctrine, like *Coates v. Cincinnati*, and

16 there was a Fifth Circuit decision involving abortion

17 regulations.  Those cases dealt with subjective standards.

18        We would submit this is an objective standard, but

19 those cases are distinguishable even if 4.07 adopts a

20 subjective standard.  In those cases, like in *Coates,* a person

21 was liable if they guessed wrong about what another person's

22 subjective conclusion was.

23        Here, you don't have to guess.  I mean, the way these

24 disputes play out in the real world is a poll watcher will

25 stand where they think they want to stand, and the election

worker will have to challenge them on that point.  They will
have to stay, "Please don't stand there," and the poll watcher
would say in that instance, "No, I need to stand here in order
to see."  If it's a subjective standard, the poll worker can,
of course, avoid liability by letting the person stand where
they need to stand.

THE COURT:  So the testimony we had in the case was a
person was at the ballot box, completed her ballot, is walking
to the tabulator, and the poll watcher is following her.

MR. CAPOZZI:  Yes.

THE COURT:  What purpose would the poll watcher have
under that scenario of following that voter?

MR. CAPOZZI:  Yeah.  So if I was the election judge
in that situation, I would have asked the poll watcher to take
a couple steps back.  There's no evidence that anyone tried to
do that.  That's what an election judge is probably required
to do under the Election Code.

But, again, for purposes of standing and on the
merits, the question is about the delta of pre-SB 1 versus
post-SB 1.  And, you know, pre-SB 1, the watcher is entitled
to be enough -- near enough to conveniently see and hear.  So
it's not clear to me that that action involving Sharon
Watkins-Jones from Delta was prohibited by pre-SB 1 law, and I
don't think that post-SB 1 law authorizes what that poll
watcher did.

1          And, again, there's no evidence that anyone tried to
2    tell that particular poll watcher to take a couple of steps
3    back.  I think most people would respond reasonably if you ask
4    asked them to do that.
5          THE COURT:  So I'll give you more time for your
6    second part.
7          MR. CAPOZZI:  Thank you, Your Honor.
8          Okay.  Now I will address plaintiffs' First Amendment
9    challenges to Section 7.04, and if I have time, their
10   vagueness challenges.  These challenges are premature and also
11   fail on the merits.
12         Start with prematurity.  No person anywhere has been
13   investigated, prosecuted, or threatened with prosecution under
14   Section 7.04.  Accordingly, plaintiffs' facial challenges fail
15   right out of the gate because the state courts have had no
16   occasion to interpret Section 7.04 and to adopt a limiting
17   construction.
18         You know, *Washington State Grange* is a good example
19   of a case that says you have to give state courts that
20   opportunity before striking down a challenge.  This is a First
21   Amendment case as well.  This is a — I think that's on point,
22   but *Burson* is another First Amendment case where the courts
23   said the same thing; you have to give the state a chance to
24   interpret the challenged law.
25         Just one quick point on the last point.  The LULAC

1  plaintiffs suggest that they are bringing as-applied

2  challenges in this case.  That's not right.  In the *Reno* case,

3  the Supreme Court said the definition of an as-applied

4  challenge is as a law has been applied to a particular

5  plaintiff.  The law hasn't been applied to any plaintiff here,

6  and so these are facial challenges.  These are not as-applied

7  challenges.

8          If the Court proceeds to the merits, it should still

9  reject plaintiffs' claims.  Plaintiffs have a daunting burden

10  to prove that Section 7.04 has a substantial number of

11  unconstitutional applications compared to the statute's

12  plainly legitimate sweep.  That's a demanding standard of

13  proof.

14          On the back half of that equation, the plaintiffs

15  practically concede that Section 7.04 has a plainly legitimate

16  sweep.  On page 100 of their brief, the LULAC plaintiffs

17  suggest that Texas can and should just prevent canvassers from

18  trying to persuade people to support candidates and measures,

19  while the voter is actually filling out their ballot.  That's

20  page 100 of their brief.

21          That's a wise concession.  All 50 states provide that

22  protection for in-person voting.  But that's a substantial

23  part of what Section 7.04 does for mail voters.  It protects

24  them from pressure while they are filling out their mail

25  ballot at home.

1          So then on the front half of the equation, plaintiffs
2    try to prove that there's a substantial number of
3    unconstitutional applications, but most of the examples that
4    they offer clearly do not fall within 7.04's terms.
5          First, plaintiffs express concern about canvassers
6    engaged in ordinary canvassing activities or when people are
7    engaging in political speech around hidden mail ballots.
8    We've heard hypotheticals about mail ballots hidden in voter's
9    purses or in the other room.  Or, as my friend on the other
10   side said, "Whenever a mail ballot happens to be present."
11   This interpretation is foreclosed by the text.  Section 7.04's
12   scienter requirement limits its scope to knowingly providing
13   vote-harvesting services.
14          And when a statute specifies scienter for one
15   element, the presumption is that that applies to all the
16   elements in the statute.  *Rehaif v. United States* is a good
17   example of that rule being applied, 139 S. Ct. at 2194.
18          Thus, the statute does not reach most canvassing.
19   The vast majority of the time, canvassers will not know a mail
20   ballot is physically present.  When you walk to someone's
21   front door, their mail ballot is rarely sitting in plain view
22   on the living room table.
23          Secondly, plaintiffs express concern about canvassers
24   who do learn that a ballot is present.  But that scenario is
25   not covered by Section 7.04 either.

1        Section 7.04 only covers advocacy that directly
2   relates to the ballot itself.  If you look at the statutory
3   language, it says it must directly involve — the interaction
4   must directly involve the mail ballot.  My friends didn't
5   acknowledge that language.

6        The word "directly" means to do some work.  And so
7   when Keith Ingram talks about this really applying to
8   situations where the mail ballot is really in the voter's
9   hand, you know, immediately present, that's the work that
10  directly involves this doing in the statute.

11       And, so as long as the canvasser — you know, the
12  canvasser can push the person to vote for whoever they want.
13  They can push candidates or measures.  They can engage in all
14  kinds of canvassing.  They just can't do so when the mail
15  ballot is directly at hand in an interaction that directly
16  involves the mail ballot.

17       And, finally, plaintiffs express concerns that voter
18  assistance in imperiled by Section 7.04, but voter assistance
19  is not covered by this law either.  Voter assistance is not
20  intended to deliver votes for a specific candidate or measure.

21       It is intended to assist the voter cast her vote, but
22  the candidate of her choice.  It only crosses the line if the
23  person providing the assistance is pressuring the person to
24  vote for a particular candidate or measure while providing
25  voter assistance.  You're not supposed to do that under the

1  voter assistance laws.

2       In any event, if there's any doubts, the Court should

3  accept a narrowing construction of Section 7.04 to preserve

4  its constitutionality.  The Court should not interpret it

5  broadly so as to render it unconstitutional.  The rules of

6  constitutional avoidance and lenity support our

7  interpretation.  The Court should leave the question of

8  Section 7.04's meaning to the State courts in the first

9  instance, but if it proceeds to construe Section 7.04 on the

10 merits, it should adopt defendants' construction.

11      And then, finally, on the merits — I think I'm

12 running out of time — under strict — you know, there's a

13 debate on what standard applies.  We made arguments in our

14 briefs, but we think 7.04 is clearly valid under strict

15 scrutiny.

16      You don't hear that too often, but *Burson v. Freeman,*

17 504 U.S. at 199, upheld laws in all 50 states prohibiting

18 political speech within a certain distance of a polling place,

19 recognizing that states had a compelling interest in

20 protecting voters from undue influence and pressure while they

21 vote.

22      That interest is only more compelling in the mail

23 ballot context where an election official is not present to

24 deter pressure on the voter, and in *Brnovich,* the Supreme

25 Court recognized that vote-buying schemes are also more

1  prevalent in the mail ballot context.  So the interests that

2  were sufficient to survive strict scrutiny in *Burson* are more

3  compelling here.

4          I've already argued how 704 is narrowly tailored.

5  It's a narrow statute that applies to a very small range of

6  conduct.  Really, plaintiffs can — and their organizations

7  can push people to vote for candidates and measures at any

8  time, in anyplace, and in any manner, save one:  When the

9  canvasser knows a mail ballot is immediately present in an

10  interaction that directly involves the mail ballot.

11          I don't think I have time to address the vagueness.

12          THE COURT:  Thank you, sir.

13          MR. CAPOZZI:  Thank you, Your Honor.

14          MS. HUNKER:  At the start of defendants' closing, my

15  colleague, Ryan Kercher, mentioned the lack of trust that has

16  surrounded elections in recent years.  It is common knowledge

17  that Americans' confidence in their civic and government

18  institution are at an all—time low.

19          In many respects, this litigation stems from that

20  deficit of trust.  Not only was the legislature seeking to

21  shore—up Texans' faith in the electoral process through SB 1

22  and the various ways that it improved transparency and

23  uniformity, but plaintiffs do not trust the State or counties

24  to implement and enforce SB 1 provisions fairly or reasonably.

25          THE COURT:  But wasn't this done through a rushed

1  legislative process?  So that was — you-all being more

2  transparent, weren't they working against their objectives by

3  doing it in the way they did it?

4          MS. HUNKER:  To the contrary, Your Honor.

5          The legislative history for SB 1 starts in January of

6  2021 and continues over a nine-month process, through three

7  legislative sessions.  This was a long, drawn-out

8  debate-building consensus around certain provisions.  And as

9  we'll show more in phase two, many of the requests from

10  Democratic legislatures as well as from civic and voting

11  rights groups were adopted as part of the SB 1 process and

12  part of the legislative process.

13          The final bill is not the bill that was introduced.

14  The final bill is instead much more refined, focused on

15  improving voter access.  And then also focused on improving

16  transparency and uniformity as well as election integrity, and

17  doing so by specifically adjusting and clarifying provisions

18  that were, before, uncertain, as well as directing certain

19  vulnerabilities in the Election Code, such as with mail

20  ballots and the lack of identification verification.

21          And I want to say that it is understandable that

22  plaintiffs would have some lack of trust in Texas as a State

23  as well as some of the prosecutors and county election

24  officials throughout the state, because Americans, as united

25  people, have never felt further apart.  And we can't step away

1   too far from the fact that Texas, in decades past, did have a

2   troublesome history with respect to voting rights.  And that

3   history will stay with us.  It is part of the cultural memory

4   of the state.

5           And we will also acknowledge that the turbulent

6   rollout of SB 1 aggravated many of these concerns.  Because

7   SB 1 was enacted during a second special session in response

8   to the walk-out over the regular session, the Secretary in

9   counties did not have the summer lull to implement the new

10  law.

11          The Secretary, therefore, could not utilize its

12  summer conference to educate counties about the new law.  The

13  first election under SB 1 was the March primary, not the

14  constitutional election, which is far easier to administer.

15          Multiple counties as well as Keith Ingram testified

16  that the primary election is the most difficult election for

17  counties to administer.  The law came into effect just as the

18  voters started to submit annual applications for

19  ballot-by-mail and during a ballot -- paper shortage.

20          THE COURT:  So the effective date could have been

21  later, right?  That wasn't done.

22          MS. HUNKER:  If that had been proposed, it does not

23  appear from the legislative record that anyone had considered

24  the fact that the enactment in September would have this type

25  of consequence; particularly since it seems to be a confluence

1    of issue, such as redistricting occurring late, which had
2    never occurred in the history of the country; but because of
3    the COVID-19 pandemic, that pushed redistricting first to
4    October, as well as the implementation period of SB 1.

5           So the Secretary and counties are doing two very
6    major overhaul tasks.  One, advising on the election precinct
7    lines and redistricting; and then, two, trying to implement a
8    new law that touched upon a variety of different areas of the
9    Election Code, from voter registration to voting by mail to
10   having video cameras that were live-streaming over balloting
11   materials.

12          So this was a very complex law that perhaps should
13   have been given a longer rollout, but I think there was not an
14   understanding at the time that SB 1 was enacted that all these
15   factors would come together to create the turbulence that we
16   saw in the March primary.

17          In short, it was a perfect storm.  And the
18   consequence is that the State and counties had less time and
19   resources to educate voters and election workers about the new
20   law.  And this led to some confusion over SB 1 and, indeed, a
21   higher rejection rate than both the State and plaintiffs agree
22   is acceptable, bar none.

23          Since then, though, the Secretary and counties have
24   had time to get a handle of the law.  This has given states
25   and counties the opportunity to inform stakeholders of their

1 obligations and develop best practices and guidelines, and the
2 results speak for themselves.  Rejection rates have declined
3 to pre-SB 1 levels, if not below.

4         Conflicts between poll watchers and election workers
5 have declined in response to the clarified standards, as well
6 as the poll watcher training and oath.  And despite four
7 statewide elections occurring under SB 1, since its passage
8 and the trial back in September, no prosecutor has brought a
9 criminal action pursuant to SB 1, much less the broad
10 interpretations that plaintiffs have proposed throughout this
11 litigation.  The county witnesses uniformly and unequivocally
12 testified that the November 2022 election was a success.

13         Now, plaintiffs asked this Court for prospective
14 relief.  The question before the Court is then whether the
15 early problems plaintiffs identified was attributable to the
16 provisions themselves rather than the tapered rollout and the
17 general dissatisfaction that occurs whenever a change in law
18 is introduced and a new rule enacted.

19         Given the facts adduced at trial, the answer is
20 definitively the latter.  In practice, SB 1 mostly introduced
21 minor adjustments that clarified ambiguous provisions and
22 practices, and where more substantive rules were introduced,
23 such as the ID number requirement, the evidence shows that the
24 burden of impact on voters was minor, once voters became
25 accustomed to the rule.

1          Plaintiffs argue that SB 1 in many ways did not go
2    far enough, but there are additional means of expanding access
3    to voters and expanding protections to voters.  And this
4    concern is valid.  It is a valid position to have because we
5    all, I think, at the end of the day, want all voters who are
6    qualified to vote to be able to cast a ballot and have that
7    ballot accepted.
8          And no matter how smoothly or securely an election is
9    run, there is also room for improvement.  But the proper venue
10   for that debate is the legislature.  As I discussed earlier in
11   my discussion on *Anderson–Burdick*, SB 1, in fact, expanded
12   voting access.  And as I had just mentioned earlier at the
13   start of this small presentation, there was a long deliberate
14   legislative process that adopted many of the proposed
15   expansions that were offered by civic groups like those here
16   today.
17         The same will be true in future legislation, and that
18   again is where we think that this debate needs to be had
19   rather than in a courtroom that would override the rule of
20   elected representatives.
21         Thank you, Your Honor.
22         THE COURT:  Thank you.  Are you ready for rebuttal?
23         MS. PERALES:  Well, Your Honor, we could be ready,
24   but if we had five minutes, it would be less chaotic.
25         THE COURT:  Let's take a ten-minute break.

1    *(Recess)*

2            THE COURT:  Ms. Perales.

3            MS. PERALES:  Thank you.

4            Plaintiffs have reserved 30 minutes for rebuttal.

5            With respect to standing, only one plaintiff with

6    standing is necessary to confer jurisdiction.  The case is

7    *Town of Chester New York versus Laroe Estates,* 581, U.S. 433,

8    439.  U.S. Supreme Court decision from 2017.

9            Defendants highlight a handful of instances where

10   they contend a particular plaintiff lacks standing, but that

11   doesn't answer the standing question.

12           My friend, Mr. Capozzi, talked about a rather arduous

13   task involving matching every plaintiff to every possible

14   claim, and we would suggest the task is somewhat less arduous.

15   And it is to determine whether, for each claim, there is a

16   plaintiff with standing.

17           If the answer is yes, that claim can and should be an

18   adjudicated.  Plaintiffs rest on their papers to show they

19   have established associational and organizational standing,

20   and in some cases, individual standing, sufficient for the

21   Court to be able to adjudicate each claim.

22           Two small points on rebuttal with respect to

23   Section 208.  My friend, Mr. Kercher, mentioned *Arkansas*

24   *United,* and he stressed that the District Court in that case

25   found that it was acceptable to require information from

1  assisters when they were assisting voters.  That information

2  at issue in that case was name and address.

3        The Texas Election Code has required name and address

4  from assisters for a very long time.  That's not what

5  plaintiffs challenge here.  Plaintiffs challenge SB 1's

6  imposition of additional information requirements beyond name

7  and address.

8        So although we like the decision in *Arkansas United*,

9  because it did strike down the voter assistance ban on

10  categories of assisters, we would contend that *Arkansas United*

11  is not helpful to answer the question before the Court here,

12  which is about requiring information from assisters that is

13  more than simply the name and address that historically has

14  been required.

15        With respect to the *Arkansas United* limitation, which

16  was that an assister could only help up to five persons and

17  not assist more, the Court found that that was invalid under

18  208.  It's very similar to the OCA decision, which found

19  invalid under 208 a categorical exclusion of assisters who

20  were registered to vote in a county other than the person that

21  they were assisting.  SB 1 does the same type of categorical

22  exclusion in Section 6.06 and 7.04, just like the statute

23  struck down in OCA.

24        No one disputes that employees of LUPE are

25  compensated to assist mail-ballot voters.  Their acts are now

1    criminalized.  Even putting aside the issues that the Court

2    has to resolve about whether volunteers who are compensated

3    with gas cards or T-shirts or sports tickets or meals are

4    given something sufficiently of economic value to trigger 6.06

5    or 7.04, there's no question that there's a categorical

6    exclusion of paid employees, LUPE's staff that does this work,

7    and the Court has abundant information about that at Docket

8    850, pages 15 through 23, which is a description of how this

9    works.

10           Finally, going back to my friend, Mr. Capozzi's,

11   slide, Number 5, where he talks about Section 6.40 and changes

12   to the assistance oath and suggests that these are mere

13   clarifications of things that previously existed in the Texas

14   Election Code, and we respectfully disagree.  There was no

15   prior requirement in the Texas Election Code that the voter

16   represent his or her eligibility for assistance as a condition

17   of receiving assistance.

18           That's the first difference.  It's not a

19   clarification.  That's an addition of an entirely new

20   requirement that we contend is illegal under 208.

21           Second, there was a prior separate statute

22   criminalizing assistance to an ineligible voter with its *mens*

23   *rea* accompanying requirement.  That is not the same thing as

24   requiring a voter to represent his or her eligibility as a

25   condition of receiving assistance.

1          Also, the new additional language that the assister

2    has to acknowledge the ballot may not be counted if the voter

3    is determined to be ineligible.  That is not something that

4    was there before.  It doesn't clarify any pre-existing

5    elements of the Election Code.

6          It's also, as the Court has heard from assisters,

7    language that makes them reluctant to assist, even while at

8    the same time is probably not even capable of execution,

9    because once that piece of paper is fed into the tabulator,

10   it's unclear how one would ever not count that vote, right?

11   Once it's mixed among the others.  So this language, which

12   came from nothing before and adds a deterring element to the

13   form, does not clarify.

14         I'd like to pass now the microphone to my colleague.

15         THE COURT:  Before you do that, are you going to

16   address or someone else going to address the suggestion by the

17   defendants that you only challenge certain sections of SB 1,

18   but not any prior statutes that were in existence; so even if

19   I struck down certain sections of SB 1, all this other stuff

20   still exists out there?  What do I make of that?

21         MS. PERALES:  Well, we would have to take it

22   provision by provision.

23         With respect to the assister oath, we have the new

24   condition of having to make a statement of eligibility in

25   order to receive assistance.  If that were struck, there's

1  nothing else that exists or comes into force that would

2  reimpose that requirement, right, if the Court strikes down

3  the acknowledgment that the ballot may not be counted if the

4  voter's determined to be ineligible.

5        There's nothing else that exists in the Election

6  Code, as far as I know — and my understanding may be

7  imperfect of the Election Code; but as far as I know, there's

8  nothing else that comes into force or already exists.

9        There's also the pressure or coerce.  We would

10  contend that's different than what is already — and what we

11  haven't challenged, that's already in the Texas Election Code.

12        And then, finally, a point that my colleague,

13  Ms. Holmes, mentioned, which is, there is a false statement

14  under-oath statute in the Texas Penal Code, I believe.  It

15  could be the Code of Criminal Procedure, but that's very

16  different from opening the assister oath with "I am swearing

17  under penalty of perjury," which is something that causes the

18  assister to take that pause and become reluctant to assist,

19  according to the evidence that the Court has heard.

20        So we would say it's provision by provision, and that

21  defendants have not carried any sort of burden to show that

22  the Court's invalidation or striking of these provisions would

23  not remedy or would not be redress.

24        Thank you.

25        THE COURT:  So I'm not sure who wants to go up next,

1   but the defendants' stronger points, I think, have to do with

2   drive-thru voting and 24-hour overnight.

3            Who wants to address those?

4            MS. HOLMES:  Thank you, Your Honor.  Jennifer Holmes.

5            There are a couple points I would make here, and

6   first, this doesn't go directly to drive-thru voting or

7   24-hour, but Your Honor asked Mr. Gore about *Brnovich*'s

8   language that there's a legitimate interest in preventing

9   fraud, even prophylactically.  And you asked him:  How does

10  the Court know if that interest is too speculative?

11           And I'd like to point you, *Brnovich* doesn't really

12  answer that question, so we have to look to binding Fifth

13  Circuit precedent on that, and so I'd like to point you to the

14  en banc decision in *Veasey*, which says that the — which

15  essentially says that there cannot be a total disconnect

16  between the announced interest by the State and the actual

17  statute that is enacted.

18           And so here, I think, we have a number of provisions

19  that have that disconnect; either they don't actually address

20  or achieve the interests that the State has proffered; they

21  don't target an actual vulnerability with the method of

22  voting; or they haven't actually detected any fraud.  And that

23  is true of drive-thru voting and 24-hour voting in that there

24  was no fraud evidence there.  With 24-hour voting, there was

25  no vulnerability identified with that —

1          THE COURT:  What claim from your side would succeed
2   on that?  Because as I recall the evidence -- that you had
3   evidence there that Black and Hispanics liked drive-thru
4   voting, but did you actually need evidence to show that if
5   drive-thru voting was discontinued, there would be an adverse
6   effect?  I don't remember seeing any evidence that if you took
7   it away, what would happen.
8          MS. HOLMES:  I believe there is evidence in the
9   record, but it's qualitative evidence.
10          And first I would say that the statistical evidence
11  that can support -- I'm specifically talking about a Section 2
12  claim.  The statistical evidence can be about the usage rates,
13  which racial groups are more likely or have shown that they
14  used certain methods of voting more than others.  And that is
15  sufficient, and here we also have that supported by
16  qualitative evidence in the record.
17          THE COURT:  What happens, though, if Whites also
18  liked it?
19          MS. HOLMES:  I think actually the evidence shows that
20  many groups liked it, but Black and Latino disproportionately
21  liked it as compared to White voters.  They relied on it at
22  higher rates.  And so it is a disparity there; although, I
23  agree with the Court that it was a popular method of voting,
24  and 128,000 people in Harris County alone used drive-thru
25  voting.

1          So it's also relevant here when we are talking about

2    the burden under the first *Brnovich* factor to look at the

3    number of people affected by removing their preferred method

4    of voting.  In the *Brnovich* case itself, the number of

5    affected voters by the out-of-precinct voting restriction was

6    only 3,709 voters.  Here with drive-thru voting, we are

7    talking about 128,000 voters who have been affected by being

8    unable to use that method of voting.  So this is not the

9    *Brnovich* case.  Again, we have numbers that are far greater

10   when we talk about the elimination of drive-thru voting.

11          THE COURT:  What do I do with the argument, well, it

12   was actually illegal for Harris County to do that?

13          MS. HOLMES:  Well, I think that argument about

14   whether or not it was legal, I have two points there.  First,

15   that that doesn't change the fact that the passage of this law

16   had an impact.  It doesn't change the facts on the ground that

17   128,000 people could vote using drive-thru voting, and no

18   longer can do it now.

19          When they voted before, their votes were counted by

20   the State, and now they are not allowed to use that method.

21   So there was an actual — when we look at reality on the

22   ground, there was an effect.  Regardless if we — we can argue

23   about whether it was illegal or not illegal before SB 1.

24          And to that question of legality, pre-SB 1, there was

25   no actual court opinion that held that drive-thru voting was

1  illegal.  What the defendants have cited are dicta, a part of

2  an opinion that's been vacated and was not the holding of an

3  opinion, and dissent, so we actually don't have a Court

4  finding from a state court or a federal court that found that

5  drive-thru voting was illegal.  So I believe that's an open

6  question and doesn't answer —— doesn't resolve anything here.

7          I'd like to quickly touch on a brief standing matter

8  before I let my colleagues speak, and that is to address some

9  of the arguments that I believe Mr. Capozzi made about the

10  standing of HAUL.  And this was about whether HAUL had to show

11  that their diversion of resources related to particular

12  provisions of SB 1.

13          Well, here, Ray Shackelford testified that the

14  elimination of drive-thru voting and 24-hour voting caused

15  confusion and that diversion of resources by HAUL was to

16  address this confusion.  You can find this testimony in the

17  transcript in the pages 2243 through, roughly, 2259.

18          And he has specific testimony here where he talks

19  about how focus of those trainings was to educate voters on

20  the options in '22 that are no longer available in 2024.

21  That's a reference to those eliminated forms of voting.  So we

22  do have evidence in the record that this diversion was caused

23  by specific provisions of SB 1.

24          With that, I think I will cede my time to my

25  colleagues.

1          MS. TULIN:  Good afternoon, Your Honor.

2          I would like to briefly address a number of points

3     that, again, my friend, Mr. Capozzi, made; specifically with

4     respect to the argument about what were described in the slide

5     as plaintiffs' fear of prosecution claims and why they are too

6     speculative to prove standing.

7          Taking them separately.  With respect to the poll

8     watcher provisions, my friend said that there has been no

9     enforcement of these provisions and that, therefore, it's

10    speculative whether there would be enforcement against the

11    plaintiffs here.  That is a mischaracterization of the record.

12         In fact, one of the exhibits that Mr. Capozzi took

13    issue with, because we cited it with respect to it, what he

14    said is that it doesn't speak to distancing a poll watcher.

15    But I would point the Court to LUPE 182 and LUPE 183, which

16    are both post-SB 1 investigations under 4.09.  Mr. Capozzi is

17    correct that it was not about distancing, but it was about

18    obstructing a poll — both of those investigations related to

19    obstructing a poll watcher.

20         Second, Keith Ingram testified that he referred

21    violations of 4.09 to the Attorney General for investigation

22    both before and after SB 1.  That's at a September 22nd

23    transcript, 1838, line 24, to 1884, line 4.

24         The — another one of my friends, maybe several of my

25    friends, claimed several times that problems with poll

1  watchers were reduced after SB 1.  I didn't hear them cite to
2  anything in the record to support that, and I believe that the
3  plaintiffs' findings of fact and the evidence that the Court
4  heard show that that's simply not true.
5       It's also the case that there hasn't been a
6  presidential election since SB 1 went into effect, and so a
7  lot of the testimony about the 2020 contested -- the
8  circumstances in 2020 related to a highly contested
9  presidential election where a turnout is high.
10      Second point about the fear of prosecution.  The
11  standard is that the plaintiffs have to show a credible threat
12  of prosecution.  In *Holder versus Humanitarian Law Project,*
13  the Supreme Court addressed this specifically, and the
14  analysis in that case shows that the plaintiffs have met that
15  bar here.
16      In *Holder,* the Court concluded that there was a
17  credible threat of prosecution where the plaintiffs had
18  engaged in conduct arguably covered by the challenged law in
19  the past; that they indicated that they would engage in that
20  conduct again, if the statute or the ban were lifted; and the
21  government had charged people with violations of the statute
22  in the past and that the government did not argue that the
23  plaintiffs wouldn't be prosecuted in the future.
24      All of those circumstances have been established
25  here.  All of the poll workers who testified before indicated

1  that they had served in the past, that they wished to serve

2  again and/or would serve again.

3       Again, the record shows that there have been

4  prosecutions under this law in the past.  The district

5  attorneys, several district attorneys, districts' attorney

6  submitted stipulations in this case that are in evidence at

7  LULAC Exhibits 94 and 96 disclaiming any -- disclaiming that

8  they won't prosecute; in other words, that they are not

9  indicating that they won't not prosecute under these.  That is

10  sufficient.

11       Separately, Mr. Capozzi made the point about fear of

12  prosecution with respect to the voter assistance provisions.

13  Specifically with respect to the ADA and Section 6.04, but I

14  believe that this is true of all the voter assistance

15  provisions.  The claimed harm with respect to all of the

16  challenges for those provisions is not based on a fear of

17  prosecution.  They are based on -- because the fear of

18  prosecution that's at issue in those circumstances are the

19  assisters.

20       The plaintiffs are not representing assisters or

21  making any claims that the assisters have a right to engage in

22  any particular conduct.  The claim is that there is actual

23  harm that has already happened and that will continue to

24  happen, because assisters will be afraid and will not provide

25  the assistance that voters are entitled to.

1          Switching back again to the void for vagueness just
2  for a moment.  I'll just make a few points.  The first relates
3  to the limiting construction.  It is true that a federal court
4  is required to consider a reasonable limiting construction
5  that has been proposed by a state agency that is enforcing the
6  state law.

7          Not only is that not the case, the intervenor
8  defendants, during closing arguments, seem to have put forth a
9  limiting construction with respect to the poll watcher
10  provisions and with respect to 7.04, but certainly with
11  respect to the poll watcher provisions.  In fact, to the
12  extent that there is any state agency testimony, Keith Ingram
13  specifically disclaimed that limiting construction when he
14  said that 4.09, in his view, is subjective.

15          The other point about it, the reasonableness point,
16  it is true that 4.09 uses the term "reasonable," but it
17  also -- it's modifying "effective."  It's the "not reasonably
18  effective" that is the problem, and the "effectiveness" is
19  what is judged from the standpoint of the poll watcher, not by
20  an election official.

21          And so -- just one more additional point.  So *Village
22  of Hoffman Estates* is the case that you can look to, to set
23  the standard for when a state agency proffered limiting
24  construction is appropriate to adopt.  Also *Boos versus Barry*,
25  485 U.S. 312, talks about that when a federal court is

1  considering a limiting construction to a state statute, it has

2  to be both reasonable and readily apparent, and we would say

3  that that is not the case here based on the evidence in this

4  record.

5       I believe that that is all — I believe that I will

6  pass my time.  Oh, I will — actually, I'm sorry.  I will make

7  one more point, which is just that — and I believe this is

8  all in our briefing, but it is true that the inclusion of a

9  scienter requirement can alleviate vagueness.  It is not the

10  case that the inclusion of a scienter requirement in a statute

11  means that there cannot be a vagueness challenge.

12       Thank you.  I'll pass it to —

13       MR. NKWONTA:  Your Honor, I'm going to respond

14  briefly to a few points that Ms. Hunker made about the

15  *Anderson-Burdick* test.  Before I do, I want to clarify the

16  record very briefly with respect to drive-thru voting.  I

17  believe Ms. Hunker said that Mr. Zeph Capo, president of AFT,

18  rode in a car with employees to vote using drive-thru voting.

19  Mr. Capo said no such thing.  In fact, he rejected that

20  insinuation.  That was the September 14th transcript at 954 8

21  to 18, and 949, 4 to 17.

22       Now, turning to the *Anderson-Burdick* test, I want to

23  just go back to the guidepost I mentioned earlier.  So first,

24  the focus is on voters impacted by the law.  The Supreme Court

25  has said it twice in *Anderson* and in *Crawford.*  There's been

1  no answer to those cases by defendant because they are

2  unanswerable.

3          Opposing counsel pointed to *Vote.Org*, and how

4  *Vote.Org* supposedly rejected this.  But *Vote.Org* could not

5  have, and it did not.  In fact, what *Vote.Org* said was the

6  severity analysis isn't limited to a small number of voters.

7  Emphasis on "small number of voters."  You cannot find a

8  severe burden based on a small number of voters.

9          And, likewise, *Richardson* was also concerned with the

10 emphasis on a small number of voters to establish a severe

11 burden.  That's an entirely different principle and not one

12 that we're afflicted with here.

13         In *Richardson*, the signature match law impacted 5,000

14 voters across two elections; 1500 or so in one election, 3,000

15 or so in another election.  That pales in comparison to both

16 the actual disenfranchisement and the risk of

17 disenfranchisement that we have identified here.  And that's

18 in slides 27 to 33 of the LULAC plaintiffs' slide deck.

19         Next, opposing counsel mentioned that *Crawford*

20 rejected the focus on impacted groups.  I'm not sure where

21 exactly *Crawford* said that, but if you look to slide 7 of

22 LULAC plaintiff's slide deck, there's a quote there from

23 *Crawford* specifically focusing on the 1 percent of voters that

24 did not have ID.

25         And the biggest clue that *Crawford* did not reject

1  substantive analysis, that *Crawford* focused on the impacted
2  voters, is Justice Scalia's concurrence.  The reason he
3  concurred was because he disagreed with the lead opinion's
4  focus on impacted voters.  And he would not have focused on
5  those voters.  That's the reason why you have a concurrence
6  from Justice Scalia to begin with.

7          Next, cumulative impact matters.  Opposing counsel
8  continues to resist that position, but they offer no citation
9  for it.  We cited cases establishing and saying cumulative
10 impact matters.  That's slide 16 of the LULAC plaintiff's
11 slide deck.

12         And we have more evidence, the Supreme Court
13 decision, *Storer v. Brown.*  The Court said, "To assess the
14 totality of election laws" –– or "a number of facially valid
15 provisions of election laws may operate in tandem to produce
16 impermissible barriers to constitutional rights."  That's 415
17 U.S. 724, pin site 737.

18         And there's still more.

19         The Fifth Circuit has adopted that phrase
20 specifically in a case asserting constitutional challenges to
21 election law.  *Pilcher v. Rains,* 853 F.2d 334, pin site 336.
22 And this is also cited in paragraph 94 of the HAUL and MFV
23 plaintiffs' conclusions of law.  And that case cites *Storer*
24 and says several requirements of the Election Code may combine
25 to make ballot access excessively burdensome.  Cumulative

1  impact matters, both in the Supreme Court and in the Fifth

2  Circuit.

3       *McDonald.*   You heard discussion of *McDonald.*

4  *McDonald* still does not apply, notwithstanding the cases

5  opposing counsel mentioned.   They still have not identified a

6  binding merits opinion that applies *McDonald.*

7       *LULAC v. Hughs* was a state panel order.   That state

8  panel order relied on *TDP I.*   What's more, like *TDP I*, *LULAC*

9  *v. Hughs* has also been vacated, likely because the case below

10  was moot.

11       In other words, the only merits panel decision that

12  you have been presented that talks about *McDonald* is *TDP II*,

13  which specifically abandoned the reliance on *McDonald* and the

14  analysis that opposing counsel is relying on here.

15       Now, during my presentation earlier, Your Honor asked

16  what to make of the Alabama state order in the *People First of*

17  *Alabama v. Merrill,* the case involving curbside — the ban on

18  curbside voting.   The short answer is not much.   The SCOTUS's

19  stay order is not a decision on the merits.   It just allows

20  the Court to consider the merits after full briefing.

21       Case in point, in *Merrill v. Milligan,* the Supreme

22  Court stayed the District Court's preliminary injunction, but

23  after full briefing on the merits, it later affirmed the

24  District Court's preliminary injunction.

25       But putting that aside, the ban on curbside voting

1  further highlights the distinction here, because we are not

2  talking about a procedure that has been banned when we talk

3  about the mail provisions.  We're talking about a law and

4  procedures that induce hundreds of thousands of voters to

5  enter into a procedure that is constitutionally defective;

6  that will result in their disenfranchisement because of

7  defects in the data, structural defects in the data.

8         In slide 27, we highlight cases that have found

9  unconstitutional burdens when voters have been disenfranchised

10  because of defects in the State's process.  And keep in mind

11  when we talk about the burdens and then the highly

12  individualized and fact-specific analysis, in this case, not

13  everyone is entitled to vote absentee in Texas.

14         It's actually limited to those who are most likely to

15  need to vote absentee; most likely to have difficulty voting

16  in person.  In other words, the greatest burdens imposed by

17  the mail voting provision and restrictions.  The greatest

18  burdens are imposed on those who are least likely to overcome

19  them, and that's why it's unconstitutional.

20         Thank you, Your Honor.

21         MS. OLSON:  Good afternoon, Your Honor, Wendy Olson

22  on behalf of the Mi Familia Vota plaintiffs.  And as

23  Ms. Holmes did with respect to the HAUL plaintiffs, I just

24  want to briefly address why there is organizational standing

25  for Mi Familia Vota.

1          I would direct the Court to what we did in our
2    findings of fact and conclusions of law, address how there is
3    injury to Mi Familia Vota through the individual provisions
4    contrary to Mr. Capozzi's arguments, and that would be on
5    pages 238 to 241 of the findings of fact and conclusions of
6    law.  And those are findings of fact 1,012 to 1,026.  And also
7    at 827 -- findings of fact 827 to 834, so they are there in
8    the record for the Court, Your Honor.
9          With respect to -- there's been some discussion about
10   702, and I think that's -- we're the only plaintiff
11   challenging that.  702, the defense argues, expanded the
12   ability to vote.
13         And Your Honor, what 702 does is it required the
14   employer to provide time off from work to vote, and there are
15   exceptions.  No time off was required if the employee had two
16   consecutive hours off work to vote when the polls were open on
17   Election Day.  So when it was added the provision to include
18   the earlier election period, the exception became unless there
19   were two hours off to vote on Election Day or at anytime
20   during the election period.
21         And it's our position, Your Honor, that that
22   exception swallows the rule.  And particularly, Your Honor,
23   individuals, and individuals who Mi Familia Vota serves, who
24   are new to their jobs, may not be given time off.  Each
25   employer can now take the position, with respect to their

1 particular employment, the employee has two hours off either

2 on Election Day or some other early day.

3         And Ms. Razo from Mi Familia Vota talked about how

4 those are precisely the kind of voters that Mi Familia Vota

5 serves and tries to make a plan to vote.  And, Your Honor, we

6 would also submit that Section 702 is one of those provisions

7 that imposes a cumulative burden on the voters under either

8 Section 2 or the *Anderson-Burdick* standard, Your Honor.

9         There's one factual issue we wanted to address with

10 respect to the mail ballot rejection rate, and I think the

11 State argued that the 2.7 percent that the State found in

12 November of '22 was not significantly higher than before SB 1,

13 which was at .84 percent.  By my math — I'm not great at

14 math — that's three times the rate.

15         But, Your Honor, more significantly, there were two

16 plaintiff experts that testified that the rate was actually

17 either 4.1 percent higher than the Secretary of State's

18 percentage, and then 3.4 percent, and those would be

19 respectively, Your Honor, nearly five times what it was pre-SB

20 1 and nearly just a little over four times what it was

21 pre-SB 1, and that was from the November 2022 election, Your

22 Honor.

23         With respect to the question that the Court posed

24 earlier — and maybe it's unfair that we get to have multiple

25 shots at this — but with respect to the drive-thru voting and

1  the concern about whether that was illegal before, well, Your

2  Honor, I would propose that there was one other thing the

3  legislature could have done, and that would have been to make

4  drive-thru voting legal and make that clear.

5          Instead -- it would -- it would have met their

6  interest in making sure it was legal.  Instead, they took the

7  step of burdening 130,000 voters who were disproportionally

8  Black and Latino by removing that way to vote.

9          Your Honor, with respect to District Attorney Ogg, I

10  would argue that his position -- her position with respect to

11  Mr. Nichols' position with respect to the *Ex Parte Young*

12  exception to sovereign immunity and then the addressability

13  element of standing is no different today than it was back in

14  August of '22 when this Court issued its order and found that

15  District Attorney Ogg was both a proper defendant and would be

16  able to redress -- an injunction would redress the plaintiffs'

17  injuries from the criminal provisions in SB 1.

18          The only difference, Your Honor, I think makes that

19  case clear, that's the enactment of HB 17, Section 1, that

20  went into effect September 1st of last year, and basically

21  says we're going to remove you from office if you enact a

22  policy that says you're not going to enforce the criminal

23  provisions, Your Honor.

24          With respect to the rest of the standing as to each

25  of those criminal provisions, I would submit that when the

1  Court this morning heard argument about the various merits

2  claims and the various provisions, the Court also heard

3  argument about why there is standing and the injury, in fact,

4  that occurred to the various plaintiff groups.  And again, as

5  Ms. Perales pointed out, generally, also with the claims as to

6  District Attorney Ogg, only one plaintiff need have standing

7  for the claims to go forward.

8       And with that, I will cede the rest of my time to

9  Mr. Dolling.

10      MR. DOLLING:  Good afternoon, Your Honor.  I'm

11  Zachary Dolling for the OCA plaintiffs, and I just have two

12  very brief points.

13      First, while discussing the Section 7.04 voter

14  interaction ban, Mr. Capozzi relied on language that

15  Section 7.04 only applies when a ballot is, quote, "directly

16  involved," but that language is equally vague and overbroad as

17  the other language discussed previously.  Stacking vague terms

18  on top of other vague terms does not solve the problem.  What

19  it means to directly involve a ballot is entirely unclear.

20      For instance, if a canvasser is talking to a voter

21  who has a mail ballot on the table in the next room over, and

22  the canvasser says, "When you fill out your ballot, I

23  encourage you to mark 'yes' on the drainage measure on that

24  ballot," does that speech, which refers to and consumes a

25  ballot, directly involve a ballot?  We would submit that

1  reasonable people could not tell whether such conduct would be

2  criminalized, and so the statute is still impermissibly vague.

3       Intervenor defendants raised a bevy of alleged

4  standing issues earlier today, in response to which my

5  colleague, Ms. Perales and Ms. Olson, reminded the Court of

6  the one good plaintiff rule.  I simply want to highlight for

7  the Court that in their post-trial briefing the State and

8  intervenor defendants did not specifically challenge

9  OCA-Greater Houston's or the League of Women Voters of Texas's

10 standing to bring their challenges to SB 1 Sections 6.06 and

11 Section 7.04.

12       Both OCA-Greater Houston and the League linked their

13 injury specifically to the provisions challenged, and the

14 citations to that testimony may be found in the OCA

15 plaintiffs' post-trial briefing at Docket 848, paragraphs 2 to

16 27 and 121 to 127.  Thank you.

17       THE COURT:  Thank you.

18       Looks like that concludes that list.

19       Okay.  Ms. Perales.

20       MS. PERALES:  There is a housekeeping matter, Your

21 Honor.  Prior to that, though, I was encouraged to get up and

22 say something really fancy and sort of sum up everything, and

23 I can't.  But I did want to offer the plaintiffs' thanks to

24 the Court and the Court staff for their patience with what can

25 occasionally be an unwieldy case.  And I know that my very

1    professional opposing counsel join us in that gratitude to the
2    Court.
3         If I might move to the housekeeping matter, Your
4    Honor.  This is a discussion that we've been having with State
5    defendants regarding their proposed findings of fact.  There
6    are some portions of the State defendants findings of fact
7    that cite and rely on the Jonathan White declaration.  This is
8    the document that was filed by State defendants in support of
9    their response to motions for summary judgment, and this
10   declaration was also the subject of LUPE plaintiff's opposed
11   motion to strike and motion in limine to exclude testimony for
12   sword-and-shield reasons.
13        The Court granted our motion in limine, and that
14   structured the testimony of Mr. White at trial; however, the
15   Court denied as moot our request to strike the portions of
16   these documents from the Court record, and the Court said that
17   it was moot because, quote, "It's the contention of all
18   sides -- correct me if I'm wrong -- that this is now moot
19   because the defendants' side does not intend to rely on the
20   declaration of Mr. White at all, so that's now moot," unquote.
21        No defendant spoke up at that time; however, we find
22   ourselves now in a situation where some findings of fact.
23   Now, in conversation with State defendants, I understand that
24   they are prepared to make a statement here, but I do want to
25   inform the Court that we plan to refile our motion, which is

1  Docket 761, in some form or another, because we are concerned

2  that the fact that this — these documents or this document

3  remains in the Court's record in some way or another opens the

4  door to either inadvertent or purposeful reliance either here

5  or on appeal, and one of the reasons for that, Your Honor, is

6  the current heated debate up at the Fifth Circuit regarding

7  the scope of the record on the Court's summary judgment ruling

8  on materiality.

9          Mr. Freeman from the Department of Justice is here to

10  explain to the Court, if it would like more information, about

11  what's going on at the Fifth Circuit and the dispute regarding

12  the scope of the record.  In fact, I've never spent a day in

13  court with Mr. Freeman before without him saying anything, so

14  he is available to explain to the Court, and I think it would

15  be worth a moment of the Court's time.

16          THE COURT:  So before we get to that, let's talk

17  about this.  So that declaration is not part of the record.

18  It wasn't admitted in evidence, so how was it used now in

19  support of the findings of fact and conclusions of law?

20          MR. KERCHER:  Purely an error, Your Honor, and we are

21  willing to withdraw the citations to that, and we told

22  Ms. Perales that we would be willing to do that.  So I think

23  there are kind of two components, and it's a function of a lot

24  of cooks in the kitchen when it comes to putting together the

25  findings of fact.  We are happy to withdraw the citations to

1  it with regard to — and I would be interested to hear what

2  Mr. Freeman has to say regarding the Fifth Circuit.

3           MS. PERALES:  From his cab?

4           MR. KERCHER:  From his cab.

5           There is an ongoing —

6           THE COURT:  So I haven't followed at all what's been

7  going on upstairs, so this is all new.

8           MR. KERCHER:  Oh, it's super interesting.  I will —

9  and I can say that intervenor defendants have taken the lead

10 on briefing that on behalf of the State in terms of what the

11 record is or whether — or what the Fifth Circuit may or may

12 not rely on in evaluating the materiality ruling.

13          The Fifth Circuit has already denied the motion filed

14 by the United States.  We believe that what the Fifth Circuit

15 is going to review is entirely the Fifth Circuit's purview,

16 but I'll be interested to hear what Ms. Perales has to say or

17 propose that this Court do regarding the Fifth Circuit's

18 purview to review information.

19          THE COURT:  So fill me in, since we last left this a

20 long time ago, because I know nothing of this issue.

21          MS. PERALES:  Thank you, Your Honor.

22          And just to make clear, the disputed declaration and

23 the disputed portions of Jonathan White's declarations are not

24 part of the trial record.  They are part of the summary

25 judgment record.

1          THE COURT:  But are we talking about this case now —

2          MS. PERALES:  Yeah, this case.

3          THE COURT:  — or are we talking about the one at the

4    Fifth Circuit?

5          MS. PERALES:  No.  This case, the concern that LUPE

6    plaintiff's have regarding the Jonathan White declaration is

7    not that it was admitted at trial, because it wasn't.  But

8    because it remains on the docket, it's part of the summary

9    judgment evidence.

10          The Court might question why there might ever be a

11    dispute about the scope of the record evidence in this trial,

12    but we would like to point out that in the appeal of this

13    Court's grant of summary judgment on the materiality

14    provisions, this Court announced its summary judgment ruling

15    before the trial started; however, the Court issued its

16    opinion memorandum and order following the trial of this case.

17          THE COURT:  And just to be fair to me, I mean, I did

18    it because both sides here encouraged me to do that.

19          MS. PERALES:  Understood, Your Honor.

20          At the Fifth Circuit now, it's my understanding that

21    appellants intend to rely on the entire trial record in their

22    appeal of the Court's summary judgment ruling.  The United

23    States filed a motion for clarification with the Fifth Circuit

24    to understand whether the record on appeal was going to be

25    limited to what was before the Court in the summary judgment

1  filings.  The Fifth Circuit has denied that motion.

2           I'll let Mr. Gore continue.

3           MR. GORE:  I can briefly speak to that, Your Honor.

4           The good news is that I don't think there is anything

5  really for this Court to do.  First, we're just finding out

6  about this Jonathan White declaration issue, so we join in the

7  State in whatever it deems is appropriate to agree to with

8  Ms. Perales, but I'm coming at this a little bit late to the

9  party, since I didn't converse with any of the opposing

10  counsel about this before right now.

11          In terms of the Fifth Circuit, there is — there was

12  a motion filed by the United States to clarify what should be

13  in and out of the record for purposes of the Fifth Circuit.

14  The Fifth Circuit denied that motion.

15          If there is some dispute as to whether something

16  filed in this Court is part of the record on appeal or can be

17  considered by the Fifth Circuit on appeal in the materiality

18  provision appeal or some other appeal, that's a question for

19  the Fifth Circuit.  And that's what we argued to the Fifth

20  Circuit and it denied the motion.

21          And whether there's going to be a dispute about the

22  content of the appellate record in the materiality provision

23  appeal or some other appeal is just not ripe yet.  We don't

24  know.  We haven't briefed that appeal.  We don't know what

25  we're going to point to or rely upon yet, in terms of our

1  appellate arguments to the Fifth Circuit.

2          So on that score, both for the materiality provision

3  appeal and for this current motion or agreement we are

4  reaching with Ms. Perales, there's nothing this Court can do

5  to bind or pre-decide that issue for the Fifth Circuit.  That

6  would all be for the Fifth Circuit to decide in due course.

7          THE COURT:  Unless they remand.

8          MR. GORE:  Which they might, but the ordinary course

9  when there is a dispute about the appellate record is for a

10 party to file a motion to strike in the appellate court and

11 the appellate court to resolve it in the first instance.

12         THE COURT:  I get you.

13         MS. PERALES:  For that reason, we plan to refile our

14 motion to strike here in the District Court while this case

15 remains in the District Court, so we can have a resolution of

16 that request, which we believe is not moot, in light of recent

17 events.

18         Thank you.

19         THE COURT:  Okay.  I'll wait to see that, and I'll

20 wait to see a response.  And regardless of whatever I do, the

21 Fifth Circuit is free to say whatever it thinks, when it's up

22 there at the time it got up there.

23         Okay.  I'll take this matter under submission.  This,

24 of course, is a very complex matter.  It's going to take

25 hundreds of pages to work through this.  We're on our way.  It

1  will be a while.

2          I do not need any additional briefing.  We have

3  plenty of paper to read, so the only caveat is, in the event

4  any of you become aware of a Fifth Circuit decision, a U.S.

5  Supreme Court decision, or any other district or circuit court

6  case, that directly bears right on all fours on any of the

7  issues that we have in this case, you can file an advisory

8  letter with the Clerk's Office.

9          Just make me aware of the new case that has come

10  down.  You can give me just a little summary, no argument, and

11  at least I'm aware of what new law may or may not be popping

12  up here, but you are limited to just that; no more than just

13  advising me of the presence of a new case.

14          Thank you.  This was very helpful, and it was

15  wonderfully done.

16          *(Concludes proceedings)*

17

18

19

20

21

22

23

24

25

1                              —o0o—

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.  I

4   further certify that the transcript fees and format comply

5   with those prescribed by the Court and the Judicial Conference

6   of the United States.

7

8   Date:  02/22/24              /s/ *Gigi Simcox*
                                 United States Court Reporter
9                                262 West Nueve Street
                                 San Antonio TX 78207
10                               Telephone:  (210)244-5037

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25