FILED

MAR 1 1 2024

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK



# United States Court of Appeals
## for the Fifth Circuit

Certified as a true copy and issued
as the mandate on Mar 11, 2024

Attest: *Lyle W. Cayce*
Clerk, U.S. Court of Appeals, Fifth Circuit

No. 23-50201

United States Court of Appeals
Fifth Circuit

**FILED**

February 16, 2024

Lyle W. Cayce
Clerk

LA UNION DEL PUEBLO ENTERO; FRIENDSHIP-WEST BAPTIST
CHURCH; SOUTHWEST VOTER REGISTRATION EDUCATION
PROJECT; TEXAS IMPACT; MEXICAN AMERICAN BAR
ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR
POLITICAL EDUCATION; JOLT ACTION; WILLIAM C.
VELASQUEZ INSTITUTE; JAMES LEWIN; FIEL HOUSTON,
INCORPORATED,

*Plaintiffs—Appellees,*

*versus*

GREGORY W. ABBOTT, *in his Official Capacity as Governor of Texas, Et
al.,*

*versus*

SENATOR PAUL BETTENCOURT; REPRESENTATIVE BRISCOE
CAIN,

*Appellants.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-844

No. 23-50201

Before SMITH, GRAVES, and WILSON, *Circuit Judges*.

JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is REVERSED, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that appellees pay to appellants the costs on appeal to be taxed by the Clerk of this Court.

The judgment or mandate of this court shall issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. *See* FED. R. APP. P. 41(b). The court may shorten or extend the time by order. *See* 5TH CIR. R. 41 I.O.P.

James E. Graves, Jr., *Circuit Judge*, dissenting.

# United States Court of Appeals
## for the Fifth Circuit

_____

No. 23-50201

_____

United States Court of Appeals
Fifth Circuit

**FILED**

February 16, 2024

Lyle W. Cayce
Clerk

LA UNION DEL PUEBLO ENTERO; FRIENDSHIP-WEST BAPTIST
CHURCH; SOUTHWEST VOTER REGISTRATION EDUCATION
PROJECT; TEXAS IMPACT; MEXICAN AMERICAN BAR
ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR
POLITICAL EDUCATION; JOLT ACTION; WILLIAM C.
VELASQUEZ INSTITUTE; JAMES LEWIN; FIEL HOUSTON,
INCORPORATED,

                                            *Plaintiffs—Appellees,*

*versus*

GREGORY W. ABBOTT, *in his Official Capacity as Governor of Texas, et
al.,*

*versus*

SENATOR PAUL BETTENCOURT; REPRESENTATIVE BRISCOE
CAIN,

                                            *Appellants.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-844

_____

Before SMITH, GRAVES, and WILSON, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Appellees[1] (collectively "LUPE") seek to discover, from defendant-intervenor Harris County Republican Party ("HCRP"), documents and communications sent to or exchanged with the Texas Legislature and various members of the Texas executive branch regarding Texas Senate Bill 1 ("S.B. 1"). Defendants[2] (collectively "state defendants") and non-party appellants[3] (collectively "legislators") maintain that some of those materials are protected from discovery by legislative privilege.

The district court concluded the legislative privilege did not apply. Because that was error and an abuse of discretion, we reverse.

## I.

In 2021, the Texas Legislature enacted S.B. 1,[4] relating to "voter registration, voting by mail, poll watchers, and other aspects of election integrity and security." *La Union del Pueblo Entero v. Abbott*, 68 F.4th 228, 231–32 (5th Cir. 2023) ("*Hughes*"[5]). LUPE sued, taking aim at S.B. 1, alleging that (1) S.B. 1's amendments chill voter registration and (2) S.B. 1 was enacted

---

[1] La Union del Pueblo Entero; Friendship-West Baptist Church; Southwest Voter Registration Education Project; Texas Impact; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velasquez Institute; Fiel Houston, Incorporated; and James Lewin.

[2] The State of Texas, the Secretary of State of Texas in his official capacity, and the Attorney General of Texas in his official capacity, and several county law enforcement and election officials.

[3] Senator Bettencourt and Representative Cain.

[4] *See* An Act Relating to Election Integrity and Security, S.B. 1, 87th Leg., 2d Spec. Sess. (2021).

[5] That decision is often referred to as *Hughes* because Senator Hughes was the first-named non-party legislator appellant who was claiming legislative privilege.

No. 23-50201

with an intent to discriminate against racial minorities.[6]  Initially, the only named defendants were the state defendants.  HCRP was added as a defendant-intervenor after the district court granted its renewed motion to intervene in May 2022.  Shortly after HCRP was joined, LUPE sought documents and communications that HCRP had sent to or exchanged with the Texas Legislature and various members of the Texas executive branch regarding S.B. 1.

In November 2022, LUPE moved to compel HCRP to produce those materials.  Following a hearing, the district court ordered HCRP to "produce documents responsive to Plaintiffs' requests for production, subject to the objections sustained at the hearing" and the HCRP's "assertions of privilege."  In response to LUPE's deposition requests, HCRP designated Alan Vera, the chair of the HCRP Ballot Security Committee, as its document custodian.

LUPE took Vera's deposition on February 27, 2023.  At that deposition, Vera testified that he had communicated extensively on behalf of HCRP with legislators and legislative staff regarding S.B. 1 from June 2020 through September 2021.  But Vera declined to testify when the scope of the question appeared potentially to encompass Vera's communications with the legislators or legislative staff in response to a legislative inquiry.  Office of Attorney General ("OAG") attorneys representing the state defendants also objected to those questions on the ground of legislative privilege.

Vera's deposition was the first time the parties became aware that Vera held potentially privileged documents on his personal email and per-

---

[6] Nearly three dozen plaintiffs then filed five lawsuits taking aim at S.B. 1.  Those suits have been consolidated under one lead cause number.  LUPE is part of that consolidated plaintiff class.

No. 23-50201

sonal computer. LUPE, upon so learning, held Vera's deposition open and filed a motion to compel HCRP "to conduct a search for and produce all relevant documents in response to Plaintiffs' Requests for Production ... , including documents in Mr. Vera's personal email address and personal computer," and "to provide deposition testimony in response to Plaintiffs' questions regarding [HCRP's] communications with legislators and legislative staff."

The district court, following a hearing on LUPE's motion, rejected Vera's and OAG attorneys' invocations of legislative privilege. It then ordered (1) Vera to submit to another deposition and (2) Vera and HCRP to produce documents responsive to LUPE's requests for production. The legislators appeal the denial of legislative privilege.

## II.

There are three jurisdictional issues we must resolve before turning to the merits of the appeal: *First*, whether the legislators, as non-parties, have standing to appeal. *Second*, whether the collateral order doctrine applies. *Last*, whether the order on appeal is moot.[7]

### A.   *Non-Party Standing*

LUPE contends the legislators lack standing to bring this appeal because they are not parties to the case. The legislators agree that non-parties generally cannot appeal an order or judgment. *See Castillo v. Cameron Cnty.*, 238 F.3d 339, 349 (5th Cir. 2001). They observe that that general rule permits of an exception: A non-party may appeal "if the decree affects his

---

[7] Although "there is no mandatory sequencing of jurisdictional issues," we begin with standing because it is "logically antecedent" to mootness. *Acheson Hotels, LLC v. Laufer*, 144 S. Ct. 18, 23 (2023) (Thomas, J., concurring) (cleaned up).

No. 23-50201

interests." *Id.*

Three factors guide our determining whether the legislators qualify for that exception: (1) "whether the nonparties actually participated in the proceedings below," (2) whether "the equities weigh in favor of hearing the appeal," and (3) whether "the nonparties have a personal stake in the outcome." *Id.* at 350 (cleaned up).

### 1. Participation

The legislators have participated adequately in the district court proceedings.

The legislators had previously been served with third-party subpoenas—seeking the *same* documents and communications at issue in this appeal—by plaintiffs in the consolidated district court proceedings. In responding to those subpoenas, the legislators invoked legislative privilege and involved themselves in the district court proceedings. As noted by the district court, the legislators sent "a letter asserting various objections including legislative privilege" and attended "numerous meet-and-confer sessions."[8] The legislators also filed briefing and attended hearings where they explained that the legislative privilege applied and was not waived. Extensive is the legislators' efforts in defending their claims of legislative privilege.

LUPE posits we should disregard the legislators' efforts in opposing those third-party subpoenas, theorizing that the only relevant proceedings that should be examined for purposes of the first factor are the exact proceedings giving rise to the order on appeal. Observing that the non-parties in *Castillo* "brought the very motion that was denied in the order that [was] being

---

[8] Order, *La Union del Pueblo Entero v. Abbott*, No. 5:21-cv-00844-XR, ECF No. 425, at 2 (W.D. Tex. May 25, 2022) (cleaned up).

No. 23-50201

appealed," 238 F.3d at 350, LUPE asserts that the legislators did not partici-pate in the district court proceedings at all, in that they did not personally invoke the privilege at Vera's deposition or attend the subsequent hearing.

LUPE's theory misinterprets *Castillo.* True, the non-party in *Castillo* brought "the very motion that was denied in the order that [was] being appealed." *Id.* Indeed, that was one of the reasons *Castillo* concluded there was "no question ... the [non-party] has been an active participant in the proceedings." *Id.* But that was not the only basis for the *Castillo* court's conclusion. Also considered was the non-party's participation in proceed-ings *other than* the order on appeal.[9] Thus, *Castillo* cuts against LUPE's theory and suggests that non-parties need not participate in the same pro-ceedings concerning the order on appeal.

Nor can LUPE's interpretation of *Castillo* be squared with subsequent Fifth Circuit caselaw. Take, for example, *Maiz v. Virani,* 311 F.3d 344 (5th Cir. 2002), which dealt with an appeal brought by two non-party companies challenging a turnover order divesting them of property allegedly worth tens of millions of dollars, *see id.* at 339. *Maiz* held those two companies had standing to appeal the turnover order even though "there [wa]s simply no indication that [non-party] appellants requested relief from the district court or intended to have any direct involvement in the Receivership proceed-ings." *Id.* at 339, 341. That was because those two non-parties "allege[d] an actual injury and thus have a personal stake in this appeal. [That] is sufficient ... to grant them an exception to the general rule that a non-party should not be allowed to appeal the district court's judgment." *Id.* at 339 (citations

---

[9] *Id.* ("From the time the plaintiffs first amended their complaint to just two days before the continuance of the injunctions, the State was a named party to the proceedings. In fact, the State brought the very motion that was denied in the order that is being appealed.").

No. 23-50201

omitted).  LUPE's interpretation cannot be squared with *Maiz*.

The first factor is satisfied because the legislators have participated adequately in the proceedings in the district court.

### 2. *Equitable Considerations*

There are two reasons the equities weigh in favor of allowing the legislators to appeal:

*First*, it is well established that "a non-party may appeal orders for discovery if he has no other effective means of obtaining review." *United States v. Chagra*, 701 F.2d 354, 359 (5th Cir. 1983).  Such is the situation here.  This appeal is the only mechanism for the legislators to obtain appellate review of the order denying their claims of legislative privilege.  The district court, by denying the legislators' privilege claims, has ordered the production of potentially privileged documents.  But once such production has occurred, "there would be no further point to the claim of privilege" because "it would be irretrievably breached and beyond the protection of an appellate court."[10] Equity favors this appeal because the legislators have no other mechanism to vindicate their potentially meritorious claims of legislative privilege.

*Second*, denials of legislative privilege affect interests far beyond those held by the legislators and the plaintiffs in this case.  That privilege, "so well grounded in history and reason," is necessary "to enable and encourage a representative of the public to discharge his public trust with firmness and success."  *Tenney v. Brandhove*, 341 U.S. 367, 373, 376 (1951).  Erroneous denials of legislative privilege threaten both the public's "substantial interest in ensuring that elective office remains an invitation to draft legislation" and

---

[10] *Hughes*, 68 F.4th at 234 (quoting *Overby v. U.S. Fid. & Guar. Co.*, 224 F.2d 158, 162 (5th Cir. 1955)); *see also id.* at 233 (noting the legislators cannot "retract privileged information that has been shared into the public domain").

No. 23-50201

the legislators' interest in "[f]reedom from constant distraction"—a high-order value. *Hughes*, 68 F.4th at 233.

Consequently, the equities favor the legislators' ability to appeal the order denying their claims of legislative privilege.

LUPE maintains the contrary is true for three reasons: (1) the legislators waited too long to appeal; (2) its discovery requests were served on HCRP and do not impose cost and burden on the legislators; and (3) post-judgment review would adequately protect the legislators' interests. LUPE's three contentions do not change our conclusion:

There is no merit to LUPE's first contention—that the legislators waited too long to appeal. According to LUPE, the legislators had thirty days to appeal from December 9, 2022—the day the district court granted in part and denied in part LUPE's motion to compel discovery responses from multiple defendant-intervenors.

The procedural history reveals the absurdity of LUPE's first contention. Vera was not served with a notice of deposition until February 23, 2023, and his deposition took place four days later on February 27. It was not until that deposition that the parties even knew Vera had potentially privileged material stored on his personal email and personal computer. LUPE is asking the legislators to do the impossible—that is, to claim privilege and take an appeal months before they even knew the deponent's identity or that he held potentially privileged documents.

Moreover, LUPE's first contention proves too much. When taken to its logical conclusion, LUPE's position would require legislators to claim legislative privilege—against *any* discovery order, served on *any* party—based on nothing more than pure speculation that privileged material may lie within its scope. Legislators would be required constantly to monitor the status of *all* discovery proceedings in *all* pending cases, or else, forfeit their ability to

8

No. 23-50201

claim legislative privilege. That turns the legislative privilege on its head: The privilege is designed to allow "lawmakers to focus on their jobs rather than on motions practice in lawsuits." *Hughes*, 68 F.4th at 233, 237. LUPE's position would make legislators full-time motions practitioners.

LUPE's second contention is as meritless as the first. Its assertion that its discovery request does not impose cost or burden on legislators is foreclosed squarely by *Hughes*.

To start, LUPE identifies only one of the two purposes served by the legislative privilege. True, one purpose is to protect legislators from the cost, burden, and inconvenience of trial. But that's not all. Equally important is the privilege's function to guard against "judicial interference" by protecting legislators from courts' seeking to "inquire into the motives of legislators" and "uncover a legislator's subjective intent in drafting, supporting, or opposing proposed or enacted legislation." *Id.* at 238 (citations omitted).

While LUPE's discovery request may be directed at HCRP, the materials it seeks go to the content of the legislators' communications. Discovery requests that reveal such communications, even if served on non-legislators, nonetheless burden—and therefore deter—legislators from "the uninhibited discharge of their legislative duty." *Id.* (quoting *Tenney*, 341 U.S. at 377). It is therefore no less burdensome to the privilege's purpose of protecting "the exercise of legislative discretion . . . [from] judicial interference." *Id.* (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 52 (1998)).

Worse still, LUPE's second contention is inconsistent with its first. LUPE's first contention burdens legislators with the massive cost, inconvenience, and distraction of surveilling the status of all discovery proceedings in all pending cases merely to preserve their claims of legislative privilege. But that cost, inconvenience, and distraction *vanish* under LUPE's second contention—LUPE asserts that the discovery requests don't burden the leg-

No. 23-50201

islators at all because they were served on HCRP. So even a legislator who invests the time and effort to identify cases implicating the privilege would nonetheless be stymied from appealing its denial.

Put together, LUPE's first and second contentions yield an understanding of legislative privilege that protects communications with third parties in name only. And that cannot be, for *Hughes* holds that the legislative privilege's scope extends to legislators' communications with third parties. *See id.* at 236. We reject what is, in essence, "an indirect attack on the privilege's scope." *Id.*

*Hughes* also forecloses LUPE's last contention. There, the court explained that denials of legislative privilege could not be meaningfully reviewed on appeal because "there would be no further point to the claim of privilege" once a non-party's "privileged information . . . has been shared into the public domain." *Id.* at 233–34 (citation omitted). LUPE's notion—that post-judgment appellate review sufficiently protects the legislators' interests—fails.

### 3. *Personal Stake*

The third *Castillo* factor—whether the party seeking appellate review has a personal stake in the outcome—is also met. LUPE seeks to discover documents and communications HCRP sent to or exchanged with the Texas Legislature and various members of the state executive branch regarding S.B. 1. The legislators can potentially assert legislative privilege over those documents because they may have been created, reviewed, or produced "within 'the sphere of legitimate legislative activity' or within 'the regular course of the legislative process.'" *Hughes*, 68 F.4th at 235 (quoting *Tenney*, 341 U.S. at 376, and *United States v. Helstoski*, 442 U.S. 477, 489 (1979)).

In response, LUPE asserts the legislators "surrendered whatever interest they might have in the confidentiality of these documents when they

10

No. 23-50201

shared them with private parties who are not members or employees of the Legislature."

LUPE's assertion is incorrect. In *Hughes*, this court held that the legislative privilege protects the "many actions and documents" legislators take, review, or produce "within 'the legislative process itself.'" 68 F.4th at 235 (quoting *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015)); *see also Tenney*, 341 U.S. at 372. That means the legislative privilege covers material provided by or to third parties involved in the legislative process, *Hughes*, 68 F.4th at 237; *see also In re N.D. Legis. Assembly*, 70 F.4th 460, 464 (8th Cir. 2023), because all of these actions occur "within 'the regular course of the legislative process,'" *Hughes*, 68 F.4th at 235 (quoting *Helstoski*, 442 U.S. at 489 (1979)). The legislators' communications do not lose their protected character merely because they are stored with a third party. Consequently, the legislators have a personal interest in the privileged documents stored on Vera's personal computer and personal email.

In sum, we hold that the legislators have standing to bring this appeal.

*B.    Interlocutory Review*

This court's appellate jurisdiction generally extends only to "final decisions of the district courts." *Id.* at 232 (quoting *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 448 (5th Cir. 2019)); *see also* 28 U.S.C. § 1291. But "we have jurisdiction over a narrow class of decisions immediately appealable as collateral orders even if no final judgment has been rendered." *Id.* (cleaned up).

A collateral order is immediately appealable if it meets the three conditions in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). They are whether the order "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal." *Vantage Health Plan,*

No. 23-50201

913 F.3d at 448 (quoting *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 171 (5th Cir. 2009)). Ultimately, "the decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009) (quoting *Will v. Hallock*, 546 U.S. 345, 352–53 (2006)).

We do not determine whether an order is immediately appealable on a case-by-case basis or in an individualized manner. *See Hughes*, 68 F.4th at 232. Instead, "our focus is on 'the entire category to which a claim belongs'" and on "the class of claims[] taken as a whole." *Id.* (alteration in original) (quoting *Mohawk*, 558 U.S. at 107).

There are two reasons the district court's order satisfies the *Cohen* and *Mohawk* requirements:

*First*, the *Hughes* court, after considering the three *Cohen* factors, held that the class of "orders denying non-party state-legislators' assertions of legislative privilege ... are immediately appealable." *Id.* The order on appeal fits within that class.[11]

Tellingly, the *Cohen* analysis for this order is indistinguishable from the one conducted in *Hughes*: The first *Cohen* factor is met because HCRP could be sanctioned for failing to comply with the district court's order compelling production of Vera's documents. *Id.* at 233. Likewise, the order meets the second *Cohen* factor since the issue of privilege does not decide the legality of various provisions of S.B. 1. *See id.* And the issue is important because denials of legislative privilege—especially if unreviewable—would deter lawmakers from the uninhibited discharge of their legislative duty and

---

[11] Vera claimed privilege on behalf of the legislators. *See infra* part III.A.

No. 23-50201

diminish the public good. *See id.* Last, the denial of legislative privilege is effectively unreviewable on appeal. As discussed *supra* part II.A.2, this appeal is the only mechanism for the legislators to obtain appellate review of the denial of legislative privilege. Once HCRP has produced the potentially privileged documents, "there would be no further point to the claim of privilege" because "it would be irretrievably breached and beyond the protection of an appellate court." *Hughes*, 68 F.4th at 234 (quoting *Overby*, 224 F.2d at 162); *see also id.* at 233 (noting the legislators can't "retract privileged information that has been shared into the public domain").

LUPE says this order is distinguishable from *Hughes* because it was directed at HCRP and not the legislators themselves. That is not a meaningful distinction. This order is no less conclusive than was the one in *Hughes*. Indeed, the district court's order expressly contemplates increased sanctions and contempt of court. The identity of the party being sanctioned is unrelated to the likelihood that sanctions will be imposed. Additionally, the issue raised on appeal is no less important because HCRP's release of privileged documents into the public domain is equally damaging to the interests and values advanced by the legislative privilege.

*Second*, the legislative privilege implicates "'a substantial public interest' or 'some particular value of a high order.'" *Id.* at 233 (quoting *Mohawk*, 558 U.S. at 109). Specifically, "[t]he public has a substantial interest in ensuring that elective office remains an invitation to draft legislation, not defend privilege logs. Freedom from constant distraction is a high-order value." *Id.* Those interests would be imperiled absent the availability of interlocutory appeal because denials of non-party claims of legislative privilege are effectively unreviewable at later stages of litigation.

Consequently, this court has appellate jurisdiction over the legislators' appeal.

No. 23-50201

## C.    *Mootness*

Mootness is a jurisdictional matter "since it implicates the Article III requirement that there be a live case or controversy." *United States v. Sosebee*, 59 F.4th 151, 154 (5th Cir. 2023) (cleaned up). A case on appeal is moot "only when it is impossible for a court to grant *any* effectual relief *whatever* to the prevailing party." *Id.* (cleaned up) (emphasis added). A case is not moot so long as the parties have "a concrete interest, however small, in the outcome of the litigation." *Id.* (cleaned up).

Vera unexpectedly passed away while this appeal was pending. The legislators contend that moots the appeal. They claim LUPE sought documents Vera held for the purpose of deposing him about his communications with legislators and their staff. That purpose, the legislators aver, vanished upon Vera's passing.

But that's not the only reason LUPE sought those documents. In addition to assisting them in preparing for Vera's deposition, LUPE believes those documents might shed light on the Texas Legislature's motivations for passing S.B. 1. Vera's death does not affect the potential relevance of those documents and does not render the district court's order moot.

Furthermore, the order survives Vera's passing because it was directed at "Mr. Vera and the HCRP."[12] Vera's death does not eliminate HCRP's obligation to produce documents that Vera sent on HCRP's behalf using his personal email account. HCRP's obligation exists independently of Vera's: The district court expressly ordered HCRP to search and produce all relevant documents, including those "located on Mr. Vera's personal

---

[12] Order, *La Union del Pueblo Entero v. Abbott*, No. 5:21-cv-00844-XR, ECF No. 561, at 9 (W.D. Tex. Mar. 9, 2023).

No. 23-50201

computer and email account."[13]

The legislators nonetheless maintain that HCRP's obligation cannot be separated from Vera's. They speculate the district court contemplated that Vera would produce the material in both his individual capacity and his capacity as an agent of HCRP. That speculation is not supported by the record. At the hearing on the motion to compel, the district court contemplated the possibility that someone other than Vera would search his personal computer and email. The court's order merely requires an agent of HRCP—and not Vera himself—to conduct the search. Consequently, the order is not moot.

### III.

Having assured ourselves of appellate jurisdiction, we turn to the merits.

Discovery orders are reviewed for abuse of discretion. *See Hughes*, 68 F.4th at 235. "The district court's legal conclusions should be reviewed de novo, and its factual findings should not be disturbed unless they are clearly erroneous." *Id.* (citation omitted).

### A.   *Invoking the Privilege*

The legislative privilege is personal to the legislator. *See Gravel v. United States*, 408 U.S. 606, 616 (1972). According to LUPE, that means no one present at Vera's deposition could have invoked the legislative privilege. Not so.

The legislative privilege "covers all aspects of the legislative process." *Hughes*, 68 F.4th at 235 (cleaned up). But the complexity of the modern legislative process makes it impossible for legislators "to perform their

---

[13] *Id.* at 5.

No. 23-50201

legislative tasks without the help of aides and assistants," *Gravel*, 408 U.S. at 616, which is why the Supreme Court has long recognized that legislators' aides and assistants can invoke legislative privilege, *see id.*

Yet it remains the case that neither aides nor assistants independently possess a claim to the legislative privilege. Their ability to invoke the privilege comes not from their positions as "aides" or "assistants." Instead, it depends on whether the act for which they invoke privilege was done at the direction of, instruction of, or for a legislator.[14] Aides and assistants can invoke privilege only over acts meeting that conditional, for those acts occur within the legislative process and "would be immune legislative conduct if performed by the [legislator] himself." *Id.* at 622.

Accordingly, there is no reasoned basis to draw the line at aides and assistants.[15] As *Hughes* recognized, "communications 'outside the legislature'" such as "private communications with advocacy groups" is "part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider." 68 F.4th at 236 (cleaned up). Those acts—even if performed by third parties brought into the legislative process—"occur[] within 'the sphere of legitimate legislative activity.'" *Id.* at 235 (quoting *Tenney*, 341 U.S. at 376). Consequently, when a legislator brings third parties into the legislative process, those third parties may invoke the privilege on that legislator's behalf for acts

---

[14] *See Gravel*, 408 U.S. at 622 ("[T]he privilege available to the aide is confined to those services that would be immune legislative conduct if performed by the [legislator] himself.").

[15] *See id.* at 620 (surveying caselaw and noting that "[n]one adopted the simple proposition that immunity was unavailable to congressional or committee employees because they were not Representatives or Senators"); *see also id.* at 619–20 (observing "committee counsel was deemed protected to some extent by legislative privilege") (citing *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967)).

No. 23-50201

done at the direction of, instruction of, or for the legislator.

Vera is a third party brought into the legislative process itself. *See id.* at 235, 237. The legislators sought his comments on draft language for bills that eventually became S.B. 1. Vera also provided feedback on proposed provisions on bills that eventually became S.B. 1. He also emailed senators with suggested language to include in S.B. 1. Much like the services of a legislative aide or assistant conducting legislative acts at the behest of a legislator, Vera's acts "occurred within 'the sphere of legitimate legislative activity,'" *id.* at 235 (quoting *Tenney*, 341 U.S. at 376), and are part of "the modern legislative process," *Gravel*, 408 U.S. at 616. Vera could therefore invoke the legislative privilege for those acts since they were undertaken at the direction of, instruction of, or for a legislator.

At the deposition, Vera carefully declined to testify when the scope of the question appeared potentially to encompass his communications with the legislators or legislative staff in response to a legislative inquiry.[16] Thus, Vera properly invoked legislative privilege to the extent that his invocations concerned acts that were done at the direction of, instruction of, or for a legislator.

In addition to Vera, OAG attorneys present at the deposition raised objections on the basis of legislative privilege. Although those OAG attorneys represent both the state defendants and the legislators, they attended the deposition only in their capacity as counsel for the state defendants. In light of the subject matter of the deposition, only Vera's acts occurred within

---

[16] It is unclear whether the legislators instructed Vera to invoke the legislative privilege on their behalf. That ambiguity is of no moment, however, for aides and assistants may invoke the privilege without the prior authorization of a legislator. *Gravel* contemplates that situation, expressly noting that "an aide's claim of privilege can be repudiated and thus waived by the [legislator]." 408 U.S. at 622 n.13.

No. 23-50201

the scope of the legislative process. Thus, the OAG attorneys could not have invoked legislative privilege at Vera's deposition.

### B.   Scope of the Privilege

The scope of the legislative privilege is "necessarily broad." *Hughes*, 68 F.4th at 236. Extending well beyond voting for or against a particular piece of legislation, the legislative privilege covers "all aspects of the legislative process," including material prepared for a legislator's understanding of legislation and materials the legislator possesses related to potential legislation. *Id.* at 235–36.[17]

The privilege extends to material provided by or to third parties involved in the legislative process, *id.* at 237, because all of those actions occur "within 'the regular course of the legislative process,'" *id.* at 235 (quoting *Helstoski*, 442 U.S. at 489 (1979)).[18] That makes sense, given that lawmakers routinely "meet with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation as part of the regular course of the legislative process." *Id.* at 235–36 (cleaned up).

The legislative privilege applies to documents shared, and communications made, between the legislators and Vera. That includes Vera's emails, which contain the legislators' communications with a third party who was brought into the legislative process. *See id.* at 235, 237. Vera's emails are

---

[17] *Cf. Almonte v. City of Long Beach*, 478 F.3d 100, 103 (2d Cir. 2007) ("[L]egislative immunity applies not only to . . . vote[s] . . ., but also to any discussions and agreements . . . prior to the vote, regardless of whether those discussions and agreements took place in secret.").

[18] Including, for example, "communications with third parties, such as private communications with advocacy groups." *Hughes*, 68 F.4th at 236; *see also In re N.D. Legis. Assembly*, 70 F.4th at 464.

No. 23-50201

"part and parcel of the modern legislative process through which legislators receive information possibly bearing on the legislation they are to consider." *Id.* at 236 (quoting *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980)). Because they were created, transmitted, and considered *within* the legislative process itself, they are protected by legislative privilege.

LUPE's attempt to distinguish this case from *Hughes* fails. In its view, *Hughes* addressed only whether legislators themselves could be compelled to produce documents they shared with third parties. LUPE claims this case is "fundamentally different" because the question presented is "whether legislators can prevent *private parties* from producing documents that are in the private parties' possession, after legislators willingly relinquished control over those documents."

LUPE's distinction relies on a faulty premise. The legislators did not willingly relinquish control over Vera's emails. That is because the legislators brought Vera into the legislative process to conduct legitimate legislative acts. His emails were created, transmitted, and considered *within* the legislative process itself, so the legislators have not waived their claims of privilege. Put another way, waiver has not occurred because those emails have not been publicly released *outside* of the legislative process. *See id.* at 237.

## C.   *When the Privilege Yields*

The legislative privilege "must yield" in "extraordinary instances." *Hughes*, 68 F.4th at 237 (cleaned up). That includes cases "where important federal interests are at stake," such as the "enforcement of federal criminal statutes," *United States v. Gillock*, 445 U.S. 360, 373 (1980), and "extraordinary civil cases," *Hughes*, 68 F.4th at 237–38. But those "qualifications do not subsume the [legislative privilege]." *Id.* at 238. The mere fact that "constitutional rights are at stake" or that there is a "claim of unworthy purpose does not destroy the privilege." *Id.* "Even for allegations involving

No. 23-50201

racial animus . . . the Supreme Court has held that the legislative privilege stands fast." *Id.*

LUPE contends that the legislative privilege must yield. We disagree. LUPE's claims are largely indistinguishable from those underlying the dispute in *Hughes*. Both allege S.B.1 violates sections 2 and 208 of the Voting Rights Act ("VRA") and the First and Fourteenth Amendments of the U.S. Constitution. *Hughes* held that the legislative privilege should not yield in the face of such claims, *see* 68 F.4th at 238–39, and that holding applies to this case in full force.[19]

And even if we assume, *arguendo*, that *Hughes*'s holding does not apply, we alternatively hold that this is not a case in which the legislative privilege must yield. To determine whether this is an extraordinary civil case to which the privilege yields, we must determine whether this case is "closer on the continuum of legislative . . . privilege to the suits under 42 U.S.C. § 1983 at issue in *Tenney* and *Bogan* than it is to the criminal prosecution under federal law in *Gillock*." *Hughes*, 68 F.4th at 240.

At one end of the continuum is *Gillock*, which dealt with a federal criminal prosecution; it is the only binding case that held the legislative privilege yielded. 445 U.S. at 373. At the other end is *Tenney* and *Bogan*, both of which involve private plaintiffs' claims under 42 U.S.C. § 1983 for alleged civil rights violations.[20] In neither of those cases did the privilege yield—notwithstanding "the important federal rights that § 1983 aims to vindicate." *Hughes*, 68 F.4th at 239 (citations omitted).

Three characteristics distinguish *Gillock* from *Tenney* and *Bogan*:

---

[19] "[W]e are bound by the Supreme Court and our own caselaw." *Garcia v. United States*, 986 F.3d 513, 531 n.66 (5th Cir. 2021).

[20] *See Tenney*, 341 U.S. at 371; *Bogan*, 523 U.S. at 47.

No. 23-50201

*First*, at stake in *Gillock* was an important federal interest beyond a constitutional or statutory claim involving racial animus. *Second*, *Gillock* was decided in the context of a federal criminal prosecution—that is, an action brought by the United States as a sovereign enforcing its laws. *Last*, for the dispute in *Gillock*, the marginal benefit gained from vindicating the important federal interest exceeded the speculative losses resulting from the marginal intrusion into the state legislative process.

Those three characteristics, in turn, inform the definition of an "extraordinary civil case" in which the legislative privilege "must yield." *See id.* at 237–38 (cleaned up). A civil case is extraordinary if it satisfies three elements:

*First*, the civil case must implicate important federal interests beyond a mere constitutional or statutory claim. Per *Tenney* and *Bogan*, civil cases involving only civil rights claims are not extraordinary. *See Tenney*, 341 U.S. at 371; *Bogan*, 523 U.S. at 47; *see also Hughes*, 68 F.4th at 239.

*Second*, the civil case must be more akin to a federal criminal prosecution than to a case in which a private plaintiff seeks to vindicate his own rights. *Gillock* highlights two characteristics that are common in federal criminal prosecutions but rare in civil suits. The first characteristic concerns who is entitled to bring suit. Only the United States, acting as a sovereign, is entitled to bring federal criminal prosecutions. Similarly circumscribed should be the cause of action for an extraordinary civil case. The second characteristic concerns the relief that may be sought. A successful federal criminal prosecution provides for unique relief (*i.e.*, incapacitation) that could not be sought by private litigants. Likewise, a civil case is more likely extraordinary if the cause of action provides additional and unique relief—above and beyond what may be sought by typical private plaintiffs.

*Third*, the civil case cannot be brought so frequently that it would, in

21

No. 23-50201

effect, destroy the legislative privilege. "Our Federalism" demands that we remain sensitive to "the legitimate interests of both State and National Governments" and refrain from "unduly interfer[ing] with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44 (1971). Exceptions to the legislative privilege must not be created at the expense of our "proper respect for state functions," *id.*, such as its "impact on [a state legislator's] exercise of his legislative function," *Gillock*, 445 U.S. at 373.[21]

Of those three elements, LUPE's case satisfies none. The first element is not satisfied because LUPE merely alleges that "the Texas Legislature enacted S.B. 1 with an intent to discriminate against racial minorities." LUPE's case thus fails to implicate any important federal interest *beyond* constitutional or statutory claims of racial animus.

Nor is the second factor satisfied. LUPE's case shares neither of the characteristics common to federal criminal prosecutions. Take, for example, LUPE's racial-animus claim under section 2 of the VRA. The Supreme Court has long allowed private plaintiffs and the United States to bring VRA section 2 suits.[22] Private plaintiffs entitled to file VRA section 2 suits are legion—in stark contrast to federal criminal prosecutions.[23] Moreover, neither LUPE nor the United States is entitled to any relief beyond what is available in other private plaintiffs' VRA section 2 suits. Any judicial relief granted for successfully litigating a section 2 claim—say, for example, an

---

[21] *See also Hughes*, 68 F.4th at 238 (noting "the privilege would be of little value" if courts classified so many cases as extraordinary that legislators would constantly "be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to hazard a judgment against them based upon a jury's speculation as to motives" (quoting *Tenney*, 341 U.S. at 377)).

[22] *See, e.g., Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2334 (2021). *But see Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023).

[23] For this reason, LUPE's case also fails to satisfy the third element.

No. 23-50201

injunction of a racially-gerrymandered electoral map—is inherently non-excludable and necessarily accrues to all affected voters *regardless* of whether the lawsuit is brought by the United States or by LUPE or any other private plaintiff. Even VRA section 2 suits brought by the United States in its sovereign capacity, which we recognize is no mere plaintiff,[24] are not extraordinary civil cases in which the privilege must yield. That same conclusion necessarily follows for LUPE—a mere private plaintiff.

In sum, this is not "one of those 'extraordinary instances' in which the legislative privilege must 'yield.'" *Hughes*, 68 F.4th at 237 (cleaned up).

## IV.

In summary: The legislators have standing to bring this appeal as non-parties, and we have jurisdiction under the collateral order doctrine. Neither this appeal nor the district court's order is moot.

The district court's order is reversible error. The legislative privilege was properly invoked; protects documents shared and communications made between the legislators and Vera; and does not yield under the circumstances here presented.

The order denying legislative privilege is REVERSED.

---

[24] *See Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy but of a sovereignty.").

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting:

I disagree with the majority's conclusion that the district court committed error or abused its discretion in finding that legislative privilege did not apply to the discovery at issue here. Because I would affirm the district court, I respectfully dissent for the reasons stated herein.

In August 2021, the Texas Legislature passed Senate Bill 1 (S.B. 1), which amended various provisions of the Texas Election Code related to voter registration, voting by mail, poll watching, and other election matters. S.B. 1 also led to the filing of lawsuits by numerous plaintiffs, including La Union del Pueblo Entero (LUPE), against various Texas officials, both state and local, on the basis that S.B. 1 violated the Voting Rights Act of 1965, the Civil Rights Act of 1964, the U.S. Constitution, and various other provisions of law. The lawsuits were then consolidated. The consolidated litigation has resulted in multiple interlocutory appeals. Of relevance here:

In October 2021, various local and national Republican committees, including the Harris County Republican Party, (collectively "HCRP") sought to intervene in the case. The district court found that the committees had not established a legally protectable interest or that the state defendants' representation would be inadequate. This court reversed and remanded on appeal, essentially agreeing with the committees' argument raised for the first time on appeal that their interest in S.B. 1's provisions concerning party-appointed poll watchers warranted intervention. *See La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. March 25, 2022) (*LUPE I*).

As a result, the committees' renewed motion to intervene in May 2022 was granted by the district court. The district court also amended the scheduling order to track proposals offered by the parties. The plaintiffs (collectively "LUPE") sought to compel the production of various documents from the committees and sought additional depositions.

Specifically, LUPE asked the district court to order HCRP to respond to requests 1 and 3 and to provide deposition testimony related to the party's communications regarding S.B. 1 with Texas legislators, legislative staff, and certain executive branch agencies. At a hearing in November of 2022, HCRP agreed multiple times to produce the documents, said it was "happy" to do it, and said that it did not believe any of the documents were privileged, which is presumably why a privilege log was not initially produced. However, in its subsequent production, HCRP produced 61 documents – only 7 of which were responsive to the first request – and claimed that no other responsive documents were identified. LUPE sent a deficiency letter to HCRP in early 2023 asking HCRP to expand their search.

LUPE also served HCRP with notices to depose Alan Vera and others, including HCRP Chairman Cindy Siegel, pursuant to Rule 30 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 30(b)(1), (6). Vera, a Republican Party volunteer, was a named document custodian, chair of the HCRP Ballot Security Committee and a lobbyist who had communicated with legislators and their staff regarding S.B. 1 and other matters significant to the party. Vera typically used his personal email address and personal computer for these communications, but he also used his telephone and retained written notes. Additionally, Vera had repeatedly provided feedback on S.B. 1 to various individuals and legislators, including Texas Senator Paul Bettencourt and Representative Briscoe Caine, who are the third-party legislators bringing this appeal. Pursuant to his original deposition, Vera testified that he did not search for any of those documents, nor did he give anyone access to his computer to do so.

On March 9, 2023, the district court granted the motion, finding that legislative privilege did not apply. Specifically, the district court ordered Vera to submit to another deposition, and for Vera and HCRP to produce the relevant documents under requests 1 and 3. Bettencourt and Caine

(collectively "legislators"), who are not parties and had neither intervened nor objected to the request, filed a third-party notice of appeal on March 20, 2023.  Meanwhile, Vera, who had not yet been re-deposed, suddenly died at the Texas Capitol in May of 2023 as he was preparing to testify about election legislation, as he had done repeatedly for many years.

On May 17, 2023, this court decided *La Union del Pueblo Entero v. Abbott*, 68 F.4th 228 (5th Cir. 2023) (*LUPE II/Hughes*).[1]  In *LUPE II/Hughes*, the League of United Latin American Citizens (LULAC) plaintiffs sought discovery directly from the non-party legislators, as opposed to outside parties here.  The legislators largely refused and asserted legislative privilege.  The district court rejected most of the privilege claims and ordered the legislators to produce the documents, but the court also stayed the order while the legislators filed an interlocutory appeal.  This court then reversed the district court, concluding that legislative privilege applied because requiring the legislators to respond or comply with those subpoenas would undermine the purpose of the privilege.

The majority now extends legislative privilege a step farther and concludes that it applies to outside parties in this appeal, regardless of the content of the documents involved.

### I. Whether the legislators have appellate standing.

The law is well-settled that, typically, a person must either be a party or first move to intervene or quash to bring an appeal.  *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009); *Marino v. Ortiz*, 484 U.S. 301, 304 (1988);  *Louisiana v. Jack*, 244 U.S. 397, 402 (1917); *see also* Fed. R. App. P. 3(c)(1)(A).  Moreover, the Supreme Court has cautioned

---

[1] The majority refers to this decision as *Hughes*, so I will refer to it as *LUPE II/Hughes* in an effort to avoid confusion.

that, "the better practice is for such a non-party to seek intervention for purposes of appeal." *Marino*, 484 U.S. at 304.

However, there is a limited exception for nonparties to appeal. As the majority recites, there are three factors to be considered to determine the application of that exception: (1) whether the nonparties actually participated in the proceedings below; (2) whether the equities weigh in favor of hearing the appeal; and (3) whether the nonparties have a personal stake in the outcome. *See Castillo v. Cameron Cnty.*, 238 F.3d 339, 349 (5th Cir. 2001). The majority's weighing of the factors is wrong.

### * *Participation*

The majority concludes that the legislators adequately participated in the district court proceedings by asserting legislative privilege in a letter, filing "briefing," and attending hearings. I disagree. Further, the record does not support the majority's conclusion that "[e]xtensive is the legislators' efforts in defending their claims of legislative privilege."

To reiterate, no party filed this appeal. The legislators are not parties. They did not intervene or move to intervene. *See* Fed. R. App. P. 3(c)(1)(A). Additionally, as LUPE asserts, they did not actively participate in the proceedings from which they seek to appeal. They also did not object. The "briefing" to which the majority refers was the legislators' letter response to a motion to compel filed by the LULAC plaintiffs addressed in *LUPE II/Hughes*. One response to a separate motion in a massive case does not constitute "briefing" nor establish active participation for purposes of this appeal, and the majority fails to cite any authority to establish that it does.

The majority also states that the district court noted, "the legislators sent 'a letter asserting various objections including legislative privilege' and attended 'numerous meet-and-confer sessions.'" This reference is to the second page of the district court's order granting the LULAC plaintiffs'

27

motion to compel. However, after recounting that counsel for the legislators sent the plaintiffs a letter, the district court said: "After numerous meet-and-confer sessions, *the Parties* were unable to resolve their disagreements concerning the State Legislators' assertions of privilege." Order, *La Union del Pueblo Entero v. Abbott*, No. 5:21-cv-00844-XR, ECF No. 425, at 2 (W.D. Tex. May 25, 2022) (emphasis added). Importantly, the legislators are not parties. That sentence does not say the non-parties or the third-parties or the legislators participated in numerous meet-and-confer sessions. It says "the Parties" did and "were unable to resolve their disagreements" concerning the legislators' assertions, and it was on an entirely different motion and order that were the subject of a previous appeal before this court. *See LUPE II/Hughes*, 68 F.4th at 228.

The majority goes on to say that LUPE misinterprets *Castillo*, which involved a non-party who actually brought the motion that was denied by the order on appeal. *Id.*, 238 F.3d at 349. The majority states that in *Castillo*, "[a]lso considered was the non-party's participation in proceedings *other than* the order on appeal. Thus, *Castillo* cuts against LUPE's theory and suggests that non-parties need not participate in the same proceedings concerning the order on appeal." (Emphasis original). But *Castillo* neither says nor suggests such a conclusion. Moreover, even if *Castillo* had made any such suggestion, it would be that non-parties need not participate in the exact proceedings concerning the appeal if they were previously a named party who actively participated throughout the proceedings. *See Castillo*, 238 F.3d at 350. Not only was the non-party here never a named party, but there was only one letter in response to an earlier motion.

The majority also cites *Maiz v. Virani*, 311 F.3d 334 (5th Cir. 2002), as further support for the claim that *Castillo* suggests something that it does not. *Maiz* involved judgment creditors and the use of the Texas turnover statute to strip corporations of assets without prior adjudication to pierce the

corporate veils.  This court reversed and remanded, concluding that "the Texas turnover statute cannot be utilized to adjudicate the substantive property rights of the two non-judgment debtor corporations in this case without a prior judicial determination which pierces their corporate veils." *Id.* at 336.  But the connection between the corporations and the action, importantly, does not exist here, as the legislators are not corporations being stripped of tens of millions of dollars via the Texas turnover statute.

The majority also states that "[t]he legislators had previously been served with third-party subpoenas—seeking the *same* documents and communications at issue in this appeal—by plaintiffs in the consolidated district court proceedings."  The majority's emphasis on "same" is unclear. It is also unclear how the majority determined that these are all "the *same* documents and communications," particularly since even the appellants only loosely assert that there may be some of the same documents.  Further, the appellees assert that the legislators failed to serve a privilege log, which would be relevant for the majority to make such a determination.  In the case of reversal, the appellees ask this court to remand to the district court to consider, in the first instance, to what extent any fact-based information should be disclosed in light of any privilege log produced.  The requirement of a privilege log and the applicability of legislative privilege pertaining to documents and communications shared with third parties are issues in *Jackson Municipal Airport Authority v. Harkins*, 21-60312, 2023 WL 5522213 (5th Cir. Aug. 25, 2023), which is currently before this court on rehearing en banc. *See Harkins*, 78 F.4th 844 (5th Cir. Aug. 29, 2023).[2]

---

[2] I am recused in this matter, as is Judge Wilson.  However, based on the majority's handling of the issues here, this matter should likely be stayed pending the en banc court's resolution of *Harkins*.

Under this factor, the legislators have failed to establish that they have actually participated. This conclusion is also consistent with authority from other circuits. *See Habelt v. iRhythm Tech., Inc.*, 83 F.4th 1162, 1165-67 (9th Cir. 2023) (No standing to appeal where Habelt filed initial complaint but did not participate in case after the appointment of the lead plaintiff); *see also United States ex rel. Alexander Volkhoff, LLC v. Janssen Pharmaceutica N.V.*, 945 F.3d 1237, 1241-42 (9th Cir. 2020) ("We have allowed nonparties to appeal when they were *significantly* involved in the district court proceedings") (emphasis added); *Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014) (A non-party may appeal, in relevant part, where he "participated in the proceedings *actively* enough to make him privy to the record.") (emphasis added) (quoting *Kenny v. Quigg*, 820 F.2d 665, 668 (4th Cir. 1987)).

### * Equities

The majority states that the equities weigh in favor of allowing the legislators to appeal for two reasons, (1) this appeal is the only means for obtaining relief and (2) denials of legislative privilege affects interests far beyond this case. I disagree.

The majority recites a quote from *United States v. Chagra*, 701 F.2d 354 (5th Cir. 1983) that "a non-party may appeal orders for discovery if he has no other effective means of obtaining review." *Id.* at 359. But *Chagra* can be distinguished.

*Chagra* involved the access of the press to a pretrial bail reduction hearing in a criminal trial for the murder of a federal judge in San Antonio. *Id.* at 355-56. The defendant asked the court to close the hearing because evidence adduced there, if published, would prejudice his right to a fair trial. *Id.* at 356. The magistrate closed a portion of the hearing and ordered the transcript sealed. The magistrate then reopened proceedings but announced

that he intended to hear additional matters in camera the next morning. A couple of newspapers objected the next day. Chagra again moved to close a portion of the hearing regarding a prior statement he had given. After hearing arguments from the newspapers, the magistrate again closed the hearing. The newspapers then asked the district court to vacate the magistrate's order and to unseal the transcripts. *Id.* at 356-57. The district court heard arguments on the newspapers' motions and concluded that there was not sufficient evidence to support the closing of the courtroom. The district scheduled a later hearing to accept evidence on the closure order. At the subsequent hearing, "[t]he newspapers were afforded a full opportunity to participate." *Id.* at 357. The district court ultimately ruled that the closure order was justified. The newspapers appealed to this court.

In a paragraph setting out various provisions of general law, this court included the proposition quoted by the majority. *Id.* at 359 (citing *United States v. Nixon*, 418 U.S. 683, 692 (1974) and *Branch v. Phillips Petroleum Co.*, 638 F.2d 873, 877-79 (5th Cir. 1981). In *Branch*, this court said that: "The theory of allowing an appeal rests on the proposition that forced disclosure would irretrievably breach the claim of privilege and render an appeal from final judgment meaningless...." *Id.* at 878 (quoting *Cates v. LTV Aerospace Corp.*, 480 F.2d 620, 622 (5th Cir. 1973)). Significantly, this court then pointed out that the Supreme Court rejected that argument in *United States v. Ryan*, 402 U.S. 530 (1971).

In *Ryan*, the Supreme Court said:

> We think that respondent's assertion misapprehends the thrust of our cases. Of course, if he complies with the subpoena he will not thereafter be able to undo the substantial effort he has exerted in order by [sic] comply. But compliance is not the only course open to respondent. If, as he claims, the subpoena is unduly burdensome or otherwise unlawful, he may

> refuse to comply and litigate those questions in the event that contempt or similar proceedings are brought against him. Should his contentions be rejected at that time by the trial court, they will then be ripe for appellate review.

*Id.* at 532 (internal marks and citations omitted).

These cases clearly establish that this is not the legislators only means of review.

The majority quotes *LUPE II/Hughes* for the proposition that the legislators "cannot 'retract privileged information that has been shared into the public domain.'" *Id.*, 68 F.4th at 234 (internal citation omitted). However, again, the legislators have another option. Moreover, *LUPE II/Hughes* is easily distinguished as the discovery there was sought directly from individual, non-party state legislators. *Id.* at 231. The discovery here is sought from the HCRP. The majority dismisses that fact, saying it " is not a meaningful distinction." But it absolutely is a meaningful distinction because the HCRP is not entitled to legislative privilege. Also, the majority cites no basis in the law or the record for its conclusion that any communication between a legislator and any outside party regarding any aspect of S.B. 1 is entitled to legislative privilege without qualification.

Additionally, the majority's reliance on *LUPE II/Hughes* is misplaced, as the analysis it cites was pertaining to whether this court had appellate jurisdiction to consider the interlocutory appeal, not whether the non-party legislators had standing to appeal. *See id.* at 232-34 (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). Significantly, *LUPE II/Hughes* did not address the *Castillo* factors for non-party standing to appeal.

The equities weigh against hearing the appeal.

**\* *Personal Stake***

The majority concludes that the legislators are able to establish a personal stake in the outcome. I disagree.

LUPE asserts that the legislators surrendered whatever interest they might have had in the confidentiality of the documents when they shared them with multiple people outside the Legislature. The majority disagrees and points to *LUPE II/Hughes*. However, again, the discovery in *LUPE II/Hughes* was sought directly from the legislators. I do not dispute that the legislators may not have surrendered their interest in the confidentiality of documents they maintained in their possession. But the discovery here is sought from third parties and includes documents the third parties produced independently. The majority cites no authority that allows the extension of legislative privilege to any such materials. The legislators are unable to establish a personal stake. Thus, they are without standing to bring this appeal.

But the majority does not stop there. The majority cites *Gravel v. United States*, 408 U.S. 606, 616 (1972), for the proposition that legislative privilege may extend to the legislators' aides and assistants and quotes the following: "[T]he privilege available to the aide is confined to those services that would be immune legislative conduct if performed by the [legislator] himself." *Id.* at 622. The majority then relies on *Gravel* to conclude that, "there is no reasoned basis to draw the line at aides and assistants." I submit that *Gravel* supplied the reasoned basis by logically allowing the privilege to extend only to a congressional employee or subordinate. *Id.* at 618, 620, 637 n. 3, 663. There is no authority for the majority's perversion of legislative privilege by expanding its application, based exclusively on speculation and without so much as a privilege log, to include any random party volunteer or operative who ever communicated with a legislator on a given topic.

For these reasons, I would affirm the district court.  Accordingly, I respectfully dissent.