# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al., §
    *Plaintiffs,* §
       §
v.           §    5:21-CV-0844-XR
          §   [Consolidated Cases]
GREGORY W. ABBOTT, et al., §
    *Defendants.* §

## ORDER ON RENEWED MOTION TO STRIKE DECLARATION

On this date, the Court considered the LUPE Plaintiffs'[1] motion to strike (ECF No. 992) the declaration of Jonathan White, State Defendants' response (ECF No. 1078), and LUPE Plaintiffs' reply (ECF No. 1126). Ater careful consideration, the motion is **GRANTED**.

## BACKGROUND

In August 2021, the Texas Legislature passed Senate Bill 1 ("S.B. 1"), which amended various provisions of the Texas Election Code pertaining to voter registration, voting by mail, poll watchers, and more. Numerous parties then began filing complaints against various Texas state officials (the "State Defendants") and local elections administrators in this district, challenging certain provisions of S.B. 1 under the United States Constitution and various federal civil rights statutes. In the interest of judicial economy, these were consolidated under the above-captioned case, as it was first filed.[2]

---

[1] The "LUPE Plaintiffs" include La Unión del Pueblo Entero, Friendship-West Baptist Church, Southwest Voter Registration Education Project, Texas Impact, Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, William C. Velasquez Institute, FIEL Houston Inc., and James Lewin.

[2] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021) and *Mi Familia Vota v. Abbott*, No. 5: 21-cv-920 (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex. 2021); *United States v. Texas*, No. 5:21-cv-1085 (W.D. Tex. 2021), ECF No. 13.

In May 2023, the United States and the OCA-GH Plaintiffs[3] filed motions for summary judgment, arguing that S.B. 1's identification number requirement for mail-in voting violated the "Materiality Provision" of the Civil Rights Act of 1964, now codified under 52 U.S.C. § 10101(a)(2) ("Section 101"). *See* ECF Nos. 609, 612.

In support of their responses in opposition to the motions filed in June 2023, the State Defendants proffered a declaration by Jonathan White, the former Division Chief of the Election Integrity Division of the Texas Office of the Attorney General ("OAG"), who claimed to have reviewed hundreds of investigations and handled approximately 100 prosecutions. *See* ECF No. 645-5 at 14–23 ("White Declaration"); ECF No. 646-3 at 29–38 (same document). The White Declaration purported to provide evidence on three topics: (1) the existence, prevalence and techniques of various types of voter fraud, including "mail ballot fraud and voter assistance fraud schemes"; (2) the inability of current investigative techniques to address voter fraud; and (3) the ways in which S.B. 1 helps fight voter fraud. *See id.* The Declaration, produced long after the close of discovery (and executed two days before response briefs were filed), relied on selectively disclosed information from investigative and prosecution files and out-of-court statements by other individuals at the OAG—all information that the State has withheld under claims of privilege and, in many instances, failed even to identify.

From the start of discovery, the State Defendants withheld, on privilege grounds, documents containing non-public information related to voter fraud investigations and prosecutions. For example, both the OAG and the Secretary of State ("SOS") objected to the Private Plaintiffs' requests for "[a]ll documents and communications discussing actual or alleged illegal voting, election fraud, or other criminal conduct in connection with" all methods of voting

---

[3] The "OCA Plaintiffs" include Plaintiffs OCA-Greater Houston, League of Women Voters of Texas, and REVUP-Texas.

and voter assistance. *See* ECF No. 992-3 (OAG); ECF No. 992-16 (OAG); ECF No. 992-20 (SOS). The State Defendants also failed to identify on its privilege logs responsive documents that contained such information, including investigative files and reports that Mr. White would have considered in determining whether to refer a case for prosecution. *See* ECF No. 992-14 at 54 (listing two documents withheld by OAG custodians); *see also* ECF No. 992-24, White Dep. at 116:20–117:4 (acknowledging that "there are investigative files in the Election Integrity Division that would be relevant to voter fraud investigations but" that "are not on [the] privilege log.").

Over the course of discovery, the State Defendants produced fewer than 500 documents associated with OAG custodians, and identified about 180 privileged documents held by OAG. Two of the documents produced are investigation files; both relate to post-S.B. 1 allegations of poll watcher obstruction by election officials. The rest of the produced documents are largely public information, including news articles, copies of public indictments or plea agreements, public legislative transcripts, complaints of purported election irregularities submitted to the SOS and OAG and SOS advisories to election officials.

In depositions, the State Defendants objected to, and instructed witnesses not to answer, questions seeking nonpublic information related to voter fraud investigations and prosecutions. On April 27, 2022, Plaintiffs deposed Mr. White in his personal capacity. *See* ECF No. 992-10, White Dep. Following numerous objections by OAG counsel, the parties stipulated that OAG counsel could have a running objection and OAG counsel "instruct[ed]" Mr. White "not to provide any answers that would encroach on attorney client, attorney work-product, legislative or investigative privileges, or any other applicable privilege, including deliberative process or any others that ... could conceivably be implicated by the questions." *Id.* at 43:20-44:21. OAG counsel asserted privilege objections 29 times over the course of the deposition and Mr. White censored himself

accordingly. On May 5, 2022, Mr. White was deposed in his capacity as a representative of the Office of the Attorney General. *See* ECF No. 992-11, White Dep. Again, OAG counsel lodged similar privilege objections and, in several instances, instructed Mr. White not to answer. *See generally id.* (listing 87 objections). And, as in his prior deposition, Mr. White followed his counsel's instruction and refrained from providing non-public information regarding investigations and prosecutions.

In response to Mr. White's testimony, the LUPE Plaintiffs raised sword-and-shield concerns in their briefing on a pending motion to compel documents from the SOS and OAG. ECF No. 655. The United States echoed these concerns in a notice of potential waiver of privilege filed on July 10, 2023. *See* ECF No. 656. The LUPE Plaintiffs again presented their sword-and-shield arguments to the Court at a hearing on July 11, 2023, at which point the Court suggested that the State Defendants make Mr. White available for a third deposition. ECF No. 661, July 11, 2023, Hr'g Tr. at 45:20–22.

Mr. White was redeposed on August 11, 2023. Although the State Defendants agreed that Mr. White could be asked questions about any closed investigations and cases of voter fraud, the State Defendants never identified any such investigations, nor did they produce any investigatory materials before the deposition that would have allowed Plaintiffs' counsel to prepare questions about closed matters.

On August 17, 2023, the Court issued a "Summary Ruling" granting summary judgment on the substance of the United States' and the OCA Plaintiffs' materiality claims.[4] ECF No. 724

---

[4] After the motions for summary judgment were fully briefed, the United States, the OCA Plaintiffs, State Defendants, and Intervenor Defendants—the only parties to a Section 101 materiality claim—submitted an advisory to the Court, noting that cross-motions had been filed. *See* ECF No. 701 at 1; *see also* ECF No. 608 at 6–15 (Intervenor Defendants' motion for summary judgment, arguing that S.B. 1 complied with the Materiality Provision). The parties agreed that the Section 101 claims were "likely resolvable via summary judgment" and recommended that the Court issue a preliminary ruling as a means of streamlining the upcoming trial, even if the Court had not yet finalized its opinion and order. *Id.*

at 1. The Court specified that "[a] written order awarding the declaratory and injunctive relief . . . requested" by the United States and the OCA Plaintiffs "will follow." *Id.* at 6.

Two weeks later, the LUPE Plaintiffs filed a motion to strike the White Declaration and motion *in limine* seeking to limit testimony relating to investigations and prosecutions of alleged voter fraud to publicly available information. ECF No. 761. The LUPE Plaintiffs argued that, because the State Defendants limited Mr. White's deposition testimony to publicly available information about alleged voter fraud, under the sword-and-shield doctrine, he should not be permitted to testify outside those bounds in his Declaration. They also asserted that the Declaration's lay opinion testimony was inadmissible because it was not based on Mr. White's personal knowledge. And to the extent that the State Defendants proffered the opinions as expert testimony, the LUPE Plaintiffs pointed out Mr. White was never designated as an expert and that his opinions could not otherwise satisfy the reliability standards for expert testimony set forth in reliable under Rule 702 and the analytical framework of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The LUPE Plaintiffs also asserted that the White Declaration contained impermissible legal conclusions and inadmissible summary evidence presented without any supporting information.

The bench trial of Plaintiffs' remaining claims began on September 11, 2023, and continued until October 20, 2023.[5] On September 20, after oral argument, the Court granted a motion *in limine*, holding that Mr. White's trial testimony would be limited to public information and documents that were produced to Plaintiffs in discovery. Tr. at 1459:24–60:13. However, given representations by the State Defendants and Intervenor Defendants that they did not intend

---

[5] The parties agreed before trial that the record would remain open with respect to Plaintiffs' claims alleging intentional discrimination pending the Fifth Circuit's resolution of an appeal of an order in this case addressing the legislative privilege. *See* ECF No. 753 at 2 n.2. Because that appeal was not resolved until March 2024—months after the first phase of trial ended in October 2023—the trial record remains open with respect those claims. *See* ECF No. 941.

to rely on the White Declaration, the Court denied as moot the LUPE Plaintiffs' request to strike the Declaration. *Id.* The State Defendants called Mr. White to the stand on October 16, 2023, where he testified in accordance with the Court's ruling. The State Defendants then made an offer of proof of the remaining facts they otherwise would have included in their case-in-chief.

In November 2023, following the close of evidence but before the filing of the parties' proposed findings of fact and conclusions of law and closing arguments, the Court issued its memorandum opinion granting summary judgment in favor of the United States and the OCA Plaintiffs' as to their Section 101 claims. *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023) [hereinafter "*LUPE*"].

The State Defendants and Intervenor Defendants filed notices of appeal on December 1, 2023. *See* ECF Nos. 823, 827. On appeal, the State Defendants and Intervenor-Defendants claimed that the record on appeal should include the transcripts, exhibits, and other filings from the trial. The United States maintained that the record should be limited to what was before the Court on August 17, 2023, when the Court issued its summary ruling, and filed a motion asking the motions panel to prohibit the merits panel from considering evidence introduced at trial. The Intervenor Defendants opposed the motion, arguing that it was both flawed and premature since the merits panel had discretion over the evidence it hears. Ultimately, the Fifth Circuit denied the United States' motion.

Following trial, the State Defendants and Intervenor Defendants cited and relied on the White Declaration in six paragraphs of their proposed findings of fact filed in January 2024. *See* ECF No. 861 ¶¶ 806–09, 811–12. Although the State Defendants offered to retract—and did in fact withdraw—the relevant portions of its proposed findings of fact, the LUPE Plaintiffs remained concerned that having the Declaration remain part of the Court's record "open[ed] the door to

either inadvertent or purposeful reliance either here or on appeal." ECF No. 1033, Feb. 13, 2024, Tr. at 253:22–25; *see* ECF No. 1018 (withdrawing reliance for State Defendants only).

Accordingly, on February 20, 2024, the LUPE Plaintiffs filed a renewed motion to strike the White Declaration. *See* ECF No. 992. In their response in opposition to the motion, the State Defendants argue that the LUPE Plaintiffs do not have "standing" to contest the White Declaration because they did not participate in the underlying summary judgment briefing. *See* ECF No. 1078 at 3. The State Defendants also assert that, at this stage of the litigation, the Declaration is "moot" and that the district court is not the appropriate venue by which to obtain relief. The Court addresses each argument in turn before reaching the merits of the motion to strike.

## DISCUSSION

### I.   Procedural Objections to the Motion: Standing, Mootness, and Ripeness

To begin, the Court concludes that the LUPE Plaintiffs have a sufficiently concrete interest in the contested portions of the White Declaration to file this motion, even though they did not participate in the summary judgment briefing. Contrary to the accusations in the State Defendants' response, *see* ECF No. 1078 at 9, the LUPE Plaintiffs have confirmed that they do not seek to prevent the Fifth Circuit from relying on the White Declaration when it considers the Court's November 2023 summary judgment order, *see* ECF No. 1126 at 4 n.2. Indeed, the LUPE Plaintiffs do not have a stake in that appeal because they did not assert a claim under the Materiality Provision.

Ironically, the Court did not rely on the White Declaration in its summary ruling or memorandum opinion on the parties cross-motions for summary judgment because its contents—addressing the policy justifications for S.B. 1's identification number-matching requirement—were entirely irrelevant to the analysis under the Materiality Provision:

> Unlike many other causes of action in the voting-rights context, the
> Materiality Provision is not a burden-interest balancing statute. Materiality
> Provision violations are prohibited no matter their policy aim.

*LUPE*, 2023 WL 8263348, at *8; *see also Migliori v. Cohen*, 36 F.4th 153, 163 (3d Cir. 2022),

("[W]hatever sort of fraud deterrence or prevention [a] requirement may serve," it is irrelevant

under Materiality Provision if it is not material to determining voter qualifications), *judgment*

*vacated as moot by Ritter v. Migliori*, 142 S. Ct. 1824 (Mem) (2022).

   While the LUPE Plaintiffs did not assert a claim under the Materiality Provision, they have,

however, asserted several causes of action that, unlike Section 101 challenges, will require the

Court to weigh the burden that the challenged provisions of S.B. 1 impose on voters against the

precise state interests that purportedly justify the burden. *See, e.g.*, ECF No. 208 ¶¶ 218–29

(challenging number-matching requirement, assistance provisions, and in-person canvassing

restrictions as undue burdens on the right to vote under *Anderson-Burdick*);[6] *id.* ¶¶ 255–65

(challenging assistance provisions and in-person canvassing restrictions under Section 2 of the

Voting Rights Act).[7] Indeed, by citing the White Declaration in their proposed findings of fact, the

State Defendants and Intervenor Defendants implicitly recognized its relevance to claims beyond

the Section 101 challenges addressed in the summary judgment briefing.

   Although they take competing views of the status of the White Declaration in the record,

neither the State Defendants nor the Intervenor Defendants have agreed to refrain from relying on

the White Declaration in an appeal of a ruling by this Court on the LUPE Plaintiffs' claims.

---

[6] *Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)) ("A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'").

[7] *Brnovich v. Democratic Nat'l Comm'n*, 141 S. Ct. 2321, 2338 (2021) (in determining whether voting is "equally open" under Section 2 of the VRA, courts should consider, among other things, the size of the burden imposed by a challenged voting rule and the strength of the state interests served by the rule).

The State Defendants contend that the purpose of the White Declaration "expired" when the Court granted summary judgment, that the White Declaration is not part of the "trial record," and that Mr. White's "trial testimony represents the best evidence for factual disputes going forward." ECF No. 1078 at 1. Given their position that the parties should rely on White's trial testimony going forward, the State Defendants fail to explain how they would be prejudiced by the removal of the "expired" declaration from the record.

Meanwhile, at closing argument, the Intervenor Defendants declined to withdraw their post-trial reliance on the White Declaration and held open the possibility of relying on the White Declaration in "some other appeal."[8] Moreover, the Intervenor Defendants recently argued to the Fifth Circuit that the summary judgment record in this case *includes* the trial record, since trial evidence is "record evidence." *See United States v. Paxton*, No. 23-50885 (5th Cir.) ECF No. 110-1 at 6–7 (arguing that the United States, by seeking to limit the record on appeal to the summary judgment record, has wrongly and "preemptively declared a category of record evidence outside the record on appeal[.]"). As the LUPE Plaintiffs' correctly point out, this logic supports the converse argument that the record on appeal following trial the LUPE Plaintiffs' remaining claims includes the "record evidence" from the summary judgment proceedings.

---

[8] Counsel for Intervenor Defendants stated:

> If there is some dispute as to whether something filed in this Court is part of the record on appeal or can be considered by the Fifth Circuit on appeal in the materiality provision appeal *or some other appeal*, that's a question for the Fifth Circuit. . . And whether there's going to be a dispute about the content of the appellate record in the materiality provision appeal *or some other appeal* is just not ripe yet. We don't know. We haven't briefed that appeal. We don't know what we're going to point to or rely upon yet, in terms of our appellate arguments to the Fifth Circuit. So on that score, both for the materiality provision appeal *and for this current motion* or agreement . . . there's nothing this Court can do to bind or pre-decide that issue for the Fifth Circuit. That would all be for the Fifth Circuit to decide in due course.

ECF No. 1033, Feb. 13, 2024, Tr. at 255:15–56:6 (emphasis added).

In short, the State Defendants argue that the LUPE Plaintiffs' motion is "moot" because the Declaration's purpose expired with the Court's summary judgment ruling in August 2023 and is not part of the trial record. At the same time, the Intervenor Defendants insist that questions about the content of the trial record are not yet "ripe" because the parties have yet to file their briefing in any appeal of the Courts' rulings on the Private Parties' remaining claims. Defendants cannot have it both ways.

The State Defendants argue that the LUPE Plaintiffs must file a motion with the merits panel after the State Defendants and Intervenor Defendants file their opening brief on appeal.[9] The Intervenor Defendants' assertion that the Court's exclusion of the White Declaration would not affect the record on appeal, and the State Defendants' similar suggestion that "[t]he rules do not permit either LUPE Plaintiffs or this Court to curate what documents and evidence appear before the Fifth Circuit" ECF No. 1078 at 2, are misplaced at this stage of the proceedings. The Court has not issued any final rulings on the claims presented by the LUPE Plaintiffs at trial. It follows that there is no pending appeal of the Court's rulings on the LUPE Plaintiffs' claims and, accordingly, no appellate record.

The notion that the Court lacks the authority to manage the record evidence in this case now based on *potential* appeals of *future* orders is nonsensical.[10] Although the Fifth Circuit will,

---

[9] The Court observes that the record unquestionably remains open with respect to the LUPE Plaintiffs' claims for intentional discrimination under the Fourteenth and Fifteenth Amendments. *See* ECF No. 208 at ¶¶ 230–54 (challenging number-matching requirements, assistance provisions, and in-person canvassing restrictions as intentionally discriminatory); *see also* ECF No. 941 at 3 ("The parties do not intend to present argument regarding any private plaintiffs' Fourteenth Amendment, Fifteenth Amendment, or Voting Right Act § 2 intentional discrimination claims as the record is not yet complete on those claims.). Thus, even if the Fifth Circuit ultimately considers the White Declaration in any future appeals of the Court's rulings on the LUPE Plaintiff's disparate-impact claims—the Court must decide whether the Declaration belongs in the "record evidence" to the extent that it bears on the LUPE Plaintiffs' remaining claims for alleging intentional discrimination.

[10] To the extent State Defendants argue that the Court's August 17, 2023 Summary Ruling closed the time period in which LUPE Plaintiffs could move to strike the White Declaration (ECF No. 1078 at 10), that argument is contradicted by the Intervenor Defendants' argument that summary judgment proceedings extended through November 29, 2023.

in the event of such an appeal, receive documents filed in this case as part of the record on appeal, the scope of the appellate record will be defined according to this Court's evidentiary rulings: evidence stricken or excluded by this Court will not be considered by the Fifth Circuit. *See Mun. Employees' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 436 (5th Cir. 2019) ("Because these "red flags" were set out in an expert report that the district court struck, we cannot consider them.") (citing *Munoz v. Orr*, 200 F.3d 291, 303 (5th Cir. 2000).

No matter how the appeal of the Court's summary judgment ruling is resolved, the White Declaration remains in the "the original papers and exhibits filed in the district court" (FED. R. APP. P. 10(a)(1)) and will be transmitted to the Fifth Circuit in any subsequent appeal. Without an order striking the White Declaration, Defendants will be able to argue that the Fifth Circuit should consider the Declaration in any subsequent appeal. Of course, Defendants may choose to appeal the Court's evidentiary rulings, but the mere possibility of a theoretical future appeal cannot deprive the Court of authority to make such rulings in the first instance.

## II.     Motion to Strike

The State Defendants' response relies exclusively on their procedural objections to the motion to strike and does not reach the merits of the motion. *See generally* ECF No. 1078. Even so, the Court will address the substance of the LUPE Plaintiffs' arguments in the interest of clarity.

### A.     Legal Standards

#### 1.   Federal Rule of Civil Procedure Rule 37(c)

Under Rule 37(c)(1) of the Federal Rules of Civil Procedure, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" FED. R. CIV. P. 37(c)(1). "[T]he language of

Rule 37 does not require a motion to compel before its exclusion sanction may apply." *Hovanec v. Miller*, 331 F.R.D. 624, 634 (W.D. Tex. 2019).

Rule 26(a) requires a party to provide to the other parties "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(ii).

Rule 26(e), in turn, requires that a party who has responded to an interrogatory or request for production must supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P.26(e)(1)(A).

"Generally, the burden of proving substantial justification or harmlessness is on the nondisclosing party." *Hovanec*, 331 F.R.D. at 637. "To determine whether a failure to disclose was harmless, the Court evaluates four factors: (1) the explanation for the failure to disclose; (2) the importance of the information; (3) potential prejudice to the opposing party of including the evidence; and (4) the availability of a continuance to cure such prejudice." *Id.* (citing *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir. 2009)). "Substantial justification for the failure to make a required disclosure has been regarded as justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure obligation." *Olivarez v. GEO Grp., Inc.*, 844 F.3d 200, 205 (5th Cir. 2016) (cleaned up). "The court, on motion and after giving an opportunity to be heard," "may order payment of the reasonable expenses, including attorney's fees, caused by the failure" of the nondisclosing party. FED. R. CIV. P. 37(c)(1)(A).

2.      **Federal Rule of Civil Procedure 56**

Federal Rule of Civil Procedure 56 requires that "[a]n affidavit or declaration used to . . . oppose a motion" for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). As such, "[t]he substance of an affidavit must demonstrate the affiant has personal knowledge of the facts contained therein." *Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 846 (S.D. Tex. 2011). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). To that end, if an "affidavit fails to meet any of the procedural requirements" under Rule 56(c)(4), "a motion to strike that sets forth specific objections is the proper method" for a party "to challenge the affidavit." *See Wojciechowski*, 763 F. Supp. 2d at 846.

B.      **Analysis**

1.      **Sword-and-Shield Objections**

The testimony in the White Declaration is subject to exclusion for the same sword-and-shield reasons as those relied upon by the Court when it excluded certain testimony by Jonathan White at trial. Because the Court limited Mr. White's trial testimony to documents and public information previously disclosed to Plaintiffs, and excluded trial testimony by Mr. White on nonpublic information related to voter fraud investigations (Tr. 1460:1–13), it is appropriate to strike those portions of the White Declaration that contain the same, previously excluded testimony.

Under the sword-and-shield doctrine, "a party may not use privileged information both offensively and defensively at the same time." *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th

Cir. 2005); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) (emphasizing "a client's inability to, at once, employ the [attorney-client] privilege as both a sword and shield."). As the Fifth Circuit has emphasized, allowing a party to do so "would be manifestly unfair to the opposing party." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989).[11] "When a party puts privileged matter in issue as evidence in a case, it thereby waives the privilege as to all related privileged matters on the same subject." *See* 8 Charles Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2016.2 (3d ed. 2023); *see also Willy*, 423 F.3d at 497; *Doe 1 v. Baylor Univ.*, 320 F.R.D. 430, 439 (W.D. Tex. 2017).

Although the State withheld all but two investigative reports, as well as documents related to its investigations and prosecutions, Mr. White testified that he based his declaration testimony on those same records. *See* ECF No. 666-2, Supplemental White Decl. (July 14, 2023) ¶ 6 (stating that the paragraphs in his original Declaration addressing his "understanding" of ballot harvesting was gained through his "years of criminal investigative experience" and mentioned public information about the ongoing prosecution of Zul Mohamed "[a]s an illustration").

Similarly, the White Declaration offers detailed descriptions of the alleged techniques used to provide fraudulent voter assistance—by approaching voters, gaining their trust, and voting their ballots. White Decl. ¶¶ 8, 10, 11, 14, 15. When asked to describe a particular example of illegal assistance in his April 2022 deposition, however, Mr. White first refused to answer; OAG counsel then objected and direct him to answer "to the extent that there's anything in the public record about the case." ECF No. 992-10, White Dep. at 185:14–187:23. Mr. White then identified a case of alleged voter registration fraud and explained, "The case that came to mind does not actually

---

[11] The Court observes that it would also be "manifestly unfair" to allow Defendants to rely on the exclusion of the Declaration from the trial record as a shield to the LUPE Plaintiff's motion, yet allow the Declaration's existence in the "record evidence" as a sword for a future appeal of the LUPE Plaintiffs' claims.

involve ballot assistance, it involved voter registration, and so it may not be directly applicable to your -- your question, and I think it may not. But if something is in the public record, I would make that available to you." *Id.* at 188:2–16. Mr. White acknowledged that he could not point to any prosecutions for illegal assistance in the polling place. *Id.* at 75:13–76:14.

In short, the State Defendants have failed to produce or identify the evidence that forms the basis of Mr. White's testimony in the Declaration. The State should have disclosed these records initially under Rule 26(a) and then supplemented its responses in accordance with Rule 26(e). Given the State Defendants' affirmative use of information it had withheld or otherwise failed to produce, there is "no factual or legal basis for its position that the alleged burden of" disclosure could "excuse its non-compliance with its obligations under Rule 26(a) and Rule 26(e)." *Flores v. AT&T Corp.*, No. 3:17-cv-00318-DB-ATB, 2019 WL 2746774, at *8 (W.D. Tex. Mar. 27, 2019). The LUPE Plaintiffs will be significantly prejudiced in any potential appeal because they have not had the opportunity to review, much less challenge, information that informed Mr. White's declaration. Regardless of the importance of the information withheld—which is difficult to assess without any visibility into its contents—the LUPE Plaintiffs have no opportunity to cure the prejudice with respect to their claims that have already been fully tried.

Accordingly, under Rule 37(c), the presumptive sanction of exclusion applies, *see Honey-Love v. United States*, 664 F. App'x 358, 361–62 (5th Cir. 2016), and the relevant portions of the White Declaration must be stricken from the record. *See* ECF No. 992-1 (Redacted Declaration).

### 2.      Objections to Inadmissible Summary Evidence

The LUPE Plaintiffs object that the White Declaration constitutes inadmissible summary testimony in violation of Federal Rule of Evidence 1006, which provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be

conveniently examined in court [, but] . . . must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.

FED. R. EVID. 1006. To be admissible, summary testimony must be supported with evidence that "[has] been '*presented previously* to the [factfinder] to establish any assumptions reflected in the summary.'" *United States v. Nguyen*, 504 F.3d 561 (5th Cir. 2007) (quoting *United States v. Hart*, 295 F.3d 451, 454 (5th Cir. 2002)).

The White Declaration states, during his time at OAG, Mr. White has "reviewed hundreds of investigations and handled approximately 100 prosecutions, many of which were complex[.]" White Decl. ¶ 3. During his August 2023 deposition, Mr. White testified that his investigative experience formed "a large portion of" the basis for the knowledge of the topics addressed in his Declaration. ECF No. 992-24, White Dep. at 71:8–21. Based on that experience, the White Declaration repeatedly makes summary statements about alleged mail ballot and voter-assistance fraud schemes. White Decl. ¶ 6. For example, the Declaration:

- Provides a breakdown of the proportion of investigations and prosecutions in his office dealing with "mail-in ballot fraud," "illegal voting, and voter assistance." *Id.* ¶ 7.

- Summarizes what, in Mr. White's estimation, are "common" features of alleged mail ballot fraud, vote harvesting fraud, and voter assistance fraud schemes. *Id.* ¶¶ 7–17, 24–31, 34–38, 40, 42–45.

- Notes what Mr. White believes are "common" features (*e.g.*, *id.* ¶¶ 6, 7, 20, 27–30) or phenomena that "often" (*e.g.*, *id.* ¶¶ 14, 15, 25, 29, 35, 38), "normally" (*e.g.*, *id.* ¶¶ 11–12, 14, 39, 45), "usually" (*e.g.*, *id.* ¶¶ 11, 14), or "typically" (*e.g.*, *id.* ¶¶ 13, 25, 45) occur.

Despite the summary nature of these assertions, the State Defendants withheld as privileged underlying information that is non-public and failed even to identify investigation or prosecution files relating to both active and closed investigations.[12] Because this "supporting evidence must

---

[12]To the extent that the State Defendants assert any privilege over that information, the sword-and-shield doctrine bars their reliance on the summary testimony of for its defense.

have been '*presented previously*,'" the State Defendants cannot now rely on summary testimony in the White Declaration. *Nguyen*, 504 F.3d at 572.

Further, Mr. White's summary testimony "exceed[s] the bounds of Rule 1006 because [he] stated that [his] testimony was premised, in part, on out-of-court statements" not presented to the factfinder and information that is not even within Mr. White's personal knowledge. *Id.* Rather, his summary is informed by conversations with investigators and prosecutors. Mr. White had no role in investigating allegations of voter fraud and generally referred cases to other attorneys for prosecution. When deciding to move forward with the prosecution of a matter referred by the Criminal Investigations Division, Mr. White would make a decision "fairly quickly" and then "would refer the file to the prosecutor and connect him with the investigator." ECF No. 992-24, White Dep. at 29:16–24. When asked about "[h]ow much of an investigative file [came] to [his] attention," Mr. White testified that he might see the report written by an investigator, or he "might just verbally be told about election records that were obtained," or "might be told about . . . witness interviews or things that the investigator had learned or researched." *Id.* at 26:22–27:11. Indeed, Mr. White acknowledged that he "didn't always need to read an entire investigative report if one was provided," as "a lot of it would be based on the conversation . . . with the investigator so I could cut to the chase. Especially if the investigator . . . wasn't that good of a writer, I might get the information out of him just via conversation." *Id.* at 27:25–28:13. He also testified that he learned about the outcomes of an investigator's efforts "[g]enerally" through "one-on-one conversations." *Id.* at 20:8–17.

Accordingly, the Court concludes that the summary testimony in the White Declaration must be stricken because it is unsupported by evidence "*presented previously*" to the factfinder and relies on hearsay statements. *See Nguyen*, 504 F.3d at 572 (district court erred by admitting

testimony by FBI financial analyst summarizing her investigation and authenticated summary chart describing the operation because "her testimony was premised, in part, on out-of-court statements that unspecified witnesses made to FBI agents during the investigation"); *cf. United States v. Valencia*, 600 F.3d 389, 417–18 (5th Cir. 2010) (no violation of Rule 1006 where government provided opposing counsel with underlying records one month before trial).

### 3.    Objections to Improper Opinion Testimony

The LUPE Plaintiffs assert that the White Declaration contains improper lay opinion testimony that must be excluded under under Federal Rules of Evidence 701 and Federal Rule of Civil Procedure 56(c)(4) because it not based on his "direct and particularized" personal knowledge and observations.

Although the State Defendants identified Mr. White as a lay witness, "it is the content of testimony, not a witness's formal designation as an expert witness, which determines whether Rule 702 applies." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 198 (5th Cir. 2016). "A lay witness's "testimony in the form of an opinion is limited to one that is . . . not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 264–65 (5th Cir. 2022) (quoting FED. R. EVID. 701(c)).

"Under [Federal Rule of Evidence] 701, a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the" factfinder. *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011) (quoting *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997)). "Testimony need not be excluded as improper lay opinion, even if some specialized knowledge . . . was required," but the testimony still must be "based on *first-hand observations in a specific investigation.*" *El-Mezain*, 664 F.3d at

514 (emphasis added). Thus, "the witness must have personalized knowledge of the facts underlying the opinion and the opinion must have a rational connection to those facts." *In re: Taxotere*, 26 F.4th at 265 (quoting *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002)). Such personal knowledge must be "direct and particularized," *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 686 (5th Cir. 2003), and "it has always been the rule that lay opinion testimony may be elicited only if it is based on the witness's first-hand knowledge or observations," *id.* at 685.

Mr. White's statements about the methods and prevalence of voter fraud, the efficacy of pre-SB1 investigative techniques and the extent to which S.B. 1 aids in combating voter fraud "did not merely draw straightforward conclusions from observations informed by *his own* experience," *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) (emphasis added). Instead, as discussed above, Mr. White's "knowledge" relies on one-on-one conversations with investigators and cursory reviews of their case files—he was not personally involved in any of the specific investigations he mentioned.

The lay opinions in the White Declaration must be stricken because they are not based on personal knowledge and rely on inadmissible hearsay. *See* FED. R. CIV. P. 56(c)(4) (requiring that affidavit used to "oppose a motion must be made on personal knowledge" and "set out facts that would be admissible in evidence"); *cf. El-Mezain*, 664 F.3d at 514 (testimony by FBI agents was proper lay testimony because those agents "were extensively involved in the investigation" at issue, and "their testimony was either descriptive or based on their *participation* in, and understanding of, the events in" that case). Mr. White's opinions "cannot be admitted under Rule 701 because [they are] not based on personal knowledge and would instead have to be based on specialized knowledge." *Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, 84 F. Supp. 3d 553, 564

(S.D. Tex. 2015). Because the State Defendants seek to rely on Mr. White's "specialized knowledge," "not simply lay opinion testimony based on his perceptions," the White Declaration cannot be lay opinion testimony. *See In re: Taxotere*, 26 F.4th at 267; *see also* FED. R. EVID. 701.

In other words, Mr. White's opinion testimony would only be admissible as expert testimony. Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) (citing FED. R. EVID. 701–703). Mr. White was never designated as an expert witness, however, and his opinions would not otherwise satisfy the reliability requirements for expert testimony set forth in Federal Rule of Evidence 702 and *Daubert*.

Rule 702 provides that an expert testimony may testify only if, among other things, "the testimony is based on sufficient facts or data" and "the testimony is the product of reliable principles and methods[.]" FED. R. EVID. 702(b) and (c). "The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue." *Holcombe v. United States*, 516 F. Supp. 3d 660, 673 (W.D. Tex. 2021). Regardless of whether an expert witness is "well-qualified by experience," the expert's testimony "still may be barred if it is not based on sound data." *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).

Of course, the LUPE Plaintiffs have been handicapped in their efforts to address deficiencies in Mr. White's testimony based on the State Defendants' refusal to produce evidence that purportedly supports his analysis. Still, based on the limited information they do have, the LUPE Plaintiffs have identified several defects in the accuracy and reliability of Mr. White's

analysis. As the LUPE Plaintiffs point out, Mr. White's "data" about the actual prevalence of voter fraud is skewed because his job was to review cases that had already been referred for prosecution—he had no information about the nature and prevalence of investigations that were *not* escalated to him, because they never came across his desk. *See* ECF No. 992, White Dep. at 18:23–19:6 ("[I]f there was a complaint that didn't require further investigation—that didn't merit investigation[—] it's unlikely that that would be brought to my attention."); *see Falcon v. State Farm Lloyds*, No. 1:12-CV-491-DAE, 2014 WL 2711849, at *13 (W.D. Tex. June 16, 2014) ("Rather than sending a variety of samples in an attempt to evaluate the actual condition of the [] residence, [the expert] sent samples which appeared to show smoke contamination.").

Moreover, Mr. White's testimony about methods of voter fraud and the efficacy of S.B. 1 in combatting voter fraud are not logically (or factually) supported by the evidence on which Mr. White purported to base his opinion testimony. For example, in describing techniques employed by fraudulent vote assistors, he relied on an example of a prosecution in which the defendant was ultimately acquitted. An unsuccessful prosecution for assistance fraud cannot serve as evidence of how assistance fraud actually occurs. Similarly, Mr. White cited the prosecution of Zul Mohamed in support of S.B. 1's ID-number matching requirement, concluding that had an "ID number requirement" been in place for mail ballots—"either on the applications or ballot envelopes"—that requirement "would have prevented this fraud scheme entirely" because "Mr. Mohamed "would not . . . have been able to provide the identification numbers" necessary to satisfy that requirement. White Decl. ¶ 21. But, according to an OAG press release issued October 2020, Mr. Mohamed "allegedly obtained a virtual mailbox using a false identity, forged at least 84 *voter registration applications* . . . ., and had them sent to a fraudulent location." ECF No. 992-25 at 2 (emphasis added). Texas has required new voter registration applicants to include an ID number on their

application since 2004. To have registered voters, then, Mr. Mohamed necessarily must have had access to their ID numbers. It follows that S.B. 1's ID-number provisions would have done nothing to identify or prevent Mr. Mohamed's fraud—he could readily reproduce the same ID numbers on applications to vote by mail and mail-in ballots.

Even if Mr. White had been properly designated as an expert witness in this case, because his testimony is based on incomplete and inaccurate information and faulty reasoning, his testimony about both the characteristics of voter fraud and any measures that would address such fraud would be inadmissible under Rule 702 and the *Daubert* framework.

### 4. Objections to Impermissible Legal Conclusions

The LUPE Plaintiffs assert that the White Declaration contains impermissible legal conclusions ECF No. 922 at 34 (citing White Decl. ¶¶ 6, 31, 41–42, 48 (generally opining that S.B. 1's ID requirement is reasonably calculated and necessary to serve the State's interest in election integrity, despite the many difficulties in identifying, proving, and prosecuting instances of voter fraud)). Expert and lay witnesses alike are prohibited from providing opinions on legal issues. *See Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020); *El-Mezain*, 664 F.3d at 511. "[T]estimony that amounts to a legal conclusion is improper." *United States v. Keys*, 747 F. App'x 198, 207 (5th Cir. 2018). The Court agrees that the challenged paragraphs constitute inadmissible legal conclusions and must be stricken from the record of this case.

### CONCLUSION

The LUPE Plaintiffs' motion to strike (ECF No. 992) the declaration of Jonathan White is **GRANTED**.

The declaration of Jonathan White (ECF No. 645-5 at 14–23; ECF No. 646-3 at 29–38) is **STRICKEN** from the record of this case.

The Clerk is **DIRECTED** to **REPLACE** both documents with the redacted version docketed at ECF No. 992-1.

It is so **ORDERED**.

**SIGNED** this 29th day of April, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE