IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX W

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO,  *
et al.,                      *
        Plaintiffs,          *
                             *
v.                           *   Civil Action No.
                             *   5:21-cv-844 (XR)
STATE OF TEXAS, et al.,      *
        Defendants.          *


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
THE DALLAS COUNTY ELECTIONS ADMINISTRATOR
THROUGH ITS DESIGNATED REPRESENTATIVE,
MICHAEL SCARPELLO
APRIL 13, 2023

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


DEPOSITION of MICHAEL SCARPELLO,
produced as a witness at the instance of the
Plaintiffs, and duly sworn, was taken in the
above-styled and numbered cause on the 13th day of
April, 2023, from 10:20 a.m. to 2:25 p.m., before
Christy R. Sievert, CSR, RPR, in and for the State
of Texas, reported by machine shorthand, at the
offices of the Dallas County Records Building, 500
Elm Street, Dallas, Texas, pursuant to the Federal
Rules of Civil Procedure and the provisions stated
on the record or attached hereto.

18

1   2022 general election, correct?
2      A.   Correct.
3      Q.   Did you use the same polling places for
4   early voting that you did for election day?
5      A.   We used a certain amount of polling places
6   for early voting and then additional -- then used
7   those also plus additional ones for election day.  I
8   think it was 50 early voting places and 469 election
9   day.
10     Q.   And on election day, were you polling
11  places vote centers?
12     A.   Yes.
13     Q.   And for early voting, were your 50 polling
14  places, 50ish, were they vote centers as well?
15     A.   Yes.
16     Q.   And it's correct to say that you used vote
17  by mail for certain voters for the 2022 general
18  election, correct?
19     A.   Yes.
20     Q.   Do you know approximately what percent of
21  ballots were cast by mail in the 2022 general
22  election?
23     A.   I do not.  I don't recall.
24     Q.   Did you send applications for ballot by
25  mail for the 2022 general to any voters who had not

19

1   requested an application --
2      A.   No.
3      Q.   -- for ballot by mail?
4      A.   No.
5      Q.   Do you know whether in 20- -- do you know
6   whether your practice in the 2022 general election
7   of not sending unsolicited ABBMs was different than
8   Dallas County's practice in 2020?
9      A.   I don't believe so.
10     Q.   For the 2022 general election, did you
11  include any inserts along with either ABBMs or mail
12  ballots that were intended to inform voters about
13  requirements under SB1?
14     A.   Yes.
15     Q.   Can you tell me about those inserts?
16     A.   The Texas ABBM -- this is in the -- in the
17  mail ballot packet, if that's what you're referring
18  to.
19     Q.   Either.  Either you included it when you
20  sent someone an application for ballot by mail or
21  you included it when you sent someone the mail
22  ballot packet?
23     A.   Okay.  In the mail ballot packet, we find
24  that the items provided by the Secretary of State,
25  the required items are incredibly user unfriendly.

20

1   I think an 8.5 by 11 or -- 8.5 by 14-inch insert
2   with verbiage from top to bottom, as well as the
3   vote by mail envelope being chock-full of verbiage
4   also.  And it's been my experience that when you do
5   that -- when you have that sort of thing, no one
6   reads anything, and, thus, the compliance with those
7   rules is -- is not good.
8         And so what we did is we summarized on
9   a -- we put on a pink sheet step-by-step
10  instructions to help voters understand what the
11  requirements were.  And using kind of the best
12  practices, plain language, getting it down to a, you
13  know, fifth, sixth grade level so that people can
14  understand what they need to do to return that mail
15  ballot.
16     Q.   And so did you have a name for that insert?
17  What did you call that insert?
18     A.   Abbreviated instructions.
19     Q.   Who created the abbreviated instructions?
20     A.   I did.
21     Q.   And did you work with other members of your
22  staff --
23     A.   Yes.
24     Q.   -- in consultation?
25     A.   Yes.

21

1      Q.   Did the abbreviated instructions address
2   the requirement to provide an identification number
3   on the mail ballot --
4      A.   Yes.
5      Q.   -- material?
6         Did you instruct the voter to provide one
7   ID number or two ID numbers?
8      A.   We instructed them to -- we advised them to
9   provide both numbers.
10     Q.   Does the Secretary of State's material
11  advise the voter to provide both?
12     A.   I don't recall, but I don't think so.
13     Q.   Did you provide the abbreviated
14  instructions sheet in languages other than English?
15     A.   I believe so.  I can't remember, but I -- I
16  believe so, yes.
17     Q.   Would Ms. Tacoma Phillips know?
18     A.   Yes.
19     Q.   I will ask her that question.
20         Did the Secretary of State provide you
21  guidance on including additional materials in your
22  mail ballot packet to assist voters in meeting the
23  new ID requirements?
24     A.   No.
25     Q.   Did you send any similar inserts to voters

130

1    A.  Yes.
2    Q.  And do you recall saying that the turnout
3  rate for mail voting as compared to overall voting
4  was down in November 2022?
5    A.  That's my -- my vague memory of it is yes.
6    Q.  Okay.  What did you mean by "previous
7  elections"?  What was your comparison?
8    A.  Well, prior to going into an election, I
9  talked about how we project and we do our
10  projections.  So we look at similar type of
11  elections over the last several years.  And not only
12  the overall turnout but turnout by type and then
13  turnout by location.  My general impression is that
14  vote by mail, we -- the projections weren't -- the
15  actual numbers weren't as high as we projected based
16  off of historic turnout.
17    Q.  Do you know if these voters would have
18  voted in person?
19    A.  Don't know.
20    Q.  And when you said you were looking at the
21  past elections in your analysis for projection, was
22  that looking at midterm elections, or did that also
23  include looking at presidential?
24    A.  We look at all elections but focus on the
25  similar type of election.  But I will say that

131

1  there's -- there's no so many factors that play into
2  turnout, that it's -- it's an art as much as it is a
3  science.
4    Q.  So I guess I'm just trying to understand
5  your -- your answer.  Is it that the rate was not as
6  high as you projected, or is it down compared to
7  previous elections?
8    A.  I don't know that it's down compared to
9  previous elections.  I can very easily pull up that
10  information.  I just don't recall.  My general
11  impression was that it was down.
12    Q.  Do you recall telling counsel you thought
13  the rejection rate was too high?
14    A.  Yes.
15    Q.  So I kind of want to understand what your
16  baseline is.  So in your mind, what should the
17  rejection be?
18    A.  It should be zero.
19    Q.  Would you then consider a 1 percent
20  rejection rate to be too high?
21    A.  I think any rejection rate is too high.
22    Q.  Are you aware of any election that had a
23  zero percent rejection rate?
24    A.  No.
25    Q.  Dallas County was able to reduce its

132

1  rejection rate compared to the primary elections,
2  correct?
3    A.  Correct.
4    Q.  And it was able to reduce its rejection
5  rates as compared to the primary runoff and the May
6  election, correct?
7    A.  Correct.
8    Q.  And you -- Dallas County will be continuing
9  to work to reduce the number of rejection rates in
10  elections going forward, correct?
11    A.  Correct.
12    Q.  You still have rejections due to lack of
13  signature, mismatched signature or statement of
14  residence; is that correct?
15    A.  Yes.
16    Q.  Will you be working to decrease those
17  rejections as well?
18    A.  Yes.
19    Q.  Do you know what the cure process was
20  perSB1?
21    A.  I'm vaguely familiar with it.
22    Q.  Do you expect the rejection rate to ever be
23  zero?
24    A.  Rejection rate for applications or carrier
25  envelopes?

133

1    Q.  Carrier envelopes.
2    A.  No.
3        THE STENOGRAPHER:  I'm sorry, your
4  answer?
5        THE WITNESS:  No.
6    A.  And I'll elaborate.  No, under the current
7  law.
8  BY MS. HUNKER:
9    Q.  Do you think that the rejection rate due to
10  lack of signature will ever be zero?
11    A.  No.
12    Q.  Do you think the rejection rate regarding
13  mismatched signature will ever be zero?
14    A.  No.
15    Q.  And do you think that the rejection rate
16  do -- voters not including required statement of
17  residence will ever be zero?
18    A.  No.
19    Q.  You talked with counsel about the
20  abbreviated insert, correct?
21    A.  Yes.
22    Q.  Did you include a type of abbreviated
23  insert prior to SB1?
24        MS. PERALES:  Objection; asked and
25  answered.

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX X

Anne Scott                                                                    April 18, 2023

```
 1                IN THE UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3

 4   LA UNION DEL PUEBLO ENTERO,    )(
     et al.                         )(
 5            Plaintiffs            )(
                                    )(
 6   VS.                            )(    CASE NO.
                                    )(    5:21-cv-844-XR
 7                                  )(    (LEAD CASE)
     GREGORY W. ABBOTT, et al.      )(
 8            Defendants            )(
     _____
 9
      OCA-GREATER HOUSTON, et al.   )(
10            Plaintiffs            )(
                                    )(    CASE NO.
11   VS.                            )(    1:21-cv-780-XR
                                    )(
12   JANE NELSON, et al.            )(
              Defendants            )(
13   _____

14   HOUSTON AREA URBAN LEAGUE,     )(
     et al.                         )(
15            Plaintiffs            )(
                                    )(    CASE NO.
16   VS.                            )(    5:21-cv-848-XR
                                    )(
17   GREGORY WAYNE ABBOTT, et al.   )(
              Defendants            )(
18   _____

19   LULAC TEXAS, et al.            )(
              Plaintiffs            )(
20                                  )(
                                    )(    CASE NO.
21   VS.                            )(    1:21-cv-0786-XR
                                    )(
22   JANE NELSON, et al.            )(
              Defendants            )(
23   _____

24

25
```



## Page 2

```
 1   _____
 2   MIFAMILIA VOTA, et al.      )(
            Plaintiffs           )(
 3                               )(   CASE NO.
     VS.                         )(   5:21-cv-0920-XR
 4                               )(
     GREG ABBOTT, et al.         )(
 5          Defendants           )(
 6   _____
 7   UNITED STATES OF AMERICA     )(
            Plaintiff            )(
                                 )(   CASE NO.
 8   VS.                         )(   5:21-cv-1085-XR
                                 )(
 9   THE STATE OF TEXAS, et al.  )(
            Defendants           )(
10   _____
11
              ORAL AND VIDEOTAPED DEPOSITION OF
12                       ANNE SCOTT
                      APRIL 18, 2023
13   _____
14
15        ORAL AND VIDEOTAPED DEPOSITION OF ANNE SCOTT,
16   produced as a witness at the instance of the State
17   Defendants, taken in the above-styled and numbered
18   cause on APRIL 18, 2023, between the hours of 9:44 a.m.
19   and 11:04 a.m., reported stenographically by DONNA
20   McCOWN, Certified Court Reporter No. 6625, in and for
21   the State of Texas, at 7030 Mile 2 3/4 East, Mercedes,
22   Texas, pursuant to the Federal Rules of Civil Procedure
23   and any provisions stated on the record or attached
24   therein.
25
```

## Page 3

```
 1                    APPEARANCES
 2   COUNSEL FOR STATE DEFENDANTS:
 3      DAVID BRYANT
        OFFICE OF THE TEXAS ATTORNEY GENERAL
 4      P.O. Box 12548
        Austin, Texas, 78711-2548
 5
     COUNSEL FOR DEFENDANT HIDALGO COUNTY ELECTIONS
 6   ADMINISTRATOR:
 7      LEIGH ANN TOGNETTI
        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
 8      100 East Cano Street
        Edinburg, Texas  78539
 9
     COUNSEL FOR INTERVENOR DEFENDANTS:
10
        STEPHEN KENNY, via Zoom
11      JONES DAY
        51 Louisiana Avenue, NW
12      Washington, DC  20001
13   COUNSEL FOR PLAINTIFFS OCA-GREATER HOUSTON, et al.:
14      LISA SNEAD
        DISABILITY RIGHTS TEXAS
15      222 West Braker Lane
        Austin, Texas, 78758-1024
16
        LUCIA ROMANO, via Zoom
17      DISABILITY RIGHTS TEXAS
        1500 McGowen, Suite 100
18      Houston, Texas  77004
19      CHRISTOPHER McGREAL, via Zoom
        DISABILITY RIGHTS TEXAS
20      1420 West Mockingbird Lane, Suite 450
        Dallas, Texas  75247
21
     COUNSEL FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE,
22   et al.:
23      DESTINY LOPEZ, via Zoom
        REED SMITH, LLP
24      355 South Grand Avenue No. 2900
        Los Angeles, California, 90071
25
```

## Page 4

```
 1   COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
 2      DANIEL J. FREEMAN, via Zoom
        U.S. DEPARTMENT OF JUSTICE
 3      950 Pennsylvania Avenue NW, 4CON 8.143
        Washington, DC  20530
 4
     COUNSEL FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO,
 5   et al.:
 6      PATRICK BERRY, via Zoom
        BRENNAN CENTER FOR JUSTICE
 7      120 Broadway, Suite 1750
        New York, New York  10271
 8
     ALSO PRESENT:
 9      Rene Ortiz, Videographer
10                       INDEX
11                                            PAGE
     Appearances ....................................   2
12
     ANNE SCOTT
13   Examination by Mr. Bryant .......................   6
     Examination by Ms. Snead ........................  44
14
     Errata Sheet/Signature Page ....................  46
15
     Reporter's Certificate .........................  48
16
     Attached to the end of the transcript:  Stipulations
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                      EXHIBITS
 2   NUMBER   DESCRIPTION                         PAGE
 3     1      Notice of Deposition ...................  27
 4     2      Sixth Supplemental Initial Disclosures ..  27
 5     3      REV UP Website Pages ...................  34
 6     4      The Arc of Texas Website Pages .........  35
 7     5      Texas Secretary of State Website Pages ..  37
 8     6      Impact Report, The Arc of Texas ........  38
 9     7      Texas Department of Public Safety Website
               Pages .................................  39
10
11     8      Texas by Texas Webpages ................  42
12     9      Texas by Texas Welcome Webpage .........  43
13    10      Texas Department of Public Safety
               Website Pages .........................  43
14
15
16
17
18
19
20
21
22
23
24
25
```



Anne Scott

April 18, 2023
Pages 14 to 17

Page 14

1    A. Yes, sir.
2    Q. And did she also vote in person?
3    A. Yes, sir.
4    Q. In connection with the 2022 general election,
5  did you submit an application for a mail-in ballot?
6    A. Yes, sir.
7    Q. And did your daughter Taylor also submit an
8  application for a mail-in ballot?
9    A. I submitted one for her.
10    Q. And did you provide on your application for a
11  mail-in ballot an identification number of some kind?
12    A. Yes, sir.
13    Q. What type of identification number did you
14  submit with your application for a ballot by mail in
15  the 2022 general election?
16    A. I believe I submitted my passport number.
17    Q. Did you submit only one number, or did you
18  submit multiple numbers?
19    A. I think it was just the one number on the
20  passport.
21    Q. Was that a United States passport that was
22  still active --
23    A. Yes.
24    Q. -- not expired?
25    A. Yes, sir.

Page 15

1    Q. And approximately when did you submit that
2  application for a mail-in ballot in connection with the
3  2022 general election?
4    A. I'm sorry. I really don't remember. It was
5  during early -- it was before early voting, I believe.
6  And I'm sorry. I don't really remember the date.
7    Q. After you submitted that application for a
8  mail-in ballot, did you receive a mail-in ballot?
9    A. I did, yes.
10    Q. Approximately when did you receive that
11  mail-in ballot for the 2022 general election?
12    A. I'm sorry. I don't remember.
13    Q. I believe you said that you filled in your
14  mail-in ballot once you had received it; is that
15  correct?
16    A. That is correct.
17    Q. And did you submit an identification number or
18  numbers of some kind on that mail-in ballot?
19    A. Yes, sir.
20    Q. What identification number or numbers did you
21  submit?
22    A. My United States passport number.
23    Q. And did you mail in that mail-in ballot to the
24  proper address in Hidalgo County?
25    A. Yes, sir.

Page 16

1    Q. Approximately when did you do that?
2    A. There again, I really don't remember the date.
3  I'm sorry. I just --
4    Q. Okay. And sometime after you submitted your
5  mail-in ballot in connection with the 2022 general
6  election, did you receive some type of communication or
7  return of that ballot prior to the general election?
8    A. I -- I received the ballot back before the
9  election, yes.
10    Q. Okay. When you received your mail-in ballot
11  back, do you know if you received it from the Hidalgo
12  County Election Office or from the U.S. Postal Service
13  or from whom?
14    A. It was the election office, because it was
15  stamped.
16    Q. And what did the stamp say on it?
17    A. It just said "return" -- I don't even remember
18  what it said, but there was a stamp on it, and it said
19  return for more information or something. I don't
20  really recall, but it was stamped by the Hidalgo County
21  Election Office.
22    Q. I take it from that answer that you don't
23  recall what specific information the Hidalgo County
24  Election Office indicated you needed to provide in
25  order to -- or to have a mail-in ballot that they would

Page 17

1  accept?
2    A. That is correct.
3    Q. Did you attempt to get any help from anyone to
4  try to determine what you needed to do to provide
5  information requested by the Hidalgo County Election
6  Office so your mail-in ballot would be accepted?
7    A. No, I did not contact anyone.
8    Q. Why did you not contact anyone to get some
9  assistance in that matter?
10    A. Well, I was going to have to transport Taylor
11  over to -- because she did not get a ballot, so I
12  figured, well, if I have to transport Taylor over
13  there, I might as well take my ballot in hand and do it
14  there in Mercedes at the polls.
15    Q. At any time prior to completing the mail-in
16  ballot for the 2022 general election, did you do
17  anything to get information about what types of
18  identification numbers were required or acceptable?
19    A. No. I figured a U.S. passport would be fine.
20  I didn't use my driver's license because my name is
21  misspelled, and so it's not my correct name. So
22  that -- I use that as a form of identification wherever
23  I go, and it seems to work.
24    Q. In 2022, did you have a valid Texas driver's
25  license?



Anne Scott                                                     April 18, 2023
                                                              Pages 18 to 21

Page 18

1    A.  Yes, I do.
2    Q.  In 2022, did you have a Social Security number?
3    A.  Yes, sir.
4    Q.  Did you consider submitting the last four
5    digits of your Social Security number on the
6    application for mail-in ballot or on the mail-in ballot
7    as an identification number?
8    A.  I believe I did also, but I can't remember
9    if -- if I did or not, but I -- if it -- if they asked
10   for it, I'm sure I did.
11   Q.  Did you look at anything either online or any
12   materials in paper form to determine whether or not a
13   passport number was an acceptable form of
14   identification for voting in Texas?
15   A.  I assume a passport would -- a valid passport
16   would be just about the best identification you could
17   have.
18   Q.  My question was whether you did anything to --
19   A.  No.
20   Q.  -- determine that rather than just assume.
21   A.  No.
22   Q.  When -- strike that.
23        When did your daughter first register to
24   vote?
25   A.  Before the 2020 election, but I can't remember

Page 19

1    the exact date.
2    Q.  In 2022, did your daughter have a Texas
3    driver's license?
4    A.  She had an expired Texas ID.
5    Q.  Okay.  So she did not have a driver's license,
6    but she had a state ID card?
7    A.  Yes, sir.
8    Q.  And how long had she had a Texas state ID card?
9    A.  I'm going to say since she was 20 years old.
10   It went through two cycles of renewal, because I did it
11   online once, so...
12   Q.  And when did the state ID card expire in the
13   year or two prior to the general election in 2022?
14   A.  It expired Taylor's birthday 10-25-2020.
15   Q.  Did you or Taylor take any steps to try to
16   renew her state ID card in 2019, 2020, or 2021?
17   A.  No.
18   Q.  Is there a reason why neither of you took any
19   steps to renew her Texas state ID card during those
20   years?
21   A.  Taylor is medically fragile, and this was
22   during COVID, and Taylor didn't even leave the house
23   for quite -- quite a while.  So I already had renewed
24   it over -- online previously, so I couldn't do it
25   again.  So that's the story on that.

Page 20

1    Q.  In 2022, did you or Taylor take any steps to
2    attempt to renew her Texas state ID card?
3    A.  No, sir.
4    Q.  What was the reason for not taking any steps
5    like that in 2022?
6    A.  I guess just being lazy.
7    Q.  And have you or Taylor taken any steps in 2023
8    so far to attempt to renew her Texas state ID card?
9    A.  No, we have not.
10   Q.  Is there any reason for that?
11   A.  Taylor still does not go out in the public,
12   normally.  She does go to day care.  Everyone wears a
13   mask.  Most people at day care are medically fragile.
14   They're tested once a week for COVID.  So it's kind of
15   a closed situation.
16        So Taylor goes to day care and comes home,
17   and that's pretty much it for her.  Like a lot of
18   medically fragile people, we have to be very careful.
19   She is up-to-date on her COVID shots and everything,
20   but we still worry about her because of her medical
21   condition.
22   Q.  Does your daughter Taylor have a Social
23   Security number?
24   A.  Yes, she does.
25   Q.  How long has she had a Social Security number,

Page 21

1    roughly?
2    A.  Probably since she was born.
3    Q.  By the way, I forgot to say, but I want to say
4    any time you want to take a break, feel free to call a
5    break.  If you have to take care of the dog or anything
6    else, please feel free.
7    A.  I'm fine.
8    Q.  Okay.  So what caused Taylor to have an
9    interest for the first time in voting in 2022, if
10   that's the first time she expressed that interest?
11        MS. SNEAD:  Objection, form.
12        THE WITNESS:  I can still answer the
13   question?
14        MS. SNEAD:  Yes.
15   A.  I think -- I think just -- just listening to
16   the news, and she just decided, "Hey, it's my right.  I
17   would like to vote, Mom," you know.  There was a lot of
18   people trying to get out to vote.
19   Q.  I may have made an error in my question.  Did
20   she first vote in 2020?
21   A.  Yes.
22   Q.  Okay.
23   A.  That is correct.
24   Q.  I asked you about 2022 --
25   A.  Oh, okay.  Okay.



**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX Y

Taylor Scott                                                April 18, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

 4  LA UNION DEL PUEBLO ENTERO,    )(
    et al.                         )(
 5           Plaintiffs            )(
                                   )(
 6  VS.                            )(     CASE NO.
                                   )(     5:21-cv-844-XR
 7                                 )(     (LEAD CASE)
    GREGORY W. ABBOTT, et al.      )(
 8           Defendants            )(
    _____
 9
     OCA-GREATER HOUSTON, et al.   )(
10           Plaintiffs            )(
                                   )(     CASE NO.
11  VS.                            )(     1:21-cv-780-XR
                                   )(
12  JANE NELSON, et al.            )(
             Defendants            )(
13  _____
14   HOUSTON AREA URBAN LEAGUE,    )(
    et al.                         )(
15           Plaintiffs            )(
                                   )(     CASE NO.
16  VS.                            )(     5:21-cv-848-XR
                                   )(
17  GREGORY WAYNE ABBOTT, et al.   )(
             Defendants            )(
18  _____
19   LULAC TEXAS, et al.           )(
             Plaintiffs            )(
20                                 )(
                                   )(     CASE NO.
21  VS.                            )(     1:21-cv-0786-XR
                                   )(
22  JANE NELSON, et al.            )(
             Defendants            )(
23  _____
24

25
```



Taylor Scott

April 18, 2023
Pages 2 to 5

Page 2

```
1
2   MIFAMILIA VOTA, et al.      )(
          Plaintiffs           )(
3                              )(   CASE NO.
    VS.                        )(   5:21-cv-0920-XR
4                              )(
    GREG ABBOTT, et al.        )(
5         Defendants           )(

6
    UNITED STATES OF AMERICA   )(
7         Plaintiff            )(
                               )(   CASE NO.
8   VS.                        )(   5a:21-cv-1085-XR
                               )(
9   THE STATE OF TEXAS, et al. )(
          Defendants           )(
10
11
             ORAL AND VIDEOTAPED DEPOSITION OF
12                    TAYLOR SCOTT
                     APRIL 18, 2023
13
14
15        ORAL AND VIDEOTAPED DEPOSITION OF TAYLOR SCOTT,
16  produced as a witness at the instance of the State
17  Defendants, taken in the above-styled and numbered
18  cause on APRIL 18, 2023, between the hours of
19  11:33 a.m. and 11:57 a.m., reported stenographically by
20  DONNA McCOWN, Certified Court Reporter No. 6625, in and
21  for the State of Texas, at 7030 Mile 2 3/4 East,
22  Mercedes, Texas, pursuant to the Federal Rules of Civil
23  Procedure and any provisions stated on the record or
24  attached therein.
25
```

Page 3

```
1                    APPEARANCES
2   COUNSEL FOR STATE DEFENDANTS:
3       DAVID BRYANT
        OFFICE OF THE TEXAS ATTORNEY GENERAL
4       P.O. Box 12548
        Austin, Texas, 78711-2548
5
    COUNSEL FOR DEFENDANT HIDALGO COUNTY ELECTIONS
6   ADMINISTRATOR:
7       LEIGH ANN TOGNETTI
        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
8       100 East Cano Street
        Edinburg, Texas  78539
9
    COUNSEL FOR INTERVENOR DEFENDANTS:
10
        STEPHEN KENNY, via Zoom
11      JONES DAY
        51 Louisiana Avenue, NW
12      Washington, DC  20001
13  COUNSEL FOR PLAINTIFFS OCA-GREATER HOUSTON, et al.:
14      LISA SNEAD
        DISABILITY RIGHTS TEXAS
15      222 West Braker Lane
        Austin, Texas, 78758-1024
16
        LUCIA ROMANO, via Zoom
17      DISABILITY RIGHTS TEXAS
        1500 McGowen, Suite 100
18      Houston, Texas  77004
19      CHRISTOPHER McGREAL, via Zoom
        DISABILITY RIGHTS TEXAS
20      1420 West Mockingbird Lane, Suite 450
        Dallas, Texas  75247
21
    COUNSEL FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE,
22  et al.:
23      DESTINY LOPEZ, via Zoom
        REED SMITH, LLP
24      355 South Grand Avenue No. 2900
        Los Angeles, California, 90071
25
```

Page 4

```
1
2   COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
        DANIEL J. FREEMAN, via Zoom
3       U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue NW, 4CON 8.143
4       Washington, DC  20530

5   COUNSEL FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO,
    et al.:
6       PATRICK BERRY, via Zoom
        BRENNAN CENTER FOR JUSTICE
7       120 Broadway, Suite 1750
        New York, New York  10271
8
    ALSO PRESENT:
9       Rene Ortiz, Videographer
        Anne Scott
10                       INDEX
11                                                 PAGE
    Appearances ...................................   2
12
    TAYLOR SCOTT
13  Examination by Mr. Bryant ......................   5
    Examination by Ms. Snead .......................  18
14
    Errata Sheet/Signature Page ....................  21
15
    Reporter's Certificate .........................  23
16
    Attached to the end of the transcript:  Stipulations
17
                       EXHIBITS
18
    NUMBER  DESCRIPTION                            PAGE
19
       (No Exhibits Marked)
20
21
22
23
24
25
```

Page 5

```
1        THE VIDEOGRAPHER:  Today is April 18,
2   2023.  It is 11:33 a.m.  We're on the record.
3             TAYLOR SCOTT,
4   having been duly sworn, testified as follows:
5             EXAMINATION
6   BY MR. BRYANT:
7   Q.  Ms. Scott, my name is David Bryant.  I am with
8   the Texas Attorney General's Office, and appreciate you
9   being here for the deposition today.
10       I want to allow the other attorneys to
11  state their appearances so everyone will know who's
12  participating in the deposition.
13       MS. SNEAD:  This is Lisa Snead from
14  Disability Rights Texas representing the OCA Plaintiffs
15  and defending Ms. Scott's deposition.
16       MS. TOGNETTI:  Leigh Ann Tognetti from the
17  Hidalgo County District Attorney's Office representing
18  the Hidalgo County Elections Administrator.
19       MR. BRYANT:  Are there other participants
20  on Zoom who want to state an appearance?
21       Let the record reflect that there are
22  none.  And we'll begin the deposition at this time.
23  Q.  (By Mr. Bryant) Ms. Scott, I'm going to be
24  asking you a series of questions.  You're under oath
25  just as you would be if you were testifying in court or
```



MAGNA
LEGAL SERVICES

Taylor Scott

April 18, 2023
Pages 6 to 9

Page 6

1  in front of a judge.
2         And so you -- you have an obligation to be
3  as truthful as you can.  Do you understand that
4  obligation?
5     A.  Yes.
6     Q.  Have you ever testified in a deposition or
7  otherwise --
8     A.  No.
9     Q.  -- before today?
10    A.  No, sir.
11    Q.  Okay.  One of the things that we have to
12 remember in these depositions is that all that really
13 matters is what the court reporter writes down, so if
14 you and I were just having a conversation, a lot of
15 times you would know what I'm asking before I finish my
16 question and you might answer it, but if you can wait
17 until my question is finished before you answer it --
18    A.  Okay.
19    Q.  -- that will help, and also, I will try not to
20 interrupt you when you are giving an answer --
21    A.  Okay.
22    Q.  -- so your answer will get fully on the page.
23    A.  Okay.
24    Q.  Any time that you need to take a break --
25    A.  Okay.

Page 7

1     Q.  -- please feel free to just say, "I need a
2  break."
3     A.  Yeah.
4     Q.  And you'll get one.
5     A.  Okay.
6     Q.  And also, if you have any difficulty
7  understanding anything that is going on, I want you to
8  feel free to --
9     A.  Okay.
10    Q.  -- consult your attorney, and your mother is
11 present here, and I'm fine with that on behalf of
12 the --
13    A.  Okay.
14    Q.  -- Attorney General and the State Defendants in
15 this case.
16    A.  Okay.
17    Q.  Okay.  What was your date of birth?
18    A.  10-30-87.
19    Q.  And are we currently in your home in Mercedes,
20 Texas?
21    A.  Yes, sir.
22    Q.  Have you lived here all your life?
23    A.  Yes, sir.
24    Q.  Do you recall when you first got a Texas state
25 ID?

Page 8

1     A.  Yes.  I had to go over to the driver's license
2  place.
3     Q.  About how old were you when you did that?
4     A.  I can't remember.
5     Q.  And do you still have a Texas state ID card?
6     A.  Yes.
7     Q.  Is it now expired?
8     A.  Yes, sir.
9     Q.  Approximately, when did your Texas state ID
10 card expire?
11    A.  I can't remember, sir.
12    Q.  Have you ever voted in an election?
13    A.  Yes.
14    Q.  How many times have you voted in an election?
15    A.  Once by mail.
16    Q.  And do you know what year it was when you voted
17 by mail in an election?
18    A.  No, sir.
19    Q.  What do you recall about the instance in which
20 you voted by mail in an election?
21    A.  We got our ballots.  We signed them and sent
22 them back.
23    Q.  And do you know what year that was?
24    A.  I don't remember.
25    Q.  Have you ever voted in person in a Texas

Page 9

1  election?
2     A.  Yes.
3     Q.  How many times have you voted in person?
4     A.  Once.
5     Q.  What year was it when you voted in person in an
6  election?
7     A.  It was this year.
8     Q.  Okay.  This year is 2023.  Was it the last
9  election in November '22?
10    A.  Yes.  No.  It was 2023.
11    Q.  Okay.  What do you recall about voting in the
12 election in person?
13    A.  I had to go to a building and vote.  I took my
14 passport to vote.  I didn't have my ID.
15    Q.  Where did you vote?
16    A.  In a building in Mercedes.
17    Q.  Was that a building you had been to before, or
18 was it the first time you had been there?
19    A.  It was the first time I've been there.
20    Q.  And who went with you to vote on that occasion?
21    A.  My mom.
22    Q.  Did you have any trouble casting your ballot
23 when you went to the polling place in Mercedes in that
24 election?
25    A.  No.  It was all done electronically.



Taylor Scott

April 18, 2023
Pages 10 to 13

Page 10

1    Q.  Do you recall any occasion in which you
2  attempted to vote by mail but couldn't do so?
3    A.  Yes.
4    Q.  When did that occur?
5    A.  In this year's election.
6    Q.  Was that in 2022 or 2023?
7    A.  2023.
8    Q.  And what do you recall about the attempt that
9  you made to vote by mail on that election?
10    A.  I didn't get a ballot.
11    Q.  Do you recall whether or not you sent in an
12  application for a mail-in ballot on that occasion?
13    A.  Yes.
14    Q.  Did you fill out that application yourself?
15    A.  My mom did.
16    Q.  Okay.  Did you sign that application?
17    A.  She -- she writes for me.  I can't -- I can't
18  write.
19    Q.  And did you read that application before it was
20  sent in?
21    A.  She read it to me.
22    Q.  And do you recall that the application required
23  you to provide some type of identification number?
24    A.  Yes, sir.
25    Q.  And what type of identification number or

Page 11

1  numbers, if any, did -- did your mother provide on your
2  application for a mail-in ballot?
3    A.  My passport number.
4    Q.  Did she provide any other numbers?
5    A.  No.
6    Q.  At the time that that attempt was made to get a
7  mail-in ballot, did you have a Social Security number?
8    A.  Yes.
9    Q.  Did you know at that time that you could
10  provide the last four digits of your Social Security
11  number on that application?
12    A.  Yes, sir.
13    Q.  Is there a reason why you or your mom did not
14  provide the last four digits of your Social Security
15  number on that application?
16    A.  I don't know.
17    Q.  Did you provide the number on your state ID
18  card, even though it was expired?
19    A.  No, sir.
20    Q.  Why did you not do that?
21    A.  Because it was expired.  I used my passport.
22    Q.  When I spoke with your mother earlier, she told
23  me that you had gone to high school; is that right?
24    A.  Yes.
25    Q.  So do you read well?

Page 12

1    A.  Not very well.
2    Q.  Is it -- do you think that you read?
3    A.  Excuse me?
4    Q.  Do you read fairly well?
5    A.  Barely.  I can read some words, but not many.
6    Q.  Did you -- strike that.
7        Do you go online and read things?
8    A.  No.
9    Q.  Did you read any of the -- any material related
10  to the voting process when you applied to vote by mail?
11    A.  No.
12    Q.  Are you a registered voter in Texas?
13    A.  Yes, sir.
14    Q.  How long have you been a registered voter in
15  Texas?
16    A.  I just started last year.
17    Q.  Which year was that?
18    A.  Last year.
19    Q.  Was that 2022 or 2023?
20    A.  2023.
21    Q.  Did your mother assist you in getting
22  registered as a voter?
23    A.  Yes.
24    Q.  Have you ever sought any assistance from anyone
25  other than your mother in connection with the voting or

Page 13

1  registering to vote?
2    A.  No.
3    Q.  Is it fair to say that you've never had any
4  contact with anybody at the State of Texas about
5  voting?
6    A.  No, sir.
7    Q.  Is it correct that you have not had any
8  contact, other than when you went in person, with
9  anybody at Hidalgo County about voting?
10    A.  No, sir.
11        MS. SNEAD:  I'm going to object to the
12  form, because I'm not sure she understands the
13  question.
14        MR. BRYANT:  Okay.
15        MS. SNEAD:  If you can phrase it more
16  directly.
17        MR. BRYANT:  I'll try to do that.
18    Q.  Have you ever talked in person or on the phone
19  with anyone from the State of Texas about voting?
20    A.  My hand -- I cannot use the phone.  My hand --
21  my hands do not work, so...
22    Q.  So I assume from that that you've never talked
23  with anybody on the phone --
24    A.  No, no.
25    Q.  Have you ever talked with anybody from the



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

### STATE DEFENDANTS' BRIEF IN RESPONSE TO
### OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX Z



**In The Matter Of**

**La Union Del Pueblo Entero, et al.,**

**Plaintiffs**

**v**

**State Of Texas, et al.,**

**Defendants**

**CASE**

**5:21-cv-844**

**Date**

**4-27-2022**

**Witness**

**Jonathan Sherman White**

**Certified Copy
Transcript**

**National Court Reporters Inc. · 888.800.9656 ·
NationalCourtReporters.com
NCRNetwork@nationalcourtreporters.com**

Serving Legal Professionals From Coast To Coast and Internationally

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 1 (1 - 4)

1 (1 - 4)

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF TEXAS
2  SAN ANTONIO DIVISION
3  LA UNION DEL PUEBLO    §
   ENTERO, ET AL.,        §
4      Plaintiffs,        §  Civil Action No.
                          §  5:21-cv-844 (XR)
5  VS.                    §  (Consolidated Cases)
                          §
6  STATE OF TEXAS, ET AL. §
       Defendants.        §
7  **********************************************
8          ORAL DEPOSITION OF
9       JONATHAN SHERMAN WHITE
10         APRIL 27, 2022
11
12  **********************************************
13      ORAL DEPOSITION OF JONATHAN SHERMAN WHITE,
14  produced as a witness at the instance of the Plaintiffs
15  and Plaintiff-Intervenors, and duly sworn, was taken in
16  the above-styled and numbered cause on the 27th day of
17  April 2022, from 9:11 a.m. to 5:31 p.m., before Caroline
18  Chapman, CSR in and for the State of Texas, reported by
19  Computerized Stenotype Machine, Computer-Assisted
20  Transcription, held at the William P. Clements Jr. State
21  Office Building, 300 West 15th Street, Hearing Room
22  1001E, Austin, Texas, pursuant to the Federal Rules of
23  Civil Procedure.
24
25

**Page 2**

1          A P P E A R A N C E S
2  COUNSEL FOR THE PLAINTIFFS AND PLAINTIFF-INTERVENORS:
3      RICHARD A. DELLHEIM
       DANA PAIKOWSKY
4      Attorneys, Voting Section
       Civil Rights Division
5      U.S. Department of Justice
       950 Pennsylvania Avenue NW
6      Washington, D.C. 20530
       (202) 305-4355
7      daniel.freeman@usdoj.gov
       dana.paikowsky@usdoj.gov
8
       JENNIFER J. YUN (via videoconference)
9      Trial Attorney
       Voting Section, Civil Rights Division
10     U.S. Department of Justice
       4 Constitution Square
11     150 M Street NE
       Washington, DC 20530
12     (202) 307-2767 (202) 305-5533
       jennifer.yun@usdoj.gov
13  COUNSEL FOR THE DEFENDANTS THE STATE OF TEXAS, ET AL.:
14     ERIC HUDSON
       Office of the Attorney General for the
15       State of Texas
       Special Litigation Division
16     P.O. Box 12548, Capitol Station
       Austin, Texas 78711-2548
17     (512) 936-2266 Fax: (512) 457-2548
       eric.hudson@oag.texas.org
18  COUNSEL FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND
    EDUCATIONAL FUND (MALDEF):
19     NINA PERALES
       Vice President of Litigation
20     Mexican American Legal Defense and
       Educational Fund, Inc. (MALDEF)
21     JULIA LONGORIA (via videoconference)
       Staff Attorney at MALDEF
22     110 Broadway, Suite 300
       San Antonio, TX 78201
23     210) 845-5147 Fax: (210) 224-5382
       nperales@maldef.org
24
25     - and -

**Page 3**

1      A P P E A R A N C E S (CONTINUED)
2      KATIE M. FRIEL (via videoconference)
       Fellow, Voting Rights & Elections
3      Brennan Center for Justice at NYU School of Law
       120 Broadway, Suite 1750
4      New York, NY 10271
       (646) 292-8310 Fax: (212) 463-7308
5      freilk@brennan.law.nyu.edu
6  COUNSEL FOR THE LUPE PLAINTIFFS:
       ELIZA SWEREN-BECKER (via videoconference)
7      Counsel, Voting Rights & Elections Program
       Brennan Center for Justice at NYU School of Law
8      120 Broadway, Suite 1750
       New York, NY 10271-202
9      (646) 925-8765 Fax: (917) 597-9040
       Eliza.sweren-becker@nyu.edu
10  COUNSEL FOR MI FAMILIA VOTA PLAINTIFFS:
11     LAURA E. ROSENBAUM (via videoconference)
       STOEL RIVES, LLP
12     760 SW Ninth Avenue, Suite 3000
       Portland, OR 97205
13     (503) 294-9642
       Laura.rosenbaum@stoel.com
14  COUNSEL FOR DEFENDANT TRAVIS COUNTY CLERK REBECCA
15  GUERRERO AND DISTRICT ATTORNEY JOSE P. GARZA:
       ANTHONY "TONY" NELSON (via videoconference)
16     Civil Litigation Division of the Travis County
       Attorney's Office
17     P.O. Box 1748
       Austin, TX 78767-1748
18     (512) 854-9513 Fax: (512) 854-4808
       tony.nelson@traviscountytx.gov
19  COUNSEL FOR YVONNE RAMÓN ELECTIONS ADMINISTRATORS OF
20  HIDALGO COUNTY:
       LEIGH ANN LEAVELL TOGNETTI (via videoconference)
21     Hidalgo County District Attorney's Office
       100 East Cano, Courthouse Annex III, 1st Floor
22     Edinburg, TX 78539
       (956) 292-7609 EXT 8182
23     Leigh.tognetti@da.co.hidalgo.tx.us
24
25

**Page 4**

1      A P P E A R A N C E S (CONTINUED)
2  COUNSEL FOR THE HIDALGO COUNTY DISTRICT ATTORNEY'S
   OFFICE:
3      VICTOR M. GARZA (via videoconference)
       Chief Administrative Attorney
4      Civil Division-Assistant District Attorney
       Office of the Criminal District Attorney
5      Hidalgo County, Texas
       100 East Cano Street
6      Edinburg, TX 78539
       (956) 292-7609 EXT. 8185
7      Fax: (956) 292-7619
       victor.garza@da.co.hidalgo.tx.us
8  COUNSEL FOR OCA-GREATER HOUSTON PLAINTIFFS:
       ZACHARY "ZACH" DOLLING (via videoconference)
9      STAFF ATTORNEY
       TEXAS CIVIL RIGHTS PROJECT
10     P.O. Box 17757
       Austin TX 78760
11     (512) 496-4746
       zachary@texascivilrightsproject.org
12
13  COUNSEL FOR REVUP:
       LUCIA IRENE ROMANO-OSTROM (via videoconference)
14     Supervising Attorney
       Disability Rights Texas
15     1500 McGowen Street, Suite 100
       Houston, TX 77004-1153
16     (832) 681-8210
       lromano@disabilityrightstx.org
17  COUNSEL FOR ISABEL LONGORIA WITH THE HARRIS COUNTY
    ATTORNEY'S OFFICE:
18     SUSANNAH MITCHAM (via videoconference)
19     ASSISTANT COUNTY ATTORNEY
       Office of the Harris County Attorney
20     1019 Congress, 15th Floor
       Houston, TX 77002
21     (713) 274-5334
       Susannah.Mitcham@cao.hctx.net
22
23
24
25

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

1 (1 - 4) Jonathan Sherman White

**Page: 1 (1 - 4)**

5:21-cv-844 (XR)
4/27/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 22 (85 - 88)

22 (85 - 88)

Page 85

1  identifying information, or an identifier such as a DL
2  or the last four of the social.  That could be an
3  obstacle to a vote harvesting crew that wishes to bypass
4  the voter.
5         And then, as I already stated, it could
6  also be an obstacle to gaining the voter's compliance,
7  because here's a stranger asking for my DL number so
8  that they can complete these documents on my behalf or
9  submit this, you know, carrier envelope on my behalf, so
10  it -- by putting the control of the interaction more in
11  the voter's hands because those are -- those are numbers
12  that the voter has access to that the harvester is less
13  likely to have access to, I think it promotes security
14  in that fashion.
15     Q.  So if I, moving forward, refer to the activity
16  you described of collecting as many absentee ballots and
17  collecting and submitting ballots by mail as illegal
18  vote harvesting, will you understand what I'm referring
19  to?
20     A.  Sure.  And if for some reason that definition
21  needs clarifying, then I'll bring it up at that time.
22     Q.  You mentioned that SB1's mail ballot
23  identification requirements would be more effective in
24  preventing some vote harvesting more so than others.
25  Are there instances you can think of where SB1's mail

Page 86

1  ballot identification requirements would not be
2  effective in deterring vote harvesting?
3     A.  The primary scenario I can think of is where a
4  vote harvesting crew already has enough information
5  about the voters that they possess those identifying
6  numbers that have to be provided.
7     Q.  Do you believe that SB1's mail ballot
8  identification requirements would be effective in
9  preventing vote harvesting if a defendant filled out
10  either the voter's application or mail ballot in the
11  presence of that voter?
12         MR. HUDSON:  Objection, form, foundation.
13  Objection, incomplete hypothetical.
14     A.  If I understand the question, I think that
15  the -- the piece that I mentioned earlier, where the
16  voter could be put off by a harvester requesting that
17  information from the voter, that could reduce the
18  likelihood of a successful vote harvesting transaction.
19  I think that would be my answer.
20     Q.  And can you think of situations where a
21  perpetrator might be able to obtain an ID from the
22  person they're seeking to harvest a ballot from?
23         MR. HUDSON:  Objection, incomplete
24  hypothetical.  Objection, foundation.
25     A.  An ID number or an actual -- actual

Page 87

1  identification document.  They could just ask for it,
2  and if the voter was inclined to provide it or show it
3  to them because they had that level of trust somehow
4  with a stranger or -- or a harvester maybe that they've
5  known from previous election cycles, that's possible.
6     Q.  Uh-huh.
7         Do you have any personal knowledge of the
8  operative underlying facts of a case that was positively
9  resolved, so the spreadsheet we've been working on,
10  where the defendant who engaged in voter -- in a vote
11  harvesting crime filled out the voter's ballot or
12  absentee ballot by mail request in the voter's presence?
13     A.  Sure.  Although I would say, because this --
14  this isn't the most up-to-date document.  Some of the
15  most recent cases are the ones that are immediately
16  popping in my mind and they're not on this document
17  yet, but they have been resolved.
18     Q.  They have been resolved?
19     A.  And there may be ones on here as well that I
20  would have to take a look at, but most of these cases
21  focus on the -- on the -- kind of the harvesting side of
22  the process rather than the seeding or the application
23  side of the process, from what I looked through.
24  Actually, you know, I was flagging the ones that were --
25  that were unlawful assistance interactions, and so we

Page 88

1  probably do have some application fraud situations here.
2  But a majority -- I would say a majority of the
3  application violation cases do involve completing an
4  application in the presence of the voter.
5     Q.  The majority involve completing an application
6  in the presence of the voter?
7     A.  Most of it happens in the presence of the
8  voter.  And I think the reason for that is because
9  eventually they have to go back to the voter for the
10  ballot, and so it's helpful to have that prior
11  interaction with the voter.  It's helpful to get -- it's
12  easy to get an actual signature from the voter for an
13  application, because I'm just helping you get a mail
14  ballot.
15     Q.  Right.
16     A.  Now, when you go to the mail ballot, that's
17  where the skill comes in.
18     Q.  So in most of these vote harvesting schemes,
19  the harvesters are trying to build some relationship
20  with the people they're targeting?
21     A.  I would say they're trying to -- trying to
22  establish some level of trust or confidence with that --
23  with that voter.  If they're doing it well, they are.
24     Q.  And in those instances, is it possible that
25  they could ask the voter for their identification number

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

22 (85 - 88) Jonathan Sherman White

Page: 22 (85 - 88)

Case 5:21-cv-00844-XR   Document 1129-2   Filed 04/29/24   Page 19 of 69

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 23 (89 - 92)

23 (89 - 92)

Page 89

1 or have the voter fill out their own identification
2 number?
3    **A. That's right. Absolutely.**
4      MS. PAIKOWSKY: If it's okay, can I take a
5 five-minute break?
6    **A. Sure.**
7      MR. HUDSON: No objection.
8      (Lunch recess.)
9    Q. (By Ms. Paikowsky) Mr. White, I'm going to go
10 back to asking questions about SB1's mail ballot
11 identification provisions. Without SB1's mail ballot
12 identification provisions, would your office have other
13 means of detecting vote harvesting?
14      MR. HUDSON: Object to the extent that
15 that would encroach on investigator privilege, and
16 remind you of the stipulation concerning the running
17 objection. Just instruct the witness, to the extent
18 that that would encroach on methods of investigation or
19 practices, I'll instruct you not to answer.
20    **A. Yeah. Without going into our mental**
21 **impressions and our investigative practices, I guess I**
22 **could say we have prosecuted vote harvesting cases in**
23 **the past.**
24    Q. And this, again, is not seeking specific
25 information about any investigation, but do you have --

Page 90

1 does your office have methods by which you would detect
2 potential illegal vote harvesting?
3      MR. HUDSON: Same objections.
4    **A. We have --**
5      MR. HUDSON: Same instruction.
6    **A. We have other methods.**
7    Q. All right. I'm going to show you a document
8 that we can mark Exhibit 5.
9      (Exhibit 5 marked.)
10      MS. PERALES: What are you marking? You
11 tell me. This is 5?
12      MS. PAIKOWSKY: This is 5.
13    Q. (By Ms. Paikowsky) Do you recognize this
14 document? Sorry, and I should say this is marked
15 State -- Bates No. State 05462.
16    **A. Yes, I believe I do.**
17    Q. And what is this document?
18    **A. It is a PowerPoint file including some**
19 **information about election integrity at the Attorney**
20 **General's Office.**
21    Q. Who created this PowerPoint?
22    **A. I guess a collaboration involving myself and**
23 **some other members of our team, I'm not sure exactly**
24 **who.**
25    Q. What has the slide show been used for?

Page 91

1    **A. This specific version, I'm not 100 percent**
2 **sure, but -- I couldn't say for sure.**
3    Q. What are instances where you presented some
4 version of this slide show?
5    **A. The one I recall is -- would be the Secretary**
6 **of State's annual elections conference for elections**
7 **administrators.**
8    Q. And in that conference, who are you presenting
9 this slide show to?
10    **A. Elections officials.**
11    Q. What is the purpose of giving this presentation
12 to election officials?
13    **A. To inform them about election integrity efforts**
14 **and enforcement and to give them some information on**
15 **what they can look for in terms of detecting election**
16 **fraud and how to report it.**
17    Q. If you wouldn't mind turning to Bates
18 No. 054641.
19    **A. Okay.**
20    Q. Can you describe this slide?
21    **A. So this slide is intended to show some examples**
22 **or representations of examples of mail ballot**
23 **application activity that might be associated with --**
24 **with fraud or vote harvesting operations.**
25    Q. Does this slide show tools that your office

Page 92

1 uses to detect vote harvesting and impersonations?
2    **A. The intent was to show elections administrators**
3 **items that they might detect, and if looking -- if I**
4 **looked into further might find evidence of fraud that**
5 **they would report to our office.**
6    Q. So is it fair to say that the examples you see
7 here might give your office or others cause to
8 investigate potential absentee ballot by mail fraud?
9    **A. They might if we received a complaint with this**
10 **type of information inside of it.**
11    Q. Have there been instances -- again, not going
12 into privileged information about any specific
13 investigation -- have there been instances in the past
14 where you office has received a complaint that includes
15 an example that you -- similar to those that you've
16 provided here to detect a vote harvesting?
17    **A. Yes.**
18    Q. To your knowledge, will your office continue to
19 rely on this tool to detect vote harvesting?
20    **A. We'll continue to rely on complaints that have**
21 **credible information about election fraud.**
22    Q. And the kinds of evidence that you might
23 consider credible evidence warranting an investigation
24 would be -- would include what's provided on this slide
25 show?

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

23 (89 - 92) Jonathan Sherman White

**Page: 23 (89 - 92)**

5:21-cv-844 (XR)
4/27/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 54 (213 - 216)

54 (213 - 216)

Page 213

1 or some other polling place, and without respect to
2 whether the food is being offered as an inducement to
3 vote, but just having a barbecue set up, chicken plates
4 on the lawn of the county courthouse, outside the
5 electioneering zone does not violate Texas law, right?
6        MR. HUDSON:  Objection, form, incomplete
7 hypothetical.  Objection, asked and answered.
8 Objection, foundation.  Go ahead.
9    A.  I -- yeah, I mean, I might miss something, but,
10 you know, absent -- absent some facts that actually
11 indicate an offense under the Election Code or some
12 other code, no, I mean people can gather and have food.
13    Q.  And you mentioned that the chicken plate is a
14 phenomenon of South Texas.  Is that what you've heard?
15    A.  That's what I've heard.
16    Q.  Are you aware that campaigns set up barbecues
17 and tents and lawn chairs and hand out food to people in
18 other parts of Texas besides South Texas?
19    A.  That wouldn't surprise me to hear that.  I just
20 haven't heard a lot of those stories.
21    Q.  What percent of the cases that you have
22 prosecuted of voter assistance fraud have involved Anglo
23 defendants versus non Anglo defendants?
24    A.  No idea.
25    Q.  Have you ever seen an instance where a voter

Page 214

1 cast a ballot for a family member who was ineligible
2 because the family member was dead?
3    A.  I'm trying to think of whether I have any of
4 those cases on the resolved prosecutions spreadsheet.
5 But I -- I could say I have seen that scenario, but I
6 would be limited to talking about the facts of those
7 scenarios unless they've been resolved prosecutions.
8    Q.  Would the answer be the same if I asked you if
9 you've ever seen instances where a voter cast the ballot
10 for a family member who was ineligible because the
11 family member was no longer a resident of the
12 jurisdiction?
13    A.  We've had lots of residency cases, but I don't
14 remember one where a vote was cast for a family member.
15    Q.  You've never seen, for example, parents vote a
16 mail ballot for a child who's in college but that child
17 is already gone and voting on their own wherever they
18 went?
19    A.  I don't recall the fact of the family member
20 voting another family member's ballot who had, you know,
21 vacated the residency or moved their residency.
22    Q.  Can you give me any other examples of a voter
23 casting a ballot for another voter who is ineligible
24 either because of felony convictions, deceased, absent,
25 no longer a resident?  Any other examples of people

Page 215

1 voting for other people, basically?
2    A.  Sure.  Well, the one that comes to mind
3 immediately is the one associated with the victim's
4 assistance coordinator of Omar Escobar, whose vote
5 harvesting operation caught up a deceased voter who had
6 been -- who had passed away nine years earlier, and
7 applied for a mail ballot for that voter, and that mail
8 ballot got voted.  The issue in the case was actually
9 pending that offense to the specific person, and we
10 ultimately did not obtain that conviction against
11 Ms. Garza in that case.
12    Q.  Did you charge her?  Did you go to court?
13    A.  We did.
14    Q.  Was she acquitted?
15    A.  No.
16    Q.  The charges were dropped?
17    A.  The charges were dropped.
18    Q.  Okay.  Do you have any sense of the relative
19 proportion of fraud that occurs by family members voting
20 for other family members versus one of these vote
21 harvesting operations that you've identified in your
22 chart?
23    A.  I have a very general sense of it based on just
24 a cumulative 14 years of dealing with cases.
25    Q.  And what is your sense?

Page 216

1    A.  The exception to the rule.
2    Q.  What would be fair to say, also, though, that
3 you are less likely to learn of an instance in which a
4 family member votes for another family member because
5 it's isolated and there are fewer people to report it?
6    A.  I would say we're probably equally likely to
7 learn of it if the voter is deceased, for example,
8 because there are ways that gets flagged by the system.
9 If it's a -- we might -- anytime a voter is aware that
10 their ballot has been taken and voted against their will
11 or they show up to vote in person to vote but they're
12 told, "No, you've already voted by mail," or something
13 like that, it's fairly likely that that could get
14 reported.
15        So I think I agree with the premise that
16 it is probably more likely in a number of situations for
17 a vote harvesting operation to be reported than a family
18 member.  It's also not across the board, and there are
19 other factors in a vote harvesting operation that make
20 it extremely unlikely for those offenses to be reported,
21 as well, such as the fact that if it's done correctly,
22 vote harvesting is invisible to the voter.  "Someone
23 stopped by to help me with my ballot," and as far as the
24 voter knows, they voted exactly the way the voter wanted
25 them to vote, because I asked you, "Who would you like

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

54 (213 - 216) Jonathan Sherman White

Page: 54 (213 - 216)

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 55 (217 - 220)

55 (217 - 220)

Page 217

1 to vote for for this race?"  And I may or may not
2 mention the down ballot races, which I fill in for the
3 people that I'm actually working for, because I don't
4 care about who's up ballot when I'm vote harvesting.  I
5 care about local elections that I'm getting paid for.
6 So, you know, done properly, vote
7 harvesting is invisible to the voter, and unless there's
8 a situation where something has been just completely --
9 you know, without the voter's knowledge or consent,
10 there has been an application for a mail ballot and they
11 are planning on voting in person and find out that,
12 "Wait a second.  No, I already voted by mail?  No, I
13 don't."  That's going to get reported a lot of the time,
14 you know.  So I agree and -- and would disagree or
15 distinguish --
16 Q.  Uh-huh.
17 A.  -- on other grounds.
18 Q.  Is it also the case that if a voter assister, a
19 mail ballot voter assister is doing everything the way
20 that they are supposed to do, that the experience is
21 similarly seamless for the voter, who understands that
22 the assister is filling out according to their wishes
23 and helping them with the ballot and in a completely
24 appropriate way.  The voter would similarly have a
25 seamless and non-troubling experience with that?

Page 218

1 A.  Yeah.  And I would say it's more likely that
2 the voter would have a bad experience when the vote
3 harvester is doing the wrong thing, but, yeah, I think
4 that that's the challenging -- that's the challenge of
5 investigating mail ballot fraud and proving it after the
6 fact, is that, done correctly, it may look to the voter
7 just like it's done appropriately.
8 Q.  I'm going to ask you no more questions about
9 your testimony.
10 Is it -- is it your contention that when
11 you are advising a legislator during the legislative
12 process about facts related to voter fraud, that you
13 have an attorney-client relationship with the
14 legislator?
15 MR. HUDSON:  I'm going to object to the
16 extent that that would encourage attorney-client
17 privilege between me and my client, or attorney work
18 product, or legislative privilege.  To the extent that
19 you can answer that without revealing any
20 attorney-client privilege or any other privileges,
21 you're free to do so.  Otherwise, I'm instructing you
22 not to answer.
23 A.  I don't know that I can.
24 THE REPORTER:  Can we take a short break?
25 (Brief recess.)

Page 219

1 MS. PERALES:  Yes.
2 Q.  Okay.  We're back on the record.  I was -- and
3 I'm also checking -- okay.  I was asking you some
4 questions about the attorney-client relationship.
5 Look, it's the end.  You can see right
6 here, there's nothing -- there's nothing down below,
7 so --
8 MR. HUDSON:  You can't sweet talk him into
9 answering your question.
10 THE WITNESS:  That's exciting.
11 MR. HUDSON:  For purposes of the record,
12 we're all laughing.  I know this isn't being recorded,
13 but I want to make it very clear that we're all
14 chuckling about that one.
15 MS. PERALES:  Yes, it's all in good humor.
16 And I've been foiled by Mr. Hudson and my charm
17 offensive.
18 Q.  (By Ms. Perales)  So I do have some questions
19 for you about the attorney-client privilege, which is,
20 is there a difference, in your mind, in terms of whether
21 you've formed an attorney-client relationship with a
22 legislator or whether you are giving fact information --
23 for example, like the number of prosecutions or what a
24 prosecution was about -- versus advising them on
25 something like the interpretation of statutory language?

Page 220

1 Do you draw a distinction there at all?
2 MR. HUDSON:  I'm going to object.  That's
3 an improper contention.  Mr. White is here as a fact
4 witness, not to give legal opinions about
5 attorney-client, attorney work product.  We also have a
6 stipulation on the record.  With that, I'll instruct you
7 not to answer to the extent that your answer would
8 encroach on any stipulated privileges.  To the extent
9 that you can answer, you're free to do so.
10 A.  I don't -- I don't know that I can.
11 Q.  Okay.  Well, that was -- that is me kind of
12 getting closer to what I really want to ask you about,
13 which is discussions that you've had with legislators
14 that you consider not privileged by the attorney-client
15 privilege.  Not every discussion you've ever had with a
16 legislator can be understood to be attorney-client
17 privileged.  Would you agree with me on that?
18 A.  Certainly not questions that I was asked at a
19 legislative committee hearing.  Things like that would
20 be -- would be covered, I would agree.
21 Q.  So for the purpose of the record, are you
22 asserting that any private conversation you would have
23 had with a legislator, regardless of the content, would
24 be privileged as attorney-client privilege?
25 MR. HUDSON:  Same objections.

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

55 (217 - 220) Jonathan Sherman White

**Page: 55 (217 - 220)**

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

LA UNION DEL PUEBLO ENTERO, et al., §
     *Plaintiffs,* §
§
*v.* §   Case No. 5:21-cv-844-XR
§
GREGORY W. ABBOTT, et al., §
     *Defendants.* §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX AA

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## DECLARATION OF JONATHAN WHITE

I, Jonathan White, pursuant to 28 U.S.C. 1746, am executing this declaration as part of my assigned duties and responsibilities.  I declare under penalty of perjury that the facts stated below are true and correct to the best of my personal knowledge and belief.

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.  The evidence set out in the foregoing Declaration is based on my personal knowledge.

2. I am the former Division Chief of the Election Integrity Division of the Office of the Attorney General of Texas and submit this Declaration in support of the State's Motion for Summary Judgment in the above-captioned case.

3. I have been involved in election fraud prosecutions as some portion of my work since I started at the Attorney General's office 15 years ago in the White Collar Crime and Public Integrity Section of the Criminal Prosecutions Division. Through the years, our election caseload expanded, resulting in the creation of an Election Fraud Section, and ultimately the Election Integrity Division. In that time, I have reviewed hundreds of investigations, and handled approximately 100 prosecutions, many of which were complex, involving multiple, if not dozens, of election offenses.

4. The Election Integrity Division receives complaints about potential election fraud forwarded primarily from the Secretary of State's office.  Our investigators then determine whether the facts support an allegation of fraud, and, if warranted, the Election Integrity Division prosecutes the offenses or assists counties in prosecuting the offenses. This prosecution role has evolved somewhat since the end of 2022.

1

5. During my tenure as Division Chief of the Election Integrity Division, I became familiar with the administration and operations of Texas elections, including the tasks, practices, and responsibilities that local Texas election authorities must fulfill; and the laws and regulations with which local election authorities must comply to plan, coordinate, manage, and execute a successful election.

6. 

7.

8.

9.

10.

11.



16. ████████████████████████████████████████████ ████████████████████████ the Court of Criminal Appeals' ruling in *State v. Zena Stephens*, which declared the AG's statutorily granted authority to prosecute election cases unconstitutional.

17. All mail ballots, due to their nature of being handled and voted outside of a polling location, ████████████████████████████████████ In the polling location, in-person voters have election judges and poll watchers to make sure that there is no electioneering; no harassment, pressure, or persuasion being placed on the voter to vote a certain way; that no one is marking the voter's ballot without authorization; and that the vote is actually turned in, counted, and not altered by any person. Paid operatives are not allowed to loiter in the polling place, or to collect ballots from voters and remove them from the polling place, with a promise to turn them in later on behalf of the voter. ████. There are laws prohibiting many of these bad acts, ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

18. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ The City of Carrolton spans three different counties, ████████████████████████████████████ ██████████████████████████

19. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

20. ████████████████████████████████████████████

4



21.

22. Once processed and removed from their envelopes, ballots are entirely anonymous and untraceable. They cannot be identified for removal from counting. Additionally, once a voter requests a mail ballot, they are unable to vote at a polling place without surrendering their mail ballot or going to election headquarters to file paperwork, including a sworn affidavit.

23.

24.

25.

26. 

27.

28.

29.

30.



31. 

32. 

33. Prior to SB1, one requirement intended to protect the integrity of the mail ballot was comparing the signature on the carrier envelope with the signature on the application for ballot by mail or another signature on file.

34. 

35.



36.

37.

38.

39. in Gregg County.

Shannon Brown, Marlena Jackson, Charlie Burns, and

DeWayne Ward were indicted and pled guilty to election fraud 

40. SB1 requires a voter to provide an ID number (either a driver's license, Texas ID, election identification certificate, DPS-issued personal identification card number, or the last 4 digits of an SSN) in order to apply for and cast a ballot by mail.

41.

42.

43.

44.

45.

46. 

47.

48.

Executed in Travis County on the <u>22nd</u> day of <u>June</u>, 2023.

Jonathan White
Former Division Chief
Election Integrity Division
Office of the Attorney General of Texas

Transcript of the Testimony of

# Jonathan White

### Date:

May 05, 2022

### Case:

LA UNION DEL PUEBLO ENTERO vs STATE OF TEXAS

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO            )
     ENTERO, et al,                 )
 4                                  )
                     Plaintiffs,    )
 5                                  ) CIVIL ACTION
     VS.                            )
 6                                  ) NO.: 5:21-cv-844(XR)
     STATE OF TEXAS, et al,         ) (Consolidated Cases)
 7                                  )
                     Defendants.    )
 8                                  )

 9            ------------------------------------

10            ORAL AND VIDEOTAPED DEPOSITION OF

11                     JONATHAN WHITE

12   Designated Representative for the Office of the Texas

13                    Attorney General

14                     MAY 5, 2022

15            ------------------------------------

16        ORAL DEPOSITION OF JONATHAN WHITE, produced as a

17   witness at the instance of the DEFENDANTS, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on May 5, 2022, from 10:02 a.m. to 4:06 p.m. before Miah

20   Parson, CSR in and for the State of Texas, reported by

21   oral stenography, at the Offices of the Attorney General

22   300 W. 15th Street Austin, Texas 78701, pursuant to the

23   Federal Rules of Civil Procedure and the provisions

24   stated on the record or attached hereto.

25
```

Jonathan White

May 05, 2022
Pages 90 to 93

Page 90

1 and incomplete hypothetical.
2     A. I don't have a position on that very specific
3 scenario to share. I can say that we not entered into
4 one of those agreements historically.
5     Q. Thank you. That was my next question.
6     A. I knew it was.
7     Q. So if we could turn back to Exhibit No. 5
8 which was Chapter 273 of the election code. I'd like to
9 go to 273.022 which is also on Page 2 and I'll just read
10 it out slowly. Title is cooperation with local
11 prosecutor. The attorney general may direct the county
12 or district attorney serving the county in which the
13 offense is to be prosecuted to prosecute an offense that
14 the attorney general is authorized to prosecute under
15 Section 273.021 or to assist the attorney general in the
16 prosecution. Did I read that correctly?
17     A. Yes, sir.
18     Q. Has the OAG ever used this authority to direct
19 a county prosecutor to prosecute an offense without the
20 OAG's involvement?
21     A. Not to my recollection.
22     Q. Has the OAG ever used this authority to direct
23 a county prosecutor to assist the OAG in a prosecution?
24     A. I think my answer would be the same as it was
25 to your similar question under Section 273.002 to the

Page 91

1 extent that we've ever done this we have never directed
2 a district attorney to prosecute or assist. It's
3 possible that we may have mentioned this provision and
4 now refreshing my recollection that there are separate
5 provisions for investigations and prosecution, I'm not
6 sure which is which, but if we ever used it would have
7 been the same circumstances I described before as it
8 would have been a soft touch. It would have been a
9 request that we would not have pushed without agreement
10 of the district attorney. And at most it would have
11 been a reference to a code section, but never a
12 mandatory directive.
13     Q. Okay. And so I guess that means that the OAG
14 has never utilized this provision against a county
15 prosecutor's wishes?
16     A. Exactly. Not -- not used it per se, but it
17 could have been referenced with regards to a request.
18     Q. Okay.
19     A. It was not, you know, a directive or mandatory
20 in nature.
21     Q. Would the OAG ever use this authority if a
22 county prosecutor did not want to prosecute or assist
23 with the -- in the -- the prosecution?
24        MR. HUDSON: Object as to attorney/client
25 privilege, work product doctrine, investigative

Page 92

1 privilege, similar processes privilege, to the extent
2 you can respond without encroaching on those privileges,
3 you may do. Otherwise I'm instructing you not to
4 answer.
5     A. I know way of knowing if the attorney general
6 would ever use it. We have never used it in the past
7 and as I previously testified here and before the
8 legislature is we always used a soft touch and a
9 cooperative approach with local prosecutors. We'd never
10 desired to step on a local prosecutor's toes or tried to
11 force them to do anything or be involved in anything
12 that they didn't want to be.
13     Q. Okay. Thank you. So handing you what I've
14 marked as Exhibit 8, which is a copy of SB1 enrolled.
15 Just confirm that for me.
16        (Exhibit No. 8 marked.)
17     A. Yes, sir.
18        MR. HUDSON: In the interest of short
19 circuiting out objections on the document itself as he's
20 asking questions. Can you verify where you got it from
21 and the reason I ask that is, is there's an actual
22 signed copy on the Secretary of States website. I don't
23 know if this is the final enrolled copy or not. Is
24 there any chance I can get you to clarify that?
25     Q. (BY MR. DOLLING) I cannot remember exactly what

Page 93

1 the website is called, but it's the legislative look up
2 that's provided by the state on the capital website or
3 whatever it is.
4        MR. HUDSON: Thank you.
5     Q. (BY MR. DOLLING) So, Mr. White, do you
6 understand that when text is struck through it means
7 that SB1 removed that text from the law?
8     A. Yes, sir.
9     Q. And when text is underlined it means that the
10 text was added by --
11     A. Yes.
12     Q. Okay. And then if we turn to Page 75
13 Section 10 -- oh sorry. Wait for you to get there.
14     A. Yes, sir.
15     Q. It says, Section 10.04 says, this act takes
16 effect on the 91st day after the last day of the
17 legislative session; is that correct?
18     A. Yes, sir.
19     Q. And would you agree with me that that means
20 that SB1 took effect on December 2nd, 2021?
21     A. Sounds correct.
22     Q. And so when I refer to the effective date of
23 SB1, I'm referring to December 2nd, 2021?
24     A. Yes, sir.
25     Q. So can we turn to Section 2.04 which is I think

Jonathan White                                              May 05, 2022
                                                       Pages 142 to 145

Page 142

1 receive specific to their work on violation of election
2 laws of Texas?
3     A. I generally provide training to my group on the
4 election laws. I'm not aware of any source such as
5 TDCAA, any source that provides election specific
6 training to prosecutors.
7     Q. And those trainings that you provide to the
8 investigators within Election Integrity Unit do you
9 sometimes use power points?
10    A. I dont. They're generally one on one.
11    Q. Are there any written materials that are
12 provided as training materials to those investigators?
13    A. No, I don't believe.
14    Q. You testified that the Election Integrity
15 Division was stood up as an independent division because
16 the Election Integrity issues are so complex or at least
17 that's one of the reasons; is that correct?
18    A. It's a specialized field.
19    Q. Would you recall whether you had desribed it as
20 complex before?
21    A. They are complex cases.
22    Q. And I think you then -- explaining the term
23 complex to Mr. Dolling said that voting takes place in a
24 block box. Do you recall that?
25    A. I do recall that.

Page 143

1     Q. What do you mean by voting takes place in a
2 black box?
3     A. Well, what I testified in terms of the secrecy
4 of the ballot provides a certain shroud around the
5 voting process that's protected. We generally don't
6 have or didn't used to have cameras in the polling place
7 particularly with the mail balloting process. Mail
8 ballots operate in an uncontrolled environment.
9 Someone's home, there's no election officials around.
10 So there -- there's quite a bit of the process that is
11 not really outfitted with a whole lot of security
12 features at least historically speaking.
13    Q. That's not any different from some other kind
14 of fraud, correct?
15    A. I think it might be.
16    Q. Well, for example, if you had a caregiver who's
17 taking care of another person some reason and has their
18 power of attorney that person would have the ability to
19 embezzle funds or take funds with really hardly any
20 oversight, correct.
21    A. Correct. Particularly if that person had
22 dementia or something like that that might be very
23 similar to what we see.
24    Q. So there's other similar kinds of investment
25 challenges and other kind of criminal activity, correct?

Page 144

1     A. Certainly.
2     Q. And you testified a lot election security is on
3 the honor system. Do you call testifying to that?
4     A. Yes, ma'am.
5     Q. What do you mean by that?
6     A. If I check the box that's on a voter
7 registration application and affirm and swear that I'm
8 eligible to vote the system essentially in the past has
9 taken people at their word and register them to vote
10 vote and let them vote when they come to the pole and
11 let's the check in. So voting in that sense in terms of
12 eligibility has been primarily on the honor system.
13    Q. And there are other kinds of government
14 benefit's or processes that operate on the honor system
15 as well, correct?
16        MR. HUDSON: Objection; form. Foundation.
17    A. I sort of stay in my lane of Election Integrity
18 you may be right.
19    Q. (BY MS. OLSON) So you simply don't know if
20 there are other torts, for example, Social Security
21 applications that might operate on the honor system.
22        MR. HUDSON: Objection; form. Foundation
23 Objection. Outside of the scope.
24    A. I think what you're saying may be true. I
25 don't have enough experience with the system to know

Page 145

1 where the gaps are and how easy they are to fit through.
2     Q. (BY MS. OLSON) And so it may be that the
3 election security being on the honor system is no
4 different than in a lot oh other circumstances where
5 conduct is on the honor system?
6        MR. HUDSON: Same objections.
7     A. It sounds like -- it sounds like the examples
8 that your giving may be similar examples that may be
9 investigated and prosecuted federally, but maybe not on
10 a state level on some of those.
11    Q. (BY MS. OLSON) Have you ever prosecuted any
12 benefit fraud cases on the state level?
13    A. I haven't.
14    Q. And so it might be the same on the state level
15 someone filled out a form indicating that they're
16 eligible for some sort of state benefit that also might
17 be done on the honor system, correct?
18        MR. HUDSON: Same objections.
19    A. I haven't heard of state prosecutions for
20 benefits fraud.
21    Q. (BY MS. OLSON) So you just don't have any
22 knowledge one way or the other whether that would be an
23 appropriate example or appropriately similar to being
24 something that's on the honor system similar to election
25 security?

Jonathan White

May 05, 2022
Pages 146 to 149

Page 146

1    A.  Correct I haven't really seen those cases in
2  14 years.
3    Q.  You indicated that there were also complexities
4  in the prosecution of election law cases; is that
5  correct?
6    A.  Yes, ma'am.
7    Q.  And I think you talked about how there were
8  often times in a matter that was investigated there
9  could be hundred of ballots affected, for example,
10  correct?
11    A.  Yes.
12    Q.  And that the conviction stage you typically
13  didn't hold that number because you couldn't get every
14  witness every voter and they may not be able to identify
15  the person who came and got the ballot from them is that
16  a fair summary of what you testified to before?
17    A.  I think so more or less.
18    Q.  And some of your cases have been resolved by a
19  plea agreement; is that correct?
20    A.  Yes, ma'am.
21    Q.  And that doesn't require any witness to take
22  the stand?
23    A.  That's correct.
24    Q.  And what has been the largest number of
25  harvested ballots in a case of conviction whether by

Page 147

1  trial or by plea?
2    A.  And do you mean.
3    Q.  For a single Defendant what is the -- based on
4  your knowledge of these cases, what is the highest
5  number of ballots that someone has plead guilty to or
6  been convicted of harvesting?
7    A.  I don't know that off the top of my head, but
8  it would probably be a small number.
9    Q.  Even if it were a conviction by way of a plea
10  agreement?
11    A.  Correct.  Normally.  Normally that's how plea
12  agreements work.
13    Q.  Is it fair to say when you say normally that's
14  how plea agreements work, what do you mean?
15    A.  One of the primary negotiation terms in a plea
16  would be to get the number of counts down to one that's
17  what a defense attorney would be looking to get the
18  number of offenses the Defendant is pleading guilty to
19  to down to one.  And usually a lower level of offense.
20    Q.  But then that's all they're convicted of,
21  correct?
22    A.  That's correct.
23    Q.  I think, Mr. Dolling asked you the question,
24  his question was, is it fair to say that the office of
25  the attorney general ahs a policy of investigating all

Page 148

1  credible allegations of a violation of the election
2  code.  Do you recall that question?
3    A.  Yes, I believe I do.
4    Q.  And I think your answer was yes that the policy
5  of the office of the attorney general to investigate all
6  credible allegations; is that right?
7         MR. HUDSON:  Objection; form.  Foundation
8  objection.  Remind you the stipulation concerning his
9  presentation on responding to that tweet.
10         MS. OLSON:  Well, with respect to your
11  objection, Mr. Hudson, Mr. Dollings question that I
12  repeated back was asked in a much earlier portion of the
13  deposition.
14    Q.  So do you recall that prior to being asked
15  about the tweet, do you recall Mr. Dollig's question, is
16  it fair to say that the office of the Attorney General
17  has a policy of investigating all credible allegations
18  of a violation of the election code?
19    A.  I do remember that question.
20    Q.  And do you recall what your answer was?
21    A.  I think I do.
22    Q.  And what was your answer?
23    A.  I think I answered that, I was not prepared to
24  make a policy statement by the Attorney General's office
25  on that specific language, but that our practice in the

Page 149

1  Election Integrity Division is to or Election Integrity
2  Unit evaluates every credible complaint, then determines
3  whether to proceed with an investigation and that we do
4  not blanket, exclude any specific type of case we don't
5  have a standing policy that we actually filter out
6  cases.
7    Q.  And I think the term credible allegations was
8  actually Mr. Dolling's term, but is there a phrase where
9  a standard practice is used by the Election Integrity
10  unit to assess whether somethings a credible allegation?
11         MR. HUDSON:  Objection; form.
12  Argumentative.
13    A.  I don't believe there's a defined standard for
14  what credible is.
15    Q.  (BY MS. OLSON)  And, for example, I'll tell you
16  that in some prosecutors offices or some investigating
17  officers the standard is if the facts as alleged would
18  make out a violation of the statute they will initiate
19  an investigation.  So is there anything like that a
20  standard that is used when reviewing and complaint a
21  standard that is used by the Election Integrity Unit to
22  determine whether or not it's going to move forward on
23  investigation?
24    A.  Not as such that's a very baseline standard.
25  We would have that standard in place because if a

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX BB

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al.,<br>*Plaintiffs,* | § § § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al.,<br>*Defendants.* | § § § | |

STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX CC

```
 1                 UNITED STATES DISTRICT COURT
                             FOR THE
 2                  WESTERN DISTRICT OF TEXAS


 3


 4   LA UNION DEL PUEBLO ENTERO, et. al. )
             Plaintiff,                  )
 5                 v.                    )Civil Action No. 5:21-cv-00844-XR
     GREGORY W. ABBOTT, et al.           )
 6                                       )
             Defendant.                  )
 7


 8


 9   - - - - - - - - - - - - - - - - - - - - - - - - x

10   Deposition of J. SCOTT W, WIEDMANN, taken pursuant to Subpoena to

11   testify at Deposition, was held at the U.S. Department of Justice, 150

12   M Street NE, 8th Floor, Washington, DC 20002, commencing July 29, 2022

13   at 9:48 A.M., on the above date, before JEANINN ALEXIS, a Stenographer

14   and Notary Public in and for the District of Columbia.

15   - - - - - - - - - - - - - - - - - - - - - - - - x

16

17

18                 MAGNA LEGAL SERVICES
                       (866)624-6221
19                   www.MagnaLS.com

20

21

22
```



J. Scott Wiedmann

July 29, 2022
Pages 46 to 49

Page 46

1   the last four digits.

2       Is that correct?

3   A   If they have such number, yes.

4   Q   Is there anything about paragraph 6 that you

5   believe is now inaccurate as compared to when you

6   wrote this particular draft?

7   A   I believe paragraph 6 is accurate.

8   Q   Are there any changes you would make to

9   paragraph 6 since the time you wrote this initial

10  draft?

11  A   I don't believe so.

12  Q   You can put Exhibit 2 to the side, but I

13  wouldn't put it too far.

14      (Wiedmann Deposition Exhibit 3 marked for

15  identification.)

16      BY MS. HUNKER:

17  Q   Do you have Exhibit 3 in front of you?

18  A   Yes.

19  Q   And do you recognize this document?

20  A   Yes, I do.

21  Q   This is a voter registration absentee ballot

22  request specifically known as a Federal Post Card

Page 47

1   Application; is that correct?

2   A   It appears to be, yes.

3   Q   I will represent to you that I got this

4   particular Federal Post Card Application from the

5   Federal Voting Assistance Program's website.

6       Do you have any reason to doubt on that?

7   A   I do not. I haven't read every word but I

8   have no reason to doubt it.

9   Q   And so there are a bunch of different

10  fields. Let's look at Section 1 first. It says, Who

11  are you pick one. And then it has four check boxes

12  which reads, I am on active duty in the Uniformed

13  Services or Merchant Marines or I am an eligible

14  spouse or dependent. Two, I am a US citizen living

15  outside the country and I intend to return. Three, I

16  am a US citizen living outside the country and my

17  intent to return is uncertain. And, Four, I am a US

18  citizen living outside the country. I have never

19  lived in the United States.

20      Did I read those correctly?

21  A   You did. I would characterize them as five

22  options, but you did read them correctly.

Page 48

1   Q   And do you know what happens if the voter

2   does not check one of these boxes?

3   A   So these boxes would serve a couple

4   purposes. One is as stated in the red box at the top,

5   the form is intended for active duty military and

6   their families who are absent from their voting

7   jurisdiction or US citizens outside the United States.

8       So if an individual submitting this form did

9   not check one of these five boxes, it would be

10  difficult for the local election office to determine

11  if this person is actually an individual who is

12  covered by Uniformed Overseas Citizens Absentee Voting

13  Act.

14  Q   So -- oh, sorry.

15  A   That's the primary reason for those boxes.

16  Q   So if an individual does not check one of

17  these boxes, they would have their application

18  rejected.

19      Is that correct?

20  A   I would say it depends on the state and what

21  their procedures are as to what to do with a Federal

22  Post Card Application. They may not reject it

Page 49

1   outright. They may put it on hold and contact the

2   voter or they could reject it outright and send a

3   notification to the voter. It depends on the state's

4   procedures.

5   Q   But if -- a voter does not fill out one of

6   these five boxes would not have their FPCA accepted.

7       Is that right?

8   A   I can't say what a state would accept or not

9   accept.

10  Q   But would you agree with me that certain

11  states would require the voter either resubmit the

12  form or provide additional information before

13  accepting the FPCA in the event the voter did not fill

14  out one of these five boxes?

15  A   I would agree with that statement, yes.

16  Q   And also in Section 1, we have fields for

17  last name, first name, and middle name as well as

18  previous names, birth date; is that correct?

19  A   Yes.

20  Q   And also in Section 1, there's a field for

21  social security numbers; is that right?

22  A   Yes.



J. Scott Wiedmann

July 29, 2022
Pages 50 to 53

Page 50

1    Q    And there is also a field for driver's
2  license or state ID numbers; is that right?
3    A    Yes.
4    Q    And so the fields with social security
5  numbers and driver's license or state ID number are on
6  the Federal Post Card Application?
7        Is that right?
8    A  Yes, they are.
9    Q    And you had stated before that the Federal
10  Post Card Application did not change as a result of
11  Senate Bill 1; correct?
12    A    That's correct.
13    Q    So the social security number field and
14  driver's license field existed on the Federal Post
15  Card Application independent of Senate Bill 1; is that
16  correct?
17    A    That's correct.
18    Q    Now, you had mentioned that you do updates
19  for the Federal Post Card Application every two years.
20  Was the social security number field and the driver's
21  license number field added in 2021 or did it
22  pre-exist?

Page 51

1    A    It pre-existed, to the best of my
2  recollection.
3    Q    So the social security number field and the
4  driver's license number field pre-existed on the
5  Federal Post Card Application prior to 2021; is that
6  right?
7    A    Yes.
8    Q    Do you know when they were added to the
9  form?
10    A    I cannot recall them not being on the form.
11    Q    And you've been working with the Federal
12  Voting Assistance Program since 1993; is that right?
13    A    Yes.
14    Q    And since 1993, you do not recall a Federal
15  Post Card Application that did not have a social
16  security number or a driver's license field; is that
17  right?
18    A    That is correct.
19    Q    In your experience, do applicants typically
20  fill in all the fields?
21    A    I do not receive these forms so I cannot
22  comment on what fields are filled out or not filled

Page 52

1  out.
2    Q    So you don't know what percentage of voters
3  would fill in a field for social security numbers or
4  driver's licenses; is that right?
5    A    That is correct.  I do not know.
6    Q    So you mentioned that these fields have been
7  on the form for quite some time.  Do you know why they
8  were put on the form?
9    A    So the form is to facilitate communications
10  between the voter and their election office so the
11  voter can provide information necessary so they can be
12  registered to vote and to have a ballot sent to them.
13  So if a state -- if states require these, that's why
14  they will be on there.
15    Q    And so the field on the Federal Post Card
16  Application for social security number and driver's
17  license number is to facilitate registration and
18  absentee ballot requests with the state; is that
19  right?
20    A    As part of the form as a whole, yes.
21    Q    And do you know what occurs if an individual
22  does not provide their birth date on the Federal Post

Page 53

1  Card Application?
2    A    I believe it will be something similar to
3  the other check boxes in that the state would, based
4  on the state rules, regulations, procedures, determine
5  whether or not the form could be accepted and/or they
6  would have to communicate with the voter for
7  subsequent information prior to accepting the form.
8    Q    So you would agree with me that if an
9  overseas or military voter did not provide a birth
10  date on a Federal Post Card Application, that some
11  states would require the voter to either resubmit the
12  form or, in some way, communicate the information to
13  the state; is that right, before accepting the
14  application?
15    A    My understanding is that it is a requirement
16  by the states, yes.
17    Q    And have you looked into how states require
18  a military or overseas voter to cure these types of
19  defects such as not providing a birth date on the
20  Federal Post Card Application?
21    A    We do not have -- we do not collect and/or
22  distribute information on the cure process for any



J. Scott Wiedmann

July 29, 2022
Pages 66 to 69

Page 66

1    A    My understanding is that upon receiving this
2  and it being approved, meeting the states' or
3  localities' requirements for voter registration, than,
4  yes, all subsequent elections for federal offices that
5  occur during that year, the absentee ballot will be
6  sent to the voter.
7    Q    So barring a mistake on the form, the voter
8  would only have to fill this out one time each
9  calendar year; is that right?
10    A    As long as that individual's situation has
11  not changed.
12    Q    That's a good clarification.  Thank you.
13       If we can go back to the first page.  You
14  see Section 2 where it says, What is your address in
15  the US state or territory were you're registering to
16  vote and requesting an absentee ballot.
17    A    Yes.
18    Q    Now, if a voter failed to fill out this
19  particular section, you will agree with me that the
20  state would require the voter to either resubmit their
21  Federal Post Card Application or provide additional
22  information before the application was accepted.

Page 67

1       Is that correct?
2    A    This would be part of the information
3  required by many states in order to correctly process
4  the form, yes.
5    Q    We can put this document to the side.
6       (Wiedmann Deposition Exhibit 4 marked for
7  identification.)
8       BY MS. HUNKER:
9    Q    This is Exhibit No. 4.  Do you have the
10  document in front of you?
11    A    Yes.
12    Q    And do you recognize this document?
13    A    It looks like it is a complete Federal
14  Write-In Absentee Ballot form.
15    Q    And I will represent to you that I took this
16  particular form from the website of the Federal Voting
17  Assistance Program.
18       Do you have any reason to doubt my
19  characterization of this document?
20    A    I do not.
21    Q    And so this acts as the backup ballot for
22  military and overseas voters; is that correct?

Page 68

1    A    Yes, it is one avenue.  It is one back up
2  that can be used, yes.
3    Q    Look where it says, You can vote wherever
4  you are.  This is how.
5       Do you see that?
6    A    Yes.
7    Q    One, Fill out your voter information page
8  completely and accurately.  The first bullet point
9  reads, Your US voting residence is used to determine
10  where you are eligible to vote absentee.  For military
11  voters, it is usually the last address in your state
12  of legal residence.  For overseas citizens, it is
13  usually the last place you lived before moving
14  overseas.  You do not need to have any current ties to
15  this address.  Do not write a post box in Section 2.
16       Did I read this correctly?
17    A    Yes.
18    Q    And you agree with me that providing a
19  voting residence address is required by many states
20  for the Federal Write-In Ballot to be accepted?
21    A    I do not know to what extent states would
22  verify all the information on this voter information

Page 69

1  sheet that's provided.
2    Q    And you see in the second bullet point, it
3  says, Most states allow you to provide a driver's
4  license number or the last four digits of your social
5  security number.  New Mexico, Tennessee, and Virginia
6  require a full social security number.
7       Did I read that correctly?
8    A    Yes.
9    Q    And so for those states, mainly New Mexico,
10  Tennessee, and Virginia, based on this document, a
11  voter would have to put on there their driver's
12  license number or their full social security number in
13  order to accurately fill out and have their Federal
14  Write-In Absentee Ballot accepted.
15       Is that correct?
16    A    I'm not sure if that's correct because there
17  are states as listed up above or that are not listed
18  up above that will accept this form as both the
19  registration form and the absentee ballot itself.
20       So I can't say for sure whether or not those
21  states would reject the ballot if the voter had
22  already gone through the registration process



J. Scott Wiedmann

Page 70

1  previously.

2      Q    Okay.  Would you agree with me that some
3  states require a driver's license number, state ID
4  number, or social security number in order to complete
5  the -- successfully complete the Federal Write-In
6  Absentee Ballot?

7      A    Again, I'm not sure what states, what
8  information on this form states would use to verify
9  the voter's identification before accepting the voter
10  ballot portion.

11      Q    And this document is prescribed in your
12  office; correct?

13      A    That is correct.

14      Q    And that is true also from the Federal Post
15  Card Application?

16      A    That is correct.

17      Q    And so if we turn to page 2, you will see
18  that it has a bunch of fields where the voter has to
19  fill out.

20          Is that correct?

21      A    Yes.

22      Q    And like with the FPCA, Section 1 provides a

Page 71

1  list of five check boxes that read, I am on active
2  duty in Uniformed Services or Merchant Marine, I am an
3  eligible spouse with dependent, I a US citizen living
4  outside the country and intend to return, I am a US
5  citizen living outside of the country and my intent to
6  return is uncertain, I am a US citizen living outside
7  the country.  I have never lived inside the United
8  States.

9          Did I read those correctly?

10      A    Yes.

11      Q    And do you know what happens if a voter does
12  not check one of these five boxes?

13      A    I am not 100 percent sure.  It may depend on
14  whether the voter is using this form for voter
15  registration versus just as a way of affirming who
16  they are upon reaching the ballot.

17      Q    Would you agree with me that in some states,
18  if a voter did not check one of these five boxes, that
19  the state would require the voter to either resubmit
20  the write-in ballot or provide additional information
21  before they would accept the Federal Write-In Absentee
22  Ballot?

Page 72

1      A    I can't necessarily agree with that because
2  I don't -- again, I don't know what states would
3  require for solely affirming the voter's identity to
4  accept the ballot versus in a state where this might
5  be used for registration.

6      Q    So what about the states that don't use it
7  as a voter registration form?  For those states, would
8  you agree with me that if a voter did not check one of
9  these boxes, that the state or states would require
10  the voter to either resubmit the Federal Write-In
11  Absentee Ballot or, in some way, provide the
12  additional information?

13      A    That may be the case.  I would agree that
14  may be the case.

15      Q    And if we look at Section 1, you will see a
16  bunch of different fields like last name; first name;
17  middle name; suffix; previous name, if applicable; and
18  birth date.

19          Is that correct?

20      A    Yes.

21      Q    And then we also have a field for social
22  security number and driver's license or state ID

Page 73

1  number; is that correct?

2      A    Yes.

3      Q    And I should specify these fields are
4  separate, so social security is one field, driver's
5  license or state ID is another field?

6      A    Yes.

7      Q    And you had mentioned that the Federal
8  Voting Assistance Program did not make changes to the
9  form, specifically the federal Write-In Absentee
10  Ballot in response to Senate Bill 1; correct?

11      A    That's correct.

12      Q    And so the fields that have social security
13  number and the field that has driver's license or
14  state ID number, is this form independent of the
15  requirements of Senate Bill 1; is that correct?

16      A    That's my understanding, yes.

17      Q    Were the fields for social security number
18  and driver's license or state ID on this form prior to
19  2021?

20      A    Yes.

21      Q    And is this also an example of you not
22  remembering the Federal Write-In Absentee Ballot not



J. Scott Wiedmann

July 29, 2022
Pages 74 to 77

Page 74

1  having a field for social security number and/or
2  driver's license and state ID?
3      A   I don't recall whether it was or was not on
4  there for my entire time there, but I don't recall
5  that.
6      Q   Okay.  To your recollection, did these
7  fields exist prior to 2021?
8      A   Yes.
9      Q   To your recollection, do you know how long
10  they would have been on this form?
11     A   I would say multiple election cycles.  I
12  don't remember exactly.
13     Q   So the fields for social security numbers
14  and driver's license or state ID have been on the
15  Federal Write-In Absentee Ballot for multiple election
16  cycles; is that right?
17     A   Yes.
18     Q   And you don't know what percentage of voters
19  provide either driver's license number or social
20  security number when filling out this form, do you?
21     A   We do not.
22     Q   Do you know if voters typically fill in all

Page 75

1  the fields available?
2          MS. YUN:  Objection.  Foundation.
3          BY MS. HUNKER:
4      Q   You can answer.
5      A   I do not know how complete the voters submit
6  -- complete the form before submission.
7      Q   Does the Federal Voting Assistance Program
8  recommend to voters that they fill out all the fields
9  on this form?
10     A   We recommend voters provide as much
11  information as possible to ensure the election office
12  has the information they need to process it and either
13  register or have the ballot count.
14     Q   Do you recommend that -- when I say you, I
15  mean the Federal Voting Assistance Program recommend
16  that voters put down their social security number or
17  their driver's license or state ID number?
18     A   Again, we would recommend that voters
19  provide whatever information they feel is necessary to
20  ensure that the state can process the form.  If a
21  voter has concern about providing those numbers
22  because of security or whatever other reasons, then we

Page 76

1  may tell them to check with the election official to
2  see whether or not it's required.
3      Q   And if we look to Section 4, it says, What
4  is your contact information.  This is so election
5  officials can reach you about your request.
6          Did I read that correctly?
7      A   Yes.
8      Q   And there are four fields.  The fields read:
9  Email, alternate email, phone, fax.
10         Did I read that correctly?
11     A   Yes.
12     Q   And this is in part so that election
13  officials can get in contact with the voters; is that
14  correct?
15     A   That would be one reason they would provide
16  the information.
17     Q   And what are the other reasons?
18     A   If they are requesting using this as a
19  registration form and providing the email so the voter
20  or the state can either send them a ballot by email or
21  through some sort of email with a link-type,
22  online-type service.

Page 77

1      Q   And do you recommend to voters that they put
2  their email or phone number?
3      A   We do.
4      Q   And you wouldn't happen to know what
5  percentage provide their phone or email?
6      A   I do not know.
7      Q   And then if we look to No. 6, it says, What
8  additional information must you provide.
9          Did I read that correctly?
10     A   Yes.
11     Q   And then there are a couple of sentences
12  following.  It reads, Alabama requires two witness
13  signatures; Alaska, Virginia, and Wisconsin require
14  one witness signature.
15         Did I read that line correctly?
16     A   Yes.
17     Q   And so I take from this that Alabama
18  requires two witnesses signatures in order for the
19  absentee ballot to be counted.
20         Is that correct?
21         MS. YUN:  Objection.  Foundation.
22         THE DEPONENT:  In our coordination with the



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX DD

Transcript of the Testimony of

**Lisa Wise**

**Date:**

April 13, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
 4        Plaintiffs,           )
                                )
 5   v.                         ) Civil Action No. SA-21-CV-
                                )            00844-XR
 6   GREGORY W. ABBOTT, et al., )
          Defendants.           )
 7

 8

 9         ----------------------------------------

10           ORAL AND VIDEOTAPED DEPOSITION OF
                       LISA WISE
11                  APRIL 13, 2022
                     Volume 1
12         ----------------------------------------

13

14

15              ORAL AND VIDEOTAPED DEPOSITION OF LISA

16   WISE  produced as a witness at the instance of Plaintiff,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on the 13th day of April, 2022 from 10:02

19   a.m. mountain time to 5:27 p.m. mountain time, before

20   Nancy Newhouse, a Certified Shorthand Reporter in and for

21   the State of Texas, reported by oral shorthand, located

22   at the 500 East San Antonio, Room 503, El Paso, Texas

23   79901, pursuant to the Federal Rules of Civil Procedure,

24   and the provisions stated on the record or attached

25   hereto.
```

Lisa Wise

April 13, 2022
Pages 138 to 141

Page 138

1    A.  Correct.
2    Q.  (BY MR. WHITE)  So apart from providing your
3   driver's license number or your social security number,
4   what other information is required on the form for
5   application by ballot by mail?
6         MS. SPECTOR:  Objection, vague.
7    A.  Depending on the election there may be a party
8   selection, if it's a primary; what qualifies you to vote
9   by mail, so obviously your date of birth is required; if
10  you're voting by mail because of disability, you need to
11  mark that; if you're voting by mail because you're going
12  to be out of the county during early voting on Election
13  Day you mark that and then give us an address outside
14  the county to mail the ballot, that's that on the
15  qualifications.
16        The other information is what elections
17  you want.  There is the annual option, which is, if you
18  qualify, you must be 65 or over or have marked disabled
19  on the application, and in that example we'll give you a
20  ballot for every election that your jurisdiction is
21  participating in, we'll send you one so you don't have
22  to keep sending in the application.  Or you can mark the
23  -- this, in this one for example you could mark Democrat
24  or Republican primary or any resulting runoff, the
25  election selection.

Page 139

1    Q.  (BY MR. WHITE)  What information on the
2   application for ballot by mail is used to identify the
3   voter requesting the ballot, apart from the driver's
4   license number or the partial social -- social security
5   number?
6         MS. SPECTOR:  Objection, vague.
7    A.  It's generally the name, address and date of
8   birth.
9    Q.  (BY MR. WHITE)  And is the name of registered
10  voters on that public file that you maintain?
11   A.  Yes.
12   Q.  And is the address on that public file?
13   A.  Yes.
14   Q.  And is the date of birth?
15   A.  We do not give date of birth out on the public
16  file.
17   Q.  And now after -- strike that.
18        Sin -- you maintain driver's license
19  numbers and partial social security numbers in your
20  voter registration file, is that correct?
21   A.  Yes.
22        MS. SPECTOR:  Objection --
23        THE WITNESS:  Sorry.
24        MS. SPECTOR:  -- vague.
25        It's okay.

Page 140

1    A.  Yes.
2    Q.  (BY MR. WHITE)  And when did you start
3   maintaining that information?
4         MS. SPECTOR:  Objection, calls for
5   speculation.
6    A.  Yeah.  I mean, well before I started.
7    Q.  (BY MR. WHITE)  Do you remember what the
8   requirement is to keep that information?
9         MS. SPECTOR:  Objection, vague, calls for
10  legal conclusion.
11   A.  I'm sorry, I don't understand the question.
12   Q.  (BY MR. WHITE)  Do you remember what law
13  required you to gather that information when voters
14  registered?
15        MS. SPECTOR:  Same objections.
16   A.  I -- I don't know the law offhand.  I know
17  that -- that right now that's required from the
18  registration form, and that we do ask for that, but no,
19  that was well before I lived here, probably even in the
20  state of Texas.
21   Q.  (BY MR. WHITE)  Does the identification
22  number, whether it's the driver's license, a
23  certificate, identification certificate or your social
24  security number, does that end up in the public file
25  that can be obtained on voters?

Page 141

1         MS. SPECTOR:  Objection, vague.
2    A.  It's in our system, but it's not run on the
3   voter file for the publically-released information.
4    Q.  (BY MR. WHITE)  So if I wrote in and asked for
5   all the voters registered in El Paso County, I wouldn't
6   get the driver's license number or the social security
7   number, correct?
8    A.  Correct.
9    Q.  And are the voter registration files regularly
10  requested from your office?
11        MS. SPECTOR:  Objection, vague.
12   A.  Regularly?  I -- I mean, we get -- we get
13  requests.  I don't know exactly how many we've had, but
14  I would say monthly at least.
15   Q.  (BY MR. WHITE)  Is it a big file?
16        MS. SPECTOR:  Objection, vague.
17   A.  It's large.
18   Q.  (BY MR. WHITE)  How many people are registered
19  in the -- in the system?
20   A.  About 495,000.
21   Q.  And do you know who's requesting those files?
22        MS. SPECTOR:  Objection, vague.
23   A.  We -- it's we get different people.  We've had
24  media that requests it, we have campaigns or candidates
25  that request it, we have the city clerks who are allowed

Lisa Wise                                                          April 13, 2022
                                                                  Pages 142 to 145

Page 142

1   by law to have a copy, so they'll take the list, and
2   that's -- that's about it.
3      Q.   (BY MR. WHITE)  So does adding an additional
4   requirement to the application for ballot by mail that's
5   not in that public file, would you admit that that makes
6   it more difficult for somebody to impersonate a
7   registered voter and request their ballot?
8           MS. SPECTOR:  Objection, calls for
9   speculation, vague.
10     A.   I mean, in my experience I have not seen an
11  impersonation on that form, but yes, I would say it
12  does.
13     Q.   (BY MR. WHITE)  And how would you know if
14  somebody was impersonating a registered voter and
15  requesting their ballot illegally?
16          MS. SPECTOR:  Object to form.
17     A.   I mean, generally, when we would get the
18  ballot, have it sent to that location, the address of
19  the registered voter.  If that person didn't ask it, we
20  -- we'll get calls and somebody might say -- we've had
21  this.
22          We have had this happen, where somebody
23  requested an annual ballot, maybe in January, and then
24  the ballot for the March election might come and they
25  may say I don't remember that I requested this, and so

Page 143

1   we'll show them the form and they did.
2           So I would assume we would be either
3   alerted to that, if a ballot was sent to an address that
4   someone did not request, and then once the ballot is
5   returned, if it is, the signature verification on that.
6      Q.   (BY MR. WHITE)  And do you have any history of
7   people complaining about receiving a ballot that they
8   didn't request?
9           MS. SPECTOR:  Objection, vague.
10     A.   Just those few examples where maybe they
11  forgot, but we have had people come down into our office
12  and actually review their application, and then they
13  will.  We've never had someone say no, that's absolutely
14  not my signature.  When they come in, they -- they've
15  all agreed yes, okay, I forgot that I sent this in, or I
16  didn't know that.
17          MR. JEFF WHITE:  It's been an hour in
18  this session.  Why don't we take a break here for a
19  little bit?
20          MS. SPECTOR:  Okay.
21          VIDEOGRAPHER:  We are off record at 2:15
22  p.m.
23          (Off the record.)
24          VIDEOGRAPHER:  We are back on record at
25  2:32 p.m.

Page 144

1      Q.   (BY MR. WHITE)  So Ms. Wise, I'm going to hand
2   you another document, I think this is now Exhibit 5.
3           (Defendant's Exhibit No. 5 was marked for
4   identification.)
5           (Sneeze.)
6           THE WITNESS:  Excuse me.
7           VIDEOGRAPHER:  Bless you.
8           THE WITNESS:  I'm sorry, I apologize.
9           MS. SPECTOR:  You're okay.
10     Q.   (BY MR. WHITE)  Have you had a chance to look
11  at it?
12          So Ms. Wise, can you --
13     A.   Yes.
14     Q.   -- read the title at the top of this page?
15     A.   "Voter Information Field Guide".
16     Q.   And can you read the bottom footer?
17     A.   The Exhibit 5 or the revised?
18     Q.   At the very bottom of Exhibit 5, can you read
19  what it has on the document?
20     A.   "Revised 02/09/2021".
21     Q.   Are you familiar with this document?
22     A.   Yes.
23     Q.   And what is your understanding of what this
24  is?
25     A.   This explains what the categories are in the

Page 145

1   voter -- in a -- in the voter registration system.
2      Q.   Does this show the information that the public
3   can obtain with a request to your office?
4           MS. SPECTOR:  Objection, vague.
5      A.   I believe so, with the exception of the birth
6   date.  There was a case, not 100 percent sure when, but
7   that's not, that's no longer included in our voter file
8   made available to the public.
9      Q.   (BY MR. WHITE)  So if I told you I pulled this
10  off your website, is this out of date?
11     A.   Probably.
12     Q.   Do you --
13     A.   I would have to double check.  I know that I
14  -- what I remember that we could give the year but not
15  the full DOB, if I remember correctly.
16     Q.   And you believe there is a case that made that
17  the requirement?
18     A.   I believe it was an AG opinion.  I don't
19  remember exactly about DOBs being public.
20     Q.   Do you remember about when that may have came
21  out?
22     A.   I don't, I'm sorry.
23     Q.   So we talked in detail about the application
24  for ballot by mail in the 2020 March primary.  So now I
25  want to move to the situation where you've actually sent

Lisa Wise                                          April 13, 2022
                                                   Pages 214 to 217

Page 214

1  them. I don't know if I would say that they were trying
2  to register, since they marked on there not citizen,
3  very few, I think I can think of three, so obviously we
4  sent them a rejection notification stating that they are
5  -- they marked non-citizen, we are not able to register,
6  as directed by law.
7      Q.  (BY MR. WHITE)  Have you ever identified
8  individuals that have successfully registered to vote,
9  and then later you found out that they were not
10 citizens?
11         MS. SPECTOR:  Object to form.
12     A.  Not that I can recall.
13     Q.  (BY MR. WHITE)  Have you ever received any
14 complaints about voters being paid to vote for a
15 particular candidate?
16         MS. SPECTOR:  Object to form.
17     A.  No.
18     Q.  (BY MR. WHITE)  Are you aware of any
19 allegations of that sort in El Paso County?
20     A.  No.
21     Q.  In El Paso County do you have any issues with
22 organizations that gather voter registration cards
23 providing invalid registrations?
24         MS. SPECTOR:  Objection, vague.
25         MS. PERALES:  I'm sorry, could you repeat

Page 215

1  the question?  I can't hear, because you're --
2         MR. JEFF WHITE:  Oh, I'm sorry.
3         MS. PERALES:  -- facing away from me, and
4  your voice is getting softer.
5         MR. JEFF WHITE:  Sorry. I will say it.
6      Q.  (BY MR. WHITE)  Are you aware of any
7  organizations that collect voter registration
8  information providing you with faulty information?
9         MS. SPECTOR:  Objection, vague.
10     A.  No.
11     Q.  (BY MR. WHITE)  Have you had any complaints in
12 El Paso County about individuals providing assistance to
13 voters but pressuring the voter to vote a certain way?
14         MS. SPECTOR:  Objection, vague, compound.
15     A.  We've had isolated incidences of someone
16 calling and say I -- I think I heard someone tell him
17 how to vote, or I was at the polling site and so and so
18 was telling their wife how to vote, those isolated
19 instance -- incidences, yes, but, you know, generally,
20 we would call the judge and ask them, did you -- did you
21 witness this, has this been an issue?  We haven't had
22 anything substantiated on that.  It's nothing that we've
23 had documentation on.
24     Q.  (BY MR. WHITE)  So in your opinion as
25 elections administrator, based on your experience, do

Page 216

1  you believe fraud occurs in elections in El Paso County?
2         MS. SPECTOR:  Object to form.
3      A.  In my experience in El Paso County and my
4  experience in -- in Douglas County in Nebraska, very
5  isolated incidents.
6      Q.  (BY MR. WHITE)  And do you -- strike that.
7         Do you think some voters in Texas think
8  that fraud occurs in elections?
9         MS. SPECTOR:  Object to form, calls for
10 speculation.
11     A.  I do.
12     Q.  (BY MR. WHITE)  Do you hear from those voters
13 about their concerns about fraud?
14         MS. SPECTOR:  Object to form.
15     A.  However, it seems that steps that we've
16 taken -- I mean, we used to get complaints about fraud
17 dealing with the machines, now we have paper-based
18 system, so that's -- you know, those are all -- have all
19 been basically handled.
20         So it -- it seems like we get kind of a
21 little pocket here of an issue and then it's --
22 hopefully, it's gets resolved by either being
23 transparent or meeting with them, having them come lodge
24 an accuracy test, explaining processes and then it's
25 generally dropped.

Page 217

1      Q.  (BY MR. WHITE)  So if citizens of Texas are
2  concerned about fraud, do you think it's a valid purpose
3  of the legislature to take steps to reduce that concern,
4  whether or not the fraud is actually happening or not?
5         MS. SPECTOR:  Object to form, calls for
6  legal conclusion, vague and calls for speculation.
7      A.  I believe to take necessary steps, reasonable
8  steps, yes.
9      Q.  (BY MR. WHITE)  If voters are concerned about
10 fraud, does that affect their confidence in the outcome
11 of elections?
12         MS. SPECTOR:  Object to form, calls for
13 speculation.
14     A.  Yes.
15     Q.  (BY MR. WHITE)  So if the legislature takes
16 steps that reduce their concern about fraud, would the
17 result be that they would have greater confidence in the
18 outcome of elections?
19         MS. SPECTOR:  Object to form, calls for
20 speculation.
21     A.  I think that's a pretty vague question.  I
22 think there's some steps that you -- that can be taken
23 for that, to reach that, however, I don't know if, you
24 know, voters also lose faith in the process if they
25 don't believe that their vote counts, or that they're

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| Defendants. | § | |

## STATE DEFENDANTS' BRIEF IN RESPONSE TO
## OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX EE

Transcript of the Testimony of

# Lisa Wise

## Date:

April 15, 2022

## Case:

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO ENTERO )
      et al.,                    )
 4         Plaintiffs,           )
                                 )
 5    v.                         ) Civil Action No. SA-21-CV-
                                 )        00844-XR
 6    GREGORY W. ABBOTT, et al., )
           Defendants.           )
 7

 8
                 ----------------------------------------
 9
                    ORAL AND VIDEOTAPED DEPOSITION OF
10                              LISA WISE
                            APRIL 15, 2022
11                            Volume 1

12               ----------------------------------------

13

15

16                    ORAL AND VIDEOTAPED DEPOSITION OF LISA

17    WISE  produced as a witness at the instance of Plaintiff,

18    and duly sworn, was taken in the above-styled and

19    numbered cause on the 14th day of April, 2022 from 9:06

20    a.m. to 5:05 p.m., before Nancy Newhouse, a Certified

21    Shorthand Reporter in and for the State of Texas,

22    reported by oral shorthand, located at the 500 East San

23    Antonio, Room 503, El Paso, Texas 79901, pursuant to the

24    Federal Rules of Civil Procedure, and the provisions

25    stated on the record or attached hereto.
```

Lisa Wise

April 15, 2022
Pages 34 to 37

Page 34

1    A.  I don't believe that we contacted our vendor.
2    We -- we can import that list into -- into our system
3    without, I believe, going through there, unless there's
4    fields that weren't created yet or something like that,
5    so I believe we did that internally.
6        Q.  (BY MS. PERALES)  And so when you import that
7    update into your system, would that have to be done
8    individually by voter, or could it come as a multiple-
9    voter input to you?
10            BY MS. SPECTOR:  Object to form.
11    A.  I believe as one -- one report, we would do
12    one action to import it.
13    Q.  (BY MS. PERALES)  Do you know if that update
14    information was provided to El Paso County in a way that
15    you could import it?
16            MS. SPECTOR:  Object to form.
17    A.  I believe so; how -- I -- however, I have to
18    say I'm not 100 percent sure.
19    Q.  (BY MS. PERALES)  So is it your best
20    understanding that El Paso County did, in fact, receive
21    and import that update from the Secretary of State?
22            MS. SPECTOR:  Object to form.
23    A.  Yes.
24    Q.  (BY MS. PERALES)  And it is -- is it also fair
25    to say that, after that update, you still had many

Page 35

1    voters for whom you were unable to match information
2    that they provided on their application for ballot by
3    mail, or mail ballot related to ID number?
4        MR. JEFFREY WHITE:  Objection, form.
5    A.  Yes.
6    Q.  (BY MS. PERALES)  Yesterday you mentioned that
7    when you had either an application for ballot by mail or
8    mail ballot with a number that you could not match, that
9    you would go into TEAM and see if there was an update on
10    that voter's ID number information, is that correct?
11    A.  We would go into the ballot tracker.  That was
12    the -- I'm sorry, if I said TEAM I meant ballot tracker.
13    Q.  Probably my mistake in note-taking.
14        So I want to walk you through those steps
15    from when you received the application for ballot by
16    mail or mail ballot.
17        So if you can think about that time
18    leading up to the March 2022 primary election, and your
19    office or one of your workers would receive an
20    application for ballot by mail, and there would be an ID
21    number written on there, that worker would then look up
22    the voter, is that how it would work?
23    A.  Correct.
24    Q.  That worker would be looking up the voter in
25    the El Paso County system, is that right?

Page 36

1    A.  Correct.
2    Q.  And if the worker saw, for example, no
3    driver's license or last four of the social for that
4    voter, what would the worker do with the application for
5    ballot by mail right in that moment?
6    A.  You would mark it as pending, and we would --
7    we would send them a notice, a notification, letting
8    them know that this information was missing, with a
9    clean application, eventually, with a voter registration
10    form, so if they wanted to match that up, and -- and
11    mail it back out.
12    Q.  Okay.  And would you do that immediately, or
13    would you put that application for ballot by mail or
14    mail ballot to the side, to wait a day or so to check
15    the ballot tracker and see if you could get updated
16    information that way?
17    A.  We were turning them around in about 24 to 48
18    hours; however, we still were tracking -- we were still
19    checking ballot tracker one by one on pending or
20    rejected, to see if those had -- had been updated.
21    Q.  Okay.  So when you were sending the voter the
22    notice that you -- you were unable to confirm the number
23    on their application for ballot by mail, for example,
24    would you enclose that original application for ballot
25    by mail in the mailing back to the voter, or would you

Page 37

1    hang onto the application for ballot by mail?
2    A.  We would hang on to that.  But the
3    notification also informed them how they could get on
4    ballot tracker.  So honestly, until we sent them that
5    notification, the voter real -- wasn't aware that they
6    -- their ballot -- ballot tracker existed.  So we would
7    keep it, we would send them a clean copy with the
8    notification and -- and how they could get on the ballot
9    tracker, if they wanted, or just send in a new
10    application.
11    Q.  So because you retained the applications for
12    ballot by mail, you were able then to both notify the
13    voter, but maybe also use that document to check in a
14    day or so against the ballot tracker, to see if the
15    information had been updated?
16    A.  Correct.
17    Q.  How many times would you check for, let's say,
18    one particular application for ballot by mail, was it
19    just after that couple of days later, then you would
20    just put it aside if you still couldn't match it?
21    A.  No.  We'd continue to check until we basically
22    had no more time to check.  We -- we asked for reports,
23    you know, or, I mean, we were kind of doing two things.
24    We were asking reports for the SOS, we were also trying
25    to get our vendor to work with that system, to give us

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

### STATE DEFENDANTS' BRIEF IN RESPONSE TO
### OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX FF

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                  SAN ANTONIO DIVISION

4   LA UNION DEL PUEBLO         )
    ENTERO, et al.,             )
5                               )
                Plaintiffs,     )
6                               )
    vs.                         )
7                               ) NO. 5:21-cv-844-XR
    GREGORY W. ABBOTT, et al.,  )
8                               )
                Defendants.
9   -----------------------------------

10         ORAL AND VIDEOTAPED DEPOSITION OF

11                     LISA WISE

12                  April 18, 2023

13                (REMOTELY REPORTED)

14   -----------------------------------

15      The Oral and Videotaped Deposition of LISA WISE,

16  produced as a witness at the instance of the defendant,

17  and duly sworn, was taken in the above-styled and

18  numbered cause on the 18th of April, 2023 from 9:13 a.m.

19  to 3:27 p.m., in and for the State of Texas, reported by

20  machine shorthand, conducted El Paso County Courthouse

21  500 E. San Antonio, 5th Floor, Suite 503 El Paso, Texas

22  79901, pursuant to the Federal Rules of Civil Procedure

23  and the provisions stated on the record or attached

24  hereto.

25



Lisa Wise

April 18, 2023
Pages 38 to 41

Page 38

1  Q. (BY MS. HUNKER)  That's a good question --
2  that's a good distinction.
3         So you receive applications for ballots by
4  mail weeks, if not months, in advance of an election,
5  correct?
6  A. Correct.
7  Q. Okay.  So let's talk then first about the ones
8  that are received well before the election -- before
9  the -- the ballots go out.
10        When does your office check to determine
11  whether or not the application for ballot by mail
12  satisfied the ID number requirement after it arrived?
13        MS. LEBEL:  Object to form.
14  A. Usually that day or the next business day.
15  Depending on, obviously, how many we have.
16  Q. (BY MS. HUNKER)  And how long from that does it
17  take to issue a notice of defect in the event that the
18  number did not match?
19        MS. LEBEL:  Object to form.
20  A. I would say 24 to 48 hours.
21  Q. (BY MS. HUNKER)  So is it fair to say that if
22  an application for ballot by mail arrives in your
23  office, a notice of defect will go out within 24 to 48
24  hours in the event that that application for ballot by
25  mail did not satisfy the ID number requirements?

Page 39

1         MS. LEBEL:  Object to form.
2  A. Yes.  Now, if we have a lot of them, I mean,
3  that's a separate issue.  I mean, it could be three
4  days, it could be 72 hours.  But in general, I would say
5  two days.  I would say 48 hours.
6  Q. (BY MS. HUNKER)  Is it fair to say that you try
7  to get the notice of defect out as fast as possible to
8  inform the voter of the need to cure?
9  A. Yes.
10  Q. And is that true for applications that arrive
11  closer to the election?
12        MS. LEBEL:  Object to form.
13  A. Yes.
14  Q. (BY MS. HUNKER)  And if an application for
15  ballot by mail arrives and it has a defect other than an
16  ID number related issue, how long does that take to go
17  out?
18        MS. LEBEL:  Object to form.
19  A. Same time.
20  Q. (BY MS. HUNKER)  And you are an offline county,
21  correct?
22  A. We're an offline county.
23  Q. So when an application for ballot by mail comes
24  in, your office first checks your offline county
25  database system to determine whether the ID number is in

Page 40

1  the system; is that correct?
2  A. Correct.
3  Q. And in the event the number is not in your
4  system, do you check the TEAMS database?
5  A. We do.
6  Q. So you mentioned that you send out an insert
7  for the applications for ballot by mail.  In the event
8  that there was a defect due to the numbers not appearing
9  in the system, do you also send out a voter registration
10  form with the notice of defect?
11  A. We do.
12  Q. And that is because a voter can update the ID
13  numbers for the voter registration file by submitting a
14  voter registration form; is that correct?
15  A. Correct.
16  Q. And did you notice that sending a voter
17  registration form along with the notice of defect helped
18  the voter cure?
19        MS. LEBEL:  Object to form.
20  A. Yes.
21  Q. (BY MS. HUNKER)  And so I want to talk now
22  about the ballot by mail.
23  A. Okay.
24  Q. Federal law requires that ballots by mail go
25  out 45 days to military and overseas voters before a

Page 41

1  federal election, correct?
2         MS. LEBEL:  Object to form.
3  A. Correct.
4  Q. (BY MS. HUNKER)  Did your office meet that
5  deadline this -- for the November 2022 General Election?
6  A. Yes.
7  Q. And when did the ballots go out for voters who
8  were not military or overseas?
9  A. They got out the next week.  Sometimes it's
10  four days later, sometimes it's five days later, but
11  they go within the next week following the military and
12  overseas.
13  Q. And when a ballot by mail comes in, does your
14  office remove the flap to check whether or not the ID
15  number was included on the carrier envelope?
16  A. Yes.
17  Q. And does your office check that number against
18  the system?
19        MS. LEBEL:  Object to form.
20        MS. HUNKER: Let me rephrase that.
21  Q. (BY MS. HUNKER)  Does your office check the ID
22  number on the carrier envelope to the voter's
23  registration file?
24  A. Yes.
25  Q. How does your office contact the voter to



Lisa Wise

April 18, 2023
Pages 86 to 89

Page 86

1 Administrator account?
2     A.  Yes.  It's El Paso County Elections.
3     Q.  Were any of the groups you spoke with -- you
4 know, you gave the example of rotary groups -- were any
5 of those in Spanish?
6     A.  None that I spoke to, no.
7     Q.  More broadly with your office, do you know if
8 there were any?
9     A.  I know that when we did the -- like, our voter
10 registration drives, both of -- we have Spanish speakers
11 at those, and I know that they did address that with
12 people that had questions and things like that.
13         So I know they were able to communicate if
14 somebody brought that question up in Spanish at those
15 locations, but -- those events.  But when I would speak
16 at events, no.
17     Q.  I think you said you did not have any paid
18 media in connection with the November 2022 General,
19 right?
20     A.  Correct.
21     Q.  Who developed the content of this outreach?
22 Let's take them one at a time.
23         So we'll start with, you know, what you're
24 going to say in an in-person town hall, you know, who
25 comes up with the content for that?

Page 87

1         MS. LEBEL:  Object to form.
2     A.  Generally I do.  When -- and it's basically
3 based off of the insert and things like that, which I
4 created in conjunction with our County Attorney's Office
5 to make sure there wasn't any issue with that.  And then
6 also, share that with the SOS, just to let them know
7 that we were doing that and -- so they knew that that
8 was something we were promoting.
9     Q.  (BY MR. STEWART)  Did the SOS, and I assume you
10 mean the Secretary of State --
11     A.  Yes, yes --
12     Q.  Yeah, just for the record.
13         Did the SOS have any feedback on the
14 insert?
15     A.  I think they supported that.  I mean, you know,
16 we had had those conversations that other counties were
17 also doing some inserts.  And that's kind of where we
18 got the idea, too.  So I believe they were in favor of
19 it.
20     Q.  Did you pattern your insert off another county?
21         MS. LEBEL:  Object to form.
22     A.  No, I don't think we did.  We may have picked
23 from a couple that we saw that we liked, but we really
24 drafted that on our own with our attorneys.
25     Q.  (BY MR. STEWART)  Did the SOS ask you to change

Page 88

1 anything on the insert?
2     A.  No.
3     Q.  And then for social media, were you also coming
4 up with the content for that?
5     A.  Yes.
6     Q.  Did you consult with the SOS on your voter
7 education efforts in any way beyond the insert?
8     A.  No.
9     Q.  Were you aware during the General Election
10 period of the voter education efforts conducted by the
11 Secretary of State?
12         MS. LEBEL:  Object to form.
13     A.  I'm aware that they had mentioned that that was
14 going to be a component.
15         But as far as voter education, we would
16 receive our advisories, but I did not -- I was not
17 seeing anything out in the -- I guess, in the public if
18 that's what you're asking.
19     Q.  (BY MR. STEWART)  Yeah.  Maybe I'll ask it more
20 crisply, you know.
21         Did you notice the presence of the
22 Secretary of State's voter education efforts during the
23 General Election?
24         MS. HUNKER:  Objection.  Form.
25         MS. LEBEL:  Object to form.

Page 89

1     A.  I remember a press release.  And that's --
2 that's what I remember.
3     Q.  (BY MR. STEWART)  Okay.  Did you receive any
4 feedback from voters regarding the voter education
5 efforts you undertook?
6     A.  Yes.  I mean, I know that they did appreciate
7 the insert, and we -- especially with the ballot, where
8 we would send the picture of what the envelope would
9 look like and highlight where they were supposed to
10 actually fill it in and send the screenshot.  I know
11 that people -- we did get positive feedback on that.
12     Q.  Did you hear from any voters who were
13 continuing to struggle with the ID number requirements
14 during the General Election?
15         MS. LEBEL:  Object to form.
16         MS. HUNKER:  Object to form.
17     A.  Yes, we did.
18     Q.  (BY MR. STEWART)  About how many?
19         MS. LEBEL:  Object to form.
20     A.  That's really tough to -- to give.  I didn't
21 keep -- I didn't keep track of that.  We would get some
22 calls, and I -- I don't know the number.
23     Q.  (BY MR. STEWART)  Was it primarily by phone?
24         MS. LEBEL:  Object to form.
25     A.  Primarily by phone.  We would -- we would get



Lisa Wise

April 18, 2023
Pages 90 to 93

Page 90

1 maybe something on an application, a little note like,
2 why do I have to fill this out, like, something like
3 that. But mostly phone.
4     Q. (BY MR. STEWART) Was most of that feedback
5 regarding the ID requirement?
6         MS. LEBEL: Object to form.
7         MS. HUNKER: Objection. Form.
8     A. Was the feedback about the ID requirement
9 regarding the ID?
10     Q. (BY MR. STEWART) Yeah. I guess that's -- let
11 me --
12     A. Sorry.
13     Q. -- strike that question and make -- make it
14 much clearer.
15         I guess I would say, what portion of the,
16 you know, overall feedback you received from voters
17 during the General Election period pertained to the ID
18 requirement?
19         MS. LEBEL: Object to form.
20         MS. HUNKER: Object to form.
21     A. It's hard for me to really quantify that,
22 honestly. Because, like I said, we really didn't
23 keep -- keep track of it in, like, how many calls we got
24 about the ID. But we did still spend a lot of time
25 explaining ID -- ID requirements to -- to voters that

Page 91

1 were on it to vote by mail.
2     Q. (BY MR. STEWART) Did you generate any topics
3 for future voter education based on what you were
4 hearing from voters?
5     A. So generally we do a pretty robust media
6 package for presidential years 'cause we always have
7 something that comes up.
8         For example, in 2024 -- I'm sorry. In
9 2020, we had the pandemic. So in 2024, we will, again,
10 do a media package, and one of the components will be
11 the identifier. We will really try to replace some of
12 that pandemic language with the -- the identifier, the
13 changes, and, frankly, any major changes that come out
14 of this legislative session.
15         So we -- we try to do that because we have
16 a lot of voters who do only vote every four years, and
17 we like to -- you know, we don't have an endless budget,
18 so we kind of put that all in -- what we can in the
19 presidential years.
20     Q. I -- I believe you've already said, correct me
21 if I'm wrong, that at some point, your office began
22 advising voters to put both their driver's license or ID
23 number and their Social Security number on mail ballot
24 materials; is that correct?
25     A. Correct.

Page 92

1     Q. That did not begin during the General --
2 right -- that predated the General?
3     A. That predated the General.
4     Q. Why did you continue to give that advice?
5     A. We had done that about -- we didn't do it
6 initially in March until we started to see these -- you
7 know, these rejection rates and these -- coming back, so
8 then we started to include it, I would say about,
9 halfway through the actual process in -- for the March
10 election.
11         So basically we just said, look, let's --
12 let's not wait for an application to be rejected, let's
13 just give them all this information at the very
14 beginning. So we -- if somebody asked us for, you know,
15 an application, then with the application we would send
16 them that information.
17         Now, people can also get an application on
18 our website or they could get it from a party. You
19 know, there might be other entities that send out the
20 application. We can't control that they didn't have the
21 insert or any of that information in there, and so we
22 may still receive applications that were not -- that
23 didn't comply with that requirement.
24     Q. Were there any ways besides the insert that you
25 transmitted that message to voters?

Page 93

1         MS. LEBEL: Object to form.
2         MS. HUNKER: Object to form.
3     A. The social media, the -- you know, what we did
4 with interviews. Anything we could, we would try to get
5 that information out. But frankly, you know, the best
6 bang for the buck was with the application because they
7 were, we know, going to fill that out, and it was there
8 included in the packet.
9         MR. STEWART: I want to use -- I think
10 we're on number 5?
11         THE REPORTER: Yes.
12     Q. (BY MR. STEWART) And I don't want to rush you
13 reading it, but, in general, do you recognize this
14 document?
15     A. Yes.
16     Q. And what is this?
17     A. This is our application for ballot by mail.
18     Q. And your office uses the standard ABBM prepared
19 by the Secretary of State, correct?
20     A. We do.
21     Q. And you would agree that the portion that
22 implements the ID number requirement is below the
23 bold -- or the capital letters, rather, you must provide
24 one and then lower case of the following numbers?
25     A. Yes.



Lisa Wise

April 18, 2023
Pages 118 to 121

Page 118

1          Let me put it this way; during the
2  November 2022 General Election cycle, did El Paso County
3  do any investigation of whether the ID numbers, so
4  driver's license, SSN, and ID number, contained in VOTEC
5  are accurate?
6          MS. LEBEL:  Object to form.
7          MS. HUNKER:  Object to form.
8      A.  So, like, specifically check if, like, my
9  driver's license matches what the DPS gave the State?
10     Q.  (BY MR. STEWART)  Yes.
11     A.  No.
12     Q.  Did you conduct any investigation like that for
13  El Paso County voters located in TEAM?
14     A.  No.
15     Q.  Earlier today, I believe counsel asked you
16  whether the November 2022 General Election was
17  successful in El Paso County, specifically as it relates
18  to mail balloting; is that right?
19     A.  Yes.
20     Q.  And you said it was successful, right?
21     A.  Yes.
22     Q.  How do you define success in this circumstance?
23     A.  So -- it -- when I would look at success, I
24  mean, that kind of a question I asked, is that I
25  would say, you know, were we have -- was there anything

Page 119

1  that violated the code?  Was there anything that stood
2  out that was obviously we'd done something wrong and
3  that kept voters from voting?  You know, those kinds of
4  things is how I guess I would deem that.
5      Q.  So were you answering it from the standpoint of
6  the El Paso County Election Administration's
7  administration of the election?
8      A.  Yes.
9      Q.  Do you believe there were areas for
10  improvement?
11     A.  Yes.
12     Q.  What were those?
13     A.  There's always things I know that we can do
14  better.  I think that in -- with regards to -- we did
15  have to send out a corrected ballot.  I know we
16  mentioned that earlier.  We -- I believe there's things
17  we could be quicker on.  I mean, I know sometimes we get
18  stuff out in 48 hours.  With the sheer volume, sometimes
19  we can't get stuff out in 24 hours.  I'd love to have
20  our staff trained even better, having more knowledge on
21  the Election Code.
22          So there's always a couple of things I'd
23  love to see us do a little bit differently.  Have more
24  money.  I'd love to do a media package every election,
25  every general election.  Those are our wish list, so --

Page 120

1      Q.  So when you say that the election was
2  successful, was that making any comment on, you know,
3  whether the mail ballots rejection rate was acceptable?
4          MS. HUNKER:  Object to form.
5          MS. LEBEL:  Object to form.
6      A.  I don't think so.  I think it's just, to me,
7  did we do the best we could with what we had?  And
8  that's, I guess, how I kind of looked at it.
9      Q.  (BY MR. STEWART)  And I think you also
10  testified earlier that you weren't aware of any voters
11  who were unable to vote because of SB1; is that right?
12     A.  Correct.
13     Q.  That doesn't include voters having their mail
14  ballots rejected because of the identification number
15  requirement, correct?
16     A.  Correct.
17     Q.  How did you understand -- so, let me strike
18  that.
19          What did you include in not able to vote
20  then when you were asked that question?
21     A.  I'm sorry?
22     Q.  Sure.
23          When counsel asked you, you know, were any
24  voters unable to vote, how did you determine whether
25  someone was unable to vote?

Page 121

1      A.  You know, I guess a final rejection on a
2  ballot, that if they had sent that and they weren't able
3  to cure in time, if we didn't get in touch with them.
4  We did hear from a few voters where we sent their ballot
5  back to be cured, and they thought it was just a second
6  ballot, and so they didn't open it.  I do remember two
7  voters specifically that called our office that said, I
8  tossed that ballot because I thought that was a second
9  ballot and you just sent me another ballot.
10          And so, I mean, those -- obviously those
11  voters didn't vote, and they thought they had voted
12  because they did not take the -- they did not open up
13  the notice of defect.  So those, you know, little kind
14  of pockets out there.
15     Q.  So those are people you would characterize as
16  unable to vote in the past election?
17     A.  Well, they thought they did, and they didn't.
18  So --
19     Q.  Sure.
20          MR. STEWART:  Can we go off the record for
21  two minutes?
22          MS. LEBEL:  Yup.
23          THE VIDEOGRAPHER:  The time is 1:36 p.m.
24  And we're off the record.
25          (A recess was taken.)



Lisa Wise                                                    April 18, 2023
                                                          Pages 174 to 177

Page 174

1   Q.  Did any nonprofit group contact your office
2  about concerns over the voting assistance oath?
3        MS. LEBEL:  Object to form.
4   A.  I don't believe so.
5   Q.  (BY MS. HUNKER)  Do you recall talking to
6  counsel about a person in your staff who handled notices
7  of defects?
8   A.  Yes.
9        MS. LEBEL:  Object to form and to the
10 extent this is concerning any communications with your
11 attorneys on the basis of privilege.  You said talked to
12 counsel.
13       MS. HUNKER:  Oh, so let me clarify.
14   Q.  (BY MS. HUNKER)  Do you recall during this
15 deposition opposing counsel asking you about a person in
16 your office who handled notices of defects?
17   A.  Yes.
18   Q.  Did that person handle notifying voters who had
19 detects other than the ID requirement -- the ID number
20 requirement?
21   A.  Yes.
22   Q.  Would it be fair to say that she handled
23 implementing the cure provisions in Senate Bill 1?
24       MS. LEBEL:  Object to form.
25   A.  Yes.

Page 175

1   Q.  (BY MS. HUNKER)  Do you recall earlier in the
2  deposition opposing counsel asking whether you thought
3  the number of voters who had their ballot rejected due
4  to missing or mismatched ID numbers would ever be zero?
5   A.  Yes.
6   Q.  Do you believe that the number of voters who
7  had their ballot rejected due to missing or mismatched
8  signature will ever be zero?
9        MS. LEBEL:  Object to form.
10   A.  No.
11   Q.  (BY MS. HUNKER)  And so I want to clarify a
12 question that I had asked earlier based on the opposing
13 counsel's subsequent question.
14       To the best of your knowledge, you're not
15 aware of any voters who were unable to vote in-person in
16 El Paso County during the November 2022 General Election
17 because of SB1 or any of its provisions, correct?
18       MS. LEBEL:  Object to form.
19   A.  Not that I know of.
20   Q.  (BY MS. HUNKER)  Do you recall discussing the
21 Secretary of State's voter education program with
22 counsel -- opposing counsel earlier in this deposition?
23   A.  Yes.
24   Q.  And do you recall stating that you had not seen
25 the Secretary of State's voter education materials; is

Page 176

1  that correct?
2   A.  I've seen a press release, I believe -- that I
3  remember seeing.  And we received documents informing us
4  as election administrators, but I do not remember seeing
5  anything for a voter besides the press release.
6   Q.  Were you specifically looking for the Secretary
7  of State's voting education material?
8   A.  No.
9   Q.  And when you were saying that you were
10 receiving notifications from the Secretary of State's
11 Office, can you maybe describe in a little bit more
12 detail what was in those communications?
13   A.  Sure.
14       We would receive, like, copies of the press
15 release, you know, Secretary of State announces, changes
16 via SB1, updated poll watcher training, those things.
17 We would get those notifications in our -- to our email.
18   Q.  Did you use any of the Secretary of State's
19 voting education materials in your own voter education
20 outreach?
21   A.  I don't believe so.
22       MS. HUNKER:  No further questions.
23       MS. LEBEL:  Can we take 5 to 10 minutes off
24 the record?
25       THE VIDEOGRAPHER:  The time is 3:16 p.m.,

Page 177

1  and we're off the record.
2        (A recess was taken.)
3        THE VIDEOGRAPHER:  The time is 3:36 p.m.
4  We're back on the record.
5        MS. LEBEL:  I don't have any questions.  So
6  the witness is ready to review and sign.
7        MS. HUNKER:  Just before we do, does the
8  intervenor defendants have any questions they want to
9  ask?
10       MR. CORE:  We have no questions.  Thank
11 you.
12       MR. STEWART:  I have no further questions.
13       MS. PERALES:  No questions here.
14       MS. HUNKER:  All right.
15       THE VIDEOGRAPHER:  This concludes the
16 deposition.  Time is 3:27 p.m.  We are now off the
17 record.
18       (The deposition concluded.)
19
20
21
22
23
24
25



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,            §
     *Plaintiffs,*                                             §
                                                               §
*v.*                                                                 §    Case No. 5:21-cv-844-XR
                                                               §
GREGORY W. ABBOTT, et al.,                         §
     *Defendants.*                                           §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX GG



Uice Chair, Natural Resources
and Economic Development
Texas Judicial Council
Chair, Eagle Ford Shale
Legislative Caucus

Judith Zaffirini
State Senator, District 21
President Pro Tempore, 1997

Committees
Administration
Business and Commerce
State Affairs

December 3, 2018

The Honorable
Bryan Hughes, Chair
Senate Select Committee
    on Election Security
P.O. Box 12068
Austin, TX 78711



EXHIBIT
34

Dear Chair Hughes:

Thank you for your leadership as Chair of the Senate Select Committee on Election
Security. It is my privilege to serve with you, and I appreciate the opportunity to
share my perspective regarding the Committee's Interim Report to the 86th
Legislature. The report includes numerous good recommendations, and I am
delighted to sign it. This letter, however, is to record my concerns regarding the
need to (1.) provide concrete recommendations to address mail-in ballot fraud and
(2.) reflect that Texas lags behind much of the nation in modernizing and
simplifying the registration process, which is critical in offering adequate
opportunities for all Texans to register to vote.

During the last several sessions many legislators have focused on voter ID laws
intended to prevent in-person voter fraud, but not on the increasingly serious
problem of mail-in ballot fraud. Our Committee heard troubling testimony
regarding the state of election security related to the latter. The report's
recommendation that the Legislature needs to find a solution to the "vexing issue"
of mail-in ballot fraud at nursing homes and assisted living facilities is a good start,
but we must take all possible steps to address voting irregularities caused by
fraudulent mail-in ballots.

The report also states that current federal and state laws governing Texas' voter
registration system "create a broad base of opportunity for registration for all
Texans" and describes how eligible persons may register to vote. It does not
mention, however, that we have not adopted secure voter registration reforms that

many other states have. Texas, for example, is one of only thirteen states that does not offer online registration. The Legislature should consider this and other secure methods to facilitate voter registration.

Thank you for your dedication to the many important issues we examined during the 85th Interim. I look forward to continuing to work with you and other members of the committee during our next legislative session.

May God bless you.

Very truly yours,

Judith Zaffirini

Judith Zaffirini

Z/ah

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,　　§
　　　　*Plaintiffs,*　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
*v.*　　　　　　　　　　　　　　　　§　　Case No. 5:21-cv-844-XR
　　　　　　　　　　　　　　　　　　§
GREGORY W. ABBOTT, et al.,　　　　　§
　　　　*Defendants.*　　　　　　　　　§

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX HH

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al.,
*Plaintiffs,*

v.

GREGORY W. ABBOTT, et al.,
*Defendants.*

5:21-cv-844-XR

**DECLARATION OF CHRISTINA WORRELL ADKINS SUPPORTING
DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

1.  My name is Christina Worrell Adkins. I am over 18 years old and competent to make this declaration. I currently serve as the Director of the Elections Division at the Texas Secretary of State's Office and have been in this position since March 10, 2023 (initially as the Acting Director until April 26, 2023). Prior to becoming Elections Director, I served as Legal Director of the Elections Division, and I have worked at the Secretary of State's Office since 2012.

2.  The Texas Secretary of State is the chief election officer for Texas. As the State's chief election officer, the Secretary, through the Elections Division, prepares and distributes guidance to appropriate state and local authorities in the administration of elections in Texas and provides certain administrative support.

3.  In accordance with the Texas Election Code, the Secretary of State's Elections Division assists and advises election authorities on the application, operation, and interpretation of the Election Code and other election laws. The Secretary of State also is directed to obtain and maintain uniformity in the application, operation, and interpretation of the Election Code and other election laws. Our office discharges these obligations through, among other things, election advisories, handbooks and manuals, training presentations, and email correspondence to election authorities (including mass emails to election officials across the State). In this respect, the Secretary of State serves an advice-and-assistance role; ultimately, election officials—in consultation with their own counsel—must determine whether and how their actions comply with the Election Code.

4.  In its 88th Regular Session, the Texas Legislature passed several bills involving provisions at issue in this litigation, including changes related to the procedures for applications for

ballot by mail (ABBMs), mail ballots, and in-person voting for individuals with disabilities. Among other benefits, these changes should help improve the accessibility and effectiveness of the corrective action process, which allows voters to cure various defects in their ABBMs and mail ballots.

5.  Senate Bill 1599 adopts multiple changes to the procedures for reviewing and correcting ABBMs and mail ballots. The bill creates a comprehensive corrective action process for voters to correct defects in their ABBMs, including allowing voters to utilize the Secretary of State's Ballot by Mail Tracker to complete certain corrective actions that are not available under existing law. The bill provides additional time, on a uniform basis, for early voting ballot boards (EVBBs) to meet to initiate the corrective action process sooner, thus allowing voters more time to correct defects in their mail ballots. Senate Bill 1599 simplifies the authentication provisions for accessing the Ballot by Mail Tracker by removing the requirement that a voter enter their voter registration address to utilize the tracker; a voter will now be required to enter their date of birth (in addition to the existing requirements of the voter's name, last four digits of social security number, and driver's license number or personal identification card number). The bill also changes the materials that an EVBB or signature verification committee (SVC) sends to a voter who submits a defective carrier envelope; as a result of Senate Bill 1599, voters would be mailed—and be authorized to return to the EVBB or SVC—a form to complete the corrective action process (rather than having to send the defective carrier itself) in addition to being able to utilize the Ballot by Mail Tracker or cancel their ABBM to correct the defect.

6.  House Bill 357, similar to Senate Bill 1599, amends the authentication requirements for voters to access the Ballot by Mail Tracker. The bill removes the requirement that a voter enter their registration address to enter the system. Instead, a voter would enter their date of birth and other identifying information specified in paragraph 5 above.

7.  House Bill 315 requires the Secretary of State to add a statement to the officially prescribed ABBM explaining the benefits of furnishing a telephone number on the ABBM, including how that information assists the early voting clerk. Pursuant to other provisions of the Texas Election Code, there are circumstances in which election officials may notify a voter by telephone of defects in their ABBM or mail ballot. Accordingly, in certain instances, by including their telephone number on an ABBM, a voter may be able to receive more timely notice of a defect in their balloting materials and resolve that defect prior to the specified deadlines. House Bill 315 will result in additional information being provided directly to voters regarding the State's mail ballot procedures and will allow the Secretary of State to highlight the importance of including a telephone number on balloting materials.

8.  Senate Bill 975 codifies existing processes regarding the issuance of a personal identification certificate to a person who surrenders their driver's license.  The bill directs

the Department of Public Safety to notify such persons that their voter registration information will need to be updated to include the identification number of the newly issued certificate and provided an opportunity to update their voter registration information at the time of applying for the certificate to include the new identification number.

9.  Senate Bill 477 requires each polling place to have an area for parking not smaller than the size of one parking space reserved for curbside voting under Section 64.009 of the Texas Election Code. The bill directs election officials to clearly mark the area with a sign indicating that the space is reserved for voters who are unable to enter the polling place and displaying a telephone number that voters can use to request assistance from election officers at the polling place (or providing a button or intercom that the voter may use to request assistance from an election officer).

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 23 2023.

Christina Worrell Adkins