UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br><br> *Defendants.* | 5:21-cv-844-XR |
| LULAC TEXAS, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> JANE NELSON, et al., <br><br> *Defendants.* | 1:21-cv-0786-XR |

**LULAC PLAINTIFFS' SUPPLEMENTAL BRIEF ON ORGANIZATIONAL STANDING**

## TABLE OF CONTENTS

Table of Authorities..................................................................................................................... ii

Introduction.................................................................................................................................. 1

Argument ..................................................................................................................................... 2

    I.    *Alliance for Hippocratic Medicine* reaffirms existing requirements for organizational standing under *Havens Realty* and Fifth Circuit precedent............. 2

    II.    LULAC Plaintiffs have standing under *Alliance for Hippocratic Medicine*. ......... 5

        A.    LULAC has organizational standing. .......................................................... 5

        B.    AFT has organizational standing. ................................................................ 7

        C.    TARA has organizational standing. ............................................................. 9

    III.    Voto Latino has organizational standing. ............................................................. 11

Conclusion ................................................................................................................................. 13

Certificate of Service ................................................................................................................. 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
  78 F.4th 210 (5th Cir. 2023) ...................................................................................................4

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ...............................................................................................................6

*El Paso Cnty. v. Trump*,
  982 F.3d 332 (5th Cir. 2020) ...................................................................................................3

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ......................................................................................................*passim*

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ...............................................................................................................3

*Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*,
  82 F.4th 345 (5th Cir. 2023) ................................................................................................3, 4

*McAllen Grace Brethren Church v. Salazar*,
  764 F.3d 465 (5th Cir. 2014) ...................................................................................................4

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ...................................................................................................4

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ...............................................................................................................4

*Vote.org v. Callanen*,
  89 F.4th 459 (5th Cir. 2023) ...................................................................................................3

**INTRODUCTION**

Plaintiffs LULAC Texas ("LULAC"), Texas Alliance for Retired Americans ("TARA"), Texas AFT ("AFT"), and Voto Latino (collectively "LULAC Plaintiffs") file this supplemental brief in response to the Court's June 17, 2024, order. *See* ECF No. 1136. The Court's order asks two questions: (1) Whether, in view of the Supreme Court's decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, any organizational plaintiff "intends to waive its arguments as to organizational standing and rely exclusively on associational standing," and (2) whether—as relevant to the LULAC Plaintiffs—Voto Latino has shown that the challenged provisions of SB 1 have "directly affected and interfered with [its] core organizational activities, apart from any diversion of resources." *Id.* (quotations omitted).[1]

Taking those questions in turn, (1) none of the LULAC Plaintiffs intend to waive any argument as to their organizational standing, as *Alliance for Hippocratic Medicine* confirms they have each readily met the bar for such standing; and (2) Voto Latino has shown that SB 1 has directly affected and interfered with its core activities, apart from its diversion of resources. The LULAC Plaintiffs' response first sets forth the relevant organizational standing principles identified in *Alliance for Hippocratic Medicine*, which reaffirms existing Supreme Court and Fifth Circuit precedent explaining that an organizational plaintiff has standing when a challenged law perceptibly impairs its operations. *See infra* Part I. Next, LULAC Plaintiffs explain how LULAC,

---

[1] LULAC Plaintiffs have challenged SB 1 Sections 3.04, 3.09, 3.10, 3.12, 3.13, 4.12, 5.02, 5.03, 5.07, 5.08, and 7.04. These provisions are referred to herein as the "Challenged Provisions." In this first phase of trial, however, LULAC Plaintiffs have only challenged SB 1's mail ballot identification requirements and procedures for returning mail ballots in person (Sections 4.12, 5.02, 5.03, 5.07, and 5.08), as well as restrictions on in-person voter interactions (Section 7.04). *See* ECF No. 700; FOF-COL ¶ 111 n.4. LULAC Plaintiffs' challenges to SB 1's restrictions on drive-thru voting and extended-hour voting (Sections 3.04, 3.09, 3.10, 3.12, 3.13), under Section 2 of the Voting Rights Act, will be considered alongside other parties' discriminatory intent claims during phase two.

1

AFT, and TARA have demonstrated organizational standing, in addition to their associational standing, focusing specifically on how the Challenged Provisions perceptibly impair their core activities. *See infra* Part II. Finally, LULAC Plaintiffs explain how Voto Latino has established organizational standing for the same reason—the Challenged Provisions perceptibly impair Voto Latino's voter-related activities meant to achieve its mission of empowering the Latino community in Texas. *See infra* Part III.

## ARGUMENT

**I.** *Alliance for Hippocratic Medicine* **reaffirms existing requirements for organizational standing under** *Havens Realty* **and Fifth Circuit precedent.**

In *Alliance for Hippocratic Medicine*, a unanimous Supreme Court reaffirmed "well-known" "fundamentals of standing." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). To establish standing, a plaintiff must demonstrate (1) the existence of an injury-in-fact that is concrete and particularized, actual or imminent, and not speculative, *id.* at 380–81; (2) "that the injury likely was caused or will be caused by the defendant," *id.* at 380; and (3) "that the injury likely would be redressed by the requested judicial relief," *id.* The purpose of this test is to "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.

In *Alliance for Hippocratic Medicine*, the Supreme Court found that medical associations with "moral . . . objections to elective abortion and to FDA's relaxed regulation" of an abortion drug lacked organizational standing. *Id.* at 396. The medical associations lacked organizational standing because the FDA's actions did not "perceptibly impair[] [their] ability" to conduct any of their core activities. *Id.* at 395. Although the medical associations argued that they had "incurr[ed] costs to oppose FDA's actions" by "conduct[ing] their own studies on mifepristone" to "better inform their members and the public about mifepristone's risks," and "drafting citizen petitions to

2

[the] FDA, as well as engaging in public advocacy and public education" in opposition to the use of mifepristone, *id.* at 394, the Court reaffirmed its longstanding command that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," *id.*; *see also Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) ("*LaFHAC*") (explaining that "an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct" (citing *El Paso Cnty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020)).

In effect, the medical associations were mere bystanders, with an interest, but not a stake, in the FDA's actions. In contrast, the Supreme Court was careful to reaffirm that "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *All. for Hippocratic Med.*, 602 U.S. at 382. It further emphasized that *Havens Realty* remains good law, reinforcing that to have standing under that precedent, an organization must show that the challenged practice "perceptibly impair[s]" the organization's ability to carry out its core activities—be that providing services for housing counseling (as in *Havens*) or engaging with and turning out voters in Texas (as here). *Id.* at 395 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Thus, the touchstone inquiry for organizational standing remains whether a challenged policy "perceptibly impair[s]," or "affect[s] and interfere[s]" with, an organization's work, activities, or operations. *Id.* Such an "impediment" to an organization's ability to carry out its work is an actionable injury. *Id.*

The Supreme Court's decision is also consistent with Fifth Circuit precedent, which similarly recognizes that an organization suffers an injury-in-fact when a challenged law or policy impedes or impairs the organization's work. *See, e.g.*, *Vote.org v. Callanen*, 89 F.4th 459, 470 (5th

3

Cir. 2023) ("An organization suffers an injury in fact if a defendant's actions perceptibly impair the organization's activities and consequently drain the organization's resources." (cleaned up)); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610–12 (5th Cir. 2017) ("Texas statutes at issue 'perceptibly impaired' OCA's ability to 'get out the vote' among its members").[2] In fact, just last year, the Fifth Circuit emphasized that "perceptible impairment to an organization's ability to carry out its mission, not the drain on the organization's resources, is the concrete and demonstrable injury for organizational standing." *LaFHAC*, 82 F.4th at 353 (cleaned up). The Fifth Circuit has likewise echoed the point that simply spending "resources" on a "core mission activity" does not suffice to establish standing absent an organization showing the challenged conduct "perceptibly impaired its mission." *Id.* at 354. Therefore, *Alliance for Hippocratic Medicine* at most clarifies, but does not fundamentally alter, longstanding circuit precedent.[3]

With those principles in hand, LULAC Plaintiffs explain why each plaintiff has organizational standing, and why LULAC, AFT, and TARA also have associational standing.

---

[2] The Fifth Circuit's underlying decision that was reversed by the Supreme Court in *Alliance for Hippocratic Medicine* declined to consider whether the plaintiffs had organizational standing. *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 240 (5th Cir. 2023) ("Because we hold that the Medical Organizations and Doctors have associational standing, we need not consider whether they also have organizational or third-party standing.").

[3] It also remains true that only one plaintiff needs to establish standing for the Court to grant injunctive relief. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit.").

## II. LULAC Plaintiffs have standing under *Alliance for Hippocratic Medicine*.

### A. LULAC has organizational standing.

LULAC's mission is "to improve the lives of Latino families throughout the United States," including in Texas, and to protect the civil rights of all Latinos. LULAC Pls.' Proposed Findings of Fact and Conclusions of Law, ECF No. 849 ("FOF-COL") ¶ 146 (quoting Tr. at 1633:10–18). The right to vote is "crucial" to this mission because when Latinos are "allowed to vote, they are able to choose candidates of their choice" who "will stand and work on issues that are important to them." FOF-COL ¶ 147 (quoting Tr. at 1645:4–15). LULAC pursues its mission through civic engagement activities—such as voter registration, get-out-the-vote, and voter assistance programs that it conducts every year, FOF-COL ¶ 150—and through initiatives focused on education, healthcare, immigration and refugee assistance, and community crisis response, FOF-COL ¶ 148. These initiatives, and particularly LULAC's civic engagement programs, are "core . . . activities" central to LULAC's mission to protect the civil rights of Latinos. *See All. for Hippocratic Med.*, 602 U.S. at 395. At trial, when asked why these initiatives are important to the organization, LULAC's National President Domingo Garcia explained that LULAC's efforts go to "the core" of LULAC's mission by working to ensure that Latinos are fairly "treated just like all Americans" in politics, the economy, and education. Tr. at 1642:4–10. Each of the Challenged Provisions interferes with these core activities and, as a result, impair LULAC's ability to pursue its mission. *See All. for Hippocratic Med.*, 602 U.S. at 395.

First, Section 7.04 directly regulates and chills LULAC's speech—specifically around voter registration, voter assistance, and get-out-the-vote ("GOTV") efforts. FOF-COL ¶¶ 140–41. By restricting when and how LULAC may communicate with voters, and deterring the

5

organization and its volunteers from engaging in get-out-the-vote programming, Section 7.04 interferes with LULAC's core activities. *See* FOF-COL ¶¶ 159–60.[4]

Second, SB 1's mail voting provisions (Sections 4.12, 5.02, 5.03, 5.07, and 5.08) have also perceptibly impaired LULAC's voter mobilization and GOTV efforts by making it more difficult for Latino voters, including LULAC members and constituents, to have their mail ballots counted. FOF-COL ¶ 153; *see also* FOF-COL ¶¶ 70–80, 82–85 (describing persistently higher mail ballot rejection rates in 2022 general election). Consequently, LULAC has been forced to adjust how it conducts GOTV programs: For instance, LULAC launched a statewide voter education campaign and diverted resources from its education, scholarship, and naturalization and citizenship programs towards its GOTV activities to mitigate the suppressive impact and outright disenfranchisement caused by the Challenged Provisions. FOF-COL ¶ 154–57. And these injuries will continue in the future absent injunctive relief. FOF-COL ¶ 157.[5]

SB 1's provisions restricting drive-thru voting and extended-hour voting (Sections 3.04, 3.09, 3.10, 3.12, and 3.13) similarly interfere with LULAC's core activities by eliminating methods of in-person voting that the Latino voters LULAC seeks to mobilize have disproportionately relied on to participate in the political process. FOF-COL ¶¶ 116–17, 122, 151–52; *see also* Tr. at 1645:16–1646:5, 1648:9–21. The testimony at trial affirmed this: LULAC leaders observed a

---

[4] *Alliance for Hippocratic Medicine* also did not disturb the well-settled principle that an organization has standing to challenge a law that chills its speech, which provides LULAC a separate basis for organizational standing. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 376 (2010) (Roberts, C.J., concurring) (explaining political organizational standing where its speech was chilled by law prohibiting political speech). Furthermore, LULAC has associational standing to challenge Section 7.04 because it chills the speech of LULAC's members and volunteers and deters them from participating in voter engagement efforts. FOF-COL ¶¶ 290, 293.

[5] LULAC also has associational standing to challenge Sections 4.12, 5.02, 5.03, 5.07, and 5.08 because its members have been, and will continue to be, injured by each of these provisions. FOF-COL ¶¶ 290–92.

decline in voter turnout in 2022 among Latinos in Harris County—where LULAC has a significant membership, FOF-COL ¶ 151, and where these restrictions had the most immediate impact, FOF-COL ¶¶ 114–17, 119 & n.10—after these methods were banned. FOF-COL ¶¶ 116–17, 122, 151–52; *see also* Tr. at 1660:1–1662:16. Thus, these provisions have made it more difficult for LULAC to enhance Latino voter turnout and civic engagement, directly impairing its ability to improve the lives of Latino families through the political process. FOF-COL ¶¶ 147–150.[6]

### B.   AFT has organizational standing.

AFT's mission is to advocate for the employment rights of its members and to champion high-quality public education for the students, families, and communities it serves. FOF-COL ¶ 163. To advance that mission, AFT endorses and supports candidates for political office; converses with members about policy issues that most significantly impact their work; and mobilizes its members to vote and elect leaders who will uphold their interests and priorities. FOF-COL ¶¶ 135, 164–65. This voter mobilization work is a "core . . . activit[y]" central to AFT's mission to advocate for its membership, which is directly impacted and impaired by the Challenged Provisions in several ways. *See All. for Hippocratic Med.*, 602 U.S. at 395.

First, Section 7.04 directly regulates AFT's interactions with voters. *See id.* at 382. AFT runs a block-walking program in which its staff and volunteers knock on the doors of other AFT members to discuss the issues and candidates the union supports. FOF-COL ¶¶ 135–36, 165. In exchange for their efforts, AFT block-walkers receive compensation or other benefits. FOF-COL ¶¶ 135, 166. Because of Section 7.04, AFT has been forced to significantly scale back its in-person

---

[6] LULAC also has associational standing to challenge Sections 3.04, 3.09, 3.10, 3.12, and 3.13 because a significant portion of its members reside in Harris County and have been, and will continue to be, injured by each of these provisions. FOF-COL ¶¶ 114–17, 119 & n.10, 151–52, 290; *see also* Tr. at 1643:19–1644:10, 1645:16–1646:5, 1648:9–21, 1660:1–1662:16.

interactions due to concerns that its block-walkers could be prosecuted for engaging in advocacy efforts with voters who may have their mail ballots with them during those conversations. FOF-COL ¶¶ 137–38, 167–69.[7]

Second, SB 1's mail ballot provisions have made it more difficult for AFT members and constituents to successfully cast and return mail ballots; indeed, the mail ballot restrictions have resulted in the rejection of AFT members' ballots, FOF-COL ¶ 175; *see also* FOF-COL ¶¶ 70–85 (describing persistently higher mail ballot rejection rates in 2022 general election), and impeded AFT's longstanding GOTV efforts. The confusion surrounding SB 1's mail ballot and other provisions has forced the organization to hire additional temporary political organizers—paid staff members who support AFT's organizing, advocacy, and voter persuasion efforts—to respond to a dramatic influx of new questions related to compliance with SB 1's mail ballot requirements and to prevent disenfranchisement of their members and constituents who are at risk of having their mail ballots rejected. FOF-COL ¶¶ 170, 172–73, 175, 299. These impacts are not merely "costs" "incur[ed]" to "oppose" SB 1, as was the case in *Alliance for Hippocratic Medicine*. *See* 602 U.S. at 394.[8] They reflect how SB 1 has directly impacted AFT's GOTV work—a core, mission-critical activity—by making it more difficult for its members and constituents to convert their support for specific initiatives and programs into political action. *See id.* at 395.[9]

---

[7] For the same reasons above, *see supra* note 4, AFT also has organizational standing to challenge Section 7.04 because the provision chills its protected speech, *see* FOF-COL ¶¶ 132–39, 169, and associational standing on behalf of its members and volunteers who are also deterred from participating in the block-walking program.

[8] As LULAC Plaintiffs previously explained, these additional costs forced AFT to divert staff and volunteer time from engaging with members on issues involving school programming and recruiting new members. FOF-COL ¶¶ 171, 173.

[9] AFT also has associational standing to challenge Sections 4.12, 5.02, 5.03, 5.07, and 5.08 because its members have been, and will continue to be, injured by each of these provisions. FOF-COL ¶¶ 174–76, 303–04.

Third and finally, SB 1's provisions restricting drive-thru voting and extended-hour voting make it more difficult for AFT members to cast their ballots. Many AFT members—teachers and bus drivers, for example—start their workdays before the polls open, cannot leave their job sites during lunch breaks, and typically cannot end their days in time to get to their precincts before polls close because they often work at schools located in different areas from where they live. Tr. at 941:24–942:17, 943:17–944:23. These members relied heavily on drive-thru and extended-hour voting to ensure they were able to vote. FOF-COL ¶¶ 174, 176. SB 1's elimination of those voting options has made it more difficult for AFT members to express their support for AFT's endorsed candidates and policy priorities, directly interfering with AFT's efforts to mobilize voters to turn out and ensure the success of those candidates and priorities. Tr. at 940:14–941:1, 943:17–944:14.[10]

### C. TARA has organizational standing.

TARA is the Texas state member of the National Alliance for Retired Americans and its mission is to advocate on behalf of Texas seniors on issues including social security, Medicare, Medicaid, and pensions. FOF-COL ¶¶ 177–78. Core to its issue advocacy is voter engagement and participation because virtually every one of its goals depends *entirely* on the modification of existing state or federal statute by either voter initiatives or elected lawmakers. FOF-COL ¶¶ 179, 180, 202, 205. For example, an initiative providing cost of living adjustments for retired Texas teachers was recently put to a vote of the people, and ensuring that members and constituents cast ballots in favor was essential. Tr. at 1762:16–1763:4, 1783:14–23, 1784:5–10. TARA's standing is

---

[10] AFT also has associational standing to challenge Sections 3.04, 3.09, 3.10, 3.12, and 3.13 because a significant number of its members reside in Harris County and have been, and will continue to be, injured by each of these provisions. FOF-COL ¶¶ 114–17, 119 & n.10, 162, 176, 303; *see also* Tr. at 941:24–942:17, 943:17–944:23.

even more apparent now following the Supreme Court's decision in *Alliance for Hippocratic Medicine* because SB 1 has "directly affected and interfered with [TARA]'s core . . . activities"—namely, its public advocacy and its mobilization of members to vote. *All. for Hippocratic Med.*, 602 U.S. at 395.

As with LULAC and AFT, Section 7.04 directly regulates TARA's advocacy activities and thereby "satisf[ies] both the injury in fact and causation requirements." *Id.* at 382. TARA's paid organizer, Judy Bryant, visits community events and meetings where she speaks or sets up tables, FOF-COL ¶¶ 181, 183–84; because of Section 7.04, Ms. Bryant no longer participates in these events after ballots have been mailed because if any person at the event were to have a ballot, she could potentially violate the law. FOF-COL ¶ 185. Section 7.04 thus "directly affect[s] and interfere[s] with" TARA's work. *All. for Hippocratic Med.*, 602 U.S. at 395; *see also* FOF-COL ¶¶ 142, 185–86.[11]

Second, SB 1's mail ballot provisions have perceptibly impaired TARA's efforts to mobilize its members and constituents to vote successfully and elect candidates of their choice—which is one of TARA's principal tools for achieving its goals. Tr. at 1773:6–1774:3. Because TARA's membership is composed of senior citizens, mail voting is crucial to their ability to cast a ballot. FOF-COL ¶¶ 177, 199. SB 1's mail ballot restrictions have resulted in the rejection of mail ballot applications and mail ballots submitted by TARA members, including Elaine Jones, whose mail ballot was rejected due to a missing ID number. FOF-COL ¶ 194; *see also* FOF-COL ¶¶ 70–85 (describing persistently higher mail ballot rejection rates in 2022 general election). To mitigate

---

[11] TARA, like LULAC and AFT, also has standing to challenge Section 7.04 because of the First Amendment injury the law causes to the organization itself by chilling its speech. *See supra* note 4; *see also* FOF-COL ¶¶ 132–33, 142. Similarly, TARA has associational standing to challenge Section 7.04 because the provision also chills the speech of its members and volunteers, including Ms. Bryant. *See* FOF-COL ¶¶ 184–85, 290, 293.

10

this impediment to its core activities, *All. for Hippocratic Med.*, 602 U.S. at 395, TARA has been forced to alter its core voter engagement and voter turnout activities. For example, it has added a significant voter education component to its mail voting work. FOF-COL ¶¶ 201, 311; *see also* Tr. at 1767:13–1769:13. This has come at the expense of TARA's other core activities: advocating for federal lawmakers to adopt social security reforms and for state lawmakers to expand Medicaid, FOF-COL ¶¶ 202, 205—all of which TARA was forced to curtail or abandon as a result of SB 1.[12]

Similarly, SB 1's provisions restricting drive-thru voting and extended-hour voting directly interfere with TARA's efforts to mobilize voters in support of candidates, initiatives, and policies that will advance its members' Social Security, Medicare, and pension needs. Drive-thru voting and extended voting hours both made voting more accessible to TARA members. FOF-COL ¶¶ 111–16, 119–20. Consequently, the prohibition of these opportunities to vote in person makes it more difficult for TARA to address its members' needs and affect tangible policies through the democratic process. FOF-COL ¶¶ 177–80.

### III. Voto Latino has organizational standing.

Although Voto Latino is not a membership organization, and thus does not assert associational standing like the other three LULAC Plaintiffs, it has established organizational standing for essentially the same reasons explained above. Voto Latino's organizational mission is the education, empowerment, and enfranchisement of Latino voters across the country, and particularly in key states like Texas, so that the Latino community can realize its full political power in the United States. FOF-COL ¶¶ 206, 208–209. In pursuit of this mission, Voto Latino conducts numerous activities aimed at encouraging voting and civic participation in the Latino

---

[12] TARA also has associational standing to challenge Sections 4.12, 5.02, 5.03, 5.07, and 5.08 because its members have been, and will continue to be, injured by each of these provisions. FOF-COL ¶¶ 316–318.

community. FOF-COL ¶ 208. In Texas, Voto Latino pursues its mission through three main bodies of work: voter registration, mobilizing Latino voters to vote, and communicating with voters about issues important to the Latino community, FOF-COL ¶¶ 210–212.

SB 1's provisions restrict voting methods that Voto Latino promotes as part of its core-mission GOTV work in Texas. FOF-COL ¶¶ 209, 215–18. For example, SB 1's restrictions directly impede efforts to promote mail voting because they result in increased rejection rates for mail ballots—which disproportionately impacts and disenfranchises voters in the exact Latino communities that Voto Latino exists to enfranchise. FOF-COL ¶¶ 104, 106–07; *see All. for Hippocratic Med.*, 602 U.S. at 395; FOF-COL ¶ 221; *see also* FOF-COL ¶¶ 70–80, 82–85 (describing persistently higher mail ballot rejection rates in 2022 general election). Likewise, Latino voters disproportionately relied on drive-thru and on extended-hour voting in Texas—both of which were eliminated by SB 1. FOF-COL ¶¶ 116–17, 122, 215–16. And SB 1's provisions restricting these methods directly impedes Voto Latino's mission by making it more difficult for it to mobilize Latino voters. Tr. at 3591:14–3593:1.

In response, Voto Latino has been forced to modify how it encourages Latinos in Texas to vote, including by building new programs aimed at mitigating the impacts of SB 1's restrictions. FOF-COL ¶¶ 219–31. For example, Voto Latino has launched a program that identifies voters who requested, but did not successfully return, mail ballots and then contacts these voters to educate them on, and encourage them to cast, mail ballots. FOF-COL ¶ 224. Likewise, Voto Latino has launched a campaign focused on alerting those who voted in the 2020 general election about SB 1's changes to election administration given the widespread confusion about these changes. FOF-COL ¶ 226.

This campaign has also required Voto Latino to divert resources away from its core voter registration and issue advocacy activities in Texas. FOF-COL ¶ 233. As a result, Voto Latino expects to register fewer Texas voters in 2024 than it did in 2020, and to engage with fewer voters about policies that Voto Latino supports. FOF-COL ¶¶ 230–231. Accordingly, SB 1 directly interferes with Voto Latino's core activities, and the organization has suffered injury as a result. *All. for Hippocratic Med.*, 602 U.S. at 395.

\* \* \*

LULAC, AFT, TARA, and Voto Latino therefore have organizational standing consistent with the Supreme Court's rulings in *Alliance for Hippocratic Medicine* and *Havens Realty*.

## CONCLUSION

For all the foregoing reasons, this Court should conclude that LULAC Plaintiffs have standing to pursue their claims.

Dated: July 11, 2024                                  Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Christopher D. Dodge*
Elena A. Rodriguez Armenta*
Daniela Lorenzo*
Marcos Mocine-McQueen*
Marisa A. O'Gara*
Omeed Alerasool*
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
cdodge@elais.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
mmcqueen@elias.law
mogara@elias.law
oalerasool@elias.law

*Counsel for LULAC Plaintiffs*

*Admitted Pro Hac Vice

14

## CERTIFICATE OF SERVICE

On July 11, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>/s/ Uzoma N. Nkwonta</u>
Uzoma N. Nkwonta