# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| La Unión del Pueblo Entero, *et al.*, | |
| *Plaintiffs*, | Case No. 5:21-CV-844-XR |
| v. | (consolidated cases) |
| State of Texas, *et al.*, | |
| *Defendants* | |

## <u>HAUL PLAINTIFFS' BRIEF ON SUPPLEMENTAL AUTHORITY</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD.................................................................................................... 1

ARGUMENT................................................................................................................. 4

    I.       Houston Area Urban League ........................................................... 5

    II.      Delta Sigma Theta Sorority, Inc. ................................................... 8

    III.    The Arc of Texas .......................................................................... 14

CONCLUSION............................................................................................................ 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)..................................................................................................*passim*

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)..................................................................................................*passim*

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*,
82 F.4th 345 (5th Cir. 2023) ..............................................................................1, 3, 7, 13

*Louisiana v. U.S. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024) ......................................................................................3

*McAllen Grace Brethren Church v. Salazar*,
764 F.3d 465 (5th Cir. 2014) ....................................................................................4

*OCA-Greater Houston v. Texas*,
867 F.3d 604 (5th Cir. 2017) ...................................................................................2, 9

*Town of Chester v. Laroe Estates, Inc.*,
581 U.S. 433 (2017)..................................................................................................3

*United States v. Tanksley*,
848 F.3d 347 (5th Cir. 2017) ....................................................................................2

*Vote.Org v. Callanen*,
89 F.4th 459 (5th Cir. 2023) .....................................................................................1

**Statutes**

Fair Housing Act..................................................................................................5

**INTRODUCTION**

The HAUL Plaintiffs[1] respectfully submit this Brief on Supplemental Authority in response to the Court's June 16, 2024, Order concerning the impact of the U.S. Supreme Court's decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) (hereinafter, "*FDA*"), on organizational Plaintiffs' standing in this case. ECF 1136. As explained below, *FDA* does not disturb prevailing Supreme Court and Fifth Circuit precedent on organizational standing, and there is ample evidence in the trial record demonstrating that the HAUL Plaintiffs meet the standard pursuant to that precedent.

**LEGAL STANDARD**

The requirements to establish organizational standing are the same as those for individual standing—injury, causation, and redressability. *See FDA*, 602 U.S. at 380, 393-94. As outlined in HAUL Plaintiffs' Proposed Conclusions of Law, an organization establishes an injury-in-fact when it shows a "concrete and demonstrable injury" to its activities. ECF 852, COL ¶ 7 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The U.S. Supreme Court held in *Havens Realty* that "there can be no question" such a showing is made where a defendant's behavior has "perceptibly impaired" an organization's ability to fulfill its mission. 455 U.S. at 379. The Fifth Circuit has consistently reiterated the "perceptibly impaired" standard. *See La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) (hereinafter "*LaFHAC*") (holding that "the perceptible impair[ment] to an organization's ability to carry out its mission . . . is the concrete and demonstrable injury for organizational standing" (internal citations and quotation marks omitted)); *Vote.Org v. Callanen*, 89 F.4th 459, 470 (5th

---

[1] The HAUL Plaintiffs refer to the Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, and Jeffrey Lamar Clemmons. Because Mr. Clemmons is an individual, this brief does not address his standing.

Cir. 2023) (same); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (same). This Court is bound by this Fifth Circuit precedent unless "a Supreme Court decision expressly or implicitly overrules" it. *United States v. Tanksley*, 848 F.3d 347, 350 (5th Cir. 2017) (internal citation omitted).

*FDA* did neither. Rather, in *FDA*, the Supreme Court reinforced this core principle of organizational standing. As the Court explained, an organizational plaintiff establishes injury when it shows that a defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." *FDA*, 602 U.S. at 395. The Court held the plaintiff in *FDA* could not manufacture standing simply by spending money opposing FDA's actions. *See id.* at 394. Such expenditures were insufficient to establish injury because they were not connected to any impairment of the organization's core activities. *Id.* at 394-95 (holding that the organization's efforts "to gather information and advocate against" the FDA's actions may have resulted in "incurring costs to oppose the FDA," but expending resources to challenge a policy was not sufficient to confer standing because the policy did not "directly affect[] or interfere[] with" the plaintiff's core activities). In other words, the organization could not "spend its way into standing" where it "ha[d] not suffered a concrete injury caused by a defendant's action." *FDA*, 602 U.S. at 394; *see id.* (explaining that the injury must be more than "a setback to the organization's abstract social interests" (quoting *Havens*, 455 U.S. at 379)).

By contrast, the Court in *Havens* held that the plaintiff had organizational standing because the defendant's actions impaired the organization's core activities. Those activities included counseling and referral services for clients who were low- and moderate-income homeseekers. Because the defendant's practice of racial steering impaired the organization's effectiveness in carrying out those activities, the Court held the plaintiff had alleged a "concrete and demonstrable

Case 5:21-cv-00844-XR   Document 1144   Filed 07/11/24   Page 6 of 22

injury to the organization's activities." *Havens*, 455 U.S. at 379. In distinguishing the *FDA* plaintiff from the *Havens* plaintiff, the *FDA* Court emphasized that the *Havens* plaintiff "not only was an issue-advocacy organization, but also operated a housing counseling service." *FDA*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 368). The defendant's racial steering practices therefore "directly affected and interfered with HOME's core business activities" of "provid[ing] counseling and referral services for low- and moderate-income homeseekers." *Id*. (quoting *Havens*, 455 U.S. at 379). By contrast, the plaintiff in *FDA* was a pure advocacy organization, and the defendant's actions did not impair its core activities. In *Havens*, the plaintiff alleged it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Havens*, 445 U.S. at 379; s*ee id.* (recognizing that the "injury to the organization's activities" had a "consequent drain on the organization's resources. . . ."). Thus, unlike in *FDA*, the organization's diversion of resources in *Havens* was connected to the impairment of plaintiff's core activities. The Fifth Circuit has similarly held that merely spending money cannot confer standing if it is not related to the harm to an organization's mission. *See LaFHAC*, 82 F.4th at 353 ("[T]he 'perceptible impair[ment]' to an organization's ability to carry out its mission, not the 'drain on the organization's resources,' is the 'concrete and demonstrable injury' for organizational standing. [The plaintiff] fails to plead an injury because it fails to allege how its diversion of resources impaired its ability to achieve its mission." (quoting *Havens*, 455 U.S. at 379)).

Finally, *FDA* did not alter the well-established rule that only "[o]ne party with standing" is necessary to "satisf[y] the constitutional requirement." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 467 (5th Cir. 2024); *see also Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[W]hen there are multiple plaintiffs[,] [a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."); *see also McAllen Grace Brethren Church v. Salazar*,

764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit.").

## ARGUMENT

Based on the facts established at trial, the HAUL Plaintiffs satisfy the requirements for organizational standing under Article III as interpreted by *FDA* and *Havens Realty*. Unlike *FDA*, this is not a case where pure advocacy organizations seek to manufacture standing by spending money to oppose a law or policy they disagree with. Rather, as explained below, the Houston Area Urban League, Delta Sigma Theta Sorority, Inc., and the Arc of Texas are organizations that provide direct services to communities of voters, and these core organizational activities have been directly affected and interfered with by the provisions of SB1 they challenge in this action. Each organization's mission suffered due to SB1's impact on the voter education, voter assistance, and civic engagement services they provide to the communities they serve. As a result of the challenged provisions of SB1, those activities are now more time consuming, more resource intensive, and less effective because they must counteract voters' confusion, fear, and loss of voting options under the law. In some instances, SB1 has also chilled volunteers that the organizations rely on to conduct these activities, further impairing these efforts. Moreover, as the organizations have had to devote more resources to these activities, they have had to divert resources from other important elements of their missions, compounding the harm. Accordingly, they have established an organizational injury-in-fact that confers standing.[2]

---

[2] Rather than fully repeat their previous arguments, HAUL, DST, and The Arc of Texas also incorporate by reference the standing analysis contained in their conclusion of law submissions, *see* ECF 856, COL ¶¶ 11-20 (HAUL); ECF 856, COL ¶¶ 22-30 (DST); ECF 852, COL ¶¶ 21-44 (The Arc of Texas), which are supplemented by the arguments in this brief.

I.      <u>**Houston Area Urban League**</u>

Plaintiff Houston Area Urban League ("HAUL") has standing in its own right to challenge the constitutionality and legality of SB1. HAUL is a racial justice organization whose mission includes advancing civic engagement and providing voter education for Black and Latino communities in the Houston area through a range of activities aimed at boosting voter turnout among its members and clients. These include but are not limited to voter registration drives, civic engagement courses for young members, and speaking engagements directed at young audiences. ECF 856, FOF ¶¶ 23-24. HAUL understands voting to be intrinsic to its ability to accomplish other parts of its mission, creating social and economic parity for the communities it serves. *Id*. ¶¶ 16, 21 (discussing HAUL's programs which cover housing, jobs and workforce development, education, health, and social justice and advocacy). Like the plaintiff in *Havens*, and unlike the plaintiff in *FDA*, HAUL is principally a direct-services organization rather than solely an issue-advocacy organization. *Compare FDA*, 602 U.S. at 396-97 (finding plaintiff Alliance for Hippocratic Medicine's generalized legal, moral, ideological, and policy objections to FDA's actions do not confer Article III standing), with *Havens Realty*, 455 U.S. at 368, 379 (holding plaintiff HOME, which, in addition to advocacy, engaged in direct services such as housing counseling and referrals, satisfies Article III standing to bring Fair Housing Act claim). HAUL's standing is not based on any resources it expended to advocate against SB1 but instead on the need to intensify its voter education and civic engagement activities because of SB1's negative impacts on voter access for the predominantly Black and Latino communities HAUL serves.

The challenged provisions of SB1 impaired HAUL's ability to carry out its mission by eliminating, or restricting, methods of voting that were important for the communities HAUL served, and by sowing confusion about the voting process. For example, SB1's elimination of drive-thru voting, 24-hour voting, and straight-ticket voting, and its restrictions on dropping off

mail ballots made the process of voting more complicated and confusing for HAUL's members and clients, impairing HAUL's core activity of educating those voters and engaging them in the political process. ECF 856, FOF ¶¶ 931-32, 937, 939, 941-43. Because of this impairment, HAUL has had to divert and expend additional resources to educate and prepare its members and clients on the changes imposed by SB1 and to counteract the severe burdens and racially discriminatory impact of those changes. To counteract the confusion and discouraging effect of SB1, HAUL was forced to significantly increase the frequency of its voter education trainings and repeat the trainings multiple times with the same audience due to "people not understanding or having a clear reason as to why [previously available voting options] were taken away. . . ." 10/3 Tr. 2259:16-2259:22 (Shackelford). By contrast, pre-SB1, HAUL's trainings were limited to an hour with limited follow-up on an as need basis. ECF 856, FOF ¶ 951. In addition, HAUL began hosting virtual meetings and radio shows about SB1's changes to the voting process, developed an Advocacy U curriculum focused on SB1, and shortened community presentations on other HAUL focus areas like family and community engagement to leave time to educate audiences about the changes to SB1. ECF 856, FOF ¶¶ 945-46, 953-54.

Simply put, SB1's discriminatory restrictions on voting impair HAUL's mission of educating and preparing voters in Black and Latino communities in Houston, just as racial steering practices impaired HOME's mission of advancing equal housing access in *Havens Realty*. Whereas the *FDA* plaintiffs attempted to manufacture standing "by expending money to gather information and advocate against the defendant's action," HAUL has been forced to mitigate obstacles to voting created by SB1 by increasing activities in its civic engagement and voter education programs. *See FDA*, 602 U.S. at 394. SB1's restrictions on voting impair HAUL's core civic engagement and voter education activities because they target methods of voting that were

more likely to be used by Black and Hispanic voters, constituents HAUL serves. ECF 856, COL ¶¶ 122-23. For these communities, HAUL has had to spend more time educating voters and helping them develop alternative voting plans for each voter. *See id.* ¶ 957; *see also* ECF 856, COL ¶ 105.

SB1's impairment to HAUL's civic engagement and voter education services has also forced HAUL to divert significant resources away from other activities core to its mission in order to educate voters, its members, and clients on the changes imposed by SB1 and counteract the racially discriminatory impact of those changes, rendering it substantially more difficult for HAUL to accomplish other elements of its mission. ECF 856, FOF ¶ 944. SB1 affected HAUL's ability to pursue its voter registration and deputization activities because the HAUL volunteers who usually do the bulk of this work had to participate in supplemental training on SB1. Because of this additional training, HAUL lost essential capacity from all its volunteers; some were able to devote less time to voter registration and deputization programs, while others were completely deterred from volunteering at all. ECF 856, FOF ¶ 956. HAUL has also recruited fewer volunteers to conduct voter outreach and education because of the extra training hours needed to train volunteers in the wake of SB1. *Id.* With this loss of volunteer capacity, HAUL has been able to "reach fewer [voters] in the same amount of time," through its voter registration and deputization work because of the "reduced . . . number of people that it [can] speak to on a given day." ECF 856, COL ¶ 16; *see LaFHAC*, 82 F.4th at 354. Relatedly, due to the increase in voter education, HAUL was obliged to reduce the voter registration work it has done in prior years. *See* ECF 856, FOF ¶ 28; *id.* ¶ 950 (citing 10/3 Tr. 2259:4-9 (Shackelford)). Additionally, HAUL's holistic approach means that each client is typically serviced by multiple programs under different areas of its mission. *See* 10/3 Tr. 2233:12-2234:15 (Shackelford). Therefore, the loss of its client base in its civic engagement programs has broad repercussions across HAUL's other mission-driven

programs. Finally, SB1 required HAUL to reorganize its staff by moving a full-time employee from the United Way Thrive Program to the Center for Social Justice and Education, resulting in the need to hire two additional full-time staff to fill the gap and reducing the number of clients who could be served. ECF 856, FOF ¶ 952 (citing 10/3 Tr. 2254:1-6 (Shackelford)). For these reasons, SB1's impediments to voting interfere with the services HAUL is able to provide to current and potential clients. ECF 856, FOF ¶ 957 (noting the anticipation that diversion of resources is ongoing as long as SB1 is in effect).

Thus, HAUL satisfies the test for organizational standing under *Havens Realty*, *FDA*, and controlling Fifth Circuit precedent.

## II.   Delta Sigma Theta Sorority, Inc.

Plaintiff Delta Sigma Theta Sorority, Inc. ("DST") also has organizational standing to challenge the constitutionality and legality of SB1 because the challenged provisions of SB1 have directly affected and interfered with its core organizational activities.[3] DST is a national, nonpartisan, nonprofit organization of Black college-educated women whose mission includes facilitating civic engagement, particularly through voter mobilization and voter education for Black and Latino communities in Texas. ECF 856, FOF ¶ 1. The challenged provisions of SB1 eliminated methods of voting (drive-thru voting, 24-hour voting, and straight-ticket voting) and restricted other methods of voting (mail voting and voting with assistance) that were crucial means by which the communities DST serves voted. The elimination and restriction of these methods of voting perceptibly impaired DST's ability to carry out its mission by creating confusion about the voting process that made people more hesitant to vote and chilled DST volunteers whose service

---

[3] DST has pursued standing on only an organizational basis in this litigation, *see* ECF 852, COL ¶¶ 22–30, and thus, does not intend to waive its assertion of organizational standing.

efforts are critical to its voting-related activities. To counteract the negative impact of the challenged provisions of SB1, DST has had to redouble its efforts to educate and reassure voters and recruit volunteers, but some chapters were nevertheless unable to carry out certain activities due to fear among would-be volunteers. DST's increased efforts also required the organization to divert resources from other activities core to its mission.

DST's mission is to serve Black communities, and it pursues this mission through social action activities in each area of its "Five Point Programmatic Thrust": educational development, economic development, international awareness and involvement, physical and mental health, and political awareness and involvement. ECF 856, FOF ¶ 3. As part of the fifth prong, each DST chapter in Texas participates in voter registration drives, voter education, and other civic engagement activities to encourage community members to vote and ensure they know how and are aware of the issues and candidates on the ballot. ECF 856, FOF ¶¶ 5-6. Additionally, many DST chapters assist voters by providing transportation to the polls, providing in person assistance at the polls, and helping voters complete applications for ballots by mail (ABBMs), mail ballots, and change of address forms. ECF 856, FOF ¶¶ 5, 7.

The challenged provisions of SB1 have "directly affected and interfered with" DST's goal of registering, mobilizing, and assisting as many people as possible to lawfully exercise their right to vote. *FDA*, 602 U.S. at 395. DST's civic engagement activities have been rendered less effective because of SB1 because DST can reach fewer voters and recruit fewer volunteers. *See OCA-Greater Houston*, 867 F.3d at 611-612 (affirming that a law had "perceptibly impaired" an organization's ability to get out the vote when the organization "went out of its way to counteract the effect of" the law and mitigate its real-world impact on the organization's members and the public).

SB1 created confusion surrounding the elimination and restriction of previously available methods of voting and fear of potential prosecution. *See, e.g.*, ECF 856, FOF ¶ 962 (discussing confusion of DST members and community members caused by the elimination of 24-hour voting in SB1 §§ 3.09 and 3.10); ECF 856, FOF ¶ 978 (describing how DST members found SB1 §§ 6.03 and 6.04, which require people providing in-person assistance to voters to disclose personal information and swear an oath under penalty of perjury, confusing and intimidating); 10/3 Tr. 2201:16–2202:19 (Watkins-Jones) (discussing DST members' concerns regarding the collection of personal information to assist a voter and the criminal penalties associated with SB1 § 6.05). DST was forced to counteract the widespread confusion and fear from the challenged provisions of SB1, which made their voter registration and mobilization activities more difficult because the interactions necessary to explain to community members how they could vote and assuage concerns related to voting took longer. ECF 856, FOF ¶¶ 12, 14. DST has "had to put more effort into the number of trainings that [it] provide[s]" and "had to have more volunteers" to educate the community on SB1. 10/2 Tr. 2101:22- 2102:1 (Brown). As Michelle Brown testified, SB1 jeopardized "all the work that [DST has] done up to this point to get people out to vote" because some of the provisions discourage DST's communities and our members from participating in the political process. ECF 856, FOF ¶ 988 (citing 10/2 Tr. 2100:14–2101:1 (Brown)). To prevent such voter discouragement, DST has been forced to spend "more time" on its voting efforts because it has become necessary to reeducate and reassure existing voters in addition to the typical work of educating and registering new voters. ECF 856, FOF ¶¶ 982-83. DST similarly responded to the fear and confusion of its *members* by spending additional time analyzing SB1 and training members about how they can provide voter assistance without running afoul of new requirements. ECF 856, FOF ¶ 11. All told, due to SB1, DST's voter education activities have become more time

and resource intensive, which leaves less time to reach new potential voters through voter registration and mobilization.

The lack of clarity and the threat of penalties inherent in the challenged voter assistance provisions of SB1 also have discouraged DST members from volunteering for the organization's social action efforts related to political participation. *See, e.g.*, ECF 856, FOF ¶¶ 976- 981; 10/3 Tr. 2223:25 – 2224:4 (Watkins-Jones) ("I have knowledge that members are concerned and that some members did not assist because of their concerns."). Confusion regarding SB1 § 6.01, which requires a person who simultaneously transports seven or more curbside voters to the polls to disclose additional personal information, deterred individual DST members from providing transportation to the polls, a service some DST chapters previously provided. ECF 856, FOF ¶ 968; *see, e.g.*, 10/3 Tr. 2196:21- 2197:7 (Watkins-Jones); 10/2 Tr. 2108:7- 2109:3 (Brown) ("Our members or even community members who provide transportation are afraid to fill out those forms. They don't know what's going to happen to the information that they put on those forms."). The requirement in SB1 §§ 6.03 and 6.05, that a person who provides voting assistance either in-person or with a mail ballot must disclose whether they received "compensation," also frustrates DST's get out the vote efforts because DST members are uncomfortable providing this information and the statute does not give a clear definition of "compensation." ECF 856, FOF ¶ 969. Many members who ordinarily would have volunteered to assist voters failed to provide voter assistance post-SB1 because "people are le[e]ry of providing their personal information because they don't know what will happen with it . . . they don't understand." ECF 856, FOF ¶¶ 10, 970 (quoting 10/2 Tr. 2109:9–2110:2 (Brown)). In addition, the criminal penalty associated with § 6.05 makes DST members feel less confident about assisting voters with mail ballots. 10/3 Tr. 2202:4-14 (Watkins-Jones).

The cumulative impact of SB1's chilling effect on would-be volunteers is that entire DST chapters have had to scale back on their voter assistance activities due to the lack of members willing to assist. ECF 856, FOF ¶ 978; *see also* ECF 856, FOF ¶ 977 ("[C]hapters have difficulty finding members who would risk the penalties.") (quoting 10/3 Tr. 2203:10-15 (Watkins-Jones)). For example, the DST chapters in Austin and Fort Worth stopped providing assistance to voters in nursing homes and senior centers, and many DST members statewide shied away from assisting voters with completing their mail ballots. ECF 856, COL ¶ 28. To counteract this impact of SB1, DST was forced to spend more time, "especially [in] the one-to-one conversations with members who would normally be volunteers for the assistance piece of the voter projects, . . . reassuring members that they can continue to assist voters, [and convincing them] that they can continue to transport voters under the provisions." 10/3 Tr. 2204:25–2205:9 (Watkins-Jones); *see also* ECF 856, FOF ¶¶ 985, 982. Because it took more time for DST to assemble fewer volunteers, SB1 made it more difficult for the organization to accomplish its voter assistance activities.

DST's increased efforts in response to SB1 to educate (and reeducate) voters and train and reassure skittish members also had a "consequent drain on the organization's resources." *Havens Realty*, 455 U.S. at 379. For example, the DST Bay Area Houston Chapter had to increase its budget for social action related to voting from $700 per election cycle to $1,000 in 2022 when SB1 went into effect, and other DST chapters likely similarly increased their budget allocations for voting work post-SB1. ECF 856, FOF ¶ 995. Before SB1, this budget was spent on "voter registration drives and mobilization efforts," but the Bay Area Houston Chapter increased the budget to allocate additional funds to "the added training [for volunteers] and enhanced education [for community members] needing to be done around SB1." ECF 856, FOF ¶ 995; *see also* 10/2

Tr. 2156:23- 2157:3 (Watkins-Jones) (noting that DST funds that would have been spent on mobilizing voters to the polls are now spent allaying fears and informing voters of their rights).

DST also diverted human capital from other projects that are a normal part of DST's voting work in order to increase its voter education and reeducation activities. ECF 856, COL ¶ 25. Sharon Watkins-Jones testified that voter registration and voter mobilization efforts lost essential volunteer time due to the new emphasis on voter education that SB1 required: "[b]efore SB1 [DST] could focus 100 percent of our time on registration and mobilization." ECF 856, FOF ¶ 989 (quoting 10/3 Tr. 2205:10—2205:19 (Watkins-Jones)). Had SB1 not been enacted, these DST members "would otherwise have devoted that time to other DST efforts." ECF 856, FOF ¶ 12; *see also* 10/2 Tr. 2105:25–2106:16 (Brown). However, "[a]fter SB1, probably 50 percent of that time is spent on education." ECF 856, FOF ¶ 989 (quoting 10/3 Tr. 2205:10—2205:19 (Watkins-Jones)); *see also* 10/3 Tr. 2205:10—2205:19 (Watkins-Jones) ("That time of volunteering has been focused on education in ways that draw from mobilization which would be a normal part of our efforts."). This diversion of volunteer time is likely to persist, as "[DST] still find[s] that members are confused as to what they can and can't do and what the penalties are, and as well as, the general public or rather the communities that we serve need a lot of explaining of SB1." ECF 856, FOF ¶ 992 (quoting 10/3 Tr. 2206:8–2206:12 (Watkins-Jones)); *see also* ECF 856, FOF ¶ 959. Voter mobilization is central to DST's mission, but as a result of SB1, DST has reached fewer voters through its get out the vote efforts. ECF 856, COL ¶ 29; *see also LaFHAC*, 82 F.4th at 354; *FDA*, 602 U.S. at 394.

Although DST did expend resources advocating against SB1, that is not its basis for organizational standing. Instead, its standing results from the harms to its core, non-advocacy activities wrought by SB1: the deterrence of its members who carry out its civic engagement work,

the increased cost and difficulty of providing voter education for communities rife with confusion in the wake of the law, and the consequent diversion of resources—both human capital and financial—from voter mobilization and other priorities. Unlike the plaintiff in *FDA*, DST did not attempt to "spend its way into standing by expending money to gather information and advocate against the defendant's action." *FDA*, 602 U.S. at 394. Rather, DST diverted financial resources and human capital to counteract the impact of the challenged provisions of SB1, which make it substantially more difficult for DST to pursue its mission. ECF 856, FOF ¶ 8.

Because the challenged provisions of SB1 directly affected and interfered with DST's core activities, DST has satisfied the injury-in-fact requirement as articulated in *FDA*.

### III.      The Arc of Texas

Plaintiff The Arc of Texas asserted both associational and organizational standing in this case.[4] ECF 852, COL ¶¶ 21-44. While The Arc of Texas recognizes that only one of these two grounds is necessary to establish standing, it does not intend to waive its assertion of organizational standing. The Arc of Texas is a 501(c)(3) membership organization that advocates for the human rights of Texans with intellectual and developmental disabilities (IDD). ECF 852, FOF ¶ 1. The Arc of Texas has four public policy priorities, and voting rights are the "backbone" of the organization's work. *Id.* ¶ 9. Voting is "critical to self-determination" for people with IDD, "and voting rights advocacy has been a priority since The Arc of Texas was founded." *Id.* (quoting 10/11 Tr. 3494:5-3494:10 (Martinez)). Prior to SB1, the core activities of the organization's voting rights

---

[4] The Arc of Texas also asserted associational standing on behalf of its members. ECF No. 852 at ¶¶ 21-34. This Court has not requested supplemental briefing on associational standing, so Plaintiffs do not address it here. Briefly, while Justice Thomas's concurrence in *FDA* touches on associational standing, no other members of the Court joined his opinion, and it was not raised in Justice Kavanagh's opinion for the Court. *Compare FDA*, 602 U.S. at 396-97 *with id.* at 398 (Thomas, J., concurring). Thus, The Arc of Texas's associational standing argument is unaffected by the Court's decision in *FDA* and should be considered as an independent basis for standing.

work primarily consisted of voter education about registration and polling place locations. *Id.* ¶ 14.

SB1's identification requirements for mail voting and restrictions on voter assistance made the Arc of Texas's voter education work significantly more difficult and less effective.  In addition to simply providing information to voters with disabilities, The Arc of Texas now works to quell "the fears of disabled voters that they won't get prosecuted for voting and assuring them that they still have a right to vote." *Id.* ¶ 17 (quoting 10/11 Tr. 3510:1-3510:18 (Martinez)). Thus, like the housing organization in *Havens* and unlike the organization in the recent *FDA* case, The Arc of Texas did not merely "spend[] its way into standing" by expending resources on advocacy. *FDA*, 602 U.S. at 394.  Rather, SB1 fundamentally changed the nature of its voting work. ECF 852, FOF ¶ 17. And this change was not merely a "setback to the organization's abstract social interests. *FDA*, 602 U.S. at 394 (quoting *Havens*, 445 U.S. at 379). Like the organization in *Havens*, SB1 directly "affect[s] and interfere[s]" with The Arc of Texas's "core business activities" of providing voting rights education for Texans with IDD. *Id.* at 395. Instead of being able to provide voters with IDD with voting and polling information, The Arc of Texas now has to answer the more fundamental question of whether Texans with IDD who seek to vote with an assistor of their choice will expose that person to prosecution. Like the organization in *Havens*, SB1 "impaired" The Arc of Texas's "ability to provide counseling" for Texans with IDD who want to exercise their right to vote. *Compare id.* (quoting *Havens*, 445 U.S. at 379) *with* ECF 852, FOF ¶ 17. Indeed, this is exactly the type of noneconomic injury that supported standing in *Havens*. *See Havens*, 445 U.S. at 379 n.20 ("That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not [a]ffect the nature of the injury suffered, and accordingly does

not deprive the organization of standing.") (citing *Arlington Heights v. Metro. Hous. Corp.*, 429 U.S. 252, 263 (1977)).

The impairment of The Arc of Texas's ability to provide counseling to voters shows standing under *Havens*, as examined by the Court in *FDA*. *Compare* ECF 832, FOF ¶¶ 13, 16, 19, 21 (describing how The Arc of Texas' ability to provide counseling was fundamentally altered by SB1)*, with FDA*, 602 U.S. at 396 (describing how the organizational plaintiff's activities were not impacted by the challenged FDA regulations). This is unlike the organization in *FDA*, which could only show that it spent resources to oppose the challenged agency action and could not otherwise show that it was harmed by the FDA's relaxation of mifepristone regulations. *FDA*, 602 U.S. at 396. Thus, The Arc of Texas has organizational standing under *Havens* as reiterated by the Supreme Court in *FDA*.

## **CONCLUSION**

For the foregoing reasons, the HAUL Plaintiffs have established standing to bring the claims in this action.

Date: July 11, 2024

Respectfully submitted,

*/s/ J. Michael Showalter*

J. Michael Showalter*
ARENTFOX SCHIFF LLP
South Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: (312) 258-5561
j.michael.showalter@afslaw.com

Jennifer A. Holmes*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
jholmes@naacpldf.org

Amir Badat*
Victor Genecin*
Breanna Williams*
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
abadat@naacpldf.org
vgenecin@naacpldf.org
bwilliams@naacpldf.org


Shira Wakschlag*
The Arc of the United States, Inc.
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org


Kenneth E. Broughton
Texas Bar No. 03087250
Reed Smith LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
Facsimile: (713) 469-3899
kbroughton@reedsmith.com
kpippin@reedsmith.com


Sarah Cummings Stewart
Texas Bar No. 24094609
Reed Smith LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
sarah.stewart@reedsmith.com

Derek Ha*
ARENTFOX SCHIFF LLP
44 Montgomery St., 38th Floor
San Francisco, CA 94104
derek.ha@afslaw.com
Tel: (415) 757-5500
derek.ha@afslaw.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs Houston Area Urban League;
Delta Sigma Theta Sorority, Inc.; The Arc of Texas;
and Jeffrey Lamar Clemmons*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 11, 2024, a true and correct copy of the foregoing document was served on all counsel of record by filing with the Court's CM/ECF system.

*/s/ J. Michael Showalter*
J. Michael Showalter
