# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
(OVERBREADTH, VAGUENESS, AND FREE SPEECH CHALLENGES TO S.B. 1 § 7.04)**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 3

PROCEDURAL HISTORY ................................................................................. 5

FINDINGS OF FACT .......................................................................................... 7

   THE CANVASSING RESTRICTION ................................................................ 7

   THE PARTIES ................................................................................................... 8

      The OCA Plaintiffs ....................................................................................... 9

         OCA-Greater Houston ............................................................................... 9

         League of Women Voters of Texas .......................................................... 11

      The LULAC Plaintiffs ................................................................................ 12

         League of United Latin American Citizens ............................................. 12

         Texas AFT .............................................................................................. 13

         Texas Alliance for Retired Americans .................................................... 14

      The LUPE Plaintiffs ................................................................................... 15

         La Union Del Pueblo Entero .................................................................... 15

         Mexican American Bar Association of Texas ......................................... 16

      Defendants .................................................................................................. 16

         The Texas Attorney General .................................................................... 17

         The Texas Secretary of State ................................................................... 19

         The County DAs ...................................................................................... 20

   IMPACT OF THE CANVASSING RESTRICTION ....................................... 21

      There is widespread confusion about how to interpret the Canvassing Restriction ............ 21

         Confusion about the meaning of "compensation or other benefit" ................................. 22

         Confusion about the meaning of "physical presence" ....................................... 23

         Confusion about canvassers' ability to provide voting assistance .................................... 23

      The Canvassing Restriction has chilled Plaintiffs' in-person interactions with voters ......... 24

CONCLUSIONS OF LAW .................................................................................. 27

   SUBJECT MATTER JURISDICTION ............................................................. 27

      Plaintiff's Claims fall within the *Ex parte Young* Exception to Sovereign Immunity .......... 27

      Plaintiffs have Standing to Challenge the Canvassing Restriction ....................................... 34

   PLAINTIFFS' CONSTITUTIONAL CHALLENGES ..................................... 45

      The Canvassing Restriction is Facially Overbroad .............................................................. 53

      The Canvassing Restriction is Unconstitutionally Vague .................................................... 66

      The Canvassing Restriction is Unconstitutional as applied to Plaintiffs' Speech ................. 72

   PERMANENT INJUNCTION OF THE CANVASSING RESTRICTION ............................. 74

   CONCLUSION ................................................................................................... 77

# INTRODUCTION

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as "S.B. 1." *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021).

Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 amended the Texas Election Code to, among other things, prohibit compensated canvassers from engaging in voter advocacy in the presence of a mail-in ballot (the "Canvassing Restriction").[1] *See* S.B. 1 § 7.04 (JEX 1 at 59–60), codified at TEX. ELEC. CODE ("TEC" or the "Election Code") § 276.015.[2]

Several private plaintiffs filed lawsuits, challenging certain provisions of S.B. 1 as unconstitutional and otherwise unlawful under federal voter-protection statutes. For judicial economy, these were consolidated under the above-captioned case, which was first filed.[3]

---

[1] While Section 7.04 of S.B. 1 sets out a ban on "vote harvesting," *see* TEC § 276.015, Plaintiffs generally refer to the provision as a "ban on in-person canvassing" or "voter interaction ban." *See, e.g.*, ECF No. 848 ¶ 97; ECF No. 849 ¶ 296. In the Court's view, all three characterizations are misleading in multiple respects. Regardless of how the term is defined in the Election Code, Section 7.04's proscriptions reach conduct well beyond any common understanding of "vote harvesting." On the other hand, the provision does not ban canvassers from interacting with voters altogether—it prohibits *compensated* interactions in the *presence of a mail ballot*. In an effort to describe Section 7.04's scope more accurately and impartially, the Court refers to the challenged provisions as the "Canvassing Restriction" throughout this order.

[2] Section 7.04 of S.B. 1 also added TEC provisions addressing the solicitation of applications to vote by mail (TEC § 276.016), the distribution of early voting ballots and balloting materials (TEC § 276.017), and unauthorized alterations to election procedures (TEC § 276.019). For the purposes of this order, however, "Section 7.04" refers only to the Canvassing Restriction, codified at TEC § 276.015.

[3] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Area Urban League v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021) and *Mi Familia Vota v. Abbott*, No. 5: 21-cv-920 (W.D. Tex. 2021) under the lead case.

Three Plaintiffs groups—the OCA Plaintiffs,[4] the LULAC Plaintiffs,[5] and the LUPE Plaintiffs[6]—assert that Section 7.04's Canvassing Restriction is overbroad, unconstitutionally vague, and burdens their core political speech. *See* Tr. at 230:14–17, 232:24–233:1, 234:23–235:4. Following a six-week bench trial, the Court agrees.

After careful consideration, the Court issues the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a) bearing on Plaintiffs' claims under 42 U.S.C. § 1983 that the Canvassing Restriction, codified at TEC § 276.015, violates the First and Fourteenth Amendments of the United States Constitution.

---

[4] For the purposes of the OCA Plaintiffs' free speech and due process challenges to the Canvassing Restriction, this group includes OCA-Greater Houston and the League of Women Voters of Texas. *See* ECF No. 200 (OCA Compl.) ¶¶ 214–25 (free speech claim), ¶¶ 226–39 (due process claim); Text Order dated Apr. 14, 2022 (granting Texas Organizing Project's withdrawal from the case); ECF No. 551 (granting Workers Defense Action Fund's withdrawal from the case and dismissing its claims with prejudice).

[5] This group includes LULAC Texas, Texas Alliance for Retired Americans, Texas AFT, and Voto Latino. *See* ECF No. 207 (LULAC Compl.) ¶¶ 273–86 (free speech claim).

[6] This group includes La Unión del Pueblo Entero, the Mexican American Bar Association of Texas, the Southwest Voter Registration Education Project, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., Friendship-West Baptist Church, Texas Impact, and James Lewin. *See* ECF No. 208 (LUPE Compl.) ¶¶ 286–300 (free speech and due process claims).

## PROCEDURAL HISTORY

Plaintiffs filed their original complaints in August and September 2021, seeking to enjoin the Secretary of State and Attorney General of the State of Texas (together, the "State Defendants") and local election officials from enforcing many provisions of S.B. 1, including provisions that (like the Canvassing Restriction) impose criminal liability.

In December 2021, the Texas Court of Criminal Appeals held in *State v. Stephens* that the Election Code's delegation of unilateral prosecutorial authority to the Attorney General to prosecute election crimes violated the separation-of-powers clause of the Texas Constitution. 663 S.W.3d 45 (Tex. Crim. App. 2021). The court explained that the Texas Constitution assigns to county and district attorneys, as members of the judicial branch, the "specific duty" to represent the state in criminal prosecutions. *Id.* at 52. The Attorney General, as part of the state's executive branch, has no similar, independent power under the Texas Constitution. Thus, the Attorney General can prosecute election crimes only with the consent of local prosecutors. *Id.* at 47.

Following *Stephens*, Plaintiffs amended their complaints to join local district attorneys from several Texas counties as Defendants.[7] The State Defendants moved to dismiss these complaints in their entirety, including Plaintiffs' free speech and due process challenges to the Canvassing Restriction. The Court denied the motions as to those challenges in August 2022, concluding that Plaintiffs had adequately alleged standing to challenge the Section 7.04 and that their claims against the State Defendants fell within the *Ex parte Young* exception to sovereign immunity.[8]

---

[7] Plaintiffs' Second Amended Complaints ("SACs"), filed in January 2022, are the operative pleadings. ECF Nos. 199, 200, 207, 208.

[8] *See La Union del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509 [LULAC], 618 F. Supp. 3d 388 [OCA], 618 F. Supp. 3d 504 [LUPE] (W.D. Tex. 2022).

In May 2023, the State Defendants joined in a motion for summary judgment filed by a group of Republican committees that intervened in this case as Defendants (the "Intervenor-Defendants"),[9] arguing that Plaintiffs' pre-enforcement free speech and vagueness claims were premature and otherwise meritless because the Canvassing Restriction did not impose a "severe" burden on protected speech and was intended to protect voters from confusion and undue influence. *See* ECF No. 608 at 29–34. The Court carried the motion with the case and addresses those arguments herein to the extent that they were not disposed in the Court's orders on the State Defendant's motions to dismiss.

The Court held a bench trial from September 11, 2023 to October 20, 2023. In all, the parties presented about 80 witnesses (both live and by deposition testimony), nearly 1,000 exhibits, producing over 5,000 pages of trial transcripts. The Court heard testimony from voters, Plaintiffs' organizational representatives and volunteers, former and current state and local officials, and expert witnesses.

The parties submitted proposed findings of fact and conclusions of law in January 2024,[10] and presented closing arguments on February 13, 2024.[11]

---

[9] The Intervenor-Defendants include the Harris County Republican Party, the Dallas County Republican Party, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee.

[10] *See, e.g.*, ECF No. 848 (OCA); ECF No. 849 (LULAC); ECF Nos. 854, 855 (LUPE); ECF No. 843-1 (Dallas County District Attorney); ECF Nos. 861, 862 (State Defendants). The State Defendants filed their proposed findings of fact and conclusions of law jointly with the Intervenor-Defendants. *See* ECF Nos. 861, 862. In light of the joint submissions, the Court has no need to address the Intervenor-Defendants separately in this order and will attribute the filings and arguments therein to the State Defendants.

[11] At the Court's request, the parties also submitted supplemental briefing addressing the impact of the Supreme Court's recent decision in supplemental briefing addressing the impact of the Supreme Court's recent decision in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), on Plaintiffs' standing. *See* ECF Nos. 1138, 1140, 1142–45.

## FINDINGS OF FACT

**THE CANVASSING RESTRICTION**

1.      Section 7.04 of S.B. 1 creates three new, third-degree felonies under the Election Code, each imposing up to ten years in prison and a fine of up to $10,000 on anyone who gives, offers, or receives some "compensation or other benefit" for "vote harvesting services." TEC § 276.015(f); TEX. PENAL CODE § 12.34.

2.      "Vote harvesting services" include any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

3.      A "benefit" is "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." TEC § 276.015(a)(1).

4.      Using these definitions, Section 7.04 creates three third-degree felonies:

   (b)  A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit.

   (c)  A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services.

   (d)  A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services.

TEC §§ 276.015(b)–(d).

5.      The Canvassing Restriction contains a number of exceptions. It "does not apply" to:

      (1)   an activity not performed in exchange for compensation or a benefit;

(2)   interactions that do not occur in the presence of the ballot or during the voting process;

(3)   interactions that do not directly involve an official ballot or ballot by mail;

(4)   interactions that are not conducted in-person with a voter; or

(5)   activity that is not designed to deliver votes for or against a specific candidate or measure.

TEC § 276.015(e).

**THE PARTIES**

**The Plaintiffs**

6.      Plaintiffs are membership-driven, non-partisan civil rights and social advocacy groups in Texas that regularly conduct in-person voter outreach and engagement activities. Despite the diversity of their respective missions in the state—e.g., encouraging civic participation, supporting K-12 public school employees, advocating for the interest of senior citizens, improving infrastructure in the colonias—the Plaintiff organizations rely on in-person voter advocacy to advance their causes.

7.      All Plaintiffs have endorsed ballot measures (and some have supported candidates) aligned with their organizational missions in the past and deployed staff, independent contractors and volunteers to engage with voters in person to increase turnout and electoral support for their preferred measure or candidate. These voter engagement efforts include neighborhood door-knocking campaigns, voter registration drives, candidate forums, town hall meetings, tabling at community events, and exit-polling. Plaintiffs' staff and volunteers have also regularly helped voters with disabilities and/or voters with limited English proficiency ("LEP"), including voters who vote by mail.

8.      Plaintiffs' volunteers often receive refreshments, t-shirts, pens, gas cards, and other tokens of appreciation for their canvassing and assistance efforts.

9.      Plaintiffs' voter engagement activities generally occur in the weeks before elections (when they are most effective), when voters are likely to have received their mail ballots. During some outreach events, voters have taken out their mail ballots while speaking with Plaintiffs' organizers to ask questions about their ballots or request voting assistance.

10.      Plaintiffs fear that the Canvassing Restriction will subject their organizations, staff, and volunteers—and even voters—to criminal liability for engaging in ordinary and routine in-person interactions with voters.

**The OCA Plaintiffs**

*OCA-Greater Houston*

11.      Plaintiff OCA-Greater Houston ("OCA") is a membership-driven organization dedicated to advancing the social, political, and economic well-being of Americans of Asian and Pacific Island descent ("AAPIs"), largely in Harris, Brazoria, and Fort Bend counties. Tr. at 1684:8–12, 1685:1–3, 1686:16–17, 1688:10–14. The organization has nearly 200 dues-paying members who serve on and elect the organization's board, and hundreds of volunteer members. Tr. at 1686:19–1687:7, 1688:7–9.

12.      The organization's mission comprises four main goals: (1) advocate for social justice, equal opportunity, and fair treatment; (2) promote civic participation, education, and leadership; (3) advance coalition and community building; and (4) foster cultural heritage. Tr. at 1689:6–13.

13.     In support of this mission, OCA has endorsed and advocated for ballot measures at in-person events and while conducting door-to-door canvassing and is likely to do so in the future. Tr. at 1711:8–19, 1712:17–1713:11, 1726:8–14.

14.     Before S.B. 1 was enacted, OCA regularly hosted election events attended by hundreds of people, including in-person candidate forums (Tr. at 1694:21–1696:8), "AAPI meet-and-greets" with AAPI political candidates (Tr. at 1699:24–1702:2), and voting machine demonstrations (Tr. at 1706:12–1707:3). Attendees often brought their mail-in ballots to these events and received assistance, including language assistance, from OCA volunteers and staff. Tr. at 1696:9–1697:8, 1697:22–1699:7 (candidate forums); Tr. at 1700:1–1702:2 (meet-and-greets), Tr. at 1706:12–1707:3 (voting machine demonstrations).

15.     OCA also engaged in canvassing efforts through volunteers and staff, who knocked on voters' doors to provide information about voting. Tr. at 1702:3–17. As they were door-knocking, some bilingual OCA canvassers assisted voters who requested language assistance with their mail-in ballots. Tr. at 1703:17–20.

16.     In addition to candidate forums, meet-and-greets, and canvassing, OCA conducts exit-polling at polling locations, where voters also requested (and received) assistance with their mail-ballots from OCA staff and volunteers. Tr. at 1706:4–11, 1723:6–13.

17.     OCA's voting-related activities are carried out by volunteers and paid staff, all of whom are OCA members. Tr. at 1687:22–1688:6, 1693:21–25. OCA's standard practice is to provide staff, volunteers, and attendees with refreshments during voting-related activities. Tr. at 1694:11–20. OCA provides its members and volunteers with benefits like food and beverages at in-person events where they provided voting assistance to LEP voters. Tr. at 1694:4–20, 1697:22–

25. Similarly, OCA provides canvassers with benefits like Gatorade and water "to canvass in the Texas heat of a hundred degrees or more" to help them stay hydrated. Tr. at 1718:1–5.

### *League of Women Voters of Texas*

18.     The League of Women Voters of Texas ("LWV" or the "League") is a non-partisan organization founded in San Antonio in 1919 with over 3,000 dues-paying members, including members in Harris and Travis Counties. Tr. at 1580:1–4, 1585:18–22, 1586:7–19, 1587:19–21.

19.     The League's mission is to empower voters and defend democracy. Tr. at 1580:1–4. The League actively works to register eligible citizens to vote, ensure that voters' ballots count, help voters obtain mail-in ballots, vote by mail, and obtain voter assistance when needed. Tr. at 1580:1–8, 1581:9–18, 1589:12–15, 1589:25–1590:3.

20.     The League educates its members and Texas voters about the voting process through resources it creates, like the League's voter's guide, get out the vote ("GOTV") events for every election, and voter education materials on the League's social media, videos, and website. Tr. at 1583:22–1584:16, 1606:23–1608:10.

21.     The League does not endorse specific candidates, Tr. at 1595:18–20, but has supported ballot measures in the past, Tr. at 1600:17–25.

22.     The League hosts in-person election events across Texas that are open to the public, including candidate forums and discussions of proposed ballot measures and constitutional amendments. Tr. at 1599:3–9. The League does not ask whether voters have their mail ballots in their possession, Tr. at 1600:6–16, but it is likely that some voters will bring their ballots to such events. These events almost always occur when mail-ballots have been sent out because "that's when people are most interested in learning about candidates and what's on the ballot." Tr. at 1599:17–21.

23.     Volunteers at the League's in-person outreach events often receive token gifts for their efforts, including pens, stickers, refreshments, free parking, and certificates of participation or letters of recommendation. Tr. at 1598:6–22, 1601:18–1602:1.

### The LULAC Plaintiffs

#### *League of United Latin American Citizens*

24.     The League of United Latin American Citizens ("LULAC") is a national Latino civil rights organization founded in 1929 in Corpus Christi, Texas. Tr. at 1632:9–11.[12] The group has approximately 4,000 to 5,000 dues-paying members within Texas, as well roughly 80,000 to 90,000 "eMembers" in the state. There are 30 to 40 LULAC councils in Texas, including in Dallas, San Antonio, Houston, and El Paso. Tr. at 1634:6–20, 1637:3–7.

25.     LULAC's mission is "to improve the lives of Latino families throughout the United States" and "to protect their civil rights in all aspects." Tr. at 1633:10–18. Promoting the right to vote is "crucial" to LULAC's mission because when Latinos are "allowed to vote, they are able to choose candidates of their choice" who "will stand and work on issues that are important to them." Tr. at 1645:4–15.

26.     LULAC has volunteers that engage in voter registration and GOTV efforts every year. Tr. at 1645:23–1646:5. These efforts often focus on community members who face greater challenges when voting, including elderly Latinos and those who do not speak or write English. Tr. at 1649:7–24. Accordingly, LULAC has historically run a voter assistance program for seniors, including many who are not literate or have physical disabilities. Tr. at 1654:20–1655:5.

---

[12] LULAC has approximately 4,000 to 5,000 dues-paying members within Texas, as well roughly 80,000 to 90,000 "eMembers" in the state. Tr. at 1637:3–7. There are 30 to 40 LULAC Councils in Texas, including in Dallas, San Antonio, Houston, and El Paso. Tr. at 1634:6–20, 1637:3–7.

27.     LULAC's members and volunteers who participate in these GOTV and voter assistance efforts often receive food and drink, gas credit, or other tokens of appreciation for their efforts. Tr. at 1655:19–1656:10, 1656:11–18.

### Texas AFT

28.     Texas AFT ("AFT") is a 501(c)(5) designated labor union representing K-12 public school employees and higher education employees in Texas, Tr. at 920:16–20, with about 66,000 members across the state. Tr. at 920:16–20.

29.     AFT's mission is to advocate for increased funding for public schools, for programming that treats children as holistic individuals and seeks to remove external barriers to receiving a high-quality education, and for capping class sizes at a reasonable number so that all students get appropriate attention from their teacher. Tr. at 922:2–22. To advance its mission, AFT also participates in the political process by regularly engaging with its membership about the candidates and issues that best align with the organization's values. Tr. at 923:2–15.

30.     Prior to S.B. 1, AFT's primary way of communicating with its members about advocacy issues and endorsed candidates was door-knocking. Tr. at 924:13–20. AFT members would typically knock on the doors of fellow union members, introduce themselves, and then discuss the issues and candidates that the organization was endorsing and why. Tr. at 926:5–10.

31.     While these conversations between members and AFT block-walkers would unfold, members would sometimes have their ballots with them, either because they were home and had questions about how to fill them out or because they were gathering with other members to fill out their ballots as a group. Tr. at 927:21–23.

32.    Some of the members who would engage in this type of door knocking or "block-walking" for AFT are paid staff members. Tr. at 929:6–930:5. Others are volunteers who would receive benefits such gas and meal cards in exchange for their work. Tr. at 929:6–24.

### *Texas Alliance for Retired Americans*

33.    Texas Alliance for Retired Americans ("TARA") is the Texas state member of the National Alliance for Retired Americans, an organization with 4.5 million members that works on issues that affect seniors and retirees. Tr. at 1761:4–10. TARA itself has chapters throughout Texas, including in Dallas, Fort Worth, Austin, Houston, San Antonio, Corpus Christi, Beaumont, and Port Arthur. Tr. at 1761:14–18.

34.    TARA educates and mobilizes its members and volunteers around issues impacting seniors, including the government pension offset for social security and the expansion of Medicaid within Texas. Tr. at 1762:8–19. TARA is non-partisan organization, but it does engage in issue advocacy and endorses local and state candidates based on their positions on issues relevant to TARA. Tr. at 1764:3–10. It also advocates for or against ballot measures impacting TARA's areas of concern. Tr. at 1764:3–10.

35.    To advance its views on these issues, TARA hosts monthly chapter meetings across Texas with members. Tr. at 1762:20–1763:4. TARA holds rallies and community events to promote its views, and also uses social media and email to educate its members and the public. Tr. at 1762:20–1763:4.

36.    TARA's voter advocacy relies primarily on the efforts of its sole paid field organizer, Judy Bryant, who testified on behalf of TARA at trial. Tr. at 1763:16–18.

**The LUPE Plaintiffs**

*La Union Del Pueblo Entero*

37.     La Union Del Pueblo Entero ("LUPE") is a non-partisan, membership organization headquartered in San Juan, Texas, with members primarily in Hidalgo, Cameron, Willacy, and Starr Counties, Texas. Tr. at 58:13–16.

38.     LUPE organizes its approximately 8,000 members and other colonia residents on issues that affect low-income neighborhoods, including drainage, lighting, paved roads, safety, emergency services, trash pickup, among others. Tr. at 88:8–24.

39.     In recent years, LUPE's primary organizing focus has been civic engagement and educating voters about their right to vote. Tr. at 60:10–61:2. LUPE relies on paid staff members, temporary paid canvassers, and volunteers to engage with voters in-person. Tr. at 88:1–7.

40.     LUPE members speak to voters on issues promoted by LUPE, including urging voters to support certain non-partisan ballot measures. Tr. at 88:1–24. LUPE has supported ballot measures, including a drainage bond, the creation of a health care district in Hidalgo County, increased broadband access in South Texas, Tr. at 88:8–89:18, and plans to advocate for other ballot measures in the future. Tr. at 88:25–89:16.

41.     LUPE staff and canvassers advocate for its support of any ballot measures in a variety of settings, including when meeting with community members in neighborhoods, at LUPE events, at union halls, and in the LUPE offices. Tr. at 89:7–18. Speaking to voters at their homes is an essential part of LUPE's activities because it ensures that hard-to-reach voters in the colonias have the information they need to vote to improve their communities. Tr. at 3686:1–20.

42.     While canvassing neighborhoods in support of ballot measures, LUPE organizers have been invited into voters' homes and asked for assistance with voters' mail-in ballots. Tr. at

71:1–72:15, 75:11–75:17, 119:20–120:18. LUPE members also often bring mail ballots to meetings at LUPE offices and union halls. Tr. at 90:4–24.

43.     LUPE staff members and volunteers have been asked for assistance with voting by mail and in-person at the polls by elderly and disabled voters, and have provided such assistance. *See* Tr. at 145:16–20, 145:25–146:4, 150:9–13, 150:19–151:2, 157:14–158:9.

44.     LUPE often provides its volunteers with t-shirts or gas cards, particularly because there is little public transportation in the Rio Grande Valley. Tr. at 122:3–19.

### *Mexican American Bar Association of Texas*

45.     The Mexican American Bar Association of Texas ("MABA") is a volunteer-based professional membership association of Latino lawyers across Texas with approximately 500 members. Tr. at 2533:20–23, 2535:9–10.

46.     Although MABA is non-partisan, it routinely encourages voters to support a candidate or measure. Tr. at 2535:19, 2542:6–8.

47.     MABA engages in voter outreach and education by tabling at local community events, such as candidate forums. Tr. at 2535:21–2536:5. MABA members also provide voter assistance. *See, e.g.*, Tr. at 2539:3–4. Members are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while performing these activities. Tr. at 2542:6–20.

**Defendants**[13]

48.     Collectively, Plaintiffs have sued the Attorney General and Secretary of State of Texas (together, the "State Defendants"), and the district attorneys of Travis County, Dallas

---

[13] Over the course of the litigation, several Defendants have been substituted pursuant to Federal Rule of Civil Procedure 25(d).

County, and Hidalgo County, and 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties (collectively, the "DAs" or "County DAs").[14]

**The Texas Attorney General**

49.     Plaintiffs sue Defendant Ken Paxton in his official capacity as the Attorney General of the State of Texas (the "AG").

50.     The AG has statutory duties for certain aspects of Section 7.04's enforcement scheme. *Stephens* did not alter the authority of the AG to investigate allegations of election-related crimes, and, in some cases, the Office of the Attorney General ("OAG") considers certain investigative duties to be "statutorily required" or "mandatory" for election-related allegations. Tr. at 4041:18–4042:25; *see, e.g.*, TEC § 273.001 (providing that the AG "shall investigate" allegations of election crimes in elections covering more than one county). The AG may also "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* TEC § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them).

51.     The AG has demonstrated a willingness to enforce the Canvassing Restriction, and has actually enforced, the Election Code, including S.B. 1. Tr. at 3909:8–17, 3913:9–3914:16.

52.     The AG publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud. *See, e.g.*, OCA-384, OCA-385, OCA-386. The OAG continues to operate the Criminal Prosecutions Division unit that prosecutes election-related allegations, known as the Election Integrity Division. Tr. at 3903:23–3905:4, 3905:11–15,

---

[14] Although the LULAC Plaintiffs' SAC names local election officials as Defendants to their free speech claims, *see* ECF No. 207 at 57, their proposed findings of fact and conclusions of law do not argue that any local election officials' have a role in enforcing the Canvassing Restriction, *see* ECF No. 849. The Court thus considers the LULAC Plaintiffs to have waived any such argument and will dismiss their undeveloped claims seeking to enjoin local election officials from enforcing the Canvassing Restriction.

4039:14–19. As of March 17, 2023, the OAG had identified at least one investigation of a possible violation of the Canvassing Restriction. [15] *See* LULAC-86 at 6.

53.     Before *Stephens*, the OAG regularly prosecuted election crimes, including alleged vote-harvesting schemes, in counties across Texas. *See* OCA-377 (showing 401 counts—not cases—of election crimes prosecuted by the OAG, alone or in conjunction with local prosecutors, between 2005 and 2022).

54.     Even after *Stephens*, Jonathan White, former Chief of the OAG Election Integrity Division, testified that the "vote harvesting" schemes (purportedly targeted by the Canvassing Restriction) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8. For the November 2022 elections, the OAG established a 2022 General Election Integrity Team and publicly stated it was "prepared to take action against unlawful conduct where appropriate," highlighting offenses related to "vote harvesting." OCA-383.

55.     Although the AG may no longer unilaterally prosecute allegations of election-related crimes, *Stephens*, 663 S.W.3d at 51–55, the OAG enforces criminal election offenses through other mechanisms. After OAG investigations conclude, the OAG refers cases to local prosecuting attorneys[16] and often seeks opportunities to partner with DAs to prosecute such allegations through deputization by a DA or appointment *pro tem* by a district judge or the DA. Tr. at 3908:21–3909:17, 3909:1–12; 4043:21–4045:21; 4051:2–10.

---

[15] There may very well be additional investigations that the DA failed to produce during discovery. Throughout this litigation, the OAG has, invoking the investigative privilege, withheld documents discussing "actual or alleged illegal voting, election fraud, or other criminal conduct in connection with" voting and voter assistance. *See* ECF No. 992-3; ECF No. 992-16; *In Re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 568–69, n.2 (5th Cir. 2006) (the investigative privilege, also known as the "law enforcement privilege," protects government documents relating to an ongoing criminal investigation from release).

[16] For example, after the prosecution of Hervis Rogers was dismissed in Montgomery County, the OAG referred the case to the Harris County DA, who brought charges against Mr. Rogers before a grand jury. Tr. at 4058:17–4059:24, 4062:7–12. The same procedure was used in the prosecution of Ignacio González Beltrán, whose case was dismissed in Montgomery County and referred by the OAG to Harris County, where it was presented to a grand jury. Tr. at 4063:3–4064:6.

56.     The OAG has specifically identified previous prosecutions in which it participated, including prosecutions for "vote harvesting" and prosecutions conducted by or with the assistance of local DAs in the following counties: Nolan County, Limestone County, Hidalgo County, Harris County, Navarro County, Brewster County, Gregg County, and Starr County. *See* OCA-377.

**The Texas Secretary of State**

57.     The LUPE Plaintiff seek to enjoin Jane Nelson, the Secretary of State (the "Secretary") from enforcing the Canvassing Restriction.

58.     The Secretary routinely collaborates with the OAG to enforce election laws in accordance with her mandatory duties under the Election Code. Tr. at 3913:9–19, Tr. at 4054:16–4055:8.

59.     Under the Election Code, the Secretary must evaluate information she "receiv[es] or discover[s]" about potential election crimes and, if she "determines that there is probable cause to suspect that criminal conduct occurred, the [S]ecretary *shall* promptly refer the information to the attorney general" and provide all pertinent documents and information in his possession to the AG. TEC § 31.006 (emphasis added).

60.     In this capacity, the Secretary serves as "a gathering point for election complaints from individuals and election officials." Tr. at 3913:12–19. The Secretary logs each complaint received. Tr. at 4326:23–4327:2. Sometimes, the Secretary will also ask the complainant for additional information. Tr. at 1876:24–1879:21. Ultimately, the Secretary must determine whether the information in her possession satisfies the probable cause standard. Tr. at 1881:1–9. "If it's a close call, [the Secretary of State's Office] refer[s] it anyways, because it's better to err on the side of making sure that crimes are prosecuted." Tr. at 1877:14–21.

61.     The Secretary has received allegations related to mail ballot "vote harvesting," which she has referred to the OAG both before and after the passage of S.B. 1. Tr. at 1914:1–6.

**The County DAs**

62.     Plaintiffs have sued the District Attorneys of several counties in Texas (the "DAs" or "County DAs") in their official capacity to enjoin them from enforcing Section 7.04's Canvassing Restriction.

63.     The OCA Plaintiffs seek injunctive relief against the Travis County DA. *See* ECF No. 200. The LULAC Plaintiffs name the DAs of Travis, Dallas, and Hidalgo Counties as Defendants. *See* ECF No. 207. The LUPE Plaintiffs seek injunctive relief against the DAs of Travis County, Dallas County and the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. *See* ECF No. 208.

64.     Every County DA other than the DA for the 34th Judicial District executed a stipulation stating that he or she had *not* (1) adopted a policy refusing to prosecute crimes under S.B. 1, (2) instructed law enforcement to refuse to arrest individuals suspected of criminal conduct under S.B. 1, or (3) permitted an assistant DA to take either of the foregoing actions. *See* ECF No. 753-6 (Travis) ¶¶ 3–6; ECF No. 753-7 (Dallas) ¶¶ 3–4; ECF No. 753-13 (Hidalgo) ¶¶ 3–6. For his part, the DA of the 34th Judicial District agreed not to enforce the provisions challenged by the LUPE Plaintiffs during the pendency of this action but stipulated that he has the authority to enforce crimes under the Election Code, would be free to do so at any time, and intended to fulfill his duty to enforce election crimes, subject to his prosecutorial discretion. ECF No. 753-8 ¶¶ 5–7.

65.     A newly enacted law House Bill 17 ("H.B. 17") curbs DAs' authority to adopt a policy against enforcing crimes under the Election Code. H.B. 17, which went into effect on September 1, 2023, provides that DAs may be removed from office if they adopt any policy that

"prohibits or materially limits the enforcement of any criminal offense." H.B. 17 § 1 (adding Tex. Loc. Gov't Code § 813(B)).

**IMPACT OF THE CANVASSING RESTRICTION**

**There is widespread confusion about how to interpret the Canvassing Restriction**

66.     The Canvassing Restriction applies to anyone who knowingly gives or receives some "compensation or other benefit" for an "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

67.     Trial testimony establishes that there is widespread confusion about the meaning of the Canvassing Restriction. Even local election administrators ("EAs") are unsure about how to interpret Section 7.04. *See, e.g.*, Tr. at 496:5–8 (Dallas County EA Michael Scarpello) ("I don't know what ballot harvesting means," "it could be interpreted a lot of different ways based on the definition . . . put into the law."); Tr. at 844:1–12 (former Travis County EA Dana DeBeauvoir) (pointing out that the Canvassing Restriction criminalizes "paying someone to encourage people to vote *for* a measure" but not against that same measure).

68.     Witnesses were particularly uncertain about how to interpret the terms "compensation" and "physical presence"—neither of which is defined in the statute—and how Section 7.04 impacts organizers' ability to provide voting assistance.

69.     Despite this confusion, state officials have not offered any definitive answers about the scope of the Canvassing Restriction. The Secretary of State has not provided any guidance. Tr. at 1914:7–14, 1924:7–18. Nor has the OAG. Tr. at 1924:24–1925:3.

70.    At trial, the State Defendants' witnesses attempted to clarify the meaning of the

Canvassing Restriction, but their testimony only underscored the potential for disagreement about

what kind of conduct Section 7.04 proscribes.

**Confusion about the meaning of "compensation or other benefit"**

71.    Plaintiffs are uncertain whether providing volunteers food, beverages, gas cards,

bus fare, letters of recommendation, or academic credit to volunteers for their advocacy work is

unlawful because "compensation" is not defined in the Election Code and benefit is merely defined

by a synonym. TEC § 276.015(a)(1) (defining "benefit" as "anything reasonably regarded as a

gain or advantage"). For example, MABA members, all of whom are attorneys, worry that a bottle

of water could be considered "compensation." Tr. at 2544:9–43.

72.    They also worry that their voter outreach activities could expose *voters* to criminal

liability if they offer door-to-door canvassers refreshments, for example. *See* Tr. at 1592:1–5 ("It's

not just my concern for the League members, but it's also a concern if just a voter that were helping

provides compensation, or the place that they live provides compensation of some type that they

may be committing a crime."). AFT has cautioned its members that they should not complete their

ballots at meetings in its offices because the free use of its facilities and other resources could be

construed as a "compensation or other benefit." Tr. at 928:1–9.

73.    Former Election Division Director Keith Ingram testified that providing volunteers

with bus fare was not "compensation" because "[t]hey can get their expenses reimbursed. That's

not payment." Tr. at 1904:1–2.[17] In contrast, the State's chief voter fraud prosecutor, Jonathan

White, stated that he would need to perform legal research to determine what kinds of economic

---

[17] Mr. Ingram was interpreting the term "compensation" in connection with S.B. 1 § 6.06, which prohibits
compensation for mail-ballot assistance, but nothing in his testimony suggests that he would apply a different meaning
to the word as it is used in S.B. 1 § 7.04, which, again, is not defined.

benefits would violate the provision. Tr. at 3992:20–3993:21 (conceding that he would need to "review[] the case law" to determine whether a meal, bus fare, or a gift bag containing a t-shirt constitute prohibited compensation).

### Confusion about the meaning of "physical presence"

74.     Plaintiffs worry about liability for canvassing in the "physical presence" of a mail ballot because their members have historically brought their ballots to candidate forums, town hall meetings, and other in-person events at community centers, union halls, and people's homes.

75.     Because "physical presence" is not defined in Section 7.04, Plaintiffs are unsure how physically proximate a ballot must be to a volunteer or employee to violate the Canvassing Restriction and risk exposure to a decade in prison.

76.     Indeed, trial witnesses were afraid of criminal liability for inadvertently advocating for a ballot measure in conversations with voters who happened to have a mail ballot in their possession. *See, e.g.*, Tr. at 1780:17–1781:4 (TARA's organizational representative, Judy Bryant, suggesting that a ballot might be concealed in a voter's backpack or purse during the conversation).

77.     At trial, Mr. Ingram refused to offer a specific distance or any concrete guidance about how canvassers should determine whether they are in the "physical presence" of a mail ballot, which can only be determined on a case-by-case basis. *See* Tr. at 1917:5–14; *see also* Tr. at 1916:1–4 (stating that the Secretary does not have an official opinion on whether a ballot being within five or ten feet of a discussion constitutes physical presence under Section 7.04). "Whether or not a prosecutor agrees with us," he conceded, "is a different story entirely." Tr. at 1917:18–19.

### Confusion about canvassers' ability to provide voting assistance

78.     County election officials agreed that Section 7.04 could interfere with community organizers' ability to assist voters with their mail-ballots because its prohibition on "in-person

interactions" in the "presence of a mail ballot" does not include an exception for mail-ballot assistance. *See* Tr. at 758:8–19, 758:22–759:12 (Cameron County EA Remi Garza); Tr. at 841:15–842:9, 844:13–25 (DeBeauvoir); Tr. at 496:2–8 (Scarpello).

79.     Mr. White testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is a subterfuge for voter fraud. Tr. at 3995:11–24. He acknowledged, however, that prior to S.B. 1, the Election Code already criminalized: assisting a voter who is not eligible for assistance or did not ask for assistance; voting a ballot differently than the voter wished or directed the assistant to vote the ballot; suggesting to the voter during the voting process how the voter should vote, or attempting to influence or coerce the voter receiving assistance. Tr. at 3923:21–3924:14, 3925:4–6.

**The Canvassing Restriction has chilled Plaintiffs' in-person interactions with voters**

80.     Plaintiffs and their members cannot determine from the text of TEC § 276.015 whether the Canvassing Restriction prohibits their organizations' routine voter engagement activities. This ambiguity has chilled Plaintiffs' willingness to conduct in-person community events and political outreach to voters where a mail-in-ballot might be present, including events where Plaintiffs' members have historically provided (and received) voting or language assistance.

81.     To avoid putting staff members and volunteers in legal jeopardy under the Canvassing Restriction, Plaintiffs and their members have limited their in-person interactions with voters in the weeks before elections, when voters are most likely to have mail ballots in their possession—and when Plaintiffs' speech is most likely to be effective. Tr. at 1766:15–23 (TARA's mission has been severely impacted by the restrictions during the early voting period because voter engagement and advocacy efforts are most critical in the weeks leading up to an election); Tr. at

1599:17–21 (The League hosts events in the weeks before elections, "when people are most interested in learning about candidates and what's on the ballot.").

82.     For example, Judy Bryant, TARA's sole paid field organizer, is no longer willing to "accept or set up any tabling invitations or events" once "mail ballots go out" because she does not want to take the chance of a person "having a mail ballot" when she advocates on behalf of TARA. Tr. at 1765:24–1766:5. As a result, Ms. Bryant plans to cease any in-person advocacy "after the first week in October" before an election "because mail ballots are generally going out by that time in most counties." Tr. at 1766:6–9. But for S.B. 1, Ms. Bryant would engage in this work "right up to and including Election Day." Tr. at 1766:10–14.

83.     Similarly, prior to S.B. 1, Deborah Chen, OCA's civic engagement programs director, personally provided language assistance to LEP voters who brought their mail-in ballots to OCA's candidate forums. Tr. at 1697:13–18. Ms. Chen has been unwilling to assist voters since S.B. 1 was enacted, due to the threat of criminal liability. Tr. at 1726:21–1727:6.

84.     Ms. Bryant and Ms. Chen are not alone their decisions to restrict their in-person voter outreach activities due to threat of criminal sanctions under the Canvassing Restriction:

- **OCA** has stopped hosting in-person events where members have historically brought mail-in ballots and received voting assistance, include candidate forums, Tr. at 1718:20–24, and no long offers voters assistance or rides to the polls, Tr. at 1722:3–16. OCA is especially worried about exposing its student volunteers to criminal charges, since one of its missions is to educate and develop a pool of future leaders. Tr. at 1721:2–10, 1721:11–1722:22.

- **The League** determined that it "would turn away members with their mail-in ballots from candidate forums." Tr. at 1620:7–1621:1

- **LUPE** planned to advocate on a number of measures in the November 2023 Constitutional Amendment election but trained its staff not to advocate on the ballot measures in the presence of a mail ballot. Tr. at 3681:6–3682:8.

- **MABA** members are no longer willing to provide voting assistance because members fear that they might inadvertently commit a crime, potentially costing them their law licenses. Tr. at 2543:14–2544:23.

- **LULAC** volunteers "scaled . . . down" their GOTV efforts and decided not to conduct voter outreach with seniors, many of whom require voting assistance, for "fear that they could be subject to prosecution if they help seniors vote by mail." Tr. at 1655:10–18.

- **AFT** has shifted its voter engagement efforts away from block-walking to communicating with voters over the phone, video, and text message. Tr. at 924:21–925:12–14, 928:17–929: 3, 934:7–21, and must train its remaining block-walkers and temporary paid organizers to limit their interactions with voters to avoid criminal penalties, Tr. at 928:2–9.

85.     Plaintiffs have found that alternative methods of communication are much less effective at reaching voters—during the precise time when their speech is most critical. *See* Tr. at 1720:9–15 (describing attendance at OCA's virtual candidate meet-and-greet in spring 2022 as "fairly abysmal" compared to previous, in-person meet-and-greets); Tr. at 930:11–21 (noting that AFT's outreach to voters by phone and text and video detracted from the "quality of the conversations" AFT was able to have with voters). As Ms. Bryant explained, "the closer you can do some education and information sharing the closer to the time of someone voting" the more effective it will be, "because people tend to forget or not be familiar with an issue" and speaking with them "closer to actually [] voting makes a big difference." Tr. at 1766:15–23.

86.     Uncertainty about how to comply with S.B. 1's provisions, including the Canvassing Restriction, and fear of potential criminal liability have also impaired Plaintiffs' ability to recruit members and chilled existing members' willingness to volunteer with the Plaintiff organizations. MABA, for example, is finding it harder to recruit volunteers to educate and assist voters because of S.B. 1 because members fear that they might inadvertently commit a crime and risk their law licenses by accepting meals, gas cards, swag or other forms of compensation while tabling at community events or providing voter assistance. *See* Tr. at 2543:14–2544:16, 2553:11,

2542:6–20. AFT's members are likewise less willing to volunteer with the organization because they are uncertain about how to comply with the law. Tr. at 934:7–21.

## CONCLUSIONS OF LAW

**SUBJECT MATTER JURISDICTION**

This Court has subject matter jurisdiction pursuant to 28. U.S.C. § 1331, which provides that "district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**Plaintiff's Claims fall within the *Ex parte Young* Exception to Sovereign Immunity**

The State Defendants reassert their affirmative defense that, as to the Secretary and the AG, Plaintiffs' constitutional challenges to the Canvassing Restriction are barred by sovereign immunity. *See* ECF No. 862 at 21–26. Because the Election Code imposes particular enforcement duties upon both the AG and the Secretary and both Defendants have demonstrated a willingness to enforce the Canvassing Restriction, however, the Court concludes that Plaintiffs' claims fall within the *Ex Parte Young* exception to sovereign immunity. The County DAs do not assert that they are entitled to sovereign immunity. [18]

---

[18] The Court recently dismissed all constitutional claims against Harris County DA Kim Ogg as barred by Eleventh Amendment immunity in accordance with the Fifth Circuit's ruling and mandate issued in *Mi Familia Vota v. Ogg*, 105 F.4th 313 (5th Cir. 2024). *See* ECF No. 1147.

The remaining DAs have not argued that they are entitled to sovereign immunity in this action. Instead, they have stipulated that (1) they are responsible for investigating and prosecuting violations of the Canvassing Restriction and (2) they do not intend to refrain from enforcing the Canvassing Provision absent an injunction in this case. *See* ECF No. 753-6 (Travis) ¶¶ 3–6; ECF No. 753-7 (Dallas) ¶¶ 3–4; ECF No. 753-13 (Hidalgo) ¶¶ 3–6; ECF No. 753-8 ¶¶ 5–7 (34th Judicial District). Moreover, the DA of 34th Judicial District sought—and received—permission to be excused from participation in this case and agreed not to enforce the criminal provisions challenged by the private Plaintiffs during the pendency of the case. *See* ECF No. 356; Text Order dated Apr. 11, 2022.

Although district courts may raise the question of sovereign immunity *sua sponte*, Fifth Circuit precedent suggests that their authority to do so is discretionary. *See Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) (holding that the

## Legal Standard

State sovereign immunity under the Eleventh Amendment generally precludes suits against state officials in their official capacities. *City of Austin v. Paxton*, 943 F.3d 993, 997 (2019). The *Ex parte Young* exception to state sovereign immunity, however, allows private parties to bring "suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013) (citing *Ex parte Young*, 209 U.S. 123, (1908)).

"*Ex parte Young* is a 'necessary exception' to sovereign immunity, preventing state officials from using their state's sovereignty as a shield to avoid compliance with federal law." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 451 (5th Cir. 2022) (quoting *P.R. Aqueduct*

---

district court "*could sua sponte* dismiss [a] complaint" based on sovereign immunity) (emphasis added). The Court declines to exercise its discretion with respect to the remaining County DAs here, for two reasons.

First, Fifth Circuit law addressing whether and when Eleventh Amendment immunity extends to local officials is unsettled. For example, in January 2024, the panel in *National Press Photographers Association v. McCraw* declined to extend Eleventh Amendment immunity to a county prosecutor charged with enforcing the challenged state statutes "because 'state sovereign immunity applies only to *states and state officials*, not to political subdivisions like counties and county officials." 90 F.4th 770, 787 (5th Cir. 2024) (emphasis added). As the panel went onto explain:

> [W]e have held that Texas district attorneys are not protected by the Eleventh Amendment precisely because they are county officials, not state officials. Granted, a couple of unpublished opinions have suggested that a district attorney's entitlement to Eleventh Amendment immunity may depend on whether he or she is performing in a local or state capacity. But we understand our precedent to employ a more categorical approach, informed by various factors that [the DA] does not otherwise argue support his position that he is protected by the Eleventh Amendment.

*Id.* (quotations, citations, and alteration marks omitted) (citing *Clark v. Tarrant County*, 798 F.2d 736, 744–45 (5th Cir. 1986) (enumerating six factors that courts should consider in determining whether an entity is entitled to Eleventh Amendment immunity)).

Nonetheless, only five months after *McCraw*, the *Ogg* panel assumed that the Harris County DA could assert state sovereign immunity, without addressing *McCraw* or engaging with any of the factors set forth in *Clark*. *See generally Ogg*, 105 F.4th at 325–33. Nor did the panel offer any guidance about the how H.B. 17's restrictions on prosecutorial discretion should impact the duty analysis under *Ex parte Young*. *See id.*

Second, directing the County DAs to submit evidence and briefing on the question of their sovereign immunity would only serve to defeat one of the central purposes of their stipulations and of the doctrine of sovereign immunity itself: to preserve government resources. *See Ogg*, 105 F.4th at 324 ("[B]oth parties correctly highlight the costs and consequences of litigation when considering whether sovereign immunity applies[.]"); *cf. Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 720 n.4 (5th Cir.), *opinion corrected on denial of reh'g*, 380 F.3d 231 (5th Cir. 2004) (finding waiver where defendant waited until after summary judgment to raise sovereign immunity).

*& Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). The rule is based on the legal fiction that a sovereign state cannot act unconstitutionally. *Young*, 209 U.S. at 159. Thus, where a state actor enforces an unconstitutional law, he is stripped of his official clothing and becomes a private person subject to suit. *Id.* at 160.

The Supreme Court has counseled that, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alterations on original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)). The Supreme Court has also made clear that, for the *Ex parte Young* exception to apply, the state official, by virtue of his office, must have "some connection with the enforcement" of the challenged law. *Young*, 209 U.S. at 157.

Despite the straightforward inquiry that the Supreme Court envisioned, the Fifth Circuit has acknowledged that its own decisions "are not a model of clarity on what 'constitutes a sufficient connection to enforcement.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party I*), 961 F.3d 389, 400 n.21 (5th Cir. 2020) (quoting *City of Austin*, 943 F.3d at 999). Nevertheless, the Fifth Circuit has articulated some general rules. For instance, the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are implemented.'" *Id.* at 400–01 (emphasis in original) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). The Fifth Circuit has also determined that "[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent and our *Young* analysis ends." *Id.* at 401 (quotation marks and citation omitted). "Moreover,"

according to the Fifth Circuit, "a mere connection to a law's enforcement is not sufficient—the state officials must have taken some step to enforce." *Id.*

The Fifth Circuit has further explained that plaintiffs must at least "show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Tex. Democratic Party v. Abbott* (*Tex. Democratic Party II*), 978 F.3d 168, 179 (5th Cir. 2020) (quoting *Morris*, 739 F.3d at 746). Put differently, the state "official must be 'statutorily tasked with enforcing the challenged law[,]'" *id.* (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 161 (2021)), though whether the particular duty to enforce the statute in question "arises out of the general law, or is specially created by the [statute] itself, is not material so long as it exists[,]" *Young*, 209 U.S. at 157.

"Enforcement typically means 'compulsion or constraint.'" *Tex. Democratic Party II*, 978 F.3d at 179 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). The definition extends beyond the "type of direct enforcement found in *Ex Parte Young*, for instance, where the attorney general threatened civil and criminal prosecution." *Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024) (quoting *Air Evac EMS*, 851 F.3d at 519. "[S]uch enforcement is not required." *Id.* "A 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' will do." *Tex. Democratic Party II*, 978 F.3d at 179 (quoting *City of Austin*, 943 F.3d at 1002). In short, "if an 'official *can* act, and there's a significant possibility that he or she *will* . . . , the official has engaged in enough compulsion or constraint to apply the *Young* exception.'" *Tex. Democratic Party I*, 961 F.3d at 401 (emphasis in original) (quoting *City of Austin*, 943 F.3d at 1002).

**Analysis**

To begin, the State Defendants each have particular enforcement duties under the Election Code. Whether the defendant has the "particular duty" to enforce the challenged law is different than whether there is a "demonstrated willingness" of enforcement. *See Mi Familia Vota*, 105 F.4th at 325. To demonstrate a "particular duty," *Ex parte Young* requires neither a history of enforcement nor a statutory requirement of enforcement. *City of Austin*, 943 F.3d at 1001; *Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020).

The Election Code provides that the AG "shall investigate" allegations of election crimes in elections covering more than one county. TEC § 273.001(a); *see also Garza v. Harrison*, 574 S.W.3d 389, 402 (Tex. 2019) (noting that, under Texas law, "[t]he term 'shall,' . . . 'imposes a duty.'") (quoting TEX. GOV'T CODE § 311.016(2)). Allegations of vote-harvesting against the Plaintiff organizations are especially likely to be investigated by the AG because each of them operates in multiple counties in Texas. The AG may also investigate potential election crimes on its own initiative, TEC § 273.001(b), but also has the power to compel local prosecutors to investigate such allegations. *See* TEC § 273.002(b).

Likewise, the Election Code provides that the Secretary "shall promptly refer" information establishing probable cause to believe that an election crime has occurred to the AG" and "provide all pertinent documents and information in his possession to the AG." TEC § 31.006; *see also* TEC § 276.019 ("A public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly

authorized by this code.").[19] The AG, in turn, "may investigate" referrals from the Secretary. TEC § 273.001(d).

Whether the State Defendants' enforcement is mandatory or discretionary speaks to a "demonstrated willingness" to enforce the statute—not whether they have the "particular duty" to enforce the Canvassing Provision. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024) (finding state agency heads with discretionary enforcement power had a particular duty to enforce and noting that "[a]s heads of Texas law-enforcement agencies, [defendants] have more than just the general duty to see that the state's laws are implemented— they are directly responsible for enforcing Texas's criminal laws").

Here, the State Defendants have shown a desire to enforce the statute. Critically, neither the AG nor the Secretary has disavowed enforcement. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 302 (1979) ("[T]he State has not disavowed any intention of invoking the criminal penalty . . . . Appellees are thus not without some reason in fearing prosecution for violation of the ban[.]"). In the First Amendment context, this is enough. *See McCraw*, 90 F.4th at 782 ("Unlike in other constitutional

---

[19] The Court rejects the State Defendants' argument that the Secretary has no enforcement duty because her title does not appear in the Canvassing Provision itself. ECF No. 862 ¶ 23. Their position that *Ex parte Young* asks the Court to read each provision in a vacuum, without reference to any other Election Code provision—no matter how relevant to the enforcement question at hand—is entirely divorced from Fifth Circuit precedent, from the fundamental precepts of statutory interpretation, and from common sense. "[R]easonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (ellipsis in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "[T]he cardinal rule [is] that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citing *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)).

contexts, in the speech context, we may assume a substantial threat of future enforcement absent compelling contrary evidence.") (internal citation and quotation omitted).

Beyond the AG's refusal to disavow, the trial record makes clear that he *does* intend to enforce the Canvassing Restriction. Jonathan White, former Chief of the OAG Election Integrity Division, testified that the "vote harvesting" schemes (purportedly targeted by the Canvassing Restriction) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8; *see also* LULAC-86 at 6 (identifying at least one OAG investigation of a possible violation of the Canvassing Restriction as of March 17, 2023). The OAG has specifically identified previous prosecutions in which it participated, including prosecutions for "vote harvesting" and prosecutions conducted by or with the assistance of local DAs in multiple counties. *See* OCA-377. The Secretary, for her part, has received allegations related to mail ballot "vote harvesting," which she has referred to the OAG both before and after the passage of S.B. 1. Tr. at 1914:1–6.

The State Defendants' duties under the Election Code and scintilla of enforcement are sufficient to establish that Plaintiffs' constitutional challenges to the Canvassing Restriction fall within the *Ex parte Young* exception to sovereign immunity.[20] Thus, the Court turns to the second

---

[20] The Court observes that, even if these statements were insufficient to establish the required scintilla of enforcement, it would be manifestly unfair to permit the State Defendants to pursue their sovereign immunity defense on this basis given their repeated use of the "investigative privilege" to withhold investigative documents throughout this litigation. *See* ECF No. 992-3 (OAG); ECF No. 992-16 (OAG); ECF No. 992-20 (SOS).

Under the sword-and-shield doctrine, "a party may not use privileged information both offensively and defensively at the same time." *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th Cir. 2005); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) (emphasizing "a client's inability to, at once, employ the [attorney-client] privilege as both a sword and a shield."). As the Fifth Circuit has emphasized, allowing a party to do so "would be manifestly unfair to the opposing party." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989).

Here, the State Defendants cannot rely on Mr. White's testimony that that "vote harvesting" schemes remain among the most common elections-related allegations that the OAG pursues as proof that the Canvassing Restriction serves a compelling interest, Tr. at 3915:3–8, and at the same time argue, based on the dearth of documentary evidence of allegations, that the OAG has no role in enforcing Section 7.04.

component of subject matter jurisdiction challenged by the State Defendants: Plaintiffs' standing to challenge the Canvassing Restriction.

**Plaintiffs have Standing to Challenge the Canvassing Restriction**

Plaintiffs have established organizational standing to assert their constitutional challenges to the Canvassing Restriction. Plaintiffs and their members are directly regulated by the Canvassing Restriction and have chilled their speech due to a credible threat of enforcement by the State Defendants and the County DAs. An order enjoining enforcement of the Canvassing Restriction would remove the chill from their protected speech.

### <u>Legal Framework</u>

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* In a case that proceeds to trial, plaintiffs must establish all three elements by a preponderance of the evidence. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[I]n a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing "must be supported adequately by the evidence adduced at trial."). These requirements ensure that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the

presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497 (2007) (quoting *Baker v. Carr*, 369 U.S. 186 (1962)) (quotation marks removed).

"[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury" for the self-evident reason that "injunctive and declaratory relief 'cannot conceivably remedy any past wrong.'" *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

To constitute an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 720–21 (citations omitted). The injury must be "imminent . . . to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* at 721 (quoting *Lujan*, 504 U.S. at 564 n.2). For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Nonetheless, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted). "This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Id.* (quotations omitted).

Juridical entities may establish standing under an associational or organizational theory of standing. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to

protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,* 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)). Participation of individual members is not required where, as here, the association seeks prospective and injunctive relief, rather than individualized damages. *Consumer Data Indus. Ass'n v. Texas,* No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous.,* 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler,* 178 F.3d 350, 356 (5th Cir. 1999)). An organization can establish a likely future injury if it intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt,* 442 U.S. at 298; *see, e.g., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n,* 760 F.3d 427, 439 (5th Cir. 2014) (charitable organizations had standing to challenge statute prohibiting their use of bingo proceeds for political advocacy as an unconstitutional burden on their political speech).[21]

**<u>Analysis</u>**

Plaintiffs have established by a preponderance of the evidence that OCA, the League, LUPE, MABA, LULAC, TARA, and AFT and their respective members (1) are prospectively

---

[21] *See also S. Christian Leadership Conf. v. Sup. Ct. of State of La.,* 252 F.3d 781, 788 (5th Cir. 2001) (concluding that "at least some" of the plaintiffs—law students and faculty and community and student organizations—had standing to challenge a Louisiana Supreme Court rule restricting representation by student-practitioners because the operations of law-school clinics were "directly regulate[d]" and "[s]everal of the client organizations would be unable to obtain representation by the clinics").

subject to the Canvassing Restriction and (2) have been injured by the Canvassing Restriction's chilling effect on their speech.[22]

### Plaintiffs have suffered an organizational injury to their speech

"Organizations, like individuals, enjoy rights to free speech, free exercise, and equal protection of the laws." *Caractor v. City of New York Dep't of Homeless Servs.*, No. 11 CIV. 2990 DLC, 2013 WL 2922436, at *3 (S.D.N.Y. June 14, 2013) (citing *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936)); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) ("Government may not suppress political speech on the basis of the speaker's corporate identity").

Like individuals, an organization does not need to affirmatively violate a law to have standing to challenge it. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 579–82 (2023) (considering company's First Amendment pre-enforcement challenge). Instead, the plaintiff need only "aver[] that it intend[s] to do so in the future." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 927 n.23 (5th Cir. 2023).

The Fifth Circuit has "repeatedly held, in the pre-enforcement context, that '[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement.'" *Speech First, Inc. v. Fenves,* 979 F.3d 319, 330–31 (2020), *as revised* (Oct. 30, 2020) (quoting *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)). To satisfy standing requirements, this type of self-censorship must arise from a fear of prosecution that is not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979). A fear of prosecution is "imaginary or wholly speculative" where plaintiffs "do not

---

[22] When multiple plaintiffs seek the same injunctive relief, only one needs to establish standing. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Here, the Court must identify at least one organization in each Plaintiff group with standing to seek injunctive against the local DAs in their respective jurisdictions.

claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible.'" *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

The Fifth Circuit recently clarified in *Fenves* that, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will *assume* a credible threat of prosecution in the absence of compelling contrary evidence." *Fenves*, 979 F.3d at 335 (emphasis added) (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).

To establish a credible fear of enforcement, then, a plaintiff may, but need not, rely on a history of past enforcement of similar policies or direct threats to enforce the challenged policies: "Past enforcement of speech-related policies can assure standing," but "a lack of past enforcement does not alone doom a claim of standing." *Fenves*, 979 F.3d at 336 (citing *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006). Rather, a plaintiff may also establish a substantial threat of enforcement simply by showing that she is "either presently or prospectively subject to the regulations, proscriptions, or compulsions [being challenged]." *Id.* at 335 (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).

A plaintiff whose speech is subject to the challenged restriction can establish standing even when the defendant disavows any intention to enforce the policy. *Id.* at 337. As the Fifth Circuit put it:

> [I]f there is no history of inappropriate or unconstitutional past enforcement, and no intention to pursue discipline [up to and including criminal referral] under these policies for speech that is protected by the First Amendment, then why maintain the policies at all? At least, why maintain the plethora of potential sanctions?

*Id.* "Where the policy remains non-moribund, the claim is that the policy causes self-censorship among those who are subject to it, and the [plaintiffs'] speech is arguably regulated by the policy,

there is standing." *Id.* at 336–37 (citing *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767–70 (6th Cir. 2019) (fact that "there is no evidence in the record" of past enforcement "misses the point")). In the pre-enforcement context, "the threat is latent in the existence of the statute." *Id.* at 336. If a plaintiff "plainly belong[s] to a class arguably facially restricted by the [law]," that is enough to establish "a threat of enforcement." *Id.*; *see also Babbitt*, 442 U.S. at 302 (recognizing union's standing to assert pre-enforcement because the union was "not without some reason in fearing prosecution," since the criminal penalty provision applied to the union's speech, and "the State ha[d] not disavowed any intention of invoking the criminal penalty provision against unions").

The evidentiary burden for proving that a plaintiff is "prospectively" subject to the challenged regulation is not demanding. *Fenves*, 979 F.3d at 335; *Laird*, 408 U.S. at 11. A plaintiff need not show that it has engaged in arguably proscribed conduct in the past to demonstrate an intent to engage in such conduct in the future. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 579–82 (2023) (considering company's First Amendment pre-enforcement challenge to an anti-discrimination statute by a graphic designer who had never created a wedding website but "worrie[d] that, if she enter[ed] the wedding website business, the State [of Colorado would] force her to express messages inconsistent with her belief[s]").

**Plaintiffs are prospectively subject to the Canvassing Restriction.**

All of the organizations:

> (a)  have supported ballot measures and/or candidates in the past and intend
>       to do so in the future;[23]

---

[23] *See* Tr. at 1711:8–19, 1712:17–1713:11; 1726:8–14 (OCA has advocated for certain ballot measures); Tr. at Tr. at 1600:17–19 (LWV has supported ballot measures, including a school bond in Austin); Tr. at 89:2–18 (LUPE has supported ballot measures, including a drainage bond, the creation of a health care district in Hidalgo County, increased broadband access in South Texas); Tr. at 2542:6–8 (MABA routinely encourages support for candidates and ballot measures by tabling at local events, such as candidate forums); Tr. at 1632:25–1633:9 (LULAC does not endorse particular candidates but has taken positions on issues such as school and municipal bond measures, state constitutional amendments, and ballot propositions affecting taxes and public education); Tr. at 1764:3–10 (TARA has advocated for and against ballot measures, engaged in issue advocacy, and endorsed local and state candidates based on their

(b)  have advocated for their positions through in-person voter engagement efforts, such as neighborhood block-walking, tabling in public places, and hosting candidate forums, town hall meetings, and other events at their offices and in members' homes;[24]

(c)  reasonably expect mail-in ballots to be present during such interactions with voters, who often take out their ballots at election events or in conversations with door-to-door canvassers because they have questions about the ballot or needed voting assistance;[25] and

(d)  maintain staff and/or volunteers who receive some "compensation or other benefit" in exchange for their in-person canvassing efforts.[26]

Each Plaintiff has thus established an intention, as an organization, to engage in speech arguably proscribed by the Canvassing Restriction. *See 303 Creative*, 600 U.S. at 579–82; *Susan B. Anthony List*, 573 U.S. at 159. Moreover, all the organizations and their members have self-

---

positions on issues relevant to TARA); Tr. at 929:6–930:5 (AFT engaged in block-walking to advocate for candidates and issues supported by the organization);

[24] *See* Tr. at 1694:21–1696:8, 1699:24–1702:2, 1706:12–1707:3 (OCA hosted election events attended by hundreds of people, including in-person candidate forums and meet-and-greets, and conducts block-walking and exit-polling, and encountered voters who requested assistance with their mail ballots); Tr. at 1595:3–15, 1596:3–12, 1607:7–14 (LWV hosts in-person events attended by hundreds of people in part because members like to hear about ballot measures and discuss them with other members of the community and ask candidates questions about their positions); Tr. at 71:1–72:15, 75:11–75:17, 90:4–24, 119:20–120:18 (LUPE members brought mail ballots to LUPE offices and meetings and took them out during interactions with door-to-door canvassers and asked for voting assistance); Tr. at (MABA tables at local events, including candidate forums); Tr. at 1654:2–1657:19 (LULAC members provided voter assistance during their GOTV efforts with senior citizens); Tr. at 1762:20–1763:4 (TARA hosts monthly chapter meetings, rallies, and community events across Texas); Tr. at 929:6–930:5 (AFT engaged in block-walking to advocate for candidates and issues supported by the organization).

[25]*See id; see also* Tr. at 925:9–12, 926:17–928:1 (AFT members have had voters take out their mail-in ballots while engaging in block-walking and door-to-door canvassing and AFT members themselves have filled out their mail ballots together during chapter meetings).

[26] *See* Tr. at 1717:24–1718:5, 1714:13–22, 1716:14–22, 1694:11–20 (OCA routinely offers volunteers benefits that could be considered compensation—meals, beverages, snacks, academic credit, shirts, and other nominal gifts—and pays independent contractors for literature-drop canvassing); Tr. at 1597:11–13, 1598:23–1599:1, 1601:2–8, 1601:12–1602:1 (LWV provides volunteers who staff in-person events with benefits such as food and letters of recommendation); Tr. at 75:11–17 (LUPE relies primarily on paid staff members and temporary paid canvassers); Tr. at 2542:17–20, 2544:14–16 (MABA volunteers are concerned that accepting gas cards, meals, swag, or a bottle of water will expose them to criminal liability); Tr. at 1654:2–1657:19 (LULAC volunteers receive modest compensation in the form of raffle tickets, food, and gasoline money); Tr. at 1763:16–18 (TARA relies primarily on its one paid field organizer, Judy Bryant); Tr. at 929:6–930:5 (AFT block-walkers include paid staff and volunteers who receive gas cards, food, "swag," and raffle tickets for their efforts).

censored speech that is "arguably regulated by" the Canvassing Restrictions.[27] Plaintiffs have also experienced a chilling effect on their associational rights, including their ability to recruit new members and volunteers and to assist voters during in-person events.[28]

**Plaintiffs' Organizational Injuries are Traceable to Defendants.**

The injury to Plaintiffs' and their members' free speech rights are fairly traceable to the State Defendants and County DAs, based on their authority to enforce the Canvassing Restriction under Texas law and willingness to do so.

Because the Canvassing Restriction "facially restrict[s]" Plaintiffs' expressive activity the Court must "*assume* a credible threat of prosecution in the absence of compelling contrary evidence." *Fenves*, 979 F.3d at 335 (emphasis added). The threat here is traceable to State Defendants and the County DAs, who, under the circumstances described in the Election Code,

---

[27] *See* Tr. at 1718:20–24, 1720:1–15, 1722:3–16, 1722:17–1723:5 (OCA no longer hosts in-person candidate forums and have stopped offering voter assistance); Tr. at 1599:17–21, 1620:7–1621:1 (LWV does not track whether voters bring ballots to their events but prospective voters are likely to have their ballots with them during candidate forums, which are typically held during the voting period); Tr. at 91:18–92:24, 3674:22–3675:11, 3684:13–3685:11, 3685:5–11 (LUPE has trained its canvassers to cease ballot issue advocacy to voters when a mail ballot is or might be present); Tr. at 2543:16–23 (MABA members are no longer willing to provide voter assistance); Tr. at 1654:2–1657:19 (LULAC had several counsels terminate their GOTV efforts with senior citizens because they were afraid of being asked for assistance); Tr. at 1765:19–1766:23 (TARA's only paid field organizer, is no longer willing to "accept or set up any tabling invitations or events" once "mail ballots go out" because she does not want to take the chance of a person "having a mail ballot" when she advocates on behalf of TARA); Tr. at 925:9–12, 926:17–19, 928:2–9, 930:11–21 (AFT has shifted its focus from in-person voter engagement to communicating with voters by text message, email, and phone, and must now warn its remaining block-walkers and temporary paid organizers to limit their interactions with voters so as to not risk criminal penalties).

[28] *See* Tr. at 1717:5–13, 1721:2–4, 1718:20–24, 1719:3–8, 1720:1–15 (OCA's attendance at virtual events has been "abysmal" and S.B. 1 has "decimated" its ability to provide voter assistance at events); Tr. at 1620:7–1621:1 (LWV "would turn away members with their mail-in ballots from candidate forums"); Tr. at 2543:14–2544:23 (MABA has had difficulty recruiting members to table events in support of candidates because of SB1 and because members fear that they might inadvertently commit a crime); Tr. at 1655:10–18 (LULAC volunteers "scaled . . . down" their GOTV efforts and decided not to conduct voter outreach with seniors, many of whom require voting assistance, for "fear that they could be subject to prosecution if they help seniors vote by mail"); Tr. at 1766:15–23 (TARA's mission has been severely impacted by the restrictions during the early voting period because voter engagement and advocacy efforts are most critical in the weeks leading up to an election); Tr. at 934:7–21 (AFT's members are less willing to volunteer with the organization because they are uncertain about how to comply with the law).

are vested with the authority to enforce the Canvassing Restrictions in the various jurisdictions in which Plaintiffs' free speech rights have been injured.[29]

That mere possibility that a defendant might exercise his discretion to decline to enforce a challenged law does not change the analysis: discretion does not obviate authority or defeat traceability. *See, e.g.*, *303 Creative*, 600 U.S. at 581 ("[S]tate officials . . . *may* bring actions to enforce the law. . . The Colorado Commission on Civil Rights *can* issue cease-and-desist orders and require violators to take various other "affirmative action[s]."").[30] After all, it is the credible threat of enforcement that has harmed Plaintiffs and their members. *See Longoria v. Paxton*, No. SA:21-CV-1223-XR, 2022 WL 447573, at *17 (W.D. Tex. Feb. 11, 2022), *vacated and remanded on other grounds*, No. 22-50110, 2022 WL 2208519 (5th Cir. June 21, 2022) ("To be clear, the irreparable harm alleged in this case is not *actual* enforcement of the anti-solicitation provision; the harm is the chilling effect on Plaintiffs' speech that arises from the credible *threat* of enforcement." (emphasis in original)).

The injuries to Plaintiffs' First Amendment rights are traceable to the County DAs, who have "the specific duty" to prosecute election law violations. In Texas, County DAs are tasked with enforcing the State's criminal laws and represent the State of Texas in all criminal cases in

---

[29] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the Secretary and the AG. Among the OCA Plaintiffs, who have also sued the Travis County DA, *see* ECF No. 200, the League operates in Travis County, *see* Tr. at 1586:12–13 (LWV). Among the LULAC Plaintiffs, who have also sued the County DAs of Travis, Dallas, and Hidalgo Counties, *see* ECF No. 207, LULAC, TARA, and AFT operate across Texas, including through local chapters in Dallas County. *See* Tr. at 1634:6–20 (LULAC); Tr. at 1765:24–1766:5 (TARA); Tr. at 923:18–25 (AFT has 66,000 members across Texas). Among the LUPE Plaintiffs, who have also sued the DAs of Travis County, Dallas County and the 34th Judicial District (including Hidalgo County), *see* ECF No. 208, LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and MABA has chapters throughout the state of Texas, Tr. at 2533:21–23.

[30] In *303 Creative*, the Supreme Court held that the plaintiff had established a credible threat of enforcement based on "*Colorado*'s" history of enforcement "against nearly identical conduct" and the fact that "*Colorado*" declined to disavow future enforcement proceedings. In attributing this conduct to "*Colorado*," the Court did not distinguish between the roles that the two key defendants—the Colorado Civil Rights Commission and the Colorado Attorney General—played in the previous enforcement proceedings. *See* 600 U.S. at 581–82 (citing a past enforcement under the same accommodation law that made its way to the Supreme Court in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617 (2018)).

their district, unless conflicts arise. Tex. Const. art. 5, § 21; TEX. CODE CRIM. P. ART. 2.01; *see* TEX. GOV'T CODE § 43.180(b). "For this reason, courts have long recognized that prosecutors are 'natural targets for § 1983 injunctive suits since they are the state officers who are threatening to enforce and who are enforcing the law.'" *McCraw*, 90 F.4th at 785 (quoting *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736 (1980)).

By virtue of their positions, DAs are charged with investigating and prosecuting violations of the Election Code, including the Canvassing Restriction. *Stephens*, 663 S.W.3d at 52; *see also* TEC § 273.001 (granting county and district attorney's authority to investigate election crimes). Indeed, all prosecutions under the Election Code require the consent or authorization of the applicable DA. *See Stephens*, 663 S.W.3d at 52 (concluding that the AG "can prosecute [crimes under the Election Code] with the permission of the local prosecutor but cannot initiate prosecution unilaterally."). All the County DAs acknowledge that they are responsible for enforcing the Canvassing Provision.[31]

None of the County DAs have disavowed enforcement of the Canvassing Restriction. Indeed, the County DAs may *not* disavow such enforcement under Texas law. *See* TEX. LOC. GOV'T CODE § 87.011(3)(B) (prohibiting district attorneys from adopting an enforcement policy of refusing to prosecute a type or class of criminal offense); *see also KVUE, Inc. v. Moore*, 709 F. 2d 922, 930 (5th Cir. 1983) (holding that plaintiffs had standing to pursue a pre-enforcement challenge in part because "the state has not disavowed enforcement"), *aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S. 1092 (1984).

---

[31] *See* ECF No. 753-6 (Travis County) ¶ 2; ECF No. 753-7 (Dallas County) ¶ 2; ECF No. 753-13 (Hidalgo County) ¶ 2; ECF No. 753-8 (El Paso County) ¶ 2.

Plaintiffs' injuries are traceable to the AG, who, even after *Stephens*, retains "broad investigatory powers" under the Election Code, State's Br. at 49, *LUPE v. Scott*, No. 22-50775 (5th Cir. Dec. 9, 2022), ECF No. 62, and may "direct the county or district attorney . . . to conduct or assist the attorney general in conducting the investigation." *See* TEC § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them). On top of this investigative power, "the Attorney General can prosecute with the permission of [a] local prosecutor," *Stephens*, 663 S.W.3d at 55, and no County DA has disavowed a willingness to let the AG pursue cases within their counties.

Plaintiffs' injuries are also traceable to the Secretary. The Secretary must review complaints about potential violations of elections laws and, upon finding probable cause to believe that a crime occurred, refer the case to (and provide all relevant documents) to the AG. TEC § 31.006; *see also* TEC § 276.019 ("A public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by this code."). Because this duty is mandatory under the Election Code, absent injunctive relief against the Secretary, she will be forced to refer potential violations of the Canvassing Restriction to the AG—even if the AG has himself been enjoined from enforcing TEC § 276.015. The threat of a such a referral to the AG could still chill Plaintiffs' speech by inviting the AG to embark on an arbitrary and discriminatory fishing expedition.

**Plaintiffs' Organizational Injuries are Redressable by Defendants.**

Finally, the Court finds that Plaintiffs' injuries are "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338. An order declaring the Canvassing Restriction unlawful and enjoining its enforcement would remove the chill that the provision presently imposes on Plaintiffs and their members. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d

655, 661 (5th Cir. 2006) (finding "redressability prong[] of the standing inquiry . . . easily satisfied" where "[p]otential enforcement of the statute caused the [plaintiff's] self-censorship, and the injury could be redressed by enjoining enforcement of the [statute]"); *Nat'l Press Photographs Ass'n v. McCraw*, 504 F. Supp. 3d 568, 582 (W.D. Tex. 2020), *aff'd* 90 F.4th 770 (5th Cir. 2024) (similar).

In short, Plaintiffs' position with respect to Section 7.04's Canvassing Restriction is "sufficiently adverse" to the State Defendants and the County DAs to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.[32]

Satisfied of its jurisdiction, the Court turns to the merits of Plaintiffs' constitutional challenges to the Canvassing Restriction.

## PLAINTIFFS' CONSTITUTIONAL CHALLENGES

Plaintiffs challenge the Canvassing Restriction as applied to their in-person advocacy with voters in the presence of a mail ballot in multiple contexts, including interactions in which voters have asked Plaintiffs' staff members and volunteers questions involving their mail ballots or for

---

[32] Many, if not all, of the Plaintiffs, would also have associational standing as membership organizations with members in Texas who receive compensation or other benefits in connection with their in-person canvassing activities. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) (where "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates").

Plaintiffs' individual members would independently meet the Article III standing requirements because they have engaged in self-censorship of speech that is arguably regulated by the Canvassing Restriction. *See, e.g.*, Tr. at 1765:19–1766:23 (TARA's only paid field organizer, Judy Bryant, is no longer willing to "accept or set up any tabling invitations or events" once "mail ballots go out" because she does not want to take the chance of a person "having a mail ballot" when she advocates on behalf of TARA).

Their First Amendment injuries are traceable to the State Defendants and the County DAs, based on their power to enforce the Canvassing Restriction under Texas law. Moreover, the free speech interests that Plaintiffs seek to protect are germane to their respective organizational missions. *See, e.g.*, Tr. at 1762:8–19, 1764:3–10, (TARA educates and mobilizes its members and volunteers to advance the interests of seniors citizens in Texas by engaging with voters in person about local and state candidates and ballot measures that would advance TARA's mission). Because Plaintiffs seek prospective and injunctive relief, rather than individualized damages, the participation of their members is not required. *See Consumer Data Indus. Ass'n*, 2023 WL 4744918, at *4 n.7.

The Court need not examine Plaintiffs' associational standing to challenge the Canvassing Restriction in any further detail, however, considering the obvious organizational interests at stake.

assistance completing them. The OCA Plaintiffs and LUPE Plaintiffs also assert facial challenges to the Canvassing Restriction as overbroad and unconstitutionally vague. *See* ECF Nos. 200, 208.

"Confusion abounds over the scope of as-applied and other types of First Amendment challenges that a plaintiff can pursue when challenging a statute," *Just. v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014), but the primary distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at 331.

"[T]he overbreadth doctrine enables litigants 'to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Hill v. Colorado*, 530 U.S. 703, 731–32 (2000) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) ("Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society[.]").

In the First Amendment context, facial challenges require courts to evaluate whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (finding in the "singular" First Amendment context, "even a law with a plainly legitimate sweep may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones.") (citation and internal quotations omitted).

"[E]ven if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

As a practical matter, the Court will begin its analysis with Plaintiffs' facial challenges because, the "first step" in overbreadth and vagueness cases is to "construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers."); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982) ("In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.").

### The Canvassing Restriction is subject to strict scrutiny.

The threshold question is what level of scrutiny applies to the Canvassing Restriction. *See Turner Broad. System, Inc. v. FCC*, 512 U.S. 622, 637 (1994). The Canvassing Restriction is subject to strict scrutiny both because it is a content-based and because it burdens Plaintiffs' core political speech.

The First Amendment to the U.S. Constitution protects against laws "abridging the freedom of speech." Free speech is protected both "from abridgment by Congress" and "from impairment by the States." *Gitlow v. New York*, 268 U.S. 652, 666 (1925). Accordingly, under the First Amendment, states have "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972)).

Content-based restrictions on speech "single[] out specific subject matter for differential treatment." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 169). They distinguish between "favored" and "disfavored speech." *Serv. Emps. Int'l Union*, *Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010). "[A] speech regulation

targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reagan Nat'l Advert.*, 596 U.S. at 71 (citation omitted).

Courts apply "strict scrutiny" to content-based restrictions on speech and laws that burden political expression. *See Reed*, 576 U.S. at 163–64 (content-based restrictions); *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (political speech); *Citizens United*, 558 U.S. at 340 (same); *Veterans of Foreign Wars*, 760 F.3d at 438–39 (same). Such laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

Strict scrutiny is required because the First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). Efforts to encourage voters to support a candidate or ballot measure constitute "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22. That is because "'[f]ree trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *NAACP v. Button*, 371 U.S. 415, 437 (1963) (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945)). Thus, facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984).

The Canvassing Restriction is content based because it "single[s] out specific subject matter"—speech intended to deliver votes for a specific candidate or measure—"for differential treatment." *Reagan Nat'l Advert.*, 596 U.S. at 69 (quoting *Reed*, 576 U.S. at 169). No other

category of speech is targeted for similar disfavored treatment. *City of Houston*, 595 F.3d at 596 (holding that content-based regulations are those that distinguish between "favored" and "disfavored speech"). It does not matter that the Canvassing Restriction does not target speech in support of *specific* candidates or measures—a regulation is content-based "even if it does not discriminate among viewpoints within that subject matter." *Reagan Nat'l Advert.*, 596 U.S. at 71.

Plaintiffs' in-person voter engagement activities constitute "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22; *see also NAACP v. Button*, 371 U.S. 415, 437 (1963) ("'Free trade in ideas' means free trade in the opportunity to persuade to action" (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945))). Urging voters to support particular measures or candidates during in-person interactions—the category of speech targeted by the Canvassing Restriction—is fundamentally expressive, and an individual or organization that conducts such activities engages in core political speech.

The State Defendants incorrectly assert that *Anderson/Burdick* governs the level of scrutiny applicable to Plaintiffs' challenge to the Canvassing Restriction, based on a misreading of the Fifth Circuit's decision in *Voting for America Inc. v. Steen*, 732 F.3d 382, 385 (5th Cir. 2013).

*Steen* involved a challenge to Texas regulations governing the appointment of volunteer deputy registrars ("VDRs"), who are trained and empowered under Texas law to collect and deliver completed voter registration applications. *Id.* Specifically, the regulations provided that VDRs must be Texas residents and that they could register voters only for counties in which the VDRs had been appointed. *Id.* at 389. Reversing the district court's preliminary injunction, the Fifth Circuit acknowledged that VDRs often engage in core political speech by "soliciting, urging and

49

persuading the citizen to vote," *id.* at 390, but concluded that the VDR provisions did not impose any burden on such speech:

> The Non–Resident and County provisions do not in any way restrict or regulate who can advocate pro-voter-registration messages, the manner in which they may do so, or any communicative conduct. They merely regulate the receipt and delivery of completed voter-registration applications, two non-expressive activities.

*Id.* at 391 (citations omitted). In other words, prohibiting out-of-state canvassers from registering voters in Texas did not affect their ability to promote voter registration in Texas. Moreover, the voter registration application itself did not represent the VDR's speech, the majority reasoned, but the *voter*'s speech. *Id.* at 390. Because the canvassers' speech was "distinct from both the collection and delivery of the forms and from the voters' 'speech' in registering," registration drives could not be considered "expressive conduct" protected by the First Amendment. *Id.* at 391. Despite finding it "indisputable" that requirements "burden[ed] no one's core political speech," the majority addressed the alleged burden on the canvassers' purportedly expressive conduct under *Anderson-Burdick* for the sake of argument. *See id.* at 392–96 (concluding that any burden was minimal and justified by Texas's interest in preventing voter registration fraud).

*Steen* does not stand for the proposition that any election-related speech should be analyzed under *Anderson-Burdick*. To the contrary, the Supreme Court has made clear that while *Anderson-Burdick* applies to laws and regulations that "control the mechanics of the electoral process," it does not apply to "a regulation of pure speech," even in the election context. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995).

Burdens on core political speech during elections, like *all* burdens on core political speech, are subject to strict scrutiny. *Id.* at 347.[33] And with good reason: it would defy logic to subject a

---

[33] *See also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict

content-based restriction of core political speech to *lesser* scrutiny because it happens to regulate speech during elections, when "the importance of First Amendment protections" is at its "zenith." *Meyer*, 486 U.S. at 425; *see also McIntyre*, 514 U.S. at 346–47 (noting political speech "occupies the core of the protection afforded by the First Amendment" and that "[n]o form of speech is entitled to greater constitutional protection"). Indeed, "it can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Serafine v. Branaman*, 810 F.3d 354, 361 (5th Cir. 2016) (holding that content-based restriction in election context was subject to "exacting scrutiny" (citing *McIntyre*, 514 U.S. at 347)).[34]

The State Defendants have not identified any election-related conduct purportedly regulated by the Canvassing Restriction—let alone non-expressive conduct—suggesting that it is directed toward the "mechanics of the electoral process" as opposed to "pure speech." Indeed, outside of voting assistance (which, as discussed herein, the State Defendants insist is still permitted under the Canvassing Restriction), it is unclear to the Court how a canvasser could

---

scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest."); *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138, 142 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023) (concluding that *Anderson-Burdick* applies only to laws that "primarily regulate the mechanics of the electoral process, as opposed to core political speech," not to laws "that are primarily directed at regulating 'pure speech'") (quoting *McIntyre*, 514 U.S. at 345); *Lichtenstein v. Hargett*, 83 F.4th 575, 593 (6th Cir. 2023) (explaining the Supreme Court has "applied strict scrutiny—not *Anderson-Burdick* balancing—to many election laws" implicating core political speech) (collecting cases); *Fusaro v. Cogan*, 930 F.3d 241, 258 (4th Cir. 2019) (observing the Supreme Court has "distinguished between laws that . . . regulate 'pure speech,'" and those subject to *Anderson-Burdick*); *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000) (recognizing "strict scrutiny," rather than *Anderson-Burdick*, "is applied where the government restricts the overall quantum of speech available to the election or voting process"); *Cotham v. Garza*, 905 F. Supp. 389, 396 (S.D. Tex. 1995) (holding that provisions governing the mechanics of voting are subject to *Anderson-Burdick* while a "content-based restriction on core political speech" is subject to strict scrutiny).

[34] Although the Supreme Court at times has used the terms "strict" and "exacting" scrutiny interchangeably when describing the relevant standard of review for content-based restrictions, more recent Supreme Court precedent has clarified that both content-based regulations and laws that restrict political speech are subject to strict scrutiny. *See, e.g.*, *City of Austin*, 596 U.S. at 68–69 (content-based regulations warrant application of strict scrutiny); *Reed*, 576 U.S. at 164 (content-based regulations must satisfy strict scrutiny); *Citizens United*, 558 U.S. at 340 (laws burdening political speech are subject to strict scrutiny); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812–13 (2000) (subjecting content-based restriction to strict scrutiny).

engage in an "in-person interaction" with a voter "intend[ing] to deliver votes for a specific candidate or measure" *without* engaging in core political speech.[35]

Any argument that the Canvassing Restriction regulates conduct—e.g., the payment of "compensation or other benefit"—rather than speech is foreclosed by *Citizens United*, 558 U.S. at 351 (applying strict scrutiny to a ban on independent corporate expenditures for electioneering communications); *see also Buckley v. Valeo*, 424 U.S. 1 (1976). "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19. As the Supreme Court has acknowledged, "all speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech," *Citizens United*, 558 U.S. at 351:

> [V]irtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.

*Buckley*, 424 U.S. at 19. "The First Amendment protects the resulting speech." *Citizens United*, 558 U.S. at 351.

Strict scrutiny applies to the Canvassing Restriction.

---

[35] The Canvassing Restriction does regulate *voters*' conduct insofar as it prevents them from voting by mail in the presence of a paid canvasser advocating for a particular candidate or ballot measure. Indeed, the LUPE Plaintiffs have in fact challenged Section 7.04's impact on voters as an unconstitutional burden on the right to vote in violation of the First and Fourteenth Amendments and acknowledge that *Anderson-Burdick* applies to that claim. *See* ECF No. 208 ¶¶ 219–29; *see also* ECF No. 854 § V. This order is limited to Plaintiffs' free speech and overbreadth challenges to Section 7.04 in their capacity as *canvassers*.

**The Canvassing Restriction is Facially Overbroad**

###### The Legal Framework

A "law imposing criminal penalties on protected speech is a stark example of speech suppression," *Ashcroft v. Free Speech Coal.*, 535 U.S. 564, 573 (2002), and the overbreadth doctrine permits courts to invalidate laws with civil or criminal penalties that might chill or dampen expressive activity of members of the public at large:

> Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas. Overbreadth adjudication, by suspending all enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech.

*Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citations omitted). Still, "invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects." *United States v. Williams*, 553 U.S. 285, 292 (2008).

To "strike[] a balance between competing social costs," a court considering a First Amendment overbreadth challenge should invalidate the statute only if a significant number of its applications are unconstitutional, considering the statute's intended scope. *United States v. Stevens*, 559 U.S. 460, 473 (2010).

### *The Scope of the Canvassing Restriction*

The Court first "assess[es] the state law's scope." *Moody*, 144 S. Ct. at 2398. The Canvassing Restriction imposes criminal liability on anyone who receives or offers "compensation or other benefit" and engages in speech that is "intended to deliver votes for a specific candidate or measure" in "the physical presence" of a mail ballot. TEC § 276.015.

Neither the Secretary nor the OAG has provided any guidance on the meaning of the Canvassing Restriction. Tr. at 1914:7–14, 1924:7–18, 1924:24–1925:3.

<u>The Canvassing Restriction is not limited to instances of voter fraud or coercion.</u>

Despite the text of the statute, Mr. Ingram testified that vote harvesting involves "physical presence, intimidation, making sure that a voter marked one box one way," Tr. at 1914:1–6, and occurs when somebody puts pressure on a voter to vote a particular way on a particular race[.]" Tr. at 4427:7–18. However, the Canvassing Restriction says nothing about "intimidation," "making sure the voter marked one box one way," or putting "pressure on a voter." *See generally* TEC § 276.015.

The Canvassing Restriction criminalizes compensation for *interactions* rather than the actual *delivery* of votes and imposes liability based on the *intent* of the voter outreach activity—to encourage a voter to support a particular candidate or ballot measure—rather than its actual effect on a voter. Nothing in the text of the statute limits its application based on the *voter's perception* of the interaction.

The text of the Canvassing Restriction reaches activities in the presence of a mail ballot regardless of the interaction's *ability* to affect the voter. By its text, Section 7.04 does not even permit an organizer to continue speaking in the presence of a mail ballot that the organizer learns will never deliver a vote for her cause, simply because she entered the interaction with the *intent* to garner electoral support. Section 7.04 is silent as to the canvasser's knowledge about the *voter*'s intent or ability to *actually cast* the ballot that happens to be present in favor of the canvasser's preferred candidate or measure. The ballot may have already been completed in favor of an opposing candidate or measure. A voter in possession of a mail-in ballot may become ineligible to vote by mail under Texas law due to changes in her travel plans (or some other change in

circumstances)[36] and decide to surrender his mail ballot at a polling station and vote in person. Likewise, the ballot materials might contain some damage or defect that would invalidate the ballot. There is no chance that the canvasser's compensated speech would, under those circumstances, intimidate or pressure a voter *during the voting process*.

The text of the Canvassing Restriction reaches organizers who provide voter assistance at a voter's request. The State Defendants assert that such assistance falls outside the purview of Section 7.04 because it is not "designed to deliver votes for or against a specific candidate or measure." ECF No. 862 ¶ 479 (citing TEC §276.05(e)); *see also* ECF No. 608 at 36.

But any efforts designed to increase *turnout* among voters who are already likely to vote for the organization's preferred candidate or measure are, arguably "designed to deliver votes for the candidate or measure." Thus, training canvassers on how to provide non-coercive voting assistance to LEP and disabled voters upon request during candidate forums or block-walking would be arguably "designed to deliver votes for a specific candidate or measure" if the organization's outreach efforts were directed toward like-minded voters.

The expansive reach of the term "interaction"—as opposed to "communication" or "speech" or "advocacy"— compels the same conclusion because it very clearly encompasses *both* core political speech *and* voting assistance. *See Interaction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/interaction (last visited Sept. 24, 2024) (defining "interaction" means "mutual or reciprocal action or influence"). Nothing in the text of the Canvassing Restrictions suggests that a voter who asks a canvasser for voting assistance while

---

[36] Texas authorizes several categories of voters to vote by mail. These include voters who are 65 years of age or older, disabled voters who cannot vote in person on Election Day "without the likelihood of needing personal assistance or injuring [their] health," voters absent from their home counties for the entire in-person voting period, and voters who expect to give birth near Election Day. TEC §§ 82.001–004, .007–.008.

discussing a ballot measure begins a new, distinct "interaction" that is no longer imbued with the canvasser's original intent.

Finally, the text of the Canvassing Restriction can be read to impose criminal liability on the very voters it purports to protect. For example, a voter discussing his mail ballot with a like-minded GOTV volunteer would arguably violate Section 7.04 by offering a glass of water as a pick-me-up during a hot afternoon of door-knocking. *See* TEC § 276.015 (making it a crime to offer a benefit for the canvasser's "services").[37] Likewise, a paid organizer could violate the statute by using her *own* mail-in ballot as a visual aid during conversations with voters. Section 7.04 criminalizes both interactions, even though neither voter faces risk of coercion or intimidation based on the "compensation" involved or the "presence" of a mail ballot.

<u>The Canvassing Restriction is not limited to speech during active voting.</u>

The State Defendants insist that the Canvassing Restriction is merely a restriction on the *timing* of canvassers' speech only "in situations where an individual is actively voting or is being pressured to do so." ECF No. 862 ¶ 1038; *see also* Tr. at 1915:12–16 (Mr. Ingram's testimony that illegal vote harvesting is limited to "whenever the voter and the harvester get together and they're reviewing the ballot together, and then they get down to that candidate, and the harvester makes sure they check the right box[.]").

Here, again, because nothing in the text of the Canvassing Restriction even limits its application to interactions involving *live* ballots, it appears to apply to interactions in the presence of mail ballots that will never actually be cast.

---

[37] This application of the Canvassing Restriction is not purely hypothetical. At trial, Grace Chimene, testifying on behalf of the League, was especially worried that League volunteer activities' during door-to-door canvassing could expose *voters* to criminal liability: "It's not just my concern for the league members, but it's also a concern if just a voter that were helping provides compensation, or the place that they live provides compensation of some type that they may be committing a crime." Tr. at 1592:1–5; *cf.* Tr. at 1904 (Keith Ingram's testimony that a voter would violate Section 6.06's bar on compensated assistance by offering a volunteer $20 to help them vote).

Even with respect to live ballots, the State Defendants' position is unsupported by the text of the provision, which applies to interactions that occur "in the presence of the ballot *or* during the voting process." TEC § 276.015(e)(2) (emphasis added). Nothing in S.B. 1 or the Election Code defines what it means for an individual to be in the "physical presence" of a ballot. Tr. at 1914:18–20. According to the State Defendants, "'physical presence' does not simply mean in the same house or within a particular distance, it means a vote harvester going through the ballot with the voter and ensuring the voter chooses the harvester's candidate." ECF No. 862 ¶ 479. To have any meaning at all, however, "in the physical presence of a ballot" must extend *beyond* the voting process itself. *Cf. Nielsen v. Preap*, 586 U.S. 392 (2019) (explaining that, under the interpretative canon against surplusage, "every word and every provision is to be given effect [and n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (quotation marks and citation omitted)). As discussed below in connection with Plaintiffs' vagueness claims, however, it is anyone's guess how far the Canvassing Restriction reaches beyond ballots that are being actively voted.

Having construed the Canvassing Provision, the next step is to "decide which of the [law's] applications violate the First Amendment, and to measure them against the rest." *Moody*, 144 S. Ct. at 2398.

### The Canvassing Restriction is unconstitutional in a large number of applications

Because the Canvassing Restriction is subject to strict scrutiny, the State Defendants must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Veterans of Foreign Wars*, 760 F.3d at 438 (quoting *Citizens United*, 558 U.S. at 340).

**Legal Standard**

A law is "narrowly tailored" if it (1) actually advances the state's interest, (2) does not sweep too broadly, (3) does not leave significant influences bearing on the interest unregulated (i.e., is not underinclusive), and (4) could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative). *Id.* at 427.

Speech restrictions cannot "sweep too broadly" if they are to be considered "narrowly tailored." *Id.* at 440 (quoting *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (en banc)). The Government must identify an "actual problem" in need of solving, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000), and demonstrate that restricting free speech is *necessary* to the solution, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). In other words, "if a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813; *see also Serv. Emps. Int'l Union*, 595 F.3d at 603–04 (holding that Houston's broad restriction on the timing of parades was not narrowly tailored because the city could have advanced its interests with less restrictive alternatives); *see generally Citizens United*, 558 U.S. at 340.

In addition to overbreadth, evidence of underinclusivity can defeat a statute subject to strict scrutiny. *See Reed*, 576 U.S. at 172 ("[A] 'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited[.]'") (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)).

**Analysis**

The State Defendants insist that Section 7.04 of S.B. 1 "was enacted to prevent paid partisans from haranguing Texas citizens while they fill out their mail ballots." ECF No. 862 ¶

1023. "It applies," they argue, "only to individuals who are paid to press individuals to fill out their ballots—in the canvasser's presence—in particular ways. It does not apply to canvassing beyond that narrow situation." ECF No. 862 ¶ 1023 (citations omitted).

To the contrary, the Canvassing Restriction is unconstitutional precisely because, by its plain text, it reaches beyond that narrow situation to protected speech in a substantial number of its applications. Moreover, it is unclear to the Court that County DAs would even be able to adopt such a limiting construction without violating TEX. LOCAL GOV'T CODE § 813(B), which prohibits DAs from adopting any policy that "prohibits or materially limits the enforcement of any criminal offense."

The State Defendants' proposed limiting constructions are unsupported by the text and, in any event, would not satisfy strict scrutiny because the Canvassing Restriction, besides being overbroad, (1) does not actually advance the state's interest, (2) is underinclusive, and (3) could be replaced with a less restrictive alternative. *See Veterans of Foreign Wars*, 760 F.3d at 438.

**The Canvassing Restriction does not advance any state interests.**

To be clear, Plaintiffs do not suggest that the First Amendment confers upon canvassers an unfettered right to "harangue" a voter as she is casting a mail ballot—with or without the canvasser's assistance. States, to be sure, have an "important state interest" in "[e]nsuring that every vote is cast freely," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2341 (2021).

Indeed, Plaintiffs acknowledge that the Election Code already imposes criminal penalties against "effort[s] to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," TEC § 276.013, or voting (or attempting to vote) a ballot belonging to another person, or attempting to mark another person's ballot without their consent or specific direction, TEC § 64.012. Similarly, it is already a crime for a voting assistor to

"suggest[] by word, sign, or gesture how the voter should vote" while providing such assistance or "prepare[] the voter's ballot in a way other than the way the voter directs or without direction from the voter." TEC § 64.036.

The fact that these preexisting provisions target the very conduct purportedly regulated by the Canvassing Restriction indicate that the law is not "necessary" to serve the government's interests. *R.A.V.*, 505 U.S. at 395; *see also*, *e.g.*, *Veterans of Foreign Wars*, 760 F.3d at 441 (holding that a statute's provision was not narrowly tailored because the purported interest it served was already met by a different provision).

The State Defendants dismiss concerns expressed by voters and election officials alike as "farfetched" and "fanciful hypotheticals." ECF No. 862 ¶¶ 1018, 1022. But, for their part, the State Defendants have not offered even *hypothetical* scenarios in which the Canvassing Restriction would serve the government's interest in ways that are not already accomplished by other criminal provisions of the Election Code, let alone identified an "actual problem" in need of solving. *United Playboy Ent. Grp., Inc.*, 529 U.S. at 813. The State Defendants failed to offer any evidence that voters have been confused or improperly influenced by "compensated" canvassers for community-based organizations who advocated in the presence of mail-in ballots. Nor is there any evidence that the preexisting limitations on mail-in ballot assistance were insufficient to identify and prosecute the few alleged instances of misconduct in Texas.

**The Canvassing Restriction is not narrowly tailored to any compelling interest.**

Even if the Canvassing Restriction served Texas's interest in preventing its citizens from being "harangued" while they fill out their mail ballots, ECF No. 862 ¶ 1023, it is not narrowly tailored to that purpose because, as discussed, nothing in the text of the Canvassing Restriction limits its application to "haranguing" speech or even speech that occurs *during the voting process*.

*See Am. Booksellers*, 484 U.S. at 397 ("[T]he statute must be readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements." (quotation omitted)).

The Canvassing Restriction "sweep[s] too broadly." *Veterans of Foreign Wars*, 760 F.3d at 440. It is clear that Section 7.04 "could be replaced by . . . [an]other regulation that could advance the interest . . . with less infringement of speech," *id.*

If the legislature sought to prohibit canvassers from "haranguing" voters as they filled out their ballots, it could have said so. Instead, Section 7.04's broad terms extend its application to *any* "in-person interaction," from conversations at the voter's front door to conversations at the post office, sweeping in vast swaths of protected First Amendment activity. Rather than prohibiting protected expression—"intended[ed] to deliver votes for a specific candidate or measure"—the legislature could have crafted language specifically targeting speech that is "intended to defraud, confuse, unduly influence or deceive." Likewise, rather than restricting speech whenever a ballot is merely "present," the restriction at issue easily could have been limited to instances when a voter is actively completing their ballot.

Not only would a less restrictive provision serve the Government's purported interest, but it would also serve the Government's interests *better* than the Canvassing Restriction. Instead of targeting *interactions* with voters, the legislature could have discouraged "vote harvesting" activity by criminalizing compensation based on a canvasser's actual *delivery* of votes. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 512 (1996) ("[T]he First Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another means that the government may use to achieve its ends."). Indeed,

before S.B. 1, TEC § 86.105 prohibited "performance-based compensation" for voting assistance based on the number of voters assisted or a quota of voters to be assisted. *See* JEX 1 at 54–55.[38]

**Comparisons to Texas's electioneering regulations are inapposite.**

The State Defendants insist that the protection afforded by the Canvassing Restriction is "precisely what Texas gives in-person voters by requiring campaigners and partisans to remain 100 feet away from in-person polling places." ECF No. 862 ¶ 1024; TEC §§ 61.003, 85.036. The analogy to in-person voting is inapt, for a number of reasons.

To begin, such electioneering laws apply only in specific locations—within 100 feet of polling places—and thus implicate the Supreme Court's "'forum based' approach for assessing restrictions that the government seeks to place on the use of its property." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678 (1992)) ("A polling place in Minnesota qualifies as a nonpublic forum. It is, at least on Election Day, government-controlled property set aside for the sole purpose of voting. The space is a special enclave, subject to greater restriction." (quotations omitted)).

That approach is impossible here, because there are no restrictions on where in the state a mail-ballot may be present or voted—including in traditional public forums, where content-based restrictions remain subject to strict scrutiny. *Id.* The Canvassing Restriction, then, according to the State Defendants, effectively converts the entirety of Texas into a polling place where conversations about candidates can create criminal liability. Under the State Defendants' theory, in weeks before an election, public parks and streets will vacillate from moment to moment between being traditional public forums and non-public forums designated for voting depending on whether a voter happens to be carrying or a casting a mail ballot on the premises. This position

---

[38] Section 6.06 of S.B. 1 amended TEC § 86.105 to prohibit all compensation for voting assistance.

fails as a matter of law and common sense.[39] *Cf. Burson v. Freeman*, 504 U.S. 191, 207–08 (1992) (upholding campaign-free zone outside the polls based on "common sense" that a was "necessary" to secure the advantages of the secret ballot and protect the right to vote).

The Canvassing Restriction itself implicitly acknowledges the difference in circumstances by requiring an "in-person interaction" between the canvasser and a voter in the context of mail ballots, while the electioneering provision prohibits individuals from "posting, us[ing], or distribut[ing] political signs or literature" or "loiter[ing]" within 100 feet of the door to a building in which a polling place is located. TEC § 61.003.

Because of the flexibility that voting by mail provides, mail voters who encounter unwelcome canvassing activities can simply put their ballots away and vote some other time. In-person voters, in contrast, do not have free rein to decide where to vote or the authority to control who else shows up at the polling place. In-person voters are essentially captives to the circumstances of their polling locations from the moment they get in line until they receive their "I voted" sticker.

Accordingly, the State of Texas has exercised its authority to restrict certain conduct in and around polling places that are simply inapplicable to the mail-in voting process. For example, in addition to electioneering restrictions, Texas law prohibits a person from using a wireless communication device within 100 feet of a voting station. TEC § 61.014(a). But the absentee analog—prohibiting a person from using such a device "in the presence of a mail-in ballot"— would be impractical. It would bar a voter from filling out his mail-in ballot at his kitchen table while watching the news and force his wife and children to turn off their phones in their own home.

---

[39] By prohibiting speech in support of a candidate or measure in the presence of mail ballots, even in public forums or at the voter's request, the Canvassing Restriction also appears to restrict the public's access to the canvassers' core political speech. *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 77 (1976) (Powell, J., concurring) ("[T]he central First Amendment concern remains the need to maintain free access of the public to the expression.").

Texas voters have the right to vote in secret. TEX. ELEC. CODE § 62.0115(b)(2). Nothing, however, imposes on voters a *duty* to vote in secret. Electioneering zones and other restrictions on who can enter polling places often creates de facto secrecy for in-person voters, of course, because again, as a practical matter, a voter cannot waive other voters' right to a secret ballot free from intimidation by inviting *his* preferred canvasser into the building to persuade them to vote a certain way. *See Burson v. Freeman*, 504 U.S. 191, 207–08 (1992) (upholding campaign-free zone outside the polls based on "common sense" that a was "necessary" to secure the advantages of the secret ballot and protect the right to vote).

But a voter's choice to complete his or her *mail* ballot in the presence of a paid organizer affects no one *else*'s right or ability to cast a secret ballot. Indeed, before S.B. 1, mail voters could—and often did—intentionally vote their ballot in the presence of canvassers for trusted community groups and advocacy organizations. For example, before S.B. 1, members of OCA and LUPE often brought their ballots to election events, seeking voting assistance.[40] Members of retiree chapters of AFT sometimes brought their mail-ballots to chapter meetings and marked and mailed their ballots together as a group. Tr. at 972:17–23.

**The Canvassing Restriction is underinclusive.**

The Canvassing Restriction is also underinclusive in several respects, especially in comparison to the electioneering restrictions applicable to in-person voting.

The electioneering laws, for example, apply on their face to anyone campaigning within 100 feet of the polling station, *regardless of compensation*, whether they are electioneering "for *or against* any candidate, measure, *or political party*." TEC §§ 61.003, 85.036. In contrast, the

---

[40] Tr. at 1694:21–1696:8, 1699:24–1702:2, 1706:12–1707:3 (OCA); Tr. at 71:1–72:15, 75:11–17, 119:20–120:18 (LUPE).

Canvassing Restriction prohibits canvassers receiving "compensation or other benefit" from interacting with voters to deliver votes *for* a particular candidate or measure. TEC § 276.015.

In other words, by its text, the Canvassing Restriction does *not* prohibit paid canvassers from engaging in the kind of "haranguing" conduct the provision is purportedly concerned with, so long as the organizers intend to deliver votes (1) *against* a particular candidate or measure or (2) *for or against* a *political party*. It is unclear to the Court why such haranguing would be more tolerable from a different class of canvasser—e.g., a paid party staffer or a hungrier, thirstier volunteer—seeking to deliver votes *against* their opponents or *for* a political party generally. [41]

The underinclusiveness of the Canvassing Restriction undermines the State Defendants' argument that it is narrowly tailored to further a compelling government interest. *See Reed*, 576 U.S. at 172 ("The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time allowing unlimited numbers of other types of signs that create the same problem."); *Veterans of Foreign Wars*, 760 F.3d at 441 (concluding that the "obvious underinclusiveness" of limiting undermines any argument that Texas is truly interested in regulating gambling).

The State Defendants maintain that the Canvassing Restrictions' sweep is sufficiently narrowed by the scienter requirement because "the vast majority of the time" canvassers will be unaware that they are in the presence of a mail ballot. The State Defendants have offered no evidence demonstrating how often canvassers encounter mail ballots while advocating for a candidate or issue. Plaintiffs, on the other hand, produced several witnesses who testified that

---

[41] Despite the State Defendants' unwillingness to define "compensation," to the extent that it includes items like bottles of water, bus fare, and t-shirts, the State Defendants have not demonstrated that such nominal gifts cause create an "actual problem" in need of solving (i.e., that they cause canvassers to "harangue" voters). *United Playboy Ent. Grp., Inc.*, 529 U.S. at 813.

voters regularly produced their mail ballots during in-person interactions with organizers to ask questions about their ballot or request voting assistance. [42]

Both overbroad and underinclusive, the Canvassing Restriction is unconstitutional in most of its applications, judged in relation to its legitimate applications to voter fraud or coercion. *Moody*, 144 S. Ct. at 2397.

**The Canvassing Restriction is Unconstitutionally Vague**

### The Legal Framework

A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement*." McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied* 144 S. Ct. 348 (2023).

"A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). When a statute "authorizes or even encourages arbitrary and discriminatory enforcement," it is a telltale sign of its unconstitutional vagueness. *Hill v*, 530 U.S. at 732; *Hiett v. United States*, 415 F.2d 664, 670 (5th Cir. 1969) ("another reason for holding vague statutes void . . . is that they furnish insufficient checks on Government discretion").

---

[42]*See id; see also* Tr. at 925:9–12, 926:17–928:1 (AFT members have had voters take out their mail-in ballots while engaging in block-walking and door-to-door canvassing and AFT members themselves have filled out their mail ballots together during chapter meetings).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests.*, 455 U.S. at 498. The Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99; *cf. Citizens United*, 558 U.S. at 337 ( "The law before us is an outright ban, backed by criminal sanctions.").

When "a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up). In such cases, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests.*, 455 U.S. at 499; *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–04 (1967) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression . . . Because First Amendment freedoms need breathing space to survive."); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008) (cleaned up) ("[A] more stringent vagueness test should apply where a law threatens to inhibit the exercise of constitutionally protected rights," especially when it is "capable of reaching expression sheltered by the First Amendment.").

### <u>Analysis</u>

The Canvassing Restriction is unconstitutionally vague because people of common intelligence "must necessarily guess at its meaning and differ as to its application." *Connally*, 269 U.S. at 391.

Indeed, trial testimony evinced widespread confusion and disagreement about how to interpret the Canvassing Restriction, not only among Plaintiffs' members but also among state and

local government officials tasked with interpreting and applying the laws. *See, e.g.*, Tr. at 496:5–8 (Dallas County EA Michael Scarpello) ("I don't know what ballot harvesting means," "it could be interpreted a lot of different ways based on the definition . . . put into the law.").

Witnesses were particularly uncertain about how to interpret the terms "physical presence" and "compensation"—neither of which is defined in the statute—and how the Canvassing Restriction impacts organizers' ability to provide voting assistance during their in-person interactions with voters.

### *The term "compensation or other benefit" is vague.*

It is unclear to Plaintiffs from the text of the Canvassing Restriction whether providing volunteers food, water, swag, letters of recommendation, academic credit, gas cards, bus fare, free parking, or even the use of its offices for their advocacy work is unlawful. Nothing in the text of the Canvassing Restriction explains which, if any of these items, qualifies as "compensation."

The definition of "benefit"—"anything reasonably regarded as a gain or advantage"—is no help, considering that it merely defines a term through its synonym. TEC § 276.015(a)(1). Stating that a benefit is a gain does not help a reasonable person to understand what is or is not permitted under the statute.

Considered alongside definitions of "compensation" elsewhere in the Election Code, the meaning of the term "compensation or other benefit" in Section 7.04 becomes even less clear. For example, the ban on compensated assistance under S.B. 1 § 6.06, codified at TEC § 86.0105, incorporates by reference the definition of "compensation" set forth in TEX. PENAL CODE § 38.01:

> anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee, accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value.

TEC § 86.105(f); TEX. PENAL CODE § 38.01. The ban on compensation for mailing another person's ballot, codified at TEC § 86.052, on the other hand, defines "compensation" as "any form of monetary payment, goods, services, benefits, or promises or offers of employment, or any other form of consideration offered to another person in exchange for depositing ballots." TEC § 86.052(e). Which of these definitions of "compensation", if either, should canvassers, voters, and courts apply to the Canvassing Restriction and how are they distinct from a "benefit"?

Trial testimony by state officials offered no satisfying answers, undermining the State Defendants' assertion that the meaning of "compensation or other benefit" is "crystal-clear." ECF No. 862.[43] For example, former Election Division Director Keith Ingram opined that providing volunteers with bus fare was not "compensation" because "[t]hey can get their expenses reimbursed. That's not payment." Tr. at 1904:1–2. The State's chief voter fraud prosecutor, Jonathan White, on the other hand, testified that he would need to perform *legal research* to determine what kinds of economic benefits would violate the provision. Tr. at 3992:20–3993:21 (conceding that he would need to "review[] the case law" to determine whether a meal, bus fare, or a gift bag containing a t-shirt constitute prohibited compensation).

This conflicting testimony effectively concedes the vagueness of "compensation or other benefit." "[N]otice is insufficient if lay persons are required to 'perform[ ] the lawyer-like task of statutory interpretation by reconciling the text of [ ] separate documents.'" *United States v. Rybicki*, 354 F.3d 124, 158 (2d Cir. 2003) (Jacobs, J., dissenting) (quoting *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999)). Likewise, courts have found insufficient notice where, as here, those charged with enforcing a rule lack a shared understanding of its meaning, because their divergent interpretations are evidence that the rule "impermissibly delegates basic policy matters to

---

[43] Even in their own briefing, the State Defendants treat the terms as interchangeable, defining them by reference to one another. *See* ECF No. 862 ¶ 106 (describing "benefit" as "any *compensation*") (emphasis altered).

policemen, judges and juries for resolution on an ad hoc and subjective basis." *Chatin*, 186 F.3d at 89 (quoting *Grayned*, 408 U.S. at 108–09).

***The term "physical presence" is vague.***

Plaintiffs cannot tell from the text of the Canvassing Restriction how physically proximate a ballot must be to a volunteer or employee to be criminally liable because the term "physical presence" is not defined in Section 7.04.

The Court agrees with the State Defendants that Plaintiffs and their members cannot be held liable for unknowingly canvassing in the presence of a mail ballot, both because of Section 7.04's scienter requirement ("knowingly") and because such interactions would not "directly involve" a mail ballot. TEC § 276.015(e).

In some circumstances, "[t]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests*, 455 U.S. at 499; *see also League of Women Voters of Fla. Inc*, 66 F.4th at 946–47.

Here, the problem is that a person's knowledge that there is a ballot in the vicinity still does not tell them whether they are violating the statute. Is it a crime to speak to a voter about a candidate while the voter's mail ballot lies nearby on the entryway table? What if the ballot is on the kitchen table in the next room instead of the entryway? What if the voter brings the ballot to a community meeting at which Plaintiffs' employees speak?

A person of "ordinary intelligence" has no way to know where the line is drawn and will respond with self-censorship of core political speech. *See Hill*, 530 U.S. at 732 (2000); *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 947-48 (11th Cir. 2023) ("We will not rely on the assumption that a state court enforcing the law would impose a *mens rea* requirement,

apply the law with lenity, and require that the defendant's conduct had the natural and probable effect of influencing the voter." (alterations and citation omitted)).

At trial, Mr. Ingram refused to offer a specific distance or any concrete guidance about how canvassers should determine whether they are in the "physical presence" of a mail ballot, which can only be determine on a case-by-case basis. *See* Tr. at 1917:5–14; *see also* Tr. at 1916:1–4 (stating that the Secretary does not have an official opinion on whether a ballot being within five or ten feet of a discussion constitutes physical presence under Section 7.04). "Whether or not a prosecutor agrees with us," he conceded, "is a different story entirely." Tr. at 1917:18–19.

Indeed, under these indefinite meanings, it is easy to see how the State Defendants and County DAs could arbitrarily discriminate in their enforcement of the Canvassing Restriction. *Computer & Commc'ns Indus. Ass'n v. Paxton*, No. 1:24-CV-849-RP, 2024 WL 4051786, at *18 (W.D. Tex. Aug. 30, 2024) (citing *Smith v. Goguen*, 415 U.S. 566, 575 (1974) ("Statutory language of such a standardless sweep allows prosecutors and juries to pursue their personal predilections." (alteration marks omitted)).

The State Defendants dismiss concerns expressed by voters and election officials alike as "farfetched" and "fanciful hypotheticals." ECF No. 862 ¶¶ 1018, 1022. Even setting aside the real-world scenarios in which Plaintiffs' core political speech were actually chilled, courts considering vagueness challenges to criminal statutes should be wary of accepting the government's interpretations uncritically, considering the potential consequences:

> As an abstract exercise, debating fact patterns like these may seem good fun. But there is nothing entertaining about a 2-year mandatory federal prison sentence. Criminal statutes are not games to be played in the car on a cross-country road trip. To satisfy the constitutional minimum of due process, they must at least provide "ordinary people" with "fair notice of the conduct [they] punis[h]."

*Johnson v. United States*, 576 U.S. 591, 595 (2015). Because the Canvassing Restriction does not provide such notice, it is unconstitutionally vague on its face under the Fourteenth Amendment.

**The Canvassing Restriction is Unconstitutional as applied to Plaintiffs' Speech.**

Beyond its applications to conduct that is already proscribed elsewhere in the Election Code (i.e., voter fraud and intimidation), the Canvassing Restriction is unconstitutional. Nothing in the trial record suggests that Plaintiffs' or their members seek to defraud or intimidate voters. Thus, as applied to Plaintiffs' voter outreach activities, the Canvassing Restriction violates Plaintiffs' First Amendment freedoms by criminalizing interactions meant to foster engagement and turnout in the communities they serve. The Canvassing Restriction has created an environment in which Plaintiffs and their members fear that they risk criminal sanction for assisting or speaking with voters, which has both chilled their speech and impaired their ability to recruit new members and volunteers and provide voter assistance.

The breadth of the prohibition not only reaches core political speech but basic common courtesy, potentially alienating voters and further burdening the effectiveness of Plaintiffs' political speech and associative activities. For example, the Canvassing Restriction would prohibit Plaintiffs' paid staff members from answering a voter's question about how to complete S.B. 1's identification-number requirement in the presence of his mail-in ballot during an event promoting a ballot measure.[44] When State Defendants' counsel suggested that an organizer who confronted a mail ballot at such an event could just ask the voter to "leave their ballot in the car," Grace Chimene, testifying on behalf of the League, responded that she "wouldn't ask anybody to do anything with their ballot" and pointed out that a voter might be "intimidated" by questions about

---

[44] This is not a "fanciful hypothetical." *United States v. Williams*, 553 U.S. 285, 301 (2008). Indeed, Ms. Chen testified that community members often brought their mail ballots to political events with questions about their ballots to OCA events with questions about the voting process and seeking assistance. Tr. at 1698:21–1699:8.

the physical location of his ballot (and being asked to leave the event if he had brought it along). Tr. at 1620:15–1621:4. Indeed, counsel's recommendation is impractical for several reasons,[45] not the least of which is the disruption of Plaintiffs' core political communications with awkward, inconvenient, and suspicion-inducing requests that voters move their ballots elsewhere or leave the event altogether.

Again, Plaintiffs do not assert a First Amendment right to "harangue" voters as they complete their ballots. Rather, they are afraid to advocate for ballot measures or candidates in circumstances where voters have historically brought their mail ballots and/or requested assistance, because Plaintiffs' members will either be forced to turn voters away (frustrating both their free speech and their associations with voters) or expose themselves to criminal liability by continuing to engage with the voter. The breadth and vagueness of Section 7.04 have compounded the chilling effect on Plaintiffs' speech by making it difficult for their members to know what kinds of interactions with voters are permissible.

Citizens confronted with vague and overbroad laws "inevitably" elect to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," *Grayned*, 408 U.S. at 109 (cleaned up), but the Constitution does not permit laws that unnecessarily stifle protected speech, especially not during elections, when "the importance of First Amendment protections" is at its "zenith." *Meyer*, 486 U.S. at 425. "First Amendment freedoms need breathing space to survive." *Keyishian*, 385 U.S. at 603–04.

---

[45] A voter who took a bus to the event or was dropped off by a friend might not have access to a car in which to store their ballot. And even a voter who drove to the event may be unable to make multiple trips to and from the parking lot due to a physical disability. It's not clear that other alternatives, such as leaving the ballot in another room at the event venue, would be anymore "secure" than permitting the voter to hold onto their ballot in the presence of paid canvassers, considering the potential for theft and loss.

The First Amendment protects Plaintiffs' "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 414. By Plaintiffs' restricting in-person interactions with voters, Section 7.04 "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression." *Id.*

In short, the Court concludes that the Canvassing Restriction is unconstitutional under the First and Fourteenth Amendments, both facially and as applied to Plaintiffs' voter outreach activities. The Court now considers the proper scope of relief.

**PERMANENT INJUNCTION OF THE CANVASSING RESTRICTION**

A party seeking a permanent injunction must prove: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). The Court addresses each factor in turn.

First, for the reasons set forth in this order, the Court concludes that the Canvassing Restriction violates Plaintiff's First Amendment rights. Plaintiffs have thus succeeded on the merits of their First Amendment challenge to Sections 7.04 of S.B. 1.

Second, the Court concludes that failure to grant the requested injunction will result in irreparable injury to Plaintiffs, their members, and other organizers in Texas. Plaintiffs and their members have established that the Canvassing Restriction has had a chilling effect on their speech that arises from the credible *threat* of enforcement. *See also Babbitt*, 442 U.S. at 302 ("a plaintiff need not first expose himself to actual arrest or prosecution" to establish a cognizable harm). The

Supreme Court has long recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). A permanent injunction, as discussed, would remove the threat of enforcement and the resulting chill on Plaintiffs' protected speech. Thus, it is an appropriate remedy in this case.

Third, threatened and ongoing injury to Plaintiffs outweighs any potential harm that an injunction might cause Defendants. Without injunctive relief, Plaintiffs and their members will continue to suffer irreparable injury to their constitutional rights. As a general matter, "injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (citation and quotation marks omitted); *see also RTM Media, L.L.C. v. City of Houston*, 518 F. Supp. 2d 866, 875 (S.D. Tex. 2007) ("It is clearly in the public interest to enjoin an ordinance that restricts the public's constitutional right to freedom of speech."). To overcome the irreparable injury arising from this infringement on Plaintiffs' rights, Defendants must produce "powerful evidence of harm to its interests" to tip the equities in their favor. *Opulent Life Church*, 697 F.3d at 297.

Plaintiffs' requested injunction does not affect any voting or election procedures and thus does not create the potential for confusion and disruption of the election administration contemplated by the "*Purcell* principle." *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). The *Purcell* principle provides that, as a general rule, federal courts "should not alter state election laws in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered

six weeks before the general election). *Purcell*'s logic, however, extends only to injunctions that affect the mechanics and procedures of election law applicable to voting.[46]

Moreover, unlike an order requiring affirmative changes to the election process before it occurs, an injunction against enforcement proceedings is removed in space and time from the mechanics and procedures of voting. Prosecutions simply do not occur at the polls (or, as the case may be, during block-walking and candidate forums); they require investigation, evidence, and due process. Because criminal prosecutions necessarily follow the offending conduct in time, the only prospective interest that Defendants can plausibly allege would be impaired by injunctive relief is the deterrent effect of the Canvassing Restriction. Given that its chilling effect on speech is the very feature that renders the Canvassing Restriction constitutionally infirm, however, deterring violations is unlikely to serve the public interest. *See Ingebretsen on behalf of Ingebretsen v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation"); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

The public interest is not served by Texas officials' enforcement of a restriction on speech that Plaintiffs have shown violates their fundamental rights under the First Amendment. Plaintiffs' core political speech has been chilled and will continue to be chilled absent injunctive relief.

---

[46] *See, e.g.*, *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (extension of absentee ballot deadline); *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (mask mandate exemption for voters); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 244 (procedures for authenticating mail-in ballot signatures); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (new ballot type eliminating straight-ticket voting); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 411–12 (5th Cir. 2020) (absentee ballot eligibility requirements); *DNC v. Wis. State Leg.*, 141 S. Ct. at 31 (extension of absentee ballot deadline).

Accordingly, the balance of the equities and the public interest weigh in favor of a permanent injunction.

Therefore, Plaintiffs' request for injunctive relief is granted.

**CONCLUSION**

For the foregoing reasons, the Court hereby **DECLARES** that the Canvassing Restriction created by Section 7.04 of S.B. 1, codified at Texas Election Code § 276.015 is:

(1) an invalid restriction on speech, both on its face and as applied to Plaintiffs' speech, in violation of the First Amendment to the United States Constitution as incorporated to Texas by the Fourteenth Amendment of the United States Constitution; and

(2) unconstitutionally vague in violation of the due process clause the Fourteenth Amendment of the United States Constitution.

It is **FURTHER ORDERED** that the Intervenor-Defendants' motion for summary judgment (ECF No. 608) is **DENIED** as to Plaintiffs' First Amendment speech and Fourteenth Amendment due process claims.

**IT IS FURTHER ORDERED** that the Attorney General and Secretary of State of Texas and the District Attorneys of Travis County, Dallas County, Hidalgo County, and the 34th Judicial District, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **IMMEDIATELY AND PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to the Canvassing Restriction created by Section 7.04 of S.B. 1, codified at Texas Election Code § 276.015, that violates Plaintiffs' free speech and due process rights under the First and Fourteenth Amendments to the U.S. Constitution.

Thus, the Attorney General may not investigate potential violations of TEC § 276.015, refer potential violations of TEC § 276.015 to DAs for investigation or prosecution, or prosecute any

potential violation of TEC § 276.015 with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge.[47] The County DAs are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of TEC § 276.015 that occur within their jurisdictions.

It is so **ORDERED**.

**SIGNED** this 28th day of September, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[47] In the interest of clarity, the Attorney General constitutes an "agent" or "person acting in concert with" a County DA under the terms of this order when he prosecutes crimes under the Election Code with the consent of, at the request of, or in cooperation with such County DA.