**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21–CV–0844–XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**(CLAIMS UNDER SECTION 208 OF THE VOTING RIGHTS ACT)**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1
PROCEDURAL HISTORY .................................................................................................. 3
FINDINGS OF FACT ........................................................................................................... 5
   THE CHALLENGED PROVISIONS ............................................................................... 6
      Section 6.01 – Transportation Disclosures (Curbside Voting) ............................... 6
      Section 6.04 – Amendments to Oath of Assistance ................................................ 7
      Sections 6.03, 6.05, 6.07 – Assistor Disclosures ................................................... 8
      Section 6.06 – Ban on Compensated Mail–Ballot Assistance .............................. 11
      Section 7.04 – Canvassing Restriction .................................................................. 12
   THE PARTIES ................................................................................................................ 14
   The Plaintiffs ................................................................................................................. 14
      The HAUL-MFV Plaintiffs .................................................................................... 15
         The Arc of Texas ............................................................................................. 15
         Delta Sigma Theta Sorority, Inc. .................................................................... 16
      The OCA Plaintiffs ................................................................................................. 17
         OCA-Greater Houston ..................................................................................... 17
         The League of Women Voters of Texas .......................................................... 18
      The LUPE Plaintiffs ............................................................................................... 19
         La Union Del Pueblo Entero ........................................................................... 19
         Mexican American Bar Association of Texas ................................................. 21
         Familias Inmigrantes Estudiantes Luchar ...................................................... 21
      The LULAC Plaintiffs ............................................................................................ 22
         League of United Latin American Citizens ..................................................... 22
   Defendants ..................................................................................................................... 23
      The State Defendants .............................................................................................. 23
         The State of Texas ........................................................................................... 23
         Texas Attorney General ................................................................................... 23
         Texas Secretary of State .................................................................................. 26
      County Defendants .................................................................................................. 27
         County Election Officials ................................................................................ 27
         County District Attorneys ............................................................................... 28
   IMPACT OF THE CHALLENGED PROVISIONS ....................................................... 30
      Transportation Disclosure (§ 6.01) ........................................................................ 30
      Oath of Assistance (§ 6.04) and Assistor Disclosures (§§ 6.03, 6.05, 6.07) ....... 32
      Ban on Compensated Assistance (§ 6.06) ............................................................. 52
      The Canvassing Restriction (§ 7.04) ..................................................................... 55
CONCLUSIONS OF LAW .................................................................................................. 57
   SUBJECT MATTER JURISDICTION ......................................................................... 57
   SECTION 208 PREEMPTION ...................................................................................... 77
      Portions of the Oath of Assistance (§ 6.04) are preempted by Section 208 .......... 85
      The Assistor Disclosures (§§ 6.03, 6.05, 6.07) are preempted by Section 208 ..... 91
      Bans on Compensated Assistance (§§ 6.06 and 7.04) are preempted by Section 208 ... 95
   PERMANENT INJUNCTION OF S.B. 1 §§ 6.03–6.07 AND 7.04 ............................... 98
      Injunctive relief as to the Secretary's forms and instructions implicates Purcell. .. 101
      Injunctive relief as to election officials' conduct implicates Purcell. ..................... 102
      Enjoining enforcement proceedings does not implicate the Purcell principle. ........ 102
CONCLUSION .................................................................................................................... 106

## INTRODUCTION

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as "S.B. 1." *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021).

Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 modified various provisions of the Texas Election Code, imposing, among other things, new restrictions on voter assistance and in-person canvassing activities. *See, e.g.*, S.B. 1 §§ 6.01, 6.03–6.07, 7.04 (JEX-1 at 50–56, 59–60).

Several private plaintiffs filed lawsuits, challenging certain provisions of S.B. 1 as unconstitutional and otherwise unlawful under federal voter-protection statutes. For judicial economy, these were consolidated under the above-captioned case, which was first filed.[1]

Four Plaintiffs groups—the HAUL Plaintiffs,[2] the OCA Plaintiffs,[3] the LUPE Plaintiffs,[4] and the LULAC Plaintiffs[5]—collectively challenge S.B. 1 §§ 6.01, 6.03–6.07, and 7.04 (the "Assistance Provisions") as preempted by Section 208 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10508, which guarantees qualified voters the right to vote with an assistor of their choice.

---

[1] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Area Urban League v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021) and *Mi Familia Vota v. Abbott*, No. 5:21-cv-920 (W.D. Tex. 2021) under the lead case.

[2] For the purposes of the HAUL Plaintiffs' Section 208 claims, this group includes The Arc of Texas, Delta Sigma Theta Sorority, Inc., and Mi Familia Vota. ECF No. 199 (HAUL Compl.) ¶¶ 287–94 (Count V).

[3] For the purposes of the OCA Plaintiffs' Section 208 claims, this group includes OCA-Greater Houston, The League of Women Voters of Texas, and REVUP-Texas. *See* ECF No. 200 (OCA Compl.) ¶¶ 176–81 (Count IV); Text Order dated Apr. 14, 2022 (granting Texas Organizing Project's withdrawal from the case); ECF No. 551 (granting Workers Defense Action Fund's withdrawal from the case and dismissing its claims with prejudice).

[4] This group includes La Unión del Pueblo Entero, Friendship-West Baptist Church, the Southwest Voter Registration Education Project, Texas Impact, the Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., and James Lewin. ECF No. 208 (LUPE Compl.) ¶¶ 266–71 (Count V).

[5] For the purposes of the LULAC Plaintiffs' Section 208 challenges, this group includes LULAC Texas, Voto Latino, Texas Alliance for Retired Americans, and Texas AFT. *See* ECF No. 207 (LULAC. Compl.) ¶¶ 287–94 (Count IV).

Plaintiffs allege that S.B. 1's new disclosure requirements (§§ 6.01, 6.03, 6.05, 6.07), modifications to the oath of assistance (§ 6.04), ban on compensated assistance (§ 6.06) and in-person canvassing restriction (§ 7.04) subvert the protections of Section 208 by narrowing the class of eligible assistors, requiring voters to take additional steps as a prerequisite to receiving assistance, and deterring voters from requesting—and assistors from providing—assistance in the voting process. Following a six-week bench trial, the Court largely agrees.

After careful consideration, the Court issues the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a) bearing on Plaintiffs' Section 208 claims.

## PROCEDURAL HISTORY

Plaintiffs filed their original complaints in August and September 2021, seeking to enjoin the State of Texas and the Secretary of State and Attorney General of the State of Texas (together, the "State Defendants") and local election officials from enforcing many provisions of S.B. 1, including provisions that, like most of the Assistance Provisions, impose criminal liability.

In December 2021, the Texas Court of Criminal Appeals held in *State v. Stephens* that the Election Code's delegation of unilateral prosecutorial authority to the Attorney General to prosecute election crimes violated the separation-of-powers clause of the Texas Constitution. 663 S.W.3d 45 (Tex. Crim. App. 2021). The court explained that the Texas Constitution assigns to county and district attorneys, members of the judicial branch, the "specific duty" to represent the state in criminal prosecutions. *Id.* at 52. The Attorney General, as part of the state's executive branch, has no similar, independent power under the Texas Constitution. Thus, the Attorney General can prosecute election crimes only with the consent of local prosecutors through a deputization order. *Id.* at 47.

Following *Stephens*, Plaintiffs amended their complaints to join local district attorneys from several Texas counties as Defendants.[6] The State Defendants moved to dismiss these complaints in their entirety, including Plaintiffs' Section 208 challenges. The Court denied the motions as to those challenges in August 2022, concluding that the VRA waived sovereign immunity and created a private right of action to enforce Section 208, and that Plaintiffs had adequately alleged standing to assert their Section 208 claims.[7]

---

[6] Plaintiffs filed their Second Amended Complaints, the operative pleadings, in January 2022. *See* ECF Nos. 199, 200, 207, 208.

[7] *See La Union del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509 [LULAC], 618 F. Supp. 3d 388 [OCA], 618 F. Supp. 3d 449 [HAUL], 618 F. Supp. 3d 504 [LUPE], (W.D. Tex. 2022). The Court dismissed the HAUL Plaintiffs' claims against the Governor, however, concluding that their injuries were not fairly traceable to him.

In May 2023, the State Defendants joined in a motion for summary judgment filed by a group of Republican committees (the "Intervenor-Defendants"),[8] arguing that: (1) state-law restrictions and requirements on assistors "of the voter's choice" do not violate Section 208 and therefore cannot be preempted; and (2) Section 208 permits state-law restrictions on who may serve as an assistor beyond the limitations provided in federal law. *See* ECF No. 608 at 27–30. The District Attorney of Harris County, Kim Ogg, also moved for summary judgment, asserting that Plaintiffs lacked standing. *See* ECF No. 614. The Court carried the motions with the case and addresses their arguments herein to the extent that they were not disposed in the Court's orders disposing of the State Defendant's motions to dismiss.

The Court held a bench trial from September 11, 2023, to October 20, 2023. In all, the parties presented about 80 witnesses (both live and by deposition testimony), nearly 1,000 exhibits, and producing over 5,000 pages of trial transcripts. The Court heard testimony from voters, Plaintiffs' organizational representatives and volunteers, former and current state and local officials, and expert witnesses.

The parties submitted proposed findings of fact and conclusions of law in January 2024,[9] and presented closing arguments on February 13, 2024.

---

[8] The Intervenor-Defendants include the Harris County Republican Party, the Dallas County Republican Party, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee. The Court initially denied their motion to intervene for failing to identify a legally protectable interest at stake in this litigation or show that the State Defendants' representation of any such interest would be inadequate. *See* ECF No. 122 at 2–7. The Fifth Circuit reversed, concluding that the Committees' interest in S.B. 1's provisions concerning party-appointed poll watchers—an interest raised for the first time on appeal—warranted intervention. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022). Accordingly, the Committees were allowed to intervene. It is not clear to the Court that their interest in the provisions applicable to *partisan* poll watchers establishes a commensurate interest in voter assistance regulations. Nonetheless, because the State Defendants joined the arguments in the Committees' motion for summary judgment, *see* ECF No. 610, the Court considers the Intervenor-Defendants' motion and briefing.

[9] *See, e.g.*, ECF Nos. 850, 852 (Plaintiffs, jointly); ECF No. 855 (LUPE); ECF No. 856 (HAUL); ECF No. 843-1 (Dallas County DA); ECF No. 845 (Harris County DA); ECF Nos. 861, 862 (State Defendants and Intervenor-Defendants). The parties also submitted supplemental briefing on the Supreme Court's recent decision in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). *See* ECF Nos. 1138, 1140, 1142–45.

## FINDINGS OF FACT

1.      Under S.B. 1, Texas law recognizes the following interactions as crimes under the

Texas Election Code (the "Election Code" or "TEC"):

> a.      A man helps his blind wife of 20 years cast her ballot at the polls without
> first securing a representation from her that she is "eligible for assistance."
> Even if he completes her ballot according to her exact instructions, he faces
> up to two years in prison and a fine of up to $10,000. *See* TEC § 276.018(b);
> TEX. PENAL CODE § 12.35; Tr. at 3991:1–5.

> b.      While meeting with a client about his tax return, a staff member for a
> community organization that provides free income tax services agrees to
> help translate the man's mail-in ballot. The client fills out his own ballot,
> with accurate translation assistance from the staff member. Even though the
> ballot reflects the clients wishes, the staff member faces up to two years in
> prison, she and her employer may be fined up to $10,000, and the client's
> ballot may not be counted. *See* TEC §§ 86.0105(a), (c); TEX. PENAL CODE
> § 12.35; TEC § 86.010(d); Tr. at 3996:8–3997:5.

> c.      An elderly woman with arthritis answers her door to find a college student
> from her alma mater canvassing for a ballot measure that would create an
> endowment for their school. Mentioning her arthritis, the woman asks the
> student for help completing her mail ballot and offers the student an iced
> tea and cookies as a token of her appreciation. The student agrees and
> completes the ballot according to the voter's instructions. The voter and the
> student each face up to 10 years in prison and fines of up to $10,000. *See*
> TEC §§ 276.015(a)–(c), (f); TEX. PENAL CODE § 12.34; Tr. at 1904:1–
> 1906:5, 3995:11–24.

2.      Plaintiffs assert that, by criminalizing these routine interactions and imposing

additional requirements on voters and their assistors, various provisions of S.B. 1 have frustrated

qualified voters' rights under federal law to voting assistance from a person of their choice.

3.      Section 208 of the Voting Rights Act provides:

> Any voter who requires assistance to vote by reason of blindness, disability,
> or inability to read or write may be given assistance by a person of the
> voter's choice, other than the voter's employer or agent of that employer or
> officer or agent of the voter's union.

52 U.S.C. § 10508.

4.      Section 208 creates a federally guaranteed right of an assistant of the voter's choice when "voting," which includes "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration . . . or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast[.]" 52 U.S.C. § 10310(c)(1).

5.      Congress enacted Section 208 "[t]o limit the risks of discrimination" against voters with who require assistance and "avoid denial or infringement of the[ir] right to vote." S. Rep. No. 97-417 at 62 (May 25, 1982). As the Senate Report explains:

> Clearly, the manner of providing assistance has a significant effect on the free exercise of the right to vote by such people who need assistance. Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice. As a result, people requiring assistance in some jurisdictions are forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote. The Committee is concerned that some people in this situation do in fact elect to forfeit their right to vote. Others may have their actual preference overborne by the influence of those assisting them or be misled into voting for someone other than the candidate of their choice." The Committee has concluded that the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write, is to permit them to bring into the voting booth a person whom the voter trusts and who cannot intimidate him.

*Id.* at 472.

**THE CHALLENGED PROVISIONS**

**Section 6.01 – Transportation Disclosures (Curbside Voting)**

6.      Texas provides curbside voting for voters who are "physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health," allowing them to vote from the convenience and safety of a vehicle during early voting or on Election Day. TEC § 64.009(a); *see* Tr. at 4355:22–4356:2.

7.      Section 6.01 of S.B. 1 modified Texas's curbside voting procedures by requiring a person who "simultaneously" provides seven or more voters with transportation to a polling place for curbside voting to complete and sign a form—prescribed by the Secretary of State and provided by an election officer—reporting her name, address, and whether she is only providing transportation or also serving as an assistant to the voters. TEC §§ 64.009(e), (f), (h).[10]

8.      Section 6.01 further provides that "a poll watcher is entitled to observe any activity conducted under this section," other than the preparation of a voter's ballot with an assistor of the voter's choice. TEC § 64.009(e). Poll watchers are thus entitled to observe drivers as they fill out the form prescribed by the Secretary of State.

9.      Completed forms must be delivered to the Secretary of State as soon as practicable. TEC § 64.009(g). The Secretary must make the form available to the Attorney General for inspection upon request. *Id.*

**Section 6.04 – Amendments to Oath of Assistance**

10.      Section 6.04 of S.B. 1 amends the oath that a person assisting a voter is required to swear (the "Oath of Assistance" or "Oath") by adding the underlined and bolded language:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; [~~I will confine my assistance to~~ **reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot**;][11] ~~answering the voter's questions, to stating propositions~~

---

[10] The driver need not provide the disclosures if the person is related to each voter within the second degree by affinity or the third degree by consanguinity under TEX. GOV'T CODE § 573.023. TEC § 64.009(f-1).

[11] The requirement that a person who assists a voter must confine assistance to reading the ballot, marking the ballot, and directing the voter to do the same was enjoined in *OCA of Greater Houston v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *4 (W.D. Tex. June 6, 2022).[11] Accordingly, this Court held that "all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined . . .are moot." *LUPE v. Abbott*, 614 F. Supp. 3d 509, 513 n.3 (W.D. Tex. 2022).

The United States brought a Section 208 claim in this consolidated action challenging the oath language enjoined in *OCA-Greater Houston v. Paxton (OCA-Greater Hous. II)*, No. 1:15-CV-679-RP, 2022 WL 2019295, (W.D. Tex. June 6, 2022), which was rendered moot by the injunction. *See LUPE v. Abbott*, 614 F. Supp. 3d at 513 n.3.

7

> on the ballot, and to naming candidates and, if listed, their political parties; ~~~~
> I will prepare the voter's ballot as the voter directs; **I did not pressure or coerce the voter into choosing me to provide assistance**; [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.**

TEC § 64.034. An offense under this subsection is a state jail felony, punishable by up to two years in prison and a fine of up to $10,000 and will result in the rejection of the voter's ballot. TEC § 276.018(a)(2)–(b); TEX. PENAL CODE §§ 12.35(a), (b).

11.     An assistor must take the Oath of Assistance (and complete the disclosure form) for each voter she assists. Election officials, on the other hand, are not required to take the Oath or complete the disclosure form. *See* TEC § 64.034. When a voter receives assistance from an election official, however, Texas law permits poll watchers to be present at the voting station, and the watchers are entitled to examine the ballot before it is deposited in the ballot box. TEC § 33.057(a).

12.     The Oath of Assistance must be printed on BBM carrier envelopes and signed by the assistor. TEC § 86.013(e); *see* LUPE-009 (form BBM carrier envelope prescribed by the Secretary of State).

13.     Providing mail ballot assistance without signing the Oath is a state jail felony unless the assistor is a close relative of the voter or is physically living with the voter when the assistance is provided. *See* TEC § 86.010(h)(1).

**Sections 6.03, 6.05, 6.07 – Assistor Disclosures**

14.     Before S.B. 1, the Election Code provided that, if assistance was provided by a person of the voter's choice at a polling place, an election officer must enter the person's name and address on the poll list beside the voter's name. *See* TEC § 64.032(d). A person providing

mail-ballot assistance was required to provide his or her signature, printed name, and a residential address. *See* TEC § 86.010(e); JEX-1 at 53.

15.　　Sections 6.03, 6.05 and 6.07 of S.B. 1 added provisions imposing new disclosure and documentation requirements on persons who provide voter assistance.

16.　　Section 6.03 provides: "A person, other than an election officer, who assists a voter in accordance with this chapter is required to complete a form stating: (1) the name and address of the person assisting the voter; (2) the relationship to the voter of the person assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." TEC § 64.0322(a).

17.　　The Secretary of State must prescribe the Assistor Disclosure form. TEC § 64.0322(b). As prescribed by the Secretary, the form also contains the "Oath of Assistance," discussed below. *See* LUPE-189 ("Oath of Assistance Form").

18.　　Section 6.05 amended the Election Code to require a person who assists a mail-in voter to disclose their relationship with the voter and any compensation from a candidate, campaign, or political committee on the assisted-voter's BBM carrier envelope. TEC § 86.010(e). The Election Code already required assistors to provide their names and addresses on the carrier envelope. *See id.*; JEX-1 at 53.

19.　　Section 6.07 amends the disclosures on the BBM carrier envelopes that must be completed by anyone providing ballot-dropping assistance to add a space indicating the assistor's relationship to the voter (along with the person's name and address, which were already required). TEC § 86.013(b).

20.　　As prescribed by the Secretary of State, the form BBM carrier envelope does not distinguish between assistance in completing the ballot and ballot-dropping assistance. *See* LUPE-

009 ("If you are assisting a voter by depositing the Carrier Envelope in the mail or with a common or contract carrier, you must complete the assistant section below.").

21.     Providing BBM assistance without completing the Assistor Disclosures is a state jail felony, punishable by up to two years' confinement and a fine of up to $10,000 and may result in the rejection of the voter's ballot. TEC § 86.010(g); TEX. PENAL CODE §§ 12.35(a), (b). The criminal consequences are inapplicable, however, to mail-ballot assistance provided by a close relative of the voter or a person who was physically living with the voter when the assistance was provided. *See* TEC § 86.010(h)(2).

22.     Although the Assistor Disclosures required under §§ 6.03 and 6.05 are technically distinct from the required Oath of Assistance set forth in § 6.04, the requirements are, as a practical matter, indistinguishable to assistors. As the images below demonstrate, on both the "Oath of Assistance" form and the form mail ballot carrier envelope prescribed by the Secretary, the space for the assistor's signature (subscribing to the Oath) appears in the same section as the disclosure requirements—directly under the printed Oath language.

*Oath of Assistance*



LUPE-189 at 1.

*Form Mail Ballot Carrier Envelope*



LUPE-009 at 2.

23.     Moreover, the provisions impose identical consequences for non-compliance. Knowingly providing assistance without completing the Oath (evidenced by the assistor's signature) or the relevant disclosure fields on mail-in ballots (1) is a state jail felony and (2) may result in the rejection of the voter's ballot. *See* TEC §§ 86.010 (d), (f)–(g).

**Section 6.06 – Ban on Compensated Mail–Ballot Assistance**

24.     Section 6.06 of S.B. 1 makes it a state jail felony, for a person who is not an attendant or caregiver previously known to the voter, to compensate or offer to compensate another person—or to solicit, receive, or accept compensation—for assisting voters with their mail-in ballots. TEC §§ 86.0105(a), (c).

25.     For purposes of this section, "compensation" means "anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee,

accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value." *Id.*; *see also* TEX. PENAL CODE § 38.01(3).

26.     The prohibition on compensation does not apply if the person assisting the voter is an "attendant" or "caregiver" previously known to the voter. Tr. at 1906:23–1907:2. S.B. 1, however, does not define "attendant" or "caregiver," Tr. at 1907:3–6, nor has the Secretary published any guidance or training on how to interpret either term. Tr. at 1907:7–12, 1908:17–24. Further, the Secretary of State's Office does not define the phrase "previously known to the voter," nor has it published any guidance or training on how the phrase should be interpreted. Tr. at 1909:3–13. At trial, former Director of the Elections Division in the Secretary of State's Office Keith Ingram testified that it does not matter how long the voter has actually known the attendant or caregiver before providing voter assistance; it could be "15 years" or "15 minutes." Tr. at 1909:14–22.

**Section 7.04 – Canvassing Restriction**

27.     Section 7.04 of S.B. 1 creates three new, third-degree felonies under the Election Code, each imposing up to ten years in prison and a fine of up to $10,000 on anyone who gives, offers, or receives some "compensation or other benefit" for "vote harvesting services." [12] TEC § 276.015(f); TEX. PENAL CODE § 12.34.

---

[12]While Section 7.04 of S.B. 1 sets out a ban on "vote harvesting," *see* TEC § 276.015, Plaintiffs generally refer to the provision as a "ban on in-person canvassing" or "voter interaction ban." *See, e.g.*, ECF No. 848 ¶ 97; ECF No. 849 ¶ 296. In the Court's view, all three characterizations are misleading in multiple respects. Regardless of how the term is defined in the Election Code, the scope of Section 7.04's proscriptions reach conduct well beyond any common understanding of "vote harvesting." On the other hand, the provision does not ban canvassers from interacting with voters altogether—it prohibits *compensated* interactions in the *presence of a mail ballot*. To describe Section 7.04's proscription more accurately and impartially, the Court refers to the challenged provisions as the "Canvassing Restriction" throughout this order.

Section 7.04 also added Election Code provisions addressing the solicitation of applications to vote by mail (TEC § 276.016), the distribution of early voting ballots and balloting materials (TEC § 276.017), and unauthorized alterations to election procedures (TEC § 276.019). For the purposes of this order, however, "Section 7.04" refers only to the Canvassing Restriction, codified at TEC § 276.015.

28.     "Vote harvesting services" include any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

29.     A "benefit" is "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." TEC § 276.015(a)(1).

30.     Using these definitions, Section 7.04 creates three third-degree felonies:

> (b)  A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit.

> (c)  A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services.

> (d)  A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services.

TEC §§ 276.015(b)–(d).

31.     There are a number of exceptions. The Canvassing Restriction "does not apply" to:

> (1)     an activity not performed in exchange for compensation or a benefit;

> (2)     interactions that do not occur in the presence of the ballot or during the voting process;

> (3)     interactions that do not directly involve an official ballot or ballot by mail;

> (4)     interactions that are not conducted in-person with a voter; or

> (5)     activity that is not designed to deliver votes for or against a specific candidate or measure.

TEC § 276.015(e).

## THE PARTIES

### The Plaintiffs

32.     Plaintiffs are membership-driven, non-partisan civil rights and social advocacy groups in Texas with members who require voting assistance due to a disability, blindness, or an inability to read or write the language in which ballot is written. Their staff and volunteers have regularly assisted voters with disabilities and/or voters with limited English proficiency ("LEP"), including mail voters, cast their ballots.

33.     Plaintiffs conduct in-person voter outreach and engagement activities, including voting assistance and transportation to the polls. Despite the diversity of their respective missions in the state—e.g., encouraging civic participation, empowering voters with disabilities, improving infrastructure in the colonias—the Plaintiff organizations rely on in-person voter advocacy to advance their causes. These voter engagement efforts include neighborhood door-knocking campaigns, voter registration drives, candidate forums, town hall meetings, tabling at community events, and exit-polling. During some outreach events, voters have taken out their mail ballots while speaking with organizers to ask questions about their ballots or request voting assistance.

34.     Plaintiffs' volunteers often receive refreshments, t-shirts, pens, gas cards, and other tokens of appreciation for their canvassing and assistance efforts.

35.     Plaintiffs' organizational representatives testified at trial that the Challenged Provisions have frustrated their voter engagement and turnout efforts by chilling their members' willingness to provide voter assistance due to fear of criminal liability. Moreover, some of Plaintiffs' members with disabilities who typically vote with assistance decided to forgo assistance altogether to avoid subjecting their preferred assistors to criminal sanctions.

36.     Collectively, Plaintiffs seek declaratory and injunctive relief and ask the Court to enjoin the Attorney General ("AG"), and Secretary of State ("Secretary" or "SOS") of Texas, and several local election officials and prosecutors from enforcing the Challenged Provisions.

**The HAUL-MFV Plaintiffs**

37.     Together, the HAUL-MFV Plaintiffs challenge the Transportation Disclosure (S.B. 1 § 6.01), the Amended Oath (§ 6.04), and the Assistor Disclosures (§§ 6.03. 6.05, 6.07), seeking injunctive relief against the Secretary, the AG, and the local election officials and the DAs of Bexar County and Harris County. *See* ECF No. 199 ¶ 323.

### *The Arc of Texas*

38.     The Arc of Texas (the "Arc") is a non-profit organization founded in 1953 by parents of children with intellectual and developmental disabilities ("IDD") to advocate for their children to have access to education, employment, community supports, and other areas of community life. Tr. at 3492:18–25, 3493:1–5. The Arc has 7,000 individual members across the state.[13] Tr. at 3495:20–25, 3496:4–24.

39.     The Arc's mission is to "promote, protect, and advocate for the human rights and self–determination of Texans with intellectual and developmental disabilities." Tr. at 3490:23–25, 3493:7–9. In pursuit of that mission, The Arc engages in legislative advocacy and grassroots advocacy to help empower people with IDD advance public policy and. Tr. at 3493:10–21; 3494:5–10. Voting is "the backbone" of The Arc's work because it is critical to members' self-

---

[13]Although individual members previously paid membership dues, The Arc stopped charging fees after concluding that they were a barrier for people with IDD being able to join the organization. Tr. at 3497:17–25, 3498:1–3 (noting that people with IDD often "live in poverty and don't have extra money to pay membership dues."). Thus, members can join The Arc of Texas in several other ways, including by subscribing to their Disability Dispatch email, making a donation, serving on the board, or serving on a committee. Tr. at 3495:22–25, 3496:1–3, 3497:10–16.

determination and voting rights advocacy has been a priority since The Arc's founding. Tr. at 3499:23–3500:12, 3499:23–3500:12.

40.     As discussed in greater detail herein, several members of the Arc with disabilities have been unable to vote with their assistor of choice due to the burdens imposed by S.B. 1's Assistor Disclosure requirement and amended Oath of Assistance, including Jodi Lydia Nunez Landry. Tr. at 3229:15.

### Delta Sigma Theta Sorority, Inc.

41.     Plaintiff Delta Sigma Theta Sorority, Inc. ("DST" or the "Sorority") is a national, nonprofit, nonpartisan organization of Black, college-educated women, focused on serving the Black community through social action. Tr. at 2081:1–20. DST has 75 Chapters in Texas, including chapters in Bexar, Harris, and Travis Counties, and 21,450 members registered to vote in Texas. Tr. at 2083:13–25.

42.     The Sorority organizes its social action under what it calls its "Five Point Programmatic Thrust": educational development, economic development, international awareness and involvement, physical and mental health, and political awareness and involvement. Tr. at 2081:7–13.

43.     In support of this mission, DST has participated in voting rights efforts since its founding in 1913. Tr. at 2082:23–2083:8. The organization's civic engagement programs include voter registration drives, voter education, candidate forums, and voter assistance and transportation programs. Tr. at 2086:21–2087:15.

44.     DST Chapters in Texas provide voter assistance to residents of nursing homes and senior care facilities who need help filling out applications for ballots by mail ("ABBMs"), address changes, and ballots by mail ("BBMs") and voting in-person. Tr. at 2088:1–18, 2199:9–19.

45.     Before S.B. 1, DST members regularly provided transportation to the polls by participating in Souls to the Polls, a caravanning initiative that partners with churches to drive voters to their voting location. Tr. at 2088:8–15.

46.     Members of DST include individuals that have disabilities and depend on assistance to cast their vote. Tr. at 2110:3–11.

**The OCA Plaintiffs**

47.     Together, the OCA Plaintiffs challenge the Ban on Compensated Assistance (S.B. 1 § 6.06), seeking injunctive relief against the Secretary, the AG, the County Clerks of Harris and Travis Counties, and the DAs of Harris and Bexar Counties. *See* ECF No. 200 ¶ 181.[14]

### *OCA-Greater Houston*

48.     Plaintiff OCA-Greater Houston ("OCA") is a membership-driven organization dedicated to advancing the social, political, and economic well-being of Americans of Asian and Pacific Island descent ("AAPIs"), largely in Harris, Brazoria, and Fort Bend counties. Tr. at 1684:8–12, 1685:1–3, 1686:16–17, 1688:10–14.

49.     The organization's mission comprises four main goals: (1) advocate for social justice, equal opportunity, and fair treatment; (2) promote civic participation, education, and leadership; (3) advance coalition and community building; and (4) foster cultural heritage. Tr. at 1689:6–13.

50.     To further this mission, OCA engages in numerous election-related activities carried out by volunteers and paid staff, all of whom are OCA members. Tr. at 1687:22–1688:6, 1693:21–25. Before S.B. 1 was enacted, OCA regularly hosted election events, including in-person

---

[14] OCA-Greater Houston, REV UP Texas, and the League of Women Voters Texas voluntarily withdrew their Section 208 challenges to S.B. 1 § 6.04. *See* ECF No. 753 at 5 nn.4–5

candidate forums (Tr. at 1694:21–1696:8), "AAPI meet-and-greets" with AAPI political candidates (Tr. at 1699:24–1702:2), and voting machine demonstrations (Tr. at 1706:12–1707:3). Attendees often brought their mail-in ballots to these events and received assistance, including language assistance, from OCA volunteers and staff. Tr. at 1696:9–1697:8, 1697:22–1699:7, 1700:1–1702:2, 1706:12–1707:3.

51.     OCA has also engaged in canvassing efforts through volunteers and staff, who knocked on voters' doors to provide information about voting. Tr. at 1702:3–17. As they were door-knocking, some bilingual OCA canvassers assisted voters who requested language assistance with their mail-in ballots. Tr. at 1703:17–20. OCA staff and volunteers have provided mail-ballot assistance while conducting exit-polling at polling locations, where voters also requested (and received) assistance with their mail-ballots from OCA. Tr. at 1706:4–11, 1723:6–13.

52.     OCA's voting-related activities are carried out by volunteers and paid staff. Tr. at 1687:22–1688:6, 1693:21–25. OCA provides its members and volunteers with benefits like food and beverages at in-person events where they provide voting assistance to LEP voters. Tr. at 1694:4–20, 1697:22–25.

### The League of Women Voters of Texas

53.     The League of Women Voters of Texas ("LWV" or the "League") is a non-partisan organization founded in San Antonio in 1919 with over 3,000 dues-paying members, including members in Harris and Travis Counties. Tr. at 1580:1–4, 1585:18–22, 1586:7–19, 1587:19–21,

54.     The League's mission is to empower voters and defend democracy. Tr. at 1580:1–4. The League actively works to register eligible citizens to vote, ensure that voters' ballots count, help voters obtain mail-in ballots, vote by mail, and obtain voter assistance when needed. Tr. at 1580:1–8, 1581:9–18, 1589:12–15, 1589:25–1590:3.

55.     The League has members who use assistants when they vote by mail, and members who assist others with their vote by mail ballots. Tr. at 1578:3–8, 1589:12–1590:3. League members assist mail-in voters who are family, friends, in nursing homes, in assisted living centers, or in homes where voters with disabilities live. Tr. at 1590:16–25. Members of the League "offer[] tea, or coffee, or water," to assistors that help them and other voters vote by mail. Tr. at 1591:1–1592:5, 1590:4–12.

### **The LUPE Plaintiffs**

56.     Together, the LUPE Plaintiffs challenge the Oath of Assistance S.B. 1 (S.B. 1 § 6.04), Assistor Disclosures (§§ 6.03, 6.05, 6.07), the Ban on Compensated Assistance (§ 6.06), and the Canvassing Restriction (§ 7.04) seeking injunctive relief against the Secretary, the AG, and the election officials and prosecutors of Dallas and El Paso Counties and the Travis County District Attorney. *See* ECF No. 208 ¶ 267.

### *La Union Del Pueblo Entero*

57.     La Union Del Pueblo Entero ("LUPE") is a non-partisan, membership organization headquartered in San Juan, Texas, with members primarily in Hidalgo, Cameron, Willacy, and Starr Counties, Texas. Tr. at 58:13–16.

58.     LUPE organizes its approximately 8,000 members and other colonia residents on issues that affect low-income neighborhoods, including drainage, lighting, paved roads, safety, emergency services, trash pickup, among others. Tr. at 88:8–24. In addition to civic engagement organizing, LUPE is a social services hub for the community and provides income tax services, language translation services and family-based immigration legal services. Tr. at 61:3–17

59.     In recent years, LUPE's primary organizing focus has been civic engagement and educating voters about their right to vote. Tr. at 60:10–61:2. LUPE relies on paid staff members,

temporary paid canvassers, and volunteers to engage with voters in-person. Tr. at 88:1–7. LUPE members speak to voters on issues promoted by LUPE, including urging voters to support certain non-partisan ballot measures. Tr. at 88:1–24.

60.     LUPE organizers advocate for ballot measures in a variety of settings, including when meeting with community members in neighborhoods, at LUPE events, at union halls, and in the LUPE offices. Tr. at 89:7–18. While canvassing neighborhoods in support of ballot measures, LUPE organizers have been invited into voters' homes and asked for assistance with voters' mail-in ballots. Tr. at 71:1–72:15, 75:11–75:17, 119:20–120:18. LUPE members also often bring mail ballots to meetings at LUPE offices and union halls. Tr. at 90:4–24.

61.     LUPE's membership includes individuals who use assistance to vote by mail and in-person, including elderly and/or disabled voters and voters with limited English proficiency ("LEP") or low-literate. Tr. at 63:19–64:6, 65:7–65:13, 75:18–77:4, 77:17–78:2, 84:4–84:25, 85:1–85:4, 87:3–87:21, 97:11–97:17, 119:20–120:18, 116:22–117:7, 3676:11–25. Some of these members are not literate in English or Spanish. Tr. at 64:7–65:6.

62.     Members of LUPE include voters who are disabled and vote with assistance in person and by mail. Tr. at 63:19–64:6, 65:7–65:13, 96:15–97:17, 75:18–77:4, 77:17–78:2, 84:4–84:25, 85:1–85:4, 119:20–120:18, 116:22–117:7, 87:3–87:21, 3676:11–25.

63.     LUPE staff members and volunteers have been asked for assistance with voting by mail and in-person at the polls elderly and disabled voter and have provided such assistance. *See* Tr. at 145:16–20, 145:25–146:4, 150:9–13, 150:19–151:2, 157:14–158:9; LUPE-284, Maria Gomez Dep. at 41:24–42:24, 11:15–12:10, 15:17–20, 29:9–12. 40:24–42:2. LUPE trains its organizers to provide voter assistance consistent with the law, to limit assistance to what is requested by the voter, and to carry out the wishes of the voter. Tr. at 78:3–78:15.

64.     LUPE often provides its volunteers with t-shirts or gas cards, particularly because there is little public transportation in the Rio Grande Valley. Tr. at 122:3–19.

### Mexican American Bar Association of Texas

65.     The Mexican American Bar Association of Texas ("MABA") is a volunteer-based professional membership association of Latino lawyers across Texas with approximately 500 members. Tr. at 2533:20–23, 2535:9–10.

66.     Although MABA is non-partisan, it routinely encourages voters to support a candidate or measure. Tr. at 2535:19, 2542:6–8.

67.     MABA encourages its attorneys to provide pro bono services and support voter engagement in their local communities. Tr. at 2533:24–2534:4, 2535:11–2536:5. MABA engages in voter outreach and education by tabling at local community events, such as candidate forums. Tr. at 2535:21–2536:5. MABA members also provide voter assistance. *See, e.g.*, Tr. at 2539:3–4. Members are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while performing these activities. Tr. at 2542:6–20.

### Familias Inmigrantes Estudiantes Luchar

68.     Familias Inmigrantes Estudiantes Luchar ("FIEL"), translated to English means "Immigrant Families and Students in the Fight." Tr. at 2430:12–19. FIEL is an immigrant-led civil rights organization with approximately 16,000 members in the Greater Houston area. Tr. at 2431:21–25. FIEL employs eight paid staffers. Tr. at 2433:18–22. FIEL's mission is to organize and empower people, and to make sure that people know their rights and that they exercise their rights in the community. Tr. at 2434:21–2435:1. FIEL focuses on work related to access to higher education, community organizing, and civic engagement, including voter outreach. Tr. at 2435:2–14.

69.     Before S.B. 1 was enacted, FIEL furthered its mission of voter outreach and civic engagement by assisting its members in voting at the polls. Tr. at 2438:9–11, 2444:24–2445:3. FIEL typically partnered with another organization to take people to vote and provide translation and other assistance at the polls. Tr. at 2438:12–16.

**The LULAC Plaintiffs**

70.     The LULAC Plaintiffs challenge the Canvassing Restriction (S.B. 1 § 7.04), seeking relief against the AG, the Secretary, election officials and district attorneys in Bexar, Travis, Hidalgo, Dallas and El Paso Counties. ECF No. 207.

*League of United Latin American Citizens*

71.     The League of United Latin American Citizens ("LULAC") is a national Latino civil rights organization founded in 1929 in Corpus Christi, Texas. Tr. at 1632:9–11. The group has about 4,000 to 5,000 dues-paying members within Texas, as well roughly 80,000 to 90,000 "eMembers" in the state. There are 30 to 40 LULAC councils in Texas, including in Dallas, San Antonio, Houston, and El Paso. Tr. at 1634:6–20, 1637:3–7.

72.     LULAC's mission is "to improve the lives of Latino families throughout the United States" and "to protect their civil rights in all aspects." Tr. at 1633:10–18. Promoting the right to vote is "crucial" to LULAC's mission because when Latinos are "allowed to vote, they are able to choose candidates of their choice" who "will stand and work on issues that are important to them." Tr. at 1645:4–15.

73.     LULAC has volunteers that engage in voter registration and GOTV efforts every year. Tr. at 1645:23–1646:5. These efforts often focus on community members who face greater challenges when voting, including elderly Latinos and those who do not speak or write English.

Tr. at 1649:7–24. Accordingly, LULAC has historically run a voter assistance program for seniors, including many who are not literate or have physical disabilities. Tr. at 1654:20–1655:5.

74.     LULAC's members and volunteers who participate in these GOTV and voter assistance efforts often receive food and drink, gas credit, or other tokens of appreciation for their efforts. Tr. at 1655:19–1656:10, 1656:11–18.

**Defendants**[15]

75.     Collectively, Plaintiffs have sued the State of Texas, the Attorney General and Secretary of State of the State of Texas, and the chief election officials and district attorneys of several counties in Texas, including Harris County, Bexar County, Travis County, Dallas County, Hidalgo County, and El Paso County, all in their official capacities.

### The State Defendants

#### *The State of Texas*

76.     The State of Texas became the 28th state in the union in 1845.

#### *Texas Attorney General*

77.     Defendant Ken Paxton is the Attorney General of the State of Texas. His office, the Office of the Attorney General of Texas ("OAG"), is an executive department or agency of the State of Texas. ECF No. 753 ¶ 40.

78.     The AG has statutory duties for certain aspects of S.B. 1's enforcement scheme, including Sections 6.04, 6.05, 6.06 & 7.04. *Stephens* did not alter the authority of the AG to investigate allegations of election-related crimes, and, in some cases, the OAG considers its investigative duties to be "statutorily required" or "mandatory" for election-related allegations. Tr.

---

[15] Over the course of these proceedings, several Defendants sued in their official capacities were substituted by their successors in office pursuant to Federal Rule of Civil Procedure 25(d).

at 4041:18–4042:25; *see, e.g.*, TEC § 273.001 (providing that the AG "shall investigate" allegations of election crimes in elections covering more than one county). The AG may also "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* TEC § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them).

79.     The AG has demonstrated a willingness to enforce, and has actually enforced, the Election Code, including S.B. 1. Tr. at 3909:8–17, 3913:9–3914:16. He publicly maintains that one of his key priorities is to investigate and prosecute allegations of voter fraud. *See, e.g.*, OCA-384, OCA-385, OCA-386.

80.     The OAG continues to operate the Criminal Prosecutions Division unit that prosecutes election-related allegations, known as the Election Integrity Division. Tr. at 3903:23–3905:4, 3905:11–15, 4039:14–19. As of March 17, 2023, the OAG had identified investigations of a possible violations of the Assistor Disclosure requirement for mail ballots (S.B. 1 § 6.03) and the Canvassing Restriction (S.B. 1 § 7.04). [16] *See* LULAC-86 at 6.

81.     Before *Stephens*, the OAG regularly prosecuted election crimes, including alleged unlawful-assistance and vote-harvesting schemes, in counties across Texas. *See* OCA-377 (showing 401 counts—not cases—of election crimes prosecuted by the OAG, alone or in conjunction with local prosecutors, between 2005 and 2022).

82.     Even after *Stephens*, Jonathan White, former Chief of the OAG Election Integrity Division, testified that the "vote harvesting" schemes (purportedly targeted by the Canvassing

---

[16] There may very well be additional investigations that the DA failed to produce during discovery. Throughout this litigation, the OAG has, invoking the investigative privilege, withheld documents discussing "actual or alleged illegal voting, election fraud, or other criminal conduct in connection with" voting and voter assistance. *See* ECF No. 992-3; ECF No. 992-16; *In Re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 568–69, n.2 (5th Cir. 2006) (the investigative privilege, also known as the "law enforcement privilege," protects government documents relating to an ongoing criminal investigation from release).

Restriction) and "assistance fraud" (purportedly targeted by the all the challenged provisions) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8. For the November 2022 elections, the OAG established a 2022 General Election Integrity Team and publicly stated it was "prepared to take action against unlawful conduct where appropriate," highlighting offenses related to voter assistance and "vote harvesting." OCA-383.

83.     Although the AG may no longer unilaterally prosecute allegations of election-related crimes, *Stephens*, 663 S.W.3d at 51–55, the OAG enforces criminal election offenses through other mechanisms. After OAG investigations conclude, the OAG refers cases to local prosecuting attorneys[17] and often seeks opportunities to partner with DAs to prosecute such allegations through deputization by a DA or appointment *pro tem* by a district judge or the DA. Tr. at 3908:21–3909:17, 3909:1–12; 4043:21–4045:21; 4051:2–10.

84.     The OAG has specifically identified previous prosecutions in which it participated, including prosecutions for unlawful voting assistance and "vote harvesting" and prosecutions conducted by or with the assistance of local DAs in the following counties: Nolan County, Limestone County, Hidalgo County, Harris County, Navarro County, Brewster County, Gregg County, and Starr County. *See* OCA-377.

85.     Finally, the AG is tasked to enforce S.B. 1 against election officials who are subject to civil prosecution for Election Code violations. S.B. 1 § 8.01 (TEC §§ 31.128, .129, .130); *see* Tr. at 772:2–6. He is authorized under S.B. 1 § 8.01 (TEC § 31.129(b)) to assess civil penalties

---

[17] For example, after the prosecution of Hervis Rogers was dismissed in Montgomery County, the OAG referred the case to the Harris County DA, who brought charges against Mr. Rogers before a grand jury. Tr. at 4058:17–4059:24, 4062:7–12. The same procedure was used in the prosecution of Ignacio González Beltrán, whose case was dismissed in Montgomery County and referred by the OAG to Harris County, where it was presented to a grand jury. Tr. at 4063:3–4064:6.

against local officials who violate the law by failing to enforce certain provisions of S.B. 1, including provisions that Plaintiffs challenge.

### Texas Secretary of State

86.     Plaintiffs seek to enjoin Defendant Jane Nelson, the Secretary of State (the "Secretary") of the State of Texas, from enforcing the Challenged Provisions.

87.     The Secretary is the Chief Election Officer of Texas. TEC § 31.001(a). In that capacity, the Secretary is charged with "broad duties to oversee administration of Texas's election laws." *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (quoting *Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022)).

88.     It is the Secretary's duty to obtain and maintain uniformity in the interpretation, application, and operation of the election code and election laws outside the election code. TEC § 31.003; Tr. at 1827:6–12.

89.     These responsibilities include "prescribing official forms" for elections. Tr. at 1834:2–12; TEC §§ 31.001(a)–(b), 31.003. The Secretary, for example, is responsible for the design and content of the Assistor Disclosure form and BBM carrier envelopes. *See* Tr. at 1843:4–7; TEC §§ 64.0322(b), 86.013(d); LUPE-009; LUPE-189.

90.     The Secretary routinely issues guidance, directives, orders, instructions, and handbooks to county registrars of all 254 Texas counties, as well as to district attorneys, political candidates, and voters, on various election procedures, including changes implemented in S.B. 1. Tr. at 119:24–120:6, 125:4–21, 128:14–20, 129:3–14, 143:15–18, 159:9–160:11, 1831:7–14, 1875:5–10, 1875:18–25.

91.     The Secretary also collaborates with the OAG to enforce election laws in accordance with her mandatory duties under the Election Code. Tr. at 3913:9–19, 4054:16–4055:8.

92.     Under the Election Code, the Secretary must evaluate information she "receiv[es] or discover[s]" about potential election crimes and, if she "determines that there is probable cause to suspect that criminal conduct occurred, the [S]ecretary *shall* promptly refer the information to the attorney general" and provide all pertinent documents and information in his possession to the AG. TEC § 31.006 (emphasis added).

93.     In this capacity, the Secretary serves as "a gathering point for election complaints from individuals and election officials." Tr. at 3913:12–19. The Secretary logs each complaint received. Tr. at 4326:23–4327:2. Sometimes, the Secretary will also ask the complainant for additional information. Tr. at 1876:24–1879:21. Ultimately, the Secretary must determine whether the information in her possession satisfies the probable cause standard. Tr. at 1881:1–9. "If it's a close call, [the Secretary of State's Office] refer[s] it anyways, because it's better to err on the side of making sure that crimes are prosecuted." Tr. at 1877:14–21.

94.     The Secretary has received allegations related to mail ballot "vote harvesting," which she has referred to the OAG both before and after the passage of S.B. 1. Tr. at 1914:1–6.

**County Defendants**

95.     Plaintiffs have named various local election officials and prosecutors as Defendants in their official capacities for their roles in implementing and enforcing the Challenged Provisions.

*County Election Officials*

96.     Plaintiffs have sued local election administrators in several counties in Texas (the "EAs" or "County Clerks," as applicable) in their official capacity to enjoin them from enforcing the Challenged Provisions.

97.    The HAUL Plaintiffs seek injunctive relief against the Bexar County EA and the Harris County Clerk.[18] *See* ECF No. 199. The OCA Plaintiffs seek injunctive relief against the County Clerks of Harris County and Travis County. *See* ECF No. 200. The LUPE Plaintiffs seek injunctive relief against the EAs of Dallas County and El Paso County. *See* ECF No. 208. The LULAC Plaintiffs seek injunctive relief against the Bexar County EA, the Harris County Clerk, the Travis County Clerk, the Hidalgo County EA, and the Dallas County EA. *See* ECF No. 207.

98.    Local election officials administer Texas elections. They are responsible for administering the Oath of Assistance at polling places, TEC § 64.034, and for collecting and reviewing required disclosures at the polls and on the carrier envelopes of mail-in ballots, *id.* § 64.034. They also receive and review mail carrier and ballot envelopes to voters, *id.* § 86.002, receive and process marked ballots, *id.* §§ 86.006, 86.007(b), 86.011, verify voter signatures, *id.* § 87.027(i), and count the results, *id.* § 87.061.

### *County District Attorneys*

99.    Plaintiffs seek to enjoin the District Attorneys of several counties in Texas (the "DAs" or "County DAs") from enforcing S.B. 1 §§ 6.04–6.06 and 7.04.

100.    The HAUL Plaintiffs seek injunctive relief against the DAs of Bexar County, Harris County, and Travis County. *See* ECF No. 199. The OCA Plaintiffs seek injunctive relief against the Harris County DA and the Travis County DA. *See* ECF No. 200. The LUPE Plaintiffs seek injunctive relief against the DAs of Travis County, Dallas County and the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. *See* ECF No. 208. The LULAC Plaintiffs name the DAs of Travis, Dallas, and Hidalgo Counties as Defendants. *See* ECF No. 207.

---

[18] The Harris County EA's office was abolished on September 1, 2023, pursuant to 88th Leg. R.S. Senate Bill 1750 (amending TEC § 31.050). ECF No. 753 ¶ 44 & n.12.

101.     County district attorneys are tasked with enforcement of the State's criminal laws and represent the State of Texas in all criminal cases in their district, unless conflicts arise. Tex. Const. art. 5, § 21; TEX. CODE CRIM. P. ART. 2.01; *see* TEX. GOV'T CODE § 43.180(b). Thus, by virtue of their positions, DAs are charged with investigating and prosecuting violations of the Election Code, including those among the Challenged Provisions. *See Stephens*, 663 S.W.3d at 55. Indeed, all prosecutions under the Election Code require the consent or authorization of the applicable DA. *See id.* (concluding that the Attorney General "can prosecute [crimes under the Election Code] with the permission of the local prosecutor but cannot initiate prosecution unilaterally.").

102.     The DAs for Travis, Dallas, and Hidalgo Counties each executed stipulations stating that he or she had *not* (1) adopted a policy refusing to prosecute crimes under S.B. 1, (2) instructed law enforcement to refuse to arrest individuals suspected of criminal conduct under S.B. 1, or (3) permitted an assistant DA to take either of the foregoing actions. *See* ECF No. 753-6 (Travis) ¶¶ 3–6; ECF No. 753-7 (Dallas) ¶¶ 3–4; ECF No. 753-13 (Hidalgo) ¶¶ 3–6.

103.     The Bexar County DA likewise signed a stipulation stating that his office has not disavowed any intent to investigate or prosecute crimes under S.B. 1. ECF No. 753-5 ¶¶ 2–6.

104.     The DA of the 34th Judicial District agreed not to enforce the provisions challenged by the LUPE Plaintiffs during the pendency of this action but stipulated that he has the authority to enforce crimes under the Election Code, would be free to do so at any time, and intends to fulfill his duty to enforce election crimes, subject to his prosecutorial discretion. ECF No. 753-8 ¶¶ 5–7.

105.     The Harris County DA's Office ("HCDAO") has previously prosecuted alleged violations under the Election Code and/or related to elections, including under provisions that were

amended by S.B. 1.[19] The Harris County DA has jointly prosecuted at least two election–related cases alongside the OAG in the past.[20]

106.    A newly enacted law House Bill 17 ("H.B. 17") curbs DAs' authority to adopt a policy against enforcing crimes under the Election Code. H.B. 17, which went into effect on September 1, 2023, provides that DAs may be removed from office if they adopt any policy that "prohibits or materially limits the enforcement of any criminal offense." H.B. 17 § 1 (adding TEX. LOC. GOV'T CODE § 813(B)).

**IMPACT OF THE CHALLENGED PROVISIONS**

107.    At trial, the Court heard testimony (live and by deposition designation) from numerous voters who qualify for voting assistance, individuals who have served as assistants in the past, and election officials describing the impact that the Challenged Provisions have impaired voters' ability to vote with their chosen assistors of their choice.

**Transportation Disclosure (§ 6.01)**

108.    Before S.B. 1, DST members regularly provided transportation to the polls by participating in Souls to the Polls, a caravanning initiative that partners with churches to drive voters to their voting location. Tr. at 2088:8–15.

109.    DST members who provide transportation assistance members are concerned about who may gain access to the personal information disclosed on the forms required under Section

---

[19] For example, in 2022, after the prosecution of Hervis Rogers was dismissed in Montgomery County, OAG referred the case to HCDAO, who presented charges against Rogers to a grand jury. Tr. at 4058:17–4059:24, 4062:7–12. In addition, HCDAO presented another charge to a grand jury regarding an alleged Election Code violation by Mr. González Beltrán after the case was similarly dismissed in Montgomery County. Tr. at 4063:3–4064:6.

[20] OCA-377 at 17 (noting certain cases that were "[p]rosecuted by or with assistance of local district/county attorney," including Harris County); *id.* at 14 (identifying joint prosecution of Anthony Rodriguez with Harris County in 2019); OCA-225 at 4 (Harris DA interrogatories identifying prosecution of Anthony Rodriguez under a provision amended or enacted by S.B. 1); OCA-377 at 6 (identifying joint prosecution of Avery Ayers with Harris County in 2015). The Harris DA further acknowledged prosecuting two other election–related violations in 2020 under provisions enacted or amended by S.B. 1. OCA-225 at 4 (identifying prosecutions of Richard Bonton and Natasha Demming).

6.01 and potential harassment by poll watchers, who are permitted to observe drivers subject to Section 6.01 as they complete the Transportation Disclosure form during curbside voting. Tr. at 2108:7–2109:3 ("Our members or even community members who provide transportation are afraid to fill out those forms. They don't know what's going to happen to the information that they put on those forms.").

110.    It is unclear whether drivers who refuse to complete the disclosure form will face any consequences. Unlike the provisions of S.B. 1 requiring individuals providing voting assistance to make similar disclosures on mail ballot carrier envelopes (TEC § 86.010(g).) and take the Oath of Assistance (TEC § 64.034), Section 6.01 does not, to the Court's knowledge, state that non-compliance is punishable as a state jail felony or will result in the rejection of a voter's ballot. Section 6.01 merely explains that SOS must maintain records of the drivers' disclosures and produce them to the AG upon request. TEC § 64.009(g). Instead, enforcement of Section 6.01 appears to be left to election officers, who would, presumably not permit the curbside voters to cast their ballots until the driver had completed the disclosure form.

111.    The Austin Alumnae Chapter of DST stopped providing transportation assistance to elderly, disabled individuals because of Section 6.01's transportation assistance disclosure requirement and the attendant criminal penalties assistors maybe subjected to under S.B. 1. Tr. at 2147:12–2148:3. The Austin Alumnae and Bay Area-Houston Chapters have been unable "to recruit members who are brave enough to assist with senior voters [with transportation to the polls] because of the fear[] of criminal penalties." Tr. at 2198:2–6. Members of the Fort Worth Chapter of DST had routinely provided transportation assistance to elderly voters at the Friendship Senior Center in Fort Worth, Texas. However, none of the members were willing to assist because of the burdens on assistance placed on Section 6.01 Tr. at 2197:3–17, 2198:20–24.

**Assistor Disclosures (§§ 6.03, 6.05, 6.07) and Oath of Assistance (§ 6.04)**

112.    The Assistor Disclosures and Oath requirements deter voters from requesting, and assistors from providing, assistance in the voting process. As a result, some voters who need assistance have forgone assistance altogether and struggled to complete their ballots. Those who engaged with election officials sacrificed their privacy while voting but still did not receive the assistance they needed.

113.    The Court heard trial and deposition testimony from several Texas voters who, due to their physical disabilities, require assistance in nearly every facet of their daily lives, including Jodi Nunez Landry, Laura Halvorson, Amy Litzinger, and Nancy Crowther. All four witnesses are members of the Arc.

114.    Although Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther are eligible for assistance under Texas and federal law, none of them received voting assistance from their assistors of choice in the 2022 primary or general election because of the burdens—including the threat of criminal liability—that S.B. 1's disclosure and oath requirements impose on assistors.

115.    These voters were not worried that their chosen assistors would influence their vote. Ms. Halvorson testified that she has never felt that one of her attendants was trying to influence her choices or would manipulate the way her ballot was marked. Tr. at 3318:3–11. Similarly, Ms. Litzinger explained that her personal care attendant is not able to manipulate how she votes because she is always present when they are assisting her with marking the ballot and ensures that she can see her ballot and verify what the attendant marks. *See, e.g.*, Tr. at 3296:20–3297:8.

116.    Instead, voters' primary concern was exposing their caregiver to criminal liability under S.B. 1 and losing the critical assistance they provide outside the voting process. Ms. Nunez Landry testified that her "worst fear is ending up in a nursing facility due to her inability to find

care attendants." Tr. at 3234:7–23 (has had difficulty finding personal care attendants due to shortage of home health care workers, who generally receive low wages without benefits and can earn more money working less physically demanding jobs); *see also* Tr. at 3331:2–18 (Halvorson) (finding replacement caregivers is "hard enough" without criminal penalties being added to the mix of what they are being asked to do).

117.   Voters with disabilities also fear being disenfranchised due to the mistaken perception by election workers and poll watchers that voters receiving assistance are being improperly coerced or influenced. As Ms. Halvorson explained, "especially if they don't have an understanding of disability," people may believe that "we're not able to make decisions for ourselves or we don't have the intellectual capacity to do so. . . . I [worry] that other people would perceive that my caregivers were influencing my vote, if they just see from across the room someone pressing buttons for me." Tr. at 3324:15– 3325:5, 3331:2–18.

**Voters have been deterred from requesting assistance.**

*Jodi Nunez Landry*

118.   Jodi Nunez Landry is a registered voter of Harris County, Texas and votes with assistance. Tr. at 3236:11–17; Tr. at 3234:1–6. Ms. Nunez Landry has a rare, untreatable, and progressive form of muscular dystrophy. Tr. at 3233:7–14. She uses a power wheelchair to navigate and requires assistance with most activities of daily living, including bathing, dressing, cooking, and cleaning. Tr. at 3233:2–14, 3235:10–3236:2

119.   Ms. Nunez Landry prefers to vote in person. Tr. at 3236:24–3237:14. She prefers to have her partner assist her with voting because she "can trust him and there's a certain amount of privacy there[.]" Tr. at 3243:5–25. Because her partner already understands the contours of her

disability, she does not need to give him a lengthy explanation of the assistance she needs. Tr. at 3234:2–6, 3236:24–3237:14.

120.    Ms. Nunez Landry has not asked her partner for voting assistance since S.B. 1 was enacted because she did not "want to put him in jeopardy" or draw attention to herself or have people assume that she was "being coerced" in light of S.B. 1' voter assistance provisions. Tr. at 3246:23–3247:6. She explained:

> I would have liked to have had my partner assist me but I knew under SB 1 that we were going to have to go through all sorts of difficulties to do that, and . . . I didn't want to put him through that. I'm really afraid of losing assistance and not having anyone, and also I don't want to draw more attention to myself.

Tr. at 3256:15–3257:4; *see also id.* at 3260:2–18 (stating that she was "too afraid to ask his assistance," noting that S.B. 1 has a "chilling effect" on voters who need assistance "makes it very burdensome and frightening for many of us to risk losing attendants or risk putting them in some type of legal jeopardy").

121.    In the November 2022 election, Ms. Nunez Landry could not access the remote that would allow her to vote independently at her voting station and, once she had it, found that it was not functioning properly. Tr. at 3244:25–3245:14. When the poll worker she asked for help did not understand the problem, he brought other unknown individuals to Ms. Nunez Landry's booth. Tr. at 3245:18–3246:10. Although they failed to help her, all three strangers watched as Ms. Nunez Landry made her selections.

122.    Discussing the loss of her privacy, Ms. Nunez Landry testified that it "made me really nervous" and "they all voted with me, much to my chagrin and frustration." Tr. at 3246:7–8. Had she been able to receive assistance from her partner, "he could have touched the screen and

it would have all been rather effortless." Tr. at 3246:16–17. When she finally finished voting, she "was very, very angry." Tr. at 3246:21–22.

### Laura Halvorson

123.   Laura Halvorson is a registered voter in Bexar County. Tr. at 3315:25. Ms. Halvorson has chronic muscular respiratory failure and muscular dystrophy, a progressive condition that has worsened since her diagnosis. Tr. at 3311:14–22. Presently, Ms. Halvorson relies on a breathing machine and a power wheelchair. Tr. at 3312:2–3.

124.   Ms. Halvorson requires "total care" for everyday life, including assistance with transferring, bathing, dressing, eating, and meal preparation. Tr. at 3312:9–12. To accomplish these daily tasks, Ms. Halvorson employs several personal care attendants. Tr. at 3312:15–17.

125.   In the March 2022 primary, Ms. Halvorson opted to vote by mail. Tr. at 3318:23–24. Her assistant, however, did not feel comfortable taking the Oath of Assistance and declined to assist Ms. Halvorson. Tr. at 3319:7–16. As a green card holder, her personal care attendant was not comfortable taking an oath under penalty of perjury that could risk her green card status. This was the first time a personal care attendant ever declined to assist Ms. Halvorson in voting. Tr. at 3319:14–16. Without her assistant, Ms. Halvorson struggled to complete the mail in ballot. Tr. at 3319:17–20. Her muscle weakness inhibited her ability to write legibly, Tr. at 3320:4–18, forcing her to fill out her ballot in ten- or fifteen- minute intervals over the course of two full days. Tr. at 3320:19–22.

126.   In the November 2022 general election, Ms. Halvorson voted in-person. Tr. at 3322:5–10. She again voted without assistance to avoid exposing her assistants to potential liability. Tr. at 3322:11–18, 3323:10–24. Ms. Halvorson believes S.B. 1's Oath is intimidating, ambiguous, and that her caregivers may be accused of influencing her vote by simply helping her

cast it. Tr. at 3324:11–3325:5. When Ms. Halvorson arrived to vote, her remote control had a glitch that essentially inverted the controls. Tr. at 14–17. She struggled to highlight voting machine choices, and when was able to do so, could not deduce what the candidate's party affiliation was. Tr. at 3327:13–23. Ms. Halvorson testified that, when she sought help from poll workers, they snidely told her to push the buttons. Tr. at 3328:6–11. After nearly 45 minutes at the poll booth, Ms. Halvorson weakly delivered it into the counting machine. Tr. at 3329:1–8; 3330:1–3.

### *Amy Litzinger*

127.    Amy Litzinger is a registered voter in Travis County. Tr. at 3281:14–17. Ms. Litzinger has spastic quadriplegic cerebral palsy, which impairs her stability and ambulation and limits her muscle strength. Tr. at 3275:19–24. Additionally, Ms. Litzinger has dysautonomia, which affects involuntary functions, such as her digestion, breathing, and heart rate and temperature regulation. Tr. at 3276:2–6.

128.    Due to these conditions, Ms. Litzinger uses a power wheelchair and other mobility devices. Tr. at 3276:8–10. Because her muscle strength fluctuates, Ms. Litzinger cannot always operate these devices, Tr. at 3276:18–22, and often requires the assistance with her daily activities. Tr. at 3279:11–15. Ms. Litzinger requires assistance to get in and out of bed, to the shower, and to use the restroom. Tr. at 3279:16–25. She cannot lift or raise anything heavier than two pounds— which inhibits her ability to write and open doors. Tr. at 3277:16–3278:6. Ms. Litzinger owns a mobility van, which her assistors use to drive her around the city. Tr. at 3277:10–14. They must also secure Ms. Litzinger into her power wheelchair using a "chest clip" and "strap" and secure her power wheelchair in the van. Tr. at 3277:4–9.

129.    Although she is eligible to vote by mail, Ms. Litzinger prefers to vote in person because she anticipates that her disability will produce conflicting handwriting samples on a mail

ballot—her own handwriting fluctuates with her strength, and she sometimes relies on assistors to complete her ballot. Tr. at 3282:14–21.

130.    Ms. Litzinger prefers to have her personal care attendant assist with voting. Since she has limited dexterity, the poll worker would have to interact with intimate parts of her body, which could be unsafe or uncomfortable for both individuals. Tr. at 3286:11–3287:4. She also relies on her personal care attendant to get to the polling site. Her attendant drives her van, loads and unloads Ms. Litzinger from the van, ensures there are no barriers to enter the voting space, requests curbside voting, handles her ID, and places the completed ballot in the machine. Tr. at 3284:13–3285:23. Ms. Litzinger also relies on an attendant when voting by mail, as she did in 2020. Ms. Litzinger needs someone to open the envelope, fill it out, and tape it down so she can sign it. Tr. at 3287:20–3288:5.

131.    All of Ms. Litzinger's attendants have expressed to her that they are uncomfortable taking the Oath of Assistance, and accordingly, none of them have provided voting assistance since S.B. 1 was enacted. Tr. at 3293:17–21.

132.    During the May 2022 primary, when Ms. Litzinger approached the ballot machine to vote in person, she realized her chest clip was still fastened. Tr. at 3289:23–3290:2. She was uncertain if the assistant could release the clip or if that would be considered impermissible voting assistance. Tr. at 3290:2–5. Thus, Ms. Litzinger voted with the chest clip fastened and remembered it was "quite painful." Tr. at 3290:13–17. Due to the discomfort, she struggled to complete the five-page ballot. Tr. at 3290:15–17.

133.    In the November 2022 general election, Ms. Litzinger spoke at length with her attendant about the Oath. Ultimately, to avoid exposing the attendant to criminal liability under the Oath, especially concerning Ms. Litzinger's "eligibility" for assistance, they decided that the

attendant would provide Ms. Litzinger with transportation assistance but would not help her inside the polling place. Tr. at 3291:4–3292:5. Thus, Ms. Litzinger held her own notes and was ultimately unable to review them while she voted because she dropped them and could not pick them up. Tr. at 3292:6–9. Despite Ms. Litzinger's decision to vote without assistance, poll workers attempted to have the attendant sign the Oath simply because she was in the room with Ms. Litzinger. Tr. at 3292:9–17. During the entire time Ms. Litzinger was voting, three people debated whether she needed assistance and ultimately watched her vote. Tr. at 3293:1–13. She described the process as nerve-wracking and noted that "for something that was designed to keep my ballot private, I didn't think . . . it was very private because everyone [was] watching me vote and debating whether [I was] self-sufficient or not." Tr. at 3292:21–3293:4–7.

### Nancy Crowther

134.     Nancy Crowther, a registered voter in Travis County, is a member of The Arc. HAUL-413, Crowther Dep. at 16:22–25, 17:4–5, 30:5–12. Ms. Crowther has a progressive neuromuscular disease and requires a personal care attendant to complete major life activities. She cannot sit up by herself, so her attendant helps her get dressed, use the bathroom, transfer in and out of her wheelchair, and use her CPAP machine for her sleep apnea. Ms. Crowther also uses her attendant to complete household tasks and personal hygiene. Her attendant is with her for most of her daily activities. *Id.* at 23:25–24:8, 18:3–9, 30:5–12.

135.     Ms. Crowther did not take her attendant with her to vote in May 2022 because of her fears that the Oath could jeopardize her relationship with her attendant: "I would be mortified . . . if they were to get in trouble just for helping me." *Id.* at 52:11–53:4, 54:7–14. Ms. Crowther explained that, even though she will need more and more help over time as her disability

progresses, she does not want to expose her attendants to "danger" that "they aren't paid for" by asking for their assistance under the conditions imposed by S.B. 1.

### The Oath of Assistance (§ 6.04) deters voting assistance.

136.   The Oath of Assistance under Section 6.04 of S.B. 1, as enjoined by Judge Pitman, provides:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; **I did not pressure or coerce the voter into choosing me to provide assistance**; [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted**.

TEC § 64.034.

137.   Aside from the amended language that has not already been enjoined, Plaintiffs challenge the chilling effect on voting assistance created by the Oath's "penalty of perjury" language, the requirement that the voter represent his or her eligibility for assistance and assistor statements concerning eligibility and "pressure or coerc[ion]."

### *The "penalty of perjury" language deters assistance.*

138.   At trial, voters,[21] assistors,[22] and election officials[23] alike characterized the "penalty of perjury" language in the amended Oath as "intimidating," "scary," and "threatening." Several witnesses who assisted voters in elections prior to S.B. 1's enactment testified that they are no longer willing to serve as assistors due to the threat of criminal sanctions under the Oath.[24]

---

[21] *See, e.g.*, Tr. at 3324:10–14 (Halvorson).

[22] *See, e.g.*, Tr. at 147:10–148:8 (Rocha); Tr. at 3208:9–17; Tr. at 3217:12–3218:1 (Miller); Tr. at 2439:24–2440:10 (Espinosa); Tr. at 2540:21–23 (Ortega).

[23] *See, e.g.*, Tr. at 175:6–176:8 (Wise); Tr. at 1312:25–1314:9 (Longoria)

[24] *See, e.g.*, Tr. at 2443:20–2444:14 (Espinosa); Tr. at 2539:12–19 (Ortega).

139.    Witnesses also pointed out that the "penalty of perjury" language can interact with other language in the Oath to prohibit assistors from providing the assistance a voter requires. For example, an assistor must swear "under the penalty of perjury," that they "will not suggest, by word, sign, or gesture, how the voter should vote." Although this language appeared in the Oath before S.B. 1, the "penalty of perjury" language poses barriers to assistance to voters with intellectual disabilities and certain cognitive and physical impairments who need to be reminded of their selections, discussed in a previous conversation with their chosen assistor. *See, e.g.*, Tr. at 3491:9–20 (explaining that "cuing" is a common method of assistant voters with IDD); *see also* Tr. at 3740:19–23; LUPE-002 ¶ 40, Table 1 (stating that approximately 1,082,500, or one-third of voting-eligible Texans with disabilities, have a "cognitive impairment," defined as difficulty remembering, concentrating, or making decisions).

140.    Before voting curbside, Toby Cole, a disability rights attorney and Harris County voter with quadriplegia, goes through a sample ballot with his assistant, who helps him research candidates and mark the sample ballot. During the voting process, Mr. Cole asks his assistant to reference the sample ballot to remind him of his previous selections:

> I don't remember things the way I did when I was younger. I need someone
> to help me . . . I rely on my assistants to help me remind me of things. . . .
> And so I specifically request the people that help me, that they help remind
> me of what I've told them I want to do and how I want to vote.

Tr. at 702:10–703:19, 706:19–707:20. Thus, read together with the "penalty of perjury" language, Mr. Cole understands this portion of the Oath to mean that he must either change how he votes or require his assistor to commit perjury. Tr. at 710:20–711:11. Mr. Cole is not the only attorney concerned about the "perjury" language. MABA members find this language alarming because they do not want to subject themselves to the consequences of being accused of perjury—and potentially be disbarred—for providing voter assistance. Tr. at 2538:8–14.

141.    Voters with disabilities testified that they believed the "penalty of perjury" language will deter some people from voting altogether:

> I talk to a lot of people after they get disabled…as you make things harder, you just start cutting things out…it's too hard to find someone to feed me, or it's embarrassing, so I don't want to go to dinner. It's too hard to get on an airplane to go travel, so I just don't do that. And so every time you put even one little road bump or one little barrier in front, it just makes it that much harder, and so you don't do it…I look at the oath and it says "I swear under the penalty of perjury."…That's a big deal. That's a scary deal. [A]m I going to have somebody that may get deported or thrown in jail come help me? No, I'm just not going to vote. I'm just not going to exercise that right.

Tr. at 714:6–18, 715:1–14. Ms. Halvorson stated that many of her friends with disabilities are worried about their caregivers facing these issues with the penalty of perjury and "[s]ome of them may not be going out and voting like they used to, due to it." Tr. at 3332:11–18.

142.    Finally, there is some uncertainty about the type of "assistance" that triggers the Oath requirement in the first place. Ms. Litzinger did not ask her attendant to unfasten her chest clip while she was voting out of concern that it would trigger the Oath requirement. Tr. at 3290:2–5. Mr. Ingram testified that whether an attendant who wheels a voter who uses a wheelchair to the poll booth (but does not actually help her cast the ballot) must take the Oath is "a very gray area and kind of depends on the presiding judge." Tr. at 4420:18–4422:6. Mr. Ingram suggested that a voter faced with such a situation could ask the presiding judge for a reasonable accommodation (by permitting her attendant to move her to the poll booth without taking the Oath).[25] Alternatively, Mr. Ingram suggested that the attendant could "just take the Oath of Assistance, and whether you help the voter or not, you're in the polling place legally at that point." Tr. at 4420:18–4422:6. But,

---

[25] Of course, there is no guarantee that a presiding judge would in fact grant such an accommodation. *Cf.* TEC § 276.019 ("public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by" the Election Code); TEC § 1.002 (recognizing qualified individuals' right to "*request*[] a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law," but not their right to *receive* any such accommodations) (emphasis added).

of course, this response just begs the question. Voters and attendants want to know what kind of assistance can be provided, if any, *without* trigging the Oath requirement.

143.     Voter Eligibility for Assistance. Voters and assistors testified that these portions of the Oath addressing the voter's eligibility to receive assistance were troubling, in numerous respects.

144.     To begin, although the Oath requires the voter to affirm his eligibility for assistance, it does not define who is "eligible" to receive voting assistance or explain who determines eligibility. *See* TEC § 64.034. As a result, both voters and assistors expressed confused about the eligibility requirements.[26] Tr. at 3251:16–3252:11 (Nunez Landry); Tr. at 3561:2–3562:17, 3575:1–10 (Cranston); Tr. at 149–25 (Rocha).

145.     Mr. White testified that the new language in the Oath probably requires the assistant to obtain a representation of eligibility from the voter. Tr. at 3991:1–5.

146.     Voters expressed discomfort with the requirement to represent their eligibility to their assistors or explain the basis for their eligibility. As several voters with disabilities pointed out, the requirement that the voter affirmatively represents his or her eligibility amounts to an *additional* eligibility requirement. Ms. Nunez Landry testified that, while her partner served as her assistor before S.B. 1, she had never specifically told him that she was eligible to receive assistance. Tr. at 3252:17–3253:2. She felt that it would be "very undemocratic" if her vote did not count because she failed to represent her eligibility and that she "would feel disenfranchised"

---

[26] Adding to the confusion, the Secretary of State's "VOTER INFORMATION" poster, which must be posted in every polling place and voting station, provides an incorrect and overly-narrow definition of eligibility for voter assistance:

    a.    You have: (6) The right to assistance while casting your ballot if you cannot write, see the ballot, understand the language in which it is written, or cannot speak English, or communicate only with sign language, and want assistance in communicating with election officials.

LUPE-265, https://perma.cc/LKS6-HGJH; TEC § 62.011.

and like a "a second-class citizen." Tr. at 3252:17–3253:2. Mr. Cole stated that the provision is "offensive" because it requires him to share private health information with his assistor to receive the assistance he needs to vote—something he is not required to do in any other aspect of his life in order to receive the assistance he needs. Tr. at 695:6–7.

147.    While the Oath does not explicitly require voters to explain the basis for their eligibility, in practice, assistors who want to ensure that a voter's ballot will be counted must also confirm that the voter is eligible to receive assistance, because, as the Oath cautions, the voter's ballot may not be counted if he or she is ineligible. TEC § 64.034.

148.    Critically, because it does not contain a scienter requirement, the Oath appears as it is written to hinge on *actual* eligibility, regardless of the assistor's *or* voter's beliefs about the voter's eligibility. In other words, the provision of assistance itself, even if it is given in accordance with the voter's wishes, may result in the rejection of the voter's ballot. Thus, from an assistor's perspective, to avoid disenfranchising the very voters he hopes to assist, he must confirm that voters who have asked for his help are eligible for assistance and cannot reasonably rely on the voter's representation of their own eligibility.

149.    How assistors are supposed to confirm a voter's actual eligibility without asking the voter to disclose private health information is not at all clear. *See, e.g.*, Tr. at 147:1–9 (LUPE staff member is uncertain whether a voter who asks for help because he cannot see too well has sufficiently represented his eligibility); Tr. at 2543:21–16 (MABA members are concerned because they cannot guarantee that they have the knowledge to attest to someone's disability). Mr. White testified that "anyone who takes this oath is determining what that means to them," Tr. at 3989:10–16, but acknowledged that "it would certainly be the interpretation of the D.A. in that

county where [the potential] offense took place" that would determine whether an assistor would be prosecuted, Tr. at 4105:13–21.

150.    Assistors and witnesses with disabilities also testified that the statements regarding eligibility in the Oath were likely to subject voters receiving assistance to greater scrutiny in the polls, especially those with disabilities that are not readily perceptible. For example, Jennifer Miller, whose daughter, Danielle, requires voting assistance due to dysgraphia, worried that because Danielle's disability is not always visible, her daughter's vote might not be counted based on someone else's perception that she was ineligible for assistance. Tr. at 3215:16–3216:8. Even voters with *visible* disabilities attempting to vote *without* assistance have been subject to undue scrutiny, such as Ms. Litzinger, have had their privacy invaded while voting due to election officials' questions about her need for assistance. *See* Tr. at 3293:1–13; *see also* Tr. at 3245:18–3246:10 (Nunez Landry).

151.    Pressure or coercion. Voters and assistors expressed concerns about the Oath provision requiring assistors to swear that they "did not pressure or coerce the voter into choosing me to provide assistance" due to confusion about the meaning of "pressure" under such circumstances. *See* Tr. at 2540:11–16 (MABA organizational representative stating that, as an attorney, she would like to see a definition or context for the words "pressure" and "coerce").

152.    For example, assistors worry that encouraging voters to seek assistance if they need it or calling them to ask about their plans to vote could be construed as "pressuring" a voter to choose them as assistors. Tr. at 2540:11 (MABA).

153.    Witnesses also explained that the practical reality of relationships between caregivers and their clients means that many voters may have few potential assistors to choose from. For example, Ms. Nunez Landry asked:

What does pressure or coerce mean in this context? And I think especially if people…are under penalty of perjury they may be afraid, and for so many of us who don't have options on who is going to help us, is that coercion? Is that pressure? I just think there is going to be so much confusion that my fear is that people will be too afraid to help us.

Tr. at 3249:21–3250:2.

154.    Ms. Miller, whose daughter requires voting assistance, worried that parents could face prison time based on simple logistical matters: if a voter prefers that her father assist her, for example, but it is more convenient for her mother to take her to the polls, has the mother "pressured" the voter into choosing the mother by relaying this information to her daughter? Tr.at 3206:11–3207:4; *see also* Tr. at 3207:20–25, 3214:13–3215:9.

155.    Cameron County Election Administrator Remi Garza testified that he believed the "I did not pressure" language in the Oath could make people hesitant to provide assistance based on the fear that they could be understood to be pressuring the voter to take their assistance: "The wording is vague enough where …they might be concerned that they are going to violate the oath if they signed it." Tr. at 733:21–734:7

156.    <u>Communication to others about how the voter has voted.</u> Plaintiffs did not meaningfully challenge the language in the Oath barring assistors from "communicat[ing] information about how the voter has voted to another person," either at trial or in any of their post-trial briefing. The Court thus considers any challenge to this language to have been waived. Additionally, it is difficult to see how this language could possibly frustrate Section 208, which was enacted in large part to protect voters' privacy.[27]

---

[27] Still, the Court observes that it is unclear whether this proscription applies to the *substance* of the voter's ballot or the *manner* in which the ballot was cast.

**The Assistor Disclosure requirements (§§ 6.03, 6.05, and 6.07) deter voting assistance.**

157.     Sections 6.03 and 6.05 of S.B. 1 require a voter assistor to record and swear to their relationship to the voter and indicate whether the assistor received or accepted any form of compensation or benefit from a candidate campaign or a political action committee. Section 6.03 creates a new form with this requirement for assistors in the polling place and Section 6.05 adds this requirement to the mail ballot carrier envelope. TEC § 86.010(e).

158.     Section 6.07 revises the mail ballot carrier envelope to require a person who deposits the carrier envelope in the mail to indicate that person's relationship to the voter. *Id.* at 55. Even before S.B. 1, the mail ballot carrier envelope required assistors to disclose their name and address. *See* TEC § 86.010(e); JEX-1 at 53.

159.     Assistors and county election officials testified that the form requirement, coupled with the Oath of Assistance, created delays during in-person voting. Tr. at 81:15–25 (Chavez Camacho); Tr. at 383:14–18 (Scarpello); Tr. at 732:8–733:17 (Garza); Tr. at 1057:12–24 (Callanen); Tr. at 2316:16–20 (Ramon). Ms. Rocha, a LUPE employee, testified that, on two occasions when agreed to assist voters at the polls under S.B. 1, she left the voter to stand in a separate line for assistors and, by the time she had completed the disclosures, the voter was being assisted by other people. Tr. at 150:6–18, 151:3–14, 152:6–153:3, 153:4–17, 150:9–12, 150:14–151:2, 157:14–158:9. Extended wait times at the polls are especially burdensome on voters with physical disabilities, and waiting in line is the most common difficulty that voters with disabilities face. *See* Tr. at 3756:1–19; LUPE-002, Table 10.

160.     In addition to the potential delays caused by the Oath of Assistance Form at the polls, potential assistors who, like many of Plaintiffs' staff and volunteers, do not have preexisting

relationships with voters they help vote by mail or at the polls have a well-founded concern about providing the information required by Sections 6.03 and 6.05.

161.    Even absent evidence of fraud or coercion, the consequences for both the voter and the assistor for failing to disclose their relationship on a mail ballot are severe: the voter's ballot may not count, and the assistor faces up to two years in prison and a fine of up to $10,000. *See* TEC § 86.010(g). These criminal sanctions, however, are inapplicable to mail-ballot assistance provided by a close relative of the voter or someone who lives with the voter. *See* TEC § 86.010(h)(2).

162.    Jonathan White, the State's top voter fraud prosecutor, testified that, in his view, "normal assistance" is a voter being assisted by family members or caregivers. Tr at 3987:15–23. With respect to Section 6.03, Mr. White testified that having information about assistors' relationships to voters can help distinguish between workers with no relationship to the voter versus the folks who are assisted by family members or caregivers, which he considers more legitimate assistance. Tr. at 3987:1–14. Still, the OAG's tracker of election crime prosecutions resolved does not identify a single case of voter assistance fraud relating to assistance provided in the polling place. Tr. at 4034:16–20; OCA-377 at 1–12.

163.    Despite Mr. White's impression that voter assistance provided by members of trusted community organizations (rather than, e.g., family members or caregivers) is somehow suspect, in 2020, approximately one-fifth of voters with disabilities received voting assistance from non-family members. LUPE-002 ¶ 102. This is unsurprising, as Texans with disabilities are more likely to live alone, less likely to be married, and more likely to be separated, divorced, or widowed. Tr. at 3747:20–25; LUPE-002, Table 4. And, irrespective of Mr. White's perception that "caregivers" are "normal" assistants, a caregiver who provides BBM assistance is still subject to

47

criminal sanctions for failing to disclose his relationship to the voter, unless the caregiver is *also* a close relative of the voter or lives with the voter. *See* TEC § 86.010(h)(2).

164.     Sections 6.05 has deterred DST members from helping mail-in voters because these provisions threaten assistors with criminal liability for failing to satisfy these disclosure requirements or violating the Oath, which appears in the same section of the ballot envelope. Tr. at 2202:9–14. DST chapters have had difficulty recruiting members who are willing to place themselves at risk to provide in-person voter assistance at the polls. Tr. at 2199:16–2200:3, 2202:9–14, 2203:10–15.

165.     Out of fear of prosecution pursuant under Sections 6.04 and 6.05 of S.B. 1, LUPE staff and volunteers turn away voters who ask for their assistance, and instead encourages them to ask a family member or a friend for assistance. Tr. at 82:6–12, 111:10–111:20, 118:16–119:4. Cris Rocha, a LUPE employee, is only willing to assist voters at the polls if she is the last person the voter can use as an assistor. Tr. at 145:21–24; 48:22–149:3, 156:12–18. Maria Gomez, a LUPE volunteer who has provided voting assistance for over 25 years, is no longer willing to provide assistance due to the threat of criminal sanctions under S.B. 1. LUPE-284, Gomez Dep. at 13:19–14:15, 32:2–8, 17:2–13, 33:7–35:9, 40:24–42:2.

166.     FIEL no longer conducts voter caravans because its members feel uneasy about running afoul of requirements put in place by S.B. 1, including the Oath and the Oath of Assistance Form (which includes the required Assistor Disclosures). Tr. at 2450:3–20. Without these caravans to the polls, FIEL is unable to engage as many voters as possible and help them actively participate in the voting process. Tr. at 2451:1–5.

167.     FIEL has also struggled to recruit volunteers to provide in-person voter assistance at the polls since the enactment of S.B. 1 due to FIEL members' concerns about the Oath and the

Assistor Disclosure requirements. Tr. at 2444:10–14, 2444:24–2445:7, 2451:19–25, 2452:1–11. Indeed, while before S.B. 1 about 100 FIEL members volunteered to assist voters at the polls, in 2022, there were at most 20 members who did so. Tr. at 2470:22–25. Cesar Espinosa, the founding executive director of FIEL, no longer provides voter assistance due to his concerns about the Oath's "penalty of perjury" language and the Assistor Disclosure requirements. Tr. at 2430:3–4, 2439:6–23, 2444:24–2445:7; *see also* Tr. at 2445:4–22 (Espinosa) (describing FIEL member Debany Gonzales, who was a very active voter assistant at the polls, but is no longer willing to assist voters due to amended language of the Oath of Assistance); Tr. at 2445:23–2446:22, 2447:6–13 (Espinosa) (describing Tonya Rodriguez, naturalized citizen with LEP, who sought, but did not receive, translation assistance from a FIEL member at the polls and struggled to cast her ballot in person).

168.    Mr. Espinosa is particularly concerned about the Assistor Disclosures because when he volunteers at the polls, he often provides translation assistance to voters with whom he has no direct relationship. Tr. at 2443:24–2443:3. Asked about his concerns, Mr. Espinosa stated:

> [T]he number one question that . . .  pops into my head is why is this table even necessary?  Or what is my information that I provided here going to be used for?  How is it going to be stored?  Who is going to be able to handle it or see it? Who is going to be able to see my signature?

Tr. at 2442:6–2443:9

169.    Consistent with Mr. Espinosa's concerns about the Assistor Disclosure requirements, community stakeholders submitted letters to the Texas legislature, anticipating that S.B. 1's additional paperwork and disclosure requirements were likely to have a "chilling effect" on voter assistance. *See* HAUL-216 (testimony regarding S.B. 1 before the Senate State Affairs Committee by Alex Cogan, Manager of Public Policy and Advocacy for The Arc, asserting that

the new Assistor Disclosure requirements would "create a chilling effect that decreases the availability of support for Texas with disabilities to exercise their right to vote").

### Election officials are inadequate substitutes for private assistors

170.    By deterring assistance by private assistors, the Assistant Disclosure and Oath requirements encourage voters to forgo assistance altogether or receive assistance from an election official. Election officials are imperfect substitutes for voters' chosen assistors for at least two practical reasons.

171.    First, election officials may be unable to provide the kind of assistance the voter requires. For example, an election official who does not speak the same language as a voter who needs assistance will be unable to translate and mark the voter's ballot. Similarly, a voter with cognitive or memory impairments will be unable to receive "cuing" assistance from election officials who are unfamiliar with how the voter intends to vote. Finally, it may be unsafe or uncomfortable for voters with physical disabilities to receive assistance from an election official who is unfamiliar with the contours of their disabilities and needs. For example, Ms. Litzinger explained that it takes over two months to train a personal care attendant to safely transfer her out of her wheelchair due to her balance issues. Tr. at 3281:1–17.

172.    Second, voters who receive assistance from election officials are forced to sacrifice the privacy of their ballot. Their selections must be disclosed not only to the county elections official(s) providing the assistance but to any poll watchers observing the activity. TEC § 33.057(a).

173.    Thus, S.B. 1's Oath and Assistor Disclosure requirements leave many voters in need of assistance with a choice between three dignitary harms—voting without any assistance, losing their privacy while voting, or foregoing the voting process altogether. *See* Tr. at 707:25–

708:14 (Cole) (describing the loss of his privacy when an official prevented his assistant from helping him vote as a violation).

174.    This is precisely the choice that the right to assistance under Section 208 was intended to avoid: "As a result, people requiring assistance in some jurisdictions are forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote. The Committee is concerned that some people in this situation do in fact elect to forfeit their rights to vote." S. Rep. No. 97-417 at 472.

175.    Dr. Douglas Kruse, Plaintiffs' expert witness on S.B. 1's impact on voters with disabilities, explained that adding additional requirements to the assistance process for both voters and assistors increases the likelihood that voters with disabilities will be disenfranchised:

> It doesn't sound like a big deal . . . but it's an extra hurdle. It's an extra thing to do. Combined with all the other barriers that people with disabilities face, it's an extra thing to — simply to remember, but there's also an extra issue that both the assister and the person with the disability may be uncertain about. It's an extra hurdle. It kind of exacerbates the other issues that — in combination with all the other hurdles that people with disabilities face, that they — that may make it more difficult to exercise the right to vote.

Tr. at 3776:19–3777:8; LUPE-002 ¶ 101 ("[I]t is highly likely that many Texans with disabilities will find it difficult or impossible to obtain the assistance they require given the restrictions imposed by section 6.04 . . . and will cause some Texans with disabilities to be disenfranchised[.]").

176.    Trial testimony by voters reified these predictions about the impact that additional barriers to voting can have on voters with disabilities

177.    Ms. Crowther explained that S.B. 1 has hampered her ability to receive assistance in voting because it puts her attendants in a position of "danger" that "they aren't paid for" and she would not want to put them in a situation that has legal ramifications even though she will need

more and more help over time as her disability progresses. HAUL-413, Crowther Dep. at 80:8–

81:8. As Ms. Crowther summarized:

> That something as meaningful as voting is to me, that I need assistance with. . .
> has now a bump . . . in the process, to where now it's become more threatening
> to bring an attendant in. . . why would I want to bring. . . my attendant, into that
> role and have them get all freaked out about, You mean to tell me if I help you do
> something that is not on this form. . . I could get in trouble? And it's just not worth
> it when your life is dependent on your attendant or your caregiver or your spouse
> or anything. It's just not worth it.

*Id.* at 98:6–22.

178.    Mr. Cole testified that each provision of S.B. 1 that makes voting marginally harder

for disabled people makes it less likely that they will vote:

> Well, it just makes it hard. You know, the thing that we have, and I talk to
> a lot of people after they get disabled, is as you make things harder, you just
> start cutting things out. You know, it's too hard to find someone to feed me,
> or it's embarrassing, so I don't want to go to dinner. It's too hard to get on
> an airplane to go travel, so I just don't do that. And so every time you put
> even one little road bump or one little barrier in front, it just makes it that
> much harder, and so you don't do it.

Tr. at 714:17–715:15.

**Ban on Compensated Assistance (§ 6.06)**

179.    Section 6.06 of S.B. 1 prevents voters from choosing Plaintiffs' staff members and

volunteers to assist them with their mail ballots because they receive "compensation" for their

assistance efforts. It creates a state jail felony for offering, soliciting or receiving compensation for

assisting mail ballot voters, unless the compensated assistor is an "attendant or caregiver

previously known to the voter." TEC § 86.0105.

180.    At trial, Jonathan White testified that offering or accepting compensation for mail

ballot assistance is a state jail felony, with a sentence of up to two years, *even if there is no fraud

in the assistance and the assistor marks the ballot consistent with the wishes of the voter*. Tr. at

3996:8–3997:5. He confirmed that Section 6.06 "criminalizes compensation for assistance" as

opposed to criminalizing fraud in assistance. Tr. at 3995:25–3996:7. Formerly, the Election Code prohibited payment for performance-based work, i.e. paying someone to assist mail voters on a quota basis. Tr. at 3991:18–3992:15. S.B. 1 extended the offense, making it a crime to provide, receive or ask for compensation to assist a mail ballot voter regardless of whether the assistance is on a per capita basis. Tr. at 3992:3–7, 12–19.

181.     Mr. White confirmed that Section 6.06 "appear[s] to apply to [the] scenario" in which a paid canvasser for a nonprofit Get Out the Vote organization engages with voters and provides mail ballot assistance at the voter's request. Tr. at 3993:22–3995:10. He testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is used as a subterfuge for voter fraud, and "we'd be looking for the fraud at the bottom of things." Tr. at 3995:11–24. Again, however, a conviction under TEC § 86.0105 requires no evidence of fraud or coercion.

182.     Indeed, these provisions potentially expose *voters* to liability for providing tokens of appreciation to assistors who help them complete their mail ballots. Keith Ingram confirmed that a voter who offered a volunteer $20—or offered to buy a friend lunch—to help him complete his mail-ballot could be liable under Section 6.06. Tr. at 1904:1–1906:5.

183.     This is not a fanciful hypothetical. Grace Chimene, testifying on behalf of the League, was especially worried that volunteer activities' during door-to-door canvassing could expose *voters* to criminal liability: "It's not just my concern for the League members, but it's also a concern if just a voter that were helping provides compensation, or the place that they live provides compensation of some type that they may be committing a crime." Tr. at 1592:1–5. Members of the League "offer[] tea, or coffee, or water," to assistors that help them and other voters vote by mail. Tr. at 1591:1–1592:5, 1590:4–12. To avoid jeopardizing voters and

volunteers, institutions like assisted care centers that historically welcomed the League as assistors now discourage the League from sending people to assist residents. Tr. at 1593:9–22. Texans— including League members—residing in these facilities who relied on the League for years are no longer able to obtain assistance voting from the individuals of their choice.

184.    As a result of S.B. 1's prohibition on compensated mail-ballot assistance, voters may no longer choose Plaintiffs' staff members and volunteers who accept "anything of value" to assist them with their mail ballots. TEC § 86.0105; TEX. PENAL CODE § 38.01(3).

185.    Before S.B. 1, LUPE staff would assist members to complete their mail ballots one-on-one and provide assistance, either at the LUPE offices, in house meetings, or at LUPE's union hall events. Some members would call LUPE and ask LUPE to go to their home to help them fill out their ballot by mail and LUPE would provide that assistance in the members' homes. Tr. at 87:3–21, 3676:11–25.

186.    LUPE has stopped assisting voters who request their help completing mail ballots. Tr. at 119:20–120:18. As LUPE's executive director Tania Chavez testified, LUPE has stopped assisting members with their mail ballots because "[it] will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, and so we have refrained from doing so." Tr. at 82:20–84:3.

187.    Now, when a LUPE member comes to the LUPE office and requests help with their mail ballot, LUPE informs the member that LUPE cannot provide assistance and tells the voter that they should find help with their family or friends. Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21. LUPE staff will not provide mail ballot assistance to LUPE members who are elderly and/or disabled or otherwise need assistance to vote by mail and choose LUPE staff as their assistors. Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21.

188.    LUPE is not alone in its decision to stop providing mail ballot assistance. OCA no longer offers voters assistance. Tr. at 1722:3–16. The League has stopped providing voting assistance at some retirement homes and assisted care centers out of the fear the voters—including League members—will "compensate" their assistors with refreshments. Tr. at 1620:7–1621:1. MABA members are no longer willing to provide voting assistance because members fear that they might inadvertently commit a crime, potentially costing them their law licenses. Tr. at 2543:14–2544:23. LULAC volunteers "scaled . . . down" their GOTV efforts and decided not to conduct voter outreach with seniors, many of whom require voting assistance, for "fear that they could be subject to prosecution if they help seniors vote by mail." Tr. at 1655:10–18.

**The Canvassing Restriction (§ 7.04)**

189.    The Canvassing Restriction applies to anyone who knowingly gives or receives some "compensation or other benefit" for an "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

190.    Section 7.04 interferes with community organizers' ability to assist voters with their mail-ballots because its prohibition on "in-person interactions" in the "presence of a mail ballot" does not include an exception for mail-ballot assistance. *See* Tr. at 758:8–19, 758:22–759:12 (Cameron County EA Remi Garza); Tr. at 841:15–842:9, 844:13–25 (DeBeauvoir); Tr. at 496:2–8 (Scarpello).

191.    Mr. White testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is a subterfuge for voter fraud. Tr. at 3995:11–24. He acknowledged, however, that prior to S.B. 1, the Election Code already criminalized: assisting a voter who is not

eligible for assistance or did not ask for assistance; voting a ballot differently than the voter wished or directed the assistant to vote the ballot; suggesting to the voter during the voting process how the voter should vote, or attempting to influence or coerce the voter receiving assistance. Tr. at 3923:21–3924:14, 3925:4–6.

192.     Finally, like Section 6.06, the Canvassing Restriction can be read to impose criminal liability on the very voters it purports to protect. For example, a like-minded voter who asks for voting assistance from a GOTV volunteer and invites him inside for an iced tea would arguably violate Section 7.04. *See* TEC § 276.015 (making it a crime to offer a benefit for the canvasser's "services").

193.     Trial testimony establishes that there is widespread confusion about the meaning of the Canvassing Restriction. Even local election administrators ("EAs") are unsure about how to interpret Section 7.04. *See, e.g.*, Tr. at 496:5–8 (Dallas County EA Michael Scarpello) ("I don't know what ballot harvesting means," "it could be interpreted a lot of different ways based on the definition . . . put into the law.").

194.     Witnesses were particularly uncertain about how to interpret the terms "compensation" and "physical presence"—neither of which is defined in the statute—and how Section 7.04 impacts organizers' ability to provide voting assistance. Despite this confusion, state officials have not offered any definitive answers about the scope of the Canvassing Restriction. The Secretary of State has not provided any guidance. Tr. at 1914:7–14, 1924:7–18. Nor has the OAG. Tr. at 1924:24–1925:3.

195.    In response to Section 7.04, many Plaintiffs groups stopped hosting in-person events where voters had frequently brought their mail ballots for voting assistance and stopped providing assistance to voters.[28]

## CONCLUSIONS OF LAW

**SUBJECT MATTER JURISDICTION**

Before addressing the merits of Plaintiffs' challenges under Section 208, the Court must first consider its subject matter jurisdiction over Plaintiffs' claims. Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

As the Court has previously explained, Section 208 of the VRA permits private enforcement by both individual voters who need assistance and private organizations representing their interests. *See, e.g.*, *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 426 (W.D. Tex. 2022) (citing *OCA-Greater Houston v. Texas (OCA-Greater Hous. I)*, 867 F.3d 604, 609–614 (5th Cir. 2017)).[29] Because this civil action arises under federal law, the Court has federal question jurisdiction under 28 U.S.C. § 1331.

Sovereign immunity does not limit the Court's subject matter jurisdiction over this action. Section 208 claims are enforceable against state officials because, in enacting the VRA, Congress

---

[28] Tr. at 1718:20–24, 1721:2–10, 1721:3–1722:22 (OCA has stopped hosting in-person events where members have historically brought mail-in ballots and received voting assistance, including candidate forums, and no long offers voters assistance or rides to the polls); Tr. at 1593:9–22, 1620:7–1621:1 (The League has been discouraged from providing assistance to voters at assisted living facilities and determined that it "would turn away members with their mail-in ballots from candidate forums"); Tr. at 82:20--84:3 (LUPE has stopped assisting members with their mail ballots because "[it] will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, and so we have refrained from doing so."); Tr. at 2543:14--2544:23 (MABA members are no longer willing to provide voting assistance because members fear that they might inadvertently commit a crime, potentially costing them their law licenses).

[29] *See also Ark. United v. Thurston*, 517 F. Supp. 3d 777, 790, 798 (W.D. Ark. 2021); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1301 (N.D. Ga. 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 233–36 (M.D.N.C. 2020); *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 988–90 (N.D. Fla. 2021).

validly abrogated state sovereign immunity. *See id.* at 433 (citing *OCA-Greater Hous. I*, 867 F.3d at 614).

Finally, the Court considers Plaintiffs' standing to assert their Section 208 challenges because standing "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018).

## Standing

### **Legal Framework**

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* In a case that proceeds to trial, plaintiffs must establish all three elements by a preponderance of the evidence. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[I]n a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing "must be supported adequately by the evidence adduced at trial."). These requirements ensure that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v.*

*EPA*, 549 U.S. 497 (2007) (quoting *Baker v. Carr*, 369 U.S. 186 (1962)) (quotation marks removed).

"[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury" for the self-evident reason that "injunctive and declaratory relief 'cannot conceivably remedy any past wrong.'" *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

To constitute an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 720–21 (citations omitted). The injury must be "imminent . . . to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* at 721 (quoting *Lujan*, 504 U.S. at 564 n.2). For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Nonetheless, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Hous. I*, 867 F.3d at 612) (quotations omitted). "This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Id.* (quotations omitted).

Juridical entities may establish standing under an associational or organizational theory of standing. *Id.* at 610.

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the

59

relief requested requires participation of individual members." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,* 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Participation of individual members is not required where, as here, the association seeks prospective and injunctive relief, rather than individualized damages. *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous. I*, 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)).

"When the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. An organization can establish a likely future injury if it intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see, e.g.*, *Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 439 (5th Cir. 2014) (charitable organizations had standing to challenge statute prohibiting their use of bingo proceeds for political advocacy as an unconstitutional burden on their political speech).[30]

---

[30] *See also S. Christian Leadership Conf. v. Sup. Ct. of State of La.*, 252 F.3d 781, 788 (5th Cir. 2001) (concluding that "at least some" of the plaintiffs—law students and faculty and community and student organizations—had standing to challenge a Louisiana Supreme Court rule restricting representation by student-practitioners because the

Finally, an unregulated organization can also demonstrate the requisite injury by showing that the challenged conduct or regulation has "perceptibly impaired" the organization's "core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Such "business activities" need not be profit-driven. *See Havens*, 455 U.S. at 379 n.20 ("That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not [affect] the nature of the injury suffered, and accordingly does not deprive the organization of standing."). "It has long been clear that economic injury is not the only kind of injury that can support a plaintiff's standing." *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977). Still, a mission-driven organization must proffer evidence of interference with its core activities to ensure it has a personal stake in the outcome of case beyond its "abstract social interests." *Havens*, 455 U.S. at 379.[31]

The effect on the organization's activities need not be great. *OCA-Greater Hous. I*, 867 F.3d at 612; *see also Havens*, 455 U.S. at 379. In *Havens*, for example, the Supreme Court held that the organizational plaintiff, HOME, had standing to sue a real estate company, Havens, for providing false information to HOME's black employees about apartment availability on four occasions. *Havens*, 455 U.S. at 368–69. "Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *All. for Hippocratic Med.*, 602 U.S. at 394. HOME asserted that these discriminatory racial steering practices "perceptibly impaired

---

operations of law-school clinics were "directly regulate[d]" and "[s]everal of the client organizations would be unable to obtain representation by the clinics").

[31] *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977) (recognizing that non-profit's interest in building a low-cost housing project arose "not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce" and concluding that "[t]he specific project [the plaintiff] intends to build, whether or not it will generate profits, provides that 'essential dimension of specificity' that informs judicial decisionmaking").

[its] ability to provide counseling and referral services for low-and moderate-income homeseekers." *Havens*, 455 U.S. at 379.[32] HOME alleged only that its counseling services had been "frustrated" by Havens's conduct—not that HOME had been forced to stop providing the services altogether. *Cf. La. Fair Hous. Action Ctr. at, Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 35 (5th Cir. 2023) ("HOME could not place African American clients into housing at Havens's complex when Havens was engaged in illegal racial steering."). Still, the Court concluded that if Havens had impaired HOME's ability to provide such services, "there can be no question that the organization has suffered injury in fact." *Havens*, 455 U.S. at 379.

"When the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *All. for Hippocratic Med.*, 602 U.S. at 383 (quoting *Lujan*, 504 U.S. at 562). But plaintiffs generally cannot show causation by "rely[ing] on speculation about the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013) (quotation marks omitted). "Therefore, to thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (quotation marks omitted) (citing *California v. Texas*, 593 U.S. 659, 675 (2021)). The "line of causation between the illegal conduct and injury"—the "links in the chain of causation," *Allen*

---

[32] In describing its injuries, HOME also alleged that it "had to devote significant resources to identify and counteract [Havens]'s racially discriminatory steering practices." *Havens*, 455 U.S. at 379. As the Supreme Court recently confirmed, however, *Havens* does not stand for the expansive theory that "standing exists when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394; *see also Azalea*, 82 F.4th at 355 ("We [] hold [that] 'diverting' resources from one core mission activity to another, i.e., prioritizing which 'on-mission' projects, out of many potential activities, an entity chooses to pursue, does not suffice—organizations daily must choose which activities to fund, staff, and prioritize. Nor do conclusory allegations that an organization's diversion of resources 'impaired or impeded' some planned projects.").

*v. Wright*, 468 U.S. 737, 759 (1984)—must not be too speculative or too attenuated, *Clapper*, 568 U.S. at 410–11.

The causation requirement is satisfied where it is sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs. *All. for Hippocratic Med.*, 602 U.S. at 386. In *Department of Commerce v. New York*, for example, the Supreme Court recognized states' standing to challenge the reinstatement of the citizenship question on the census because noncitizens would "likely react in predictable ways to the citizenship question"—i.e., by failing to respond to the census altogether—"even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential." 588 U.S. 752, 767–68 (2019). The depression of the response rate among non-citizens would, in turn, cause them to be undercounted in the census results and injure states with disproportionate numbers of non-citizens through, *e.g.*, the loss of federal funds, diminishment of political representation, and the degradation of census data. The Court concluded that the states' "theory of standing thus [did] not rest on mere speculation about the decisions of third parties; it relie[d] instead on the predictable effect of Government action on the decisions of third parties." *Id.* at 768.

The defendant's conduct contributes to a plaintiff's injuries, even if it is not the sole cause of those injuries. *Massachusetts v. E.P.A.*, 549 U.S. 497, 523 (2007). Similarly, the traceability requirement is not a proximate cause standard; it can be satisfied with a showing that the alleged injury was only indirectly caused by the defendant. *Bennett v. Spear*, 520 U.S. 154, 168 (1997).

An injury is redressable when it is "likely" as opposed to merely "speculative" that a decision in a plaintiff's favor would grant the plaintiff relief. *OCA-Greater Hous. I*, 867 F.3d at 610. A plaintiff does not need to demonstrate that a favorable decision will "relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). They only need to show that a decision

in their favor will "relieve a discrete injury to [them]self." *Id.* Even "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)); *see also Netsphere, Inc. v. Baron*, 703 F.3d 296, 314 (5th Cir. 2012) (explaining so long as "there is some means by which [the court] can effectuate a partial remedy, [there] remains a live controversy" (citation omitted)). Plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement by "demonstrat[ing] 'continuing harm or a real and immediate threat of repeated injury in the future.'" *James v. Hegar*, 86 F.4th 1076, 1081 (5th Cir. 2023) (quoting *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992)). A threatened future injury suffices for standing so long as "there is a substantial risk that the harm will occur." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 158).

When multiple plaintiffs seek the same injunctive relief, only one needs to establish standing. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Here, the Court must identify at least one organization in each Plaintiff group with standing to seek injunctive against local election officials and DAs in their respective jurisdictions.

### **Analysis**

At the outset, the Court observes that the State Defendants and Intervenor-Defendants appear to be confused about the basis for Plaintiffs' standing, insisting that Section 208 does not afford Plaintiffs a "right" to provide voting assistance. *See, e.g.*, ECF No. 608 at 643.

To be clear, the "right" to provide assistance is not now, nor has it ever been, at issue in this case. Defendants are correct, of course, that Section 208 did not create such a right—just as the FHA did not create a "right" to provide housing referrals.

64

Defendants' confusion appears to stem from the fact that most Plaintiffs have two bases for standing under Section 208: associational standing (based on injuries to their members entitled to voting assistance) and organizational standing (based on impairment of the organizations' ability to provide voting assistance). The concept is not difficult: some of Plaintiffs' members *require* voting assistance, while others *provide* voting assistance. The former establish a basis for associational standing; the latter establish a basis for organizational standing.

As in *Havens*, the organizational injury here is a perceptible impairment of one of Plaintiffs' core services—voter assistance—resulting from violations of a federal law—Section 208. And, to the extent that a rule directly regulates the Plaintiff organizations (rather than their individual assistors), Plaintiffs unquestionably have standing to challenge it. *See Lujan*, 504 U.S. at 561–62.

### Sections 6.01 – Curbside Voting Transportation Disclosure

DST challenges Section 6.01's requirement that a driver transporting seven or more voters to the polls for curbside voting complete a disclosure form stating her name, address, and whether she is serving as an assistor. Because Section 6.01 does not regulate DST directly, DST must demonstrate that "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383.

DST asserts that Section 6.01 has deterred its members from providing transportation to the polls. ECF No. 856 ¶ 968 (citing Tr. at 2196:21–2197:7). While the Court agrees that DST has suffered a perceptible impairment to one of its core voter activities—transporting voters to the polls—DST has not shown that its injury is fairly traceable to Section 6.01, which applies only to curbside voting.

The State Defendants object that DST cannot establish standing because the obligation to provide the Transportation Disclosures bears no "close relationship" to "traditional[]" legal injuries. ECF No. 862 ¶ 62(k) (quoting *TransUnion*, 594 U.S. at 431). The Court disagrees. The Supreme Court has recognized the deterrent effect that disclosure requirements can have on associative activities. *See, e.g.*, *Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (striking down law requiring teachers to disclose all of the organizations to which they had belonged in the past five years because "[e]ven if there were no disclosure to the general public, the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy"); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958); *see also Dep't of Com. v. New York*, 588 U.S. at 767 (finding no clear error in district court's conclusion that the reinstatement of a citizenship question on the census was likely to discourage non-citizens from responding to the census).

DST has not shown, however, that its members who drive voters to the polls have engaged or intend to engage in conduct that is "arguably proscribed" under Section 6.01 by transporting more than seven voters to polls for curbside voting. *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) ("Without concrete plans or any objective evidence to demonstrate a 'serious interest' [to engage in proscribed conduct], [plaintiff] suffered no threat of *imminent injury*."); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990) ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.").

Given Section 6.01's limited application, it is not "sufficiently predictable" that DST members would respond to Section 6.01's regulation of transportation for more than seven curbside voters by refusing to provide transportation to the polls altogether—even for voters

casting their ballots inside the polling place. *All. for Hippocratic Med.*, 602 U.S. at 383. Thus, the Court concludes that DST has failed to thread the causation needle establishing a connection between Section 6.01 and the injury DST members have caused to DST's organizational interests.

Accordingly, DST has not established standing to challenge Section 6.01's Transportation Assistance disclosure requirement, and its claim must be dismissed without prejudice for a lack of subject matter jurisdiction.

### *Sections 6.03, 6.04, 6.05 and 6.07 –Oath of Assistance and Assistor Disclosures*

Sections 6.03, 6.04, and 6.05 of S.B. 1 establish new procedures for voter assistors, specifically by requiring the assistor to disclose certain information—their name, address, relationship to the voter, and whether they are being compensated by a candidate, campaign, or political committee—on a form at the polling place (Section 6.03) or on the mail ballot carrier envelope (Section 6.05) and by requiring assistors to take a revised Oath (Section 6.04).

Section 6.04 of S.B. 1, amending the Oath of Assistance, is challenged by the HAUL Plaintiffs (including The Arc) and the LUPE Plaintiffs. Sections 6.03 and 6.05 are challenged by the HAUL and LUPE Plaintiffs. Section 6.07 is challenged only by the HAUL Plaintiffs.

<u>The Arc has associational standing to challenge § 6.04.</u>

As a result of the Oath of Assistance requirements set forth in S.B. 1 § 6.04, members of The Arc who qualify for assistance under Section 208 voted without the assistors of their choice, both in-person and by mail, in Harris County, Bexar County, and Travis County. [33]

---

[33] Ms. Halvorson, a registered voter in Bexar County and a member of The Arc, voted without assistance for the very first time in the March 2022 primary (by mail) because her personal care attendant was uncomfortable taking the Oath of Assistance printed on the mail carrier envelope. Tr. at 3318:25–3319:20. In the November 2022 general election, Ms. Halvorson voted in person, again voting without assistance due to fear of exposing her personal attendant to potential criminal liability. Tr. at 3322:5–18, 3323:10–24.

Ms. Nunez Landry, a registered voter of Harris County and a member of The Arc, voted without her chosen assistant— her partner—in both the March 2022 primary and the November 2022 general election because she did not want to

Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther have each suffered an injury in fact and each would have standing to sue in her own right. Even if voters requiring assistance successfully cast a ballot, their right under Section 208 is violated if they voted without an assistor of their choice or forwent assistance altogether. *See* Consent Decree, *United States v. Hale County*, No. 5-05CV0043-C (N.D. Tex. Apr. 27, 2006) (requiring election administrators to provide language assistance to voters with limited English-language proficiency who had voted in an election in which the County failed to permit assistance to those voters); *Democracy N.C. v. N.C. State Bd. of Elections*, 590 F. Supp. 3d 850, 869 (M.D.N.C. 2022) (holding legally blind plaintiff who voted absentee with his wife's assistance had standing to challenge a law restricting assistance that would prevent him from seeking assistance from staff at nursing home). As long as the amended Oath of Assistance remains in effect, these voters will be unwilling to expose their attendants to criminal liability by asking for their assistance. Thus, there is a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721.

The members' interests in voting with the assistors of their choice are germane to the purposes of The Arc, which works to empower people with disabilities in the voting process.[34]

Plaintiffs' injuries arising out of S.B. 1's amended Oath language are traceable to the Secretary because she has created forms implementing Section 6.04. *See* LUPE-009 (mail ballot

---

expose him to criminal liability. Tr. at 3236:11–17; Tr. at 3234:1–6, 3256:15–3257:4. She did not receive any assistance while voting in either election.

Amy Litzinger, a registered voter in Travis County and a member of The Arc. Tr. at 3281:14–17. Ms. Litzinger voted without assistance from her personal attendant in the March 2022 primary and November 2022 general election because she and her attendant were concerned about criminal liability under the Oath. Tr. at 3291:4–3292:5.

Ms. Crowther did not take her attendant with her to vote in May 2022 because of her fear that the Oath could jeopardize her relationship with her attendant. HAUL-413, Crowther Dep. at 52:11–53:4, 54:7–14.

[34] The Arc's mission is to "promote, protect, and advocate for the human rights and self–determination of Texans with intellectual and developmental disabilities." *Id.* at 3490:23–25, 3493:7–9. Voting is "the backbone" of The Arc's work because it is critical to members' self-determination and voting rights advocacy has been a priority since The Arc's founding. Tr. at 3499:23–3500:12, 3499:23–3500:12.

carrier envelope) and LUPE-189 (Oath of Assistance form). The Oath regulates Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther directly by requiring them to represent their eligibility to potential assistors as a condition of their eligibility.

Plaintiffs' injuries from these provisions are fairly traceable to the local election officials who are responsible for administering the Oath in polling places, TEC § 64.034, and printing, sending, receiving, and reviewing mail carrier and ballot envelopes, TEC §§ 86.002–.004, 86.008–.009, 86.011. Thus, their injuries are fairly traceable the Bexar County EA, Harris County Clerk, and Travis County Clerk, because Plaintiffs' members suffered their injuries while voting in those jurisdictions.

The Arc members' injuries are also traceable to the DAs in those counties and the State Defendants based on the chilling effect that the credible threat of criminal enforcement of the Oath against their assistors have had on their willingness and ability to receive assistance from their chosen assistors. Although Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther are not themselves subject to criminal sanctions under § 6.04, given the practical realities of these voters' relationships with their chosen assistors—including their physical dependence on their attendants for assistance outside of voting—their unwillingness to expose their assistors to criminal liability is "sufficiently predictable" to establish causation for standing purposes. *All. for Hippocratic Med.*, 602 U.S. at 386.

Similarly, their attendants' unwillingness to provide in-person or mail-ballot assistance due to potential criminal liability under S.B. 1 is not speculative—attendants specifically cited the "penalty of perjury" and "eligibility" language in the Oath as their reasons for declining to provide assistance. Tr. at 3319:7–16 (Ms. Halvorson's attendant told her that she was unwilling to take the Oath of assistance "under penalty of perjury" due to her green card status); Tr. at 3291:4–3292:5

(Ms. Litzinger's attendant was not comfortable assisting her due to fear of criminal liability under the Oath, especially with respect to the meaning of "eligibility" and "assistance"). Indeed, the chilling effect on assistors was *actually foreseen* by disability rights advocates who testified before the Texas legislature in opposition to S.B. 1. *See, e.g.*, HAUL-216.

Thus, The Arc's "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable [and actual] effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. at 767 (recognizing that citizenship question on the census was likely to depress non-citizens' response rate).

The State of Texas enforces election crimes, including violations of the Oath of Assistance through county and local prosecutors. *Stephens*, 663 S.W.3d at 52. The State has not disavowed enforcement. *KVUE, Inc. v. Moore*, 709 F. 2d 922, 930 (5th Cir. 1983) (holding that plaintiffs had standing to pursue a pre-enforcement challenge in part because "the state has not disavowed enforcement"), *aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S. 1092 (1984). Individual County DAs *may not* disavow such enforcement under Texas law. *See* TEX. LOC. GOV'T CODE § 87.011(3)(B) (prohibiting district attorneys from adopting an enforcement policy of refusing to prosecute a type or class of criminal offense).[35]

Plaintiffs' organizational injuries are also traceable to the AG, who, even after *Stephens*, retains "broad investigatory powers" under the Election Code, State's Br. at 49, *LUPE v. Scott*, No. 22-50775 (5th Cir. Dec. 9, 2022), ECF No. 62, and may "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* TEC § 273.002(1)

---

[35] Neither the Bexar County DA nor the Travis County DAs have disavowed enforcement of the challenged provisions. *See* ECF No. 753-5 (Bexar County) ¶¶ 2–6; ECF No. 753-6 (Travis County) ¶ 2. Coupled with TEX. LOC. GOV'T CODE § 87.011(3)(B), the Harris County DA's history of accepting referrals for Election Code prosecutions from the AG following S.B. 1, *see supra* ¶ 98, is sufficient to establish a substantial threat of future injury to Plaintiffs' members' right to assistance under Section 208.

(emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them). On top of this investigatory power, "the Attorney General can prosecute with the permission of [a] local prosecutor," *Stephens*, 663 S.W.3d at 55, and no County DA has disavowed a willingness to let the AG pursue cases within their counties.

An order declaring the challenged language in the amended Oath unlawful and enjoining its enforcement would remove the chilling effect on voter assistance that the provisions presently impose on these members of The Arc and their assistors. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (finding "redressability prong[] of the standing inquiry . . . easily satisfied" where "[p]otential enforcement of the statute caused the [plaintiff's] self-censorship, and the injury could be redressed by enjoining enforcement of the [statute]"); *McCraw*, 504 F. Supp. 3d at 582 (W.D. Tex. 2020), *aff'd*, 90 F.4th 770 (5th Cir. 2024) (similar).

In short, with respect to their Section 208 challenge to S.B. 1 § 6.04, members of The Arc are "sufficiently adverse" to the State Defendants and the election officials and DAs of Bexar County, Harris County, and Travis County to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

<u>DST and the LUPE Plaintiffs have organizational standing to challenge §§ 6.03–6.05, 6.07</u>

DST, LUPE, MABA, and FIEL have had difficulty recruiting members to provide voting assistance services due to the threat of criminal sanctions under S.B. 1's Assistor Disclosure and Oath requirements, and some members have stopped providing assistance altogether.[36]

---

[36] Tr. at 2203:10–15, 2202:9–14, 2110:12–2111:1, 2148:25–2149:10 (DST chapters have had difficulty recruiting members who are willing to risk criminal liability to provide assistance, by mail or in-person, under S.B. 1, and some chapters have ceased providing voting assistance altogether due to the threat of enforcement of the Assistor Disclosure and amended Oath requirements); Tr. at 80:2–82:12, 150:15 (LUPE's staff and volunteers who assist voters are frightened by the new oath language, and as a result LUPE's staff and volunteers have restricted their assistance to voters, encouraging voters to seek assistance from friends and family members before turning to LUPE); *see also* Tr. at 145:25–46:4 (LUPE employee Chris Rocha); LUPE-284 at 13:19–14:15; 32:2–8; 17:2–13 (LUPE volunteer Maria Gomez); Tr. at 2543:16–23 (MABA members are no longer willing to provide voter assistance due to fears about the

The Assistor Disclosure requirements are burdensome to assistors and have also caused delays at polling places that have interfered with voting assistance.[37] Providing such assistance is a core part of their respective missions.[38]

Plaintiffs' organizational injuries are fairly traceable to S.B. 1 §§ 6.03–6.05. The chilling effect that the Assistor Disclosure and Oath requirements would have on individuals' willingness to provide voting assistance—and the downstream effects on organizations' ability to perform voter assistance services—was "sufficiently predictable" to establish causation for standing purposes. *All. for Hippocratic Med.*, 602 U.S. at 386; *see Shelton*, 364 U.S. at 486, *NAACP*, 357 U.S. at 462; *Dep't of Com. v. New York*, 588 U.S. at 767. Indeed, the chilling effect on assistors was *actually foreseen* by disability rights advocates who testified before the Texas legislature in opposition to S.B. 1. *See, e.g.*, HAUL-216.

Here again, the organizations' injuries are traceable to the Secretary, who creates forms implementing the requirements, and to local election officials, who administer oaths, collect disclosures, and review mail ballots in the counties in which DST, LUPE, MABA, and FIEL operate.[39] Their organizational injuries are also fairly traceable to the State Defendants and the

---

Oath requirements); Tr.at 2470:22–25, 2430:3–4, 2439:6–23, 2444:24–2445:7 (FIEL has had difficulty recruiting volunteers to provide voter assistance at the polls and some members have stopped providing assistance).

[37] Tr. at 81:15–25 (Chavez Camacho); Tr. at 383:14–18 (Scarpello); Tr. at 732:8–733:17 (Garza); Tr. at 1057:12–24 (Callanen); Tr. at 2316:16–20 (Ramon).

[38] Tr. at 2081:7–13, 2086:21–2087:15 (DST provides in-person and mail-ballot voter assistance in support of its "political awareness and involvement" mission); Tr. at 60:10–61:2 (LUPE provides voting assistance to support its mission of increasing civic engagement in the colonias); Tr. at 2533:24–2534:4, 2535:11–2536:5 (MABA provides voter assistance to support its mission to promote public service by its members and promote civic engagement); Tr. at 2438:9–11, 2444:24–2445:3 (FIEL furthered its mission of voter outreach and civic engagement by assisting its members in voting at the polls).

[39] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and. FIEL serves voters in Harris County. MABA and DST have chapters throughout Texas, including Bexar, Harris, Dallas, and Travis Counties Tr. at 2533:21–23, 2536:17–20 (MABA); Tr. at 2083:13–25 (DST).

local DAs in those counties based on the chilling effect that the "credible threat" of criminal enforcement has on their willingness to provide BBM assistance.

Even before S.B. 1, the Election Code required election officials to note an assistor's name and address next to each voter they assisted in the poll list, TEC § 64.032(d) (1986), and required assistors to provide the same information and their signature on the outside of voters' mail-ballot carrier envelopes, TEC § 86.010(e), JEX-1 at 53. Accordingly, Plaintiffs cannot establish that any injuries arising from the mere *disclosure* of assistors' names and addresses—at the polls or on the mail ballot carrier envelopes—would be redressed by an order enjoining enforcement of Sections 6.03 and 6.05. Section 6.03 did not relieve election officials of their duty to separately record assistors' names and addresses in the poll list under TEC § 64.032(d). Indeed, the Secretary has issued several form poll lists that contain spaces for recording assistors' names and addresses.[40] Being required to provide duplicative information on a separate form for each voter that an assister helps is undoubtedly burdensome.

An order declaring the challenged language in the amended Oath and the Assistor Disclosure requirements unlawful and enjoining their enforcement would remove the chilling effect on voter assistance that has impaired the organization's ability to provide assistance services to voters.

The Court concludes that DST, LUPE, MABA, and FIEL are "sufficiently adverse" to the State Defendants, the election officials and DAs of Bexar, Harris, Travis, and Dallas Counties and the 34th Judicial District to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

---

[40] *See, e.g.*, Tex. Sec'y of State, Form 7-57, https://perma.cc/RAZ3-2G7K; Tex. Sec'y of State, Form 7-59, https://perma.cc/NN7T-PM9P; Tex. Sec'y of State, Form 7-61, https://perma.cc/G79M-NWKG; *see also* Tex. Sec'y of State, Texas Requirements for Electronic Pollbook Forms at 2, https://perma.cc/TH7A-2D79 (requiring poll book to entry for each voter to contain fields for assistor's name and address).

**Section 6.06 – Prohibition on Compensated Mail-Ballot Assistance**

Section 6.06 is challenged by the OCA Plaintiffs and the LUPE Plaintiffs. OCA, the League, LUPE, and MABA are regulated by Section 6.06 of S.B. 1 because they have provided their staff members and volunteers with "compensation," as it is broadly defined under TEX. PENAL CODE § 38.01(3), for assisting voters, including mail voters.[41] As a result, Plaintiffs have stopped assisting mail voters.[42]

"When the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62.

Again, because their conduct is being directly regulated by Section 6.06 and exposes the OCA Plaintiffs (and their members) to criminal liability, their organizational injuries—their inability to provide mail-ballot assistance—is fairly traceable to the State Defendants and to the DAs in the jurisdictions in which Plaintiffs operate.[43]

Both the OCA and LUPE Plaintiffs' name local election officials as Defendants to their Section 208 challenges to the S.B. 1 § 6.06. *See* ECF No. 200 at 61; ECF No. 208 at 76. Plaintiffs have not identified, and the Court cannot locate, any reason to believe that their organizational

---

[41] *See* Tr. at 1694:21–1696:8, 1699:24–1702:2, 1706:12–1707:3 (OCA provided meals, beverages, snacks, academic credit, shirts, and other nominal gifts to volunteers, who provide assistance to mail voters during OCA events); Tr. at 1598:6–15 (League volunteers who assist members and other voters "often get little pens," "stickers" "cookies" "doughnuts" and "pizza"); Tr. at 75:11–17, 124:14–127:13 (LUPE relies primarily on paid staff members); Tr. at 2539:3–4, 2542:6–20 (MABA are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while providing voting assistance).

[42] Tr. at 1717:5–13, 1719:3–22, 1723:6–19, 1724:3–15, 1726:21–1727:6 (OCA); Tr. at 1620:7–1621:1 at (LWV); Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21 (LUPE); Tr. at 2542:17–20, 2543:16–23, 2544:14–16 (MABA).

[43] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. OCA operates primarily in Harris County, Tr. at 1688:10–14, and the League operates chapters throughout the State of Texas, including in Travis County, Tr. at 1586:12–13. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and MABA operates throughout the State of Texas. Tr. at 2533:21–23.

injuries caused by the Section 6.06 are fairly traceable to (or redressable by) local election officials, who have no criminal enforcement authority under the Election Code. Accordingly, Plaintiffs lack standing to sue these local election officials in connection with their challenges to Section 6.06.

**Section 7.04 – Canvassing Restriction**

Section 7.04 is challenged by the LUPE Plaintiffs and the LULAC Plaintiffs. At trial, Plaintiffs established by a preponderance of the evidence that LUPE and LULAC and their staff and volunteers are presently and prospectively subject to Section 7.04.

Both organizations:

(a) have supported ballot measures and/or candidates in the past and intend to do so in the future;[44]

(b) have advocated for their positions through in-person voter engagement efforts, such as neighborhood block-walking, tabling in public places, and hosting candidate forums, town hall meetings, and other events at their offices and in members' homes;[45]

(c) reasonably expect mail-in ballots to be present during such interactions with voters, who often take out their ballots at election events or in conversations with door-to-door canvassers because they have questions about the ballot or needed voting assistance;[46] and

(d) maintain staff and/or volunteers who receive some "benefit" in exchange for their in-person canvassing efforts.[47]

---

[44] Tr. at 89:2–18 (LUPE has supported ballot measures, including a drainage bond, the creation of a health care district in Hidalgo County, increased broadband access in South Texas); Tr. at 2542:6–8 (MABA routinely encourages support for candidates and ballot measures by tabling at local events, such as candidate forums); Tr. at 1632:25–1633:9 (LULAC does not endorse particular candidates but has taken positions on issues such as school and municipal bond measures, state constitutional amendments, and ballot propositions affecting taxes and public education).

[45] Tr. at 71:1–72:15, 75:11–75:17, 90:4–24, 119:20–120:18 (LUPE members brought mail ballots to LUPE offices and meetings and took them out during interactions with door-to-door canvassers and asked for voting assistance); Tr. at 2535:21–2536:5 (MABA tables at local events, including candidate forums and provides voter assistance ); Tr. at 1654:2–1657:19 (LULAC members provided voter assistance during their GOTV efforts with senior citizens).

[46] *See id.*

[47] Tr. at 75:11–17 (LUPE relies primarily on paid staff members and temporary paid canvassers); Tr. at 2542:17–20, 2544:14–16 (MABA volunteers are concerned that accepting gas cards, meals, swag, or a bottle of water will expose them to criminal liability); Tr. at 1654:2–1657:19 (LULAC volunteers receive modest compensation in the form of raffle tickets, food, and gasoline money).

Accordingly, the LUPE and LULAC Plaintiffs can no longer ask staff members to provide mail-ballot assistance as part of their jobs or treat volunteers who provide such assistance during in-person events.[48] Again, because their conduct is being directly regulated by the Canvassing Restriction and exposes Plaintiffs to criminal liability, their organizational injury—their inability to provide mail-ballot assistance—is fairly traceable to the State Defendants and to the DAs in the jurisdictions in which Plaintiffs operate.[49]

These injuries are also "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338. An order declaring that S.B. 1 § 7.04 is preempted by Section 208 and enjoining its enforcement by the State Defendants and County DAs would remove the restrictions and burdens on assistors that have frustrated Plaintiffs' ability to provide voting assistance services and Texas voters' right to vote with their chosen assistors under Section 208.

The LUPE and LULAC Plaintiffs' position with respect to Section 7.04's Canvassing Restriction is "sufficiently adverse" to the State Defendants and the County DAs to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

Both the LUPE and LULAC Plaintiffs' name local election officials as Defendants to their Section 208 challenges to the Canvassing Restriction. *See* ECF No. 207 at 60; ECF No. 208 at 76. Plaintiffs have not identified, and the Court cannot locate, any reason to believe that their organizational injuries caused by the Canvassing Restriction are fairly traceable to local election officials, who have no criminal enforcement authority under the Election Code. Accordingly,

---

[48] *See* Tr. at 120:19–120:25 (LUPE staff and volunteers to fear prosecution and to stop assisting voters when they are canvassing on a ballot measure); Tr. at 2543:16–23 (MABA members are no longer willing to provide voter assistance); Tr. at 1655:10–18 (LULAC volunteers "scaled . . . down" their GOTV efforts and decided not to conduct voter outreach with seniors, many of whom require voting assistance, for "fear that they could be subject to prosecution if they help seniors vote by mail").

[49] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and MABA and LULAC have chapters throughout the State of Texas, Tr. at 2533:21–23 (MABA); Tr. at 1634:6–20 (LULAC).

Plaintiffs lack standing to sue these local election officials in connection with their challenges to Section 7.04.

## SECTION 208 PREEMPTION

### Legal Framework

Section 208's text is "unambiguous." *OCA–Greater Hous. I*, 867 F.3d at 614. It provides that voters with disabilities and voters unable to read or write are entitled to voting assistance from "a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

The Supremacy Clause of the U.S. Constitution requires preemption of any state statute that, when enacted, makes compliance with both federal and state law impossible or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting Section 208. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal citations omitted).

Congress enacted Section 208 with the "clear purpose to allow [a] voter to decide who assists them" during the voting process. *Ark. United v. Thurston (Ark. United II)*, 626 F. Supp. 3d 1064, 1085 (W.D. Ark. 2022), *appeal docketed*, No. 22-2918 (8th Cir. Sept. 12, 2022). It found "this broad protection was necessary to prevent discrimination against voters who require assistance because 'many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice.'" *Id.* at 1085–86 (citing S. Rep. No. 97-417 at 62 (1982)). The Senate Report explained that Section 208 was necessary "to limit the risks of discrimination against voters in these specified groups and avoid denial *or infringement* of their right to vote." *Id.* (emphasis added).

Section 208 provides covered voters with more than a bare right to assistance in the poll booth. Rather, it ensures that they will have access to any kind of assistance they need, at any step of the voting process, from a person of their choice other than their employer or a representative of their union. *See, e.g.*, *OCA-Greater Hous. I*, 867 F.3d at 615 (explaining that assistance to vote "plainly contemplates more than the mechanical act of filling out the ballot sheet"). Section 208 thus preempts state laws that impermissibly constrain access to voting assistance in various ways. *See id.* at 614 (concluding that a limitation on assistance "beyond the ballot box"—even with "near–unfettered choice of assistance *inside the ballot box*"—"impermissibly narrows the right guaranteed by Section 208" (emphasis in original)); *see also OCA Greater Hous. v. Texas* (*OCA-Greater Hous. II*), No. 1:15-CV-679, 2022 WL 2019295, at *3 (W.D. Tex. June 6, 2022) (modifying injunction to enjoin new state law "limiting the activities eligible for assistance to 'marking or reading the ballot'" (citation omitted)).

Because a state law can interfere with a voter's substantive rights under Section 208 by regulating assistors just as readily as by regulating voters needing assistance, laws regulating assistors may stand as obstacles to accomplishing Congress's objectives in enacting Section 208. Determining whether they in fact frustrate Congress's purpose is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *see also Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963); *Arizona v. United States,* 567 U.S. 387, 399 (2012); *Felder v. Casey*, 487 U.S. 131, 151 (1988) (state law preempted where it "interferes with and frustrates the substantive right Congress created").

Consistent with Section 208's text, context, and history, courts have found state laws regulating assistors to be preempted both because compliance with such laws makes full

compliance with Section 208 impossible, *see Disability Rts. N.C. v. N.C. State Bd. of Elections (Disability Rts. N.C. II)*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *4–6 (E.D.N.C. July 11, 2022); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 235 (M.D.N.C. 2020), and because such laws "pose[] an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls," *Ark. United II*, 626 F. Supp. 3d at 1085; *see also, e.g.*, *OCA-Greater Hous. I*, 867 F.3d at 614–15.

In support of their view that states are permitted to further restrict voters' choice of assistor—beyond the two groups excluded by the text of the statute—the State Defendants insist that Section 208 only guarantees "an" assistor of the voter's choice, not "the" assistor of the voters' choice. *See* ECF No. 862 ¶ 551 (citing *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020), *rev'd and remanded*, 860 F. App'x 419 (6th Cir. 2021)).[50] Thus, according to the State Defendants, "Section 208 recognizes that covered voters have the right to select a someone as an assistor, as opposed to having one chosen for them, but it does not guarantee them their first choice; nor does it foreclose Texas from enacting reasonable regulations on whom might assist voters and the procedural prerequisites assistors must follow." *Id.* The Court is not persuaded by the State Defendants' tortured grammatical analysis, which is unsupported by the plain text of Section 208, Congress's legislative intent, or common sense.

To begin, nothing in the text of Section 208 allows states to impose additional limitations or exceptions not stated in the statute. "[W]here Congress explicitly enumerates certain exceptions

---

[50] The Court is neither bound nor persuaded by *Nessel*, which has also been rejected by other courts. *See, e.g.*, *Ark. United I*, 2020 WL 6472651, at *4 ("[T]he Court is unconvinced by the opinion in *Nessel*."). Nessel flouts the settled canon that enumerated statutory exceptions are presumed to be exclusive, engages in an undue burden analysis unsupported by the statute and preemption law, and misreads the legislative history by overlooking the importance of voter choice as Congress's chosen remedy. *Compare Nessel*, 487 F. Supp. 3d at 619 (relying solely on dictionary definition of "a" to interpret Section 208), with *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481 (2021) (explaining that courts must look at the statutory context to determine the meaning of "a"); *see also United States v. Alabama*, 778 F.3d 926, 933 (11th Cir. 2015) ("We have repeatedly found . . . that the context of a statute required us to read 'a' or 'an' to mean 'any' rather than 'one.'").

to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980)); *see also United States v. Rand*, 924 F.3d 140, 144 (5th Cir. 2019). As the Fifth Circuit analogized in another context:

> [W]hen Congress provided the two exceptions to the . . . requirement, it created all the keys that would fit. It did not additionally create a skeleton key that could fit when convenient. To conclude otherwise "would turn this principle on its head, using the existence of two exceptions to authorize a third very specific exception."

*Parada v. Garland*, 48 F.4th 374, 377 (5th Cir. 2022) (quoting *Quebrado Cantor v. Garland*, 17 F.4th 869, 874 (9th Cir. 2021)).

No other exceptions are provided, and nothing in the statute suggests that extra-textual exceptions can be imposed or implied. *See Ark. United v. Thurston (Ark. United I)*, No. 5:20-CV-5193, 2020 WL 6472651, at *4 (W.D. Ark. Nov. 3, 2020) ("[T]here is nothing in the statutory language to suggest that a state may burden, unduly or otherwise, the right [to choice] articulated in § 208."). "The express exclusion of only two groups is significant, because it implies that all other categories of assisters are permitted. If Congress intended to exclude more categories, or to allow states to exclude more categories, it could have said so." *Disability Rts. N.C. v. N.C. State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *4 (E.D.N.C. July 11, 2022) ("[O]ther than these two excluded groups, the plain language of Section 208 gives voters unrestricted choice over who may assist them with the voting process").

The Senate Judiciary Committee's Report—which is the "authoritative source for legislative intent" regarding the 1982 amendments to the Voting Rights Act, *Thornburg v. Gingles*, 478 U.S. 30, 43 n.7 (1986)—confirms Congress's intent that covered voters must be allowed assistance "from a person of their own choosing, with two exceptions" only. S. Rep. No. 97-417

at 2; *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481 (2021) (explaining that courts must look at the statutory context to determine the meaning of "a"). Indeed, Congress viewed the guarantee of choice as so central to its remedial scheme that it noted Section 208's employer exception should yield in certain circumstances where "the burden on the individual's right to choose a trustworthy assistant would be too great to justify application of the bar on employer assistance." Rep. No. 97-417 at 64.

The State Defendants' reading also flatly contradicts Texas's own interpretation of Section 208. The Election Code provides that, "on the voter's request, the voter may be assisted by *any* person selected by the voter other than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." TEC § 64.032(c) (emphasis added). In *OCA-Greater Hous. I*, Texas argued that this provision "track[s] the plain language of Section 208," 867 F.3d at 615, and the Fifth Circuit approved of this reading, interpreting the state law assistor provisions as granting physically disabled voters "the right to select *any* assistor of their choice, subject only to the restrictions expressed in Section 208 of the VRA itself." *Id.* at 608. Texas and the Fifth Circuit have used "a" and "any" interchangeably when interpreting Section 208 without adopting the contrived distinction the State Defendants now propose. *Id.*; *cf. United States v. Naranjo*, 259 F.3d 379, 382 (5th Cir. 2001) ("'Such *a* violation' . . . refers to . . . *any* violation . . . .").

The facts of *OCA-Greater Hous. I* itself foreclose the State Defendants' interpretation. In that case, Mallika Das, a registered voter in Williamson County, brought her son to serve as an interpreter in the polling place. Her son was barred from assisting Ms. Das, however, under a Texas statute, TEC § 61.033, that limited the class of eligible interpreters in each county to individuals

registered to vote in the same county. Because he was registered to vote in Travis County, Mr. Das's son was prohibited from serving as his mother's interpreter in Williamson County.

The Fifth Circuit affirmed the district court's conclusion that denying Ms. Das the right to select her son as an interpreter violated her right to vote with assistance from the person of her choice under Section 208. The Fifth Circuit did *not* conclude, as the State Defendants propose here, that the interpreter provision was consistent with Section 208 because it still permitted Ms. Das to make a choice among the narrow class of translators eligible under state law. That is, even though Ms. Das could have chosen someone else—any voter registered in Williamson County who spoke her language—to serve as her translator, her right to assistance from "a" person of her choice under Section 208 was violated because the law precluded her from receiving assistance from "the" person she actually chose—her son.

The State Defendants insist that the Fifth Circuit's decision in *OCA-Greater Hous. I* is inapposite because it hinged on the VRA's capacious definition of "vote," rather than regulating assistors themselves. ECF No. 862 ¶¶ 562–68. But the translator restriction violated Section 208 only because, under the VRA's expansive definition of "voting," narrowing the class of eligible *translators* necessarily narrowed the class of eligible *assistors* beyond the two categories identified in the text of Section 208. In reaching this conclusion, the Fifth Circuit clarified that a "state cannot restrict [Section 208's] federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined." 867 F.3d at 615.

The indefinite "a" (as opposed to the definite "the") is appropriate because the identity of the chosen assistor is (and cannot be not) known to the reader of the statute. Moreover, the indefinite article clarifies that Section 208's protections are enforceable against attempts by states and local governments (and their officials) to encroach on a voter's choice of assistor; it is not

enforceable against putative assistors themselves. A right to assistance from "the" person of a voter's choice would imply that chosen assistors *must* provide the assistance requested of them. But Section 208 does not permit voters to conscript assistors who are unwilling or unable to help; it prohibits regulations that effectively narrow the universe of willing and eligible assistors from which a voter can choose.[51]

The State Defendants' reading would eviscerate Section 208 by permitting states to give voters a "choice" between two assistors hand-picked by the state because voters could receive assistance from "a person" of their choice between the two possibilities. Section 208's use of "a" to modify "person" does not obviate Section 208's essential guarantee, and it is no evidence of an "intent by Congress to allow states to restrict a federally created right, for Congress does not 'hide elephants in mouseholes.'" *Disability Rts. N.C. v. N.C. State Bd. of Elections (Disability Rts. N.C. I)*, 602 F. Supp. 3d 872, 878 (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

In their motion for summary judgment, the Intervenor-Defendants suggest that S.B. 1's restrictions on choice of assistor are "exactly the type of laws Congress sought to leave undisturbed

---

[51] It is self-evident that the assistor must be actually *capable* of providing the assistance the voter needs in order to serve as an assistor. The State Defendants' and Intervenor-Defendants fanciful hypotheticals about the scope of voters' right to receive assistance are unavailing. For example, Intervenor-Defendants argue that Plaintiffs' reading would allow a voter to select an incarcerated person as an assistor. ECF No. 608 at 35. As the court in *Ark. United I* explained, "a common-sense reading of § 208 suggests that any assistor chosen by a voter must be willing and able to assist. If a chosen person declines to assist the voter or simply does not show up at the polling place, that person has not violated § 208." 626 F. Supp. 3d 1064, 1087 (W.D. Ark. 2022). "And an incarcerated person would not be able assist at the polling place for reasons that are completely unrelated to [Texas's] elections laws." *Id.*

At trial, counsel for the State Defendants similarly posited that Plaintiffs' reading of Section 208 would require election officials to admit assistors who refuse to provide assistance unless they can bring a firearm into the polling place. Not so. There is no question that assistors remain subject to generally applicable laws. At issue here, however, are laws that regulate voting assistors in their capacity as voting assistors (rather than as members of the general public). But regulations governing "voter assistance" must "be established in a manner which *encourages greater participation* in the electoral process." S. Rep. No. 97-417 at 241. Because the provisions in S.B. 1 challenged in this case regulate voter assistance specifically, the question before the Court is whether those provisions "encourage greater participation in the electoral process."

when it enacted Section 208." ECF No. 608 at 35. But the Senate Report refutes that. It directly addresses which contemporary state laws Section 208 intended to leave undisturbed: those in "many states [that] already provide for assistance by a person of the voter's choice." S. Rep. No. 97-417 at 63. Congress could have preserved other more restrictive state laws by adding more exceptions to the text of Section 208. It didn't. Instead, the Senate Judiciary Committee was clear that guaranteeing voters their choice of assistor was "the most effective method of providing assistance while at the same time conforming to the pattern already in use in many states." *Id.* at 64. States may not second guess that decision. And while the Senate Committee recognized the states' rights "to establish necessary election procedures . . . designed to protect the rights of voters," it also clearly stated the intention that any such voter assistance procedures "be established in a manner which *encourages greater participation* in the electoral process." *Id.* at 241 (emphasis added); *see, e.g.*, *id.* at 240 ("Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice . . . The Committee is concerned that some people in this situation do in fact elect to forfeit their right to vote.").

Finally, given the evidence adduced at trial, the State Defendants' grammatical argument is purely academic: several voters who testified at trial have voted without assistance from their chosen assistors under S.B. 1 because of its burdensome requirements on both voters and assistors.

**Analysis**

Section 208 of the federal Voting Rights Act prohibits states from limiting voters' right to assistance and preempts conflicting state laws. S.B. 1 §§ 6.03–6.07 and 7.04 are preempted, in whole or in part, by Section 208 of the VRA because:

- Section 6.04 requires voters to represent to their assistors that they are eligible for assistance as a condition of receiving assistance.

- Section 6.04 deters voter assistors by requiring them to swear, under penalty of perjury, to additional information, including that they did not pressure or coerce the voter into choosing them to assist, and that they obtained a representation of eligibility of assistance from the voter. Section 6.04 also deters voters from using their chosen assistors for fear of placing them at risk of criminal prosecution.

- Sections 6.03, 6.05 and 6.07 deter assistors by requiring them to complete an additional form with duplicative information and disclose their relationship to a voter as a prerequisite to providing voter assistance.

- Sections 6.06 and 7.04 deny mail voters the ability to choose assistors who are compensated or receive "anything reasonably regarded" as an economic gain or advantage.

**Portions of the Oath of Assistance (§ 6.04) are preempted by Section 208**

Section 6.04 of S.B. 1 amends the Oath by adding the underlined and bolded language:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; **I did not pressure or coerce the voter into choosing me to provide assistance**; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.**

TEC § 64.034.

The Oath of Assistance set forth in S.B. 1 § 6.04 restricts the right of assistance protected under Section 208 by conditioning voters' eligibility for assistance on their "represent[ation] to [their chosen assistor that] they are eligible to receive assistance."

This new restriction on the right to assistance and other provisions of the Oath have also deterred voters from requesting assistance and narrowed the universe of willing assistors, thereby "interfer[ing] with and frustrat[ing] the substantive right Congress created" under Section 208.

*Felder*, 487 U.S. at 151. Accordingly, those portions of Section 6.04, described below, are preempted by Section 208 of the VRA.

### The "penalty of perjury" language is preempted by Section 208.

The State Defendants assert that the "penalty of perjury" language in the Oath cannot frustrate Section 208 because the Oath has always been taken under penalty of perjury. *See* ECF No. 862 ¶ 455. It is true that, since 1974, it has been a Class A misdemeanor "make[] a false statement under oath" with "intent to deceive and with knowledge of the statement's" meaning TEX. PENAL CODE § 37.02; *see also id.* § 12.21 (Class A misdemeanors can impose fines of up to $4,000 and up to one year in confinement). S.B. 1, however, added a new provision increasing the penalties for perjury as to oaths under the Election Code, making it a state jail felony to "knowingly or intentionally make a false statement or swear to the truth of a false statement" in an oath with "the intent to deceive." TEC § 276.018.

In any event, neither of the scienter requirements set forth in either perjury provision appear in the Oath itself, with confusing results. What does it mean, for example, for an assistor to "knowingly" make a false statement that he "understand[s] that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." Suggesting that an assistor can be criminally liable for "knowingly" failing to understand a fact appears to be a contradiction in terms. The Oath could have said, "I am not knowingly assisting someone who is ineligible for assistance." As written, however, the Oath requires assistors to confirm that voters are eligible to receive assistance to ensure that their assistance will be effective (i.e., that the voter's ballot will count). Similarly, voters with cognitive disabilities or memory impairments may need their assistors to remind them how they intended to vote or visually point out the voter's preferred candidate on the ballot. Because of the assistance he requires when voting, Mr. Cole understands

this portion of the Oath to mean that he must either change how he votes or require his assistor to commit perjury. Tr. at 710:20–711:11.

At trial, voters,[52] assistors,[53] and election officials[54] alike characterized the "penalty of perjury" language in the amended Oath as "intimidating," "scary," and "threatening." Without any reference to the scienter requirement of the Election Code's perjury provision, there is nothing in the Oath to mitigate these concerns. Even attorneys involved in voting assistance are concerned about the reference to "perjury" in the Oath. MABA members find this language alarming because they do not want to subject themselves to the consequences of being accused of perjury—and potentially be disbarred—for providing voter assistance. Tr. at 2538:8–14; *see also* Tr. at 710:20–711:11 (Cole).

As it is written, the "penalty of perjury" language has deterred assistors from providing qualified voters with assistance and deterred voters from requesting assistance they need to vote, thereby frustrating Section 208's purpose.

### *The statements regarding voter eligibility are preempted by Section 208.*

Section 6.04 conditions a voter's eligibility for assistance on her willingness to make a representation about her eligibility—in effect adding a new requirement to her eligibility for assistance. That new requirement is preempted by Section 208, which affords voters the right to assistance from their chosen assistor regardless of their representations to the assistor about why they need assistance in the voting process. A voter's eligibility for assistance is determined by the conditions described in Section 208: blindness, disability, or inability to read or write. 52 U.S.C.

---

[52] *See, e.g.*, Tr. at 3324:10–14 (Halvorson).

[53] *See, e.g.*, Tr. at 147:10–148:8 (Rocha); Tr. at 3208:9–17; Tr. at 3217:12–3218:1 (Miller); Tr. at 2439:24–2440:10 (Espinosa); Tr. at 2540:21–23 (Ortega).

[54] *See, e.g.*, Tr. at 175:6–176:8 (Wise); Tr. at 1312:25–1314:9 (Longoria).

§ 10508. Imposing additional eligibility requirements on voters impermissibly narrows the class of voters Section 208 was intended to protect.

Moreover, the Election Code's fixation with voter eligibility for assistance undermines any assertion that Section 6.04 protects voters who need assistance. On its face, Section 6.04's eligibility language appears to protect only the inverse class of people—those who do *not* need assistance. In other words, Section 6.04 gestures at the possibility of fraudulent assistance targeting some ill-defined category of people who, for some reason *other than* blindness, disability, or the inability to read or write, are especially vulnerable to manipulation. But "protecting" voters who are *ineligible* for assistance does nothing to protect *eligible* voters. Assistance to an eligible voter is no less effective because the same assistance is provided to someone who does not need it. More importantly, Congress did not pass a law to protect voters who are *ineligible* for assistance; it passed a law to protect those who need it. Texas cannot establish laws that protect the former at the expense of the latter.

Finally, it is not even clear to the Court that the Election Code even operates to "protect" ineligible voters from "coercion" because even ballots voted in accordance with a voter's wishes may be voided if the voter received unauthorized assistance. *See* TEC § 64.037 ("If assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."). This possibility—that an otherwise valid ballot might be tossed out based on a mistaken belief about a voter's eligibility for assistance—discourages assistance. Assistors with any uncertainty about the meaning of "eligibility" or whether a particular individual is legally eligible will refrain from

providing assistance.[55] *See, e.g.*, Tr. at 3291:4–3292:5 (Litzinger); Tr. at 147:1–9 (LUPE); Tr. at 2543:21–16 (MABA).

The Oath's eligibility language is preempted because it "promise[s] to deter otherwise lawful assistors from providing necessary aid to a vulnerable population." *Disability Rts. of Miss. v. Fitch*, 684 F. Supp. 3d 517, 520 (S.D. Miss. 2023), *vacated as moot*, 2024 WL 3843803 (5th Cir. Aug. 14, 2024) (enjoining state law criminalizing third-party mail ballot collection and regulating the "identity of allowable assistors" based on the ill-defined categories of exempt assistors and broad impact on the state's voting population, coupled with the threat of criminal sanctions). *Id.* at 52.[56]

### *The statement regarding "pressure or coerc[ion]" is preempted by Section 208.*

The Oath's statement that the assistor did not "pressure or coerce" the voter into choosing the assistor to provide assistance suffers from the same defects as the eligibility statements. Specifically, the Oath does not define "pressure or coerce" or include a scienter element.

Rather, by its text, the Oath requires an assistor to accurately judge the *actual* consequences of their conduct on another person's state of mind, judged against two undefined terms. But this

---

[55] Upon the suggestion by counsel for the State Defendants that voters concerned about their eligibility for assistance should contact the SOS office regarding the requirements of the Oath, Ms. Nunez Landry responded: "So I guess all disabled people have to call the Secretary of State to find out precisely whether we're eligible to vote [with assistance] and whether we're pressured or coerced? They are going to be a very busy office I would think." Tr. at 3265:21–3266:11. Impracticality aside, counsel's proposal would not cure the Oath's Section 208 problem because, much like the representation of eligibility, it would impose an additional eligibility requirement on voters who need assistance (i.e., that they confirm their eligibility with the SOS).

[56] The court highlighted the dearth of evidence justifying the restrictions on ballot-dropping assistance:

> Defendants were unable to provide any data illustrating whether Mississippi has a widespread ballot harvesting problem. Seemingly, no fact-findings or committee-finding investigations or legislative committee inquiries have focused upon this perceived threat. This may explain why the definitional approach of the statute is so barren.

> Plaintiffs, contrariwise, have provided this court with examples of how S.B. 2358, which subjects violators to criminal penalties, would deter eligible absentee voters[.]

*Disability Rts. of Miss.*, 684 F. Supp. 3d at 521–22.

language fails to provide assistors with any notice about the standard of conduct to which they are swearing or affirming. *See Coates v. City of Cincinnati*, 402 U.S. 611, 612 (1971). In *Coates*, for example, the Supreme Court held that an ordinance prohibiting conduct that was "annoying to persons passing by" was unconstitutionally vague because "[c]onduct that annoys some people does not annoy others." 402 U.S. at 614. The ordinance required "men of ordinary intelligence" to "guess at its meaning" because it specified "no standard of conduct . . . at all." *Id.*

Similarly, the Eleventh Circuit recently struck down a statute prohibiting "activity with the . . . effect of influencing a voter" as unconstitutionally vague because, even if the meaning of "influence" was clear, because "[k]nowing what it means to influence a voter does not bestow the ability to predict which actions will influence a voter." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th Cir. 2023). "How," the court asked, "is an individual seeking to comply with the law to anticipate whether his or her actions will have the subjective effect of influencing a voter?" *Id.* "If the best—or perhaps only—way to determine what activity has the 'effect of influencing' a voter is to ask the voter, then the question of what activity has that effect is a 'wholly subjective judgment[ ] without statutory definition[ ], narrowing context, or settled legal meaning[ ].'" *Id.*

Of course, the constitutionality of the Oath's "pressure or coerce" language is not before the Court; the question is whether the language frustrates Section 208 by deterring lawful voting assistance. But the vagueness analysis explains the chilling effect that the "pressure or coerce" statement has on assistance. *See* Tr. at 2540:11–16 (MABA) (assistors do not want to sign an oath swearing to conduct that appears without definition or context); Tr. at 3249:21–3250:2 (Nunez Landry) (worried that assistors will be too afraid to provide assistance due to confusion about the meaning of the terms); Tr. at 733:21–734:7 (Garza) ("The wording is vague enough where . . . they

might be concerned that they are going to violate the oath if they signed it."). It is unreasonable to expect assistors to swear an oath, under penalty of perjury, that requires them to guess at its meaning. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.").

The Court concludes that the chilling effect of the Oath's vague statement requiring assistors to swear that they did not "pressure or coerce" voters into choosing them as assistors frustrates Section 208's purpose. The language is therefore preempted by Section 208.

### The Assistor Disclosures (§§ 6.03, 6.05, 6.07) are preempted by Section 208

The requirements that assistors complete an additional form disclosing duplicative information at the polls and disclose their relationships with the voters they assist have deterred voters from requesting assistance and narrowed the universe of willing assistors and thereby "interfer[ed] with and frustrat[ed] the substantive right Congress created" under Section 208. *Felder*, 487 U.S. at 151. Accordingly, S.B. 1 §§ 6.03 and 6.05 (as implemented by 6.07) are preempted by Section 208 of the VRA.

The Supreme Court has recognized the deterrent effect that disclosure requirements can have on associative activities. *See, e.g.*, *Shelton*, 364 U.S. at 486, *NAACP*, 357 U.S. at 462; *Dep't of Com. v. New York*, 588 U.S. at 767.[57] And, in this case, individuals who assist voters with whom they do not have a preexisting relationship—including staff members and volunteers for the Plaintiff organizations—have good reason to be concerned about the basis for the disclosure requirement.

---

[57] It's worth noting that the disclosure of an assistor's address and relationship to the voter on the outside of the mail ballot carrier envelope risks public exposure of that information given (1) the potential delay between the time the mail ballot is completed and the time it is mailed or dropped off, and (2) the right to public inspection of the mail carrier envelopes after the election. TEC § 86.014(b).

The State Defendants insist that such disclosures "help enforce" Section 208 "by having assistors articulate their relationship to the voter, which lets county election officials flag violations of the law." ECF No. 862 ¶ 605. But both trial testimony and the text of S.B. 1 § 6.05 indicate that the purpose of the "relationship disclosure" requirement is not to identify either of the categories of prohibited assistors under Section 208. After all, the Oath of Assistance already requires in-person and mail-ballot assistors to swear or affirm that they do not belong to either of the proscribed classes. *See, e.g.*, TEC § 64.034 ("I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs[.]").

Instead, the "Voter Relationship Disclosure" requirement appears to be designed to distinguish between assistors with no relationship to the voter and assistors who are family members and caregivers to the voter, who Mr. White characterized as providing "normal assistance." *See also* TEC § 86.010(h)(2) (excusing close relatives from criminal penalties for failing to disclose their relationship to the voter).

But Section 208 is indifferent to Mr. White's theories about "normal assistance." Aside from the two relationships explicitly identified in the text, Section 208 leaves the choice of assistor entirely up to the voter. To be sure, some voters may prefer to vote with the assistance of a close family member or friend. Others might be more comfortable receiving help from a stranger who has been trained by a trusted community organization to provide high-quality voting assistance. Such an assistor may be more familiar with the voting process (and thus help the voter avoid common pitfalls) and, as a stranger serving multiple voters in an election period, may be less likely to remember or care how an individual voter casts his or her ballot. Neither Mr. White nor the State of Texas is permitted to second-guess the basis for the voter's selection.

The "Voter Relationship Disclosure" discourages community organizations like the Plaintiffs from providing voter assistance services by implicitly requiring that they have an articulable relationship to the voters they assist *beyond* "assistor." But nothing in the text of Section 208 suggests that Texas can adopt rules that discourage certain categories of assistors by, e.g., subjecting them to greater scrutiny, greater administrative burdens, and greater penalties for non-compliance than the state's preferred assistors. Such laws "pose[] an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls," *Ark. United II*, 626 F. Supp. 3d at 1085; *see also, e.g.*, *OCA-Greater Hous. I*, 867 F.3d at 614–15; *see also Cummings v. Missouri*, 71 U.S. 277, 278 (1866) ("[W]hat cannot be done directly cannot be done indirectly.").

Here, Texas seeks to supplant its belief that assistors should have a close, personal relationship with voters over Congress's judgment that voters should be empowered to choose anyone other than their employer or union representative. Texas may not substitute its judgment for that of Congress, or for that matter, Texans who require voting assistance. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 164 (2016) (explaining that "[s]tates may not seek to achieve ends, however legitimate, through . . . means that intrude" on federal power); *see also Ark. United II*, 626 F. Supp. 3d at 1086 (noting there is no "exception to the Supremacy Clause when a state has a compelling interest in enacting a statute that conflicts with federal law").

While the Senate Committee recognized the states' rights "to establish necessary election procedures . . . designed to protect the rights of voters," it also clearly stated the intention that any such voter assistance procedures "be established in a manner which *encourages greater participation* in the electoral process." S. Rep. No. 97-417 at 63 at 241 (emphasis added). Thus, any regulations of the assistors must encourage—or at a minimum not discourage—people from providing voting assistance.

Congress's concern for voters cannot serve as the basis for gutting the very means Congress chose to address that issue. In fact, these differing paths to a common goal underscore that preemption is appropriate. *See Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 529 (5th Cir. 2013) ("As the Supreme Court has cautioned, . . . 'conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" (quoting *Crosby*, 530 U.S. at 380)); *see also United States v. Locke*, 529 U.S. 89, 115 (2000) ("[A] state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." (quoting *Charleston & W. Carolina Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604 (1915))).

The "Voter Relationship Disclosure" requirement set forth in S.B. 1 §§ 6.03–6.04 (and implemented by S.B. 1 § 6.07) and the requirement that in-person assistors complete a separate disclosure form under S.B. 1 § 6.03 is preempted by Section 208.

The State Defendants correctly observe that none of the Plaintiffs challenge the requirement that assistors disclose whether they "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee" under TEC § 64.0322(a) or § 86.010(e)(3). *See* ECF No. 862 at 216–17. Plaintiffs' failure to challenge that disclosure requirement preserves the question on mail ballot carrier envelopes, but it does not save the separate disclosure form prescribed by the Secretary of State for in-person voting. *See* LUPE-189. For the compensation question to have any meaning, the assistor would still be required to provide duplicative information—his name (and probably address)—on the form for identification purposes. The answer to a single yes-or-no question cannot justify imposing an entirely new form on each chosen assistor. The Secretary and local election officials can comply with Section 6.03 by adding the answer to this question to the poll lists, alongside the assistor's name and address.

*See* TEC § 63.004 (permitting the Secretary to combine the poll list, the signature roster, or any other form used in connection with the acceptance of voters at polling places).

### Bans on Compensated Assistance (§§ 6.06 and 7.04) are preempted by Section 208

The prohibitions on compensated assistance set forth in S.B. 1 §§ 6.06 and 7.04 conflict with the text of Section 208 of the VRA because they facially restrict the class of people who are eligible to provide voting assistance beyond the categories of prohibited individuals identified in the text of the statute—the voter's employer (or an agent of the employer) or union representative.[58]

In doing so, Sections 6.06 and 7.04 "interfere[] with and frustrate[] the substantive right Congress created" under Section 208. *Felder*, 487 U.S. at 151. S.B. 1 §§ 6.06 and 7.04 are thus preempted by Section 208 of the VRA. Sections 6.06 and 7.04 make it an "impossibility" for an eligible voter to choose an assistor who is permitted by Section 208 but disqualified by S.B. 1 because that assistor is compensated (or receives an economic benefit) either to provide mail ballot assistance or to advocate for a ballot measure. *Fla. Lime & Avocado Growers*, 373 U.S. at 142–43.

Section 6.06's exception for family members and "attendant or caregiver previously known to the voter" does nothing to save the rule from preemption. Implicitly acknowledging that neither

---

[58] The State Defendants assert that assistance by paid canvassers falls outside the purview of Section 7.04 because it is not "designed to deliver votes for or against a specific candidate or measure." ECF No. 862 ¶ 479 (citing TEC §276.05(e)); *see also* ECF No. 608 at 36. But any efforts designed to increase *turnout* among voters who are already likely to vote for the organization's preferred candidate or measure are, arguably "designed to deliver votes for the candidate or measure." Thus, training canvassers on how to provide non-coercive voting assistance to LEP and disabled voters upon request during candidate forums or block-walking would be arguably "designed to deliver votes for a specific candidate or measure" if the organization's outreach efforts were directed toward like-minded voters.

The expansive reach of the term "interaction"—as opposed to "communication" or "speech" or "advocacy"— compels the same conclusion because it very clearly encompasses *both* core political speech *and* voting assistance. *See Interaction*, Merriam-Webster, https://www.merriam-webster.com/dictionary/interaction (last visited Sept. 24, 2024) (defining "interaction" means "mutual or reciprocal action or influence"). Nothing in the text of the Canvassing Restrictions suggests that a voter who asks a canvasser for voting assistance while discussing a ballot measure begins a new, distinct "interaction" that is no longer imbued with the canvasser's original intent.

"caregiver" nor "previously known to the voter" are defined in the Election Code, the State Defendants have taken the position that "[t]he ban on compensation applies only in the narrow circumstance when an individual is paid specifically to assist the voter with their ballot." ECF No. 862 ¶ 653 (citing Tr. at 1902:4–8). The "caregiver or attendant" exception to Section 6.06 suggests that just the opposite is true. By exempting paid caregivers and attendants "to ensure that Section 6.06 would not interfere with their duties," as the State Defendants describe it, Section 6.06 impliedly *does* interfere with the duties of *other* professionals who might provide mail-ballot assistance in the ordinary course of their employment. It would prohibit a high school teacher, for example, from providing mail-ballot assistance to students with disabilities during a civics unit. It would likewise prevent a legal aid attorney from translating his client's mail ballot, and an activities director at an assisted living facility from helping disabled voters cast their BBMs.

Moreover, the State Defendants' position squarely conflicts with testimony by their own witnesses. For example, the State Defendants insist that nothing in Sections 6.06 or 7.04 prevent "individuals with paid jobs, such as canvassing, from assisting the voter." ECF No. 862 ¶ 653.[59] At trial, however, Mr. White confirmed that Section 6.06 "appear[s] to apply to [the] scenario" in which a paid canvasser for a nonprofit Get Out the Vote organization engages with voters and provides mail ballot assistance at the voter's request. Tr. at 3993:22–3995:10. Similarly, while the State Defendants purportedly endorse Mr. Ingram's position that reimbursement is not "compensation," *see* ECF No. 862 ¶ 653 (citing Tr. at 1903:10–1904:2), Mr. White testified that

---

[59] The State Defendants themselves have taken inconsistent positions on the question of whether Section 7.04 reaches voter assistance activity. *Compare* ECF No. 862 ¶ 653 (arguing that nothing prevents paid canvassers from providing voter assistance) with *La Union del Pueblo Entero v. Abbott*, No. 22-50775, ECF No. 92 at 2 (5th Cir. Oct. 9, 2024) (suggesting that an injunction against criminal enforcement of the Canvassing Restriction would somehow impact selectively quoted instructions pertaining to the Assistor Disclosure requirements). If, as the State Defendants would have it, the Canvassing Restriction always permitted paid canvassers to provide mail-ballot assistance, enjoining criminal enforcement of the Canvassing Restriction should have no impact on how canvassers provide such assistance.

he would need to perform *legal research* to determine what kinds of economic benefits would violate Section 6.06. Tr. at 3992:20–3993:21 (conceding that he would need to "review[] the case law" to determine whether a meal, bus fare, or a gift bag containing a t-shirt constitute prohibited compensation).

Even if S.B. 1 purports to share Section 208's goal of preventing voter coercion, Congress decided that an assistor of choice, as opposed to an election official, would best ensure that the voter's intent is carried out when marking the ballot. *See* H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) (discussing need to deter coercion of voters by election officials). Thus, S.B. 1's voter assistance provisions "involve[] a conflict in the method of enforcement. The Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'" *Arizona v. United States*, 567 U.S. at 406 (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971)).[60]

---

[60] Even under the State Defendants' proposed balancing test, Sections 6.06 and 7.04 would fail. The Senate Report states that any voter protection laws must be implemented to "encourage participation in the electoral process." S. Rep. No. 97-417 at 63 at 241. The trial record shows that several, non-partisan community organizations have stopped providing mail-ballot assistance to voters because they compensate their staff members (with salaries) and volunteers (with nominal gifts). *See, e.g.*, Tr. at 1722:3–16 (OCA); Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21, 86:9–86:13, 86:14–87:2, 87:3–87:21 (LUPE); Tr. at 2543:14–2544:23 (MABA). Worse, both Mr. White and Mr. Ingram acknowledged that, in addition to exposing their assistors to criminal liability under Sections 6.06 and 7.04, voters themselves could face jail time under either provision for offering to buy their assistor lunch as a token of appreciation. Tr. at 1904:1–1906:5. Members of the League have stopped providing assistance at assisted living facilities based on this very concern. Tr. at 1620:7–1621:1. Threatening volunteers who accept water bottles and the voters who offer them with years in prison and thousands of dollars in fines can hardly be said to "encourage participation in the electoral process."

The State Defendants insist that these provisions protect voters from incentive structures that increase the likelihood of assistors applying pressure on the voter in pursuit of partisan or ideological ends. But nothing in the text of either Section 6.06 or 7.04 limits the application of criminal liability to those who receive or offer compensation to "apply pressure" for partisan or ideological ends. Nor is there any evidence that bottles of water, t-shirts, bus fare, or a person's receipt of their normal salary constitute "an incentive structure that increases the likelihood" of such pressure. Indeed, the State Defendants failed to proffer a shred of evidence showing that S.B. 1's assistance provisions actually protect voters from undue influence or encourage participation by voters who need assistance. Weighed against the effect of excluding these broad categories of non-partisan assistors and exposing voters and assistors alike to criminal liability, the burden that Sections 6.06 and 7.04 impose on voters' right to vote with assistance from a person of their choice cannot be justified by the State Defendants' vague gesture toward voter protection.

The text of Section 208 does not permit the restrictions on the class of eligible assistors imposed by Sections 6.06 and 7.04 of S.B. 1. Accordingly, those provisions are preempted.

## PERMANENT INJUNCTION OF S.B. 1 §§ 6.03–6.07 AND 7.04

### Legal Standard

A party seeking a permanent injunction must prove: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). The Court addresses each factor in turn.

Further, in accordance with Federal Rule of Civil Procedure 65(d)(1), an order granting a permanent injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail ... the act or acts restrained or required." *Scott v. Schedler*, 826 F.3d 207, 208 (5th Cir. 2016) (quoting FED. R. CIV. P. 65(d)(1)). According to the Fifth Circuit, this means the injunction must not be vague or overbroad. *Id.* "[A]n injunction is overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not 'narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." *Id.* (quoting *Doe v. Veneman*, 380 F.3d 807, 813 (5th Cir. 2004)).

### Analysis

Plaintiffs have satisfied all four factors required for injunctive relief. *Valentine*, 993 F.3d at 280.

First, for the reasons set forth in this order, the Court concludes that the Sections 6.03–6.07 and 7.04 of S.B. 1. are preempted, at least in part, by Section 208. Plaintiffs have thus succeeded on the merits of their Section 208 claims challenging those provisions.

Second, the Court concludes that failure to grant the requested injunction will result in irreparable injury to Plaintiffs and their members by interfering with voters' rights and ability to vote with help from their chosen assistors.

Plaintiffs have established that Sections 6.03, 6.04, 6.05, and 6.07 of S.B. 1 have deterred members from requesting—and their chosen assistors from providing—voting assistance guaranteed under Section 208 due to the credible *threat* of enforcement. *See also Babbitt*, 442 U.S. at 302 ("a plaintiff need not first expose himself to actual arrest or prosecution" to establish a cognizable harm). As a result, voters, including some of Plaintiffs' members, have forgone assistance to which they are lawfully entitled and will continue to do so as long as those provisions remain in effect. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (recognizing the "strong interest in exercising the fundamental political right to vote") (citing *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).

Finally, it is clear to the Court that the injunction would not disserve the public interest, and, to the contrary, will serve the public interest by protecting individuals' right to vote with help from their chosen assistors under Section 208 and their fundamental right to vote. *See Dunn*, 405 U.S. at 336 (stating that protecting the right to vote is of particular public importance because it is "preservative of all rights.") (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)).

Even recognizing the importance of the fundamental right to vote, a court must weigh any protective action against the potential for confusion and disruption of the election administration under the "*Purcell* principle." *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). The *Purcell* principle provides that, as a general rule, federal courts "should not alter state election laws in the

period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered six weeks before the general election). In *Purcell*, the Supreme Court reversed a lower court's order enjoining the implementation of a proposition, passed by ballot initiative two years earlier, that required voters to present identification when they voted on election day. Reversing the lower court, the Court emphasized that the injunction was likely to cause judicially-created voter confusion in the face of an imminent election. *Purcell*, 549 U.S. at 2, 6.

The Supreme Court has recognized that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. The *Purcell* principle's logic extends only to injunctions that affect the mechanics and procedures of the act of voting. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm. ("RNC v. DNC")*, 140 S. Ct. 1205, 1207 (2020) (extension of absentee ballot deadline); *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (mask mandate exemption for voters); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (new ballot type eliminating straight-ticket voting); *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. at 31 (extension of absentee ballot deadline).

Even when *Purcell* applies, however, it does not constitute an absolute bar on all injunctive relief in the runup to an election. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). Rather, it directs courts to consider whether: (1) "the underlying merits are entirely clearcut in favor of the plaintiff;" (2) "the plaintiff would suffer irreparable harm absent the injunction;" (3) the "plaintiff has [] unduly delayed bringing the complaint to court;" and (4) "the changes in question are at least feasible before the election without significant cost, confusion, or

hardship." *Id.*; *see also Robinson v. Ardoin*, 37 F.4th 208, 228 n.11 (5th Cir. 2022) (per curiam) (citing *Merrill* concurrence as authority on *Purcell*). The Court concludes that Plaintiffs have satisfied the first three elements with respect to all their successful Section 208 challenges. Thus, the Court must determine, with respect to each challenged provision, whether the conduct to be enjoined affects the mechanics of voting and, if so, the feasibility of implementing any injunctive relief before the November 2024 election.

### *Injunctive relief as to the Secretary's forms and instructions implicates Purcell.*

Plaintiffs have succeeded on the merits of their Section 208 challenges to two forms designed by the Secretary of State: the "Oath of Assistance Form" used to collect Assistor Disclosures at the polls (LUPE-189) and the mail ballot carrier envelope (LUPE-009). Specifically, she will be required to withdraw the Oath of Assistance Form, remove the "Relationship to Voter" line from the mail-ballot carrier envelope, and revise the Oath printed on the mail ballot carrier envelope to reflect the language below:

> I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person.

The Secretary will also be required to revise any training and instructional materials for state and county election officials to remove language that reflects the substance of the Enjoined Oath Language or the Voter Relationship Disclosure requirements. Any injunctive relief against the Secretary as to Sections 6.03, 6.04, 6.05, and 6.07 of S.B. 1 will plainly implicate *Purcell* and it is not feasible for the Secretary to redesign any of these materials in the weeks before the November 2024 general election.

Accordingly, the Court will stay any injunction applicable to the Secretary's forms until after the November 2024 general election.

### *Injunctive relief as to election officials' conduct implicates Purcell.*

Injunctive relief as to election officials' administration of the Oath and Assistor Disclosure requirements for both in-person and mail-in voting clearly implicates *Purcell*.

The Court will not enjoin the County Election Officials from using either of the forms prescribed by the Secretary of State in administering the November 2024 general election for the same reasons set forth above.

Of course, it would be feasible, in terms of both cost and hardship, to enjoin officials from giving *effect* to certain portions of the forms by, e.g., permitting assistors to skip the "Relationship to Voter" line on the disclosure form at the polls or accepting mail ballots omitting that information. It would be similarly feasible to direct officials to administer the revised Oath orally at the polls. Nonetheless, due to the potential for voter confusion about the procedural discrepancies between in-person and mail-in voting, the Court will not enjoin officials from implementing the requirements of Sections 6.03, 6.04, and 6.05 of S.B. 1 until after the November 2024 general election.

### *Enjoining enforcement proceedings does not implicate the Purcell principle.*

With respect to criminal enforcement of S.B. 1 §§ 6.04, 6.05, 6.06, and 7.04, injunctive relief against the State Defendants and County DAs would not affect the procedures for voting by mail from a voter's perspective.

Enjoining enforcement proceedings premised on violations of the Enjoined Oath Language, for example, does not require any changes to the Oath as it is printed on the mail ballot carrier envelope or the Oath of Assistance Form or any of the inserts used in the mail voting

process. *See, e.g.*, LUPE-009 at 2; LUPE-189 at 2; Tex. Sec'y of State, Form 6-29, https://perma.cc/N5FYXSCL; Tex. Sec'y of State, Form 6-26, https://perma.cc/QGT9-UH9E.

The first insert urges voters to report "attempts to pressure or intimidate" them to their local county elections office, local district attorney, or the Secretary of State. To state the obvious, an injunction against enforcement has no impact on the general public's ability to report activity—criminal or otherwise—to the officials responsible for collecting such reports. Enjoining criminal enforcement of the Enjoined Oath Language would not impair any official's ability to enforce provisions of the Election Code criminalizing efforts to "pressure or intimidate" a voter. For example, the Election Code already imposes criminal penalties against "effort[s] to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," TEC § 276.013, or voting (or attempting to vote) a ballot belonging to another person, or attempting to mark another person's ballot without their consent or specific direction, TEC § 64.012. Similarly, it is already a crime for an assistor to "suggest[] by word, sign, or gesture how the voter should vote" while providing such assistance or to "prepare[] the voter's ballot in a way other than the way the voter directs or without direction from the voter." TEC § 64.036.

The second insert explains to voters that their assistor's failure to sign the Oath and complete the Assistor Disclosures is a state jail felony unless the person is one of certain close relatives of the voter or physically living in the same dwelling. Tex. Sec'y of State, Form 6-26, https://perma.cc/QGT9-UH9E. Again, the Court is not directing any change to the inserts, the Oath, or the Assistor Disclosure requirements at this time. Instead, injunctive relief against enforcement of the provisions would simply prevent the Secretary from referring alleged violations of the Enjoined Oath Language or the Voter Relationship Disclosure requirement to the Attorney

General, and prevent the Attorney General and the State of Texas (through its local prosecutors) from investigating and prosecuting such violations.

The Election Code itself acknowledges a distinction between its administrative procedures and their enforcement. For example, the Oath of Assistance, printed on the mail ballot carrier envelope and Oath of Assistance Form, does not reflect the scienter requirement set forth in the criminal enforcement provision. *Compare* LUPE-009, LUPE-189, and TEC § 64.034 with TEC § 276.018. Likewise, the Election Code—and the forms that implement it—requires *all* assistors to complete the Assistor Disclosures. *See* LUPE-009, LUPE-189, and TEC § 64.0322. The provision imposing criminal liability on *some* mail-ballot assistors—but not others—who knowingly fail to comply with the requirements is codified under a separate provision, TEC § 86.010(h)(2), but neither the distinction between types of assistors nor the scienter requirement appears on the BBM carrier envelope. *See* LUPE-009.

Any objection to enjoining criminal enforcement of the Enjoined Oath Language or Voter Relationship Disclosure requirement, in effect, amounts to an objection to the limited relief that the injunction will afford. That is, both requirements will undoubtedly continue to have some chilling effect on voter assistance in the November 2024 election. To be sure, with respect to the November 2024 election, Plaintiffs' prospective injuries will not be fully relieved. But *Purcell* does not require courts to double-down on the unjust effects of unlawful election rules by continuing to permit criminal enforcement of those provisions. *See Longoria v. Paxton*, 585 F. Supp. 3d 907, 935 (W.D. Tex. 2022) (less than three weeks before primary, enjoining statute criminalizing solicitation of vote-by mail applications), *vacated and remanded on other grounds*, 2022 WL 2208519 (5th Cir. 2022); *Chancey v. Ill. State Bd. of Elections*, 635 F. Supp. 3d 627, 629–30, 644 (N.D. Ill. 2022) (declining to apply *Purcell* less than a month before an election,

reasoning that an injunction of the campaign finance law at issue "did not implicate the same concerns" as *Purcell*, as because "it is difficult to imagine . . . that if relief is granted, then voters will be confused about whether, how, where, when, or for whom they can vote"); *Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370, 1393 (N.D. Ga. 2021) (enjoining SB 202 provision imposing criminal penalties one month before election); *Towbin v. Antonacci*, 885 F. Supp. 2d 1274, 1295–96 (S.D. Fla. 2012) (similar).

The Court is not considering a preliminary injunction of a new election law intended to mitigate its administrative consequences before an upcoming election. At most, *Purcell* justifies a temporary stay of otherwise *permanent* injunctive relief, and, even then, only to the extent that an injunction materially impacts election administration. The effect of an injunction prohibiting criminal enforcement is limited to the criminal realm. Indeed, injunctions against criminal enforcement are, by their nature, removed in space and time from the mechanics and procedures of voting. Prosecutions simply do not occur at the polls (or, as the case may be, during block-walking and candidate forums); they require investigation, evidence, and due process.

In the same vein, the Attorney General and County District Attorneys may very well be pursuing investigations and prosecutions arising out of violations of these provisions that occurred in *previous* elections. Regardless of the upcoming election, those investigations and prosecutions constitute enforcement of state laws that are preempted by Section 208 of the VRA. How could an injunction of such enforcement activity possibly implicate *Purcell*? Indeed, considering the State Defendants' continued reliance on the investigative privilege in the course of this litigation, it is difficult to imagine that voters are so accustomed to the enforcement of these provisions that they would be confused by an injunction that—for the purposes of November 2024 election—changes nothing about how or when they cast their ballot, by mail or in person.

Because criminal investigations and prosecutions necessarily follow the offending conduct in time, the only prospective interest that the AG and DAs can plausibly allege would be impaired by injunctive relief is the deterrent effect of the provisions arising from the threat of enforcement. However, given that the chilling effect on voting assistance is the very feature that renders the challenged provisions infirm under Section 208, permitting the State Defendants and local prosecutors to continue to threaten criminal enforcement is unlikely to serve the public interest.

## CONCLUSION

For the foregoing reasons, the Court concludes that Sections 6.06 and 7.04 of S.B. 1 and portions of Sections 6.03, 6.04, 6.05, and 6.07 of S.B. 1 are preempted by Section 208 of the VRA.

The motions for summary judgment filed by the Intervenor-Defendants (ECF No. 608) and the Harris County District Attorney (ECF No. 614) are **DENIED** as to Plaintiffs' Section 208 claims.

The HAUL Plaintiffs' Section 208 challenge to S.B. 1 § 6.01 is **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

### Section 6.04 (TEC § 64.034) – The Oath of Assistance

With respect to the HAUL and LUPE Plaintiffs' Section 208 challenges to S.B. 1 § 6.04, codified at TEC § 64.034:

The Court **DECLARES** that the following statements in the Oath of Assistance, codified at TEC § 64.034, are preempted by Section 208 of the Voting Rights Act:

- "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance";

- "I did not pressure or coerce the voter into choosing me to provide assistance; and"

- "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."

Plaintiffs' challenges to the Oath's statement that "I will not communicate information about how the voter has voted to another person" are dismissed.

The Attorney General and Secretary of State of Texas, the District Attorneys of Bexar County, Harris County, Travis County, Dallas County, Hidalgo County, and the 34th Judicial District, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to the following language in the Oath of Assistance, codified at TEC § 64.034 (the "Enjoined Oath Language"):

- "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance";

- "I did not pressure or coerce the voter into choosing me to provide assistance; and" and

- "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."

Nothing in this order should be read to enjoin the Attorney General, the Secretary, or the County District Attorneys from enforcing the surviving portions of the Oath under TEC § 276.018(b).

Accordingly, the Attorney General may not investigate potential violations, refer potential violations to District Attorneys for investigation or prosecution, or prosecute any potential violation of the Enjoined Oath Language with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge. Likewise, all county and local prosecutors are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of the Enjoined Oath Language that occur within their jurisdictions.

In the interest of clarity, injunctions against enforcement extend to civil penalties and civil investigations and enforcement proceedings (e.g., writs of mandamus) against election officials pursuant to Section 8.01 of S.B. 1 (codified at TEC §§ 31.129, 31.130),

The Secretary of State is **PERMANENTLY ENJOINED** from implementing the Enjoined Oath Language. The Secretary shall revise any applicable forms and training and instructional materials for state and county election officials to remove language that reflects the substance of the Enjoined Oath Language. This injunction is **STAYED**, however, **until after the November 2024 general election**.

The Bexar County Elections Administrator, Harris County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator are **PERMANENTLY ENJOINED** from implementing the Enjoined Oath Language. This injunction is **STAYED**, however, **until after the November 2024 general election**. Nothing in this order should be read, however, to prevent local election officials from providing reasonable accommodations to voters consistent with TEC § 1.022.

### <u>Sections 6.03, 6.05, 6.07 (TEC § 64.034) – Voter Relationship Disclosure</u>

With respect to the LUPE and HAUL Plaintiffs' Section 208 challenges to S.B. 1 §§ 6.03, 6.05, and 6.07:

The Court **DECLARES** that the Oath of Assistance Form and Voter Relationship Disclosure requirement, codified at TEC §§ 64.0322(a)(2) and 86.010(e)(2) (and implemented by TEC §§ 64.0322(b) and 86.013(b)) are preempted by Section 208 of the Voting Rights Act.

The State Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC § 86.010(e)(2). All county and local

prosecutors are agents of the State of Texas in prosecuting crimes under the Election Code. *Stephens*, 663 S.W.3d at 52.

Accordingly, the Attorney General may not investigate potential violations of TEC § 86.0105, refer potential violations of TEC § 86.010(e)(2) to county or local prosecutors for investigation or prosecution, or prosecute any potential violation of TEC § 86.010(e)(2) with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge. Likewise, all county and local prosecutors, as agents of the State of Texas, are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of TEC § 86.010(e)(2) that occur within their jurisdictions.

In the interest of clarity, injunctions against enforcement extend to civil penalties and civil investigations and enforcement proceedings (e.g., writs of mandamus) against election officials pursuant to Section 8.01 of S.B. 1 (codified at TEC §§ 31.129, 31.130).

The Secretary of State is **PERMANENTLY ENJOINED** from implementing the Voter Relationship Disclosure requirement. The Secretary shall revise all applicable forms and training and instructional materials for state and county election officials to remove language that reflects the substance of the Voter Relationship Disclosure requirement. This injunction is **STAYED**, however, **until after the November 2024 general election**.

The Bexar County Elections Administrator, Harris County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator are **PERMANENTLY ENJOINED** from using the Oath of Assistance Form (LUPE-189) or implementing the Voter Relationship Disclosure requirement. This injunction is **STAYED**, however, **until after the November 2024**

**general election**. Nothing in this order should be read, however, to prevent local election officials from providing reasonable accommodations to voters consistent with TEC § 1.022.

### Section 6.06 (TEC § 86.0105) – Ban on Compensated Mail-Ballot Assistance

With respect to the OCA and LUPE Plaintiffs' Section 208 challenges to S.B. 1 § 6.06:

The Court **DECLARES** that the ban on compensated mail-ballot assistance, codified at TEC § 86.0105, is preempted by Section 208 of the Voting Rights Act.

The State Defendants, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC § 86.0105. All county and local prosecutors are agents of the State of Texas in prosecuting crimes under the Election Code. *Stephens*, 663 S.W.3d at 52.

Accordingly, the Attorney General may not investigate potential violations of TEC § 86.0105, refer potential violations of TEC § 86.0105 to county or local prosecutors for investigation or prosecution, or prosecute any potential violation of TEC § 86.0105 with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge. Likewise, all county and local prosecutors, as agents of the State of Texas, are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of TEC § 86.0105 that occur within their jurisdictions.

The OCA and LUPE Plaintiffs' Section 208 claims challenging S.B. 1 § 6.06 against the Harris County Clerk, Travis County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator, as applicable, are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

**Section 7.04 (TEC § 276.015) – Canvassing Restriction**

With respect to the LUPE and LULAC Plaintiffs' Section 208 challenges to S.B. 1 § 7.04:

The Court **DECLARES** that the Canvassing Restriction, codified at TEC § 276.015, is preempted by Section 208 of the Voting Rights Act.

The State Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC § 86.0105. All county and local prosecutors are agents of the State of Texas in prosecuting crimes under the Election Code. *Stephens*, 663 S.W.3d at 52.

Accordingly, the Attorney General may not investigate potential violations of TEC § 276.015, refer potential violations of TEC § 276.015 to county or local prosecutors for investigation or prosecution, or prosecute any potential violation of TEC § 276.015 with the consent or at the request of any county or local prosecutor or appointment *pro tem* by a district judge. Likewise, all county and local prosecutors, as agents of the State of Texas, are permanently enjoined from deputizing the Attorney General, appointing him *pro tem*, or seeking his appointment *pro tem* from or by a district judge to prosecute alleged violations of TEC § 276.015 that occur within their jurisdictions.

The LUPE and LULAC Plaintiffs' Section 208 claims challenging S.B. 1 § 7.04 against the Dallas County Elections Administrator, El Paso County Elections Administrator, Bexar County Elections Administrator, Travis County Clerk, Harris County Clerk, and Hidalgo County Elections Administrator, as applicable, are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

It is so **ORDERED**.

**SIGNED** this 11th day of October, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE