**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

La Unión del Pueblo Entero, *et al.*,

*Plaintiffs*,

v.

State of Texas, *et al.*,

*Defendants*

Case No. 5:21-CV-844-XR
(consolidated cases)

**HAUL PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL OR, IN THE ALTERNATIVE, FOR ADMINISTRATIVE STAY PENDING APPEAL AND REQUEST FOR EXPEDITED CONSIDERATION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................ 1

BACKGROUND ........................................................ 2

PROCEDURAL HISTORY ........................................................ 3

LEGAL STANDARD ........................................................ 4

ARGUMENT ........................................................ 5

I. *Purcell* Does Not Bar the Court's Injunction ........................................................ 5

II. Defendants Are Unlikely to Succeed on the Merits ........................................................ 10

a. Standing ........................................................ 17

III. Defendants Will Suffer No Irreparable Injury Absent A Stay ........................................................ 20

IV. A Stay Will Substantially Injure Plaintiffs ........................................................ 21

V. A Stay Would Harm the Public Interest ........................................................ 23

CONCLUSION ........................................................ 25

**INTRODUCTION**

Plaintiffs Houston Area Urban League, The Arc of Texas, Delta Sigma Theta Sorority, Inc., and Jeffrey Lamar Clemmons (collectively the "HAUL Plaintiffs") respectfully respond in opposition to State Defendants' and Intervenor-Defendants' (collectively, "Defendants") Opposed Motion for Stay Pending Appeal or, in the Alternative, for Administrative Stay Pending Appeal and Request for Expedited Consideration, filed October 15, 2024 (ECF No. 1175).

Consistent with a decades old federal right, the Court's limited injunction ensures that millions of Texas voters are entitled to assistance without fear of exposing their assistor to prosecution. This Court has granted Plaintiffs and their members, who provide and rely on critical voter assistance, a reprieve from the real fear of prosecution under a law that violates the Voting Rights Act. The Court's carefully calibrated injunction will mitigate the chilling effect of the S.B.1's Assistance Provisions, enabling voters with disability, low literacy, or limited English proficiency to exercise their right to assistance from a person of their choice. At the same time, the injunction runs only against the State Defendants and local District Attorneys. And the injunction does not require them to do anything.

Nothing in this injunction implicates election administration concerns at all. "This [ ] is not a case in which [injunctive] relief would require the state to cancel or reschedule an election, discard ballots already cast, or prepare new ballots or other election materials." *Scott v. Roberts*, 612 F.3d 1279, 1296 (11th Cir. 2010). This Court's limited injunction will not sow "chaos and confusion," nor will it require a "heroic efforts by [] state or local officials" to comply with the injunction. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). Indeed, no local election officials are even subject to the injunction, meaning that—as with the enjoined Defendants—election officials are not required to do anything at all.

For this reason, *Purcell* and its progeny are simply inapplicable here. *See id*. at 881 (recognizing that *Purcell* is inapplicable where, as here, the merits are "clearcut in favor of the plaintiff", and the injunction is "feasible" to administer "without significant cost, confusion, or hardship"). In contrast, a stay would cause significant and irreparable harm to vulnerable Texas voters during this critical period when they most need assistance with mail-in and in-person voting. Accordingly, the Court should deny the Defendants' motion for a stay.

**BACKGROUND**

In September 2021, Texas enacted a sweeping election law known as Senate Bill 1 ("S.B.1.") Among other changes to the Texas Election Code, S.B.1 enacted imposed new restrictions on voting assistance. Section 6.03, 6.05, and 6.07 of S.B.1 added new disclosure and documentation requirements for people who provide voting assistance. ECF No. 1173 ¶¶ 15-19. And section 6.04 of S.B.1 amended the Oath of Assistance that people who provide voting assistance must swear whether assisting with in-person voting or voting by mail. *Id.* ¶ 22. Providing voting assistance without completing the disclosures on the carrier envelope or without completing the Oath is a state jail felony (with some exceptions) and may result in the rejection of the voter's ballot. *Id.* ¶¶ 21, 23. This brief refers to section 6.03, 6.04, 6.05, and 6.07 collectively as the "Assistance Provisions."[1]

Within days of the Governor's signing of S.B.1 into law, various voting rights, civil rights, and disability rights organizations filed lawsuits to challenge the law, and those lawsuits were consolidated. Plaintiffs are organizations in Texas that serve communities or have members who require voting assistance due to a disability, blindness, or an inability to read or write the language

[1] This brief does not address sections 6.06 or 7.04, which were not challenged by the HAUL Plaintiffs under Section 208 of the VRA.

in which ballot is written. Among the HAUL Plaintiffs, Delta Sigma Theta Sorority, Inc. ("DST") and The Arc of Texas ("The Arc") challenged the Assistance Provisions under Section 280 of the Voting Rights Act. 52 U.S.C. § 10508 ("Section 208").

## PROCEDURAL HISTORY

Following a six-week trial in this case, on October 11, 2024, this Court entered its opinion and order on Plaintiffs' Section 208 claims, permanently enjoining §§ 6.03–6.07 and 7.04 of S.B.1. ECF No. 1173 (Findings of Fact and Conclusions of Law (Claims Under Section 208 of the Voting Rights Act)) (the "Second Order"). The Court, however, stayed certain portions of the injunction until after the November 5, 2024 General Election.

The Court permanently enjoined State Defendants and Local DA Defendants from enforcing certain language in the Oath of Assistance under section 6.04 and from enforcing the voter relationship disclosure requirements under 6.03, 6.05, and 6.07. ECF No. 1173 at 106-109. The Court explained this injunction prohibits the investigation, referral or prosecution (including civil enforcement) of any alleged violations of that oath language and disclosure requirement. *Id.* Second, the Court permanently enjoined the Secretary of State and county election officials from implementing or using forms reflecting the enjoined oath language or forms implementing the voter relationship disclosure requirement and required these defendants to revise all related forms and training materials accordingly. The Court stayed this second injunction until after the November 2024 election, however, in effect requiring no changes to the forms, training materials or administration of the oath or disclosure requirement during the upcoming election. *Id.* at 106-110. Thus, the only portion of the injunction currently in place is the prohibition on prosecution.

Despite the fact that the Court has sua sponte stayed the most of its injunction, State Defendants and Intervenor-Defendants' (collectively "Defendants") filed an Opposed Motion for

Stay Pending Appeal or, in the Alternative, for Administrative Stay Pending Appeal and Request for Expedited Consideration, seeking to stay the remainder of the injunction. ECF No. 1175.

Prior to the Second Order, on September 28, 2024, the Court entered its Findings of Fact and Conclusions of Law on Plaintiffs' overbreadth, vagueness, and Free Speech Clause challenges to S.B. 1 § 7.04 and permanently enjoined that provision.[2] ECF No. 1157 (the "First Order"). Following the Court's denial of State Defendants' motion to stay the First Order (ECF No. 1161), State Defendants filed an emergency motion in the Fifth Circuit to stay the First Order pending appeal. Dkt. No. 6, Defendants' Emergency Motion to Stay District Court Order and Permanent Injunction Pending Appeal and for Temporary Administrative Stay, *LUPE v. Abbott*, No. 24-50783 (5th Cir. Oct. 3, 2024). On October 15, 2024, the Fifth Circuit granted State Defendants' emergency motion to stay the First Order in a published opinion. Dkt. No. 112-1, *LUPE v. Abbott*, No. 24-50783 (5th Cir. Oct.15, 2024). In that opinion, the motions panel considered only the Court's analysis in the First Order; it did not conduct any analysis related to Section 208.

**LEGAL STANDARD**

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal citations omitted). In determining whether a stay is warranted, courts consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434. "The proponent of a stay bears the burden of establishing its need." *Richardson v. Texas Sec. of State,* 978 F.3d 220,

[2] The HAUL Plaintiffs did not bring this claim.

228 (5th Cir. 2020) (citing *Clinton v. Jones*, 520 U.S. 681, 708 (1997)). To satisfy its burden under the first factor, "[i]t is not enough that the chance of success on the merits be 'better than negligible.' Texas must make a 'strong showing.'" *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024).

**ARGUMENT**

Defendants failed to satisfy any of the traditional stay factors: (1) Defendants have not "made a strong showing that [they are] likely to succeed on the merits"; (2) they will not be "irreparably injured absent a stay"; (3) a stay "will substantially injure" Plaintiffs; and (4) "the public interest lies" in protecting the ability for voters to receive assistance from a person of their choice during this critical period of mail voting, early voting, and on election day. *Nken*, 556 U.S.at 426 (citation omitted). Defendants' reliance on *Purcell* is misplaced. The portions of the injunction not already stayed by the Court do not alter the implementation of the Assistance Provisions during the election and affect only the prosecution of people for running afoul of the Assistance Provisions. Election administration and voting procedures will proceed in the same manner as before the injunctions. The concerns that animate *Purcell*—the risks that a change in the status quo will create voter confusion, sow chaos or impose costs or hardship on election officials—are absent here. Even if *Purcell* were applicable (and it is not), a stay would be unwarranted here.

## I. *Purcell* Does Not Bar the Court's Injunction

Under *Purcell*, "federal courts ordinarily should not enjoin a state's election laws in the period close to an election" because "election officials need substantial time to plan for elections" and last-minute changes often cause "significant cost, confusion, or hardship," *Merrill v. Milligan*, 142 S. Ct. at 880-81 (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez,* 549 U.S. 1 (2006) (per curiam)). "Chief amongst those considerations" animating *Purcell* "is the potential for an

injunction issued close to an election 'to confuse voters, unduly burden election administrators, or otherwise sow chaos or distrust in the electoral process.'" Stay Order at 4, Dkt. No. 112-1, *LUPE v. Abbott*, No. 24-50783 (5th Cir. Oct. 15, 2024) ("Stay Order") (quoting *Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022)).

Not all injunctions in an election case automatically implicate *Purcell*. Where issues that lie "at the heart of *Purcell*"—the "risks of chaos, district, or voter confusion"—are not triggered by the injunction, *Robinson*, 37 F.4th at 231, there is no reason to conduct a *Purcell* analysis. For example, one week ago, the Eleventh Circuit declined to stay a lower court's preliminary injunction of a state law that the district court found violated Section 208 without addressing *Purcell*. *See Ala. State Conf. of NAACP v. Marshall*, No. 34-13111, 2024 WL 4481489 (11th Cir. Oct. 11, 2024). In relevant part, the injunction concerned the enforcement of a criminal law that allowed for prosecution of individuals who assist a disabled, blind, or low literacy voter with an absentee ballot application and receive a payment or gift, a restriction similar to those at issue in the instant case. A unanimous panel of the Eleventh Circuit denied the motion to stay using the traditional stay analysis. Apparently, an injunction against a criminal provision that did not alter election administration or voting procedures did not necessitate a *Purcell* analysis.

So too here. Not only does the Court's injunction leave election administration and voting procedures unchanged, but the only immediate change required by the injunction is for the Attorney General and local District Attorneys to refrain from investigating and prosecuting violations (including civil enforcement) of the Assistance Provisions. This enforcement would not occur before the election so *Purcell* does not apply.[3]

---

[3] To the extent the injunction applies to existing investigations and prosecutions of violations from prior elections, *Purcell*'s concerns are not implicated by changes related to prior elections.

Even where implicated, *Purcell*, however, is "not absolute," and is "best understood as a sensible refinement of ordinary stay principles for the election context." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Justice Kavanaugh has put forward certain factors that a plaintiff can establish to overcome *Purcell* "even with respect to an injunction issued close to an election":

> (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.* at 881. As the Court concluded in its Order, all these factors support Plaintiffs, and *Purcell* should not apply. ECF No. 1173 at 100-101.

First, as discussed below, *infra* at Section II, the merits of Plaintiffs' Section 208 claims are clearcut in their favor. Section 208 is a four-decade old federal law that entitles certain voters to "assistance by a person of the voter's choice." 52 U.S.C. § 10508. Its text is "unambiguous" *OCA–Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017), and it provides for no limitations on that right beyond the two expressed in the statute. "[T]here is nothing in the statutory language to suggest that a state may burden, unduly or otherwise, the right articulated in § 208." *Ark. United v. Thurston (Ark. United I)*, No. 5:20-CV-5193, 2020 WL 6472651, at *4 (W.D. Ark. Nov. 3, 2020).

By contrast, the Court's First Order that was stayed by a motions panel concerned First Amendment challenges to section 7.04's restrictions on political speech. Although subject to strict scrutiny, restrictions on speech require a complex balancing test. Burdens on the First Amendment can be justified in certain circumstances, making a merits analysis on a First Amendment claim subject to a weighing of state interests and assessment of the scope of the restriction, ECF No. 1157 (citing *Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438 (5th

Cir. 2014)), unlike a straightforward Section 208 preemption analysis. In its Second Order on Section 208 claims, the Court relied on ample testimony from voters and assistors and organizations who provide assistance about how sections 6.03, 6.04, 6.05, and 6.07 have chilled voters from requesting assistance and assistors from providing it. ECF No. 1173 ¶¶ 40, 113-135, 138-156, 164-178. Indeed, some Plaintiff organizations have dismantled entire voting assistance initiatives due to the laws and the dearth of volunteers. ECF No. 1173 ¶¶ 164, 166-167; *id.* at 71 n.36. Thus the preemption analysis is clearcut: Congress's purpose in enacting Section 208 was to afford certain voters a right to choose their assistor, and because sections 6.03, 6.04, 6.05, and 6.07 frustrate voters' right to receive assistance from a person of their choice, they are preempted by Section 208.

Second, Plaintiffs would suffer irreparable harm absent the injunction as discussed in detail below. *See infra* at Section IV.

Third, Plaintiffs did not delay in bringing these actions to the Court. S.B.1 was passed by the Texas legislature in late August 2021 and signed into law by the Governor on September 7, 2021. ECF No. 856 ¶ 400. The LUPE Plaintiffs and the OCA Plaintiffs both filed their complaints on September 3, 2021, even before the Governor's signature. The HAUL Plaintiffs and LULAC Plaintiffs both filed their complaints on September 7, 2021. And the MFV Plaintiffs filed their complaint on September 27, 2021.[4] In an effort to avoid a ruling close to an election, Plaintiffs initiated this litigation in the early days and weeks after the passage of S.B.1. The law went into effect on December 2, 2021. *Id.*

---

[4] *See* Compl. *La Union Del Pueblo Entero v. Abbott*, No. 5:21-cv-0844-XR; Compl. *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); Compl. *Houston Area Urban League v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); Compl. *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021); Compl. *Mi Familia Vota v. Abbott*, No. 5:21-cv-920 (W.D. Tex. 2021).

Finally, the last factor assesses whether "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Plaintiffs easily clear this bar because the Court's injunction requires no changes before the election on the part of election administrators or voters. Unlike in the First Order concerning section 7.04, in the Second Order, the Court already stayed large portions of its injunction, expressly preserving aspects of the law that would require retraining of election administrators or voters. The already stayed portions are the aspects that would implicate *Purcell*—those affecting the implementation of and voter experience with the Assistance Provisions during the upcoming election. ECF No. 1173 at 106-111. As the Court explained, injunctive relief related to election forms, instructions, or election officials' conduct implicates *Purcell* while and injunctive relief related to criminal or civil enforcement does not. *Id.* at 101-106. The remaining active injunction permits section 6.03, 6.04, 6.05, and 6.07 to be fully implemented during the November 2024 election while enjoining only the enforcement of criminal and civil penalties that may result from a violation of those provisions. *Id.* No county election official is constrained by these portions of the injunction not already stayed, and none will be required to make any changes to the administration of the November election. *Id.* There is simply no burden, cost, or hardship on the officials who are key to making elections run smoothly. *See Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Moreover, the narrow injunctions here do not alter "the mechanics of voting" for the November 2024 election. Stay Order at 4. Voters and their assistors must follow the same procedures, complete the same forms, and are subject to the same "rules of the road" that existed before the Court's ruling. *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring). These unchanged voting procedures will protect voter privacy and ballot integrity to the same extent they did prior to the injunction. Organizations and election

officials will not need to communicate the injunction's changes to voters because they do not affect the voting process. Thus, there is a minimal risk of voter confusion because the process of receiving or providing voting assistance will proceed as before.

As discussed earlier, the injunction against enforcement by the Attorney General and local District Attorneys for violations the Assistance Provisions would impact prosecutorial conduct that arises out of the election. Such enforcement would not occur "before the election" so the feasibility of enjoining it does not bear on the *Purcell* analysis under this factor. *Id.* at 881. Further, Defendants have identified no costs or hardship to them—monetary, administrative, or otherwise—in implementing this change. Even if they had, "the question, under *Purcell*, is not whether an injunction would burden the defendants, but whether that burden is intolerable." *Robinson v. Ardoin*, 37 F.4th 208, 230 (5th Cir. 2022). Here Defendants have not shown that a burden exists, let alone that it is intolerable.

Despite the injunction's proximity to the election, all the factors relevant to a *Purcell* analysis support denying Defendants' motion to stay.

## II. Defendants Are Unlikely to Succeed on the Merits[5]

The traditional stay factors also weigh in Plaintiffs' favor. Defendants cannot satisfy the first stay factor because they are unlikely to succeed on the merits. In issuing its injunction, this Court explicitly found that Plaintiffs have succeeded on the merits, ECF No. 1173 at 98, a well-reasoned ruling that is unlikely to be reversed by a reviewing court. Section 208's text, its legislative history, and the weight of authority support this Court's prior conclusions.

---

[5] Section 208 permits private enforcement. *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 609–14 (5th Cir. 2017). Binding precedent also forecloses Defendants' sovereign immunity defense. ECF No. 1175 at 6 n.2, 7. *OCA-Greater Hous.*, 867 F.3d at 614 (recognizing that the VRA validly abrogated sovereign immunity).

Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. Section 208 contains no exemptions for state laws, nor otherwise gives states the authority to add further limitations or restrictions beyond those stated in the text.

"State laws are preempted when they conflict with federal law" including "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). In other words, a state law is preempted when it "creates a conflict with the plan Congress put in place," *id.* at 403, or "interferes with and frustrates the substantive right Congress created," *Felder v. Casey*, 487 U.S. 131, 151 (1988). In the context of Section 208, state laws that "limit[] voter choice" are preempted because they "impermissibly narrow[] the right guaranteed by Section 208." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (invalidating Texas requirement that an interpreter chosen by the voter must be registered in the same county as the voter).[6]

In assessing the "purpose and objectives of Congress" behind Section 208, the Court looked not only to the text but also the legislative record. ECF No. 1173 at 77-84. The Court also surveyed case law applying Section 208, including at the Fifth Circuit, in district courts within the Circuit, and outside the Circuit. *Id.* Finally, the Court relied on ample testimony from voters and

[6] Defendants claim that *OCA-Greater Houston* does not ban regulations on voter assistance and its only holding is defining the term to "vote." ECF No. 1175 at 12. However, defining "to vote" was simply part of the reasoning that supported the holding that Section 208 preempted the state law at issue in that case. The State had argued its restrictions on interpreters did not implicate Section 208's right to assistance because 208 applied only to assistance with "the literal act of marking the ballot." *OCA-Greater Hous.*, 867 F.3d at 615. Based on the broad definition of "voting" in the VRA, the Fifth Circuit concluded that the term encompassed the act of receiving interpretation assistance to facilitate voting, and thus easily held that Section 208 banned the state's restriction on interpreters. *Id.*

assistors and organizations who provide assistance about how sections 6.03, 6.04, 6.05, and 6.07 operate to frustrate the purpose of congress—by chilling voters from requesting assistance and assistors from providing it. ECF No. 1173 ¶¶ 40, 113-135, 138-156, 164-178. As the Court properly concluded, Congress's purpose, evinced by the plain text of Section 208 and its legislative history, was to afford certain voters a right to choose their assistor, and because sections 6.03, 6.04, 6.05, and 6.07 frustrate voters' right to receive assistance from a person of their choice, they are preempted by Section 208. ECF No. 1173 at 85-94; *see also Ala. State Conf. of NAACP v. Marshall* ("*Ala. NAACP*"), No. 2:24-cv-00420, 2024 WL 4448841, at *3 (N.D. Ala. Oct. 4, 2024). ("[A]ny law that limits a § 208 voter's choice or provides additional exceptions to this right unduly burdens the rights of § 208 voters, and is, as a matter of law, in conflict with § 208.")

In their motion to stay, Defendants bring various counterarguments, many of which have been repeatedly rejected by the Court.

Regarding section 6.04, Defendants argue that the Oath language and Section 208 are not in conflict because, in their view, assistors simply prefer to not comply with the state rule. ECF No. 1175 at 15-16. Defendants also claimed the Court relied on speculative concerns that the Oath would have a chilling effect. *Id.* at 16. Thes arguments mischaracterizes the evidentiary record, which shows a real fear on the part of voters about and assistors about swearing under penalty of perjury to certain vague language or language that require them to attest to a voter's eligibility, and this fear had resulted in them refraining from seeking or providing voter assistance. ECF No. 1173 at ¶¶ 138-155. While Defendants' claim the oath furthers Section 208 aims to ensure voters who need assistance are not coerced, the evidence shows the oath has a different impact. *Id.* In any event, Congress stated that protecting the voter's unencumbered choice of assistor guarded against improper influence, not adding restrictions to that choice. *See* S. Rep. No. 97-417, at 62 (1982)

("the only way to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter" is to permit them "to have the assistance of a person of their own choice.").

On the disclosure provisions (6.03, 6.04, and 6.07), Defendants offer an alternative account of how the Assistor Disclosure requirements in these provisions operate in a manner that does not conflict with Section 208, arguing that the requirements are *de minimis*. ECF No. 1175 at 13-15. But this account seems largely theoretical as it does not meaningfully engage with the evidentiary record, which is rife with evidence of how the disclosures discouraged people from assisting voters and prevented voters from using the assistor of their choice, particularly when an omission, mistake, or violation could result in criminal prosecution. ECF No. 1173 ¶¶ 164-168; *id.* at 71 n.36. In practice, these provisions frustrate Congress's purpose to afford the rights under Section 208. "Section 208 does not say . . . that disabled voters are limited to 'a person of the voter's choice from a list"—or in a manner—"to be determined by the several states.'" *League of Women Voters of Ohio v. LaRose*, 2024 WL 3495332, at *11 (N.D. Ohio 2024). Defendants also offer justifications for the disclosure requirements, ECF No. 1175 at 14-15, but these state interests are not part of the preemption analysis. *See id.* at *18 (rejecting claim that Section 208 injunction might expose a political party to "new illegitimate competitive tactics"); *Ark. United,* 626 F. Supp. 3d at 1086 (rejecting state's defense of a challenged law purportedly designed to serve the compelling state interest in "election integrity" because there is no "exception to the Supremacy Clause when a state has a compelling interest in enacting a statute that conflicts with federal law").

Defendants also argue that the text of Section 208 permits states to further regulate and restrict voter assistance, based on the statute's use of the article "*a* person of the voter's choice" rather than "the" or "any" person. But this single, indefinite article cannot bear the weight of

Defendant's argument—which several courts, including this one, have rejected. *See Disability Rts. N.C. v. North Carolina. State Bd. of Elections*, 602 F. Supp. 3d 872, 878 (E.D.N.C. 2022) ("The use of the indefinite article 'a' does not show intent by Congress to allow states to restrict a federally created right."); *Ark. United*, 2020 WL 6472651, at *4 (same). "In common terms, when 'a' or 'an' is followed by a restrictive clause or modifier, this typically signals that the article is being used as a synonym for either 'any' or 'one.'" *United States v. Alabama*, 778 F.3d 926, 932 (11th Cir. 2015) (cleaned up). Thus, courts have "repeatedly" found that "an indefinite article was purposefully used as a synonym for the word 'any,' determining that the context of a statute required us to read 'a' or 'an' to mean 'any' rather than 'one.'" *Id*. at 933 (collecting cases). If Texas could limit who is "a person" under Section 208, the "phrase 'of the voter's choice' is either superfluous or loses all meaning." *LaRose*, 2024 WL 3495332, at *11.

Reasoning that "Congress does not hide elephants in mouseholes," these courts concluded that Congress would not cloak its intent to permit further limitations of a voter's right to their assistor of choice in this way. ECF No. 1173 at 83 (collecting cases). This is especially true where Congress already enumerated the only two limitations in the statute.[7] "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013).

Defendants also take issue with the Court's assessment of legislative history, pointing out that the Senate Report's states "only to the extent that they unduly burden the right recognized in

---

[7] Defendants' absurd examples they claim flow from the Court's common sense reading of the text conflate a voter's right to assistance from "a person of the voter's choice" with a voter's right to forced assistance from an unwilling or unavailable person of the voter's choice. ECF No. 1175 at 10. Under Section 208, a voter's choice could be limited by geographic distance, refusal on the part of the assistor, or other life circumstances—but it may not be restricted by state law.

[Section 208], with that determination being a practical one dependent upon facts." ECF No. 1175 at 12-13. But this misreads the Senate Report, which "contains a 'clear statement' of [congressional] intent to preempt certain state laws that would contravene (*or unduly burden*) a § 208 voter's right to receive assistance from a person of the voter's choice." *Ala. NAACP*, 2024 WL 4448841, at *4 (emphasis added). That is, "any law that limits a § 208 voter's choice or provides additional exceptions to this right unduly burdens the rights of § 208 voters, and is, as a matter of law, in conflict with § 208. *Id.* at *3; *Ark. United I*, 2020 WL 6472651, at *4 ("[T]here is nothing in the statutory language to suggest that a state may burden, unduly or otherwise, the right articulated in § 208."). Moreover, the Court's fact-bound analysis demonstrated how the Assistance Provisions of S.B.1 in fact unduly burdened the right of voters to an assistor of their choice and are therefore preempted by Section 208.

Defendants also argue that the Court should adopt a "presumption against preemption" and assume that Texas's historic police powers were not superseded by Section 208 "unless that was the clear and manifest purpose of congress." ECF No. 1175 at 11. Putting aside whether this analysis, rooted in the 67-year-old case of *Rice v. Santa Fe Elevator Corp.*, applies to the conflict preemption question here,[8] Congress expressed a "clear and manifest purpose" to displace contemporaneous state laws governing voting assistance by "prescribing minimal requirements"

---

[8] The Supreme Court has inconsistently applied the presumption against preemption. *See e.g., Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013) (holding that federal law preempted state law without mentioning the presumption against preemption); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625 (2012) (similar); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011) (similar); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) *(similar); Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008) (similar); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) (similar); *United States v. Locke*, 529 U.S. 89, 108 (2000) (similar). *See also, e.g.,* Charles W. Tyler & Heather K. Gerken, The Myth of the Laboratories of Democracy, 122 Colum. L. Rev. 2187, 2240 (2022) ("The Court has recognized the presumption since its 1947 decision in *Rice v. Santa Fe Elevator Corp.*, but it has applied the presumption only episodically—sometimes calling it a 'cornerstone[]' of preemption jurisprudence, other times ignoring it entirely."); Thomas W. Merrill, Preemption and Institutional Choice, 102 Nw. U. L. Rev. 727, 741 (2008) ("[T]he presumption against preemption is honored as much in the breach as in observance.").

that apply "to the manner in which voters may choose to receive assistance." S. Rep. No. 97-417 at 63. Congress left undisturbed the laws in "many states [that] already provide for assistance by a person of the voter's choice." *Id.* But Congress "extend[ed] this right to blind, disabled and illiterate citizens *in all states*," which would now need to "conform[] to the pattern already in use in many states" that had already recognized a right to assistance. *Id.* (emphasis added).

Defendants also attempt to transform Section 208 and preemption analysis into a balancing test, but this finds no support in either doctrine. Defendants urges the Court to focus its inquiry on whether voters "retain and real choice in who helps them," while also putting a thumb on the scale for the state by affording its election procedures "considerable deference." ECF No. 1175 at 11. Defendants pluck this deference language from *Vote.Org v. Callanen*, a case that did not address Section 208 or preemption. 89 F.4th 459, 481 (5th Cir. 2023).[9] Defendants "fail to cite any authority carving out an exception to the Supremacy Clause when a state has a compelling interest in enacting a statute that conflicts with federal law." *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1086 (W.D. Ark. 2022). There is no support for importing these standards into the Section 208 context, which is governed by a straightforward conflict preemption analysis. Rather, "[t]he preemption inquiry is driven by 'congressional purpose,' not the purpose of the state [law]." *Id.*

Finally, Defendants argue that the two limitations in the text of Section 208—that an assistor cannot be an employer or union officer—define only the "cap" on a Section 208 right but not the "floor" is nonsensical and contravenes rules of statutory interpretation. *See Hillman*, 569

[9] *Vote.Org* concerned a Texas's wet signature requirement for voter registration applications, which Plaintiffs challenged under the Materiality Provision of the Civil Rights Act of 1964. The opinion surveyed standards by which to assess legislative justifications for voting laws challenged under different claims, such as the *Anderson-Burdick* claim in *Crawford v. Marion County Board of Elections*, 553 U.S. 181 (2008) and the claim under Section 2 of the Voting Rights Act in *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016). None of these cases, however, involved or even mentioned Section 208.

U.S. at 496. There is no evidence that Congress intended to delineate the outerbound of a Section 208 right while allowing that right to be eroded through state law infringements up to an undefined "floor." Congress was not concerned with reining in unfettered voting assistance choice by placing a "cap" on the entitlement. The Senate Report show quite the opposite: a congressional desire to "extend this right to blind, disabled and illiterate citizens in all states" by mandating that those voters "be permitted to have the assistance of a person of their own choice" to ensure they receive assistance that would "make [their vote] fully meaningful." S. REP. No. 97-417 at 62, 63 (1982).

The Court should again reject Defendant's argument and hold that Plaintiffs are likely to succeed on the merits of their Section 208 claim.

**a. Standing**

Defendants also challenge Plaintiffs' standing to bring their Section 208 claims. The Court's Second Order provides an exhaustive analysis of party standing, ECF No. 1173 at 58-75. It is well-established that only "[o]ne party with standing" is necessary to "satisf[y] the constitutional requirement." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 467 (5th Cir. 2024); *see also Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[W]hen there are multiple plaintiffs[,] [a]t least one plaintiff must have standing to seek each form of relief requested in the complaint.").

In addition to other Plaintiffs, DST and The Arc both challenged S.B.1's Assistance Provisions under Section 208, and established standing to bring that claim.[10] The Court relied on testimony from several members of the Arc who are Texas voters with disabilities and have been

---

[10] Defendants wrongly claim that DST did not challenge section 6.07, citing language in the Court's order that "Section 6.07 is challenged only by the HAUL Plaintiffs." ECF No. 1175 at 7. Of course, consistently throughout this case, DST has been identified as one of the HAUL Plaintiffs, *see* ECF No. 1173 at 1 n.2 ("For the purposes of the HAUL Plaintiffs' Section 208 claims, this group includes The Arc of Texas, Delta Sigma Theta Sorority, Inc., and Mi Familia Vota."). DST challenged section 6.07 as part of its Section 208 claim. *See* ECF No. 199, ¶ 324; ECF No. 852 ¶ 179.

unable to vote with their assistor of choice due to the chilling effect and the credible threat of criminal enforcement of the Oath, forming the basis of the Arc's associational standing to challenge section 6.04. ECF No. 1173 ¶¶ 40, 113-135; *id.* at 67-71 (discussing Arc of Texas members Jodi Nunez Landry, Laura Halvorson, and Amy Litzinger, and Nancy Crowther). These members individually satisfied the requirements of Article III standing, their interests in voting are germane to the purposes of the Arc, and their individual participation was not required to seek injunctive relief, fulfilling the associational standing requirements. *Id.* at 67-71; *see Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2157 (2023). The Court also held the DST had organizational standing to challenge section 6.03-6.05 and 6.07, finding that providing in person and mail-ballot assistance was part of DST's mission and that provisions' Assistor Disclosure and Oath requirements had a chilling effect that interfered with the organization's ability to perform these voter assistance services.[11] ECF No. 1173 ¶¶ 42-44; *id.* at 72 & n.38. Because the provisions had "perceptibly impaired" DST's "core business activities in the manner, DST had established a cognizable injury that supported standing. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (*FDA*)) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Because DST's voter assistance activities were also directly regulated by the Assistance Provisions—by requiring members and volunteers participating in DST voter assistance activities to make certain disclosures and swear to the language of the Oath—this supplies another basis for organizational standing. *See id*. at 382. ("Government regulations

---

[11] The Court dismissed DST's challenge to section 6.01 for lack of standing, holding DST failed to show it intended to engage in the conduct regulated by 6.01 – the transportation of seven or more voters specifically for curbside voting. ECF No. 1173 at 66-67.

that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish.”).

Defendants launch various scattershot arguments to attempt to undermine Plaintiffs’ standing, but none hit the mark. Although Defendants claim that the Secretary of State and the Attorney General do not enforce S.B.1, this proposition appears to exist only as legal fiction; the evidence adduced at trial revealed enthusiastic and ongoing enforcement of the Assistance Provisions by these Defendants, making Plaintiffs’ injuries fairly traceable to and redressable by them. Even after the decision in *State v. Stephens*, 663 S.W.3d 45, 57 (Tex. Crim. App. 2021), the Office of Attorney General can and does prosecute election-related violations through various mechanisms, has investigated possible violations of the Assistor Disclosure requirement as recently as 2023, and publicly confirmed its commitment to taking action against alleged “assistance fraud.” ECF No. 1173 ¶¶ 80-83. These facts also show a “credible threat” of enforcement that has understandably deterred Plaintiffs and their members from seeking or providing voter assistance. Contrary to Defendants’ contention, Plaintiffs’ fear of prosecution is not speculative where there is evidence that Defendants have threatened to and indeed launched investigations and prosecutions related to voter assistance laws, and thus “will likely react in predictable ways that in turn will likely injure the plaintiffs.” *FDA*, 602 U.S. at 383. Regarding section 6.04, Defendants maintain this fear is speculative where no Plaintiff has asserted an intention to “pressure or coerce” a voter into choosing them to provide assistance in violation of the oath. ECF No. 1175 at 9. On the contrary, witnesses testified that the fear and deterrent effect is magnified, not diminished, by the vague, undefined language “pressure or coerce” that an assistor must swear without knowing how a prosecutor may interpret the phrase and how to conform their conduct accordingly. ECF No. 1173 ¶¶ 151-155; *id.* at 89-91; *Grayned v. City of*

*Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.").

Defendants also argue Plaintiffs' fear stems *only* from section 6.04's oath requirement and not the assistor disclosure requirements of 6.03, 6.05, and 6.07, but they are directly contradicted by the trial testimony. *See, e.g.*, ECF No. 1173 ¶¶ 164-168; *id.* at 71 n.36.

### III. Defendants Will Suffer No Irreparable Injury Absent A Stay

Defendants will suffer no irreparable harm from the Court's injunction. First, Defendants claim they are irreparably injured by the inability to "carry[] out validly enacted, constitutional laws governing elections." ECF No. 1175 at 19. However, irreparable injury cannot follow from an order that merely requires the State to comply with federal law. *See United States v. Texas*, No. 1:24-CV-8-DAE, 2024 WL 861526 at 41 (W.D. Tex. Feb. 29, 2024); *see also United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("[W]e discern no harm from the state's nonenforcement of invalid legislation."). In any event, because there are "no concerns" that the injunction "will substantially disturb the election process, the public interest is congruent with the final resolution of the merits of this matter." *Patino v. City of Pasadena*, 677 F. App'x 950, 952 (5th Cir. 2017).

Second, Defendants' purported interests in uniform election laws are undermined by SB 1 itself, because Sections 6.03-6.05 and 6.07 "interfere[]" with blind, disabled, and low-literacy Texans' "ability to vote with help from their chosen assistors." ECF No. 1173 at 99. This undue and disparate burden on Section 208 voters cannot plausibly further an interest in clear and uniform election law.

Third, the permanent injunction of SB 1 Sections 6.03-6.05 and 6.07 does not hinder the state from furthering its other asserted interests. Any suggestion that the injunction undermines the

state's interests in ensuring fair and honest elections, bringing order to the democratic process, and allowing the vote to be fully realized, ECF No. 1175 at 19, is without merit. Indeed, Defendants make generalized arguments about how the injunction will hinder the furtherance of its purported interests with no support for how having the freedom to pursue future prosecutions under and invalid law those interests. Rather, Section 208 supplies the mechanism to further these interests. Congress determined that Section 208 was the best measure to "fully realize" the right to vote for voters who need assistance due to blindness, disability and illiteracy, and Congress recognized that the best means to thwart improper influence is to allow these voters themselves to choose who will give them assistance. *See* S. Rep. No. 97-417, at 62 (1982) ("the only way to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter" is to permit them "to have the assistance of a person of their own choice.").

## IV. A Stay Will Substantially Injure Plaintiffs

By contrast, "[d]enial of the right to choose their assistors would work irreparable harm on these disabled, blind, and illiterate voters who have a greater need for assistance than other voters." *Ala. NAACP*, 2024 WL 4448841, at *4. Here, "the injury [Plaintiffs] seek to prevent—holding an election under an unlawful plan with discriminatory effects [on Section 208 voters]—is . . . , it should go without saying, a serious one." *Thomas v. Bryant*, 919 F.3d 298, 303-04 (5th Cir. 2019); *cf. also* Veasey v. Abbott, 830 F.3d 216, 270 (5th Cir. 2016) (en banc) (holding that "[i]t would be untenable" to permit a discriminatory law to "remain in operation for [an upcoming] election").

Thus, the Court correctly found that the "failure to grant the requested injunction will result in irreparable injury to Plaintiffs and their members by interfering with voters' rights and ability to vote with help from their chosen assistors." ECF No. 1173 at 101. Specifically, the Court detailed the chilling effect of the enjoined provisions, including deterring members of Plaintiff

organizations from requesting and providing voting assistance guaranteed under Section 208. *Id.* Because of the threat of prosecution under the Assistance Provisions, "voters, including some of Plaintiffs' members, have forgone assistance to which they are lawfully entitled and will continue to do so as long as those provisions remain in effect." *Id.* Should the Court stay its injunction against prosecution under these provisions, these voters and others, will continue to go without voting assistance, which constitutes an irreparable injury to their fundamental voting rights. *Id.; League of Women Voters of N.C. v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *See Ala. State Conf. of NAACP*, 2024 WL 4481489 ("the issuance of a stay would injure the plaintiffs (and other Section 208 voters)"). For voters with disabilities, voting without assistance from a trusted assistor often also means experiencing physical pain, embarrassment, or loss of privacy in order to vote without assistance or with the assistance of an election official. ECF No. 1173 at 34-41. These voters should not have to choose between these hardships and exercising their fundamental right to vote. *See Veasey v. Abbott*, 870 F.3d 387, 394 (5th Cir. 2017) ("Indeed, because these laws affect—or threaten to affect—the plaintiffs' right to vote, it is the plaintiffs who have shown they will suffer an irreparable injury should the stay be implemented."); *Stringer v. Hughs*, 2020 WL 6875182, at *7 (W.D. Tex. Aug. 28, 2020) ("The future injury—disenfranchisement – is irreparable. The right to vote is a fundamental right, and the deprivation of such right is something Plaintiffs 'will never be able to recover.'"). Plaintiffs' missed opportunities to assist voters are also irreparable, not only because unassisted voters may not be able to vote at all, but also because those opportunities for voter engagement have been permanently lost. *See League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm where policies "ma[d]e it more difficult for [plaintiff organizations] to accomplish their primary mission of registering voters"); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005)

(holding that an organization suffered "significant, irreparable harm" resulting from state law restrictions on voter registration drives). Indeed, "organizations with core voter-advocacy missions," like The Arc and DST, "are irreparably harmed when the defendant's actions perceptibly impair the organization's programs, making it more difficult to carry out its mission." *Democracy N.C. v. North Carolina State Bd. of Elections*, 476 F. Supp. 3d 158 (M.D.N.C. 2020) (internal citations and quotation marks omitted). With election day less than a month away, and voting by mail already underway, the Court's injunction has created only a brief window of time for Plaintiffs and their members to provide and receive voting assistance free from the fear of prosecution. Cutting this short with a stay would cause grave harm to Plaintiffs.

The suggestion that a stay would somehow not irreparably harm Plaintiffs is baffling. Defendants suggest that a stay would maintain the "status quo that has existed in Texas since September 7, 2021," because several primary, general, and constitutional amendment elections have taken place under S.B.1. ECF No. 1175 at 19. Plaintiffs have already endured multiple elections under Assistance Provisions this Court has now held violate the Voting Rights Act. Suffering this harm in yet another election compounds the irreparable harm visited upon Plaintiffs rather than curing it.

## V. A Stay Would Harm the Public Interest

The public interest is harmed when state officials are permitted to defy federal law. *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (finding that an injunction that prevented state officials from enforcing an unconstitutional law serves the public interest). The public interest is not served by allowing another election to proceed under state laws that violate the Voting Rights Act. *See Ala. State Conf. of NAACP*, 2024 WL 4481489 (holding that "the public interest does not weigh in favor of a stay" in a case involving

claims under Section 208). More than three million voting-eligible Texans have disabilities, but people with disabilities turnout at a lower rate than those without disabilities. ECF No. 852 ¶ 104, 124. It is clearly in the public interest to ensure that every eligible Texas voter who is blind, disabled, or illiterate can exercise the right to vote and to eliminate barriers that keep those voters from getting the necessary assistance. *See Dunn v. Blumstein*, 405 U.S. 330, 336 (stating that protecting the right to vote is of particular public importance because it is "preservative of all rights") (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)); *OCA Greater Houston v. Texas*, 2016 WL 4597636 (W.D. Tex. Sept. 2, 2016) (finding that the public interest was best served by ensuring that "all Texas voters receive the right to assistance in voting provided by Section 208 of the VRA"); *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 595 (5th Cir. 2006) (finding that the public has an interest in "the correct and *constitutional* application of Texas's duly-enacted election laws"). Therefore, the Court correctly found "that the injunction would not disserve the public interest, and, to the contrary, will serve the public interest by protecting individuals' right to vote with help from their chosen assistors under Section 208 and their fundamental right to vote." ECF No. 1173 at 101. A court "should be extremely reluctant to have an election take place under a law that a district court has found, and that [the Fifth Circuit] may find, is discriminatory." *Veasey v. Perry*, 769 F.3d 890, 896 (5th Cir. 2014) (Costa, J., concurring). In balancing the public's interest in ensuring that all eligible voters have the assistance necessary to vote and its interest (if any) in enforcement of the State's laws, the district court concluded that "permitting the State Defendants and local prosecutors to continue to threaten criminal enforcement is unlikely to serve the public interest." ECF No. 1173 at 108.

The Court's injunction preserves the status quo in election procedure while preventing further injury to voters and potential assistors. The Court stayed the portions of its injunction that

require revisions to the Secretary's forms and mail ballot inserts or that would require re-training election officials regarding the Oath and Assistor Disclosure requirements for in-person and mail-in voting until after the November 2024 election. But, the Court, immediately enjoined criminal enforcement of the Assistance Provisions because "*Purcell* does not require courts to double-down on the unjust effects of unlawful election rules by continuing to permit criminal enforcement of those provisions." ECF No. 1173 at 106.

With the Court's injunction in place, the same forms would be used for the November 2024 election and the process for assistors and voters would remain unchanged. However, potential assistors would be free from the threat of criminal prosecution, which previously chilled participation in the political process and violated of federal law. The chilling effect of an unlawful law is not a part of the status quo that it is in the public interest to preserve. Consistent with the public interest, the Court's "focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 2018) ("If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury."). Because a stay would stifle political participation and compound the harm to Plaintiffs, Section 208 voters, and assistors, it would harm the public interest. Like all other factors, the public interest weighs heavily against a stay.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Stay should be denied.

Dated this 18th day of October, 2024.

Respectfully submitted,

/s/ *Jennifer Holmes*
Jennifer A. Holmes*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
jholmes@naacpldf.org

Amir Badat*
Victor Genecin*
Breanna Williams*
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
abadat@naacpldf.org
vgenecin@naacpldf.org
bwilliams@naacpldf.org

Shira Wakschlag*
The Arc of the United States, Inc.
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org

Kenneth E. Broughton
Texas Bar No. 03087250
Reed Smith LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
Facsimile: (713) 469-3899
kbroughton@reedsmith.com
kpippin@reedsmith.com

Sarah Cummings Stewart
Texas Bar No. 24094609
Reed Smith LLP
2850 N. Harwood Street, Suite 1500

Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
sarah.stewart@reedsmith.com

J. Michael Showalter*
ARENTFOX SCHIFF LLP
South Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: (312) 258-5561
j.michael.showalter@afslaw.com

Derek Ha*
ARENTFOX SCHIFF LLP
44 Montgomery St., 38th Floor
San Francisco, CA 94104
derek.ha@afslaw.com
Tel: (415) 757-5500
derek.ha@afslaw.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs Houston Area Urban League; Delta Sigma Theta Sorority, Inc.; The Arc of Texas; and Jeffrey Lamar Clemmons*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2024, a true and correct copy of the foregoing document was served on all counsel of record by filing with the Court's CM/ECF No. system.

*/s/ Jennifer A. Holmes*
Jennifer A. Holmes