IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., § | | |
| *Plaintiffs,* § | | |
| § | | |
| v. § | | 5:21-CV-0844-XR |
| § | | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., § | | |
| *Defendants.* § | | |

### ORDER ON MOTION FOR STAY OF THE COURT'S
### PERMANENT INJUNCTION AS TO S.B. 1 §§ 6.03, 6.04, 6.05, 6.06, 6.07, 7.04

On this date, the Court considered the State Defendants' opposed motion to stay pending appeal (ECF No. 1175) of the Court's order enjoining their enforcement of certain provisions of the Texas Election Code bearing on voter assistance—S.B. 1 §§ 6.03–6.07 and 7.04 (together, the "Assistance Provisions")—as preempted by Section 208 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10508. For the reasons stated herein, the State Defendants' motion (ECF No. 1175) is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND

As described in greater detail below, on October 11, 2024, this Court issued its Findings of Fact and Conclusions of Law as to Plaintiffs' Section 208 claims, concluding that Plaintiffs had prevailed on their challenges to S.B. 1 § 6.06 (the "Ban on Compensated Assistance") and § 7.04 (the "Canvassing Restriction") and largely prevailed on their challenges to S.B. 1 § 6.04 (the "Oath of Assistance") and §§ 6.03, 6.05, and 6.07 (the "Assistor Disclosures"). *See* ECF No. 1173 (the "Section 208 Order").[1]

---

[1] The Court further concluded that Plaintiffs lacked standing to challenge S.B. 1 § 6.01, which requires drivers of seven or more curbside voters to complete a disclosure form. Section 208 Order at 65–67.

In light of the impending November 2024 general election, the Court partially stayed injunctive relief bearing on the Oath of Assistance and the Assistor Disclosures as implemented by the Secretary of State and local election officials under *Purcell v. Gonzalez*, based on the risk of "voter confusion" about last-minute changes to those requirements. 549 U.S. 1, 5–6 (2006).

The Court declined to similarly stay its order enjoining the State Defendants and local prosecutors from enforcing S.B. 1 §§ 6.04, 6.05, 6.06, and 7.04 through criminal investigations and proceedings (and civil proceedings against election officials) because such proceedings do not require any last-minute changes to election procedures that could confuse voters. Section 208 Order at 102–106. Rather, "[t]he effect of an injunction prohibiting criminal enforcement is limited to the criminal realm. Indeed, injunctions against criminal enforcement are, by their nature, removed in space and time from the mechanics and procedures of voting." *Id.* at 105. The Court acknowledged that permitting the Oath and Assistor Disclosure requirements to remain in effect during the November 2024 general election would continue to have some chilling effect on voter assistance but held that "*Purcell* does not require courts to double-down on the unjust effects of unlawful election rules by continuing to permit criminal enforcement of those provisions." *Id.* at [2]

The State Defendants filed a Notice of Appeal of the Court's Order, followed by a motion to stay the order (ECF No. 1175), which the Court now considers. The State Defendants seek to stay the Court's order pending the general election in November 2024.[3] They also seek a stay pending appeal of all relief against them awarded in the Section 208 Order.

---

[2] *See, e.g.*, *Chancey v. Ill. State Bd. of Elections*, 635 F. Supp. 3d 627, 629–30, 644 (N.D. Ill. 2022) (declining to apply *Purcell* less than a month before an election, reasoning that an injunction of the campaign finance law at issue "[did] not implicate the same concerns" as *Purcell*, because "it is difficult to imagine . . . that if relief is granted, then voters will be confused about whether, how, where, when, or for whom they can vote").

[3] The State Defendants assert that *Purcell* requires a stay of the Court's injunction of Section 6.07, which requires the Secretary to add a space to the mail ballot carrier envelope for anyone providing ballot-dropping assistance to disclose their relationship to the voter. ECF No. 1175 at 9. The Court agrees—this is why the Section 208 Order explicitly stayed the injunction of Section 6.07 until after the November 2024 election. *See* Section 208 Order at 101.

**The Section 208 Order**

The Supremacy Clause of the U.S. Constitution requires preemption of any state statute that, when enacted, makes compliance with both federal and state law impossible or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting Section 208. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal citations omitted). Determining whether state laws in fact frustrate Congress's purpose is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Section 208 of the Voting Rights Act provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C. § 10508. Section 208 creates a federally guaranteed right of an assistant of the voter's choice when "voting," which includes "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration . . . or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast[.]" 52 U.S.C. § 10310(c)(1).

Congress enacted Section 208 "[t]o limit the risks of discrimination" against voters with who require assistance and "avoid denial *or infringement* of the[ir] right to vote." S. Rep. No. 97-417 at 62 (May 25, 1982) (emphasis added). The Senate Committee "concluded that the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write, is to permit them to bring into the voting booth a person whom the voter trusts and who cannot intimidate him." *Id.* at 472. While the Committee recognized the states' rights "to establish necessary election procedures . . . designed to protect the rights of voters," it

3

clearly stated that any such procedures must "be established in a manner which *encourages greater participation* in the electoral process." *Id.* at 241 (emphasis added).

### Section 6.04 - The Oath of Assistance

Section 6.04 of S.B. 1 amends the oath that a person assisting a voter is required to swear (the "Oath of Assistance" or "Oath") by adding the underlined and bolded language:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; [I will confine my assistance to **reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot**;][4] I will prepare the voter's ballot as the voter directs; **I did not pressure or coerce the voter into choosing me to provide assistance**; [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted**.

TEC § 64.034. An offense under this subsection is a state jail felony, punishable by up to two years in prison and a fine of up to $10,000 and will result in the rejection of the voter's ballot. TEC § 276.018(a)(2)–(b); TEX. PENAL CODE §§ 12.35(a), (b).[5]

The Oath of Assistance must be printed on BBM carrier envelopes and signed by the assistor. TEC § 86.013(e); *see* LUPE-009 (form BBM carrier envelope prescribed by the Secretary

---

[4] The requirement that a person who assists a voter must confine assistance to reading the ballot, marking the ballot, and directing the voter to do the same was enjoined in *OCA of Greater Houston v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *4 (W.D. Tex. June 6, 2022).[4] Accordingly, this Court held that "all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined . . .are moot." *LUPE v. Abbott*, 614 F. Supp. 3d 509, 513 n.3 (W.D. Tex. 2022).

The United States brought a Section 208 claim in this consolidated action challenging the oath language enjoined in *OCA-Greater Houston v. Paxton (OCA-Greater Hous. II)*, No. 1:15-CV-679-RP, 2022 WL 2019295, (W.D. Tex. June 6, 2022), which was rendered moot by the injunction. See *LUPE v. Abbott*, 614 F. Supp. 3d at 513 n.3.

[5] An assistor must take the Oath of Assistance for each voter she assists. Election officials, on the other hand, are not required to take the Oath or complete the disclosure form. *See* TEC § 64.034. When a voter receives assistance from an election official, however, Texas law permits poll watchers to be present at the voting station, and the watchers are entitled to examine the ballot before it is deposited in the ballot box. TEC § 33.057(a).

of State). Providing mail ballot assistance without signing the Oath is a state jail felony unless the assistor is a close relative of the voter or is physically living with the voter when the assistance is provided. *See* TEC § 86.010(h)(1).

At trial, the Court heard credible testimony from members of The Arc of Texas—one of the HAUL Plaintiffs—who, despite their qualifying disabilities, voted without assistance due to the threat of criminal enforcement of the Oath's new requirements against their chosen assistors. Section 208 ¶¶ 113–35. Specifically, these voters were deterred from requesting—and their assistors from providing—assistance due to the following language in the amended Oath of Assistance (the "Enjoined Oath Language"):

- "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance";

- "I did not pressure or coerce the voter into choosing me to provide assistance; and" and

- "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."

Assistors (and other voters) confirmed the deterrent effect of these statements. Section 208 Order ¶¶ 136–56.

Accordingly, the Court concluded that the statements deterring assistance are preempted by Section 208. Section 208 Order at 85–91.[6]

### Sections 6.03, 6.05, 6.07 – Assistor Disclosures

Sections 6.03, 6.05 and 6.07 of S.B. 1 added provisions imposing new disclosure and documentation requirements on persons who provide voter assistance.

- Section 6.03 provides: "A person, other than an election officer, who assists a voter in accordance with this chapter is required to complete a form stating: (1) the name and

---

[6] The Court added that "[n]othing in this order should be read to enjoin the Attorney General, the Secretary, or the County District Attorneys from enforcing the surviving portions of the Oath under TEC § 276.018(b)." Section 208 Order at 107.

5

address of the person assisting the voter; (2) the relationship to the voter of the person assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." TEC § 64.0322(a).[7]

- Section 6.05 amended the Election Code to impose the same requirements on mail-ballot assistors, mandating that they disclose their relationship with the voter and any compensation from a candidate, campaign, or political committee on the assisted-voter's mail ballot carrier envelope. TEC § 86.010(e).[8]

- Section 6.07 amends the disclosures on the mail ballot carrier envelopes that must be completed by anyone providing ballot-dropping assistance to add a space indicating the assistor's relationship to the voter (along with the person's name and address, which were already required). TEC § 86.013(b).[9]

Providing mail ballot assistance without completing the Assistor Disclosures is a state jail felony, punishable by up to two years' confinement and a fine of up to $10,000 and may result in the rejection of the voter's ballot. TEC § 86.010(g); TEX. PENAL CODE §§ 12.35(a), (b). The criminal consequences are inapplicable, however, to mail-ballot assistance provided by a close relative of the voter or a person who was physically living with the voter when the assistance was provided. *See* TEC § 86.010(h)(2).

At trial, assistors and county election officials testified that the form requirement, coupled with the Oath of Assistance, created delays during in-person voting. Section 208 Order ¶ 159. The Court also heard credible testimony from several witnesses for the LUPE Plaintiffs and one of the HAUL Plaintiffs—Delta Sigma Theta Sorority, Inc. ("DST")—that their members have been

---

[7] The Texas Secretary of State must prescribe the Assistor Disclosure form. TEC § 64.0322(b). As prescribed by the Secretary, the form also contains the "Oath of Assistance," discussed below. *See* LUPE-189 ("Oath of Assistance Form"). Before S.B. 1, the Election Code provided that, if assistance was provided by a person of the voter's choice at a polling place, an election officer must enter the person's name and address on the poll list beside the voter's name. *See* TEC § 64.032(d). A person providing mail-ballot assistance was required to provide his or her signature, printed name, and a residential address. *See* TEC § 86.010(e); JEX-1 at 53.

[8] The Election Code already required assistors to provide their names and addresses on the carrier envelope. *See id.*; JEX-1 at 53.

[9] As prescribed by the Secretary of State, the form mail ballot carrier envelope does not distinguish between assistance in completing the ballot and ballot-dropping assistance. *See* LUPE-009 ("If you are assisting a voter by depositing the Carrier Envelope in the mail or with a common or contract carrier, you must complete the assistant section below.").

6

deterred from providing assistance to voters, both by mail and at the polls, due to the Assistor Disclosure and Oath requirements. *See* Section 208 Order ¶¶ 164–68.

Accordingly, the Court concluded that the Assistor Disclosure form required by S.B. 1 § 6.03 and Voter Relationship Disclosure requirement under §§ 6.03, 6.05, and 6.07 are preempted by Section 208.

### Sections 6.06 and 7.04 – Bans on Compensated Mail-Ballot Assistance

- Section 6.06 of S.B. 1 makes it a state jail felony, for a person who is not an attendant or caregiver previously known to the voter, to compensate or offer to compensate another person—or to solicit, receive, or accept compensation—for assisting voters with their mail-in ballots. TEC §§ 86.0105(a), (c). S.B. 1 does not define "attendant" or "caregiver," Tr. at 1907:3–6, nor has the Secretary published any guidance or training on how to interpret either term. Tr. at 1907:7–12, 1908:17–24. For the purposes of Section 6.06, "compensation" means "anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee, accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value." *Id.*; *see also* TEX. PENAL CODE § 38.01(3).

- Section 7.04 of S.B. 1 (the "Canvassing Restriction")[10] creates three new, third-degree felonies under the Election Code, each imposing up to ten years in prison and a fine of up to $10,000 on anyone who gives, offers, or receives some "compensation or other benefit" for an "in-person interaction" with a voter in the "physical presence" of an official ballot or a ballot voted by mail, "intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2). The Canvassing Restriction does not define "compensation" or "physical presence" and nothing in its text limits its application to instances of voter fraud, coercion, or harassment, or speech that occurs while a voter is actively completing their ballot.

---

[10] While Section 7.04 of S.B. 1 sets out a ban on "vote harvesting," *see* TEC § 276.015, Plaintiffs generally refer to the provision as a "ban on in-person canvassing" or "voter interaction ban." *See, e.g.*, ECF No. 848 ¶ 97; ECF No. 849 ¶ 296. In the Court's view, all three characterizations are misleading in multiple respects. Regardless of how the term is defined in the Election Code, the scope of Section 7.04's proscriptions reach conduct well beyond any common understanding of "vote harvesting." On the other hand, the provision does not ban canvassers from interacting with voters altogether—it prohibits *compensated* interactions in the *presence of a mail ballot*. To describe Section 7.04's proscription more accurately and impartially, the Court refers to the challenged provisions as the "Canvassing Restriction" throughout this order.

Section 7.04 of S.B. 1 also added TEC provisions addressing the solicitation of applications to vote by mail (TEC § 276.016), the distribution of early voting ballots and balloting materials (TEC § 276.017), and unauthorized alterations to election procedures (TEC § 276.019). For the purposes of this order, however, "Section 7.04" refers only to the Canvassing Restriction, codified at TEC § 276.015.

7

Trial testimony demonstrated widespread confusion about the meaning of both Sections 6.06 and 7.04. Despite this confusion, state officials have not offered any definitive answers about the scope of the Canvassing Restriction. Tr. at 1914:7–14, 1924:7–18; 1924:24–1925:3. And the answers provided by the State Defendants' witnesses conflicted with one another and with the State Defendants' positions in their post-trial briefing.[11]

To avoid putting staff members and volunteers (who often receive nominal gifts) in legal jeopardy under either provision, several Plaintiff organizations that provided mail-ballot assistance in their communities have stopped providing such assistance. Section 208 Order ¶¶ 183–88. Their staff members and volunteers must now turn away voters who have chosen them as assistors.

The Court thus concluded that Sections 6.06 and 7.04 are preempted by Section 208 because they categorically prohibit voters from choosing community organizations' staff, organizers, and volunteers as assistors because they are compensated for their work.

## DISCUSSION

I.  ***Purcell* Stay**

The State Defendants first seek a stay of the Court's injunction against criminal enforcement of the enjoined portions of the Assistance Provisions under *Purcell*, which provides that, as a general rule, federal courts "should not alter state election laws in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh,

---

[11] For example, former Election Division Director Keith Ingram opined that providing volunteers with bus fare was not "compensation" because "[t]hey can get their expenses reimbursed. That's not payment." Tr. at 1904:1–2. The State's chief voter fraud prosecutor, Jonathan White, on the other hand, testified that he would need to perform *legal research* to determine what kinds of economic benefits would violate the provision. Tr. at 3992:20–3993:21 (conceding that he would need to "review[] the case law" to determine whether a meal, bus fare, or a gift bag containing a t-shirt constitute prohibited compensation).

Similarly, Jonathan White, former Chief of the OAG Election Integrity Division, testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is a subterfuge for voter fraud. Tr. at 3995:11–24. The State Defendants, on the other hand, assert that such assistance falls outside the purview of the Canvassing Restriction because it is not "designed to deliver votes for or against a specific candidate or measure." ECF No. 862 ¶ 479.

J., concurring) (upholding Seventh Circuit's stay of injunction entered six weeks before the general election).

*Purcell* does not constitute an absolute bar on all injunctive relief in the runup to an election. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). Rather, it directs courts to consider whether: (1) "the underlying merits are entirely clearcut in favor of the plaintiff;" (2) "the plaintiff would suffer irreparable harm absent the injunction;" (3) the "plaintiff has [] unduly delayed bringing the complaint to court;" and (4) "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.*; *see also Robinson v. Ardoin*, 37 F.4th 208, 228 n.11 (5th Cir. 2022) (per curiam) (citing *Merrill* concurrence as authority on *Purcell*).

The Court already concluded that Plaintiffs satisfied the first three elements with respect to their successful Section 208 challenges, but determined that enjoining election officials from using the forms implementing S.B. 1 §§ 6.03–6.05 and 6.07 (as prescribed by the Secretary) would not be feasible before the election. Section 208 Order at 101.

On October 15, 2024, the Fifth Circuit stayed an earlier order of this Court enjoining criminal enforcement of the Canvassing Restriction as an unconstitutional burden on the rights to free speech and due process under the First and Fourteenth Amendments to the Constitution. *See La Union del Pueblo Entero v. Abbott*, No. 24-50783, ECF No. 112-1 ("Stay Order").[12] Drawing

---

[12] Despite the panel's apparent concern that the Court "did not see fit" to enjoin the Canvassing Restriction, which has "been on the books for more than three years," until September 2024, the Court observes that Plaintiffs never sought a preliminary injunction of the Canvassing Restriction. *Cf. All. for Hippocratic Med. v. Food & Drug Admin.*, 78 F.4th 210 (5th Cir. 2023) (Ho, J., concurring) (suggesting that an FDA determination that had been "on the books" for over two decades should be enjoined). Based on principles of judicial restraint and impartiality, this Court generally refrains from issuing injunctive relief in the absence of a fully briefed motion. *But see United States v. Texas*, No. 24-50149, ECF No. 43 (5th Cir. Mar. 2, 2024) (issuing, without explanation and without considering briefing by the United States or private plaintiffs, an indefinite administrative stay of order enjoining state law contravening 150-year-long status quo that states are excluded from regulating entry and removal and postponing resolution of State's stay motion).

Moreover, the Supreme Court has counseled that "the importance of First Amendment protections" is at its "zenith" during elections. *Meyer v. Grant*, 486 U.S. 414, 425 (1988). Accordingly, in the months that expired between the

on caselaw applying *Purcell*,[13] the Court reasoned that *Purcell*'s logic extends only to "mechanics and procedures of election law applicable to voting." ECF No. 1157 at 76 ("First Amendment Order"). The Court thus concluded that *Purcell* did not require a stay as to criminal enforcement of the Canvassing Restriction because:

> unlike an order requiring affirmative changes to the election process before it occurs, an injunction against enforcement proceedings is removed in space and time from the mechanics and procedures of voting. Prosecutions simply do not occur at the polls (or, as the case may be, during block-walking and candidate forums); they require investigation, evidence, and due process.

First Amendment Order at 76. The Fifth Circuit rejected the Court's conclusion, invoking Justice Kavanaugh's discussion of the *Purcell* principle in the context of a gerrymandering case. Stay Order at 4–5 (citing *Merrill*, 142 S. Ct. at 879–80 (Kavanaugh, J., concurring)).

Respectfully, it is not clear how the panel's citation to *Merrill* supports a contrary conclusion. Injunctive relief in gerrymandering cases plainly affects the "mechanisms and procedures" of the voting process—changes to electoral maps affect which candidates appear on a voter's ballot (and, accordingly, require election officials to print new ballots). Voters who research their pre-injunction candidates before heading to the polls will necessarily be confused when they are confronted with a different slate of candidates at the ballot box. Indeed, Justice

---

closing arguments in this action in February 2024—and following, over the summer, a Supreme Court opinion bearing on standing, *see All. For Hippocratic Med.,* 602 U.S. at 395 (reversing the Fifth Circuit's conclusion that plaintiffs had standing to challenge FDA determination based on their injuries of "conscience"), and an opinion from the Fifth Circuit bearing on questions of sovereign immunity relevant to the constitutional challenges to Section 7.04, *Mi Familia Vota v. Ogg*, 105 F.4th 313 (5th Cir. 2024)—the Court prioritized its ruling on Plaintiffs' First Amendment challenges. *Cf. United States v. Paxton*, No. 23-50885, ECF No. 31 (December 6, 2023 order granting administrative stay of injunction issued in 53-page order), ECF No. 80 (granting stay pending appeal on December 15, 2023), ECF No. 194 (granting the State Defendants and Intervenor-Defendants an extension to file their reply brief until September 17, 2024, over ten months after administrative stay of the Court's injunction).

[13] *See* ECF No. 1157 at 76 n.46 (citing *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (extension of absentee ballot deadline); *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (mask mandate exemption for voters); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 244 (procedures for authenticating mail-in ballot signatures); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (new ballot type eliminating straight-ticket voting); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 411–12 (5th Cir. 2020) (absentee ballot eligibility requirements); and *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (extension of absentee ballot deadline)).

Kavanaugh's concurrence in *Merrill* devotes extensive attention to the *practical effects* of enjoining a districting plan on election administration:

> With respect to the request for a stay of the District Court's injunction for the 2022 elections, the State argues that the District Court's injunction is a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters, among others. The State says that those individuals and entities now do not know who will be running against whom in the primaries next month. Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. Indeed, at this point, some potential candidates do not even know which district they live in. Nor do incumbents know if they now might be running against other incumbents in the upcoming primaries.
>
> On top of that, state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges. The District Court's order would require heroic efforts by those state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion.

*Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

The panel suggested that the Canvassing Restriction affected the mechanics of voting by "protecting voter privacy when it comes to mail-in ballots." Stay Order at 5.[14] Even this characterization is somewhat confusing, however, as nothing in the Canvassing Restriction protects voters' privacy, even *while they are voting*, from individuals who are paid to advocate *against* a candidate or ballot measure or are paid to advocate *for or against a political party*, from uncompensated advocates, or from non-advocates who happen to be nearby while a voter casts his or her mail ballot. *See* First Amendment Order at 65. Moreover, nothing in the Canvassing Restriction limits its application to advocacy in the presence of live ballots that are being actively

---

[14] Without addressing any of the Court's findings to the contrary, *see* First Amendment Order at 62–64 ("Comparisons to Texas's electioneering regulations are inapposite."), the Fifth Circuit determined that the State's "theory" of the Canvassing Restriction was likely to prevail because it is analogous to similar protections at the voting booth. Stay Order at 2.

11

voted or excludes the voters it purportedly protects from criminal liability. *Id.* at 56–57; *cf.* Stay Order at 3 (concluding without explaining how the Court's findings were erroneous that "[t]he law has no effect outside of the voting process."). A canvasser who uses her own mail ballot as an example during conversations with voters faces up to 10 years in prison, up to $10,000 in fines, and the rejection of her mail ballot, even if she ultimately completes her mail ballot in private. First Amendment Order at 56.

These findings underscored the Court's conclusions that the Canvassing Restriction is not "narrowly tailored" to a compelling government interest (First Amendment Order at 60–66) and that enjoining the Canvassing Restriction would serve the public interests of restoring clarity to the law and vindicating the right to free speech (ECF No. 1161 at 11).[15] Still, nothing in the Court's injunction of the Canvassing Restriction changed the options on voters' ballots or the manner in or deadline by which their ballots must be cast. Nonetheless, the Fifth Circuit enjoined the Court's injunction.

Here again, nothing in the Court's order changes the substance or mechanics of the Oath of Assistance or the Assistor Disclosure requirements with respect to either mail-in voting or in-person voting.[16] Nonetheless, based on the panel's understanding of *Purcell* (and implicit

---

[15] The State Defendants themselves have taken inconsistent positions on the question of whether Section 7.04 reaches voter assistance activity. *Compare* ECF No. 862 ¶ 653 (arguing that nothing prevents paid canvassers from providing voter assistance) with *La Union del Pueblo Entero v. Abbott*, No. 22-50775, ECF No. 92 at 2 (5th Cir. Oct. 9, 2024) (suggesting that an injunction against criminal enforcement of the Canvassing Restriction would somehow impact selectively quoted instructions pertaining to the Assistor Disclosure requirements). If, as the State Defendants would have it, the Canvassing Restriction always permitted paid canvassers to provide mail-ballot assistance, enjoining criminal enforcement of the Canvassing Restriction should have no impact on how canvassers provide such assistance.

[16] The Election Code itself acknowledges a distinction between its administrative procedures and their enforcement. For example, the Oath of Assistance, printed on the mail ballot carrier envelope and Oath of Assistance Form, does not reflect the scienter requirement set forth in the criminal enforcement provision. *Compare* LUPE-009, LUPE-189, and TEC § 64.034 with TEC § 276.018. Likewise, the Election Code—and the forms that implement it—requires *all* assistors to complete the Assistor Disclosures. *See* LUPE-009, LUPE-189, and TEC § 64.0322. The provision imposing criminal liability on *some* mail-ballot assistors—but not others—who knowingly fail to comply with the requirements is codified under a separate provision, TEC § 86.010(h)(2), but neither the distinction between types of assistors nor the scienter requirement appears on the BBM carrier envelope. *See* LUPE-009.

disagreement with the Court's findings), the Court cannot discern a principled distinction between the Fifth Circuit's stay of the injunction entered in the First Amendment Order and the *Purcell* stay requested by the State Defendants here.[17]

Accordingly, the Court's injunctions prohibiting the State Defendants from enforcing (1) the Enjoined Oath Language of S.B. 1 § 6.04, (2) the Voter Relationship Disclosure requirement of § 6.05, (3) the Ban on Compensated Assistance of § 6.06, and (4) the Canvassing Restriction of § 7.04 are **STAYED** until after the November 2024 election.

## II.     Stay Pending Appeal[18]

A stay pending appeal is "extraordinary relief" for which defendants bear a "heavy burden." *See Vote.Org v. Callanen*, 39 F.4th 297, 300 (5th Cir. 2022) ("extraordinary relief"); *Nken v. Holder*, 556 U.S. 418, 433–34 (2009) ("The party requesting a stay bears the burden of showing that the circumstances justify [it]."). "A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (internal quotations and citations omitted); *Purcell*, 549 U.S. at 5–6 (vacating Ninth Circuit's

---

[17] In their motion, the State Defendants incorrectly assert that the injunction as to the criminal prosecutions applies "only to certain counties." ECF No. 1175 at 10. Not so. The Court clearly stated in the Section 208 Order that the State of Texas is among the Defendants to this action and that the State Defendants (including all county and local prosecutors, as agents of the State of Texas for the purposes of criminally enforcing the Election Code) were enjoined from enforcing the Assistance Provisions to the extent described in the injunction. *See, e.g.*, Section 208 Order at 109 ("All county and local prosecutors are agents of the State of Texas in prosecuting crimes under the Election Code.") (citing *State v. Stephens*, 663 S.W.3d 45, 52 (Tex. Crim. App. 2021)); *see also OCA-Greater Hous.*, 867 F.3d at 616 (directing the district court to craft a revised injunction against the *State of Texas*).

[18] The Fifth Circuit appears to have conflated the standards for a stay under *Purcell* with the standards for a stay pending appeal. *See* Stay Order at 3 (stating that the "traditional" standard for a stay does not apply in the period close to an election). There is no reason to believe that the practical considerations applicable to a *Purcell* stay—which is by definition limited in time to the period *before* an election—affect the traditional standards for a stay pending appeal *after* the election. *See Merrill*, 142 S. Ct. at 879 (Kavanaugh, J., concurring) ("The stay order is not a ruling on the merits, but instead simply stays the District Court's injunction *pending a ruling on the merits.*") (emphasis in original). This Court has ruled on the merits. This Court has already stayed the injunction pending the November 2024 election. Thus, the traditional standard applies to the State Defendants' motion for a stay pending appeal *following* the November 2024 election. The mere timing of a trial court's order does not lower the standard applicable to an appellant's motion for a stay pending appeal.

13

injunction of voter identification law a month before an election for failing "to give deference to the discretion of the District Court," noting that "[t]here has been no explanation given by the Court of Appeals showing the ruling and findings of the District Court to be incorrect.").

In determining whether to grant a motion for stay pending appeal, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

### A.     The State Defendants are unlikely to prevail on the merits.

To begin, the State Defendants are unlikely to prevail on the merits of their appeal of the Court's conclusion that Sections 6.06 and 7.04 of S.B. 1 are preempted by Section 208 because they categorically exclude a class of assistors beyond the two groups identified in the text of Section 208. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 609–614 (5th Cir. 2017) (affirming district court's conclusion that a state law narrowing the class of eligible *translators* was preempted by Section 208 because it necessarily narrowed the class of eligible *assistors* beyond the two categories identified in the text of Section 208). The Fifth Circuit has confirmed that a "state cannot restrict [Section 208's] federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined." 867 F.3d at 615.

Section 6.06 and 7.04 precludes voters from choosing paid staff members and volunteers of trusted community organizations as their assistors. By exempting paid caregivers and attendants "to ensure that Section 6.06 would not interfere with their duties," as the State Defendants describe it (ECF No. 862 ¶ 653), Section 6.06 impliedly *does* interfere with the duties of *other* professionals who might provide mail-ballot assistance in the ordinary course of their employment. It would

14

prevent a legal aid attorney from translating his client's mail ballot and an activities director at an assisted living facility from helping disabled voters cast their mail ballots. Nothing in Section 208 permits the State of Texas to prevent voters from choosing such assistors.

The OCA and LUPE Plaintiffs have standing to challenge S.B. 1 § 6.06 because it directly regulates their conduct—paying salaried staffers and volunteers who receive nominal compensation to provide mail-ballot assistance—and has prevented them from providing voter assistance services in their communities. *See* Section 208 Order at 74–75. The LUPE and LULAC Plaintiffs have standing to challenge S.B. 1 § 7.04 for the very same reasons. *Id.* at 75–75.

At trial, Plaintiffs established that Sections 6.03, 6.04, 6.05, and 6.07 of S.B. 1 have deterred voters from requesting—and their chosen assistors from providing—voting assistance guaranteed under Section 208 due to the credible threat of enforcement. These laws thus "pose[] an obstacle to Congress's clear purpose to allow the voter to decide who assists them at the polls," *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1085 (W.D. Ark. 2022), *appeal docketed*, No. 22-2918 (8th Cir. Sept. 12, 2022); *see also, e.g.*, *OCA-Greater Hous.*, 867 F.3d at 614–15; *see also Cummings v. Missouri*, 71 U.S. 277, 278 (1866) ("[W]hat cannot be done directly cannot be done indirectly.").

Due to its deterrent effect, the Enjoined Oath Language leaves many in-person voters in need of assistance with a choice between three dignitary harms—voting without any assistance, losing their privacy while voting with assistance from an election official, or foregoing the voting process altogether. *See* Tr. at 707:25–708:14 (Toby Cole) (describing the loss of his privacy when an official prevented his assistant from helping him vote as a violation); *see also* Tr. at 3293:1–13 (Amy Litzinger) (same); *see also* Tr. at 3245:18–3246:10 (Jodi Nunez Landry) (same). It imposes a similar choice on many mail voters. This is precisely the choice that the right to assistance under

Section 208 was intended to avoid: "As a result, people requiring assistance in some jurisdictions are forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote. The Committee is concerned that some people in this situation do in fact elect to forfeit their rights to vote." S. Rep. No. 97-417 at 472. The Enjoined Oath Language is thus preempted by Section 208.

The Court heard credible testimony from several voters with disabilities (and members of The Arc of Texas) who voted without assistance due to the threat of enforcement of the Enjoined Oath Language. Section 208 Order ¶¶ 113–35. The Court also heard credible testimony from several witnesses for the LUPE Plaintiffs and one of the HAUL Plaintiffs (DST) that their members have been deterred from providing assistance to voters, both by mail and at the polls, due to the Assistor Disclosure and Oath requirements. *See* Section 208 Order ¶¶ 138–68. These organizations have standing to challenge the Assistor Disclosure and Oath requirements because those provisions have "perceptibly impaired" their voter assistance services, which are central to their respective missions. *See id.* at 71–73; *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).[19] Oddly, the State Defendants take issue with the Court's conclusion that the HAUL Plaintiffs have standing to challenge Section 6.07 based on its analysis of DST members' unwillingness to provide mail-

---

[19] The effect on the organization's activities need not be great. *OCA-Greater Hous.*, 867 F.3d at 612 ("The injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle.") (quotations omitted); *see also Havens*, 455 U.S. at 379 (recognizing impairment of organization's housing referral services based on real estate company's provision of false information to organization's black employees on four occasions).

Nor do the organization's activities need to be profit-driven. *See Havens*, 455 U.S. at 379 n.20 ("That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not [affect] the nature of the injury suffered, and accordingly does not deprive the organization of standing."); *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977) (recognizing that non-profit's interest in building a low-cost housing project arose "not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce" and concluding that "[t]he specific project [the plaintiff] intends to build, whether or not it will generate profits, provides that 'essential dimension of specificity' that informs judicial decisionmaking").

16

ballot assistance due to the disclosure requirements. *See* ECF No. 1175 at 7. But, of course, DST is *one of* the HAUL Plaintiffs, *see* ECF No. 199 (HAUL Compl.) ¶ 324, and when multiple plaintiffs seek identical injunctive relief, only one of them needs to establish standing. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

The "Voter Relationship Disclosure" requirement under S.B. 1 §§ 6.03 and 6.05 (and implemented by § 6.07) discourages community organizations (including Plaintiffs DST and LUPE) from providing voter assistance services by implicitly requiring that they have a preexisting, articulable relationship to the voters they assist *beyond* "assistor." The Supreme Court has recognized the deterrent effect that disclosure requirements can have on associative and civic activities. *See, e.g.*, *Shelton v. Tucker*, 364 U.S. 479, 486 (1960); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019). Jonathan White, former Chief of the OAG Election Integrity Division, confirmed that disclosure requirements distinguished between what he characterized as "normal assistance" by family members or caregivers and assistance by workers without a preexisting relationship to voters.[20] Tr at 3987:1–23.

But nothing in the text of Section 208 suggests that Texas can adopt rules that discourage certain categories of assistors by, e.g., subjecting them to greater scrutiny, greater administrative burdens, and greater penalties for non-compliance than the state's preferred assistors. Some voters may prefer to vote with the assistance of a close family member or friend. Others might be more comfortable receiving help from a stranger who has been trained by a trusted community

---

[20] Despite Mr. White's impression that voter assistance provided by members of trusted community organizations (rather than, e.g., family members or caregivers) is somehow suspect, in 2020, approximately one-fifth of voters with disabilities received voting assistance from non-family members. LUPE-002 ¶ 102. And even a caregiver who provides mail ballot assistance will be subject to criminal sanctions for failing to disclose his relationship to the voter, unless he is *also* a close relative of or lives with the voter. *See* TEC § 86.010(h)(2).

organization to provide high-quality voting assistance. Such an assistor may be more familiar with the voting process (and thus help the voter avoid common pitfalls) and, as a stranger serving multiple voters in an election period, may be less likely to remember or care how an individual voter casts his or her ballot. Nothing in Section 208 permits the State of Texas to second-guess the basis for the voter's selection.

In short, the State Defendants are unlikely to succeed on the merits of their appeal.

**B.     The State Defendants will not suffer irreparable harm absent a stay.**

The State Defendants have not produced "powerful evidence of harm to [their] interests" to tip the equities in their favor. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (2012).

States, to be sure, have an "important state interest" in "[e]nsuring that every vote is cast freely," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2341 (2021). But the Election Code already imposes criminal penalties against "effort[s] to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," TEC § 276.013, or voting (or attempting to vote) a ballot belonging to another person, or attempting to mark another person's ballot without their consent or specific direction, TEC § 64.012. Similarly, it is already a crime for a voting assistor to knowingly "suggest[] by word, sign, or gesture how the voter should vote" while providing such assistance, "prepare[] the voter's ballot in a way other than the way the voter directs or without direction from the voter," or assist a voter who is ineligible for assistance or has not requested assistance. TEC § 64.036. And nothing in the Court's injunction against enforcement of the Enjoined Oath Language prevents investigators and prosecutors from pursuing violations of the surviving provisions of the Oath of Assistance.

At trial, the State Defendants failed to offer even *hypothetical* scenarios in which the Assistance Provisions would serve the government's interest in ways that are not already accomplished by other criminal provisions of the Election Code, let alone evidence that these provisions actually operate to protect voters. The Assistance Provisions impose criminal sanctions on assistors who help voters cast ballots in accordance with the voters' wishes. Tr. at 3995:11–3997:5. How will the State's interests—or the public's, for that matter—be irreparably harmed by its inability to prosecute such assistors?

Indeed, it is worth noting that, confronted with extensive testimony by voters with disabilities, assistors, election officials, and an expert witness establishing that the Assistance Provisions have deterred assistance, the State Defendants' defense did not include a single witness from the population that these measures were purportedly meant to protect. The question is not whether the State Defendants *believe* the Assistance Provisions protect voters; the question is whether the Assistance Provisions "*encourage[] greater participation* in the electoral process." S. Rep. No. 97-417 at 63 at 241 (emphasis added). As the Court's Section 208 Order explains in detail, they do not.

Aside from the injunctions against criminal enforcement, the Secretary will, at most, be required to revise some forms by the next election, which local election officials will then use in their local elections. Especially considering the dearth of evidence that the Enjoined Oath Language or the Assistor Disclosure requirements protect voters who need assistance, the Secretary's revision of some forms in advance of the next election can hardly be described as "irreparable harm."

### C. Plaintiffs will suffer irreparable harm in the event of a stay.

The Court already concluded that failure to grant the requested injunction would result in irreparable injury to Plaintiffs and their members by interfering with voters' rights and ability to vote with help from their chosen assistors. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also Purcell*, 549 U.S. at 7 (recognizing the "strong interest in exercising the fundamental political right to vote") (citing *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).

### D. The public interest lies in enjoining the Assistance Provisions.

The Court considered the impact of the injunction on the public interest in its Order. *See* Section 208 Order at 99–106.

## CONCLUSION

For the foregoing reasons, the State Defendants' motion for a stay (ECF No. 1175) of this Court's order enjoining the State Defendants from criminally enforcing the Enjoined Oath Language of S.B. 1 § 6.04, the Voter Relationship Disclosure requirement of § 6.05, the Ban on Compensated Assistance of § 6.06 and the Canvassing Restriction of §7.04 until after the November 2024 general election is **GRANTED**.

The State Defendants' motion is otherwise **DENIED** in all respects.

It is so **ORDERED**.

**SIGNED** this 18th day of October, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE