**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21–CV–0844–XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**(CLAIMS UNDER THE ADA AND SECTION 504 OF THE REHABILITATION ACT)**

## INTRODUCTION

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021).

Premised on the state legislature's authority to make all laws necessary to detect and punish fraud under article VI, section 4 of the Texas Constitution, S.B. 1 went into effect on December 2, 2021, and amended the Texas Election Code (the "Election Code" or the "TEC") by altering various election practices and procedures pertaining to mail-in voting, voter assistance, and more. *See, e.g.*, S.B. 1 §§ 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.03–6.07, and 7.04.

Several private plaintiffs filed lawsuits, challenging certain provisions of S.B. 1 as unconstitutional and otherwise unlawful under federal civil rights statutes. For judicial economy, these were consolidated under the above-captioned case, which was first filed.[1]

Three Plaintiffs groups—the HAUL Plaintiffs,[2] the OCA Plaintiffs,[3] and the LUPE Plaintiffs[4]—collectively challenge S.B. 1 §§ 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.03–6.07, and 7.04 (the "Challenged Provisions")—under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").

---

[1] *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-cv-780 (W.D. Tex. 2021); *Houston Area Urban League v. Abbott*, No. 5:21- cv-848 (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-cv-786 (W.D. Tex. 2021) and *Mi Familia Vota v. Abbott*, No. 5:21-cv-920 (W.D. Tex. 2021) under the lead case).

[2] For the purposes of the HAUL Plaintiffs' ADA and Section 504 claims, this group includes The Arc of Texas and Delta Sigma Theta Sorority, Inc. ECF No. 199 (HAUL Compl.) ¶¶ 337–65 (Counts VII–VIII); ECF No. 753 at 7.

[3] For the purposes of the OCA Plaintiffs' ADA and Section 504 claims, this group includes REV UP Texas. *See* ECF No. 200 (OCA Compl.) ¶¶ 129–94 (Counts 2, 3), ¶¶ 182–213 (Counts 5, 6); Text Order dated Apr. 14, 2022 (granting Texas Organizing Project's withdrawal from the case); ECF No. 551 (granting Workers Defense Action Fund's withdrawal from the case and dismissing its claims with prejudice); ECF No. 753 at 5 n.5 (OCA and the League of Women Voters of Texas voluntarily dismissing their claims under the ADA and the Rehabilitation Act).

[4] This group includes La Unión del Pueblo Entero, the Southwest Voter Registration Education Project, Texas Impact, Jolt Action, MABA Texas, and FIEL Houston Inc. ECF No. 208 (LUPE Compl.) ¶¶ 272–85 (Count VI).

Specifically, Plaintiffs assert that new mail-voting identification requirements and restrictions on voter assistance and canvassing activities:

(1)    deny voters with disabilities an equal opportunity to participate in and benefit from Defendants' voting programs;

(2)    provide voters with disabilities a service that is not as effective in affording an equal opportunity to obtain the same benefit . . . as that provided others;

(3)    use criteria or methods of administration that subject voters with disabilities to discrimination or substantially impair accomplishment of the voting program's objectives with respect to voters with disabilities; and

(4)    fail to make reasonable modifications to their policies, practices, and procedures, including having adequate systems in place to train counties regarding their obligations under the ADA, providing voters with disabilities with notice of their rights under the ADA and providing reasonable modifications needed to avoid discrimination in Defendants' voting program.

*See* ECF No. 199 ¶ 350; ECF No. 200 ¶¶ 130-135, ECF No. 208 ¶ 282.

Following a six-week bench trial, the Court largely agrees. After careful consideration, the Court issues the following findings of fact and conclusions of law pursuant to Rule 52(a) bearing on Plaintiffs' claims under the ADA and Section 504.

## PROCEDURAL HISTORY

Plaintiffs filed their original complaints in August and September 2021, seeking to enjoin the State of Texas and the Secretary of State and Attorney General of the State of Texas (together, the "State Defendants") and local election officials from enforcing many provisions of S.B. 1, including, as relevant here, provisions impacting individuals with disabilities, some of which impose criminal liability.

In December 2021, the Texas Court of Criminal Appeals held in *State v. Stephens* that the Election Code's delegation of unilateral prosecutorial authority to the Attorney General to prosecute election crimes violated the separation-of-powers clause of the Texas Constitution. 663 S.W.3d 45 (Tex. Crim. App. 2021). The court explained that the Texas Constitution assigns to county and district attorneys, members of the judicial branch, the "specific duty" to represent the state in criminal prosecutions. *Id.* at 52. The Attorney General, as part of the state's executive branch, has no similar, independent power under the Texas Constitution. Thus, the Attorney General can prosecute election crimes only with the consent of local prosecutors. *Id.* at 47.

Following *Stephens*, Plaintiffs amended their complaints to join local district attorneys from several Texas counties as Defendants.[5] The State Defendants moved to dismiss these complaints in their entirety, including Plaintiffs' ADA and Section 504 challenges. The Court largely denied the motions as to those challenges, concluding that the ADA waived sovereign immunity and created a private right of action, enforceable both by individuals with disabilities and organizations that represent them, and that Plaintiffs had adequately alleged standing to assert their disability claims. The Court dismissed Plaintiffs' ADA claims against the Attorney General, however, because his office does not provide "the service or benefit" at issue in this case—voting

---

[5] Plaintiffs filed their Second Amended Complaints in January 2022. *See* ECF Nos. 199, 200, 208.

and voting by mail—within the meaning of Title II of the ADA.[6] The Court further concluded that Plaintiffs had plausibly alleged that the State Defendants had waived any immunity from liability under Section 504 by accepting federal funds. *Id.* at 426.

In May 2023, the State Defendants moved for summary judgment, arguing that: (1) voters with disabilities have "ample" opportunities to vote under Texas law; (2) Plaintiffs' failure to make any pre-suit requests for reasonable accommodations defeated their ADA claims; and (3) Plaintiffs' requested accommodation—a blanket injunction of the Challenged Provisions—was unreasonable and would fundamentally alter "Texas policy." *See* ECF No. 616. The District Attorney of Harris County, Kim Ogg, also moved for summary judgment. *See* ECF No. 614. The Court carried the motions with the case and addresses their arguments herein to the extent that they were not rejected in the Court's orders on the State Defendants' motions to dismiss.

The Court held a bench trial on the consolidated cases from September 11, 2023, to October 20, 2023. In all, the parties presented about 80 witnesses (both live and by deposition testimony) and nearly 1,000 exhibits, producing over 5,000 pages of trial transcripts. The Court heard testimony from voters with disabilities, caregivers and relatives who provide voting assistance, Plaintiffs' organizational representatives and volunteers, former and current state and local officials, and expert witnesses. The parties submitted proposed findings of fact and conclusions of law in January 2024,[7] and presented closing arguments on February 13, 2024.

---

[6] *See La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 419–20 [OCA], 618 F. Supp. 3d 449, 489 [HAUL], 618 F. Supp. 3d 504, 542 [LUPE], (W.D. Tex. 2022).

[7] *See, e.g.*, ECF Nos. 852 (Plaintiffs, jointly); ECF No. 855 (LUPE); ECF No. 856 (HAUL); ECF No. 843-1 (Dallas County DA); ECF No. 845 (Harris County DA); ECF Nos. 847 (State Defendants). The parties also submitted supplemental briefing on the Supreme Court's recent decision in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). *See* ECF Nos. 1138, 1140, 1142–45.

# FINDINGS OF FACT

1.      Plaintiffs collectively challenge S.B. 1 §§ 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 (the "Number-Matching Requirement"), §§ 6.03–6.07 (the "Assistance Provisions"), and § 7.04 (the "Canvassing Restriction") of S.B. 1 under the ADA and Section 504.

2.      There are at least 3 million voting-eligible Texans with disabilities. Tr. at 3738:17; LUPE-002 ¶¶ 14, 38. Voters with disabilities are more likely to vote by mail and more likely to need assistance while voting than voters without disabilities. Tr. at 3757:17–21, 3801:10–18; LUPE-002 ¶ 69.

3.      Plaintiffs allege that S.B. 1's addition of an identification number requirement to Texas's mail-voting process and new obligations and restrictions on voting assistors unduly burden their members with disabilities in violation of the ADA.

4.      Congress enacted the ADA as "a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (internal citations omitted).

5.      This mandate was premised on Congressional findings that:

> "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem,"

> "[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . . relegation to lesser services, programs, activities, benefits, jobs, or other opportunities," and

> "[D]iscrimination against individuals with disabilities persists in such critical areas as . . . voting."

42 U.S.C. § 12101(a)(2), (a)(5), (a)(3).

6.      Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[8]

7.      Because Congress perceived disability discrimination to be "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect," 28 C.F.R. § 35.130(b)(7), "the express prohibitions against disability-based discrimination in Section 504 and Title II include an *affirmative obligation* to make benefits, services, and programs accessible to disabled people," *Pierce v. D.C.*, 128 F. Supp. 3d 250, 266–67 (D.D.C. 2015) (emphasis added). ADA regulations also impose an affirmative duty on public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7). As the Fifth Circuit has explained, the ADA imposes "an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability." *Delano-Pyle v. Victoria County*, 302 F.3d 567, 575 (5th Cir. 2002) (citation and quotation marks omitted).

8.      Despite this affirmative obligation, the State Defendants have consistently taken a "know-nothing, do-nothing policy of non-administration" to their ADA obligations in administering elections in Texas. *Dunn v. Dunn*, 318 F.R.D. 652, 664 n.11 (M.D. Ala. 2016),

---

[8] Before enacting the ADA, Congress prohibited disability discrimination by recipients of federal funding under Section 504, 29 U.S.C. § 794. Section 504 and the ADA impose nearly identical substantive requirements and courts have interpreted them in tandem. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017); *Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020). Section 504 requires that the discrimination must be "solely by reason" of plaintiff's disability, but this does not indicate a higher standard than the ADA. *Bennett-Nelson v. La. Bd. Of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (explaining that there is no difference between the two because both impose upon public entities an affirmative obligation to make reasonable accommodations for individuals with disabilities).

*modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020). The ADA, they insist, "is not an election law." ECF No. 847 at 12.

9.  Witnesses for the Office of the Texas Secretary of State (the "Secretary" or "SOS") testified that it does not have familiarity with or expertise in the ADA or how it applies to voting and that any modification requests the state receives are redirected to the counties. Christina Adkins, Director of the Elections Division of the SOS Office, testified:

> I always tell my attorneys to be very cautious with making any recommendations or statements or offering guidance with respect to ADA issues, because we are not ADA experts . . . . . My understanding [is that] . . . there's the ability for individuals to request accommodations. Since we are not the ones administering elections…we would always direct those individuals to the specific county . . . . . [W]hen [we] get questions of law that pertain to issues outside of elections, [we] advise the county election official that's asking us to consult with their local county or district attorney or whoever advises on this area of law.

Tr. at 4593:21–4594:11, 4594:19–25. Former Director of the Elections Division Keith Ingram similarly testified that he does not know what Section 504 is and does not know "in detail" how the ADA applies to elections. Tr. at 1927:13–16, 1926:14–25.

10.  The Secretary's office has no written policies on the State's obligations under the ADA regarding the administration of elections. Tr. at 1927:21–1928:21. Nor has the Secretary's office trained county officials on their obligations under the ADA apart from consulting with them on the physical accessibility of polling places. Tr. at 1930:22–1931:2. Mr. Ingram stated that he was unaware of any efforts to educate voters about their right to reasonable modifications under the ADA or the Election Code. Tr. at 1931:3–9.

11.  The Election Division's professed unfamiliarity with disability rights is unsettling because the Election Code explicitly tasks the Secretary with evaluating requests for accommodations submitted to county election officials. *See* TEC § 61.013(c).

12.     The Election Code directs voters with a disability who desire an accommodation to submit the request "with the early voting clerk" 21 days before the election (for non-federal elections). TEC § 61.013(b). In response to such a request:

> A county or political subdivision may make a showing of undue burden . . . by filing an application with the secretary of state not later than the 90th day before the date of the election that states the reasons that compliance would constitute an undue burden. A showing of an undue burden may be satisfied by proof that the election costs associated with compliance . . . constitute a significant expense for the county or political subdivision . . . Not later than the 20th day after the date of receiving an application under this section, *the secretary of state shall determine whether compliance . . . is an undue burden for the county or political subdivision*."

TEC § 61.013(c) (emphasis added). Nothing in the Election Code authorizes counties to make reasonable accommodations based on (1) federal elections, (2) requests within 21 days of election, (3) the county's affirmative duty to make reasonable accommodations (i.e., without requests).

13.     While the Election Code protects voters' right to *request* reasonable accommodations, it does not require any election entity or administrator to actually *make* such accommodations. *See* TEC § 1.022 ("A provision of this code may not be interpreted to prohibit or limit the right of a qualified individual with a disability from *requesting* a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law or rule that the individual is entitled to request under federal or state law.") (emphasis added).

14.     In fact, Section 7.04 of S.B. 1 *prohibits* election officials from creating, altering, modifying, waiving, or suspending any election standard, practice, or procedure in a manner not expressly authorized by code. TEC § 276.019. Section 8.01 of S.B. 1, in turn, imposes civil penalties on election officials for violations of the Election Code, including termination and loss of benefits. TEC § 31.129(b). It follows that any election official in Texas who makes an affirmative accommodation for disabled voters risks her job and benefits.

15.    County officials did not receive guidance or training from the Secretary about how the ADA applies to the Challenged Provisions impacting voters with disabilities. Many testified that they lacked ADA coordinators to respond to reasonable modification requests, that they did not have written ADA policies related to voting, that they had done nothing to update their ADA policies following the enactment of S.B. 1, and that they did not offer training to staff on responding to reasonable modifications.[9] County election officials stated that they did receive some requests for accommodation (i.e., curing number-matching requirements by email) and were told by the SOS to "read the statute." Tr. at 1304:6–1306:2.

16.    The Elections Division "depend[s] on the Coalition of Texans with Disabilities and Texans for Disability Rights" to conduct surveys, training sessions, and audits of polling place accessibility, and to address problems that arise during elections. Tr. at 1926:14–1927:9. It is worth noting that the private advocacy groups to which the Elections Division has sought to outsource its disability-related obligations are not themselves empowered to make affirmative accommodations for voters. It is also worth noting that these very groups testified before the Texas legislature in *opposition* to S.B. 1. *See, e.g.*, STATE-296, Senate Session (Part II), Tr. at 330:1–25 (describing testimony by Disability Rights Texas advocate opposing new oath and disclosure requirements for voting assistors because they would limit disabled voters' access to voting assistance).

17.    The Plaintiffs groups also made numerous efforts before the passage of S.B. 1 to notify the State of Texas and the Legislature of the harm that would occur to voters with disabilities

---

[9] *See* Tr. at 991:24–992:1, 992:14–16 (Callanen) (no ADA coordinator; no updated ADA policies post-S.B. 1); Tr. at 444:14–16, 444:5–9, 444:1–4 (Scarpello) (no ADA coordinator; no written ADA policies related to voting by mail; training regarding modifications limited to allowing disabled voters to go to the front of the line or allowing them to vote curbside); Tr. at 1523:12–18 (Johnson) (no ADA policies pertaining to mail voting); Tr. at 278:12–17, 278:18–279:2, 279:7–10 (Wise) (no training provided to address reasonable modification needs of voters with disabilities who vote by mail following enactment of SB 1).

should S.B. 1 be passed. Representatives from The Arc of Texas and REV UP Texas testified multiple times before the state legislature.[10] Many other groups also testified or wrote letters notifying the legislature of concerns related to how S.B. 1 would harm voters with disabilities.[11]

18.    Nonetheless, state and local election officials failed to heed these concerns in implementing S.B. 1 and failed to provide reasonable, affirmative accommodations that would allow voters with disabilities to avoid—or at least minimize—these foreseeable harms. As a result, voters with disabilities have experienced multiple mail ballot rejections and experienced humiliation, the loss of their privacy, and physical pain while voting.

**VOTING IN TEXAS BEFORE S.B. 1**

**Voter Registration and Database**

19.    Texas's statewide voter registration database, maintained by the SOS, is known as the Texas Election Administration Management ("TEAM") system. Tr. at 4317:6–9, 17–23. Each voter record is assigned a Voter Unique Identification Number ("VUID"), which may itself be associated with up to two other ID numbers. Specifically, each VUID may be associated with (1) <u>one</u> number issued by the Texas Department of Public Safety ("DPS") on a driver's license, personal identification card, or election identification certificate (collectively, a "DPS number"), (2) <u>one</u> SSN4, (3) both a DPS number and an SSN4, or (4) neither number.

---

[10] *See, e.g.*, HAUL-216 (testimony before the Senate State Affairs Committee by representative of The Arc, asserting that the new disclosure requirements would "create a chilling effect that decreases the availability of support for Texans with disabilities to exercise their right to vote"); HAUL-213 (testimony before the House Elections Committee); HAUL-214 (testimony before the Senate State Affairs Committee); HAUL-229 (testimony of member of The Arc before the Senate Affairs Committee); HAUL-270 (Cogan testimony before Senate State Affairs Committee by representative of The Arc); Tr. at 3621:16–3622:12.

[11] *See* HAUL-223 (Testimony of Ruei Tuo, 87th - 1st Special Session - Texas Bill SB1/HB3); HAUL-225 (Testimony of Emily Eby, Staff Attorney, Texas Civil Rights Project, Texas Senate State Affairs Committee); HAUL-226 (Testimony of James Slattery, Senior Staff Attorney, Texas Civil Rights Project, Texas House Select Committee on Constitutional Rights & Remedies); HAUL-269 (testimony of staff attorney for Texas Civil Rights Project, Texas Senate State Affairs Committee); HAUL-283 (Testimony of Texas Civil Rights Project).

20.    Since 2004, the official Texas voter registration form prepared by the SOS has required the applicant to provide (1) a Texas Driver's License or Personal Identification number ("DPS number"), (2) "if no [DPS number]," the last four digits of her Social Security Number ("SSN4"), or (3) a statement that she has not been issued either identification number. OCA-238.

21.    Texas did not require voter-registration applicants to provide an ID number until January 1, 2004, in compliance with the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq. See* TEC § 13.002(c)(8)(A); 52 U.S.C. § 21083(d).

22.    HAVA provides that applicants must provide a current and valid driver's license number or, if they have not been issued such a number, their SSN4, which the state must then compare with the Social Security Administration database or Department of Labor database. *See* 52 U.S.C. § 21083(a)(5)(A)(i). Applicants who indicate that they have neither a driver's license number nor an SSN4 must be assigned a unique identification number on the state's computerized database, which will "serve to identify the applicant for voter registration purposes." *See id.* § 21083(a)(5)(A)(ii).

23.    Since both HAVA and the Texas voter registration application only require *one* number, some voters have only one ID number—either a DPS number or their SSN4—associated with their voter record in TEAM. Tr. at 1855:18–25. While Texas voters can have multiple DPS identification numbers, TEAM will only reflect the most current ID number. Tr. at 1846:3–15.

**Voting By Mail**

24.    Texas authorizes limited categories of voters to vote by mail. These include voters who are 65 years of age or older, disabled voters who cannot vote in person on Election Day "without the likelihood of needing personal assistance or injuring [their] health," voters absent

from their home counties for the entire in–person voting period, and voters who expect to give birth near Election Day. TEC §§ 82.001–004, .007–.008.

25.     Voters with disabilities are three to four times more likely to vote by mail than voters without disabilities. Tr. at 3757:17–21, 3801:10–18; LUPE-002 ¶ 69. In Texas, voters with disabilities represented 32% of all voters who voted by mail in 2020. Tr. 3758:17–18

26.     According to election officials, the most common bases for eligibility for vote by mail are the "over 65" and "disability" categories.[12] A voter who checks "over 65" as his reason for mail voting may also have a qualifying disability that is not reflected on his application for a ballot by mail ("ABBM"). Tr. at 1299:25–1300:2; *see also* Tr. at 3742:13–23 (disability correlates "[v]ery, very highly" with age). Since marking only one eligibility option is required for mail voting, a voter with a disability might rely on his age to support his eligibility to avoid questions about whether his disability meets the legal standard for requesting a mail ballot. Tr. at 1299:18–1300:2. Thus, the number of voters who mark "disability" underrepresents the number of mail-voters with disabilities.

27.     A qualified voter seeking to obtain a mail ballot must first submit a signed ABBM to their county's early voting clerk. TEC §§ 84.001, 84.007. The ABBM includes "the applicant's name and the address at which the applicant is registered to vote," information demonstrating the voter's eligibility for a mail ballot, "an indication of each election for which the applicant is applying for a ballot," and a mailing address, if different from the address of registration. *See* TEC § 84.002.

---

[12] *See, e.g.*, Tr. at 1158:16–22 (Harris County); *see also* Tr. at 313:13–18 (El Paso County); Tr. at 1299:4–10 (Harris County).

28.    If the early voting clerk determines that the ABBM does not "fully comply with the applicable requirements," the clerk is generally required to mail the applicant a new application with a written notice that identifies the defects in the application and explains to the applicant how the defects may be corrected. *Id.* § 86.008.

29.    Upon receiving a timely and non-defective ABBM, the clerk sends the voter an official ballot by mail ("BBM"), a ballot envelope in which to place the ballot, and an official carrier envelope in which to place the ballot envelope. *Id.* §§ 86.001–002, .012–.013.

30.    To vote by mail, a voter must then (1) place his BBM in the official ballot envelope, (2) seal the ballot envelope, (3) place the ballot envelope in the official carrier envelope, (4) seal the carrier envelope, (5) sign the certificate on the carrier envelope, and (6) return the ballot materials to the early voting clerk, either by mail or common or contract carrier or in-person on election day (with an acceptable form of photo identification). *Id.* § 86.005–.06, .013.[13]

31.    In every election, each county in Texas convenes an Early Voting Ballot Board ("EVBB"), which opens the carrier envelopes and determines whether to accept individual BBMs based on, *e.g.*, whether the voter's ABBM stated a legal ground for voting by mail and whether the signature on the carrier envelope matches the signature on the ABBM.[14] *Id.* § 87.041(b). An optional Signature Verification Committee ("SVC") may also be appointed to carry out the same functions. *Id.* §§ 87.027(a), (i).

32.    At the direction of the Texas Legislature, the SOS has developed an online tool for tracking ABBMs and mail ballots, which "must . . . for each carrier envelope, record or assign a

---

[13] Military voters, military family members, and overseas citizens may also use a Federal Post Card Application to apply for a mail ballot and a Texas-issued signature sheet to accompany a mail ballot in lieu of a carrier envelope, both of which must comply with S.B. 1's requirements. *See* TEC §§ 101.052(e), 101.057, 101.107.

[14] The voter's ABBM and carrier envelope signatures may also be compared with other signatures on file with the county clerk or voter registrar. TEC §§ 87.027(i), 87.041(e).

serially numbered and sequentially issued barcode or tracking number that is unique to each envelope." *See id.* § 86.015(c)(2) (the "Ballot Tracker"). Accordingly, carrier envelopes now bear a unique number that links them to an associated voter and their ABBM. Counties are responsible for entering the information used to track ABBMs and mail ballots into the Ballot Tracker.

**Voting with Assistance**

33.     Under Texas law, regardless of the method of voting, "[a] voter is eligible to receive assistance. . . if the voter cannot prepare the ballot because of: (1) a physical disability that renders the voter unable to write or see; or (2) an inability to read the language in which the ballot is written." TEC § 64.031.

34.     At the federal level, Section 208 of the Voting Rights Act provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C. § 10508.

35.     Voters with disabilities are twice as likely to need assistance voting in person as voters without disabilities, and ten times as likely to need assistance voting by mail. Tr. at 3771:11–15, 3771:16–25.

36.     Approximately one-fifth of voters with disabilities receive voting assistance from non-family members. LUPE-002 ¶ 102.

37.     Voters with disabilities may have difficulty with dexterity, seeing, or getting around the polling place. Tr. at 3770:20–25, 3771:1–4. Voters with intellectual and developmental disabilities ("IDD") may need assistance with physically accessing a polling location, using assistive technology, navigating around the polling place, and translating forms into plain language. Tr. at 3491:21–3492:17, 3512:11–3513:2.

38.     Voters with IDD or other cognitive disabilities also need voting assistance when voting in person or by mail to ensure they fully understand their choices in the voting process, which may require more time.[15] Tr. at 3494:14–20.

39.     Before S.B. 1, the Election Code required election officials to note an assistor's name and address next to each voter they assisted at the polls in the poll list, TEC § 64.032(d) (1986). The Election Code required assistors to provide the same information and their signature on the outside of voters' mail-ballot carrier envelopes after assisting mail voters. TEC § 86.010(e). Assistors were also required to take an Oath of Assistance. TEC § 64.034.

**THE CHALLENGED PROVISIONS**

**Section 5 – Number-Matching Requirement for Mail-in Voting**

40.     S.B. 1's number-matching framework, codified in Sections 5.02, 5.03, 5.06–5.08, 5.10, and 5.12–5.14 of S.B. 1, superimposes a new identification requirement on the mail-in voting process, at both the application and voting stages. To have their ballots counted under S.B. 1, Texans voting absentee must write an ID number that matches an ID number in TEAM on both their ABBM and BBM materials.

41.     At the application stage, Section 5.02 requires voters to write one of three pieces of information on their ABBM, according to the following hierarchy:

(1) the applicant's DPS number;
(2) if the applicant "has not been issued" a DPS number, his or her SSN4; or
(3) if the applicant lacks both a DPS ID number and an SSN4, a statement to that effect.

TEC § 84.002(a)(1–a). An applicant is permitted to use an expired DPS ID number, if the number is otherwise valid, for purposes of fulfilling these requirements. *Id.* § 84.002(b–1).

---

[15] Over 1,000,000 voting-eligible Texans—a third of those with disabilities—have a cognitive impairment. Cognitive impairment is defined as difficulty remembering, concentrating, or making decisions. Tr. at 3740:19–23; LUPE-002 ¶ 40, Table 1.

42. To implement this new requirement, Section 5.03 of S.B. 1 directs the SOS to create a space for this information on its "officially prescribed" ABBM. TEC § 84.011(a), (a)(3–a); *see id.* § 31.002.

43. The SOS designed an official ABBM with the following instructions:

> YOU MUST PROVIDE ONE of the following numbers. . . Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (NOT your voter registration VUID#) . . . If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number[.]

LUPE-119 at 1.

*Excerpt from Form ABBM*



*See id.*

44. At the voting stage, Section 5.08 further requires that the carrier envelope in which the ballot envelope is mailed include a space, hidden from view when sealed, for the voter to enter the same identification number information required under Section 5.02. TEC § 86.002(g). To implement this mandate, the SOS prepared a carrier envelope with identical instructions under the flap of the envelope. LUPE-009 at 3.

45. Under Sections 5.07 and 5.13 of S.B. 1, an ABBM or BBM must be rejected if the voter fails to provide a DPS number or SSN4 that identifies "the same voter identified on the applicant's application for voter registration." *See* TEC § 86.001(f) (codifying S.B. 1 § 5.07, which provides that early voting clerks "shall reject" mail ballot applications that do not include a

matching ID number); TEC § 87.041(b)(8) (codifying S.B. 1 § 5.13, which establishes that a mail ballot "may be accepted only if" it includes a matching ID number).

46.     Finally, S.B. 1 establishes notice-and-cure procedures for ABBMs and BBMs that are rejected based on the number-matching requirements. *See* S.B. 1 § 5.06, 5.10, and 5.12 (collectively, the "Cure Provisions").

47.     Section 5.06 of S.B. 1 permits a voter who cancels her ABBM after being sent a BBM but fails to return her BBM to the early voting clerk, to vote in person by casting a provisional ballot. TEC § 84.035.

48.     Section 5.10 requires the SOS Ballot Tracker to "allow a voter to add or correct information" on her ABBM or carrier envelope as required by S.B. 1's number-matching requirement. TEC § 86.015(c)(4). Using their date of birth, voters can correct defects on a mail ballot, including failure to sign the carrier envelope or a signature on the carrier envelope that cannot be certified as that of the voter. Tr. at 327:17–328:25.

49.     Sections 5.12 and 5.14 amend the responsibilities of the EVBB (and any SVC, if appointed) to include notifying the voter of any carrier envelope flagged for rejection for a variety of reasons, including S.B. 1's number-matching requirement. *See* TEC §§ 87.0411; 87.0271.[16]

---

[16] When initially enacted, Sections 5.12 and 5.14 instructed the SVC and EVBB, respectively, to determine within two business days of identifying a defect whether it would be possible for the voter to correct the defect and return the carrier envelope before polls closed on election day. If so, the SVC and EVBB had the option of returning the carrier envelope to the voter by mail or to the early-voting clerk, who could contact the voter directly. If not, Sections 5.12 and 5.14 authorized the SVC and EVBB to contact voters by telephone or e-mail and inform them of their options to either cancel their mail-in ballot and vote in person or to correct the carrier envelope in person at the early voting clerk's office within six days after the election. The Legislature has since enacted a provision, effective September 1, 2023, allowing the SVC and EVBB to mail back a corrective action form to the voter. Tex. S.B. 1599, 88th Legis., R.S., § 8, sec. 87.0271(b), 2023 Tex. Gen. Laws.

**Section 6.04 – Amendments to Oath of Assistance**

50.    Section 6.04 of S.B. 1 amends the oath that a person assisting a voter is required to swear (the "Oath of Assistance" or "Oath") by adding the underlined and bolded language:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; [~~I will confine my assistance to~~ **reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot**;][17] ~~answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties~~; I will prepare the voter's ballot as the voter directs; **I did not pressure or coerce the voter into choosing me to provide assistance**; [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted.**

TEC § 64.034. An offense under this subsection is a state jail felony, punishable by up to two years in prison and a fine of up to $10,000 and will result in the rejection of the voter's ballot. TEC § 276.018(a)(2)–(b); Tex. Penal Code §§ 12.35(a), (b).

51.    An assistor must take the Oath of Assistance (and complete a disclosure form, discussed below) for each voter she assists. Election officials, on the other hand, are not required to take the Oath or complete a disclosure form. *See* TEC § 64.034. When a voter receives assistance from an election official, however, Texas law permits poll watchers to be present at the voting station, and the watchers are entitled to examine the ballot before it is deposited in the ballot box. TEC § 33.057(a).

---

[17] The requirement that a person who assists a voter must confine assistance to reading the ballot, marking the ballot, and directing the voter to do the same was enjoined in *OCA of Greater Houston v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, at *4 (W.D. Tex. June 6, 2022). Accordingly, this Court held that "all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined . . . are moot." *LUPE v. Abbott*, 614 F. Supp. 3d 509, 513 n.3 (W.D. Tex. 2022).

52.     The Oath of Assistance must be printed on BBM carrier envelopes and signed by the assistor. TEC § 86.013(e); *see* LUPE-009 (form BBM carrier envelope prescribed by the SOS).

53.     Providing mail ballot assistance without signing the Oath is a state jail felony unless the assistor is a close relative of the voter or is physically living with the voter when the assistance is provided. *See* TEC § 86.010(h)(1).

**Sections 6.03, 6.05, 6.07 – Assistor Disclosures**

54.     Before S.B. 1, the Election Code provided that, if assistance was provided by a person of the voter's choice at a polling place, an election officer must enter the person's name and address on the poll list beside the voter's name. *See* TEC § 64.032(d). A person providing mail-ballot assistance was required to provide his or her signature, printed name, and a residential address. *See* TEC § 86.010(e); JEX-1 at 53.

55.     Sections 6.03, 6.05 and 6.07 of S.B. 1 added provisions imposing new disclosure and documentation requirements on private assistors.

56.     Section 6.03 requires private assistors at polling places to fill out a new form (the "Assistor Disclosure Form"): (1) the name and address of the person assisting the voter; (2) the relationship to the voter of the person assisting the voter; and (3) whether the person assisting the voter received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." TEC § 64.0322(a).

57.     The Secretary must prescribe the Assistor Disclosure Form. TEC § 64.0322(b). As prescribed by the Secretary, the form also contains the "Oath of Assistance," discussed above. *See* LUPE-189 ("Oath of Assistance Form").

58.     Section 6.05 amended the Election Code to require a person who assists a mail-in voter to disclose their relationship with the voter and any compensation from a candidate,

20

campaign, or political committee on the assisted-voter's BBM carrier envelope. TEC § 86.010(e). The Election Code already required assistors to provide their names and addresses on the carrier envelope before S.B. 1 was enacted. *See id.*; JEX-1 at 53.

59.    Section 6.07 amends the disclosures on the BBM carrier envelopes that must be completed by anyone providing ballot-dropping assistance to add a space indicating the assistor's relationship to the voter (along with the person's name and address, which were already required). TEC § 86.013(b).

60.    As prescribed by the SOS, the form BBM carrier envelope does not distinguish between assistance in completing the ballot and ballot-dropping assistance. *See* LUPE-009 ("If you are assisting a voter by depositing the Carrier Envelope in the mail or with a common or contract carrier, you must complete the assistant section below.").

61.    Providing BBM assistance without completing the Assistor Disclosures is a state jail felony, punishable by up to two years' confinement and a fine of up to $10,000 and may result in the rejection of the voter's ballot. TEC § 86.010(g); TEX. PENAL CODE §§ 12.35(a), (b). The criminal consequences are inapplicable, however, to mail-ballot assistance provided by a close relative of the voter or a person who was physically living with the voter when the assistance was provided. *See* TEC § 86.010(h)(2).

62.    Although the Assistor Disclosures required under §§ 6.03 and 6.05 are technically distinct from the required Oath of Assistance set forth in § 6.04, the requirements are, as a practical matter, indistinguishable to assistors. As the images below demonstrate, on both the "Oath of Assistance" form and the form BBM carrier envelope prescribed by the Secretary, the space for the assistor's signature (subscribing to the Oath) appears in the same section as the disclosure requirements—directly under the printed Oath language.

*Oath of Assistance*



LUPE-189 at 1.

*Form Mail Ballot Carrier Envelope*



LUPE-009 at 2.

     63.    Moreover, the provisions impose identical consequences for non-compliance. Knowingly providing assistance without completing the Oath (evidenced by the assistor's signature) or the relevant disclosure fields on the carrier envelope (1) is a state jail felony and (2) may result in the rejection of the voter's ballot. *See* TEC §§ 86.010 (d), (f)–(g).

**Section 6.06 – Ban on Compensated Mail-Ballot Assistance**

64.     Section 6.06 of S.B. 1 makes it a state jail felony, for a person who is not an attendant or caregiver previously known to the voter, to compensate or offer to compensate another person—or to solicit, receive, or accept compensation—for assisting voters with their mail-in ballots. TEC §§ 86.0105(a), (c).

65.     For purposes of this section, "compensation" means "anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee, accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value." *Id.*; *see also* TEX. PENAL CODE § 38.01(3).

66.     The prohibition on compensation does not apply if the person assisting the voter is an "attendant" or "caregiver" previously known to the voter. Tr. at 1906:23–1907:2. S.B. 1, however, does not define "attendant" or "caregiver," Tr. at 1907:3–6, nor has the Secretary published any guidance or training on how to interpret either term. Tr. at 1907:7–12, 1908:17–24. Further, the Secretary's Office does not define the phrase "previously known to the voter," nor has it published any guidance or training on how the phrase should be interpreted. Tr. at 1909:3–13. At trial, Mr. Ingram testified that it does not matter how long the voter has actually known the attendant or caregiver before providing voter assistance; it could be "15 years" or "15 minutes." Tr. at 1909:14–22.

**Section 7.04 – Canvassing Restriction**

67.     Section 7.04 of S.B. 1 creates three new, third-degree felonies under the Election Code, each imposing up to ten years in prison and a fine of up to $10,000 on anyone who gives,

offers, or receives some "compensation or other benefit" for "vote harvesting services." [18] TEC § 276.015(f); Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ § 12.34.

68.    "Vote harvesting services" include any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

69.    A "benefit" is "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion, whether to a person or another party whose welfare is of interest to the person." TEC § 276.015(a)(1).

70.    Using these definitions, Section 7.04 creates three third-degree felonies:

>    (b)    A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit.

>    (c)    A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services.

>    (d)    A person commits an offense if the person knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services.

TEC §§ 276.015(b)–(d).

71.    There are a number of exceptions. The Canvassing Restriction "does not apply" to:

>    (1)    an activity not performed in exchange for compensation or a benefit;

>    (2)    interactions that do not occur in the presence of the ballot or during the voting process;

---

[18] While Section 7.04 of S.B. 1 sets out a ban on "vote harvesting," the scope of Section 7.04's proscriptions reach conduct well beyond any common understanding of "vote harvesting." To describe Section 7.04 more accurately and impartially, the Court refers to it as the "Canvassing Restriction" throughout this order.

(3)    interactions that do not directly involve an official ballot or ballot by mail;

(4)    interactions that are not conducted in-person with a voter; or

(5)    activity that is not designed to deliver votes for or against a specific candidate or measure.

TEC § 276.015(e).

## THE PARTIES

### The Plaintiffs

### <u>The OCA Plaintiffs</u>

72.    The OCA Plaintiffs challenge S.B. 1's Number-Matching Requirement (§§ 5.02, 5.03, 5.07, 5.10, 5.12) and amended Oath of Assistance (§ 6.04), seeking injunctive relief against the Secretary, the Attorney General, the County Clerks of Harris and Travis Counties, and the DAs of Harris and Bexar Counties. *See* ECF No. 200 at 46–50, 63–65.

#### *REV UP Texas*

73.    REV UP Texas is a statewide, non-partisan, grassroots, non-profit organization incorporated in Texas. Tr. at 3621:2–3, 3617:15–16, 3619:2–3, 3626:1, 3619:4–5. REV UP stands for "Register, Educate, Vote, Use Your Power." Tr. at 3616:6–17.

74.    REV UP Texas' mission is "to empower people with disabilities to get more involved in the disability and political process to be able to influence issues of concern to the disability community." Tr. at 3616:19–22. Examples of issues important to REV UP Texas's mission are "affordable integrated housing, long waiting lists for home- and community-based services, community attendants' wages and benefits[,] accessible transportation, durable medical equipment, assistive technology, issues that affect the . . . disability population that makes up the disability vote." Tr. at 3617:1–7.

75.     REV UP Texas operates through a regional network of organizational representatives, who disseminate information and further its mission throughout the state. Tr. at 3618:15–25. Along with these regional representatives, REV UP has approximately 500 members statewide. Tr. at 3620:13, 19–20.[19]

76.     As discussed in greater detail herein, several members of REV UP Texas with disabilities have experienced barriers to voting by mail and in-person because of S.B. 1, including Jodi Lydia Nunez Landry, who is a regional representative.  Tr. at 3229:15.

**The HAUL Plaintiffs**

77.     Together, the HAUL Plaintiffs challenge S.B. 1's Number-Matching Requirement (§§ 5.02, 5.03, 5.06, 5.07, 5.10) and Assistor Disclosures (§§ 6.03. 6.05, 6.07), seeking injunctive relief against the Secretary, the Attorney General, and the local election officials and the DAs of Bexar County and Harris County. *See* ECF No. 199 ¶¶ 337–55.

***The Arc of Texas***

78.     The Arc of Texas (the "Arc") is a non-profit organization founded in 1953 by parents of children with intellectual and developmental disabilities ("IDD") to advocate for their children to have access to education, employment, community supports, and other areas of community life. Tr. at 3492:18–25, 3493:1–5. The Arc has 7,000 individual members across the state.[20] Tr. at 3495:20–25, 3496:4–24.

79.     The Arc's mission is to "promote, protect, and advocate for the human rights and self–determination of Texans with intellectual and developmental disabilities." Tr. at 3490:23–25,

---

[19] Members do not pay dues because so many people with disabilities are low-income, but their engagement ranges from receiving information "to those who are active in doing the various registration, education, and voting," and to "regional reps, who we engage monthly on regional phone calls." Tr. at 3620:21–25, 3639:6–10.

[20] Although individual members previously paid membership dues, The Arc stopped charging fees after concluding that they were a barrier for people with IDD being able to join the organization. Tr. at 3497:17–25, 3498:1–3 (noting

3493:7–9. In pursuit of that mission, The Arc engages in legislative advocacy and grassroots advocacy to help empower people with IDD to advance public policy. Tr. at 3493:10–21; 3494:5– 10. Voting is "the backbone" of The Arc's work because it is critical to members' self-determination and voting rights advocacy has been a priority since The Arc's founding. Tr. at 3499:23–3500:12, 3499:23–3500:12.

80.     As discussed in greater detail herein, several members of the Arc with disabilities have experienced barriers to voting by mail and in-person because of S.B. 1, including Jodi Lydia Nunez Landry. Tr. at 3229:15.

### *Delta Sigma Theta Sorority, Inc.*

81.     Plaintiff Delta Sigma Theta Sorority, Inc. ("DST" or the "Sorority") is a national, nonprofit, nonpartisan organization of Black, college-educated women, focused on serving the Black community through social action. Tr. at 2081:1–20. DST has 75 Chapters in Texas, including chapters in Bexar, Harris, and Travis Counties, and 21,450 members registered to vote in Texas. Tr. at 2083:13–25.

82.     The Sorority organizes its social action under its "Five Point Programmatic Thrust": educational development, economic development, international awareness and involvement, physical and mental health, and political awareness and involvement. Tr. at 2081:7–13.

83.     In support of this mission, DST has participated in voting rights efforts since its founding in 1913. Tr. at 2082:23–2083:8. The organization's civic engagement programs include voter registration drives, voter education, candidate forums, and voter assistance and transportation programs. Tr. at 2086:21–2087:15.

---

that people with IDD often "live in poverty and don't have extra money to pay membership dues."). Thus, members can join The Arc of Texas in several other ways, including by subscribing to their Disability Dispatch email, making a donation, serving on the board, or serving on a committee. Tr. at 3495:22–25, 3496:1–3, 3497:10–16.

84.    DST Chapters in Texas provide voter assistance to residents of nursing homes and senior care facilities who need help filling out ABBMs, address changes, BBMs, and voting in-person. Tr. at 2088:1–18, 2199:9–19.

85.    Members of DST include individuals who have disabilities and depend on assistance to cast their vote. Tr. at 2110:3–11.

### The LUPE Plaintiffs

86.    Together, the LUPE Plaintiffs challenge S.B. 1's amended Oath of Assistance (§ 6.04), Assistor Disclosures (§§ 6.03 and 6.05), Ban on Compensated Assistance (§ 6.06), and Canvassing Restriction (§ 7.04), seeking injunctive relief against the Secretary, the Attorney General, and the election officials and prosecutors of Dallas and El Paso Counties and the Travis County District Attorney. *See* ECF No. 208 ¶ 267.

### *La Union Del Pueblo Entero*

87.    La Union Del Pueblo Entero ("LUPE") is a non-partisan, membership organization headquartered in San Juan, Texas, with members primarily in Hidalgo, Cameron, Willacy, and Starr Counties, Texas. Tr. at 58:13–16.

88.    LUPE organizes its approximately 8,000 members and other colonia residents on issues that affect low-income neighborhoods, including drainage, lighting, paved roads, safety, emergency services, trash pickup, among others. Tr. at 88:8–24. In addition to civic engagement organizing, LUPE is a social services hub for the community and provides income tax services, language translation services and family-based immigration legal services. Tr. at 61:3–17.

89.    In recent years, LUPE's primary organizing focus has been civic engagement and educating voters about their right to vote. Tr. at 60:10–61:2. LUPE relies on paid staff members, temporary paid canvassers, and volunteers to engage with voters in-person. Tr. at 88:1–7. LUPE

members speak to voters on issues promoted by LUPE, including urging voters to support certain non-partisan ballot measures. Tr. at 88:1–24.

90.      LUPE organizers advocate for ballot measures in a variety of settings, including when meeting with community members in neighborhoods, at LUPE events, at union halls, and in the LUPE offices. Tr. at 89:7–18. While canvassing neighborhoods in support of ballot measures, LUPE organizers have been invited into voters' homes and asked for assistance with voters' mail-in ballots. Tr. at 71:1–72:15, 75:11–75:17, 119:20–120:18. LUPE members also often bring mail ballots to meetings at LUPE offices and union halls. Tr. at 90:4–24.

91.      Members of LUPE include voters who are disabled and vote with assistance in person and by mail. Tr. at 63:19–64:6, 65:7–65:13, 96:15–97:17, 75:18–77:4, 77:17–78:2, 84:4–84:25, 85:1–85:4, 119:20–120:18, 116:22–117:7, 87:3–87:21, 3676:11–25.

92.      LUPE staff members and volunteers have been asked for assistance with voting by mail and in-person at the polls by elderly and disabled voters and have provided such assistance. *See* Tr. at 145:16–20, 145:25–146:4, 150:9–13, 150:19–151:2, 157:14–158:9; LUPE-284, Maria Gomez Dep. at 41:24–42:24, 11:15–12:10, 15:17–20, 29:9–12. 40:24–42:2.

93.      LUPE often provides its volunteers with t-shirts or gas cards, particularly because there is little public transportation in the Rio Grande Valley. Tr. at 122:3–19.

### MABA Texas

94.      The Mexican American Bar Association of Texas ("MABA") is a volunteer-based professional membership association of Latino lawyers across Texas with approximately 500 members. Tr. at 2533:20–23, 2535:9–10.

95.      Although MABA is non-partisan, it routinely encourages voters to support a candidate or measure. Tr. at 2535:19, 2542:6–8.

96.     Members of MABA include voters who are disabled and vote with assistance in person and by mail. Tr. at 2543:1–13.

97.     MABA encourages its attorneys to provide pro bono services and support voter engagement in their local communities. Tr. at 2533:24–2534:4, 2535:11–2536:5. MABA engages in voter outreach and education by tabling at local community events, such as candidate forums. Tr. at 2535:21–2536:5. MABA members also provide voter assistance. *See, e.g.*, Tr. at 2539:3–4. Members are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while performing these activities. Tr. at 2542:6–20.

### *FIEL Houston, Inc.*

98.     Familias Inmigrantes Estudiantes Luchar translated to English means "Immigrant Families and Students in the Fight." Tr. at 2430:12–19. FIEL Houston, Inc. ("FIEL") is an immigrant-led civil rights organization with approximately 16,000 members in the Greater Houston area. Tr. at 2431:21–25. FIEL employs eight paid staffers. Tr. at 2433:18–22. FIEL's mission is to organize and empower people, and to make sure that people know and exercise their rights in the community. Tr. at 2434:21–2435:1. FIEL focuses on access to higher education, community organizing, and civic engagement, including voter outreach. Tr. at 2435:2–14.

99.     Members of FIEL include voters who are disabled and vote with assistance. Tr. at 2536:14–18.

100.    Before S.B. 1, FIEL furthered its mission of voter outreach and civic engagement by assisting its members in voting at the polls. Tr. at 2438:9–11, 2444:24–2445:3. FIEL typically partnered with another organization to take people to vote and provide translation and other assistance at the polls. Tr. at 2438:12–16.

**Defendants**[21]

101.    Collectively, Plaintiffs have sued the Secretary of State and Attorney General of the State of Texas,[22] and the chief election officials and district attorneys of several counties in Texas, including Harris County, Bexar County, Travis County, Dallas County, Hidalgo County, and El Paso County—all in their official capacities.

### The State Defendants

#### *Texas Secretary of State*

102.    Plaintiffs seek to enjoin Defendant Jane Nelson, the Secretary of State (the "Secretary") of the State of Texas, from enforcing the Challenged Provisions.

103.    The Secretary is the Chief Election Officer of Texas. TEC § 31.001(a). In that capacity, the Secretary is charged with "broad duties to oversee administration of Texas's election laws." *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (quoting *Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022)).

104.    It is the Secretary's duty to obtain and maintain uniformity in the interpretation, application, and operation of the election code and election laws outside the election code. TEC § 31.003; Tr. at 1827:6–12.

105.    These responsibilities include "prescribing official forms" for elections. Tr. at 1834:2–12; TEC §§ 31.001(a)–(b), 31.003. The Secretary, for example, is responsible for the design and content of the Assistor Disclosure form and BBM carrier envelopes. *See* Tr. at 1843:4–7; TEC §§ 64.0322(b), 86.013(d); LUPE-009; LUPE-189.

---

[21] Over the course of these proceedings, several Defendants sued in their official capacities were substituted by their successors in office pursuant to Federal Rule of Civil Procedure 25(d).

[22] The Court previously dismissed Plaintiffs' ADA claims against the Attorney General, *see La Union del Pueblo Entero*, 618 F. Supp. 3d at 419–20, but their Section 504 claims against him remain pending.

106.    The Secretary routinely issues guidance, directives, orders, instructions, and handbooks to county registrars of all 254 Texas counties, as well as to district attorneys, political candidates, and voters, on various election procedures, including changes implemented in S.B. 1. Tr. at 119:24–120:6, 125:4–21, 128:14–20, 129:3–14, 143:15–18, 159:9–160:11, 1831:7–14, 1875:5–10, 1875:18–25.

107.    The Secretary also collaborates with the OAG to enforce election laws in accordance with her mandatory duties under the Election Code. Tr. at 3913:9–19, 4054:16–4055:8.

108.    Under the Election Code, the Secretary must evaluate information she "receiv[es] or discover[s]" about potential election crimes and, if she "determines that there is probable cause to suspect that criminal conduct occurred, the [S]ecretary *shall* promptly refer the information to the attorney general" and provide all pertinent documents and information in her possession to the AG. TEC § 31.006 (emphasis added). In this capacity, the Secretary serves as "a gathering point for election complaints from individuals and election officials." Tr. at 3913:12–19. The Secretary has received allegations related to mail ballot "vote harvesting," which she has referred to the OAG both before and after the passage of S.B. 1. Tr. at 1914:1–6.

### *Texas Attorney General*

109.    Defendant Ken Paxton is the Attorney General ("AG") of the State of Texas. His office, the Office of the Attorney General of Texas ("OAG"), is an executive department or agency of the State of Texas. ECF No. 753 ¶ 40.

110.    The AG has statutory duties for certain aspects of S.B. 1's enforcement scheme, including Sections 6.04, 6.05, 6.06 and 7.04. *Stephens* did not alter the authority of the AG to investigate allegations of election-related crimes, and, in some cases, the OAG considers its investigative duties to be "statutorily required" or "mandatory" for election-related allegations. Tr.

at 4041:18–4042:25; *see, e.g.*, TEC § 273.001 (providing that the AG "shall investigate" allegations of election crimes in elections covering more than one county). The AG may also "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* TEC § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them).

111.    The AG has demonstrated a willingness to enforce, and has actually enforced, the Election Code, including S.B. 1. Tr. at 3909:8–17, 3913:9–3914:16.

112.    The OAG continues to operate the Criminal Prosecutions Division unit that prosecutes election-related allegations, known as the Election Integrity Division. Tr. at 3903:23–3905:4, 3905:11–15, 4039:14–19. As of March 17, 2023, the OAG had identified investigations of possible violations of the Assistor Disclosure requirement for mail ballots (S.B. 1 § 6.05) and the Canvassing Restriction (S.B. 1 § 7.04). *See* LULAC-86 at 6.

113.    Before *Stephens*, the OAG regularly prosecuted election crimes, including alleged unlawful-assistance and vote-harvesting schemes, in counties across Texas. *See* OCA-377 (showing 401 counts—not cases—of election crimes prosecuted by the OAG, alone or in conjunction with local prosecutors, between 2005 and 2022).

114.    Even after *Stephens*, Jonathan White, former Chief of the OAG Election Integrity Division, testified that "assistance fraud" (purportedly targeted by the many of the Challenged Provisions) and "vote harvesting" schemes (purportedly targeted by the Canvassing Restriction) remain among the three most common elections-related allegations that the OAG pursues. Tr. at 3915:3–8.

115.    Although the AG may no longer unilaterally prosecute allegations of election-related crimes, *Stephens*, 663 S.W.3d at 51–55, the OAG enforces criminal election offenses

through other mechanisms. After OAG investigations conclude, the OAG refers cases to local prosecuting attorneys and often seeks opportunities to partner with DAs to prosecute such allegations through deputization by a DA or appointment *pro tem* by a district judge or the DA. Tr. at 3908:21–3909:17, 3909:1–12; 4043:21–4045:21; 4051:2–10.

116.    Finally, the AG is tasked to enforce S.B. 1 against election officials who are subject to civil prosecution for Election Code violations. S.B. 1 § 8.01 (TEC §§ 31.128, .129, .130); *see* Tr. at 772:2–6. He is authorized under S.B. 1 § 8.01 (TEC § 31.129(b)) to assess civil penalties against local officials who violate the law by failing to enforce provisions of S.B. 1.

**County Defendants**

117.    Plaintiffs have named various local election officials and prosecutors as Defendants in their official capacities for their roles in implementing and enforcing the Challenged Provisions.

### *County Election Officials*

118.    Plaintiffs have sued local election administrators in several counties in Texas (the "EAs" or "County Clerks," as applicable) in their official capacity to enjoin them from enforcing the Challenged Provisions.

119.    The HAUL Plaintiffs seek injunctive relief against the Bexar County EA and the Harris County Clerk.[23] *See* ECF No. 199. The OCA Plaintiffs seek injunctive relief against the County Clerks of Harris County and Travis County. *See* ECF No. 200. The LUPE Plaintiffs seek injunctive relief against the EAs of Dallas County and El Paso County. *See* ECF No. 208.

120.    Local election officials administer Texas elections. They are responsible for administering the Oath of Assistance at polling places, TEC § 64.034, and for collecting and

---

[23] The Harris County EA's office was abolished on September 1, 2023, pursuant to 88th Leg. R.S. Senate Bill 1750 (amending TEC § 31.050). ECF No. 753 ¶ 44 & n.12.

reviewing required disclosures at the polls and on the carrier envelopes of mail-in ballots, *id.* §§ 64.0322, 86.010(e). They also receive and review mail carrier and ballot envelopes to voters, *id.* § 86.002, receive and process marked ballots, *id.* §§ 86.006, 86.007(b), 86.011, verify voter signatures, *id.* § 87.027(i), and count the results, *id.* § 87.061.

### *County District Attorneys*

121.    Plaintiffs seek to enjoin the district attorneys of several counties in Texas (the "DAs" or "County DAs") from enforcing S.B. 1 §§ 6.04–6.06 and 7.04.

122.    The HAUL Plaintiffs seek injunctive relief against the DAs of Bexar County, Harris County, and Travis County. *See* ECF No. 199. The OCA Plaintiffs seek injunctive relief against the Harris County DA and the Travis County DA. *See* ECF No. 200. The LUPE Plaintiffs seek injunctive relief against the DAs of Travis County, Dallas County, and the 34th Judicial District, which includes El Paso, Culberson, and Hudspeth Counties. *See* ECF No. 208.

123.    County DAs are charged with investigating and prosecuting violations of the Election Code, including those among the Challenged Provisions. *See Stephens*, 663 S.W.3d at 55.

124.    A newly enacted law curbs DAs' authority to adopt a policy against enforcing crimes under the Election Code. House Bill 17 ("H.B. 17"), which went into effect on September 1, 2023, provides that DAs may be removed from office if they adopt any policy that "prohibits or materially limits the enforcement of any criminal offense." TEX. LOC. GOV'T CODE § 813(B).

**IMPACT OF THE CHALLENGED PROVISIONS**

**Section 5 - Mail-In Voting Provisions (§§ 5.02, 5.03, 5.06, 5.07, 5.10, 5.12)**

**Deficiencies in TEAMs & S.B. 1 led to high rejection rates of ABBMs and BBMs**

125.     S.B. 1's requirement that a mail-in voter include the voter's DPS number or SSN4 on ABBMs and on BBM ballot carrier envelopes has made voting more burdensome, especially for voters with disabilities, resulting in a dramatic increase in ABBM and mail-ballot rejections.

126.     In the first statewide election after S.B.1's effective date, the March 2022 Primary, the Texas-wide mail ballot rejection rate for the March 2022 Primary was 12.4 percent, twenty times higher than in 2020. Tr. at 1879:6–16. In Harris County and Tarrant Counties, 90 percent of the rejected ballots were rejected in that election because of missing, incomplete, or non-matching ID numbers as required by S.B. 1. Tr. at 1983:12–18.

127.     Thousands of qualified voters have been disenfranchised because of Sections 5.07 and 5.13. *See, e.g.*, LUPE-301, LUPE-302. In March 2022, more than 25,000 mail ballots were rejected because of the ID requirements. ECF No. 820 at 9. In November 2022, more than 11,000 were rejected for that reason. *Id.*

128.     The instructions on the BBM carrier envelope are in tiny type, and the spaces for the voter to enter the identification numbers are hidden under the flap. STATE-217. Voters complained that the ABBM and BBM forms were not user-friendly. The forms do not draw enough attention to the identification number requirements, so the spaces to enter the numbers are easy to miss. Tr. at 210:2–11.

129.     Some voters, including voters with disabilities, did not see the instruction to place their identification number under the flap on the BBM carrier envelope, and some called their local

elections office to say that they believed an identification number was unnecessary on the BBM carrier envelope because they had already supplied one with their ABBM. *Id.* at 212:15–18.

130.    Dr. Kruse testified that people with disabilities may have difficulty remembering and locating their ID number to include with their ballot application or ballot. Many people with disabilities are older and it may have been a long time since they registered to vote, so they may have trouble remembering what number they used. Others, particularly those with cognitive disabilities or who live in congregate settings, may have difficulty retrieving their ID number because they do not know where to find that information or where it is stored or might have to retrieve it from parents who live elsewhere. Tr. 3760:6–19, 3761:7–18; LUPE-002 ¶ 91. In addition, voters with cognitive impairments may have difficulty complying with S.B. 1's identification requirements because they may have difficulty understanding the relevant instructions and requirements of the provisions. Tr. at 3761:7–18.

131.    Election officials ultimately determined that incomplete records in the TEAM system could interfere with a qualified voter's ability to cast a mail ballot that would be counted under the new requirements, even if the voter submitted a valid ID number.

132.    Older voters, who registered to vote before 2004, may not have any number associated with their TEAM registration record.

133.    Even for voters who registered *after* 2004, the Texas Voter Registration Application instructs the registrant to enter a TDL/TID "or" SSN4, as does Row 9 of the Application, which provides blanks for entry of those numbers. OCA-283. In other words, a DPS number is *not* required to enter both numbers when registering to vote, and a registrant who enters a TDL and not an SSN—or vice versa—reasonably believes that the second number is not required.

134.    It is possible, moreover, for a registered voter to have multiple identification numbers issued by DPS; TEAM, however, lists only one DPS-issued identification number per voter and there are no plans to update TEAM to include multiple DPS-issued identification numbers. Tr. at 1846:3–19.

135.    Because matching a DPS number or SSN4 against incomplete and erroneous voter registration records fails to identify some voters accurately, S.B. 1 requires election officials to reject mail ballot materials from voters who provided accurate information. Thus, an ABBM or BBM with a valid DPS number may be rejected for failing to satisfy the Number-Matching Requirement because the voter's record on TEAM: (1) does not contain any ID numbers, (2) contains only the voter's SSN4, (3) contains another DPS number, or (4) contains a typo.

136.    The State Defendants conceded that, as of the time of trial in this case, at least 667,685 Texas voters could put a valid DPS number or SSN4 on an ABBM or BBM and not have it match their voter registration record in TEAM. Tr. at 1920:3–7; *see* LULAC-75. Plaintiffs estimate that the problem may be three times larger than the State admits based on study showing that 2,394,435 Texas voters have one DPS-issued ID number in TEAM, but their DPS files list multiple identification numbers. Any of these voters could insert a correct DPS-issued identification number on an ABBM or BBM and have their application or ballot rejected because the number they inserted was not the one in their TEAM record. STATE-200 at 22, App. A, ¶ 22.

137.    After S.B. 1 became effective, voters who are older, who never drove, who were born outside traditional hospitals, or who have disabilities, have had difficulties because their identification numbers are not on file. Tr. at 1281:23–1282:13. Although S.B. 1 technically permits entry of a TID, "in [the] experience [of the Harris County EA's Office,] if you're not driving then you probably don't have an ID number." Tr. at 1281:14–15.

138.     To make matters worse, the instructions on the Form ABBM and BBM carrier envelope reflect the text of S.B. 1, calling for the voter to enter either a DPS number or an SSN/4. *See* LUPE-009, LUPE-119, TEC §§ 84.002, 86.002(g). ***The Secretary cannot amend the form ABBM or BBM carrier envelope to advise voters to include both numbers because doing so would be inconsistent with statutory requirements of the Election Code***. Tr. at 1838:17–23. A voter who complies with the letter of S.B. 1—who enters just one number on an ABBM form is gambling that the number he or she enters will be the one that is in TEAM. Tr. at 1033:23B1034:19; 1034:21–1035:19.

139.     In response to the pervasive confusion and rejection of ABBMs and BBMs, election officials took action to mitigate S.B. 1's impact on voters, with mixed results.

140.     Because the Election Code prohibits election officials from modifying election procedures in a manner not expressly authorized by code, TEC § 276.019, most of the election official's attempts to mitigate S.B. 1's involved sending voters more paperwork—new voter registration form and instructions for completing (or curing defects in) ABBMs and BBMs.

141.     These additional instructions often added to the confusion. With each rejection notice for an ABBM related to ID-number problem, the El Paso County EA sent an application to register to vote, in the hope that the voter would return the registration form with an identification number or numbers that could be entered into SOS's system. The EA received many calls from voters who were confused by the inclusion of the registration application, as they were already registered to vote. Tr. at 217:6–21.

142.     The ABBM rejection form does not specify which identification number the voter entered on the rejected ABBM. HAUL-396-A. In correspondence with Christina Adkins, the Denton County Deputy EA wrote, "We both know that voters can't remember how they filled out

the defective [ABBM] once it's sent." Tr. at 165:25–166:6; LUPE-194. Ms. Adkins similarly recognized in her trial testimony that, after submitting an ABBM, a voter may not remember which number he or she entered. Tr. at 1842:6–14.

143.    If voters in general are unable to remember which number they submitted on their ABBM only weeks earlier, it is not clear to the Court how elderly voters and voters with cognitive disabilities can be expected to recall and produce the very same identification number(s) they provided on a registration form months or years earlier. S.B. 1 not only permits voters to provide expired DPS numbers but *requires* voters to provide an expired DPS number whenever their TEAM record contains an expired number.

144.    On February 1, 2022 the Election Division Staff responded to a query from the US Department of Defense Voter Assistance Program concerning which ID number (TDL/TID or SSN/4) should be filled in on an FPCA ballot application by explaining "the counties and our office are telling voters it is permissible to put both numbers if they are not sure" because "many voters do not remember which number they originally gave the county when they registered." LUPE-130.

**Deficiencies in the Ballot Tracker led to low cure rates**

145.    County election officials acknowledged that curing a mail ballot application or mail ballot could be more difficult for voters with disabilities, Tr. at 447:19–21.

146.    To begin, voters with disabilities are less likely to be able to access the Ballot Tracker because they are less likely to have access to or use the internet.[24] The Ballot Tracker is also inaccessible to blind and visually-impaired voters.

---

[24] Texans with disabilities are three times more likely to live in homes without internet access; an estimated 460,600 voting-eligible Texans with disabilities live in homes without internet access. Tr. at 3748:20-25, 3749:1–7; LUPE-002 ¶ 54, Table 6. Texans with disabilities are twice as likely to not use the internet, whether at home or otherwise. In

147.    The Ballot Tracker theoretically allows voters to add or correct their ID numbers but limits access to the Tracker to voters who enter both their SSN/4 and their DPS number. Thus, a voter whose TEAM record does not have *both* required numbers is shut out of the Tracker for purposes of curing an ABBM or a BBM carrier envelope. ***This is a statutory requirement that SOS cannot modify.*** Tr. at 1850:21–1852:22.

148.    To the extent that a voter is unable to use the Ballot Tracker, he must cure his ballot in person. Of course, a voter with a physical disability that affects mobility or access to transportation will face barriers correcting a mail-in ballot carrier envelope in-person.[25] Tr. at 219:4–8 (Wise); Tr. at 486:4–10 (Scarpello); Tr. at 1521:10–19 (Johnson); Tr. at 1300:3-4, 1300:20–1301:6 (Longoria).

149.    The Harris County EA asked the Secretary to permit disabled voters to vote by email, as members of the military are allowed to do, but the SOS denied the request and further denied the request to allow disabled voters to cure defective BBMs by email ballot. The Secretary takes the position that the Election Code is strict: there is no way for disabled voters to correct their BBMs except in person or with the Ballot Tracker, and no assister may do this for the voter. See Tr. at 1300:3–1301:25.

---

absolute numbers, an estimated 832,200 citizens with disabilities do not use the internet, whether inside or outside the home. Tr. at 3750:1–12; LUPE-002 ¶ 55, Table 6.

[25] 123.    Just over half of Texans with disabilities have a mobility impairment (1,604,700), defined as difficulty walking or climbing the stairs. Tr. at 3740:3–7; LUPE-002 ¶ 40, Table 1.

124.    Approximately one-third of Texans with disabilities have difficulty going outside the home alone (1,127,500). Tr. at 3740:10–16; LUPE-002 ¶ 40, Table 1. Texans with disabilities are four times more likely to live in a zero-vehicle household, less likely to take trips outside the household, and less likely to be able to drive. Tr. at 3751:25, 3752:1–5; LUPE-002 ¶ 57, Table 7. They are more likely to live alone, less likely to be married, and more likely to be separated, divorced, or widowed. Tr. at 3747:20–25; LUPE-002, Table 4. They are also half as likely to be employed as other working-age people without disabilities and are twice as likely to be in poverty. Tr. at 3746:18–22; LUPE-002, Table 4. The lower employment levels, greater likelihood of living alone, lower internet access, and transportation barriers among people with disabilities contribute to social isolation. LUPE-002 ¶ 60. People with disabilities also face social stigma because of their disability. Tr. at 3752:16–25, 3753:1–2; LUPE-002 ¶¶ 60, 61.

150.    The Travis County Elections Division director testified that her office received complaints from voters that the Ballot Tracker was difficult to navigate: some voters were never able to use it successfully and were unable to cure ballot deficiencies. Tr. at 1551:18-22, 1574:15-20.

151.    Travis County officials attempted to walk voters through the process of curing their ballot through the Ballot Tracker; but those efforts took 30–40 minutes per voter or longer, and there were voters who still could not cure online. Tr. at 1520:1–1521:19. There were ballots, moreover, that were received too late to be cured. Tr. at 1521:20–1522:2.

152.    The individual experiences of voters illustrate S.B. 1's widespread effects, especially for voters with disabilities.

### *Yvonne Yvette Iglesias*

153.    Yvonne Yvette Iglesias is a member of The Arc of Texas and REV UP and registered voter in Hidalgo County. Ms. Iglesias is blind in one eye, has paraplegia, and has diabetes. HAUL-416, Iglesias Dep. at 18:12–17, 19:8-14, 21:6–22:5, 25:8–15, 416:18:12–17. She always votes by mail because she can only travel by ambulance services, and they are unable to take her to vote in person. *Id.* at 29:4–11. Her pressure ulcers make it impossible for her to sit. *Id.* at 21:6–22:5

154.    Ms. Iglesias applied to vote by mail based on her disability in both the 2022 primary and general elections, but her ABBMs were rejected in both elections. *Id.* at 35:6–15, 39:18–21. When she contacted the Hidalgo County election office, she was told that her ballot had been rejected because she failed to include an ID number, although she believes she entered her information correctly. *Id.* at 41:24–42:20. She resubmitted her application, but it was again rejected, and she was told it did not include an ID number. *Id.* at 44:22–45:11, 46:24–47:25.

### *Teri Saltzman*

155.    Teri Saltzman, a legally blind voter and member of the Arc of Texas, had her ballot application rejected multiple times for ID related reasons and was told by Travis County to use the ballot tracker to cure her application, but the ballot tracker was inaccessible to her as a blind person. She was then informed by Travis County that the rejection was based on Ms. Saltzman using an outdated application that the County had sent her. Tr. at 3351:14–3353:6. After submitting a second application and carefully checking the ID numbers she entered using assistive technology available to her at work, her application was accepted about one week before the March 2022 primary.

156.    Ms. Saltzman then attempted to vote by mail and asked her husband to review the ballot to ensure she filled everything out properly, since the ballot was inaccessible to her as a blind person. Despite this extra review, her ballot was rejected because she missed something that needed to be filled in under the flap on the carrier envelope. Her disability prevented her from seeing the instructions about what should go under the flap since the ballot was inaccessible to her. Tr. at 3356:1–3357:1.

157.    Ms. Saltzman actively tried to get assistance from Travis County several times over three elections when her mail ballot applications and mail ballots were rejected. She explained that she had a disability, that she could not come in person to cure her application and ballot, and that the online system was inaccessible due to her vision impairment. The county did not offer to change or waive any S.B. 1 requirements or provide other modifications to Ms. Saltzman.

158.    When Ms. Saltzman received her mail ballot application for the November 2022 general election, the type on the form was even smaller than it had been previously, and she was not able to access it.

### Stella Guerrero-Mata

159.     Stella Guerrero-Mata is a 73-year-old voter in Harris County with limited vision. Tr. at 965:8–23. Ms. Guerrero-Mata, like Ms. Saltzman, had difficulty seeing the text on the carrier envelope, and did not see that she needed to write her ID number on the envelope when she filled it out for the November 2022 election. Tr. at 971:7–15, 972:5–9. Her ballot for the November 2022 general election was rejected because she did not include her ID number on the carrier envelope.

160.     She received notice of the rejection too late to cure it and she was unable to vote in that election. Ms. Guerrero-Mata has limited ability to drive due to her eyesight and was not able to drive to the Harris County elections office to cure her ballot after it was rejected. She also has not used her home computer in more than a year. She was therefore unable to cure her ballot and did not vote in the November 2022 general election. She is not sure that her mail ballot would be counted if she voted in the future. Tr. at 966:16–969:12.

### Section 6 – Assistance Provisions

161.     The Assistance Provisions have disparate impact on voters with disabilities because they are simultaneously more likely to need assistance and more likely to be socially isolated (and have fewer options for potential assistors).

162.     At trial, the Court heard testimony (live and by deposition designation) from numerous voters with disabilities who require voting assistance, individuals who have served as assistors in the past, and election officials describing the impact that the Challenged Provisions have on impaired disabled voters' ability to vote with assistance.

**Assistor Disclosures (§§ 6.03, 6.05, 6.07) and Oath of Assistance (§ 6.04)**

163.     The Assistor Disclosures and Oath requirements deter voters from requesting, and assistors from providing, assistance in the voting process. As a result, some voters who need

assistance have forgone assistance altogether and struggled to complete their ballots. Others who engaged with election officials sacrificed their privacy while voting but still did not receive the assistance they needed.

164.     The Court heard trial and deposition testimony from several Texas voters who, due to their physical disabilities, require assistance in nearly every facet of their daily lives, including Jodi Nunez Landry, Laura Halvorson, Amy Litzinger, and Nancy Crowther. All four witnesses are members of the Arc.

165.     Although Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther are eligible for assistance under Texas and federal law, none of them received voting assistance from their assistors of choice in the 2022 primary or general election because of the burdens—including the threat of criminal liability—that S.B. 1's Disclosure and Oath requirements impose on assistors.

166.     These voters were not worried that their chosen assistors would influence their vote.[26] Instead, voters' primary concern was exposing their caregiver to criminal liability under S.B. 1 and losing the critical assistance they provide outside the voting process.[27]

167.     Voters with disabilities also fear being disenfranchised due to the mistaken perception by election workers and poll watchers that voters receiving assistance are being improperly coerced or influenced. As Ms. Halvorson explained, "especially if they don't have an

---

[26] Ms. Halvorson testified that she has never felt that one of her attendants was trying to influence her choices or would manipulate the way her ballot was marked. Tr. at 3318:3–11. Similarly, Ms. Litzinger explained that her personal care attendant is not able to manipulate how she votes because she is always present when they are assisting her with marking the ballot and ensures that she can see her ballot and verify what the attendant marks. *See, e.g.,* Tr. at 3296:20–3297:8.

[27] Ms. Nunez Landry testified that her "worst fear is ending up in a nursing facility due to her inability to find care attendants." Tr. at 3234:7–23 (has had difficulty finding personal care attendants due to shortage of home health care workers, who generally receive low wages without benefits and can earn more money working less physically demanding jobs); *see also* Tr. at 3331:2–18 (Halvorson) (finding replacement caregivers is "hard enough" without criminal penalties being added to the mix of what they are being asked to do).

understanding of disability," people may believe that "we're not able to make decisions for ourselves or we don't have the intellectual capacity to do so. . . . I [worry] that other people would perceive that my caregivers were influencing my vote, if they just see from across the room someone pressing buttons for me." Tr. at 3324:15– 3325:5, 3331:2–18.

**Voters with disabilities have been deterred from requesting assistance.**

*Jodi Nunez Landry*

168.    Jodi Nunez Landry is a registered voter of Harris County, Texas and votes with assistance. Tr. at 3236:11–17; Tr. at 3234:1–6. Ms. Nunez Landry has a rare, untreatable, and progressive form of muscular dystrophy. Tr. at 3233:7–14. She uses a power wheelchair to navigate and requires assistance with most activities of daily living, including bathing, dressing, cooking, and cleaning. Tr. at 3233:2–14, 3235:10–3236:2.

169.    Ms. Nunez Landry prefers to vote in person. Tr. at 3236:24–3237:14. She prefers to have her partner assist her with voting because she "can trust him and there's a certain amount of privacy there[.]" Tr. at 3243:5–25. Because her partner already understands the contours of her disability, she does not need to give him a lengthy explanation of her needs. Tr. at 3234:2–6, 3236:24–3237:14.

170.    Ms. Nunez Landry has not asked her partner for voting assistance since S.B. 1 was enacted because she did not "want to put him in jeopardy" or draw attention to herself or have people assume that she was "being coerced" in light of S.B. 1's voter assistance provisions. Tr. at 3246:23–3247:6. She explained:

> I would have liked to have had my partner assist me but I knew under SB 1 that we were going to have to go through all sorts of difficulties to do that, and . . . I didn't want to put him through that. I'm really afraid of losing assistance and not having anyone, and also I don't want to draw more attention to myself.

Tr. at 3256:15–3257:4; *see also* Tr. at 3260:2–18 (stating that she was "too afraid to ask his assistance," noting that S.B. 1 has a "chilling effect" on voters who need assistance because it is "very burdensome and frightening for many of us to risk losing attendants or risk putting them in some type of legal jeopardy").

171.    In the November 2022 election, Ms. Nunez Landry could not access the remote that would allow her to vote independently at her voting station and, once she had it, found that it was not functioning properly. Tr. at 3244:25–3245:14. When the poll worker she asked for help did not understand the problem, he brought other unknown individuals to Ms. Nunez Landry's booth. Tr. at 3245:18–3246:10. Although they failed to help her, all three strangers watched as Ms. Nunez Landry made her selections.

172.    Discussing the loss of her privacy, Ms. Nunez Landry testified that it "made me really nervous" and "they all voted with me, much to my chagrin and frustration." Tr. at 3246:7–8. Had she been able to receive assistance from her partner, "he could have touched the screen and it would have all been rather effortless." Tr. at 3246:16–17. When she finally finished voting, she "was very, very angry." Tr. at 3246:21–22.

### *Laura Halvorson*

173.    Laura Halvorson is a registered voter in Bexar County. Tr. at 3315:25. Ms. Halvorson has chronic muscular respiratory failure and muscular dystrophy, a progressive condition that has worsened since her diagnosis. Tr. at 3311:14–22. Presently, Ms. Halvorson relies on a breathing machine and a power wheelchair. Tr. at 3312:2–3.

174.    Ms. Halvorson requires "total care" for everyday life, including assistance with transferring, bathing, dressing, eating, and meal preparation. Tr. at 3312:9–12. To accomplish these daily tasks, Ms. Halvorson employs several personal care attendants. Tr. at 3312:15–17.

175.    In the March 2022 primary, Ms. Halvorson opted to vote by mail. Tr. at 3318:23–24. Her assistant, however, did not feel comfortable taking the Oath of Assistance and declined to assist Ms. Halvorson. Tr. at 3319:7–16.[28] This was the first time a personal care attendant ever declined to assist Ms. Halvorson in voting. Tr. at 3319:14–16. Without her assistant, Ms. Halvorson struggled to complete the mail in ballot. Tr. at 3319:17–20. Her muscle weakness inhibited her ability to write legibly, Tr. at 3320:4–18, forcing her to fill out her ballot in ten- or fifteen- minute intervals over the course of two full days. Tr. at 3320:19–22.

176.    In the November 2022 general election, Ms. Halvorson voted in-person. Tr. at 3322:5–10. She again voted without assistance to avoid exposing her assistant to liability. Tr. at 3322:11–18, 3323:10–24. Ms. Halvorson finds S.B. 1's Oath intimidating and ambiguous and worries that her caregivers may be accused of influencing her vote by simply helping her cast it. Tr. at 3324:11–3325:5. When Ms. Halvorson arrived to vote, her remote control had a glitch that essentially inverted the controls. Tr. at 14–17. She struggled to highlight voting machine choices, and when was able to do so, could not deduce what the candidate's party affiliation was. Tr. at 3327:13–23. Ms. Halvorson testified that, when she sought help from poll workers, they snidely told her to push the buttons. Tr. at 3328:6–11. After nearly 45 minutes at the poll booth, Ms. Halvorson weakly delivered it into the counting machine. Tr. at 3329:1–8; 3330:1–3.

### *Amy Litzinger*

177.    Amy Litzinger is a registered voter in Travis County. Tr. at 3281:14–17. Ms. Litzinger has spastic quadriplegic cerebral palsy, which impairs her stability and ambulation and limits her muscle strength. Tr. at 3275:19–24. She also has dysautonomia, which affects

---

[28] As a green card holder, her personal care attendant was not comfortable taking an oath under penalty of perjury that could risk her green card status.

involuntary functions, such as her digestion, breathing, and heart rate and temperature regulation. Tr. at 3276:2–6.

178.    Due to these conditions, Ms. Litzinger uses a power wheelchair and other mobility devices. Tr. at 3276:8–10. Because her muscle strength fluctuates, Ms. Litzinger cannot always operate these devices, Tr. at 3276:18–22, and often requires assistance with her daily activities. Tr. at 3279:11–15. Ms. Litzinger requires assistance to get in and out of bed, to shower, and to use the restroom. Tr. at 3279:16–25. She cannot lift or raise anything heavier than two pounds—which inhibits her ability to write and open doors. Tr. at 3277:16–3278:6. Ms. Litzinger owns a mobility van, which her assistors use to drive her around the city. Tr. at 3277:10–14. They must also secure Ms. Litzinger into her power wheelchair using a "chest clip" and "strap" and secure her power wheelchair in the van. Tr. at 3277:4–9.

179.    Although she is eligible to vote by mail, Ms. Litzinger prefers to vote in person because she anticipates that her disability will produce conflicting handwriting samples on a mail ballot—her own handwriting fluctuates with her strength, and she sometimes relies on assistors to complete her ballot. Tr. at 3282:14–21.

180.    Ms. Litzinger prefers to have her personal care attendant assist with voting. Since she has limited dexterity, the poll worker would have to interact with intimate parts of her body, which could be unsafe or uncomfortable—for both individuals. Tr. at 3286:11–3287:4. She also relies on her personal care attendant to get to the polling site: her attendant drives her van, loads and unloads Ms. Litzinger from the van, ensures there are no barriers to enter the voting space, requests curbside voting, handles her ID, and places the completed ballot in the machine. Tr. at 3284:13–3285:23. Ms. Litzinger also relies on an attendant when voting by mail, as she did in

2020. Ms. Litzinger needs someone to open the envelope, fill it out, and tape it down so she can sign it. Tr. at 3287:20–3288:5.

181.    All of Ms. Litzinger's attendants have expressed to her that they are uncomfortable taking the Oath of Assistance, and accordingly, none of them have provided voting assistance since S.B. 1 was enacted. Tr. at 3293:17–21.

182.    During the May 2022 primary, when Ms. Litzinger approached the ballot machine to vote in person, she realized her chest clip was still fastened. Tr. at 3289:23–3290:2. She was uncertain if the assistant could release the clip or if that would be considered impermissible voting assistance. Tr. at 3290:2–5. Thus, Ms. Litzinger voted with the chest clip fastened and remembered it was "quite painful." Tr. at 3290:13–17. Due to the discomfort, she struggled to complete the five-page ballot. Tr. at 3290:15–17.

183.    In the November 2022 general election, Ms. Litzinger spoke at length with her attendant about the Oath. Ultimately, to avoid exposing the attendant to criminal liability under the Oath, especially concerning Ms. Litzinger's "eligibility" for assistance, they decided that the attendant would provide Ms. Litzinger with transportation assistance but would not help her inside the polling place. Tr. at 3291:4–3292:5. Thus, Ms. Litzinger held her notes but was unable to review them as she voted because she dropped them and could not pick them up. Tr. at 3292:6–9.

184.    Despite Ms. Litzinger's decision to vote without assistance, poll workers attempted to have the attendant sign the Oath simply because she was in the room with Ms. Litzinger. Tr. at 3292:9–17. During the entire time Ms. Litzinger was voting, three people debated whether she needed assistance and ultimately watched her vote. Tr. at 3293:1–13. She described the process as nerve-wracking and noted that "for something that was designed to keep my ballot private, I didn't

think . . . it was very private because everyone [was] watching me vote and debating whether [I was] self-sufficient or not." Tr. at 3292:21–3293:4–7.

### Nancy Crowther

185.    Nancy Crowther, a registered voter in Travis County, is a member of The Arc. HAUL-413, Crowther Dep. at 16:22–25, 17:4–5, 30:5–12. Ms. Crowther has a progressive neuromuscular disease and requires a personal care attendant to complete major life activities. She cannot sit up by herself, so her attendant helps her get dressed, use the bathroom, and transfer in and out of her wheelchair. Ms. Crowther also uses her attendant to complete household tasks and personal hygiene and most other daily activities. *Id.* at 23:25–24:8, 18:3–9, 30:5–12.

186.    Ms. Crowther did not take her attendant with her to vote in May 2022 because of her fears that the Oath could jeopardize her relationship with her attendant: "I would be mortified . . . if they were to get in trouble just for helping me." *Id.* at 52:11–53:4, 54:7–14. Ms. Crowther explained that, even though she will need more and more help over time as her disability progresses, she does not want to expose her attendants to "danger" that "they aren't paid for" by asking for their assistance under the conditions imposed by S.B. 1.

**The Oath of Assistance (§ 6.04) deters voting assistance.**

187.    The Oath of Assistance under Section 6.04 of S.B. 1, as enjoined by Judge Pitman, provides:

> I swear (or affirm) **under penalty of perjury** that **the voter I am assisting represented to me they are eligible to receive assistance**; I will not suggest, by word, sign, or gesture, how the voter should vote; **I did not pressure or coerce the voter into choosing me to provide assistance**; [and] I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; **I will not communicate information about how the voter has voted to another person**; **and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted**.

TEC § 64.034.

188.    Plaintiffs challenge the chilling effect on voting assistance created by the Oath's "penalty of perjury" language, the requirement that the voter represent his or her eligibility for assistance and assistor statements concerning eligibility and "pressure or coerc[ion]."

### The "penalty of perjury" language deters assistance.

189.    At trial, voters,[29] assistors,[30] and election officials[31] alike characterized the "penalty of perjury" language in the amended Oath as "intimidating," "scary," and "threatening." Several witnesses who assisted voters in elections prior to S.B. 1's enactment testified that they are no longer willing to serve as assistors due to the threat of criminal sanctions under the Oath.[32]

190.    Witnesses also pointed out that the "penalty of perjury" language can interact with other language in the Oath to prohibit assistors from providing the assistance a voter requires. For example, an assistor must swear "under the penalty of perjury," that they "will not suggest, by word, sign, or gesture, how the voter should vote."

191.    Although this language appeared in the Oath before S.B. 1, the "penalty of perjury" language impairs assistance to voters with intellectual disabilities and certain cognitive and physical impairments who need to be reminded of their selections, discussed in a previous conversation with their chosen assistor. *See, e.g.*, Tr. at 3491:9–20 (explaining that "cuing" is a common method of assisting voters with IDD); at 3740:19–23; LUPE-002 ¶ 40, Table 1 (stating that approximately one million, or one-third of voting-eligible Texans with disabilities, have a "cognitive impairment," defined as difficulty remembering, concentrating, or making decisions).

---

[29] *See, e.g.*, Tr. at 3324:10–14 (Halvorson).

[30] *See, e.g.*, Tr. at 147:10–148:8 (Rocha); Tr. at 3208:9–17; Tr. at 3217:12–3218:1 (Miller); Tr. at 2439:24–2440:10 (Espinosa); Tr. at 2540:21–23 (Ortega).

[31] *See, e.g.*, Tr. at 175:6–176:8 (Wise); Tr. at 1312:25–1314:9 (Longoria).

[32] *See, e.g.*, Tr. at 2443:20–2444:14 (Espinosa); Tr. at 2539:12–19 (Ortega).

192.    Before voting curbside, Toby Cole, a disability rights attorney and Harris County voter with quadriplegia, goes through a sample ballot with his assistant, who helps him research candidates and mark the sample ballot. During the voting process, Mr. Cole asks his assistant to reference the sample ballot to remind him of his previous selections:

> I don't remember things the way I did when I was younger. I need someone to help me . . . I rely on my assistants to help me remind me of things. . . . And so I specifically request the people that help me, that they help remind me of what I've told them I want to do and how I want to vote.

Tr. at 702:10–703:19, 706:19–707:20. Thus, read together with the "penalty of perjury" language, Mr. Cole understands this portion of the Oath to mean that he must either change how he votes or require his assistor to commit perjury. Tr. at 710:20–711:11.[33]

193.    Voters with disabilities testified that they believed the "penalty of perjury" language will deter some people from voting altogether:

> I talk to a lot of people after they get disabled . . . as you make things harder, you just start cutting things out . . . it's too hard to find someone to feed me, or it's embarrassing, so I don't want to go to dinner. It's too hard to get on an airplane to go travel, so I just don't do that. And so every time you put even one little road bump or one little barrier in front, it just makes it that much harder, and so you don't do it . . . I look at the oath and it says "I swear under the penalty of perjury." . . . That's a big deal. That's a scary deal. [A]m I going to have somebody that may get deported or thrown in jail come help me? No, I'm just not going to vote. I'm just not going to exercise that right.

Tr. at 714:6–18, 715:1–14. Ms. Halvorson stated that many of her friends with disabilities are worried about their caregivers facing these issues with the penalty of perjury and "[s]ome of them may not be going out and voting like they used to, due to it." Tr. at 3332:11–18.

---

[33] Mr. Cole is not the only attorney concerned about the "perjury" language. MABA members find this language alarming because they do not want to subject themselves to the consequences of being accused of perjury—and potentially be disbarred—for providing voter assistance. Tr. at 2538:8–14.

194.     Finally, there is some uncertainty about the type of "assistance" that triggers the Oath requirement in the first place. Ms. Litzinger did not ask her attendant to unfasten her chest clip while she was voting out of concern that it would trigger the Oath requirement. Tr. at 3290:2–5. Mr. Ingram testified that whether an attendant who pushes a wheelchair user to the poll booth (but does not actually help her cast the ballot) must take the Oath is "a very gray area and kind of depends on the presiding judge." Tr. at 4420:18–4422:6. Mr. Ingram suggested that a voter faced with such a situation could ask the presiding judge for a reasonable accommodation (by permitting her attendant to move her to the poll booth without taking the Oath).[34] Alternatively, Mr. Ingram suggested that the attendant could "just take the Oath of Assistance, and whether you help the voter or not, you're in the polling place legally at that point." Tr. at 4420:18–4422:6. But, of course, this response just begs the question. Voters and attendants want to know what kind of assistance can be provided, if any, *without* trigging the Oath requirement.

### Voter Eligibility for Assistance

195.     Voters and assistors testified that these portions of the Oath addressing the voter's eligibility to receive assistance were troubling, in numerous respects.

196.     To begin, although the Oath requires the voter to affirm his eligibility for assistance, it does not define who is "eligible" to receive voting assistance or explain who determines eligibility. *See* TEC § 64.034. As a result, both voters and assistors expressed confusion about the

---

[34] Of course, there is no guarantee that a presiding judge would in fact grant such an accommodation. *Cf.* TEC § 276.019 ("public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by" the Election Code); TEC § 1.002 (recognizing qualified individuals' right to "*request*[] a reasonable accommodation or modification to any election standard, practice, or procedure mandated by law," but not their right to *receive* any such accommodations) (emphasis added).

eligibility requirements.[35] Tr. at 3251:16–3252:11 (Nunez Landry); Tr. at 3561:2–3562:17, 3575:1–10 (Cranston); Tr. at 149–25 (Rocha).

197.    Mr. White testified that the new language in the Oath probably requires the assistant to obtain a representation of eligibility from the voter. Tr. at 3991:1–5.

198.    Voters with disabilities expressed discomfort with the requirement to represent their eligibility to their assistors or explain the basis for their eligibility. As several pointed out, the requirement that the voter affirmatively represents his or her eligibility amounts to an *additional* eligibility requirement. Ms. Nunez Landry testified that, while her partner served as her assistor before S.B. 1, she had never specifically told him that she was eligible to receive assistance. Tr. at 3252:17–3253:2. She felt that it would be "very undemocratic" if her vote did not count because she failed to represent her eligibility and that she "would feel disenfranchised" and like a "a second-class citizen." Tr. at 3252:17–3253:2. Mr. Cole stated that the provision is "offensive" because it requires him to share private health information with his assistor to receive the assistance he needs to vote—something he is not required to do in any other aspect of his life in order to receive the assistance he needs. Tr. at 695:6–7.

199.    While the Oath does not explicitly require voters to explain the basis for their eligibility, in practice, assistors who want to ensure that a voter's ballot will be counted must also confirm that the voter is eligible to receive assistance, because, as the Oath cautions, the voter's ballot may not be counted if he or she is ineligible. TEC § 64.034.

---

[35] Adding to the confusion, the Secretary of State's "VOTER INFORMATION" poster, which must be posted in every polling place and voting station, provides an incorrect and overly-narrow definition of eligibility for voter assistance:

    a.    You have: (6) The right to assistance while casting your ballot if you cannot write, see the ballot, understand the language in which it is written, or cannot speak English, or communicate only with sign language, and want assistance in communicating with election officials.

LUPE-265, https://perma.cc/LKS6-HGJH; TEC § 62.011.

200.    Critically, because it does not contain a scienter requirement, the Oath appears as it is written to hinge on *actual* eligibility, regardless of the assistor's *or* voter's beliefs about the voter's eligibility. In other words, the mere provision of assistance itself—even if it is given in accordance with the voter's wishes—may result in the rejection of the voter's ballot. Thus, from an assistor's perspective, to avoid disenfranchising the very voter he hopes to assist, he must confirm that the voter who has asked for his help is eligible for assistance. He cannot simply rely on the voter's representation of her own eligibility.

201.    How assistors are supposed to confirm a voter's actual eligibility without asking the voter to disclose private health information is not at all clear.[36] Mr. White testified that "anyone who takes this oath is determining what that means to them," Tr. at 3989:10–16, but acknowledged that "it would certainly be the interpretation of the D.A. in that county where [the potential] offense took place" that would determine whether an assistor would be prosecuted, Tr. at 4105:13–21.

202.    Assistors and witnesses with disabilities also testified that the Oath's eligibility statement is likely to subject voters receiving assistance to greater scrutiny at the polls, especially those with disabilities that are not readily perceptible. For example, Jennifer Miller, whose daughter, Danielle, requires voting assistance due to dysgraphia, worried that because Danielle's disability is not always visible, her daughter's vote might not be counted based on someone else's perception that she was ineligible for assistance. Tr. at 3215:16–3216:8. Even voters with *visible* disabilities attempting to vote *without* assistance have been subject to undue scrutiny and have had their privacy invaded while voting due to election officials' questions about her need for assistance. *See* Tr. at 3293:1–13 (Litzinger); *see also* Tr. at 3245:18–3246:10 (Nunez Landry).

---

[36] *See, e.g.*, Tr. at 147:1–9 (LUPE staff member is uncertain whether a voter who asks for help because he cannot see too well has sufficiently represented his eligibility); Tr. at 2543:21–16 (MABA members are concerned because they cannot guarantee that they have the knowledge to attest to someone's disability).

### *Pressure or coercion.*

203.    Voters and assistors expressed concerns about the Oath provision requiring assistors to swear that they "did not pressure or coerce the voter into choosing me to provide assistance" due to confusion about the meaning of "pressure" under such circumstances. *See, e.g.*, Tr. at 2540:11–16 (MABA organizational representative stating that, as an attorney, she would like to see a definition or context for the words "pressure" and "coerce").

204.    For example, assistors worry that encouraging voters to seek assistance if they need it or calling them to ask about their plans to vote could be construed as "pressuring" a voter to choose them as assistors. Tr. at 2540:11 (MABA).

205.    Witnesses also explained that the practical reality of relationships between caregivers and their clients means that many voters may have few potential assistors to choose from. As Ms. Nunez Landry put it:

> What does pressure or coerce mean in this context? And I think especially if people . . . are under penalty of perjury they may be afraid, and for so many of us who don't have options on who is going to help us, is that coercion? Is that pressure? I just think there is going to be so much confusion that my fear is that people will be too afraid to help us.

Tr. at 3249:21–3250:2.

206.    Ms. Miller, whose daughter, Danielle, requires voting assistance, worried that parents could face prison time based on simple logistical matters: if Danielle prefers that her father assist her, for example, but it is more convenient for Ms. Miller to take her to the polls, has Ms. Miller "pressured" Danielle into choosing her as an assistant by relaying this information to her daughter? Tr.at 3206:11–3207:4; *see also* Tr. at 3207:20–25, 3214:13–3215:9.

207.    Cameron County Election Administrator Remi Garza testified that he believed the "I did not pressure" language in the Oath could make people hesitant to provide assistance based

on the fear that they could be understood to be pressuring the voter to take their assistance: "The wording is vague enough where. . . they might be concerned that they are going to violate the oath if they signed it." Tr. at 733:21–734:7.

### *Communication to others about how the voter has voted*

208.    Plaintiffs did not meaningfully challenge the language in the Oath barring assistors from "communicat[ing] information about how the voter has voted to another person," either at trial or in any of their post-trial briefing. The Court thus considers any challenge to this language to have been waived.

### **The Assistor Disclosure requirements (§§ 6.03, 6.05, and 6.07) deter voting assistance.**

209.    Sections 6.03 and 6.05 of S.B. 1 require a voter assistor to record and swear to their relationship to the voter and indicate whether the assistor received or accepted any form of compensation or benefit from a candidate, campaign or a political action committee. Section 6.03 creates a new form implementing this requirement for assistors in the polling place, and Section 6.05 adds this requirement to the mail ballot carrier envelope. TEC §§ 64. 0322, 86.010(e).

210.    Section 6.07 revises the mail ballot carrier envelope to require a person who deposits the carrier envelope in the mail to indicate that person's relationship to the voter. Even before S.B. 1, the mail ballot carrier envelope required assistors to disclose their name and address. *See* TEC § 86.010(e); JEX-1 at 53.

211.    Assistors and county election officials testified that the form requirement, coupled with the Oath of Assistance, created delays during in-person voting.[37] Extended wait times at the

---

[37] Tr. at 81:15–25 (Chavez Camacho); Tr. at 383:14–18 (Scarpello); Tr. at 732:8–733:17 (Garza); Tr. at 1057:12–24 (Callanen); Tr. at 2316:16–20 (Ramon).

polls are especially burdensome on voters with physical disabilities, and waiting in line is the most common difficulty that voters with disabilities face. *See* Tr. at 3756:1–19; LUPE-002, Table 10.

212.    In addition to the potential delays caused by the Oath of Assistance Form at the polls, potential assistors, like many of Plaintiffs' staff and volunteers, do not have preexisting relationships with voters they help vote and have a well-founded concern about providing the information required by Sections 6.03 and 6.05.

213.    Even absent evidence of fraud or coercion, the consequences for both the voter and the assistor for failing to disclose their relationship on a mail ballot are severe: the voter's ballot may not count, and the assistor faces up to two years in prison and a fine of up to $10,000. *See* TEC § 86.010(g). These criminal sanctions, however, are inapplicable to mail-ballot assistance provided by a close relative of the voter or someone who lives with the voter. *See* TEC § 86.010(h)(2).

214.    Jonathan White, the State's top voter fraud prosecutor, testified that, in his view, "normal assistance" is a voter being assisted by family members or caregivers. Tr at 3987:15–23. With respect to Section 6.03, Mr. White testified that having information about assistors' relationships to voters can help distinguish between workers with no relationship to the voter versus the folks who are assisted by family members or caregivers, which he considers more legitimate assistance. Tr. at 3987:1–14. Still, the OAG's tracker of election crime prosecutions resolved does not identify a single case of voter assistance fraud relating to assistance provided in the polling place. Tr. at 4034:16–20; OCA-377 at 1–12.

215.    Despite Mr. White's impression that voter assistance provided by members of trusted community organizations (rather than, e.g., family members or caregivers) is somehow suspect, in 2020, approximately one-fifth of voters with disabilities received voting assistance

from non-family members. LUPE-002 ¶ 102. This is unsurprising, as Texans with disabilities are more likely to live alone, less likely to be married, and more likely to be separated, divorced, or widowed. Tr. at 3747:20–25; LUPE-002, Table 4. And, irrespective of Mr. White's perception that "caregivers" are "normal" assistants, a caregiver who provides BBM assistance is still subject to criminal sanctions for failing to disclose his relationship to the voter, unless the caregiver is *also* a close relative of the voter or lives with the voter. *See* TEC § 86.010(h)(2).

216.    Sections 6.05 has deterred DST members from helping mail-in voters because these provisions threaten assistors with criminal liability for failing to satisfy the new disclosure requirements or violating the Oath, which appears in the same section of the ballot envelope. Tr. at 2202:9–14. DST chapters have also had difficulty recruiting members who are willing to place themselves at risk to provide in-person voter assistance at the polls. Tr. at 2199:16–2200:3, 2202:9–14, 2203:10–15.

217.    Out of fear of prosecution under Sections 6.04 and 6.05 of S.B. 1, LUPE staff and volunteers turn away voters who ask for their assistance and instead encourage them to ask a family member or a friend for assistance.[38] Tr. at 82:6–12, 111:10–111:20, 118:16–119:4.

218.    FIEL no longer conducts voter caravans because its members feel uneasy about running afoul of requirements put in place by S.B. 1, including the Oath and the Oath of Assistance Form (which, again, includes the required Assistor Disclosures). Tr. at 2450:3–20. Without these caravans to the polls, FIEL is unable to engage as many voters as possible and help them actively participate in the voting process. Tr. at 2451:1–5.

---

[38] Cris Rocha, a LUPE employee, is only willing to assist voters at the polls if she is the last person the voter can use as an assistor. Tr. at 145:21–24; 48:22–149:3, 156:12–18. Maria Gomez, a LUPE volunteer who has provided voting assistance for over 25 years, is no longer willing to provide assistance due to the threat of criminal sanctions under S.B. 1. LUPE-284, Gomez Dep. at 13:19–14:15, 32:2–8, 17:2–13, 33:7–35:9, 40:24–42:2.

219.    FIEL has also struggled to recruit volunteers to provide in-person voter assistance at the polls since the enactment of S.B. 1 due to FIEL members' concerns about the Oath and the Assistor Disclosure requirements. Tr. at 2444:10–14, 2444:24–2445:7, 2451:19–25, 2452:1–11. Indeed, while before S.B. 1 about 100 FIEL members volunteered to assist voters at the polls, in 2022, there were at most 20 members who did so. Tr. at 2470:22–25.[39]

220.    Mr. Espinosa is particularly concerned about the Assistor Disclosures because when he volunteers at the polls, he often provides assistance to voters with whom he has no direct relationship. Tr. at 2443:24–2443:3. Asked about his concerns, Mr. Espinosa stated:

> [T]he number one question that . . . pops into my head is why is this table even necessary? Or what is my information that I provided here going to be used for? How is it going to be stored? Who is going to be able to handle it or see it? Who is going to be able to see my signature?

Tr. at 2442:6–2443:9.

221.    Consistent with Mr. Espinosa's concerns about the Assistor Disclosure requirements, community stakeholders submitted letters to the Texas legislature, anticipating that S.B. 1's additional paperwork and disclosure requirements were likely to have a "chilling effect" on voter assistance.[40]

**Election officials are inadequate substitutes for private assistors**

222.    By deterring assistance by private assistors, the Assistant Disclosure and Oath requirements encourage voters with disabilities to forgo assistance altogether or receive assistance

---

[39] Cesar Espinosa, the founding executive director of FIEL, no longer provides voter assistance due to his concerns about the Oath's "penalty of perjury" language and the Assistor Disclosure requirements. Tr. at 2430:3–4, 2439:6–23, 2444:24–2445:7; *see also* Tr. at 2445:4–22 (Espinosa) (describing FIEL member Debany Gonzales, who was a very active voter assistant at the polls, but is no longer willing to assist voters due to amended language of the Oath of Assistance).

[40] *See* HAUL-216 (testimony regarding S.B. 1 by representative of The Arc before Senate State Affairs Committee, asserting that the new Assistor Disclosure requirements would "create a chilling effect that decreases the availability of support for Texas with disabilities to exercise their right to vote").

from an election official. Election officials are imperfect substitutes for voters' chosen assistors for at least two practical reasons.

223.    First, election officials may be unable to provide the kind of assistance the voter requires. For example, a voter with cognitive or memory impairments will be unable to receive "cuing" assistance from election officials who are unfamiliar with how the voter intends to vote. Moreover, it may be unsafe or uncomfortable for voters with physical disabilities to receive assistance from an election official who is unfamiliar with the contours of their disabilities and needs. For instance, Ms. Litzinger explained that it takes over two months to train a personal care attendant to safely transfer her out of her wheelchair due to her balance issues. Tr. at 3281:1–17.

224.    Second, disabled voters who receive assistance from election officials are forced to sacrifice the privacy of their ballot. Their selections must be disclosed not only to the county elections official(s) providing the assistance but to any poll watchers observing the activity. TEC § 33.057(a).

225.    Thus, S.B. 1's Oath and Assistor Disclosure requirements leave many disabled voters with a choice between three dignitary harms—voting without any assistance, losing their privacy while voting, or foregoing the voting process altogether. *See* Tr. at 707:25–708:14 (Cole) (describing the loss of his privacy when an official prevented his assistant from helping him vote as a "violation").

**Ban on Compensated Assistance (§ 6.06)**

226.    Section 6.06 of S.B. 1 prevents voters from choosing Plaintiffs' staff members and volunteers to assist them with their mail ballots because they receive "compensation" for their assistance efforts. It creates a state jail felony for offering, soliciting or receiving compensation for

assisting mail ballot voters, unless the compensated assistor is an "attendant or caregiver previously known to the voter." TEC § 86.0105.

227.    At trial, Jonathan White testified that offering or accepting compensation for mail ballot assistance is a state jail felony, with a sentence of up to two years, *even if there is no fraud in the assistance and the assistor marks the ballot consistent with the wishes of the voter*. Tr. at 3996:8–3997:5. He confirmed that Section 6.06 "criminalizes *compensation* for assistance" as opposed to criminalizing *fraud* in assistance. Tr. at 3995:25–3996:7.[41]

228.    Mr. White confirmed that Section 6.06 "appear[s] to apply to [the] scenario" in which a paid canvasser for a nonprofit Get Out the Vote organization engages with voters and provides mail ballot assistance at the voter's request. Tr. at 3993:22–3995:10. He testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is used as a subterfuge for voter fraud, and "we'd be looking for the fraud at the bottom of things." Tr. at 3995:11–24. Again, however, a conviction under TEC § 86.0105 requires no evidence of fraud or coercion.

229.    Indeed, these provisions potentially expose *voters* to liability for providing tokens of appreciation to assistors who help them complete their mail ballots. Keith Ingram confirmed that a voter who offered a volunteer $20—or offered to buy a friend lunch—to help him complete his mail-ballot could be liable under Section 6.06. Tr. at 1904:1–1906:5.

230.    As a result of S.B. 1's prohibition on compensated mail-ballot assistance, voters may no longer choose Plaintiffs' staff members and volunteers who accept "anything of value" to assist them with their mail ballots. TEC § 86.0105; TEX. PENAL CODE § 38.01(3).

---

[41] Formerly, the Election Code prohibited payment for performance-based work, i.e. paying someone to assist mail voters on a quota basis. Tr. at 3991:18–3992:15. S.B. 1 extended the offense, making it a crime to provide, receive or ask for compensation to assist a mail ballot voter regardless of whether the assistance is on a per capita basis. Tr. at 3992:3–7, 12–19.

231. Before S.B. 1, LUPE staff would assist members to complete their mail ballots one-on-one and provide assistance, either at the LUPE offices, in house meetings, or at LUPE's union hall events. Some members would call LUPE and ask LUPE to go to their home to help them fill out their ballot by mail and LUPE would provide that assistance in the members' homes. Tr. at 87:3–21, 3676:11–25.

232. LUPE has stopped assisting voters who request their help completing mail ballots. Tr. at 119:20–120:18. As LUPE's executive director Tania Chavez testified, LUPE has stopped assisting members with their mail ballots because "[it] will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, and so we have refrained from doing so." Tr. at 82:20–84:3.

233. Now, when a LUPE member comes to the LUPE office and requests help with their mail ballot, LUPE informs the member that LUPE cannot provide assistance and tells the voter that they should find help with their family or friends. Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21. LUPE staff will not provide mail ballot assistance to LUPE members who are disabled or otherwise need assistance. Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21.

**The Canvassing Restriction (§ 7.04)**

234. The Canvassing Restriction applies to anyone who knowingly gives or receives some "compensation or other benefit" for an "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." TEC § 276.015(a)(2).

235. Section 7.04 interferes with community organizers' ability to assist voters with their mail-ballots because its prohibition on "in-person interactions" in the "presence of a mail ballot" does not include an exception for mail-ballot assistance.

236.    Mr. White testified that if his office encountered a GOTV group that paid its organizers to provide mail ballot assistance as a public service while canvassing, he would be concerned that this activity is a subterfuge for voter fraud. Tr. at 3995:11–24. He acknowledged, however, that prior to S.B. 1, the Election Code already criminalized: assisting a voter who is not eligible for assistance or did not ask for assistance; voting a ballot differently than the voter wished or directed the assistant to vote the ballot; suggesting to the voter during the voting process how the voter should vote, or attempting to influence or coerce the voter receiving assistance. Tr. at 3923:21–3924:14, 3925:4–6.

237.    Finally, like Section 6.06, the Canvassing Restriction can be read to impose criminal liability on the very voters it purports to protect. For example, a like-minded voter with a disability who asks for voting assistance from a GOTV volunteer and invites him inside for an iced tea would arguably violate Section 7.04. *See* TEC § 276.015 (making it a crime to offer a benefit for the canvasser's "services").

238.    Trial testimony establishes that there is widespread confusion about the meaning of the Canvassing Restriction. Even local EAs are unsure about how to interpret Section 7.04.[42]

239.    Witnesses were particularly uncertain about how to interpret the terms "compensation" and "physical presence"—neither of which is defined in the statute—and how Section 7.04 impacts organizers' ability to provide voting assistance. Despite this confusion, state officials have not offered any definitive answers about the scope of the Canvassing Restriction. The Secretary of State has not provided any guidance. Tr. at 1914:7–14, 1924:7–18. Nor has the OAG. Tr. at 1924:24–1925:3.

---

[42] *See, e.g.*, Tr. at 496:5–8 (Dallas County) ("I don't know what ballot harvesting means," "it could be interpreted a lot of different ways based on the definition . . . put into the law.").

240.    In response to Section 7.04, many Plaintiffs groups stopped hosting in-person events where voters had frequently brought their mail ballots for voting assistance and stopped providing assistance to voters.[43]

### Cumulative Impact of the Provisions on Voters with Disabilities

241.    People with disabilities turn out to vote at lower rates than people without disabilities. In 2020, the disability gap was 5.15 percentage points—similar to the gap in the 2016 presidential election.[44] According to Plaintiffs' expert, Dr. Douglas Kruse, research shows that this participation gap cannot be fully explained by lower levels of education and income, lower feelings of political efficacy among people with disabilities, and greater social isolation. LUPE-002 ¶ 65. Thus, part of the remaining gap in participation can be traced to lower turnout due to prior difficulties in voting. *Id.*

242.    Dr. Kruse explained that adding additional requirements to the assistance process for both voters and assistors increases the likelihood that voters with disabilities will be disenfranchised:

> My overall opinion is that ***these provisions are going to raise the cost of voting for people with disabilities.*** Taken one by one . . . each of these may seem to be a small thing. Together, though, they compound. They can raise the cost of voting, make it more difficult to vote. . .there's plenty of political science research showing that when the costs of voting are higher, people are less likely to vote. Even if they do go ahead and vote, there are still higher costs being imposed. There's still extra hassle. . . And ***to the extent that there's extra hassle, people with disabilities are going to be less likely to vote.*** And if they do vote . . . it's still extra hassle that's being created by these provisions.

---

[43] Tr. at 82:20–-84:3 (LUPE has stopped assisting members with their mail ballots because "[it] will mean that our staff could be jailed, that I could be put in prison, that any volunteer that receives any kind of compensation could be then prosecuted, and so we have refrained from doing so."); Tr. at 2543:14–2544:23 (MABA members are no longer willing to provide voting assistance because members fear that they might inadvertently commit a crime, potentially costing them their law licenses).

[44] COVID did not significantly affect the turnout gap because many people with disabilities were able to vote by mail. Tr. at 3797:17–25, 3798:1-16, 3798:19–22, 3800:1–5.

Tr. at 69:2–17; *see also* LUPE-002.

243.     Trial testimony by Plaintiffs' organizational representatives and individual voters reified these predictions about the impact that additional barriers to voting can have on voters with disabilities.

244.     The Challenged Provisions have made members of The Arc of Texas fearful that they might do something wrong when they are simply trying to vote. Tr. at 20:25–21:2, 25:2–12 (Martinez); *see also* Tr. at 3239:6–13 (Nunez Landry) (members of The Arc of Texas and the disability community were "very worried … and confused about S.B. 1).

245.     Ms. Crowther explained that S.B. 1 has hampered her ability to vote with assistance because she does not want to put her attendants at risk, even though she will need more and more help over time as her disability progresses. HAUL-413, Crowther Dep. at 80:8–81:8. As Ms. Crowther summarized:

> That something as meaningful as voting is to me, that I need assistance with … now [has] a bump…in the process, to where now it's become more threatening to bring an attendant in…why would I want to bring…my attendant, into that role and have them get all freaked out about, You mean to tell me if I help you do something that is not on this form…I could get in trouble? And ***it's just not worth it when your life is dependent on your attendant or your caregiver or your spouse [.] It's just not worth it.***

*Id.* at 98:6–22 (emphasis added).

246.     Ms. Halvorson likewise stated that many of her friends with disabilities are worried about their caregivers facing these issues with the penalty of perjury and "***[s]ome of them may not be going out and voting like they used to, due to it***." Tr. at 3332:11–18 (emphasis added).

247.     Mr. Cole testified that each provision of S.B. 1 that makes voting marginally harder for disabled people makes it less likely that they will vote:

> Well, it just makes it hard. You know, the thing that we have, and I talk to a lot of people after they get disabled, is as you make things harder, you just start cutting things out. You know, it's too hard to find someone to feed me,

or it's embarrassing, so I don't want to go to dinner. It's too hard to get on an airplane to go travel, so I just don't do that. And so ***every time you put even one little road bump or one little barrier in front, it just makes it that much harder, and so you don't do it.***

Tr. at 714:17–715:15 (emphasis added).

248.    Ms. Nunez Landry testified that "disabled people . . . already encounter so many obstacles, . . . and I'm afraid that there are going to be people who won't go and vote because of the difficulties [that S.B. 1 presents]." Tr. at 3232:3–7.

> ***I don't understand if people believe in our stated democratic principles why you would want to make it more arduous for older and disabled people to vote.*** It's inscrutable to me …. I don't understand that at all, and without any evidence of widespread fraud in our elections, to me, it seems like if you really want to have integrity … in our elections that you need to make it accessible for all eligible people. ***I feel like there's something fundamentally wrong with trying to prevent people to vote.***

Tr. at 3254:8–23 (Nunez Landry).

249.    These statements demonstrate that the cumulative effect of the Challenged Provisions has been to create the very type of harm ADA and Section 508 were meant to eliminate.

## CONCLUSIONS OF LAW

**LEGAL FRAMEWORK**

The ADA is organized into three primary titles governing different types of entities. Title II, at issue here, proscribes discrimination in the provision of public services, while Title I addresses discrimination in employment, 42 U.S.C. § 12111 *et seq.*, and Title III prohibits discrimination by places of public accommodation, 42 U.S.C. § 12181 *et seq.*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "disability" is "a physical or mental impairment that substantially limits one or

more major life activities[.]" *Id.* § 12102(1)(A). "Public entities" include States, local governments, and their agencies and instrumentalities. *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020) (citing 42 U.S.C. § 12131(1)(A)).

Title II's protections extend to all services, programs, and activities of public entities, including voting. 42 U.S.C. § 12132; *see Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) ("Voting is a quintessential public activity[,]" and "[e]nsuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others helps ensure that those individuals are never relegated to a position of political powerlessness.") (citing *Tennessee v. Lane*, 541 U.S. 509, 525 (2004)).

Before enacting the ADA, Congress prohibited disability discrimination by recipients of federal funding under Section 504 of the Rehabilitation Act of 1973 ("Section 504"). 29 U.S.C. § 794 ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). Section 504 and the ADA impose nearly identical substantive requirements and courts have interpreted them in tandem. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017); *Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020). It is undisputed that each of the Defendants receives federal financial assistance, and the Court will consider Plaintiffs' claims under the ADA and Section 504 together.[45]

---

[45] *See* Tr. at 1857:9–14 (Adkins) (testifying that the Secretary of State receives federal funding through the Help America Vote Act ("HAVA")); Tr. at 991:15–19 (Callanen) (testifying that the Office of the Elections Administrator in Bexar County received federal funding through HAVA and the CARES Act in 2021 and 2022); Tr. at 1173:13–20 (Obakozuwa) (testifying that Harris County receives federal funding through HAVA and other means); Tr. at 1550:9–12 (Escobedo) (testifying that Travis County receives federal funding); HAUL-112 (Travis County Reports on Federal and State Awards for the Year Ended September 30, 202); HAUL-113 (Resolution of Bexar County Commissioners); HAUL–114 (Bexar County Adopted Budget Fiscal Year 2021–22); HAUL-115 (Bexar County Adopted Budget Fiscal Year 2022–23); HAUL-120 (Travis County Fiscal Year 2022 Adopted Budget); HAUL-90 (federal grant to Harris County District Attorney's Office); HAUL–98 (HAVA awards to state and counties).

To prevail on a claim of disability discrimination under either statute, Plaintiffs must establish by a preponderance of the evidence that:

(1) they, their members, or their constituents are "qualified individuals" with disabilities under the ADA;

(2) they, their members, or their constituents were or are being excluded from participation in or denied the benefits of services, programs, or activities for which the public entities are responsible, or are otherwise being discriminated against by the public entities; and

(3) the exclusion or discrimination was by reason of their or their members' or constituents' disability.

*See Luke v. Texas*, 46 F.4th 301, 305 (5th Cir. 2022); *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004) (citing *Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997)).

A public entity's failure to make a reasonable modification may satisfy the second and third prongs of the prima facie case, *Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 618 (5th Cir. 2020), because Title II requires public entities to make "reasonable modifications in policies, practices, or procedures" for disabled individuals, unless the entity can show that a modification would "fundamentally alter the nature" of the service or program it offers. 28 C.F.R. § 35.130(b)(7)(i); *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997).

**SUBJECT MATTER JURISDICTION**

Before addressing the merits of Plaintiffs' disability discrimination claims, the Court must first consider its subject matter jurisdiction over Plaintiffs' claims. Subject matter jurisdiction is a federal court's statutory or constitutional power to adjudicate a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

As the Court has previously explained, the ADA permits private enforcement by both individual voters with disabilities and private organizations representing their interests. *See, e.g.*,

*La Unión del Pueblo Entero*, 618 F. Supp. 3d at 419–20 ("[M]any courts have allowed organizations that serve disabled individuals to sue public entities under Title II." (collecting cases)). Because this civil action arises under federal law, the Court has federal question jurisdiction under 28 U.S.C. § 1331.

Sovereign immunity does not limit the Court's subject matter jurisdiction over this action. ADA claims are enforceable against state officials because, in enacting the VRA, Congress validly abrogated state sovereign immunity. 42 U.S.C. § 12202.

Finally, the Court considers Plaintiffs' standing to assert their ADA and Section 504 challenges because standing "is a component of subject matter jurisdiction." *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018).

**Standing**

### Legal Framework

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish standing by satisfying three irreducible requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* In a case that proceeds to trial, plaintiffs must establish all three elements by a preponderance of the evidence. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). These requirements ensure that

plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497 (2007) (quoting *Baker v. Carr*, 369 U.S. 186 (1962)) (quotation marks omitted).

"[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury" for the self-evident reason that "injunctive and declaratory relief 'cannot conceivably remedy any past wrong.'" *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

To constitute an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 720–21 (citations omitted). The injury must be "imminent . . . to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* at 721 (quoting *Lujan*, 504 U.S. at 564 n.2). For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Nonetheless, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Houston v. Texas (OCA-Greater Hous. I)*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted). "This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Id.* (quotations omitted).

Juridical entities may establish standing under an associational or organizational theory of standing. *Id.* at 610.

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,* 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Participation of individual members is not required where, as here, an association seeks prospective and injunctive relief, rather than individualized damages. *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous. I*, 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)).

"When the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. An organization can establish a likely future injury if it intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).[46]

---

[46] *See also S. Christian Leadership Conf. v. Sup. Ct. of State of La.*, 252 F.3d 781, 788 (5th Cir. 2001) (concluding that "at least some" of the plaintiffs—law students and faculty and community and student organizations—had standing to challenge a Louisiana Supreme Court rule restricting representation by student-practitioners because the

Finally, an unregulated organization can also demonstrate the requisite injury by showing that the challenged conduct or regulation has "perceptibly impaired" the organization's "core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Such "business activities" need not be profit-driven. *See Havens*, 455 U.S. at 379 n.20; *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977) ("It has long been clear that economic injury is not the only kind of injury that can support a plaintiff's standing."). Still, a mission-driven organization must proffer evidence of interference with its core activities to ensure it has a personal stake in the outcome of case beyond its "abstract social interests." *Havens*, 455 U.S. at 379.[47]

The effect on the organization's activities need not be great. *OCA-Greater Hous. I*, 867 F.3d at 612; *see also Havens*, 455 U.S. at 379. In *Havens*, for example, the Supreme Court held that the organizational plaintiff, HOME, had standing to sue a real estate company, Havens, for providing false information to HOME's black employees about apartment availability on four occasions. *Havens*, 455 U.S. at 368–69. "Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *All. for Hippocratic Med.*, 602 U.S. at 394. HOME asserted that these discriminatory racial steering practices "perceptibly impaired [its] ability to provide counseling and referral services for low-and moderate-income homeseekers." *Havens*, 455 U.S. at 379.[48] HOME alleged only that its counseling services had

---

operations of law-school clinics were "directly regulate[d]" and "[s]everal of the client organizations would be unable to obtain representation by the clinics").

[47] *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977) (recognizing that non-profit's interest in building a low-cost housing project arose "not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce" and concluding that "[t]he specific project [the plaintiff] intends to build, whether or not it will generate profits, provides that 'essential dimension of specificity' that informs judicial decisionmaking").

[48] In describing its injuries, HOME also alleged that it "had to devote significant resources to identify and counteract [Havens]'s racially discriminatory steering practices." *Havens*, 455 U.S. at 379. As the Supreme Court recently

been "frustrated" by Havens's conduct—not that HOME had been forced to stop providing the services altogether. *Cf. La. Fair Hous. Action Ctr. at, Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 35 (5th Cir. 2023) ("HOME could not place African American clients into housing at Havens's complex when Havens was engaged in illegal racial steering."). Still, the Court concluded that if Havens had impaired HOME's ability to provide such services, "there can be no question that the organization has suffered injury in fact." *Havens*, 455 U.S. at 379.

"When the plaintiff is an *unregulated* party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *All. for Hippocratic Med.*, 602 U.S. at 383 (emphasis added) (quoting *Lujan*, 504 U.S. at 562). But plaintiffs cannot show causation by "rely[ing] on speculation about the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013) (quotation marks omitted). "Therefore, to thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (quotation marks omitted) (citing *California v. Texas*, 593 U.S. 659, 675 (2021)). The "line of causation between the illegal conduct and injury"—the "links in the chain of causation," *Allen v. Wright*, 468 U.S. 737, 759 (1984)—must not be too speculative or too attenuated, *Clapper*, 568 U.S. at 410–11.

---

confirmed, however, *Havens* does not stand for the expansive theory that "standing exists when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394; *see also Azalea*, 82 F.4th at 355 ("We [] hold [that] 'diverting' resources from one core mission activity to another, i.e., prioritizing which 'on-mission' projects, out of many potential activities, an entity chooses to pursue, does not suffice—organizations daily must choose which activities to fund, staff, and prioritize. Nor do conclusory allegations that an organization's diversion of resources 'impaired or impeded' some planned projects.").

The causation requirement is satisfied where it is sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs. *All. for Hippocratic Med.*, 602 U.S. at 386. In *Department of Commerce v. New York*, for example, the Supreme Court recognized states' standing to challenge the reinstatement of the citizenship question on the census because noncitizens would "likely react in predictable ways to the citizenship question"—i.e., by failing to respond to the census altogether—"even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential." 588 U.S. 752, 767–68 (2019). The depression of the response rate among non-citizens would, in turn, cause them to be undercounted in the census results and injure states with disproportionate numbers of non-citizens through, *e.g.*, the loss of federal funds, diminishment of political representation, and the degradation of census data. The Court concluded that the states' "theory of standing thus [did] not rest on mere speculation about the decisions of third parties; it relie[d] instead on the predictable effect of Government action on the decisions of third parties." *Id.* at 768.

The defendant's conduct contributes to a plaintiff's injuries, even if it is not the sole cause of those injuries. *Massachusetts v. E.P.A.*, 549 U.S. 497, 523 (2007). Similarly, the traceability requirement is not a proximate cause standard; it can be satisfied with a showing that the alleged injury was only indirectly caused by the defendant. *Bennett v. Spear*, 520 U.S. 154, 168 (1997).

An injury is redressable when it is "likely" as opposed to merely "speculative" that a decision in a plaintiff's favor would grant the plaintiff relief. *OCA-Greater Hous. I*, 867 F.3d at 610. A plaintiff does not need to demonstrate that a favorable decision will "relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). They only need to show that a decision in their favor will "relieve a discrete injury to [them]self." *Id.* Even "the ability 'to effectuate a

partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

Plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement by "demonstrat[ing] 'continuing harm or a real and immediate threat of repeated injury in the future.'" *James v. Hegar*, 86 F.4th 1076, 1081 (5th Cir. 2023) (quoting *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992)). A threatened future injury suffices for standing so long as "there is a substantial risk that the harm will occur." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 158).

When multiple plaintiffs seek the same injunctive relief, only one needs to establish standing. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Here, the Court must identify at least one organization in each Plaintiff group with standing to seek injunctive against local election officials and DAs in their respective jurisdictions.

**<u>Analysis</u>**

### *Section 5.02, 5.03, and 5.07 – The ABBM Number-Matching Provisions*

The OCA and HAUL Plaintiffs have established associational standing to challenge Sections 5.02, 5.03, and 5.07 of S.B. 1, which introduce an ID number-matching requirement to Texas's ABBM process.

At least one member of The Arc and REV UP with a disability, Ms. Iglesias, has had multiple ABBMs rejected because she was unable to comply with S.B. 1's number-matching requirements. As long as Sections 5.02, 5.03, and 5.07 remain in place, there is a "substantial risk"

that the injury will occur. *Stringer*, 942 F.3d at 721.[49] Ms. Iglesias's interest in voting with assistance on equal terms with non-disabled voters is germane to the purposes of The Arc and REV UP, which work to empower people with disabilities in the voting process.**[50]**

Plaintiffs' injuries arising out of the ABBM-Matching Provisions are traceable to the Secretary because she has created forms and instructions implementing Sections 5.02, 5.03, and 5.07. *See* LUPE-119 at 1 (ABBM Form).

Plaintiffs' injuries arising out of the ABBM-Matching Provisions are also traceable to local election officials because they are responsible for reviewing each ABBM and either (1) providing notice that the ABBM was rejected and information about curing the ABBM or (2) sending the voter his or her BBM. TEC § 86.001(f), (f-1).

Neither the OCA Plaintiffs nor the HAUL Plaintiffs' operative pleadings challenge Section 5.08 (codified at TEC § 86.002 (g), implementing the number-matching requirement at the BBM stage) or Section 5.13 of S.B. 1 (codified at TEC § 87.041(b), requiring election officials to reject BBMs that do not identify the voter). Still, given the burdens that the number-matching requirement imposes on voters with disabilities even at the ABBM stage, enjoining Sections 5.02, 5.03, and 5.07 of S.B. 1 would afford Plaintiffs at least partial relief. *Uzuegbunam*, 592 U.S. 279.

Accordingly, the Court concludes that

---

[49] County election officials expect that voters will continue to face problems with ABBMs and mail ballot rejections in future elections because of mismatched or missing ID numbers, including elderly voters, voters with disabilities, and voters newly eligible to vote by mail. Tr. at 439:23–25 (Scarpello); Tr. at 1161:8–10 (Obakozuwa); Tr. at 1051:1–25, 1052:1–20 (Callanen).

[50] The Arc's mission is to "promote, protect, and advocate for the human rights and self-determination of Texans with intellectual and developmental disabilities." Tr. at 3490:23–25, 3493:7–9. Voting is "the backbone" of The Arc's work because it is critical to members' self-determination and voting rights advocacy has been a priority since The Arc's founding. Tr. at 3499:23–3500:12, 3499:23–3500:12. REV UP Texas' mission is "to empower people with disabilities to get more involved in the disability and political process to be able to influence issues of concern to the disability community." Tr. at 3616:19–22.

### *Section 5.06, 5.10, and 5.12 – The Curative Provisions*

The OCA and HAUL Plaintiffs also seek to enjoin several of S.B. 1's "curative" provisions, allowing voters to substitute BBMs with provisional ballots during in-person voting (Section 5.06), permitting voters to cure certain mail ballot defects using the Ballot Tracker (Section 5.10), and describing the SVC's obligations to notify voters of any carrier envelope flagged for rejection pursuant to S.B. 1's number-matching requirement (Section 5.12).

Even acknowledging that voters with disabilities may have difficulty accessing some of these curative provisions—because, for example, mobility issues prevent them from appearing at a polling place, because the Ballot Tracker is inaccessible to blind people, or because voters with disabilities are less likely to use the internet, possess a DPS number, or be able to provide a matching signature—it is not clear to the Court how Plaintiffs' proposed relief—enjoining the provisions altogether and depriving *all voters* of these curative measures—will redress their members' harms.

Accordingly, the Court concludes that the OCA Plaintiffs lack standing to challenge Sections 5.10 and 5.12 of S.B. 1, and the HAUL Plaintiffs lack standing to challenge Sections 5.06 and 5.10 of S.B. 1.

### *Sections 6.03, 6.04, 6.05 and 6.07 –Oath of Assistance and Assistor Disclosures*

Plaintiffs' organizational injury here is a perceptible impairment of one of the core services they provide to their members with disabilities—voter assistance—resulting from violations of federal law—the ADA and Section 504. And, to the extent that a rule directly regulates the Plaintiff organizations (rather than their individual assistors), Plaintiffs unquestionably have standing to challenge it. *See Lujan*, 504 U.S. at 561–62.

Sections 6.03, 6.04, and 6.05 of S.B. 1 establish new procedures for voter assistors, specifically by requiring the assistor to disclose certain information—their name, address, relationship to the voter, and whether they are being compensated by a candidate, campaign, or political committee—on a form at the polling place (Section 6.03) or on the mail ballot carrier envelope (Section 6.05) and by requiring assistors to take a revised Oath (Section 6.04).

Section 6.04 of S.B. 1, amending the Oath of Assistance, and Sections 6.03 and 6.05 are challenged by the HAUL Plaintiffs (including The Arc) and the LUPE Plaintiffs. Section 6.07 is challenged by the HAUL Plaintiffs only.

<u>The Arc and REV UP have associational standing to challenge § 6.04.</u>

As a result of the Oath of Assistance requirements set forth in S.B. 1 § 6.04, members of The Arc and REV UP with disabilities voted without assistance, both in-person and by mail, in Harris County, Bexar County, and Travis County, causing physical pain and the loss of their privacy.[51]

Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther have each suffered an injury in fact and each would have standing to sue in her own right. Even if voters requiring assistance successfully cast a ballot, as discussed below, their rights under the ADA and Section

---

[51] Ms. Halvorson, a registered voter in Bexar County and a member of The Arc, voted without assistance for the very first time in the March 2022 primary (by mail) because her personal care attendant was uncomfortable taking the Oath of Assistance printed on the mail carrier envelope. Tr. at 3318:25–3319:20. In the November 2022 general election, Ms. Halvorson voted in person, again voting without assistance due to fear of exposing her personal attendant to potential criminal liability. Tr. at 3322:5–18, 3323:10–24.

Ms. Nunez Landry, a registered voter of Harris County and a member of The Arc, voted without her chosen assistant—her partner—in the March 2022 primary and the November 2022 general election because she did not want to expose him to criminal liability. Tr. at 3236:11–17; Tr. at 3234:1–6, 3256:15–3257:4. She did not receive any assistance while voting in either election.

Amy Litzinger is a registered voter in Travis County and a member of The Arc. Tr. at 3281:14–17. Ms. Litzinger voted without assistance from her personal attendant in the March 2022 primary and November 2022 general election because she and her attendant were concerned about criminal liability under the Oath. Tr. at 3291:4–3292:5.

Ms. Crowther did not take her attendant with her to vote in May 2022 because of her fear that the Oath could jeopardize her relationship with her attendant. HAUL-413, Crowther Dep. at 52:11–53:4, 54:7–14.

504 are violated if the Challenged Provisions make it unreasonably difficult for them to do so. As long as the amended Oath of Assistance remains in effect, these voters will be unwilling to expose their attendants to criminal liability by asking for their assistance. Thus, there is a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721.

The members' interests in voting with assistance on equal terms with non-disabled voters are germane to the purposes of The Arc and REV UP, which work to empower people with disabilities in the voting process.[52]

Plaintiffs' injuries arising out of S.B. 1's amended Oath language are traceable to the Secretary because she has created forms implementing Section 6.04. *See* LUPE-009 (mail ballot carrier envelope) and LUPE-189 (Oath of Assistance form). The Oath regulates Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther directly by requiring them to represent their eligibility to potential assistors as a condition of their eligibility.

Plaintiffs' injuries from these provisions are fairly traceable to the local election officials who are responsible for administering the Oath in polling places, TEC § 64.034, and printing, sending, receiving, and reviewing mail carrier and ballot envelopes, TEC §§ 86.002–.004, 86.008– .009, 86.011. Thus, their injuries are fairly traceable the Bexar County EA, Harris County Clerk, and Travis County Clerk because Plaintiffs' members suffered their injuries while voting in those jurisdictions.

The Arc and REV UP members' injuries under Section 504 are also traceable to the DAs in those counties and the State Defendants based on the chilling effect that the credible threat of

---

[52] The Arc's mission is to "promote, protect, and advocate for the human rights and self-determination of Texans with intellectual and developmental disabilities." Tr. at 3490:23–25, 3493:7–9. Voting is "the backbone" of The Arc's work because it is critical to members' self-determination and voting rights advocacy has been a priority since The Arc's founding. Tr. at 3499:23–3500:12, 3499:23–3500:12. REV UP Texas' mission is "to empower people with disabilities to get more involved in the disability and political process to be able to influence issues of concern to the disability community." Tr. at 3616:19–22.

criminal enforcement of the Oath against their assistors have had on their willingness and ability to receive assistance from their chosen assistors. Although Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther are not themselves subject to criminal sanctions under § 6.04, given the practical realities of these voters' relationships with their chosen assistors—including their physical dependence on their attendants for assistance outside of voting—their unwillingness to expose their assistors to criminal liability is "sufficiently predictable" to establish causation for standing purposes. *All. for Hippocratic Med.*, 602 U.S. at 386.

Similarly, their attendants' unwillingness to provide in-person or mail-ballot assistance due to potential criminal liability under S.B. 1 is not speculative—attendants specifically cited the "penalty of perjury" and "eligibility" language in the Oath as their reasons for declining to provide assistance. Tr. at 3319:7–16 (Ms. Halvorson's attendant told her that she was unwilling to take the Oath of assistance "under penalty of perjury" due to her green card status); Tr. at 3291:4–3292:5 (Ms. Litzinger's attendant was not comfortable assisting her due to fear of criminal liability under the Oath, especially with respect to the meaning of "eligibility" and "assistance"). Indeed, the chilling effect on assistors was *actually foreseen* by disability rights advocates who testified before the Texas legislature in opposition to S.B. 1. *See, e.g.*, HAUL-216.

Thus, the theory of standing presented by the Arc and REV UP "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable [and actual] effect of Government action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 767 (recognizing that citizenship question on census was likely to depress non-citizens' response rate).

Individual County DAs *may not* disavow such enforcement under Texas law. *See* TEX. LOC. GOV'T CODE § 87.011(3)(B) (prohibiting district attorneys from adopting an enforcement policy of refusing to prosecute a type or class of criminal offense).

Plaintiffs' organizational injuries are also traceable to the AG, who, even after *Stephens*, retains "broad investigatory powers" under the Election Code, State's Br. at 49, *LUPE v. Scott*, No. 22-50775 (5th Cir. Dec. 9, 2022), ECF No. 62, and may "direct the county or district attorney . . . to *conduct* or *assist* the attorney general in conducting the investigation." *See* TEC § 273.002(1) (emphasis added); *see also id.* § 273.001 (district attorneys must investigate alleged violations referred to them). On top of this investigatory power, "the Attorney General can prosecute with the permission of [a] local prosecutor," *Stephens*, 663 S.W.3d at 55, and no County DA has disavowed a willingness to let the AG pursue cases within their counties.

An order declaring the challenged language in the amended Oath unlawful and enjoining its enforcement would remove the chilling effect on voter assistance that the provisions presently impose on these members of The Arc and their assistors. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (finding "redressability prong[] of the standing inquiry . . . easily satisfied" where "[p]otential enforcement of the statute caused the [plaintiff's] self-censorship, and the injury could be redressed by enjoining enforcement of the [statute]"); *McCraw*, 504 F. Supp. 3d at 582 (W.D. Tex. 2020), *aff'd*, 90 F.4th 770 (5th Cir. 2024) (similar).

In short, with respect to their ADA and Section 504 challenges to S.B. 1 § 6.04, members of The Arc and REV UP are "sufficiently adverse" to the State Defendants and the election officials and DAs of Bexar County, Harris County, and Travis County to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

<u>DST and the LUPE Plaintiffs have organizational standing to challenge §§ 6.03–6.05, 6.07</u>

DST, LUPE, MABA, and FIEL have had difficulty recruiting members to provide voting assistance services due to the threat of criminal sanctions under S.B. 1's Assistor Disclosure and Oath requirements, and some members have stopped providing assistance altogether.[53]

The Assistor Disclosure requirements are burdensome to assistors and have also caused delays at polling places that have interfered with voting assistance.[54] Providing such assistance is a core part of their respective missions.[55]

Plaintiffs' organizational injuries are fairly traceable to S.B. 1 §§ 6.03–6.05. The chilling effect that the Assistor Disclosure and Oath requirements would have on individuals' willingness to provide voting assistance—and the downstream effects on organizations' ability to perform voter assistance services—was "sufficiently predictable" to establish causation for standing purposes. *All. for Hippocratic Med.*, 602 U.S. at 386; *Dep't of Com.*, 588 U.S. at 767.[56] Indeed,

---

[53] Tr. at 2203:10–15, 2202:9–14, 2110:12–2111:1, 2148:25–2149:10 (DST chapters have had difficulty recruiting members who are willing to risk criminal liability to provide assistance, by mail or in-person, under S.B. 1, and some chapters have ceased providing voting assistance altogether due to the threat of enforcement of the Assistor Disclosure and amended Oath requirements); Tr. at 80:2–82:12, 150:15 (LUPE's staff and volunteers who assist voters are frightened by the new oath language, and as a result LUPE's staff and volunteers have restricted their assistance to voters, encouraging voters to seek assistance from friends and family members before turning to LUPE); *see also* Tr. at 145:25–46:4 (LUPE employee Chris Rocha); LUPE-284 at 13:19–14:15; 32:2–8; 17:2–13 (LUPE volunteer Maria Gomez); Tr. at 2543:16–23 (MABA members are no longer willing to provide voter assistance due to fears about the Oath requirements); Tr.at 2470:22–25, 2430:3–4, 2439:6–23, 2444:24–2445:7 (FIEL has had difficulty recruiting volunteers to provide voter assistance at the polls and some members have stopped providing assistance).

[54] Tr. at 81:15–25 (Chavez Camacho); Tr. at 383:14–18 (Scarpello); Tr. at 732:8–733:17 (Garza); Tr. at 1057:12–24 (Callanen); Tr. at 2316:16–20 (Ramon).

[55] Tr. at 2081:7–13, 2086:21–2087:15 (DST provides in-person and mail-ballot voter assistance in support of its "political awareness and involvement" mission); Tr. at 60:10–61:2 (LUPE provides voting assistance to support its mission of increasing civic engagement in the colonias); Tr. at 2533:24–2534:4, 2535:11–2536:5 (MABA provides voter assistance to support its mission to promote public service by its members and promote civic engagement); Tr. at 2438:9–11, 2444:24–2445:3 (FIEL furthered its mission of voter outreach and civic engagement by assisting its members in voting at the polls).

[56] The Supreme Court has recognized the deterrent effect that disclosure requirements can have on associative activities. *See, e.g.*, *Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (striking down law requiring teachers to disclose all of the organizations to which they had belonged in the past five years because "[e]ven if there were no disclosure to the general public, the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy"); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958);

the chilling effect on assistors was *actually foreseen* by disability rights advocates who testified before the Texas legislature in opposition to S.B. 1. *See, e.g.*, HAUL-216.

Here again, the organizations' injuries are traceable to the Secretary, who creates forms implementing the requirements, and to local election officials, who administer oaths, collect disclosures, and review mail ballots in the counties in which DST, LUPE, MABA, and FIEL operate.[57] Their organizational injuries are also fairly traceable to the State Defendants and the local DAs in those counties based on the chilling effect that the "credible threat" of criminal enforcement has on their willingness to provide BBM assistance.

Even before S.B. 1, the Election Code required election officials to note an assistor's name and address next to each voter they assisted in the poll list, TEC § 64.032(d) (1986), and required assistors to provide the same information and their signature on the outside of voters' mail-ballot carrier envelopes, TEC § 86.010(e), JEX-1 at 53. Accordingly, Plaintiffs cannot establish that any injuries arising from the mere *disclosure* of assistors' names and addresses—at the polls or on the mail ballot carrier envelopes—would be redressed by an order enjoining enforcement of Sections 6.03 and 6.05. Section 6.03 did not relieve election officials of their duty to separately record assistors' names and addresses in the poll list under TEC § 64.032(d). Indeed, the Secretary has issued several form poll lists that contain spaces for recording assistors' names and addresses.[58] Being required to provide duplicative information on a separate form for each voter that an assistor helps is undoubtedly burdensome.

---

[57] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and. FIEL serves voters in Harris County. DST has chapters throughout Texas, including Bexar, Harris, Dallas, and Travis Counties. Tr. at 2083:13–25.

[58] *See, e.g.*, Tex. Sec'y of State, Form 7-57, https://perma.cc/RAZ3-2G7K; Tex. Sec'y of State, Form 7-59, https://perma.cc/NN7T-PM9P; Tex. Sec'y of State, Form 7-61, https://perma.cc/G79M-NWKG; *see also* Tex. Sec'y of State, Texas Requirements for Electronic Pollbook Forms at 2, https://perma.cc/TH7A-2D79 (requiring poll book to entry for each voter to contain fields for assistor's name and address).

An order declaring the challenged language in the amended Oath and the Assistor Disclosure requirements unlawful and enjoining their enforcement would remove the chilling effect on voter assistance that has impaired the organization's ability to provide assistance services to voters.

The Court concludes that DST, LUPE, MABA, and FIEL are "sufficiently adverse" to the State Defendants, the election officials and DAs of Bexar, Harris, Travis, and Dallas Counties and the 34th Judicial District to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

### Section 6.06 – Prohibition on Compensated Mail-Ballot Assistance

Section 6.06 is challenged by the LUPE Plaintiffs. LUPE and MABA are regulated by Section 6.06 of S.B. 1 because they have provided their staff members and volunteers with "compensation," as it is broadly defined under TEX. PENAL CODE § 38.01(3), for assisting voters, including mail voters.[59] As a result, Plaintiffs have stopped assisting mail voters.[60]

"When the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62.

Again, because their conduct is being directly regulated by Section 6.06 and exposes the LUPE Plaintiffs (and their members) to criminal liability, their organizational injuries—their

---

[59] *See* Tr. at 75:11–17, 124:14–127:13 (LUPE relies primarily on paid staff members); Tr. at 2539:3–4, 2542:6–20 (MABA are concerned that they are committing a crime if they accept meals, gas cards, swag or other forms of compensation while providing voting assistance).

[60] Tr. at 86:9–86:13, 86:14–87:2, 87:3–87:21 (LUPE); Tr. at 2542:17–20, 2543:16–23, 2544:14–16 (MABA).

inability to provide mail-ballot assistance—is fairly traceable to the State Defendants and to the DAs in the jurisdictions in which Plaintiffs operate.[61]

The LUPE Plaintiffs name local election officials as Defendants to their ADA and Section 504 challenges to the S.B. 1 § 6.06. *See* ECF No. 208 at 77. Plaintiffs have not identified, and the Court cannot locate, any reason to believe that their organizational injuries caused by the Section 6.06 are fairly traceable to (or redressable by) local election officials, who have no criminal enforcement authority under the Election Code. Accordingly, Plaintiffs lack standing to sue these local election officials in connection with their challenges to Section 6.06.

**Section 7.04 – Canvassing Restriction**

Section 7.04 is challenged by the LUPE Plaintiffs. At trial, Plaintiffs established by a preponderance of the evidence that LUPE and MABA and their staff and volunteers are presently and prospectively subject to Section 7.04.

Both organizations:

   (a)   have supported ballot measures and/or candidates in the past and intend to do so in the future;[62]

   (b)   have advocated for their positions through in-person voter engagement efforts, such as neighborhood block-walking, tabling in public places, and hosting candidate forums, town hall meetings, and other events at their offices and in members' homes;[63]

   (c)   reasonably expect mail-in ballots to be present during such interactions with voters, who often take out their ballots at election events or in

---

[61] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and MABA operates throughout the State of Texas. Tr. at 2533:21–23.

[62] Tr. at 89:2–18 (LUPE has supported ballot measures, including a drainage bond, the creation of a health care district in Hidalgo County, increased broadband access in South Texas); Tr. at 2542:6–8 (MABA routinely encourages support for candidates and ballot measures by tabling at local events, such as candidate forums).

[63] Tr. at 71:1–72:15, 75:11–75:17, 90:4–24, 119:20–120:18 (LUPE members brought mail ballots to LUPE offices and meetings and took them out during interactions with door-to-door canvassers and asked for voting assistance); Tr. at 2535:21–2536:5 (MABA tables at local events, including candidate forums and provides voter assistance ).

conversations with door-to-door canvassers because they have questions about the ballot or needed voting assistance;[64] and

(d)  maintain staff and/or volunteers who receive some "benefit" in exchange for their in-person canvassing efforts.[65]

Accordingly, LUPE can no longer ask staff members to provide mail-ballot assistance as part of their jobs or treat volunteers who provide such assistance during in-person events.[66] Again, because their conduct is being directly regulated by the Canvassing Restriction and exposes Plaintiffs to criminal liability, their organizational injury—their inability to provide mail-ballot assistance—is fairly traceable to the State Defendants and to the DAs in the jurisdictions in which Plaintiffs operate.[67]

These injuries are also "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338. An order declaring that S.B. 1 § 7.04 violates the ADA and Section 504 and enjoining its enforcement by the State Defendants and County DAs would remove the restrictions and burdens on assistors that have frustrated Plaintiffs' ability to provide voting assistance services and Texas voters' rights under the ADA and Section 504.

The LUPE Plaintiffs' position with respect to Section 7.04's Canvassing Restriction is "sufficiently adverse" to the State Defendants and the County DAs to present a case or controversy within this Court's jurisdiction. *Babbitt*, 442 U.S. at 302.

---

[64] *See id.*

[65] Tr. at 75:11–17 (LUPE relies primarily on paid staff members and temporary paid canvassers); Tr. at 2542:17–20, 2544:14–16 (MABA volunteers are concerned that accepting gas cards, meals, swag, or a bottle of water will expose them to criminal liability).

[66] *See* Tr. at 120:19–120:25 (LUPE staff and volunteers to fear prosecution and to stop assisting voters when they are canvassing on a ballot measure); Tr. at 2543:16–23 (MABA members are no longer willing to provide voter assistance).

[67] All Plaintiffs operate within the State of Texas and thus are subject to enforcement by the State Defendants. LUPE serves voters in Hidalgo County, Tr. at 58:13–16, and MABA has chapters throughout the State of Texas, Tr. at 2533:21–23.

The LUPE Plaintiffs also name local election officials as Defendants to their challenges to the Canvassing Restriction under the ADA and Section 504. *See* ECF No. 208 at 77. Plaintiffs have not identified, and the Court cannot locate, any reason to believe that their organizational injuries caused by the Canvassing Restriction are fairly traceable to local election officials, who have no criminal enforcement authority under the Election Code. Accordingly, Plaintiffs lack standing to sue these local election officials in connection with their challenges to Section 7.04.

**Plaintiffs' Claims Under Title II of the ADA**

The Court now considers whether, with respect to each of their challenges, Plaintiffs have established a *prima facie* case of discrimination under Title II. To do so, they must demonstrate, by a preponderance of the evidence:

> (1) that [they, their members, or their constituents are] a qualified individual within the meaning of the ADA;
>
> (2) that [they, their members, or their constituents are] being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or [are] otherwise being discriminated against by the public entity; and
>
> (3) that such exclusion, denial of benefits, or discrimination is by reason of [their or their members' or constituents'] disability.

*Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004) (citing *Lightbourn*, 118 at 428.

To begin, the Court observes that a prima facie case for discrimination under Title II requires a showing that the defendant public entity in some way provides the service or benefit at issue. *Ivy v. Williams*, 781 F.3d 250, 258 (5th Cir. 2015), *vacated and remanded as moot sub nom. Ivy v. Morath*, 580 U.S. 956 (2016). The Court previously dismissed Plaintiffs' ADA claims against the Attorney General because "it is unclear whether and how he provides the service or benefit at issue in this case, namely voting and voting by mail." *See, e.g., La Union del Pueblo*

*Entero*, 618 F. Supp. 3d at 420. Plaintiffs' ADA claims against the local DAs fail for the same reason. While local prosecutors plainly play a role in enforcing criminal provisions that affect voters with disabilities, there is no evidence that they provide the services or benefits of voting, in person or by mail, within the meaning of Title II. Finally, the Court is not aware of a basis for treating Plaintiffs' Section 504 claims differently.

Thus, on these facts, Plaintiffs have failed to establish a prima facie case of disability discrimination against the AG and local prosecutors under Title II of the ADA or Section 504, and those claims must be dismissed with prejudice.[68] The Court turns to Plaintiffs' claims against the Secretary and local elections officials.

### Plaintiffs' members with disabilities are "qualified individuals"

As to the first element, a qualified individual within the meaning of Title II is a disabled individual "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiffs have identified several members of the Arc and REV UP with disabilities who are eligible to vote in Texas and, by virtue of their disabilities, are qualified to vote by mail and/or vote with assistance in Texas elections, including Ms. Iglesias, Ms. Saltzman, Ms. Nunez Landry, Ms. Halvorson, Ms. Litzinger, and Ms. Crowther.

---

[68] The Court does not dispute that local DA's offices are "public entities" within the meaning of Title II or that, in addition to prohibiting discrimination in the provision of public services and benefits, the ADA includes a catchall protecting disabled people from "be[ing] subjected to discrimination by any such entity." 42 U.S.C. § 12132. Without evidence that an investigation or prosecution under the Challenged Provisions discriminated against individuals with disabilities, however, the Court cannot conclude that Plaintiffs' members were "subjected to discrimination" by local prosecutors.

DST, LUPE, MABA, and FIEL also have members with disabilities who are eligible to vote with assistance and by mail. Tr. at 2110:3–11 (DST); Tr. at 63:19–64:6, 65:7–65:13, 96:15–97:17, 75:18–77:4, 77:17–78:2, 84:4–84:25, 85:1–85:4, 119:20–120:18, 116:22–117:7, 87:3–87:21, 3676:11–25. (LUPE); Tr. at Tr. at 2543:1–13 (MABA); Tr. at 2536:14–18 (FIEL).

**<u>Plaintiffs and their members have suffered discrimination under the ADA</u>**

To demonstrate discrimination under the ADA in the Fifth Circuit, "a plaintiff must show that a benefit is being administered in a way that 'effectively denies' individuals with qualifying disabilities 'meaningful access' to the benefits for which they are qualified." *Frame v. City of Arlington*, 616 F.3d 476, 484 (5th Cir. 2010), *on reh'g en banc*, 657 F.3d 215 (5th Cir. 2011) (citing other Circuits holding same).

"Meaningful access" does not reduce the Title II inquiry to "some abstract question of de minimis 'meaningfulness.'" *Trivette v. Tennessee Dep't of Corr.*, No. 3:20-cv-00276, 2021 WL 10366330, at *11 (M.D. Tenn. May 5, 2021). "Title II is not targeted at merely guaranteeing minimally adequate services to disabled people, but to remedying 'unequal treatment of persons with disabilities by States and their political subdivisions." *Id.* Rather, meaningful access requires that public entities "must afford [disabled] persons equal opportunity to . . . gain the same benefit" as people without disabilities. *Id.* (internal quotations and citations omitted).

Despite the State Defendants' insistence that none of Plaintiffs' disabled members experienced discrimination because they were ultimately able to cast a ballot (*see, e.g.*, ECF No. 847 at 82–83), this "no-harm-no-foul" theory is inconsistent with the ADA. "Nothing in the statute's text or the caselaw applying it requires [plaintiff] to have alleged a bad *outcome*[.] . . . And for good reason: Lack of meaningful access is itself the harm under Title II, regardless of whether any additional injury follows." *Luke v. Texas*, 46 F.4th 301, 306 (5th Cir. 2022) (emphasis

added) (citing *Lane*, 541 U.S. at 532–33). A "partial denial of access" can be actionable. *See, e.g.*, *Lamone*, 813 F.3d at 498, 506–07 (holding that even if in-person polling place machines have accessibility features for blind voters that allow them to access in-person voting, an inaccessible mail ballot still constituted denial of equal opportunity to participate in and benefit from mail voting for blind voters under the ADA).

Thus, even a voter who successfully casts a ballot can prevail on a claim of discrimination under Title II by establishing that voting was more difficult because of her disability. "[A] plaintiff need not show it is impossible to access the benefits, but only that . . . there is an unreasonable level of difficulty in accessing the benefits." *Gustafson v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, 29 F.4th 406, 412 (8th Cir. 2022) (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Brennan v. Stewart*, 834 F.2d 1248, 1261 (5th Cir. 1988)).[69]

Indeed, the presence of restrictions that might "dissuade" a voter can establish a lack of equal opportunity. *See People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1160, 1165 (N.D. Ala. 2020) (holding that restrictions on curbside voting and photo ID requirements for absentee voting rendered in-person voting and absentee voting, respectively, inaccessible for at least some disabled voters because those restrictions "may dissuade" them from using those methods of voting).

The ADA's implementing regulations, promulgated by the Attorney General of the United States, confirm this broad understanding of the Title II's broad prohibition against discrimination

---

[69] *See also Frame*, 616 F.3d at 484 (holding that plaintiffs can establish injury by showing "how specific inaccessible sidewalks negatively affect their day-to-day lives by forcing them to take *longer and more dangerous routes to their destinations*." (emphasis added)); *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008) ("[Defendant's] argument is analogous to contending that merely because the mobility impaired may be able either to rely on the assistance of strangers or to crawl on all fours in navigating architectural obstacles, they are not denied meaningful access to public buildings. Such dependence is anathema to the stated purpose of the Rehabilitation Act." (internal citations omitted)).

by public entities. 42 U.S.C. § 12134; *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591 (1999). The ADA's implementing regulations, *inter alia*, that it is unlawful discrimination for a public entity to:

- "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is *not equal to* that afforded others," 28 C.F.R. § 35.130(b)(1)(ii) (emphasis added);

- "Provide a qualified individual with a disability with an aid, benefit, or service that is *not as effective in affording equal opportunity* to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii) (emphasis added); or

- "[I]mpose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from '*fully and equally* enjoying' the programs, services or activities of state and local governments." 28 C.F.R. § 35.130(b)(8) (emphasis added); or

- "[U]tilize criteria or methods of administration . . . [t]hat have the purpose *or effect* of defeating *or substantially impairing* accomplishment of the objectives of the public entity's program with respect to individuals with disabilities," 28 C.F.R. § 35.130(b)(3)(ii) (emphasis added).

Individually and cumulatively, the Challenged Provisions of S.B. 1 have harmed Plaintiffs and their members, voters with disabilities, by denying them an equal opportunity to participate in and benefit from Defendants' voting programs—voting by mail and in person—due to the Challenged Provisions of S.B. 1. Voters with disabilities have been prevented from voting, encountered significant barriers in voting by mail, and faced great difficulties in receiving the assistance they need to vote. This has led voters with disabilities to experience multiple mail ballot rejections, endure physical pain when voting, take significantly longer to vote, and lose privacy in their voting experience,

**Plaintiffs' members suffered discrimination by reason of disabilities**

To satisfy the last element of their prima facie case, Plaintiffs "must establish a causal link between their disabilities and their exclusion from voting." *People First of Ala.*, 491 F. Supp. 3d at 1161 (finding causal link between the state's blanket ban on curbside voting and the exclusionary impact this prohibition had on disabled voters vulnerable to COVID-19 exposure given "undisputed evidence" establishing that people with disabilities should minimize their contact with others outside the home and avoid people not wearing masks: "the court finds a causal connection between the plaintiffs' impairments that make them vulnerable to COVID-19 and the inaccessibility of their polling sites during the COVID-19 pandemic.").

Establishing such a link does not require comparison to similarly situated individuals without disabilities. *See Olmstead*, 527 U.S. at 598 (rejecting state's argument that plaintiffs' claims failed because they had not identified similarly situated individuals given preferential treatment because "[w]e are satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA"). A plaintiff can "show that he or she has been excluded from or denied the benefits of a public entity's services or programs 'by reason of such disability' even if there are other contributory causes for the exclusion or denial, as long as the plaintiff can show that the disability was a substantial cause of the exclusion or denial." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 291 (2d Cir. 2003).

Plaintiffs have evidence that, because of their disabilities that Plaintiffs' members, voters with disabilities, are more likely to vote by mail and to require assistance voting than voters without disabilities. Plaintiffs have also provided extensive evidence regarding the denial of equal opportunity to participate in or benefit from Defendants' voting programs that the Challenged Provisions have caused for voters with disabilities by reason of their disabilities. FOF Sections V-

VII. As such, Plaintiffs have established a causal link between their disabilities and their exclusion from Defendants' voting programs.

**Failure to Accommodate**

In addition to its proscriptions against disability discrimination, the ADA regulations also impose an affirmative duty on public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7). Indeed, because Congress perceived disability discrimination to be "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect," *id.*, "the express prohibitions against disability-based discrimination in Section 504 and Title II include an *affirmative obligation* to make benefits, services, and programs accessible to disabled people," *Pierce v. D.C.*, 128 F. Supp. 3d 250, 266–67 (D.D.C. 2015) (emphasis added).[70]

Thus, public entities must take affirmative steps to proactively comply with federal disability anti-discrimination mandates regardless of whether individual requests are made. According to the Fifth Circuit:

> The ADA expressly provides that a disabled person is discriminated against when an entity fails to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services . . . Congress intended to impose an *affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability*.

*Delano-Pyle v. Victoria County*, 302 F.3d 567, 575 (5th Cir. 2002) (citation and quotation marks omitted) (emphasis added); *see also Bennett-Nelson v. La. Bd. Of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (emphasis added); *Cadena v. El Paso County*, 946 F.3d 717, 724 (5th Cir. 2020).

---

[70] Discrimination under the ADA and Section 504 does not require proof of intent or animus. *See Alexander v. Choate*, 469 U.S. 287, 295–96 (1985) ("[E]limination of architectural barriers was one of the central aims of the act . . . yet such barriers were clearly not erected with the aim or intent of excluding the handicapped.").

The Fifth Circuit has held that "both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson*, 431 F.3d at 454. Under this theory of liability, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Cadena*, 946 F.3d at 724 (internal quotations omitted).

The State Defendants argue that Plaintiffs' ADA claims fail because they have not requested—and been denied—reasonable modifications by Defendants. *See* ECF No. 847 at 83–85; ECF No. 616 at 19–20. The State Defendants insist that without individual requests for modifications, "it would be impossible for the [state] to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances." ECF No. 616 at 20. These arguments are without merit.

To start, the trial record establishes that any such gesture would have been futile, and the ADA does not require individuals with disabilities to make futile gestures to state a claim. 42 U.S.C. § 12188(a)(1) ("Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.").

There are several reasons to believe that a request for accommodation to S.B. 1's number-matching and assistance provisions would have been futile.

First, witnesses for the Elections Division testified that requests for accommodation are forwarded to county election officials. But county election officials testified, in turn, they believed

they were prohibited from granting such requests.[71] The Election Code itself confirms their understanding: any election official who provides an accommodation that is not "expressly" authorized "by code" faces civil penalties, including termination and loss of benefits. *See* TEC §§ 276.019, 31.129. Voters who did in fact call their county elections offices to ask for advice about their barriers to voting were either turned down or received no response whatsoever. Tr. at 3322:19–3323:9, 3330:19-22. (Halvorson); Tr. at 3267:15–3268:14 (Nunez Landry).

More importantly, demanding that each voter with a disability request a separate accommodation from the county EA in each election in which he voted would be impractical and contravene the ADA.[72] *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738-9 (9th Cir. 2021) (differentiating between individual claims "based on an individualized request or need" and systemic claims "focused on modifying a policy or practice improve systemic accessibility) (citing multiple cases holding same).

In *Pierce v. District of Columbia*, now-Justice Jackson explained, in detail, the affirmative obligations of public entities to provide modifications with or without requests:

> [T]he District's insistence here that prison officials have no legal obligation to provide accommodations for disabled inmates unless the inmate specifically requests such aid . . . is untenable and cannot be countenanced . . . *nothing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned.* Quite to the contrary . . . Section 504 and Title II mandate that entities act affirmatively to evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access to those services…the District's suggestion that a prison facility need not act

---

[71] Tr. at 539:6–14 (Dallas County); Tr. at 771:19–772:1 (Cameron County); Tr. at 1045:3–11 (Bexar County); Tr. at 2336:18-25, 2337:1–5 (Hidalgo County); Tr. at 1304:6–1306:2, 1311:24–1312:15, 1314:24–1317:10, 1317:4–9 (Harris County); Tr. at 270:17-25, 358:5-10 (El Paso County); Tr. at 1470:4–6 (Travis County).

[72] To support their argument, Defendants rely solely on cases brought by individuals, cases that are inapplicable here. Neither *Smith v. Harris County*, 956 F.3d 311 (5th Cir. 2020) nor *Windham v. Harris County*, 875 F.3d 229 (5th Cir. 2017) addresses challenges to systemic discrimination against individuals with disabilities like that challenged by Plaintiffs in this matter. In both *Smith* and *Windham*, the plaintiffs sought modifications to practices specifically directed at them as individuals (prisoner mental health care and a driving sobriety test), rather than seeking modifications to laws of systemic applicability to a large group of voters."

to accommodate an obviously disabled inmate if the inmate does not ask for accommodations is truly baffling as a matter of law and logic . . . The implications of the District's analysis are troubling, and they sweep broadly—by the District's reasoning, it would appear that only a specific request for a wheelchair would trigger any duty to accommodate an inmate who cannot walk, and a blind inmate would need to make a specific request for a cane or a guide if he desired to move about the prison grounds; meanwhile, prison officials could sit idly by, taking no affirmative steps to accommodate such disabled prisoners and expecting to be able to wield the inmate's failure to request accommodation like some sort of talisman that wards off Section 504 and Title II liability in any future legal action. This imagined state of affairs is unquestionably inconsistent with the text and purpose of the Rehabilitation Act and the ADA, which means that the District must now face a stark reality: no matter how fervently it holds the belief that a public entity's duty to provide accommodations arises only by request, there is neither legal nor logical support for that proposition.

*Pierce*, 128 F. Supp. 3d at 269–70 (emphasis added).

Where the individual's disability is "open and obvious," public entities must offer reasonable modifications even in the absence of individualized requests. *Robertson*, 500 F.3d at 1197 (citing *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006).

Defendants can hardly claim that they were not aware of the large-scale harm that any of the Challenged Provisions would impose on voters with disabilities. In addition to the modification requests and complaints regarding the mail-ballot and assistance provisions that Defendants received, Plaintiffs and their members—voters with disabilities—testified to these harms in front of the Texas legislature before S.B. 1 was enacted.[73] Also "open and obvious" are the relevant correlations between age and disability, between disability and voting assistance, and between disability and voting by mail.

---

[73] *See, e.g.*, HAUL-216 (testimony regarding S.B. 1 before the Senate State Affairs Committee by representative for The Arc, asserting that the new Assistor Disclosure requirements would "create a chilling effect that decreases the availability of support for Texas with disabilities to exercise their right to vote").

**Injunctive Relief is Reasonable and Defendants' Affirmative Defenses Fail**

Plaintiffs need only show that their proposed accommodation "seems reasonable on its face, i.e., ordinarily or in the run of cases," or is "plausible" or "feasible" to implement. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). "The burden of production is not a heavy one and merely entails demonstrating the existence of a plausible accommodation 'the costs of which, facially, do not clearly exceed its benefits.'" *Coats v. Goodyear Tire & Rubber Co.*, No. H-01-1322, 2002 WL 32123913, at *18 (S.D. Tex. Oct. 16, 2002) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 4 AD Cases 1264 (2d Cir. 1995)).

Once plaintiffs make this showing, the burden shifts and defendants are permitted to offer "special (typically case-specific) circumstances that demonstrate" the proposed accommodation is either a fundamental alteration of their service or constitutes an undue hardship. *Barnett*, 535 U.S. at 402. However, the fundamental alteration argument is an affirmative defense that defendants must proactively raise and prove at trial. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999) (Stevens, J., concurring); *E.T. v. Paxton*, 41 F.4th 709 (5th Cir. 2022) (Failure to present evidence that proposed modification of policies would fundamentally alter their program defeats defendants' affirmative defense).

Plaintiff's proposed injunctive relief is simply a return to pre-S.B. 1 law and practice, which the State has already shown is feasible. *See, e.g.*, *Lamone*, 813 F.3d at 508 ("the fact that a version of the tool was voluntarily implemented by defendants in the 2012 elections— 'without any apparent incident,' speaks to the reasonableness of using the tool"). Plaintiffs do not seek to impose any new requirements on Defendants or to establish a new, costly program for administering election or monitoring ADA-compliance. *Cf. United States v. Mississippi*, 82 F.4th 387, 398–99 (5th Cir. 2023) (noting that federal government sought to "rework the entire Mississippi mental

health system" and "radically modif[y]" the state's existing programs, along with creating new programs, mandating minimum staffing levels, generally getting into incredible detail regarding the state's plans, and establishing a lengthy and involved monitoring process).

Given that voters with disabilities are disproportionately likely to vote by mail and to need assistance while voting, enjoining the ABBM Number-Matching Provisions, the Assistance Provisions, and the Canvassing Restriction would appear to be a reasonable modification on its face. *Barnett*, 535 U.S. at 401. Accordingly, the burden shifts to the State Defendants to demonstrate that the requested injunctions are a "fundamental alteration" to voting in Texas.

An alteration to a program is fundamental if it would eliminate an "essential" aspect of the program and undermine "the basic purpose of the rule or policy at issue." S*chaw v. Habitat for Humanity of Citrus Cnty., Inc.*, 938 F.3d 1259, 1266–67 (11th Cir. 2019). Outside of their conclusory assertions that *any* modification to a state law inherently constitutes a "fundamental alteration," *see, e.g.*, ECF No. 626 at 27–28, the State Defendants have not offered any evidence that enjoining the Challenged Provisions would "fundamentally alter" voting in Texas or that the injunction would constitute undue hardship.

The State Defendants' position is also incorrect: "Requiring public entities to make changes to rules, policies, practices, or services is exactly what the ADA does." *Lamone*, 813 F.3d at 508–09 (citing *Jones v. City of Monroe*, 341 F.3d 474, 487 (6th Cir. 2003)); *see also id.* at 508 (rejecting argument "that the mere fact of a state statutory requirement insulates public entities from making otherwise reasonable modifications to prevent disability discrimination"); *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1233 (10th Cir. 2009) (rejecting argument that modifying a state driving statute would be a "per se not reasonable" modification under the Rehabilitation

Act, and holding that "[r]eliance on state statutes to excuse non-compliance with federal laws is simply unacceptable under the Supremacy Clause").

Moreover, the State Defendants' hand wringing over the scope of the injunctive relief is unwarranted here, given that both voting by mail and voting with assistance are available only to limited categories of voters in Texas in the first place. Voters with disabilities make up a significant portion of those eligible for each category: voters with disabilities four times more likely to vote by mail than non-disabled voters, ten times more likely to need assistance voting by mail than non-disabled voters, and twice as likely to need assistance voting in person than non-disabled voters. Tr. at 3711–25, 3757:17–21, 3801:10–18; LUPE-002 ¶ 69.

Texas election officials were able to effectively administer elections before S.B. 1 was enacted and they will continue to do so if and when it is forced to comply with the injunctive relief contemplated in this order. There is simply no reason to believe that the adjustments to the Oath and Assistor Disclosure requirements or accepting ABBMs that do not comply with S.B. 1's byzantine number-matching framework will "fundamentally alter" the nature of voting in Texas.[74]

---

[74] Moreover, there is nothing to prevent the Texas legislature from amending the Election Code to revive an ID-number component to the mail voting process by, e.g., eliminating the unnecessarily confusing numerical hierarchy set forth in Section 5.02 of S.B. 1 (codified at TEC § 84.002(1-a)) and granting election officials the ability to accept non-conforming ABBMs and BBMs after confirming the voter's identity by some other means.

Throughout this litigation, Plaintiffs have acknowledged that ID numbers can be *useful* in affirmatively identifying voters. *See* ECF No. 200 at 45 (conceding that "the State may legally request this information from voters (for example, as an optional data point that would prevent the need for a signature review)"). Indeed, the number-matching framework theoretically operates as an accommodation for voters with disabilities whose signatures on ABBMs and BBMs will not match their other signatures on record because, for example, they were completed by different assistants. Such voters may be able to use the Ballot Tracker to "cure" their signature. TEC § 87.0271(e-1)(2). Moreover, providing a matching ID number on an ABBM or carrier envelope creates a rebuttable presumption that the signature on the ABBM or carrier envelope belongs to the voter. *See* TEC § 87.041(d-1).

To be sure, DPS numbers and SSN4s may be sufficient to help confirm a voter's identity. But the Election Code's insistence that they are *necessary*—combined with its rigid (and misleading) hierarchy and constraints on election officials—has unduly burdened Texas voters with disabilities. Much like the election officials who testified in this case, the Court's hands are tied in crafting an appropriate remedy: "[a] federal court cannot rewrite state law[.]." *U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl., LLC*, 966 F. Supp. 2d 690, 700 (W.D. Tex. 2013).

101

Together, the Secretary's "know-nothing-do-nothing" approach to ADA compliance in election administration and the draconian civil penalties for making affirmative modifications not "expressly authorized" under the Texas Election Code have made it impossible for hardworking and well-meaning election officials to comply with the ADA in administering elections. To make matters worse, the Assistant Disclosures and amended Oath of Assistance have discouraged assistors from providing—and voters with disabilities from requesting—voting assistance, exacerbating the injuries caused by S.B. 1's other onerous requirements.

This perfect storm has forced many voters with disabilities to confront S.B. 1's novel burdens alone. In attempting to exercise their most sacred right, *Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943), disabled voters have had their ABBMs and mail ballots rejected repeatedly and been forced to spend additional time and effort navigating burdensome workarounds to ensure that their votes are counted. Even voters who were able to successfully cast a ballot often endured the loss of their privacy, embarrassment, fear, and even physical pain. Under these conditions, it is likely that many disabled voters will be dissuaded from attempting to vote in the first place.

Texas voters with disabilities deserve better, and the ADA and Section 504 demand more.

## PERMANENT INJUNCTION OF S.B. 1 §§ 5.02, 5.03, 5.07, 6.03–6.07, & 7.04

### Legal Standard

A party seeking a permanent injunction must prove: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). The Court addresses each factor in turn.

Further, in accordance with Federal Rule of Civil Procedure 65(d)(1), an order granting a permanent injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail ... the act or acts restrained or required." *Scott v. Schedler*, 826 F.3d 207, 208 (5th Cir. 2016) (quoting FED. R. CIV. P. 65(d)(1)). According to the Fifth Circuit, this means the injunction must not be vague or overbroad. *Id.* "[A]n injunction is overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not 'narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." *Id.* (quoting *Doe v. Veneman*, 380 F.3d 807, 813 (5th Cir. 2004)).

**Analysis**

Plaintiffs have satisfied all four factors required for injunctive relief. *Valentine*, 993 F.3d at 280.

First, for the reasons set forth in this order, the Court concludes that all or portions of S.B.1 §§ 5.02, 5.03, 5.07, 6.03–6.07, and 7.04 violate Title II of the ADA and Section 504. Plaintiffs have thus succeeded on the merits of their ADA and Section 504 claims challenging those provisions. These provisions have denied voters with disabilities in Texas an equal opportunity to participate in Defendants' voting programs. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (recognizing the "strong interest in exercising the fundamental political right to vote") (citing *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).

Finally, it is clear to the Court that the injunction would not disserve the public interest, and, to the contrary, will serve the public interest by protecting disabled voters' equal opportunity to participate in elections. *See Dunn*, 405 U.S. at 336 (stating that protecting the right to vote is of

particular public importance because it is "preservative of all rights.") (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)).

Even recognizing the importance of the fundamental right to vote, a court must weigh any protective action against the potential for confusion and disruption of the election administration under the "*Purcell* principle." *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). The *Purcell* principle provides that, as a general rule, federal courts "should not alter state election laws in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered six weeks before the general election). In *Purcell*, the Supreme Court reversed a lower court's order enjoining the implementation of a proposition, passed by ballot initiative two years earlier, that required voters to present identification when they voted on election day. Reversing the lower court, the Court emphasized that the injunction was likely to cause judicially-created voter confusion in the face of an imminent election. *Purcell*, 549 U.S. at 2, 6.

The Supreme Court has recognized that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. The *Purcell* principle's logic extends only to injunctions that affect the mechanics and procedures of the act of voting. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.* ("*RNC v. DNC*"), 140 S. Ct. 1205, 1207 (2020) (extension of absentee ballot deadline); *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (mask mandate exemption for voters); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (new ballot type eliminating straight-ticket voting); *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. at 31 (extension of absentee ballot deadline).

Even when *Purcell* applies, however, it does not constitute an absolute bar on all injunctive relief in the runup to an election. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). Rather, it directs courts to consider whether: (1) "the underlying merits are entirely clearcut in favor of the plaintiff;" (2) "the plaintiff would suffer irreparable harm absent the injunction;" (3) the "plaintiff has [] unduly delayed bringing the complaint to court;" and (4) "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.*; *see also Robinson v. Ardoin*, 37 F.4th 208, 228 n.11 (5th Cir. 2022) (per curiam) (citing *Merrill* concurrence as authority on *Purcell*). The Court concludes that Plaintiffs have satisfied the first three elements with respect to all their successful ADA and Section 504 challenges. Thus, the Court must determine, with respect to each challenged provision, whether the conduct to be enjoined affects the mechanics of voting and, if so, the feasibility of implementing any injunctive relief before the November 2024 election.

### *Injunctive relief as to the Secretary's forms and instructions implicates Purcell.*

Plaintiffs have succeeded on the merits of their ADA and Section 504 challenges to several forms designed by the Secretary of State, including (1) Form ABBM (LUPE-119), (2) the "Oath of Assistance Form" used to collect Assistor Disclosures at the polls (LUPE-189), and (3) the mail ballot carrier envelope (LUPE-009). Specifically, she will be required to remove the ID number space from the Form ABBM, withdraw the Oath of Assistance Form, remove the "Relationship to Voter" line from the mail-ballot carrier envelope, and revise the Oath printed on the mail ballot carrier envelope to reflect the language below:

> I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person.

The Secretary will also be required to revise any training and instructional materials for state and county election officials to remove language that reflects the substance of the Enjoined Oath Language or the Voter Relationship Disclosure requirements.

Any injunctive relief against the Secretary as to Sections 5.02, 5.03, 5.07, 6.03–6.05, and 6.07 of S.B. 1 will plainly implicate *Purcell* and it is not feasible for the Secretary to redesign any of these materials in the weeks before the May 2025 election.

Accordingly, the Court will stay any injunction applicable to the Secretary's forms until after the May 2025 election.

### *Injunctive relief as to election officials' conduct implicates Purcell.*

Injunctive relief as to election officials' administration of the ABBM, Oath, and Assistor Disclosure requirements for both in-person and mail-in voting clearly implicates *Purcell.*

The Court will not enjoin the County Election Officials from using any of the forms prescribed by the Secretary of State in administering the May 2025 election for the same reasons set forth above.

Of course, it would be feasible, in terms of both cost and hardship, to enjoin officials from giving *effect* to certain portions of the forms by, e.g., accepting ABBMs without matching ID numbers, permitting assistors to skip the "Relationship to Voter" line on the disclosure form at the polls or accepting mail ballots omitting that information. It would be similarly feasible to direct officials to administer the revised Oath orally at the polls. Nonetheless, due to the potential for voter confusion about the procedural discrepancies between in-person and mail-in voting, the Court will not enjoin officials from implementing the requirements of Sections 6.03, 6.04, and 6.05 of S.B. 1 until after the May 2025 election.

***The Fifth Circuit has held that the Canvassing Restriction implicates Purcell***

On October 15, 2024, the Fifth Circuit stayed an earlier order of this Court enjoining criminal enforcement of the Canvassing Restriction as an unconstitutional burden on the rights to free speech and due process under the First and Fourteenth Amendments to the Constitution. *See La Union del Pueblo Entero v. Abbott*, No. 24-50783, ECF No. 112-1 ("Stay Order"). Even though the panel limited its analysis to the *Purcell* factors governing injunctive relief in the period before an election, the panel stayed of the injunction *pending appeal*.

Consistent with the Fifth Circuit's Stay Order, the injunction of the Canvassing Restriction contemplated in this order is stayed pending resolution of the appeal of the Court's previous order addressing Plaintiffs' First Amendment challenges.

## CONCLUSION

For the foregoing reasons, the Court concludes that Sections 5.02, 5.03, 5.07, 6.06, and 7.04 of S.B. 1 and that portions of Sections 6.03, 6.04, 6.05, and 6.07 of S.B. 1 violate the ADA and Section 504.

The motions for summary judgment filed by the State Defendants (ECF No. 616) and the Harris County District Attorney (ECF No. 614) are **MOOT** as to Plaintiffs' ADA and Section 504 claims.

### Sections 5.02, 5.03, and 5.07 – The ABBM Number-Matching Provisions

With respect to the HAUL and OCA Plaintiffs' ADA and Section 504 challenges to S.B. 1 §§ 5.02, 5.03, and 5.07:

The Court **DECLARES** that TEC §§ 84.002, 84.011(a), and 86.001 violate the ADA and Section 504.

The Secretary of State of Texas, the Bexar County Elections Administrator, Harris County Clerk, Dallas County Elections Administrator, the El Paso County Elections Administrator, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC §§ 84.002, 84.011(a), and 86.001.

### Sections 5.06, 5.10, and 5.12 – The Curative Provisions

The HAUL and OCA Plaintiffs' ADA and Section 504 challenges to S.B. 1 §§ 5.06, 5.10, and 5.12 are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

### Section 6.04 – The Oath of Assistance

With respect to the HAUL, LUPE, and OCA Plaintiffs' ADA and Section 504 challenges to S.B. 1 § 6.04:

The Court **DECLARES** that the following statements in the Oath of Assistance, codified at TEC § 64.034, violate the ADA and Section 504:

- "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance";

- "I did not pressure or coerce the voter into choosing me to provide assistance; and"

- "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."

Plaintiffs' challenges to the Oath's statement that "I will not communicate information about how the voter has voted to another person" are dismissed.

The Secretary of State of Texas, the Bexar County Elections Administrator, Harris County Clerk, Dallas County Elections Administrator, the El Paso County Elections Administrator, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving

any effect to the following language in the Oath of Assistance, TEC § 64.034 (the "Enjoined Oath Language"):

- "under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance";

- "I did not pressure or coerce the voter into choosing me to provide assistance; and" and

- "I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted."

The Secretary of State is **PERMANENTLY ENJOINED** from implementing the Enjoined Oath Language. The Secretary shall revise any applicable forms and training and instructional materials for state and county election officials to remove language that reflects the substance of the Enjoined Oath Language.

The Bexar County Elections Administrator, Harris County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator are **PERMANENTLY ENJOINED** from implementing the Enjoined Oath Language.

The HAUL, LUPE, and OCA Plaintiffs' ADA and Section 504 claims challenging S.B. 1 § 6.04 against the Attorney General and DAs of Harris County, Dallas County, El Paso County, and Travis County are **DISMISSED WITH PREJUDICE** because those public entities do not provide the services and benefits at issue in this case.

### Sections 6.03, 6.05, 6.07 – Voter Relationship Disclosure

With respect to the LUPE and HAUL Plaintiffs' challenges to S.B. 1 §§ 6.03, 6.05, and 6.07:

The Court **DECLARES** that the Oath of Assistance Form and Voter Relationship Disclosure requirement, codified at TEC §§ 64.0322(a)(2) and 86.010(e)(2) (and implemented by TEC §§ 64.0322(b) and 86.013(b)) violate the ADA and Section 504.

The Secretary of State is **PERMANENTLY ENJOINED** from implementing the Voter Relationship Disclosure requirement. The Secretary shall revise all applicable forms and training and instructional materials for state and county election officials to remove language that reflects the substance of the Voter Relationship Disclosure requirement.

The Bexar County Elections Administrator, Harris County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator are **PERMANENTLY ENJOINED** from using the Oath of Assistance Form (LUPE-189) or implementing the Voter Relationship Disclosure requirement.

The OCA and LUPE Plaintiffs' ADA and Section 504 claims challenging the Voter Relationship Disclosure requirement against the Attorney General and DAs of Harris County, Dallas County, El Paso County, and Travis County are **DISMISSED WITH PREJUDICE** because those public entities do not provide the services and benefits at issue in this case.

### Section 6.06 – Ban on Compensated Mail-Ballot Assistance

With respect to the OCA and LUPE Plaintiffs' challenges to S.B. 1 § 6.06:

The Court **DECLARES** that the ban on compensated mail-ballot assistance, codified at TEC § 86.0105, violates the ADA and Section 504.

The Secretary, and her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC § 86.0105. The Secretary shall revise all applicable forms and training and instructional materials for state and county election officials to remove language that reflects the substance of the ban on compensated mail-ballot assistance.

The OCA and LUPE Plaintiffs' ADA and Section 504 claims challenging S.B. 1 § 6.06 against the Harris County Clerk, Travis County Clerk, Dallas County Elections Administrator, and

El Paso County Elections Administrator, as applicable, are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

The OCA and LUPE Plaintiffs' ADA and Section 504 claims challenging S.B. 1 § 6.06 against the Attorney General and DAs of Harris County, Dallas County, El Paso County, and Travis County are **DISMISSED WITH PREJUDICE** because those public entities do not provide the services and benefits at issue in this case.

### Section 7.04 – Canvassing Restriction

With respect to the LUPE Plaintiffs' ADA and Section 504 challenges to S.B. 1 § 7.04:

The Court **DECLARES** that the Canvassing Restriction, codified at TEC § 276.015(b)–(c), violates the ADA and Section 504.

The Secretary and her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving any effect to TEC § 276.015(b)–(c). The Secretary shall revise all applicable forms and training and instructional materials for state and county election officials to remove language that reflects the substance of Canvassing Restriction.

The LUPE Plaintiffs' ADA and Section 504 claims challenging S.B. 1 § 7.04 against the Harris County Clerk, Travis County Clerk, Dallas County Elections Administrator, and El Paso County Elections Administrator, as applicable, are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

The LUPE Plaintiffs' ADA and Section 504 claims challenging S.B. 1 § 7.04 against the Attorney General and DAs of Dallas County, El Paso County, and Travis County are **DISMISSED WITH PREJUDICE** because those public entities do not provide the services and benefits at issue in this case.

It is **SO ORDERED**.

**SIGNED** this 14th day of March, 2025.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE